# MEMORANDUM IN SUPPORT

Charles Hall, by and through undersigned counsel, has respectfully moved this Court to enter an order authorizing counsel to contact the individuals who served as jurors and alternate jurors at his trial. Mr. Hall's application for relief from his conviction and death sentence pursuant to 28 U.S.C. § 2255 is due on or before June 22, 2023. Pursuant to Local Rule 37.1, undersigned counsel has conferred with opposing counsel regarding this motion. The government opposes this motion. In support of his motion, Mr. Hall respectfully submits the following.

Pursuant to the trial court's order issued May 23, 2014, no one involved in Mr. Hall's case is permitted to contact the jurors without the Court's permission. Doc. No. 788 (Order); *see also* Doc. No. 884 (text only entry denying as moot the government's motion for order prohibiting contact with jurors because the Court had previously entered the order stating that no one was permitted to contact the jurors without the Court's permission). The prohibition in this case stems from this order, not a law or local rule that prohibits contact with jurors. Thus, it is fully within the Court's discretion to allow Mr. Hall's post-conviction counsel to contact the jurors.

Mr. Hall's post-conviction counsel seeks permission to contact the jurors.[1] Juror conduct is an important area of inquiry in post-conviction proceedings. Although jurors may not testify about many aspects of their deliberations, Federal Rule of Evidence 606(b)(2) explicitly allows jurors to testify about whether they learned extraneous information; whether any jurors experienced an outside influence; or whether "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2).

The Supreme Court has repeatedly found that a juror's conduct or beliefs can justify overturning a verdict. *See*, *e.g.*, *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017) (holding that a trial court may consider evidence that a juror was racially biased in post-conviction proceedings, based on information jurors communicated to defense counsel after trial); *Wellons v. Hall*, 558 U.S. 220, 221, 226 (2010) (remanding based on potential jury misconduct); *Wellons v. Hall*, 554 F.3d 923, 930-31 (11th Cir. 2009) (explaining that the misconduct that ultimately prompted the Supreme Court to require additional factual development was uncovered by interviewing jurors: "During their post-trial interviews of the jurors, defense counsel learned that either during or immediately following the penalty

---

[1] Undersigned counsel would obviously contact any jurors with professionalism, respect, and courtesy, abiding by any request for no further contact. Counsel has personally conducted many juror interviews in various jurisdictions over the past twenty years and has never had a juror express concern about the contact made.

phase, some jury members gave the trial judge chocolate shaped as male genitalia and the bailiff chocolate shaped as female breasts. Defense counsel also learned that while the jurors were eating dinner at a local restaurant in a room separated from other diners, the judge entered their room and spoke to them."); *Williams v. Taylor*, 529 U.S. 420, 440-42 (2000) (ordering an evidentiary hearing regarding potential jury misconduct, based on a juror's affidavit provided in federal habeas proceedings).

Other federal courts, including the Eighth Circuit, have similarly vacated death sentences or required additional factual development based on evidence of jury misconduct or an extraneous influence on the jury. *See, e.g.*, *Barnes v. Joyner*, 751 F.3d 229, 235 (4th Cir. 2014) (remanding for investigation of extraneous influence on jury, based on evidence "compiled by post-conviction counsel and their investigator, which were based on post-verdict interviews with several of the jurors"); *Sampson v. United States*, 724 F.3d 150, 169-70 (1st Cir. 2013) (holding that in § 2255 proceedings the district court properly vacated Sampson's death sentence and ordered a new sentencing hearing because of jury misconduct); *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005) (vacating the judgment because "[i]n a postconviction hearing conducted more than a decade after his trial, Wisehart presented an affidavit from one of the jurors" explaining that she received extraneous information); *United States v. Jackson*, 209 F.3d 1103, 1107-

08 (9th Cir. 2000) (remanding for an evidentiary hearing in § 2255 proceedings because of information a juror gave to a defense investigator three years after the trial); *United States v. Tucker*, 137 F.3d 1016, 1019 (8th Cir. 1998) (remanding for further factual development about juror misconduct); *United States v. Everett Hall*, 85 F.3d 367, 368 (8th Cir. 1996) (remanding for further factual development about juror misconduct because "the defense presented the court with an affidavit from the jury foreperson").

So, too, have state courts. *See, e.g.*, *People v. Hensley*, 330 P.3d 296, 248-49 (Cal. 2014) (reversing death sentence because juror "wrestling" with decision whether to impose death consulted his pastor); *People v. Harlan*, 109 P.3d 616, 622 (Colo. 2005) (noting that "[a]pproximately three months after the jury's death penalty verdict, defense counsel's investigator, Raelee Knapp, contacted jurors to interview them about their jury service" and upholding vacature of death sentence based on information first learned in those interviews about the use of extraneous evidence, namely Bible passages); *State v. Dye*, 784 N.E.2d 469, 470 (Ind. 2003) (affirming vacature of death sentence and conviction because "a juror's omissions and false responses on her jury questionnaires and during voir dire amounted to gross misconduct that probably harmed the defendant, denying him a fair trial").

As noted in these cases, the extraneous influence or misconduct frequently comes to a court's attention because jurors tell defendant's counsel about it when

interviewed after trial. Moreover, the possibility of extraneous influence has only grown with the proliferation of smart phones that jurors can use during deliberations. *See, e.g.*, Hon. Amy J. St. Eve & Michael A. Zuckerman, *Ensuring an Impartial Jury in the Age of Social Media*, 11 Duke L. & Tech. Rev. 1, 9 (2012) (documenting the problem of jurors using social media during deliberations as well as the more general problem of jurors using smart phones to gather or send out information about cases); John Schwartz, *As Jurors Turn to Web, Mistrials Are Popping Up*, N.Y. Times (Mar. 17, 2009), https://www.nytimes.com/2009/03/18/us/18juries.html#:~:text=It%20might%20be%20called%20a,upending%20deliberations%20and%20infuriating%20judges (documenting examples of jurors conducting internet research to uncover inadmissible evidence, including at least one example that was not reported during trial).

Post-conviction counsel in a death penalty case "must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition" or risk forever forfeiting an important claim. *McCleskey v. Zant*, 499 U.S. 467, 498 (1991).[2] Thus, interviewing jurors is

---

[2] Academic articles have also noted the importance of juror interviews for discovering crucial, admissible evidence, and the problems caused by restricting juror interviews. *See, e.g.*, Kathryn E. Miller, *The Attorneys Are Bound and The Witnesses Are Gagged: State Limits on Post-Conviction Investigation in Criminal Cases*, 106 Calif. L. Rev. 135 (2018); Benjamin M. Lawsky, Note, *Limitations on Attorney Postverdict Contact with Jurors: Protecting the Criminal Jury and Its Verdict at the Expense of the Defendant*, 94 Colum. L. Rev. 1950 (1994).

something post-conviction counsel must do in every death penalty case in order to reveal constitutional violations and effectively represent their client.

Even more importantly, in this case, post-conviction counsel is already aware of two important potential jury-related issues that must be investigated. First, the jurors potentially made a mistake in filling out the penalty phase verdict form as to Mr. Hall. Second, the jury's quick change from "100 percent certainty that we are unable to reach a unanimous decision in regards to Defendant Hall" to reaching a unanimous death verdict suggests that there was an outside influence. Tr. 06/02/14 at 5358, 5375.

First, at Mr. Hall's trial, some jurors found that two undisputed mitigating factors did not exist, even though they were not factually disputed. There was no dispute that Mr. Hall suffered (and suffers) from chronic gastrointestinal disease and that Mr. Hall had zero disciplinary violations since the offense (this remains true today). Even though these mitigating factors were not disputed, no jurors found that Mr. Hall had zero disciplinary violations since the offense and only six jurors found that Mr. Hall suffered from Crohn's disease.

Mr. Hall's appellate counsel raised this issue on direct appeal, but the direct appeal record did not shed light on the issue. In its direct appeal opinion, the Eighth Circuit noted that "[f]ollowing their discharge, some jurors informed the district court that the foreperson may have recorded the number who voted to give

Case 4:21-cv-08001-BCW    Document 39-1    Filed 04/10/23    Page 6 of 9

these factors mitigating weight, rather than the number who found that they 'had been proved.'" *United States v. Hall*, 945 F.3d 1035, 1042 (8th Cir. 2019). Based on the limited record before it, the Eighth Circuit held that this error was harmless. It determined that a constitutional problem would arise only if the jurors assigned no weight to the two uncontested mitigating factors "because they believed, '*as a matter of law*,' that they were 'unable even to consider the evidence.'" *Hall*, 945 F.3d at 1042. It also determined "that the most likely explanation is" not that the jurors thought as a matter of law that they could not consider those factors but rather "that some jurors misunderstood the instructions on the verdict form." *Id.*

The Eighth Circuit reached this conclusion because "[n]othing in the record suggests" that the jurors thought as a matter of law that they could not consider the uncontested mitigating factors. *Hall*, 945 F.3d at 1042. Yet a direct appeal record would not typically reveal whether the jurors made a mistake and, if so, precisely what the mistake was, because jury deliberations occur outside the courtroom and off the record. Unsurprisingly, then, this direct appeal record does not reveal whether the jurors made a mistake and what mistake. The Eighth Circuit relied on the statement that "[f]ollowing their discharge, some jurors informed the district court that the foreperson may have recorded the number who voted to give these factors mitigating weight, rather than the number who found that they 'had been proved.'" *Hall*, 945 F.3d at 1042. This explanation is a third-hand report of

7

unsworn speculation—the trial judge's report about what some unidentified number of jurors told him about what they thought the foreperson may have done.

As the Eighth Circuit recognized, if the jurors did make a mistake in entering the verdict on the verdict form, this would be an exception to the no-impeachment rule, and juror testimony on this issue would be permitted. *See Hall*, 945 F.3d at 1042 (quoting Fed. R. Evid. 606(b)(2)(C)). As the Eighth Circuit also recognized, there is a possibility that "a constitutional problem ar[o]se" because of the jurors' misunderstanding of the law. *Hall*, 945 F.3d at 1042. Although the record on appeal did not suggest to the Eighth Circuit that there was a constitutional problem, the record is incomplete and ambiguous on this point. Consequently, post-conviction counsel must investigate the possibility that the jurors made a mistake of constitutional magnitude.

Second, during deliberations, the jurors informed the court that they felt "with 100 percent certainty that we are unable to reach a unanimous decision in regards to Defendant Hall." Tr. 06/02/14 at 5358. Then, less than two hours after the court instructed them to continue deliberating, the jurors reached a unanimous verdict sentencing Mr. Hall to death. Tr. 06/02/14 at 5375. The jurors' quick change from absolute certainty that they could not reach a unanimous verdict to reaching a unanimous verdict, even though they had also been instructed that they could reach a nonunanimous verdict, which would result in a life sentence,

suggests that an outside influence affected their verdict. Coupled with the strong possibility that they made a mistake in entering the verdict form, the possibility of an outside influence requires post-conviction counsel to investigate.

Therefore, post-conviction counsel must interview the jurors. Because counsel cannot conduct this necessary investigation without the Court's permission to contact the jurors, counsel hereby seeks this Court's permission to contact the jurors.

Respectfully submitted,

*/s/ Angela S. Elleman*
Angela S. Elleman
Chief, § 2255 Unit
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN   46204
Phone: 317-383-3520
E-Mail: angie_elleman@fd.org

Dated:  April 10, 2023

9