IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| CHARLES MICHAEL HALL, | ) | Case No. 4:21-CV-08001-BCW |
| | ) | DEATH PENALTY CASE |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**<u>Charles Michael Hall's Motion to Vacate, Set Aside, or
Correct Sentence Pursuant to 28 U.S.C. § 2255</u>**

Angela S. Elleman
Chief, Capital § 2255 Unit
F. Italia Patti
Assistant Federal Defender
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN   46204
Phone: 317-383-3520
E-Mail: angie_elleman@fd.org
italia_patti@fd.org

Keith O'Connor
Mo Bar No. 63134
PO Box 22728
Kansas City, MO  64113
Phone: 816-225-7771
E-Mail: keith@keithoc.com

Attorneys for Movant Charles Michael Hall

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ viii

I. INTRODUCTION ................................................................................................... 1

II. CHUCK HALL'S HISTORY ............................................................................... 6

III. PROCEDURAL HISTORY AND EVIDENCE PRESENTED AT TRIAL ......... 36

    A. Pretrial proceedings............................................................................... 36

    B. Trial ..................................................................................................... 38

    C. Jury deliberations ................................................................................. 45

    D. Sentencing, direct appeal, and appointment of § 2255 counsel ........... 46

    E. Timeliness of this motion ..................................................................... 47

IV. CLAIMS FOR RELIEF ...................................................................................... 48

CLAIM 1: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PENALTY PHASE
........................................................................................................................... 48

    A. Trial counsel was ineffective for failing to conduct an adequate life-history investigation. 51

    i. Trial counsel's life-history investigation was inadequate and their presentation to the jury was misleading................................................................................................... 52

    a. The inadequate investigation............................................................... 52

    b. The paltry trial presentation ................................................................ 60

    ii. There was a wealth of mitigating evidence available. .......................... 63

    a. Chuck's school records reveal an elementary student struggling in the classroom due to a learning disability.................................................................................................. 63

    b. Crucial mitigating evidence about Chuck being sexually abused by a serial predator at Shaker Mountain School was readily available to trial counsel. ............................. 66

    c. Other crucial mitigation evidence about Chuck's childhood was also readily available to trial counsel. ........................................................................................................ 78

i

B. Chuck Hall has brain damage, which is neurodevelopmental in part, and trial counsel was ineffective for failing to investigate and present this evidence................................................. 92

i. Trial counsel was ineffective in failing to present the jury with any evidence of Chuck's brain impairments. ........................................................................................................ 93

a. Trial counsel's failure to secure brain scans resulted from counsel's delay, neglect, and objectively unreasonable representation. ................................................................. 94

b. Because no brain scans were performed prior to trial, information about structural abnormalities in Chuck's brain was not presented to the jury. .................................... 99

ii. Chuck suffers from impairments in brain functioning. ...................................................... 100

a. Chuck has a learning disability in math known as dyscalculia. ......................................... 100

b. Chuck has long displayed poor attention and task completion. ......................................... 102

c. Social skills impairments ................................................................................................... 104

d. Sleep issues ......................................................................................................................... 104

iii. Brain scans show physical abnormalities in Chuck's brain that corroborate and support the skill deficits seen in Chuck and on neuropsychological testing. ........................................... 105

a. Volume loss.......................................................................................................................... 107

b. Ventricular asymmetry......................................................................................................... 109

c. White matter hyperintensities ............................................................................................. 110

d. Chuck has a cyst on the pineal gland in his brain. .............................................................. 111

e. Diffusion Tensor Imagining (DTI) demonstrates impairment in the communication between various parts of Chuck's brain. .............................................................................................. 113

iv. Conclusion ........................................................................................................................... 113

C. Trial counsel was ineffective for failing to give experts and mental health professionals who testified complete and accurate information about Mr. Hall, rendering their diagnoses and testimony inaccurate. ...................................................................................................................... 115

i. Dr. Wisner............................................................................................................................... 116

ii. Dr. Staples............................................................................................................................. 120

iii. Dr. Fucetola ................................................................................................................ 122

iv. Government experts ...................................................................................................... 123

D. Trial counsel was ineffective for failing to investigate and present evidence of the BOP's
mismanagement leading up to Mr. Castro-Rodriguez's death .................................................... 123

i. Trial counsel's penalty phase presentation did not inform the jury of the BOP's
mismanagement and improper designation of Mr. Coonce and Mr. Hall. ............................ 125

ii. Trial counsel's performance was deficient; they failed to present the evidence that was
known, and trial counsel knew they needed the assistance of BOP expert yet failed to consult
with one ................................................................................................................................. 127

iii. An expert on BOP procedures or someone knowledgeable about USMCFP specifically
would have been able to provide crucial information about the BOP's multiple and grave
errors in housing certain inmates in Unit 10-B, including the contributory factor of lax
monitoring of improperly classified inmates. ......................................................................... 133

a. A former high-ranking BOP administrator like Maureen Baird could have provided crucial
information .............................................................................................................................. 133

b. Former USMCFP employee Joe Buckmaster could have provided crucial information.... 136

E. Trial counsel was ineffective for failing to rebut the aggravating factor of future dangerous
by presenting evidence and expert testimony to explain how the BOP could safely house Mr.
Hall .......................................................................................................................................... 139

i. Trial counsel's penalty phase presentation rebutted the government's future dangerousness
argument with nothing but four years of clean conduct, which, without additional information,
the government was able to use to support *its* argument that Mr. Hall was patient and
calculating. ............................................................................................................................. 140

ii. Trial counsel's performance was deficient; they failed to call an expert to explain to the jury
how Mr. Hall could be housed safely. .................................................................................... 140

F. Trial counsel was ineffective for failing to challenge the other aggravating factors .......... 145

G. Trial counsel was ineffective for failing to investigate and present information about Mr.
Hall's struggles with a particularly severe case of Crohn's disease. ..................................... 150

Case 4:21-cv-08001-BCW    Document 70    Filed 04/29/24    Page 4 of 310

i. The jury heard incomplete information about Crohn's disease. .......................................... 152

ii. The jury did not hear important details about Mr. Hall's struggles with Crohn's disease, including about stool leaking from his body and the need for surgery shortly before the homicide, which Mr. Hall reported to BOP officials caused him to be teased by other inmates and have difficulty living in an open unit. .............................................................. 154

iii. The jury also did not hear from any defense witness that Chuck was on prednisone the day of the homicide, nor that it was contraindicated due to Chuck's mental illness. .................... 157

iv. Trial counsel recognized the importance of presenting information about Crohn's disease but nevertheless failed to adequately investigate. ....................................................... 159

H. Trial counsel was ineffective for failing to adequately cross-examine key witnesses. ....... 160

i. Dr. Park Dietz ........................................................................................................ 161

ii. Dr. Maureen Reardon ........................................................................................... 170

iii. Other government experts ................................................................................... 174

I. Trial counsel was ineffective because no attorney ever argued to the DOJ's Capital Review Committee that a death sentence should not be sought against him. ...................................... 174

J. Trial counsel was ineffective for failing to seek severance of the penalty phase. .............. 179

K. Trial counsel was ineffective for calling important penalty phase witnesses to testify by video. .............................................................................................................................. 181

L. Chuck was prejudiced by trial counsel's deficient performance. ...................................... 185

i. Jurors not knowing about Chuck's history of sexual abuse and childhood trauma prejudiced him. .............................................................................................................................. 188

ii. Jurors not knowing about Chuck's abnormal brain prejudiced him. ................................ 192

iii. Trial counsel's failure to provide the jurors with evidence of how BOP mismanagement contributed to the homicide and how BOP could safely house Chuck was prejudicial because the jury may have incorrectly believed that he would present a future danger. ..................... 194

iv. Trial counsel's failure to investigate Crohn's disease prejudiced Chuck. ........................ 198

v. Trial counsel's failure to educate the jury about BOP's use of prednisone to treat Chuck's Crohn's prejudiced Chuck. ................................................................................................. 199

vi. Having a joint penalty phase with co-defendant Coonce prejudiced Chuck. ................... 200

vii. Initial trial counsel's inadequate preparation for the presentation to the DOJ's Capital Review Committee prejudiced Chuck. ....................................................................... 201

viii. Trial counsel's decision to call the majority of mitigation witnesses by video and his failure to adequately interview and prepare even the witnesses he did call prejudiced Chuck, and, moreover, underscores the throughline of Chuck's trial, which is that trial counsel repeatedly cut corners when Chuck's life was on the line. ...................................................... 202

CLAIM 2: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE CULPABILITY PHASE ................................................................................................................................ 204

A. Trial counsel was ineffective for failure to seek reasonable continuances. ...................... 204

B. Trial counsel was ineffective for failing to present evidence that Mr. Hall was taking prednisone, a steroid that causes mania and rage, in the days leading up to the homicide and on the day of the homicide. .................................................................................................. 206

i. BOP records that trial counsel received in discovery show that Mr. Hall was taking prednisone on the day of the crime, but the expert who testified about Crohn's disease – who also did not realize Mr. Hall was taking prednisone on that day – did not testify until the penalty phase. .................................................................................................................. 207

ii. Mr. Hall's use of prednisone on the day of the homicide was a defense to the crime, as well as crucial mitigating evidence. ................................................................................ 211

C. Trial counsel was ineffective because learned counsel was absent from court for the entire culpability phase and significant portions of the penalty phase. ........................................... 212

D. Trial counsel's errors at the culpability phase prejudiced Mr. Hall in the culpability phase and in the penalty phase. ...................................................................................................... 216

CLAIM 3: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING JURY SELECTION ................................................................................................................ 219

A. Trial counsel was ineffective for declining to ask any questions of many of the potential jurors (*Morgan* violation). ............................................................................... 219

B. Trial counsel was ineffective for failing to object when prosecutors unlawfully excluded women from the jury.......................................................................................... 226

i. The government intentionally excluded women from the jury........................................... 226

ii. Trial counsel failed to raise a *J.E.B.* objection to the government's discriminatory use of peremptory strikes........................................................................................ 227

C. Mr. Hall was prejudiced by trial counsel's errors during jury selection. ........................... 228

CLAIM 4: CONFLICT OF INTEREST ...................................................................................... 230

A. Mr. Duchardt's relationship with Dr. Wisner created an actual conflict of interest. ......... 232

B. Mr. Duchardt's conflict of interest between himself and Mr. Hall adversely affected Mr. Duchardt's performance at trial. ........................................................................................... 239

CLAIM 5: *BRADY* VIOLATIONS ............................................................................................. 244

A. The prosecution suppressed evidence that Mr. Hall sought mental health treatment hours before the homicide.......................................................................................................... 246

B. The government also suppressed evidence about BOP mismanagement. ......................... 250

C. Suppression of this evidence is part of a pattern of misconduct by Capital Case Section attorneys, which has come to the attention of other courts......................................... 252

D. The suppressed evidence was material. ............................................................................ 256

CLAIM 6: *NAPUE* VIOLATION (BEZY TESTIMONY) ......................................................... 259

A. The testimony elicited by the government regarding violence in BOP facilities was misleading. ............................................................................................................................ 265

B. The government knew or should have known the testimony it elicited was misleading. ... 268

C. The testimony was material............................................................................................... 269

CLAIM 7: *NAPUE* VIOLATION (BRINKLEY TESTIMONY)............................................... 272

A. Dr. Chad Brinkley's testimony, uncorrected by the government, about his interactions with Mr. Hall's on the day of the homicide was misleading. ...................................................... 273

B. The government knew or should have known the testimony it elicited was misleading... 276

C. The testimony was material.................................................................................. 277

CLAIM 8: IMPROPER SUPPLEMENTAL INSTRUCTION (*ALLEN* CHARGE).................. 279

CLAIM 9: THE FEDERAL DEATH PENALTY IS UNCONSTITUTIONAL ........................ 285

CLAIM 10: CUMULATIVE ERROR...................................................................... 289

V. INCORPORATION OF RECORD....................................................................... 292

VI. PRAYER FOR RELIEF ................................................................................. 293

# TABLE OF AUTHORITIES

Cases

*Ake v. Oklahoma*, 470 U.S. 68 (1985) ....................................................................................... 52

*Alcorta v. Texas*, 355 U.S. 28 (1957).............................................................................. 265, 272, 278

*Anders v. California*, 386 U.S. 738 (1967) ................................................................................. 181

*Arizona v. Fulminante*, 499 U.S. 279 (1991).................................................................... 182, 234

*Arizona v. Youngblood*, 488 U.S. 51 (1988) .............................................................................. 251

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................... 250, 258, 262, 279

*Britt v. North Carolina*, 404 U.S. 226 (1971) ............................................................................. 52

*Buck v. Davis,* 580 U.S. 100 (2017)............................................................................................ 147

*Caban v. United States*, 281 F.3d 778 (8th Cir. 2002)............................................................... 242

*Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002) .................................................................... 197

*Chambers v. Mississippi*, 410 U.S. 284 (1973)........................................................................... 295

*Chapman v. California*, 386 U.S. 18 (1967)................................................................................ 283

*Clemmons v. Delo*, 124 F.3d 944 (8th Cir. 1997) (en banc) ............................................... 250, 252

*Code v. Montgomery*, 799 F.2d 1481 (11th Cir. 1986)............................................................... 209

*Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999) .................................................................... 203

*Commonwealth v. Baker*, 800 N.E.2d 267 (Mass. 2003)............................................................ 209

*Connick v. Thompson*, 563 U.S. 51 (2011) ................................................................................. 259

*Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008)................................................................... 207, 208

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)..................................................................................... 238

*Daniel v. Comm'r*, 822 F.3d 1248 (11th Cir. 2016) ................................................................... 192

*Day v. McDonough*, 547 US. 198 (2006) ..................................................................................... 48

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)....................................................................... 272

*Drake v. Portuondo*, 553 F.3d 230 (2d Cir. 2009)...................................................................... 272

*Ford v. Hall*, 546 F.3d 1326 (11th Cir. 2008)............................................................................ 283

*Ford v. Wainwright*, 477 U.S. 399 (1986) .................................................................................. 291

*Giglio v. United States*, 405 U.S. 150 (1972) ..................................... 265, 274, 275, 278, 282, 283

*Grant v. Royal*, 886 F.3d 874 (10th Cir. 2018)........................................................................... 197

Case 4:21-cv-08001-BCW    Document 70    Filed 04/29/24    Page 9 of 310

*Grant v. Trammell*, 727 F.3d 1006 (10th Cir. 2013)................................................................... 191

*Gregg v. Georgia*, 428 U.S. 153 (1976) ............................................................................ 149, 291

*Hammond v. Hall*, 586 F.3d 1289 (11th Cir. 2009)................................................................... 275

*Hamric v. Bailey*, 386 F.2d 390 (4th Cir. 1967) ...................................................................... 273

*Horn v. Quarterman*, 508 F.3d 306 (5th Cir. 2007) ................................................................. 187

*Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001) ............................................................ 226

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) ....................................... 232, 233, 234

*Jells v. Mitchell*, 538 F.3d 478 (6th Cir. 2008) .......................................................................... 54

*Jenkins v. Artuz*, 294 F.3d 284 (2d Cir. 2002) ........................................................................ 272

*Jimerson v. Payne*, 957 F.3d 916 (8th Cir. 2020) .................................................................... 251

*Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992).............................................................. 226

*Jones v. United States*, 527 U.S. 373 (1999) ........................................................................... 285

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) ........................................................................... 291

*Kiley v. United States*, 914 F.3d 1142 (8th Cir. 2019).............................................................. 245

*Kyles v. Whitley*, 514 U.S. 419 (1995)..................................................................................... 251

*Little v. Armontrout*, 835 F.2d 1240 (8th Cir. 1987)................................................................... 52

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013)............................................................. 197

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) ............................................................................. 149

*Martinez v. United States*, 423 F. App'x 650 (8th Cir. 2011)..................................................... 49

*McLaughlin v. State*, 789 S.E.2d 247 (Ga. App. Ct. 2016)...................................................... 209

*Mickens v. Taylor*, 535 U.S. 162 (2002).................................................................................. 238

*Miller v. Pate*, 386 U.S. 1 (1967)............................................................................................ 272

*Mooney v. Holohan*, 294 U.S. 103 (1935) ............................................................................... 272

*Morgan v. Illinois*, 504 U.S. 719 (1992).......................................................................... 225, 234

*Napue v. Illinois*, 360 U.S. 264 (1959) .............................. 250, 251, 265, 272, 278, 279

*Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007)....................................................................... 295

*Penson v. Ohio*, 488 U.S. 75 (1988) ....................................................................................... 182

*Porter v. McCollum*, 558 U.S. 30 (2009)................................................................................... 51

*Rinehart v. Wedge*, 943 F.2d 1158 (9th Cir. 1991).......................................................... 288, 289

*Rushen v. Spain*, 464 U.S. 114 (1983) .................................................................................... 288

*Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994) .................................................................... 244

ix

*Satterwhite v. Texas*, 486 U.S. 249 (1988) .............................................................................. 182

*Sears v. Upton*, 561 U.S. 945 (2010) ...................................................................................... 51

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010) ........................................................ 54

*Smith v Dept. of Corrections*, 572 F.3d 1327 (11th Cir. 2009 .................................. 265, 273, 278

*Smith v. Sec'y, Dep't of Corr.,* 572 F.3d 1327 (11th Cir. 2009) ................................................ 283

*Stankewitz v. Wong*, 698 F.3d 1163 (9th Cir. 2012) .......................................................... 51, 52

*State ex rel. Horn v. Ray*, 325 S.W.3d 500 (Mo. Ct. App. 2010) ............................................. 238

*State ex rel. Union Planters Bank, N.A. v. Kendrick*, 142 S.W.3d 729 (Mo. 2004) ................... 239

*State v. Armstrong*, 863 N.W.2d 449 (Neb. 2015) ................................................................... 210

*State v. Sanchez*, 785 P.2d 224 (N.M. 1989) .......................................................................... 217

*Stoner v. Sowders*, 997 F.2d 209 (6th Cir. 1993) .............................................................. 186, 187

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................... 50, 53, 134, 182, 190, 238, 266

*Strickler v. Greene*, 527 U.S. 263 (1999) ......................................................................... 251, 259

*Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008) ........................................................................ 273

*Trop v. Dulles*, 356 U.S. 86 (1958) ....................................................................................... 291

*United States v. Agurs*, 427 U.S. 97 (1976) ..................................................... 251, 275, 277, 283

*United States v. Alzate*, 47 F.3d 1103 (11th Cir.1995) ........................................... 265, 273, 278

*United States v. Bagley*, 473 U.S. 667 (1985) .................................................................. 251, 262

*United States v. Barrett*, 985 F.3d 1203 (10th Cir. 2021) .................................................. 190, 191

*United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) ................................................................ 273

*United States v. Burke*, 345 F.3d 416 (6th Cir. 2003) ............................................................. 187

*United States v. Cronic*, 466 U.S. 648 (1984) ................................................................. 181, 218

*United States v. Darryl Lamont Johnson*, 02-cv 6998 (N D. Ill. Dec. 13, 2012) ....................... 199

*United States v. Garcia*, 562 F.3d 947 (8th Cir. 2009) ............................................................ 251

*United States v. Grant*, 563 F.3d 385 (8th Cir. 2009) ............................................................. 234

*United States v. Harris*, 498 F.2d 1164 (3d Cir. 1974) ........................................................... 272

*United States v. Higgs*, 141 S. Ct. 645 (2021) (Sotomayor, J., dissenting) ............................... 292

*United States v. Jones*, 6:10-cr-03090 (W.D. Mo. Oct. 16, 2017) ............................................ 200

*United States v. Kenyon*, 481 F.3d 1054 (8th Cir. 2007) ......................................................... 216

*United States v. Lawrence*, 248 F.3d 300 (4th Cir. 2001) ........................................................ 186

*United States v. Meinster*, 619 F. 2d 1041 (4th Cir. 1980) ...................................................... 282

Case 4:21-cv-08001-BCW   Document 70   Filed 04/29/24   Page 11 of 310

*United States v. Meinster*, 619 F.2d 1041 (4th Cir. 1980) ........................................... 274

*United States v. Shwayder*, 312 F.3d 1109 (9th Cir. 2002) ........................................ 244

*United States v. Sutton*, 542 F.2d 1239 (4th Cir. 1976) .............................................. 272

*United States v. Watland*, No. 11-cr-00038 (D. Co. Feb. 5, 2014) ............................. 178

*Wainwright v. Witt*, 469 U.S. 412 (1985) ................................................................. 225

*Waller v. Lockhart*, 807 F.2d 136 (8th Cir. 1986) .................................................... 209

*Weeks v. Angelone*, 528 U.S. 225 (2000)................................................................. 287

*Wharton v. Chappell*, 765 F.3d 953 (9th Cir. 2014) ................................................. 193

*Wheat v. United States*, 486 U.S. 153 (1988) ........................................................... 244

*Wiggins v. Smith*, 539 U.S. 510 (2003).......................................... 51, 53, 190, 191, 193

*Williams v. Alabama*, 2021 WL 4325693 (N.D. Ala. Sept. 23, 2021)...................... 190, 192, 193

*Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008) ................................................... 190

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................ 52, 53, 147

*Winfield v. Roper*, 460 F.3d 1026 (8th Cir. 2006....................................................... 245

*Wood v. Milyard*, 566 U.S. 463 (2012)..................................................................... 48

*Woodson v. North Carolina*, 428 U.S. 280 (1976) .................................................... 149

*Zant v. Stephens*, 462 U.S. 862 (1983) ..................................................................... 149

Statutes

18 U.S.C. § 3005.................................................................................................... 213

18 U.S.C. § 3593.................................................................................................... 146

28 U.S.C. § 2255.................................................................................................... 48

Rules

ABA Model Rule Prof'l Conduct 1.7 ......................................................................... 237

ABA Model Rule Prof'l Conduct 3.8(d)..................................................................... 256

Federal Rule of Evidence 606(b) .............................................................................. 286

Guide to Judiciary Policy, Chap. 6, § 620.30 (b)(2) ................................................... 216

Local Rule 83.6(c)(1)............................................................................................... 233

Mo. Rule Prof'l Conduct 4-3.8(d).............................................................................. 256

Mo. S. Ct. R. 4-1.7(a)(2).................................................................................... 233, 235

Va. Rule Prof'l Conduct 3.8(d).................................................................................. 256

ABA Guidelines and Standards for Counsel

1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases
.................................................................................................................................... 50

2003 Guidelines 10.4(D)............................................................................................. 205, 217

2003 Guidelines, Commentary to Guideline 10.5 ................................................................ 177

2003 Guidelines, Commentary to Guideline 10.7 ................................................................ 161

2003 Guidelines, Commentary to Guideline 6.1 .................................................................. 217

2008 Supplemental Guidelines 10.11(C)............................................................................. 183

2008 Supplemental  Guidelines, Commentary to Guideline 10.10.1 ..................................... 217

ABA Standards for Criminal Justice: Providing Defense Services Standard (3d ed. 1992) ........ 51

Academic Articles and Research

Equal Justice Initiative, *Death Penalty: Inadequate Counsel* ................................................ 298

Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 10.7 (3d ed. Supp. 2004)
.................................................................................................................................... 239

Jennifer Piel, *The Defense of Involuntary Intoxication by Prescribed Medications: An Appellate Case Review*, 43 J. of Am. Academy of Psych. & L. 321 (Sept. 2015)................................. 217

Lee Kovarsky, *The Trump Executions*, 100 Tex. L. Rev. 621 (2021) ...................................... 296

Martin J. Bidwell & David L. Katz, *Injecting New Life into an Old Defense: Anabolic Steroid-Induced Psychosis as a Paradigm of Involuntary Intoxication*, 7 U. Miami Ent. & Sports L. Rev. 1 (1989) .................................................................................................... 204, 217

Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347 (1999).................................................... 296

Sean O'Brien et al., *Put Down the Phone! The Standard for Witness Interviews is In-Person, Face-to-Face, One-on-One*, 50 Hofstra L. Rev. 1 (2022) ...................................................... 186

Stephen B. Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 Yale L. J. 1835 (1994)...................................................................... 299

Tigran W. Eldred, *The Psychology of Conflicts of Interest in Criminal Cases*, 58 Kan. L. Rev. 43 (2009)............................................................................................................................... 245

News Articles

Alanna Durkin Richer, *Prisoners Charged with Killing Whitey Bulger Won't Face Death Penalty*, CBS News (July 13, 2023) ................................................................................... 178

Benjamin Weiser, *Reputed bin Laden Adviser Gets Life Term in Stabbing*, N.Y. Times (Aug. 31, 2010) ...................................................................................................................... 267

Elizbeth Bruenig, *The Government Has Not Explained How These 13 People Were Selected to Die*, New York Times (Feb 18, 2021) .................................................................... 289

Gabrielle Banks, *Houston Judge Questions Capability of Federal Prosecutor in San Jacinto County Death Penalty Case*, Houston Chronicle (June 19, 2019)......................................... 257

Jake Bleiberg & Michael Tarm, US Won't Seek Death Penalty for Alleged Texas Walmart Gunman, Associated Press (Jan. 17, 2023).............................................................. 178

Judy Thomas, *Defrocked KCK Priest No Longer Holds Active Medical License in Kansas or Missouri*, Kansas City Star (Mar. 19, 2019) .......................................................... 234

Kathee Baird, *Springfield Attorney Facing Serious Sex Charges*, The Crime Scene (June 28, 2012) ........................................................................................................................ 39

Ken Fountain, *Man Recalls Stabbing Incident in Murder Trial Testimony*, Beaumont Enterprise (May 4, 2010)............................................................................................................... 266

*Man Convicted of Killing Cellmate in Colorado*, NBC News (Mar. 15, 2007) ......................... 267

Michael Tarm, *Fuller Picture Emerges of the 13 Federal Executions at the End of the Trump Administration*, Associated Press (Oct. 3, 2023) ..................................................... 289

Michael Tarm, *How DOJ Made Different Death Penalty Decisions in the Pittsburgh Synagogue and Texas Mall Massacres*, Associated Press (July 14, 2023) ............................................... 290

Phil Hirschkorn, *Bin Laden Aide Sentenced to 32 Years in Prison for Jail Stabbing*, CNN (May 4, 2004) ...................................................................................................................... 267

*Prison Guard Foiled Al Queda Jailbreak*, ABC News (Aug. 30, 2004)................................... 266

Attorney Discipline Orders

*In re Johnson*, Mo. Sp. Ct. No. SC93707 (Dec. 9, 2013) ............................................................ 54

*In re: Darryl B. Johnson Jr*, Order (March 25, 2014) ........................................................... 39, 54

Office of Legal Ethics Informal Opinion 20030063.................................................................. 236

Office of Legal Ethics Informal Opinion 20060073.................................................................. 237

Other Authorities

United States Attorneys' Manual (1997) .................................................................................. 176

Case 4:21-cv-08001-BCW   Document 70   Filed 04/29/24   Page 14 of 310

# I. INTRODUCTION

Charles Michael Hall's[1] trial counsel failed him: he received a death sentence because his attorneys made egregious errors. Most notably, trial counsel did not conduct an adequate life history investigation – the mainstay of capital defense. As a result, the jurors never heard a wealth of evidence, readily available at the time of Chuck's trial, that would have led at least one juror to vote for a sentence less than death. Even without the mitigating evidence trial counsel failed to present, the jury was initially deadlocked as to Chuck's sentence. Without trial counsel's errors, Chuck would have received a life sentence.

Jurors were denied information about the repeated sexual abuse that Chuck suffered at the hands of the headmaster of the Shaker Mountain School, who recruited and groomed troubled middle school boys to his school to "use for his own purposes." Ex. 16 (Patricia Miles Dec.) ¶ 10. The sexual abuse of young boys was an open secret among the teachers and other students – many of whom were also victimized along with young Chuck. But trial counsel did not speak to any of Chuck's former teachers or classmates or anyone outside of his immediate family who knew him before the age of sixteen. And trial counsel spoke to only two people outside of his immediate family who knew him before he was first incarcerated. Speaking to people who knew the client growing up is a critical aspect of any competent life history investigation. Because of trial counsel's deficient investigation, trial counsel did not know about Chuck's sexual abuse and instead told the jury "we don't know what happened" during the year Chuck spent at Shaker Mountain School. Tr. 05/07/14 at 1779-80.

---

[1] Charles Michael Hall goes by Chuck, which is how this motion primarily refers to him. Sometimes the motion uses Mr. Hall.

Trial counsel's failure to conduct a life history investigation is astonishing in light of the many red flags in trial counsel's file pointing toward a history of trauma. Chuck's struggle with suicidal ideation dates back to his teen years, when he left his parents a note threatening suicide. Notes from counselors and teachers at the school Chuck attended just after Shaker Mountain observed that he was "depressed" and "something is bothering Chuck." A report by counselors who worked with the Hall family note Chuck's parents having a troubling relationship with alcohol and problems communicating with each other and Chuck's school, interfering with their ability to help Chuck. Yet trial counsel spoke to no teachers, counselors, classmates, extended family members, or friends who could have spoken about Chuck's experiences growing up.

Without this information, the government's expert witnesses and even trial counsel's own expert witness misdiagnosed Mr. Hall with anti-social personality disorder (ASPD). Knowing what he now knows about Mr. Hall, trial counsel's expert no longer stands by this diagnosis. Similarly, a psychologist who had treated Mr. Hall but testified at trial without knowing Mr. Hall had suffered sexual abuse now believes Mr. Hall suffers from post-traumatic stress disorder (PTSD). Three additional experts have opined that Mr. Hall does not have ASPD but that symptoms mistakenly attributed to ASPD are in fact symptoms of PTSD resulting from Chuck's history of sexual abuse.

Trial counsel erred in additional critical ways. Jurors did not hear how Chuck's brain's physical abnormalities impact his emotional regulation and impulse control. Trial counsel did not have this information, because although experts had recommended brain scans two years before trial, counsel waited until twenty-four days before trial to seek funding for the scans. The motion was denied because of the trial court's concerns about timing.

2

Nor did the jury hear an explanation about how the Bureau of Prisons (BOP) could safely manage Chuck if he were sentenced to life imprisonment, despite BOP mismanagement facilitating the homicide. Chuck repeatedly asked BOP staff to house him in isolation because he was having thoughts of harming others and did not want to act on those thoughts. Just days before the homicide, Chuck expressed concerns about being taunted for his medical issues. Chuck has a severe form of Crohn's disease which damaged his intestines so severely that he must expel bodily waste through a stoma (a piece of his intestine that protrudes from a surgically created hole in his abdomen) into an ostomy bag (a bag that collects stool). In early January 2010, the skin around his stoma was breaking down, and his bag was leaking stool, both of which cause foul smells. On January 11, 2011, he told BOP staff "it would be difficult for him to live in an open unit where he had to deal with teasing about his medical issues." Ex. 67 (BOP Records) at 17. The same document notes that Chuck was living in an "open unit." *Id.* The following day, Chuck had surgery, and the day after that, BOP medical staff prescribed him prednisone, which he was still taking on the day of the homicide. Prednisone is a steroid known to cause mania and rage.

Moreover, according to Joe Buckmaster – a former Lieutenant who supervised Unit 10-B where Chuck, co-defendant Wesley Coonce, and victim Victor Castro-Rodriguez were housed, who would have provided helpful information to trial counsel if asked – "had Coonce not been on 10-B, it is unlikely this homicide would have occurred. He should have been properly classified into a more restrictive area and been in restraints when walking freely." Ex. 9 (Buckmaster Dec.) ¶ 11. "Castro-Rodriguez's murder was a perfect storm. It took a violent individual – Coonce – being inappropriately placed in a general population mental health wing. It took a victim with low cognitive abilities. Castro-Rodriguez was like a child. But it also took

3

[Correctional Officer (CO) Robert] Logsdon's infrequent monitoring to make the homicide possible." *Id.* ¶ 13. CO Logsdon has received at least two disciplinary write ups for inattention, including one incident in which an inmate escaped while CO Logsdon was supposed to be watching him. Ex. 78 (BOP Employee Disc. Summ.). The jury heard none of this.

The jury did hear that since the homicide, while housed in isolation, Chuck had not had a single disciplinary infraction (which remains true to this day – Chuck has not had a single disciplinary infraction in the past fourteen years). But without context for how BOP mismanagement facilitated the homicide – or the impact of Chuck's trauma history and his physically abnormal brain, none of which trial counsel knew about – the jury may have nevertheless believed the prosecutors' allegation that Chuck would be dangerous no matter what.

Further, the psychiatrist who testified about Chuck's mental health, Crohn's disease, and the BOP's management of the unit where the homicide occurred did not review Chuck's medical records carefully enough to realize that Chuck was taking prednisone on the day of the homicide. Additionally, that psychiatrist was also a priest who has been defrocked by the Archbishop of Kansas City, Kansas for alleged sexual abuse of a minor. By the time of trial, there had been extensive local news coverage of the sexual abuse allegations.

Even so, despite trial counsel's many errors, before sentencing Chuck to death, the jurors informed the court that they were "100% certain[]" they were "unable to reach a unanimous decision regarding" whether to sentence Chuck to death or life imprisonment:

JURY'S QUESTION OR REQUEST

The jury has the following question:

> We have reached a decision in regards to Defendant Coonce. But I feel with 100 % certainty that we are unable to reach a unanimous decision in regards to ~~██~~ Defendant Hall.

(The note reads, "We have reached a decision in regards [d]efendant Coonce. But I feel with 100% certainty that we are unable to reach a unanimous decision in regards to [d]efendant Hall.") Dkt. No. 809 at 3; Tr. 06/02/14 at 5358. Despite their certainty, the trial court instructed them to deliberate further.

The jury's difficulty deciding whether to sentence Chuck to death even without hearing the most important mitigating evidence makes clear that, if Chuck's trial counsel had presented readily available mitigating evidence, there is at least a reasonable probability that the jury would have ultimately sentenced him to life imprisonment.[2]

---

[2] Indeed, jurors who served on the jury that sentenced Chuck to death have said explicitly that, if they had known about the sexual abuse Chuck suffered and the abnormal MRI results, they would not have voted for a death sentence. Although this information is more relevant to Chuck's clemency application, to which the Federal Rules of Evidence do not apply, these jurors have specifically explained that they support President Biden commuting Chuck's sentence. However, having gathered this information pursuant to the Court's order granting permission to speak with the jurors, counsel brings this information to the Court's attention. Other information in the declarations is directly relevant to the § 2255 proceedings.

Chuck's trial counsel failed him. He is entitled to a new trial, a new penalty-phase hearing, or at the very least an evidentiary hearing on the claims in this § 2255 motion.

## II. CHUCK HALL'S HISTORY[3]

*Birth, Adoption and Early Life (Ages 0-12)*

Chuck Hall was born Baby Boy Kelley in Portland, Maine, in 1971. The 18-year-old girl who bore him, Betty Jo Kelley, was from Texas. She had been sent to stay with her half-brother in Maine to hide the pregnancy. Betty Jo refused to look at Chuck: she "did not see her child nor did she wish to." Ex. 100 (Adoptive Records) at 1.

A couple named Charles and Dorothy Hall in Saco, Maine, who had adopted a girl they named Michelle two years earlier, decided to welcome another child into their family. *Id*. Chuck's sister Susan, who was their parents' biological child and older than Michelle and Chuck, explains the circumstances leading up to her parents' decision to adopt:

> Alcohol consumption was a large part of their weekend. During my childhood, I remember several occasions when their arguments would progress to knock-down, drag-out fights, including punching holes in the walls and breaking large numbers of glass items. However, I never saw them physically assault each other. On one occasion, I remember being about eight years old and hiding in the closet to try to escape their yelling and screaming. When they found me, they blamed each other for scaring me. I also remember a time when one of them broke a bottle, and in response the other swept an entire shelf of items out of the fridge so that everything shattered on the floor.

---

[3] This is a detailed account of Chuck Hall's life after a thorough examination by his current legal team. Almost none of what is written here was heard by the jury. All of what is described here was available to trial counsel. The small sections of what is described here that the jury heard, including the rare instances we cite to the trial record, is done to present a complete picture of Chuck's life. Of course, § 2255 proceedings, and in particular ineffective assistance of counsel claims, require differentiating what is known now at the § 2255 stage versus what was presented at trial. Under each individual claim and subclaim, we present a detailed explanation on the history of the material facts relevant to that issue. This section serves to provide the background of Chuck's Hall's complex and challenging life.

An even more detailed account of Chuck Hall's is submitted as Exhibit 91, which is the social history prepared by the post-conviction team's mitigation specialist and from which this history was taken.

> After this last big argument, I believe my parents realized they were not happy with the events in their lives. They made several changes: my dad stopped bowling in a league, and my mother started taking evening classes. They met with our priest for marriage counseling. A few years later they attended a marriage counseling program, to strengthen their relationship as a couple.

Ex. 35 (Shumway Dec.) ¶ 6. In retrospect, Susan realized that her parents' "plan to resolve their problems was to enlarge their family." *Id.*

Susan also explains that her parents "never withheld the fact of [Michelle and Chuck's] adoption, but always said it didn't matter, that we were a family: biological or adopted was not relevant." Dorothy and Charles' denial of adoption's long-term impact ignored, as Susan puts it, the "negative thoughts an adopted child lives with as a sort of trauma over being given away." *Id.* ¶ 10.[4]

Michelle confirms that the fact of her adoption "wasn't always at the conscious forefront of my mind, but it was often present, even if only subconsciously." Ex. 34 (Bories Dec.) ¶ 6. Her adoption made her "angry and confused without really understanding why." *Id.* Michelle also remembers Chuck as a lonely kid, "a follower, someone who just wanted to be included." *Id.* ¶ 7. "I think he never believed that people would like him for being himself. After all, his birth parents didn't – at least that's what he thought, like any adopted kid thinks." *Id.*[5]

When a school psychologist noted a decline in Chuck's academic performance around third grade, Dorothy attributed Chuck's struggles to "the family moving, death of a grandparent, and a neighbor needing to remove foster children from her home." Ex. 60 (Saco School Recs) at

---

[4] Trial counsel told the jury that Chuck was adopted, but he decided that Susan should not testify, so the jury never learned what Susan knew about the Hall family dynamics.

[5] Michelle testified, but the questing was limited, and lead trial counsel did not elicit this information from her, nor ask her about it when he interviewed her.

7

19. The situation deteriorated until he failed sixth grade in 1983 and then failed sixth grade a second time. He was suspended once for fighting. *Id.*

No one directly attributed Chuck's difficulties to his adoption, but Michelle, who was exhibiting her own maladaptive behaviors around the same time, says: "I was testing [my parents], that the knowledge of my adoption nagged at me, making me wonder why, if my own birth mother didn't want me, if she could just give me away, why would these people who had no biological connection to me want to keep me?" Ex. 34 (Bories Dec.) ¶ 8.

Finally, after repeated academic difficulties and failures, the principal of Saco Middle School referred Chuck for evaluation. The Special Services Director for Saco schools suggested serious intervention in Chuck's schooling, including testing by the school social worker to "further delinate [sic] the nature and extent of any emotional adjustment difficulties"; temporary remedial math placement; individual or group counseling; weekly progress reports; and monthly teacher-parent meetings. Ex. 60 (Saco School Recs) at 22. Instead of receiving this much needed intervention, Dorothy and Charles – who "were at their wits' end" due to Michelle's increasing promiscuity and Chuck's "serious mischief" – had already started looking for an alternative to the public schools. Ex. 35 (Shumway Dec.) ¶ 11. Susan was familiar with schools in her area "for kids who had not been able to make it in regular public school," one of which was the Shaker Mountain School (SMS) in Burlington, Vermont. *Id.*

*Shaker Mountain School (Age 13)*

Initially Chuck lived with Susan and her own young family in Burlington, rather than boarding at the school. Chuck arrived at a busy and challenging time for Susan's family, shortly after the birth of her fourth child, and in retrospect she wonders if Chuck felt left out.

8

At SMS, there was little-to-no structure, and traditional academics were non-existent. As student Elizabeth Miles puts it: "SMS was basically a holding pen. It took in the kids no one else wanted, corralling them and keeping them out of the system, so the system seemed to pretty much leave the school alone." Ex. 29 (Elizabeth Miles Dec.) ¶ 6. She adds:

> The only formal lesson I remember having in my whole time there was one on math that I requested…which lasted about five minutes. Sometimes random people from the Burlington community would come in and give a class in something or another, but only one time each. Other than that, all I learned at SMS was how to draw the numeral eight: I remember being taught during my first year there that it was like the infinity sign.

*Id.* ¶ 4. Student Fred M. "Bruce" Jackson concurs: "Most of us were local, and we were like the underbelly of the Burlington area, kids who got kicked out of public school or at least were getting into trouble there, but whose families never could have afforded private school on their own." Ex. 20 (Jackson Dec.) ¶ 7. As staff member Jane Ginsberg puts it, "often even those who weren't [state wards] had their own troubles at home, at school, or in life in general." Ex. 26 (Ginsberg Dec.) ¶ 10.

Additionally, the school had a freewheeling and sexually permissive atmosphere. A teacher once played the piano with his penis in front of everyone. Ex. 20 (Jackson Dec.) ¶ 16. Sexual relationships between the young staff members and students were not uncommon. Ex. 20 (Jackson Dec.) ¶ 17; Ex. 24 (Sanderson Dec.) ¶ 12.

The ringleader of this circus was the headmaster Jerome (Jerry) Mintz. As child welfare worker Lucy Abair described Mr. Mintz: "something [was] not quite right about the way [he] was with kids." Ex. 30 (Abair Dec.) ¶ 5. In fact, Jerry Mintz is a serial child sexual predator. Student Patricia Miles believes that "Jerry chose to work with at-risk kids and wards of the state

9

because it gave him easier and free access to young boys, and that he had the school so he could enroll children he wanted to use for his own purposes." Ex. 16 (Patricia Miles Dec) ¶ 10.[6]

Students describe how Mr. Mintz recruited boys for the school from the local community, grooming them into his trust:

> The way I ended up at SMS was kind of random…Jerry came up to me at the arcade and offered me a few quarters. He asked what I liked to do. When I told him I was into Dungeons & Dragons, Jerry said he knew someone else who played D&D, and he offered to introduce us.

Ex. 32 (Foxwell Dec.) ¶ 9.

> Even before I was an SMS student, Jerry started taking me out to do stuff. He'd take me bowling or to the movies or a baseball game or to get something to eat…

Ex. 27 (Mashteare Dec.) ¶ 4.

> …either Jerry invited a couple of us at a time, or I asked some friends or acquaintances on my own. Jerry even encouraged me to do that. They didn't have to be SMS students; they could just be kids from the neighborhood.

Ex. 33 (Kimber Dec.) ¶ 9.

> Jerry was at the detention center looking for kids who might want to go to his school. I don't know if he came by happenstance or if someone had given him my file, but there he was, and he asked if I'd like to go to SMS and live in the group home…that was run by the school…

Ex. 18 (Dougherty Dec.) ¶ 3.

Mr. Mintz focused his attention on young boys, not girls:

> Jerry also kept inviting me to…baseball games in Montreal, football games in Massachusetts[,] movies, eating out. He did this a lot, with lots of different boys, sometimes a few of us together, sometimes just one of us at a time. It was always only boys, never girls.

Ex. 27 (Mashteare Dec.) ¶ 7.

> …Jerry even encouraged me to [ask other boys to come along]…I knew it had to be boys; I remember a time I showed up with another SMS student named Barbara, and I could

---

[6] Trial counsel knew nothing about SMS – they told the jury they had no idea what happened there – and none of this information was presented at trial.

10

see the disappointment on Jerry's face. He made clear he wasn't interested…because she was a girl. He himself only ever invited boys, never girls.

Ex. 33 (Kimber Dec.) ¶ 9.

It was usually me and Frank on those evenings out…and sometimes some other boys too, but never any girls.

Ex. 32 (Foxwell Dec.) ¶ 7.

Mr. Mintz's invitations to the boys usually ended in overnights. Former students are

remarkably consistent as to the set-up of Jerry's various bedrooms and the sleeping conditions:

We would stay wherever he was living at the time, which changed a lot, because he stayed wherever someone gave him free rent. He always had multiple mattresses laying out on the floor. He'd bring us back to his place and everyone would tumble into bed, sprawled out on the mattresses. We all slept in our underwear, Jerry included….

Ex. 17 (LeClaire Dec.) ¶ 5.

Sleeping with Jerry meant sleeping in the same bed, in only your underwear – Jerry included. The bed was a bunch of mattresses on the floor, all pushed together, with one set of sheets…[Jerry] always slept in the middle…It felt like you were trapped.

Ex. 33 (Kimber Dec.) ¶ 8.

All [the loft] had in it was a few mattresses on the floor, with disgusting, stinky sheets on them. Jerry insisted that we were only allowed to stay over if we slept in the loft with him…

Ex. 18 (Dougherty Dec.) ¶ 8.

When it was time for bed, I said I'd sleep on one of the van seats in the meeting room. Jerry corrected me: he told me I would be sleeping upstairs, in the loft, with everyone else. I didn't want to, but I did what he said, and that's where I slept every time I spent the night there.

Ex. 28 (Durbin Dec.) ¶ 10.

The loft was up a ladder on top of the classrooms. It was a long, narrow space. There was only one bed, and he had us sleep in it with him. If there was more than one of us, he was always in the middle, with us on either side of him.

Ex. 27 (Mashteare Dec.) ¶ 8.

Some boys remember more distinctly than others what Jerry did to them, but the details in their stories correspond closely:

> …I woke up with him in his underwear and his arm wrapped around me, my back to his front, I pretended it wasn't happening. I heard him tell me that I should really sleep naked, with only a very thin sheet, and I knew I felt very uncomfortable, but I didn't understand what it meant that he was touching me. I still try not to think about being on that mattress with him, because I worry there are more details that I've kept myself from remembering.

Ex. 19 (Sawyer Dec.) ¶ 12.

> At first, Jerry would offer us backrubs. I never wanted one, but he kind of pushed himself on you. And then, after a while, when I'd be trying to sleep, I'd feel his hands on me. First it was just touching my hand, which seemed like it could maybe be by mistake, but then his hands started moving to other places, like around my waist, and near the top of my underwear. And then he started pressing up against me or lying partially on top of me, and when he did that, I could feel that he had an erection.

Ex. 27 (Mashteare Dec.) ¶ 11.

> …that night, for the first time, Jerry called me over to sleep next to him…Not long after I lay down, Jerry started massaging my back and buttocks, and then there was his hand, coming around to the front to fondle my penis.

Ex. 17 (LeClaire Dec.) ¶ 7.

> I stayed tense and on alert all night, squished up between Jerry and the wall…We were lying there on the mattresses, and then I felt his arm reaching over me, and his hand heading for my groin area. I could also feel his erection against my back.

Ex. 18 (Dougherty Dec.) ¶ 9.

> …Jerry would ask one of us to give him a massage, or he gave us massages instead. And he would talk about things he shouldn't, like one time I remember him asking if we knew what the strongest muscle in the body was. I guessed it was the leg, but Jerry said No, it's the buttocks…[then] he started massaging mine, and then he reached around and fondled my penis.

Ex. 20 (Jackson Dec.) ¶ 12.

Jerry's sleepovers with the boys were an open secret. Staff member Joni AvRutick attests that "He made no effort to hide it." Ex. 83 (AvRutick Dec.) ¶ 6. Doris Herbst acknowledges, "There was a little whisper in the back of my head when I learned about [the sleepovers], but I

am sorry to say that I brushed it off." Ex. 85 (Herbst Dec.) ¶ 7. Peter Carr was always "bothered" by the fact that Jerry "often invited some of the boy students to stay overnight with him," and he "felt, deep down, like something wasn't quite right about the situation." Ex. 22 (Carr Dec.) ¶ 6. Jane Ginsberg's concern about the sleepovers grew until it was "impossible to ignore." Ex. 26 (Ginsberg Dec.) ¶ 6.

By the time Chuck arrived at the school in 1984, several students had tried to disclose their abuse and were ignored. John Kimber gave up trying after being dismissed by his mother, his brother-in-law, and the Burlington community, which "pretty much just ignored Jerry[] because they were happy for him to take in us local hoodlums and get us off the streets." Ex. 33 (Kimber Dec.) ¶ 16. Richard Dougherty reports that "none of the staff stood up for me" when he reported the sexual abuse, some of them even demanded "what proof I had." Ex. 18 (Dougherty Dec.) ¶ 10. Malcolm Sawyer, in an investigation Lucy Abair describes as "botched," was told by child welfare personnel that his account alone was insufficient to substantiate charges. Ex. 30 (Abair Dec.); Ex. 19 (Sawyer Dec). With Jerry facing no accountability for his actions, Chuck was thrust into an environment ripe for his victimization.

Former staff member Theresa Koenke Diaz recalls Chuck at that time, age 13, as "quiet and observant, a gentle soul," and a "sweet boy." Considering his tendency to keep things to himself; his "mildly troubled" presentation; and the fact that he "was not particularly carefree, the way I would have expected someone his age to be," Theresa sees how Chuck was "vulnerable to Jerry's advances." Ex. 23 (Koenke Diaz Dec.) ¶ 9. Peter Carr, another staff member, remembers Chuck staying in the loft and now realizes that Chuck "was a perfect victim for Jerry." Ex. 22 (Carr Dec.) ¶ 16.

Student Jessie Mashteare, to whom Chuck was "just a quiet kind of kid, nobody who caused trouble or seemed liked he'd do anything bad," recalls the two of them spending nights in the loft. Ex. 9 (Mashteare Dec.) ¶ 9. Student Bruce Sanderson recalls that "Chucky's demeanor changed over time, . . . he got more irritable." Ex. 24 (Sanderson Dec.) ¶ 9. Student Patricia Miles remembers only one thing about Chuck:

> …my only memory of him is from the smoking area. He wasn't there to smoke: he was looking for Jerry. It was clear that he wasn't seeking Jerry out, but instead was being vigilant about where he might be. His eyes were red-rimmed. "Where's Jerry?" he'd ask us. "Do you know where Jerry is?"

Ex. 16 (Patricia Miles Dec.) ¶ 7.

Like many of the boys Jerry molested, Chuck told no one about Jerry's abuse. He ultimately disclosed details that closely tracked the experiences of multiple other boys, now men, who Chuck either never knew or had not spoken to since 1985.

Chuck's prolonged abuse by Jerry marks the tragic turning point in his life. Fellow victim Fred "Bruce" Jackson's description of his own survival after "the nightmare of what happened to me at SMS" demonstrates the intense pain of male sexual abuse:

> I'm not sure exactly how I managed to wake up; I guess it must have been part maturity and part therapy. I slowly realized that I was always the hero in my own stories, as if I needed to prove somehow that I was worth being liked or admired, and I realized how angry I was. Over time, I identified two cycles of dealing with things like what happened at SMS: either you get very angry and you do something productive with the anger, or you're the other person who never wakes up from it and then becomes violent or sexually abusive yourself. If you don't wake up from the nightmare that you're a bad person, you just keep hurting yourself and everyone around you.

Ex. 20 (Jackson Dec.) ¶ 22.

After a year at Shaker Mountain, Chuck returned home. He still had not received the services that had been recommended by Saco School, and he now had also experienced a year of sexual abuse trauma he had not disclosed to anyone.

*Back home to Maine at Thornton Academy (Ages 14-15)*

14

Although Chuck had attended the Shaker Mountain School immediately after twice failing sixth grade, at the end of Chuck's year at Shaker Mountain, Shaker Mountain concluded that Chuck could advance to ninth grade. Ex. 44 (SMS School Recs.) at 4. SMS had suggested additional testing of Chuck for a learning disability, but none occurred until Chuck enrolled at a private school called Thornton Academy (Thornton), which the Saco public schools paid for Chuck to attend because Saco was too small to have a public high school.

In his September 17, 1985 report, Stanley Payson, Ed.D., the school counselor at Thornton, indicated that something was wrong. Ex. 63 (Eval. 1985) at 2; Ex. 44 (SMS School Recs.) at 1. "His mood seemed mildly depressed and his affect was flat. Eye contact was only fair…Assessment of personality functioning suggests that…he is an individual who is moderately depressed." In addition, he:

> has difficulty dealing with his own internal processes. Chuck is very unsure of himself . . . His level of emotional development is below what might be expected for his chronological age. He has limited organizational ability and deals with life in a very practical concrete fashion. Thought content is immature and self oriented [sic]. He does have inner resources, however, access to them is limited. He is affectively sensitive but tries to avoid expression of feelings. When pushed by inner pressure or external events, perceptual distortions are noted. Although personality make up [sic] is immature and there is some difficulty in delaying gratification, he typically deals with conflict through fantasy and denial of negative feelings. Impulse expression is more likely to be seen in the form of passive aggressive behaviors versus open demonstrations of affect . . . Chuck seems distant from people.

In other words: Chuck was repressing something, and he was taking pains, consciously or not, to avoid revealing it.[7] Ex. 63 (Eval. 1985) at 2-3.

A few months after Dr. Payson's testing, the Hall family began treatment with the Family Preservation Services Program (FPS) through the Sweeter Children's Home in Saco, Maine. The

---

[7] This information was in trial counsel's file, but, inexplicably, they failed to use it in any way. The jury did not see it.

15

FPS treatment was, at least initially, focused on Michelle, whose behavior had become untenable, including defiance, running away, promiscuity, school failure, and truancy. Once the family treatment began, the providers learned that Chuck was "reacting negatively to the chaos in the home" and realized that he "owned an equal share of the problem." Ex. 62 (Sweetser Closing).[8]

The report from the FPS team and Chuck's school records combine to paint a picture of the after-effect of the abuse at Shaker Mountain. The depression and emotional dysregulation noted by Dr. Payson is supported by notes from teachers that Chuck was "'in a daze' often," "d[id]n't seem to know what [was] going on," and "[wa]s not motivated." Ex. 64 (Thornton School Recs.) at 11. His failing grades and complaint that others "pick[ed] on him" are further indication that he was struggling. The FPS documents "drastic mood swings," as well as clear bids for negative attention: "When he is angry, he destroys property, steals, skips school and lies." *Id.* In essence, it was behavior similar to what he had exhibited in grade school – distracted attention, fantastic stories, "serious mischief" – but with a darker flavor and more serious consequences.

The FPS therapists identified several areas in which the parents' own issues were exacerbating the difficulties they encountered with Chuck and Michelle. One was the "significant marital problems" that "interfere in the necessary presentation of a united front as parental authority." Ex. 62 (Sweetser Closing). Dorothy and Charles acknowledged that these issues had "only been partly resolved through marital counseling." Dorothy's "tendency to

---

[8] This report was in trial counsel's file, but, inexplicably they did nothing with it. They did not even give this report to their experts.

16

protect the kids and Charles by withholding information, and taking care of things in her own way" and the "lack of consistency around parenting and setting limits" was one such issue. *Id*.

The therapists also saw them as victims of their own self-doubt and noted that they "tend to dismiss other considerations (i.e., 'adopted kids usually have more extreme identity searches at adolescence, naturally, and act out more extreme fantasies of "self" . . .) in favor of downgrading their parenting, their marriage and themselves." Ex. 62 (Sweetser Closing) at 3.

Another area of FPS concern was Dorothy and Charles' drinking habits. Michelle confirms that the pattern Susan describes earlier in her parents' marriage – the alcohol consumption spurring arguments that led to "knock-down, drag-out fights" – persisted.

Chuck failed ninth grade in his first year at Thornton. Following a learning disability assessment, he was diagnosed with a Specific Learning Disability and assigned to the Resource Room for math, as well as to a tutor and group counseling. Ex. 64 (Thornton School Recs.) at 31. Chuck's truancy (school avoidance) and acting out behaviors are not only a response to the untreated trauma of sexual abuse, but also the response to a longstanding but until age fifteen undiagnosed learning disability.

David Ruff was assigned as Chuck's tutor. Though a twenty-three-year-old neophyte at the time, Mr. Ruff is now a highly respected education professional with decades of experience. Mr. Ruff explains, "the special education system back in Chuck's time was not what it is today . . . and the result was that Chuck didn't get what he needed." Ex. 36 (Ruff Dec.) ¶ 17. During Chuck's last of six counseling sessions at Thornton, in February 1987, his counselor notes that he was "increasingly in crisis," exhibiting truancy, "temper outbursts," theft, and running away. Ex. 64 (Thornton School Recs.) at 70.

17

Mr. Ruff found the revelation of Chuck's sexual victimization at Shaker Mountain illuminating: "[S]o much of what I had observed in Chuck [suddenly] made sense." Ex. 36 (Ruff Dec.) ¶ 21.  Even without knowledge of the abuse, Mr. Ruff noticed Chuck's distress. He generally observed Chuck as "someone who really wanted other people to like him, and yet he always seemed to feel like he was on the outside . . . [and] just didn't seem to know how to be social in a productive way, to achieve the regard he sought." *Id.* ¶ 11. In one note in Chuck's file, Mr. Ruff had said "something [wa]s bothering Chuck." Ex. 64 (Thorton School Recs.) at 49.

Though undated, it seems likely that it was during this time period that Chuck left the following note for his parents:



(The note reads: *"Mom + Dad I ran away because some one [sic] told me I should[.] I will not be in the State of Maine if you call the cops before I call you. I shall kill myself and that's not a threat it's a promise. And this is one problem you can't solve with cops so please don't call anyone. Or I a dead man [sic]. This is one promise I will keep. Chuck M. Hall Please give me until 5:30 pm Sunday (I'll kill myself if you don't)If Jim call's [sic] tell him I'm at erick's [sic] for the day I already know a way how to kill my self [sic]. ([T]hanks for the Idea mom) Carbon monoxide poisoning."*)[9]

By the end of the year, Thornton was looking for an out-of-district placement for Chuck. Charles and Dorothy, still unable to factor in the effect Chuck's adoption may have had on his psyche, unaware of the Shaker Mountain sexual abuse, and facing Thornton's refusal to keep him on, expressed "their desperation and a search for different living arrangements" – unwittingly introducing yet another trigger for abandonment issues. Ex. 64 (Thornton School Records) at 70. Ironically, with his learning disability finally diagnosed and working one on one with Mr. Ruff, Chuck was earning all As for the first time in his life. But it was too late; the school had decided to send him away. *Id.* at 66.

<u>*Sent away to Homestead (Ages 16-17)*</u>

The alternative placement chosen for Chuck was The Homestead Project, Inc., a residential program located in Ellsworth, Maine, about three hours north of Saco. Homestead used extreme tactics like versions of corporal punishment and forcing students to wear color-coded jumpsuits to humiliate them for attempting suicide. *See* Ex 38 (Moretto Dec.) ¶ 10; Ex. 37 (Tilghman Dec.) ¶ 5.

---

[9] This note was in trial counsel's file, but, inexplicably, they did not even share it with their experts, much less share it with the jury.

19

Staff member Lou Moretto agrees that there was a "humiliating aspect" to many of the consequences meted out at Homestead. He recalls one child who was made to wear socks on his hands when he couldn't stop biting his nails, and a paper Pinocchio nose when he was caught in a lie. Ex. 38 (Moretto Dec.) ¶ 12. Steve Parks, a resident and friend of Chuck's who testified at trial but was dissuaded on the stand from sharing his full experience of Homestead because it was not what trial counsel wanted to focus on, felt that a consequences system called Intensive Work Program (IWP) was designed for humiliation. Ex. 39 (Parks Dec.) ¶ 18.

Former resident John Mandarelli, who also testified at trial and, like Steve, was cut off by trial counsel from speaking about his experience at Homestead, experienced an IWP punishment, and gives a visceral description: "the 35-pound bucket was full of rocks…[and] you had to walk it back and forth for hours, until you got blisters on your hands, and blisters on your feet from the moon boots they made you wear while you were doing it." Ex. 41 (Mandarelli Dec.) ¶ 5. Other IWP assignments included carrying a backpack full of bricks; building and taking down a rock wall; repeatedly digging a hole in the sand and filling it back in, sometimes with a spoon; and continually scrubbing by hand the same spot on the floor.[10]

---

[10] Trial counsel had Chuck's records from Homestead and, as noted, Steve Parks and John Mandarelli testified. But Mr. Duchardt did not ask them to talk about their experiences at Homestead – in fact he specifically directed them away from that topic – and he did not track down other teachers or students from Homestead despite Chuck providing names. An internet search would have revealed that Homestead had been under "steady fire . . . from the state Department of Mental Health and Mental Retardation's Bureau of Children with Special Needs" regarding "several controversial punishments" and its "philosophy which holds the children as being problems in themselves, rather than as products of difficult environments," was acquired in 1992 by the Wiley House Treatment Centers of New England, in an effort to solve fiscal problems and repair the program's reputation. *See* Bangor Daily News articles: "Homestead Project files suit after state withdraws contract" (June 23, 1990); "Nearly 20 hired to staff youth treatment facility" (December 4, 1991); "Treatment center has new owners" (February 13, 1992). Yet even though two witnesses who could have spoken to the culture of Homestead took the witness stand and other witnesses could have easily been tracked down, Mr. Duchardt presented no information about Homestead's questionable practices.

20

Chuck was assigned to a therapy group facilitated by social worker Patricia (Pat) Bousquet. In a report dated November 18, 1987, after he had been there almost four months, she noted that he "appears very sensitive to issues of family fighting, loss and abandonment, and parental alcohol use." Ex. 65 (Homestead Recs.) at 8. Eight months later, Ms. Bousquet documented little progress:

> Chuck has recently been involved in some family therapy sessions while on home visits and has gone on 2 extended family trips. Chuck has voiced displeasure here at how the therapy sessions have gone, but has not dealt directly with those involved. In [Homestead group therapy], Chuck has been reluctant to examine feelings toward family members, despite group pressure to do so. He is currently feeling that a return home not [sic] what he wants, but has no definite alternate plan. Chuck has not sufficiently addressed the issue of his adoption, nor his feelings about it, to the best of my knowledge.

Ex. 65 (Homestead Recs.) at 12. Ms. Bousquet's final assessment of Chuck's progress in this area is similarly disheartening: she notes that, despite his parents' support, he still "tends to keep [them] at a 'safe' emotional distance."

A second therapeutic issue in Chuck's Homestead treatment plan was "Confusion over sense of self and sexual identity." Ms. Bousquet's strategy on this front was to get Chuck to talk about the issue in group therapy and in family counseling. With no individual therapy offered, it is unlikely that a teen boy would disclose his sexual abuse in a group with other teens. Given that Chuck was doing his best to forget that he'd ever been molested, it is no surprise that this treatment goal was unmet as well. Ms. Bousquet's initial assessment was that he had "barely started" to address it four months into the program, a reality she saw reflected in his tendency to "follow[] others into negative behaviors or attitudes as a way of gaining acceptance, rather than thinking for himself." Ex. 65 (Homestead Recs.) at 29. He was no further along at the time of Ms. Bousquet's final assessment:

> Chuck is still very insecure about who he is and what he wants from relationships with others. He continues to keep friendships superficial, to do little emotional investing, and

21

to stay "a loner" in many respects. He is very reluctant to explore [his identity], and may choose to drift in and out of relationships for some time to come.

Ex. 65 (Homestead Recs.) at 73.

Though Ms. Bousquet noted red flags in Chuck's behavior that could have led to an empathetic exploration of what was bothering him, she was apparently not an empathetic person. Fellow staff member Lou Moretto recalls:

I overheard Pat one day yelling at a girl who had refused to go to class. Pat told the girl she better get her "fucking fat ass" over to where she was supposed to be. Even one swear word could get a kid put on restriction, and yet here was one of the therapists – the head one! – swearing at a kid, with no consequences.

Ex. 38 (Moretto Dec.) ¶ 19. Resident Bonny-Sue (West) Curtis offers a particularly blunt assessment: "Pat Bousquet . . . was a bitch. She was cranky and mean." Ex. 40 (Curtis Dec.) ¶ 5; *see also* Ex. 89 (Smith Dec.) ¶ 8.

Chuck's Homestead records are replete with staff comments about what they perceived as manipulative and passive-aggressive behavior. They were unaware of Chuck's victimization at SMS, but it is easy to see that his behavior was aimed at keeping his truth well hidden, even from himself. Being "extremely subtle and difficult to pin down," Ex. 65 (Homestead Recs.) at 27, being disrespectful, making "hurtful comments of a sexual nature" to his peers, "often becom[ing] impatient, sarcastic, and openly critical of others," *Id*. at 49 – all of these actions would tend to cast him as more in control of situations than at anyone's mercy.

Chuck made little progress but aged out of Homestead. The problems consistently documented throughout his treatment at Homestead remained mostly unresolved.

*Young Adulthood back in Maine (Ages 17-25)*

Returning to live with his parents after Homestead, Chuck initially stuck to his discharge plan. He earned his GED in May and cycled through unskilled jobs with a snowmobile

22

dealership, a radio station, an amusement park, and finally a security company. But by the fall of 1989 and into the winter of 1990, burglary charges began piling up against him. He bounced in and out of the York County Jail, until he entered a plea in November 1990 to a combination of charges that yielded a sentence of three years with eighteen months to serve. He was sent to the Maine Correctional Center in Windham, Maine, at nineteen years old.

Released after serving less than eighteen months, he split his time between Saco and Portland, Maine, a bigger city twenty miles north. The draw in Portland was a friend, Rick Tayman, to whom Chuck had been introduced by a Homestead acquaintance. Rick describes Chuck as "a follower. Anything we got into was my idea; Chuck was always just along for the ride…He was like a nerdy guy who wanted people to like him." Ex. 42 (Tayman Dec.) ¶ 4. What they "got into" was yet more burglaries, including one that got them both arrested in Portland in September 1991. Though Chuck continued to commit other burglaries on his own closer to home, Rick still carries guilt about their joint arrest, because "the cops pressured me to blame Chuck for everything, and I did. I still feel really bad about that to this day, because I knew then and I know now that I was the real mastermind, and yet I only got probation while Chuck ended up serving some time." Ex. 42 (Tayman Dec.) ¶¶ 8-9.[11]

Rick attributes his lesser sentence to the fact that his family supported him and hired a high-powered Portland defense attorney. *Id.* ¶ 9. Not long after Chuck and Ricky's arrest, Charles and Dorothy moved to Florida. As Charles explained at trial, Chuck's criminal activity "was bad on both our nerves," such that they wanted to remove themselves from any connection

---

[11] Trial counsel was aware of Chuck's prior criminal history but never spoke to Rick Tayman.

to it. Chuck once again pleaded guilty to consolidated charges in York County and received a five-year sentence with three to serve.

Not long into his sentence, abdominal pain, vomiting, and weight loss led to a colon study at the Mid-Maine Medical Center. When the symptoms persisted, a doctor who performed a colonoscopy noted suspicion of Crohn's Disease; four months later, in March 1994, another doctor sent him for an official Crohn's evaluation. Ex. 91 (Social History) at 34.

As all this was happening, Chuck suffered two hand injuries, both requiring surgery, and twice requested to be removed from dorm housing. The reason he gave his caseworker for the first request was "because of hand and his youth" (he was 22). Ex. 91 (Social History) at 34. The second time, he presented at the mental health unit, requesting a bed there because he couldn't sleep in the dorm. While there are very few details about either injury or re-housing request, in conjunction they raise the question of whether Chuck was being harassed, or worse, by older prisoners, or whether he'd realized that he simply did better when he was isolated from others. In any case, his housing request was not accommodated. He was released from the state prison at Thomaston on May 3, 1994. *Id.*

Barbara Oettinger, a friend of Michelle's who was legally blind, took up with Chuck, despite being more than 20 years his senior. Together they ran a farm and cared for an older, developmentally disabled man. Chuck and Barbara married in November. Several months before the wedding, Chuck was in a motorcycle accident in New Hampshire. At the same time, Chuck's Crohn's worsened. In April 1995, his new doctor expressed concern that he had not been fully weaned off the steroid prednisone for over a year, finding his "inability to discontinue…during this time somewhat curious." Ex. 94 (Maine Dartmouth Recs.) at 66. The same doctor, who projected the eventual need for surgery, reiterated a week later that he was "concerned about the

24

long-term use of steroids." Ex. 94 (Maine Dartmouth Recs.) at 17. Surgery came sooner than later, in May 1995: a colectomy (partial to total removal of the colon, or big intestine) and an ileostomy (creation of a stoma, an abdominal surgical opening to collect intestinal waste into an external bag attached to the body).

Within a month, Chuck was reporting pain at the ileostomy site and symptoms of depression, including multiple uncontrollable crying spells a day. He was embarrassed when the bag attached to the ileostomy leaked. Based on these issues he was referred for a psychiatric consult in August 1995, which yielded a diagnosis of Major Depression.

In September, after Chuck's depression diagnosis, Barbara's therapist Dr. Richard Staples held a separate session with Chuck alone. At trial, he described Chuck's issues this way:

> He's then a 24-year-old man with the Crohn's disease, the unpleasant symptoms of the Crohn's disease itself…he had had a procedure that he dreaded, that was very uncomfortable, and he ended up with a port on his body through which waste material came out and he was very distressed…to have that happen at age 23 or 24 and face all of the concerns that it raises…

Tr. 05/22/14 at 4162. Chuck's presentation during what turned out to be his only individual session with Dr. Staples perfectly illustrates his coping mechanism of altering history to mask his feelings of powerlessness. He told Dr. Staples that he had graduated Thornton Academy with the fourth highest grades in his class and was headed to the University of California at Berkeley, but that his trajectory was disrupted by an arrest for aggravated assault for avenging the sexual molestation of a friend's four-year-old daughter. Chuck described the invented assault for Dr. Staples in detail. There was nothing even close to such an incident in Chuck's criminal history up to that point, so it is not hard to imagine that the predator in his mind while telling Dr. Staples this story was none other than Jerry Mintz, while he recast himself in the image of an innocent four-year-old girl and her avenger. As Dr. Staples further testified at trial, Chuck described to

25

him, "periods of really dramatically increased anger and that he felt that his anger would get the best of him, would overwhelm him." Tr. 05/22/14 at 4169.

Dr. Staples, however, did not have a full picture of Chuck when he testified about their single individual session at trial. Having now reviewed former students and staff members descriptions of SMS, Dr. Staples now notes that they "describe an environment sorely lacking not only in safety, but in structure. Even setting aside the trauma of sexual abuse, the Shaker Mountain School was one of the worst places Mr. Hall could have gone at that particular time in his life." Ex. 43 (Staples Dec.) ¶ 9. And of course, "he was traumatized there on top of it." *Id.* ¶ 10. "The result of this 'double whammy' was severe traumatic impairment of a normal developmental progression in a child already at a disadvantage because of his energy and attention issues." *Id.* ¶ 11. Had he known this information, Dr. Staples "would have been able to view [Mr. Hall's] made-up stories as a version of the way he had wished things had been, so much so that he believed it himself, particularly with regard to the tale of assaulting his friend's daughter's abuser, as perhaps verbalizing as reality a fantasy he had in reaction to his own unaddressed molestation." *Id.* ¶ 13.

By February 1996, Chuck was deeply distressed and desperate to have his surgery reversed. His doctor noted that he was no longer living with his "ex-wife" Barbara. Ex. 94 (Maine Dartmouth Recs.).

While things with Barbara were falling apart, Chuck had begun a relationship with a woman named Ruth Mattson. Even in her frustration with aspects of their relationship, Ruth was sympathetic to what she called Chuck's "self-consciousness" surrounding the reality of his Crohn's. Tr. 05/22/14 at 4152. Ruth also told the FBI that Chuck's Crohn's flare-ups "broke his spirit," causing him to "cry like a baby." Ex. 79 (Mattson 302) at 3.

26

The extent of his shame and sensitivity further reveals itself in the histories he provided to various medical providers just after his surgery to reverse the ileostomy on April 5, 1996. He informed one provider that the reason for his original surgery was that he'd been shot in the abdomen. The next day, he told another provider that he'd been stabbed. It was almost as if he was manifesting a more dashing explanation for his painful and humbling circumstances. But the real truth – that he had a particularly unpleasant and humiliating chronic condition – was inescapable. Almost two months after the surgical reversal, the site of his stoma was still draining excessively. In August 1996, an endoscopy showed recurrent Crohn's.[12]

*Permanent Incarceration (Ages 25-53)*

After Chuck was arrested on September 18, 1996, in Winslow, Maine, for his fifth burglary that month, the Kennebec district attorney requested revocation of his existing probation in Cumberland County. It was, unbeknownst to him, the last time Chuck would see the free world.

Chuck went to Downeast Correctional Facility. He did not settle in easily. Within six months, he'd requested placement in administrative segregation because he was "stressed out over his medical problems." Ex. 91 (Social History) at 38. He then requested transfer to Maine Correctional Center, in part because "I'm having difficulties with a few people here who seem to be going out of thier [sic] way to try to make my time here more stressfull [sic] and dificult [sic]." *Id.*

Five days later, on June 6, 1997, he attempted suicide by cutting his wrist with a razor. He was disciplined for Bodily Injury (to himself) and his security level was increased from

---

[12] Although Mr. Duchardt made Crohn's a centerpiece of his mitigation case and had Chuck's medical and prison records, he presented nothing close to this level of detail about Chuck's struggles with Crohn's.

Medium to Maximum. According to the incident report, an officer saw Mr. Hall standing with his arm over the sink, having cut his wrist. *Id.*

Just over a month later, he was transferred to Maine Correctional Center. Things did not go markedly better there. He had a Crohn's flare-up, suffered multiple injuries to his hands, head, and back, and appears to have experienced several panic attacks. The latter two circumstances were potentially related to a situation which prompted him to send a letter to another prisoner seeking information about someone "running his face" about Chuck, which resulted in a disciplinary ticket for extortion. *Id.* In December 1997, he was placed on administrative segregation "as a result of his safety concerns." *Id.*

In January 1998, his Crohn's symptoms were escalating. Chuck reported that urine had been thrown into his cell in general population, and that he'd prefer to remain in segregation until he was transferred back to Thomaston "because he has a lot of things happening right now." *Id.* at 39. When released from segregation, he incurred physical injuries to his hands and head, which he attributed to accidents, but which correspond suspiciously with his return to general population.

His next action seems calculated, if subconsciously, to gain some internal sense of control in the face of his distress, to once again present himself as someone more powerful than he was. On July 16, 1998, he mailed a letter from the prison to Maine U.S. District Court Judge Gene Carter, in which he disparaged the "piss poor" legal system that federally convicts low level marijuana dealers "while pieces of shit who rape kids get state or county time." He opined that prosecutors and judges were "scum bags [who] should have [their] balls cut off for allowing these scums to violate children again and again." He did not attempt to disguise his name or

address, and ended the letter advising that the judge could "take this as a threat if you'd like, but if you don't take me serious [sic] you'll look stupid in the end." *Id*. at 39.

Again, it is not hard to imagine that the real "scum bag" abusing children in Chuck's mind was Jerry Mintz.[13] He sent two more similar letters to Judge Carter over the next week, both in his own name, and then sent a letter addressed to "Justice Dept., C.E. Dept.," which named target locations including the federal courthouse in Portland and the Bush family compound in Kennebunkport, among others. The letter warned that "everything is in place to do what I feel is necessary in order to get my point across," adding that the fact of his incarceration should not "lead you to believe that I am unable to accomplish things in the 'free world.'" *Id*.

In late August 1998, Chuck was transferred to the Special Management Unit in Warren, Maine. Chuck began reporting stress, culminating in a note to the Mental Health unit advising that:

> I'm dealing with a stressful situation that is beccoming [sic] more of a black cloud above me as each day passes. With each passing day I feel myself falling further and further into a depression, that I fear I may never be able to fully climb out of. As I fall deeper into this depressive state of mind, I find myself going down a path of self-destruction. I'm not saying I'm suicidal. Please don't think that, because I'm not. I just find myself not carring [sic] about anything anymore. I fear the longer I hold out and try to deal with this alone the worse this depression will get.

*Id.* at 39-40.

He was then transferred to the Cumberland County Jail in Portland to plead guilty to charges pertaining to the Judge Carter letters. On December 1, 1998, from the jail, a bomb threat to the Portland ATF office was called in from his unit. *Id.* at 40. The next day, jail staff described him as tired, with bloodshot and droopy eyes. *Id.* He reported not having slept for three days and

---

[13] Of course, trial counsel knew about these letters, as they were a centerpiece of the government's penalty phase case against Chuck. But they had no idea that Chuck had been sexually abused, so were unable to contextualize Chuck's anger or poor decision-making.

indicated a desire for medication for depression. *Id.* He was placed on sleep watch, with a plan to add him to the "pysch [sic] list." *Id.* During those six days, Chuck reported being "upset + angry[,] stressed, anxious, thoughts are running 90 miles/hr." *Id*. He agreed to not harm himself, but was "weepy" and reported difficulty sleeping. *Id.* On January 19, 1999, he was sentenced in federal court to 43 months for the letters to Judge Carter, consecutive to his existing state sentence. *Id.* Two days later, he was transferred back to prison in Maine to continue serving that state sentence. *Id.*

He sent a letter to Maine U.S. Attorney Jay McCloskey inquiring about the status of the ATF bomb threat investigation. Just as when he received no response to his letters to Judge Carter, his behavior escalated when he did not hear back from Mr. McCloskey – when he was treated, he felt, as if he did not exist or did not matter. He sent at least twelve increasingly threatening letters to parties involved in the investigation, always identifying himself. *Id.*

Throughout the time he was sending the letters, he reported excessive stress and experienced an exacerbation of his Crohn's symptoms, including prednisone-induced acne on his face, neck, back and chest that "not only is…embarrassing, but it's painfull [sic]…I'm constantly bathing." *Id.* at 41. He also, seemingly paradoxically, pursued release from administrative segregation, which was denied at least twice, with notation by the hearing committee of continued threats to his safety. *Id.*

Upon arrival at his first federal facility, during a psychiatric consult, he complained of anxiety and insomnia, referencing a friend's suicide in the Cumberland County Jail, and Crohn's symptoms. *Id.* He was placed in the SHU (Special Housing Unit). At a follow-up psychiatric consult on November 10, 1999, the doctor found him "anxious and drawn" with constricted affect, his "face . . . covered with a rash and pustules." *Id.* Chuck disclosed that he was "worried

30

that he might loose [sic] control and hurt someone." *Id.* The doctor suggested consideration of transfer to a medical facility. *Id*.

On November 11, he was indicted on eleven federal counts related to the bomb threats and additional letters. He reported increased stress and Crohn's symptoms, and then reported threats and abuse by three C.O.'s, including a hand injury and saliva in his food. Before any of this could be addressed, he was sent back to the Cumberland County Jail to face the new indictments. He arrived there in early December 1999. *Id.*

His agitation rose exponentially over his time at Cumberland County, where he was put on psychotropic medication to control it. He was also back on prednisone to treat Crohn's. He told a medical provider on March 16, 2000, that he "just d[id]n't want to feel so angry and uptight all the time," but his agitation persisted. His Crohn's symptoms worsened. *Id.* at 41.

In the midst of all this, he managed to marry for a second time, to Mary Louise Blakeney, another prisoner at Cumberland County who he met during his time there. Three days later, Chuck was hospitalized outside the prison for severe abdominal pain, where he ultimately had surgery to create a new ileostomy, this time with the additional step of completely excising his internal sphincter and distal rectum and closing the external sphincter with sutures. He struggled with pain over the next two months, regularly expressing anger and irritation, until his lawyer requested transfer to a medical facility and a continuance for his trial in July 2000. He was sent to FMC Devens, where he stayed for three months until being recalled to Cumberland County for trial. He pleaded guilty on November 13, 2000, to one count of Mailing Threatening Communications pursuant to a sentencing agreement of 151 months, consecutive to the first federal sentence. Now, Chuck had a federal sentence of 194 months consecutive to his Maine prison sentence based entirely on threats he had absolutely no ability to carry out. After

31

sentencing, he was transported to prison in Maine to finish out his state sentence. Crohn's continued to dog him, eventually leading to a revision of his ileostomy in November 2003 and another in March 2004. *Id.* at 42.

He completed his state sentence and was transferred to FCI Fairton in June 2004. He experienced complications with his ileostomy within months of his arrival and was unwell through the rest of the year. *Id.* He arrived at FMC Rochester in August 2006. Though he now had access to consults and treatment at the Mayo Clinic, his medical situation was the same, and in October 2006, yet another ileostomy revision was performed. Post-surgery, he was noted to be very depressed. *Id.* at 43.

He was assaulted by another prisoner "all because of [his] ostomy bag." *Id.* He requested to talk to someone because; "I've been depressed about my medical condition and now I've got these guys giving me a hard time about it." *Id*. He reported that he had recently suffered a leakage event from his ostomy bag in the chow hall. On November 16, 2006, he attempted to hang himself with his ostomy strap. *Id.*

He was placed on suicide watch and referred to BOP psychiatrist Daniel Shine. In treatment, he continued to express embarrassment related to leaking stool and other prisoners' awareness of it. He described a history of depressive and manic symptoms, based upon which Dr. Shine gave a working diagnosis of Bipolar II. Chuck also disclosed, as he had previously at FCI Raybrook in 1999, that he worried he may hurt someone. He raised this concern again in May and June of 2007, stating in May that he was "full of anger" and requesting a mood stabilizer, and in June that, mental health issues notwithstanding, he was "sick of FMC and will do whatever it takes to get transferred." *Id.* He specifically requested a transfer to a United States Penitentiary (USP). *Id.*

32

On November 14, 2007, he attempted suicide again, this time by an overdose of aspirin. When he was revived, he expressed regret that his attempt had failed. He was started on antidepressants, and Dr. Shine redesignated him from the medical unit, where he was receiving mental health care on an outpatient basis, to the mental health unit, where he could receive, as Dr. Shine related at trial, "more aggressive, more focused treatment for his depression." Tr. 05/13/14 at 2491.

On January 12, 2008, Chuck reported leakage from his ostomy bag. On January 21, another mental health prisoner named Walter Bonin accused Chuck of attacking him. Chuck initially denied it. He presented with terse speech, constricted affect and depressed mood at a meeting with Dr. Shine on February 6, and also reported auditory hallucinations. Ex. 91 (Social History) at 44.

On February 21, a month after Mr. Bonin made his accusation, Dr. Shine received the following letter from Chuck:

> As you know I've been having thoughts of hurting others. Well, last night was that way as well, only it was more intense. I was thinking more along the lines of killing someone. While having these thoughts I became sexually aroused and my mood actually raised. For the first time I actually felt happy. Therefore, I decided that maybe that's what I should do . . . As you know I've been charged with assault. That wasn't my intent, just to punch him. What was called a headlock wasn't accurate. What actually took place was I wrapped my hands around his throat and squeezed. My intent was to choke him to death. But he was able to get out of my grasp and ran out of the room. If it wouldn't have been him it would've been someone else. My intent then was to kill someone not just assault. And to be honest with you, if I was on the open unit today, that would be my intent and goal.

*Id.* Bonin suffered a scratch. Ex. 67 (Hall BOP Recs.) at 8.

Chuck was moved back to FMC Devens on June 10, 2008. In September 2008, he once again developed problems with the ileostomy after being hit in the side by a soccer ball, resulting in persistent bleeding. FMC Devens eventually determined that they were unequipped to manage

33

the issue, so he was sent to an outside hospital. On October 8, 2008, he underwent surgery for his fourth ostomy revision. On October 17, after his bed was discovered covered in blood from an ostomy bag that had burst open, he was sent back to the hospital. *Id*. at 45.

Ten days post-surgery, Chuck was discovered semi-unresponsive and sent out for treatment yet again. He had attempted suicide for a fourth time, this time with an overdose of Tylenol. While being treated for the overdose, he experienced more bleeding from his stoma as well as blood in his urine, and required a blood transfusion. As he had after his first overdose, he expressed regret that the second attempt had also failed, as well as embarrassment about other prisoners seeing him manage his ostomy. *Id.* at 45.

The bleeding continued, debilitating and discouraging him to the extent that he could no longer contract for safety. The months that followed featured persistent abdominal pain and depressed mood, until, after many years of no communication with his parents, he reconnected with them. The reconciliation in May 2009 gave Chuck a new lease on life. He reported that suicide was no longer an option – "I know one thing for sure, the suicide stuff, I am all done with [sic], I don't want to disappoint my parents again" – and that he wanted to be released to Maine (where they had returned from Florida) so he could care for his parents. *Id.* at 46. His physical health, however, did not similarly improve: in June, he suffered another resurgence of Crohn's, which led to another revision and relocation of his ileostomy. Despite pain during recovery from the surgery, he continued to maintain a more positive outlook for several months.

In September, he began to experience agitation and insomnia, as well reporting again a recurrence of auditory hallucinations. On October 27, 2009, he arrived at United States Medical Center for Federal Prisoners (USMCFP) Springfield. *Id.* Throughout November, he reported abdominal cramping and bleeding at the ostomy site and then auditory hallucinations. On

34

December 9, 2009, he was voluntarily admitted into an inpatient mental health treatment unit. He reported to psychiatrist Patrick Gariety that his primary goal was to "find a way to control his negative affect so he can eventually function in a normal prison setting without difficulty." *Id*. But before he could do any real work to that end, on January 2, 2010, he experienced uncontrolled bleeding from his ostomy and was sent to the hospital in an ambulance. The bleeding resumed on and off over the next ten days after his return to USMCFP. *Id*.

Note was made "of possible skin breakdown around the stoma site." Ex. 7 (Steinhart Rpt.) at 11. "This type of skin breakdown can be very painful and difficult to manage and can lead to difficulty maintaining a proper fitting appliance over the stoma in order to collect the stool. This typically leads to leakage of stool onto skin and further skin breakdown and pain." *Id*. "The stool that comes from an ostomy contains digestive enzymes which are very irritating or corrosive to the skin surface. As a result, leakage caused by ostomy retraction or protrusion typically results in uncomfortable skin rashes and sometimes complete breakdown of the skin around the ostomy site." *Id*. at 10. "Not surprisingly, this leakage of stool also leads to unpleasant and embarrassing smells." *Id*. at 11.[14] And indeed, stool leakage onto Chuck's bed prompted teasing from fellow prisoners.

On January 11, 2010, Chuck expressed his concerns that "it would be difficult for him to live in an open unit where he had to deal with teasing about his medical issues." Ex. 67 (Hall BOP Recs.) at 17. Despite this concern, the same document also notes that Mr. Hall was housed in an "open unit." *Id*. The following day, January 12, 2010, St. John's Hospital performed ileostomy revision surgery – Chuck's seventh – and the next day he began the prednisone regimen that he remained on through January 26, 2010, the date of the homicide. Ex. 91 (Social

---

[14] Trial counsel did not have a Crohn's specialist testify.

35

History) at 46-47; Ex. 6 (Agharkar Rpt.) at 13-14. Prednisone, which Chuck was on the date of the homicide and nearly continuously for over fifteen years before that, is known to cause mania, rage, irritation, anxiety and insomnia. Ex. 6 (Agharkar Rpt.) at 13-14; Ex. 7 (Steinhart Rpt.) at 11.

Chuck has continued to suffer from serious health problems, surviving cancer in 2017 and having additional bowel surgeries. Ex. 6 (Agharkar Rpt.) at 13. He suffers from degeneration of his hip joint, likely due to prolonged use of prednisone to treat his Crohn's disease. Ex. 7 (Steinhart Rpt.) at 7. In 2022 he spent most of the year in a federal medical facility, FMC Butner, due to his need for lifesaving nutrition through a port in his chest, as his bowel was not absorbing adequate nutrients to sustain life. Ex. 6 (Agharkar Rpt.) at 13. While at FMC Butner, he was found unresponsive in his cell and sent to an outside hospital's ICU, where they determined he was in septic shock. Although he survived sepsis, his health remains precarious, as no cure exists for Crohn's disease. Ex. 7 (Steinhart Rpt.) at 5. He has zero conduct violations in the fourteen years since the homicide. Ex. 8 (Baird Dec.) ¶ 32.

### III. PROCEDURAL HISTORY AND EVIDENCE PRESENTED AT TRIAL

On April 7, 2010, Mr. Hall and co-defendant Wesley Coonce were charged with the January 26, 2010, death of a fellow prisoner, Victor Castro-Rodriguez. Dkt. No. 1 (Indictment); *see also* Dkt. No 59 (Superseding Indictment). The three men were housed together at the USMCFP in Unit 10-B, an open unit in the mental health ward. Mr. Hall was housed in the mental health ward because of a recent suicide attempt.

#### A. Pretrial proceedings

On April 23, 2010, Attorney Darryl Johnson, Jr. was appointed to represent Mr. Hall. Dkt. No. 11. Initially, Stuart Huffman served as Mr. Johnson's co-counsel. Dkt. No. 11. When

Mr. Huffman withdrew the following year citing a conflict of interest, Mr. Johnson's wife at the time, Lynn Johnson, joined her then-husband as co-counsel. Dkt. Nos. 11, 54, 55, 56, 58.

As part of the DOJ's process to determine whether to seek the death penalty, Mr. Hall's attorneys had the opportunity to present to the Capital Review Committee, which advises the Attorney General. This presentation is an opportunity for the defense to argue why the government should *not* seek the death penalty. However, Mr. Johnson informed the Committee that Mr. Hall wanted the death penalty. Despite Mr. Hall's prior suicide attempts and struggles with mental illness, Mr. Johnson did not seek a mental health evaluation before telling the Committee that his client wanted the death penalty. Having been told that Mr. Hall wanted the death penalty, on July 22, 2011, the government gave formal notice of its intent to seek the death penalty against both Mr. Hall and co-defendant Coonce. Dkt. No. 62.

In 2012, Darryl and Lynn Johnson withdrew from representing Mr. Hall because Mr. Johnson was facing his own criminal charges and state bar disciplinary proceedings. Dkt. Nos. 183, 184; Kathee Baird, *Springfield Attorney Facing Serious Sex Charges*, The Crime Scene (June 28, 2012), https://tinyurl.com/a9ny54r7; *see also In re: Darryl B. Johnson Jr*, Order (March 25, 2014), https://www.courts.mo.gov/page.jsp?id=71476. On August 21, 2012, Frederick A. Duchardt, Jr. replaced Mr. Johnson as Mr. Hall's lead trial counsel. Dkt. No. 185. The court appointed Robert D. Lewis as co-counsel. Dkt. No. 186. When Lewis became ill, Michael Walker joined the team. Dkt. No. 455.

In December 2012, Mr. Duchardt moved for severance of both the culpability phase and penalty phase. Dkt. No. 223. Mr. Coonce's counsel had previously moved for severance, but that motion had been denied. Dkt. Nos. 111, 152. The trial court denied Mr. Hall's motion to sever the culpability phase. Dkt. No. 678. The trial court also indicated that if the parties wanted

37

separate penalty phases, the court would grant the motion to sever the penalty phase. Tr. 05/02/14 at 1150. Yet Mr. Hall's trial counsel withdrew the motion to sever the penalty phase. Dkt. No. 742. The court decided to hold a joint penalty phase. *Id.* Mr. Hall's witnesses were interspersed with witnesses for Mr. Coonce and some witnesses, such as government expert Dr. Park Dietz, took the stand to testify against both Mr. Hall and Mr. Coonce.

On April 4, 2014, just twenty-four days before jury selection began, Mr. Duchardt filed a motion seeking funding for brain imaging. Dkt. No. 635. The motion did not explain why brain scans were necessary, except to say that mental health experts determined that further testing was needed to "judge the kind and severity" of what they believe to be brain "abnormalities." *Id.* at 3. The motion failed to explain that already-completed neuropsychological testing indicated that structural anomalies would likely be observable in brain imaging. On April 7, 2014, the trial court held a telephonic conference on the motion. The conference was *ex parte* but on the record.[15] The record reflects that at the outset of the hearing, the trial court stated, "I'm concerned with the timing of this…here we're three weeks from trial; and if we were to go forward with this, there's an awful lot that needs to be done yet." Ex. 12 (Tr. 04/07/14) at 2. The trial court denied the motion and no brain scans were performed prior to trial. *Id.* at 7; Dkt. No. 644.

**B. Trial**

Jury selection began on April 28, 2014. After five days of testimony, both Mr. Hall and Mr. Coonce were convicted of murder. The bulk of the evidence against Mr. Hall came from his own statements. Evidence showed that Mr. Hall and co-defendant Coonce entered Mr. Castro-

---

[15] Undersigned counsel requested the Court Reporter transcribe the conference in 2022. Ex. 12.

Rodriguez's cell with him, tied him up with medical tape and shoe laces, and stomped on him. He died. Surveillance footage shows the three men entering the cell and Mr. Hall and Mr. Coonce leaving but does not show what happened inside. Lieutenant Jayson Relvas and Unit Manager John Roberts testified that Mr. Hall waived them down and confessed to the killing. Tr. 05/01/14 at 858-60 (Relvas testimony); Tr. 05/02/15 at 954 (Roberts testimony). Mr. Hall described his involvement in detail to FBI Special Agent Rick McClain, who prepared a typewritten statement that Mr. Hall signed. Trial Ex. 211. The jury heard that, in the months following the homicide, Mr. Hall made additional unprompted statements to investigators taking sole responsibility. Tr. 05/06/14 at 1492-94 (McClain testimony); Tr. 05/05/14 at 1196-99 (Ramos testimony). Mr. Hall talked openly about the homicide in letters to family and friends. Two inmates from the United States Federal Medical Center at Butner, North Carolina, testified that, while housed there months later, Mr. Hall had described the killing in detail. Tr. 05/05/14 at 1412-13 (Durant testimony); Tr. 05/06/14 at 1452-57 (Wright testimony). Various USMCFP staff members also testified that in the hours and days following the homicide, Mr. Hall continued to voice thoughts of killing. In a letter to Captain Greg Baysinger, Mr. Hall pleaded with him to take his urges seriously and to put him in a cell without human contact. Trial Ex. 86.

In the penalty phase, Mr. Hall's trial counsel relied on familial love and stories about Mr. Hall's positive attributes to try to convince the jury to spare his life. He attempted to present this evidence mostly through people who had not seen Mr. Hall in many years. Counsel called fifteen witnesses to testify in the penalty phase, ten of whom testified by video.[16] Critical mitigation witnesses who testified by video were unable to even identify Mr. Hall in court.

---

[16] Mindy Graham, John Mandarelli, Michelle Bories, Steven Parks, Ruth Mattson, Dr. Richard Staples, Ronald Harnish, William Flynn, Michael Tausek, and Dr. James Kennedy

The only witnesses who knew Chuck as a child – his father, mother, and sister Michelle – testified to what the government's expert Dr. Reardon called his "fairly unremarkable upbringing" and what trial counsel referred to as a childhood full of "blessings" which was "sure darn good." Tr. 05/23/14 at 4418; Tr. 05/07/14 at 1778-79.[17]

Chuck's sister Michelle testified via video that as children she and her brother – nicknamed "Bumbles" – were inseparable. She described her parents as loving and hardworking and said that they wanted for nothing. Tr. 05/22/14 at 4088-90. She also told the jury that while Mr. Hall had been incarcerated almost the entirety of his adulthood and she had not seen him in eighteen years, she still loved him. Tr. 05/22/14 at 4101, 4109-10. Chuck's father, Charles V. Hall, offered anecdotes about his son's love for animals and children, talked about his artistic talent, and expressed that he loved him "[w]ith my whole heart." Tr. 05/23/14 at 4389-91. Before the trial, Charles had also not seen his son in over twenty years. Tr. 05/23/14 at 4387.

Chuck's mother Dorothy Hall testified about her desire for more children after having her biological daughter Susan. Dorothy and Charles adopted Michelle and then "Chuckie" in quick succession. Tr. 05/23/14 at 4313. She described an idyllic childhood where she stayed home with the young children and kept careful watch. *Id.* at 4315, 4318-19. She said that once they reached their teen years, Michelle and Chuck became challenging to control. *Id.* at 4337. After difficulty at the Saco Public Schools, Chuck was sent away to Vermont to the Shaker Mountain School,

---

testified by video. Kenneth Daugherty, Dr. Robert Fucetola, Dorothy Hall, Charles V. Hall, and Dr. John Wisner testified in person.

[17] Dr. Reardon testified, "From what I can gather from the records, his parents made multiple efforts to get him various treatment throughout his adolescence . . . and he was afforded numerous accommodations throughout that time both for his academic performance as well as counseling to aid with his behavioral problems. Unfortunately, none of those were particularly successful in helping him to conform his behavior during that time . . ." Tr. 05/23/14 at 4418.

40

initially living with Susan in Burlington. *Id.* at 4340-41. After a year, he returned to Maine. *Id.* at 4341. After Chuck returned from Vermont, his behavior spiraled. Tr. 05/23/14 at 4397-98

Dorothy then testified that she loved Chuck deeply but felt she could not do much to help him. Of Chuck and Michelle, she said, "[t]heir father and I were looking for that magic button, to find somebody that would press that magic button and straighten them out." Tr. 05/23/14 at 4352. Trial counsel concluded this line of questioning by stating, "[a]nd you did it all, right?" to which Dorothy responded, "I did what I – what I could." *Id.* at 4353. Yet Dorothy also testified that soon after Chuck turned eighteen, she and Charles relocated to Florida and they had not seen their son in person since his incarceration. *Id.* at 4366. Trial counsel did not try to explain the disconnect between Dorothy's and Charles's expression of unconditional love for Chuck and not seeing him in so many years, except to suggest that it was because "he's [Chuck] disengaged from you [his parents]" which was "[n]ot your choice, his choice?" *Id.*

Two of Chuck's friends also testified. Tr. 05/22/14 at 4068-77; Tr. 05/22/14 at 4126-30. John Mandarelli had known Chuck as a teen and had also spent time with him in prison. Mr. Mandarelli was incarcerated for violent crimes at the time he testified by video. He testified about Chuck's loyalty and friendship. Steven Parks, who also testified by video, also talked about Chuck's loyalty and friendship, although he was unable to identify Chuck by the video link and had not been in contact with him in twenty years.

The jury also heard testimony from individuals who played music with Chuck while they were incarcerated together at Maine State Prison. Tr. 05/22/14 at 4187-99. Ronald Harnish, who at the time of his testimony was on home confinement after serving twenty-seven years in the Maine State Prison for murder, also testified by video. He met Chuck in Maine State Prison teaching music. He discussed a VH1 special Music Behind Bars that featured Chuck, William

Flynn, and Mr. Harnish. *Id.* at 4189. Mr. Flynn also testified about playing music with Chuck. *Id.* at 4195. He mentioned that Chuck struggled with medical issues and that all of his interactions with Chuck were positive. *Id.* at 4196-97.

A former girlfriend of Chuck's, Ruth Mattson, also testified by video. Tr. 05/22/14 at 4133-38. Through the video, she was unable to identify Chuck; she had had not seen him in person for "many years" and said she did not recognize him. *Id.* at 4133. She testified about their romantic relationship. She discussed Chuck's poetry and art, and explained that she ended their relationship because he kept telling small lies. She said that she believed that he lied because "he didn't like the person he was so he didn't think that I would like the person that he was so he tried to make himself out to be somebody different." *Id.* at 4137.

Trial counsel called Dr. Richard Staples, who had provided therapy to Chuck's ex-wife, Barbara Oettinger, and had worked with Chuck in several therapy sessions during the summer of 1995. Tr. 05/22/14 at 4160. Dr. Staples emphasized that he was providing therapy to Barbara, not Chuck, so his notes and recollections about Chuck were limited. *Id.* at 4161. He had one session with Chuck alone because "seeing them as a couple, it was increasingly coming to light that he had some really tough issues." *Id.* at 4162. By video, he testified that he saw the devastating effects of Chuck's Crohn's disease, including leaving him depressed, anxious, and distressed. *Id.* at 4168. He also noted Chuck's struggles with anger. *Id.* at 4169. Some of Dr. Staples's testimony touched on Chuck telling untruths, like claiming that he graduated from high school fourth in his class and was set to attend the University of California at Berkeley until he was arrested for beating two men who molested his friend's four-year-old daughter, none of which was true. *Id.* at 4164-65.

The jury heard testimony from prison and jail administrators and mental health professionals. Michael Tausek, the Deputy Warden of the Maine State Prison, testified by video. He did not know Chuck at all but authenticated the Music Behind Bars video. Tr. 05/22/14 at 4210, 4215. His testimony also touched briefly on prison culture. *Id.* at 4211-12. Dr. James Kennedy, a psychiatrist at FMC Devens, also testified by video. *Id.* at 4223. He testified that Chuck struggled with auditory hallucinations with voices telling him to hurt others and himself as early as 2008. *Id.* at 4227-28, 4236-37. He further testified that Chuck's attempted suicides in late-October or early November of 2006, 2007 and 2008, suggested trauma during this time of the year. *Id.* at 4246 ("It's not uncommon for someone to make an attempt on a particular time of year based on something that may have happened on that particular date in their past."). Mindy Graham, the health services administrator at CCA-Leavenworth, also testified by video about Chuck's Crohn's disease. Tr. 05/16/14 at 3063. During her testimony about his Crohn's symptoms she was interrupted by a bad video connection but she was able to testify that in the six months he was at CCA-Leavenworth, Mr. Hall had abdominal cramping and bleeding and had to be sent to the emergency room four times. *Id.* at 3064. She also testified that Chuck was "very respectful" in every encounter they had. *Id.* In the middle of several witnesses testifying for co-defendant Coonce, Kenneth Daugherty, Chief Unit Manager at CCA-Leavenworth, testified in person that Chuck had no disciplinary violations while he was housed at Leavenworth pre-trial. Tr. 05/19/14 at 3295. He also testified that Chuck was always respectful. *Id.*

Two mental health professionals retained by trial counsel testified, both in person. Dr. Robert Fucetola, a neuropsychologist, testified that Chuck exhibited deficiencies in visual memory and visual problem solving. Tr. 05/22/14 at 4256-83. He testified that his neuropsychological testing suggested impairments, making him wonder if the brain injury Chuck

43

suffered in a motorcycle accident was perhaps responsible. *Id.* at 4273-74. He began telling the

jury about the need for brain scans, but Mr. Duchardt cut him off. *Id.* at 4282-83 ("I found

evidence on the test of deficiencies . . . it wasn't clear to me exactly what the cause of those

abnormalities are. They are there . . . I cannot say for sure conservatively, but it is there and I

recommended – " Mr. Duchardt: "Let me stop you there."). He also noted that while Chuck's

mood and behavior were beyond the scope of his assessment, he did identify symptoms of

anxiety and depression. *Id.* at 4285.

Dr. John Wisner, a psychiatrist, testified that Chuck suffered from bipolar disorder,

chronic depression, and chronic hallucinations and diagnosed him with Antisocial Personality

Disorder (ASPD). Tr. 05/28/14 at 4790. Of the ASPD diagnosis, Mr. Duchardt said, "that's kind

of a fairly easy conclusion to draw; is that true?" *Id.* On cross-examination, Dr. Wisner said it

was correct that the ASPD diagnosis "is a very important aspect of the defendant's mental

status" and that, based on the ASPD diagnosis, it would be fair to consider Mr. Hall "a

psychopath." Tr. 05/28/14 at 4823, 4826.

Dr. Wisner also testified about Chuck's debilitating Crohn's disease, although he was not

a Crohn's specialist. He noted that Chuck had been prescribed prednisone and that Chuck was

persistent in his demands to be housed in seclusion because of his ostomy and thoughts of

harming himself or other people. Tr. 05/28/14 at 4741, 4803.

Finally, although he had no experience in prison administration, based on his experience

at psychiatric hospitals, Dr. Wisner opined that USMCFP staff failed to check on the individuals

housed in Unit 10-B frequently enough. Tr. 05/28/14 at 4797-804.

### C. Jury deliberations

The jury began deliberations on Friday, May 30, 2014. On June 2, 2014, the second day of deliberations, the jury sent three notes to Judge Fenner. Dkt. No. 808. They asked two clarifying questions, then sent the following note:

**United States of America v. Wesley Paul Coonce, Jr.; Charles Michael Hall**
10-03029-01/02-CR-S-GAF

**JURY'S QUESTION OR REQUEST**

The jury has the following question:

*We have reached a decision in regards to Defendant Coonce. But I feel with 100% certainty that we are unable to reach a unanimous decision in regards to ▬ Defendant Hall.*

The note reads, "We have reached a decision in regards Defendant Coonce. But I feel with 100% certainty that we are unable to reach a unanimous decision in regards to Defendant Hall." Dkt. No. 809.

The jury had previously been instructed: "[I]f you cannot unanimously agree whether the Defendants should be sentenced to death or life imprisonment without the possibility of release, the court will sentence the Defendants to life imprisonment without the possibility of release." Dkt. No. 807 at 42 (Jury Instruction 19). Yet Judge Fenner responded to the jury's note by instructing the jurors to continue deliberating.

Soon after, the jury returned verdicts sentencing both Mr. Hall and co-defendant Coonce to death. Dkt. Nos. 808, 810, 811, 812. At the end of the special verdict form, where the jury was

45

asked whether they determine a sentence of death shall be imposed on Mr. Hall, the jury checked

the "yes" box and the "no" box, crossing out the check on the "no" box:

### A.   Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed on
Defendant Hall.

YES ___✓___

NO ___~~✗~~___

If you answer "YES," the foreperson must sign here, and you must then proceed to
Section VII.  If you answer "NO," the foreperson must sign, and you must then proceed to
Section VI(B).
Foreperson

Date: __6/2__ , 2014

Dkt. No. 812.

### D. Sentencing, direct appeal, and appointment of § 2255 counsel

Mr. Hall was formally sentenced to death on July 18, 2014.

Mr. Duchardt stayed on as lead counsel for Mr. Hall's direct appeal, as did Michael

Walker. The appellate attorneys challenged Mr. Hall's sentence, raising challenges to the court's

decision to try Hall and Coonce together; challenges to some of the mitigating and aggravating

factors that were presented to the jury; and challenges to evidentiary rulings, including the

exclusion of Mr. Hall's comparative proportionality evidence, which offered information on

aggravating and mitigating factors. The Eighth Circuit affirmed Mr. Hall's sentence and the

Supreme Court denied certiorari on March 22, 2021. Dkt. Nos. 953-56, 966.

Mr. Duchardt also sought to represent Mr. Hall in § 2255 proceedings. Dkt. No. 965. This Court declined to appoint trial counsel to handle post-conviction proceedings and appointed undersigned counsel.

**E. Timeliness of this motion**

Pursuant to an agreement between the parties, which the Court acknowledged, this motion is timely filed. Under 28 U.S.C. § 2255(f)(1), the initial deadline for Mr. Hall to file his motion to vacate, set aside, or correct his sentences was March 22, 2022, one year from the date his judgment of conviction became final. The government agreed to waive any statute of limitations defense so long as Mr. Hall's § 2255 motion was filed by May 6, 2024. Dkt. No. 61 (Fourth Agreement Regarding Timing of Filing § 2255 Motion). The Court acknowledged the parties' agreement. Dkt. No. 62 (Court's Acknowledgement of Agreement). The parties made this agreement because of the extraordinary circumstances created by the COVID-19 pandemic. Dkt. No. 61. As this motion is being filed prior to the agreed-upon date of May 6, 2024, it is timely. *See Day v. McDonough*, 547 US. 198, 205 (2006); *Wood v. Milyard*, 566 U.S. 463, 472-73 (2012); *Martinez v. United States*, 423 F. App'x 650, 650 (8th Cir. 2011) ("While a district court may sua sponte consider the timeliness of a section 2255 motion, the statute-of-limitations defense remains a non-jurisdictional affirmative defense that the government may waive.").

47

# IV. CLAIMS FOR RELIEF

## CLAIM 1: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PENALTY PHASE

### Summary of claim:

Mr. Hall's trial counsel provided ineffective assistance. Perhaps most crucially trial counsel failed to conduct a thorough life history investigation, and thus had no idea that Chuck was a victim of repeated sexual abuse as a child. However, failure to conduct a thorough life history investigation was far from the only error. Trial counsel also failed to explain Chuck's brain impairments or present brain imaging evidence showing structural abnormalities in Chuck's brain, which affected his behavior. Counsel failed to present the jury with Chuck's accurate mental health diagnosis or an explanation of his mental state, including on the day of the offense. Trial counsel also failed to present readily available evidence of BOP's mistakes leading up to the homicide. Trial counsel made many other serious errors. Mr. Hall was prejudiced by the myriad serious errors that trial counsel made.

### Discussion:

Throughout the case, Mr. Hall's trial counsel provided objectively unreasonable representation, and counsel's deficient performance prejudiced Mr. Hall. Mr. Hall's trial team deprived him of his right to effective assistance of counsel guaranteed by the Sixth Amendment.

"[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id. Strickland*'s familiar two-part standard governs ineffective assistance of counsel claims. To establish

48

ineffective assistance of trial counsel, a movant in a § 2255 proceeding must show that trial counsel's "representation fell below an objective standard of reasonableness" and that trial counsel's errors prejudiced him, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Effectively representing a client facing the death penalty requires an extensive investigation into "*all reasonably available* mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C)). Investigating "all reasonably available mitigating evidence" is incompatible with "abandon[ing] the[] investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. "[T]he most basic investigation of [a capital defendant's] background" entails interviewing "teachers, foster parents, psychiatrists, psychologists or anyone else who may have examined or spent time with [the defendant] during his upbringing." *Stankewitz v. Wong*, 698 F.3d 1163, 1166 (9th Cir. 2012); *see also Sears v. Upton*, 561 U.S. 945, 948 & n.3 (2010); *Porter v. McCollum*, 558 U.S. 30, 41 (2009). As Russ Stetler, former National Mitigation Coordinator and an expert on mitigation investigation explains, "the per curiam opinions issued by the Court by the time of Mr. Hall's capital prosecution, *Porter* and *Sears*, both stressed the importance of thorough mitigation investigation, including early childhood investigation even for middle-aged defendants and mental health evidence that 'might not have made [the defendant] any more likable to the jury, but . . . might well have helped the jury understand [him], and his horrendous acts.'" Ex. 10 (Stetler Dec.) ¶ 3 (footnote omitted) (internal citations omitted).

Counsel may not rely on their client to provide mitigating evidence. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005); *see also Stankewitz*, 698 F.3d at 1169-70. Regardless of whether the client is willing or able to assist in identifying potential sources of information, counsel must "conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

Additionally, counsel must consult with experts. The types of necessary experts vary from case to case, but expert assistance is among the "'basic tools of an adequate defense'" necessary in capital cases. *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir. 1987) (quoting *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)); *see also Ake v. Oklahoma*, 470 U.S. 68 (1985). "National standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel have access to adequate 'supporting services'" including "'expert witnesses.'" 2003 Guidelines 4.1, commentary (quoting ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.4 cmt. (3d ed. 1992)).[18]

The following subsections discuss several discrete errors by trial counsel. While each of these errors individually prejudiced Mr. Hall, the Court must not consider the errors in isolation; rather, it must consider the full impact of counsel's multiple deficiencies. *See Strickland*, 466 U.S. at 695-96 (considering effect of counsel's errors cumulatively). That is, when assessing penalty-phase prejudice, the reviewing court must "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98;

---

[18] The Guidelines referenced in this motion are the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, found at https://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_guidelines/.

*see also Wiggins*, 539 U.S. at 534. In this case, many of the discrete errors, standing alone, were enough to prejudice Mr. Hall, and the effect of the multiple errors is prejudicial and outweighs the evidence in aggravation.

First, trial counsel failed to conduct an adequate life-history investigation. Second, trial counsel was ineffective for failing to investigate and present evidence that Chuck Hall has brain damage. Third, trial counsel was ineffective for failing give experts and mental health professionals who testified complete and accurate information about Chuck. Fourth, trial counsel was ineffective for failing to investigate and present evidence ¶ the BOP's mismanagement leading up to Mr. Castro-Rodriguez's death. Fifth, trial counsel was ineffective for failing to rebut the aggravating factor of future dangerousness. Sixth, trial counsel was ineffective for failing to rebut the other aggravating factors. Seventh, trial counsel was ineffective for failing to investigate and present information about Chuck's struggles with a particularly severe case of Crohn's disease. Eighth, trial counsel was ineffective for failing to adequately cross-examine key witnesses. Ninth, trial counsel was ineffective because no attorney ever argued to the DOJ's Capital Review Committee that a death sentence should not be sought against Chuck. Tenth, trial counsel was ineffective for failing to seek severance of the penalty phase. Finally, trial counsel was ineffective for calling important penalty phase witnesses to testify by video.

**A. Trial counsel was ineffective for failing to conduct an adequate life-history investigation.**

While serving as Mr. Hall's lead trial counsel, Mr. Johnson and then Mr. Duchardt were responsible for ensuring that a thorough life history investigation was conducted. Neither fulfilled this obligation.

Typically the task of conducting a thorough life history investigation involves retaining a qualified mitigation specialist. *See, e.g.*, Ex. 10 (Stetler Dec.) ¶ 23; *Jells v. Mitchell*, 538 F.3d

51

478, 494 (6th Cir. 2008). Neither Mr. Johnson nor Mr. Duchardt ever retained someone to focus exclusively on the life history investigation, let alone a qualified mitigation specialist. Mr. Duchardt eventually hired an investigator to serve as both a fact investigator and mitigation investigator. This investigator began working on the case only two months before trial and focused on the single, narrow issue of locating Chuck's birth mother.

Regardless of whether the trial team retained a mitigation specialist, though, "the substance of [this] claim" is "whether counsel adequately investigated and presented mitigation evidence, including mental health and capacity evidence." *Sinisterra v. United States*, 600 F.3d 900, 909 (8th Cir. 2010). They did not. The trial team devoted insufficient time to the life history investigation, focused on a narrow set of sources, ignored red flags, and failed to uncover compelling and readily available mitigating evidence that competent counsel would have uncovered. In sum, the trial team failed to "adequately investigate[] and present[] mitigation evidence." *Id.*

### i. Trial counsel's life-history investigation was inadequate and their presentation to the jury was misleading.

### a. The inadequate investigation

Mr. Hall was indicted on April 7, 2010. At his Initial Appearance on April 23, 2010, Darryl Johnson was appointed as lead trial counsel. Stuart Huffman was appointed as co-counsel. Having done virtually no work on the case, Mr. Huffman withdrew a year later, on April 7, 2011. Mr. Huffman withdrew because Mr. Johnson believed he had a conflict of interest (Mr. Huffman was representing a defendant in a case where Mr. Johnson was a victim). Although Mr. Huffman disagreed that there was a conflict, he agreed to withdraw from Mr. Hall's case. Ex. 14 (Huffman Dec.) ¶ 11. He and Mr. Johnson "did not have a good working relationship," did not have

52

meetings, and did not collaborate. *Id.* ¶ 5. On April 20, 2011, Mr. Johnson's then-wife, Lynn Johnson, was appointed as his co-counsel.

In August 2012, a little over a year after Mr. Huffman withdrew, the Johnsons withdrew from the case. *See* Dkt. Nos. 183, 184. During 2012, Mr. Johnson faced criminal charges for deviate sexual assault, for allegedly groping a client in his office.[19] Mr. Johnson was also accused of professional misconduct, including showing naked photographs of women to a client, making lewd comments, and failing to check for conflicts of interest.[20]

While representing Mr. Hall from April 2010 through August 2012, before he had to withdraw to deal with his own criminal charges, Mr. Johnson did not retain a mitigation specialist. Mr. Johnson did retain a fact investigator, and Mr. Johnson and Ms. Johnson themselves interviewed witnesses, mostly by phone. *See* Dkt. No. 84; *See* Ex. 51 (D. Johnson Billing); Ex. 52 (L. Johnson Billing).[21] Mr. Johnson met Chuck's parents, but no memo from such meetings was ever provided to co-counsel Mr. Huffman or to subsequent counsel. Ex. 14

---

[19] Mr. Johnson was acquitted of the criminal charges.

[20] In an incident in which Mr. Johnson failed to check for a conflict of interest, a potential client came to meet with Mr. Johnson about representing him in divorce proceedings. When Mr. Johnson belatedly realized he could not represent the potential client because he represented his wife – the adverse party in the divorce proceedings – Mr. Johnson took the meeting as an opportunity to serve the potential client/adverse party with dissolution papers. *See In re Johnson*, Mo. Sp. Ct. No. SC93707 (Dec. 9, 2013), https://www.courts.mo.gov/sup/index.nsf/9f4cd5a463e4c22386256ac4004a490f/8aa3f186d0766 09486257c69005af9bb/$FILE/SC93707_Chief_Disciplinary_Counsel_brief.pdf. Mr. Johnson was suspended from practicing law on March 25, 2014 and reinstated on March 1, 2016. *See In re Johnson* (Mar. 25, 2014), https://www.courts.mo.gov/page.jsp?id=71476.

[21] Because the billing records are court records the public is not entitled to access, and undersigned counsel obtained directly from the court, these records have been provided to the government but are not included as part of this filing.

(Huffman Dec.) ¶ 8; Ex. 15 (Duchardt Int.) at 10.[22] Mr. Johnson received a substantial number of records from Chuck's parents, which contained many fruitful leads for a life history investigation, including the names of teachers trial counsel should have interviewed. However, there is no indication that the initial trial team followed any leads in these records to find mitigating evidence. And although Mr. Johnson and Ms. Johnson conducted some interviews, there is no indication that anyone on the initial trial team conducted any interviews with the goal of developing mitigating evidence (as opposed to gathering information about the crime). *See* Ex. 51 (D. Johnson Billing); Ex. 52 (L. Johnson Billing).

Mr. Johnson and his team were not experienced death-penalty lawyers. Mr. Johnson's practice was a combination of family law and criminal defense, and he had never represented a client facing the death penalty through resolution of the case, whether through trial or plea. Mr. Huffman's experience defending capital cases was likewise extremely limited. Ex. 14 (Huffman Dec.) ¶ 3. Mr. Huffman was second chair in the case and spent much of the year of his appointment waiting for Mr. Johnson to provide direction to him. *Id.* ¶ 9. Ms. Johnson exclusively practiced family law and had no prior experience in criminal defense.

Mr. Johnson has acknowledged that he did not, at the time, think it was important to investigate Mr. Hall's life history. While he was representing Mr. Hall, he was focused on winning the guilt-innocence phase of the case, not on conducting a mitigation investigation to

---

[22] Mr. Duchardt voluntarily agreed to make an under-oath statement that was videorecorded and transcribed. The transcript of that interview is provided as Exhibit 15. The videorecording is separately provided to the Court. His statement was taken in this manner because Mr. Duchardt expressed concern that his words would be misrepresented if the statement were not recorded, a concern borne from experience with different post-conviction counsel on another case. Ex. 15 (Duchardt Int.) at 3-4.

build a case against the death penalty. He has since learned that building a mitigation case to defend against the death penalty is a critical requirement of capital defense.[23]

Mr. Johnson did not retain any experts. He asked the trial court to order a competency evaluation, and the court ordered an evaluation by the BOP focused only on Mr. Hall's competency to stand trial, not other mental health problems. *See* Dkt. No. 66. Mr. Johnson later requested funding to retain a pharmaceutical expert on July 19, 2012, *see* Dkt. No. 181, but moved to withdraw less than a month later, before the court ruled on the motion for a pharmaceutical expert, *see* Dkt. No. 183.[24]

Mr. Huffman, for his part, "was confident that we did not know all of Chuck's story." Ex. 14 (Huffman Dec.) ¶ 13. While he was on the case, they "knew almost nothing about [Chuck's] childhood or life history, except that Darryl reported his parents seemed to be sweet and loving people." *Id.* "As Darryl was the more experienced attorney and lead counsel, I was expecting him to lead the case and tell me what he wanted me to do. He never did." *Id.* ¶ 9. Mr. Huffman indicates, "I know I did not do what Chuck deserved and did not advance any investigation of Chuck, his life, and his medical or mental health issues." *Id.* Further, "I regret that I did not push for us to obtain records and hire mental health experts and a mitigation specialist." *Id.*

---

[23] Mr. Johnson met with undersigned counsel on April 19, 2023, and relayed this information during that meeting. He declined to sign a sworn declaration based on the guidance of his legal malpractice insurance company. Ms. Johnson has refused to speak with undersigned counsel. Undersigned counsel anticipates filing a motion to conduct discovery. Given that Mr. Johnson declined to sign a declaration and Ms. Johnson refused to even speak with undersigned counsel, the need to depose Mr. Johnson and Ms. Johnson is among the reasons why undersigned counsel has shown good cause to conduct discovery.

[24] There is no indication that Chuck's subsequent trial counsel renewed this motion or that the trial court ever ruled on it. Trial counsel also did not request funding for a medical doctor to explore Chuck's significant physical illness or the significance of the medication regimen he was prescribed to treat it. *See* Claim 1.G.

55

Mr. Duchardt was appointed to replace Mr. Johnson as lead counsel on August 21, 2012, more than two years after Chuck was indicted. Dkt. No. 185. He was initially assisted by Robert Lewis. Because Mr. Lewis faced serious health problems, which caused him to undergo a 7.5-hour surgery at the end of January 2014, Michael Walker was appointed to the case on January 17, 2014. Dkt. No. 455. In early February 2014, Mr. Lewis began resuming work on the case. When the trial began on April 28, 2014, Mr. Lewis and Mr. Walker both participated.

When Mr. Duchardt took over Mr. Hall's representation, no mitigation specialist had worked on the case. Although a fact investigator, Randy Price, had worked with prior counsel, Mr. Duchardt believed that "the performance of the previous investigator was grossly substandard." Dkt. No. 375 at 3. No record exists of any interviews by that initial investigator. Yet Mr. Duchardt did not seek funding for the assistance of any investigator until August 23, 2013. Dkt. No. 375. This was a full year after Mr. Duchardt was appointed, two years after the government announced its intention to seek the death penalty, and almost three years after Mr. Hall was indicted.[25] At that time, the trial was only eight months away.[26] Despite the limited time before trial, Mr. Duchardt sought appointment of just one investigator to "to develop evidence regarding the first phase of a possible trial, as well as to assist with development of evidence pertaining to mitigating factors which might be germane to any penalty phase of trial." Dkt. No. 375 at 1. This investigator, Michael "Mic" Armstrong did not begin working on the case until six months after the motion was filed, just two months before the trial began.

---

[25] Mr. Hall was indicted on April 7, 2010, and the government filed its Notice of Intent to Seek the Death Penalty on July 22, 2011. Dkt. Nos. 1, 62.

[26] When Mr. Duchardt sought the appointment of an investigator, the trial was scheduled to begin on April 28, 2014, and the trial did begin as scheduled on April 28, 2014.

The below graphic illustrates when Mr. Duchardt finally sought funding for an

investigator and when Mr. Armstrong finally commenced his work on the case in relation to

when the trial started:



Moreover, in the two months he spent working on the case, Mr. Armstrong was focused

on finding Chuck's biological mother, not on interviewing witnesses who actually knew

Chuck.[27] Aside from two employees at CCA Leavenworth where Chuck was held pre-trial, Mr.

Armstrong did not speak to any potential witnesses who had ever interacted with Chuck or the

Hall family.[28]

---

[27] Mr. Armstrong's billing records reveal that he did the following work: On February 24, 2014, two months before the trial, Mr. Armstrong started his work on this case, spending 5.2 hours "reading depositions and discovery – reports." On March 2, 2014, he traveled from Missouri to Texas to locate Chuck's birth mother, who had given him up at birth. March 3 through March 7, 2014, he "[m]ade contact with" thirty-three witnesses and "[a]ttempted to locate" an additional thirty-four witnesses. Chuck never lived in Texas; all the Texas contacts were related to the attempt to locate Chuck's biological mother, and not people who actually knew Chuck Hall. He billed for approximately 57 hours of investigative work while in Texas. On this trip, Mr. Armstrong successfully located Chuck's biological mother. (Mr. Duchardt later interviewed her.) On March 8, 2014, Mr. Armstrong travelled back to Missouri. After his trip to Texas, Mr. Armstrong spent only 16.5 more hours on Chuck's case. On March 26, 2014, Mr. Armstrong spent 12.3 hours travelling to Springfield and meeting with other members of the defense team and Chuck. On May 13, 2014, he spent 4.2 hours travelling to CCA Leavenworth, making contact with Mindy Graham and Ken Daugherty, both employees of CCA Leavenworth, and having a telephone conversation with Mr. Duchardt. Ex. 46 (Armstrong Billing Recs.).

[28] In his August 2013 request for funding to retain Mr. Armstrong, Mr. Duchardt represented to the trial court that, as to fact witnesses, from the "hundreds of possible witnesses" identified in the "excess of 10,000 pages of discovery" provided by the government, "[u]ndersigned counsel has already identified more than 100 witnesses who will need to be

The below chart illustrates how Mr. Armstrong, the sole investigator working on the case, spent his time:



**ALL WORK PERFORMED BY FACT/MITIGATION INVESTIGATOR**

■ All Work Performed by Fact/Mitigation Investigator

| RECORD REVIEW (5.2 HOURS) | TEAM AND CLIENT MEETINGS (12.3 HOURS) | INVESTIGATION RE BIOLOGICAL MOTHER (57 HOURS) | INTERVIEWS OF CCA LEAVENWORTH STAFF (4.2 HOURS) | INTERVIEWS WITH PEOPLE WHO KNEW CHUCK BEFORE PRISON (0 HOURS) |
|---|---|---|---|---|
| 5.2 | 12.3 | 57 | 4.2 | 0 |

Other than Mr. Armstrong locating Chuck's biological mother, the trial team focused their penalty-phase investigation on just a small number of witnesses Chuck pointed them to. They did not conduct a thorough and independent life history investigation guided by the records in their possession. No one on the trial team interviewed anyone outside of Chuck's immediate family who knew him growing up. Ex. 15 (Duchardt Int.) at 85. Despite clear red flags that Chuck struggled in school, the trial team made no effort to speak to any of Chuck's teachers, who could have spoken about his experiences in school and interactions with peers. Ex. 15 (Duchardt Int.) at 86. They made no effort to speak to any of Chuck's childhood friends or

interviewed in advance of trial," and that, as to mitigation witnesses, trial counsel's "investigation related to possible aggravating and mitigating factors" had already revealed "nearly 100 additional witnesses." Dkt. No. 375 at 10. Mr. Armstrong's work, detailed above, came nowhere close to interviewing 100 witnesses, and the interviews failed to focus on people who actually knew Chuck.

elementary or middle school classmates, who similarly could have spoken about his experiences in school and interacting with peers. They made no effort to speak to any extended family members or friends of the family, who could have offered insight into the family's dynamic. Ex. Ex. 15 (Duchardt Int.) at 85. The trial team also failed to interview Dr. Patrick Gariety, Chuck's BOP treating psychiatrist who saw Mr. Hall on the day of the homicide, prior to the homicide.[29]

Instead, the life history investigation was characterized by delay and failure to follow up on obvious red flags. One red flag came from government expert Dr. Reardon, whose report indicated that Chuck "described his first sexual encounter at age 13 [as] involv[ing] the 24-year-old sister of his friend." Trial Ex. 461 at 9. The suggestion that his first sexual encounter was as a victim of crime should have prompted further inquiry. Also, Dr. Staples testified that Mr. Hall reported beating up a child molester. Trial counsel knew this to be untrue, which should have been a red flag. Further, the jury heard that Chuck had once claimed that his sister accused his father of sexual abuse, which family members all denied at trial when questioned by trial counsel. This was another red flag about Chuck's own sexual abuse history.

Expert in mitigation investigation and former National Mitigation Coordinator for the Defender Services Committee of the Administrative Office of the U.S. Courts Russ Stetler summarizes the inadequacies of trial counsel's investigation by explaining: "Trial counsel failed to utilize the records that they had to identify objective witnesses who had contact with Mr. Hall and his adoptive parents in his developmental years." Ex. 10 (Stetler Dec.) ¶ 151. Mr. Stetler provides the following examples to "illustrate the deficiency":

---

[29] Mr. Duchardt admitted in his videotaped statement that when he spoke to one person associated with Homestead and one person associated with Shaker Mountain, he spoke to them only briefly and did so only in an effort to locate any existing records pertaining to Chuck. Ex. 15 (Duchardt Int.) at 106-07, 114; Ex. 86 (McKegney Dec.).

As noted supra ¶ 102, Mr. Duchardt went to Vermont and quickly concluded, "It is impossible to tell what happened at Shaker Mountain School during the year Chuck was there because there are absolutely no records and the school no longer exists" and "former staff members are nowhere to be found." Jerry Mintz, one of the founders of Shaker Mountain School, is a well-known consultant, public speaker, and author on alternative education. Shaker Mountain also has alumni, who might have been identified through the local public library. Mr. Duchardt's file contained a three-page transcript from Shaker Mountain identifying Mr. Hall's counselor, C. C. McKegney (TF.FD.17.31.001592). The transcript noted that the school did not have a specialist in learning disabilities, but they suspected that Chuck might have a learning disability in reading comprehension (TF.FD.17.31.001593). The school's recommendation to place him in ninth grade was conditioned on testing him more thoroughly for this disability and providing help. Id. Another record identified staff member, Lisa Tomasi, who had purchased at her own expense hospital-prescribed medication when Mr. Hall "hurt his mouth," and who also noted that Mr. Hall's mother had asked "Jerry" (presumably Mr. Mintz) about the medication reimbursement (TF.FD.17.31.001597).

Ex. 10 (Stetler Dec.) ¶ 151.[30]

### b. The paltry trial presentation

Despite making no effort to try to locate anyone who knew Chuck while he was at SMS, at trial, Mr. Duchardt told the jury "Chuck was placed at the Shaker Mountain School in Vermont; and, frankly, *we don't know what happened there* because no records survive from that place for about a year's worth of schooling there." Tr. 05/07/14 at 1779-80 (emphasis added).

The trial team presented Chuck's childhood as idyllic.[31] Government expert Dr. Reardon called Chuck's childhood "unremarkable." Tr. 05/23/14 at 4418. Mr. Duchardt went even

---

[30] In preparing his declaration, Mr. Stetler was provided only information that trial counsel had, not any additional information uncovered by post-conviction counsel. And Mr. Stetler was asked to opine on trial counsel's performance, not conduct a mitigation investigation. As such, Mr. Stelter, was unaware of the sexual abuse Chuck suffered or that many other young boys were also abused by Mr. Mintz.

[31] The trial team called fifteen witnesses to testify in the penalty phase, ten by video and five in person. A central theme of their penalty-phase presentation was Chuck's family's love for him. Both of Chuck's parents testified in person, having insisted on attending the trial. His sister

further, telling the jury in his opening statement: "You will see through a history of pictures the love, the care, the understanding, the interactions that Chuck had with his adopted parents. . . .They weren't perfect but they were sure darn good, and they showed him every bit of love and care that anybody could have possibly given." Tr. 05/07/14 at 1179.

The jury was additionally told that Chuck was conceived as a product of rape, entered through a stipulation. Trial counsel proposed to the jury that Chuck may have been born bad, arguing to the jury,

> And it comes down to the classic what happens with people? Is it nature or is it nurture? And we don't know for Chuck because the rapist, we don't know what his background was. We don't know what his makeup was. We can't tell you about any of that. So we don't know.

Tr. 05/07/14 at 1781.

The jury was told almost nothing about Chuck's early years in school, other than that his grades were "bad," and he had some misbehavior. Tr. 05/23/14 at 4335. The defense psychologist made one passing reference to Chuck having had a "learning disability" in fifth grade, simply as an explanation of why the psychologist had administered certain tests. Tr. 05/22/14 at 4271. The jury was given no information about what learning disability Chuck had, what recommendations were made to deal with it, what impact it had on Chuck, or whether it persisted. Dr. Fucetola made no diagnoses at all. Dr. Wisner was the defense psychiatrist, but he did not say a single word about Mr. Hall's schooling. School records were never shown to the jury and were not a trial exhibit.

---

Michelle testified by video, at Mr. Duchardt's suggestion. The trial team did not call Chuck's sister Susan to testify.

61

The jury heard that the Halls sent their son to a "private school" in Burlington, Vermont, to try and help him "make the right choice." Tr. 05/23/14 at 4358. Three immediate family members provided cute anecdotes from childhood, but none were asked to provide any details about his school experiences. No teachers testified.

Then Mr. Duchardt told the jury that despite Chuck's "darn good" parents – and without offering any explanation – "rebelliousness started, problems started, and those problems developed into skipping school, into missing classes, into stealing from the parents, things like that." Tr. 05/07/14 at 1779. Mr. Duchardt also described Chuck's problems escalating into arrests and spending time in jail after he returned from Shaker Mountain. Yet he said that Chuck came back from Shaker Mountain "really no better for the situation, no worse for the situation." Tr. 05/07/14 at 1181.

The jury was told after returning from Shaker Mountain that Chuck first went to a private school in Maine called Thornton Academy. Tr. 05/23/14 at 4105, 05/23/14 at 4340. No further information was provided about the nature of his schooling at Thornton. Once he became truant at Thornton Academy, they were told he was sent to a residential treatment center called Homestead Academy to try to "get him this help." Tr. 05/22/14 at 4106, Tr. 05/23/14 at 4342, Tr. 05/23/14 at 4386.

Steven Parks testified about meeting Chuck at Homestead Academy in group therapy with testimony that Chuck was "real nice." Tr. 05/22/14 at 4129. John Mandarelli testified that Homestead was a "juvenile boot camp" with "intensive therapy" that included carrying a thirty-five-pound bucket. *Id.* at 4071. He noted that the place was "shut down for mistreatment" but not of him and Chuck. *Id.* at 4072. John Mandarelli additionally testified about knowing Chuck in the Maine State Prison, where Chuck helped him. Then the jury heard about Chuck's criminal history and brief romantic relationships.

62

The overall facts and argument made to the jury were that Chuck was from a good and loving family, but that he made poor choices again and again. No explanation for his poor choices was ever given.

### ii. There was a wealth of mitigating evidence available.

### a. Chuck's school records reveal an elementary student struggling in the classroom due to a learning disability.

Trial counsel offered no explanation for why Chuck was acting out as a young child. It was apparent to jurors that Chuck had behavior problems that led his parents to send him to the Shaker Mountain School in Burlington, Vermont. The jury never heard that his problems were primarily academic and related to his brain damage, which in turn led to his behavioral problems.

Chuck's difficulties in school began in the first grade, when his teacher wrote that Chuck "does a lot of daydreaming and can't keep his mind on finishing" Ex. 60 (Saco School Recs.) at 1. In the first grade, he struggled with letter formation and neatness, serving as early indications of possible "left-and right-parietal lobe weakness." Ex. 5 (Israelian Rpt.) at 5.

By third grade, it was clear that, while overall Chuck was learning, he was beginning to struggle with math problems. Ex. 60 (Saco School Recs.) at 5. Chuck was "beginning to actively avoid doing his work and distracting attention away from academics to conduct." Ex. 5 (Israelian Rpt.) at 5. He was understood as bright, but as a child who "daydreams, talks, and wanders around the room." Ex. 60 (Saco School Recs.) at 6.

In the fourth grade, he demonstrated difficulties with "task completion" which were "interpreted as a lack of 'motivation and maturity.'" Ex. 5 (Israelian Rpt.) at 6 (quoting Ex. 60 (Saco School Recs.) at 9). His grades got worse each consecutive year of elementary school, as he increasingly fell behind in math problem solving, in which he was in the bottom fifth percentile by fourth grade. Ex. 5 (Israelian Rpt.) at 6.

63

Chuck's fifth grade year demonstrated more of the same difficulties with task completion and focus. Then he failed the sixth grade. Only after failing the sixth grade a second consecutive year, did he finally get referred to the Pupil Evaluation Team at Saco Middle School. Ex. 5 (Israelian Rpt.) at 7.

School failure can occur for any number of reasons, but no one evaluated Chuck until after he had already had years without success in school, including failing the sixth grade twice. The results of this evaluation in August of 1984 demonstrated that, even though chronologically he was old enough to enroll in the eighth grade, his math skill were at the fifth grade one month level. Ex. 60 (Saco School Recs.) at 21. He also demonstrated marked weaknesses in auditory attention and short-term memory. *Id.* It was recommended that he be placed in a resource room for Math, along with additional supports with weekly reports, monthly meetings, and work with the social worker. *Id.* at 22. Conflict with his sister was noted to be "a constant source of disruption at home." *Id.* Mrs. Hall had been called into the school to discuss Chuck's behavior; he had received one suspension for fighting. Ex. 5 (Israelian Rpt.) at 7.

Instead of heeding the recommendations of the school to provide additional supports for Chuck, his parents instead sent him to the Shaker Mountain School, where he would receive no academic support. The Shaker Mountain School barely had academics, and certainly did not have any resources for special education. *See* Ex. 44 (SMS School Recs.) at 2-4; *see also, e.g.,* Ex. 29 (Elizabeth Miles Dec.) ¶ 4 ("[A]t SMS, I did not get a good academic education. I learned nothing. They called it an alternative school, but the alternative part was the schoolwork, as in: they didn't do any.")[32]

---

[32] An additional comment on his SMS records reads as follows: "Although we do not have a specialist at our school, we suspect that Chuckie has a learning disability in reading

As Dr. Israelian explains, a learning disability affects more than just academics:

An arithmetic-related deficit can be devastating for a child. Often what appears like truancy is reluctance to go to school because these learning disabled children are afraid of being perceived as failures and embarrassing themselves in front of their classmates . . . Their performance also suffers in subjects in which they are perfectly capable.

Ex. 5 (Israelian Rpt.) at 22.

She explains further the alienating and humiliating aspects of having a learning disability:

In addition to distracting attention away from themselves and skipping school, children with a learning disorder will also not complete homework assignments and even if they do complete them, they will not turn them into the teacher. Many of these behaviors…leave these children alienated from non-disabled peers. While they may succeed in avoiding further failure and public humiliation, these children often find themselves on the fringes of their peer groups. The immediate consequences being isolation but also a more long-range consequence that arises from a lack of opportunities to learn prosocial behaviors.

Indeed, Chuck engaged in many of these behaviors, much to his detriment. He did not do well in school and he remained on the fringe of his peer group.

Ex. 5 (Israelian Rpt.) at 23.

When Chuck's parents sent him to SMS, he had failed sixth grade *twice*, was struggling with learning problems and brain abnormalities.[33] A school had finally school recommended interventions to assist him. Instead, his parents sent him to the Shaker Mountain School. As Dr. Fradkin said this "private school was intended to be the place where all the problems Chuck was having would turn around." Ex. 4 (Fradkin Dec.) ¶ 92. Instead, he was sexually abused on a weekly basis by a "very skilled perpetrator." *Id.*

---

comprehension." Ex. 44 (SMS School Recs.) at 4. Among the classes listed on Chuck's transcript are "Massage." *Id.* at 3.

[33] See Claim 1.B demonstrating even greater abnormalities to Chuck's brain impacting emotional control, planning, social skills, and sleep than could have been known at that time.

65

**b. Crucial mitigating evidence about Chuck being sexually abused by a serial predator at Shaker Mountain School was readily available to trial counsel.**

Chuck was sexually molested by Jerry Mintz,[34] the headmaster at Shaker Mountain School and a serial sexual predator who preyed on the vulnerable boys in his care.[35] Chuck was thirteen years old. Following an competent mitigation investigation conducted by the post-

---

[34] Jerry Mintz was contacted by a mitigation specialist working on behalf of undersigned counsel, but declined to be interviewed.

[35] Several people witnessed Mr. Mintz engaging in grooming behavior toward boys. As Lucy Abair explained, "I felt there was something not quite right about the way Jerry was with kids. There was something about him that drew kids to him, like a Pied Piper. I saw him around town a lot with a kid at his side. I remember noticing that it was often only one kid at a time, which struck me because it's a sign of what is now called 'grooming' – that is, making a child feel special in order to gain their trust and confidence for the purpose of manipulating them later, usually sexually." Ex. 30 (Abair Dec.) ¶ 5.

Former student Jessie Mashteare concurs: "Even before I was an SMS student, Jerrty started taking me out to do stuff. He'd take me bowling or to the movie or a baseball game or to get something to eat, and then bring me home . . . . [M]y family was really poor, so I'd never gotten to do that kind of stuff before, and I liked it, so I was open to the idea of going to SMS. But there was no way my family could pay for a private school, so the state took me into their custody and paid Jerry to take me. . . . I didn't realize it at the time, but when I look back on it, it's like he was grooming us." Ex. 27 (Mashteare Dec.) ¶¶ 4, 8.

Former student Mark LeClaire also recognizes Mr. Mintz's behavior as grooming: "Looking back, and thinking about what I know about child sexual abuse now, I see that Jerry was grooming us by doing all the cool things he did with us. He used the donations and money he collected for the school to entice us – but never the girls- to enjoy spending time with him." Ex. 17 (LeClaire Dec.) ¶ 9.

Former student Bruce Jackson explains, "I remember feeling uncomfortable when Jerry touched me, both that first time and the times he did it again later, but I didn't really understand what was happening. I was confused. I guess that's why I went back as often as I did . . . and also because of the good things that came with it, like the games and the treats and just the feeling of being special." Ex. 20 (Jackson Dec.) ¶ 13.

Former student Richard Dougherty says, "Jerry was at the detention center looking for kids who might want to go to his school." Ex. 18 (Dougherty Dec.) ¶ 3.

Likewise, former student Derek Foxwell explains, "The way I ended up at SMS was kind of random. . . . Jerry Mintz, the headmaster of SMS, approached me at the local arcade . . . and offered me a few quarters. He asked what I like to do. When I told him I was into Dungeons & Dragons, Jerry said he knew someone else who played D&D, and he offered to introduce us. . . . Jerry suggested that I transfer to SMS. My family wasn't wealthy, but he said it would only cost me $5 a week." Ex. 32 (Foxwell Dec.) ¶ 3.

66

conviction mitigation specialist, we now *do* know "what happened there" at Shaker Mountain School.

Chuck only revealed that he was sexually abused when asked specifically about Jerry Mintz. By interviewing teachers and classmates at Shaker Mountain, the pattern of Jerry's deviant criminal molestation of minor boys emerged. Chuck's disclosure is corroborated by fellow victim Jessie Mashteare, who was also abused by Mr. Mintz. Having himself been abused while sleeping over in Mr. Mintz's loft, Mr. Mashteare also saw Chuck stay in the loft overnight. Jessie was literally, "in the room where it happened." Ex. 4 (Fradkin Dec.) ¶ 116. Several victims explained that staying overnight in the loft meant being sexually abused by Jerry. Peter Carr recalled that Chuck stayed overnight in the loft. Ex. 22 (Carr Dec.) ¶ 8. Patricia Miles observed Chuck's hypervigilance as to Jerry's whereabouts. Ex. 16 (Patricia Miles Dec.) ¶ 7.

This hypervigilance is just one of many red flags about Chuck's marked trauma response following his repeated abuse by Jerry. Many red flags are in reports of mental health professionals that were in the possession of trial counsel such as school psychologist Dr. Payson's report from just after Chuck returned from SMS. Reports from Homestead, a facility where Chuck lived and went to school in his late teen years noted his problems with sexual identity and keeping even his parents at a "safe" emotional distance. Ex. 65 (Homestead Recs.) at 49.

Chuck eventually disclosed that he was sexually abused to all three mental health experts who saw him at the request of current counsel: Dr. Fradkin, Dr. Israelian, and Dr. Agharkar. Ex. 4 (Fradkin Dec.) ¶ 25; Ex. 5 (Israelian Rpt.) at 11; Ex. 6 (Agharkar Rpt.) at 6. Chuck revealed details of his that were parallel to the experiences of other victims of Jerry Mintz. Ex. 4 (Fradkin Dec.) ¶¶ 77-81; Ex. 5 (Israelian Rpt.) at 12.

Courts have recognized that it is extremely common for male victims of sexual abuse not to disclose or to disclose long after the abuse occurred, and even that defendants facing the death penalty may be initially reluctant to disclose their abuse to counsel until they have a trusting relationship. *See Williams v. Alabama*, 2021 WL 4325693, *7 (N.D. Ala. Sept. 23, 2021) (crediting a defendant's explanation that when asked about sexual abuse by his lawyer, "I didn't, at first, I didn't tell him anything. And over time, I got comfortable, more comfortable with him and he asked me about it again and that's when I told him."). This is among the reasons why counsel cannot simply rely on their client to tell them what mitigating evidence is out there. Chuck, like many victims, expected to take his secret to the grave, yet disclosed it upon gentle but direct questions about Jerry from a trauma informed approach. Ex. 4 (Fradkin Dec.) ¶¶ 175-76, 178 ("mean time from abuse to disclosure [is] 21 years, and it took 28 years on average to have an in-depth discussion" of such abuse); Ex. 5 (Israelian Rpt.) at 11.

Had trial counsel conducted an adequate investigation – including interviewing as many teachers and classmates as possible, which is required in every capital case – they would have uncovered evidence of rampant sexual abuse at Shaker Mountain School, including at the time Chuck was a student there. This would have led effective counsel to retain a mental health expert to engage in a trauma informed approach to further explore Chuck's experiences at SMS. Ex. 4 (Fradkin Dec.) ¶¶ 16-19; Ex. 5 (Israelian Rpt.) at 11. As Dr. Fradkin explains, trauma informed interviewing not only avoids further trauma, but is a brain based researched method that results in obtaining more reliable information. Ex. 4 (Fradkin Dec.) ¶¶ 17-18.

There were plenty of leads available. The records trial counsel received from Chuck's mother included names of Shaker Mountain staff. Among these leads that trial counsel failed to follow is this letter, which was in his file:



TF.FD.17.31.001597

Ex. 44 (SMS School Recs.) at 1. Mr. Duchardt freely admits he has no memory and no record of attempting to locate Ms. Tomasi. Ex. 15 (Duchardt Int.) at 115.

Ms. Tomasi (now Tomasi-Carr) was, as this letter makes clear, a staff member at SMS who knew Chuck. She spoke willingly when asked about "Chucky," as he was known at SMS, and would have spoken to trial counsel if they had contacted her. Ex. 21 (Tomasi-Carr Dec.) ¶ 22. Ms. Tomasi-Carr remembered Chuck and she was aware that, while she was teaching at Shaker Mountain, the headmaster Jerry Mintz was "regularly having some of the boys stay overnight with him in the loft at the school." *Id.* ¶ 15. She had begun dating (and later married then divorced) a fellow staff member named Peter Carr, and Mr. Carr told her that his friend Jane

Ginsburg was concerned about the sleepovers. *Id.*[36] Contacting Ms. Tomasi-Carr would have led to Mr. Carr, Ms. Ginsburg and others associated with Shaker Mountain.

Peter Carr, who was also a teacher at SMS, also remembers Chuck. Like Ms. Tomasi-Carr, Mr. Carr also recalled being concerned about Mr. Mintz's sleepovers with the boys, as well as his friend Jane Ginsburg's concern. Ex. 22 (Carr Dec.) ¶¶ 2, 8. Mr. Carr "specifically remember[s] Chucky Hall staying over with Jerry in the loft." *Id.* ¶¶ 8, 17. He willingly spoke to the post-conviction team and would have spoken to trial counsel if contacted.[37]

Ms. Ginsburg is another former Shaker Mountain staff member. She possesses a wealth of information about sexual abuse at Shaker Mountain, including the names of some victims. Among Ms. Ginsburg's recollections is that a boy named Richie tried to report sexual abuse to the Shaker Mountain staff and was "shut down." Ex. 26 (Ginsberg Dec.) ¶ 6. She tried to talk to fellow staff members and the school's attorney about Mr. Mintz's sleepovers with boys in the loft, but was rebuffed. *Id.* ¶ 8. She was aware of boys named Malcolm and Richie being vulnerable to Mr. Mintz's predation.[38] She also willingly spoke to the post-conviction team and would have spoken to trial counsel if contacted.

_____

[36] Ms. Tomasi-Carr "moved to D.C. in 2007, where I got a job with the Maret School, teaching first grade. I worked at Maret until 2021, and for my entire tenure there, I was listed on their website as staff." Ex. 21 (Tomasi-Carr Dec.) ¶ 22.

[37] Mr. Carr "moved several times since leaving Vermont in 1985, but I have always been easy enough to locate, whether in Connecticut or the Washington, D.C. area, where I now live." Ex. 22 (Carr Dec.) ¶ 17

[38] In addition to Lisa Tomasi's name being available to Mr. Duchardt, a search for "Shaker Mountain School" on newspapers.com, an online archive of newspaper articles commonly used by mitigation specialists, *see* Ex. 10 (Stetler Dec.) ¶ 26, would have revealed the names of additional staff and students, including Juno Lamb, Bruce Sanderson, and Peter Carr. Ex. 45 (SMS Articles). Theresa Koenke Diaz, Juno Lamb, and Bruce Sanderson would have also been able to provide valuable information and would have willingly spoken to trial counsel if contacted.

Additional investigation would have led the trial team to students willing to speak about the sexual abuse they suffered in Jerry Mintz's loft.[39] Former staff and students provided the names of additional staff and students, including names of students who were victims of Mr. Mintz's abuse. Victims provided names of additional victims. All of the former staff and students who have spoken to the postconviction team, including victims, would have willingly spoken to the trial team and shared the same recollections with them. Ex. 16 (Patricia Miles Dec.) ¶ 15; Ex. 17 (LeClaire Dec.) ¶ 13; Ex. 18 (Dougherty Dec.) ¶ 16; Ex. 19 (Sawyer Dec.) ¶ 22; Ex. 20

Ms. Koenke (now Ms. Koenke Diaz), who was a teacher at SMS, said, she "didn't really think much of Jerry's habit of letting some of the boys sleep over with him at the school until [she] heard rumors about the accusations by a student named Malcolm who said Jerry had sexually abused him." Ex. 23 (Koenke Diaz Dec.) ¶ 7. She "ha[d]n't thought about this in a long time, but when a member of Chucky Hall's current legal team approached me to ask about SMS, I realized in retrospect that Chucky might have been one of those boys." *Id.* ¶ 9. She observed that Chuck "was quiet and observant, a gentle soul, someone who kept things to himself. He was not particularly carefree, the way I would have expected someone his age to be." *Id.*

Mr. Sanderson, a former SMS student and peer of Chuck's, recalls that his Social and Rehabilitative Services caseworker, Terry, "came to ask me whether Jerry had ever tried to touch [him] inappropriately. . . . there had been some complaints about Jerry doing that with certain boys." Ex. 24 (Sanderson Dec.) ¶ 10. He also recalled Chuck staying over with Jerry, and "also remember[s] noting that Chucky's demeanor changed over time, that he got more irritable, and there were even a few times someone had to call a community meeting because he'd gotten upset." *Id.* ¶ 9. Mr. Sanderson also explained that while a student, he had a sexual relationship with Ms. Koenke, who was a counselor. *Id.* ¶ 12.

Juno Lamb recalled her time as a student at Shaker Mountain, including "a memory of an investigation that had something to do with some kind of abuse." Ex. 25 (Lamb Dec.) ¶ 15. She also recalled that Peter Carr and Lisa Tomasi (now Tomasi-Carr) were dating. *Id.* ¶ 8. Ms. Lamb, in particular, should not have been difficult to locate at the time of trial, given her uncommon name and location in Tamworth, New Hampshire, approximately sixty miles from Burlington, Vermont. Like everyone who spoke to the post-conviction team, she confirms that she would have been willing to speak with a member of the trial team if contacted. *Id.* ¶ 17.

[39] For example, by cross-referencing documents and speaking to other former students and staff, trial counsel could easily have determined that "Malcolm" is Malcolm Sawyer and "Richie" is Richard Dougherty; both willingly spoke with the post-conviction team.

(Jackson Dec.) ¶ 25; Ex. 21 (Tomasi-Carr Dec.) ¶ 22; Ex. 22 (Carr Dec.) ¶ 17; Ex. 23 (Koenke Diaz Dec.) ¶ 11; Ex. 24 (Sanderson Dec.) ¶ 15; Ex. 25 (Lamb Dec.) ¶ 17; Ex. 26 (Ginsberg Dec.) ¶ 14 ; Ex. 27 (Mashteare Dec.) ¶ 16; Ex. 28 (Durbin Dec.) ¶ 14; Ex. 29 (Elizabeth Miles Dec.) ¶ 17; Ex. 31 (Duval Dec.) ¶ 15, Ex. 32 (Foxwell Dec.) ¶ 16; Ex. 33 (Kimber Dec.) ¶ 18; Ex. 85 (Herbst Dec.) ¶ 12; Ex. 83 (AvRutick Dec.) ¶ 8; Ex. 87 (Meister Dec.) ¶ 11; Ex. 90 (Swahlen Dec.) ¶ 15.

Mr. Mintz's victims have visceral memories of being abused when invited – really forced – to sleep over in Mintz's crowed, smelly loft, where they slept on adjoining mattresses sprawled on the floor that made one big bed.

One victim, Malcolm Sawyer, recalls:

> [W]hen I slept over at Jerry's and I woke up with him in his underwear and his arm wrapped around me, my back to his front, I pretended that it wasn't happening. . . . I didn't understand what it meant that he was touching me. I still try not to think about being on that mattress with him, because I worry there are more details that I've kept myself from remembering. I also think that trying to block it out had something to do with why I had a mental health episode and had to be hospitalized.

Ex. 19 (Sawyer Dec.) ¶ 12.

Richard Dougherty recalls Mr. Mintz trying to touch him:

> I stayed tense and on alert all night, squished up between Jerry and the wall. It was the second time I went up there that Jerry tried something with me. We were lying there on the mattresses, and then I felt his arm reaching over me, and his hand heading for my groin area. I could also feel his erection against my back. I moved fast and elbowed him in the face, right between the eyes, and then I ran down the ladder from the loft. He followed me down, saying that he'd been sleeping and must have been dreaming and just rolled over, but I didn't believe him for a minute.

Ex. 18 (Dougherty Dec.) ¶ 9.

Richie tried to tell the rest of the school what happened, but the staff did not support him.

Richie "got so angry that [he] threw an old typewriter across the room." *Id.* ¶ 10. He explains:

I was mad at Jerry, but I was also hurt by the fact that none of the staff stood up for me. I remember someone asking what proof I had. I told them that *I* was the fucking proof, and demanded to know whether they were all chickenshit, because everyone knew about the sleepovers. But nobody was willing to say they believed me or do anything about it. . . . When we got back to Starksboro that night, I had it out with two of the counselors who lived out there, Chris and Janine. They had met at the school when Janine was a student, and gotten married. I was super close with both of them, so I was really upset that they hadn't supported me at the meeting. Chris told me that I was overreacting, which really hurt, because I'd always looked up to him.

*Id.* ¶¶ 10-11.

From Jessie Mashteare, who was also abused by Mr. Mintz:

At first, Jerry would offer us backrubs. I never wanted one, but he kind of pushed himself on you. And then, after a while, when I'd be trying to sleep, I'd feel his hands on me. First it was just touching my hand, which seemed like it could maybe be by mistake, but then his hands started moving to other places, like around my waist, and near the top of my underwear. And then he started pressing up against me or lying partially on top of me, and when he did that, I could feel that he had an erection.

Ex. 27 (Mashteare Dec.) ¶ 11.

From Mark LeClaire, who recalls Mr. Mintz fondling him:

Jerry called me over to sleep next to him…Not long after I lay down, Jerry started massaging my back and buttocks, and then there was his hand, coming around to the front to fondle my penis.

Ex. 17 (LeClaire Dec.) ¶ 7.

From Bruce Jackson, who also recalls Mr. Mintz fondling him:

Jerry would ask one of us to give him a massage, or he gave us massages instead. And he would talk about things he shouldn't, like one time I remember him asking if we knew what the strongest muscle in the body was. I guessed it was the leg, but Jerry said No, it's the buttocks…[then] he started massaging mine, and then he reached around and fondled my penis.

Ex. 20 (Jackson Dec.) ¶ 12.

73

Dr. Fradkin explains that trauma memories are sensory memories, stored in the primitive parts of the brain. Ex. 4 (Fradkin Dec.) ¶¶ 18-19. These men recount their memories in very sensory ways, remembering the sheets, the bed, the loft, the smell of Jerry. *Id.* ¶¶ 133, 258.

Some of these students (now grown men) would have explained the impact of the abuse and the failure of Shaker Mountain staff or State of Vermont child welfare workers to do anything about it.

> Fred Jackson tries to explain how he managed to "wake up":
>
> I'm not sure exactly how I managed to wake up; I guess it must have been part maturity and part therapy. I slowly realized that I was always the hero in my own stories, as if I needed to prove somehow that I was worth being liked or admired, and I realized how angry I was. Over time, I identified two cycles of dealing with things like what happened at SMS: either you get very angry and you do something productive with the anger, or you're the other person who never wakes up from it and then becomes violent or sexually abusive yourself. If you don't wake up from the nightmare that you're a bad person, you just keep hurting yourself and everyone around you.

Ex. 20 (Jackson Dec.) ¶ 22.

> Mark LeClaire and his brother John were both abused, and John later died by suicide.

Mark explains:

> It was several years later when John took his own life. He injected himself with our sister's insulin for her diabetes. I know that John had a lot of problems, and they probably all had something to do with his suicide, but I will always believe that being molested by Jerry Mintz played a part.

Ex. 17 (LeClaire Dec.) ¶ 12.

Other former students, even ones who were not themselves victims of Mr. Mintz's abuse, would have been able to provide revealing information about Shaker Mountain. Student Patricia Miles believes that "Jerry chose to work with at-risk kids and wards of the state because it gave him easier and free access to young boys, and that he had the school so he could enroll children he wanted to use for his own purposes." Ex. 16 (Patricia Miles Dec.) ¶ 10. Her "only memory" of Chuck "is from the smoking area. He wasn't there to smoke: he was looking for Jerry. It was

clear that he wasn't seeking Jerry out, but instead was being vigilant about where he might be. His eyes were red-rimmed. 'Where's Jerry?' he'd ask us. 'Do you know where Jerry is?'" *Id.* ¶ 7. Dr. Israelian explains that this is an early manifestation of Chuck's hypervigilance, a symptom of his Post Traumatic Stress Disorder (PTSD). Ex. 5 (Israelian Rpt.) at 81-82; Ex. 6 (Agharkar Rpt.) at 6, 24.

Chuck's friend, Jesse Mashteare, who was abused, recalls, "I remember Chucky going to the loft sometimes without me, and I remember telling him to stay away, but we never talked specifically about what Jerry had done to either one of us. It just wasn't something you said out loud, even if everyone knew what was going on." Ex. 27 (Mashteare Dec.) ¶ 12.

Dr. Fradkin, an expert in male sexual victimization, explains that it is not surprising that Chuck kept the sexual abuse he experienced a secret; rather, "[i]t is normal to keep abuse a secret." Ex. 4 (Fradkin Dec.) ¶ 59. Dr. Fradkin has "worked with many male survivors who had planned on taking those secrets to their graves." *Id.* ¶ 58. Indeed, "this topic of keeping the abuse a secret and the severe consequences has been documented in every major book and many articles written on the topic" of male survivors of sexual abuse. *Id.*

Another difficult aspect of Chuck's abuse, is the fact that adults apparently could all see what was happening, many voicing now their discomfort at the time with Jerry's sleepovers, yet continued to look away. Ex. 83 (AvRutick Dec.) ¶ 6 ("I always had an inkling that something wasn't right about it."); Ex. 22 (Carr Dec.) ¶ 6. ("I felt, deep down, like something wasn't quite right about the situation."); Ex. 30 (Abair Dec.) ¶ 4 ("Jerry was also well-known for the suspicion that he had inappropriate relationships with the children in his care.") One staff person recalls,

> [A]s time went on, I heard from more staff that other students reported sexual abuse by Jerry when sleeping overnight at the school, and I couldn't ignore it anymore. I realized

75

there likely was some truth to the complaints….Still, I didn't have first-hand evidence of any abuse, and the other staff weren't organizing any response to the complaints, so I simply went on with my job.

Ex. 85 (Herbst Dec.) ¶ 9.

At least one staff member actually left the school over the allegations and her resulting discomfort. She recalls one student, young Richie, bringing up at a meeting his anger over something Jerry did to him in the loft where Jerry slept with the boys. She was "shocked and disturbed" by the staff's answer and both she and Richie were "shut down" when they tried to discuss the matter of Jerry's inappropriate sleepovers generally. Ex. 26 (Ginsburg Dec.) ¶¶ 6-12. Indeed, the culture was so permissive and broken that teachers had relationships with students, students frequently had acknowledged sexual relationships with one another, a teacher played the piano with his penis in front of students; and pornography was played as "sex education." *See, e.g.*, Ex. 20 (Jackson Dec.) ¶ 16; Ex. 22 (Carr Dec.) ¶ 11; Ex. 24 (Sanderson Dec.) ¶ 12; Ex. 25 (Lamb Dec.) ¶¶ 9, 10; Ex. 26 (Ginsberg Dec.) ¶ 5; Ex. 27 (Mashteare Dec.) ¶ 7; Ex. 31 (Duval Dec.) ¶ 7; Ex. 30 (Abair Dec.) ¶ 7.

Some students reported the abuse, but many were not heeded for years until the school was apparently quietly shut down after one more allegation. *See, e.g.*, Ex. 16 (Patricia Miles Dec.) ¶¶ 12-14; Ex. 18 (Dougherty Dec.) ¶ 10; Ex. 27 (Mashteare Dec.) ¶ 13; Ex. 29 (Elizabeth Miles Dec.) ¶¶ 14-15; Ex. 30 (Abair Dec.) ¶¶ 6-12; Ex. 87 (Meister Dec.) ¶ 9. Institutional betrayal, where an organization betrays trust by taking little or no action and more people are victimized, is associated with higher rates of PTSD and more complicated outcomes. Ex. 4 (Fradkin Dec.) ¶¶ 84-86. SMS engaged in institutional betrayal.

At the same time, Dr. Fradkin observes that "huge red flags that something was terribly wrong" existed in Dr. Payson's September 1985 psychological evaluation report. Ex. 4 (Fradkin

Dec.) ¶ 254. "He was found to be moderately depressed. He was very unsure of himself, emotionally shutdown, and emotionally behind. . . . He dealt with conflict through fantasy and denial of his negative feelings. He engaged in passive aggressive behaviors. He seemed distant from others. He is unable to establish healthy peer connections." *Id.* "The report recommended individual counseling, and a counselor did come to the house, but [Dr. Fradkin] believe[s] Chuck was so shut down, so ashamed, and feeling so inadequate, he responded to the counselor by stating he had no problems." *Id.* In fact, it is Dr. Fradkin's "belief that this ninth grader with all these problems was abandoned by this counselor at the very time he most needed a safe person he could trust to open up to about all of his difficulties. A trauma-informed therapist understands that it is their job to create enough safety for a client to speak their truth, and Chuck was failed here." *Id.*

Dr. Payson's report was in the trial team's possession, but they ignored the red flags suggesting that something had happened to Chuck. Instead, they unreasonably cut short any investigation into Chuck's childhood that would have revealed Chuck's experience of sexual abuse and thus presented incomplete and skewed evidence about Chuck's childhood.

Records from the Maine-Dartmouth Family Practice, which were not in trial counsel's files, show that Chuck was diagnosed as having "major depression" on August 16, 1985. Ex. 94 (Maine Dartmouth Recs.) at 11. Psychological testing that had been done on Chuck by the BOP in 2006 and 2008 were also significant red flags for the existence of trauma, as he repeatedly reported symptoms of Post Traumatic Stress Disorder. Ex. 5 (Israelian Rpt.) at 61-68. Trial counsel had knowledge that Chuck had endorsed in 2008 answers that:

"I keep reliving something horrible that happened to me."

"I've been troubled by memories of a bad experience for a long time."

"I have had some horrible experiences that make me feel guilty."

"Since I had a very bad experience, I am no longer interested in some things that I used to enjoy"

Ex. 5 (Israelian Rpt.) at 68. Yet Chuck was not asked about this prior horrible experience, nor did the jury hear of its existence.

### c. Other crucial mitigation evidence about Chuck's childhood was also readily available to trial counsel.

The trial team's penalty-phase presentation was misleading for other reasons, beyond not informing the jury that Chuck was sexually abused. Other missed red flags, including about dysfunction in the Hall household, also contributed to the misleading presentation about Mr. Hall's childhood and family.

For example, the trial team should have realized that information about Chuck's parents drinking and fights was worth looking into, if for no other reason than that Chuck had mentioned it to government experts. In her January 2012 report addressing Mr. Hall's competency to be tried, Dr. Reardon notes that "[o]n initial questioning, Mr. Hall reflected positively on his upbringing, describing his parents as 'loving, hard-working, and supportive.'" Trial Ex. 461 (Reardon eval.) at 4. "In subsequent interviews, however, Mr. Hall spoke of his parents' disregard for early signs of physical health problems (e.g. frequent vomiting, blood in stool), their heavy alcohol consumption, and frequent arguments. Additionally, while he described a close 'emotional bond' to his mother, he also recalled her as rather demeaning to him as a child, calling him a 'screw up' or informing him of the low cost of his adoption." Trial Ex. 461 (Reardon eval.) at 5. Dr. Dietz's report also references a 2006 evaluation at Rochester in which Chuck said his parents drank and argued frequently. Trial Ex. 462 (Dietz Rpt.) at 5. Dr. Reardon notes, though, that "[i]n a telephone interview, Charles and Dorothy described 'ups and downs'

78

in their 57-year marriage, acknowledging they 'didn't hide it' from the children; however, they denied any significant alcohol misuse or domestic violence." Tr. 05/23/14 at 4435. In her testimony, Dr. Reardon said she thought Mr. Hall "provided some false information during [her] evaluation, information that [she] couldn't corroborate . . . with his parents or other records." Tr. 05/23/14 4449.

Yet records did corroborate the Halls' drinking and emotional immaturity. Not only did the trial team have these records in their possession, Dr. Reardon listed these records (i.e. the Sweetser Center's report on the Hall family) as among the collateral sources of information she consulted. Trial Ex. 461 (Reardon Eval.) at 3.

The report from the Sweetser Center that both the trial team and Dr. Reardon had in their files followed a nine-week intervention in November 1985 through January 1986. This is immediately after Chuck left SMS, and he was fourteen years old. One of the recommendations was for Chuck's parents to address their relationship with alcohol and seek substance abuse evaluations:

> Substance Abuse Evaluation: The Hall's stated they each were going to have individual substance abuse evaluations. Neither followed through during our work.

Ex. 62 (Sweetser Closing Summary) at 7. The counselors also recommended marriage counseling:

> RECOMMENDATIONS: We recommend that:
> 1. The Halls contract professionally with a marriage counselor as they were still concerned with the issues to which they allude.

Ex. 62 (Sweetser Closing Summary) at 7. The counselors also flagged Mrs. Hall's emotional immaturity, noting that she felt intimidated when contacted by her children's schools:

79

> Secondly, the "different" adolescences of Michelle and Chuck have by their
> nature, brought the parents into more and more contact with school
> authorities.  For Dorothy this is a particularly significant stress because
> (1.) she apparently associates them with school authorities of her own
> childhood and feels intimidated by them and (2.) she senses they feel she
> is to blame for her children's behavior.  The latter effects both of the
> Halls because they are very socially sensitive and live in a small
> community.

Ex. 62 (Sweetser Closing Summary) at 3.

In addition to the report from the Sweetser Center, Chuck's sisters, Michelle and Susan, also knew about the dysfunction in the Hall household, including their parents' drinking. Mr. Duchardt called Chuck's sister Michelle to testify, but he had never interviewed her with open-ended questions about her experiences growing up and so did not know about many of the difficulties she and Chuck experienced. Michelle recalls that trial counsel "told me he really wanted to get across to the jury, how hard my parents tried" and to "focus on the good memories of my family." Ex. 34 (Bories Dec.) ¶¶ 12, 19. Michelle could have spoken about the emotional toll of being given up by her birth mother, explaining that she "could not wrap my head around my birth mother not keeping me" and that "as a child and teenager" she "was just angry and confused without really understanding why, and it influenced the way I acted. Ex. 34 (Bories Dec.) ¶ 6. She tested her parents by acting out, because, having been given up by her birth mother, she could not believe that her parents truly loved her. She adds that she saw much of this in Chuck, including in his tendency to make things up because he did not think people would like him for who he was. Ex. 34 (Bories Dec.) ¶ 7. She also says that the "sad truth" is that she and Chuck "needed more" than their parents were able to provide, despite their love. Ex. 34 (Bories Dec.) ¶ 12.

The trial team did not call Chuck's sister Susan to testify. Susan could have given the jury a more accurate picture of the Hall family. For example, Susan recalls that:

80

> when I was growing up, [my parents] had their struggles. Alcohol consumption was a large part of their weekend. During my childhood, I remember several occasions when their arguments would progress to knock-down, drag-out fights.

Ex. 35 (Shumway Dec.) ¶ 5. Looking back, Susan understands that Charles and Dorothy's "plan to resolve their problems was to enlarge their family," which they did by adopting Michelle and Chuck. *Id.* ¶ 6.

Susan could also have explained her parents' limitations, explaining why Chuck did not get the help he needed. Her parents "were trying their best, but they were out of their depth." Ex. 35 (Shumway Dec.) ¶ 20.

Although Susan actually provided this information to Mr. Duchardt when they met, he decided that she should not testify. Ex. 35 (Shumway Dec.) ¶¶ 24-25. The trial team's files do not explain why he believed Susan had nothing to offer, particularly as records corroborate her description of the family.

The information from Susan and the Sweetser Center's report was not all that the trial team ignored. The trial team's file included the following note written by a teenage Chuck:



Ex. 93 (Teen Suicide Note).[40] The trial team did nothing with this evidence that Chuck was in

extreme distress, including asking Chuck's sisters about it or providing it to the defense experts.

All of this distress by Chuck, his parents, and his sisters was happening simultaneously to

significant school challenges for Chuck. The jury simply heard that he went to a private school,

Thornton Academy, after returning from SMS. Not only did they not know anything about the

---

[40] The note reads: *"Mom + Dad I ran away because some one [sic] told me I should[.] I will not be in the State of Maine if you call the cops before I call you. I shall kill myself and that's not a threat it's a promise. And this is one problem you can't solve with cops so please don't call anyone. Or I a dead man [sic]. This is one promise I will keep. Chuck M. Hall Please give me until 5:30 pm Sunday (I'll kill myself if you don't)If Jim call's [sic] tell him I'm at erick's [sic] for the day I already know a way how to kill my self [sic]. ([T]hanks for the Idea mom) Carbon monoxide poisoning."*

82

horrors he experienced at SMS, they did not have the information to understand how significantly he was failed by Thornton Academy.

Chuck had been sent to SMS after failing the sixth grade twice. SMS provided nothing in the way of formal education. *See, e.g.*, Ex. 29 (Elizabeth Miles Dec.) ¶¶ 4-5. Then at age fourteen, with the fifth grade being the highest grade Chuck had passed, he was placed in the ninth grade. It could be no surprise that Chuck would fail the ninth grade. In fact, he tested as being at just a fourth-grade level in math and spelling. Ex. 64 (Thornton School Recs.) at 17.

Early into the 1985-1986 school year, Chuck's first attempt at ninth grade, he was assessed by the school psychologist but only for "behavioral and personality factors." Ex. 64 (Thornton Academy) at 19. He seemed "mildly depressed" with a flat affect and "only fair" eye contact. Ex. 64 (Thornton School Recs.) at 19. Dr. Payson concluded:

> Chuck is very unsure of himself and he tends to hold back and deal with only what he is absolutely sure of. His level of emotional development is below what might be expected for his chronological age…He does have inner resources, however, access to them is limited. He is affectively sensitive but tries to avoid expression of feelings. When pushed by inner pressure or external events, perceptual distortions are noted. Although personality make up is immature and there is some difficulty in delaying gratification, he typically deals with conflict through fantasy and denial of negative feelings . . . In the area of interpersonal relationships, Chuck seems distant from people . . . With peers he would like to be socially popular but doesn't seem to know how to accomplish this.

Ex. 64 (Thornton Academy) at 20.

During fall of 1985 a school meeting was called. A record from this meeting reflects that "discipline is no problem" and "classroom behavior" is listed as a strength. Yet his teachers report "homework completion is a problem" and "Chuck doesn't seem to know what's going on." Ex. 64 (Thornton School Recs.) at 11. He was "[i]n a daze often" and is "socially withdrawn." *Id.* at 12. Yet they continued to mainstream him in all classes, recommending family counseling and that Sweetser get involved. *Id.*

Only after he failed the ninth grade and Mr. and Mrs. Hall wrote a letter demanding evaluations for both Chuck and his sister Michelle, was he *finally* assessed for a learning disability. *Id.* at 29. It was at this time that Chuck was diagnosed with a "specific learning disability," and for the first time provided actual special education services. *Id.* at 26. Even at this time, with Sweetser's evaluation just completed and Chuck having failed the ninth grade, his teachers noted his strengths to be that he was "respectful of authority" and had "honesty with authority." *Id.* at 30. His weaknesses included motivation, skipping class, social skills, organizational skills, math skills, and depression. *Id.* At this point he was assigned to work with a tutor, a role filled by David Ruff.

The trial team also failed to contact David Ruff, whose name appears many times in Chuck's school records. Chuck's Thornton Academy records identify Mr. Ruff as Chuck's tutor during the 1986-1987 school year. *Id.* at 38.

The PET recommendation included:



Ex. 64 (Thorton School Recs.) at 31. In addition to the recommendation for counseling – itself important information that trial counsel did not follow up on – the Special Services to be provided included Resource Room for Math and a one-on-one tutor. In his role as tutor, Mr. Ruff had daily contact with Chuck at fifteen years of age. He would have willingly spoken to trial counsel about Chuck. Ex. 36 (Ruff Dec.) ¶ 22.

Receiving special education services for the first time seemed to really improve matters. Mr. Ruff could have spoken about positive aspects of working with Chuck. Ex. 36 (Ruff Dec.) ¶ 16. In November of 1986, fall of his second attempt at ninth grade, an IEP meeting was held in which significant progress was reported. Teachers reported he was "doing very well," "Chuck has been doing better," and that his "attitude has improved." Ex. 64 (Thornton School Recs.) at 36-37. Some remarks note difficulty staying on task and lack of interest, yet this was a marked improvement over any school reports since the Fourth grade. *Id.* at 37.

A few months later, at another IEP meeting he still appeared to be doing relatively well with remarks that include "Chuck is doing well," "Doing very well," and "Chuck seems to feel better about himself lately." Ex. 64 (Thornton School Recs.) at 45. Concerns were noted in Math Skills and Short term auditory memory, the precise areas with which he still continues to struggle. *Id.* at 44; Ex. 5 (Israelian Rpt.) at 51, 53, 58-59, 73-75.

By March of 1987, things appeared to be more difficult again. Mr. Ruff observed at that time:

> Ruff - feel something is bothering Chuck; however, he is getting his schoolwork done.

Ex. 64 (Thorton School Recs.) at 49. Mr. Ruff could have testified about these challenges, too. Dr. Payson noted:

> Chuck's behavior and living situation has significantly deteriorated over the course of this school year and at this time, he is essentially out of control and parents are asking for help. Chuck has clearly exhausted the resources of Thornton Academy and will require a more restrictive placement if he is to receive an education. It is recommended that he be considered for residential placement at a facility like Homestead.
>
> Stanley L. Payson, II, Ed.D.
> Consulting School Psychologist

*Id.* It was recommended that an out-of-district residential placement be found. *Id.* at 50.

Beyond having observed Chuck in the aftermath of repeated sexual abuse, Mr. Ruff explains that in school, "Chuck didn't get what he needed." Ex. 36 (Ruff Dec.) ¶ 17. Mr. Ruff, who is now an education expert with years of teaching experience, would have told the jury "that the administration and other teachers simply didn't know what to do with Chuck." *Id.* ¶¶ 3, 17, 18; *See also* Ex. 88 (Nasse Dec.) ¶¶ 4-5.

Mr. Ruff notes that "[i]n conversations with Chuck's current legal team I was surprised to learn of the sexual assaults he suffered while at the Shaker Mountain School – and then cognizant of how so much of what I had observed in Chuck made sense." *Id.* ¶ 21. "[I]t helps to explain his desire to be accepted by his peers, his embarrassment and simultaneous outbursts, and his anger regarding what he saw as an unfair system." *Id.* Mr. Ruff "can only imagine how hurtful it must have felt to hide this secret, embarrassed by it, and afraid that no one would take any actions to support him if he was public with this information." *Id.*

Mr. Ruff's explanations could have offered important context to Chuck's behavior. The trial team suggested to the jury that Chuck was out of control despite having the support he needed to thrive, which is closer to aggravating than mitigating evidence. *See* Tr. 05/07/14 at 1779. In fact, Chuck was acting out after repeated sexual abuse by a trusted adult and authority figure, while not getting the support he needed from the other teachers at Shaker Mountain, at his new school, or from his family. Mr. Ruff's testimony could have made that clear.

Instead, the jury heard that Chuck was engaging in criminal and out of control behavior and was sent to a residential facility, Homestead, in an effort to help him. Rather than helping, Homestead was "another abusive environment for Chuck instead of a therapeutic residential home." Ex. 5 (Israelian Rpt.) at 29. Homestead was more akin to an abusive labor camp

86

masquerading as therapy, where at-risk children (who were state wards at this point) were humiliated for suicide attempts and physically abused. With its militant ethos, the universe could not have drawn up a more inhospitable environment for Chuck to cope with his sexual abuse trauma.

Had the trial team interviewed Bonny-Sue Curtis, who Chuck identified for them, they would have learned that at Homestead, "[s]uicide watch meant that you had to wear a red jump suit, so everybody knew you were supposedly thinking about killing yourself." Ex. 40 (Curtis Dec.) ¶ 6. Ms. Curtis added, "It wasn't fun when you got restrained: they fully body-slammed you and lay across you on the floor as you kicked and screamed."[41] *Id.* ¶ 7.

The trial team did put on cursory evidence about Homestead Academy, but it was limited to two old friends (Steve Parks and John Mandarelli) testifying to Chuck's good nature as opposed to revealing how detached and cruel Homestead Academy was and its impact on a boy coping as a sexual abuse survivor in silence. Tr. 05/22/14 at 4068-87, 4126-33. Ms. Curtis, staff member Lou Moretto, staff member Mary Tilghman, alumnae Edith Smith,[42] Renee Dubois, or a host of others — would have provided strong mitigation evidence demonstrating Chuck did not get the help he needed. *See, e.g.*, Ex. 84 (Dubois Dec.).

---

[41] Another Homestead Academy alumnus, John Mandarelli, who did testify at trial, but not about the depths of physical abuse or its importance, described it in his declaration how the children were made to scrub the floor: "If you refused to do it, they would hold your arm and force you to. The way they got you to do that was to grab you by the back of your neck, trip you, put a knee in the back of your neck and one on your spine, and then 4-5 staff members would hold you down as they made you scrub." Ex. 41 (Mandarelli Dec.) ¶ 6.

[42] Chuck identified Edith Smith for Mr. Lewis as a person to interview. Ex. 15 (Duchardt Int.) at 111, 113.

Homestead operated on "a consequence system called IWP (Intensive Work Program)." Ex. 37 (Tilghman Dec.) ¶ 5. IWP assignments were "just plain stupid, things like carrying rocks back and forth in a bucket." *Id.*[43] The kids wore different colored jumpsuits for their transgressions. Head counselor, Pat Bosquet was described by witnesses as a "bitch," cranky and mean, unfriendly, tough, and a hypocrite (she verbally abused kids with curse words when the kids were prohibited from using them). Ex. 38 (Moretto Dec.) ¶ 19; Ex. 39 (Parks Dec.) ¶ 17; Ex. 40 (Curtis Dec.) ¶ 5; Ex. 89 (Smith Dec.) ¶ 8. Ms. Bosquet's records featured a bastion of red flags that the trial team failed to investigate, failed to present, and failed to contextualize why this particular place was so harmful to Chuck during his development.

Initially, she noted Chuck "appears very sensitive to issues of family fighting, loss and abandonment, and parental alcohol use." Ex. 65 (Homestead Recs.) at 8.[44] She identified his adoption/abandonment as one of two key areas to address, the other being "[c]onfusion over sense of self and sexual identity." *Id.* at 12. Chuck was less than two years removed from his sexual victimization. Ms. Bosquet grew frustrated that Chuck would not resolve his feelings in her two preferred settings: group therapy and family therapy. "Without individual therapy, it is unlikely a victim of sexual abuse will ever reveal the fact of their abuse; certainly a teen boy is highly unlikely to reveal such trauma in the presence of his peers." Ex. 5 (Israelian Rpt.) at 29.

---

[43] On cross-examination John Mandarelli dismissed the notion that Homestead was therapy when he sarcastically stated that a 98-pound kid carrying 30-pound buckets is not his idea of therapy. Tr. 05/22/14 at 4079. This is the heart of this subclaim: the trial team failed to investigate known information. Mr. Mandarelli introduced a glimmer of this information during questioning from the government, and it was neither followed up on nor contextualized for the jury.

[44] This is yet another example of documented conflict and alcohol abuse by the Halls. Ms. Curtis also noted that her mother came much more frequently to visit than Chuck's parents. Ex. 40 (Curtis Dec.) ¶ 7.

88

The trial team's incomplete investigation into Chuck's life story is apparent in this exchange:

> Duchardt: Is it a fair statement, though, that you and Chuck and others did run away at times?
>
> Mandarelli: Correct.
>
> Duchardt: Okay. It wasn't really very hard to run away because it wasn't a secure facility. It was a nice facility, right?
>
> Mandarelli: Right. There was no fence. They just had vans that would chase you around. But I also want to add that they shut that place down for mistreatment.
>
> Duchardt: But not to you guys, right?
>
> Mandarelli: No, I didn't see any of it.[45]

Tr. 05/22/14 at 4072-73.

What Mr. Mandarelli meant was that he "didn't see anything that happened *at the time Homestead shut down*, because [he] was already long gone by then." Ex. 41 (Mandarelli Dec.) ¶ 4. He further explained that he did not mean that he hadn't seen or experienced any mistreatment while he and Chuck were there. *Id.*

---

[45] John Mandarelli now explains,

When I look at my testimony, there's so much more I could have said about Homestead, but I didn't get the chance. I especially didn't get to talk about the mistreatment we experienced there. As soon as I mentioned that Homestead eventually got shut down because of mistreatment, Chucky's lawyer asked me: "But not to you guys, right?" When I answered, "No, I didn't see any of it," what I meant was that I didn't see anything that happened *at the time Homestead shut down*, because I was already long gone by then – and so was Chucky. Homestead was not shut down for mistreatment specifically of me and Chucky. But I did not mean that I hadn't seen or experienced any mistreatment while Chucky and I were there.

Ex. 41 (Mandarelli Dec.) ¶ 4 (emphasis in original).

89

The trial team did not even interview all of the witnesses that Chuck pointed them to, although they largely relied on Chuck for ideas about who to interview, rather than using the records in their possession or their own research to identify potential witnesses. For example, Chuck suggested that the trial team interview Bonny-Sue West (who has the same legal name now but socially uses her husband's last name, Curtis). Ms. Curtis was in group therapy with Chuck at Homestead and could have helped explain why Homestead did not help Chuck. Ex. 40 (Curtis Dec.) ¶ 4.

Further, even as to the witnesses trial counsel did interview, "[h]e seemed to know exactly what he was looking for" rather than asking questions. Ex. 39 (Parks Dec.) ¶ 18. For example, Steve Parks explains, in his one conversation with Mr. Duchardt, over the phone, Mr. Duchardt "didn't ask me about the culture at Homestead"—where Mr. Parks and Chuck met— "or what my own experience there was." *Id.* Similarly, John Mandarelli, who was also at Homestead with Chuck, says, "Chucky's lawyer didn't ask me very many questions when we talked before trial. He seemed to have a specific idea of what he wanted to hear from me, and he wasn't interested in anything more." Ex. 41 (Mandarelli Dec.) ¶ 15. And, while he "mentioned some of the mistreatment I experienced at Homestead in my testimony," he "didn't get the chance to explain it more." *Id.* ¶ 5. As such, although Ms. Curtis, Mr. Parks, and Mr. Mandarelli all willingly would have testified about it, the jury did not hear about the harsh culture at Homestead, where Chuck was sent after Thornton.

At Thornton, Mr. Ruff had realized something was bothering Chuck, and his behavior had escalated over his year there. Testimony from Ms. Curtis, Mr. Parks, and Mr. Mandarelli could have explained why Homestead was not a healing place for Chuck. Chuck's sister Michelle Bories, Dr. Richard Staples, and Mr. Joe Buckmaster also note that Mr. Duchardt did

not ask them any open-ended questions or try to get any information beyond narrow answers to the specific questions he approached them with. In addition, trial counsel failed to prepare Chuck's sister for cross examination by laying out for her the significant evidence of guilt. This resulted in her denying Chuck's guilt to the jury that had just convicted him. Ex. 34 (Bories Dec.) ¶ 22.

Overall, trial counsel's investigation was characterized by numerous failures: failure to use records in their files to identify witnesses to interview and leads to follow up on; failure to speak to all of the witnesses Chuck pointed them to, even as they mostly limited their investigation to individuals Chuck said they should speak with; failure to ask open-ended questions about Chuck's life to the people they did speak with, many of whom they spoke with only once, by telephone. National standards emphasize the fundamental need for "multiple, in-person, face-to-face, one-on-one interviews with family members and others who are familiar with the client's life and family history." Ex. 10 (Stetler Dec.) ¶ 39.

The life history investigation guaranteed to Chuck by the Sixth Amendment right to counsel would have led not only to the information above, but then to the conclusion that,

> Chuck has experienced all the classic symptoms of an untreated, unhealed male survivor of sexual trauma… he has struggled with using alcohol to cope; depression, self-harm and several serious suicide attempts; unstable self esteem; anxiety; severe insomnia; difficulty with his anger; severe problems with shame; dissociation and flashbacks; struggles with intimacy; using poor judgment; sexual dysfunction and confusion; screaming for help; difficulties managing Crohn's as it related to his abuse; keeping the abuse secret for nearly four decades, *severe PTSD* as measured by the CAPS-V; and criminal behavior.

Ex. 4 (Fradkin Dec.) ¶ 256.

Effective representation would have informed the jury that Chuck has long suffered from Post Traumatic Stress Disorder, with depersonalization and derealization as a result of being repeatedly sexually assaulted as a thirteen-year-old by Jerry Mintz. Ex. 5 (Israelian Rpt.) at 69;

Ex. 6 (Agharkar Rpt.) at 24. His "history of sexual trauma has been repressed for nearly his entire life, exacerbating his shame and symptoms." Ex. 5 (Israelian Rpt.) at p. 82. His brain abnormalities, demonstrated as early as his first-grade report card, include damage to areas responsible for math, for emotional regulation, language, memory, and attention. *Id.* at 73. His specific learning disability, dyscalculia, was never described to the jury but is associated with impairments in the area of his brain responsible for "accurately interpreting the needs and intentions of others." *Id.* at 80.[46]

Trial counsel told the jury that Chuck had received "every bit of love and care that anyone could possibly be given." Tr. 05/07/14 at 1779. While Chuck's parents loved him, trial counsel presented this as if it were Chuck's complete life history. It was not.

### B. Chuck Hall has brain damage, which is neurodevelopmental in part, and trial counsel was ineffective for failing to investigate and present this evidence.

Trial counsel failed to tell the jury about Chuck's learning disability or brain damage, instead cobbling together a mitigation story centered on two experts: Dr. Wisner and Dr. Fucetola. Collectively, they told the jury that Chuck was a psychopath with a normal IQ. The information in this claim is newly presented, but none of this is new. All the information undersigned counsel found was also present when trial occurred in 2014. Worse, from the very beginning of the case, trial counsel believed that imaging of Chuck Hall's brain, such as an MRI, would be compelling mitigating evidence. Yet trial counsel failed to request funding for brain imaging until three weeks before trial.

---

[46] Counsel's effective representation would have revealed to the jury multiple brain abnormalities, further explained in Claim 1.B.

Indeed, a PET/MRI conducted in 2023 showed physical abnormalities in Chuck's brain that would have been apparent in 2014. Because of counsel's lack of diligence, no brain-based disability was diagnosed, because brain imaging was not conducted. Without this imaging trial counsel failed to connect Chuck's symptoms and behaviors to his brain. Though the breadcrumbs – Chuck's manifestations, symptoms and behavior – were readily available in school records, therapist reports, and interviews of close acquaintances, the connection was never made.

Thus, the jury was not told of Chuck's significantly impaired brain that affected his functioning. The jury was never told that Chuck's brain has physical and structural abnormalities. Throughout the trial, the government doubted the sincerity of Mr. Hall's mental health issues and threw around the phrase "malingering" nearly as often as they did "psychopath." Trial counsel never offered a cohesive rebuttal, and worst of all, likely harmed his case with Dr. Wisner's corroborating psychopathy diagnosis.

### i. Trial counsel was ineffective in failing to present the jury with any evidence of Chuck's brain impairments.

Trial counsel presented no evidence that Chuck Hall had brain damage. The jury was not told that he had a cyst in his brain, lesions to his brain, or abnormal volume and metabolism in his brain. Instead, the jury heard a passing reference of Chuck having had a "learning disability" diagnosed in the fifth grade. Tr. 05/22/14 at 4271. Dr. Fucetola, a defense-retained neuropsychologist, rendered no diagnosis of Chuck whatsoever. Dr. Fucetola did not discuss Chuck's school records in detail, did not know about Chuck's history of sexual abuse at SMS, and did not have access to any imaging. As a result, he simply reported the results of his testing: that Chuck had a normal IQ, but had deficiencies in visual memory and problem solving, with a decrease in left hand motor speed. He testified further that Chuck had previously been in a motorcycle accident, which the family reported contributed to a decrease from his "photographic

93

memory" to a very poor memory. *Id.* at 4274-76. Dr. Fucetola made no effort to connect his poor visual memory and problem solving or left-handed impairments to real world application. The jury was left with, at best, knowledge that Chuck did poorly on a few tests, but they were not told how that might impact Chuck. When the jury heard facts that suggested Chuck acted impulsively, without empathy, or with anger, none of those traits were linked to problems with his brain. Instead, the jury was left to attribute those traits simply to him being a sociopath. Tr. 05/28/14 at 4790, 4826, 4867.

### a. Trial counsel's failure to secure brain scans resulted from counsel's delay, neglect, and objectively unreasonable representation.

The first thing Mr. Duchardt did in the case was contact an expert in brain imaging. Darryl and Lynn Johnson moved to withdraw from Chuck's case on August 14, 2012. Dkt. No. 183. Judge Fenner contacted Mr. Duchardt about representing Chuck on August 15, 2012. The very next day, on August 16, 2012, before he was officially appointed to the case, Mr. Duchardt emailed Ruben Gur, M.D., a neuroscientist and professor at the University of Pennsylvania who studies and analyzes neuroimaging, about Chuck's case. Mr. Duchardt immediately determined that brain imaging would be important. Despite immediately recognizing the importance, trial counsel let eighteen months pass before requesting funding for brain imaging.

When Mr. Duchardt first contacted him, Dr. Gur recommended pursuing neuropsychological testing prior to neuroimaging. Ex. 2 (Gur Dec.) ¶ 3. Dr. Gur, through his staff, estimated a minimum of nine to eleven weeks, not counting the time it might take a hospital to actually coordinate an appointment and security issues, from the time he received neuropsychological data until a final neuroimaging report could be completed. *Id.* at 4 (email attachment to declaration).

Based on the conversation with Dr. Gur, Mr. Duchardt then retained neuropsychologist Robert Fucetola to conduct neuropsychological testing. Dr. Fucetola forwarded a summary of the neuropsychological test results to Dr. Gur on March 19, 2013, although Dr. Gur never received the raw testing data he had requested. *Id.* ¶ 5.

After receiving the summary results from Dr. Fucetola in March 2013, Dr. Gur's staff informed Mr. Duchardt that, based on the summary neuropsychological results Dr. Gur received, he "expected that neuroimaging would show some abnormalities in Mr. Hall's brain structure." *Id.* ¶ 7. Dr. Gur and his team also concluded that the "Behavioral Image would show deficits." *Id.* ¶ 6. Despite this information from Dr. Gur, another year went by before trial counsel filed a motion with the court seeking funding for the brain imaging.

Mr. Duchardt later reported that he did not press the issue because he hoped the case would settle with a plea. Ex. 12 (Tr. 04/07/14) at 4. But settlement negotiations fell apart in the fall of 2013. In December 2013, defense psychiatrist Dr. Wisner and defense psychologist Dr. Fucetola both had completed their evaluations and urged trial counsel to pursue neuroimaging of Chuck. Despite this urging, another four months went by before trial counsel requested funding for the brain imaging.

Trial counsel finally requested funding for neuroimaging from the trial court on April 4, 2014. Trial counsel submitted the request just *twenty-four days* before the trial began. Dkt. No. 635. The motion is styled as an *ex parte* motion, but trial counsel provided a certificate of service and gave the government notice in advance. In fact, having been notified that Chuck's trial counsel was going to seek brain scans, the government acted more expeditiously than trial counsel. The government filed notice of its own expert to respond to any neuroimaging evidence

95

on March 7, 2014, before trial counsel got around to filing their own motion. Dkt. No. 543 at 25 (Notice of witness Dr. Geoffrey Aguirre).

Trial counsel's motion does not explain why brain imaging was necessary, except to say that Drs. Fucetola and Wisner determined that further testing was necessary to "judge the kind and severity" of what they believe to be brain "abnormalities." Dkt. No 635. Notably, trial counsel failed to inform the trial court that neuropsychological testing already had been conducted and indicated that structural anomalies would likely be observable in brain imaging. Instead, the motion provided great detail about the cost and location and the objections trial counsel anticipated from a prosecution expert about the specific testing procedures.

On April 7, 2014, the trial court held a telephonic conference on the motion where both Judge Fenner and Magistrate Judge John T. Maughmer were present. Ex. 12 (Tr. 04/07/14). At the outset of the hearing, Judge Fenner stated, "I'm concerned with the timing of this . . . here we're three weeks from trial; and if we were to go forward with this, there's an awful lot that needs to be done yet." *Id.* at 2. The trial court was concerned that, with only twenty-one days until trial, the testing had to be scheduled, conducted, provided to the government to analyze results, and, additionally, possible *Daubert* challenges might ensue. *Id.* at 3. Mr. Duchardt attempted to explain to the trial court his delay in seeking the motion, including the fact that he had not requested funding previously due to the possibility of settlement.[47] *Id.* at 4. But he provided no assurances that the testing actually could be completed prior to trial, much less that the trial court would have time to rule on admissibility challenges.

Magistrate Judge Maughmer additionally expressed skepticism that the testing would offer any new evidence, wondering if there was "any serious dispute" as to Chuck's having

---

[47] In fact, settlement negotiations had fallen apart the previous fall.

mental health issues since he was in the mental health unit of the USMCSP at the time of the homicide. *Id.* at 3. Mr. Duchardt tried to respond to this concern, but his convoluted explanation omitted the most important information: the difference between mental illness and physical abnormalities in the brain. The BOP placing Chuck in a mental health unit did not establish physical abnormalities in his brain; only imaging could establish physical abnormalities. Certainly mental illness can be connected to physical abnormalities in the brain, but they are not identical. *See* Ex. 1 (Bigler Rpt.) at 8. Because physical abnormalities can be seen in pictures, they are unlike mental health diagnoses, which are based on a collection of reported symptoms and observations about someone's behaviors. At the time of the hearing, Mr. Duchardt was aware that neuropsychological testing indicated that brain imaging would likely show physical abnormalities in Chuck's brain, but he did not have conclusive proof of such abnormalities, because only imaging could provide that.

Mr. Duchardt also failed to explain to the trial court that Chuck's mental illness was in fact disputed by the government, even though the BOP had placed Chuck in an in-patient mental health unit. Dr. Reardon, a BOP psychologist who had conducted a competency evaluation, had opined not only that Chuck was competent but that he had been erroneously diagnosed with Bipolar Disorder based on malingering. Dr. Reardon concluded that Chuck's proper diagnoses were Depressive Disorder (NOS) and Anti-Social Personality Disorder (ASPD).

Judge Fenner denied the motion at the hearing. Three days later, on April 10, 2014, he issued a written order denying the motion for the reasons stated on the record. Dkt. No. 644. The crux of Judge Fenner's ruling was concern that there was not enough time, as he had explained at the hearing. Ex. 12 (Tr. 04/07/14) at 2.

Dr. Wisner received a copy of Dr. Fucetola's report for the first time on April 12, 2014, after the motion for neuroimaging had been denied. Upon receiving the report, Dr. Wisner indicated that the neuropsychological testing results might support the existence of a traumatic brain injury (TBI), adding to the chorus of experts who believed the neuropsychological testing would reveal the existence of some physical abnormality that would be observable in brain imaging and provide a link to Chuck's behavior. He told Mr. Duchardt to let him know if he needed additional medical justification for the brain imaging. A few days later, Mr. Duchardt contacted Dr. Wisner and Dr. Fucetola to request additional information from them for a motion for reconsideration. Despite the additional reasons provided by Dr. Wisner and Fucetola, Mr. Duchardt never filed a motion for reconsideration (or took any other steps to secure neuroimaging).

Nor did trial counsel ask for a continuance. Mr. Duchardt said that he decided not to ask for a continuance of the April 2014 trial date "[o]nce [he] knew that a continuance was not going to change their mind about giving [him] money for [Gur]." Ex. 15 (Duchardt Int.) at 140. Asked "[w]hat made [him] think that a continuance wouldn't change their mind" he responded that Judge Fenner and Magistrate Judge Maughmer "said so." *Id.* at 140. Mr. Duchardt stated that "[a]t the ex parte conference . . . about funding for Gur" he asked the trial court " would it change [their] mind if we had a continuance to have more time to do this" but "the answer was no" apparently because "the decision, even though purportedly made on the time factor, was more made, in my understanding, on the basis of I could not show that I was going to get anything more out of that than what I already had in the experts who had already been provided." *Id.* at 141.

Contrary to Mr. Duchardt's recent claim, nowhere in the ex parte conference transcript does anyone mention the possibility of a continuance. *See* Ex. 12 (Tr. 04/07/14). Mr. Duchardt is incorrect; the Court did not indicate "a continuance wouldn't change their mind" about granting the funding motion for imaging. Nor does the transcript give any indication that either judge's real concern was that the brain imaging would not show anything beyond what Dr. Wisner and Dr. Fucetola had already provided. Moreover, if the trial court's primary concern really was that brain imaging would not show anything beyond what had been provided already, it was because Mr. Duchardt failed to explain the differences between a mental health diagnosis and brain imaging, failed to explain that only brain imaging can show physical abnormalities, and failed to explain that Dr. Wisner, Dr. Fucetola, and Dr. Gur all agreed that brain imaging would likely show abnormalities in Chuck's brain.

Once trial counsel learned that there would be no brain imaging for experts to review, it appears that trial counsel gave Dr. Fucetola no guidance on how to proceed in the case. He did not ask Dr. Fucetola to render any diagnosis in the case. Dr. Fucetola presented his testing results, telling the jury that Chuck has a normal IQ but performed poorly in three areas: visual memory, problem solving and left-hand motor speed. Tr. 05/22/14 at 4271-72. Dr. Fucetola indicated that these test results could be developmental or could be a result of the motorcycle accident he had as a young adult. *Id.* at 4275. No effort was made to link these areas to Chuck's school records, his behavior, symptoms, or real life.

### b. Because no brain scans were performed prior to trial, information about structural abnormalities in Chuck's brain was not presented to the jury.

No brain imaging was conducted prior to trial. Consequently, no evidence of the structural abnormalities in Chuck's brain were presented to the jury, although these

abnormalities are apparent in results from a PET/MRI conducted in 2023 and also would have been apparent at the time of trial. Ex. 2 (Gur Dec.) ¶ 10; Ex. 1 (Bigler Rpt.) at 6.

### ii. Chuck suffers from impairments in brain functioning.

Chuck's school records demonstrate that he failed to develop various skills, impacting his ability to succeed in school.  This lack of skills is also seen in assessments and testing conducted over the years, from elementary school through 2022. Considering the school records, observations of Chuck, and the testing, a coherent picture emerges of brain-based impairments, including a learning disability known as dyscalculia. Imaging can link these impairments to specific areas of Chuck's brain that are abnormal.

### a. Chuck has a learning disability in math known as dyscalculia.

As early as the first grade, Chuck began experiencing academic challenges in school that pointed to a possible developmental learning disability. Ex. 5 (Israelian Rpt.) at 5. The jury did not see Chuck's school records, nor did any expert go through them in detail. The records tell a compelling story of school failure. Chuck's grades are "poorest in math problem solving and computation, dictionary skills (i.e. strategy and organization), and creating writing (i.e. produces something original)." *Id.* at 6.

Dr. Marlyne Israelian, a developmental neuropsychologist retained by undersigned counsel who evaluated Chuck in 2022, explains that it is not uncommon for learning disabilities to truly become apparent around the third grade because there is "an increased demand for self-directed behavior and responsibility" at that age. *Id.* at 6.

By the fourth grade, Chuck's math problem solving had fallen from the nineteenth percentile the previous year to just the fifth percentile. *Id.* In the fifth grade, there appeared to be some concern that he might need intervention, but no special education services were provided to

him in middle school. He failed the sixth grade. There was no intervention provided, and he failed the sixth grade a second time. *Id.* at 7. Finally, at the request of his parents, he was assessed. *Id.* This assessment made even more clear Chuck's math problems. Despite being chronologically ready to enter the eighth grade, he remained at the fifth-grade level for math. *Id.* at 9. After this assessment, it was recommended that he receive special education through the resource room for math. *Id.* at 10. Instead, his parents sent him to Shaker Mountain School, where he received no formal education, and certainly no special education services.

Subjected to a year of repeated sexual victimization, he returned home to the ninth grade with no special education services or supports in place. After failing the ninth grade twice, he *finally* was assessed for a "learning disabilities work-up." *Id.* at 18. He was formally diagnosed with a Specific Learning Disability, based on being 5.5 years behind grade level in math calculation skills and math reasoning skills. *Id.* at 20. Based on this diagnosis that was slow in the making, Chuck began to receive special education services for the first time.

Chuck, like approximately 3-7% of the population, suffers from developmental dyscalculia, though it is severely underdiagnosed. *Id.* at 21. As Dr. Israelian explains, the difficulty in math concepts associated with dyscalculia is associated with difficulty processing visual-spatial information. *Id.* at 22.

Chuck's poor nonverbal abstract reasoning, his poor left hand motor speed, and poor visual memory found by Dr. Fucetola's testing in 2013 were consistent with Dr. Israelian's 2022 testing. *Id.* at 53. Dr. Israelian also tested for additional areas of reasoning abilities and found weaknesses in quantitative and analogical reasoning. *Id.* at 56. Despite being able to do basic math (addition, subtraction, multiplication) at the thirteenth-grade level, his ability to solve math

101

computation problems fell significantly below expectation at just the sixth grade, one month level. *Id.*

Chuck displayed poor perceptual reasoning abilities in 2011 on BOP testing. *Id.* at 51. He scored below the first percentile in the immediate and delayed recall of a complex figure when tested in 2022. *Id.* at 57-58.

**b. Chuck has long displayed poor attention and task completion.**

The school records, which the jury was never shown, also demonstrate as early as first grade that Chuck had difficulties with attention and task completion. His first-grade teacher wrote that Chuck, "does a lot of daydreaming and can't keep his mind on finishing." *Id.* at 5. By the third grade, he was a boy who, "still daydreams, talks, and wanders around the room. He needs to settle down and get his mind on his work." *Id.* He showed difficulty throughout elementary school with "self-discipline, sustained effort, and listening to and following directions." *Id.* at 6. Difficulties with task completion continued in fifth grade. *Id.* at 7. In the fifth grade, he had weaknesses in auditory attention and short-term memory. Ex. 60 (Saco School records) at 21. As recently as 2022, he continued to demonstrate disorganization, with a piecemeal and fragmented approach to a test, with skills below the first percentile. Ex. 5 (Israelian Rpt.) at 58.

Once Chuck was finally assessed by the school after failing the sixth grade for a second time, his brain impairments were apparent. While he demonstrated a normal IQ, his auditory working memory was in the bottom ninth percentile of children his age. He showed disorganized and arbitrary thinking that demonstrated a lack of planning and immaturity. *Id.* at 8. However, he never received the smaller group or individualized instruction and weekly reports recommended as a result of this 1984 assessment. *Id.* at 10. Instead, his parents sent him to Shaker Mountain

102

School, where he was sexually victimized. Upon return to his parents' home, he was enrolled in the ninth grade at Thornton Academy, where he was reportedly often "in a daze" and had difficulties with homework and task completion.

While this very well may have been exacerbated by the trauma he experienced at the hands of a sexual predator, some of the problems in school are consistent with the inattention and task completion problems he displayed in elementary school.

Dr. Israelian explains,

Children with developmental dyscalculia are often accused of being lazy or not trying hard enough. The hyperactivation seen on brain scans found across multiple brain areas related to math indicate that children exert a tremendous amount of effort to solve problems relative to their non-learning disabled peers. The constant struggle to keep up with the class despite significant difficulties can be demoralizing in the face of repeated failure. Negative self-image, social isolation, loss of self-esteem, and shame are common among children with learning disabilities.

*Id.* at 22.

Recent testing of Chuck's sustained visual attention demonstrate real difficulty. He demonstrated in the testing "difficulty with inattentiveness, impulsivity, and sustained attention." *Id.* at 59. Chuck himself reports that he "could not comprehend the stuff" about this schoolwork, emphasizing that he was not afraid of hard work: "he did his chores, mowed the lawn every week in the summer, shoveled snow in the winter." *Id.* at 44.

Truancy is common among students with learning disabilities, as there "is reluctance to go to school because [they] are afraid of being perceived as failures and embarrassing themselves in front of their classmates." *Id.* at 22. The jury heard testimony from both of Chuck's parents about his skipping school, but the jury did not have this context to understand any reasons for his behavior. Even before the sexual abuse trauma that he was desperately trying to hide, he was exhibiting behavior that was perfectly understandable in light of his disability. Without knowing

103

of the disability, the facts of his truancy were aggravating. Put in the proper context, however, they are part of Chuck's sympathetic life story.

### c. Social skills impairments

Chuck's sister Michelle describes Chuck as a "lonely child." Ex. 34 (Bories Dec.) ¶ 7. She does not recall him having any childhood friends. *Id.* In fact, it appears that when Chuck was first assessed at age fourteen, there was some testing of social emotional functioning. Chuck demonstrated "insecurity and an inability to reach out to others." Ex. 5 (Israelian Rpt.) at 9. After the 1984 assessment, interventions were recommended, and Chuck was to receive counseling in peer interaction skills and self-confidence. Instead of receiving this counseling, he was sent to Shaker Mountain School. When he was fifteen years old, and repeating the ninth grade for the second time, he was assessed again. The examiner wrote, "With peers he would like to be socially popular but doesn't seem to know how to accomplish this." *Id.* at 18. Chuck admits he never felt like he fit in anywhere. *Id.* at 44.

Chuck's sister saw Chuck as similar in some ways to her son with Autism, suggesting common impairments in their social skills. Ex. 34 (Bories Dec.) ¶ 18. She described them collectively as "having difficulty expressing [their] feelings, and having trouble reading the room." *Id.* Chuck was recently tested for the first time in a facial recognition test, which scored him in the borderline range. Ex. 5 (Israelian Rpt.) at 58.

### d. Sleep issues

It was clear at the time of trial that Chuck suffered from significant sleep disturbances. BOP psychiatrist and government witness Dr. Kennedy testified that Chuck previously had been prescribed medication to help with sleep. Tr. 05/22/14 at 4227. Dr. Kennedy had treated Chuck when he was an inmate at FMC Devens, where he was incarcerated immediately prior to his

placement at USMCFP Springfield. Dr. Kennedy used the fact of Chuck's significant sleep disturbance as evidence of the mood disorder that he diagnosed. *Id.* at 4227-28. He described Chuck as "crawling out of his skin" with a lack of sleep. *Id.* at 4239. He described a lack of sleep as a persistent problem for Chuck throughout his time at FMC Devens. *Id.* at 4241. The government's witness, Dr. Maureen Reardon, who had evaluated Chuck for competency prior to trial, also testified about Chuck's report of recurring sleep problems. Tr. 05/23/14 at 4477. Defense expert Dr. Wisner also testified in some detail about recurring issues with sleep throughout the BOP records. Tr. 05/28/14 at 4760. Chuck's history of sleep problems was not disputed at trial.

There can be no doubt through the years that Chuck has repeatedly demonstrated severe sleep issues, often sleeping no more than two hours a time. He is chronically sleep deprived. Chuck was sexually abused at nighttime. He has since suffered a lifetime of insomnia. "The association between fear and bedtime was too strong and the flashbacks were more than he could handle," thus he began to get in trouble at nighttime—taking his father's care out for a joy ride when he could not sleep. Ex. 5 (Israelian Rpt.) at 27. Further, steroids, like Chuck's chronic use of prednisone to treat his Crohn's disease, are known to interfere with sleep. As discussed further below, sleep disturbances may also be exacerbated or caused by a pineal cyst in Chuck's brain.

### iii. Brain scans show physical abnormalities in Chuck's brain that corroborate and support the skill deficits seen in Chuck and on neuropsychological testing.

A picture is worth a thousand words. Pictures of Chuck's brain demonstrate physical, structural abnormalities in Chuck's brain in the precise areas where he displays skill deficits in real life and in neuropsychological testing.

Unsurprisingly, given what every expert consulted before trial told trial counsel, brain imaging does indeed demonstrate overwhelming evidence of significant structural abnormalities

105

in Chuck's brain. In 2023, on the motion of undersigned counsel, the MRI/PET scan that trial counsel identified as necessary in 2012 finally occurred. The results of Chuck's MRI can be summarized concisely: "Mr. Hall has abnormal brain imaging." Ex. 1 (Bigler Rpt.) at 8. "[T]hese imaging results demonstrate multiple abnormalities with Mr. Hall's brain." Ex. 2 (Gur Dec.) ¶ 9. "The areas of brain abnormality are critical for behavioral and cognitive regulation, which based on neuropsychological test results and clinical history, are abnormal as well." Ex. 1 (Bigler Rpt.) at 8. "[T]he origin of" these abnormalities "are likely a combination of neurodevelopmental and acquired." Ex. 2 (Gur Dec.) ¶ 9.

We know that Chuck suffered significant trauma as a victim of repeated sexual abuse at Shaker Mountain School when he was 13. It is documented that psychiatric trauma can cause permanent changes to the brain. Ex. 5 (Israelian Rpt.) at 72.

The imaging technology used to conduct the MRI/PET of Chuck's brain was available at the time of trial. Ex. 1 (Bigler Rpt.) at 6. "The results from the 2023 brain imaging . . . could have been known in 2014 if imaging had been conducted at that time." Ex. 2 (Gur Dec.) ¶ 10. These "results demonstrated abnormalities in Mr. Hall's brain that [Dr. Gur] would have had the tools and software to observe and analyze in 2014, which [Dr. Gur] communicated to Mr. Duchardt." *Id.* As such, Dr. Gur "could have testified in support of mitigating circumstances. [His] testimony would have helped the jury to consider what level of culpability should be assigned to Mr. Hall for his actions, and the appropriate punishment for his actions." *Id.*

The brain is incredibly complex. When a person has a particular skill deficit, it can be related to impairments in just one or in multiple parts of the brain that contribute to the inability to properly execute that skill. The reasons for that impairment can be developmental (one just happens to have a brain that is this way), a response to trauma (a physical impact on the brain),

106

or they can develop over time (either as a result of psychiatric trauma or due to some other process or disease). Often, the cause of a particular brain impairment cannot be known. Further, more than one cause can contribute to the same area(s) of impairment. Chuck's brain is also complicated — perhaps more so than most. He has impairments that we can see in his life and on neuropsychological testing. Those correlate with physical, structural abnormalities to his brain, as well as functional metabolic changes.

The different types of changes seen in neuroimaging are listed below. Each correlates to symptoms seen in Chuck discussed above.

### a. Volume loss

The Indiana University (IU) Hospital results of neuroimaging demonstrate that Chuck has generally low brain volume in the parietal cortex portion of his brain. Ex. 11 (MRI/PET Results). Low volume of the brain literally means that he has less brain matter than expected. His low volume of brain matter is "mild generalized parenchymal volume loss with asymmetrically greater volume loss in the parietal lobes with normative percentile at 1.1." *Id.* at 3. His volume loss is focused more on the right side of his brain than the left. *Id.* at 4. He also has a 20 percent decrease in metabolism in these areas. *Id.*

Chuck's parietal cortex is in the bottom 1.1 percentile of the population in volume:



Ex. 1 (Bigler Rpt.) at 2 (original image taken from Ex. 11).

Parietal and temporal lobes "play a critical role in emotional regulation . . . executive control and memory." *Id.* at 5. The parietal lobes, among other parts of the brain, "participate in managing the stress response." *Id.* The parietal cortex, the area of volume loss in Chuck, was a portion of his brain responsible for impairments on neuropsychological testing at the time of trial. *See* Ex. 5 (Israelian Rpt.) at 52-53, Ex. 1 (Bigler Rpt.) at 1.

The developmental dyscalculia learning disability that Chuck has is longstanding, evidenced in his elementary school records. Ex. 5 (Israelian Rpt.) at 7-10. The specific learning disability that he has is directly correlated to the areas of his brain that are impaired by decreased volume. The neuroimaging demonstrates volume loss in the right posterior parietal and right tempoparietal areas, specifically associated with Chuck's skill deficits in "visual construction;

abstract nonverbal reasoning and nonverbal transitive deductive logic; visual-spatial memory; inattention, impulsivity, and poor sustained attention and vigilance on a continuous auditory attention test with a right ear advantage; a right hand advantage on a test of manual-motor finger-tapping test[48]; and difficulty benefitting from feedback on a test of non-verbal conceptual reasoning and mental flexibility." *Id.* at 74. Developmental dyscalculia is "a function of multiple dysfunctional circuits that comprise the frontoparietal network." *Id.*

The impairments that Chuck has demonstrated in reading social cues, social interactions, and perspective taking are also critical roles played by this part of the brain. *Id.* at 74-75. It is unsurprising that Chuck would have difficulties living in an open dorm with other inmates based on his specific brain impairments (not to mention PTSD and Crohn's), as can be seen on neuroimaging. *Id.* at 74, 80.

### b. Ventricular asymmetry

This volume loss is a significant finding, but not the only abnormality in Chuck Hall's brain. Chuck also has ventricular asymmetry. Usually the right and the left sides of the brain are nearly identical mirror images of one another. Chuck's ventricles are asymmetrical. Remarkably,

---

[48] The right side of the brain controls the left side of the body, and vice versa, so the impairments to the right side of his brain are expected to advantage his right-side hearing and motor skills relative to his left side.

even a lay person looking at images of his brain with a naked eye can see this asymmetry:



Ex. 1 (Bigler Rpt.) at 4. Dr. Bigler notes that this asymmetry demonstrates that his right lateral

ventricles are larger than the left, so is likely related to concerns of parenchymal integrity and his

greater right hemisphere volume reduction. *Id.* at 3. It is likely this abnormality is related to the

same concerns with volume reduction that contribute to Chuck's developmental dyscalculia and

social impairments.

### c. White matter hyperintensities

Another finding was the numerous areas of white matter hyperintensities, or "lesions," in

Chuck's brain. *Id.* at 4. Imaging also demonstrates numerous abnormal areas of white matter

hyperintensity:

110



*Id.* at 5.

Dr. Knapp, a neuroradiologist who reviewed the brain imaging, identifies at least four areas of these hyperintensities. Ex. 3 (Knapp Rpt.) at 3. These white matter hyperintensities are what we in lay terms would call "lesions" on the brain.

White matter hyperintensities could be a result of the motorcycle accident that Chuck was involved in as a young adult, which the jury heard about, but had no indication that it provided lasting impact to Chuck's brain. Ex. 5 (Israelian Rpt.) at 75. They also could be manifestations of his Crohn's disease. *Id.*

**d. Chuck has a cyst on the pineal gland in his brain.**

Additionally, "Mr. Hall has a pineal body (gland) cyst." Ex. 1 (Bigler Rpt.) at 7. The following image is taken from Dr. Avery Knapp's report. Dr. Knapp points to the presence of a pineal cyst on Chuck's brain.

111

**FIGURE 5:**



Ex. 3 (Knapp Rpt.) at 8. Dr. Knapp concludes, "Note is made of a 6 x 4 x 4 pineal cyst with associated crowding of the pineal gland." *Id.* at 2.

"The pineal gland is part of the endocrine system," Dr. Israelian explains. Ex. 5 (Israelian Rpt.) at 75. The pineal gland plays a key role in the regulation of circadian rhythms, the body's sleep/wake cycle, as it secretes melatonin, a hormone that helps regulate sleep. *Id.*

112

It was clear at the time of trial that Chuck suffered from significant sleep disturbances. However, without imaging there was no way to realize that he actually has a cyst on his brain providing pressure on the pineal gland.

Pineal gland cysts are also associated with migraines (which Chuck has), auditory hallucinations, and a wide variety of disorders, including mood disorders and schizophrenia. *Id.* at 76; Ex. 1 (Bigler Rpt.) at 8. It is possible his pineal gland cyst could be partly responsible for a variety of his mood symptoms, auditory hallucinations, and chronic headaches. Ex. 5 (Israelian Rpt.) at 76.

### e. Diffusion Tensor Imagining (DTI) demonstrates impairment in the communication between various parts of Chuck's brain.

Diffusion Tensor Imaging (DTI) is a study of the tracts in the brain that allow for communication between different brain regions. *Id.* at 76. DTI imaging of Chuck's brain identified "significant deviations from normal in the cingulum bundle, uncinate fasciculus, superior longitudinal fasciculus II, arcuate fasciculus, and optic radiation. Abnormal asymmetry was also noted in the fornix." *Id.* Many of these changes in Chuck's brain network's ability to effectively and efficiently pass signals are associated with PTSD. *Id.* at 77. This ability to communicate among parts of the brain is "critically important for normal emotional regulation, especially quick emotional activation and reactivity, especially engaging the brain's regulatory mechanisms over flight, fight and fear reactions." Ex. 1 (Bigler Rpt.) at 14. The areas impacted also affect "the ability to learn from experience," executive control, emotional regulation and a variety of psychiatric conditions. Ex. 5 (Israelian Rpt.) at 77.

### iv. Conclusion

Chuck has a profoundly broken brain. As the experts consulted before trial indicated would happen, brain imaging corroborated the neuropsychological findings, and demonstrated

113

both structural and functional abnormalities in Chuck's brain. Trial counsel failed to heed the recommendations of both experts he retained by failing to timely request funds for neuroimaging.

Dr. Israelian can now say that Chuck meets criteria and is diagnosed currently with a specific learning disability in mathematics, or dyscalculia. *Id.* at 60. The jury never heard about his disability, nor did they understand how his behaviors and skill deficits are related to his brain impairments and disability.

Dr. Wisner has recently been shown the results of the neuroimaging and concurs that "the brain imaging conducted now would have been helpful in making an accurate diagnosis of Mr. Hall." Ex. 13 (Wisner Dec.) ¶ 15. He understands that "brain changes can account for symptoms that might otherwise appear to be a mental illness but are more likely the result of brain dysfunction." *Id.* He acknowledges the symptoms he saw in Chuck back in 2013 and 2014, including "mood lability, dishonesty or confabulation, depression, anxiety, misbehavior and criminal behavior" can have many different causes. *Id.* ¶ 18. Having now heard about Chuck's abnormal brain imaging and his history of sexual abuse, Dr. Wisner believes that his prior diagnosis of Antisocial Personality Disorder may no longer be an accurate diagnosis, as the symptoms he attributed to that disorder may be better explained by his brain dysfunction and history of trauma. *Id.* The jury was deprived of this information.

Likewise, Dr. Fucetola recommended that brain imaging be conducted prior to trial. Having recently seen the results of brain imaging and heard about Chuck's sexual abuse at

Shaker Mountain, he likewise can say that this additional information would have informed his testimony at trial.[49]

Moreover, on appeal, appellate counsel was ineffective for failing to appeal the trial court's denial of funds for imaging. Trial counsel also handled the direct appeal. So while this is a claim that appellate counsel was ineffective, it stemmed from the same inattention to brain imaging that marred counsel's representation of Mr. Hall.

**C. Trial counsel was ineffective for failing to give experts and mental health professionals who testified complete and accurate information about Mr. Hall, rendering their diagnoses and testimony inaccurate.**

Trial counsel presented testimony from retained mental health experts and a psychologist who had treated Mr. Hall before he was incarcerated. These witnesses lacked complete and accurate information. As such, they could not reach reliable conclusions. To some extent the failure to provide complete and accurate information about Mr. Hall resulted from trial counsel's failure to conduct an adequate life history investigation. At the same time, there was important information in trial counsel's files that counsel nevertheless failed to provide to these witnesses.

Trial counsel failed to provide Dr. Wisner (a retained psychiatrist), Dr. Staples (a psychologist who had treated Mr. Hall), and Dr. Fucetola (a retained psychologist) with the following information:

- Information about Chuck's experience of repeated sexual abuse at Shaker Mountain School. (As explained above, trial counsel was unaware of the sexual abuse because they failed to conduct an adequate investigation into Chuck's social history.).

- Brain imaging results showing abnormalities in Chuck's brain. (As explained above, trial counsel was denied funding for brain imaging because the request was made so late and failed to adequately explain the need for imaging.).

---

[49] Dr. Fucetola met with undersigned counsel and relayed this information during that meeting. He declined to sign a sworn declaration.

- Records from the Maine Dartmouth Family Clinic, which include a diagnosis of depression from before Chuck first went to prison. These records also discuss Chuck's serious Crohn's disease. Ex. 94 (Maine Dartmouth Recs.) (Trial counsel did not obtain these records. Other records in trial counsel's possession revealed that Mr. Hall had been treated at the Maine Dartmouth Family Clinic, which should have prompted trial counsel to request these records. *Id.*).

- Chuck's Maine DOC records that show a suicide attempt in 1997. Along with the Maine Dartmouth Family Clinic records, these Maine DOC records document Chuck's long-standing struggles with depression and suicidality. Ex. 92 (1997 Suicide attempt) (Trial counsel had these records but did not provide them.).

- The note Chuck wrote to his parents as a teenager discussing suicide. Again, it documents Chuck's long-standing struggles with depression and suicidality, starting even before he was diagnosed with Crohn's disease or went to prison. Ex. 93 (Teen Suicide Note) (Trial counsel had this record but did not provide it.).

- The report from the Sweetser Center noting Charles and Dorothy's drinking and fighting as well as Dorothy's difficulty communicating with school employees about her children because she found it intimidating. This record shows the chaos in the Hall's home and establishes that Chuck's parents were ill-equipped to help Chuck with his depression, insecurity, shame, and the acting-out those feelings prompted, despite their undoubted love for him. Ex. 62 (Sweetser Closing Summary) (Trial counsel had this record but did not provide it.).

Without this information, the testimony of Drs. Wisner, Staples, and Fucetola was misleading. This is no surprise because no one can reach accurate conclusions without complete and accurate information. Ex. 10 (Stetler Dec.) ¶ 5 (mental health experts rely on trial counsel to provide full social history information)*; see also Johnson v. United States*, 860 F. Supp. 2d 663, 870-71 (N.D. Iowa 2012) (finding deficient performance and prejudice for failure to provide expert with relevant information).

### i. Dr. Wisner

Dr. Wisner testified that Mr. Hall suffered from bipolar disorder, chronic depression, chronic hallucinations, and diagnosed him with Antisocial Personality Disorder (ASPD). He said that "of course, I think it's really apparent from his past personal and social history that he suffers from antisocial personality disorder." Tr. 05/28/14 at 4790. On cross-examination, Dr.

116

Wisner said that, based on the ASPD diagnosis, Mr. Hall was a "sociopath" and it would also be fair to consider him "a psychopath." *Id.* at 4826-27.

Dr. Wisner also testified that Mr. Hall told him that "he has periods when he sort of tunes out, he loses touch with his surroundings for a few minutes and had been told by others that he's just not there . . . I felt that possibly that could relate to the head injury or to a partial complex epilepsy." *Id.* at 4791.

Dr. Wisner told the jury that Mr. Hall's "first instance" of attempting suicide was in November 2006 when he "attempted to suspend himself by the plastic tubing that was used to fasten the colostomy bag" and that Mr. Hall had made two other suicide attempts, in 2007 and 2008. *Id.* at 4761-62. Dr. Wisner also told the jury that Mr. Hall's mental health symptoms "are documented there beginning in 2000 in his medical records," explaining that this documentation was "the basis for my diagnosis of his mental illness." *Id.* at 4870.

Dr. Wisner testified that since being diagnosed with Crohn's disease in 1993, Mr. Hall had been on prednisone for many more months than he was off it. *Id.* at 4741. He explained that prednisone is a powerful corticosteroid prescribed to treat Crohn's disease with side effects including aggression and irritability. But he did not tell the jury whether Mr. Hall was taking prednisone on the day of the homicide. *Id.* at 4734, 4742.

Information that trial counsel did not provide to Dr. Wisner undermines much of his testimony. First and foremost, he no longer stands by his diagnosis of ASPD. Structural abnormalities in Mr. Hall's brain and his history as a victim of sexual abuse account for the symptoms that Dr. Wisner incorrectly attributed to ASPD. Having had the opportunity to review this information in 2024, Dr. Wisner explained: "With the additional information about Mr. Hall's abnormal brain imaging and his history of traumatic experiences, it is no longer apparent

to me that my diagnoses were completely accurate or appropriate." Ex. 13 (Wisner Dec.) ¶ 18. Dr. Wisner is "*particularly concerned with my prior diagnosis of Antisocial Personality Disorder (ASPD). I believe Mr. Hall's brain dysfunction and history of trauma may better explain his history of lying/confabulation and failure to conform with the law.*" *Id.* (emphasis added).

As to what Dr. Wisner referred to as Mr. Hall's periods of "tun[ing] out," Mr. Hall's history of trauma has led Dr. Fradkin, Dr. Israelian, and Dr. Agharkar to diagnose Mr. Hall with PTSD. Dissociation – which is what Dr. Wisner described – is a symptom of PTSD. Ex. 5 (Israelian Rpt.) at 14. Knowing about Mr. Hall's history of trauma would have allowed Dr. Wisner to view Mr. Hall's statement that "he has periods when he sort of tunes out, he loses touch with his surroundings for a few minutes and had been told by others that he's just not there" through a different lens. Tr. 05/28/14 at 4791. While at trial he testified that he felt these periods could relate to the head injury or epilepsy, knowing about Mr. Hall's history of trauma suggests that these could be dissociative episodes indicative of PTSD.

Dr. Wisner's testimony also underrepresented the number of times Mr. Hall has attempted suicide. Trial counsel did not provide Dr. Wisner with a Maine DOC Incident Report dated June 6, 1997, showing that Mr. Hall cut his wrists with a razor. Ex. 92 (1997 Suicide attempt).[50] Trial counsel also did not provide Dr. Wisner with a note written by a teenage Chuck where he tells his parents he is running away and threatens suicide. Ex. 93 (Teen Suicide Note). Without these records, Dr. Wisner was not able to testify about an additional suicide attempt and suicidal ideations, both of which predate Mr. Hall's incarceration in the BOP.

---

[50] Trial counsel provided Dr. Wisner with Maine DOC medical records but apparently did not provide additional records such as Incident Reports.

Dr. Wisner's testimony misstated the earliest documentation of mental health symptoms. Dr. Wisner says that Mr. Hall's symptoms were documented "beginning in 2000," but records from the Maine Dartmouth Family Clinic, which trial counsel failed to obtain, diagnose him with depression as early as 1995. Ex. 94 (Maine Dartmouth Recs.) at 6. These records are from before Mr. Hall first went to prison and show that his documented history of mental illness, notably depression, is even more longstanding than Dr. Wisner knew.

Additionally, although Dr. Wisner was provided with medical records showing that Mr. Hall was taking prednisone on the day of the homicide, he did not review the records carefully enough to realize this. Ex. 13 (Wisner Dec.) ¶ 20. And apparently trial counsel did not point their expert psychiatrist, to whom they had provided tens of thousands of pages of records, to records showing not just that Mr. Hall had taken a powerful steroid often, but that he was taking it the day of the homicide.

Finally, perhaps the most crucial information that trial counsel did not provide to Dr. Wisner was brain imaging. As Dr. Wisner noted after viewing the MRI/PET results obtained by current counsel in 2023:

> These results are remarkable, in that they support that Mr. Hall has abnormalities to his brain. While you can never know exactly what brain imaging will show prior to its administration . . . these abnormalities to Mr. Hall's brain are things I was asking Fred to explore back in 2013 and 2014.

Ex. 13 (Wisner Dec.) ¶ 14.

As Dr. Wisner explains about the impact of this new information, "As medical professionals, we gather as much information about the clinical presentation of a patient, then render the diagnosis, if any, that is appropriate based on that information. New or changed information can certainly affect the diagnosis." *Id.* ¶ 12. The information that trial counsel failed to provide was certainly new or changed information to him, but it was readily available to trial

119

counsel, in some cases in trial counsel's possession. Yet Dr. Wisner was not provided with this information, nor were Dr. Staples or Dr. Fucetola.

### ii. Dr. Staples

Dr. Staples, a clinical psychologist, began treating Mr. Hall's then-wife Barbara Oettinger (at the time Barbara Hall) in 1995. Tr. 05/22/14 at 4157-58. He testified that as part of his treatment of Ms. Oettinger he met with her and Mr. Hall together several times. *Id.* at 4160. He also had one individual session with Mr. Hall. *Id.* at 4162. He met with Mr. Hall individually "because seeing them as a couple, it was increasingly coming to light that he had some really tough issues." *Id.* Dr. Staples testified that Mr. Hall's Crohn's symptoms and surgeries caused him "a lot of distress." *Id.* at 4162-63. He also noted Chuck's struggles with anger. *Id.* at 4169. Some of Dr. Staples's testimony touched on Chuck telling untruths, like claiming that he graduated from high school fourth in his class and was set to attend the University of California at Berkeley until he was arrested for beating two men who molested his friend's four-year-old daughter, none of which was true. *Id.* at 4164-65.

Dr. Staples did not testify as an expert witness, but he is a mental health provider and offered insights into Mr. Hall's mental health from his time seeing Mr. Hall in his clinic. He was essentially a subject matter expert testifying as a fact witness. Prior to Dr. Staples testimony, trial counsel provided no documents for him to review. Ex. 43 (Staples Dec.) ¶ 7. His testimony "was based purely on my assessment from 1995 and my memory." *Id.*

For Dr. Staples, the most crucial piece of missing information was Mr. Hall's history of sexual abuse while at the Shaker Mountain School. Having reviewed declarations about the Shaker Mountain School provided by post-conviction counsel, he notes, "[t]he declarations I reviewed describe an environment sorely lacking not only in safety, but in structure. Even setting

120

aside the trauma of sexual abuse, the Shaker Mountain School was one of the worst places Mr. Hall could have gone at that particular time in his life." *Id.* ¶ 9. But of course, Mr. Hall did suffer from sexual abuse at the Shaker Mountain School and Dr. Staples notes that this trauma along with the otherwise terrible environment created a "double whammy" resulting in "severe traumatic impact of a normal developmental progression in a child already at a disadvantage because of his energy and attention issues." *Id.* ¶ 11.

If Dr. Staples had been provided with additional information about Mr. Hall, he would have realized that Mr. Hall may suffer from PTSD. *Id.* ¶ 14. With complete information about Mr. Hall, he could have told the jury more about why Mr. Hall suffered from "intense anger, irritability, and righteous indignation" he had documented. *Id.* ¶ 13. He also "would have been able to view [Mr. Hall's] made-up stories as a version of the way he had wished things had been, so much so that he believed it himself, particularly with regard to the tale of assaulting his friend's daughter's abuser, as perhaps verbalizing as reality a fantasy he had in reaction to his own unaddressed molestation." *Id.*

To be clear, Dr. Staples stands by what he did tell the jury – namely that Crohn's disease caused Mr. Hall significant distress. *Id.* ¶ 14. But "the knowledge of sexual abuse history would have given . . . a broader field in which to consider the depression" and "allowed me to answer Mr. Duchardt's question about what, in retrospect 'also might have been at play here,' in a different, more accurate way" by proposing a "retrospective consideration of post-traumatic stress disorder" because "Mr. Hall's tendency toward disproportionate emotional reactions is a hallmark of PTSD." *Id.* Without this information, his testimony was incomplete and consequently misleading.

### iii. Dr. Fucetola

Dr. Fucetola, a neuropsychologist, testified that Mr. Hall exhibited deficiencies in visual memory and visual problem solving. He testified that "there are objective standardized tests that measure different abilities that the brain controls like memory, attention, reasoning, spatial ability, navigating around in your car in a familiar neighborhood, language abilities, communication." Tr. 05/22/14 at 4260; *see also id.* at 4269-70. Dr. Fucetola's neuropsychological testing showed that Mr. Hall's "visual memory, his visual reasoning, and his left-hand speed were significantly weaker than would be expected given his performance on the other tests." *Id.* at 4272. By way of explanation, he said "it wasn't clear immediately what it meant . . . . This is an unexpected finding that bears on brain function but why?" *Id.* at 4274. He wondered if the brain injury Chuck suffered in a motorcycle accident was perhaps responsible. He asked himself, "Does this have to do with the motorcycle accident? Did the motorcycle accident produce a more significant head injury than it seemed on the surface?" *Id.* He also considered that, "[m]aybe this is how his brain has always been. Maybe this is just an abnormality in kind of the trajectory of how his brain developed . . . ." *Id.* at 4275; *see also id.* at 4282. Given his inability to discern what caused Mr. Hall's abnormal test results, Dr. Fucetola began telling the jury about the need for brain scans, but Mr. Duchardt cut him off. *Id.* at 4282-83 ("I found evidence on the test of deficiencies . . . it wasn't clear to me exactly what the cause of those abnormalities are. They are there . . . I cannot say for sure conservatively, but it is there and I recommended – " Mr. Duchardt: "Let me stop you there."). On cross-examination, he testified that while Chuck's mood and behavior were beyond the scope of his assessment, he did identify symptoms of anxiety and depression. *Id.* at 4285.

On its face, Dr. Fucetola's testimony makes clear that having PET/MRI results would have allowed him to testify more completely and precisely about Mr. Hall. He testified explicitly

122

that he does not know why Mr. Hall had abnormal neuropsychological test results and even began to explain his recommendation for brain imaging before being cut off.

Moreover, Dr. Fucetola has confirmed that the MRI/PET results and information about Mr. Hall's history of sexual abuse are important information that would have informed his testimony. With the benefit of MRI/PET results to review and additional information about Mr. Hall's life history, Dr. Israelian is able to do what Dr. Fucetola was unable to do and explain what Mr. Hall's aberrant test results reveal about Mr. Hall's experience of the world. *See* Ex. 5 (Israelian Rpt.).

### iv. Government experts

In addition to failing to provide Drs. Wisner, Staples, and Fucetola with key information, trial counsel failed to use this information to cross-examine government witnesses. As discussed more fully below, in Part 1.H, these records would have undercut Dr. Reardon's testimony about Mr. Hall's malingering and Drs. Reardon's and Dietz's assessment that Mr. Hall is a sociopath – a lucky kid from a nice family who acted out for no particular reason. With information that was in trial counsel's files, not to mention information that trial counsel unreasonably failed to uncover, not only would trial counsel's own witnesses have been better prepared, but the government's witnesses would have been confronted with evidence that powerfully disputed some of their most damaging conclusions.

### D. Trial counsel was ineffective for failing to investigate and present evidence of the BOP's mismanagement leading up to Mr. Castro-Rodriguez's death.

Trial counsel was ineffective by failing to investigate and present evidence that BOP's errors contributed to Victor Castro-Rodriguez's death. Trial counsel failed to take the necessary steps to research how BOP staff managed Unit 10-B. Instead of working with an expert who could have helped them understand the official documents in their possession, which revealed

serious missteps by the BOP, trial counsel relied solely on Dr. Wisner, a psychiatrist who had never worked in a prison setting. Dr. Wisner's criticism of the BOP was limited to staff not checking on inmates frequently enough. While this failure was important, the jury was not presented with the many more egregious errors by the BOP that created the conditions allowing the offense to happen. Failing to identify these errors themselves or using an expert who could teach them, trial counsel did not effectively make the case to the jury that Mr. Castro-Rodriguez's death was partly a result of BOP mismanagement.

Specifically, the jury was not told that USMCFP failed to create and employ proper inmate classification settings, allowing violent and nonviolent offenders to be housed side-by-side in open prison wings. The jury was not told that USMCFP did not have enough staff, and did not enforce its protocol disallowing prisoners in each other's cells at all times (Castro-Rodriguez was killed in his cell after Coonce and Hall entered it without reprimand). The jury was not told how BOP should have responded to Mr. Hall's consistent requests before the homicide in which he asked for more isolated placement because of feelings of irritability and distress during his recent Crohn's flare and surgery and complained of harassment by other inmates. Nor was the jury told that Corrections Officer Robert Logsdon, the sole person responsible for supervising Unit 10-B the night of the homicide, previously had been reprimanded by the BOP for sleeping on duty during an out-patient hospital transport, resulting in the prisoner escaping.

Had trial counsel exercised the necessary diligence and rendered constitutionally effective counsel, they could have presented evidence that, among other errors, "had Coonce not been on 10-B, it is unlikely this homicide would have occurred. He should have been properly

124

classified into a more restrictive area and been in restraints when walking freely." Ex. 9 (Buckmaster Dec.) ¶ 11.

### i. Trial counsel's penalty phase presentation did not inform the jury of the BOP's mismanagement and improper designation of Mr. Coonce and Mr. Hall.

Instead of pointing out BOP's many errors to the jury, Mr. Hall's counsel criticized only the BOP's policy of checking on inmates every thirty minutes, although checking every fifteen minutes was the standard of care for psychiatric hospitals. *See* Tr. 05/07/14 at 1789 (penalty-phase opening statement); *see also* Tr. 05/30/14 at 5321 (penalty-phase closing argument). Trial counsel relied on Dr. Wisner's testimony to make this point. Tr. 05/28/14 at 4799. Dr. Wisner pointed out that fifteen-minute checks were the minimum standard. Tr. 05/28/14 at 4787, 4802. To assess USMCFP's monitoring of inmates in the psychiatric ward, Dr. Wisner reviewed the facility's Post Orders and a video of Unit 10-B and compared the Post Orders and video he reviewed with his understanding of the standard of care in a mental hospital. *Id.*

However, as Dr. Wisner acknowledges, he "was not then, and [is] not now, an expert in Bureau of Prisons records, classification, placement, or security." Ex. 13 (Wisner Dec.) ¶ 21. The government's cross-examination emphasized that Dr. Wisner had no experience in a prison setting and no expertise in prison policies. The cross-examination was devastating.[51] *See* Tr. 05/28/14 at 4847-67 (Wisner admitted his BOP conclusions were based exclusively on watching surveillance video and reviewing post orders; admitted he fast forwarded the video a lot;

---

[51] Trial counsel tasked Dr. Wisner with multiple roles in his reporting and testimony, including psychiatric-, BOP-, and Crohn's-related testimony. Dr. Wisner's credibility was severely wounded when he struggled on cross examination to justify why the jury should take seriously his criticism of the BOP. This loss of credibility affected all of Dr. Wisner's testimony.

125

admitted he'd never been to USMCFP Springfield, and "doesn't know anything" about its layout/procedures; and admitted he spoke to no doctors at USMCFP Springfield).

Further, Dr. Wisner struggled to remember on cross whether he had reviewed the BOP's After-Action Report or not.[52] *Id.* at 4862-63. All told, Dr. Wisner told the jury the BOP's sole mistake was to check on inmates every thirty minutes instead of every fifteen. With Dr. Wisner being unqualified to offer further testimony, and trial counsel not investigating, consulting, retaining, and offering experts and witnesses like BOP expert Maureen Baird and Mr. Buckmaster, the jury did not hear many BOP contributory factors when they rendered Mr. Hall's death sentence, including:

- Generally, USMCFP staff improperly placed inmates who required enhanced security in Unit 10-B rather than in a more tightly controlled unit. And specifically, Mr. Coonce should not have been in Unit 10-B because of his violent history. Ex. 9 (Buckmaster Dec.).

- UMSCFP staff failed to heed Mr. Hall's repeated warnings that he wanted to be in isolation, that he was having difficulty in an open unit because he was being harassed about his ostomy bag leaking stool, and that he was having homicidal feelings that he did not want to act on. Ex. 8 (Baird Dec.).

- USMCFP staff failed to enforce rules like the prohibition on entering other inmates' cells. Ex. 8 (Baird Dec.). Enforcing this rule would have prompted staff to intervene immediately once Mr. Coonce and Mr. Hall entered Mr. Castro-Rodriguez's cell, before he was killed.

- USMCFP staff were generally inattentive. At least one staff member on duty at the time of the incident had been disciplined for sleeping on duty and for allowing an inmate to escape. Ex. 9 (Buckmaster Dec.); Ex.78 (BOP Disc. Summ.).

- USMCFP also failed to have enough staff on duty; the BOP's own report was all but explicit that there were not enough staff on duty. Ex. 77 (After Action Report); Ex. 8 (Baird Dec.).

---

[52] An After-Action Report is the result of an investigation by a committee of BOP officials into a major incident in a BOP facility that generally includes an explanation of how the incident occurred and suggestions for improvement.

126

Nor did co-defendant Coonce present evidence of the BOP's mismanagement as a contributing factor to the homicide. As part its argument that Mr. Coonce should receive the death penalty, the government presented evidence about Mr. Coonce's history of violence, non-compliance, and self-harm in prison and his violent conduct before prison. Mr. Coonce's counsel introduced evidence and elicited testimony that Mr. Coonce was not a future danger and could be safely housed going forward, but they did not explain BOP's mismanagement to the jury.

### ii. Trial counsel's performance was deficient; they failed to present the evidence that was known, and trial counsel knew they needed the assistance of BOP expert yet failed to consult with one.

Trial counsel's performance was constitutionally deficient, because they failed to investigate, consult with experts, and present evidence of the BOP's mismanagement leading up to Mr. Castro-Rodriguez's death. Trial counsel was also constitutionally deficient in not presenting what was known and in the trial file. Trial counsel knew they needed to hire an expert, were rebuffed, and then hired a local expert perfectly tailored for the job only to not use him.

Initially, trial counsel had planned to work with former warden Mark Bezy, who could help them understand BOP policies and procedures. On January 24, 2013, Mr. Lewis sent Mr. Bezy a letter listing issues about which they wanted to consult, including "Should the BOP have had Mr. Hall in an open ward?" and "Regarding the government's allegations that Mr. Hall deserves the death penalty due to his 'future dangerousness,' does the BOP have facilities to house Mr. Hall for life that would prevent any such possibility of future dangerousness." Ex. 69 (Bezy emails). Although trial counsel's file does not make clear how much work Mr. Bezy did on Mr. Hall's behalf, it does show that Mr. Bezy provided some assistance.

On February 21, 2013, Mr. Lewis sent Mr. Mark Donatelli[53] an email saying, "By the way, thanks for the Mark Bezy referral. Mr. Bezy has given us some initial terminology to obtain BOP records that have not been provided to us in the government's discovery." Ex. 69 (Bezy emails). Then Mr. Bezy stopped working on the case after a few months. On May 13, 2013, he sent an email to Mr. Duchardt and Mr. Lewis saying, "I am unable to work with your team on the case of US v. Charles Hall. Please, consider this as my notice and withdrawing my services." Ex. 70 (Email Bezy Withdraw). Mr. Bezy provided no further explanation. However, Mr. Bezy did testify on Mr. Coonce's behalf at trial, so it is reasonable to surmise he withdrew due to this conflict of interest. Trial counsel did not seek to replace Mr. Bezy with another BOP expert.

Nine months after Mr. Bezy withdrew, on February 24, 2014, trial counsel filed a motion seeking funding to hire Joe Buckmaster. Dkt. No. 512.[54] Recently retired from USMCFP, Mr. Buckmaster had begun to work with Darryl Johnson (Mr. Hall's initial lawyer) as a fact investigator, serving subpoenas, taking discovery to clients, and performing other various odds and ends. Trial counsel sought to hire him as both an expert and as an investigator. They told the trial court:

> Mr. Buckmaster has been engaged over the last five years in private investigation work in Springfield, Missouri. Before that, Mr. Buckmaster had a distinguished twenty-four year career in corrections, the last twenty-two of those years spent at USMCFP, mostly in unit management positions. Because of his experience in management at USMCFP, Mr.

[53] Mark Donatelli is Federal Resource Counsel who was available to the Hall team for assistance and consultation. He was used very little, with a limited exception of providing names of possible BOP experts for the trial team's use.

[54] In the motion, trial counsel did not tell the Court that they initially planned to retain Mr. Bezy. Instead, the motion indicated that trial counsel knew better than to try to hire someone like Mr. Bezy; it indicated that they "considered but rejected enlisting the services of certain well-known national experts, for instance . . . former prison wardens such as Mark Bezy." Dkt. No. 512. They represented that "experience has taught about what have become a legion of problems associated with use of such national experts." Dkt. No. 512. The truth is that trial counsel had tried to work with Mr. Bezy, but Mr. Bezy withdrew from the case.

128

Buckmaster is intimately familiar with not only the policies and procedures of USMCFP but also the personnel of USMCFP and the BOP who will be called to witness in this case. Mr. Buckmaster is therefore uniquely qualified to immediately come to the defense team and be able to offer expert assistance in evaluating the materials which have been provided in recent discovery. Mr. Buckmaster also is immediately ready to not only interview potential USMCFP and BOP witnesses, but also make that interview process less intimidating for the witnesses, drawing upon his own positive relationships with those witnesses.

*Id.* ¶ 6. Indeed, Mr. Buckmaster not only had experience working at the USMCFP, he was actually a night Lieutenant one month prior to the homicide, which included responsibilities supervising all of 10 Building, including Unit 10-B. Ex. 9 (Buckmaster Dec.) ¶ 3. "Being the 10 Building Lieutenant meant that [he] was the head person in charge of the entire building while [he] was on duty. The 10 Building housed all of the mental health inmates, whom [they] referred to as 'patients.'" *Id.* ¶ 4.

Trial counsel sought approval for Mr. Buckmaster to bill up to $7,500 at $50 per hour, or spend approximately 150 hours working on Mr. Hall's case. Dkt. No. 512 ¶¶ 7-8. The trial court approved trial counsel's proposal. Dkt. No. 622.

However, Mr. Buckmaster worked on Mr. Hall's case for only sixteen hours. Ex. 47 (Buckmaster billing records). He conducted no interviews. He spent no more than an hour educating Mr. Duchardt and Mr. Lewis about BOP policies or USMCFP personnel.[55] In fact, Mr. Buckmaster had no idea that trial counsel had represented to the court that he would offer the expert assistance described in trial counsel's motion. He had never seen the motion before post-conviction counsel showed it to him, and he did not discuss its contents with trial counsel. He "was shocked when [he] read it" because "Duchardt never gave me the impression that he

---

[55] He met with Mr. Duchardt and Mr. Lewis for 1 hour; reviewed Post Orders and BOP policies for 5.5 hours; reviewed Mr. Hall's Central File for up to 2 hours; reviewed the videos of Unit 10-B and timelines for 6.65 hours; and spent 0.45 hours delivering timelines to Mr. Lewis. Ex. 47.

129

wanted me around much less assist with reviewing BOP records and/or interviewing BOP witnesses." Ex. 9 (Buckmaster Dec.) ¶ 17.

Yet while he "did not do any of the things Duchardt told the Court [he] was being hired to do," Mr. Buckmaster emphasizes that he "could do those things and would have if Duchardt asked." *Id*. ¶ 18. The reason he did not do them is that "Duchardt never inquired about my knowledge of BOP policies." *Id.* ¶ 15.

Counsel has an obligation to consult with experts in specialized areas they lack knowledge. 2008 Supp'l Guidelines 10.11.E.1. BOP records are not understandable without years of experience, as trial counsel admitted, saying it was "impossible" to understand the BOP materials. Dkt. No. 512 ¶ 4. Trial counsel knew they needed an expert and asked the Court for funding for one, but then inexplicably chose to not work with Mr. Buckmaster without first investigating the wealth of information at Mr. Buckmaster's disposal.[56]

---

[56] Recently, Mr. Duchardt said that he decided not to retain an expert in BOP policies because he did not feel that he needed help understanding the BOP records he received—he "felt okay in terms of the ability to look through and figure out what we had and didn't have." Ex. 15 (Duchardt Int.) at 146. But at the time of trial, counsel was actively seeking assistance understanding BOP documents and procedures, first from Mr. Bezy and later from Mr. Buckmaster.

In the motion seeking funding for Mr. Buckmaster's assistance, trial counsel told the court that it was "impossible" to understand the BOP materials without this assistance. Dkt. No. 512. Trial counsel further noted, "[p]rior to receiving" the "thousands of pages of information regarding the inner workings of the United States Medical Center for Federal Prisoners" they "had suspicions that he would need an expert in USMCFP and BOP procedures in order to properly assess the value and consequence of the materials," and, it turned out, "actual review of the materials, particularly the new material, has confirmed that suspicion." *Id.* Trial counsel pointed out that "[i]t is also *impossible for one without experience to know the full significance of materials* which are set forth in a lexicon unique to the BOP and the USMCFP" and "*it is impossible for one without experience to understand whether what one has been provided is complete.*" *Id.* (emphasis added).

Unfortunately, trial counsel did not provide constitutionally effective performance. *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Hinton v. Alabama*, 571 U.S. 263 (2014); *Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015).

Additionally, trial counsel did not investigate issues that required follow-up based on their own trial files. For instance, in response to a BOP internal email ordering all BOP employees to refer all statements from Mr. Hall, Mr. Coonce, David Bruesch and Bevan Foo to the FBI, Dr. Elizabeth Weiner responded. Ex. 95 (Email from Weiner re Cop-out). She reported that Mr. Bruesch orally informed her that he sent a written cop-out prior to the homicide about "things [] getting out of hand on his unit[.]" *Id.* Trial counsel failed to interview David Bruesch[57]

---

An expert in BOP policies and procedures confirms this point: "Even for those individuals outside of the agency who have been involved to some degree with BOP cases in their professional capacities, comprehending and fully understanding the complexities of policies and inner workings of the BOP it is still a struggle." Ex. 8 (Baird Dec.) ¶ 19. "Absent years of direct involvement in the federal prison system it's unlikely an individual could grasp specific concepts related to federal inmates and prisons." *Id.* Additionally, trial counsel sought referrals from resource counsel Mark Donatelli for a former BOP warden who could assist them. Mr. Donatelli recommended potential experts, including Mark Bezy. The incomplete and inadequate presentation to the jury also makes clear that trial counsel did not understand the significance of documents in their possession.

[57] Mr. Bruesch died in 2017 prior to undersigned counsel's involvement in this case, and hence he was never interviewed.

and Dr. Elizabeth Weiner,[58] even though Mr. Duchardt and Mr. Lewis were in the same room as her. Ex. 97 (Bass 302) at 1.

Trial counsel was also ineffective for failing to interview Dr. Patrick Gariety. Ex. 80 (Gariety Dec.). Dr. Gariety provided critical information, suppressed by the government, and offered in a misleading fashion through its direct examination Dr. Chad Brinkley, that Mr. Hall sought mental health resources from his treating psychiatrist hours prior to the homicide. *See infra* Claims 5 and 6. Trial counsel possessed Mr. Hall's BOP records — which included a note from Dr. Gariety about seeing Mr. Hall the day of the homicide — but did not follow up with Dr. Gariety. Ex. 98 (Hall Progress Note).

Whether through a former high-ranking BOP official or through Joe Buckmaster, whose extensive knowledge of Unit 10-B would have been invaluable, the trial team could have presented to the jury a compelling case that Mr. Castro-Rodriguez would not have been killed but for BOP's serious errors. Information was available in their own records, and they secured funding to retain someone with a unique insight into Unit 10-B. Despite having the tools necessary to make this presentation, trial counsel failed to use the tools at their disposal and failed to present the jury with these compelling facts. This failure constitutes constitutionally deficient performance.

---

[58] Dr. Weiner has refused to cooperate with an interview with undersigned counsel. We intend to file a motion to conduct discovery. The need to depose Dr. Weiner is among the reasons for good cause to conduct discovery.

132

**iii. An expert on BOP procedures or someone knowledgeable about USMCFP specifically would have been able to provide crucial information about the BOP's multiple and grave errors in housing certain inmates in Unit 10-B, including the contributory factor of lax monitoring of improperly classified inmates.**

**a. A former high-ranking BOP administrator like Maureen Baird could have provided crucial information.**

Maureen Baird has decades of experience working in high-level positions for the BOP. Among her relevant experience, she trained correctional officers, counselors, and case managers; helped develop an inmate classification system; served as the Warden at USP Marion, where she was responsible for specialized housing units, including a high-security management unit which mainly housed international terrorists; and was appointed to after-action review committees to investigate serious incidents (like homicides) that occurred in BOP facilities. Like others with decades of experience working in the BOP, Ms. Baird has expertise in the BOP policies, procedures, and supervision of inmates that Dr. Wisner lacked.

An expert in BOP policies and procedures like Maureen Baird would have provided the necessary information for the jury on the BOP's mistakes in handling Mr. Hall's cries for help and failing to enforce rules and necessary boundaries.[59] Based on her review of thousands of

---

[59] At the time of Mr. Hall's trial, Ms. Baird was still employed by the BOP. However, she does note that "there were a plethora of experts, similar to experts offered in Coonce's defense, including retired BOP personnel, who likely would have been available and able to provide invaluable assistance during Hall's trial." Ex. 8 (Baird Dec.) ¶ 18. Because the trial occurred ten years ago, experts who were not then available, like Ms. Baird, are now available. Similarly, experts who were available, like Mr. Bezy, who died in 2023, are no longer available. Mr. Hall's counsel does not know why Mr. Bezy did not address these matters more fully. Since he was an expert for the codefendant, Mr. Bezy may not have been asked to address these matters by counsel for Mr. Coonce for strategic reasons related to Mr. Coonce that cannot be known by undersigned counsel.

133

pages of documents that trial counsel received in discovery,[60] Ms. Baird identified several "errors leading up to the incident." Ex. 8 (Baird Dec.) ¶ 12.

For example, the jury should have learned that Mr. Hall should not have been in Unit 10-B, given his self-reports that he was having difficulty on an open unit: "Hall's self-reports of his mental state leading up to the incident should have raised concern that he may not have been appropriate for general population within the Mental Health Unit at Springfield." *Id.* She elaborates that, "[i]n leading up to the January 2010 incident, it is clear from BOP's own documentation . . . that Hall, over the course of his incarceration, prior to the incident at MCFP Springfield, was hearing voices, had suicidal ideation, ongoing thoughts of harming others, and homicidal fantasies." *Id.* ¶ 53. She notes specifically that when Mr. Hall first arrived as USMCFP, he was classified as "**not** 'OK FOR GENERAL POPULATION' citing his Psychological Evaluation." *Id.* ¶ 51.[61] Then, "[o]n January 11, 2010, just days before the incident, Hall is stating concerns he has about his being teased about his colostomy bag . . . 'it would be difficult for him to live in an open unit where he had to deal with teasing about his medical issues.' It was further noted that Hall was in an 'open unit.'" *Id.* ¶ 52.[62]

Ms. Baird states that, "had I been directly involved in this case, as a case manager or warden, at a minimum, I would have expected and/or ordered Hall to be placed in SHU until these concerns which he had vocalized to psychology staff had been fully addressed and

---

[60] The documents on which Ms. Baird bases her opinions were produced to trial counsel in pre-trial discovery. Ms. Baird has also reviewed a more up-to-date disciplinary history, which notes Mr. Hall's clean disciplinary record since the homicide. Ex. 8 (Baird Dec.) ¶ 39.

[61] Being in general population meant being in an open unit. *See generally* Ex. 9 (Buckmaster Dec.) ¶ 5.

[62] In fact, on the very day of the homicide Mr. Hall sought to see his mental health providers. *See* Ex. 80 (Gariety Dec.) ¶ 8.

134

explored." *Id.* ¶ 53. Of course, "[t]he BOP has processes to continually evaluate inmates with propensities for self-harm or harm to others, particularly those with such significant mental health challenges who are designated to the limited number of Mental Health Units located at specific BOP facilities." *Id.* ¶ 54. Yet here, "BOP did not heed Hall's warnings or threats to harm others along with Hall's bold statements that he wanted to be housed in isolation." *Id.* Ms. Baird's testimony should have worked within a cohesive mitigation strategy that would have included Dr. Israelian's observation from the BOP's own 2008 Personality Assessment Inventory that said, Chuck's "potential for suicide should be evaluated immediately and appropriate interventions should be implemented without delay." Ex. 5 (Israelian Rpt.) at 67.

Ms. Baird also flags broader issues with how Unit 10-B was managed. Reviewing the After-Action Committee's report through the lens of her own experience conducting after-action reviews, she notes,

> At a minimum, I find the MCFP Springfield After-Action Committee's findings troubling. Several policy discrepancies, which I identified from the materials reviewed, were not mentioned in the final Report. There were deviations from policy occurring within the Mental Health Unit at MCFP Springfield, which were listed as 'Recommendations' rather than nonadherence to policy and procedure.

Ex. 8 (Baird Dec.) ¶ 58.[63]

Among the "Recommendations," which were actually "deviations from policy occurring within the Mental Health Unit at MCFP Springfield," Ms. Baird notes, the "Post Orders lacked details of correctional officers' requirements and expectations and written standardized criteria regarding which inmates are placed or removed from MCFP Springfield Mental Health Unit had

---

[63] Ms. Baird further notes that "[t]here is no indication the After-Action Investigation Committee thoroughly reviewed the mental health professionals' assessments of Hall for the years leading up to the incident." Ex. 8 (Baird Dec.) ¶ 59. She explains that "[i]n cases where I have been a member of After-Action Committees, I found it critical to conduct thorough reviews of the histories of all involved parties to an incident." *Id.*

not been established"; "the camera placement within lacked visibility of certain areas within the Unit"; "general expectations and requirements, specifically, inmate boundaries, were not clearly identified in writing, and corrections staff were not enforcing this rule within the housing unit." *Id.* As to the nonenforcement of boundaries, she specifically notes, "[i]nmates were entering others' cells, in the presence of staff, and were not being held accountable," which is particularly relevant because "Hall and Coonce entered the cell of Castro-Rodriguez multiple times, yet this didn't trigger concern for the housing unit officer, Lieutenant, or the Control Room officers who all have access to the live camera footage of the unit." *Id.* Finally, "[t]he After-Action Report also recommends increasing staff coverage during the evening shift, suggesting a higher complement of staff to inmate was needed and greater oversight of inmate activity was necessary." *Id.*

### b. Former USMCFP employee Joe Buckmaster could have provided crucial information.

Joe Buckmaster retired from USMCFP a month before Mr. Castro-Rodriguez's death, had begun working as an investigator in Springfield, Missouri, and would have been an ideal candidate to retain as an expert.[64] Not only did Mr. Buckmaster have experience working at the USMCFP, he was a former 10 Building Lieutenant, having recently retired. Ex. 9 (Buckmaster Dec.) ¶¶ 2, 3. He knew Mr. Coonce, Mr. Hall, and the staff who were on duty on 10-B. *Id.* "Being the 10 Building Lieutenant meant that [he] was the head person in charge of the entire building while [he] was on duty. The 10 Building housed all of the mental health inmates, whom [they] referred to as 'patients.'" *Id.* ¶ 4. Mr. Buckmaster could have explained errors in placing

---

[64] In fact, as previously explained, trial counsel did hire Mr. Buckmaster but barely used Mr. Buckmaster.

certain inmates in Unit 10-B and lack of diligence on the part of BOP staff. *Id.* These insights are all the more valuable because they are predicated on the BOP's own documents.

For example, Mr. Buckmaster said that, "[g]iven Wesley Coonce's history, he should never have been on Unit 10-B." *Id.* ¶ 7. He "was a difficult patient/inmate with a violent record" who "should have been in a lockdown facility." *Id.* However, Mr. Buckmaster "was not the sole decisionmaker," and other staff decided to house Mr. Coonce in Unit 10-B. *Id.* ¶ 8. Based on his experience, Mr. Buckmaster says that "[w]hen Coonce was in lockdown in Unit 10-D,[65] he was very difficult. He would threaten self-harm, ram his head into doors, and start fires. He hated being caged and threw fits." *Id.* ¶ 10. Although "[t]he correct way to deal with someone like Coonce is to place him restraints until he agrees to behave appropriately, not let him out of lockdown because he was troublesome while locked down," other staff would let Mr. Coonce out of lockdown. *Id.*

These observations, based on Mr. Buckmaster's personal experience in Unit 10-B, are in accord with the After-Action Report's note that there were no standardized criteria for inmate placement. It also underscores the relevance of Ms. Baird's observation that, although the After-Action Report classifies the lack of standardized criteria as a "Recommendation," it is really a "deviation[] from policy." Ex. 8 (Baird Dec.) ¶ 58.

Mr. Buckmaster could also have made helpful observations about staff that are supported by records in trial counsel's file. For example, Mr. Buckmaster says that "CO Logsdon was another who did not follow security procedures." Ex. 9 (Buckmaster Dec.) ¶ 12. This observation

---

[65] Mr. Buckmaster explains the various wings within 10 Building; Unit 10-D is a lockdown wing (twenty-three hours a day in your cell), and Unit 10-B is an open wing (free movement within wing and throughout 10 Building from morning until nighttime lockdown). Ex. 9 (Buckmaster Dec.) ¶¶ 4-6.

137

is consistent with the After-Action Report's note that staff were not properly enforcing inmate boundaries. This observation is also consistent with Mr. Logsdon's troubling disciplinary history. According to a summary of USMCFP employees' disciplinary histories, Mr. Logsdon was disciplined in 2002 for "Failure to Follow Policy/Breach of Security" when an inmate was not in proper restraints and *escaped* from the hospital and disciplined in 2003 for "Inattention to Duty-sleeping on duty." Ex. 78 (BOP Disc. Summ.).[66]

Mr. Buckmaster points out that Mr. Coonce's inappropriate placement and Mr. Logsdon's inattentiveness were a deadly combination: "Castro-Rodriguez's murder was a perfect storm. It took a violent individual – Coonce – being inappropriately placed in a general population mental health wing. It took a victim with low cognitive abilities. Castro-Rodriguez was like a child. But it also took CO Logsdon's infrequent monitoring to make the homicide possible." Ex. 9 (Buckmaster Dec.) ¶ 13. He also, "[b]ased on [his] personal observations and BOP-work history," believes that "this homicide would not have happened had Coonce not been on Unit 10-B. He should have been properly classified into a more restrictive area and been in restraints when walking freely." *Id.* ¶ 11. He adds that "Chuck was more of a wannabe and a follower. He wanted to be a tough guy real bad, but on the inside he just wasn't." *Id.* And finally, Mr. Buckmaster notes his "surprise[] that CO Logsdon was not reprimanded more severely following the homicide." *Id.* ¶ 13.

---

[66] Current counsel was allowed to inspect BOP personnel files March 26, 2024, at the United States Attorney's Office in Springfield, Missouri. The personnel files are not easy to understand. The 2003 falling asleep incident was included in another employee's personnel files so it's uncertain whether CO Logsdon's falling asleep incident occurred at the same time that that other employee was reprimanded for an inmate's death because of inattentive medical care, or if that is a separate incident only related to the other employee and unassociated with CO Logsdon.

Trial counsel's performance was constitutionally deficient because they failed to investigate, consult with experts, and present evidence of the BOP's mismanagement leading up to Mr. Castro-Rodriguez's death. Trial counsel was also constitutionally deficient in not presenting what was known and in their trial file. Trial counsel knew they needed to hire an expert, was rebuffed, and then hired a local expert perfectly tailored for the job only to not use him.

### E. Trial counsel was ineffective for failing to rebut the aggravating factor of future dangerous by presenting evidence and expert testimony to explain how the BOP could safely house Mr. Hall.

The jury that decided Mr. Hall's sentence had just convicted him of committing a murder while in prison. The government argued forcefully that Mr. Hall's crime meant he would be a danger in the future, telling the jury: "[I]t is shocking and it's extraordinary that at the federal medical center in Springfield that there is a murder that takes place. . . . The fact that you commit a murder in prison is powerful evidence that you are a future danger." Tr. 05/30/14 at 5244. The government also argued that Mr. Hall was just waiting for an opportunity to commit another crime. Much information existed that the BOP could safely house Mr. Hall, yet trial counsel did not call any witnesses to explain how that could be accomplished. Instead, all the jury heard was Mr. Coonce's expert talk about how Mr. Coonce could be safely housed. The jury was likely confused about whether this applied to Mr. Hall since they heard zero information, beside his violation-free conduct in the four years since the homicide, to rebut the future dangerousness aggravator. Counsel was ineffective for failing to rebut this aggravator.

**i. Trial counsel's penalty phase presentation rebutted the government's future dangerousness argument with nothing but four years of clean conduct, which, without additional information, the government was able to use to support *its* argument that Mr. Hall was patient and calculating.**

To rebut the government's future dangerousness arguments, trial counsel relied solely on Mr. Hall's unblemished disciplinary record in the four years between Mr. Castro-Rodriguez's death and the trial. In Mr. Hall's penalty phase closing statement, trial counsel said:

> What's one thing Mr. Peterson neglected to say anything about to you guys when he was making his argument? That for the last four years, let me emphasize it. It's been four years, actually four years and four months Chuck Hall hasn't even gotten in trouble for so much as spitting on the ground. And Mr. Peterson says he's waiting. Oh, give me a break. . . .

Tr. 05/30/14 at 5304-05.

While there is no doubt that Mr. Hall's commitment to following the rules in the four years since the murder is relevant, this evidence was not sufficient on its own to rebut future dangerousness. Mr. Peterson's argument that Mr. Hall was waiting for an opportunity, even if it was not true, could have resonated with jurors who had just convicted him of murder.

**ii. Trial counsel's performance was deficient; they failed to call an expert to explain to the jury how Mr. Hall could be housed safely.**

Ms. Baird, who identifies many mistakes leading up to Mr. Castro-Rodriguez's death, also concludes that with enhanced security measures "Hall can safely be managed by the BOP for the remainder of his life in prison." Ex. 8 (Baird Dec.) ¶ 10. Ms. Baird explains that "there are numerous alternative housing options available to the BOP, which offer a more restrictive environment than that of Housing Unit 10B at MCFP Springfield during the time the incident occurred. All the options have higher security measures and the capability to isolate inmates who pose a continued threat to staff or fellow inmates." *Id.* ¶ 36.

One option is ADX Florence. "When inmates are involved in the murder of staff or inmates and a death sentence is not imposed, absent medical conditions which would preclude their placement, they are typically housed at ADX." *Id.* ¶ 24. In ADX's General Population, all inmates are housed in single cells where they spend at least twenty-two hours per day and "there is no physical contact between inmates." *Id.* ¶ 25. In addition to ADX's more restrictive settings like ADX General Population (which is not like General Population in other prisons, as inmates are in their cells twenty-two hours per day and have no contact with each other), ADX also includes "another housing unit utilized by the institution to house long-term elderly inmates, otherwise not eligible for transfer out of ADX" unofficially referred to as "the 'AARP' unit." *Id.* ¶ 31. The "'AARP unit" is for those "over the age of 55, who have demonstrated positive adjustment, and who have earned their way through positive interaction with others." *Id.* "The AARP unit, still quite restrictive, affords a select group of inmates some additional privileges not available to inmates in ADX GP. There is additional out-of-cell time for a certain number of inmates at specified times throughout the day, additional phone time accessible, and limited contact with other inmates." *Id.*

Recognizing that Mr. Hall's deteriorating physical heath may require him to be housed in a medical center, Ms. Baird notes that federal medical centers "can construct cells to meet specific security needs of an inmate and apply greater security protocols based on an inmate's history and security requirements." She explains what these greater security measures would look like: "additional staff may be used to escort the inmate and the use of a higher degree of

restraints including belly chain, black box, and leg/ankle restraints may be introduced." *Id.* ¶ 32.[67]

Ms. Baird also emphasized that "[e]nhanced security protocols were applied to Hall forthwith following the homicide and will remain in place throughout his time in federal prison" and "these enhanced security protocols are not solely dependent on Hall having a death sentence"—meaning they could have been applied to Mr. Hall even if he had received a life sentence at trial (and would be applied now even if his death sentence is vacated). Ms. Baird explains that "[t]he BOP regularly assesses security needs of all inmates and bases the security requirements on an individual's security needs." *Id.*

A BOP expert testifying on Mr. Hall's behalf could have also cleared up any confusion that may have been caused by the expert testifying for Mr. Coonce. Although no federal prison expert testified for Mr. Hall, Mr. Bezy testified on behalf of Mr. Coonce. When cross-examining Mr. Bezy, the government suggested that even if strict security procedures were initially applied to Mr. Coonce, he could eventually end up back in a relatively unrestricted setting. Mr. Bezy offered a response specific to Mr. Coonce, explaining that Mr. Coonce's long history of violent and disruptive behavior in prison made it likely that he would spend the remainder of his life in a very secure setting. Yet "because of the stark contrast between Coonce's and Hall's disciplinary history, it may have left questions for the jury as to future housing assignments that would affect Hall." *Id.* ¶ 64. But "[h]ad a prison expert been offered for Hall, that expert would have been

---

[67] Indeed, in December 2021, after being sent from USP Terre Haute to an outside hospital in Indiana, Mr. Hall was transferred to the Federal Medical Center in Butner, North Carolina, where he stayed for approximately seventeen months until he was transferred back to USP Terre Haute in May 2023. Even while housed in Butner, a Medical Center, he had to spend time at an outside hospital, Duke Medical Center, because of complications with his Crohn's disease that sent him into septic shock. While at outside hospitals and at FMC Butner, enhanced security protocols applied to Mr. Hall. There were no incidents.

142

able to explain how similar security protocols despite the comparatively minimal discipline records, would also be in place for Hall." *Id.*

Indeed, had a federal prison expert testified for Mr. Hall, "[t]he expert would have described how enhanced security measures, like those initiated and applied to Hall following the homicide, would remain in place throughout his life in prison." *Id.* ¶ 15. A prison expert could also have emphasized that even if Mr. Hall were assigned to a setting less restrictive than Mr. Coonce, he would be in a setting much more restrictive than Unit 10-B.

Additionally, an expert could have underscored that while Mr. Coonce had caused problems while housed in isolation, Mr. Hall's disciplinary record did not evidence disruptive behaviors while isolated. Mr. Hall's clean disciplinary record in the four years between Mr. Castro-Rodriguez's death and trial would have been important evidence here, to underscore that regardless of whether Mr. Coonce was difficult to manage in a very high security setting, Mr. Hall had shown that he was able to adjust to the higher security measures that BOP would apply to him for the rest of his life. Without an expert to explain that Mr. Hall's clean disciplinary record showed that Mr. Hall was able to make a positive adjustment to a higher security setting, not that he would eventually be back in a setting as unrestricted at Unit 10-B, trial counsel offered no response to the government's argument that Mr. Hall was biding his time.

Mr. Hall's ability to adjust to isolation, in contrast with Mr. Coonce, is also something Mr. Buckmaster could have explained. Mr. Buckmaster was personally aware that Mr. Coonce had a long history of disruptive behavior while in isolation, as his disciplinary records show. Ex. 9 (Buckmaster Dec.) ¶ 10. Mr. Hall, by contrast, did not generally act out when housed in isolation, as his disciplinary records also show. Overall he was a non-violent inmate. *Id.* ¶ 21. He was certainly much less disruptive than Mr. Coonce. *Id.*

The key mitigating evidence that trial counsel missed would also have been important evidence to rebut the government's arguments that Mr. Hall presented a future danger. For instance, Dr. Israelian could have informed the jury that, "[i]n isolation, Mr. Hall can manage his behavior and emotions, he is less likely to act triggered and overreact. He does not feel threatened. He does not need to read other people's intentions and needs. He only has to focus on himself and his health." Ex. 5 (Israelian Rpt.) at 80.

Trial counsel's decision to not put on his own expert to contextualize all of the mitigating information and to rebut the future dangerousness aggravator was deficient performance. *See Buck v. Davis,* 580 U.S. 100, 119 (2017) (habeas relief granted for failing to appropriately use experts to rebut future dangerousness); *Williams,* 529 U.S. at 362. Trial counsel was aware the government would proceed with the future dangerousness aggravator, because he vigorously litigated it and lost. Dkt. Nos. 291, 292, 352, 494, 598. Trial counsel's constitutional obligation was to investigate and/or retain experts qualified to rebut that known, impending aggravator. Failing at that task, trial counsel never explained to the jury that if they sentenced Mr. Hall to life, he would be in a setting much more restrictive than Unit 10-B and offer evidence that the commission of additional crimes in a secure setting, provided the BOP followed its own policies and procedures, would be highly unlikely. All of this evidence, including expert testimony, was readily available, but trial counsel failed to present it.

**F. Trial counsel was ineffective for failing to challenge the other aggravating factors.**

Trial counsel was ineffective for failing to counter the other aggravating factors alleged against Mr. Hall as well.[68] At trial, the government alleged five aggravating factors in addition to future dangerousness: (1) "Defendant Hall committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Victor Castro-Rodriguez"; (2) "Defendant Hall committed the offense after substantial planning and premeditation"; and (3) "Defendant Hall committed conduct suggesting a grave indifference to human life"; (4) "Defendant Hall has shown lack of remorse"; (5) "Defendant Hall acted to obstruct justice or to retaliate against Victor Castro-Rodriguez." Ex. 57 (Verdict Form) at 3-6.[69]

There are two important legal principles guiding the jury's consideration of aggravating factors. First, the government must prove the aggravating factors beyond a reasonable doubt. *See* Ex. 57 (Verdict Form) (asking jurors whether they find each aggravating factor "beyond a reasonable doubt"); *see also* 18 U.S.C. § 3593(c) ("The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt."). Second, the Supreme Court has long held that the death penalty is only constitutional when the sentencing scheme "genuinely narrows the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v.*

---

[68] Prior to trial, trial counsel filed motions challenging the aggravating factors. *See* Dkt. Nos. 291, 295, 296, 297. However, these challenges were not successful, the government was permitted to argue to the jury that these aggravating factors were met and justified sentencing Mr. Hall to death, and the jury found them all. As discussed above, to counter the aggravating factor of future dangerousness, trial counsel should have presented readily available evidence about the BOP's ability to safely house Mr. Hall mentioned above in Claim 1.E.

[69] Exhibit 57, the Special Verdict form, is also on the trial docket as entry 812.

145

*Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)); *see also Gregg v. Georgia*, 428 U.S. 153 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

Accordingly, the aggravating factors must not simply identify characteristics of a first-degree murder but must distinguish the murder at issue from other first-degree murders. So, for instance, as to the aggravating factor of depravity, all murders are to some extent depraved, so this aggravating factor asks whether the murder is *more depraved than other first-degree murders*. A conviction for first-degree murder requires premeditation, so this aggravating factor asks whether there was "*substantial* planning and premeditation" meaning *more planning than other first-degree murders*. As to indifference, murders inherently suggest some indifference to human life, so this aggravating factor asks whether the conduct shows *more indifference to human life than other first-degree murders*. There is no doubt that this inquiry is macabre, but it is no less than what is necessary to justify a death sentence in accordance with constitutional norms.

The government's argument for these aggravating factors was based almost entirely on Mr. Hall's (mis)diagnosis of ASPD and resultant characterization as a sociopath and psychopath. The government emphasized, "[t]he defendants, both of them, can be considered psychopaths or sociopaths. They have both been diagnosed again and again with antisocial personality disorder." Tr. 05/30/14 at 5262. They added, "Defendant Hall's expert, Mr. [sic] Wisner diagnosed him himself as antisocial personality disorder. I think initially played a little word game with whether you could consider him a psychopath or sociopath and then he acknowledged, yes, that is another term for it. *Id*.

The labels "antisocial," "sociopath," and "psychopath" and Mr. Hall's threats – not actions – was all the government had to go on. Prior to this crime, Mr. Hall had never committed

146

a murder and unlike his co-defendant had no history of other brutally violent crimes, like violent rape or highly aggravated assault. At the time of the crime, Mr. Hall was serving a federal sentence for making threats to an airport from a monitored jail telephone and sending threats with his own return jailhouse address to government officials – hardly the work of a depraved criminal mastermind of "incredible resourcefulness" who excels at planning. Tr. 05/30/14 at 5245.

Arguing Mr. Hall's grave indifference to human life, the government relied on Mr. Hall's statement about his assault of Walter Bonin – not on the assault itself. Following the incident, Mr. Hall told Dr. Shine that he had wanted to kill Mr. Bonin. But the incident itself resulted in only a scratch to Mr. Bonin. Ex. 67 (Hall BOP Recs.) at 8. The government says "[t]hat shows a grave indifference to human life because he then tries to kill him." Tr. 05/30/14 at 5247. In fact, it shows that Mr. Hall was either not actually trying to kill Mr. Bonin or was incapable of actually doing so without the presence of a co-defendant with a long history of brutal violence.

Arguing lack of remorse, the government again relied exclusively on Mr. Hall's statements. The government did not rely on anything Mr. Hall actually did, but only what he said. Tr. 05/30/14 at 5249.

Arguing for "aggravating factors of heinous, cruel, and depraved nature of the crime" the government said "[t]his wasn't just a simple strangulation with a piece of rope and cord. Two men took an individual into a cell and with a boot and with a shoe they stood on his neck for a period of time until he died." Tr. 05/30/14 at 5330. Mr. Hall's history shows that he acted not out of cruelty or depravity, but that his actions were the culmination of his abnormal brain, PTSD, and his body's response to prednisone, not to mention the presence of a co-defendant whose prior criminal history does suggest cruelty and depravity.

147

When the government discussed Mr. Coonce's history, saying "the past is prologue," they referenced "the kidnapping, the carjacking, and rape of Laurel Simmons" during which Mr. Coonce took his victim at knife point and repeatedly raped her anally and vaginally, while repeatedly apologizing and saying it would not happen again; an attack on a thirteen-year-old girl; other attacks; and his BOP disciplinary history, including being found with two shanks while housed in isolation following the homicide. *Id.* at 5241-43.

Discussing Mr. Hall's history, the government referenced "prior threats from jail, threats against a federal judge, a U.S. Attorney and others. Bomb threat to an airport" and his "many, many letters or expressions that he will kill again" – not actions, threats. *Id.* at 5244, 5249.

The government's closing argument did not discuss their support for the aggravating factors of substantial planning. But Mr. Hall's abnormal brain, PTSD, and prednisone use undermine the argument that Mr. Hall planned this crime so methodically as to justify a death sentence.

Trial counsel's response to these aggravating factors should have been that Mr. Hall was a victim of sexual abuse suffering from PTSD, which creates a "tendency to misperceive and over-react to threat," and who had an abnormal brain that impaired his ability to "accurately interpret[] the needs and intentions of others." Ex. 5 (Israelian Rpt.) at 80. Mr. Hall's brain abnormalities also rendered him "more vulnerable to adverse effects in response to a broad range of stressors and circumstances such as negative neuropsychiatric complications in response to high, prolonged levels of prednisone," a drug he had been prescribed to manage a particularly severe Crohn's disease. *Id.* at 79. "Mr. Hall has abnormalities in key brain regions that are essential for social competence and for emotional and behavioral regulation." Ex. 6 (Agharkar Rpt.) at 24. "With a brain that is often inaccurate in interpreting the intent of others and

148

simultaneously primed to overreact when feeling slighted or threatened, it is easy to understand why Mr. Hall has literally been begging to be separated from others throughout the many years he has been imprisoned" – even asking to speak privately with Dr. Gariety "on the day of the homicide before it occurred." Ex. 5 (Israelian Rpt.) at 80; Ex. 80 (Gariety Dec.) ¶ 8.

An accurate life history investigation also would have contextualized Mr. Hall's threats. Mr. Hall made threats to others to justify to prison officials why he should be housed in isolation. As Dr. Israelian explains (and as Dr. Israelian or another expert could have explained to the jury if given complete and accurate life-history information): "In isolation Mr. Hall can better manage his behavior and emotions. In isolation he is less likely to get triggered and overreact. He does not feel like he is continuously under threat. He does not need to read other people's intentions and needs." Ex. 5 (Israelian Rpt.) at 80.

Mr. Hall suffered (and suffers) from "[b]rain based difficulties with emotion regulation, difficulties reading nonverbal cues, and accurately judging the intention of others, combined with PTSD autonomic dysregulation, chronic sleep deprivation, and inescapable pain" along with "anxi[ety] about the possibility of a leak in his ostomy bag." *Id.* He "suffered from deep shame over his ostomy." Ex. 80 (Gariety Dec.) ¶ 4. He "smelled like feces and suffered from 'mishaps' that he relayed to me of his ostomy leaking stool." *Id.* ¶ 5. "[I]t is not difficult to see why Mr. Hall was begging to be housed separately from others." Ex. 5 (Israelian Rpt.) at 80. Nor is it difficult to see why, in seeking to be isolated to avoid embarrassment, triggers, and the constant feeling of being under threat and unable to accurately judge other's intentions, he made threats in order to be taken seriously.

Having failed to conduct an adequate life history investigation that would have revealed Mr. Hall's trauma history and to get imaging that revealed abnormalities in Mr. Hall's brain,

counsel relied on Olga Castro's testimony that she and her brother had forgiven Chuck. Tr. 05/20/14 at 3709-13. Ms. Castro testified she felt "a lot of peace" after receiving a letter from Chuck expressing remorse. Yet there was no reason for the jury to believe that the Castro family's generosity had anything to do with Mr. Hall, as opposed to being a credit to them as kind and forgiving people.

By failing to present evidence of Chuck's history of sexual abuse and abnormal brain, trial counsel allowed the government to create the inaccurate impression that Chuck was cold and calculating – remorseless and patient, with ice in his veins, as the prosecutors argued in their closing statement. Evidence about Chuck's brain abnormalities, history of abuse, and the ways Chuck's trauma and mental illness were exacerbated with high prednisone use would have undermined the government's argument.

Even going back to Mr. Hall's childhood, he "had the classic symptoms of PTSD in childhood including nightmares, flashbacks, hypervigilance, and avoidance symptoms stemming from the childhood sexual abuse. His childhood acting-out behaviors can best be viewed in this light, as a common reaction to trauma, rather than the result of a lack of empathy or conduct disorder." Ex. 6 (Agharkar Rpt.) at 24. Looking toward the future, experts who were aware of Mr. Hall's history and evaluated him concluded, "With appropriate treatment, Mr. Hall can come to a place of empowerment and recovery from his history of trauma." Ex. 5 (Israelian Rpt.) at 82. "Chuck now wants to be a better person and knows he can't just snap his fingers to make that happen, that he has to do the work and work on relationships." Ex. 4 (Fradkin Dec.) ¶ 218.

### G. Trial counsel was ineffective for failing to investigate and present information about Mr. Hall's struggles with a particularly severe case of Crohn's disease.

Mr. Hall has long suffered from a particularly severe form of Crohn's disease. Since Mr. Hall was twenty-two years old, Crohn's has left him in pain nearly every minute of every day.

150

*See* Ex. 7 (Steinhart Rpt.) at 3-4. A "chronic disease of the gastrointestinal (GI) tract," Crohn's is "characterized by inflammation that can occur anywhere in the GI tract but most commonly affects the last part of the small intestine and the large intestine (colon)." *Id.* at 3. Crohn's cannot be cured. There are periods of remission and flare-ups, when the pain is excruciating. *See id.*

Beyond physical pain, "[g]iven the social stigma around many of the symptoms that are frequently experienced with Crohn's disease (e.g. diarrhea, rectal urgency, increased gas, abdominal grumbling and gurgling), having the disease can lead to impairments in socialization, romantic relationships, educational achievement and vocational opportunities." *Id.* at 4. These impairments are most impactful in young adults, around the age Mr. Hall was when diagnosed with Crohn's. *Id.*

Over half of Crohn's patients go through surgery, sometimes multiple surgeries. Crohn's can "lead to short bowel syndrome which is the inability to absorb sufficient nutrients from food in order to . . . live." Ex. 7 (Steinhart Rpt.) at 3. Mr. Hall's debilitating case of Crohn's has led to multiple surgeries, several hospitalizations, and short bowel syndrome. *Id.* at 4. "[M]ultiple surgeries can also lead to a condition called chronic abdominal pain syndrome." *Id.* at 9. With "this incompletely understood and incurable condition . . . individuals may experience ongoing frequent or constant abdominal pain." *Id.* "Chronic abdominal pain syndrome can be very difficult to manage, particularly in a person with both underlying Crohn's disease and psychiatric comorbidities." *Id.* at 10.

Mr. Hall's anus has been surgically closed and he passes stool into a bag though a surgically-created hole in his abdomen. *Id.* at 9. He has been harassed by fellow prisoners about the smell of stool leaking out of his bag, including in the days just before the homicide, when he

151

told BOP officials he would have trouble living in an open unit because he was being teased about his medical issues. Ex. 67 (Hall BOP Recs.) at 17.

Trial counsel presented some evidence about Mr. Hall's struggles with Crohn's disease. However, though the government did not contest this mitigating factor, only six of the twelve jurors found it to be true that "Defendant Hall had, since 1993, suffered with the serious illness of Crohn's disease." Ex. 57 (Verdict Form) at 7.

### i. The jury heard incomplete information about Crohn's disease.

Mr. Duchardt relied exclusively on Dr. Wisner, a psychiatrist, to testify about Crohn's disease. Dr. Wisner "had some knowledge of gastroenterology based on [his] medical education," Ex. 13 (Wisner Dec.) ¶ 20, and while working with psychiatry patients at the VA Hospital, treated "an older group of patients, many with – in a variety of illnesses including GI disorders," Tr. 05/28/14 at 4731. However, Dr. Wisner is not an internist, let alone a gastroenterologist.[70]

Dr. Wisner explained to the jury that "Crohn's disease is a chronic, unremitting – may get a little worse, may get a little better – inflammatory disease of the bowel" involving "sores, ulcerations, bleeding, cramping, belly pain, alternating diarrhea and constipation." Tr. 05/28/14 at 4732. He noted that Crohn's patients are "suffering usually pretty bad" without going into the details of how Crohn's had ravaged Mr. Hall's body. *Id.* at 4734.

Dr. Wisner said that there are "some specific drugs" used to treat Crohn's disease, including Remicaid, but that "the stand-by remedy almost continuously, or at least on and off as

---

[70] Becoming a gastroenterologist requires five to six years of specialized training after medical school, a three-year residency in internal medicine followed by a two or three year fellowship in gastroenterology. *See, e.g.*, American College of Gastroenterology, *What is a Gastroenterologist?*, https://gi.org/patients/gi-health-and-disease/what-is-a-gastroenterologist/.

152

the illness gets worse and then a little bit better, then a little worse, is steroids, Cortisone-like drugs because they reduce all inflammation." Tr. 05/28/14 at 4734. This information was incorrect. By the time of Mr. Hall's trial, prednisone was not recommended as a long-term treatment option and was no longer the stand-by option, both because better medications had been developed and because of prednisone's high risk of severe side-effects, especially with long-term or repeated use. Ex. 7 (Steinhart Rpt.) at 8.[71]

Dr. Wisner described, in general terms, the possible course of the disease. When discussing the possibility of surgery, he said, "Well, I'm not a surgeon so I don't really – I've helped at a few when I was a student and an intern, I've watched a few, but either a colostomy if part is [sic] the colon has had to be removed, portion of the colon is moved over and literally a new opening created in the skin of the abdomen . . . ." Tr. 05/28/14 at 4738. Dr. Wisner noted that Mr. Hall had been hospitalized "on several occasions" but did not provide any detail about the pain Mr. Hall experienced as a result of repeated complications. *Id.* at 4741.

Dr. Wisner did not address the embarrassment and shame that Crohn's disease can cause. On the mental health impact of Crohn's, Mr. Duchardt asked, "is major depression an issue that seems to, for lack of a better term, go hand in hand?" *Id.* at 4742-43. Dr. Wisner responded, "I wouldn't say exactly hand in hand because some patients don't develop depressive symptoms. You know, you're using a very specific term of art there when you say major depression." *Id.* at

[71] The Crohn's and Colitis Foundation's medication guide also explains that "[o]ther reasons for discouraging long-term steroid use are the side effects and risks, which increase with repeated or long-term use" and "[b]ecause of these side effects, doctors frequently choose other medications as initial therapy." Additionally, "[t]he need for repeated courses of steroids often indicates that a patient's primary IBD medication regimen is insufficient and that a change in dosing or medication is likely needed." *See* Crohn's and Colitis Foundation, Corticosteroids Fact Sheet, https://www.crohnscolitisfoundation.org/sites/default/files/2023-05/Corticosteroids%2010.2018_0.pdf. Although the fact sheet is dated October 2018, Dr. Steinhart makes clear that this information was well-known among Crohn's specialists by the time of Mr. Hall's trial in 2014.

4743. Dr. Wisner then went on to define major depression and opine that "Crohn's disease and major depression are a bad mixture." *Id.* at 4748. Yet despite being a psychiatrist and testifying primarily about mental health, Dr. Wisner never actually explained the mental health impact of living with Crohn's, either in general or on Mr. Hall specifically.

In addition, Dr. Wisner did not carefully review Mr. Hall's medical records about Crohn's. Notably, he failed to recognize that Mr. Hall was taking prednisone as a treatment for Crohn's on the day of the homicide. Ex. 13 (Wisner Dec.) ¶ 20. Consequently, although he testified about the potential side effects of prednisone, he did not inform the jury that Mr. Hall was taking the drug that caused these side effects on the day the homicide occurred.

### ii. The jury did not hear important details about Mr. Hall's struggles with Crohn's disease, including about stool leaking from his body and the need for surgery shortly before the homicide, which Mr. Hall reported to BOP officials caused him to be teased by other inmates and have difficulty living in an open unit.

Because the jury heard about Crohn's from Dr. Wisner, who was not a Crohn's specialist and did not review medical records about Mr. Hall's Crohn's disease in "that level of detail," Ex. 13 (Wisner Dec.) ¶ 20, the jury did not hear about important aspects of Mr. Hall's experience with Crohn's, including the extreme suffering he endured on a daily basis and problems like leaking stool, rotting skin, and unpleasant smells, all of which created particular challenges in a prison environment. Mr. Hall's medical and BOP records reflect the physical and emotional pain Mr. Hall experienced. An expert on Crohn's disease could have added important context, including explaining problems with the overuse of prednisone to treat Mr. Hall's Crohn's.

Mr. Hall's medical records indicate that on January 12, 2010, Mr. Hall "had successful revision of ileostomy stoma yesterday . . . Pt. is passing lose stool through the new stoma; mucosa appears pink and healthy." Ex. 68 (Hall BOP Prednisone Recs.) at 1. A Crohn's expert could have explained to the jury what these terms mean. *See generally* Ex. 7 (Steinhart Rpt.). A

154

Case 4:21-cv-08001-BCW    Document 70    Filed 04/29/24    Page 168 of 310

stoma is a surgically created hole in the abdomen though which waste leaves the body. An ileostomy stoma is formed by pulling the ileum, the last section of the small intestine, inside out and suturing it to the abdomen. Waste then leaves the body through the stoma. The flow of waste cannot be controlled, so someone with an ileostomy must wear a bag to collect waste at all times. The need for an ileostomy arises when the large intestine cannot be used to expel waste, in Mr. Hall's case because so much of his large intestine has been removed as a result of complications from Crohn's disease. Revisions of ileostomies are common because so many complications can arise. Mr. Hall has had at least thirteen Crohn's-related surgeries since his diagnosis. Ex. 7 (Steinhart Rpt.) at 11. Mr. Hall needed an ileostomy revision in January 2010 because he was bleeding so profusely he needed blood transfusions. Ex. 68 (Hall BOP Prednisone Recs.) at 10. Later in January, possible skin breakdown was noted. *Id.*; Ex. 7 (Steinhart Rpt.) at 11.

As Dr. Steinhart explains, "[t]his type of skin breakdown can be very painful and difficult to manage and can lead to difficulty maintaining a proper fitting appliance over the stoma in order to collect the stool." Ex. 7 (Steinhart Rpt.) at 11. The leaking stool "contains digestive enzymes which are very irritating or corrosive to the skin surface. As a result, leakage caused by ostomy retraction or protrusion typically results in uncomfortable skin rashes and sometimes complete breakdown of the skin around the ostomy site." *Id.* at 10. The skin breakdown then "leads to more difficulty with appliance fitting and further leakage of stool. This results in even more skin breakdown and a self-perpetuating cycle . . . ." *Id.*

Dr. Steinhart further notes, "[l]iving with an ostomy (ileostomy), even in the ideal setting with the best operative results and the best supportive and professional ostomy care, can mean ongoing and unpredictable problems with smell, leakage of stool, embarrassment and shame." Ex. 7 (Steinhart Rpt.) at 10. "Not surprisingly, this leakage of stool also leads to unpleasant and

embarrassing smells." *Id.* at 11. Dr. Gariety, Chuck's treating psychiatrist at the BOP at the time of the homicide, noted that Chuck "smelled like feces" and "suffered from 'mishaps'" of his ostomy leaking stool. Ex. 80 (Gariety Dec.) ¶ 5.

In Mr. Hall's case "the problems with appliance fitting and stool leakage were also aggravated by a hernia that developed around or adjacent to the ostomy site" which was "almost certainly caused by repeated surgeries"—further contributing to the vicious cycle of surgery, leakage, skin breakdown, poor fit of the appliance, leakage, skin breakdown, surgery. Ex. 7 (Steinhart Rpt.) at 10.

On January 11, 2010, Mr. Hall had informed BOP staff that he was experiencing what Dr. Steinhart characterized as "unpredictable problems with smell, leakage of stool, embarrassment and shame." Ex. 7 (Steinhart Rpt.) at 10. Mr. Hall's bag had been leaking. and he told BOP staff psychologist Dr. Brinkley that "it would be difficult for him to live in an open unit where he had to deal with teasing about his medical issues." Ex. 67 (Hall BOP Recs.) at 17. Despite this concern, the same document also notes that Mr. Hall is in an "open unit." *Id.* The following day, January 12, 2010, Mr. Hall had ileostomy revision surgery. Ex. 68 (Hall BOP Prednisone Recs.) at 1. The next day he began the prednisone regimen that he remained on as of January 26, 2010, the date of the homicide. *Id.* at 3.

This information was important for the jurors to hear. The intense physical pain that Mr. Hall endures daily and the social stigma attached to problems like stool leaking and skin breakdown, which cause unpleasant and embarrassing smells, would have shown that Mr. Hall is situated differently from other prisoners and would be suffering daily in prison if allowed to live. Further, "Mr. Hall's life expectancy is reduced compared to an age matched general population and that this increased chance of dying is due to complications of Crohn's disease and the

156

numerous surgeries that he has required over the years." Ex. 7 (Steinhart Rpt.) at 5. Presenting this information also provides context for Mr. Hall's experiences in an open unit and his request to be in isolation in part because, as he himself tried to explain to BOP officials, he was being teased about his medical problems.

### iii. The jury also did not hear from any defense witness that Chuck was on prednisone the day of the homicide, nor that it was contraindicated due to Chuck's mental illness.

As discussed more fully below, in Claim 2, Chuck's medical records repeatedly note that from January 13, 2010, through February 3, 2010 – including the date of the homicide on January 26, 2010 – Mr. Hall was taking 30 or 40 milligrams of prednisone per day. Mr. Hall's prednisone use was key mitigating evidence but trial counsel failed to explain it to the jury.

On January 12, 2010, Mr. Hall underwent ileostomy revision surgery due to complications from his Crohn's disease. The next day, January 13, 2010, BOP medical staff prescribed 40 milligrams of prednisone per day for thirty days (two 20 milligram tablets per day). Ex. 68 (Hall BOP Prednisone Recs.) at 3. Medical records dated the following day, January 14, 2012, also show that Mr. Hall was prescribed 40 milligrams of prednisone per day (two 20 milligram tablets per day), although this order indicates that Mr. Hall should take prednisone for 180 days rather than 30. *Id.* at 5. On January 20, 2010, BOP medical records indicate that BOP officials planned to start Mr. Hall on a dose of 30 milligrams of prednisone per day. *Id.* at 8. Later medical records also confirm that Mr. Hall had been, pursuant to these prescriptions, taking prednisone on the day of the homicide. *Id.* at 13 (records dated February 23, 2010 noting Mr. Hall had been prescribed 30 milligrams of prednisone for January 20, 2010 through February 3, 2010 and then prescribed 20 milligrams per day).

157

In his penalty phase testimony, Dr. Wisner did say that Mr. Hall had frequently been prescribed prednisone; however, he had no idea that Mr. Hall was taking prednisone at the time of the homicide, which was of course the most relevant date for purposes of the trial. Ex. 13 (Wisner Dec.) ¶ 20. He did not review Mr. Hall's records carefully enough to realize it, and trial counsel did not ask about it. *Id.*[72]

Nor did Dr. Wisner testify that prednisone was *contraindicated.* It is dangerous to prescribe steroid treatment to people with known psychiatric disorders. "For Mr. Hall, who suffered from a number of psychiatric conditions at various times while in prison, the long term or repeated use of steroids would have been contraindicated and would likely have contributed to an exacerbation of these underlying conditions." Ex. 7 (Steinhart Rpt.) at 8. The adverse side effect of prednisone are well documented. These side effects include more mood regulation impairment: anger, irritability, anxiety, and reduced self-control. *Id.* at 7. Mr. Hall also has a physically abnormal brain and "these brain abnormalities render Mr. Hall all the more vulnerable to adverse effects in response to a broad range of stressors and circumstances such as negative neuropsychiatric complications in response to high, prolonged levels of prednisone." Ex. 5 (Israelian Rpt.) at 79.

Moreover, no one told the jury that prednisone is no longer the preferred treatment for Crohn's disease. "By 2008 to 2010 the standard of practice had shifted to the point where most patients who needed repeated courses of steroids were offered biological therapy as a way of

---

[72] Dr. Dietz, the government's expert, did note that Mr. Hall was taking prednisone on the day of the homicide, but even then trial counsel did not emphasize this point and in particular did not point out that Mr. Hall's mental illness and brain abnormalities created particular risks, nor that prednisone was no longer a preferred treatment for Crohn's. Tr. 05/29/14 at 5185; *see also* Ex. 5 (Israelian Rpt.) (discussing risks of prednisone); Ex. 7 (Steinhart Rpt) (discussing risks of prednisone and that it is not a preferred treatment).

158

avoiding repeated or prolonged use of steroid therapy and producing a more sustained and durable improvement in inflammation and in the symptoms caused by inflammation." Ex. 7 (Steinhart Rpt.) at 8. Biologics (or biological therapy) are lab-created antibodies and used to treat Crohn's disease. They do not have the same psychological side effects as corticosteroids such as prednisone. *See* Crohn's and Colitis Foundation, Biologics Fact Sheet, https://www.crohnscolitisfoundation.org/sites/default/files/2023-08/Biologics%208.2023_15.pdf. The BOP prescribed Mr. Hall a drug that made him irritable and angry, which is contraindicated for someone with Mr. Hall's psychological history, and it was not even the preferred treatment. Yet this information was not part of counsel's mitigation presentation.

### iv. Trial counsel recognized the importance of presenting information about Crohn's disease but nevertheless failed to adequately investigate.

Mr. Duchardt recognized, at least to some extent, the importance of presenting evidence about Crohn's disease. Requesting funding to retain Dr. Fucetola, a neuropsychologist, Mr. Duchardt listed "changes in body chemistry wrought by nearly 20 years of Crohn's disease and drug treatment therefor" as one justification for hiring a neuropsychologist and conducting neuropsychological testing. Dkt. No. 204 at 4. He asked Dr. Fucetola for referrals for an internist who could address Crohn's disease but never hired one.

Trial counsel should have presented the testimony of an expert familiar with the ravages of Crohn's disease. Such an expert could have added to the information presented in Mr. Hall's records. Dr. Hillary Steinhart is one such expert.[73] He could have explained the difficulties

---

[73] He is the author of *Crohn's and Colitis: Understanding and Managing IBD*. Dr. Steinhart's book is now in its third edition, which was published in 2018. Earlier editions were published in 2006 and 2012. Dr. Steinhart is also the co-author of the *Crohn's & Colitis Diet Guide*. Both *Crohn's and Colitis: Understanding and Managing IBD* and *Crohn's & Colitis Diet*

Crohn's patients endure in terms the jury would have understood. He also could have explained problems in how Mr. Hall's Crohn's was managed, including the overuse of prednisone even though it is "contraindicated" for someone with serious mental health problems like Mr. Hall. Ex. 7 (Steinhart Rpt.) at 8.

The ABA Guidelines are clear that investigation of one's medical history, including "physical illness" as well as mental illness, is an essential part of capital defense. *See* 2003 ABA Guidelines, Commentary to Guideline 10.7. By failing to obtain a Crohn's expert to understand and explain the complex suffering experienced by Mr. Hall as a result of his lifetime of disease, Mr. Duchardt failed in his representation of Mr. Hall.

### H. Trial counsel was ineffective for failing to adequately cross-examine key witnesses.

Trial counsel failed to ask crucial questions during cross-examination of government witnesses that would have either elicited information helpful to Mr. Hall or undermined the witnesses' credibility. Most notably, trial counsel failed to use information about Mr. Hall to adequately cross-examine rebuttal mental health experts Dr. Dietz and Dr. Reardon. An understanding of Chuck's history of trauma reveals that many symptoms attributed to Antisocial Personality Disorder (ASPD) are better explained by Post Traumatic Stress Disorder (PTSD). An understanding of Mr. Hall's brain abnormalities also explains many symptoms that were

---

*Guide* are written for laypeople. Dr. Steinhart is also engaged in academic research and teaching. He serves as a Professor of Medicine at the University of Toronto. He has published over 180 research papers, mostly in the field of inflammatory bowel diseases, and has been on the editorial board for the journal *Inflammatory Bowel Diseases* and other journals. He also treats patients and was the Medical Lead of the Inflammatory Bowel Disease Centre at Mount Sinai Hospital from 2011 to 2019. Current counsel found one of Dr. Steinhart's books at the Kansas City public library. Dr. Steinhart was responsive when current counsel contacted him and he ultimately reviewed Mr. Hall's medical records and drafted a report. *See* Ex. 7 (Steinhart Rpt.).

attributed to ASPD. Among other things, Mr. Hall's brain abnormalities make it even harder for him to deal with the psychological side effects of prednisone. Dr. Dietz pointed out prednisone could account for some of Mr. Hall's symptoms but was not confronted with the fact that Mr. Hall was on prednisone the day of the murder, or that his mood disorder and brain abnormalities complicate his ability to cope with prednisone's side effects. As to Dr. Reardon, records show that she testified inaccurately that nothing corroborated Mr. Hall's account of his parents' drinking and outbursts. Trial counsel did not confront her with the corroborating records.

### i. Dr. Park Dietz

Dr. Dietz testified in rebuttal against both Mr. Hall and co-defendant Coonce. Dr. Dietz first discussed co-defendant Coonce, acknowledging that he had suffered from harmful life events. Of Mr. Hall, Dr. Dietz said, "So here too I looked for harmful life events but in childhood didn't find anything like the same kind of childhood events because Hall had a middle class upbringing in a reasonable, stable, adoptive family that met his day-to-day needs." Tr. 05/29/14 at 5064. Dr. Dietz emphasized that Mr. Hall's family "afforded him access to private education opportunities when he didn't succeed in public school." *Id.* Mr. Duchardt reinforced and confirmed this point on cross-examination, saying, "[i]s it a fair statement, though, in terms of all the information which you received, including from Chuck Hall himself, that if we're talking about nurture on the end of his background it was pretty darn good?" *Id.* at 5154.

Dr. Dietz testified that Mr. Hall suffered from agoraphobia, a social anxiety disorder. *Id.* at 5087-90. This testimony was based in part on Mr. Hall telling a psychologist in 2006 that "he's constantly, 'pissing people off to keep them away from me[,]'" which allows him to get space but also "feeds his depression." *Id.* at 5089. Dr. Dietz also diagnosed Mr. Hall with "adjustment disorder with depressed mood." *Id.* at 5096. He testified, "here the issue is how to properly

classify what is unquestionably times of depression." *Id.* "That depression had been related to his Crohn's disease over and over again, that when his Crohn's disease acts up or something goes wrong with it or he has a flare-up or he has an obstruction or there's a problem that may require surgery, he becomes very depressed and frustrated by the inability of anyone to quickly relieve the problem for him." *Id.* "My judgment is that it's most accurate to characterize this as an adjustment disorder with depressed mood, which is what is should be labeled if it truly is a reaction to physical illness or other stressors in life. If that's what dictates when he becomes depressed, then adjustment disorder is the way to characterize it." *Id.* This left the jury with the impression that his depression was solely a result of his significant health concerns and his impatience with "the inability of anyone to quickly relieve the problem." *Id.*

This minimization of depression should have been confronted with life history records that demonstrate that Chuck's depression is longstanding. Chuck suffered depression as early as 1985, before he was diagnosed with Crohn's disease but shortly after he returned from a year of repeated sexual victimization at SMS. Ex. 63 (Eval. 1985) at 2, 3. He experienced suicidality as a teenager as well, which trial counsel knew but failed to use at all. Ex. 93 (Teen Suicide Note). In 1995, he was diagnosed and treated for depression. Ex. 94 (Maine Dartmouth Recs.) at 6. Trial counsel failed to confront Dr. Dietz with these facts.

Dr. Dietz testified that Mr. Hall did not suffer from any psychotic disorder including hallucinosis. He also denied that Chuck suffered from a seizure disorder, which Dr. Wisner had speculated about. Tr. 05/29/14 at 5099.

Dr. Dietz testified that Dr. Fucetola's neuropsychological testing revealed clinically no significant neuropsychological findings or "things that affect his ability to make decisions, plan ahead, know right from wrong, et cetera." *Id.* 5100.

162

Dr. Dietz testified that Mr. Hall was a substance abuser because, "[w]hen he was at Homestead at age 16, he acknowledged that he had been using alcohol, marijuana, heroin, and cocaine" and "in October of 1996 he listed the drugs that he had used as marijuana, LSD and alcohol." *Id*. at 5087. In Dr. Dietz's exam, Chuck denied ever using heroin, said he used cocaine only once, and consumed LSD once on purpose and once when someone gave it to him without his knowledge. *Id.*

Finally, Dr. Dietz said that the Personality Assessment Inventory (PAI) showed Mr. Hall to be a "socially isolated individual" with "a personality style that is consistent with a number of antisocial character features" and "some difficulties consistent with relatively mild or transient depressive symptomatology." *Id.* at 5101-02. Dr. Dietz found that Mr. Hall met the criteria for conduct disorder in his youth. *Id.* at 5068. He also testified at length about Mr. Hall's criminal history.

There was crucial information about Chuck that trial counsel did not know and therefore did not use to cross-examine Dr. Dietz. There was also important information in trial counsel's file that Mr. Duchardt failed to use in cross-examining Dr. Dietz. Some of this information directly contradicted statements Dr. Dietz made. Other information would have shed additional light on Mr. Hall's statements and actions. Asking Dr. Dietz to consider this information would have either led him to different conclusions or would have undermined his credibility by showing that his conclusions were not based on all relevant information.

First, Dr. Dietz's statement that Mr. Hall had suffered no harmful events in childhood because he had "a middle class upbringing in a reasonable, stable, adoptive family that met his day-to-day needs" was inaccurate. *Id.* at 5064. Mr. Hall's supposedly blessed childhood was a key theme in trial counsel's penalty presentation too, so it is unsurprising that Dr. Dietz shared

163

this view. But in fact, Mr. Hall had experienced harmful, traumatizing childhood events and his family was not always able to meet his needs.

Dr. Dietz referenced the "private education opportunities" Chuck was afforded.[74] But one such opportunity, SMS, was described by former students as "basically a holding pen. It took in the kids no one else wanted, corralling them and keeping them out of the system, so the system seemed to pretty much leave the school alone." Ex. 29 (Elizabeth Miles Dec.) ¶ 6. The students "were like the underbelly of the Burlington area, kids who got kicked out of public school, or at least were getting into trouble there, but whose families never could have afforded private school on their own." Ex. 20 (Jackson Dec.) ¶ 7. Mr. Mintz, the headmaster, did not necessarily charge tuition. *See* Ex. 27 (Mashteare Dec.) ¶ 4 (family could not afford private school but he became a ward of the state and state paid SMS); Ex. 32 (Foxwell Dec.) ¶ 3 (family paid $5/week for him to attend SMS). He required students to panhandle. Ex. 27 (Mashteare Dec.) ¶ 6. The living conditions were squalid. Ex. 25 (Lamb Dec.) ¶ 6 ("[a] friend of the family who visited me there was shocked by the lack of cleanliness at Starksboro [where SMS students lived] to the point of documenting it"); Ex. 99 (SMS letter). One former student surmised that "Jerry [Mintz] chose to work with at-risk kids and wards of the state because it gave him easier and free access to young boys, and that he had the school so he could enroll children he wanted to use for his own purposes." Ex. 16 (Patricia Miles Dec.) ¶ 10.

Chuck was sexually abused by Mr. Mintz while attending SMS. The sexual abuse had a profound impact on him. "Since the repeated sexual abuse he experienced as a 13-year old at

---

[74] Additionally, Thornton Academy is a private school but the town of Saco did not have a public high school so all students from Saco had to enroll at Thornton, with tuition waived, because there was no public option.

SMS, Chuck has suffered from intrusive thoughts about the abuse, flashbacks, upsetting memories, and nightmares about the trauma as well as psychological distress and autonomic reactivity when exposed to cues that remind him of what Jerry did to him." Ex. 5 (Israelian Rpt.) at 14. As a result of the abuse, "[e]ven now, Chuck is stuck in a state of 'fight or flight.' He endorsed multiple symptoms of posttraumatic autonomic hyperarousal including a heightened startle response (especially as a kid), irritability, tension, and problems falling asleep and staying asleep." *Id.* at 15. "Following the sexual trauma, Chuck exhibited impairments in multiple areas of functioning. . . . He had more problems in social settings, more difficulty at school, and was less able to do the things he needed to do in general." *Id.* at 16.

If trial counsel had investigated Chuck's trauma history, they would have been able to point out that Dr. Dietz's diagnosis of "antisocial character features" was inaccurate. Multiple experts have noted that Mr. Hall's symptoms indicate PTSD rather than anti-social personality disorder. Dr. Israelian explains, "[h]aving uncovered Mr. Hall's trauma history, and conducted a diagnostic interview for PTSD, an ASPD diagnosis is misinformed and misapplied." *Id.* at 68. The ASPD diagnoses were "made without knowledge of this trauma history." *Id.* This is crucially important because "[a]ccording to the DSM-5, clinicians are warned that 'the diagnosis may at times be misapplied to individuals in . . . adverse circumstances and environments (e.g. child maltreatment and exposure to violence) that generate behaviors that resemble those of antisocial personality disorder but are instead reactive and contextual.'" *Id.*

Dr. Fradkin similarly explains "It is understandable to me that because no therapist knew about the abuse he suffered, when they reflected on his behavior, it seemed as if a diagnosis of Anti-Social Personality Disorder fit." Ex. 4 (Fradkin Dec.) ¶ 263. But with knowledge of the abuse, "Chuck's primary diagnoses are PTSD and Complex PTSD accompanied with moderate

165

depression and anxiety. . . it is a clinical mistake to diagnose Chuck with Anti-Social Personality Disorder, even though he has certainly engaged in criminal behavior." *Id.* ¶ 262.

Dr. Agharkar "concur[s] with Dr. Fradkin and Dr. Israelian's assessments." Ex. 6 (Agharkar Rpt.) at 24. He notes that Mr. Hall "exhibits a great deal of numbing and avoidance symptoms as a result of his childhood trauma, which is what characterizes complex Post-Traumatic Stress Disorder." *Id.* Dr. Agharkar adds that based on Mr. Hall's "visceral reaction to discussing" the abuse "I believe it is likely that the abuse was worse than he was willing to talk about." *Id.*

Trial counsel's expert Dr. Wisner now believes that his ASPD diagnosis may not be appropriate. Ex. 13 (Wisner Dec.) ¶ 18. Another defense witness, Dr. Staples, did not diagnose Mr. Hall with ASPD but also did not know about his trauma history and did not consider PTSD. Now, Dr. Staples notes that many of Mr. Hall's symptoms are hallmarks of PTSD. Ex. 43 (Staples Dec.) ¶ 14.

Trial counsel also had access to information that contradicted Dr. Dietz's conclusion that Mr. Hall's parents were consistently able to meet his needs. Chuck's sister Michelle said that being sent away was a trigger for insecurity and fear of abandonment stemming from being given up for adoption. Ex. 34 (Bories Dec.) ¶ 14. So even if Chuck had been sent away to an environment that was positive – which SMS decidedly was not – it still caused Chuck distress for his parents to send him away. Chuck's other sister, Susan observed their parents' excessive drinking and fighting and that they were overwhelmed by Chuck's and Michelle's needs. Ex. 35 (Shumway Dec.) ¶¶ 4, 11. The report from counselors at the Sweetser Center corroborates Susan's observations and adds that Dorothy was intimidated by school officials and withheld

166

information from Charles, which made addressing Chuck's and Michelle's struggles in school more difficult. Ex. 62 (Sweetser Closing Summary) at 2-4.

In addition, although Mr. Duchardt spoke to witnesses who attended Homestead with Chuck, he did not ask them about the environment at Homestead. Ex. 39 (Parks Dec.) ¶ 18; Ex. 41 (Mandarelli Dec.) ¶¶ 4-5, 15. Trial counsel was therefore unaware and unable to question Dr. Dietz about the impact of being in a punitive environment that emphasized group therapy soon after experienced the trauma of sexual abuse and trying desperately to keep it secret.

Dr. Dietz's diagnosis of agoraphobia is also inaccurate because Chuck's medical condition rules out agoraphobia. According to the DSM-5:

> Individuals with certain medical conditions may avoid situations because of realistic concerns about being incapacitated (e.g., fainting in an individual with transient ischemic attacks) or being embarrassed (e.g., diarrhea in an individual with Crohn's disease). The diagnosis of agoraphobia should be given only when the fear or avoidance is clearly in excess of that usually associated with these medical conditions.

Ex. 5 (Israelian Rpt.) at 69 (quoting DSM-5 at 221). In addition to Mr. Hall's fear not being "clearly in excess of that usually associated with" having severe Crohn's disease and experiencing frequent leaking stool from his stoma while in prison, some of Mr. Hall's symptoms are better explained by PTSD than agoraphobia. At minimum, trial counsel should have pointed out that agoraphobia does not rule out PTSD, as they frequently co-occur and among the "most frequent additional diagnoses" is "PTSD." *Id.* (conclusion referring to DSM-5 at 220-21).

As Dr. Israelian explains, with a brain that, among other abnormalities, is "primed to overreact when feeling slighted or threatened" because of PTSD, "it is easy to understand why Mr. Hall has literally been begging to be separated from others throughout the many years he has been imprisoned." *Id.* at 80. As such, "[w]hile it is true that he is anxious about the possibility of

167

a leak in his ostomy bag, his need for isolation is far greater than that." *Id.* As such, in light of Mr. Hall's Crohn's disease and PTSD, agoraphobia is not the most appropriate diagnosis.

Dr. Dietz's diagnosis of adjustment disorder with depressed mood also appears to be misplaced, in light of life history records showing depression and suicidality as a teenager. His evaluation at age 15 noted he was depressed. Ex. 63 (Eval. 1985) at 2, 3. As a teenager he wrote a note to his parents that contemplated suicide. Ex. 93 (Teen Suicide Note). Care providers diagnosed and treated depression as early as 1995. Ex. 94 (Maine Dartmouth Recs.). Trial counsel did not confront Dr. Dietz with the medical records from 1995, as he had failed to request them. Additional life history records also call into question the conclusion that Mr. Hall was a drug abuser, given that this was not previously flagged as a concern and that Mr. Hall's extensive records generally do not reflect abuse of illegal drugs.

Although Dr. Dietz concluded that Mr. Hall does not suffer from epilepsy, he was not confronted with evidence of Mr. Hall's trauma history and did not consider possibility that the symptoms flagged by Dr. Wisner as possible seizures were more likely dissociations, a common symptom of PTSD. Ex. 5 (Israelian Rpt.) at 11. Certainly from the time he was a teenager Mr. Hall experienced other "classic symptoms of PTSD" such as "nightmares, flashbacks, hypervigilance, and avoidance symptoms stemming from the childhood sexual abuse." Ex. 6 (Agharkar Rpt.) at 24. And certainly "[l]ike many victims of trauma, Chuck dissociated during these times of forced sexual contact" with Jerry Mintz. Ex. 5 (Israelian Rpt.) at 14. "He reported things did not feel real to him, his mind went blank, and time seemed to 'slow way down.' He recalled that as soon as Jerry initiated the sexual contact, it felt like the incident would never end." *Id.*

As to Dr. Dietz's statement that Dr. Fucetola's neuropsychological testing does not show any deficits that "affect his ability to make decisions, plan ahead, know right from wrong, et cetera," MRI/PET results that trial counsel did not obtain demonstrate that Mr. Hall does have such deficits. Tr. 05/29/14 at 5100. Because brain imaging was not conducted prior to trial, Dr. Dietz was not confronted with imaging results. Having reviewed the results, which show decreased volume in the right parietal and right temporoparietal regions of Mr. Hall's brain, Dr. Israelian notes that "multiple areas of Mr. Hall's brain are abnormal." Ex. 5 (Israelian Rpt.) at 79. Additionally:

> Clinical interviews, behavioral observations, review of records, tests of neuropsychological functions, and measures of psychopathology/personality were consistent and convergent with decreased volume and metabolism in key right parietal and right temporoparietal regions and association fibers that underly both cognitive abilities, emotional regulation, and interpersonal success. Areas in Mr. Hall's brain critical for accurately interpreting the needs and intentions of others in order to form warm and meaningful connections as well as areas meant for protection in the face of threat are as compromised as areas important for mathematics.

*Id.* at 80.

Finally, when trial counsel asked Dr. Dietz about symptoms that could reveal bipolar disorder, which Dr. Wisner had diagnosed, Dr. Dietz observed that many of Mr. Hall's symptoms could be attributed to prednisone. When asked about a medical record noting Mr. Hall's experiences of "insomnia for five days. Fighting. Irritable, very agitated. Pressured speech[,]" Dr. Dietz responded, "notice that on the second line it says on Prednisone. So if this is the time he's on high-dose Prednisone, that could account for this change of behavior." Tr. 05/29/14 at 5184-85 (discussing Trial Exhibit 1180). Here, Dr. Dietz makes an important point that trial counsel failed to elicit from his own expert, who has acknowledged that he did not review Mr. Hall's medical records in enough detail to recognize that Mr. Hall was taking prednisone on the day of the homicide. Ex. 13 (Wisner Dec.) ¶ 20. Even after Dr. Dietz – a government expert – opined

169

that prednisone likely caused Mr. Hall's aggressive behavior, trial counsel failed to follow up by asking more about the impact of prednisone and further failed to emphasize to the jury that the government's expert had pointed to a reason wholly beyond Mr. Hall's control for his mania and aggression. Moreover, without investigating abnormalities in Mr. Hall's brain, trial counsel was unable to point out that "these brain abnormalities render Mr. Hall all the more vulnerable to adverse effects in response to a broad range of stressors and circumstances such as negative neuropsychiatric complications in response to high, prolonged levels of prednisone." Ex. 5 (Israelian Rpt.) at 79.

Beyond not confronting Dr. Dietz with key life history information and brain imaging results, trial counsel also failed to cross-examine Dr. Dietz on his questioning technique. Dr. Wisner had referred to Dr. Dietz as a skilled questioner. However, Dr. Fradkin, an expert in trauma-informed interviewing, observes that Dr. Dietz's questions were not framed in a way that would be expected to get someone to open up about traumatic events, such as a history of sexual abuse. At times, Dr. Dietz even posited his own theories, rather than asking Mr. Hall open ended questions about his experiences. Ex. 4 (Fradkin Dec.) ¶ 217(m)-(n). Dr. Fradkin summarized:

> Dr. Dietz did not conduct a trauma-informed interview, and further at times was sarcastic, belittling, and combative. In my professional judgment, this would have led to Chuck feeling disrespected and unsafe. The impact of conducting this evaluation this way is that it likely caused Chuck to be more shut down and much less open and vulnerable. This style of interviewing made it extremely unlikely in my opinion that Chuck would have ever revealed about the sexual abuse he experienced at SMS.

*Id.* ¶ 217(r).

### ii. Dr. Maureen Reardon

Dr. Reardon testified in rebuttal about the mental examination she conducted of Mr. Hall pursuant to a court order to evaluate Mr. Hall's competency to stand trial. Dr. Reardon minimized many of Mr. Hall's serious mental and physical health problems. The same records and evidence

170

that trial counsel should have used in cross-examining Dr. Dietz would also have led to a powerful cross-examination of Dr. Reardon.

Dr. Reardon testified: "There's been varying reports about whether or not he was mistreated as a child but for the majority of the reports indicated he had a fairly unremarkable upbringing." Tr. 05/23/14 at 4418. Dr. Reardon referred to her report when testifying and the government admitted the report as an exhibit. Dr. Reardon's report noted that "[o]n initial questioning, Mr. Hall reflected positively on his upbringing, describing his parents as 'loving, hard-working, and supportive.'" Trial Ex. 461 at 4. "In subsequent interviews, however, Mr. Hall spoke of his parents' disregard for early signs of physical health problems (e.g., frequent vomiting, blood in stool), their heavy alcohol consumption, and frequent arguments. Additionally, while he described a close 'emotional bond' to his mother, he also recalled her as rather demeaning to him as a child, calling him a 'screw up' or informing him of the low cost of his adoption." *Id.* at 5. Dr. Reardon did not credit Mr. Hall's later interviews discussing drinking and some chaos during his childhood because "[i]n a telephone interview, Charles and Dorothy Hall described 'ups and downs' in their 57-year marriage, acknowledging they 'didn't hide it' from the children; however, they denied any significant alcohol misuse or domestic violence. They described Mr. Hall as a 'story-teller,' who can be 'extremely convincing.'" *Id.* Dr. Reardon testified there was no corroboration for Chuck's descriptions of chaos and alcohol consumption in his childhood home. *Id.*

Dr. Reardon denied that Mr. Hall suffered from major depression or even a depressive episode. Instead, she "diagnosed him with an unspecified depressive condition based on his history of suicide attempts and other related symptoms, although his symptom picture didn't fall neatly into the categories of major mood disorders or a major depressive disorder. . . ." Tr.

171

05/23/14 at 4459. She disputed that one of Mr. Hall's suicide attempts was genuine, referring to it as simply a "gesture." *Id.* at 4428.

Dr. Reardon also, like Dr. Dietz, "of course," diagnosed Mr. Hall with ASPD. *Id.* at 4459.

Dr. Reardon also suggested that Mr. Hall did not have any significant learning problems. She testified that:

> He underwent a comprehensive psychoeducational assessment which is common when someone is assigned to a specialized program for learning problems. They undergo regular evaluations of their intelligence. At that time he earned a full scale IQ of 98 which falls very squarely in the average range of intelligence with a verbal IQ of 95 and a performance IQ of 101. Although that's a six-point difference, it's not significant. Both of those scores fall squarely in the average range.

*Id.* at 4419.

As with Dr. Dietz, trial counsel failed to use information that either was in counsel's file or that was readily available to effectively cross-examine Dr. Reardon.

First, Dr. Reardon's claim that nothing corroborated a more negative account of his upbringing is simply incorrect. The report from the Sweetser Center did corroborate Charles and Dorothy's drinking. It also established that Dorothy, in particularly, felt overwhelmed and ill-equipped to address Chuck's and Michelle's needs. This report was provided to Dr. Reardon by initial trial counsel. Trial Ex. 461 at 3 (listing records received). Yet Mr. Duchardt did not ask her about it during cross-examination.

Susan also could have corroborated Charles and Dorthy's drinking, frequent arguments, and the possibility that Mrs. Hall was frequently overwhelmed. Ex. 35 (Shumway Dec.) ¶¶ 4, 11. Yet trial counsel had decided that Susan should not testify. As such, trial counsel was unable to confront Dr. Reardon with information from Susan that supported the supposedly uncorroborated information from Mr. Hall.

As to Dr. Reardon's ASPD diagnosis, as noted above, multiple experts have noted that Mr. Hall's symptoms are a result of PTSD and an "ASPD diagnosis is misinformed and misapplied." Ex. 5 (Israelian Rpt.) at 68. As to her minimization of Mr. Hall's depression, life history records that trial counsel failed to confront Dr. Reardon with show that he suffered depression as early as 1985. Ex. 63 (Eval. 1985) at 2, 3. He experienced suicidality as a teenager as well, which trial counsel knew but failed to use at all. Ex. 93 (Teen Suicide Note). In 1995, he was diagnosed and treated for depression. Ex. 94 (Maine Dartmouth Recs.) at 6. Trial counsel failed to confront Dr. Reardon with these facts. Further, Dr. Reardon's minimization of one of Chuck's many suicide attempts as a mere "gesture" should have been confronted by effective counsel. This nomenclature is problematic, since lethality of a suicide attempt is not correlated to suicidal intent. Ex. 6 (Agharkar Rpt.) at 16. She tended to cast doubt on Chuck's serious depression, which has existed since he was sexually abused as a child. However, counsel failed to investigate, uncover, understand, and present this information in order to confront Dr. Reardon.

And as to Dr. Reardon's testimony about Chuck's average test scores, Chuck was formally diagnosed with a learning disability in 1986. Ex. 64 (Thornton School Recs.) at 26 ("the above-named child (Charles Hall) has a specific learning disability"). Trial counsel's file included the school records that identify Chuck having a learning disability (and Dr. Fucetola even made a passing reference to them in his testimony). Chuck's learning disability is significant for many reasons, including that for children with learning disabilities, "[t]he constant struggle to keep up with the class despite significant difficulties can be demoralizing in the face of repeated failure. Negative self-image, social isolation, loss of self-esteem, and shame are common among children with learning disabilities." Ex. 5 (Isrealian Rpt.) at 22. Behavior and

173

academic problems stemming at least in part from his undiagnosed learning disability led to his being sent to Shaker Mountain School. Yet trial counsel failed to confront Dr. Reardon with this significant information that would have shown she drastically understated the learning difficulties Chuck faced in school.

### iii. Other government experts

In addition to the two key rebuttal witnesses, Dr. Dietz and Dr. Reardon, trial counsel failed to cross-examine other government witnesses. Trial counsel did not ask Dr. Brinkley about his conversation with Chuck on the day of the homicide, prior to the homicide occurring. BOP records show that Dr. Brinkley saw Mr. Hall that day, with Dr. Gariety. Dr. Gariety, who did not testify at trial, has explained that Mr. Hall approached the two doctors and asked to speak with them privately. Before they were able to speak again, the homicide had occurred. Yet trial counsel failed to elicit this information from Dr. Brinkley.

Trial counsel similarly failed to adequately cross-examine Dr. Shine, another BOP employee who provided mental health care to Mr. Hall, as well as other BOP employees the government called during the penalty phase. In conjunction with counsel's failure to affirmatively present the compelling mitigating evidence that was readily available, failing to adequately cross-examine government experts led the jury to fundamentally misunderstand who Chuck is.

### I. Trial counsel was ineffective because no attorney ever argued to the DOJ's Capital Review Committee that a death sentence should not be sought against him.

In federal cases where the alleged facts of the crime determine eligibility for the death penalty, trial counsel has an early opportunity to advocate that the government exercise discretion not to seek the death penalty. The Attorney General, with substantial assistance from the Capital Review Committee (also called the Attorney General's Review Committee on Capital

174

Cases), ultimately makes the decision whether to seek the death penalty. United States

Attorneys' Manual § 9-10.050 (1997) (hereafter USAM).[75] Prior to this decision, the Committee

must meet with defense counsel and consider mitigating evidence. USAM § 9-10.120-130.[76]

Rather than using the meeting with the DOJ as an opportunity to make a forceful

argument against the death penalty, Mr. Johnson told the Committee that Mr. Hall wanted the

death penalty.[77] He failed to advocate for his client, failing to even ask that they decline to seek

the death penalty. Ex. 15 (Duchardt Int.) at 44. He submitted no written materials to the

committee, relying solely on his verbal presentation. *See* Ex. 14 (Huffman Dec.) ¶ 10. All in all,

Mr. Johnson failed to advocate on behalf of his client at a point when he should have been

forcefully arguing against pursing a death sentence.

---

[75] In 2018, after Mr. Hall's trial, the United States Attorney's Manual was comprehensively revised and renamed the Justice Manual.

[76] The USAM underscores the importance of considering mitigating evidence, stating that "[n]o final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation." USAM § 9-10.120. And in other cases involving murders within BOP facilities, and in many other cases with highly aggravated facts, the government has declined to pursue the death penalty.

Around the time of Mr. Hall's trial, Gary Watland pled guilty and received a life sentence for murdering a fellow inmate, although he initially went to state prison for murder and was transferred to federal prison after plotting to escape. *United States v. Watland*, No. 11-cr-00038 (D. Co. Feb. 5, 2014). More recently, the DOJ declined to seek the death penalty against Fotios Geas and Paul DeCologero, who were charged with the murder of James "Whitey" Bulger, who was 89 and in a wheelchair. Alanna Durkin Richer, *Prisoners Charged with Killing Whitey Bulger Won't Face Death Penalty*, CBS News (July 13, 2023), https://www.cbsnews.com/boston/news/whitey-bulger-death-penalty-freddy-geas-paul-decologero/. The DOJ also recently declined to authorize the death penalty against defendants in other highly aggravated cases, including Patrick Crusius, who murdered twenty-three people in a mass murder targeting Hispanic shoppers in an El Paso, Texas Walmart. Jake Bleiberg & Michael Tarm, US Won't Seek Death Penalty for Alleged Texas Walmart Gunman, Associated Press (Jan. 17, 2023), https://apnews.com/article/el-paso-crime-capital-punishment-hate-crimes-afddd0e17bb68d2fc3a5eb1dc096e514

[77] Mr. Johnson confirmed this fact in an interview with undersigned counsel and, as noted above, undersigned counsel will seek to depose him.

175

Mr. Johnson made this presentation to the Committee one year after his appointment, but without conducting a mitigation investigation. At the time of the presentation, Mr. Johnson had not retained a mitigation specialist or hired any experts of any kind on behalf of Mr. Hall. *See* Ex. 14 (Huffman Dec.) ¶¶ 5, 13. Mr. Johnson should have immediately recognized the need to investigate Mr. Hall's mental health: Mr. Hall experienced cycles of depression and suicidality the BOP believed to be associated with Crohn's flares. *See* Ex. 80 (Gariety Dec.) ¶ 4. Stuart Huffman, initial co-counsel with Mr. Johnson, "believed his stated desire for the death penalty was due primarily to his poor medical condition and the suffering he experienced from it." Ex. 14 (Huffman Dec.) ¶ 12.

Moreover, that Mr. Hall was saying he wanted the death penalty would not have surprised an attorney who had done their research.[78] The ABA Guidelines note that "[s]ome clients will initially insist that they want to be executed—as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation" but "[i]t is ineffective assistance of counsel to simply acquiesce to such wishes, which usually reflect the distorting effects of overwhelming feelings of guilt and despair rather than a rational decision . . . ." 2003 Guidelines 10.5, commentary. Also, prior to the homicide, Mr. Hall repeatedly had asked for isolation and segregation from other inmates. This would have caused effective counsel to inquire about Mr. Hall's motivations for the death penalty and for this isolation.

Additionally, before presenting to the Committee, Mr. Johnson failed to challenge the prosecutor's attempt to include as an aggravating factor against Mr. Hall that this was a murder

---

[78] Mr. Hall vacillated between wanting the death penalty and wanting a lesser sentence. *See* Ex. 14 (Huffman Dec.) ¶ 12 ("[Chuck] waivered about his desire to receive the death penalty during the time I represented him, going back and forth about what he wanted.").

176

committed by someone serving a life sentence. The Notice of Intent to Seek the Death Penalty dated July 22, 2011, included this aggravating factor. Mr. Hall was not serving a life sentence. Dkt. No. 62 at (2)(B)(i). His co-defendant Mr. Coonce was serving a life sentence for a violent rape and kidnapping. Mr. Hall was serving sentences of forty-three months and 151 months for charges of mailing threatening communications. A common argument, and an argument the government actually made against Mr. Coonce, is that if someone commits a crime while serving a life sentence, they will not be punished at all unless the jury sentences them to death. This argument would not have applied to Mr. Hall.

And, unlike Mr. Coonce, Mr. Hall's criminal history did not include any crimes that carried a potential life sentence or involved significant violence. Prior to the federal charges for mailing threatening communications, which themselves involved no actual harm to any person, Mr. Hall had pled guilty to a series of property crimes and one non-aggravated assault in the state of Maine. Eventually, Mr. Duchardt successfully challenged this aggravating factor, so it was not alleged against Mr. Hall at trial. However, Mr. Johnson presented Mr. Hall's case to the Committee without taking any steps to challenge it. In failing to challenge this aggravating factor before presenting to the Committee, Mr. Johnson gave the Committee the false impression that Mr. Hall should be classified with individuals who committed murders while incarcerated in BOP facilities for far more serious crimes that carry far more serious sentences, like kidnapping, rape, and murder. Mr. Johnson should have underscored that Mr. Hall's criminal history consisted of crimes that involved no bodily injury and were mostly property crimes.

When Mr. Duchardt took over from Mr. Johnson as learned counsel, he did not correct Mr. Johnson's failure to make a reasonable presentation to the Committee. As such, no one ever

made the case to the DOJ that they should not seek the death penalty against Mr. Hall, even though there was a powerful case to be made.

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. U.S. Const. amend. VI. "The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment" *United States v. Cronic*, 466 U.S. 648, 654-55 (1984). The adversarial process requires that the accused have "counsel acting in the role of an advocate." *Anders v. California*, 386 U.S. 738, 743 (1967). Our justice system is premised on the "well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question." *Penson v. Ohio*, 488 U.S. 75, 84 (1988) (internal quotation marks omitted). While a defendant must normally show prejudice from counsel's deficient performance, prejudice may be presumed when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659.

In Mr. Hall's case, his first learned counsel completely failed to advocate that the government not seek the death penalty against his client, and second learned counsel took no steps to remedy that error. As such "an actual breakdown in the adversarial process" occurred. *Id.* at 657.

Mr. Hall's constructive denial of counsel entitles him to automatic reversal of his death sentence because of violation of his Sixth Amendment rights constituted structural error. Such an error requires automatic reversal when the constitutional violation pervades the entire criminal proceeding. *See Satterwhite v. Texas*, 486 U.S. 249, 257-58 (1988). The constitutional violation affected "the framework within which the trial proceeds, rather than simply [causing] an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Here, deprivation of the right to counsel at the presentation to Capital Review Committee affected the framework

178

within which the trial proceeded in that Mr. Hall would not have faced the death penalty had the Committee reached a different decision. In the alternative, this Court should consider this claim as part of Mr. Hall's broader IAC claim that requires a *Strickland* prejudice analysis.

**J. Trial counsel was ineffective for failing to seek severance of the penalty phase.**

Trial counsel was ineffective for requesting a joint penalty phase. The joint penalty phase meant that the jury heard about a long list of violent incidents both in and out of prison, even though the violence was committed by Mr. Coonce, not Mr. Hall.

During the penalty phase, the government presented extensive evidence of Mr. Coonce's violent history, including the violent rape and kidnapping that led to Mr. Coonce's federal charges and several violent outbursts during his time in BOP custody. Whether housed in open population or in isolation, both before and after the homicide, Mr. Coonce frequently engaged in self-harm and violence directed at others.[79] During the joint penalty phase, the evidence about Mr. Coonce's violent behavior was interspersed with evidence about Mr. Hall.[80]

Further, key government witnesses – including USMCFP employees and the government's star rebuttal witness, Dr. Park Dietz – testified against both Mr. Coonce and Mr. Hall. During his testimony, Dr. Dietz confused which defendant he was speaking about. In response to one question, he answered that Mr. Hall had been "kicking the girl and stealing the

---

[79] *See, e.g.*, Tr. 05/09/14 at 2110-62, 2173-2219; Tr. 05/13/14 at 2269-72, 2420-23, 2430-36; Tr. 05/14/14 at 2560-75, 2596-610.

[80] *See, e.g.*, Tr. 05/08/14 (testimony by James Osterrieder and Kellie Sbardella about Mr. Hall immediately following testimony by Michael Elsey about his investigation of a violent crime committed by Mr. Coonce and Lorraine Bolle who prepared a presentencing investigation report that detailed Mr. Coonce's criminal history); Tr. 05/09/14 (testimony by Henry Small and Eric Storms solely about Mr. Hall followed by testimony by William Kowalski solely about Mr. Coonce); 05/13/14 (testimony by Ron Christopher Lee solely about Mr. Coonce followed by testimony of witnesses solely about Mr. Hall); 05/14/14 (testimony by Dr. Shine solely about Mr. Hall followed by testimony of Steven Reiser solely about Coonce).

179

car," Tr. 05/29/14 at 5165, when in fact those actions had been taken by Mr. Coonce. Mr. Hall's counsel had to remind Dr. Dietz, "And remember this is Hall and not anybody else" after Dr. Dietz asked "what incident are we talking about here?" and acknowledged that he "jumped the track." *Id.* During the questioning of SIS Technician Benjamin Ramos, he addressed Coonce's significant disciplinary history, covered Mr. Hall's, and then returned to additional violations committed by Coonce. Tr. 05/13/14 at 2269-72. Questioning then returned to addressing both Mr. Hall and Coonce. *Id.* at 2272.

If there had been separate penalty phases, during Mr. Hall's penalty phase, the government's only evidence of prior acts of violence would have been an assault that Mr. Hall pled guilty to in Maine state court and a single fight in BOP custody. Neither resulted in any serious injury. The joint penalty phase, however, meant that the jury heard about a near-constant stream of serious violence perpetrated by Mr. Coonce.

The penalty phase was joint because Mr. Hall's counsel asked for a joint penalty phase. On May 2, 2014, the trial court explained that it would likely grant a request from either defendant to hold separate (sequential) sentencing hearings. Tr. 05/02/14 at 1150. Holding separate penalty phases was standard practice in the Western District of Missouri. Mr. Hall's trial counsel told Coonce's trial counsel, "you may already know that the previous approach of the WDMO Judges, including Judge Fenner, has been to address penalty phase severance issues by having sequential penalty phases after a guilty verdict for multiple death case codefendants, with the order determined by the order in the indictment." Ex. 71 (Emails about severance); *see also* Ex. 81 (McNally Dec.) ¶ 5 & n.2.

Despite the trial court's willingness to hold separate penalty phase hearings, Mr. Hall's trial counsel trial withdrew a previously filed motion for severance of the penalty phase. Dkt. No.

740. Co-defendant Coonce's trial counsel continued to argue for severance. But with Mr. Hall's trial counsel arguing against severance, the trial court decided to hold a joint penalty phase. *See* Tr. 05/05/14 at 1428-40.

Instead, Mr. Hall's trial counsel ensured that there would be a joint penalty phase during which the jury would be inundated with stories about serious violence, including by witnesses testifying against both defendants. This decision undoubtedly confused the jury as to which actions had been taken by which defendant and increased the likelihood of a death sentence for Mr. Hall because of co-defendant Coonce's violent background.

### K. Trial counsel was ineffective for calling important penalty phase witnesses to testify by video.

Several important witnesses testified by video: Chuck's sister, Michelle Bories; Chuck's longtime friends, John Mandarelli and Steven Parks; and medical and mental health providers who had treated Chuck. Trial counsel made no effort to have these witnesses testify in person. Just the opposite, in fact; trial counsel did not merely accommodate requests by witnesses to testify by video without explaining to them why it would be important for them to be in the courtroom, he actually suggested to key witnesses like Chuck's sister that they should testify by video.

Chuck's sister, Michelle, explains, "I testified by video at Chuck's trial because Fred suggested that's how we do it. . . . If I had been told my presence in the courtroom could have made a difference, I would have figured out a way to be there, but Fred never said it was important." Ex. 34 (Bories Dec.) ¶ 20. Steven Parks similarly explained that he "would have been willing travel to Missouri" to testify in person, if asked. Ex. 39 (Parks Dec.) ¶ 18. But "[b]efore testifying at Chuck's trial, I had one phone conversation with Chuck's lawyer where he asked me questions. He seemed to know exactly what he was looking for." Ex. 39 (Parks Dec.)

¶ 18. John Mandarelli was incarcerated at the time he testified, and trial counsel took no steps to get an order for him to appear in person.

While there are circumstances where conducting some proceedings by video could be appropriate, having so many important witnesses at a capital sentencing hearing testify by video was an error. As courts have observed, in proceedings conducted by video, "[t]he immediacy of a living person is lost." *Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir. 1993). "[V]irtual reality is rarely a substitute for actual presence . . . even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it." *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir. 2001). That is why, "[i]n the most important affairs of life, people approach each other in person, and television is no substitute for direct personal contact." *Stoner*, 997 F.3d at 213; *see also* Sean O'Brien et al., *Put Down the Phone! The Standard for Witness Interviews is In-Person, Face-to-Face, One-on-One*, 50 Hofstra L. Rev. 1, 6-8 (2022) (discussing pitfalls of use of video conferencing to interview witnesses, many of which apply equally to witness testimony).

Just as conducting interviews in person is essential to building rapport, testifying in person is important. *Cf.* 2008 Supp'l Guidelines 10.11(C) ("Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death."). There are, of course, situations where having a witness testify by video may be more appropriate, such as to accommodate a witness who is terminally ill, hospitalized, or medically unable to travel, *see Horn v. Quarterman*, 508 F.3d 306, 313 (5th Cir. 2007); or for a pretrial hearing before a judge, *see United States v. Burke*, 345 F.3d 416, 424 (6th Cir. 2003). But "[i]n the most important affairs of life, people approach each other in person"—

and there can be no doubt that the capital sentencing hearing to determine whether Chuck would live or die was one of the most important affairs of Chuck's life. *Stoner*, 997 F.3d at 213.

As Mr. Stetler explains, "The importance of live, in-person witnesses in proceedings where jurors are asked to decide whether the accused should live or die cannot be overstated." Ex. 10 (Stetler Dec.) ¶ 123. For one, "[j]urors are looking closely at the posture and facial expressions of the witness, drawing inferences about the nonverbal metrics that gauge the depth of the witness's feeling for the individual whose life is in their hands." *Id.* Additionally, "[i]t is important to show jurors that the witness cares enough to take the time and travel whatever distance is required, often at personal inconvenience, to bear witness." *Id.*

Moreover, the record reveals a plethora of problems created using video during the sentencing phase of Mr. Hall's trial. Some witnesses struggled to identify Chuck. Witness John Mandarelli "assumed" that Chuck was the guy in the blue shirt although he was hard to see and "very far away." Tr. 05/22/14 at 4070-71. Steven Parks could not identify Chuck, saying, "Yeah, it's tough to see. He's kind of far away." *Id.* at 4127. Then Ruth Mattson, Chuck's former girlfriend, could not identify Chuck even after trial counsel stepped away from the podium and had Chuck stand up so she could see him more clearly. When asked if she recognized him, she said, "[a]fter this many years, no." *Id.* at 4133-34.

A recess had to be taken to switch the polycom link from Mr. Mandarelli to Michelle Bories. *Id.* at 4086-87. Michelle's screen was apparently small, as Mr. Duchardt noted, warning her to "look carefully" and asking if she could see Chuck. *Id.* at 4087. Michelle was unable to see an exhibit during cross examination. *Id.* at 4115. Further, trial counsel was unable to get exhibits 1087, 1088, 1089, 1092, and 1093 admitted because he was unable to hand them to Ruth Mattson. *Id.* at 4142-43.

After cross examination, Michelle needed a moment to compose herself. *Id.* at 4118. Being in the same room with a crying family member is undoubtedly more powerful than seeing the same family member crying on a screen, far away. After Michelle's video testimony, the Court had to caution the trial team that Chuck and Michelle's mother was waving at Michelle, saying "I want to make sure that things don't get out of hand here." *Id.* at 4125.

Technical difficulties abounded during the afternoon of May 22, 2014. Witnesses could not see anything on their end. Tr. 05/22/14 at 4185. Mr. Duchardt said "I'm sorry they'll not be able to see us, but rather than making them wait any longer or the court wait any longer" he wanted to proceed. *Id.* Witnesses Ron Harnish and William Flynn were unable to see the prosecutor during their cross examination. *Id* at 4191, 4199.

On May 16, 2014, a witness who was describing Mr. Hall's abdominal cramping was interrupted because of technical problems:

A Mr. Hall had a lot of abdominal cramping and (inaudible) --

Q Hold up just a second. The telephone connection's a little bit bad. Hold up just a second. We're checking to see if we can increase volume.

You were describing Mr. Hall's abdominal cramping and bleeding?

A Uh- huh.

Q Go ahead.

Tr. 05/16/14 at 3064.

Having so many witnesses testify by video not only deprived the jury of getting an in-person impression of these witnesses, but it also suggested that important people in Chuck's life, even his own sister Michelle, did not think the trial for Chuck's life was important enough to attend in person. Any such impression was false. The only reason so many penalty phase

184

witnesses testified by video is that trial counsel – not the witnesses – decided to take this shortcut for his own convenience rather than do what was best for his client.

By communicating that people like Chuck's sister's presence was unimportant, this shortcut made the mitigating evidence about Chuck much less impactful. In such a close case, where the jury was initially deadlocked as to Chuck's sentence, having important people in Chuck's life appear in person could have been the difference between death and life. The decision to have key penalty-phase witnesses testify by video exemplifies trial counsel's lack of diligence, which is at the root of many of trial counsel's errors.

**L. Chuck was prejudiced by trial counsel's deficient performance.**

Chuck was prejudiced by trial counsel's many errors. There were mountains of readily available mitigating evidence and numerous additional steps trial counsel could have taken that would have made a life sentence a more likely outcome. The subclaims above have outlined the devastating combination of Chuck's sexual victimization, brain damage, PTSD, learning disability, Crohn's disease, and prednisone treatment. The facts are not repeated here, but they show the suffering Chuck was experiencing as he repeatedly requested that the BOP isolate him from other inmates. He did not understand what exactly was wrong with him, but he knew he did not want to act on the signals being sent by his traumatized and broken brain. If the jury had heard this evidence, there is a reasonable probability at least one juror would have voted for life and that Chuck would not have been sentenced to death.

Prejudice from trial counsel's deficient performance is established if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Many of trial counsel's penalty-phase errors were so egregious that, even standing alone, they prejudiced Chuck. However, the relevant

185

inquiry is not whether any one of these errors prejudiced Chuck but whether, in combination, "counsel's unprofessional errors" at the penalty phase prejudiced Chuck. *Id.* The prejudice analysis requires "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *See Wiggins*, 539 U.S. at 534.

Additionally, the Court must not "consider omitted mitigation evidence in a vacuum" but rather must consider all the mitigation evidence that could have been presented along with the government's evidence in aggravation. *United States v. Barrett*, 985 F.3d 1203, 1221-22 (10th Cir. 2021). Because the government's evidence in aggravation is also relevant to the prejudice inquiry, prejudice is more likely in less aggravated cases (though certainly not impossible to establish in highly aggravated cases). *See Williams v. Allen*, 542 F.3d 1326, 1342-43 (11th Cir. 2008); *Williams v. Alabama*, 2021 WL 4325693, at *50 (N.D. Ala. Sept. 23, 2021) (discussing more aggravated crimes where courts found trial counsel's errors to be prejudicial).

Presented with new mitigating evidence, the "question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Barrett*, 985 F.3d at 1221. "A reasonable probability is less than a preponderance of the evidence, but sufficient to undermine confidence in the outcome." *Id.* "In a system . . . where only a unanimous jury may impose the death penalty, the question is whether it's 'reasonably probable that at least one juror would have struck a different balance.'" *Id.* (quoting *Grant v. Trammell*, 727 F.3d 1006, 1018-19 (10th Cir. 2013); *Wiggins*, 539 U.S. at 537 (2003)). In sum, prejudice exists if it is reasonably probable – a standard lower than preponderance of the evidence – that just *one* juror presented with all of the new mitigating evidence would have voted for a life sentence.

The combination of trial counsel's deficient life-history investigation; failure to present evidence of brain abnormalities; failure to adequately prepare their experts and cross-examine government experts; failure to present evidence of BOP's mistakes and ability to safely house Chuck; failure to adequately present evidence about Chuck's serious Crohn's disease; telling the DOJ that Chuck wanted a death sentence, instead of arguing against a death sentence; asking for a joint penalty phase with Chuck's violent co-defendant; suggesting that key witnesses should testify by video; and other errors create a reasonable probability that, but for these errors, Chuck would have been sentenced to life. Even without hearing the mitigating evidence that trial counsel failed to investigate and present, the jury was initially deadlocked as to Chuck's sentence. The foreperson informed the trial court that the jury was certain they could not reach a unanimous decision about whether to sentence Chuck to death or life imprisonment. The jury's difficulty reaching a decision as to Chuck's sentence makes clear that, with the omitted mitigating evidence, at least one juror would have committed to voting for a life sentence.[81]

---

[81] In fact, there is more than just a reasonable probability that, but for counsel's unprofessional errors, Chuck would have received a life sentence. Two jurors who voted for a death sentence have said that, if they had known some of the mitigating information that was not presented to them, they would have voted differently. Ex. 53 (James Dec.) ¶ 5; Ex. 54 (Collier Dec.) ¶ 6.

These statements by jurors are primarily relevant to Chuck's petition for clemency, to which Federal Rule of Evidence 606(b) does not apply. As counsel noted when seeking the Court's permission to interview jurors, "information from jurors may be relevant to Mr. Hall's clemency application; in deciding whether to grant clemency, the Pardon Attorney and President should be informed if jurors would support a commutation of the sentence they imposed." Dkt. No. 58. And indeed, jurors informed counsel that they support a commutation. *See* Ex. 53 (James Dec.) ¶ 6; Ex. 54 (Collier Dec.) ¶ 4. Counsel has submitted these declarations to the Office of the Pardon Attorney.

Juror Dale James explains, "I have been told by a member of Mr. Hall's current legal team that he was sexually assaulted by the headmaster at Shaker Mountain School and that there is fluid in his brain where brain matter should be present." Ex. 53 (James Dec.) ¶ 4. "If I had known this information at the time of Mr. Hall's trial, I would not have voted for the death penalty for Mr. Hall." *Id.* ¶ 5. Similarly, Juror Greg Collier states, "I voted for the death penalty

**i. Jurors not knowing about Chuck's history of sexual abuse and childhood trauma prejudiced him.**

The sexual abuse that Chuck suffered is "powerful mitigation evidence" that the jury did not know about because trial counsel failed to conduct a thorough life history investigation. *Williams*, 2021 WL 4325693, at *45. The Supreme Court and circuit courts "have recognized the long-lasting effects child sexual abuse has on its victims.'" *Id.* (quoting *Daniel v. Comm'r*, 822 F.3d 1248, 1277 (11th Cir. 2016)). "Childhood sexual abuse can be powerful evidence in mitigation, particularly when it is not an isolated event." *Wharton v. Chappell*, 765 F.3d 953, 977 (9th Cir. 2014). "[E]vidence that [a defendant] was a victim of sexual abuse during his childhood formative years is 'precisely the type of evidence that is 'relevant to assessing a defendant's moral culpability.'" *Williams*, 2021 WL 4325693, at *45 (quoting *Williams v. Alabama*, 791 F.3d 1267, 1277 (11th Cir. 2015); *Wiggins*, 538 U.S. at 535).

First, the trauma Chuck suffered is mitigating in itself. Knowing about this trauma would have helped explain his behavior and elicited sympathy for Chuck. Dr. Fradkin, a psychologist and expert on male sexual victimization, emphasizes that "the connection researchers have established between unresolved trauma and criminal behavior" help explain Chuck's behavior. Ex. 4 (Fradkin Dec.) ¶ 141. Some of Chuck's poor choices had to do with feeling the need to prove his masculinity because proving his masculinity "became much more important after the

---

then" but new information "would have changed my vote." Ex. 54 (Collier Dec.) ¶ 6. Mr. Collier explains, "[t]he thing that hurt Chuck Hall the most was being tried with Wesley Coonce. It felt like – out of fairness – we had to give Hall the same punishment as Coonce. Coonce's crimes were in a completely different league. Coonce is someone who deserves the death penalty and society needs to be protected from. By comparison, Chuck seems as harmless as a fly." *Id.* ¶ 5. Additionally, "[d]uring Chuck's trial, we never heard about Chuck's sexual abuse at Shaker Mountain School, his abnormal brain scans, his high Prednisone dosage around the time of the homicide." *Id.* ¶ 6. "Also, the victim's family's desire to not execute Chuck." *Id.* According to Mr. Collier, these "are all things that in combination with a separate trial would have changed my vote and likely the majority of the rest of the jury." *Id.*

188

abuse." Ex. 4 (Fradkin Dec.) ¶ 139; *see also Williams*, 2021 WL 4325693, at *8 (different expert on male sexual victimization testifying to this point). Chuck also "has significant problems with valuing himself," which led to his multiple serious suicide attempts and contributed to other poor choices. Ex. 4 (Fradkin Dec.) ¶ 156.

Second, not knowing about the sexual abuse Chuck suffered made the expert opinions presented at trial unreliable. Many of Chuck's symptoms and behaviors that experts described at trial as antisocial behavior are actually attributable to his unaddressed trauma (along with the physical abnormalities in Chuck's brain). As Dr. Wisner explains, "[w]ith the additional information about Mr. Hall's abnormal brain imaging and his history of traumatic experiences, it is no longer apparent to me that my diagnoses were completely accurate or appropriate." Ex. 13 (Wisner Dec.) ¶ 18. Dr. Wisner is "particularly concerned with my prior diagnosis of Antisocial Personality Disorder (ASPD). I believe Mr. Hall's brain dysfunction and history of trauma may better explain his history of lying/confabulation and failure to conform with the law." Id.

Dr. Fradkin points out that "[i]t is understandable to me that because no therapist knew about the abuse he suffered, when they reflected on his behavior, it seemed as if a diagnosis of Anti-Social Personality Disorder fit. However, from a trauma-informed perspective, almost all of his significant anti-social behaviors occurred after he returned home from SMS." Ex. 4 (Fradkin Dec.) ¶ 263. Relevant to this point, Dr. Fradkin notes that "he was given a psychological evaluation when he came home, and he was not diagnosed with anti-social personality disorder at the time." *Id.*

Although not testifying as an expert witness, Dr. Staples testified about Chuck's mental health, and is an expert in mental health. Dr. Staples had provided therapy to Chuck's then-wife, and saw Chuck as part of this process. His sessions with Chuck took place prior to Chuck's

incarceration in BOP but while Chuck was an adult. Dr. Staples has explained how his trial testimony would have been more comprehensive and more accurate if he had been provided with additional information about Chuck's early life experiences.

However, "Mr. Duchardt did not provide [Dr. Staples] with any documents to review, nor did he give me any information about Mr. Hall's life prior to my treatment of him other than to clarify what had *not* happened, so my testimony was based purely on my assessment from 1995 and my memory." Ex. 43 (Staples Dec.) ¶ 7. Having reviewed declarations about the Shaker Mountain School provided by post-conviction counsel, he notes, "[t]he declarations I reviewed describe an environment sorely lacking not only in safety, but in structure. Even setting aside the trauma of sexual abuse, the Shaker Mountain School was one of the worst places Mr. Hall could have gone at that particular time in his life." *Id.* ¶ 9. He explains that "Children are not short adults. They depend on the adults around them for guidance and structure." *Id.* ¶ 10. "Mr. Hall's placement at the Shaker Mountain School not only denied him an environment that could help him thrive, but he was traumatized there on top of it." *Id.* "The result of this 'double whammy' was severe traumatic impairment of a normal developmental progression in a child already at a disadvantage because of his energy and attention issues." *Id.* ¶ 11.

Accordingly, "[h]ad [Dr. Staples] been made aware of this history before [his] testimony in 2014, [he] would have been better able to understand the intense anger, irritability, and righteous indignation in Mr. Hall that [he] had observed and documents in 1995." *Id.* ¶ 13. For one, Dr. Staples "would have been able to view [Mr. Hall's] made-up stories as a version of the way he had wished things had been, so much so that he believed it himself, particularly with regard to the tale of assaulting his friend's daughter's abuser, as perhaps verbalizing as reality a fantasy he had in reaction to his own unaddressed molestation." *Id.* Additionally, Dr. Staples

190

notes that, if he had been provided with additional information about Chuck, he would have realized that Chuck may suffer from PTSD. "[I]n addition to surmising that Mr. Hall's 1995 symptomology could potentially be characterized as bipolar disorder, [he] would have proposed a retrospective consideration of post-traumatic stress disorder as well, because in fact, Mr. Hall's tendency toward disproportionate emotional reactions is a hallmark of PTSD." *Id.* ¶ 14. This assessment is in accord with Dr. Wisner's statement that, with more information, he likely would have attributed Chuck's behaviors to trauma and dysregulation rather than ASPD. It is also in accord with Dr. Fradkin's diagnosis of complex PTSD after being provided with relevant information about Chuck's background and evaluating Chuck.

Further, Chuck's misdiagnosis led to improper treatment. Ex. 5 (Israelian Rpt.) at 81. "With no acknowledgement of the sexual abuse, there could be no treatment for the trauma it caused. When a trusted adult does something that is harmful or confusing to a child, it tremendously undermines and exploits that child's sense of what is right and true, including telling the truth about themselves." Ex. 43 (Staples Dec.) ¶ 11. The secrecy of the sexual trauma exacerbates its impact:

> [S]exual abuse festers. Festering just under the surface was Chuck's secret. At least symbolically, it was eating him up from the inside out.

Ex. 5 (Israelian Rpt.) at 30.

Particularly in conjunction with his learning disability and brain damage, awareness of Chuck's experience of childhood sexual abuse would also have allowed for powerful cross-examination of the government's experts. Prior to trial, no expert had diagnosed Chuck with PTSD. Dr. Fradkin and Dr. Israelian emphasize that knowing about Chuck's history of sexual abuse makes clear that many things previously attributed to ASPD are better explained by PTSD and unaddressed, untreated trauma. At the time of trial, based on information that was available

191

but not provided to the experts, Chuck should have been diagnosed with PTSD. Ex. 5 (Israelian Rept.) at 68-69; Ex. 6 (Agarkar Rpt.) at 24. As an expert in treating male victims of sexual abuse, Dr. Fradkin has diagnosed Chuck with complex PTSD. Ex. 4 (Fradkin Dec.) ¶ 256. This information may have changed the views of the government's experts. If not, neglecting to take this information into account would have undermined their credibility.

This information is mitigating, and it also would have helped rebut the aggravators alleging Chuck was indifferent to human life and lacked remorse. This information would have helped the experts understand the reasons behind Chuck's behavior and, in turn, helped at least one juror understand that Chuck was not antisocial and remorseless, but traumatized and unable to regulate his emotions.

### ii. Jurors not knowing about Chuck's abnormal brain prejudiced him.

Chuck's learning disability and functional and structural brain abnormalities are powerful mitigating facts the jury did not know about because trial counsel failed to fully explore Chuck's life history. Counsel did not even introduce Chuck's school records, much less use them to point out the early evidence of brain dysfunction they contain. Trial counsel also failed to request funding for brain imaging until just twenty-four days before trial. "Evidence of organic brain damage is something that [the Tenth Circuit] and other courts, including the Supreme Court, have found to have a powerful mitigating effect." *Grant v. Royal*, 886 F.3d 874, 920 (10th Cir. 2018). "Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available." *Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013). As such, courts have often found failing to present evidence of an abnormal brain to be prejudicial, even when counsel presented other mitigation evidence. *See Caro v. Woodford*, 280 F.3d 1247, 1257 (9th Cir. 2002).

192

Having a learning disability profoundly shaped Chuck's early life. He felt like a failure, especially after failing the sixth grade twice. He began acting out, which is an expected response from a child with an unrecognized learning disability not receiving the services they need and to which they are entitled. Ex. 5 (Israelian Rpt.) at 22-23. As a result, a vulnerable child, in a misguided effort to help him, was thrust into the hands of a serial sexual predator.

Evidence of Chuck's brain dysfunction could have been shown to the jury not just in his school records and testing results, but through literal pictures of his brain. Chuck's MRI results can be summarized concisely: "Mr. Hall has abnormal brain imaging." Ex. 1 (Bigler Rpt.) at 8. "[T]hese imaging results demonstrate multiple abnormalities with Mr. Hall's brain." Ex. 2 (Gur Dec.) ¶ 9. "The areas of brain abnormality are critical for behavioral and cognitive regulation, which based on neuropsychological test results and clinical history, are abnormal as well." Ex. 1 (Bigler Rpt.) at 8. "[T]he origin of" these abnormalities "are likely a combination of neurodevelopmental and acquired." Ex. 2 (Gur Dec.) ¶ 9.

The brain imaging results (along with knowledge of Chuck's childhood sexual abuse) would have changed the testimony of the experts who testified at trial. As Dr. Wisner explains "[t]he brain imaging conducted now would have been helpful in making an accurate diagnosis of Mr. Hall. When we can see and understand the areas of the brain that are abnormal, damaged, or dysfunctional, they can render clarity." Ex. 13 (Wisner Dec.) ¶ 15. The abnormalities to Chuck's brain "are things [Dr. Wisner] was asking Fred to explore back in 2013 and 2014." *Id.* ¶ 14. "With the additional information about Mr. Hall's abnormal brain imaging and his history of traumatic experiences, it is no longer apparent to [Dr. Wisner] that [his] diagnoses were completely accurate or appropriate." *Id.* ¶ 18. Dr. Wisner is "particularly concerned with [his] prior diagnosis of Antisocial Personality Disorder (ASPD). [He] believe[s] Mr. Hall's brain

193

dysfunction and history of trauma may better explain his history of lying/confabulation and failure to confirm with the law." *Id.*

The brain imaging results (like the evidence of childhood sexual abuse) also would have allowed for powerful cross-examination of the government's experts. Images of Chuck's brain show abnormalities that are observable to the naked eye, and were apparent to the disinterested professionals at Indiana University Health who produced the PET/MRI images and conducted an initial summary analysis. Chuck's abnormalities appear in areas of the brain that we know affect mood regulation, social interaction, and memory. Ex. 5 (Israelian Rpt.) at 75, 77, 80. This information may have changed the views of the government's experts. If not, neglecting to take this information into account would have undermined their credibility.

This evidence is mitigating and also rebuts several of the government's aggravators and its closing theme that Chuck has ice in his veins. The government consistently painted Chuck as the detached psychopath, with help from the trial team's chosen expert, who told the jury that Chuck has ASPD and is a sociopath and psychopath. 05/28/14 Tr. at 4823-26. The evidence about Chuck's brain that the jury heard nothing about provides concrete, indisputable evidence of abnormalities; undermines the government's themes and views of Chuck; casts doubt on all testimony accusing Chuck of malingering; and refutes the ASPD diagnosis and thus the notion that Chuck was cold and calculating.

> **iii. Trial counsel's failure to provide the jurors with evidence of how BOP mismanagement contributed to the homicide and how BOP could safely house Chuck was prejudicial because the jury may have incorrectly believed that he would present a future danger.**

Jurors' evaluations of whether a defendant will pose a danger in the future is critical to their decision whether to impose a death sentence. Courts have recognized the empirical evidence showing that "future dangerousness, and the Government's ability to protect against it,

194

is an especially important factor in death penalty cases." Ex. 82 (Johnson 2255 Order) at 5. "A number of studies suggest that future dangerousness is one of the most [significant] issues, if not the most significant, for juries deciding whether or not to sentence a defendant to death." *Id.* at 6 (citing studies). Consequently, errors impacting jurors' assessment of future danger are especially prejudicial.

Indeed, in a case out of this district, *United States v. Ulysees Jones*, the jury sentenced Mr. Jones to life for a murder committed at USMCFP after writing in the mitigating factor of the BOP's mismanagement. *See United States v. Jones*, 6:10-cr-03090, Dkt. No. 436 (W.D. Mo. Oct. 16, 2017). In Mr. Jones's case, the jury did find many of the aggravating factors, but did not find that the government had proved the aggravating factor of future dangerousness. *See id.* Mr. Jones's case makes clear that when jurors believe that the BOP – and USMCFP Springfield in particular – are partly responsible for a death, they are less likely to find that a defendant presents a future danger, and less likely to sentence him to death.

In Chuck's case, the jury was not informed about the BOP's many mistakes leading up to Mr. Castro-Rodriguez's death, and also not informed about the many tools the BOP has to safely house Chuck. "Castro-Rodriguez's murder was a perfect storm" due in large part to mistakes by BOP personnel, and BOP does have the tools to safely manage Chuck, despite this "perfect storm." Ex. 9 (Buckmaster Dec.) ¶ 13. Mr. Castro-Rodriguez's death "took a violent individual — Coonce —being inappropriately placed in a general population mental health wing," "a victim with low cognitive abilities," and "CO Logsdon's infrequent monitoring to make the homicide possible." *Id.* Mr. Buckmaster, "[b]ased on [his] personal observations and BOP-work history," believes that "had Coonce not been on 10-B, it is unlikely this homicide would have occurred. He should have been properly classified into a more restrictive area and been in restraints when

195

walking freely." *Id.* ¶ 11. By contrast, "Chuck was more of a wannabe and a follower. He wanted to be a tough guy real bad, but on the inside he just wasn't." *Id.* This assessment – from someone with years of experience working in the BOP and personal knowledge of Chuck and Mr. Coonce, the victim, and the guards who were supposed to ensure everyone's safety – mitigates Chuck's involvement in the crime while also demonstrating BOP's capacity and ability to safely house Chuck.

For her part, Ms. Baird notes that, leading up to the crime, "BOP did not heed Hall's warnings or threats to harm others along with Hall's bold statements that he wanted to be housed in isolation." Ex. 8 (Baird Dec.) ¶ 54. Mr. Buckmaster, having reviewed Ms. Baird's declaration, notes that, "Ms. Baird noted that she would have taken seriously Chuck's homicidal ideations, and that's wise. . . . Ms. Baird is right that homicidal threats must be dealt with seriously, but I will always think that without Wes Coonce on Unit 10-B, this homicide would never have occurred." Ex. 9 (Buckmaster Dec.) ¶¶ 20-21. Mr. Buckmaster's "reading of Chuck's homicidal ideations" – that is, his view that Chuck would not have engaged in this crime but for Mr. Coonce – "is colored by [his] experience dealing with Chuck." *Id.* ¶ 20. He "think[s] Chuck was afraid and would act tough to survive prison. For instance, [he] recall[s] Chuck telling [him] once that he was a member of the Hell's Angels biker gang. [He] knew right away that Chuck was telling [him] this story to appear to be tougher than he was. Hell's Angels have tattoos that Chuck did not have. Hell's Angels also don't tell people that they are in the Hell's Angels." *Id.*

The jury heard testimony implying that this homicide was the work of monsters who could not be held at bay. That impression was incorrect. One of the guards in Unit 10-B during the homicide was known to sleep on the job. BOP policies and procedures such as disallowing inmates in each other's cells were not enforced. This murder was a "perfect storm," not the work

196

of a calculating mastermind. Available evidence would have mitigated Chuck's role and provided direct rebuttal to the future dangerousness aggravator the government submitted and the jury found.

The trial team did not need to convince the jury that Mr. Castro-Rodriguez's death was entirely the BOP's fault, which, of course, it was not. All the jury would have needed to determine is that BOP mismanagement was enough of a contributing factor that in conjunction with Chuck's other mitigating evidence it pointed in favor of a life sentence, not a death sentence. The trial team just needed to provide the jury with the available evidence that would have allowed them to consider how BOP's mismanagement contributed to the homicide.

There is at least a reasonable probability that this information would have changed at least one juror's mind. Mr. Buckmaster's assessment of this situation bolsters Ms. Baird's opinion that "there are numerous alternative housing options available to the BOP, which offer a more restrictive environment than that of Housing Unit 10B at MCFP Springfield during the time the incident occurred" and the BOP can safely house Chuck in such an environment. Ex. 8 (Baird Dec.) ¶¶ 36, 78. The jury heard no testimony about how the BOP could safely house Chuck. Such testimony – including testimony about how Chuck was easier to safely house than Mr. Coonce because he adjusted well to isolation, whereas Mr. Coonce engaged in disruptive, dangerous, and violent behavior while isolated – would have made a significant impact. Because future dangerousness is such a central consideration for jurors, testimony to explain how the BOP could safely house Chuck would have been critical to convincing the at least one juror to vote for a sentence of life imprisonment.

**iv. Trial counsel's failure to investigate Crohn's disease prejudiced Chuck.**

Trial counsel failed to sufficiently present evidence about Chuck's struggles with aggressive Crohn's disease. Information about a defendant's physical ailments is mitigating, and failure to present that evidence prejudices the defendant. *See Collier v. Turpin*, 177 F.3d 1184, 1199, 1204 (11th Cir. 1999).

A complete picture of the extreme suffering Chuck endures because of his Crohn's disease would have elicited sympathy from the jury. A detailed discussion of the excruciating pain he experiences from the disease; the painful side effects he has experienced because of the medications used to treat his disease, including necrosis of the hip; the multiple surgeries; and the torment from other inmates about embarrassing leaks and foul smells, would have shown the jury that Chuck was already in misery. There is a reasonable probability that at least one juror would have determined that this was reason to spare him the additional suffering of a death sentence.

Trial counsel made Crohn's disease a key part of his mitigation presentation, essentially staking Chuck's life on sympathy because of Crohn's disease. Yet his presentation on Crohn's disease barely scratched the surface of the daily suffering Chuck endures. As a result, the government was able to turn counsel's presentation against Chuck. In closing, the government argued: "Mr. Hall let [Crohn's] disease turn his heart, a heart that had been influenced by a loving family and nurturing environment into ice." 05/30/14 Tr. at 5324. And the jurors had no reason to disbelieve the government's statement that Crohn's disease was Chuck's only struggle. Chuck's own counsel told them that his life was mostly "blessings" but for Crohn's.

By failing to explain the extent of the torture Chuck endures daily, trial counsel's ineffectiveness in investigating, retaining experts, and presenting evidence about Crohn's disease prejudiced Chuck. Had the full picture been shown and especially had the jury heard more about

198

Chuck's struggles with Crohn's in conjunction with the other mitigation evidence trial counsel omitted, there is a reasonable probability that at least one juror would have voted for life.

### v. Trial counsel's failure to educate the jury about BOP's use of prednisone to treat Chuck's Crohn's prejudiced Chuck.

Chuck's prednisone use also mitigates his responsibility. *Accord* Martin J. Bidwell & David L. Katz, *Injecting New Life into an Old Defense: Anabolic Steroid-Induced Psychosis as a Paradigm of Involuntary Intoxication*, 7 U. Miami Ent. & Sports L. Rev. 1, 62-63 (1989) ("An attorney representing a steroid user charged with a crime must consider implementing evidence of steroid-induced psychosis to eliminate or, alternatively, limit the accused's criminal responsibility."). Because trial counsel's expert psychiatrist who also testified about Crohn's disease did not review Chuck's records in enough detail to realize that Chuck was taking prednisone at the time of the homicide, the jury was also not presented with mitigating evidence about how prednisone impacted Chuck. In addition to failing to present an involuntary intoxication defense at the culpability phase, as discussed below, trial counsel also failed to present Chuck's prednisone use as mitigating evidence.

None of the experts testifying on behalf of Chuck explained to the jury that BOP medical staff prescribed Chuck prednisone to treat his Crohn's disease, that he had been taking a high dose of prednisone in the days leading up to the homicide, and that he was still taking a relatively high dose of prednisone on the day of the homicide. Nor did any expert explain that prednisone is "relatively contraindicated" for patients with mental health conditions like Chuck's. Nor did any expert explain that by 2010 prednisone was not recommended for long-term use by any Crohn's patient, in part because of the frequency of severe side effects and also because better treatments without these side effects had been developed. If this evidence had been part of trial counsel's penalty phase presentation, at least one juror may have determined that prednisone's

impact on Chuck's actions on the day of the homicide showed that he was not the calculated killer the government made him out to be. There is a reasonable probability that at least one juror would have vote to spare Chuck's life.

**vi. Having a joint penalty phase with co-defendant Coonce prejudiced Chuck.**

Because Chuck's penalty phase was joined with Mr. Coonce's, the jury heard about a near-constant stream of serious violence, all of it perpetrated by Mr. Coonce. Because the presentation blurred the defendants together, this evidence prejudiced Chuck, even though Chuck's record prior to the homicide was almost entirely nonviolent. Chuck's record mostly consisted of property crimes. He was not involved in any prior crimes or incidents in custody that resulted in any serious injury to anyone except himself, during multiple suicide attempts. Mr. Coonce, by contrast, before and after the homicide, in and out of custody, in open population and in isolation, regularly engaged in violence, as well as self-harm. Evidence about Mr. Coonce's violent behavior was interspersed with evidence about Chuck. Some of Chuck's witnesses testified between witnesses for Mr. Coonce. And key government witnesses— including USMCFP employees and the government's star rebuttal witness, Dr. Park Dietz— testified against both Mr. Coonce and Chuck. This resulted in prejudice to Chuck.

That Chuck was prejudiced by the joint penalty phase is unsurprising in light of statistics showing that in federal capital trials involving more than one defendant, juries have nearly always imposed the same punishment on both defendants. Ex. 81 (McNally 2018 Dec.) ¶ 6. As of 2018, in joint penalty phase hearings, juries had reached the same penalty-phase verdicts thirty-two times and reached different penalty-phase verdicts only four times. *Id.*

Of course, this statistic alone does not shed light on whether the jury was more inclined to give Chuck a death sentence because of Mr. Coonce or vice versa. However, the jury's note to

the judge that they had decided on a sentence for Mr. Coonce but were unable to reach a unanimous decision as to Chuck makes clear that the jury readily agreed to sentence Mr. Coonce to death but struggled to decide on Chuck's sentence. They decided to sentence Chuck to death only after the trial court told them to keep deliberating.

### vii. Initial trial counsel's inadequate preparation for the presentation to the DOJ's Capital Review Committee prejudiced Chuck.

Although there were many errors at trial, and many errors in the investigation that took place after the government decided to seek the death penalty, comprehending the full impact of trial counsel's errors requires going back to how the government came to seek a death sentence against Chuck in the first place. Initial trial counsel Darryl Johnson made his presentation to the Capital Review Committee before conducting any life history investigation, retaining a mitigation specialist, or consulting with a mental health professional or arranging for brain imaging. During the presentation, Mr. Johnson told the Capital Review Committee that Chuck wanted the death penalty. Because he had not conducted a life history investigation, he was unaware of compelling mitigating evidence, including that Chuck was sexually abused and that his brain is abnormal in ways that impact his decision-making. Mr. Johnson's failure to understand his client's life history and decision-making made him unable to advocate for Chuck. Had initial trial counsel adequately investigated the case before making their presentation to the Committee, and had counsel actually advocated for Chuck by presenting the readily available mitigating evidence to the Committee, there is a reasonable probability that the government would not have sought the death penalty at all.

**viii. Trial counsel's decision to call the majority of mitigation witnesses by video and his failure to adequately interview and prepare even the witnesses he did call prejudiced Chuck, and, moreover, underscores the throughline of Chuck's trial, which is that trial counsel repeatedly cut corners when Chuck's life was on the line.**

Trial counsel's failure to conduct multiple, in-person, open-ended interviews even with the people he did interview prejudiced Chuck. Because "counsel's interviews were substantively worthless . . . his failure to gather mitigating information did not result from its unavailability; it resulted from counsel's complete failure to ask any relevant questions." *Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir. 2008). Recognizing that simply checking a witness off the list without conducting an appropriate interview can result in prejudice, the court found that "the limited strategy that [counsel] developed was unreasonably constricted, and even with respect to that anemic strategy, counsel's investigative efforts were unreasonably weak." *Id.*

Several witnesses have explained that Mr. Duchardt seemed to know exactly what he wanted to hear from them; steered them away from other topics; did not ask any open-ended questions; and interviewed them only once, in many cases by phone. *See* Ex. 34 (Bories Dec.) ¶¶ 19, 21; Ex. 41 (Mandarelli Dec.) ¶¶ 9-12, 15; Ex. 39 (Parks Dec.) ¶¶ 9, 18; Ex. 43 (Staples Dec.) ¶¶ 6-7. This is precisely the sort of "unreasonably constricted," "anemic strategy" that is virtually guaranteed not to uncover important mitigating evidence, and that did not uncover important mitigating evidence about Chuck. *Correll*, 539 F.3d at 945.

Finally, encouraging many key witnesses to testify via video rather than in person prejudiced Chuck. For one, it communicated to the jury that even his sister could not be bothered to travel to Missouri to testify on his behalf, although that was completely untrue. Additionally, testifying by video simply does not allow the witness to make the same connection with the jury that testifying in person would. Especially in such a close case, the impact of having witnesses come to court to testify on Chuck's behalf would have made a difference to the jurors.

202

But for counsel's unprofessional errors, Chuck would have been sentenced to life imprisonment, not death. At least there is a reasonable probability that one juror would have voted for a life sentence, which would have been enough to ensure a life sentence. Even with counsel's errors, the jury was reluctant to sentence Chuck to death and initially told the trial court that they were deadlocked as to Chuck's sentence (but not Mr. Coonce's). Accordingly, if counsel had performed adequately, there is *at least* a reasonably probability that at least one juror would have struck a different balance and voted for a life sentence. Really, there is no doubt that Chuck was prejudiced by trial counsel's many failures.

Therefore, although trial counsel "was not wholly without a mitigation strategy," *Correll*, 539 F.3d at 945, "[t]he anemia of counsel's mitigation presentation was a critical error, certainly rising to the level of constitutionally deficient representation," *id.* at 947. Trial counsel failed to uncover information about Chuck – including his history of sexual abuse and brain abnormalities – that courts have acknowledged is powerful mitigating evidence, failed to use important mitigating evidence that was in his possession, and overall failed to tell the jury Chuck's life story. If trial counsel had done what they were supposed to do – what the constitutional requires – Chuck would not have received a death sentence.

203

# CLAIM 2: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE CULPABILITY PHASE

**Summary of Claim:**

In addition to errors at the penalty phase, trial counsel also made errors at the culpability phase of trial. Some of the prejudice from these errors carried over into the penalty phase.

**Discussion:**

**A. Trial counsel was ineffective for failure to seek reasonable continuances.**

Trial counsel failed to seek continuances that were necessary to adequately represent their client. "Counsel at all stages should demand on behalf of the client all resources necessary to provide high quality legal representation. If such resources are denied, counsel should make an adequate record to preserve the issue for further review." 2003 Guidelines 10.4(D). Failing to seek a reasonable continuance to allow sufficient time to prepare – among the most important resources for providing adequate representation – is unreasonable. *See Waller v. Lockhart*, 807 F.2d 136 (8th Cir. 1986) (defense counsel's failure to request a continuance to secure witness testimony was error resulting in prejudice); *Code v. Montgomery*, 799 F.2d 1481 (11th Cir. 1986); *McLaughlin v. State*, 789 S.E.2d 247 (Ga. App. Ct. 2016); *Commonwealth v. Baker*, 800 N.E.2d 267 (Mass. 2003). In particular, agreeing to a course of action "without so much as asking for a continuance was more an act of appeasement for counsel's benefit than trial strategy to benefit [the client's] defense," and constitutes deficient performance. *State v. Armstrong*, 863 N.W.2d 449, 467 (Neb. 2015).

Mr. Hall's trial began on April 28, 2014. Jury selection lasted three days (April 28 through April 30), and opening statements and witness testimony commenced on May 1, 2014. On April 30, 2014, Mr. Duchardt informed the court, by memorandum that, "the government's rebuttal mental examination of Mr. Hall was delayed until April 26, with a videotape of the

204

examination not ready until April 30, and a report not to be available until May 1 or 2." Ex. 76 (Memo 04/30/14) at 2. Mr. Duchardt noted that, "[u]nder other circumstances, this would have created a crisis, likely necessitating a request for some sort of continuance" but "[b]ecause Bob [Lewis] and Mike [Walker] would be handling nearly all of the first phase in-court duties, my presence would have been more as a backstop for them." *Id.* And so, "it was decided that it would be a better use of team resources for me to not be present in the courtroom during the first part of the first phase of trial. That would free me up to address the government's rebuttal expert and other penalty-phase-related preparation matters." *Id.*

Meanwhile, Mr. Duchardt had requested funding for neuroimaging on April 4, 2014. Dkt. No. 635. Although he had been aware of the importance of neuroimaging since he began representing Mr. Hall in 2012, he did not seek funding until April 2014. On April 7, 2014, the trial court denied the motion, citing concerns about how soon the trial would start. Judge Fenner stated, "I'm concerned with the timing of this. . . . [H]ere we're three weeks from trial; and if we were to go forward with this, there's an awful lot that needs to be done yet." Ex. 12 (04/07/14 Tr.) at 2.

Trial counsel should have sought a continuance when the funding for brain imaging was denied.[82] Trial counsel apparently understood the importance of brain imaging, having contacted

---

[82] Attempting to justify his decision not to seek a continuance, Mr. Duchardt stated that "[a]t the ex parte conference . . . about funding for Gur" he asked the trial court whether "it would change [their] mind if we had a continuance to have more time to do this" but "the answer was no." Ex. 15 (Duchardt Int.) at 140-411. However, there is no mention of a continuance in the transcript 2014 hearing. According to the record of the ex parte conference, the trial court did not, in fact, indicate a continuance would not change the decision about granting the funding for brain imaging. *See generally* Ex. 12 (04/30/14 Tr.). Mr. Duchardt gave no indication that he considered asking for a continuance to review the government's rebuttal mental examination, by Dr. Dietz. Indeed, when he told the trial court about the lateness of the government's disclosure

205

Dr. Gur in 2012. Yet when the motion was denied because there was not enough time to complete the necessary steps before trial, counsel did nothing. It is even more evident that trial counsel should have sought a continuance when the government disclosed that a video of their expert's examination of Mr. Hall would not be available until after the trial commenced, with the expert's report not available until even further into the trial.

As explained in section C below, we need not speculate on the effect of trial counsel not seeking a continuance, we know: Mr. Duchardt – learned counsel – skipped the entire culpability phase of the trial.

**B. Trial counsel was ineffective for failing to present evidence that Mr. Hall was taking prednisone, a steroid that causes mania and rage, in the days leading up to the homicide and on the day of the homicide.**

BOP records that were in trial counsel's possession show that at the time of the homicide, Mr. Hall was taking prednisone, prescribed by BOP medical staff. Prednisone, a corticosteroid, can be used to treat inflammatory bowel diseases such as Crohn's disease. Prednisone is also known to cause severe side effects, including mania and rage. For that reason, prednisone is "relatively contraindicated" for individuals with mood disorders. The risk and severity of side effects increases as the dose increases. Prolonged use can also increase the risk of side effects. Yet the BOP, which had placed Mr. Hall in a mental health unit (in part because of BOP-diagnosed mood disorders), prescribed him a high dose of prednisone shortly before the homicide, and he remained on prednisone on the day of the homicide. Trial counsel failed to

---

of Dr. Dietz's materials, he had already decided not to seek a continuance and simply skip the culpability phase of the trial in order to review the materials and prepare to cross-examine Dr. Dietz.

present any evidence of this during the culpability phase, including experts to explain the psychological impact of high dosage prednisone usage.

> **i. BOP records that trial counsel received in discovery show that Mr. Hall was taking prednisone on the day of the crime, but the expert who testified about Crohn's disease – who also did not realize Mr. Hall was taking prednisone on that day – did not testify until the penalty phase.**

Mr. Hall's medical records repeatedly note that from January 13, 2010, through February 3, 2010 – including the date of the homicide on January 26, 2010 – Mr. Hall was taking 30 or 40 milligrams of prednisone per day.

On January 12, 2010, Mr. Hall underwent ileostomy revision surgery. The next day, January 13, 2010, BOP medical staff prescribed 40 milligrams of prednisone per day for thirty days (two 20 milligram tablets per day):

| Inmate Name: | HALL, CHARLES | | | Reg #: | 03766-036 |
|---|---|---|---|---|---|
| Date of Birth: | 04/06/1971 | Sex: | M | Race: | WHITE |
| Note Date: | 01/13/2010 16:32 | Provider: | Wittmer, Phillip MD | Facility: | SPG |

**Renew Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| 77178-SPG | PredniSONE 20 MG Tab | 01/13/2010 16:32 | Take one tablet by mouth twice daily x 30 day(s) Pill Line Only |

    **Indication:** Regional enteritis of unspecified site
    **Start Now:** Yes
        **Night Stock Rx#:**
        **Source:** Nightstock
        **Admin Method:** Pill Line
        **Stop Date:**
        **MAR Label:** Take one tablet by mouth twice daily x 30 day(s) Pill Line Only

Ex. 68 (Hall BOP Prednisone Recs.) at 3.

Medical records dated the following day, January 14, 2012, *id.* at 5, also show that Mr. Hall was prescribed 40 milligrams of prednisone per day (two 20 milligram tablets per day), although this order indicates that Mr. Hall should take prednisone for 180 days rather than 30:

| 77873-SPG | PredniSONE 20 MG Tab | 01/14/2010 13:14 | Take one tablet by mouth twice daily x 180 day(s) Pill Line Only |
|---|---|---|---|

    **Indication:** Regional enteritis of unspecified site

207

On January 20, 2010, BOP medical records indicate that BOP officials planned to start Mr. Hall on a dose of 30 milligrams of prednisone per day:

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | PredniSONE Tablet | 01/20/2010 14:03 | 15 mg Orally -Two Times a Day x 14 day(s) -- tapering dose- after 2 weeks go to 10 mg po twice daily cont. this for 1 month- pt. will be seen in GI clinic in 4 weeks ( reasess ) |

**Indication:** Attention to ileostomy, Regional enteritis of unspecified site

*Id.* at 8. Later medical records also confirm that Mr. Hall had been, pursuant to these prescriptions, taking prednisone on the day of the homicide. *Id.* at 13 (records dated February 23, 2010 noting Mr. Hall had been prescribed 30 milligrams of prednisone for January 20, 2010 through February 3, 2010).

During the culpability phase of Mr. Hall's trial, trial counsel failed to use these records or elicit any testimony about Mr. Hall taking prednisone on the day of the homicide. In his penalty phase testimony, Dr. Wisner did say that Mr. Hall had frequently been prescribed prednisone; however, he had no idea that Mr. Hall was taking prednisone at the time of the homicide, which was of course the most relevant date for purposes of the trial. Ex. 13 (Wisner Dec.) ¶ 20. Since Dr. Wisner testified during the penalty phase, any assistance he could have provided to trigger the involuntary intoxication instruction was rendered moot as Mr. Hall had already been found guilty.

At trial, Dr. Wisner noted that Mr. Hall had "been on Prednisone many, many, many, many, many, many more months than he's been off it. He's only had fairly brief periods when he's not been taking Prednisone." Tr. 05/28/14 at 4741. He also explained that prednisone "can cause a variety of psychiatric symptoms. They can make people irritable and aggressive . . . . [W]hen a patient, you know, has had a history of psychiatric illness or has a psychiatric illness

208

right now, you need to watch carefully when using corticosteroids." Tr. 05/28/14 at 4742. However, as he did not review Mr. Hall's records carefully enough to know that Mr. Hall was taking prednisone on the day of the homicide, he did not include that information in his testimony. Ex. 13 (Wisner Dec.) ¶ 20.

Nor did Dr. Wisnter testify that prednisone was *contraindicated*, for two reasons that Dr. Steinhart explains. First, it is dangerous to prescribe steroid treatment to people with known psychiatric disorders. "For Mr. Hall, who suffered from a number of psychiatric conditions at various times while in prison, the long term or repeated use of steroids would have been contraindicated and would likely have contributed to an exacerbation of these underlying conditions." Ex. 7 (Steinhart Rpt.) at 8. The adverse side effect of prednisone are well documented. These side effects include "anger, irritability, anxiety and reduced self-control." *Id.* at 7. Dr. Steinhart, who could have provided this information during the culpability phase, described the effects of prednisone:

> The effects of steroids, such as prednisone, can be observed as soon as 7 days after starting therapy, especially in patients on moderate to high doses. In my own practice I have seen many individuals who have experienced such side effects and who refuse to go on steroids ever again even though the therapy may have helped their symptoms of Crohn's disease or colitis. The problem with steroids was underscored by one of my Crohn's disease patients who I treated with a course of prednisone for a flare of her disease. She came for her follow up appointment with her husband who pleaded with me to stop the prednisone as soon as possible because, even though her Crohn's symptoms had melted away, she had gone through a personality change and had become aggressive and shouting at her family, to the point where her 2 young children had become afraid of her.

209

*Id.* at 7-8. As someone dealing with mental illness, Mr. Hall was at an even higher risk for the psychological side effects of prednisone, which "would likely have contributed to an exacerbation of those underlying [psychiatric] conditions."[83] *Id.* at 8.

Second, prednisone was no longer the preferred treatment in 2010: "The options with which to treat Crohn's disease were relatively limited in the 1990s when Mr. Hall was first diagnosed. . . . By 2008 to 2010 the standard of practice had shifted to the point where most patients who needed repeated courses of steroids were offered biological therapy as a way of avoiding repeated or prolonged use of steroid therapy and producing a more sustained and durable improvement in inflammation and in the symptoms caused by inflammation." *Id.* at 8. Biologics are lab-created antibodies used to treat Crohn's disease. They do not have the same psychological side effects as corticosteroids such as prednisone. *See* Crohn's and Colitis Foundation, Biologics Fact Sheet, https://www.crohnscolitisfoundation.org/sites/default/files/2023-08/Biologics%208.2023_15.pdf. Thus, the BOP prescribed Mr. Hall a drug that made him irritable and angry, which is contraindicated for someone with Mr. Hall's psychological history, and it was not even the preferred contemporary medical solution.

In addition, "[i]n many instances Mr. Hall was treated with prednisone without what would be considered to be adequate objective evidence of active inflammatory disease that would be deemed to be sufficient to produce the symptoms that were being treated." Ex. 7 (Steinhart Rpt.)

---

[83] There are multiple documented instances where Mr. Hall suffered side effects of prednisone, so the possibility of prednisone side effects is not hypothetical. They include, but are not limited to: acne, mood swings, feelings of rage, and "avascular necrosis of the hips. This is a relatively rare but devastating complication of steroid therapy. It causes hip pain and deformity of the hip joint which often requires surgical repair, including hip replacement. Although avascular necrosis can occur after only a short course of steroids, perhaps as short as only several days, it is more commonly seen when steroids are used over long periods of time." Ex. 7 (Steinhart Rpt.) at 7.

at 8. Dr. Steinhart explains that "[t]his is important because it is generally recognized and accepted that patients with Crohn's disease often experience symptoms that are not related to Crohn's disease inflammation and, as such, will not respond to treatments such as prednisone that control or reduce inflammation. In those instances, using prednisone is not only not helpful, but it puts the individual at substantial risk of serious side effects as more prednisone is used for longer periods in hopes of producing an improvement in symptoms." *Id.* That is, the BOP was prescribing Mr. Hall an out-of-date drug, which exacerbated his psychological symptoms, when Mr. Hall was not having actual Crohn's symptoms.

### ii. Mr. Hall's use of prednisone on the day of the homicide was a defense to the crime, as well as crucial mitigating evidence.

By failing to point out that Mr. Hall was taking prednisone, pursuant to a BOP prescription, at the time of the homicide, trial counsel not only failed to mitigate the crime, but also failed to understand and present an intoxication defense during the culpability phase. A defendant charged with a specific intent crime is entitled to an intoxication instruction when "the evidence would support a finding that [the defendant] was in fact intoxicated and that as a result there was a reasonable doubt that he lacked specific intent." *United States v. Kenyon*, 481 F.3d 1054, 1070 (8th Cir. 2007).[84] Mr. Hall's medical use of the drug prednisone undermines the argument that he had the *mens rea* necessary to support a murder conviction.

In an examination of the ninety-eight relevant published appellate opinions regarding prescribed medicine utilized as an involuntary intoxication defense, three featured steroid usage. Jennifer Piel, *The Defense of Involuntary Intoxication by Prescribed Medications: An Appellate*

---

[84] The Eighth Circuit pattern instructions allow for an intoxication defense. *See* Eighth Circuit Committee on Model Criminal Jury Instructions, 9.06 Intoxication; Drug Use, *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit* (2023).

*Case Review*, 43 J. of Am. Academy of Psych. & L. 321, 322-23 (Sept. 2015), https://jaapl.org/content/jaapl/43/3/321.full.pdf. In New Mexico, a jury was given an instruction in involuntary intoxication resulting from the defendant's ingestion of prednisone. *See State v. Sanchez*, 785 P.2d 224, 229 (N.M. 1989). And legal scholars maintain that any "attorney representing a steroid user charged with a crime must consider implementing evidence of steroid-induced psychosis to eliminate or, alternatively, limit the accused's criminal responsibility." Martin J. Bidwell & David L. Katz, *Injecting New Life into an Old Defense: Anabolic Steroid-Induced Psychosis as a Paradigm of Involuntary Intoxication*, 7 U. Miami Ent. & Sports L. Rev. 1, 62-63 (1989).

Trial counsel deprived Mr. Hall's jury of crucial evidence when they failed to point out that the BOP's own records, which the BOP had furnished to trial counsel in discovery, showed that Mr. Hall was taking a sustained, high dose of a powerful steroid on the day of the homicide: "Mr. Hall experienced severe complications of Crohn's disease in the weeks leading up to the homicide and during that time he had been on doses of prednisone that [gastroenterologist Dr. Steinhart] would consider to be relatively contraindicated in someone with a significant mood disorder." Ex. 7 (Steinhart Dec.) at 12. Further, "[t]he use of prednisone *could have contributed to aggressive behavior and feelings of anxiety and rage at the time of the homicide*." *Id.* (emphasis added).

### C. Trial counsel was ineffective because learned counsel was absent from court for the entire culpability phase and significant portions of the penalty phase.

Because Mr. Hall was facing a death sentence, he was entitled to an attorney qualified by training and experience to handle death penalty cases (counsel "learned in the law applicable to capital cases" or simply "learned counsel"). 18 U.S.C. § 3005. Mr. Hall was denied his right to

212

counsel by learned counsel's absence from court for the entire culpability phase and six afternoons of the penalty phase.

"An accused's right to be represented by counsel is a fundamental component of our criminal justice system." *United States v. Cronic*, 466 U.S. 648, 653 (1984). "Without counsel, the right to a trial itself would be of little avail . . . . " *Id.* (internal quotation omitted). When facing the federal death penalty, the accused is entitled to two lawyers, one of whom at least "shall be learned in the law applicable to capital cases." 18 U.S.C. § 3005. "Ordinarily, 'learned counsel' should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high-quality representation." Guide to Judiciary Policy, Chap. 6, § 620.30 (b)(2), *Appointment of Counsel in Capital Cases*, https://www.uscourts.gov/rules-policies/judiciary-policies/cja-guidelines/chapter-6-ss-620-appointment-counsel-capital-cases#a620_30 (quoting § 3005).

Mr. Frederick Duchardt was appointed as learned counsel in this case. He was assisted by Mr. Bob Lewis and by Mr. Michael Walker. Mr. Lewis had never worked on a federal capital case. Michael Walker had been on the case for only three months before trial, having been added when Mr. Lewis' medical issues prevented him from working on the case. However, although he was serving as learned counsel, Mr. Duchardt was not present in court for significant portions of the trial.

On April 30, 2014 – the day jury selection concluded, with opening statements set to take place on May 1, 2014 – Mr. Duchardt submitted a memorandum to the trial court entitled "Plan for use of Attorney resources for Charles Michael Hall," to "give [the court] a full explanation why [he] ha[s] taken the resource utilization steps that [he] ha[s]." Ex. 76 (Memo 04/30/14) at 1.

213

In the memorandum, Mr. Duchardt explained, "[w]hat has developed naturally is a division of duties in which I covered most of the pretrial motion practice and jury instructions, with some help from Mike, Mike addressed all voir dire preparations, Bob and Mike had first phase responsibiliites [sic.], and I had control over the penalty phase presentation." *Id.* at 2. Mr. Duchardt further explained that, to avoid seeking a continuance, he would not attend the culpability phase of trial:

> Another curve was thrown our way when the government's rebuttal mental examination of Mr. Hall was delayed until April 26, with a videotape of the examination not ready until April 30, and a report not to be available until May 1 or 2. Under other circumstances, this would have created a crisis, likely necessitating a request for some sort of continuance. Because of the resources available, a natural, alternative solution presented itself. Because Bob and Mike would be handling nearly all of the first phase in-court duties, my presence would have been more as a backstop for them. Thus, it was decided that it would be a better use of team resources for me to not be present in the courtroom during the first part of the first phase of trial. That would free me up to address the government's rebuttal expert and other penalty-phase-related preparation matters.

*Id.*

While they were preparing their bills, Mr. Duchardt sent his co-counsel an email documenting when each attorney was in court. The email states:

> Days 1, 2, 3-all attorneys present in court
>
> Days 4, 5, 6-Bob and Mike present, with Fred present only for 0.5 hours at the end of the day on Day 5 to make argument regarding penalty phase severance (for that brief time we'll show all three of us present)
>
> Day 7, Mike and Bob present for arguments (AM), Fred and Bob present for penalty phase beginning (PM)
>
> Day 8 and 9, Bob and Fred present
>
> Day 10-this day is a bit confusing for me-I recall being in court all day that day myself both of you only show 1.5 hours of time on your draft timesheets. so I assume this is one of the days on which Bob either came early or left early-the precise times for the day are 3.5 hours AM and 2.3 hours PM-my suggestion is that one of you take the AM portion and one of you take the PM portion, depending upon your recollections of how the day was divided-give your input on this one via return e-mail

Day 11, Fred and Bob present

Days 12-14, on these days, I was working on penalty phase evidence prep, including getting the teleconference matters set up-on these days Fred and Bob are present AM, and Mike and Bob present are present PM

Day 15 (May 19), Fred and Mike present-Bob was under the weather this day, and also was working with Olga

Day 16 Fred and Bob present AM, Mike and Bob present PM-this was another day on which I was doing work in the PM outside the courtroom

Days 17 and 18-here Mike's and my recollections are different-Mike's notes show him being out of Court on the PM of Day 17, and in Court on the PM of the day 18, but my recollection is reversed-that is because I was presenting witnesses all day on day 18, and was preparing for that on day 17-therefore, I believe the correct lineup for these days are, for Day 17 Fred and Bob AM, Mike and Bob PM, and for Day18  Fred and Bob all day

Day 19, Fred and Bob present

Day 20, Fred and Bob present AM, Mike and Bob present PM

Day 21 and 22, Fred and Bob present with Mike making brief cameos each day to make arguments, respectively, on the proportionality offer of proof and the heinousness sufficiency

Day 23 and 24 Fred and Bob present

Ex. 75 (Emails attys in court) at 1-2.

According to his own accounting, Mr. Duchardt was absent from court for the entirety of the culpability phase, except for thirty minutes to make an argument "regarding penalty phase severance" (arguing against severing the penalty phase). *Id.* at 2. In addition to skipping the culpability phase to prepare for the penalty phase, as he had told the court he planned to do, Mr. Duchardt apparently was still "working on penalty phase evidence prep, including getting the teleconference matters set up" during the penalty phase, because he was also absent from six

afternoons of the penalty phase. *Id.* Mr. Duchardt was absent for the afternoons of the twelfth, thirteenth, fourteenth, sixteenth, seventeenth, and twentieth day of trial. *Id.*

To be clear, this was not a situation where trial counsel was faced with a difficult choice because the court denied a continuance. Rather than asking for a continuance, learned counsel preemptively decided to skip the culpability phase to avoid delaying the trial. This decision contravenes the requirement that "[c]ounsel at all stages should demand on behalf of the client all resources necessary" – which includes adequate time to prepare – "to provide high quality legal representation." 2003 Guidelines 10.4(D); *see also* 2003 Guidelines 6.1 commentary (discussing time demands of capital trials).

With different lawyers handling different phases of the case, counsel failed to present an integrated theory. Presenting an integrated theory is crucial to persuading the jury to impose a life sentence. "[I]t is critical that, well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages." 2008 Supp'l Guidelines 10.10.1 commentary. After formulating an integrated defense theory, "counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument." *Id.*

During the culpability phase, trial counsel wholesale made no mention (including expert testimony) of prednisone and how it causes irritability, mood swings and anger. In fact, trial counsel put on no defense at all during the culpability phase.

### D. Trial counsel's errors at the culpability phase prejudiced Mr. Hall in the culpability phase and in the penalty phase.

The errors that trial counsel made in preparation for and during the culpability phase of trial prejudiced Mr. Hall in both the culpability phase and the penalty phase.

216

First and foremost, trial counsel's failure to seek a reasonable continuances meant that Mr. Hall's defense team went into the trial unprepared. Trial counsel was unable to secure brain scans because the judge was concerned that there was not enough time, but counsel did not seek to address that concern by asking for more time. Trial counsel also received key information from the government's star rebuttal witness, Dr. Dietz, during trial. Mr. Duchardt skipped the entire culpability phase to prepare to cross-examine Dr. Dietz, which was hardly a reasonable solution for a delay created by the government. Had trial counsel sought a continuance because of the government's delay disclosing evidence, trial counsel would have been able to more adequately prepare to cross-examine Dr. Dietz and attend the culpability phase of trial.

It is unclear whether the trial team would have realized they should present evidence about Mr. Hall's prednisone use on the day of the homicide even if lead counsel had attended the culpability phase. But there is no doubt that trial counsel's failure to present evidence about Mr. Hall's prednisone use on the day of the homicide deprived Mr. Hall of a viable defense to the crime as well as compelling mitigating evidence.

In lieu of presenting this defense, Mr. Hall's trial team presented no defense at all during the culpability phase. Considering the jury heard no evidence in opposition to a guilty verdict, there is a reasonable probability that at least one juror would have been persuaded that Mr. Hall, who had, essentially, never acted violently in his life committed this murder because of the impact of Crohn's on his mental state. Ex. 7 (Steinhart Rpt.) at 12 ("The use of prednisone could have contributed to aggressive behavior and feelings of anxiety and rage at the time of the homicide."). And although Mr. Duchardt had psychiatrist Dr. Wisner testify both about Mr. Hall's experience with Crohn's disease and about errors the BOP made leading up to the homicide, Dr. Wisner "never knew whether [Mr. Hall] was on prednisone at the time of the

217

homicide and, if so, what dosage." Ex. 13 (Wisner Dec.) ¶ 20. Dr. Wisner "did not get into that level of detail in [his] analysis." *Id.* And, of course, he testified after Chuck was found guilty.

Understanding that Mr. Hall's behavior was influenced by a drug the BOP prescribed to him would have helped the jury understand how he came to be involved in Mr. Castro-Rodriguez's death. Mr. Hall had never been involved in other homicides or serious assaults. This evidence also should have been presented during the culpability phase. In the culpability phase, this evidence could have served the basis for an involuntary intoxication defense. At the very least, this evidence would have allowed the defense to present during the culpability phase an explanation for Mr. Hall's behavior that would harmonize with the mitigation presented during the penalty phase.

Mr. Hall's counsel failed to convey this information during either the culpability phase or the penalty phase because they did not sufficiently investigate Crohn's disease and because Mr. Duchardt handled penalty phase preparations, including working with Dr. Wisner, but did not attend the culpability phase. As such, the trial team failed to uncover powerful mitigating evidence that they should have realized could also formed a key part of their culpability phase presentation.

<h1 style="text-align:center">CLAIM 3: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING JURY SELECTION</h1>

**Summary of claim:**

Trial counsel also made significant errors during jury selection.

**Discussion:**

**A. Trial counsel was ineffective for declining to ask any questions of many of the potential jurors (*Morgan* violation).**

Trial counsel was also ineffective during jury selection. Trial counsel failed to ensure that every juror would be willing to consider a life sentence rather than a death sentence and, crucially, would be able to take into account mitigating evidence. Trial counsel declined to ask questions of many of the potential jurors, including potential jurors whose answers to earlier questions suggested that they would not be able to consider a life sentence. When trial counsel did ask questions, the questions failed to probe whether the potential jurors could consider a life sentence for this specific crime and whether the potential jurors could consider mitigating evidence. Consequently, potential jurors who should have been struck for cause became seated jurors.

Trial counsel in a capital case must ensure that the jury is "life qualified." Just as someone who could never impose the death penalty is not "death qualified" to serve as a juror in a capital case, someone who would always impose the death penalty for the crime charged is not "life qualified" to serve as a juror in a capital case. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "[A] capital defendant may challenge for cause any prospective juror who maintains such views." *Morgan*, 504 U.S. at 729. Jurors must also be willing to consider mitigating evidence and jurors who are unable to consider mitigating evidence may also be challenged for cause. *See Wainwright v. Witt*, 469 U.S. 412, 424-26 (1985). "[F]ailure to request the removal of a biased

219

juror can constitute ineffective assistance of counsel," "[a]bsent the showing of a strategic decision." *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992); *see also Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) ("The question of whether to seat a biased juror is not a discretionary or strategic decision. The seating of a biased juror who should have been dismissed for cause requires reversal of the conviction.").

It is axiomatic that, in order to fulfill the obligation to seek removal of biased jurors, trial counsel must ask potential jurors questions that could reveal biases. Without asking questions to discern whether potential jurors are biased, failing to seek removal cannot be a strategic decision. As such, "a defendant may obtain a new trial if an impaneled juror's honest responses to questions on voir dire would have given rise to a valid challenge for cause" if only the juror had been asked the necessary questions to determine whether a for-cause challenge was warranted. *Hughes*, 258 F.3d at 457.

Mr. Duchardt handled jury selection on behalf of Mr. Hall. Individual voir dire began with the trial judge questioning the potential juror. Following the judge's questions, the government, co-defendant Coonce's counsel Mr. Rubenstein (who joined Mr. Coonce's team from the Federal Death Penalty Resource Counsel Project) and then Mr. Duchardt were each permitted to ask a limited number of questions.[85] Despite having the opportunity, Duchardt neglected to ask a single question of many of the potential jurors, even when their questionnaire responses and answers to co-defendant counsel Mr. Rubenstein's questions suggested that they could not consider a life sentence or certain kinds of mitigating evidence.

---

[85] In practice, Judge Fenner allowed approximately two to three questions per counsel. That is the government, Coonce's team, and Hall's team were each allowed to ask roughly two to three questions of each venireperson. Coonce's counsel Mr. Rubenstein made a record during voir dire where he called the entire jury selection process superficial. Tr. 04/28/14 at 138-40.

For example, Venireperson 22 (who was ultimately seated on the jury) wrote on his questionnaire, "I believe if proven guilty of a crime the person involved should have proper punishment and depending on the charge, as long as fair judgment is made, all my life. I believed this all my life." Tr. 04/28/14 at 174. Rubenstein attempted to probe whether he could give "fair consideration to both sentencing options." *Id.* at 175. Venireperson 22 responded, "With proper evidence from both sides and everything, then I would weigh my decision one way or the other, you know. That's – just be fair about it, you know." *Id.* This response did not resolve whether Venireperson 22 was able to consider a life sentence. But after the court cut off Rubenstein's questioning, Mr, Duchardt declined to probe further, instead saying, "[A]gain, if I don't offend you, I don't have any other questions, sir." *Id.*

Similarly, on his questionnaire, Venireperson 106 (who was also seated on the jury) said of the death penalty, "It's a necessary part of the justice system. There has to be the possibility of punishment equal to crime to act as a deterrent." Tr. 04/29/14 at 374-75. Asked by Rubenstein to clarify, he said "I think it's fairly obvious that if there's no punishment equal to what you've done, then it's hardly a deterrent to not commit a crime. If you're able to do something greater than what your punishment might be, there's no deterrent to not commit that crime." *Id.* at 376-77. Although this response indicated that Venireperson 106 could not consider a life sentence for an intentional killing, Duchardt asked no questions. *Id.* at 377. Neither party moved to strike Venireperson 22 nor 106.

Venireperson 106's questionnaire also noted he has felt this way his entire life. Ex. 58 (Juror Questionnaires) at 157 (for "as long as I can remember").[86] He said that the movies *The Thin Blue Line* – a documentary about a wrongly convicted man sentenced to death – and *Dead*

---

[86] Redacted copies of the juror questionnaires at issue are included in Ex. 58.

*Man Walking* – a fictionalized film about the true story of a man admitting his crime and finding his faith through his spiritual advisor upon the eve of his execution – did not affect his thinking about the death penalty despite the movies making "a case against" it. *Id.* Although Venireperson 106 explained during voir dire that he felt the death penalty was the sole logical punishment for murder, Mr. Duchardt did not ask him a single question.

Mr. Duchardt also declined to ask any questions of Venireperson 43, Venireperson 90, Venireperson 92, Venireperson 104, Venireperson 106, Venireperson 111, and Venireperson 131 (all of whom were seated on the jury). Tr. 04/28/14 at 218, 345; Tr. 04/29/14 at 341, 373, 377, 386; Tr. 04/30/14 at 558.

All told, Mr. Duchardt asked questions of only eight venirepersons who became jurors. In the eight of fifteen venirepersons who became seated jurors (there were three alternates), Mr. Duchardt performed deficiently in that he failed to ask probing questions meant to uncover bias. Instead, he asked leading questions that would bolster each venireperson's lack of bias. For instance, he asked Venireperson 94 (Juror 7): "What do you think of this whole idea of mitigating factors?" Tr. 04/28/14 at 266. She responded, "Oh, dear." *Id.* Mr. Duchardt followed up with, "In your answer that they didn't read the rest of it to you, you said, I want to hear everything, basically? I'm paraphrasing but I think that's right, right? . . . That's the way you feel about things like mitigating factors?" *Id.* at 267. She responded, "Yes. Yes." Mr. Duchardt then concluded his questioning. *Id.* Mr. Duchardt's perfunctory questioning, where he "paraphras[ed]" and then accepted a simple "Yes" in response to his leading question, failed to elicit her views on the death penalty and her ability to consider a life sentence. All told, she said four words, two of them, the same word. This is far cry from the performance expected of counsel in a federal capital trial.

In a similar vein, Mr. Duchardt asked Venireperson 4 (Juror 1):

> Judge did a great job of trying to explain what's a broad category which is mitigating factors, things that might persuade a jury that a different sentence other than death would be the right sentence to have and could be something as simple as family love, can be something as complicated as mental illness and everything in between. . . . Is that something as a juror you'd want to hear about before you decided which punishment to choose?

Tr. 04/28/14 at 159. She responded, "I think we'd be required to hear about it,"which offered no insight into whether she would want to hear about or, more importantly, whether she could actually consider those factors after hearing about them. *Id.* Co-defendant counsel Mr. Rubenstein had just been cut off by the trial judge during a critical inquiry into Venireperson 4's preconceived ideas and biases. *Id.* at 153-58. Nevertheless, Mr. Duchardt asked no further questions. *Id.* at 159. The government was actively working against further inquiry, *id.* at 154-57, perhaps because it identified her as a pro-prosecution juror since her husband worked in law enforcement. Ex. 58 (Juror Questionnaires) at 5, 19 ("Trooper" listed).

*Morgan* and the Constitution required further questioning of Venireperson 4 by Mr. Duchardt, especially considering that she too identified the death penalty as a "deterrent" that also exists to provide justice to the victim's family. She identified the biggest problem in the criminal justice system as "delays," and said, "it's interesting the different methods per state and how long a person may be on death row." *Id.* at 12, 29. That is, Venireperson 4's perspective on the death penalty was (a) she's intrigued by how people are executed by different states and (b) she identifies the delays as the single biggest problem in the criminal justice system.

Further, Venireperson 4 worked as a nurse on a voluntary lockdown mental health wing. This case is about a murder in a prison's mental health wing. *Morgan* required additional questioning of Venireperson 4 to identify whether she could realistically consider a different

223

punishment for murder besides death, and it was critical to resolve whether her relevant prior work experience would interfere with the facts of this case. Those questions remain unanswered.

In yet another similar exchange, Mr. Duchardt asked Venireperson 73 (Juror 4):

It really kind of comes down to a bottom line thing for all of us and some people's feelings are strong in favor of the death penalty, some people's feelings are strong against the death penalty, but the context is what Judge Fenner has given to everybody, and that is that and, of course, we're putting the cart before the horse, as I said before. We're asking you guys to think about situations, about penalties before you've even made a finding, but we have to ask you to assume for the sake of argument that in a hypothetical case you found guilt beyond a reasonable doubt of a deliberate killing, and this is kind of what we were coming back to before is are your feelings in favor of the death penalty in that situation so strong that you couldn't possibly vote for a sentence of life, or could you in that case, depending upon the facts, see yourself voting for a sentence of life?

Tr. 04/29/14 at 319. He responded, "Yes, I could." *Id.* To that, Mr. Duchardt said, "That's what I needed to know. Thank you, sir" and concluded his questioning. *Id.* This is not a probing, curious query, it's a leading soliloquy that guided Venireperson 73 to parrot an answer trial counsel was seeking.

Mr. Duchardt asked Venireperson 73 no questions about whether he could consider mitigation or what kinds of mitigation he could consider. Nor did Mr. Duchardt ask whether there were some kinds of deliberate killing cases, such as a deliberate killing within a prison, where he could not consider a life sentence. Thus, Mr. Duchardt had no idea whether Venireperson 73 could fairly consider a life sentence for Mr. Hall, or fairly consider mitigating evidence in Mr. Hall's case.

*Morgan* and the Constitution required further questioning of Venireperson 73. On his questionnaire, he wrote, "I believe there are cases that should have the death penalty. I feel very strong on this, provide it has been show[n] without a doweit [sic]. I have always believe [sic] this." Ex. 58 (Juror Questionnaires) at 85.

Finally, Mr. Duchardt asked Venireperson 95 (Juror 8): "You said in your answer you agree with the death penalty. How much?" Tr. 04/29/14 at 354. He responded:

> Well, that has changed, like I said, since I filled out the questionnaire. I understand it a little better now. I am for the death penalty. In certain crimes that I believe it does deserve death. Other crimes I do not. Back to this same thing. I would have to weigh everything out to make a decision on that.

*Id.* Mr. Duchardt then asked, "Could you see yourself in a deliberate killing case voting for a life sentence if you thought it was appropriate?" *Id.* He responded, "Yes, sir." *Id.*

As with Venireperson 73, Mr. Duchardt asked Venireperson 95 no questions about what prompted a recent change in his views on the death penalty or whether he could consider mitigation or what kinds of mitigation he could consider. Nor did Mr. Duchardt ask whether there were some kinds of deliberate killing cases, such as a deliberate killing within a prison, where he could not consider a life sentence. Thus, Mr. Duchardt had no idea whether Venireperson 95 could fairly consider a life sentence for Mr. Hall, or fairly consider mitigating evidence in Mr. Hall's case.

Trial counsel did not move to strike either venireperson 73 or 95. Mr. Duchardt's inadequate questioning of potential jurors meant that he could not make an informed decision about which potential jurors to move to strike for cause. It also meant that he could not make an informed decision about when to use peremptory challenges, like with Venireperson 4's prior work experience.

Mr. Duchardt's decisions were not strategic. Just as a failure to investigate an obvious lead cannot be strategic, failure to question potential jurors who indicate they may not be able to consider a life sentence cannot be strategic. Counsel's obligation to seek removal of a biased juror entails the obligation to ask questions to investigate potential bias. Thus, by asking no

225

questions of jurors who indicated they were unable to consider a life sentence, trial counsel performed deficiently.

**B. Trial counsel was ineffective for failing to object when prosecutors unlawfully excluded women from the jury.**

Trial counsel failed to raise a challenge to the government's use of peremptory strikes to exclude women from the jury. The Equal Protection Clause "forbids intentional discrimination on the basis of gender" in the use of peremptory strikes because "gender, like race, is an unconstitutional proxy for juror competence and impartiality." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994). Trial counsel should have recognized that the government was unlawfully excluding women from the jury and raised a *J.E.B.* challenge. Because counsel failed to raise a *J.E.B.* challenge to the government's discriminatory use of peremptory strikes, the jury included twice as many men as women.

**i. The government intentionally excluded women from the jury.**

The underrepresentation of women on the jury was not a result of the makeup of the jury pool. After challenges for cause and death qualification, there was a pool of fifty-two venirepersons from which jurors were drawn and a pool of seven venirepersons from which alternate jurors were drawn. Ex. 59 (Juror List). The fifty-two-person pool was comprised of twenty-eight women and twenty-four men. *Id.* The prosecution was given twenty peremptory strikes and the defense teams were given twenty peremptory strikes total, which they had the option to either exercise jointly or split. *Id.* The pool of seven possible alternate jurors was comprised of seven women. *Id.* The prosecution was given two peremptory strikes and the defense teams were given two peremptory strikes total, which they had the option to either exercise jointly or split. *Id.* The prosecution and defense teams each submitted lists of their strikes to the court. Tr. 04/30/14 at 661.

226

The prosecution used its peremptory challenges to strike fifteen women and only five men, using 75% of its strikes against women. This strike rate was grossly disproportionate to the number of women in the venire, as women comprised 54% of the jury pool. After voir dire, there was a vast disparity in the number of women and men seated on the jury. The jury was comprised of four women and eight men. Ex. 59 (Juror List). The government's rate of striking women, and the fact that the jury was comprised of twice as many men as women despite nearly equal numbers of women and men in the venire, is strongly indicative of purposeful discrimination. It is exceedingly unlikely that a jury so heavily dominated by men would be produced by chance.

**ii. Trial counsel failed to raise a *J.E.B.* objection to the government's discriminatory use of peremptory strikes.**

Trial counsel did not challenge the government's discriminatory use of peremptory strikes. Mr. Duchardt stated that he did not raise a *J.E.B.* challenge because he did not prefer the jurors the government struck over other jurors. Ex. 15 (Duchardt Int.) at 153. However, his file is devoid of any indication that he was even tracking the gender of prosecution strikes.

Explaining his approach to jury selection, he noted the importance of thoroughly questioning jurors, offering that there is "nothing quite like asking an open-ended question to get a lot of good information." *Id.* at 150. Mr. Duchardt stated that he tried to "ask as many good questions in as much an open-ended fashion as I could" within the parameters set by the trial court, which limited attorneys' questioning. *Id.* at 151.

In fact, the trial transcript shows that Mr. Duchardt asked *no* questions to many of the jurors. He asked *no* questions of ten of the fifteen female venirepersons the government struck. Ex. 59 (Juror List); Tr. 04/28/14 Tr.162, 173, 180, 211, 229, 239, 253; Tr. 04/29/14 at 402; Tr. 04/30/14 at 624, 653. Having failed to ask any questions of these ten venirepersons, Mr.

227

Duchardt was not able to make an informed strategic decision about whether to raise a *J.E.B.* challenge to the prosecution's strikes. *See United States v. Grant*, 563 F.3d 385, 391-92 (8th Cir. 2009) (noting relevance to *J.E.B.* challenge to not asking a juror any questions during voir dire).[87] Mr. Duchardt did not make a strategic decision not to raise a *J.E.B.* challenge in Mr. Hall's case. He simply failed to appropriately question jurors to gather the necessary information to make informed decisions about who to strike, as discussed above, and he failed to recognize that he should raise a *J.E.B.* challenge.

**C. Mr. Hall was prejudiced by trial counsel's errors during jury selection.**

Jury selection is a crucially important part of any trial, arguably the most important part of a death penalty trial. By failing to ask any questions of many of the potential jurors and failing to object to the government's discriminatory use of peremptory strikes, trial counsel deprived Mr. Hall of his right to an unbiased, fairly selected jury who could impartially determine his fate. A biased juror always prejudices the defendant. "The presence of a biased jury is no less a fundamental structural defect than the presence of a biased judge" and "'structural defects in the constitution of the trial mechanism . . . defy analysis by "harmless error" standards.'" *Johnson*, 961 F.2d at 758 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). "If even one such juror [who is unable to consider a life sentence] is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. 719, 729. Mr. Duchardt did not ensure that Mr. Hall's jury was fair and as a result jurors who should not have been empaneled served and jurors who should not have been struck were struck. It would be tempting to assume that because the jury that was empaneled initially deadlocked on Mr. Hall's sentence,

---

[87] Mr. Duchardt also acknowledged that he had never raised a *J.E.B.* challenge in any case. Ex. 15 (Duchardt Int.) at 154.

228

even without hearing important mitigating evidence, that Mr. Hall suffered no harm from the errors at jury selection. This would be a mistake. Rather, how close this case was makes it even more clear that every juror mattered. Competent jury selection would have made the difference between life and death.

**CLAIM 4: CONFLICT OF INTEREST**

**Summary of Claim:**

Mr. Duchardt allowed his personal friendship and doctor-patient relationship with Dr. John Wisner to materially affect his representation of Chuck Hall in violation of Mo. S. Ct. R. 4-1.7(a)(2), Local Rule 83.6(c)(1), and the Sixth Amendment. In 2012, fifteen months before Mr. Duchardt hired Dr. Wisner for Mr. Hall's case, Dr. Wisner was outed as an accused pedophile by Kansas City television stations and the *Kansas City Star*.[88] Dr. Wisner was a part-time priest. In that capacity, he hosted teen boys for parties at his Table Rock Lake house and on trips to California, Hawaii, and the Cayman Islands. Multiple boys accused Dr. Wisner of molesting them during those parties and trips. In the wake of these allegations, he was asked to resign by KU Medical School. The Catholic church laicized him.[89] His forensic work dried up. Credibility is always at issue in any trial, so it is unsurprising that no one in town would hire him as an expert. Except Mr. Duchardt. Mr. Duchardt chose to have his friend and doctor's back. Their relationship and Mr. Duchardt's hiring decision created a conflict of interest between Mr. Duchardt's friendly loyalties and Mr. Hall's interest in his own capital defense. Mr. Hall was not informed of these facts and never provided consent, written or oral. This violated Mr. Hall's Sixth Amendment rights.

---

[88] A collection of news stories about Dr. Wisner and a summary of the allegations against him is available at https://www.bishop-accountability.org/accused/wisner-john-h-1972/.

[89] Laicization in the process by which priests are removed from the priesthood, taking away their rights, powers, and authority as priests. It is a penalty for grave offenses, essentially the equivalent of impeaching and removing an Article III judge, in that it removes someone from what would otherwise be a lifetime appointment because of malfeasance.

230

**Discussion:**

Mr. Duchardt and Dr. John Wisner have a long-running professional relationship that transitioned into friendship and an informal doctor-patient relationship. Dr. Wisner was a psychiatrist who regularly testified as an expert. He and Mr. Duchardt worked together on "over a dozen" cases including Mr. Hall's. Ex. 13 (Wisner Dec.) ¶ 6. Mr. Duchardt retained Dr. Wisner in August 2013 for Mr. Hall's case. *Id.* ¶ 6. Their relationship became "friendly" prior to working on Mr. Hall's case. Dr. Wisner also provided psychiatric treatment to Mr. Duchardt, his wife, and his son. *Id.* ¶ 7. Dr. Wisner prescribed medication to Mr. Duchardt as a favor and periodically checked in with Mr. Duchardt to see how the medicine was working.

Dr. Wisner was also "ordained as a priest in the Roman Catholic Church, serving as an associate vicar (associate pastor) at St. Agnes Parish in Roeland Park, KS from 1985 until 2012." *Id.* ¶ 4. In 2012, Dr. Wisner was credibly accused of pedophilia: on 41 Action News, KCTV5 and Fox 4 (the NBC, CBS and Fox affiliates in Kansas City) in May 2012 and in the *Kansas City Star* and on KMBZ (the ABC affiliate) in November 2012. Dr. Wisner said, "[t]his ended my service as a priest." Ex. 13 (Wisner Dec.) ¶ 4. Lawsuits against Dr. Wisner were settled out of court. *See* Judy Thomas, *Defrocked KCK Priest No Longer Holds Active Medical License in Kansas or Missouri*, Kansas City Star (Mar. 19, 2019), https://www.kansascity.com/news/local/article228081499.html.

When these allegations broke, and after, "Fred [Duchardt] was a true friend and had my back. He stood by me as my career was uncertain." Ex. 13 (Wisner Dec.) ¶ 7. Dr. Wisner reached out to Mr. Duchardt when the story was about to break in 2012, because they were actively working on another case. Mr. Duchardt continued to employ Dr. Wisner as an expert. Most

231

others took a different approach. The Chancellor of the University of Kansas relieved Dr. Wisner of his professorial position at the medical school, which in turn ended Dr. Wisner's forensic psychiatry practice. But Mr. Duchardt hired Dr. Wisner in August 2013 – fifteen months after the accusations were made public – in the case of *United States v. Charles Hall*.

In order to obtain relief based on his counsel's conflict of interest, a defendant must demonstrate: (1) an actual conflict of interest between the attorney and the client; and (2) the established conflict of interest adversely affected the lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). The Supreme Court later affirmed *Sullivan* in *Mickens v. Taylor,* holding the standard for conflict of interest claims raised in post-conviction ("the *Sullivan* standard") is different than the *Strickland* standard and holding that a conflict should be raised as its own legal claim. *Mickens v. Taylor*, 535 U.S. 162, 172-73 (2002). *Mickens* held that if a conflict creates an adverse impact on representation, then prejudice is presumed. *Id.* at 173 (it "render[s] the verdict unreliable, even though *Strickland* prejudice cannot be shown").

### A. Mr. Duchardt's relationship with Dr. Wisner created an actual conflict of interest.

*The Risk of Concurrent Conflicts:*

Missouri Supreme Court Rule 4-1.7(a)(2) disallows representation of a client when an attorney has a material interest that may be opposed to the client's. Missouri's rule is identical to ABA model rule 1.7, except internal references to other paragraphs. *State ex rel. Horn v. Ray*, 325 S.W.3d 500, 505-06 (Mo. Ct. App. 2010). This Court incorporated Rule 4-1.7(a)(2) in Local Rule 83.6(c)(1).

Missouri Supreme Court Rule 4-1.7(a)(2) states a lawyer "shall not" represent a client if a concurrent conflict of interest exists. A "concurrent conflict of interest exists" if "there is a significant risk that the representation of one or more clients will be materially limited by the

lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." Essentially, "[a] conflict of interest is 'any substantial risk that a lawyer's representation of a client would be materially and adversely affected because of the lawyer's countervailing interests or duties.'" *State ex rel. Union Planters Bank, N.A. v. Kendrick*, 142 S.W.3d 729, 736 (Mo. 2004) (quoting Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 10.7 (3d ed. Supp. 2004)). Rule 4-1.7(b)(4) allows the representation to continue, despite the concurrent conflict of interest, only if "each affected client gives informed consent, confirmed in writing."

Here, the potential "concurrent conflict of interest" is between Mr. Hall's right to the undivided loyalty of counsel and Mr. Duchardt's loyalty – financially, medically, and in friendship – to Dr. Wisner. The first Comment under Rule 4-1.7 says, "Loyalty and independent judgment are essential elements in the lawyer's relationship to a client." Comment Four directs that if the conflict arises after representation commences, then "the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client." Here, the conflict came about when Mr. Duchardt hired his own friend, physician and accused pedophile in a low point of his career. Mr. Duchardt could have avoided the conflict by not hiring this particular expert, but he instead chose to have the "back" of his friend and physician. Comment Eight provides valuable insight as well: "Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests."[90] Certainly, Mr.

---

[90] Formal Opinion 126, for instance, makes it impermissible for a lawyer to advise a client to waive future ineffective assistance of counsel claims. *See* Advisory Committee of the

233

Duchardt's loyalty to Dr. Wisner – to "have his back" – appear to have materially limited his ability to represent Chuck Hall in that he hired and continued to work with an expert in the midst of being publicly humiliated for alleged pedophilia. Even if the allegations against Dr. Wisner were false, several prominent local news outlets covered the allegations against him, undermining his credibility. No one asked the jurors if they were aware of the accusations or had ever heard of Dr. Wisner.

A common occurrence of a similar conflict of interest is when spouses serve as opposing counsel. Comment Eleven to ABA Model Rule 1.7 explains the "significant risk that client confidences will be revealed" and the lawyer's "family relationship will interfere with both loyalty and professional judgment," when a prosecutor goes against a spouse defense attorney. In these situations, the guidance is "ordinarily" both spouses should not be counsel for the competing sides, "unless each client gives informed consent." This makes sense, because personal relationships are complex and can interfere with the professional roles lawyers are required to play. Rule Committees and courts recognize this.[91]

---

Mo. S. Ct., Formal Opinion 126 (May 19, 2009). This is akin to Mr. Duchardt's request at the inception of this litigation to continue to represent Mr. Hall in his § 2255 lawsuit. *See* Dkt. No. 965. The central claims raised in post-conviction motions are ineffective assistance of counsel claims. This claim requires the Court to evaluate Mr. Duchardt's ethical practices; thus, Mr. Duchardt's credibility is at issue.

[91] Ethics caselaw is not as robust as other areas of law, hence our citation to hypotheticals and informal guidance. For instance, *State ex rel. Horn v. Ray* explicitly disallowed a lawyer from representing a criminal defendant and the victim concurrently. Even though this ruling was a straightforward application of Rule 4-1.7 – "such dual representation could compromise the defendant's Sixth Amendment rights" – the Court also called the decision one of first impression. *Ex rel. Horn*, 325 S.W.3d at 502-03*, 506.*

More targeted and on-point guidance can be found in two Informal Opinions of the Office of Legal Ethics Counsel for members of the Missouri Bar Association. First, Informal Opinion 20030063[92] discusses how personal relationships with experts can create conflicts:

> **QUESTION:** Attorney entered an appearance for defendant, Doctor A, in a medical malpractice case. When plaintiffs disclosed their expert, Attorney learned that Attorney had an ongoing professional and personal relationship with plaintiffs' expert. Can Attorney continue to represent doctor A?
>
> **ANSWER:** If there is a conflict of interest, it would be under Rule 4-1.7(b). If Attorney's relationship with the expert will materially limit Attorney's representation of Doctor A, a conflict exists. Even if Attorney does not believe the relationship would result in material limitation of Attorney's representation, the relationship must be disclosed and discussed with Doctor A. If there is a conflict, but Attorney has a reasonable belief that it would not adversely affect representation, Doctor A could waive the conflict.

Several parts from the informal opinion are relevant to this claim: (1) lawyers and doctors operating in similar social circles and being acquainted and friendly is acknowledged; (2) the plaintiff's expert doctor (friend of "Attorney") is presumed to have opposing viewpoints to "Doctor A" because of the adversarial process; (3) there is a conflict of interest; (4) the conflict of interest "must be disclosed and discussed" with the client; (5) that conflict may or may not be waivable; and (6) if that conflict is waivable, the client must consent. The slight distinction in this example and this claim is Doctor A and the plaintiff's expert doctor are on competing sides, whereas this claim has a client and an expert doctor on the same side. If anything, that makes the conflict in this case worse. Unlike the hypothetical, Mr. Duchardt had a choice. His personal interest and bias in wanting his friend to have gainful employment amidst a public firestorm seeped into Mr. Hall's representation. Mr. Duchardt's interest in helping Dr. Wisner might have

---

[92] The opinion is available at https://mo-legal-ethics.org/informal-opinion/20030063/.

been legitimate if Mr. Duchardt had consulted Mr. Hall's and took into account his wishes after full disclosure. But Mr. Duchardt made no such disclosure to his client.

Second, Informal Opinion 20060073[93] discusses how a lawyer's personal interest in an issue can potentially affect a client:

> QUESTION: Can Attorney tell a client that Attorney will provide free or reduced cost estate planning services to a client who leaves a portion of their estate to a not-for-profit organization?

> ANSWER: It is permissible for Attorney to offer a discount on estate planning to clients who leave a portion of their estates to a not-for-profit organization. Attorney must clearly and fully disclose Attorney's relationship with the organization. Attorney must provide objective advice and consultation to the clients regarding their options and the effects of their choices.

Three areas from this example apply to this claim: (1) the lawyer's personal interest, in this case helping a non-for-profit organization, is acknowledged; (2) the lawyer's personal interest can come from a good place; and (3) the lawyer's personal interest must be disclosed to the client.

These two Informal Opinions demonstrate that Mr. Duchardt's personal interest in his relationship with Dr. Wisner triggered a conflict of interest upon Dr. Wisner's hiring, and informed consent from Mr. Hall was required.

*Actual Conflict of Interest:*

The informal opinions give strong guidance that this conflict had gone from potential to an actual conflict. The Eighth Circuit addressed a situation analogous to the unethical conduct in this case in *Caban v. United States*, 281 F.3d 778 (8th Cir. 2002). Two defendants were represented by two lawyers who were friends. *Id.* at 780. It was in one of the defendant's interests to call the co-defendant's lawyer to testify about a bill of sale, the legitimacy of which

---

[93] The opinion is available at https://mo-legal-ethics.org/informal-opinion/20060073/.

236

was hotly debated but could provide valuable impeachment information against that same co-defendant who testified as a cooperating witness. *Id.* Ultimately, the trial lawyer decided to not call his friend, the co-defendant's lawyer. *Id.* The Eight Circuit found a concurrent conflict of interest that turned into an actual conflict of interest. One lawyer testified that "he did not want to subject his friend to an embarrassing cross-examination" and the Eighth Circuit held that "[e]ven if this was not the typical conflict situation, *i.e.* a single lawyer representing multiple defendants in a mutual prosecution, the division of loyalties is apparent." *Id.* at 784-85. "Divided loyalties violate both Sixth Amendment requirements, and well accepted rules of professional responsibility." *Id.* at 785 (internal citation omitted).

Like in the lawyer in *Caban*, Mr. Duchardt had divided loyalties. Mr. Duchardt created this conflict with his client Mr. Hall when Mr. Duchardt's thoughts and feelings towards Dr. Wisner impacted the decision to hire his friend and provide gainful employment as his career was imploding. Yet his job and his ethical duty was loyalty to Chuck Hall. Considering the myriad options available to Mr. Duchardt, it seems unfathomable any attorney would choose to proceed with an expert publicly fighting for his professional life. KU's School of Medicine did not hesitate to part ways with Dr. Wisner, nor did other attorneys working with him. This decision was a no-brainer. To continue to work with an accused pedophile on a capital case, when that expert was not in a highly specialized field, demonstrates *per se* the actual conflict. Mr. Duchardt's divided loyalties are an actual conflict of interest.

The ethical obligations of the legal practice are often self-policed, because the conflicted attorney, as was the case at trial, are often the only ones aware of split loyalties. But Mr. Duchardt never addressed the concurrent conflict of interest. He did not reach out for an informal opinion with the Missouri Bar Association, which is free of charge and something practitioners

237

occasionally utilize. He did not explain this actual conflict to his client Chuck Hall. He did not

obtain informed consent, in writing, from Chuck Hall. But, Mr. Duchardt is not the sole arbiter

of ethics.

Many courts have recognized that a conflicted attorney is not in the best position to

assess how the conflict affected him and communicate that to clients. *Wheat v. United States*,

486 U.S. 153, 162-63 (1988). "The existence of an actual conflict cannot be governed solely by

the perceptions of the attorney; rather, the court itself must examine the record to discern

whether the attorney's behavior seems to have been influenced by the suggested conflict."

*Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir. 1994). "Human self-perception regarding one's

own motives for particular actions in difficult circumstances is too faulty to be relied upon, even

if the individual reporting is telling the truth as he perceives it." *United States v. Shwayder*, 312

F.3d 1109, 1119 (9th Cir. 2002); *see also United States v. Infante*, 404 F.3d 376, 392-93 (5th Cir.

2005) (finding conflict despite attorney's denial).

Psychological research supports the court's view that attorney testimony about the

existence and effect of a conflict is not reliable. Researchers from Harvard University coined the

term "bounded ethicality" to describe people's limitations in making ethical decisions. Dolly

Chugh et al., *Bounded Ethicality as a Psychological Barrier to Recognizing Conflicts of Interest*,

in Conflicts of Interest 74-103 (Don A. Moore et al., eds., 2005), cited in Tigran W. Eldred, *The*

*Psychology of Conflicts of Interest in Criminal Cases*, 58 Kan. L. Rev. 43, 48 & n.25 (2009).

Prof. Eldred identifies several unconscious biases "relating to the motivation to maintain a

positive view of the self" which affect a lawyer's ability to make ethical decisions. One, the

"'illusion of objectivity' . . . means that humans tend to justify questionable ethical behavior as a

self-defense to maintain their illusions." Eldred, 58 Kan. L. Rev. at 66-67 (citing Chugh et al. at

78). Prof. Eldred observes, "In cases where a defense lawyer has been accused of ineffective assistance of counsel and is called upon to testify about decisions made during representation, self-interest becomes more obvious. In such circumstances, there is a direct clash between duty and self-interest." *Id.* at 75. Prof. Eldred summarizes,

> The research on psychology of conflicts of interest indicates that many lawyers will underestimate the corrosive effects of a conflict and then, when asked to provide an explanation about the decisions made on behalf of the defendant, will provide post hoc rationalizations that are inconsistent with what really transpired.

*Id.* at 81.

Whether Mr. Duchardt recognized the conflict or not, an actual conflict of interest existed between his loyalties to his friend and physician versus his ethical loyalty to Chuck Hall.

**B. Mr. Duchardt's conflict of interest between himself and Mr. Hall adversely affected Mr. Duchardt's performance at trial.**

Out of an errant desire to be loyal, Mr. Duchardt not only retained Dr. Wisner as a psychiatrist, but he stuck by his long-time friend and doctor by having Dr. Wisner play multiple roles as star witness in his client's capital trial. Instead of consulting with other appropriate experts on crucial issues relating to Mr. Hall's defense, Mr. Duchardt asked Dr. Wisner to provide expert opinions on matters he was not qualified to discuss (like Crohn's-related issues and BOP errors). Mr. Duchardt also elicited harmful expert opinions from Dr. Wisner.

Proof that the trial attorney's performance was adversely affected by the conflict of interest can be demonstrated by showing trial counsel "failed to pursue a reasonable alternative defense strategy because of the conflict." *Kiley v. United States*, 914 F.3d 1142, 1145 (8th Cir. 2019). The "objectively reasonable" alternative strategy needs to be based on the facts of the case and the defendant needs to link the failure to pursue that alternative to the conflict. *Winfield v. Roper*, 460 F.3d 1026, 1039 (8th Cir. 2006).

The reasonable alternative defense strategy was *not hiring* Dr. Wisner.[94] Dr. Wisner admitted his forensic psychiatric practice dried up in the wake of the allegations. No other lawyers would hire him. Only Mr. Duchardt was a "true friend," who "had my back," continued to hire, retain, and then offer as an expert Dr. Wisner. In 2013 when Mr. Duchardt hired Dr. Wisner, the U.S. Bureau of Labor and Statistics estimated there were 25,040 active psychiatrists practicing in America. *Occupational Employment and Wages – May 2013*, Bureau of Labor Statistics, U.S. Dept. of Labor (April 1, 2014), https://www.bls.gov/news.release/archives/ocwage_04012014.pdf (see Table 1). There were plenty of other fish in the sea.

Making matters worse, because Mr. Duchardt did not employ any mitigation specialists or investigators to investigate Chuck's life, the delicate task of getting to know Chuck and making Chuck comfortable enough to disclose his life fell to Dr. Wisner. Chuck is a sexual abuse survivor, and Dr. Wisner is an accused child sex abuser. Predictably, Chuck did not feel comfortable disclosing his past with Dr. Wisner.

Additionally, instead of consulting with other appropriate experts on crucial issues relating to Mr. Hall's defense, Mr. Duchardt asked Dr. Wisner to provide expert opinions on matters he was not qualified to discuss. Dr. Wisner testified about medical issues (Crohn's) and BOP security protocols on top of his psychiatric testimony. In his Crohn's testimony, he only offered global commentary on its impact, and failed to notice that Chuck was on large doses of prednisone prior to and on the day of the homicide. Ex. 13 (Wisner Dec.) ¶ 20. Dr. Wisner acknowledges, he "was not then, and [is] not now, an expert in Bureau of Prisons records,

---

[94] Mr. Hall is also arguing the positive turn of phrase: Mr. Duchardt should have hired a different expert.

240

Case 4:21-cv-08001-BCW    Document 70    Filed 04/29/24    Page 254 of 310

classification, placement, or security." *Id.* ¶ 21. Dr. Wisner's BOP testimony led to a cross-examination that undermined his credibility. *See* Tr. 05/28/14 at 4847-67 (Wisner admitted his BOP conclusions were based exclusively on watching surveillance video and reviewing post orders; admitted he fast forwarded the video a lot; admitted he'd never been to USMCFP Springfield and "doesn't know anything" about its layout/procedures; admitted he spoke to no doctors at MCFP Springfield). The objectively reasonable alternative strategy was to hire different experts for each of these discrete issues: one for Crohn's, one for BOP security issues, and one for mental health diagnoses.

By tasking Dr. Wisner with these additional roles he was unqualified to opine about, Mr. Duchardt enriched his friend and doctor who wrote him scripts on the side. Dr. Wisner billed by the hour, so more tasks meant more hours which meant more money. The decision to use Dr. Wisner in Swiss-army-knife-fashion was tied to Mr. Duchardt's "true friend[ship]" with Dr. Wisner. Mr. Duchardt's decision to continue employing Dr. Wisner, having his back, when the University of Kansas, the Catholic church, and every other practicing attorney abandoned Dr. Wisner, demonstrates the big picture of Mr. Duchardt's loyalty affecting Chuck's defense.

Hiring separate experts for these separate areas is an "objectively reasonable" alternative defense strategy, and it is better suited to the facts of Chuck's case for two reasons. One, choosing to treat the separate parts of Chuck's life separately instead of lumping them all together and putting all your proverbial eggs in one basket, makes those particular issues easier for the jury to understand. And two, separate experts for separate topics limits the potential damage on cross-examination. If, for instance, a lawyer hires an expert with severe credibility issues under this reasonable alternative defense strategy, then only one part of your defense has

issues. The conflict approach Mr. Duchardt took risked nearly the entirety of Chuck's defense, because he tasked Dr. Wisner with so much.

Lastly, the reasonable alternative strategy not employed by Mr. Duchardt because of his divided loyalties between Dr. Wisner and his client Chuck Hall was not firing Dr. Wisner. In the one area of law Dr. Wisner was qualified to opine about, he authored a report and testified that Chuck's diagnosis was anti-social personality disorder (ASPD). Foreseeably, this led Dr. Wisner to a brutal cross-examination where the prosecutor not only forced Dr. Wisner to admit that Chuck is a "psychopath," but painstakingly walked star witness Dr. Wisner through the DSM definition of ASPD and how Chuck (supposedly) met each of those elements. Tr. 05/28/14 at 4822-38.

The ASPD finding in Dr. Wisner's report and in his testimony was damaging and contrary to Mr. Duchardt's theory that Chuck was mostly a good guy from a good family who was respectful to prison staff. It does not further that theory to elect for the jury hear, from your own expert, that your client is a psychopath. After Dr. Wisner testified on direct about ASPD, calling it "readily apparent from his past personal and social history," Mr. Duchardt said because of Chuck's convictions, ASPD was a "fairly easy conclusion to draw." Tr. 05/28/14 at 4790.

Experts can be viewed as hired guns. Lawyers hire and fire experts based on whether that expert helps their case. Dr. Wisner was familiar with this practice. "I have always told the attorneys who hired me that they pay me for my time, not my opinion. I am not of purchasable virtue. However, my relationships with the lawyers who hire me is often collaborative. There are often back and forths on what diagnosis I am going to offer. If I offer an opinion that lawyer is not seeking, I have been let go. Being let go as an expert witness is not rare." Ex. 13 (Wisner Dec.) ¶ 5.

In this instance, Mr. Duchardt hired, retained and presented expert evidence that was contrary to Mr. Hall's best interests. Mr. Duchardt put on duplicative evidence that was cumulative to the government's case. Mr. Duchardt did not engage in "back and forths" on Chuck's diagnosis as a psychopath. He put on evidence that cut against his entire theory of mitigation. In practice, Dr. Wisner provided ammunition and gunfire in tandem with the government; all aimed metaphorically at Chuck Hall. Mr. Duchardt knew this testimony would be elicited, because he had the expert report, knew it was contrary to his strategy, and proceeded anyway. Mr. Duchardt is a loyal friend.

Mr. Duchardt had an actual conflict of interest with his client Charles Hall. Mr. Duchardt's desire to have his friend Dr. Wisner's back created divided loyalties between that interest and Mr. Hall's interests. This actual conflict of interest materially affected Mr. Hall's representation, because alternative defense strategies would have been utilized had the conflict been absent; namely, not hiring Dr. Wisner, not tasking Dr. Wisner with areas of the case he was unqualified for, but also not firing Dr. Wisner for offering harmful opinions in the area of the case he was qualified for. *Sullivan* tells us prejudice is presumed at this point, and a new trial should be ordered.

**CLAIM 5: *BRADY* VIOLATIONS**

**Summary of claim:**

Prosecutors suppressed material, favorable evidence. In particular, prosecutors did not disclose that, on the day of the homicide, before the homicide occurred, Mr. Hall had asked to privately meet with his BOP mental health providers. But this meeting never occurred, and Mr. Castro-Rodriguez was killed later that evening. Ex. 80 (Gariety Dec.) ¶ 8. Mr. Hall was seeking help from his mental health providers just before the homicide, which is consistent with his pattern of self-reporting and reaching out for help to prevent acting on his feelings of anger and aggression. This evidence is powerful mitigating evidence. The government should have disclosed this evidence to defense counsel but did not. This is not the only mitigating evidence the government failed to disclose.

**Discussion:**

In violation of the obligations imposed on prosecutors by *Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959); and their progeny, the government failed to disclose material, favorable evidence that was reasonably likely to impact the jury's decision about whether to convict Mr. Hall and especially about whether to sentence him to death. In particular, the government failed to disclose evidence that Mr. Hall was seeking mental health care hours before the homicide.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also Clemmons v. Delo*, 124 F.3d 944, 949 (8th Cir. 1997) (en banc). Although *Brady* addressed a situation where

244

defense counsel requested specific evidence, later cases clarify that "the duty to disclose such evidence is applicable even though there has been no request by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). The prosecution's duty encompasses evidence related "either to guilt or to punishment." *Brady*, 373 U.S. at 87. The duty encompasses impeachment evidence, as well as exculpatory evidence, including information about deals cooperating witnesses made with the government. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *United States v. Garcia*, 562 F.3d 947, 953 (8th Cir. 2009).

Moreover, the duty to disclose encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles*, 514 U.S. at 438. "This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437. In addition to the duty to disclose material, favorable evidence, a prosecutor may not "knowingly use false evidence, including false testimony" and may not "allow[] it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. And if the government acts in bad faith by destroying potentially material, favorable evidence, this destruction of evidence violates due process. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *Jimerson v. Payne*, 957 F.3d 916, 930-31 (8th Cir. 2020).

**A. The prosecution suppressed evidence that Mr. Hall sought mental health treatment hours before the homicide.**

In Mr. Hall's case, the government withheld evidence that Mr. Hall sought mental health care hours before the homicide – mitigating evidence that the prosecution was required to disclose to defense counsel, even if the defense did not request it.[95]

Dr. Patrick Gariety was a BOP psychiatrist who treated Mr. Hall at USMCFP. Ex. 80 (Gariety Dec.) ¶¶ 1-2. He remembers Mr. Hall well. Ex. 80 (Gariety Dec.) ¶ 3.

Dr. Gariety specifically recalls that on the day of the homicide, Mr. Hall approached him and psychologist Dr. Chad Brinkley and asked to speak with them in a more private location. Dr. Gariety asked Mr. Hall if it was urgent, and Mr. Hall said no. Dr. Gariety told Mr. Hall they could speak that afternoon. But neither Dr. Gariety nor Dr. Brinkley spoke with Mr. Hall again before the homicide. Ex. 80 (Gariety Dec.) ¶ 8.

Mr. Hall consistently sought psychiatric help when he was experiencing anger or homicidal ideations. He had previously asked to talk to someone or change his medication because he was having thoughts of harming others and "I don't want to have them." Ex. 67 (BOP Recs.) at 1. On January 11, 2010, shortly before the homicide, he told a staff psychologist that it would be difficult for him to live in an open unit because he had spilled feces onto his bed and

---

[95] Although the government is obligated to provide this information to defense counsel regardless of whether defense counsel requests it, in this case, trial counsel was also ineffective for failing to ask for this evidence and failing to seek to interview Dr. Gariety and Dr. Brinkley about their interactions with Mr. Hall on the day of the homicide. *Accord Clemmons*, 124 F.3d at 949 ("Whether framed as an ineffective assistance of counsel claim or as a *Brady* claim, [Petitioner] Clemmons's claim undeniably states a constitutional violation."). The Government disclosed no reports of interviews its attorneys or the FBI had with mental health professionals at USMCFP Springfield, including Dr. Brinkley, who testified at trial.

Here, trial counsel's failure to ask for the evidence that was obviously missing from the discovery produced by the government was part of their overall failure to show how the BOP's mistakes contributed to Mr. Castro-Rodriguez's death. Trial counsel also failed to make use of investigator Joe Buckmaster, despite securing funding for his services, and failed to retain an expert in BOP policies and procedures after Mark Bezy indicated he could not work with them.

246

inmates from the mental health unit were teasing him. *Id.* at 17. Although the psychiatrist

"reassured the inmate that the treatment team would not transfer him to a hostile housing

situation," after he returned from the hospital where he had surgery on January 12, 2010, he was

placed in an open mental health unit. *Id.* He was on that open mental health unit when he

specifically told Drs. Gariety and Brinkley that he needed to speak privately to a mental health

professional. Dr. Gariety and Dr. Brinkley worked as a team, rounding on patients together. Ex.

80 (Gariety Dec.) ¶ 8. Dr. Gariety prioritized Chuck as a patient, visiting him almost daily. Ex.

80 (Gariety Dec.) ¶ 4. Dr. Brinkley, who testified for the government at trial, also visited Chuck

most days. Tr. 5/2/2015 at 1128-29. This is because Drs. Gariety and Brinkley both knew Chuck

had severe complications due to Crohn's and his ostomy and believed they were historically

linked to his suicide attempts. Ex. 80 (Gariety Dec.) ¶ 4; Tr. 05/02/14 at 1130, 1137. Dr. Gariety

knew Chuck recently had suffered a Crohn's flare that required out-patient surgery. *Id.* That

Chuck minimized the urgency of his mental health needs is unsurprising, because (1) he suffers

from structural brain abnormalities, (2) he is a sexual abuse survivor, (3) he suffers from shame

around his ostomy and sexual abuse history, and (4) this contact occurred in a public setting with

other inmates around.[96]

The evidence that Mr. Hall asked to speak privately to a mental health professional just

before the homicide is mitigating precisely because it demonstrates that Mr. Hall sought help.

Although he reached out, he did not get the help he needed on that day. Adding to the mitigating

---

[96] Chuck's brain is not a normal brain, so his behavior can deviate from what a typical person would do, especially as to interpreting cues from others. *See* Ex. 5 (Israelian Rpt.) at 80. In addition, "childhood trauma also results in changes in how someone interacts with the health care system in later life and this can, in turn, affect the timeliness and effectiveness of the care that is provided to them." Ex. 7 (Steinhart Rpt.) at 4. Sexual abuse survivors aren't good advocates for themselves with health care providers. Other inmates, from whom he feared shame and repercussions, were around when he asked to see his mental health provider.

value of this evidence, Mr. Hall asked to speak to Dr. Gariety after having already told BOP staff that living in an open mental health unit would be difficult for him. That is, Mr. Hall repeatedly tried to avoid being in a situation where he might impulsively act out or his sense of shame would be triggered.

Dr. Gariety remembers other mitigating information about Mr. Hall, as well. As he recalls, "Mr. Hall acted very emotionally needy at times. At other times he acted with significant bravado and threats. I felt that fear and shame drove both the neediness and the bravado he demonstrated." Ex. 80 (Gariety Dec.) ¶ 11. He also recalls that "Mr. Hall suffered from deep shame over his ostomy." *Id.* ¶ 4. Additionally, "Mr. Hall smelled like feces and suffered from 'mishaps' that he relayed to me of his ostomy leaking stool. These mishaps were embarrassing and exacerbated his shame." *Id.* ¶ 5. Indeed, Dr. Gariety also recalls that Mr. Hall "voiced a desire to be isolated from other inmates to avoid the embarrassment his condition created." *Id.* Dr. Gariety also "always suspected Mr. Hall to be a victim of sexual abuse," and confirms that behaviors he observed are consistent with that history. *Id.* ¶ 10.

The government never disclosed any reports or notes of interviews with Dr. Gariety or Dr. Brinkley created during their investigation or prosecution of this case. Indeed, the government did not disclose 302s or notes of interviews with *any mental health professionals employed by the BOP who had encountered Mr. Hall*. That the government never interviewed any of these people is not a plausible explanation for why no interview reports were disclosed. As previously noted, Dr. Brinkley testified at the trial. That the government called a witness in a death penalty case without ever substantively interviewing him defies logic.

The government called only two BOP mental health providers during the culpability phase: Dr. Brinkley and Dr. DeMeier. Notably, Dr. Brinkley and Dr. DeMeier were also the only

248

two witnesses the government called during the culpability phase for whom there is no record of an interview.

The government did not call Dr. Gariety to testify but his testimony would have been strong mitigation evidence for Mr. Hall. Moreover, Dr. Gariety confirmed that Dr. Brinkley was present for Mr. Hall's request to see them as well. Dr. Brinkley's testimony, however, fails to mention his encounter with Mr. Hall just hours prior to the homicide:[97]

| | |
|---|---|
| Question: | You say you were working for the United States Medical Center for Federal Prisoners on January 26, 2010? |
| Answer: | Yes. |
| Question: | On that day where were you located? Where were you at that day? |
| Answer: | I was at home in the evening when I received a page from the institution -- I was the on-call mental health duty officer at the time -- indicating that there had been a murder at the institution and they asked me to report into work immediately. |

Tr. 05/02/14 at 1124. The government never explained that Dr. Brinkley worked the day of the homicide, he rounded with Dr. Gariety, and Mr. Hall reached out to both doctors hours before the homicide.

It strains credulity that the lack of 302s or interview reports of BOP testifying witnesses, and omission of a mitigating encounter on the day of the homicide could be mere coincidence. The unfortunate but obvious conclusion is that the government interviewed BOP mental health providers without memorializing the interviews to avoid creating *Brady* material and then declined to elicit the mitigating evidence at trial. This is a *Brady* violation. This conclusion becomes all but inescapable in light of a documented history of prosecutor James Peterson doing

---

[97] This is also a *Napue* violation, which is further detailed in Claim 7.

249

the exact same thing in another BOP homicide capital prosecution and flouting ethical norms in several other cases. Mr. Peterson, a prosecutor from the DOJ's Capital Case Section, has an unfortunate history of *Brady* violations, including failing to disclose mitigating mental health information learned from interviews with BOP mental health staff in a BOP homicide case – precisely what appears to have happened here.

**B. The government also suppressed evidence about BOP mismanagement.**

There is other evidence that was not disclosed to trial counsel, and that still has not been disclosed to undersigned counsel, that would establish that the BOP mistakes contributed to Mr. Castro-Rodriguez's death. First, the government withheld a "copout" – an inmate request to staff – from David Bruesch. Mr. Bruesch was also housed in Unit 10-B. In this copout, which he reported that he sent shortly before the homicide, he informed staff that "things were getting out of hand" on Unit 10-B. Ex. 95 (Email from Weiner re Cop-Out). Trial counsel did receive an email from BOP staff psychologist Dr. Elizabeth Weiner to SIS reporting that Mr. Bruesch told her that he "sent a copout" to report that things were "out of hand," but trial counsel did not receive the copout itself. *Id.* In her email, Dr. Weiner said she was suspicious that Mr. Bruesch had actually sent the copout. *Id.* However, there is no indication that anyone conducted any follow-up investigation or determined that no such copout existed. Undersigned counsel attempted to speak with Dr. Weiner but she declined.

Second, reviewing the After-Action Report about Mr. Castro-Rodriguez's death, former warden and BOP expert Maureen Baird notes, "[t]here were deviations from policy occurring within the Mental Health Unit at MCFP Springfield, which were listed as 'Recommendations' rather than nonadherence to policy and procedure." Ex. 8 (Baird Dec.) ¶ 58. The After-Action Report does not specify what documents the After-Action Review Team reviewed in preparing

250

the Report. The After-Action Report also does not explain how the After-Action Review Team reached its consensus, whether they held in-person meetings, corresponded by email, or employed some other process for sharing insights and reaching conclusions. Nor does the After-Action Report describe what, if any, steps were taken to implement the Report's recommendations. No such materials were provided to trial counsel and undersigned counsel also has not been provided with any further information about what records the After-Action Review Team relied on.

Finally, trial counsel did not have copies of personnel files or disciplinary reports from BOP staff members, including those who testified or those who were on duty at the time of Mr. Castro-Rodriguez's death. Trial counsel did have a written summary of this information. Ex. 78 (BOP Disc. Summ.) However, undersigned counsel's review of these documents at the U.S. Attorney's Office reveals discrepancies between the summary provided to trial counsel and the records.

For example, the summary notes that CO Logsdon was involved in an incident where an inmate escaped from the hospital because he was not in the proper restraints. The summary also notes that CO Logsdon was found sleeping on duty but makes no reference to an inmate dying. The employee disciplinary files reveal that an inmate died. Both of these events predated Mr. Castro-Rodriguez's death. After reviewing these files at the U.S. Attorney's Office undersigned counsel requested copies but has not yet received them. As with the information from Dr. Gariety, trial counsel was also ineffective for failing to follow up on this information. That does not, however, undermine *the government's affirmative obligation to disclose it.*

**C. Suppression of this evidence is part of a pattern of misconduct by Capital Case Section attorneys, which has come to the attention of other courts.**

Suppression of favorable, material evidence violates due process "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. However, a pattern of *Brady* violations by a specific prosecutor suggests a greater likelihood that evidence was withheld in a particular case. Certainly, *Brady* violations in other cases do not prove *Brady* violations in Mr. Hall's case. At the same time, a patten of *Brady* violations by a particular prosecutor puts the lack of interview reports with any BOP psychiatrists or psychologist in a different light.

Attorneys from the Department of Justice Capital Case Section, notably James Peterson, who tried this case, have demonstrated a pattern of withholding evidence. In 2014, Mr. Peterson was reprimanded by the Virginia State Bar for withholding evidence while he was a prosecutor in Virginia. It was a "private reprimand" that "is not a matter of public record." Ex. 96 (*In re Hall* filings) at 50.[98] However, a copy of the private reprimand was sent to Antonio Navarro-Covert, the defendant in the case in which Mr. Peterson committed the *Brady* violation and later filed in as an exhibit in a federal case. *Id.* In a declaration, Anjaulyeke Covert Bryant explains that she and her family "filed a bar complaint with the Virginia State Bar against James Dennis Peterson for his actions arising from the prosecution of my grandson, Antonio C. Navarro-Covert." *Id.* at 58. Mr. Navarro-Covert "was convicted by a jury and sentenced to more than 6 years for an alleged assault. The victim of the assault, Nick Goss, did not testify at trial." *Id.* The family spoke to the victim, who said that, before trial, "he had described the assailant to law enforcement as a dark skinned black male." *Id.* Mr. Navarro-Covert "is a light skinned white and

---

[98] Counsel for Mr. Hall filed a motion in the U.S. District Court for the Southern District of Indiana seeking to have that court unseal depositions about Mr. Peterson's misconduct in a Southern District of Indiana case, *United States v. Andrew Rogers*. Counsel is providing those filings to this Court, along with the accompanying exhibits in support of the motion to unseal, as Exhibit 96.

Hispanic male." *Id.* After the evidence Mr. Peterson withheld came to light, Mr. Navarro-Covert's conviction was set aside. *Id.*

Troublingly, in that case, Mr. Peterson argued that unless the defense specifically identified and requested contradictory eyewitness statements, he was not obligated to turn them over. *Id.* at 44, 92. This is inaccurate, *see Strickler*, 527 U.S. at 280, and violates the ethical obligation for prosecutors "to know what *Brady* entails and to perform legal research when they are uncertain," *Connick v. Thompson*, 563 U.S. 51, 67 (2011); *see also* ABA Model Rule Prof'l Conduct 3.8(d) (establishing disclosure obligations broader than the *Brady* rule); Va. Rules Prof'l Conduct 3.8(d) (same); Mo. Rules Prof'l Conduct 4-3.8(d) (same); Ex. 96 (*In re Hall* filings) at 69 ("The burden is on the Commonwealth to produce Brady evidence, it's not up to defense counsel to know about statements and ask for them . . . The Commonwealth's position in this case seems to be, well, maybe he didn't assault Goss, but he assaulted somebody . . .").

Mr. Peterson then failed to disclose the Virginia reprimand to a federal court when asked to inform the court of any ethics violations. In 2015, Mr. Peterson, at that point an attorney in the Capital Case Section, began working on the prosecution of James Wayne Ham in the U.S. District Court for the Southern District of Texas. The government was seeking the death penalty against Mr. Ham. According to a filing by Mr. Ham's attorneys, although the court instructed Mr. Peterson to disclose any ethics violations, he did not disclose the Virginia reprimand. Ex. 96 (*In re Hall* filings) at 34-35. Mr. Peterson's supervisor at the Capital Case Section, Richard Burns, also failed to disclose the reprimand to the court. *Id.* at 35. Counsel for Mr. Ham learned of the reprimand from Mr. Navarro-Covert's family and notified the judge presiding over Mr. Ham's prosecution. *Id.* at. 34.

Moreover, the attorneys representing Mr. Ham informed the court that "[i]n the course of our investigation, we have identified nine witnesses who have told us that they were interviewed at length by the government, yet we have received no statements from the government summarizing those interviews." *Id.* at 42. Counsel further noted that while "the government stated in oral argument that anything that is not work product has been provided to the defense," they had seen no documentation regarding those nine interviews "including who was present, what was said, and whether there is any *Brady* material." *Id.* at 43.

U.S. District Court Judge Lynn N. Hughes said on the record, "I think that America could find a better representative of its values and ideals than Mr. Peterson." Gabrielle Banks, *Houston Judge Questions Capability of Federal Prosecutor in San Jacinto County Death Penalty Case*, Houston Chronicle (June 19, 2019), https://www.chron.com/news/houston-texas/houston/article/Houston-judge-questions-capability-of-federal-14021645.php. The government accepted a plea before issues surrounding misconduct were fully resolved.

Additionally, in 2018, the government was prosecuting and seeking a death sentence against Andrew Rogers in the U.S. District Court for the Southern District of Indiana for a homicide that occurred in USP Terre Haute. Counsel for Mr. Rogers[99] submitted a declaration from Mr. Peterson's former colleague at the Capital Case Section, Amanda Haines, explaining that Mr. Peterson interviewed "over a dozen witnesses without a law enforcement agent or other witness being present," a violation of DOJ procedure that she characterized as a "fundamental error in judgment." Ex. 96 (*In re Hall* filings) at 6. The witnesses Mr. Peterson interviewed "were suspected of having information that was potentially harmful to the government's penalty

---

[99] Mr. Rogers was represented by Indiana Federal Community Defenders, which represents indigent persons facing criminal charges in the Southern District of Indiana and which also houses the § 2255 Unit that represents Mr. Hall in these proceedings.

phase case" and Mr. Peterson "destroy[ed] his interview notes, a fact he initially falsely denied, neglecting to memorialize his conversations with the witnesses, and failing to keep records of what documents he showed them to refresh their recollections or lack thereof." *Id.* Counsel for Mr. Rogers uncovered additional evidence of misconduct, including a document noting that the BOP had not responded adequately to Mr. Rogers' mental health issues and that "were these matters to be addressed in a death penalty proceeding, then the BOP might be embarrassed as a result of its incomplete response to Rogers' mental health issues." *Id.* The court in that case characterized this document as "directly contradict[ing] the position that the Government repeatedly has taken that it has not withheld any information that would indicate that the Bureau of Prisons was negligent in treating Rogers' mental health conditions." *Id.* at 3.

In response to these revelations, the court authorized Mr. Rogers' counsel to take depositions of current and former DOJ employees, including Mr. Peterson, and, after reviewing those depositions and other submissions, ordered a hearing on the government's misconduct, including the withholding of *Brady* material. *Id.* at 8. The hearing never occurred. A few days before the hearing was scheduled to begin, the government accepted a plea offer that obviated the need for the hearing on government misconduct. *Id.* at 8-9.

Counsel for Mr. Ham in the Southern District of Texas prosecution also noted that Mr. Peterson "was faulted in *Rogers* for his conversations with mental health professionals, and a month later he was noted to be dropping off records in Mr. Ham's case for Dr. Maureen Reardon to review." *Id.* at 41.[100] "Despite [the Southern District of Texas District] Court's directives, Mr.

---

[100] Of course, Dr. Reardon conducted a competency evaluation of Mr. Hall and testified against him. She testified in May 2014, in close proximity to Mr. Peterson's work on *Rogers* and *Ham*, which raises serious concerns about potential *Brady* violations or other ethics violations in conjunction with Dr. Reardon's testimony in this case.

Peterson has not revealed or described any of his conversations with Dr. Reardon to the defense." *Id.*

In yet another federal capital prosecution with which Mr. Peterson was involved, prosecutors again engaged in misconduct. Carlo Wilson was indicted in 2016 in the U.S. District Court for the Eastern District of Michigan, and the government sought the death penalty against Mr. Wilson. The misconduct that came to the court's attention in Mr. Wilson's case was a prosecutor's issuance of improper subpoenas. *Id.* at 19. Mr. Peterson was not directly implicated in issuing the improper subpoenas, but he was counsel for the government in that case. Prosecutors received a reprimand from the court and were required to receive training on the rules governing subpoenas. That case also was resolved by plea before issues surrounding misconduct were fully resolved. *Id.*

### D. The suppressed evidence was material.

Evidence that is material to punishment must be disclosed to the defense, just like evidence that is material to guilt. *Brady*, 373 U.S. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

The information from Dr. Gariety undoubtedly meets that standard. The information is extremely compelling mitigation. It comes from a psychiatrist who saw Mr. Hall just before the homicide and, significantly, who worked for the BOP, so could not be attacked as a hired gun or as biased in favor of Mr. Hall. Dr. Gariety's testimony that Mr. Hall experienced shame because of his ostomy, acted like someone who had been sexually abused, voiced a desire to be isolated, and especially that he asked to speak with him privately hours before the homicide would have powerfully impacted the jury.

This strong mitigating evidence also undermines the government's theory of "Fire and Ice" that they argued during closing. Tr. 05/30/14 at 5205 ("with respect to Defendant Hall, he has ice in his veins, he is remorseless, he is patient"); *id.* at 5263 ("Defendant Hall is the . . . ice to Defendant Coonce's fire. He's very patient."); *id.* at 5324 ("Mr. Hall let [Crohn's] disease turn his heart, a heart that had been influenced by a loving family and nurturing environment into ice."). Under the government's theory, Chuck was the cool, detached mastermind. Brain scans showing abnormalities rebut that notion. But so too does Chuck reaching out for help from Dr. Gariety just hours prior to the homicide. This is the same patient who was on high dosages of prednisone, which causes irritability and mania, who silently survived serial sexual abuse when he was thirteen, and who had a history of warning mental health professionals if he felt suicidal or homicidal. Linking that history to this specific anecdote the day of the homicide creates a reasonable probability that, if presented with this evidence, one juror would have voted for a life sentence, and the outcome of the proceeding would have been different.

Evidence about BOP mismanagement also meets the materiality standard. A note to staff before the homicide that things were getting "out of hand" would establish that staff were on notice about problems in the unit yet did take necessary steps to gain control of the unit and ensure everyone's safety. Records of employees inattention to duty – including an incident involving CO Logsdon where an inmate escaped from the hospital and another incident involving CO Logsdon where an inmate died – would help establish that poor management of the unit contributed to Mr. Castro-Rodriguez's death, and that BOP supervisors were on notice that CO Logsdon could not be trusted to maintain order and safety. The records reviewed by the After-Action Committee in drafting their After-Action report would also help establish that poor management of the unit contributed to Mr. Castro-Rodrigez's death.

As previously mentioned in the prejudice analysis in Claim 1: Ineffective Assistance of Counsel, jurors struggled to reach a decision as to an appropriate sentence for Mr. Hall. Just two hours prior to returning a death sentence for Mr. Hall, the same jury was hopelessly deadlocked and 100% certain it could not reach a verdict with respect to Mr. Hall. As such, there is a reasonable likelihood that the material mitigating evidence the government suppressed would have impacted the jury's decision.[101]

---

[101] We incorporate our arguments from prejudice in Claim 1 here, which further demonstrate the relief should be granted for the Government's failure to disclose *Brady* material.

**CLAIM 6: *NAPUE* VIOLATION (BEZY TESTIMONY)**

**Summary of claim:**

Prosecutors violate due process by presenting material testimony that is false or that creates a false impression, or by allowing such testimony to stand uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements that are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Smith v Dept. of Corrections*, 572 F.3d 1327, 1333-34 (11th Cir. 2009) (quoting *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir.1995)) ("The *Giglio* rule applies to 'explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury' while questioning a witness."). This is so even where the particular prosecutor does not know that the testimony being presented is false or misleading. *See Giglio*, 405 U.S. at 154. Indeed, the truthfulness of the process is of the utmost importance even when a specific prosecutor acts in good faith. *Id*. at 153.

The prosecution elicited testimony that, taken as a whole, created a false impression for the jury—specifically, that the BOP has no means to prevent prisoners from carrying out violent incidents in its facilities. During its cross-examination of Mr. Coonce's expert on BOP operations the government invoked a number of examples of violence in BOP facilities and made factual representations to the jury that the incidents occurred despite the BOP's "best efforts." Tr. 05/15/14 at 2829, 2832-33, 2836, 2837, 2839. But this was substantially misleading, and the government knew or should have known so. The BOP has a variety of policies and protocols to

259

effectively manage the risk of prison violence. In fact, in incidents highlighted by the government's questions, there is demonstrable evidence that staff members failed to follow the policies designed to prevent such incidents. The omission of that information gave the jury the false impression that BOP has no feasible means of preventing prison violence.

The government's elicitation of this misleading, inaccurate, and prejudicial testimony violated Mr. Hall's constitutional due process rights and misled the jury that sentenced him to death. Under *Napue* and its progeny, a violation is established if (1) the testimony in question was misleading, (2) the government knew or should have known the testimony was misleading, and (3) the testimony was material. As set forth below, Mr. Hall meets all three requirements for relief.

**Discussion:**

Mr. Coonce's trial counsel called Mark Bezy to testify about whether the BOP could safely house Mr. Coonce.[102] Prosecutor James Peterson cross-examined Mr. Bezy about a series of violent incidents that occurred in BOP facilities. These questions, however, omitted important information about staff members' failures to follow policies designed to prevent such incidents. With more complete information about these incidents, it would have been clear to the jury that violence in BOP facilities often occurs because staff fail to follow BOP policies, not because there are not policies effective in preventing violence.

---

[102] As discussed in Claims 1.D and 1.E., Mr. Bezy's testimony was the only defense testimony offered during the joint criminal trial of Wesley Coonce and Charles Hall related to BOP inmate classification. Mr. Bezy testified in support of the idea that the BOP could safely house Mr. Coonce. The information was general enough and undisputed in certain areas that the jury was left with the impression that much of Mr. Bezy's testimony regarding BOP's inmate classification applied to Mr. Hall as well. We incorporate our arguments from those sections to explain how Mr. Bezy's testimony — and trial counsel's failure to call its own BOP expert — affected Mr. Hall. Further, Mr. Hall's trial counsel failed to clarify that enhanced security measures would apply to Mr. Hall the rest of his incarcerated life and show Mr. Hall's success in locked down, isolated housing (as opposed to Mr. Coonce). This failure violated *Strickland*.

260

While trial counsel for Mr. Coonce objected to this line of questioning on the grounds that the information "doesn't have anything to do specifically with Mr. Coonce" and was "extremely prejudicial," Mr. Coonce's counsel did not ask Mr. Bezy any questions about these incidents on redirect. Tr. 05/15/14 at 2830. Mr. Hall's trial counsel said only, "I wish I could evaporate for all of this, Judge. I'm afraid that I can't." Tr. 05/15/14 at 2831. After Mr. Bezy's testimony, the jury was left with the substantially misleading presentation elicited by Mr. Peterson's questions.

Mr. Peterson began his questioning about specific incidents of violence by asking Mr. Bezy about "Snarr and Garcia, Beaumont, Texas, you're familiar with that case?" Mr. Bezy responded that he was, and Mr. Peterson asked Mr. Bezy about some details of incident:

Q: They are being brought back from the SHU rec yard and they are both handcuffed?

A: Yes.

Q: Walking down a corridor?

A: Yes.

Q: They slip out of their handcuffs?

A: Yes.

Q: They have secreted on their person despite the fact that this is the jail within the jail two shanks or a shank each, correct?

A: I believe so.

Q: And then they turn around and they start stabbing the guard, correct?

A: Correct.

Q: The other gentleman slips out of his handcuffs, correct?

A: Correct.

Q: They had been handcuffed but they were able to slip out their handcuffs, correct?

A: Correct.

261

Q: Then they both start stabbing the guard, correct?

A: It's been awhile since I've seen it [the video of the incident], yes.

Q: Many, many times? Dozens of times?

A: Okay.

Q: Do you disagree with that?

A: No.

Q: You testified you saw the videotape?

A: It's been awhile. I'll take your word for it.

Q: You don't dispute it, do you?

A: No.

Q: They bring him down the hallway, they keep stabbing the guard again and again and again, and then they remove the keys from the guard, correct?

A: Correct.

Q: Then after that they go back to the cell while the other guards are pulling him off – pulling him off the hallway there and they open the cell and they pull out another inmate and they stab that inmate dozens and dozens of times, correct?

A: Correct.

Q: Despite the best efforts of BOP, two inmates at the SHU in the jail within the jail at Beaumont, Texas, were able to stab a guard multiple times and kill another inmate, yes?

A: Correct.

Tr. 05/15/14 at 2831-33.

Mr. Peterson omitted important information in his questioning of Mr. Bezy. He concealed that BOP staff who were escorting Mr. Snarr and Mr. Garcia at the time of the incident flouted BOP policies. Testimony at their trial established that "[b]oth prisoners were classified as 'three-man-hold' inmates, meaning they should have had three guards escorting them and only one inmate at a time." *See* Ken Fountain, *Man Recalls Stabbing Incident in Murder Trial Testimony*,

Beaumont Enterprise (May 4, 2010), https://www.beaumontenterprise.com/news/article/Man-recalls-stabbing-incident-in-murder-trial-731649.php. Despite these rules for how to safely escort Mr. Snarr and Mr. Garcia, at the time of the incident only one guard was escorting Mr. Garcia and simultaneously two guards were escorting Mr. Snarr down the same hallway. *Id.*

Thus, when Mr. Peterson questioned Mr. Bezy whether Mr. Snarr and Mr. Garcia were "able to stab a guard multiple times and kill another inmate," he omitted material information about what happened. Namely, the staff flouted three critical security protocols: (1) they escorted Mr. Snarr and Mr. Garcia at the same time, rather than separately; (2) only one officer escorted Mr. Garcia, rather than the required three officers; and (3) only two officers escorted Mr. Snarr, rather than the requisite three. If staff had followed BOP policy, Mr. Snarr and Mr. Garcia would have never been in the hallway at the same time. Moreover, there would have been twice as many officers present to react to and subdue the two prisoners. Indeed, had staff properly complied with BOP policies, the incident likely could have been avoided entirely.

Another example Mr. Peterson invoked was the attack on Louis Pepe, a BOP Corrections Officer at MCC New York, by Mamdouh Salim. As Mr. Peterson framed it: "High-security wing of a BOP facility, an inmate stabs a guard, plunges a comb in his eye . . . Despite the best efforts of BOP." Tr. 05/15/14 at 2837.

Again, this framing was substantially misleading because it omitted several key details. The BOP had received a warning from the FBI about escape plans in the unit where the perpetrator, Mr. Salim, was housed, which was reserved for terrorism suspects like Mr. Salim. *See Prison Guard Foiled Al Queda Jailbreak*, ABC News (Aug. 30, 2004), https://abcnews.go.com/WNT/Investigation/story?id=131641&page=1. Mr. Salim was "a founding member of Al Qaeda" awaiting trial on terrorism charges. *See* Benjamin Weiser,

*Reputed bin Laden Adviser Gets Life Term in Stabbing*, N.Y. Times (Aug. 31, 2010),

https://www.nytimes.com/2010/09/01/nyregion/01salim.html. As did the officers in the Snarr

and Garcia incident, Officer Pepe violated several security protocols leading up to his attack.

"Contrary to policy, Officer Pepe, who was the only staff member working on 10-South at the

time, solely escorted the inmate back to his cell. Inmates assigned to that unit require a minimum

of two staff for escort." Ex. 8 (Baird Dec.) ¶ 66. "While being escorted, the attacker was not

handcuffed, nor did he have leg irons, or a martin chain applied." And "[w]ithout requiring the

cellmate to submit to restraints, Officer Pepe opened the cell door" even though "[p]rior to

unlocking cell doors within all high security units, all inmates within the cell, must, at a

minimum, submit to hand restraints before the door is opened." *Id.* The attack occurred after

Officer Pepe opened the door without restraining Mr. Salim's cellmate, while Mr. Salim was also

unrestrained. *See* Phil Hirschkorn, *Bin Laden Aide Sentenced to 32 Years in Prison for Jail

Stabbing*, CNN (May 4, 2004),

https://edition.cnn.com/2004/LAW/05/03/attacks.prison.stabbing/index.html?iref=newssearch/.

Contrary to what the jury was told, the attack on Louis Pepe did not occur "despite the best

efforts of BOP," but rather because critical BOP-mandated security protocols were ignored.

Yet another example Mr. Peterson misleadingly presented was "the William and Rudy

Sablan murder" in which "two inmates kill a third inmate." Tr. 05/15/14 at 2838. Here again, Mr.

Peterson failed to mention crucial security lapses such as placing three men in a cell designed for

two, failing to respond when an alarm button was pushed in the cell, and allowing the inmates

access to homemade wine. *See Man Convicted of Killing Cellmate in Colorado*, NBC News

(Mar. 15, 2007), https://www.nbcnews.com/id/wbna17632753.

264

As Ms. Baird notes, "The prosecution brought up a number of examples of violent acts which occur in federal prisons; however, no context was provided for any of those examples." Ex. 8 (Baird Dec.) ¶ 67. "I believe had it been conveyed to the jury, they may have better understood why some violent incidents continue to occur within the BOP, are sometimes because staff take shortcuts and deviate from policy and not because the Agency has failed to incorporate viable security protocols." *Id.* The BOP's internal investigations following serious incidents "often conclude, staff deviated from standard policies and/or circumvented security procedures. These types of 'shortcuts', often initiated to save time, can have dire outcomes." *Id.*[103]

### A. The testimony elicited by the government regarding violence in BOP facilities was misleading.

The government carefully crafted its cross-examination of Mr. Bezy. By asking narrowly tailored questions about specific incidents at BOP facilities that omitted relevant facts and context, it elicited testimony that was substantially misleading. It gave jurors the false impression that each of the highlighted instances of prison violence occurred in spite of BOP's security protocols. In fact, the opposite was true: staff members had violated the very security protocols designed to prevent such incidents. The impact of these representations were both explicit and

---

[103] Mr. Peterson also misled the jury in his cross examination of Dr. Wisner. During the cross-examination, Mr. Peterson said, "And are you aware that group of disinterested individuals who have an incredible amount of correctional and mental health experience found that there was no negligence or no problems with the procedures in place when defendant Hall murdered with Mr. Coonce Victor Castro-Rodriguez? Were you aware of that?" Tr. 5/28/14 at 4860. Following Mr. Duchart's objection that the question was "wrong on so many levels" the government introduced the After-Action Report into evidence. *Id.* After introducing the report into evidence, neither Mr. Peterson, Mr. Duchardt, nor Dr. Wisner addressed the validity of Mr. Peterson's statement that the report was written by "disinterested" individuals (who were BOP employees).

Further, as Ms. Baird had noted, many deviations from policy are noted in the After-Action Report but they are incorrectly characterized as "Recommendations." Ex. 8 (Baird Dec.) ¶ 58. This is another example of Mr. Peterson presenting misleading information to the jury, in violation of *Napue*, and of Mr. Duchardt providing ineffective assistance by failing to counter the government's misleading information by working with an expert knowledgeable about BOP operations and eliciting clarifying testimony.

265

implicit. The government explicitly put forward facts that were misleading. Those facts implied a larger claim: Charles Hall could not safely be housed within BOP facilities and thus death was their only option. Both the implicit and explicit factual representations the government made to the jury in its questioning of Mr. Bezy were false.

The government's duty to correct false testimony is not limited to situations where a witness commits perjury, but extends to testimony that is "substantially misleading." *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974). The Supreme Court has long recognized due process violations centered on testimony that created false impressions or was misleading. *See, e.g., Napue*, 360 U.S. at 269; *Miller v. Pate*, 386 U.S. 1 (1967) (due process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence that it knows creates a false impression of a material fact); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (*Napue* doctrine applies to "misleading evidence important to the prosecution's case in chief" as well as to evidence that is simply false); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (finding a due process violation where witness testimony "taken as a whole" gave a "false impression"); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).

Like the Supreme Court, circuit courts have repeatedly recognized that *Napue* and *Giglio* encompass claims involving material testimony that is either misleading or creates a false impression. *See Drake v. Portuondo*, 553 F.3d 230, 243 (2d Cir. 2009) (*Napue* violation found where prosecution's question elicited "literal accuracy while conveying [a] false impression" about witness's qualifications); *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (finding *Napue* violation where prosecution elicited "technically accurate testimony" that was "probably true but surely misleading" and the jury was left with "mistaken impression"); *United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976) (*Napue* violation found where prosecution "allowed

266

a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness"); *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) ("Evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true."); *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) (due process violation does not require finding that witness committed perjury; "It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false.").

Thus, even when information presented to the jury is not strictly untrue, the focus is on "the extent to which the testimony misled the jury." *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008); *accord Smith*, 572 F.3d at 1333 (quoting *Alzate*, 47 F.3d at 1110) ("The *Giglio* rule applies to explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury while questioning a witness.")

Here, there is no question that the jury was misled by the Mr. Peterson's questioning of Mr. Bezy about BOP's ability to securely manage prisoners and prevent violent incidents in its facilities. Mr. Bezy had to answer truthfully when asked whether these incidents occurred and where. But Mr. Peterson's cross-examination created the false impression that such incidents were inevitable and that BOP was powerless to stop them. Indeed, in his questioning of Mr. Bezy, Mr. Peterson made factual representations to the jury that the incidents happened despite BOP's "best efforts." That was false: Incidents invoked by Mr. Peterson in his cross-examination of Mr. Bezy did not happen despite BOP's "best efforts," but rather as a result of staff members'

failure to follow best practices per BOP's security protocols. Through its selective questioning, the government misled the jury.[104]

### B. The government knew or should have known the testimony it elicited was misleading.

Mr. Hall need not demonstrate that the prosecutors who tried his case were personally aware of the misleading nature of the elicited testimony. The Supreme Court has held that the presentation of false evidence against a defendant violates due process even if the falsity was unknown to the prosecutor. *See Giglio*, 405 U.S. at 154. This is because the fundamental purpose of *Napue* and *Giglio* is not to punish prosecutors for the misdeeds of a witness, but rather to ensure that the jury is not misled by any falsehoods. *See, e.g.*, *United States v. Meinster*, 619 F.2d 1041, 1044 (4th Cir. 1980).

That said, it strains credulity that the government here did not know the testimony it elicited about violent incidents in BOP facilities was substantially misleading, and/or created a false impression for the jury. Each of the cases it invoked in its questioning of Mr. Bezy resulted in not only internal BOP investigations, but also federal criminal investigations and prosecutions. Indeed, DOJ attorneys prosecuted the individuals involved in the incidents, which occurred while they were in federal custody. Mr. Peterson, who conducted the cross examination, was assigned to the Capital Case Section responsible for the prosecution of these and other BOP homicides. It

---

[104] Mr. Hall's trial counsel was also ineffective for failing to rebut the aggravating factor of future dangerousness as well as failing to point out how the BOP's mismanagement contributed to Mr. Castro-Rodriguez's death, as discussed above. Trial counsel needed to show the jury why the incidents Mr. Peterson used as examples did not establish that Mr. Hall would be a future danger, such as by presenting evidence showing that these incidents occurred because of BOP policy failures and/or distinguishing Mr. Hall from the perpetrators of these crimes. This could have been accomplished through testimony of a BOP expert testifying for Mr. Hall and/or through cross-examination of Mr. Bezy. Trial counsel did neither, which is part of the overall failure to rebut the aggravating factor of future dangerousness and make clear that BOP mismanagement played a significant role in the homicide.

is inconceivable that Mr. Peterson himself knew the detailed facts he mentioned about these incidents, but knew nothing of the blatant violations of BOP protocol leading up to them. Thus, the government knew – or certainly *should* have known – about the relevant circumstances surrounding each incident. More specifically, the government knew or should have known that these violent incidents did not occur despite BOP's "best efforts" because in each incident, staff members failed to follow critical security protocols designed to prevent such incidents from occurring.

### C. The testimony was material.

"Claims arising under *Giglio v. United States* . . . are a type of *Brady* claim that have a different and more defense friendly measure of materiality." *Hammond v. Hall*, 586 F.3d 1289, 1306 n.4 (11th Cir. 2009). Under this type of claim, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Augurs*, 427 U.S. 97, 103 (1976). The "could have" standard requires a new trial unless the prosecution persuades the court that the misleading testimony was harmless beyond a reasonable doubt. *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). "This standard favors granting relief. It is shaped by the realization that 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" *Smith*, 572 F.3d at 1333-34 (quoting *Giglio*, 405 U.S. at 153).

There is no question that the misleading testimony here was material. One of the key aggravating factors alleged by the government, and found by the jury, was that Mr. Hall "presents a future danger" and "will commit criminal acts of violence that would constitute a continuing threat to the lives and safety of others" if allowed to serve a life sentence in the BOP.

Ex. 57 (Special Verdict Form) at 5. Indeed, the government repeatedly emphasized this point in its arguments to the jury:

> The fact that they are able to and do commit a murder while serving a prison sentence is, I would suggest to you, extraordinary. And that is extraordinary evidence that Defendant Coonce and to this aspect of it Defendant Hall are future dangers.

Tr. 05/30/14 at 5239.

> The fact that you commit a murder in prison is powerful evidence that you are a future danger. I ask you to consider that for Defendant Hall.

Tr. 05/30/14 at 5244.

In fact, this crime itself is the only action of Mr. Hall's that the government pointed to as evidence of future danger. Every other argument that Mr. Hall would constitute a future danger was based on something Mr. Hall said or threatened to do, not on something Mr. Hall actually did. Thus, the government's characterization of this crime was fundamental to its argument that Mr. Hall would be a future danger.

The government's questioning of Mr. Bezy was in service of this argument for a death sentence. It was designed to give the jury the false impression that, despite its "best efforts," the BOP would be powerless to prevent Mr. Hall from being a threat to the lives and safety of others in prison – just as it had been powerless to stop the attacks at USP Beaumont, MCC New York, and USP Florence (the places were the three incidences occurred). Additionally, this testimony carried the imprimatur of a former BOP warden and corrections expert when it was elicited through the questioning of Mr. Bezy. Had the jury known the relevant circumstances surrounding these other incidents, however, it would have wholly undermined the government's future dangerousness argument.

Indeed, in 2010 a U.S. District Court granted § 2255 relief to a federally death-sentenced prisoner precisely because the government presented "incomplete" testimony that "may have left

270

the jury with [a] mistaken impression" about the security restrictions that could be imposed on an inmate, and trial counsel failed to impeach the witness on those matters. Ex. 82 (Opinion in *Johnson v. United States*, 1:02-cv-06998, Dkt. No. 112 (N.D. Ill. Dec. 13, 2010)) at 5. In so holding, the court found that the probability that the misleading evidence (and trial counsel's failure to correct it) affected the sentence "is higher in this case than in some because the errors were relevant to the issue of future dangerousness." *Id.* So although "the Court recognize[d] the importance of the fact that the jury in Johnson's case found a number of aggravating factors" the court also found "that future dangerousness, and the government's ability to protect against it, is an especially important factor in death penalty cases." *Id.* Consequently, the misleading evidence about the BOP's ability to prevent violence was material.

Here, too, the government elicited testimony about incidents of violence that omitted information about the staff mistakes that led up to these incidents.[105] In omitting these facts, the jury was given the false impression that BOP had no means to prevent such incidents, and that they occurred despite compliance with existing security protocols. This, in turn, reinforced the alleged aggravating factor that Mr. Hall would be a future danger if allowed to live in BOP custody. Thus "any reasonable likelihood that the false testimony could have affected the judgment of the jury," *Augurs*, 427 U.S. at 103, has been proven and the government cannot prove that it was harmless beyond a reasonable doubt.

---

[105] In truth, "Castro-Rodriguez's murder was a perfect storm. It took a violent individual – Coonce – being inappropriately placed in a general population mental health wing. It took a victim with low cognitive abilities. Castro-Rodriguez was like a child. But it also took CO Logsdon's infrequent monitoring to make the homicide possible" and someone who knew all parties involved "will always think that without Wes Coonce on Unit 10-B, this homicide would never have occurred." Ex. 9 (Buckmaster Dec.) ¶¶ 13, 20. And, to add further context, Mr. Hall has not received a single disciplinary write-up since Mr. Castro-Rodriguez's death, either while awaiting trial or indeed in the decade since trial.

**Summary of claim:**

Prosecutors presented material testimony that created a false impression of facts in violation of Mr. Hall's rights to a fair trial. *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements that are untrue as of the government eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Smith v Dept. of Corrections*, 572 F.3d 1327, 1333-34 (11th Cir. 2009) (quoting *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir.1995)) ("The *Giglio* rule applies to 'explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury' while questioning a witness."). This is so even where the particular prosecutor does not know that the testimony being presented is false or misleading. *See Giglio*, 405 U.S. at 154. Indeed, the truthfulness of the process is of the utmost importance even when a specific prosecutor acts in good faith. *Id*. at 153.

In this case, the government called BOP psychologist Chad Brinkley to testify in the penalty phase about his interactions with Mr. Hall at the USMCFP Springfield on the day of the homicide. Dr. Brinkley testified about interactions with Mr. Hall immediately following the homicide. However, he failed to disclose that on the day of the homicide, earlier in the day, Mr. Hall asked both Drs. Brinkley and Gariety to privately meet. This meeting never occurred, and Mr. Castro-Rodriguez was killed later that evening. Ex. 80 (Gariety Dec.) ¶ 8. This evidence shows that Mr. Hall was seeking help from his mental health providers hours before the homicide, which is consistent with his pattern of self-reporting and reaching out for help because

he did not want to act on his feelings of anger and aggression. This evidence is powerful mitigating evidence. However, Dr. Brinkley's testimony created a false impression that his only contact with Mr. Hall on that day was after the homicide had already occurred. This is inaccurate and gave the jury a false impression.

The government's elicitation of this misleading, inaccurate, and prejudicial testimony violated Mr. Hall's constitutional due process rights and misled the jury that sentenced him to death. Under *Napue* and its progeny, a violation is established if (1) the testimony in question was misleading, (2) the government knew or should have known the testimony was misleading, and (3) the testimony was material. As set forth below, Mr. Hall meets all three requirements for relief.

**Discussion:**

In violation of the obligations imposed on prosecutors by *Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959); and their progeny, the government failed to disclose material, favorable evidence that was reasonably likely to impact the jury's decision about whether to convict Mr. Hall and especially about whether to sentence him to death. In particular, Dr. Brinkley created — and the government failed to correct — the false impression that Dr. Brinkley's only contact with Mr. Hall on January 26, 2010, was after the homicide. In fact, Mr. Hall sought him out and asked for mental health care hours before the homicide.

**A. Dr. Chad Brinkley's testimony, uncorrected by the government, about his interactions with Mr. Hall's on the day of the homicide was misleading.**

The government elicited testimony at trial from Dr. Chad Brinkley, a BOP psychologist who treated Mr. Hall from approximately December 2009 until November 2011. Tr. 05/02/2015 at 1129, 1134. Dr. Brinkley was asked about his interactions with Mr. Hall on "that day,"

January 26, 2010, but only testified about interactions with Mr. Hall in the evening, *after* the homicide occurred. *Id.* at 1124.

Dr. Patrick Gariety was a BOP psychiatrist who also treated Mr. Hall at USMCFP. Ex. 80 (Gariety Dec.) ¶ 1. Dr. Gariety specifically recalls that on the day of the homicide, Mr. Hall approached him and Dr. Brinkley and asked to speak with them. *Id.* ¶ 8. Drs. Gariety and Brinkley asked Mr. Hall if it was urgent, and Mr. Hall said no. Dr. Gariety told Mr. Hall they could speak that afternoon. However, neither Dr. Gariety nor Dr. Brinkley spoke with Mr. Hall again before the homicide. *Id.*

Throughout his time in prison, Mr. Hall consistently sought mental health resources when he was experiencing anger or homicidal ideations. He previously had asked to talk to someone or change his medication because he was having thoughts of harming others and "I don't want to have them." Ex. 67 (Hall BOP Recs.) at 1. On January 11, 2010, shortly before the homicide, he told a staff psychologist that it would be difficult for him to live in an open unit because he had spilled feces onto his bed and inmates from the mental health unit were teasing him. *Id.* at 2. Although the psychiatrist "reassured the inmate that the treatment team would not transfer him to a hostile housing situation," after he returned from the hospital where he had surgery on January 12, 2010, he was placed in an open mental health unit. He was on that open mental health unit when he specifically told Drs. Gariety and Brinkley that he needed to speak privately to a mental health professional.

Dr. Gariety and Dr. Brinkley worked as a team, rounding on patients together. Ex. 80 (Gariety Dec.) ¶ 8. Dr. Gariety prioritized Chuck as a patient, visiting him almost daily. *Id.* ¶ 4. Dr. Brinkley also visited Chuck most days. Tr. 05/02/2015 at 1128-29. This is because Drs. Gariety and Brinkley both knew Chuck had severe complications due to Crohn's and his ostomy

274

and believed they were historically linked to his suicide attempts. Ex. 80 (Gariety Dec.) ¶ 4; Tr. 05/02/14 at 1130, 1137. Dr. Gariety also knew that Chuck recently had suffered a Crohn's flare that required out-patient surgery. Ex. 80 (Gariety Dec.) ¶ 4. That Chuck minimized the urgency of his mental health needs is unsurprising, because (1) he suffers from structural brain abnormalities, (2) he is a sexual abuse survivor, (3) he suffers from shame around his ostomy and sexual abuse history, and (4) this contact occurred in a public setting with other inmates around.[106]

This evidence is mitigating precisely because it demonstrates Mr. Hall sought help. Although he reached out, he did not get the help he needed on that day. Adding to the mitigating value of this evidence, Mr. Hall asked to speak to Dr. Gariety and Dr. Brinkley after having already told BOP staff that living in an open mental health unit would be difficult for him. That is, Mr. Hall repeatedly tried to avoid being in a situation where he might impulsively act out or his sense of shame would be triggered.

Dr. Brinkley's testimony was misleading to the jury, as he testified extensively about contact with Mr. Hall on the evening of January 26, 2010, but did not disclose to the defense or to the jury that Mr. Hall sought out his mental health treatment providers for a private meeting just hours before the homicide.

---

[106] Chuck's brain is not a normal brain, so his behavior can deviate from what a typical person would do, especially as to interpreting cues from others. *See* Ex. 5 (Report of Dr. Israelian) at 80. In addition, "childhood trauma also results in changes in how someone interacts with the health care system in later life and this can, in turn, affect the timeliness and effectiveness of the care that is provided to them." Ex. 7 (Steinhart Rpt.) at 4. Sexual abuse survivors aren't good advocates for themselves with health care providers. Other inmates, from whom he feared shame and repercussions, were around when he asked to see his mental health provider.

275

**B. The government knew or should have known the testimony it elicited was misleading.**

Even where the prosecutors are not personally aware of the misleading nature of their elicited testimony, the presentation of false evidence against a defendant violates due process. *See Giglio*, 405 U.S. at 153-54. The purpose of *Napue* and *Giglio* is not to punish prosecutors for the misdeeds of a witness, but rather to ensure that the jury is not fed false information. *See, e.g.*, *United States v. Meinster*, 619 F. 2d 1041, 1044 (4th Cir. 1980).

The testimony at question here was the testimony of a BOP employee in the prosecution of a BOP homicide. If the government did not actually know that Dr. Brinkley's testimony left a false impression with the jury, they should have. The prosecution has a duty to discover favorable information. *See, e.g.*, *Giglio*, 405 U.S. at 152; *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (holding that prosecutors have an express "duty to learn of any favorable evidence known to others acting on the government's behalf in the case").

The pattern of misconduct described in Claim 3 above, and incorporated here by reference, calls into question the government's credibility in pursuing information favorable to Mr. Hall from Dr. Brinkley.[107] When he was on the stand, Dr. Brinkley was a federal government employee asked about his actions on January 26, 2010: "On that day where were you located? Where were you at that day?" Although the question asked broadly about his actions on January 26, Dr. Brinkley's response discussed only what he had done after the homicide. He said, "I was at home in the evening when I received a page from the institution…. That there had been a homicide at the institution." Tr. 05/02/14 at 1124.

_____

[107] Undersigned counsel attempted to contact Dr. Chad Brinkley, but he has not returned the voicemails left on his phone.

276

The prosecutor asked a number of follow up questions, such as, "Where did you meet with Mr. Hall on January 26, 2010?" "And did you meet with him after he had already met with federal Bureau of Prisons investigator?" "Did you prepare a report concerning your contact with him on January 26, 2010?" Tr. 05/02/2015 at 1126-27. Any of these questions presented opportunities for Dr. Brinkley to explain that his interactions with Mr. Hall following the homicide were not the only interactions he had with Mr. Hall on January 26, 2010. Instead, he answered each question only with interactions with Mr. Hall following the homicide. Dr. Brinkley failed to tell the jury that he had worked at the institution earlier in the day, that he actually seen Mr. Hall prior to the homicide, and that Mr. Hall asked for additional mental health care at that time. *See* Ex. 80 (Gariety Dec.) ¶ 8. As such, his testimony left the jury with the false impression that Dr. Brinkley *only* interacted with Mr. Hall on January 26, 2010, after the occurrence of the homicide.

### C. The testimony was material.

Mr. Hall is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The "could have" standard requires a new trial unless the prosecution persuades the court that the misleading testimony was harmless beyond a reasonable doubt. *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). "This standard favors granting relief. It is shaped by the realization that 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" *Smith v. Sec'y, Dep't of Corr.,* 572 F.3d 1327, 1333–34 (11th Cir. 2009) (quoting *Giglio*, 405 U.S. at 153).

There can be no question that the misleading testimony here was material. Dr. Gariety's declaration explains that he and Dr. Brinkley encountered Mr. Hall during rounds on January 26, 2010, prior to the homicide. Evidence that Mr. Hall was reaching out for help from Drs. Brinkley and Gariety hours prior to the homicide was not only suppressed, but the jury was left with the false impression that Dr. Brinkley had no prior contact with Mr. Hall on that day. In fact, Mr. Hall, who was on high dosages of prednisone, which causes irritability and mania; who survived silently survived serial sexual abuse when he was thirteen; and who had a history of warning mental health professionals if he felt suicidal or homicidal, sought out his treatment providers asking for help. Linking Mr. Hall's history to this specific anecdote the day of the homicide creates a reasonable probability that, if presented with this evidence, one juror would have voted for a life sentence, and the outcome of the proceeding would have been different.

As previously mentioned in the prejudice analysis in Claim 1: Ineffective Assistance of Counsel, jurors struggled to reach a decision as to an appropriate sentence for Mr. Hall. Just two hours prior to returning a death sentence for Mr. Hall, this same jury was hopelessly deadlocked and 100% certain it could not reach a verdict with respect to Mr. Hall. As such, there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.[108]

---

[108] Mr. Hall incorporates the arguments from prejudice in Claim 1 here, which further demonstrate that relief should be granted for the government's *Napue* violation.

**CLAIM 8: IMPROPER SUPPLEMENTAL INSTRUCTION (*ALLEN* CHARGE)**

**Summary of claim:**

The jurors notified the court that they were "100% certain[]" they could not reach a unanimous verdict as to Mr. Hall's sentence. Dkt. No. 809 at 3; Tr. 06/02/14 at 5358. This note should have resulted in a life sentence. The Federal Death Penalty Act states that if the jurors are unable to reach a unanimous decision, the defendant must be sentenced to life imprisonment. The jury instructions made clear that there were three possible outcomes for each defendant: (1) a unanimous decision sentencing him to death; (2) a unanimous decision sentencing him to life; or (3) not reaching a unanimous decision, which would result in a life sentence. As to Mr. Hall, the jurors selected Option 3, a life sentence due to non-unanimity. Contrary to the statute and jury instructions, the trial court erroneously instructed the jurors to deliberate further. Perceiving this as a statement that a death sentence was the only acceptable option, *see* Ex. 53 (James Dec.) ¶ 7, the jury quickly sentenced Mr. Hall to death. The court's supplemental instruction was an improper influence on the jury.

**Discussion:**

Under the Federal Death Penalty Act, if a jury is unable to reach a unanimous decision, the judge must impose a sentence of life imprisonment. *See Jones v. United States*, 527 U.S. 373, 381 (1999). The jurors tasked with deciding whether to sentence Mr. Hall to death were instructed accordingly:

> Under Counts I and II as to Defendant Coonce, and under Count I as to Defendant Hall, *if you cannot unanimously agree whether the Defendants should be sentenced to death or life imprisonment without the possibility of release, the court will sentence the Defendants to life*

*imprisonment* without the possibility of release. There is no parole in the federal system.

Again, you are reminded that you are to make a separate determination for each defendant and for each count for which he is charged.

Dkt. No. 807 at 42 (Jury Instruction 19) (emphasis added).

After receiving this instruction and beginning deliberations, the jurors asked two

questions, including whether they would be polled if they could not reach a unanimous decision.

Several hours later, the jurors informed the court that, although they had reached a unanimous

decision on Mr. Coonce's sentence, they felt "with 100 percent certainty that we are unable to

reach a unanimous decision in regards to Defendant Hall":

**United States of America v. Wesley Paul Coonce, Jr.; Charles Michael Hall**
10-03029-01/02-CR-S-GAF

**JURY'S QUESTION OR REQUEST**

The jury has the following question:

*We have reached a decision in regards to Defendant Coonce. But I feel with 100 % certainty that we are unable to reach a unanimous decision in regards to �" Defendant Hall.*

Dkt. No. 809 at 3; Tr. 06/02/14 at 5358.

Because the jurors had been instructed that, if they could not unanimously agree on a

sentence for Mr. Hall, "the court *will sentence*" Mr. Hall to life imprisonment, *see* Dkt. No. 807

at 42 (emphasis added), when the jurors informed the court that they were "100% certain[]" that

they were "unable to reach a unanimous decision in regards to Defendant Hall," *see* Tr. 06/02/14

280

at 5358, they were, in effect, informing the court it should sentence Mr. Hall to life imprisonment. *See, e.g.*, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (jurors are presumed to understand and follow the court's instructions). The only response to their note that the jurors could have expected was for the court to sentence Mr. Hall to life imprisonment.

Instead, the court told the jurors, "You should continue your deliberations and try to reach unanimous verdicts." Dkt. 809 at 3. Mr. Hall's trial counsel objected, though not forcefully, pointing out that "it is a viable though not necessarily preferable option for them to do, for them to not reach a verdict and the statute takes care of that." Tr. 06/02/14 at 5360. But the issue here was not that it was a viable option for the jurors to not unanimously decide on a sentence. The issue was that, pursuant to Instruction 19, the jurors understood that telling the court they could not reach a unanimous decision meant Mr. Hall would be sentenced to life imprisonment. That is, the jurors *had* reached a decision. In their jury instructions, they had been given three options, as required by the Federal Death Penalty Act: (1) a unanimous decision sentencing him to death; (2) a unanimous decision sentencing him to life; or (3) not reaching a unanimous decision, which would result in a life sentence. By failing to come to unanimous decision, they effectively chose Option 3.

By telling them to deliberate further, the court effectively rejected their decision, communicating that Option 3 was not a valid option, and further suggesting that the only truly acceptable option was Option 1, a death sentence.

When they came back with a decision less than two hours later, in response to the verdict form's question whether they had determined by a unanimous vote that death should be imposed, the jurors checked both "YES" and "NO." The checkmark by "NO" was crossed out:

### A. Death Sentence

We determine, by unanimous vote, that a sentence of death shall be imposed on Defendant Hall.

YES ✓

NO ~~~~

If you answer "YES," the foreperson must sign here, and you must then proceed to Section VII. If you answer "NO," the foreperson must sign, and you must then proceed to Section VI(B). *Ken Polhieg*

~~Ken Polhieg~~

Foreperson

Date: 6/2, 2014

Dkt. No. 812 at 10. The jurors' having checked "NO" on the verdict form underscores that, before the court instructed them to deliberate further, they had reached a final decision. The jurors had determined that they could not reach a unanimous decision, accepted that their disagreement would result in a life sentence, and filled out the verdict form accordingly.

Under these circumstances, the judge's actions "intruded on the jury's deliberative process and coerced the verdict." *Rinehart v. Wedge*, 943 F.2d 1158, 1160 (9th Cir. 1991) (holding that, ruling on a motion for a new trial, "the district court could properly find that the process by which it recalculated the general verdict and polled the jury to ratify the recalculated verdict was flawed. Therefore, it was permitted to find later that it intruded on the jury's deliberative process and coerced the verdict."); *see also Rushen v. Spain*, 464 U.S. 114, 119 (1983) (holding that in a habeas case, a federal court may overturn a conviction for prejudice resulting from ex parte communications between the judge and jurors that relates to some aspect of the trial and that a post-trial hearing can determine prejudice). That is to say, in some cases, "[t]he judge's comments to the jury were an improper influence," and in those cases, "[p]ursuant

282

to Rule 606(b), a juror may testify to the existence of an outside influence that was improperly brought to bear upon the jury." *Rinehart*, 943 F.3d at 1160.

At least one juror who sentenced Mr. Hall to death understood the judge's response to their note to mean that a death sentence was the only acceptable outcome. Juror Dale James explains, "[w]hen the jury sent a note to the judge saying that we couldn't reach a penalty phase decision, the judge's response made me think that he would not accept a hung jury or life sentence. I felt like a death sentence was the only option the judge would accept." Ex. 53 (James Dec.) ¶ 7. Because "[t]he judge's comments to the jury were an improper influence . . . [p]ursuant to Rule 606(b)," Mr. James "may testify to the existence of an outside influence that was improperly brought to bear upon the jury." *Rinehart*, 943 F.3d at 1160. And Mr. James' report that the judge's instruction made him feel that "a death sentence was the only option the judge would accept" explains how, less than two hours later after being "100% certain[]" they could not reach a unanimous decision, the jurors reported a unanimous decision to the court.

When this issue was raised on direct appeal, the Eighth Circuit, based on the limited record before it, felt that "nothing here raises a red flag that there may have been coercion." *United States v. Hall*, 945 F.3d 1035, 1048 (8th Cir. 2019). Now, however, a juror has offered admissible evidence that he "felt like a death sentence was the only option the judge would accept." Ex. 53 (James Dec.) ¶ 7. This new evidence changes the picture. It makes clear that the judge's rejection of the jurors' decision was an improper influence on the jury.

The prejudice from this improper influence is clear. The jury had a reached a decision that, according to the instructions they had received, should have been final. If the judge had accepted their decision, Mr. Hall would have been sentenced to life imprisonment. But the judge rejected their decision, and in doing so, made the jury feel like a death sentence was the only

283

outcome the judge would accept. Only then did the jury sentence Mr. Hall to death. But for the judge rejecting the jury's decision to sentence Mr. Hall to life based on inability to reach unanimity, Mr. Hall would have been sentenced to life imprisonment.

Moreover, the jury's deadlock is particularly noteworthy because the jurors did not hear many of the most important facts about Mr. Hall's life. The jurors were not told about the structural abnormalities to his brain or that he was sexually abused as a thirteen-year-old boy. The jury did not hear from an expert in prison management how the BOP made serious missteps in classification and supervision of Mr. Hall, Mr. Coonce, and Mr. Castro-Rodrigez that contributed to the homicide. Nor did the jury hear from an expert in prison management about how Mr. Hall could be safely managed to avoid any risk of future danger. Despite lacking important mitigating information, the jury sought to sentence Mr. Hall to life imprisonment.

The judge's rejection of the jury's decision to sentence Mr. Hall to life imprisonment was prejudicial. The jury tried to sentence Mr. Hall to life, emphasizing and compounding the prejudicial impact of trial counsel's other errors.

284

# CLAIM 9: THE FEDERAL DEATH PENALTY IS UNCONSTITUTIONAL

## Summary of claim:

The federal death penalty is unconstitutional because it is used arbitrarily. Mr. Hall's case perfectly exemplifies the arbitrary application of the federal death penalty. Mr. Hall received a sentence of death not because he committed the worst crime, but because of arbitrary factors, like being appointed counsel who failed to conduct an adequate life history investigation.

## Discussion:

The federal death penalty has been used in a cruel, arbitrary, and capricious manner. The arbitrariness of the federal death penalty violates the Eighth Amendment's ban on cruel and unusual punishment. And the arbitrary use of the federal death penalty in this case, in particular, violates the Eighth Amendment's ban on cruel and unusual punishment. Consequently, the federal death penalty is unconstitutional, both generally and in its application in this case.

The Eighth Amendment prohibits "cruel and unusual punishments" in order "to protect the dignity of society itself from the barbarity of exacting mindless vengeance." *Ford v. Wainwright*, 477 U.S. 399, 410 (1986). The terms "cruel and unusual" draw their "meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). "[D]ecency, in its essence, presumes respect for the individual and thus moderation or restraint in the application of capital punishment." *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008). The death penalty cannot be imposed under conditions creating "a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion).

Under the Federal Death Penalty Act (FDPA), which was passed in 1994, there were three executions before 2004 and none between 2004 and 2020. *See* Lee Kovarsky, *The Trump Executions*, 100 Tex. L. Rev. 621, 630 & n.69 (2021); *see also, e.g.*, Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 370 (1999); *United States v. Higgs*, 141 S. Ct. 645, 647 (2021) (Sotomayor, J., dissenting). During a seven-month period between July 2020 and January 2021, the federal government executed thirteen people. *See* Elizbeth Bruenig, *The Government Has Not Explained How These 13 People Were Selected to Die*, New York Times (Feb 18, 2021), https://www.nytimes.com/2021/02/18/opinion/federal-death-penalty.html.

The government's process for selecting people for execution was secret. *Id.*; Kovarsky, 100 Tex. L. Rev. at 634-36 (the first five people executed by the Trump administration were individually selected based on criteria that Attorney General William Barr set and there was no discernable pattern in who was subsequently chosen for execution). Later, Mr. Barr said that for an inmate to be selected for execution, their guilt had to be certain and the victims uniquely vulnerable, though it is far from clear that all thirteen people executed by the Trump administration met those criteria. *See* Michael Tarm, *Fuller Picture Emerges of the 13 Federal Executions at the End of the Trump Administration*, Associated Press (Oct. 3, 2023), https://apnews.com/article/trump-executions-biden-death-penalty-brandon-bernard-c1b26807c5c40b337d14485c3d6df2de.

Indeed, interviews with people who communicated with President Trump during the execution spree make clear that even the president did not agree that all thirteen people his administration executed deserved to die: "Fresh details have emerged since the executions, including from [Alan] Dershowitz, who spoke recently to The Associated Press. The fuller

286

picture reveals that officials cut corners and relied on a pliant Supreme Court to get the executions done, even when some – including Trump himself, in [Brandon] Bernard's case – agreed that there might be valid reasons not to proceed with them all." *Id.* In her dissent in that case, Justice Sotomayor noted "that whether prosecutors exaggerated his gang status knowing he held the lowest rank deserved more scrutiny." *Id.* Lawyers for Mr. Bernard and his co-defendant had argued that "prosecutors also mischaracterized the Black defendants to a nearly all-white jury as gang thugs." *Id.*

The Trump administration's execution spree is just one example of how the federal death penalty has been applied arbitrarily. In addition to arbitrarily selecting who to execute, the government has arbitrarily selected who to pursue the death penalty against. Homicides in BOP facilities exemplify the arbitrariness of who the government seeks to kill. In the vast majority of cases where someone commits a homicide within the BOP, the government does not pursue the death penalty. There is no discernable principle for determining when the government seeks the death penalty for killings within BOP facilities and when it does not, and there have been allegations of misconduct and mismanagement against the division of the DOJ that handles case selection. *See* Michael Tarm, *How DOJ Made Different Death Penalty Decisions in the Pittsburgh Synagogue and Texas Mall Massacres*, Associated Press (July 14, 2023), https://apnews.com/article/death-penalty-capital-section-garland-bowers-crusius-27d61a947178e2a6e505c97bcb55f78a.

Perhaps most troublingly, the quality of defense lawyer has been identified as a key factor – if not the key factor – in who gets sentenced to death. *See, e.g.*, Equal Justice Initiative, *Death Penalty: Inadequate Counsel*, https://eji.org/issues/death-penalty/; Stephen B. Bright,

287

*Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 Yale L. J. 1835, 1837 (1994).

Of the thirteen individuals the Trump administration executed, two were represented at trial by Mr. Hall's trial attorney, Mr. Duchardt. No trial lawyer has had more clients sent to federal death row than Mr. Duchardt. David Rose, *Death Row: The Lawyer who Keeps Losing*, The Guardian (Nov. 24, 2016), https://www.theguardian.com/world/2016/nov/24/death-row-the-lawyer-who-keeps-losing. Mr. Hall's initial lead trial counsel, Mr. Johnson, did not advocate for his client to the DOJ committee that helps decide whether to pursue the death penalty, instead telling them Mr. Hall wanted the death penalty.

The federal death penalty is applied arbitrarily. Mr. Hall's case exemplifies its arbitrariness. The facts of the crime Mr. Hall committed are not more egregious than crimes for which people have been spared the death penalty. Mr. Hall's history is largely nonviolent. Mr. Hall is mentally ill, physically sick, and has not proven to be difficult for BOP to house safely since the homicide. In fact, Mr. Hall has zero conduct violations since the homicide. Unfortunately for Mr. Hall, "[w]hether a defendant will be sentenced to death typically depends on the quality of his legal team more than any other factor." *See* Equal Justice Initiative, *Death Penalty: Inadequate Counsel*. "The process of sorting out who is most deserving of society's ultimate punishment does not work when the most fundamental component of the adversary system, competent representation by counsel, is missing," as it was in Mr. Hall's case. Bright, 103 Yale L. J. at 1837. Mr. Hall received a death sentence because he was appointed counsel and tried by an arbitrary system that reliably results in death sentences for people who were poorly represented, not for people who committed the worst crimes.

**CLAIM 10: CUMULATIVE ERROR**

Chuck's conviction and sentence of death violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because of the cumulative impact of the errors that occurred throughout his capital trial. *Chambers v. Mississippi*, 410 U.S. 284 (1973), held that "the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). The cumulative impact of multiple errors may violate due process, even when no individual error rises to the level of a constitutional violation that would warrant habeas relief. *Id.* "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive.'" *Id.* at 928 (quoting *Chambers*, 410 U.S. at 294.)

Chuck has identified numerous errors that occurred during the guilt and penalty phases of his trial, including in Claim 1 the failure of trial counsel to conduct an adequate life history investigation and inform his jury of the fact of his learning disability diagnosis, the impact that had, the failure of the schools or his parents to provide appropriate accommodations and instead sending him to a school where he would be a victim of repeated sexual trauma. Trial counsel had clues, records and red flags he should have heeded to guide his investigation. Trial counsel additionally failed to explain Chuck's abnormal brain. Trial counsel failed to use numerous relevant records and facts with his own experts or cross examine the government experts. Trial counsel erred by failing to demonstrate the BOP's multiple errors contributing to the homicide. The jury was left without an understanding of how the BOP could safely manage Mr. Hall for the remainder of his life. Trial counsel was ineffective for failing to rebut aggravating factors. The jury was deprived of an understanding of Chuck's daily struggles with an aggressive case of

289

Crohn's disease. Trial counsel erred in their failure to advocate against the seeking of the death penalty. Trial counsel ineffectively acquiesced to a joint penalty phase with Chuck's more dangerous co-defendant. Trial counsel erred by allowing many penalty phase witnesses to testify by video.

As set out in Claim 2, the jury was deprived of the ability to consider the involuntary intoxication defense. Claim 3 explains that trial counsel erred in jury selection, failing to adequately question jurors to understand if they could fairly consider mitigation and impose a life sentence and by failing to object to the prosecutor's sex-based strikes. As set out in Claim 4, trial counsel operated under a conflict of interest by hiring an accused pedophile as the defense psychiatrist in the case.

Claims 5-7 set out various government misconduct claims that prevented the jury from hearing relevant mitigating evidence, including that Chuck asked to see his mental health providers just hours before the homicide. Additionally, the government failed to disclose key facts about prior attacks in BOP facilities, leaving the jury with the false impression that the BOP was without recourse to prevent future violence in prisons without sentencing Chuck to death.

Finally, as set out in Claim 8, the trial court improperly forced the jury to continue deliberations after they indicated that they were one hundred precent certain they could not unanimously impose the death penalty on Chuck. And as set out in Claim 9, due to its arbitrariness, the federal death penalty it is unconstitutional.

Each of these claims merits relief individually. But the cumulative impact of these combined errors violated Chuck's rights to due process, a fair trial, the right to confront the evidence against him, a fair and impartial jury, and a fair and reliable guilt and penalty determination. The errors committed here are prejudicial and material.

Because Chuck's rights under the Fifth, Sixth, and Eighth Amendments were violated, and the error was not harmless, this Court must vacate his convictions and death sentence.

## V. INCORPORATION OF RECORD

Charles Hall incorporates the full and complete court record from his trial and appeal. Mr. Hall incorporates the record before the Western District of Missouri in this matter, including all documents, transcripts, exhibits, orders and filings relating to the co-defendant. Mr. Hall incorporates the record before the Eighth Circuit Court of Appeals, including the briefing, pleadings, motions, exhibits, transcripts, orders, and other documents on file or lodged with the Court.

Mr. Hall also incorporates the exhibits that accompany this Motion.

# VI. PRAYER FOR RELIEF

WHEREFORE, Charles Hall prays that this Court:

1.      Authorize discovery under Rule 6 of the Rules Governing Section 2255 Proceedings, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the practice and principles of law, including, but not limited to:  depositions, requests for production, requests to admit, interrogatories, and subpoenas;

2.      Require the Government to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings;

3.      Permit Mr. Hall to file a Reply to the Government's Answer, responding to any affirmative defenses raised by the Answer;

4.      Permit Mr. Hall to amend this Motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion;

5.      Conduct an evidentiary hearing to resolve any factual disputes raised by the Government's Answer to this Motion, or by Mr. Hall's Reply to any affirmatie defenses raised by the Government;

6.      Permit Mr. Hall to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

7.      Permit oral argument as appropriate and required;

8.      Stay Mr. Hall's execution pending final disposition of this Motion;

9.      Grant the Motion and vacate Mr. Hall's convictions and/or sentence and order than appropriate retrial and/or sentencing hearings be conducted; and

10.     Grant such further and additional relief as may be just and proper.

293

Respectfully Submitted,

 /s/ Angela S. Elleman
Angela S. Elleman
Indiana Federal Community Defenders
Capital § 2255 Unit
111 Monument Circle
Suite 3200
Indianapolis, IN 46204
Phone: 317-383-3520
Email: angie_elleman@fd.org

 /s/ Keith O'Connor
Keith O'Connor
Law Office of Keith O'Connor
P.O. Box 22728
Kansas City, MO 64113
Phone: 816-225-7771
Email: keith@keithpoc.com

 /s/ Florence Italia Patti
Florence Italia Patti
Indiana Federal Community Defenders
Capital § 2255 Unit
111 Monument Circle
Suite 3200
Indianapolis, IN 46204
Phone: 317-383-3520
Email: italia_patti@fd.org

294

**Certificate of Service**

I hereby certify that on April 29, 2024, the foregoing was served by this Court's electronic filing system.

/s/ Angela S. Elleman

Angela S. Elleman

295

## UNITED STATED DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

CHARLES MICHAEL HALL,           )
                                )
    Movant,  )    Case No. 4:21-CV-08001-BCW
                                )
V.                              )
                                )
UNITED STATES OF AMERICA,        )
                                )
    Respondent.  )
_____ )

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is the movant in the above action, that he has reviewed the claims in the above pleading and that the information contained therein is true and correct to the best of his knowledge and he authorizes counsel to file this Motion.

Charles Michael Hall

Date:

Location:   Terre Haute, IN