*Howard R. Fradkin, Ph.D.*
*Consulting Psychologist*

314 King Avenue
Columbus, OH 43201
614-578-8887
Howardfradkin@me.com

*Ohio Board of Psychology License #3237
*Ohio Licensed Independent Chemical Dependency
Counselor and Certified Supervisor, #933439

*United States of America v. Charles Hall Report*

## I.     INTRODUCTION.

1. I am writing this report as a counseling psychologist and expert in Trauma Psychology who was hired by the legal team representing Charles Hall in capital post-conviction proceedings. I was asked specifically to review relevant records and conduct a trauma-informed interview with Charles Hall (hereafter referred to as "Chuck") about the sexual abuse he had reported he had experienced while going to school at Shaker Mountain School.

## II.     EXPERT QUALIFICATIONS.

2. I, Howard Fradkin, Ph.D., LICDC-CS, have been licensed as a psychologist since 1982 by the State of Ohio, and have been licensed as a Licensed Independent Chemical Dependency Counselor since 2005 by the State of Ohio.

3. I have provided psychological psychotherapy since 1979 to people who had experienced sexual trauma, providing me with over 42 years of clinical experience.  I retired from private clinical practice in December 2017. Before my retirement, for at least 20 years, more than

IFCD 00027557

50% of my clients were survivors of sexual trauma. Of those, the large majority were male survivors, with a minority being female survivors of sexual trauma. Over the course of my career, it is my best estimate that I have provided psychotherapy and psychological interventions to more than 1,000 male survivors of sexual trauma and over 200 female survivors utilizing individual therapy, group therapy, and weekend therapeutic retreats.

4. I co-founded the organization, The National Organization on Male Sexual Victimization (NOMSV), in 1985, which is now known as Malesurvivor: The National Organization Against Male Sexual Victimization.  I served on the board of NOMSV for six years, including a term as President.  I served as an Advisory Board Member of Malesurvivor from 2001-2017 and rejoined the Advisory Board in 2019. I served as the Chairperson of the Malesurvivor Weekends of Recovery program from 2001-2010 and served as the Co-Chairperson from 2011-2016.  During this time, more than 1500 male survivors participated in the program.  The Weekends of Recovery program is now housed at menhealing.com, where I serve as Facilitator Emeritus and also consult with a prison education program within MenHealing, Healing Outreach for Men Everywhere (HOME).

5. I have provided professional training to more than 2,000 colleagues about male sexual trauma on numerous occasions throughout the United States, including providing the Keynote Address to the Malesurvivor International Conference in New York in 2010. In 2012, I was selected by Penn State University to provide professional training to their entire counseling staff who provide services in their more than 20 campuses after the serial abuses done to boys in a charity led by Penn State Coach Jerry Sandusky were revealed.  In November 2011, I appeared on Dr. Phil to talk about the Penn State scandal.  From 2014-2017, I also trained over 2,000 military personnel at all levels of the hierarchy.

6. I have worked as a presenter with Training for the Mind, an Oregon-based training organization from 2016-2018, co-presenting a three-part course on Men and Trauma for seven different training sessions. I taught about Adverse Childhood Experience (ACE's) research, how to assess for trauma in a trauma-informed way, and how to help trauma survivors heal. I have received several professional awards for my work with survivors of sexual trauma.

7. I am a well-respected expert for national media audiences. I was selected to be the expert for *The Oprah Winfrey Show's "200 Men",* which aired on November 5 and 12, 2010. I also appeared as an expert on the 2019 Oprah show, *"After Neverland",* the story of two men sexually abused by Michael Jackson. I have appeared on many other national and local TV and radio shows to educate the public about the impact of sexual victimization on boys and men.

8. I am the author of *Joining Forces: Empowering Male Survivors To Thrive,* published by Hay House in November 2012. It has been highly reviewed by the leading clinical professionals in the field and many male survivors. It is a self-help book targeted to male survivors of sexual abuse. I co-authored two chapters in two guides to providing therapeutic treatment for male survivors (Gartner, 2018). These books, *Understanding The Sexual Betrayal Of Boys And Men: The Trauma Of Sexual Abuse*, and *Healing Sexually Betrayed Men And Boys: Treatment For Sexual Abuse, Assault, And Trauma* were edited by the leading expert in the field of male sexual victimization, Dr. Richard Gartner.

9. In addition to teaching, I have consulted as an expert trauma psychologist in capital cases in Ohio. These include seven cases where I have been certified as an expert in Ohio from 2013-2022; in addition, I have provided evaluations, affidavits, and reports on 20 additional cases in Ohio, Pennsylvania, Hawaii, Alabama, South Carolina, and Oklahoma. Every time I have been offered in court as an expert, I have been qualified by the Court as an expert trauma psychologist.

10. My ongoing continuing education has included attending courses on how to interview traumatized individuals using compassionate, trauma-informed, and sensory-based approaches, the use of PTSD measurement tools, and other relevant topics to my expertise.

## III. SOURCES OF INFORMATION AND METHODS OF EVALUATION

### A. Collateral records and testimony reviewed:

- Dorothy Hall Penalty Phase transcript

- Charles Hall, Sr. Penalty phase transcript

- School records

- Maine Adoption Records

- Wisner Psychiatric Eval of Hall Feb 9, 2014

- Wisner Addendum

- Dietz report 4/30/14

- Test results of Dr. Marlyne Israelian: Beck Depression Inventory and Beck Anxiety Inventory

- Penalty phase transcript of William Flynn

- Penalty phase transcript of Robert Fucetola

- Penalty phase transcript of Steven Parks

- Penalty Phase transcript of Todd Miller

- Penalty phase transcript of Ruth Mattson

- Penalty phase transcript of Ronald Harnish

- Penalty phase transcript of Richard Staples

IFCD 00027560

- Penalty phase transcript of Dorothy Hall

- Penalty phase transcript of Paula O-Brien

- Penalty phase transcript of Maureen Reardon

- Penalty phase transcript of Mindy Graham

- Penalty phase transcript of Michelle Bories

- Penalty phase transcript of Michael Tausek

- Penalty phase transcript of Kenneth Daugherty

- Penalty phase transcript of Kellie Sbardella

- Penalty phase transcript of John Mandarelli

- Penalty phase transcript of Henry Small

- Penalty phase transcript of Eric Storms

- Penalty phase transcript of William Kowalski

- Penalty phase transcript of Benjamin Ramos

- Penalty phase transcript of James Osterrieder

- Penalty phase transcript of James Kennedy

- Penalty phase transcript of Benjamin Ramos

- Certificate of Baptism

- Certificate of First Holy Communion

- Tests of General Educational Development (GED)

- Sweetser-Children's Home Records

- Shaker Mountain School Transcript

- Lucy Abair Declaration

- Joni Avrutick Declaration

- Chris Duval Declaration

- Fred (Bruce) Jackson Declaration

- John Kimber Declaration

- Jessie Mashteare Declaration

- Kevin McKegney Declaration

- Torley Meister Declaration

- Malcolm Sawyer Declaration

- Lisa Tomasi Declaration

- Louis Moretto Declaration

- Malcolm Sawyer Declaration

- Bruce Sanderson Declaration

- Mary Tilghman Declaration

- Trish Miles Declaration

- Jane Ginsberg Declaration

- Zack Durbin Declaration

- Renee Dubois Declaration

- Edith Smith Declaration

- Elizabeth (Liz) Miles Declaration

- John Mandarelli Declaration

- Mark LeClaire Declaration

- Doris Herbst Declaration

- Theresa Koenke Diaz Declaration

- Steve Parks Declaration

IFCD 00027562

- Peter Lauffer Carr Declaration

- Juno Lamb Declaration

- Dr. Park Dietz Video interview 4/26/2014

- U. Of Vermont Medical Center records from January 1984-December 1985

- Michelle Bories Declaration

- Bonny-Sue Curtis Declaration

- Derek Foxwell Declaration

- Mary Nasse Declaration

- Susan Shumway Declaration

- David Ruff Declaration

- Richard Dougherty Declaration

- Cindy Swahlen Declaration

**B.    Personal Examination and interviews**

11.    I spent 8.65 hours interviewing Chuck at the Butner North Carolina Federal Medical Center, US Federal Bureau of Prisons over the course of two days.

**C.    The psychological literature on the impact of trauma and sexual trauma**

12.    I also rely on literature I have studied and reviewed that relates to the symptoms, challenges and diagnosed conditions that Chuck has experienced throughout his life. In this report, I will occasionally insert references to relevant studies.

## IV.  BEHAVIORAL OBSERVATIONS OF CHUCK HALL

13.   Chuck was dressed in appropriate medical center clothing. He was able to maintain eye contact through much of the interview until we began talking about the sexual abuse he reported experiencing at a boarding school.  At that point, he had a much more difficult time maintaining eye contact, and at times, seemed unable to stay present and most likely was dissociating in order to stay in the room. His range of emotion expressed was muted; he admitted to experiencing a range of emotion but showed me very little. He was polite, appreciative, and humble.

## V.  METHODOLOGY

14.   For this case, I used the following methodology:

15.   I reviewed all documents provided to me by Chuck's legal team, as detailed above.  Importantly, this included reviewing available medical records, treatment records and school records. I also reviewed law enforcement records, transcripts, and declarations. These included a number of people who had firsthand or secondhand knowledge of Jerry Mintz's (hereafter referred to as Mintz) inappropriate sexual behavior with children, a number of whom knew Chuck and witnessed him with Mintz and observed Chuck's behavior after the abuse.

16.   Secondly, I utilized a trauma-informed approach which I learned attending many trainings offered by professional organizations. When talking to a survivor of trauma, it has long been established that the professional must use a trauma-informed approach, which was first defined in 1994. The Substance Abuse and Mental Health Services Administration (SAMHSA) is a division of the U.S. Department of Health and Human Services. SAMHSA is the agency within the U.S. Department of Health and Human Services that leads public health efforts to advance the behavioral health of the nation. Congress established SAMHSA in 1992, and since then, they have created guidelines for the treatment of both substance abuse disorders and psychological problems. SAMHSA

was instrumental in defining what is meant by trauma-informed approaches, and in advocating for trauma to be addressed as an important component of effective behavioral health service delivery. SAMHSA began addressing trauma as early as 1994. SAMHSA defines individual trauma as "resulting from an event, series of events, or set of circumstances that is experienced by an individual as physically or emotionally harmful or life-threatening and that has lasting adverse effects on the individual's functioning and mental, physical, social, emotional or spiritual well- being." (SAMHSA, 2014). Trauma-informed interviewing is essential to utilize in talking with a survivor of trauma to acquire the most accurate accounting of the traumas they have experienced.

17. The basics of trauma-informed interviewing were delineated by Steinmetz (1997) who described the need to employ strategies that balanced forensic and therapeutic factors when interviewing children with child abuse allegations. She described how investigative interviewing combines a secure knowledge base of trauma and its impacts on a child, along with critical interviewing skills. Further, she argued that when using this balanced approach, "there is a greater likelihood that the truth can be discovered in the majority of sexual abuse allegations (p.4)."

18. Trauma-informed interviewing is based on the scientific findings of neuropsychologists and neurobiologists (Van der Kolk, Lanius & Siegel, 2022; Brenner, G.H., 2018; Hopper, J.W., 2018). When trauma occurs, the prefrontal cortex (the more advanced part of the brain that records the sequence of events, and specific details and peripheral information) frequently shuts down, and the more primitive part of the brain takes over, which records only sensory information and fragmented emotions. Bessel van der Kolk, the leading expert on the impact of trauma on the brain, states that "trauma impacts nearly every part of the brain, causing disconnections between the parts of the brain that could help a person in the midst of a trauma" (Van der Kolk, Lanius & Siegel, 2022).

Therefore, in trauma-informed interviewing, the psychologist asks about sensory experiences and emotions rather than trying to document a timed sequence. A trauma-informed approach also recognizes that the behavior of victims must be seen as being significantly impacted by the traumas they have experienced, as opposed to seeing the person as simply flawed or bad. It also recognizes that trauma has long-lasting behavioral and mental health consequences on individuals, long after the trauma is over (Bryer, et al. 1987; Easton, 2018; Turner & Lloyd, 1995).

19. The most important aspect of a trauma-informed interview with a survivor of sexual trauma is that there is a major focus on their safety, which is a key need of survivors who have had their bodily safety violated, which leads to them also feeling unsafe psychologically. From the start of the interview, for example, they are informed of guidelines which empower them to be able to take breaks, to say they do not want to answer a given question, to ask any question they need to ask, and to stop the interview any time they desire. In addition, there is a major focus on asking open-ended questions rather than simple yes or no questions. Instead of being forced to give a timeline, which many survivors cannot do due to the way advanced parts of the brain shut down including the pre-frontal cortex where sequential memory is stored, survivors instead are asked to talk about sensory memory. Sensory memory is stored in the primitive parts of the brain that are associated with the ability to engage in flight, fight, collapse or submit. All these aspects of the interview help to create a trusting non-pressured environment where a survivor is likely to feel safer and more comfortable, even though they are being asked to talk about highly personal and vulnerable aspects of their experience.

20. I also administered a specific scientific measure of PTSD, the Clinician-Administered PTSD Scale for DSM-5 (CAPS-5) (Past Month / Worst Month): The *Clinician Administered PTSD Scale for DSM-5 (CAPS-5)*. It is considered the "gold standard" by the Veterans Administration (Weathers, et.al, 2015) and by trauma experts presenting at the American Academy of Forensic Psychology (Pietz, 2022), and is also the best validated measure of PTSD (Pietz, 2022). The CAPS-5 is a

comprehensive structured clinical interview that is designed to assess the essential features of a posttraumatic stress disorder as defined by the DSM-5. Symptom severity ratings are determined based on symptom frequency and intensity. Symptom severity ratings are based on a structured scoring system. Potential symptoms are rated as: 0 (Absent), 1 (mild / subthreshold), 2 (moderate / threshold), 3 (severe / markedly elevated), and 4 (extreme / incapacitating). A rating of 2 or higher is needed to consider the symptom being present. The presence vs. Absence of symptoms and their severity during the past month were queried.

21.     A number of self-report trauma inventories are available. I chose to use The Philadelphia ACE Survey (Institute for Safe Families, 2013, Philadelphia ACE Project, 2021), which was developed by social scientists to expand on the traumas originally researched in the ACEs study, funded by the government agency, The Center for Disease Control (CDC).  The diagram below is included on the CDC website to illustrate the mechanism by which adverse childhood experiences influence health and well-being throughout the lifespan.



Mechanism by which Adverse Childhood Experiences Influence Health and Well-being Throughout the Lifespan

22.     I had planned on administering the Beck Depression and Anxiety Inventories, but found out that the neuropsychologist, Dr.

Marlyne Israelian, had already done that previously, and there was no reason to repeat them.

## VI. RELEVANT BACKGROUND

### A. Family history

23. Chuck was born in Maine on April 6, 1971. His parents had one biological child but were unable to have additional biological children. His parents had adopted his sister Michelle in January 1970. In January 1971, they let the adoption agency know they were interested in a second child. Chuck was placed for adoption with the Halls on May 27, 1971.

24. Chuck's biological mother Betty Jo Kelley was born in Temple, Texas. Ms. Kelley was unmarried and requested Chuck be placed for adoption. He learned later in life that his birth mother claimed he was born as a result of her being gang raped. She gave up all her parental rights. A foster mother took care of Chuck until his placement with the Halls at about seven weeks of age.

25. Chuck's adoption was finalized on January 11, 1972. Chuck spoke lovingly of his parents, recalling good times with his adoptive parents. He remembers he loved gardening and carpentry with his dad and being in the kitchen with his mom. He told me he loved to have others be his "guinea pig" with his culinary creations; his dad would try anything. A friend of his mom's was a trained chef, and he would help Chuck learn how to make things and point out things that were missing. He always knew his parents loved him, and he regarded them as his best friends. However, later in our interview, he revealed some difficulties in his relationship with his parents and told me they trusted him a little and were proud of him only a little. He believes their discipline was appropriate and usually involved being grounded and privileges taken away. Even when he acted out, he believed that they never stopped loving him. His parents

IFCD 00027568

loved reading, and he remembers his dad had banana boxes filled with books.

26. His parents were religious, active in their Catholic parish. Chuck was baptized on June 6, 1971. He received his first Holy Communion on May 20, 1979.

27. His parents' only biological child is his oldest sister, Susan. Susan was born in 1955. She turned 17 right after Chuck came to live with the Hall family in 1971. She graduated from high school in 1973 and moved to New Hampshire for nursing school and subsequently got married and settled in Vermont. Susan would routinely visit her parents, and therefore continued to be in Chuck's life. Chuck recalls Susan getting in fights with her husband, and he and his dad would drive to Vermont to pick her up.

28. Chuck was very close to his adopted sister Michelle, and reports he spent the majority of his life before prison with her. He told me he never stopped loving her and her love was always a constant. He regarded her as like his second mother. In her declaration, Michelle confirmed they were inseparable as kids, and always protective of each other. She also noted they grew apart in middle and high schools.

29. Chuck's maternal extended family included a number of relatives who lived nearby. His maternal grandfather, who was close to Chuck and his family, died when he was in third grade. In contrast he met his paternal grandfather only once. His family would spend a week a year with his paternal grandmother in Erie, Pennsylvania.

30. His sister Susan is the one who recommended Shaker Mountain School, a private school in her community of Burlington, where Chuck has reported he was sexually abused often throughout the year he spent there.

## B. School History

31. Elementary school was good, according to Chuck. He has pictures of himself smiling, and he had friends. He remembers the school

IFCD 00027569

was in a small town, and his teachers would sometimes go to the same church as he and his family. However, even his first-grade records show that he tended to daydream. In third grade, it was also reported by his teachers he had problems daydreaming and wandering around the room. He was capable of getting good grades, but when his behavior suffered, so did his grades. He had several favorite teachers.  He had to repeat sixth grade.

32.    After failing the sixth grade a second time, he was sent to Shaker Mountain School (hereinafter referred to as SMS) in the town of Burlington, Vermont, where his sister Susan lived with her husband. At enrollment, Chuck was 13 years, 2 months old. Chuck described it as very laid back, students had a lot of autonomy, and it was small, maybe a dozen students.  He felt like he had responsibility as he was voting along with his classmates on activities, and he had to be conscious of the impact of his decisions. Chuck recalls no actual courses, no exams, or quizzes. He remembers learning racquetball, skiing, and photography. It was only headmaster Mintz's decision after getting input from staff about whether you would progress.  Chuck believed it came down to if Mintz liked you, you would do well. Chuck reports upon leaving SMS after a year he was no better off academically than he had been after failing sixth grade twice. Yet, he does think after SMS he was a lot quieter.

33.    He was given the Peabody Achievement Test at SMS at 14 yr., 1 month on 5/10/1986. He scored age equivalent 15-11 on PVOC (Peabody Picture Vocabulary Test), 11-11 on Math, 16-4 on Reading Recognition, 11-5 on Reading Comprehension, 9-1 on Spelling, and 13-9 on General Information. This puts him achieving below what is expected for his age on four out of six of the subtests. It was noted he was the Meeting Chairperson and Meeting Secretary for the student government. All of his classes were listed, including a large variety of classes including "massage," "math games," and "flower dissection." Chuck received a pass grade in all classes. It was recommended he be placed in ninth grade, with the additional comment made that they did not have a specialist at the school, but they suspected Chuck had a learning disability in reading comprehension.  They additionally recommended that Chuck be tested

further for such a disability and provided services in order to be placed in ninth grade.

34.    When Chuck came home from SMS, he skipped to 9th grade at Thornton Academy. He was evaluated at the beginning of that year.  He was moderately depressed, had difficulty with his own internal pressures, he was very unsure of himself and tended to hold back. He was behind in his emotional development and had limited organizational abilities. His thought content was immature and self-oriented. He had inner resources but had limited access to them. He avoided expression of his feelings. He dealt with conflict through fantasy and denial of negative feelings. His impulse expression was more likely to be in the form of passive aggressive behaviors versus any open expressions of affect. He was found to be distant from others.  In summary, he was a socially withdrawn somewhat depressed boy with a mixture of academic learning problems, passive aggressive behaviors, and compulsive traits. He was emotionally restricted, unmotivated in school and it was predicted he was likely to be a poor performer despite having average cognitive ability. He was recommended for individual counseling, which was to be sought in late November 1985. No record suggests he ever received this individual counseling.

35.    Chuck recalls that he struggled with fights the whole 9th grade year. His older sister Susan had gone to Thornton, and she was a great student. Chuck was aware the expectation was he would do well just like Susan, but as much as he wished he could be like her, he wasn't. His sister Michelle also went to Thornton and also was struggling, running away, skipping classes, and her grades were suffering.  The family did seek intervention (see Sweetser summary below).

36.    In that academic year, 1985-86, he received only D's and F's and had school suspensions. He failed the 9th grade. He was diagnosed with a learning disability following this year, on July 16, 1986. Following this he repeated the 9th grade and was provided resource room instruction, tutorial assistance, and group counseling with the school social worker.

He spent almost all of his time in the resource room with a special education assistant, David Ruff, who noted in his declaration that he had no teaching education or experience, and barely any supervision. Despite this, Ruff noted that in May Chuck had an A in every class. Still, he struggled with mental lapses, daydreams, and his attention span was short. Ruff did not recall Chuck getting in fights or exhibiting violent behavior; in fact, he didn't witness any problematic behavior, except for some truancies. Ruff also noted at the time, Chuck suffered from low self-esteem, embarrassment and simultaneous outbursts, and anger at an unfair system, symptoms that all made sense to him today when he learned about the sexual assaults Chuck experienced at SMS. He was aware while working with him that something was bothering Chuck, but he nor the school could identify what it was. Ruff has spent his subsequent career in education and educational consulting, and from that standpoint he opined that although Thornton was a good place, Chuck clearly did not get what he needed from the Thornton special education program. It is noted Chuck met with school psychologist Dr. Payson in October 1986. Problems continued in school and at home, and by March of 1987 the school recommended an out of district residential and day school program. April 7, 1987, there was an emergency meeting as Chuck's behavior was escalating at home, with him stealing the family car, becoming more physically threatening, punching holes in walls, and on probation with the condition he see a counselor at York County Counseling Services. By August 3, there was a letter from Homestead indicating they were planning on admitting Chuck.

Mary Nasse, who became the Special Education director at Thornton after Chuck left, reviewed his records and also noted a number of questionable decisions by the staff. She opined in her declaration that moving Chuck to the resource room full-time was an "unusual move with what looks like Chuck's relatively minor level of academic difficulty." She also opined that going to SMS and then being sent to Homestead "would be a shock to anyone's system because of their polar-opposite

philosophies." She agreed with Ruff and Dr. Payson that the "necessary services were not available" to Chuck at Thornton.

37.     At the Homestead Program, Chuck reports that he learned a lot in school, and even learned to like math and science because the teacher made it interesting and fun. He also was involved in group counseling (see more information below).

38.     Chuck earned his GED after his completion of the Homestead program on May 8, 1989, from the Biddeford Adult & Community Education Center.

39.     School academic and learning problems have been found in the research on survivors of sexual trauma (Barrera, Calderon, & Bell, 2013; Perfect, et al., 2016; Porche, Costello, & Rosen-Reynoso, 2016). Behavioral problems in school following sexual abuse are also well documented in the literature (Gardner, 1999, Dhaliwal, et al., 1996).

### C.     Work history

40.     Chuck remembers he had a job at an amusement park as a teenager. As a young adult he reports a number of jobs, including working at a frozen food warehouse, a security job, and a local radio station. After getting out of state prison, he was hired by a husband and wife to work at their horse farm.

41.     Chuck briefly worked for Ruth Mattson's father doing construction and odd jobs in early 1990's.  He's been continuously incarcerated since 1996.

### D.     Spiritual history

42.     As a child, he went to the Catholic Church, and was active in youth activities. Through the Catholic youth group he went to dances, Red Sox games, Celtics games, and made a few friends.

43.     As a young adult when not incarcerated he continued to go to church, even if his wife didn't. He reports he does talk to the chaplain in prison, but they do not have church services available to him or he would go. He told me he takes his faith seriously and has always taken pride in his beliefs.  He admits he has broken every commandment there is, and he tries to do better each day. He prays and will pray for others when requested. He said typically people ask him to pray for them when they have serious diseases, such as his neighbor who has cancer.

## E.     Relationship history

44.     His first romantic relationship was in 9th grade, but it wasn't significant, according to Chuck. They worked together at the amusement park.

45.     When Chuck got out of prison, he moved in with his sister Michelle.  Her boyfriend introduced him to Barbara and her husband. He worked on their farm.  After Barbara and her husband separated, she asked Chuck to move in with her to take care of the house. She was legally blind and needed someone to drive her and take care of a bipolar, mentally challenged man she took care of.  In 1994, he married Barbara Ottenger, who was 24 years older than him. She was 47 and he was 23. Barbara sold the farm and horses and moved to central Maine to take care of her dad. Before they moved, Chuck had a motorcycle accident. Barbara and Chuck separated, and their divorce was finalized in May 1996.

46.     His next relationship was with a friend's sister, Ruth Mattson, who he met at the end of 1995. He lived with her in Waterville, Maine with her three-year-old son, Dustin, who he loved like his own son. At trial, she talked about how she never saw him have a temper, he shared his emotionally deep poems with her, and was a good songwriter, singer, guitarist, keyboard player and drummer. She started cheating on him. She would leave the house at 2 p.m. and not come back until 3 a.m. He said he tried to work it out, but that didn't work.

47. Chuck married a woman he had met in jail, Mary Blakeney, who subsequently died.

### F. Legal history

48. Chuck's difficulties with the legal system began when he was fifteen years old with a variety of arrests for theft and burglary. This behavior all began after his return from SMS.

49. He had more cases as a young adult for theft, burglary, and other charges. He had a number of sentences of probation or short terms in prison.

50. In 1994 he was driving a motorcycle when he was involved in an accident pursuant to a high-speed chase with police. The chase occurred because Chuck fled because he had a suspended license, and his bike wasn't registered. However, he ended up flying off the bike and hitting his head. He went to the hospital with only minor injuries noted.

51. In 1996 Chuck was sentenced on several burglaries. Chuck was offered a 6-year sentence, but he insisted on a longer sentence of 8 years and 1 day and no probation.

52. In 1998 he received a federal conviction for mailing threatening communications to a federal judge in Maine.

53. In 1999 he was convicted of mailing threatening communications to US Attorney for Maine, Mr. McCloskey, which led to a federal sentence, and he was sent to FMC Devens. Then he sent a telephonic threat to the Portland Maine Airport threatening there were explosives at the airport that would blow up the airport. He also sent threatening telephonic communications to ATF, the Secret Service office in Maine, threatening that building was going to be blown up.

54. He's been in prison continuously since 1996, first in state prison and then in a variety of federal institutions. He has served time in the Federal Detention Center in Brooklyn, NY; was in a medium security

facility in NJ for a year, and then in 2005-2006 he was at the Rochester, MN Federal Medical Center. He was transferred to Fort Devens, Massachusetts Federal Medical Center, but they couldn't meet his medical needs, and in October 2009 after suicide attempts, he was transferred to the Federal Medical Center in Springfield, Missouri. On January 26, 2010, he and a co-defendant engaged in the homicide of a fellow prisoner. He was sentenced to death and sent to USP Terre Haute in the Special Confinement Unit (SCU) where federal death row inmates are typically held. Because of his complex medical needs, he was being housed at the Federal Medical Center Butner (FMC Butner) at the time of my visits.

55.    Chucks reports he has had no disciplinary infractions of any kind since January 26th, 2010.

56.    I asked Chuck about his awareness of the decisions that led to him being sent to Federal Medical Centers. He acknowledges he "kept shooting myself in foot." When he lived in the community with an ostomy bag, it was quite expensive, and it was difficult for him to maintain his health. As mentioned above, the prisons he had been in Maine did not provide adequate medical care. He knew he needed surgeries and heard that the medical centers in federal prisons provided better care. This is what led to him making the bomb threats, as he knew that was a federal crime. He was tired of not getting the medical care he needed, and was having a number of Crohn's flare-ups, and he figured federal prison was his best sanctuary. He had no means to carry out the threats he made.

### G.    Medical history

57.    Chuck was born on April 6, 1971, in Portland, Maine at the Osteopathic Hospital. He weighed 7 pounds, 8 ounces at birth. He was assessed as being in good health. His birth mother reported she had good pre-natal care. At six weeks, he weighed 10 pounds and was assessed to be in good health.

58.    During his stay at SMS, he had two visits to the emergency room. On December 1, 1984, he injured his thumb and knuckle while

skiing.  He was diagnosed with a sprained right thumb.  On January 12, 1985, he was seen again in the emergency room for a puncture wound caused by a ski pole at the back of his mouth and face swelling.

59.    On October 26, 1987, Homestead sent a letter to Chuck's parents that there was a mole on his shoulder, and they recommended it be removed. The mole was deemed to be benign and was removed.

60.    Chuck had a colonoscopy in 1993 leading to his diagnosis of Crohn's Disease.  He had a temporary ileostomy in 1994, and then in 1996 a permanent ostomy. Chuck has had numerous surgeries over the years since as a result of his Crohn's disease.

61.    Chuck reports having struggled with depression as a result of his Crohn's disease, especially before he went to prison. Since being in prison, coping with the disease has been even tougher, as he has experienced the guards discussing his medical issues, and they make jokes about it. One time in a hospital in Indiana, a guard said out loud, "anybody else need to take a shit like a bitch," referring to him.

62.    In January 1994, he had surgery on one of his hands.  He had a fracture and had two plates and four screws on each plate in his hand.

63.    In October 1997, prison records indicate he hit his head on a table, but he doesn't remember it.

64.    In May 1998, he stepped out of the shower and slipped and wound up with a gash on the right side of his forehead. He denied losing consciousness.

65.    In April 2004, he got a black eye after a line drive hit him during a softball game. It was witnessed by staff, and he explained he lost the ball in the sun. The ball hit his glove and then hit his eye.

66.    Chuck has additionally suffered from kidney cancer, which appears to be in remission.  He has numerous other medical ailments, including necrosis of his hip bones.

## VII.  RESULTS OF THE PHILADELPHIA ACE SURVEY

67.    As indicated above the Philadelphia ACE survey is a self-report instrument. Chuck reported 10 adverse childhood experiences out a possible 30.

68.    The most significant traumatic experience in Chuck's life is that he was sexually abused by his private school headmaster, Mintz.

69.    In addition, both his parents abused alcohol.  His mother was depressed, and he reports she threatened to have he and sister take pills to kill them and then she planned to take her own life. His parents fought frequently, and he remembers them yelling screaming and insulting each other. His sister Michelle has confirmed on Friday nights, they would have a special dinner together after taking care of she and Chuck. They would drink too much, argued, and would throw things and slam doors. She remembers being with Chuck and hearing the arguments and how they were both scared. He believed he and his sister's problematic behavior was the cause of their arguments, and Michelle confirmed their parents admitted their own frustration with both of them acting out led to them taking their frustration out on each other. Chuck's older sister Susan who was not around through much of his childhood confirmed that during her younger years, alcohol consumption was a large part of weekends for her parents. She observed knock-down, drag-out fights, including punching holes in walls and breaking large numbers of glass items. She did note when Michelle and Chuck were adopted, her parents were arguing less and were less hostile.

70.    Being adopted is not part of the Adverse Childhood Experience questionnaire, but both he and Michelle were adopted in 1971 and 1969 respectively.  Their adoptive parents did not hide the adoption from them and supported them finding their birth parents. His sister Susan affirmed her parents repeatedly emphasized with her that her adopted

siblings would be treated as "our own." She also remembered how Chuck had his own room starting at 3 or 4, but he didn't sleep well and would go sleep on the floor on his mother's side of the bed. She'd take him back to his room, but he'd wind up later in the night sleeping again by his mother's side in his parent's room.  At the time, she saw this as funny, but now "it seems clear he was dealing with abandonment issues." Chuck denies he felt any anger about being adopted,  but his sister Michelle believes both of them have abandonment issues despite being loved by their adoptive parents. His birth mother told the trial attorney she did not want to talk to Chuck or testify, because she had not informed her husband or her kids about Chuck. While Chuck respects that decision, he also would like to meet her kids.

71.    Chuck also experienced bullying from peers and being beat up. David Ruff confirmed Chuck was picked on at Thornton. Chuck was sent to jail as an adolescent.

72.    As an adult, he has experienced some other adverse traumatic incidents, including having a stranger point a gun at him, having been threatened with death by his wife's ex-husband, having suffered from Crohn's disease and kidney cancer.  In addition, he has experienced abuse by prison officers, including one that assaulted him while he was chained to a hospital bed and another that put feces on his food tray.  Both of those incidents by prison officials resulted in lawsuits and settlements with the BOP.

73.    In summary, Chuck not only suffered from 10 of the specified Adverse Childhood Experiences measured by the Philadelphia ACE Survey, but in addition suffered additional traumas as an adult. While most of these events were one time, the sexual abuse he suffered was over the course of an entire year as described in more detail below.   Even one ACE can have a profound impact on many aspects of a person's life (Anda, et al., 2006; Dong, et al., 2004; Dube, et  al., 2001). Chuck has many more.  It is also important to mention here that Chuck has a way of

minimizing the traumas he has experienced. Being singled out for abuse is very triggering for him.

74. Another important aspect of ACEs is that the impact of ACEs is cumulative and additive, which means that the traumatic effect is not simply measured by a number, but rather by the piling up of one on top of the other, especially when the victim has never had the opportunity to address any of the ACE's (Anda, et al., 2006; Dong, et al., 2004; Dube, et al., 2001; Felitti, et al., 1998). The aspect of ACEs being cumulative and additive with exponential impacts explains why in this case Chuck has experienced lifetime consequences for the traumas he has experienced.

## VIII. CHUCK'S EXPERIENCES AT SHAKER MOUNTAIN SCHOOL (SMS)

75. I begin this section with my definition of sexual victimization:

Sexual victimization consists of any overt or covert sexual behavior by which the **abuser chooses** to take advantage of a power differential with a **dependent or vulnerable victim** in order to satisfy the abuser's needs **without the victim's consent**. I emphasize the words "abuser chooses" because it squarely places the responsibility for the abuse on the abuser. I emphasize the words "dependent or vulnerable" to highlight the power differential of the abuser. I emphasize the words "without the victim's consent" to be clear that this lack of consent is what makes the behavior abuse because it was not a free choice of the victim, but rather a choice the abuser made.

76. It is important to remind the reader that Chuck was 13 years, 2 months old when he enrolled at SMS as a student. This is the time when boys are entering puberty or adolescence, a time of significant hormonal, physical, emotional, and sexual development and changes. When he first met Mintz, he told me he seemed like a nice guy, and not a predator. He

put on a friendly act; he was kind, gentle, and a nice funny guy. He seemed concerned about his education. His mother, father, and his sister Susan, all met him at the same time. Susan has a distinct memory of that first meeting, when Mintz came down the driveway "poorly dressed and unkempt." She remembered her mother remarking "I guess he didn't waste any time ironing his clothes." Despite this very bad first impression, they still enrolled Chuck at SMS. Like other similar perpetrators, grooming includes family members too by leading them to believe he was trustworthy and truly interested in Chuck's education. Chuck visited there in the summer, his parents decided they liked it, and wouldn't let him come home even when he asked.

77. Mintz started his grooming with taking one to two students to play racquetball, go to dinner and a movie. He'd let them choose where they'd go. Chuck remembers he went to the movies with Mintz one time, and nothing happened. Chuck knew that Mintz didn't invite everyone, so this led to him feeling special. He also took him skiing. Chuck knew he didn't invite everyone to stay at the school, so that also felt like a privilege. Mintz would give him a few dollars here and there to go to the arcade. He never gave him clothes or any other gifts, and never more than $10. The arcade was nearby, and three or four children would go, and Mintz would give them money. Since his mom and dad trusted Mintz to leave him there, and he seemed at first like a nice guy, Chuck also trusted him.

78. The abuse started with Mintz during the summer when he was at summer camp and was staying with Susan. Chuck clearly remembers the office where Mintz lived: the ping pong table, the office, the storage room, and that Mintz lived up a ladder in a loft behind the main office. The loft he described as one little room, with a mattress on the floor. He doesn't remember the lights. Sometimes when he arrived at school, Mintz would still be sleeping in the loft, as the children who lived at a shelter associated with the school would get there first. He remembers when he went to the school, he was a small child for his age.

79. The first time Chuck slept in the loft, he was not even a student yet. He didn't even know if his parents would let him go to school there.

He and Mintz first went out to dinner and played ping pong for a while. They also played pinball and then he told Chuck they would sleep in the loft. Chuck remembers laying down, wearing white briefs or shorts. There were no lights, it was pretty dark and there were no windows. He said he was nervous because he'd never been there. It was about half hour to an hour with nothing happening and he started dozing off and then he felt Mintz's hand on his penis. Mintz was fondling him, and Chuck froze; he didn't know what to do. He doesn't remember hearing anything. Chuck remembers that Mintz smelled like sweat. He said it was over in a few minutes and they didn't say anything. Afterwards, he was thinking about why he didn't stop him, and it made him feel very angry. He just wanted for the night to end so he could leave. Mintz felt his penis through his shorts the first time. He's not sure if it was the first time or after when Mintz told him not to tell anyone and this was just between us. When asked what the most difficult part was, he said the whole thing was difficult. What he can't forget is the smell of Mintz's sweat: that it sticks with him. In fact, he reports since then, any time he smells a strong sense of sweat, he is triggered and gets anxious. If he sweats, he reports he needs to scrub himself off immediately.

80. Chuck said that he wanted to call his mom to tell her, but he felt embarrassed and ashamed. He didn't tell her what he had experienced, but he did ask her if he could come home, and she said no. He states this is why he stole the check from Susan and her husband that fall in an effort to run away. He stole Susan's check so he could get a bus ticket to Maine to go home, but it wasn't enough money. Following his theft, Susan and her husband believed they couldn't trust Chuck to live there and called their parents to come take Chuck home. She thought when they got him, they were taking him home, but instead unbeknownst to Susan, he went to live at the school. To this day, Chuck still believes it is his fault that he didn't tell his parents about what Mintz was doing to him.

81. After the first time, he described there were a lot of other times at least every week Mintz would put his hands down his shorts. Mintz would get Chuck's hands on to his penis. Chuck said he would pull his hand back from Mintz's penis every time. He reports he tried to forget it.

He told me that Mintz was erect when he put his hand on his penis. He reports he felt scared, he didn't like it and he didn't know what to do. He does not remember how all of this transpired. He does remember that sometimes they would just sleep, and sometimes he'd touch Chuck and make Chuck touch him. He reports there was a lot of fondling "if you want to call it that". He remembers that the night before he left to go home and Mintz knew that he was on his way home, he abused him that night and told him again "Remember just us keep this with us." Chuck knows that Mintz did not ask everybody to have a sleepover. For instance, his friend Bruce was older and bigger than other students and he didn't think that he was ever asked to come up to the loft. Chuck says that he has always remembered the details of what he experienced with Mintz.

82. As he talked about it, and anytime he thinks about what Mintz did to him, he feels a lot of intense anger. He also states he doesn't have any use for sexual predators especially if they get in his face. He says he already dislikes what they are in prison for. He told me that an older guy told him not to target sexual predators because there are so many. He told me that one time a guy in Rochester got in his face and after a dozen times of telling him to get away he finally got in a fight with him.

83. Chuck reports that for years he tried to forget and block it out. He said he's done his best to forget it and that it's put a strain on his relationship with his parents, his sister and ruined every romantic relationship he's had. Chuck knew that Mintz liked men. He also told me about how when they went to play racquetball, Mintz wanted all of them to shower together and to go into the sauna with him. When they were in there, he knew that Mintz was watching him. He knew that Mintz had a membership at the Rackets Edge, a racquetball club. He denies remembering if Mintz touched him in the showers. He does know that two or three of them would shower with Mintz at the racquet club. In the sauna, sometimes they would wear a towel around them and sometimes they would all be naked. Chuck said there were children who didn't seem to mind being around Mintz and there were definitely other children he was touching. He was probably touching them on their penis and their legs. He doesn't think he saw them touching Mintz. He stated again that

he just feels angry when he remembers.  When asked about the threats, Chuck reported that anytime something happened with Mintz, he'd say the threat to Chuck. He thought something wasn't right, but he wasn't able to stop it. He does not know if Mintz ever took pictures of him. He denies that he had to pose for Mintz, and he doesn't think that Mintz shared any pornography with him.  Chuck denies remembering whether there were any times that Mintz inserted any part of his body into him. He does remember that Mintz was erect but does not remember Mintz having an orgasm. He denied there were any times that Mintz forced, invited, or encouraged him to insert any part of his own body into Mintz's. He does not remember whether or not he himself had an erection.

84.    At the school, he wasn't paying attention and spent a lot of time with other children who were smoking even though he didn't smoke. Chuck figured if he spent time with two girls Liz and Trish who smoked, perhaps he could fool people.

85.    He remembers specifically it was a strain when he initially lived with his sister Susan and her husband. He reports he was really angry with his parents and his sister for leaving him in Mintz's care. He knew it wasn't their fault, but he blamed them anyway. He thought that because Susan was living in the town, she should have known about Mintz.  Susan confirmed the strain was not only because of Chuck's behavior, but also because they had their own financial difficulties and stress raising four children of their own, and also had severe roof damage in February that led to all of them living in two rooms on the first floor.  Chuck had called her in February about moving back with her, but that was impossible given their level of stress.

## IX.  CORROBORATIVE TESTIMONY ABOUT MINTZ

86.    Lucy Abair worked for 14 years as the Director of the Residential Licensing Unit for the Vermont Department of Rehabilitative and Social Services (SRS). In her role, she reviewed the Lakeview Youth Shelter in Burlington run by Mintz, who also was the headmaster of SMS at the time. According to Lucy Abair, "Jerry was also well-known for the

suspicion that he had inappropriate relationships with the children in his care." She was aware of classic grooming behaviors he engaged in, such as bringing one child at a time into town to gain their trust. She remembered two specific incidences in the mid-1980's, one involving Mintz's sexual abuse of a child at the school, and a second involving the disrepair and chaos at the Lakeview shelter. During her investigation of the shelter, she was told by a "staff member" that they routinely did what they called a "Fuck Patrol," which was a verbal warning to any children having sex with each other to get back where they were supposed to be. In addition, the property was a mess. She recommended the license be removed and it was, despite the Lt. Governor being a vocal supporter of Mintz. The second charge she remembered about Mintz sexually abusing a child involved him sleeping with the child in their underwear, in the loft at the school where Mintz lived.  This investigation went to the Director of Childcare Licensing, Rolland Gerhart and that the charge came from a mandated reporter. From her description of the "investigation", no trauma-informed interviewing was done; rather Gerhart presented what he assumed to be the story, no open-ended questions were used to help the child tell his own story, and as a result, the child shut down.  Gerhart concluded the abuse couldn't be substantiated.

87.    It is important to point out here that the story that was alleged here is the exact same story Chuck has reported, in the exact same place, and of course with the same perpetrator.

88.    Joni Avrutick was a staff member at SMS during the time Mintz was headmaster and had worked there from the late 1970's until 1983, before Chuck enrolled. She described how the school for many children was good and a healing place, with a very dedicated and caring staff.  She stated in her declaration that she "believes he (Mintz) was physically and emotionally inappropriate with many of the teenage boys. He would invite young boys to stay overnight with him and made no effort to hide it." On reflection now, she stated she was "confident it was inappropriate, and that he was doing things he shouldn't with the boys, sexually abusing them." She admitted that none of the victims told her, and that it was regarded as an "open secret that we all knew about, felt

awkward about, and simply ignored." She left in 1983, and came back five years later, to learn the school was closed, with the rumor being if the school didn't close, there would be an investigation into Mintz's behavior with the boys.

89. This staff member, although she didn't know Chuck, is confident that the sexually abusive behavior of Mintz had been going on for years, and none of the staff chose to deal with it.

90. Jane Ginsberg was another staff member at SMS from the early to the mid-80's. She was only there a short time while Chuck was there as a day student. However, she was very aware of Jerry's pedophilic behavior. She was at first a part of the residential staff and then became the Director of the Residential Program. She described both the good parts of SMS as well as the part that was most uncomfortable, that boundaries were not important. She knew of at least two intimate relationships between staff and students. She also knew about Mintz regularly having young boys who were students and community children stay overnight with him. She felt she was fairly alone in her perception that this was confusing and disturbing.

91. She described a student Richie who during a morning meeting was very upset with Mintz, describing Mintz touching him inappropriately. She had a hazy memory of Richie throwing something at Mintz when he denied Richie's story. When Jane raised her concern with other staff, she also was shut down by them. She remembered talking to the school's attorney, and that he intended to stand behind Mintz one hundred percent. Only one other of her fellow staff members did not shut her down, but he was too disempowered to fight. She did eventually confront Jerry, trying to appeal to his desire for the school to survive, and to tell him the rumors were being harmful, and he had to stop. She remembers he got furious with her, said he would stop sleeping with the boys, but she heard he never stopped. When she realized she couldn't stop Mintz, she decided to leave. She remembered Chuck only vaguely as one of the younger children at SMS and didn't get to truly know him. When she left SMS, Mintz told her she was "dead to him." She became a

psychologist and finally realized more clearly how unsafe the situation with Mintz was for the young boys at SMS.

92. Peter Carr was also a staff member at SMS, in fact his friend Jane Ginsberg was working at the school and after she described it to him when he was finishing up college, he applied for a summer internship there. He worked there from summer 1984 to June 1985 as an intern and then became a staff member. Jane was still on staff when he arrived. He wrote in his declaration that Mintz was not a good listener and was a bully and a slob. Further, he stated he was "always bothered" that Mintz "invited some of the boy students to stay overnight with him at the loft above the school where he lived. I felt deep down like something wasn't quite right about the situation." He specifically remembers that Chuck did stay over with Mintz in the loft, and "even having some sense that Chucky and Jerry had some kind of special relationship, although I was too young and naïve to have a real sense of what that relationship might be, even though the idea of it made me uncomfortable." He remembered that Jane was the only staff member who ever addressed the sleepover issue, and that she told him that she had told Mintz directly to stop doing it, which he refused. He further stated as he was the "nominal head counselor," Chucky was the "least of my worries because he usually didn't cause any problems. I remember that Chuck was gung-ho, participating in all activities and going with the flow, in contrast to other Starksboro students."

93. He also described how he witnessed at the Lakeview youth shelter Mintz ran that he saw a staff member making out with one of the residents. He was with others, and no one reacted even though it didn't sit right with him.

94. Late in the school year, he learned from a few students about an intimate relationship between their co-counselor Theresa and a student named Bruce. They learned that their fellow counselor Paul knew about it and kept it a secret because some of the children had been blackmailing him. Theresa was asked to leave, and Bruce left with her.

95. It was after Theresa and Bruce left that he learned about the official accusations of sexual molestation against Mintz, around June of 1985. He gathered the other counselors and called the Department of Social & Rehabilitative Services to see if they could help, but they said they didn't have enough evidence to charge Mintz. None of the students had confided in Peter, so all he could do was corroborate that the sleepovers had occurred, and that he believed the accusations. He remembers the staff meeting in the school van, where he confronted Mintz who flat-out denied the allegations. His assistant CC was very defensive of Mintz. The staff told Mintz they didn't believe him. It was shortly after that, he and fellow staff member Lisa quit, and Mintz left the state. He remembers completing tasks in his last week he understood to be in the service of shutting the school down.

96. In retrospect, Peter shared that he realized Chucky was a perfect victim for Mintz, being on the younger side, living first with his sister he hardly knew and then a boarding student far from home. He remembers Chucky as "very agreeable and easy to like." All of this in his opinion made him vulnerable, and he believed other students like him were equally vulnerable.

97. Doris Herbst was a staff member also at SMS from sometime in the 70's into the early 80's. Although she found many aspects of SMS to be healing and therapeutic for the students, she also knew from almost the beginning about Mintz regularly having young boys stay overnight with him, which he did not hide. She admitted in her declaration there was a little whisper in the back of her head that she brushed off. Although none of the boys directly told her about Mintz's inappropriate touching and molestation, she did remember complaints told to other staff. She remembered the first such complaint was dismissed by the staff member as unbelievable, and she admitted she did not follow up. She had this perception that because of his intense commitment to the school, it was hard for her to imagine Mintz would compromise it by abusing the children. As time went on, she heard more and more complaints and finally couldn't ignore it. Since no one else was organizing a response, and she had no first-hand evidence, she chose to go on with her job. She

eventually became overwhelmed with her responsibilities and left the job. She did remember talking with staff at Social and Rehabilitative Services (SRS) and told them all she knew as well as her misgivings she had not done more while she was there. She doesn't know the results of the investigation, only that the school was shut down and Mintz left town. She did not know Chuck.

98. Theresa Koenke Diaz also was a staff member from 1982 to 1985 at SMS. She loved many aspects of the school, but also was groomed by Mintz. As an example, when Mintz asked her to donate some of her salary back to the school, she felt pressure to comply. She knew about the sleepovers, but like others, she didn't think much about them, at least not until she heard Malcolm's accusations that Mintz had sexually abused him. She doesn't remember how she learned about his accusations but did remember how he had some kind of "mental episode where he disappeared and was later discovered outside somewhere, disoriented, in freezing weather." She did wonder after that if other boys might also have been vulnerable to Mintz's advances, and when she was contacted by Chuck's legal team, she realized in retrospect Chuck could have been one of those boys, because he was quiet, observant, a gentle soul, someone who kept things to himself, and was "mildly troubled." She was shocked to hear about how Chuck's life turned out as she would have never expected anything violent from him.

99. Cindy Swahlen worked as a bookkeeper at SMS in the 80's. She learned about Mintz sexually abusing boys, but also found out there had never been charges because the boys who accused him backed down when asked to repeat their accusations to the authorities, which she believed was because they were too scared. She didn't approve of Mintz's fundraising activities, getting the kids to beg and running a bingo where they'd sell cards even after all the winning cards had already been sold. After Mintz left, she and her friend Jane tried to run the school, hired a certified teacher, but the Board of SMS stayed in touch with Mintz, and he influenced them to stop any legitimate fund-raising ideas she proposed. Eventually the school ran out of money, and the Board dismissed her. Her

memory of the school meetings she attended was that they were long and boring.

100. Chris Duval went to SMS years before Chuck, from about 1976 to 1980. He met Mintz and asked for a spot at the stock car races, which Mintz regularly attended. According to Duval, he got the word out by telling boys who were playing video games at Upton's, the local Burlington arcade. There were children from SMS as well as community children, and Mintz used it as an opportunity to promote his private school. Duval admitted he was having trouble in junior high; he described a very open sexual environment where sex between students was actively encouraged at SMS, including the supply of condoms. Regarding Mintz, he stated he "had a reputation of being a homosexual and had a habit of inviting young boys to stay overnight with him at the school." He described how he stayed over a few times, slept in his underwear like Mintz, on multiple mattresses on the floor in Mintz's loft. Since he'd heard rumors about Mintz messing with children who slept next to him, he made sure he never did. He also remembered Mintz taking new students or boys from the arcade off for what he called "private meetings." He was suspicious about what was going on in those meetings, since they seemed to last longer than they should have. He also remembered Mintz getting free passes for the Racquet Club and trying to get boys to go in the hot tub with him there, which he also avoided because he felt funny about it. He also remembered free passes to the races, movie theaters bowling alleys and ski resorts. When they'd ask for money from Mintz, he remembers Mintz would send them out to panhandle on Church St. in Burlington.

101. As pointed out above, Chuck was groomed by Mintz with many special outings, like Chris, including skiing, restaurants, the racquet club, and movies. Chuck only remembers being with Mintz in the loft alone, however Chris validates Mintz took a number of youths there and he knew of Mintz's sexual abuse of them.

IFCD 00027590

102.  Fred Jackson who goes by Bruce, also attended SMS prior to Chuck from 1976-1980.  Bruce had an experience on his way to school when a stranger approached him who wanted him to go with him.  He said the stranger "looked like an obvious child molester." Bruce refused and the man followed him to the school.  When Bruce got there, he told Mintz about all the things he said and had done, but Mintz took no action with the stranger, called no one in law enforcement, but instead encouraged Bruce to write a book. He now realizes as an adult, Mintz should have done more.

103.  Like Chris and Chuck, he also remembers lots of "fun things" Mintz invited him to, including hockey games in Montreal, bowling, video games, the arcade where he gave them lots of quarters to play, and going out to eat. He remembers sleeping in the loft with the ladder, a detail Chuck also remembered, but like Bruce, he remembered sleeping up there with other boys.

104.  He remembered Mintz both asking them to give him a massage and also him giving them massages. One time he remembered Mintz asking the boys what the strongest muscle in the body was, and he told them "The buttocks, and then he reached and started to massage mine, and then he reached around and fondled my penis." Bruce described how uncomfortable he was being touched by Mintz, but that he'd go back one or two times a week because of "all the good things that came with it." He also described what he does remember about those nights, including Mintz's creepy rayon pants, the smell of him, and how filthy his sheets were. I also can't shake the memory of his body hair, how it covered his back."

105. Bruce's report is distinct in him remembering how Mintz smelled, a memory that is also distinct and to this day still disturbing with Chuck.  Bruce's report also confirms how powerful the grooming was, with all those "special treats", as Chuck described. So even though he felt uncomfortable, he also wanted the "perks".

106.  Bruce reported also about the other inappropriate activities of staff, such as skinny-dipping with students, and he also described the

"Fuck Patrol" that Lucy Abair described. He also described his first French kiss with a teacher named Sharon. Another time at the Lakeview Shelter, a teacher named Joseph was dared to play the piano with his penis, which he did in front of all of them. Child services came for a visit and Joseph was laying underneath the door mat singing a song about being a dirty old man. They just ignored him. He also talked about another staff member Chris, who once handed him a condom when he saw him with his girlfriend, even though he was a virgin and hadn't asked. He remembered that Chris got involved with another student and they got married and had children. In a sex education class, he remembered a doctor at the University of Vermont who played a pornographic movie as part of the class.

107. Bruce experienced similar consequences of his sexual abuse as did Chuck, as you will read below in Section IX. He felt for a long time he was a bad person, that he deserved to be punished and that he was only hurting other people by being around them. These feelings led to drugs, legal problems, and more problems with his anger. The struggle Bruce had is very comparable to the struggles Chuck had when he got out of SMS, problems which lasted a long time.

108. John Kimber was also a student at SMS in the early 70's. He had lots of behavioral problems and was eventually sent to SMS. Like others above, he also got the grooming treatment by Mintz, including being taken out to eat, movies and bowling. He also went out to Mintz's house in Starksboro on the weekends. He loved all the freedom and trips at SMS, but the one thing he didn't like was "the overnighters" with Mintz. John also described the mattresses on the floor, and like Chris, he took whatever steps he needed to be sure he wouldn't be sleeping next to Mintz, including inviting others, whether they were students or not, which Mintz welcomed. He described a feeling of being "trapped" because of the way Mintz had sewn all the sheets together, ostensibly to "keep the body heat in", but John knew better. Like Chuck, he also described the discomfort of being in the showers with Mintz and described it as a "funny feeling." Like Bruce, he also remembered the massages and they all knew whoever was next to Mintz would get a backrub. Looking back, he

realizes how he was recruiting other children to be victimized by Mintz and to block Mintz from him. The last night he was with Mintz, he agreed to take John to a movie he wanted to see and to dinner. Then Mintz took him back to Overlake, and he knew he was there only with Mintz alone, and he became very scared. As usual, they got into bed only in their underwear, and then Mintz started with a massage that led to him slipping his hands under the band of his underwear. He jumped up, and Mintz did all he could to convince him to stay. He left and started walking home, but Mintz followed and convinced him to get in the van. He took the longest route to John's mom's house, and he got increasingly angry, and when he got out of the van, he threw rocks at it as he was going inside. He told his mom that night and she went to talk to Mintz, who of course denied everything. She promised she'd take care of it in the morning, but no action was ever taken. His brother-in-law blamed him for enjoying it, and he shut down. He met another fellow student Bart years later, and asked him about his experience with Mintz, but all he could do was put his hand up.

109. Derek Foxwell also attended SMS before Chuck from 81-83. He remembered how another student Billy tried to talk him out of staying over with Mintz and remembered the fear in his eyes. Derek went anyway, and remembered how uncomfortable it was. He described Mintz as "gross, never well-shaven, and overweight." Although he denied Mintz sexually abused him, he does remember a few times in the loft when Mintz threw his arm over him and he felt trapped. He remembered other boys who spent the night talking about the rumors of Mintz messing with other boys, and how they'd all insist it wasn't happening to any of them. He further described how "sleeping there felt like pimping yourself out. The loft was greasy and disgusting, sheets never seemed clean, it didn't smell good, and when you climbed down the ladder when other kids were there, it felt demeaning and made me feel dirty." He also described problems after he left SMS, including abusing alcohol, crashing his car, and living a shady lifestyle. He did get sober in 2005 and got married.

110. Richard Daugherty was also a student in the late 70's and early 80's at SMS, and he remembered he never trusted Mintz from day one,

and remembered Mintz as "kind of dirty, greasy and gross." He remembered Mintz trying to get him and others to shower with him, which he refused, but it didn't stop Mintz from repeatedly asking. He remembered too how other than the sleeping over part, the part before that was fun, because Mintz would take them out to the movies, bowling, dinner and to the bagel shop in the morning. After he saw the loft, he didn't want to stay there, because it was "disgusting, small and the mattresses had stinky sheets." Although Mintz insisted on anyone who spent the evening with him had to stay in the loft, for the first few times he refused and slept on the couch in the meeting room. He doesn't remember how it happened, but two times he ended up sleeping in the loft. Mintz tried to get him to sleep in his underwear, which he refused. He remembered feeling tense and being on alert all night long, squished between Mintz and the wall.

111. The second time Mintz tried something with Richard, he felt "his arm reaching over me, and his hand heading for my groin area. I could also feel his erection against my back. I moved fast and elbowed him in the face, right between the eyes and then I ran down the ladder from the loft. He followed me down, saying he'd been sleeping and must have been dreaming and just rolled over, but I didn't believe him for a minute. I stayed downstairs the rest of the night. In the morning meeting, I announced I had something to say and then told how Mintz had tried to touch me. He immediately denied it, saying he'd been asleep and must have been dreaming. I was mad at Mintz, and also hurt none of the staff stood up for me. Someone asked about my proof, and I said, I was the fucking proof, and demanded to know whether they were all chickenshit, because everyone knew about the sleepovers. But nobody was willing to say they believed me or do anything about it. Back at Starksboro that night, I had it out with two counselors, Chris and Janine. Chris told me I was overreacting, which really hurt, because I'd always looked up to him. As hurt and as much rage as I felt inside, I didn't leave right away, but I never stayed at school again." Richard remembered too that he kept talking about it and trying to convince other boys not to sleep in the loft.

IFCD 00027594

Eventually, Mintz convinced him to go to a group home in Brattleboro, where he was able to graduate high school.

112. Jessie Mashteare was also a student at SMS in the early to mid-80's when he also was having trouble in public school. Unlike all the other declarations, Jessie was "Chucky's" best friend, and he knew well what he experienced because he was in the loft with him. Like Chucky and all the others, Jessie's grooming started before he even became a student: bowling, movies, baseball game or out to eat. His family was poor, so the state took him into their custody, which was a way Mintz afforded to run the school. Like Chucky and others, all described how much fun they had, how few classes they had, and the trips they went on. He also remembers like Chucky going to the arcade during the school day. He also was made to beg on Church Street. He remembered going to Racquet's Edge club, and how he had to get in the hot tub with Mintz naked, and how he'd look at them while they were showering. He described it as "something you had to put up with." He described how his cousin Bruce, also a student, was sleeping with a counselor Theresa.

113. Jessie, like Chucky, also described climbing up the ladder to the loft, how there was only one bed and how you had to sleep with him. If there were more than one boy present, Mintz would sleep in the middle, and everyone only wore underwear. He now can see all of Mintz's special treatment as grooming. He remembered a time when Mintz took them bowling, and Mintz got upset that he was not winning, becoming so loud they both felt very embarrassed. Mintz refused to let Chucky bowl anymore, and afterwards he took both of them back to the loft, and this is a time he doesn't remember what transpired, just that he felt uncomfortable. He remembers Mintz's backrubs, and how as he went to sleep, he'd feel "his hands on me, first it was just touching my hand, which seemed like it could maybe be by mistake, but then his hands started moving to other places, like around my waist, and near the top of my underwear. And then he started pressing up against me or lying partially on top of me, and he did that, I could feel that he had an erection." He tolerated it as long as he could, but one night he got the courage to push

him away and told him he'd tell his cousin Bruce if he touched him again, and it stopped, along with all the "special treats."

114. He also remembered times Chucky went to the loft without him, and remembered telling him to stay away, but they never talked specifically about what either of them had experienced. He told his counselor at Starksboro where he lived and he "told me to stay away from the loft." Even though he remembered a big meeting about Mintz being accused of messing with boys and all he remembers hearing is, don't talk to anyone, and no one ever followed up.

115. He lost touch with Chucky but remembered him instantly when his legal team got in touch. He also identified with all the anger.

116. This testimony from Jessie is critically important because he was "in the room where it happened." Jessie's clear memory is a very important validation of all that Chuck shared about his experience being groomed, and about how as Jessie described him, Mintz was "gross" and he like Chuck, felt more and more uncomfortable and angrier and angrier. Like Chuck, he also remembers Mintz having an erection when he was touching them. Jessie is describing the process of submitting to the abuse as all the other victims, including Chuck, have described. Unfortunately, submitting is also associated with feelings of shame and guilt, discussed in more detail below.

117. Torley "Torey" Meister attended SMS around 1983-84. He did not know Chuck. Like others he was having trouble in public school, so wound up at SMS. He too described all the perks Mintz got them including free ski tickets and free ski equipment, free movie tickets and bowling and food. He described how they skied, played football and pinball more than any classes. He too described how they were made to beg for money in town. He remembers all the joking that went on about Mintz inviting boys to sleep over with him in his loft at school. He thought it was just something funny about it until he stayed over himself, and like Chuck, he only remembers being there alone with Mintz. He remembered staying as far away as he could, with Mintz in his underwear. Some of his friends "more or less confided in me that Jerry had touched them, so I

IFCD 00027596

knew it was true." He told the doctor Bob Belenky, who referred him to SMS, that Mintz was "a child molester." Bob was a mandated reporter, and Tory told him only that other children had been touched, so he did the legal right thing and reported Mintz to the authorities, which eventually led to SMS being closed down. He heard that Mintz had gotten in trouble before he started the school for the same reason.

118. Malcolm Sawyer also was a student at SMS from 1982-83 the first time, although he does not remember Chuck. He grew up on a commune and met Mintz through a fellow commune dweller who had begun working at SMS. A couple locals knew Mintz and thought he might be a good fit for the school. But he could only be a day student, so his mom decided to move out of the commune to Burlington so he could attend. Mintz became a father figure to him, something he'd been missing. He described like all the others all the perks/gifts from Mintz, including fast food, the arcade baseball games, and field trips to other states. He made some friends but left SMS to return to the commune. He never felt accepted at the commune after abandoning it the first time, so he went back to SMS again. Like others, he heard snickers about Mintz having some of the boys stay over with him overnight in the loft. At the time, he didn't see anything wrong with it because it was like the commune. Mintz invited him to stay over, which he did. At the commune as far as he knew, when people slept together, there was never anything inappropriate. When other children found out he'd slept over with Mintz, they called him a "homo."

119. He remembered when he slept over, he woke up with Mintz's hands in his underwear and his arm wrapped around him, with his back to Mintz's front. He remembered pretending it wasn't happening. He is aware he remembers Mintz trying to convince him to sleep naked, and how confused he felt by the touch. He also stated he tries not to think about being on the mattress with Mintz because he is worried there are more details he has kept from remembering. He also thinks that trying to block out the memories is what led to his hospitalizations.

120. In the aftermath to his abuse, Malcolm had several hospitalizations. When he returned the second year, he said "everything fell apart." Mintz touched him again and he could not block it out. Then he got a phone call from Social and Rehabilitative Services (SRS), saying a fellow student (Torley Meister, 1112) had told Doctor Bob Belenky about Mintz molesting him. He was scared and they called his mom, threatening her that if she kept him at SMS, they would take custody of him, so she did withdraw him. His friend Bruce from school convinced him to talk to SRS because what Mintz had done was wrong. After going through the grueling interview, they concluded it wasn't enough evidence to go after Mintz. Malcolm has suffered additional manic episodes, job instability, lifelong disability, and the end of a marriage.

121. Bruce Sanderson was also a student at SMS early to mid 80's, first a day student, but then left. He came back when he went into SRS custody, boarded at the Bunkhouse first, and then the Dome. He described also how all staff were counselors who also were teachers, how each student made their own curriculum. He described how Mintz did not teach except one student about the stock market; but he was a master fundraiser. He also remembered how everyone pitched in making fundraising calls. Looking back, he now believes it seemed a "little cultist"; with field trips, if they ran out of money, Mintz would negotiate to have them clean the parking lot for food or room.

122. Bruce described Mintz as a big, fat, hairy slob who didn't shower a lot. Still when he invited him to stay overnight, he did. He'd suggest I stay in town while everyone else went back to Starksboro (where the Dome/bunkhouse were); so, we could go bowling or something. He didn't know why he picked him, but he stayed to have fun. He knew he picked other boys at times to stay. We both slept in our underwear on the one futon mattress on the floor. It was a little strange, but I think he knew I wouldn't stand for being messed with, so he left me alone. Nights when he stayed over, he was the only one. He knew sometimes there were one or more boys at a time. He remembers it was announced at the end of the day who would be staying. Mintz would ask who wanted to stay, then he would make his choice. You could also tell who had stayed over because

IFCD 00027598

they'd be there early the next morning. If there were day students when he arrived, he knew they had stayed over with Mintz. Bruce remembers noticing this a few times with Chucky Hall, who he remembered as a day student. He also remembered how Chucky's demeanor changed over time, how he got more irritable, and there were a few times someone had to call a community meeting because he'd gotten upset.

123. Reflecting on the sleepovers, Bruce said he didn't especially enjoy sleeping next to Mintz, but it never occurred to him anything was really wrong with the overnights until his SRS caseworker Terry asked him if Mintz had ever tried to touch him inappropriately. She said there had been complaints about Mintz doing it with certain boys. Bruce told Terry that nothing had happened, but he was bothered enough by what she said that he told the SMS school counselor, CC McKegney, about it. He thought maybe they'd have a community meeting, but instead, he got brought to the school van, where the whole staff was waiting, including Mintz. He told them what Terry had told him; he doesn't remember much about anyone's reaction, other than it seemed like no one thought it was a big deal. He got the impression no one thought Mintz would do something like that.

124. That's why he was surprised when Mintz suddenly left the state. He doesn't know how it happened or when; he wasn't kicked out, but there was a blowup when someone reported he was having a relationship with one of the counselors, which was true. They kicked Theresa out and he went with her. He never returned to school.

125. Trish Miles also attended SMS from 80-86. She remembers Chuck in the smoking area, but he wasn't there to smoke, but to look for Mintz. He wasn't seeking Mintz out, but rather being vigilant about where he might be. He'd ask, "where's Jerry?" "Do you know where he is?"

126. She remembers no meetings about Chuck. She remembers Mintz screaming at their morning meetings describing him as a master manipulator, beyond a slob, gross and overweight.

127. Trish believes that Mintz chose to work with at-risk children and wards of the state because it gave him easier and free access to young

boys, who he could use for his own purposes. She is aware of two different boys who were molested by Mintz. She says, "I believe Jerry had a habit of having boys sleep overnight with him in his loft. The overnights were common knowledge, they happened a lot, maybe a few times a week, so much so that our reaction was to snicker and make comments like 'there goes another one.'" She recognized that favors were given to the boys that would sleep over. She said, "I didn't know what a pedophile was, but I felt uncomfortable, like something was not right. Then a boy named Richie said that Mintz had attempted to molest him; he was one of the cool kids, he said he'd been in bed with Mintz, faced away, and felt Mintz's hands in his underwear, feeling his butt. He said he kicked Mintz so hard he fell out of the loft." Then she became aware that another student named Malcolm filed a report about Mintz molesting him. He apparently wasn't believed, or there wasn't enough evidence. She knew Mintz left town and had heard he'd gotten run out.

128. Elizabeth (Liz) Miles also attended SMS from 1980-1986, where her older sister also attended. She also confirmed there was little learning there and no academics, except very rarely. She was a day student. She had only a vague memory of Chuck because he didn't stand out to make an impression one way or the other. She confirmed the relationship between student Bruce and teacher/counselor Theresa, which was not a well-kept secret. She also described the other "open secret" about the regular sleepovers with headmaster Mintz with the boy students. One time she and a friend climbed up to the loft to see what they were missing, and found "how gross it was, dirty mattresses on the floor, stinky, dark." She described Mintz as a "greasy, dumpy man." Further, she described him as distant and detached, and also his assistant, CC McKegney, as also being distant and unapproachable. She distinctly remembered how at one of the morning meetings, a fellow student Malcolm reported Mintz for molesting him. She had heard plenty of whispers and rumors and suspicions about what Mintz did with the boys in the loft, and definitely believed he was "messing around with them

sexually." Afterwards, it was clear to her that Malcolm making the report took a toll on him, but Mintz "acted like nothing had happened."

129. Zack Durbin was also a student at SMS in 82-83. He did not know Chuck. However, he was also one of the students invited to sleep in the loft, with one or two other boys between three and eight times over the year. He described how on the one hand, there was no reason to decline the invitation as it always involved some fun activity. The evenings in the loft he described as awkward, partly because Mintz always wore his "tighty whities", which grossed him out and still makes him shudder when he remembers it. He has a similar memory to Richie, one night when he also was sleeping next to Mintz with his back to him. In Zach's case, he was awake and felt Mintz turn over and press against him. He went on alert, and then Mintz moved in against him again, and this time he reached back and elbowed him, hard. He turned over and that was the end of it, but he reported in his declaration he has never forgotten the incident. He knew he never slept there again, but knew other friends did. He said he mostly tried to block it out. When the legal team approached him, he knew immediately they wanted to talk about Mintz molesting boys in that loft.

130. Mark LeClair in his declaration talked about how his brother John, a year older than he, was a day student and for a while a residential student at SMS. He and his dad and Mintz were all fiddle players, and he remembers Mintz coming over to their house and playing music with he and his dad. Even though Mark wasn't a student at SMS, Mintz would invite him to some of the activities after the school day. He described how he and John and other boys would be invited by Mintz to stay with him, where he always had multiple mattresses laying on the floor. He described how they all slept in underwear, and specifically remembered how Mintz would call one boy at a time to come sleep by him. One day his brother John asked him what he would do if someone put their hands in his underwear and played with his penis. He told him he'd tell their dad, but John asked him not to, and at the time, told him it was his secret to tell. On the one occasion, Mintz invited Mark to sleep by him. Mintz "started massaging my back and buttocks, and then there was his hand, coming around to the front to fondle my penis. I jumped up, asking him what the

IFCD 00027601

hell he was doing. He acted like nothing had happened. I moved to another mattress away from him and got through the night, but I didn't sleep at all. I was 13 or 14 at the time." He got home and told his dad both that he and John had been molested by Mintz, and his dad went to where Mintz was and punched him in the face, and John was removed from SMS. In 1979, he and his brother John were in a serious car accident, and a few years later, John died by suicide. He reflected, "I know John had a lot of problems, and they probably all had something to do with his suicide, but I will always believe that being molested by Mintz played a part."

131. Juno Lamb was also a student at SMS from 1984-85. She did not know Chuck. She attended SMS because her parents were advocates of free, democratic schools, having attended, and worked at a similar school in England. They both knew about sexual abuse that occurred at their own school which "traumatized both of them." Juno verified that there were no regular classes, and that she spent most of her time wandering around downtown Burlington or going to the library. She also verified they had to seek donations from townspeople for their field trips. He shared that the students wrote their own report cards and characterized this activity as "studying economics." He stated that you had to seek out a teacher if you wanted instruction, but that they "often failed to oblige." Although it was supposed to be a democratic school, he remembered that Mintz would "spend much of the airtime at the meetings (in the morning) haranguing the rest of us to vote for his point of view." Juno also witnessed staff member Theresa in bed with a male student.

132. Her dad maintained contact with Mintz over the years after she left SMS. She never understood her dad's tolerance for Mintz, who she described as "not a pleasant person to be around because he was pushy, and also because he didn't seem to take care of himself physically or hygienically. In general, he was not a person I enjoyed interacting with or ever wanted to spend time with." She remembers when investigators came to ask her fellow students about staff touching them in any way that felt uncomfortable, and they all denied it. Juno never went up to the loft.

**133.** **In summary, there is significant evidence that Mintz engaged in sexually abusive behavior with students and young male community members over a period of years. This behavior was well known to the staff, some of whom tried to intervene, and a number who knew the truth, but didn't have the ability, maturity, willingness, or courage to intervene.** It is important to acknowledge that the staff were groomed by Mintz to the extent that even knowing the truth they still kept silent. **A number of boys gave declarations that they too experienced being molested and sexually abused by Mintz in the loft.** All of them were successfully groomed by Mintz by his invitations to enjoy a variety of activities with him, and all of them followed instructions to sleep with Mintz in their underwear (i.e., they submitted). **Chuck's best friend Jessie was in the loft with Chuck. Chuck's fellow student Bruce remembers noticing significant negative changes in Chuck's behavior after he stayed in the loft while a day student. A number of these men have very distinctive sensory memories, and a number of them acknowledged similar aftereffects that Chuck also experienced as you will read below. Chuck suffered from a number of mental health problems, failed relationships, failed vocations and suffers from intense fear and distrust of those in authority.**

134. There is also significant evidence that the quality of education was practically non-existent, both hearing from staff and students. This is significant because it means not only was Chuck failed by the sexual abuse he experienced, but also by the lack of academic preparation. He entered SMS after failing the sixth grade twice. After one year he was placed into 9th grade. During his 9th grade year, it is documented in a psychological exam that he had severe problems in his emotional, psychological, and academic functioning.

## X. THE AFTERMATH OF THE ABUSE CHUCK EXPERIENCED AT SHAKER MOUNTAIN SCHOOL (SMS)

135. **Like many of Mintz's other victims, Chuck suffered in the aftermath of the abuse he experienced at the hands of Mintz.**

IFCD 00027603

## A. Behavioral

136. By 9th grade, he'd wait for his folks to leave and then he'd go back home from school or head to the beach 7 miles away. He'd go to the arcade, restaurants, or might skip with someone else.

137. He taught himself how to drive and got good at driving. He would take his dad's truck. He reported he didn't care about his own safety or anyone else's, nor did he worry about getting into accidents.

138. He engaged in stealing and skipping school. He no longer cared.

139. He sometimes thought he was tougher than he was, and always got into fights with guys bigger than him. He always thought he could win. An additional way of being tough was reporting he hung out with gang members. **Proving his masculinity became much more important after the abuse.**

140. When Chuck was a teenager he got a wrong number call from a woman in Grand Forks, North Dakota. He got the idea he'd go visit her, took his mother's credit card, and took a bus to see her. She was 18, and he spent the weekend with her.

141. Chuck's illegal behaviors have been documented above. These behaviors have led to him being diagnosed with Anti-Social Personality Disorder; however, **it is very important to note the connection researchers have established between unresolved trauma and criminal behavior. A scientifically documented after-effect of unhealed trauma is** *involvement in legal difficulties* (Eitle and Turner, 2002; Falshaw, Browne, & Hollin, 1996; Kerig & Becker, 2014; McGrath, Nilsen, & Kerley, 2011; Miller, et al., 1999; Van der Put, Asscher, Wissink, & Starnes, 2014). Several studies have concluded that having higher ACE scores (such as Chuck) is associated with adult criminality (Reavis, Looman, Franco, & Rojas, 2013). Another study by Currie and Tekin (2012) found that **child maltreatment is a major determinant of future criminal behavior, and that child maltreatment roughly doubles the probability an individual will engage in many types of crime**. Widom

IFCD 00027604

(1989) found that being abused or neglected as a child increases the risk for arrest as a juvenile by 53% and increases the probability of arrest as an adult by 38%. The probability of arrest for a violent crime is also increased by 38%. This study included a long-term follow-up, making it more reliable.

## B.    Alcohol and drugs

142.  Chuck tried alcohol, cigarettes, and marijuana. He had seen his parents drinking, so he thought he could handle alcohol, but he couldn't. After he came home from SMS, he remembers he broke into his parent's liquor cabinet. He remembers intentionally getting drunk twice. He told me that alcohol leads to him not feeling in control, so he doesn't like it. He smoked cigarettes from 15-16 until 18 and quit. His father introduced him to cigarettes. He tried marijuana twice, but it just made him tired and hungry. He just couldn't understand what people got out of it. He has admitted he did try cocaine one time, and LSD two times, once on purpose, and the second time when a drummer in his band put LSD in his drink unbeknownst to him.  When he lived with Michelle, he remembers drinking one to two drinks every month or two, and champagne on New Year's Eve. But he said he would pay for it for a number of days afterwards, due to his Crohn's.

143.  Having problems with substances is another well-documented outcome both of sexual trauma and aces (Dhaliwal, et al., 1996; Fradkin, 2012; Gardner, 1999; Hyman & Gold, 2018); Spinelli, 2018).

## C. **Depression, Self-harm, and Suicide attempts**

144.  Michelle saw a suicide note provided by the legal team from Chuck from after the time he came home from SMS.  She stated it was clearly Chuck's handwriting, and in it, he mentioned killing himself three times. He described how he planned to kill himself with carbon monoxide poisoning if his parents called the police.

145.  On June 6, 1997, in Maine Department of Corrections, he intentionally cut his left wrist with a razor blade, and told the CO, "I just did something stupid" and gave the CO the razor blade.

146.  October 4, 1998 Chuck composed the following handwritten note to Maureen LNU, "I'm dealing with a stressful situation that is becoming more of a black cloud above me as each day passes; with each passing day I feel myself falling further and further into a depression, that I fear I may never be able to fully climb out of; As I fall deeper into this depressive state of mind, I find myself going down a path of self-destruction; I'm not saying 'I'm suicidal' please don't think that, because I'm not. I just find myself not caring about anything anymore I fear the longer I hold out and trying to deal with this alone the worst this depression will get. If you could please find the time to talk with me on Monday, Oct 5, 1998, I would greatly appreciate it."

147.  Chuck has had a number of other brief counseling sessions related to his stress, difficulties controlling his anger, managing his depression, and difficulties with his Crohn's disease.  These included sessions on November 5, 1999, November 8, 1999, November 12, 1999, July 31, 2000, and January 27, 2004 (possibly including self-inflicted wounds). On October 15, 2004, he requested transfer to Supermax with

little or no contact because of his troubles with his ostomy, and to protect others and himself from his own anger. In a handwritten note, he related he has had many homicidal thoughts and ideations. On August 25, 2005, he tried to confess to killing someone on the street by disemboweling them; the story was actually the story of another inmate; the confession was forwarded to FBI, but they didn't buy it. In an examination, Chuck admitted he was using it to try to get out of general population and back to a segregation unit. On March 8, 2006, he was assessed and admitted to having random homicidal thoughts.

148. Chuck has had three very serious suicide attempts. On November 16, 2006, he attempted to hang himself with his ostomy bag. He was depressed and had let everything build up inside him. At the time, they diagnosed him with Axis I Bipolar II disorder, most recent episode depressed, severe without psychotic features.

149. In November 2007, he attempted suicide by overdosing on aspirin and Tylenol, a couple hundred each. He told me he was suffering with depression as a result of the Crohn's and the ostomy bag. Prison records say he left a note, but he does not remember.

150. On January 21, 2008, Chuck assaulted inmate Bonin, because he believed the inmate was a child molester. But in a psychological examination, Chuck stated he was upset with him for talking with him about being able to go home, and Chuck tried to strangle him, but he got away. In a psychological exam, he was found to report severe symptoms of depression, sadness, worthlessness, failure, anhedonia, disturbed sleep, decreased energy, loss of appetite, anxiety, phobias, and thoughts of suicide and self-harm.

151.  In October 2008, there was the third attempt with over one hundred Tylenol. He told me it was close to the holidays, and he had surgery to repair a hernia.  The sutures dehisced, and it left a wound, which was next to his ostomy stoma. It was not healing, and he leaked all the time. Other inmates could smell it, and it got on his clothes, and this made him even more of a target for their harassment. He told me he was changing his ostomy bag five to six times per day, and he was getting very tired of it. This is what led to the suicide attempt: he wanted medical attention.  He left an advanced directive asking not to be given any life saving measures, and initially refused treatment, but they gave it to him anyway.  He wound up in the Intensive Care Unit, he needed dialysis to flush his system of the Tylenol, and then they put him on suicide watch. He was then sent back to his unit and went to a range with two other prisoners.  COVID hit then, and he was moved back again around other prisoners.

152.  He told me even though he still gets depressed, he made a commitment to his father not to attempt suicide again, and he intends to keep his word. Currently, he feels like he wants to have the doctors amputate his legs due to the severe neuropathy or when he struggles with the Crohn's.

153.  Chuck has fears that talking about the abuse will lead to him feeling suicidal again. He knows that his legal team wants this information and that the goal is to get him off of death row. He states that he wants to survive and wants to get off of death row, but surviving is different. He is very worried about what might happen, if anything, if he goes back into the general population.

154.  These struggles with depression and self-harm are very common in the literature on male survivors (Barnard, 2018; Bryer, et al.,

1987; Chandy, Blum & Resnick, 1996; Dhaliwal, et al., 1996; Dimock, 1988; Easton, 2018; Fradkin, 2012; Gardner, 1999, 2018, 2018a; Hunter, 1990, 1990a; Lew, 1988, 2004). Feeling and acting in suicidal ways is yet another associated symptom with experiencing childhood sexual trauma and other traumas including bullying (Cohen, Shahar and Brunstein, 2020; Dhaliwal et al., 1996; Easton, 2018; Gardner, 1999, 2018; Hunter 1990, 1990a; Lew 1988, 2004).

### D.  An unstable self-esteem

155.        Problems with developing a healthy self-esteem are highlighted often in the literature (Dhaliwal, et al., 1996; Fradkin, 2012; Gardner, 1999, 2018; Gensler, 2018).

156.        Chuck has significant problems with valuing himself. Even though he believes his parents loved him even with all his acting out, he was left believing they had very little pride in him, which was very painful for him as he described to me. His suicide attempts were due to his inability to feel he has self-worth and that his life was worth living. Many of his struggles with his Crohn's Disease are rooted in this unstable self-esteem, that has been exacerbated by both staff and inmates making fun of him, harassing him, attacking him, and rejecting him as he rejects himself in the same way.

### E.         Anxiety

157.  Chuck struggles with anxiety because of shaming and harassment and his body issues. He prefers being at a heavier body weight because he feels more secure.

158. With regard to the possibility of my report about his sexual trauma becoming part of the public record, he is very anxious about that. He worries it gives other prisoners more ammunition. He says people there use any kind of weakness to belittle others. There is nowhere to go to avoid it. He says he worries it could make his life more miserable and people on death row already make fun of his ostomy. He knows that they make fun of his co-defendant for the sexual abuse that he experienced. He fears that they will read about his case and would say you liked it, or you wouldn't have done it if you didn't want it.

159. Chuck is triggered by smells, including passing gas, using the toilet, and the fear his ostomy is leaking. The other day somebody's toilet backed up and the whole unit smelled like feces, and he told me he took five showers that day because he kept thinking it was his odor.

160. Problems with anxiety for male survivors have also been described in the literature (Barnard, 2018; Gardner, 2005, 2018, 2018a, Hopper, 2018).

### F. Insomnia

161. Chuck states he can go two to three days without sleep. He has tried various medications for sleep with little or no success. He tries to practice good sleep hygiene, so if he can't fall asleep in an hour, he will get up. He keeps the light off and plays his TV as quietly as possible. He says he tosses and turns a lot and gets frustrated.

162. Sleep disorders have also been documented as common side effects of unhealed sexual trauma (Barnard, 2018; Fradkin, 2012; Gardner, 2005; Hunter, 1990; Spinelli, 2018). These problems with sleep oftentimes develop when a victim's abuse is done to them in a bed,

as is the case with Chuck.  As Chuck and others described the abuse, they would start to fall asleep, and then, at that most vulnerable time, Mintz would strike and begin his assault on their bodies and genitals. This could also contribute to problems falling asleep.

## G.    Anger

163.  He remembers after he came back from SMS, he got into a lot of fights at school, often at Thornton Academy.  He also remembers punching holes in the walls at home at least once or twice. He remembers even the slightest things would irritate him and he'd get angry. Sometimes he would just wake up angry. He directed his anger at his family, as they were the closest to him, and he blamed them for what he experienced at SMS with Mintz.  He was angry with his parents for leaving him with his abuser, even after he had begged them to bring him home.

164.  Before and after the homicide for a period of months, Chuck had thoughts of murdering others if given the opportunity. In May of 2009, he told a psychologist he would get a gun and shoot his brother-in-law for stopping his sister from having contact with him.

165. To this day, Chuck feels angry and depressed and has been angry for so long that he says it's his most comfortable feeling.

166. Problems struggling with anger for male survivors of sexual trauma have been extensively documented in the literature (Barnard, 2018; Dhaliwal, et al., 1996; Dimock, 1988; Fradkin, 2012; Gardner, 1999; Hunter, 1990, 1990a; Lew 1988, 2004; Linden, 2018).

## H.    Dissociation and flashbacks

167.  I witnessed Chuck drifting off and spacing out while talking about Mintz. He admits he can drift off into space; in prison, he may detach himself from what is happening so as not to get involved.  He says that sometimes others tell him he is staring off into space. He also admits that he sometimes becomes numb.  He states this has occurred if something bad is happening to someone else, and he doesn't want to get involved, as it leads to more problems. His sister Michelle also described how her son Josh "gets a look, like he's there, but at the same time he is not there. She acknowledged that she has seen this same behavior from Chuck.  This seems consistent with what I observed with Chuck as dissociative behavior.

168.  Chuck states that he has not had flashbacks recently, but if he sees things on the news especially when students are taken advantage of by staff or when he's seen people report about priest abuse, he is triggered. He says when he has a flashback, he experiences the sexual abuse all over again.  He states that the flashbacks last a couple hours and he stays angry long after.

169.  Prison records do also on occasion indicate Chuck has reported hearing voices, such as on November 22, 2009, when he said he occasionally hears voices to harm himself and on January 24, 2008, when said he heard voices others cannot hear. On December 4, 2009, he reported auditory hallucinations beginning shortly after his diagnosis with Crohn's. He told the examiner he heard multiple voices, sounding as though they are screaming outside of his head (he hears them through his ears). He said they say denigrating things and sometimes enjoin him to kill himself.  Chuck reported that antipsychotic meds help decrease the frequency and intrusiveness of these auditory hallucinations.  However, in a subsequent exam, he denied telling Dr. Gariety this.  He also denied this in 2011. He also denied with me he hears voices.

IFCD 00027612

170. Problems with experiencing flashbacks have been documented in research by Barnard (2018); Briere & Elliot (2003); Hunter (1990); Perkonigg, et al., (2000).

## I.    Shame

171. He states that he remains embarrassed and ashamed of the incidents with Mintz and doesn't know how to feel. He's glad that he didn't perpetuate the cycle. Regards to perpetration he says he doesn't think it is a choice, but it is learned behavior. He states that he always feels dirty any time the topic of sex comes up.  He states there are lots of times he feels ashamed and before he tried to commit suicide, he stated that he believed his life was not worth living and he prayed to God that he would let him die in his sleep. He didn't want it to happen again, and he remembers praying while he was a resident at the school that God would let him die in his sleep. Again, he believes he would be horribly judged if others found out.  So, he definitely connects his struggles with suicide with the feelings of shame. He knows that as a result of not valuing his life, that he would do stupid things like going to the top of a mountain skiing and then skiing really unsafely so much so that the ski patrol told him he was skiing unsafely and still he continued.  Regards to whether or not his Crohn's disease is somehow related to being a survivor of sexual trauma, he says that he believes that no one knows enough about whether or not it is stress-related or genetic. He knows he has no knowledge of medical history on his paternal side and his biological mother has denied a history of Crohn's disease in her family.

172. He admits he feels embarrassed and disappointed in himself, that he could have gotten out of prison decades ago. He took more time and committed offenses because he reasoned at the time that given his medical problems, prison was the best sanctuary since he couldn't support himself.

173. Although early in the interview he told me his parents were always proud of him, later in the interview he admitted they were only proud of him a little, and that they only trusted him a little. This suggests he feels significant shame related to his relationship with them and how much he had let them down. This is amplified by the fact that his mother refused to come visit him in any prison.

174. Shame is frequently discussed in the literature as an after-effect of sexual trauma, especially with males (Barnard, 2018; Beduna, Perrone-McGovern, & Marie, 2019; Courtois and Ford, 2012; Fradkin, 2012; Gardner, 1999; Rauch, 2018). Shame also is the primary reason survivors keep the abuse they suffer a secret.

### J. Keeping the abuse a secret and what led to Chuck telling his legal team

175. Chuck kept the sexual abuse he experienced a secret for several decades, in fact nearly 40 years. Had it not been for a trauma-informed investigator in this case, it is a good likelihood it would still be a secret.

176. I have worked with many male survivors who had planned on taking those secrets to their graves. In the male survivor literature, this topic of keeping the abuse a secret and the severe consequences has been documented in every major book and many articles written on the topic (Barnard, 2018; Dhaliwal, et al., 1996; Dimock, 2018; Easton, 2018; Fradkin, 2012; Gardner, 1999, 2018; Gensler, 2018, Hunter, 1990, 1990a; Lew, 1988, 2004; Palfy, 2019; Polusny & Follette, 1995; Singer, 2010).

177. As Easton (2018) found in his landmark research on male survivors, the longer a survivor keeps a secret, the more significant mental health problems they will have.

178. A significant additional finding of Easton's research is that most men keep their secrets for many years. Easton (2018) found that the mean time from abuse to disclosure was 21 years, and it took 28 years on average to have an in-depth discussion of their abuse. It is normal to keep abuse a secret, especially when the perpetrator is a friend of the family, or the victim knows that the family likes/respects the perpetrator as was the case here with Mintz. This creates additional barriers to disclosure.

179. Oktedalen, et al. (2014) called this phenomenon "trauma-related shame" and defined it as "a negative evaluation of the self in the context of trauma with a painful affective experience, and a behavioral tendency to hide and withdraw from others to conceal one's own perceived deficiencies." Such shame has been found to be a predictor of PTSD symptoms (Labash & Papa, 2014).

180. As I have indicated in this report, Chuck blames himself, a classic outcome of sexual trauma, especially when the perpetrator is in a position of great power and authority over the victim. Chuck has been unable to talk about the abuse in therapy, and thus he will continue to suffer consequences of the secret.

181. In addition, he is very fearful that if other men learn of his sexual abuse, he will experience severe judgment, shaming, and harassment. This is a very common fear of survivors and is another primary reason why they choose to keep it a secret (Fradkin, 2012). When a survivor keeps their abuse and trauma a secret, it has a direct impact on how much shame they feel about themselves. The more shame a survivor

feels, the more they will behave in dysfunctional ways to try to avoid feeling that shame, including depression, unstable sense of self, struggles with anger, substance abuse, difficulties with developing trust and intimacy, and dissociative symptoms.

182. I asked Chuck what led to him being able to tell Rebecca, the investigator, and he said that one time when she came to visit, she started to talk about SMS and that she had talked to a former student. She told him she noticed a physical change in his demeanor when she asked about Mintz. He remembers telling Rebecca that Mintz shouldn't be allowed to be around children and that's what started the conversation. Rebecca told him that some of what he told her was exactly what other students had said and they didn't know each other, and Chuck had no knowledge of what those students told Rebecca.

183. To this day, Chuck continues to believe that he should have stopped Mintz; that is how he feels. When I suggested he didn't have the power to do that, he said that's how I feel. He feels especially ashamed and disappointed in himself that he didn't know what to do when Mintz said that this is "our secret".

## K. Problems with poor judgment

184. Chuck's life is literally littered with examples of poor judgment triggered by significant emotional disturbance prior to the act. Some of the examples relate to the criminal screams for help he engaged in, such as calling in bomb threats that resulted in severe disruptions to airports, passengers, and security forces when he believed medical personnel and guards were disregarding his screams for help about his complications from Crohn's Disease. When he had opportunities to ask for help, his ability to trust was so impaired that instead, he'd decide to break the rules, steal a car or money, run away, and most tragically and

IFCD 00027616

unfortunately, engage in a murder. The psychiatric evaluation completed by Dr. Wisner on February 9, 2014, concluded that Chuck was under unusual and substantial duress around the time of the homicide. He was experiencing severe mental and emotional disturbance at the time of the homicide. In my book (Fradkin, 2012), I described these symptoms as a part of what I describe as being loyal to dysfunction. This is often the only option a survivor has available in their coping tool chest, as they have not yet learned to be loyal to functionality, which would lead to healthy avenues of behavior that would actually help them address their severe distress.

### L. Impact on Chuck's sexuality

185. Chuck remembers as a 20-year-old having erectile dysfunction and having no interest in having sex. He states the women were willing and ready, but he was not able to perform. He states that it felt like they believed that it was them that was at fault, and he couldn't disclose why it was he was having problems being functional. He states he couldn't tell anybody. He said it felt like it was his fault, and he couldn't tell. He told me the abuse ruined all of his relationships. For most of the girlfriends he had, the relationships lasted only six months to a year, and all he ever did was kiss. He said he wasn't interested in sex or sexual encounters.

186. Such problems have been well documented in the research (Barnard, 2018; Dhaliwal, et al., 1996; Easton, 2018; Fradkin, 2012; Gardner, 1999, 2018; Hunter, 1990; Kort, 2018).

187. Regards to concerns about his own sexuality, he stated that when he was younger, he thought that there was something wrong with him that he did something to attract Mintz. He knew he didn't like the experience, but he had not been with a girl. He didn't know what to feel or think.

## M. Screaming for help and attention: being loyal to dysfunction

188. Chuck has acted out for attention, he's engaged in manipulation and lied at times, all of which I would suggest are screams for help. What he does need help for includes primarily the shame he feels because of the abuse, his feelings of inadequacy, and his feelings of helplessness when his medical situation is minimized, ignored, and when he is stigmatized and teased for it.

189. There are multiple examples of his loyalty to dysfunction, and here are a few:

a) At SMS, he screamed for help when he stole a check from Susan and her husband so he could get away from perpetrator Mintz.

b) When he came home from SMS, he engaged in many forms of screaming for help: he got into fights with bigger children, he skipped school, failed to do his homework, and took his father's truck for joyrides, to name a few.

c) He stole his mother's credit card to use to buy a bus ticket to Grand Forks, Nebraska to visit a woman he never met.

d) He called in bomb threats that were false, with serious consequences.

190. I have come to understand this type of behavior as the outcome of **learning to be loyal to dysfunction and disloyal to functionality.** In my book (Fradkin, 2012), in two chapters I explained that it is common for survivors to be loyal to dysfunction, which is the complete opposite of what would lead to healthy functioning. Being loyal to dysfunction, which is learned when a survivor is abused, shamed, harassed, bullied, ignored, and misunderstood, becomes the only tool or guide a survivor has to cope

IFCD 00027618

with all the challenges they encounter in life. Being loyal to dysfunction is not a choice, it is learned behavior, and until a survivor has an opportunity to receive trauma-informed therapy, many will continue to go down this path of self-destructive behaviors as they have no other coping tools.

### N.    The impact of Crohn's on his life

191. Chuck has struggled a lot with Crohn's in prison, especially with getting the professional help he needs.  He's been accused of faking it, exaggerating, and trying to manipulate when he's complained about his symptoms.  While in a medical facility, he was physically attacked by a prison guard and punched.

192. Spinelli (2018) details the many significant problems a survivor can have interacting with the health care system.

### O.    Struggles with intimacy

193. Difficulties with intimacy have been addressed often in the literature (Dhaliwal, et al., 1996; Dimock, 1988; Easton, 2018; Fradkin, 2012; Gardner, 1999, 2018; Hunter, 1990, 1990a; Lew, 1988, 2004). One aspect of this difficulty is an impaired ability to trust, which has also been addressed in the literature ((Fradkin, 2012; Gardner, 1999; Gensler, 2018; Lisak, 2018).

194. In Chuck's case, he has only had three relationships of any significance. In the case of Barbara, the relationship fell apart due to a variety of differences and challenges, including different expectations around intimacy and availability to one another. There also was a very

large age difference of 23 years which was also a substantial barrier to overcome.

195. He then picked Ruth, who was another emotionally unavailable partner. They did share some interests, but she was unable to be faithful to him.

196. His last relationship was with a woman he met in jail, clearly another example of an unavailable partner.

197. Chuck has substantial difficulties with trust because his trust has been betrayed so many times. The major betrayal of his trust began at SMS. This is an essential skill needed for intimacy, and Chuck is still very impaired. Chuck's trust was so impaired after SMS that even when his parents and counselors tried to reach him, he had severely shut down that part of himself that would allow him to share any vulnerable part of himself, including all the emotional damage he had experienced. Part of his recent ability to trust I would attribute to Chuck being heard and believed with regards to his medical needs, his legal needs, and his sexual abuse history.

## XI. RESULTS OF THE CAPS-5 AND PTSD

198. I asked him about what period of time in his life seemed the most traumatic for him and he said the whole school year at SMS until he left was horrible. He said when he got home for a very short time, he had a honeymoon period with his parents and then the bottom fell out. He said he would help around the house with chores, but after a while he didn't want to be anywhere where he was. He said they tried to treat him as an adult, but he'd be gone for two to three days at a time with his friends and then he'd pop back up at the house. He knew his mother and father were worried and upset with him, but he just did what he wanted to do. He got

IFCD 00027620

Ex. 4 Page 442 of 531    Case 4:21-cv-08001-BCW    Document 70-5    Filed 04/29/24    Page 64 of 131

arrested for breaking and entering and for receiving stolen property. He said he did stupid stuff like standing on a moving car and using the cars as a surfboard or stealing his parent's car. He had a general disregard for himself and for others.

199. I asked him about unwanted memories, and he said he would stay up all night long. He'd sit and watch TV while others slept, focusing on much anger and hate inside. His brewing anger caused him to have thoughts of harming others, including his own parents. I asked him about flashbacks, and he said a couple times with women when they touched his penis with their hands, he would jump back.

200. He states that to this day he does not like being touched. He states that Barbara and he had many arguments even about holding hands. He said that Barbara took it as rejection, but he didn't want to be touched by anyone. He would watch his nephew who was autistic, but he'd have to ask his mother to change his diaper because he felt so uncomfortable. He states he knew how to change diapers but felt uncomfortable with the contact. He states he wouldn't change Susan's daughter's diaper either when he lived with her family.

201. I asked him about being emotionally upset when reminded of the sexual abuse, and he stated that he stayed perpetually angry. He said he faked a smile and laughed, and they would ask what was wrong, and he would tell them he was fine. He said that the more they asked, the more irritated he got and that led to them asking even more. He physically reacted by withdrawing from any touch. He stated that the overpowering smell of sweat makes him nauseous. His father had glasses like Mintz's, and he told his dad he hated those glasses. His dad changed them. The Bureau of Prisons gave him black plastic frames just like Mintz's and he hated them too. I asked him if he tries to avoid thinking about the abuse, and he said, "I've spent my entire life trying to forget."

202. I asked him if there were activities that he avoided doing because they reminded him of the abuse and he stated that since he left SMS, he's never played racquetball and never wanted to stay at anyone else's home. He stated that he used to hang out with other children and

spend their nights with them. I asked him if he has difficulty remembering some aspects of the abuse and he states that some parts he remembers, but he's not sure if he's purposely blocked stuff out or whether it's just the passage of time. He says there are things that he's discussed now with Angie and Dr. Israelian and me that he didn't tell Rebecca at the time because he didn't remember.

203. Clearly, he's had many strong negative beliefs about himself as I've detailed. He definitely blames himself and has strong negative feelings including anger and shame. He states that he's been much less interested in activities he used to enjoy including sports. He states he's felt distant or cut off from other people much more after being at SMS. He states that he just couldn't make friends when he came back the way he used to. He said he felt like everybody was looking at him differently. He also stated that he has difficulty experiencing positive feelings even now that he continues to push people away. He agrees that he can be very irritable and angry. He states that he went four years without talking to people. He cut off everybody. He states, "I was here, and they were outside" and it was easier to shut everyone out. One way he deals with this now is burning through his allocated minutes of phone time he gets to communicate with others as fast as he can so that he can avoid others the rest of the month.

204. He states that in terms of taking more risks, he said he took many more risks as I've detailed above. He said he was definitely hypervigilant and would walk around the house at night and check all the doors to be sure they'd be locked even though his father did it and he knew that his father had done it. He's not sure about strong startle reactions but does know that he's had problems with concentration and then it got worse after SMS. He said that his sleep definitely got worse after SMS and even today he still struggles with sleep.

205. With regards to a diagnosis of PTSD, Chuck meets criteria for a diagnosis of PTSD. He has experienced sexual violence which satisfies Criterion A. Additional Criteria for the diagnosis for PTSD include intrusion symptoms, avoidance symptoms, cognitions and mood

symptoms, arousal and reactivity symptoms, duration of disturbance, and distress or impairment.  He meets all these criteria. In fact, at the time of my evaluation for the past month he endorsed symptoms consistent with severe PTSD.  For his worst month, he endorsed symptoms consistent with extreme PTSD.

206. When I asked him about what it's been like sharing these memories, he stated it was difficult just reliving it in his mind. He states that he knows that it's going to sit in his head for days and when he starts thinking about it, he will dwell on it. It's like a problem he's had for a long time that he just can't let go.  He told me that even though it was difficult and clearly there were times when it appeared that he was dissociating or spacing out, he stated that I made it easier. He said he wasn't sure if with another man he would be able to open up, but he said that I helped him. I asked him what he would say to other guys with similar experiences to him and he said he couldn't say, because he doesn't believe that he'd want to tell them that they should tell their truth. He still thinks that it's his fault, but he would feel bad for them and wished that he could help them, but he states I can't even help myself.

207. Regards to the long-term effects, he states that I don't like placing blame on others and I want to accept responsibility for my own behavior. He states that he used to cheer for Penn State but because of Sandusky and that it happened for so long, he can't do that anymore. He states he doesn't even know Jerry's last name (Mintz) and wants to believe there's a special place in hell for him.

208. He states that he continues to feel angry, and he's upset with himself because he didn't say anything. He thinks that if he could have said something, he wonders if he could have prevented someone else from being sexually abused. At the same time, he wonders about the others who were abused before him who also didn't speak up and wonders if they had, could they have prevented abuse of others, including himself.

209. I asked him how he planned to take care of himself after this interview, and he said I'm going to bury it and I'm going to try not to get too angry. He says I have to be careful and distract myself. He said he'll

probably get on his tablet and play video games and sudoku puzzles and crossword puzzles and hopefully he can just forget. He plans to bury himself in his books. The last thing he said was that I respect my legal team especially Rebecca and Angie.

210. Being diagnosed with PTSD as a survivor of sexual trauma has been extensively discussed in the literature (Barnard, 2018; Gardner, 1999; Hopper, 2018, 2019; Hunter, 1990; Hyman & Gold, 2018a; Oktedalen, 2014; Skidmore & Roy, 2018). An important conclusion Oktedalen reported is that keeping one's abuse a secret is highly correlated with the development of PTSD.

## XII. RESULTS OF THE BECK DEPRESSION AND BECK ANXIETY INVENTORY

211. As indicated above, Dr. Israelian administered the Beck Depression Inventory and the Beck Anxiety Inventory on November 28, 2022. For the Beck Depression Inventory (Beck, Steer and Brown, 1996; Beck, Steer & Garbin, 1988), Chuck scored endorsed symptoms demonstrating that at the time of this test he was experiencing *moderate depression*.

212. On the Beck Anxiety Inventory (Beck, et al., 1988), he endorsed symptoms consistent with *moderate anxiety* at the time of administration.

## XIII. COUNSELING AND RESIDENTIAL EXPERIENCES

213. **Counseling with the church priest:** This was his first counseling experience. It was right before he went to SMS. He doesn't remember anything about it.

214. **Family counseling at home via Sweetser-Children's Home:** In 9th grade, he remembers counselors coming to the house. He told them

what they wanted to hear, and he wanted them to think he was not having any problems. He remembers they stopped asking him questions and just talked to his parents. Eventually this led to Chuck being enrolled at Homestead.

215. They provided a nine-week intervention from November 5, 1985, through January 8, 1986, which is their typical intervention time. During this time, counselors met with both the parents, Michelle and Chuck separately, and they also had family counseling. The counseling was initiated largely because of Michelle's difficulties at home and school, however once it got started, it was clear that Michelle and Chuck were taking turns acting out, creating a lot of chaos in the home and major stress for both parents and their relationship. The intervention was believed to have strengthened the parent's relationship, increased their ability to set healthier boundaries, and allowed times when they enjoyed activities together. Still, it was recommended that a substance abuse evaluation be done with the parents, which they do not appear to have followed through with. It was recommended that both Michelle and Chuck have a psychiatric evaluation. Michelle had such an evaluation, with a recommendation for individual counseling. It was recommended the Halls receive marriage counseling as well.

216. **Counseling/residential treatment At Homestead:**

a. In August 1987 Chuck was admitted to a residential treatment program at Homestead. The program at Homestead was a very structured program with classes. Chuck recalls Homestead including camping, canoeing and other outdoor activities, though education and group therapy were priorities. They had very strict discipline, and even had a padded room where Chuck was restrained. He was made to scrub the floor with scrub brushes strapped to his hands. They also put moon boots on them and made them carry five-pound buckets of rocks for one to two hours on the beach or the basketball court. Another discipline he experienced was being made to dig a hole, fill it with rocks, then dig it up again. He told me that didn't happen "too often." Despite all this, he reported he made good friends there, and liked the staff. He felt respected and trusted by

staff.  He succeeded in getting to the highest group regards to discipline and he was able to graduate the program. One of his best friends, John, was behind him in the program, and they made a promise to each other that if John would graduate, and Chuck would attend aftercare, Chuck would attend his graduation, and they kept both promises.

b.     Records reflect that as of August 25, 1988, Chuck was addressing family fighting, loss and abandonment issues, and parental alcohol use. It was noted he was starting to use group effectively to address his 1) criminal behavior, 2) manipulation and intimidation of others, 3) poor peer interaction skills, 4) family stress due to adoption and poor parent/child communication, 5) confusion over his sense of self and sexual identity, 6) non-compliance with rules and authority, and 7) his inability to function in the public school.  Chuck was unable to disclose his history of sexual abuse.  Counseling was exclusively done in group therapy, and he feared others knowing about his shameful secret.  He believed he knew how the children would be and he was very fearful they would use it against him.   However, he credits the counselors at Homestead with being professional, seeing through his b.s., and they actively tried to get him to tell them what he had experienced.  They knew he had issues with his sexual identity, and he believes they understood the root of those problems, but he only acknowledged the bare minimum to get out of there.  He was in group therapy there; he admits he talked little and did his best to stay on the surface; and manipulated to get out of talking if he could.

c.     On February 29, 1988, it was recommended he continue another six months as he was making bare minimal progress and minimizing his problems. He was now achieving a B average in schoolwork, a substantial improvement.

d.     By August 1988, he had achieved Level III at Homestead, and he was decreasing his denial of his problems, but he still disliked the group pressure to really look at himself. He expressed fears about turning 18 and having no plan. He did go AWOL on a group trip on August 12th and took items not belonging to him, leading to Homestead filing theft charges

against him. He was still struggling in school. On December 14, 1988, there was a treatment summary announcing an intention to discharge him in January 1989 despite inconsistent progress, rule breaking, and difficulties with his attitude and peer interactions. Individual therapy was recommended upon discharge.

e. The Homestead record also contains Chuck's own appraisal, consistent with his request to fly under the radar and appease in order to avoid scrutiny: After stealing a sleeping bag, he now realizes the seriousness, and doesn't think he will continue to have a problem. He believes he has learned to own what he does instead of lying. He feels he is more straight forward and understands that rules do apply to him too. He realizes he needs to address his sarcasm and negativity. He does have a better sense of self. He believes he has had no issues with non-compliance and has found other healthier ways to deal with things. Chuck stated he wants to enroll in adult education.

f. On January 16, 1989, a final report from Homestead indicated he was discharged from the program and had agreed to engage in aftercare for 2 months. In this report, they note his progress but also his ongoing need to deal with his identity confusion and tendency to relate in a passive aggressive manner.

g. Mary Tilghman was a staff member in the 80's at the Homestead as a residential team member and team leader and confirmed the types of punishment and discipline that Chuck described to me. She felt it was too abusive, harsh, and hypocritical.

h. Bonny-Sue Curtis, who legal last name is West, knew Chuck, as they attended the Homestead Project at the same time. They were in the same therapy group. She described how they "dated", but how restricted that was since they were unable to touch and were watched all the time. They did tell each other they liked each other and talked on the phone during their home visits. She described how Chuck was always very nice to her and treated her well. Further, she never saw him be violent or aggressive, was funny, a sweetheart, and smart. She described being disciplined with all the same types of abusive techniques described in

point a above. The last time they saw each other was in 1993 when Chuck visited her for a few hours, which she said was pleasant. Further, she stated she always cared about him and considered him a good friend.

i. Renee Dubois also attended the Homestead program. She has only vague memories of Chuck, and she doesn't remember him getting in a lot of trouble, but just "kind of around, he didn't really stand out." She also confirmed the same types of harsh discipline that a staff member Mary and Chuck detailed.

j. Edith Smith was also enrolled at Homestead while Chuck was there. She also confirmed the discipline Chuck described, and also credited Homestead staff with creating a space where you could address your root problems, including her own sexual abuse. She remembers Chuck as being a "really nice guy," but she was not in the same group with him. She described him as easy to get along with, and how he made her laugh. She thinks he exaggerated his stories to try to get people to like him, and most people did. She did have phone contact with Chuck in 1989 a few times when she found out he was a DJ at a radio station in Saco.

k. John Mandarelli details Homestead "mistreatment" of "intensive therapy" carrying a 35 pound bucket with rocks until you got blisters on your hands and feet; scrubbing floors which they forced you to do by grabbing you by the back of the neck and one on your spine, tripping you, and being held down by 4-5 staff members as they made you scrub; wearing heavy clumsy moon boots; getting restrained and put in a padded room;  and how the "therapy" could be for something as minor as swearing or interrupting, and that at least for him it was a few times a week or even every day.

l. He confirmed that Chuck was like a big brother to him and tried to protect him, but there were many things he couldn't protect him from. He confirmed that he never knew Chuck to get in a fight or any confrontations when they were both in Maine State Prison (MSP). He described how Chuck got "punked out more often than not, but he stayed humble. He was aways taking the blame for other people.  If someone got

caught with tattoos Chuck had given them, he'd still take the blame or give up his tattoo gun" to save the other guy from receiving punishment.

m. He described too how he learned from Chuck it was better to be humble than to answer every call to violence. He remembers hearing people talking and calling him "shitbag" after an accident with his ostomy bag. He saw too how Chuck was affected by the teasing and gossip because he tended to isolate so he didn't have to be subjected to more teasing.

n. Steve Parks also attended Homestead and testified at the capital trial in 2014. He was sent there by his probation officer. Chuck was in the same therapy group with Steve. Chuck was his mentor and he looked up to him. Steve especially enjoyed playing music with Chuck. Steve detailed all the various discipline strategies used by the staff, and explained in his declaration how many of them were designed to be and indeed felt humiliating. Steve did not have an opportunity at the trial to talk about the negative punitive behavior management program, nor did he have a chance to talk about what he believed to be the poor-quality therapy based on his extensive therapy experience, in that they only offered group therapy and no individual therapy. He did provide a positive character reference for Chuck, testifying he was not rebellious nor a troublemaker, never witnessed him being a bully, and was a nice guy who tended to help out the new people who got there, including Steve.

217. **Counseling and prior evaluations in prison:**

a. In August 1999, shortly following incarceration, his evaluations described symptoms of insomnia, psychomotor agitation, irritability, angry outbursts, racing thoughts, accusatory auditory hallucinations, and anxious depressed mood. He was diagnosed as Bipolar Mood Disorder, type 1, occasionally type 2 with depression and psychosis. He received treatment with antidepressant, anti-psychotic, and sedative hypnotic medications, along with intermittent treatment with anti-anxiety medications. His mood was reported as depressed, anxious, and irritable. There were a number of subsequent evaluations, resulting

in diagnoses of some form of affective mood disorder, sensitivity to criticism, over-reporting of symptoms (either viewed as exaggerated or a cry for help). A diagnosis of anti-social personality disorder had been added by some due to Chuck's early criminal history and his later anti-social acts. While incarcerated, as indicated above, he made three attempts at suicide: hanging, taking 100 Tylenol, and the third by ingesting large dose of aspirin. Both overdoses required hospitalization.

b. On February 9, 2014, four years after killing Victor Castro-Rodriguez, he was given a psychiatric evaluation by Dr. Wisner. Dr. Wisner concluded in a review of his psychiatric symptoms at the time that Chuck had brief periods of inability to sleep; restless, racing thoughts; irritability; increased goal-directed activity, usually with increase in depressed mood; denies euphoria; no connection between these episodes and flare ups of abdominal pain; these experiences are once or twice a year, lasting up to 9 days; Chuck reported concerns of his ostomy and his concern inmates will taunt him about his deformity. He reported auditory hallucinations that are either more intense or more distressing during these episodes. Further, he reports the hallucinations are harsh, accusatory, demeaning voices telling him he is worthless, no good and does not deserve to be alive. At times they suggest suicide or to harm others. He cannot quote the hallucinations but can only identify their content or meaning.

c. He was found to minimize his mood symptoms, reticent to describe his sense of humiliation and sensitivity to be taunted or not listened to about his symptoms; Chuck had the same reluctance to report psychological symptoms to staff and caregivers, except to emphasize his need to be housed in more isolated or segregated detention and/or treatment settings, stating he avoided appearing weak or crazy which he feared would draw attention away from the management of his Crohn's disease. Dr. Wisner noted that when in more open settings, Chuck becomes more anxious and irritable. He seeks to remain isolated or segregated to deal with these feelings.

d.      Chuck also admitted to episodes of becoming unaware of his surroundings and losing track of events (10-15 min duration); he denied incontinence or abnormal motor movements in association with these periods of absence but says other inmates told him he was "tuned out" and unresponsive. He recalled a racing pulse and feeling more anxious immediately after these episodes. They occur one to two times per year.

e.      Overall, the psychiatrist found that Chuck was mostly anxious about his medical condition, his ostomy and being disrespected. The hallucinations have increased in severity and intensity during periods when he is more irritable, hyperactive, sleepless, and vigilant.

f.      Dr. Wisner further noted he had a chronic depressed mood and desire to be left out of public view. He reported chronic difficulty falling asleep, wakes frequently during the night, and his insomnia is much worse during periods of increased anxiety, restlessness, irritability, racing thoughts and hyperactivity. His depressed mood and auditory hallucinations are present most of the time with brief periods when they are less intense or negligible, and they appear to be chronic or sub chronic. Both are worsened by periods of excitability, irritability, and reduced sleep. He reports increased thoughts, and some hallucinations are related to harming others when his mood disorder is unstable, and his sleep is disordered. Chuck reports ongoing thoughts of suicide, but no intent or plans in the recent past. He also reported his auditory hallucinations are less distressing where he is in segregation from the general population and his Crohn's Disease is in good control. During the offense, he recounted feeling greatly disrespected by the victim, and felt outrage and humiliation.

g.      Regards to a mental status exam, he was found to have his emotions restricted; he understood context; denied hallucinations, he was minimally distractible, coherent and goal directed; Chuck had difficulty providing additional detail when describing his emotions. His mood was average; memory grossly intact; but Chuck had difficulty identifying

IFCD 00027631

specific dates; he also reported feelings of decreased self-esteem especially regards to his ostomy and illness. Records quote him as periodically having feelings of hurting himself or others.

h.  The psychiatrist noted his high level of concern, anger, and vigilance re: being disrespected by other inmates, not being believed by staff about his flare-ups of his Crohn's Disease and taunted about his physical impairment.

i.  In summary, he was diagnosed with:

Axis I:  Major Affective mood disorder
Bipolar Disorder
Chronic Psychosis
Chronic Depression
Phobic Anxiety
Axis II:  Antisocial Personality Disorder
Axis III:  IBD-Crohn's Disease
Axis IV:  Severe medical illness, incarceration and charged with capital offense
Axis V:  Global Assessment of Functioning: 45 (serious impairment in social, occupational, or school functioning)

j.  The psychiatrist offered the following opinions: Chuck was apparently not treated with mood stabilizing medications; and that the medications he was given have potential to trigger or exacerbate Bipolar illness. His known history of head trauma has not been assessed regards to any brain injury, which could have some impact on his vulnerability, severity of illness and degree of duress. Psychiatrist Wisner was unsure about whether the degree of care given to Chuck was appropriate.

k.  He concluded that Chuck was under unusual and substantial duress on and around 1/26/2020. He was experiencing severe mental and emotional disturbance on and around 1/26/2020.

l.     Further, he stated he believed with appropriate supervision and segregation, any future risk of violence can be effectively minimized with more appropriate treatment with mood stabilizing agents and anticonvulsants.  Based on his review of tapes of the night of the murder, he further stated his opinion that the institution failed to provide the appropriate standard of care re: patient observation and monitoring.

m.     The prosecution hired Dr. Park Dietz and he completed an evaluation of Chuck on April 26, 2014, a couple months later. Dr. Dietz videotaped his evaluation.  I note that Chuck was not asked to sign a consent form for the interview or for the interview being videotaped.  In a trauma-informed interview, it is recommended questions be phrased as open-ended as opposed to closed (yes/no).  An example from Dr. Dietz's interview with Chuck is when he asked, "did you have an active sex life" and "were you physically attracted to her" versus more open-ended questions about his relationships. Another example from the interview is when Dr. Dietz asked Chuck, "were you badly injured" versus "tell me about your injuries." Many of Dr. Dietz's other questions were yes/no.

n.     Dr. Dietz at times offered his own theories about Chuck's behavior, as opposed to asking Chuck about his motivations, which would have been trauma-informed.  An example is when Chuck shared the story of his mother's alleged attempt to kill him, his sister and then herself. Dr. Dietz says: "what if that was a story you made up to get sympathy from women, and you told it over and over until you believed it?" In a trauma-informed interview, a typical question would be "tell me more about…", but Dr. Dietz rarely asked for such elaboration of his feelings and thoughts. In a trauma-informed interview, the interviewer often will offer empathy, and Dr. Dietz offered little (except for offering empathy for his feeling to protect himself due to his ostomy, and one other time offering compassion about Chuck's reaction to the medical staff accusing him of causing his stoma to herniate and complicate his Crohn's Disease just to get attention).  In response to Chuck talking about taking many aspirin as a suicide attempt, Dr. Dietz asks, "Did you think aspirin would give you

Crohn's Disease?" At times, he offers his opinion about Chuck's feelings/behavior, such as when they discussed Chuck wanting to kill his brother-in-law, and Dr. Dietz responds: "it seems an extreme reaction to him rubbing you the wrong way." This is a judgment. Or asking, "you don't think you are a pathological liar?" To me, this is a statement from Dr. Dietz, "I think you are a pathological liar." Or asking, "were you making up the homicidal thoughts?" In my estimation, this is Dr. Dietz telling Chuck he thinks he was making them up. Or asking regards to the motorcycle accident when the police hit his back tire and he went flying off the bike, Dr. Dietz asks, "think you made a bad decision fleeing?" Or asking "did your assault have anything to do with him being a child molester" which is again Dr. Dietz offering his own theory. In discussing Chuck's attempt to kill his adoptive father, Dr. Dietz asks, "That's a really serious thing you did. You think he had it coming?" In my assessment, this is Dr. Dietz suggesting his own ideas of Chuck's motivation versus asking in a more open-ended way. In talking about his criminal history, he asks demeaning questions to Chuck such as "does that make sense to you? That wasn't a good idea either." In another instance, he tells Chuck "You told me you don't like to be disrespected, yet you disrespected a judge. What does that make you?" In talking about the psychiatric reports being different than what Chuck states he told them, Dr. Dietz asks, "Do you think they are just looking at the chart and picking stuff from the past to write down?" To me, this seems an attempt to belittle Chuck.

o. Chuck appeared to be less present and unable to stay focused and exhibited a blank expression on his face. This included him being unable to maintain eye contact. These symptoms are consistent with my experience with clients who are dissociating. This occurred at least twice during the interview in my assessment, but Dr. Dietz did not seem to notice. One specific instance was when Dr. Dietz asked about a guy molesting a 4-year-old. He also exhibited the same behavior when he was talking about putting on extra weight. In a trauma-informed interview, when observing such behavior, it is important to pause and give the client an opportunity to breathe and ground themselves before proceeding,

acknowledging what we are talking about can bring up a lot of uncomfortable feelings.

p.      There was at least one time when Dr. Dietz was quite sarcastic, when Chuck told him this was the first time an interview has ever been recorded, and he says, "It has only been a common technology for 30 years."

q.      When Dr. Dietz first asks Chuck what happened to Castro, Chuck says, "To be honest, I don't feel comfortable talking about it because it is going to the prosecutor who is prosecuting my case." This was an opportunity for Dr. Dietz to respect Chuck's feelings, but he presses on, and then Chuck agrees. When they do talk about the murder, most of Dr. Dietz's questions are yes and no questions, and few are open-ended.

r.      In summary, Dr. Dietz did not conduct a trauma-informed interview, and further at times was sarcastic, belittling, and combative. In my professional judgment, this would have led to Chuck feeling disrespected and unsafe. The impact of conducting this evaluation this way is that it likely caused Chuck to be more shut down and much less open and vulnerable. This style of interviewing made it extremely unlikely in my opinion that Chuck would have ever revealed about the sexual abuse he experienced at SMS.

s.      Dr. Dietz offered these conclusions:

1)      Chuck had a middle-class upbringing in a reasonably stable adoptive family with access to private educational opportunities when he did not succeed in public school.

2)      As a youth, he had a serious conduct disorder associated with juvenile delinquency (including his alleged attempt to kill his adoptive father).

3)      His substance history includes excessive drinking in adolescence, smoking marijuana, and single episodes of cocaine and LSD.

4)      He never suffered any psychotic illness, nor does he suffer from hallucinations.

5) He does not suffer from seizure disorder or have significant neurological sequelae of head trauma.

6) He has a serious physical illness -Crohn's Disease diagnosed in 93 and for which he's undergone significant surgery.

7) His anxiety disorder is best described as agoraphobia, similar to social anxiety disorder or specific phobia, situational type; this began in childhood and manifests today by embarrassment related to his Crohn's Disease and his desire to be isolated from others except his trusted friends.

8) He has experienced considerable depression related to his Crohn's Disease. While it is most accurate to characterize it as adjustment disorder with depressed mood, the combination of physical illness and depression have been serious enough to result in three suicide attempts and to cause multiple clinicians to diagnose major depression, atypical depressive illness or bipolar disorder.

9) His diagnosis of antisocial personality disorder is based on his conduct disorder onset before age 15; due to his acts that are grounds for arrest; aggressiveness, repeated failure to sustain consistent work behavior or support himself; and lack of remorse for the attempted murder of Bonin and for killing Castro. The evidence is conflicting about his degree of deceitfulness and impulsivity.

10) The evidence of his participation in the Castro homicide was planned, malicious and deliberate. His ability to understand the wrongfulness of his behavior, his exercise of the power of reason, and his control his behavior that he knew was wrongful was fully intact and not impaired.

11) His motives were retaliation for being disrespected along with the instrumental goal of being permanently isolated from other inmates through segregation on Supermax or as he would prefer, Death Row.

t. In my professional opinion, it is not surprising that Dr. Dietz reached these conclusions, especially given the style of interviewing he engaged in (non-trauma-informed) and the fact that he did not have access to the same information I did about the serious traumas he experienced at the hands of Mintz. Since he appears not to conceptualize a person

considering their trauma history, and did little to elicit any trauma history, he diagnosed Chuck based on his problem behaviors only.

### 218. Counseling At Butner Medical Center

a.  At the time of my meeting Chuck, he was housed at the Federal Medical Center Butner.  Chuck reported he was going to counseling one time per week.  He was learning that he displaces his anger on others, but his anger is mainly toward himself.

b.  Chuck now wants to be a better person and knows he can't just snap his fingers to make that happen, that he has to do the work and work on relationships.

c.  He states he now wants to do it for himself.

d.  He is keeping his commitment to his dad re: suicide.

e.  He knows he has to let people in, one or a few and talk about things.

f.  Even if it doesn't help his case, he still knows he needs to do this work.

g.  He also has come to terms with his anger toward his co-defendant, who has now apologized for "trying to save his own ass" thus minimizing his own role. Chuck says he doesn't hate him anymore.  He also is taking responsibility for his own choices, and he is relieved his anger and hate are gone.

h.  He is trusting the legal team and listening to their guidance and not going against it, like not communicating with people they advise against.

i.  He also is valuing his friends including people who've never been in prison.  He told me he is tired of disappointing people and wants to keep his friends.

j.      He's also finally learned to respect rules and authority. He's had no infractions since Jan 2010, the time of the homicide.

## XIV. THE SIGNIFICANT CONTRIBUTION OF MINTZ'S GROOMING TO THE DAMAGE DONE TO CHUCK

219.  Mintz was a highly skilled sexual predator, especially due to his superior grooming skills.  Grooming behaviors include any behaviors by a perpetrator to build a relationship, trust, and emotional connection with a victim and often with their families with the goal of manipulating, exploiting, and abusing them. Grooming can take place over weeks, months, or years.  Mintz began his grooming when he opened SMS, and worked hard to convince the entire Burlington community he was providing a vital resource for troubled children, much as Jerry Sandusky did in Happy Valley.  Grooming involves the giving of gifts, including all the things Mintz offered Chuck as well as numerous other students who gave declarations (see Section IX above). These gifts included cash for the arcade, movie tickets, bowling privileges, taking them on trips, free ski tickets and free ski equipment, taking them to restaurants, hockey games, baseball games, using the athletic club, the hot tub, and receiving "massages" and backrubs. The whole goal of grooming is to lead the victim to believe they are receiving "special" treatment and that they have a "special" relationship with the perpetrator. Having their victims believe they are being considered special, especially when they are vulnerable, poor, troubled, and having mental health problems, is a powerful tool of manipulation for the perpetrator to control the emotions and loyalty of the victim. Chuck told me how these gifts and privileges led to him feeling special in Mintz's eyes.

220.  When a perpetrator is an expert groomer, whenever possible they will direct their grooming behaviors not only to the victim, but also to their family members.  In Chuck's case, his father, mother, and sister were all included. As Chuck told me, since his parents and sister trusted Mintz, so did he. Therefore, even after the abuse started, before he was

IFCD 00027638

even enrolled, he tried to tell his parents he wanted to come home, but Mintz had already effectively groomed the parents, so they believed he was in a safe and effective school setting.

221. When a perpetrator is an expert groomer, the damage done is that it leads to a deep degree of trust in the perpetrator's behaviors, no matter how uncomfortable such behaviors are. The deeper the trust, the more loyalty the victim feels toward the perpetrator.

222. When a perpetrator is an expert groomer, it leads to their victims keeping silent, because they don't want to lose access to the "gifts". The victims are led to believe that they are responsible for the well-being of the perpetrator, and in this case, the well-being of the whole school. Further, they don't want to betray the person who has chosen them as "special."

223. Expert groomers have power over their victims because they choose vulnerable victims, and Mintz had his choice of many boys over the course of many years who were poor, troubled, and suffered from multiple mental health issues. Further Mintz had additional power because he alone chose when a child would "graduate". Chuck clearly was a vulnerable victim.

224. The damage is done because grooming leads to trust, and then the perpetrator betrays that trust. This leads to the victim being unable to trust anyone who acts in caring ways, who offers gifts, or is in a position of authority. (See the section below on betrayal trauma).

225. The expert groomer also succeeds in preventing the victim from ever holding them accountable; instead, they believe it was their fault because they never stopped the abuser. Inside the brain of the victim, all they comprehend is that they are "special" and are incapable of understanding that the perpetrator set all this up so that it would be impossible for the victim to betray them or ever hold them accountable. This is clearly the case with Chuck. To this day, he believes he is totally responsible for his own abuse.

## XV. THE RELEVANCE OF INSTITUTIONAL BETRAYAL AND BETRAYAL TRAUMA

226. Betrayal trauma theory (Freyd, 1996) posits that abuse perpetrated within close relationships is more harmful than abuse perpetrated by strangers because violation of trust occurs within a necessary relationship.

227. Betrayal trauma is associated with higher rates of a host of outcomes, including post-traumatic stress disorder (PTSD), dissociation, anxiety, depression, and borderline personality disorder, compared to interpersonal trauma perpetrated by strangers (Freyd and Birrell, 2013). In order to cope with betrayal trauma, oftentimes, victims by necessity engage in unawareness or "blindness" to their betrayal. I have referred to this in my writing (Fradkin, 2012) as learning to be loyal to dysfunction.

228. Thus, a victim will continue to maintain the relationship with perpetrators, leading to additional abuse and lack of insight into their continued suffering, which can lead to additional psychological difficulties (Polusny, et al., 2008; van der Kolk, et al., 2005).

229. Institutions have the potential to either worsen posttraumatic outcomes or become sources of justice, support, and healing (Burmester, 2018, Rauch, 2009). No one at SMS was a source of justice, support, or healing for Chuck; instead, they worsened the traumatic outcomes for each student victimized by their acknowledgement most all of them trusted Mintz and turned their heads and minimized the damage Mintz was doing.

230. The concept of institutional betrayal was explained in a landmark article by Smith and Freyd (2013, 2014). Institutional betrayal occurs when an institution causes harm to an individual who trusts or depends upon that institution (such as SMS). In the article, based on the traumas of sexual harassment and sexual violence (both highly appropriate for this case), the authors examine the systemic and institutional actions and inactions which served to explain a variety of reactions to traumatic experiences. These actions and inactions include

omission of protective, preventative, or responsive institutional actions; direct failure to act after a complaint; organizational tolerance of harassment or lack of any sanctions/punishments for engaging in harassment; committing acts of commission such as taking retaliatory actions against those who report harassment; and actions that may seem isolated at first and then become more clearly systemic.

231. Examples of institutional betrayal include unchecked abuse in residential schools (the Horace Mann School), insufficient/totally inadequate responses to sexual trauma in the military, and the failure of universities to hold accountable known perpetrators of sexual violence toward students (including Penn State, Michigan State, and Ohio State). In these cases, victims often came forward and alerted authorities, and either little or no action was taken for a long period of time, leading to a great many more victims and long-lasting damage to the victims.

232. Institutional betrayal is associated with complex outcomes similar to those associated with interpersonal betrayal. When measured directly, the exacerbating effects of institutional betrayal on psychological well-being is clear and consistent with betrayal trauma theory: higher rates of dissociation, anxiety, sexual dysfunction, interpersonal difficulties, and other trauma-related outcomes (Smith and Freyd, 2013, 2014).

233. Examination of those institutional settings in which traumatic events are *more likely* to transpire include the following characteristics: inflexible requirements for membership (such as an athletic team, the military, or a religious group); prestige (when institutions and leaders of institutions enjoy an elevated role within the community-such as Jerry Sandusky in Happy Valley and Mintz in Burlington, Vermont); priorities (when performance or reputation is valued over, or divorced from, the well-being of members-such as the status of a doctor's reputation being valued over the well-being of athletes, as is the current case against the Ohio State University when the well-being of athletes was prioritized over the well-being of their bullying victims); and institutional denial (examples are the Catholic church denying the abuses done by priests, and

the military refusing to address the extreme problem of male survivors of military sexual trauma).

234. Burmester (2018) furthers Freyd's term of institutional betrayal by also describing what he terms "institutional dissociation." For Burmester, there is both the dynamic of an institution that pushes aside evidence of abuse for fears there is much more (such as he describes as the role of Penn State Vice President Schultz) and then engages in minimization, what he describes as dissociation's more distant cousin. An example in this case is the awareness documented in Section IX of the staff, townspeople, family members-including perhaps his sister Susan, and counselors who ignored what was going on, as if it wasn't all that bad. Another example is the inadequate and incompetent investigation of Mintz's alleged sexual abuse by the Director of Childcare Licensing. Yet another example is the townspeople being fully aware students at the school were panhandling on the street. It seems such behavior could well have sent out red flags for townspeople, yet no one reacted.

235. Burmester describes how sexual abuse can persist for so long because of dissociation's power to dispel the distress of sexual abuse for all involved by making the real appear unreal or just making it disappear. He further describes how when the institution fails to notice and intervene, the impact on the victim is to also silence him and subordinate his will to the more powerful.

236. In this case, institutional betrayal includes how all of these victims were left to their own devices to protect themselves. Mintz, like Sandusky, was such a powerful figure in the town that even though many people had at the very least heard rumors or had their own suspicions, not one of them chose to ask questions. When an entire school staff, charged with caring for the well-being of their students, continues to only think of the positive aspects of SMS, while at the same time acknowledging they knew something was wrong, that is the classic definition of institutional betrayal.

237. Even the board of education seems to have been blind to the abnormal ways in which SMS was run. For example, what board of

education would consider Massage a legitimate junior high school class? It seems highly unlikely anyone ever had any oversight over the classes, often taught by students and not staff, and rarely was the course content consistent with what would be taught in a typical junior high school. This is certainly evident in how academically behind Chuck was when he left SMS.

## XVI.  My assessment of Chuck's Mental State Today

238. Chuck has come a very long way in his emotional development and maturation.  As I indicated above, because of his counseling at Butner, he has made significant progress in forgiveness of others, taking responsibility for his own dysfunctional choices, and improving his ability to trust others. Regards to his own personal responsibility for his problems, he now believes that 75% of the time, what happens is in his control.  He knows he has the ability to control his own reactions.

239.  He respects the law and authority. His last infraction was in January 2010, when he committed the homicide.   That is more than 13 years ago.

240.  Chuck has true regrets for hurting his parents so badly, and no longer holds anger toward them for what he experienced at the hands of Mintz. He knows now how much they loved him and accepts that he was the one who kept them at arm's length and pushed them further away.

241.  Chuck is now tired of disappointing people and accepts how many people he has hurt in the process of all the acting out he has done. He knows there are people in the world who are still his true friends, and he wants to keep them, and knows in order to do that, he has to stop hurting them by acting in ways that will disappoint them.  He gave me the example of his friend John who graduated from Homestead, and he kept his end of the bargain and stayed in aftercare and then attended his graduation. He told me he takes friendships seriously now.

242.  Chuck has written a book which has never been published, but he hopes one day it could be.  He also is a talented song writer and tattoo artist. He also draws and paints, and has won a couple awards, including a first-place award, in *Life Lines,* a non-profit organization that fights to abolish the death penalty.  He also is working on a cookbook from his mother's favorite recipes, which he is calling "Remembering Mom".  He told me he likes cooking for the guys on his range, and he shares the food he cooks.  One example is he's made homemade brownies from scratch. Simply put, he is more willing to invest in relationships.

243. At the same time, Chuck states he's never talked with a counselor about his sexual abuse and states that even though they tell him his counseling is confidential, he's still very concerned that BOP staff have access to his chart. He just doesn't trust that things will be kept confidential. He states he sure wasn't going to trust someone from the Bureau of Prisons. He states that he knows that the guards on death row will talk to one person and then tell others and then anything he says could be used against him.  This will continue to be a stumbling block for Chuck as he seeks to make progress in his emotional /mental well-being.

244. It is at the same time also fair to say that despite all of this progress, Chuck still has significant struggles he faces. He still struggles mightily with emotional dysregulation. He is still prone to his depression turning to anger. He still states he would much rather be isolated than have the opportunity to be around others as he still lives with great fear of others hurting him, much of which is rooted in his lived experience. He had for a long time desired the death penalty, which for me reflected his sense of worthlessness and desire for self-protection. The emotional maturity I have suggested I would attribute largely to be a result of him having lived with significant protection in the safe living environment of the medical unit at Butner, and perhaps for the first time, having his medical condition being taken seriously. Living in a safe place has also afforded him the space and time to be able to reflect more on his life and gain some fresh perspective.

245. I would go one step further and assess that what Chuck is suffering from can best be described as Complex Post Traumatic Stress Disorder. Complex PTSD (6B41) is now an official diagnosis in the ICD-11 (International Classification of Diseases, published by the World Health Organization, 2022). As I have described above, he meets the criteria for PTSD based on the CAPS-V. However, what Chuck is suffering from is much more severe, as I will describe below.

246. When a person experiences repeated traumas of many different types, they may well develop what has become to be known by trauma experts as Complex Trauma, or Complex PTSD. Judith Herman (1992) first introduced the concept of complex trauma to demarcate these experiences of prolonged and repeated interpersonal traumatic events from experiences of more isolated, non-interpersonal trauma to highlight the more complex psychological consequences, such as affect regulation difficulties, alterations in attention and consciousness, somatization, identity disruption, harmful behaviors, and disturbed interpersonal relationships. Although it is not an official diagnosis in the DSM-V, the literature describes this pattern of extreme interpersonal trauma (abuse, neglect, betrayal, exploitation, rejection, antipathy, and abandonment) (Courtois & Ford, 2012; Ford & Courtois, 2009).

247. Courtois and Ford defined seven categories of symptoms that are used to assess for PTSD/DESNOS (Post traumatic stress disorder or disorders of extreme stress not otherwise specified) or what is also called PTSD-C (complex trauma) or Complex PTSD:

> a) alterations in the regulation of affective impulses, including difficulty with modulation of anger and tendencies toward self-destructiveness, including methods such as addictions and self-harming behaviors
>
> b) alterations in attention and consciousness leading to amnesias, dissociative episodes, and depersonalization
>
> c) alterations in self-perception, predominantly negative and involving a chronic sense of guilt and responsibility and ongoing feelings of intense shame, leading to incorporating

IFCD 00027645

these abuse messages into their developing sense of self and self-worth

    d) alterations in perception of the perpetrator, including incorporating his or her belief system

    e) alterations in relationships to others, such as not being able to trust the motives of others and not being able to free intimate with them

    f) Somatization and/or medical problems

    g) Alterations in systems of meaning, leading to often feeling hopeless about finding anyone to understand them or their suffering.

248. Chuck meets all of these criteria.

## CONCLUSION AND OPINIONS

249. I state the opinions and conclusions herein and below are my professional opinions as a trauma psychologist, and are made within a reasonable degree of psychological certainty:

250. Based upon my assessment of the evidence available, which included but was not limited to personal examination of Chuck, a review of records and his medical and counseling/psychiatric history, academic history, family history, employment history, legal history, declarations and testimony, I am able to provide opinions as to the traumatic impact of the sexual abuse suffered by Chuck, as well as to opine on the long-term consequences of this abuse and all the other traumatic experiences in his childhood and adult life. Also, my opinion is based on my education, training, and experience as a practicing psychologist providing psychotherapy to more than 1000 male survivors of sexual trauma, as well as all of the psychological literature I have quoted above that details the impact of trauma, sexual victimization, grooming, betrayal trauma and institutional betrayal.

251. I want to assert once more my definition of sexual victimization, as this is critical to understanding the trauma history of Chuck Hall. Sexual victimization consists of any overt or covert sexual behavior by which the **abuser chooses** to take advantage of a power differential with a dependent or vulnerable victim in order to satisfy the abuser's needs without the victim's consent. I emphasize the words "abuser chooses" because it squarely places the responsibility for the abuse on the abuser. The abuser in this case is Mintz, the principal/headmaster of SMS, a man who had significant power over Chuck during the year he spent at SMS.

252. It is my professional opinion, within a reasonable degree of certainty, that Chuck has suffered a significant degree of many forms of trauma in his life. A few of these traumas occurred prior to the time he spent at SMS, however **most of the traumas in his life began with his experiences of repeated sexual abuse by Mintz,** the headmaster/principal of the school, and then escalated severely. He had problems at school beginning in first grade, when he had a hard time concentrating. It was noted his attitude was poor in third grade and poor behavior was interfering with his grades. He had Bs to Ds in fifth grade, and then by sixth grade he failed and had to repeat that grade. It was not noted in his school records that he was given any kind of special assistance despite his struggles. When he repeated sixth grade, his parents arranged for him to see a church priest for counseling, but they did not note any changes in his behavior. While it is understandable they chose a church priest to provide counseling given their Catholic faith, it is highly likely he would have been ill-equipped to help a child with such significant problems, and it is my opinion **it was his ethical responsibility to refer Chuck to a professional therapist or psychologist since he was failing to help Chuck alter his behavior**. He was reported to be having constant conflict with his sister, he felt inadequate when he let his parents down by lying, and he lacked confidence in both academic and social situations. His parents were already fighting, both his mom and dad were drinking at home, and based on Chuck's memory of dad drinking a 12 pack a night and his mother drinking on the weekends while depressed, it is my belief

IFCD 00027647

that this constituted alcohol abuse on their part. **It was recommended he get psychological testing to learn more about his emotional difficulties, but that is when he was instead sent to SMS. This exclusive private school was intended to be the place where all the problems Chuck was having would turn around.**

253. Instead, he was sexually abused on at least a weekly basis by a very skilled perpetrator with excellent grooming skills, the principal/headmaster of the school. Chuck is able to describe in significant sensory detail what he experienced at the hands of Mintz. Chuck has not ever "forgotten" the abuse; but he did bury it as deeply as he could for decades. As I have indicated above, during trauma, the parts of the brain that remain intact are usually the sensory parts, which Chuck is able to access. This is the advantage of using trauma-informed interviewing because it creates enough safety for survivors to be able to describe what they experienced. He screamed for help in any way he could, but the screams were not heard. A primary example of this is stealing a check from Susan and her husband so he could get a bus ticket home. **No one questioned why it was that Chuck wanted to escape.** Because of the expert grooming employed by Mintz, it was impossible for Chuck to report what he was experiencing, even after he came home (see Section X). I have detailed above **how common it is for survivors to keep their abuse a secret**. Further, he received little attention or assistance with his academic problems, and by his report and the report of other students and staff, they didn't have much in the way of an education at all. *When he came home, instead of going to eighth grade, he was promoted to ninth grade for reasons that are completely unclear to me.* He had failed sixth grade, had multiple problems, and then had little education at SMS, as other students and staff have validated. Further, they indicated they believed it was likely he had a learning disability, but they had no staff member available to test it. Even that seems questionable, given that this was supposed to be an exclusive private school, and I would think that they could have easily arranged for a specialist to come to the school as needed to perform such evaluations, especially given Mintz's unique abilities to manipulate others. And, on the Peabody exam, he was

behind his age in mathematics, reading comprehension, spelling and slightly behind in general information. That means at least three of the six subtests he was behind. The decision to have him skip eighth grade may have also contributed to his continuing difficulties.

254. **The immediate impact of the damage done to Chuck is evident in the psychological evaluation he was given in ninth grade on September 17, 1985.** I want to highlight a few of the findings which should have been **huge red flags that something was terribly wrong.** He was found to be moderately depressed. He was very unsure of himself, emotionally shutdown, and emotionally behind. He had limited organizational ability. His thought content was immature. He had limited access to his inner resources. He dealt with conflict through fantasy and denial of his negative feelings. He engaged in passive aggressive behaviors. He seemed distant from others. He is unable to establish healthy peer connections. The psychologist describes him as "socially withdrawn somewhat depressed boy with a mixture of academic learning problems, passive aggressive behaviors, and compulsive traits. He is unmotivated in school and likely to be a poor performer despite average cognitive ability." The report recommended individual counseling, and a counselor did come to the house, but I believe Chuck was so shut down, so ashamed, and feeling so inadequate, he responded to the counselor by stating he had no problems. He reported to me that the counselor stopped asking him, and only talked to his mom and dad. As I understand it, the Sweetser intervention was designed to be very short-term, and given all the problems Chuck, Michelle and the parents were having, it was grossly inadequate. There is an indication that Michelle had her psychiatric evaluation and was set up for individual counseling, but there is no indication this was arranged for Chuck. It is my belief that this ninth grader with all these problems was *abandoned by this counselor at the very time he most needed a safe person he could trust to open up to about all of his difficulties. A trauma-informed therapist understands that it is their job to create enough safety for a client to speak their truth, and Chuck was failed here.*

IFCD 00027649

255.  In October of 1986, Chuck began to see a school psychologist alone.  This was almost a full year after individual counseling was strongly recommended. He spent this year at Thornton Academy, and based on staff declarations, it is also clear he was failed here as they did not have the resources necessary to help him. He struggled mightily there, and this led to his enrollment at the Homestead Program. They did help Chuck to a degree to open up about his problems with his parents, his sister, and being emotionally shut down. *To their credit, they did ask about sexual abuse, as he was displaying many of the typical problems a sexual abuse survivor has;* however, he denied it and they did not pursue it.  To me, **that was another major counseling failure,** because he should have been given a safe place in individual counseling to talk about it, and then, *only if he felt safe enough*, would he be encouraged to talk about it in group therapy. Again, I emphasize that a **trauma-informed therapist has the responsibility to create safety**, especially once it is clear to them there is trauma that needs to be discussed.  However, Chuck understood that anything he shared in individual he would have to share in group, and he understandably was very afraid of how the other children would treat him once they heard his secret.  **A trauma-informed therapist would have understood the immense shame he was carrying and would have provided all the support he needed to help heal that shame. Instead, they dealt with all the ways he was acting out the shame without ever dealing with the root of the problem.**

256.  As I have explained above, **Chuck has experienced all of the classic symptoms of an untreated, unhealed male survivor of sexual trauma**, all of which have been well documented in the psychological literature.  Specifically, he has struggled with using alcohol to cope; depression, self-harm and several serious suicide attempts; unstable self-esteem; anxiety; severe insomnia; difficulty with his anger; severe problems with shame; dissociation and flashbacks; struggles with intimacy; using poor judgment; sexual dysfunction and confusion; screaming for help; difficulties managing Crohn's as it relates to his abuse; keeping the abuse secret for nearly four decades; **severe PTSD** as measured by the CAPS-V; and criminal behavior. Further, as I have

indicated above, his symptoms are so severe that they also qualify him for a diagnosis of **Complex PTSD (6B41 in the ICD-11). Complex PTSD is due to a history of repeated traumas over a sustained period of time that are characterized by powerlessness, helplessness, and a lack of any successful treatment to address the serious nature of the symptoms.**

257. It is also important for me to address the history of Chuck compulsively lying. This is especially important as it is possible that Chuck's "sudden" disclosure of sexual abuse could be seen as yet another compulsive lie to secure relief from his Death Sentence. As a trauma-informed psychologist, I seek to understand any dysfunctional behavior of a client in the context of the damage done as a result of the abuse. I believe these lies served a number of purposes. I submit that Chuck's history of compulsive lying is rooted in the severe degree of shame he has carried ever since the abuse, and the significant anxiety and depression he has worked to deny and minimize since the abuse as well. I believe his lying was a way to act out, seek attention and cry for help in times when he felt powerless, misunderstood, disrespected and uncared for. Even though it makes no logical sense, in his mind, his lying was designed to seek respect and caring that he felt totally unworthy of due to his own perceived failure to prevent Mintz from abusing him. It makes no sense especially when the lies were an attempt to cover up his own shameful, reckless and at times criminal behavior. His lies have also served to present himself as much more capable, masculine, and unflawed than he truly feels. Lying about his perfect childhood is a great example when in fact, it was so bad he would escape out of his bedroom window for hours to avoid the chaos inside, as well as the feeling of guilt and shame knowing it was likely his parents were fighting about him. On the other hand, other times he would lie about aspects of his childhood or adulthood to seek compassion and sympathy, such as making up stories about how people died.

258. I also want to strongly assert that with my experience of working with more than 1000 male survivors, I am very confident that the *most unlikely lie a man would make up is that he was sexually abused.*

This is definitely not a strategy a man would employ to get sympathy and compassion, especially when they feel severe shame and guilt about the abuse. Therefore, they would be extremely unlikely to risk making up such a lie when it would most likely lead to more shame. This explains why Chuck has been so reticent to let his truth be known, because he is terrified that other inmates would seize on this knowledge and use it against him. He is taking a significant risk now to his own safety, and in addition, he was certain that talking about his abuse would lead to a lot more discomfort and personal pain, which he would again feel forced to do his best to bury as he has no professional in his life he feels safe enough with to explore the abuse in a spirit of seeking healing. In all of my experience working with male survivors, rather than it being at all likely that a man would make up a story of sexual abuse he did not experience, it is extremely likely and common that instead a man who experiences sexual abuse would bury it, minimize it, and deny it had any impact on him at all. Many survivors, due to male socialization messages, often interpret that what was done to them was not abuse at all, but rather "how I learned about sex", or they fail to allow themselves to see themselves as a victim because men are taught, they must be strong and virile and always in control. As you have read, Chuck feels deep shame for his failure to stop the abuse, i.e., he should have been in control. Further, consistent with Easton's research (2018), like most male survivors, Chuck buried his truth for several decades, more than the average two decades that Easton found in his research. Further, in section IX, I emphasize how there is substantial corroboration of Mintz's sexual abuse of many boys including Chuck. Chuck's recounting of the sexual abuse itself is remarkably consistent with details shared by other victims of Mintz, including the location of abuse in the loft, the description of Mintz's bed, the sensory memories of his smell and specifically what he did with his hands, details of grooming behavior, and his efforts to lure boys to his loft.

259. **Chuck has been failed by therapists who tried to help him. His shame, fear, anxiety, depression, PTSD and Complex PTSD have all stood in his way of getting the help he needs to heal and are all understandable in the context of this failure.**

260. As you have read throughout this report, all the layers of the effects of Chuck's adverse childhood experiences, especially the sexual trauma, are illustrated in the CDC diagram of the impact of trauma on page 11 above, except for the top level-early death. Even this consequence is believed to be likely according to the medical report that will be filed in this case by Dr. Hilary Steinhart. Chuck has experienced disrupted neurodevelopment; social, emotional, and cognitive impairment; adoption of health-risk behavior; disease, disability, and social problems. I have discussed the social conditions that contributed to Chuck's trauma background.

261. It is very important in understanding the impact of ACEs to recognize that ACEs should not be assumed as isolated exposures with unique effects, and that both the negative short and long-term influences of aces on health and behaviors is better conceptualized and examined as a *cumulative, dose-response relationship (*Anda et al., 2006; Dong et al., 2004; Dube et al., 2001; Turner, R.J. & Lloyd, D.A., 1995). In other words, it is the piling up of the impact of traumas one on top of the other in the psyche of the survivor without any opportunity to heal from these traumas that contributes significantly to negative outcomes in their lives. **Chuck has had no trauma-informed opportunity to heal from the traumas he experienced.** Accumulated childhood trauma has been shown to also contribute to trauma and complex symptomatology (Briere, Kalman, & Green, 2008; Polusny, M.A. & Follette, V.M., 1995). Dong et al (2004) warn that by not assessing the impact of other factors of childhood adversity, long-term outcomes may be wrongly attributed to single types of abuse.

262. It is my professional opinion, within a reasonable degree of psychological certainty, that **Chuck's primary diagnoses are PTSD and Complex PTSD accompanied with moderate depression and anxiety (APA, 2022).** I believe it is a clinical mistake to diagnose Chuck with Anti-Social Personality Disorder, even though he has certainly engaged in criminal behavior. The fact is he rarely has acted in any anti-social ways since January 2010. Further, he now has an increased capacity to feel remorse and an increased capacity to feel empathy. He has an increased capacity not to act in irresponsible ways. He also has an increased

capacity not to act with reckless disregard for the safety of himself or others. He has not been reprimanded for fights, aggressiveness, or assaults. He has an increased capacity not to act in impulsive ways. He has an increased capacity to refuse to engage in deceitfulness. He is much more able to follow social norms. These observations have been true for over 13 years, as he continues to make progress, which is a substantial period of time.

263. **It is understandable to me that because no therapist knew about the abuse he suffered, when they reflected on his behavior, it seemed as if a diagnosis of Anti-Social Personality Disorder fit.** However, from a trauma-informed perspective, almost all of his significant anti-social behaviors occurred after he returned home from SMS. Even his stated consideration of killing his parents can be explained as Chuck feeling intense pain, rage, and powerlessness over the abuse he had buried inside. As I have indicated above, he was given a psychological evaluation when he came home, and he was not diagnosed with anti-social personality disorder at the time.

264. **It is also necessary to add another layer of damage to Chuck and of course all the classmates who agreed to talk to the legal team now representing Chuck, and that is the severe consequences of institutional betrayal. Institutional betrayal is associated with complex outcomes similar to those associated with interpersonal betrayal. When measured directly, the exacerbating effects of institutional betrayal on psychological well-being are clear and consistent with betrayal trauma theory: higher rates of dissociation, anxiety, sexual dysfunction, interpersonal difficulties, and other trauma-related outcomes, all symptoms Chuck continues to struggle with** (Smith and Freyd, 2013, 2014).

265. In my professional opinion, within a reasonable degree of psychological certainty, I believe that Chuck's history must be understood as the piling up of the effects of years of various forms of untreated trauma, which have negatively impacted all aspects of his daily functioning. **The impact of the untreated trauma is the best**

**explanation for the many dysfunctional behaviors he engaged in throughout his life, culminating in the murder of a fellow inmate. As is true for many survivors, for most of his life, Chuck learned to be loyal to dysfunction, which led to many tragic outcomes as he had no other understanding of how to cope with the pain, anguish, anxiety, anger and shame he carried inside. Further, it has led to the diagnoses of PTSD, Complex PTSD, moderate depression, and moderate anxiety. Chuck still has significant healing to do, as he has yet to address the primary trauma in his life, the sexual abuse he suffered at Shaker Mountain School at the hands of perpetrator Mintz.** At the same time, I believe he is worthy of being given the opportunity to obtain trauma-informed psychotherapy that would afford him a chance for deeper healing, as he has demonstrated in the past 13 years, he is capable of much more functional behavior. **He is now learning to be loyal to functionality, and this in my belief could well be the foundation for significant additional healing and healthy functioning.**

266. Unless otherwise specified, I, or another competent expert in the field, would have been able to provide the expert opinions, analysis, recommendations, and conclusions contained in this report at the time of trial, if requested by defense counsel.

267. I reserve the right to further amend this report pending additional testimony secured through further discovery in this case.

Signature:

_Howard R Fradk, Ph.D, LICDC-CS_

Howard R. Fradkin, Ph.D., LICDC-CS, Psychologist
Ohio Board of Psychology License # 3237

State of Ohio

County of Franklin

Sworn to or affirmed and subscribed before me by _HOWARD R FRADKIN_

on this date of _9/13/ 2023_

_____

Signature of Notary Public

KATERINA HALIMHAMITI
Notary Public
State of Ohio
My Comm. Expires
May 30, 2028

100

# References

American Psychiatric Association (2022). *Desk reference to the Diagnostic Criteria from DSM-5-TR.* Washington, D.C.: American Psychiatric Association.

Anda, R.F., Felitti, V.J., Bremner, J.D., Walker, J.D., Whitfield, C., Perry, B.D., et al. (2006). The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology. *European Archives of Psychiatry and Clinical Neuroscience*, 256, 174–186.

Barrera, M., Calderón, L., & Bell, V. (2013). The cognitive impact of sexual abuse and PTSD in children: A neuropsychological study. *Journal of Child Sexual Abuse: Research, Treatment, & Program Innovations for Victims, Survivors, & Offenders, 22*, 625–638. doi:10.1080/10538712.2013.811141.

Barnard, L.S. (2018). Adult male survivors of sexual assault. In Gartner, R. B., Ed. *Healing sexually betrayed men and boys: Treatment for sexual abuse, assault, and trauma.* New York: Routledge.

Beck, A. T., Steer, R. A., & Brown, G. K. (1996). *Manual for the Beck Depression Inventory–II.* San Antonio, TX: Psychological Corporation.

Beck, A. T., Steer, R.A., & Garbin, M.G. (1988) Psychometric properties of the Beck Depression Inventory: Twenty-five years of evaluation. *Clinical Psychology Review,* 8(1), 77-100.

Beck, A. T., Epstein, N., Brown, G., & Steer, R. (1988). *Beck Anxiety Inventory* [Database record]. APA psyctests. Https://doi.org/10.1037/t02025-000

Beduna, K. N., Perrone-McGovern, K. M., & Marie, K. (2019). Recalled childhood bullying victimization and shame in adulthood: The influence of attachment security, self-compassion, and emotion regulation. *Traumatology,25(1),21-32.* Https://doi.org/10.1037/trm0000162

Brenner, G.H. (2018). Neurobiology, trauma, and dissociation: From basic science to clinical relevance. Chapter in Gartner, R.B. (2018), Ed. *Understanding the sexual betrayal of boys and men.* New York, NY.: Routledge.

Briere, J., & Elliott, D. M. (2003). Prevalence and psychological sequelae of self-reported childhood physical and sexual abuse in a general population sample of men and women. *Child Abuse & Neglect, 27*(10), 1205–1222. Https://doi.org/10.1016/j.chiabu.2003.09.008

Briere, J., Kaltman, S., & Green, B.L. (2008). Accumulated childhood trauma and symptom complexity. *Journal of Traumatic Stress*, 21, 223-226.

Bryer, J.B., et al., (1987). Childhood sexual and physical abuse as factors in adult psychiatric illness. *American Journal of Psychiatry,* 144 (11), 1426-1430. DOI: 10.1176/ajp.144.11.1426

Burmester, W. (2018). Interpersonal and institutional dissociation in the sexual abuse of boys. Chapter in Gartner, R.B. (2018), Ed. *Understanding the sexual betrayal of boys and men.* New York, NY.: Routledge. Pages 204-246.

Chandy, J.M., Blum, R.W. & Resnick, M.D. (1996) History of sexual abuse and parental alcohol misuse: Risk, outcomes, and protective factors in adolescents. *Child and Adolescent Social Work Journal,* 13, 411–432. Https://doi.org/10.1007/BF01875858

Cohen, O. B. S., Shahar, G., & Brunstein Klomek, A. (2020). Peer victimization, coping strategies, depression, and suicidal ideation among young adolescents. *Crisis: The Journal of Crisis Intervention and Suicide Prevention, 41*(3), 156–162. Https://doi.org/10.1027/0227-5910/a000614

Courtois, C. And Ford, J. (2012) Treatment of Complex Trauma: A Sequenced, Relationship-Based Approach. New York: Guilford Press.

Currie, J. And Tekin, E. (2012). Understanding the cycle: Childhood maltreatment and future crime. *The Journal of Human Resources.* 47 (2): 509-549. DOI: 10.1353/jhr.2012.0017

Dhaliwal, G.K., Gauzas, L., Antonowicz, D.H., & Ross, R.R. (1996). Adult male survivors of childhood sexual abuse: Prevalence, sexual abuse characteristics, and long-term effects. *Clinical Psychology Review,* 16 (7), 619-639.

Dimock, P. (1988). Adult males sexually abused as children: Characteristics and implications for treatment. *Journal of Interpersonal Violence,* 3 (2), 203-221.

Dong, M., Anda, R.F., Felitti, V.J., Dube, S.R., Williamson, D.F., Thompson, T.J., et al. (2004). The interrelatedness of multiple forms of childhood abuse, neglect, and household dysfunction. *Child Abuse and Neglect*, 28, 771–784.

Dube, S.R., Anda, R.F., Felitti, V.J., Chapman, D.P., Williamson, D.F., & Giles, W.H. (2001). Childhood abuse, household dysfunction and the risk of attempted suicide throughout the life span: Findings from the Adverse Childhood Experiences Study. *Journal of the American Medical Association*, 286, 3089–3096.

Easton, S.D. (2018). Building knowledge for recovery: Contemporary research on the long-term effects of child sexual abuse on men. Chapter in Gartner, R.B. (2018), Ed. *Understanding the sexual betrayal of boys and men.* New York, NY.: Routledge.

Eitle, D. & Turner, J. (2002). Exposure to community violence and young adult crime: The effects of witnessing violence, traumatic victimization, and other stressful life events. *Journal of Research in Crime and Delinquency,* 39 (2), https://doi.org/10.1177/002242780203900204

Falshaw, L., Browne, K.D., & Hollin, C.R. (1996). Victim to offender: A review. *Aggression and Violent Behavior.* 1 (4); 389-404.

Felitti, V.J., Anda, R.F., Nordenberg, D., Williamson, D.F., Spitz, A.M., et al. (1998). Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults. American Journal of Preventive Medicine, 14, 245-258.

Ford, J. D., & Courtois, C. A. (2009). Defining and understanding complex trauma and complex traumatic stress disorders. In C. A. Courtois & J. D. Ford (Eds.), *Treating complex traumatic stress disorders: An evidence-based guide* (pp. 13–30). The Guilford Press.

Fradkin, H.R. (2012). *Joining forces: Empowering male survivors to thrive.* Carlsbad, CA.: Hay House. ISBN: 978-1-4019-4134-5.

Freyd, J.J. (1996). *Betrayal trauma: The logic of forgetting childhood abuse.* Cambridge, MA: Harvard University Press.

Freyd, J.J. & Birrell, P.J. (2013) *Blind to betrayal.* New York, NY: Wiley.

Gartner, R.B. (1999). *Betrayed as boys: Psychodynamic treatment of sexually abused men.* New York, NY: Guilford.

Gartner, R. B. (2005) *Beyond betrayal: Taking charge of your life after boyhood sexual abuse.* Hoboken, N.J: John Wiley and Sons.

Gartner, R.B., Ed. (2018) *Understanding the sexual betrayal of boys and men: The trauma of sexual abuse.* New York: Routledge.

Gartner, R. B., Ed. (2018a) *Healing sexually betrayed men and boys: Treatment for sexual abuse, assault, and trauma.* New York: Routledge.

Gensler, D. (2018) Psychotherapy with sexually abused boys. Chapter in Gartner, R.B. (2018), Ed. *Understanding the sexual betrayal of boys and men.* New York, NY.: Routledge.

Herman, J. (1992) Complex PTSD: A syndrome in survivors of prolonged and repeated trauma. *Journal of Traumatic Stress,* Vol 5 (3), pgs. 377-391.

Hopper, J.W. (2019) Sexual assault and the brain: Key information for investigators, attorneys, judges, and others. Jimhopper.com/sexualassaultandthebrain.

Hopper, J.W. (2018) Brain circuitries brain apps, cultural software, and the inner worlds of sexually abused males: a new framework for understanding, healing, and happiness. Chapter in Gartner, R.B. (2018), Ed. *Understanding the sexual betrayal of boys and men.* New York, NY.: Routledge.

Hunter, M. (1990). *Abused boys: The neglected victims of sexual abuse.* Lexington, MA.: Lexington Books & D.C. Heath and Company.

Hunter, M., Ed. (1990a) *The sexually abused male: Volume 2: Application of treatment strategies.* Lexington, MA.: Lexington Books.

Hyman, S.M. & Gold, S.N. (2018). Anesthetizing open wounds: substance addiction in male survivors of sexual victimization. Chapter in

Gartner, R.B. (2018a), Ed. *Healing sexually betrayed men and boys: Treatment for sexual abuse, assault, and trauma.* New York, NY.: Routledge.

Institute for Safe Families (2013). Findings from the Philadelphia Urban ACE survey. Prepared by the Research and Evaluation Group. Https://simplebooklet.com/findingsfromphiladelphiaacesurveyandcomparedacequestions#page=1

International Statistical Classification of Diseases and Related Health Problems (2022) (11th ed.; ICD-11; World Health Organization).

Kerig, P.K. & Becker, S. (2014) Early abuse and neglect as risk factors for the development of criminal and antisocial behavior. Chapter 12 in J. Morizot & L. Kazemian, (eds.), *The development of criminal and antisocial behavior,* DOI 10.1007/978-3-319-08720-7_12, Springer International Publishing, Switzerland.

Kort, J. (2018) Sexual aftereffects in male survivors of childhood sexual abuse: orientation confusion, compulsions, kinky sexual interests, and dysfunctions. Chapter in Gartner, R.B. (2018), Ed. *Understanding the sexual betrayal of boys and men.* New York, NY.: Routledge.

Labash, H., & Papa, A. (2014). Shame and PTSD symptoms. *Psychological trauma: Theory, research, practice, and policy,* 6, 159-166, DOI: 10.1037/a0032637

Lew, M. (2004) *Victims no longer: The classic guide for men recovering from sexual child abuse. Second Edition.* New York, New York: Quill/Harper Collins.

Lew, M. (1988) *Victims no longer: Men recovering from incest and other sexual child abuse.* New York, New York: Nevraumont Publishing Co.

Linden, P. (2018) Body awareness and self-protection training for male sexual abuse survivors. Chapter in Gartner, R.B. (2018a), Ed. *Healing sexually betrayed men and boys: Treatment for sexual abuse, assault, and trauma.* New York, NY.: Routledge.

McGrath, S.A.; Nilsen, A.A.; & Kerley, K.R. (2011). Sexual victimization in childhood and the propensity for juvenile delinquency and adult criminal behavior: A systematic review. *Aggression and Violent Behavior,* 16, 485-492.

Miller, L.S., et al., (1999). Witnessed community violence and antisocial behavior in high-risk, urban boys. *Journal of Clinical Child Psychology*, 28:1, 2-11, DOI: 10.1207/s15374424jccp2801_1

Oktedalen, T., et al. (2014). The Trauma Related Shame Inventory: Measuring trauma-related shame among patients with PTSD. *Journal of Psychopathology and Behavioral Assessment,* 36, 600-615. Http://dx.DOI: 10.1007/s10862-014-9422-5

Palfy, K. (2019). *Men Too: Unspoken truths about male sexual abuse.* Monee, ILL.: Peaks & Valleys Publishing.

Perfect, M.M., Turley, M.R., Carlson, J.S. *et al.* (2016) School-Related Outcomes of Traumatic Event Exposure and Traumatic Stress Symptoms in Students: A Systematic Review of Research from 1990 to 2015. *School Mental Health* **8,** 7–43. Https://doi.org/10.1007/s12310-016-9175-2

Perkonigg, A., et al., (2000). Traumatic events and post-traumatic stress disorder in the community: Prevalence, risk factors, and comorbidity. *Acta Psychiatric Scandinavica,* 101 (1), 46-59. DOI: 10.1034/j.1600-0447.2000.101001046.x

Philadelphia ACE Project (2021). Https://www.philadelphiaaces.org/philadelphia-ace-survey

Pietz, C. (2022) Assessing allegations of trauma in forensic contexts. Workshop presented at the American Academy of Forensic Psychology, Chicago.

Polusny, M. A. And Follette, V. M. (1995). Long-term correlates of child sexual abuse: Theory and review of the empirical literature. *Applied and Preventative Psychology,* 4,143-166, http://www.sciencedirect.com/science/article/pii/S09621849058 00551

Porche, M. V., Costello, D. M., & Rosen-Reynoso, M. (2016). Adverse family experiences, child mental health, and educational outcomes for a national sample of students. *School Mental Health: A Multidisciplinary Research and Practice Journal,* *8*(1), 44–60. Https://doi.org/10.1007/s12310-016-9174-3

Rauch, M. (2009). *Healing the soul after religious abuse: The dark heaven of recovery.* Westport, CT: Praeger.

Rauch, M. (2018). The heart of the matter: A female therapist works with a male survivor. Chapter in *Healing sexually betrayed men and boys.* Edited by Gardner, R. (2018a). NY: Routledge. Pages 203-212.

Reavis, J.A., Looman, J., Franco, K.A., & Rojas, B. (2013). Adverse childhood experiences and adult criminality: How long must we live before we possess our own lives? *The Permanente Journal.* 17 (2), 44-48. DOI: 10.7812/TPP/12-072.

SAMHSA's Trauma and Justice Strategic Initiative, (2014). SAMHSA's concept of trauma and guidance for a trauma-informed approach. Https://ncsacw.samhsa.gov/userfiles/files/SAMHSA_Trauma.pdf

Singer, K. (2010) *Evicting the perpetrator: A male survivor's guide to recovery from childhood sexual abuse.* Holyoke, MA: NEARI Press.

Skidmore, W. C. & Roy, M. (2018) Male veteran's recovery from sexual assault and harassment during military service. Chapter in Gartner, R.B. (2018a),

Ed. *Healing sexually betrayed men and boys: Treatment for sexual abuse, assault, and trauma.* New York, NY.: Routledge.

Smith, C.P. & Freyd, J.J. (2013). Dangerous safe havens: Institutional betrayal exacerbates sexual trauma. *Journal of Traumatic Stress, 26*(1), 119–124. doi:10.1002/jts.21778

Smith, C.P. & Freyd, J.J. (2014). Institutional betrayal. *American Psychologist,* 69 (6), 575-587.

Spinelli, F. (2018). The sexually abused man's relationship with his physician. Chapter in Gartner, R.B. (2018), Ed. *Understanding the sexual betrayal of boys and men.* New York, NY.: Routledge.

Steinmetz, M.M. (1997) *Interviewing for child sexual abuse: Strategies for balancing forensic and therapeutic factors.* Notre Dame, IND: Jalice Publications.

Turner, R. J., & Lloyd, D. A. (1995). Lifetime traumas and mental health: The significance of cumulative adversity. *Journal of Health and Social Behavior, 36*(4), 360–376. Https://doi.org/10.2307/2137325

Van der Kolk, B.; Lanius, R., & Siegel, D. (2022) How trauma impacts specific areas of the brain (and how this can affect your treatment). Online course, National Institute for the Clinical Application of Behavioral Medicine. Https://www.nicabm.com/program/brain-trauma/?Itl=store

Van der Put, C.E.; Asscher, J.J..; Wissink, I.B.; & Starns, G.J.J.M. (2014). The relationship between maltreatment victimization and sexual and violent offending: Differences between adolescent offenders with and without intellectual disability. *Journal of Intellectual Disability Research,* Vol 58 (11), pp 979-991. DOI: 10.1111/jir.12031.

Weathers, F. W., Blake, D. D., Schnurr, P. P., Kaloupek, D. G., Marx, B. P., & Keane, T. M. (2015). *The Clinician-Administered PTSD Scale for DSM-5 (CAPS-5) – Past Week* [Measurement instrument]. Available from https://www.ptsd.va.gov/

Widom, C.S. (1989) The cycle of violence. *Science*, 244 (4901): 160-166. DOI: 10.1126/science.2704995

# VITA

*HOWARD R. FRADKIN, PH.D., L.I.C.D.C.-CS*

*PRIVATE CONSULTING ADDRESS & PHONE*
314 King Avenue
Columbus, OH 43201
614-578-8887 cell
E-Mail:  howardfradkin@me.com

*EDUCATION*

Ph.D., COUNSELING PSYCHOLOGY, University of North Carolina at Chapel Hill, 1980.

M.S., THERAPEUTIC RECREATION, University of North Carolina at Chapel Hill, 1978.

B.S., RECREATION AND LEISURE STUDIES, Temple University, Philadelphia, PA, 1974.

*DISSERTATION*
An Exploratory Study of the Specific Effects of Training Counselors to Work with Gay and Lesbian Clients, 1980.

*LICENSURE*
Psychologist, Ohio Board of Psychology, Granted October 1982, License #3237

Licensed Independent Chemical Dependency Counselor and Certified Supervisor, Chemical Dependency Professionals Board, Granted 01/14/2005, #933439

*CERTIFICATION*
Council for the National Register of Health Service Providers in Psychology, Granted 4/11/84; #33033

Internationally Certified Alcohol and Drug Counselor, granted 4/26/11, by the International Certification and Reciprocity Consortium

VITA
Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 2

*PROFESSIONAL EXPERIENCE*

**Consulting Psychologist and Trainer**, 2012-
Provide expert reports and consultation in legal cases for male and female survivors of childhood and adulthood sexual abuse and other childhood and adulthood traumas across the United States. Experience includes working with Ohio and Federal Public Defender's Offices on death row mitigation cases providing reports and court testimony; accepted as a trauma expert in Ohio courts in six cases; provided expert testimony for a victim of priest abuse and work with private attorneys in legal cases involving trauma. Provide professional, para-professional and public awareness training for the Veteran's Administration, military bases, and sexual abuse agencies about male sexual victimization.

**Psychologist, Founding Partner, Affirmations Psychological Services, Inc.** 1982-2013**. Psychologist and Partner Emeritus,** 2013-2017**. Partner Emeritus,** 2018-
Provided psychotherapy in private practice, primarily serving adults with a variety of psychological problems. Specializations include: Individual psychotherapy, group psychotherapy, couples psychotherapy, male and female survivors of sexual victimization, Gay and Lesbian affirmative psychotherapy, chemical dependency, sexual addiction, AIDS/HIV-related concerns, sexuality & sexual dysfunction, adult children of alcoholics and other dysfunctional families, hypnotherapy, men's issues, women's issues, depression and anxiety disorders, dissociative disorders. Retired from active private practice December 31, 2017.

**Facilitator Emeritus, MenHealing.org.** 2018-
Consult with Weekends of Recovery team as they continue to provide healing weekends for male survivors of sexual trauma.

**Psychologist, Trainer, Healthy Minds Group,** 2016-2018
Co-developed a three-part sequential experiential training program for therapists working with men with trauma histories with Jim Struve, LISW.  Healthy Minds Group is a national educational organization based in Portland, Oregon.

VITA
Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 3

*PROFESSIONAL EXPERIENCE (cont'd)*

**Co-Chairperson, MaleSurvivor Weekends of Recovery Program,** 2010-
August 2017
**Leadership Team, MaleSurvivor Weekends of Recovery Program,** 2014-
August 2017
**Chairperson, MaleSurvivor Weekends of Recovery Program,** 2001- 2009
Administrated and facilitated 3-day intensive experiential Weekends of Recovery
for male survivors in the U.S. and Canada for over 1200 male survivors.
Supervised a team of 12 psychotherapists who facilitated each weekend
experience.

**Co-facilitator, HIV Spectrum Support Group, Columbus AIDS Task Force,**
October 1986- December 1998
Co-facilitated weekly support group with over 300 men and women over the
course of the last nine years. Helped train co-facilitators for other groups.

**Psychologist, Southeast Community Mental Health Center,** November
1982- December 1983.
Provided adult psychotherapy to variety of outpatient clients, including individual,
family, and marital, and group psychotherapy. Consulted and helped organize
domestic violence program for court referrals. Provided supervision for psychology
practicum students.

**Counselor, Southeast Community Mental Health Center,** July 1981-
October 1982.
Provided outpatient psychotherapy to variety of clients. Specialized in alcohol
and substance abuse counseling.

**Senior Counselor, State University of New York at Fredonia**, August
1980- June 1981.
Provided outpatient counseling as member of small college counseling center staff.
Organized structured and unstructured group counseling program. Organized and
facilitated workshop program for dormitory residents on a number of mental health
topics. Co-facilitated faculty awareness support group. Served as advisor for
gay/lesbian student group.

*PROFESSIONAL EXPERIENCE (cont'd)*
**Psychology Intern, The Ohio State University Counseling and Consultation Service**, September 1979- June 1980.
Full-time psychology internship, APA-approved. Provided individual, couples and group psychotherapy. Trained in a variety of psychotherapeutic approaches.

*PUBLICATIONS*
Struve, J., Beckstead, L. and Fradkin, H.R. (2018) Beyond the gay/straight binary: Gender and/or sexually diverse male survivors.  In Gartner, Richard (Ed.). Understanding the sexual betrayal of boys and men: The trauma of sexual abuse. NY, NY:  Routledge.

Fradkin, H.R. and Struve, J. (2018) Empowering Male Survivors to Heal Through Community and Peer Connections. In Gartner, Richard (Ed.). Healing sexually betrayed men and boys: Treatment for sexual abuse, assault, and trauma. NY, NY: Routledge.

Fradkin, H.R., and Rauch, M. (2014) Empowering male survivors who struggle with addiction.  Paradigm Magazine, pgs. 9-11.

Fradkin, H.R., Rauch, M. and Anderson, C.A. (2014) Male survivors of sexual victimization. Paradigm Magazine, pgs. 8-9.

Fradkin, H.R. (2012) **Joining forces: Empowering male survivors to thrive.** Carlsbad, CA: Hay House.

Hall, A.S. & Fradkin, H.R. (1992) Affirming gay men's mental health: Counseling with a new attitude.  Journal of Mental Health Counseling.

Fradkin, H.R. (1987) AIDS: New challenge to the counseling psychologist in private practice. Paper presented at the Annual Convention of the American Psychological Association (95th, New York, New York, August 28-September 1, 1987). (Eric Document Reproduction Service N. ED 289-152).

*PUBLICATIONS (cont'd)*
Sher, M., Stevens, M., Good, G., & Eichenfield, G. (Eds). (1987). Counseling men in the AIDS crisis. In <u>Handbook of Counseling and Psychotherapy with Men</u>. NY, NY: Sage Publications

*ADMINISTRATIVE/ORGANIZATIONAL EXPERIENCE*
CO-CHAIRPERSON, Ohio Psychological Association Prevention and Wellness Program, September 2022-August, 2023

CHAIRPERSON, Ohio Psychological Association Prevention and Wellness Program, October 2020-August 2022.

CHAIRPERSON, Ohio Psychological Association Colleague Assistance Program, September, 2019-2020.

COMMITTEE MEMBER, Ohio Psychological Association, Ethics Committee, October 2019- current; Prevention and Wellness Program, September 2023-present; Membership committee, September 2022-present

PRESIDENT, National Organization on Male Sexual Victimization, January 1997- December 1997; Treasurer, 1999- 2001; Board Member, 1995-2001; Advisory Board, 2001-2017.

CHAIRPERSON, Ohio Psychological Association Lesbian, Gay, Bisexual and Transgender Task Force, 2000-2004.

CHAIRPERSON, Ohio Coalition on Male Survivor Issues (1993-1995) and the Chairperson of the Steering Committee, 6th World Interdisciplinary Conference on Male Sexual Victimization. October 5-7, 1995. Columbus, OH.

VITA

*ADMINISTRATIVE/ORGANIZATIONAL EXPERIENCE (Cont'd)*
SUPPORT SERVICES CHAIRPERSON, 1986-1992;
CHAIRPERSON, 1988-1992, Ohio AIDS Coalition.
Served as the statewide coordinator of service providers for this advocacy group.
Served as Primary Facilitator of statewide Healing Weekends for HIV Challenged
individuals. for 15 Healing Weekends from October,1987-February 1992. Chaired
planning committee for each weekend. Facilitated number of workshops at each
weekend, including: Intimacy, Grieving, Humor as Healing, Sexual Addiction and
Sexual Healing, Positive Sexual Expression, Spirituality. Consulted with Ohio
Dept of Health AIDS unit.

SUPPORT SERVICES ADMINISTRATIVE DIRECTOR, Columbus AIDS
Task Force, 1984-1987.
Served as first volunteer administrator of Support Services of this community-
based AIDS organization. Tasks included recruitment of administrative staff,
organizing, and facilitating training of buddy support program volunteers, policy
development, supervision of social service advocate, budget development, program
administration. Also developed curriculum and provided training for HIV antibody
testing and education.

*MEDIA APPEARANCES*
*Oprah Winfrey Presents: After Neverland*, HBO/OWN, March 4, 2019.

Aaron Klein Show, WABC-Radio, January 13, 2013

First Coast Connect, Melissa Ross, WJCT-Radio, January 2, 2013.

Globe and Mail.  Canadian newspaper.  Quoted in article, December 18, 2012.

Change Your Attitude, Joan Hermann, Nationally syndicated radio program,
December 11, 2012.

Voices in the Family, Dan Gottlieb, WHYY-Radio, December 10,

2012.

VITA
Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 6

*MEDIA APPEARANCES (cont'd.)*
Carlette Christmas, NC Radio, On Point, December 10, 2012.

Bob Barrett, The Health Show, WAMC/NPR, November 20 and 23, 2012.

Male Survivor Conference Examines Sexual Abuse in Sports. New York Times Sports Section, November 19, 2012.

Huffington Post Live TV, November 14, 2012

Surviving and Coping with Male Sexual Abuse. All Sides with Ann Fisher, WOSU-FM Radio, November 8, 2012.

Bottom Line's Daily Health News: Male Sexual Abuse-Survivors, Are You Truly Over It? November 8, 2012.

Katie Couric Show.  Expert with Keyon Dooling.  November 8, 2012.

Gary Goldberg, In the Spirit, WRPI-Radio. November 1, 2012.

Philadelphia Inquirer.  Jeff Gammage.  September 14, 2012.

All Sides with Ann Fisher. Focus on the Jerry Sandusky trial. WOSU-FM Radio. June 20, 2012.

Penn State Scandal: Parents Beware. Dr. Phil Show, appeared as the expert on the show.  November 16, 2011.

The Penn State Scandal. All Sides with Ann Fisher. WOSU-FM Radio, November 14, 2011.

The Gayle King Show, Penn State Scandal, November 14, 2011.

Assisting Male Survivors of Sexual Violence. Office for Victims of Crime HELP for Victim Service Providers Web Forum, August 31, 2011.

*MEDIA APPEARANCES (cont'd.)*
TAALK Radio. Show on Male Survivors of Sexual Abuse, hosted by Diane Cranley. April 29, 2011. Appeared with Simon Weinberg and Kathy Barbini, Big Voice Pictures.

On Point Radio with Tom Ashbrook. Show on Senator Scott Brown and Male Sexual Abuse. February 11, 2011. Appeared with Mikele Rauch, MFT.

*The Oprah Winfrey Show, 200 Men: Male Survivors of Sexual Abuse*, 2-part show aired on November 5 and November 12, 2010. Appeared as the only expert on the show speaking about the dynamics of male survivors and abuse recovery. Chicago, Il.

*PROFESSIONAL, PARAPROFESSIONAL AND MILITARY PUBLIC AWARENESS TRAININGS*

Uncovering and explaining the long-term consequences of childhood and adult trauma. Ohio Federal Public Defenders training. Columbus, OH. June 30, 2023. 1.75 hours

Empirical foundations of Impostor Phenomenon: Practical and experiential strategies for self-care. Ohio Psychological Association Summer Workshop Series. August 2, 2022.

Impostor phenomenon and self-care. Dinsmore and Shohl Leadership Academy. Columbus, OH. May 4, 2022. 1 hour.

Exploring the Connections between Self-Care while Developing a Greater Social Consciousness and Social Justice Activism. Co-presented with April Sutton, Joseph Grochowski, Jeeseon Park-Saltzman and Jennifer Duncan. Ohio Psychological Association Spring Convention. March 28, 2022. 3 hours.

The Ethical and Legal Practice of Psychology. Co-presented with the OPA Ethics Committee. Ohio Psychological Association Spring Convention. March 30, 2022. 3 hours.

VITA
Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 8

*PROFESSIONAL, PARAPROFESSIONAL AND MILITARY PUBLIC
AWARENESS TRAININGS (cont'd)*
Breaking the silence: Healing the shame of male sexual trauma and the trauma
of spiritual abuse.  Co-presented with Mikele Rauch.  11th Wisconsin Serving
Victims of Crime Conference.  August 24, 2021. 3 hours.

Providing a helping hand; Training for the Ohio Psychological Association
Prevention and Wellness Program Provider Panel.  Co-presented with Cathy
McDaniels Wilson and Carl Tishler.  Recorded webinar for The Ohio
Psychological Association.  Summer, 2020.

The ethical and legal practice of psychology live webinar. Co-presented with
OPA Ethics Committee.  June 3, 2020.  2 hours.

Now is the Time for Us: Prioritizing Your Self-Care. Co-presented with Cathy
McDaniels Wilson. The Ohio Psychological Association 2019 Convention,
Columbus, Ohio. April 25, 2019.

Engaging Males to Heal from Trauma. Sponsored by Training for the Mind.
Portland, OR.  January 12, 2017.  Clark County, WA.  May 8, 2017. Seattle,
WA, September 12, 2018.

Retaining Males in the Ongoing Process of Healing from Trauma.  Sponsored
by Training for the Mind.  Portland, OR.  February 13, 2017.  Clark County,
WA.  July 18, 2017.  Salem, OR November 15, 2017, Mt. Vernon, WA
Behavioral Health Organization, November 15, 2018.

Special Therapeutic Issues When Working with Male Trauma Survivor.
Sponsored by Training for the Mind.  Portland, OR.  March 22, 2017. Clark
County, WA. August 30, 2017, Salem, OR October 25, 2018.

Breaking the Silence of Male Sexual Trauma in the US Military: Aim High to
Enhance Trust, Character and Mission Readiness.  US Air Force Academy.
Colorado Springs, CO.  April 12, 2017

VITA
Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 9

*PROFESSIONAL, PARAPROFESSIONAL AND MILITARY PUBLIC AWARENESS TRAININGS (cont'd)*
Breaking the Silence: Male on Male Sexual Assault.  Joint Base Fort Sam Houston Sexual Assault Awareness and Prevention Month.  San Antonio, TX.  April 19, 2017.

Breaking the Silence of Male Sexual Trauma in the Military: Do Your Part to Enhance Trust, Character and Mission Readiness.  Camp Atterbury Sexual Assault Awareness Prevention Month Training. Edinburgh, IN.  April 24, 2017.

Understanding and Supporting Male Survivors of Sexual Victimization. Indiana Coalition Against Sexual Assault.  Indianapolis, IN.  September 15, 2016.
Breaking the Silence: Healing the Shame of Male Survivors of Military Sexual Trauma.  Blanchfield Army Community Hospital (BACH), Sexual Harassment Assault Response Program (SHARP), Fort Campbell, Kentucky.  3-hour training for Behavioral Health Providers and 3 hour training for SARC's/VA's. September 8, 2016.

Healing the Shame of Male Survivors of Military Sexual Trauma. Teleconference for Region 4A, Mountain Region, Veteran's Administration Military Sexual Trauma Counselors.  April 14, 2016
Exquisite Self Compassion: A Key for Thriving for Survivors. With Rob Hawkings. 74th Annual Conference of the American Society for Group Psychotherapy and Psychodrama. Phoenix, AZ.  April 2, 2016.

Healing the Shame of Male Survivors of Military Sexual Trauma. Army Special Forces, Ft. Bragg, NC.  November 20, 2015.

Healing the Shame of Male Survivors of Military Sexual Trauma. With Lynne MacDonell. Minnesota Army and Air National Guard. Minneapolis, MN. November 18, 2015.

VITA

Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 10

*PROFESSIONAL, PARAPROFESSIONAL AND MILITARY PUBLIC
AWARENESS TRAININGS (cont'd)*
Healing the Shame of Male Survivors of Military Sexual Trauma. Great Lakes
Naval Station.  North Chicago, Illinois.  September 21 and December 7, 2015.

Healing the Shame of Male Survivors of Military Sexual Trauma. US Army Africa
Sexual Assault Summit for Junior and Senior Commanders.  Vicenza, Italy.  Oct
6-7, 2015.

Healing the Shame of Male Survivors of Military Sexual Trauma.  National Guard
Annual Conference-Training for SARC's and VA's.  Leesbury, VA. May 12,
2015.

Male on Male Sexual Assault. JFHQ-NCR/Assault Response and Prevention
Conference. Military District of Washington Sexual Assault Conference. Ft.
Belvoir, VA Officer's Club.  May 7, 2015.

Breaking the Silence: Healing the Shame of Male Sexual Trauma Survivors.
Beausejour Family Crisis Resource Centre. With Lynne MacDonell. Moncton,
New Brunswick, Canada.  April 20, 2015.

Breaking the Silence: Healing the Shame of the Male Veteran's Sexual Trauma.
Chalmers P. Wylie VA ACC, Columbus, OH.  April 6, 2015.

Breaking the Silence: Healing the Shame of the Male Veteran's Sexual
Trauma. Louis Stokes Cleveland VAMC, Cleveland, OH.  April 2, 2015.

Sculpting Challenges and Strengths in Relationship. Co-presented with Rob
Hawkings, MA, MES, MBA. 73rd Annual Conference of the American Society for
Group Psychotherapy and Psychodrama, Philadelphia PA.  Apr. 2015

Ending Isolation, Finding Hope and Creating Community to Heal. Presented at
14th International MaleSurvivor Conference.  Newark, NJ.  October 31, 2014.

Exquisite Compassion: A Key to Thriving. Presented at 14th International
MaleSurvivor Conference.  Newark, NJ.  November 2, 2014.

*PROFESSIONAL, PARAPROFESSIONAL AND MILITARY PUBLIC AWARENESS TRAINING (cont'd)*

Breaking the Silence: Healing the Shame of the Male Veteran's Sexual Trauma. Webinar for the National Military Sexual Trauma (MST) Support Team, Veteran's Administration. June 5, 2014.

Empowering Survivors of Sexual Abuse. Co-presented with Rob Hawkings, MA, MES, MBA, and Bill Burmester MA, MFT. 72nd Annual Conference of the American Society for Group Psychotherapy and Psychodrama, Oakland, CA. April 2014.

Breaking the Silence, Healing the Shame of Male Survivors of Sexual Victimization. 18th Interpersonal Violence, Abuse and Trauma Conference. Plenary workshop presented with Christopher Anderson. September 10, 2013. San Diego, CA.

Empowering Male Survivors to Break Their Silence. National Child Protection Training Center; When Words Matter: Emerging Issues in Forensic Interviewing. August 1, 2013. Columbus, Ohio.

Surviving Male Sexual Abuse –Patterns, Care, and Case Study: Plenary Session for the 13th Annual Child Abuse Conference, Child Abuse Training Services Program, Prosecuting Attorneys Association of Michigan. June 19, 2013. Traverse City, Michigan.

Great Lakes Bay Male Survivor Task Force Professional Training. April 30, 2013. Midland, Michigan.

In the Wake of the Penn State Scandal. Keynote Plenary Panel Member. Ending Violence Against Women International Conference, April 2013.

Empowering Male Survivors to Thrive in the Aftermath of Sexual Abuse Scandals. Sponsored by The Ohio State University School of Social Work. February 2012.

*PROFESSIONAL, PARAPROFESSIONAL AND MILITARY PUBLIC AWARENESS TRAINING (cont'd)*

Male Survivors of Sexual Abuse. Sponsored by the Central Ohio Psychological Association.  August 26, 2011.  Columbus, OH.

Invisible Survivors: The Legacy of Male Sexual Trauma: Implications for Mental Health Clinicians and other Health Care Providers. Sponsored by Boston Area Rape Crisis Center.  April 8, 2011, Boston, Massachusetts.

Keynote Address: Dare to Dream: The MaleSurvivor Weekends of Recovery: Creating Community One Weekend at a Time, The MaleSurvivor International Conference, March 2010, New York City.


*IN-SERVICE TRAINING EXPERIENCE*
Breaking the Silence, Healing the Shame of Male Survivors of Sexual Victimization. With Jim Struve.  Provided to the Penn State Counseling Service, April 2012.

Sculpting in Group Psychotherapy and Training—Provided to The Ohio State University Counseling and Consultation Service, May 2002.

Sexual Addiction Recovery--Provided training to the Columbus Health Department staff of HIV/AIDS counselors and outreach workers, 1997; Provided training to The Ohio State University Counseling and Consultation Service clinical staff, 2000.

AIDS and Mental Health -- Presented over 15 workshops to various agencies, including Franklin County Alcohol, Drug and Mental Health Board; North Central Mental Health Center; Maryhaven Inc.; Southeast Community Mental Health Center; Grant Hospital; Riverside Methodist Hospital; The Ohio State University Counseling and Consultation Service; The Ohio State University Medical School; 1986-1994

VITA
Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 13

*IN-SERVICE TRAINING EXPERIENCE (*cont'd
Gay and Lesbian Affirmative Psychotherapy-- Provided various workshops for
The Ohio Department of Health AIDS Activities Unit; Franklin County Alcohol,
Drug and Mental Health Board; The Ohio State University Counseling and
Consultation Service; The Ohio State University Medical School; 1991-1994.

*CONTINUING EDUCATION EXPERIENCE*
Live: Ethical dilemmas: Best practices for forensic witnesses. Palo Alto
University Continuing and Professional Studies. Michael Perlin, JD and Ellis
Cucolo, JD. August 23, 2023. 1.5 hours.

When a healthcare professional needs help-A guide for licensees of the Ohio
Board of Psychology, Ohio PHP. August 23, 2023. 1 hour.

Providing support to gender and sexual minority youths. Ohio Psychological
Association. June 28, 2023. 2 hours.

A systematic review of gambling-related findings. Home study. January 17,
2023. 2.25 hours.

Prevention and treatment of HIV among people living with substance abuse
problems. January 16, 2023. 4 hours.

Clinician-administered PTSD scale for DSM-5 (CAPS-5) Clinician Training.
US Dept. of Veterans Affairs Employee Education System. December 21, 2022.
4 hrs.

Assessing allegations of trauma in forensic contexts. American Academy of
Forensic Psychology. November 4, 2022. 2.5 hrs.

Developing, managing, and maintaining a forensic psychology practice.
American Academy of Forensic Psychology. November 4, 2022. 2 hrs.

Evidence for mental health professionals. American Academy of Forensic
Psychology. November 3, 2022. 2 hrs.

HIPAA and forensic psychology: Am I out of compliance? American Academy
of Forensic Psychology. November 3, 2022. 2 hrs.

Moving beyond a color-blind approach to forensic assessment. American
Academy of Forensic Psychology. November 3, 2022. 3 hrs.

VITA
Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 14

*CONTINUING EDUCATION EXPERIENCE* (cont'd)
To a reasonable degree of certainty-Confronting threats to validity in forensic decision-making. American Academy of Forensic Psychology. November 2, 2022. 3 hrs.

Real stories of false confessions. American Academy of Forensic Psychology. November 2, 2022. 2 hrs.

Adverse Childhood Experiences and Stress impacts across the lifespan. Ohio Psychological Association Spring Convention. March 25, 2022. 2 hours.

Culturally competent forensic evaluations: What we can learn from forensic approaches. OPA Convention. April 21, 2021. 2 hours.

Remembering trauma-informed care while managing a "pandemic within a pandemic". OPA Convention, April 21, 2021. 2 hours.

Ethical considerations for diagnosing posttraumatic stress disorder (PTSD) in diverse clinical populations with chronic trauma exposure: Challenges and clinical considerations amidst the mass trauma of the COVID-19 pandemic. OPA Convention, April 21, 2021. 1 hour.

Turning toward ourselves and each other: Part 2: Restoring and sustaining clinician well-being. APA Insurance Trust.
March 8, 2021. 3 hours.

Get off my lawn: I don't want to learn a new way to write forensic reports. American Academy of Forensic Psychology. February 26, 2021. 4 hours.

Turning toward ourselves and each other: The pivotal nature of clinician self-care. Part 1: Understanding the stakes and recognizing the terrain. APA Insurance Trust. February 19, 2021. 3 hours.

Historical trauma: Clinical considerations for the oppressed. Dr. Loren Hill. IVAT webinar. January 20, 2021. 1.5 hours.

Beyond self-care: Rooting ourselves in an anti-colonial nurturance culture. Cleveland Psychological Association. December 7, 2020. 1 hour.

When helping hurts: Understanding the impact of secondary traumatic stress and compassion fatigue. Institute for Research, Education and Training in Addictions. October 21, 2020. 1.5 hours.

VITA
Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 15

*CONTINUING EDUCATION EXPERIENCE* (cont'd)
Applying Adverse Childhood Experience (ACEs) research to clinical practice. The Institute on Violence, Abuse and Trauma. September 17, 2020. 2 hours.

On Being An Effective Expert Witness. American Academy of Forensic Psychology, November 17, 2019. San Diego, CA. 6 hours.

Ethical Issues in Forensic Psychology Practice. American Academy of Forensic Psychology, November 16, 2019. San Diego, CA. 6 hours.

Writing an Effective Forensic Report. American Academy of Forensic Psychology, November 14, 2019. San Diego, CA. 6 hours.

Practical Application of the Forensic Experiential Trauma Interview. Certified FETI. August 21-23, 2019. 18 hours.

Working Together to Build A Culture of Understanding. The Ohio Psychological Association 2019 Spring Convention. April 25-26, 2019. 10 hours; 7 ethics credits.

Complex Trauma and LGBTQI+ Clients: Ethical and Clinical Competencies. Ohio Psychological Association, June 25, 2018. Columbus, OH. 6 hours.

Introduction to the Forensic Experiential Trauma Interview. CertifiedFETI.com. June 11, 2018. Columbus, OH. 16 hours.

Star Behavioral Health Providers Evidence Based Psychotherapy. June 16, 2016. 13.50 hours.

Star Behavioral Health Providers Military Sensitivity Training for Civilian Professionals. Tier Two Training. March 23-24, 2016. Cincinnati, OH 18 hours.

Star Behavioral Health Providers Military Culture Training for Civilian Professionals. Tier One Training. March 3, 2016. Akron, OH. 8 hours

American Group Psychotherapy and Psychodrama Conference. April 9-12, 2015. Philadelphia, PA 15 hours

MaleSurvivor 14th International Conference. Oct 31-Nov 2, 2014. Newark, NJ.16 hours.

Practicing Telepsychology in Ohio. Sept 26, 2014. Columbus, OH. 3 hours.

American Society of Group Psychotherapy and Psychodrama 72nd Annual Conference. April 3-6, 2014. Oakland, CA. 27.75 hours

Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 16

*CONTINUING EDUCATION EXPERIENCE* (cont'd)
A Paradigm Shift: The Forensic Experiential Trauma Interview (FETI). Presenter Russell Strand. End Violence Against Women International Webinar, August 22, 2013. 1.5 hours

Ending Violence Against Women International Conference, Baltimore, Maryland. April 3-5, 2013. 11. 25 hours.

MaleSurvivor International Conference, New York, NY. November 15-18, 2012. 24 hours.

Ethical Boundary Considerations. The Ohio Psychological Association. Columbus, OH. June 9, 2010. 3 hours.

Healing and Hope. MaleSurvivor International Conference, New York, NY. March 18- 20, 2010. 20 hours.
Religious and Spiritual Abuse. The Ohio Psychological Association. Columbus, OH. June 5, 2009. 6 hours.

Psychology, Policy and Politics. The Ohio Psychological Association. Columbus, OH. October 31, 2008. 1 hour.

Addressing Medication Abuse and Misuse. The Ohio Psychological Association. Columbus, OH. October 31, 2008. 3 hours.

Treating LGBT Clients When You're Not. The Ohio Psychological Association. Columbus, OH. October 31, 2008. 3 hours.

Denial Management Counseling. The Cenaps Corporation. Spring Hill, FL. November 16, 2007. 14 hours.

Clinical Supervision. Association for Advanced Training in the Behavioral Sciences. Online Study Course. November 9, 2006. 10 hours.

Ecstasy (MDMA) Abuse: Current Research. Association for Advanced Training in the Behavioral Sciences. Online Study Course. October 27, 2006. 3 hours.

Anabolic Steroid Abuse. Association for Advanced Training in the Behavioral Sciences. Online Study Course. October 26, 2006. 2 hours.

Ex. 4 Page 121 of 131    Case 4:21-cv-08001-BCW    Document 70-5    Filed 04/29/24    Page 127 of 131

VITA
Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 17

*CONTINUING EDUCATION EXPERIENCE* (cont'd)
A Body to Die For: Advanced Training in the Treatment of Eating Disorders and Body Image Disturbance in Women. The Renfrew Center Foundation. Columbus, OH. April 7, 2006.  6 hours.

Psychopharmacology and Psychotherapy. The Institute for Dynamic Psychiatry and Psychotherapy.  Columbus, OH.  February 24, 2006.  3.5 hours.

Boundaries and Boundary Violations in Psychotherapy. The Institute for Dynamic Psychiatry and Psychotherapy.  Columbus, OH.  February 24, 2006. 3 hours.

*HONORS*

President Award, Ohio Psychological Association, and

Committee of the Year for Prevention and Wellness Program, Ohio Psychological Association, November 2021.

Marquis Who's Who Top Professionals, October 2019.

Award of Excellence, Ohio Psychological Association, April 2019.

Albert Nelson Marquis Lifetime Achievement Award, October 2018.

Columbus Mayor's Commendation for Male Survivor Recognition Day. November 2012.

Biltmore Who's Who, December 2010.

Faye Honey Knopp Award, November 2007, awarded by MaleSurvivor, for outstanding contributions to the field of treatment for male abuse survivors.

Association for Gay, Lesbian and Bisexuals Issues in Counseling (AGLBIC) Legacy Inaugural Fellow, March  2007

VITA

Howard R. Fradkin, Ph.D., L.I.C.D.C.-CS
Page 18

*HONORS (cont'd.)*
Who's Who in the World, 2006.

Achievement Award for Public Interest, Ohio Psychological Association, 2005.

Nationwide Register of Who's Who in Executives and Businesses, 2002.

President's Award of Appreciation of Service, National Organization On Male Sexual Victimization, 2001.

Ohio Psychological Association Special Projects Award, 2001.

Stonewall Union Gay, Lesbian and Bisexual Community Leadership Award,

1997. American Directory of Who's Who, 1997-1998, 1988.

Spirit of Healing Award, Ohio AIDS Coalition Leadership Award, 1996.

Who's Who in Medicine and Healthcare, 1997-1998.

Who's Who of Emerging Leaders in America, 1992, 1990, 1988.

Ohio Department of Health Director's AIDS Service Award, 1988.