# AGHARKAR AND ASSOCIATES

404.939.6636 (T)
866.824.5215 (F)
4062 Peachtree Rd NE, Suite A-203
Atlanta, Georgia 30319
agharkarmd@gmail.com

April 20, 2024

Angie Elleman, Esq.
111 Monument Circle, Ste. 3200
Indianapolis, IN 46204

Re:  Mr. Charles Hall
DOB:  4/6/71

Dear Ms. Elleman:

I have conducted a psychiatric evaluation of Mr. Charles Hall, performed on September 29, 2022, and April 6, 2023. This evaluation was performed pursuant to your request in order to assess the existence and extent of Mr. Hall's psychiatric difficulties. The opinions expressed in this report represent my professional opinion to a reasonable degree of psychiatric certainty, based upon my clinical interviews with Mr. Hall and review of relevant records.

**Qualifications**

I am a medical doctor, who is licensed to practice medicine in Georgia since 2002. I have maintained an active clinical private practice since 2005. I treat a wide variety of conditions including ADHD, Depression, Bipolar Disorder, Anxiety, Schizophrenia, Post-traumatic Stress Disorder, Panic Disorder, and Substance-related illnesses. On a weekly basis, I conduct neuropsychiatric evaluations of persons with neurologic impairments, acquired brain injuries, and neurodevelopmental disorders including Intellectual Disability.

I earned my Doctor of Medicine degree from the State University of New York Health Science Center at Syracuse and completed my residency at Emory University School of Medicine Department of Psychiatry and Behavioral Sciences, where I was Chief Resident. I also completed a Forensic Psychiatry Fellowship at Emory University School of Medicine. I hold dual board certification as a Diplomate of Adult Psychiatry (AP) and Forensic Psychiatry (FP) of the American Board of Psychiatry and Neurology (ABPN).

IFCD 00028655

In addition to my private practice, I am an Adjunct Assistant Professor of Psychiatry at Morehouse School of Medicine and a Clinical Assistant Professor with the Emory University School of Medicine.

I was awarded Distinguished Fellow status of the American Psychiatric Association in 2015. I have served as a consultant to various school systems in the Atlanta area, Emory University Hospitals, Georgia Tech Athletic Department, Georgia Composite State Board of Medical Examiners, Arizona Medical Board, the Federal Bureau of Investigation (FBI), the United States Armed Forces, and the Department of Defense (DoD). I have been an invited lecturer at several law schools including the Boalt School of Law at the University of California-Berkeley, Columbia University, Emory University, Penn State, and the University of Texas. I hold Top Secret security clearance with the United States government. I am one of the only civilian forensic psychiatrists to evaluate detainees held at Guantanamo Bay. My curriculum vitae is attached.

I have experience consulting and testifying in criminal and civil cases nationwide and have consulted internationally on forensic matters. I perform independent medical examinations and medical record reviews for psychiatric malpractice and disability cases. I am able to provide professional opinions on an array of legal questions, including criminal and civil competencies, criminal responsibility (insanity defense), personal injury, medical malpractice, and fitness for duty.

**Sources of Information**

I was retained by counsel for Charles Hall to conduct a psychiatric evaluation of him. I conducted clinical interviews on September 29, 2022, and April 6, 2023, for approximately 2.5 and 1.75 hours, respectively.

I have also received and reviewed the following documentary information regarding Mr. Hall:

1.  Trial Testimony:

    Testimony of Robert Fucetola, PhD

    Testimony of Benjamin Ramos

    Testimony Charles Hall, Sr.

    Testimony of Daniel Shine, MD

    Testimony of Dorothy Hall

    Testimony of Eric Storms

Testimony of Henry Small

Testimony of James Kennedy, MD

Testimony of James Osterrieder

Testimony of John Mandarelli

Testimony of John Wisner, MD

Testimony of Kellie Sbardella

Testimony of Kenneth Daugherty

Testimony of Maureen Reardon

Testimon of Michael Tausek

Testimony of Michelle Bories

Testimony of Mindy Graham

Testimony of Park Dietz

Testimony of Paula O'Brien

Testimony of Richard Staples, PhD

Testimony of Ronald Harnish

Testimony of Ruth Mattson

Testimony of Steven Parks

Testimony of Todd Miller

Testimony of William Flynn


2. Expert records and reports:
   Records from Dr. Fucetola's file
   Dr. Fucetola's report
   Dr. Fucetola's C.V.
   Dr. Wisner's report
   Dr. Wisner's addendum to his report
   Dr. Wisner's C.V.
   Pages from Dr. Staples file
   Park Dietz Eval Video, Parts 1 – 4
   Dr. Dietz Report

IFCD 00028657

Charles Hall PAI
PAI Report
Dr. Dietz power point with inserted video clips
Dr. Dietz Report regarding Coonce
Rochester psychological testing records
Memo from interview with Betty Smith
Social History report from Rebecca Cohen
Report from Dr. Hilary Steinhart
Report from Dr. Howard Fradkin
Report from Dr. Marlyne Israelian
Report from Dr. Maureen Baird
MRI results, report and data
Declaration from Dr. Ruben Gur
Report from Dr. Avery Knapp
Addendum report from Dr. Avery Knapp
Report from Dr. Erin Bigler
Declaration from Dr. John Wisner
Declaration from Dr. Patrick Gariety

3. Records:

BOP Medical Records
Maine General Medical Center Records
Maine Medical Center Records
Mercy Hospital Records
Various School Records
Homestead Records
Maine Dept Of Corrections Detention Records
Maine Dept Of Corrections Medical Records Correct Care Solutions
CCA-Leavenworth Detention Center Detention Records
CCA-Leavenworth Detention Center Medical Records
Greene Co Missouri Sheriff's Dept Medical Records
Frisbie Memorial Hospital Records
Mayo Clinic Records
Maine HHS Adoption Records
Music Behind Bars Video File
Family photos
Maine Dartmouth Family Clinic
Handwritten suicide note
Sweetser Children's Home records

IFCD 00028658

4. FBI and Incident reports:
   2011.10.19 Carter, Gene 302 re threatening letters from Hall
   2011.10.19 Osterrieder, James 302 re letter from Hall
   Coonce statements
   Hall statements and letters
   Initial Reports of homicide
   Letters to Jay McCloskey from Hall and related letters

5. Post-conviction collected lay declarations:
   Abair, Lucy
   AvRutick, Joni
   Bories, Michelle
   Carr, Peter
   Curtis, Bonnie Sue
   Dougherty, Rick
   Dubois, Renee
   Durbin, Zack
   Duval, Chris
   Foxwell, Derek
   Ginsberg, Jane
   Herbst, Doris
   Jackson, Bruce
   Kimber, John
   Koenke, Theresa
   Lamb, Juno
   LeClaire, Mark
   Mandarelli, John
   Mashteare, Jessie
   McKegney, Kevin
   Meister, Torley
   Miles, Liz
   Miles, Trish
   Moretto, Lou
   Nasse, Mary
   Parks, Steve
   Ruff, David
   Sanderson, Bruce
   Sawyer, Malcolm
   Shumway, Susan
   Smith, Edith
   Swahlen, Cindy
   Tayman, Rick
   Tilghman, Mary

IFCD 00028659

Tomasi, Lisa.

**Psychiatric Interview**

At the outset of the evaluation, I informed Mr. Hall that I was conducting a psychiatric evaluation that it was not confidential, that anything he told me I might be asked to testify about in a hearing. Mr. Hall stated that he understood these conditions and agreed to proceed.

Mr. Hall was calm and cooperative with the interviews. He discussed his medical conditions in detail as they are significant and occupy much of his time and worry. In fact, he explained several times that the only reason he committed the crimes that initially resulted in federal charges was to be moved into the federal prison system where he believed the health care was better than in the state prisons in Maine. He explained he was desperate for good medical care because of the complexity and seriousness of his medical conditions. While, in general, he related that he tries to keep his moods "even" he feels depressed more often than not. His depressed moods can last for two weeks or so, during which he has poor sleep and impaired concentration. He admitted to experiencing periods of several days of mood elevation, an increase in energy and goal-directed activities, distractibility and irritability. When he has been prescribed Prednisone (a steroid anti-inflammatory) in the past, Mr. Hall noticed his moods become more irritable and angry. This is a known side effect of Prednisone.

A social history investigation by Mr. Hall's defense team revealed that Mr. Hall and several other boys were sexually molested while attending Shaker Mountain, a small alternative school in Burlington, Vermont. Mr. Hall boarded at the school. During our second evaluation, I asked him directly about this. He responded by saying, "This will be short, right?" He clearly was uncomfortable and avoidant talking about these experiences. He discussed how he was fondled and molested by the headmaster at the private school, Jerry Mintz. His face flushed and he teared up while describing what happened to him. He explained he had never told anyone about this before his defense mitigation specialist had asked him recently very specifically about Jerry. Mr. Hall avoids thinking about what happened to him and does not talk about it. He is very concerned about harassment at the prison should his past sexual abuse become known to inmates and staff.

He remembers the sexual molestation going on for about a year and he felt horror, helpless, and powerless. He experienced nightmares, avoidance, and numbing symptoms as a result. He was hypervigilant and "on edge" after this happened to him. He had a lot of externalizing and behavioral problems after the molestation, and his childhood and adolescent acting out behaviors can be viewed in this light. Mr. Hall said he "just didn't care after that" and was looking for "attention." He noted, "I've gotten really good at blocking things out." He told me he would probably not sleep for several nights following

6

our discussion of the abuse because he would be so "worked up" from talking about the abuse and will be irritable and depressed. He said, "This has really stirred up a lot for me."

**Brief Social History**

Charles "Chuck" Hall was born on April 6, 1971, in Portland, Maine, at Maine Medical Center. Mr. Hall was put in temporary foster care after his birth. When he was between six-to-thirteen weeks old, he was placed with Charles and Dorothy Hall, who formally adopted him when he was one year old. The Halls were in their early thirties when they adopted Mr. Hall.

After his adoption by Charles and Dorothy, Mr. Hall was reared in the Saco, ME area, fifteen (15) miles from Portland. He lived with his adopted parents, their biological daughter, Susan Ellen Shumway (DOB 1956), and an older adopted sister, Michelle Lee Bories (DOB 1969). Mr. Hall was the youngest of the three children. He was reportedly closer to his sister Michelle, as Susan was 15 years older than he was and left to attend nursing school when Mr. Hall was still a young boy. Mr. Hall recalled that he was cared for by both Dorothy and Susan as a child.

Charles V. Hall, (Mr. Hall, Sr.) was originally from New York. He completed three years of college, apprenticed to become an electrician, and later found work as a manager at a Naval Shipyard. The shipyard constructed nuclear submarines. For many years before the homicide, Mr. Hall was not in contact with his father. Mr. Hall reported that his father had had at least one heart attack. Mr. Hall's father actually suffered three heart attacks after his children left home and he had retired to Florida. (Charles Hall Testimony)

Dorothy Hall was born in Maine. She was a high school graduate and worked principally as a homemaker. Occasionally, Dorothy worked in a shoe store. Mr. Hall stated that his adoptive mother had a "minor stroke," after which she had difficulties with her memory. Dorothy testified that she had a stroke and a heart attack after retiring to Florida with her husband, when the couple was in their early fifties. (Dorothy Hall Testimony)

Mr. Hall expressed deep affection for his parents. He has reported that his parents drank heavily on the weekends and when they were intoxicated frequently got into fights where they threw things at each other. It has been suggested that this was not true, but both Michelle and Susan have signed sworn declarations corroborating their parents drinking and fighting. Sweetser records also suggested referral for both parents to substance abuse screening, further corroborating a concern by contemporaneous reporters about such behavior.

At other times, Mr. Hall has in fact told facts that are either untrue or cannot be corroborated. Mr. Hall has told the following stories numerous times, including to the government's trial expert Dr. Park Dietz, who believed Mr. Hall was, in part, genuine: 1)

Once after a fight with Charles, Dorothy told the children to pack their things as if she intended to leave the house. The children later found her passed out in her room. In another version of this incident, Mr. Hall stated that his mother had attempted a murder-suicide pact where she tried to kill him (then age 9), his sister Michelle, and herself by giving them an overdose of pills after an argument with their father. According to Mr. Hall, his mother passed out from alcohol intoxication and was unable to complete her plan. 2) At age 12, Mr. Hall claimed that he tried to kill his father by replacing his heart medication with Drano after Michelle accused their father of sexual abuse. She later recanted. Each of these incidents was denied by Mr. Hall's parents, and by Michelle, when they testified during the penalty phase of Mr. Hall's capital trial. In fact, his parents made clear that replacing the heart medication with Drano *could* not have occurred, since Mr. Hall, Sr. was not taking any heart medication at the time Mr. Hall lived with his parents. Mr. Hall's parents and sister Michelle all testified that Mr. Hall made up stories or "tall tales," and had an "active, creative imagination." The prosecution pointed out that Mr. Hall had a long history of lying. Dr. Park Dietz was somewhat unsure as to whether Mr. Hall was lying when he told these particular stories. He "leaned toward" the idea that Mr. Hall had attempted to kill his father, despite the impossibility of it occurring as relayed to him. At other times, it is clear that Mr. Hall has relayed information that was not true; even his family members testified to his "tall tales."

At age 23, Mr. Hall was diagnosed with Crohn's Disease. This is not in dispute. Park Dietz was clear in his testimony that Mr. Hall "did not manipulate prison medical staff to receive care for his disease." Mr. Hall initially had a temporary ileostomy and tried treating the disease with different medications, including Prednisone. Ultimately, he incurred such severe damage to his colon from his disease that he required a total colectomy and permanent ostomy. Mr. Hall has required numerous abdominal surgeries and was often treated with large doses of steroids, primarily Prednisone.

Mr. Hall reported to a prior examiner that his first sexual experience was with an adult woman when he was 13. He described it as "consensual." Fucetola report. There does not appear to have been any follow up in terms of identifying who this adult was. A sexual encounter between any adult and a 13 year old is abuse. It is extremely likely that Mr. Hall's relaying to Dr. Fucetola this sexual encounter at age 13 with an adult was actually his effort to convey his sense of victimization by the headmaster of the Shaker Mountain School. Casting this encounter as with a female instead of a male is a less vulnerable and more socially acceptable version. He was approximately 13 when we know he did experience sexual abuse at the hands of an adult male.

Prior to attending the Shaker Mountain School, Mr. Hall's records are not particularly eventful. His first grade teacher described him as "a nice little boy" who was regularly distracted. His sister Michelle, remembers him as a lonely boy. He began to tell stories for attention as early as the first grade.

8

As Mr. Hall approached adolescence, his began to have learning difficulties in school. What began as daydreaming turned into failing classes. A third grade request for a parent teacher conference documents his mother attributing his poor performance to "the family moving, death of a grandparent, and a neighbor needing to remove foster children from her home." His grades did not improve. His sister Michelle began acting out and demonstrated promiscuity and mischievousness quite early. She attributes her behavior at the time as testing her parents in light of her own unstable sense of security owing to her adoption. Facing Michelle's increasing problems, Chuck's primary area of concerns seemed to be academic. He failed the sixth grade. And then he failed the sixth grade a second time. Unsure how to meet Mr. Hall's needs, his parents chose to send him to a school in Vermont, the Shaker Mountain School. He would initially live with his sister, Susan, who was a young mother of four children and living nearby. When Mr. Hall became too much for Susan and her husband to manage, he became a boarding student at the Shaker Mountain School.

It is there at the Shaker Mountain School that Mr. Hall is repeatedly sexual violated by the headmaster of the school. Sexual permissiveness pervaded the school, but it appears academic needs were untended. It is apparent the school had no trained therapists, no trained special education teachers, no assessments for learning problems. Instead of meeting the needs of this young student, he was exploited and violated.

Numerous sworn declarations outline not just the sexual abuse by the Shaker Mountain School headmaster, but the grooming behavior creating an environment for his abuse. Grooming behavior makes the victim feel loved and wanted by his abuser, further complicating the sexual exploitation that follows. In part because the headmaster appears to have surrounded himself with a young and inexperienced staff, he continued this abuse of his students for years.

Mr. Hall was one of many victims made to feel special by the headmaster, lured to his loft for an overnight sleepover, and sexually molested. Like most of the other students, Mr. Hall did not report his abuse until years later when asked directly about it by his current legal team. Even when he was confronted, the headmaster evaded any accountability for his actions, demonstrating the level of emotional control he exerted in his leadership.

Mr. Hall returned to his parents' home after a year of repeated sexual victimization. Having had no formal education while at Shaker Mountain, and having failed the sixth grade twice, he was nonetheless enrolled in the ninth grade. He returned having lost any trust in adults in his life, experiencing significant trauma, with depression, and without the skills to succeed in school. It is unsurprising that his schooling continued to be unsuccessful and he acted out increasingly maladaptive ways.

After Mr. Hall returned from the Shaker Mountain School at age 14 his behavior rapidly deteriorated. Through his teen years, Mr. Hall admitted that his parents called the police

9

on him a few times, for example, after he took their car "joyriding" overnight and after he used his mother's credit card without permission. In testifying, Mr. Hall's parents downplayed the issue with the car. His father testified that he took the car for the night and brought it back, so it wasn't a problem. (Testimony of Charles Hall)

While he was initially enrolled in 9th grade at Thornton Academy upon return from the Shaker Mountain School, Mr. Hall was clearly not equipped emotionally or academically to manage high school. He was quickly put into special education classes, where he managed for a time until his maladaptive behaviors escalated and he stopped attending. By the time he is in 9th grade for a second year, he is attending meetings with the school psychologist. Their last session was in February 1987, at which point Chuck was "increasingly in crisis," exhibiting truancy, "temper outbursts," theft, and running away. (School Records)

It appears to be around this time that Chuck threatened to commit suicide, in a note left to his parents. Depression or suicidality do not appear to have been properly addressed.

The school system recognized they could not meet his needs and placed him at The Homestead Project, a residential facility designed for treatment of troubled teens, many of whom were court ordered to live there. This system was punitive in nature and very strict, a stark contrast to the permissiveness Mr. Hall experienced at the Shaker Mountain School.

No individual therapy was offered at Homestead, but group therapy was required. It is difficult to imagine a teen boy like Mr. Hall initially disclosing his sexual victimization and beginning the healing process from his experiences in the context of group therapy with other teens. Staff at Homestead were clear that Mr. Hall was maintaining a "safe emotional distance" from others in his life as well as experiencing "confusion over sense of self and sexual identity." It is unsurprising that a victim of sexual abuse would seek to maintain emotional safety and distance from others and would struggle with sexual identity. This seeking of emotional safety and distance would be a recurring theme to the present time for Mr. Hall, who suffers from unresolved trauma due to his sexual abuse. Given that group therapy was the only avenue to address these matters, it is not only unsurprising, but expected, that no progress was made during his time at Homestead. Instead, when identity issues arose in group therapy, Mr. Hall fled by running away from the program. (Treatment Summary, August 25, 1988, p.2.)

He was discharged from the Homestead Project and returned home to his parents, where he completed his GED. However, his trauma was untreated and he continued his chaotic behavior and participated in various burglaries and thefts.

As an adult, Mr. Hall was involved in several relationships with older women. He was married twice. At the age of 23, Mr. Hall met Barbara Ottinger, a 48-year-old married

woman. In 1994, she divorced her first husband and shortly thereafter married Mr. Hall. They separated and divorced less than two years later.

During 1995-1996, Mr. Hall had an 18-month relationship with a woman named Ruth Mattson. He lived with Ruth, her son and her parents. Ruth insisted that Mr. Hall move out of her home several months later, when she learned that he had lied to her about being divorced from Barbara Ottenger. Ruth testified that Mr. Hall also told a number of other "inconsequential" or "little" lies to her. She came to believe that Mr. Hall was a "pathological liar" and his lying was evidence of a "personality disorder." She remained in touch with him, however, through sporadic letters. (Testimony of Ruth Mattson)

Mr. Hall married Mary Blakeney Hall in 1997. Both were inmates in the Cumberland County (ME) jail when they met and married. Mary and Mr. Hall never divorced, but in 2013, Mr. Hall reported that Mary was dying of liver cancer. She died in early 2014. (Penalty Phase Witness Stmt of Mary's Mother, Geraldine Francis, pp.2-4)

In October of 2011, Mary Hall was interviewed by FBI Special Agent Rick McLain. During the time Mary was interviewed regarding Mr. Hall, she was being treated for cancer and taking a number of medications, including narcotics for pain. Mary told the FBI untruths about Mr. Hall, which were unfortunately relied upon by mental health evaluators, including Bureau of Prisons (BOP) doctors at the Butner Medical Facility, and by the investigator who prepared a preliminary report for Dr. Park Dietz. Overall, Mary made a series of damaging accusations against Mr. Hall, later proven to be false. (See also Mary Blakeney and Geraldine Francis' Penalty Phase Witness Stmts)

Mr. Hall has no biological children.

Throughout the 1990's Mr. Hall was in and out of jail and prison in Maine, and in 1999, was sentenced to 16 years in federal prison.

In 2010, he was charged with the instant offense. At his capital trial, Mr. Hall's family members testified that they were unaware that Mr. Hall had been convicted of federal crimes and was in federal prison. Mr. Hall's parents saw him for the first time in 18 years at his 2014 capital trial. His sister Michelle testified by video, but saw him via video at the time of her testimony, which was the first time she had seen Mr. Hall for many years. (Testimony of Michelle Bories; Dorothy and Charles Hall)

**Medical History - General Overview**

Mr. Hall denied major childhood illnesses, but he did have shingles at age 11. He has also been diagnosed with a hernia, past hypertension, GERD, neuropathy and he has reported multiple head traumas. He requires reading glasses.

In 1993, when Mr. Hall was 22, he was diagnosed with Crohn's disease. (Maine Medical records). He had suffered from weight loss, bloody stool and diarrhea for years prior to diagnosis. His course of illness has been chronic with numerous exacerbations.

In 1994 he was involved in a motorcycle accident while evading police pursuant to a traffic stop.

By 1995 at the age of 24 he had been on steroids for Crohn's management for a couple of years when his condition worsened. He was admitted to the hospital with vomiting, weight loss, diarrhea and abdominal pain. Tests revealed a significant amount of Crohn's active disease in his colon. He underwent a colectomy, with placement of an ostomy. (Mid-Maine Medical Discharge Summary; Dartmouth Records).

He was treated for major depression in 1995.

Mr. Hall requested a reversal of his ileostomy, which was completed in April of 1996. By August of that year he presented in the Emergency Room with abdominal pain and reported 10-12 loose stools daily. (Mid-Maine Medical Center). He continued to receive Prednisone regularly.

In 1997 he was found to have multiple ulcers in his small bowel and rectum. (Hall00008693). After years of Crohn's flares, in May of 2000 he presented to the emergency room with a partial bowel obstruction. He was in pain and was vomiting blood in the hospital. A permanent ileostomy was performed with a proctectomy. There was a request for a "neuro consult" at discharge, but it is unclear why and whether any follow-up was actually completed. Mr. Hall was an inmate at the time.

Mr. Hall returned to the Emergency room five times in the following year, with multiple revisions and cauterization of tissue required.

Since his colectomy, Mr. Hall has experienced numerous flares on a frequent and recurring basis. Those have been treated with high doses of Prednisone as well as other medications.

When Mr. Hall has Crohn's flares, he experiences abdominal cramping, nausea, vomiting and loose and bloody stools. Mr. Hall has depression that has been associated with Crohn's disease and his colectomy, though depression also predates his Crohn's diagnosis. His ostomy bag produces chronic discomfort. He feels "agitated and tense." Mr. Hall has stated that as a result of the physical and emotional complications of Crohn's, he attempted suicide on three occasions between 2007 and 2013.

As Dr. Steinhart reports, Mr. Hall has an aggressive form of Crohn's disease and has undergone at least 13 surgeries.

12

Due to the amount of his colon that has been removed in multiple surgeries over the years, he has had some difficulty absorbing adequate nutrients ingested orally to sustain life. When I visited him at Butner FMC he was receiving total parental nutrition (TPN), nutrition delivered intravenously. I understand he is not currently in need of TPN, but the recurrence of this is a significant risk for Mr. Hall, especially if he were to need further surgery. The loss of additional bowel could be fatal or could lead to lifetime inability to digest food orally. Mr. Hall has also had kidney cancer (2017), kidney stones, ureteral stones, multiple hernia repairs, many resections of his ostomy, and a life threatening bout with septic infection secondary to his having required total parental nutrition (TPN).

*Course of Prednisone treatment*
Mr. Hall has been treated with courses of the steroid Prednisone off and on for much of his adult life as a means of attempting to control inflammation and flares of his Crohn's disease. Dr. Steinhart is a preeminent expert in Gastroenterology with specialization in inflammatory bowel diseases such as Crohn's disease. Crohn's disease is a chronic and incurable disease that affects approximately 1-2% percent of the population. As Dr. Steinhart explains, Mr. Hall has a severe case of Crohn's disease. Crohn's disease causes chronic pain and discomfort.

Prednisone is a steroid prescription medication. It has been commonly prescribed for decades as a first line of treatment for particular types of inflammation. It is not uncommon to be prescribed for common bronchial inflammation. However, a certain segment of the population suffers with significant psychiatric side effects from the use of Prednisone.

Prednisone is normally prescribed with warnings about possible side effects. The mood related side effects of prednisone include depression, anxiety, delirium, panic disorder, increased energy, insomnia, agitation, irritability, mania and rage. These side effects are more common in individuals with pre-existing mental health concerns.

Mr. Hall has received prescription Prednisone for decades. The earliest incarcerations include Mr. Hall being prescribed daily 30 mg of Prednisone, even during times with no symptoms of Crohn's. (IFCD00023723) His dosage was at times as high as 60 mg daily. (Hall00003031) Often he was scheduled to taper his medications, but before he was to wean off the medication the dosage was increased again.

The fact that he received chronic prescriptions for Prednisone complicates the ability to accurately ascertain true symptoms of bipolar disorder.

At the time of the homicide Mr. Hall was prescribed 30mg of Prednisone daily. This is a moderately high dose. (TF.FD.06.00.001173) Side effects from Prednisone, including

13

mental health issues, can begin within 3-4 days of starting the medication, but can begin later. Mr. Hall had been on 40mg of Prednisone daily prior to admission to the hospital briefly (TF.FD.12.05.001468), but then his dosage was reduced. Mr. Hall was on 5mg daily of prednisone on January 12, 2010 when he was in Mercy Hospital for surgery (Hall00007522). 5mg is a maintenance dosage that can be helpful for some patients but is less likely to produce side effects. Mr. Hall's prescription was increased to 40mg on January 13, 2010. On January 20, 2010, his dosage of prednisone was again reduced, this time to 30 mg.

Mr. Hall requested to see his mental health treatment providers on the day of the homicide, earlier in the day. (Declaration of Patrick Gariety, MD)

On January 27, 2010, the day after the homicide, Mr. Hall was seen by the psychiatrist and disclosed anxiety and command hallucinations.

Mr. Hall now suffers from degeneration of his hip, a known side effect from long term Prednisone use. On the days immediately following the homicide, staff noted hand tremors in his hand. (TF.FD.14.08.003205). He reports symptoms of increased anxiety following the homicide, and is prescribed Ativan to manage his anxiety. (TF.FD.14.08.003204) These are all known side effects of Prednisone.

There are other times in which increased agitation and insomnia co-occur at time he is on Prednisone. The records demonstrate, for example, that in April of 2000 at a time he was prescribed Prednisone he was observed to have increased volatility, agitation, insomnia, increased motor activity. Chuck said at that time he was "ready to kill" and "rageful."

The Bureau of Prison's prescription of Prednisone to Mr. Hall is a relevant factor to Mr. Hall's state of mind at the time of the offense. Prednisone likely contributed to Mr. Hall's agitation and homicidality on January 26, 2010.

**Present Examination - Behavioral Observations and Mental Status**

Mr. Hall was a 52-year-old Caucasian man of average height and build, dressed in prison attire. His grooming appeared adequate. He was cooperative during the evaluation and had reasonable eye contact with his examiner. His speech was within normal limits. He demonstrated a good command of the English language. He was fully oriented to person, place, time and situation. He endorsed an "ok" mood overall. His affect was restricted. He denied current auditory and visual hallucinations. He denied any active homicidal or suicidal thoughts or attempts in the recent past. His thought processes were linear. There was no evidence of current delusional thinking. His insight and judgment were fair.

**Mental Health History**

*Childhood and Adolescence*
Mr. Hall was referred for educational testing in Middle school but went to the Shaker Mountain School instead.

Upon return from the Shaker Mountain School, Mr. Hall's parents became involved with "Tough Love," a support group for parents of adolescents founded in the US in the early 1970s. The Hall family was Roman Catholic. They attended Mass weekly at Most Holy Trinity Church in Saco. Mr. Hall was an altar boy. As a part of the "Tough Love" philosophy, the Hall's parish priest (spiritual leader) came to speak with Mr. Hall about his behavior. School records show that Mr. Hall was assessed as "moderately depressed" and later as "depressed" and "emotionally disabled" as an adolescent. He threatened suicide as a teenager.

*Adulthood*
Mr. Hall stated that he has suffered for years from depression, anxiety and insomnia. His depression has been treated with Prozac. His anxiety and insomnia have been treated with Elavil. On occasion, Mr. Hall has reported hallucinations and has been treated with an antipsychotic.

As a young adult in 1995 reported symptoms of depression and irritability, with poor sleep. The depression was often linked to his experience with Crohn's disease. He was diagnosed with major depression and prescribed antidepressants in 1995.

During a particularly bad period of insomnia, Mr. Hall did not sleep for days on end. He reported that his lack of sleep resulted in his experiencing auditory and visual hallucinations.

He often reports symptoms of depression like episodes of "uncontrolled tearfulness", fear, shame, humiliation, difficulty sleeping, sadness, decreased mood. He isolated himself enough to earn a provisional diagnosis of R/O Social Phobia. (See, e.g., Nov. 20, 2006 Progress Note) At other times he reports anger and irritability. He says, "I'm full of anger." (See Notes of Dr. Shine on May 15, 2007).

*Suicide Attempts*
Mr. Hall's hopelessness has resulted in attempted suicide four times while incarcerated. He reported that he tried to kill himself because he was depressed and exhausted from coping with his Crohn's disease, including bleeding, vomiting, pain and flares. Mr. Hall stated that he was "tired of it," "couldn't deal" and "wanted to die." (See, E.g. October 31, 2008 Counseling session notes by Mark Brooks, PhD)

IFCD 00028669

In June of 1997 Mr. Hall cut his wrist with a razor while in the State of Maine Department of Corrections. (TF.FD.11.15.001736) This suicide attempt was never mentioned by prior examiners to my knowledge.

In November 2006 Mr. Hall tried to hang or strangle himself with his colostomy bag cord. The cord was too elastic and did not work. There do not appear to have been witnesses to this attempt. Dr. Reardon testified for the government that this attempt was actually a "gesture" as records showed that Mr. Hall summoned staff members immediately after he tied the bag on. (Dr. Reardon Testimony) Suicide "gesture" is problematic nomenclature that mental health practitioners have been discouraged from using since at least 2010, with debates about its use spanning the two decades before that. Intent to commit suicide and lethality of the action are not necessarily correlated, rendering the term unhelpful for assessing suicide risk. (Heilbron N, Compton JS, Daniel SS, Goldston DB. The Problematic Label of Suicide Gesture: Alternatives for Clinical Research and Practice. Prof Psychol Res Pr. 2010 Jun 1;41(3):221-227.) In any event he voiced suicidality and hopelessness prior to the event and reported his own self harm actions to practitioners, seeking help. Following the event, he continued to endorse "sporadic, passive suicidal thoughts." His diagnosis at that time was Adjustment D/O with depressed mood; R/O major depressive D/O. (TF.FD.14.02.000260) Noted symptoms included depressed mood, decreased sleep, decreased motivation, increased anhedonia, increased social isolation, rumination and decreased appetite. (TF.FD.14.03.000812)

The evaluation at the time of the 2006 suicide attempt noted that his ostomy had been leaking more and he was quite embarrassed by this, leading to a physical altercation with another inmate a few weeks previously. The working diagnosis was changed then to Bipolar II Disorder, Most Recent Episode Depressed, Severe without psychotic features. As a likely basis for the Bipolar II disorder diagnosis, Mr. Hall recounted past episodes with increased energy for several days with pressured speech and increased goal-directed activities as well as increased risk-taking behaviors. No effort appears to have been made to place these episodes in time relative to medications he may have taken at the time. (Federal Medical Center, Rochester Outpatient Psychiatric Evaluation, dated 11/27/2006 by Dr. Shine.)

On two other occasions Mr. Hall attempted to kill himself by overdosing on purchased or hoarded medication, first with aspirin and then with Tylenol. In November 2007, he took a large dose of aspirin before going to sleep in his cell. He was told later that he was found unconscious and taken to the hospital by ambulance. Mr. Hall required dialysis to survive. (Id., p.34) He was upset that he received dialysis and was not allowed to die. The attempt was nearly lethal.

In reports relative to the 2007 suicide attempt Mr. Hall reported "hearing many voices yelling at him, but he is not sure if it is really AH [auditory hallucinations] or not."

16

(Medical note 11/20/2007 TF.FD.06.00.000445) He repeatedly voiced hopelessness and a desire to no longer live. By this time he seems to consistently be diagnosed with Bipolar Disorder II, depressed in various records. A psychological evaluation was conducted by Dr. Shine, dated December 11, 2007. Dr. Shine lists working diagnoses of Bipolar Disorder II, Most Recent Episode Depressed, Severe with Psychotic Features and Antisocial Personality Disorder. Mr. Hall reported to Dr. Shine that, "I was on an emotional high for three or four weeks and then I got more depressed." He reported being rebuffed in efforts to contact his sister, as she did not respond to his correspondence and refused to provide him with the address for his parents. He reported hearing auditory hallucinations of derogatory voices. (Federal Medical Center, Rochester Outpatient Psychiatric Evaluation, date 11/27/2006 by Dr. Shine.)

Mr. Hall had been transferred to the mental health unit at the Rochester FMC in November 2007, "because of a severe aspirin overdose with lethal intent." He was placed in a special housing unit on suicide watch. Ten days later, he was transferred to the Martin Wing "observation room." He continued to experience depression but reported a decrease in suicidal thinking. He also reported auditory hallucinations. He was later transferred to the Federal Medical Center, Devens.

On October 30, 2008 Mr. Hall was found unresponsive following a Tylenol and ibuprofen overdose. He took 500 pills over the course of 10 minutes. (Health Alliance Hospital Discharge report November 7, 2008) Mr. Hall left a suicide note at this attempt. Mr. Hall refused medical treatment, causing concern by the medical staff that he was experiencing degradation of his liver functioning. (October 31, 2008 counseling session notes by Mark L. Brooks, PhD) Medical treatment was subsequently conducted against Mr. Hall's wishes. While in the hospital pursuant to his overdose he had continual blood in his ostomy, requiring a blood transfusion due to his low blood count. (Discharge report)

Following the 2008 suicide attempt Mr. Hall indicated his chronic illness and humiliation at his own body were reasons he saw no reason to continue living. (November 7, 2008 Progress Notes)

**Mental health evaluations:** Mr. Hall has been evaluated a number of times including by Bureau of Prisons experts, defense experts and a prosecution expert.

Psychological Test Results repeatedly demonstrate an average IQ across measures at different times, including in 2008, 2012, 2013 and 2023. He also tested with a twelfth grade or better reading level at each of these evaluations. Dr. Israelian outlines compelling reasons that tests for feigning or malingering should, at a minimum, be considered with caution in their appropriate use on Mr. Hall.

In 2012 Bureau of Prisons experts evaluated Mr. Hall for competency to stand trial. Those test results showed some mildly impaired nonverbal problem solving abilities, but adequate results in other limited areas tested. Mr. Hall endorsed only mild symptoms of depression (BDI-II =17). Mr. Hall was deemed competent to proceed, on the basis of clinical interviews and his completed MacCAT-CA, which "suggested minimal to no impairment in Mr. Hall's factual understanding of the legal system and the process of adjudication, nor in his logical reasoning of case information and basic ability to assist counsel." In interviews, Mr. Hall "showed a sophisticated understanding of basic court proceedings and the roles of key trial personnel." (Id., pp.25-26)

The 2012 evaluators diagnosed him with the following:
Axis I: Depressive Disorder, NOS, 311
Axis II: ASPD, 301.7 (Principal Diagnosis)
Axis III: Crohn's Disease, Status Post Ileostomy; Hyperlipidemia, Esophageal Reflux; Poor Dentition; Vitamin B12 Deficiency.
Axis IV: Legal Problems. Problems with Primary Support Group.
Axis V: GAF=75
(Id., p.28)

The conclusion here is noteworthy because while he was diagnosed with Depressive Disorder as a mood condition, he was not diagnosed with bipolar disorder, as he had been since 2007. The 2012 evaluators reasoned that the bipolar diagnosis had based only on self-reported symptoms. Because malingering was assumed and there were no direct observations of manic or hypomanic symptoms, the diagnosis of bipolar disorder was rejected.

In 2013 Mr. Hall was evaluated by defense expert Dr. Robert Fucetola, a neuropsychologist. Dr. Fucetola found that Mr. Hall's left hand motor speed was relatively decreased. Mr. Hall's visual memory was deficient. The 42-point difference between his AMI and VMI scores is very rare. The 31-point difference between his VMI and VWMI is also rare. Mr. Hall's Visual Immediate and Visual Delayed Memory Index scores were both significantly below expectation for someone of Mr. Hall's average intelligence. Dr. Fucetola looked for but found no evidence of deliberate exaggeration or fabrication of cognitive impairment when tested with multiple symptom validity tests.

Mr. Hall reported to Dr. Fucetola pronounced symptoms of anxiety and depression on self-report scales. He denied current suicidal thoughts but reported many vegetative symptoms of depression.

Dr. Fucetola concluded that there were significant deficiencies in visual memory, visual/ nonverbal reasoning and left hand motor speed. He also concluded there were deficiencies in problem solving functions. He did not have a conclusion about the

18

etiology or age of onset of his abnormal findings, but recommended brain imaging to determine if there was a structural or functional anatomic deficit, and to possibly learn whether these were neurodevelopmental or posttraumatic deficiencies.

Dr. Fucetola rendered no diagnosis.

Dr. John H. Wisner is a psychiatrist that evaluated Mr. Hall in 2013 and 2014 on behalf of Mr. Hall's trial defense team.

He claimed that Mr. Hall had no documented history of mental illness prior to his imprisonment in the Federal Bureau of Prisons, apparently unaware of a 1995 diagnosis of Major Depression and treatment with antidepressants. However, Dr. Wisner did note that not long after he entered the BOP in August 1999, Mr. Hall was evaluated by a psychiatrist. Mr. Hall "self-reported episodes of insomnia, psychomotor agitation, irritability, angry outbursts, periods of racing thoughts, accusatory auditory hallucinations and anxious, depressed mood." Dr. Wisner diagnosed Mr. Hall with Antisocial Personality Disorder as well as Bipolar Disorder 2, Chronic psychosis, chronic depression and phobic anxiety.

Dr. Wisner briefly detailed the course of Mr. Hall's Crohn's Disease, with diagnosis at 23, his subsequent colectomy and ileostomy, and later treatment with what he described as "nearly chronic doses of Prednisone." Dr. Wisner observed that, "[f]rom a psychiatric perspective, Prednisone has the potential to produce difficulty controlling emotion, difficulty in maintaining train of thought, depression, mania, psychosis, or other psychiatric symptoms such as mental confusion, poor memory and attention, insomnia and anxiety. These effects of steroid treatment can arise in persons with no history of mental illness or psychiatric symptoms, and exacerbate psychiatric symptoms in susceptible individuals who have a current or prior history of mental illness." (Wiser Report, p.3) Dr. Wisner explained in his testimony as well that Prednisone can cause a variety of psychiatric symptoms, making people irritable, aggressive, insomniatic, or exacerbating mental illness. (Transcript at p. 4741-4742) While Dr. Wisner explained in his testimony that Mr. Hall has had "only fairly brief periods when he's not been taking Prednisone," he did not tell the jurors whether Mr. Hall was taking Prednisone at the time of the homicide. (Id.) Dr. Wisner now admits that while he knew Mr. Hall had consumed "nearly chronic doses of Prednisone" and that Prednisone was known to cause agitation and mania related symptoms, he did not analyze whether Mr. Hall was receiving Prednisone at the time of the homicide.

With regard to the time of the offense on January 26, 2010 Dr. Wisner wrote, "Mr. Hall recounted being and feeling greatly 'disrespected' by the victim, Victor Castro-Rodriques [sic], during a period when he [Hall] was preparing some commissary food for a group of inmates. He made specific reference to the fact that this was in front of others and heightened his sense of courage and humiliation." Dr. Wisner offered no attempt at an

19

explanation for why a feeling of disrespect or humiliation might have led to an outsized reaction of participation in a homicide.

Dr. Wisner opined that Mr. Hall was under extreme duress. Mr. Hall's duress was continually and unexpectedly worsened by his mental illness, including his "Bipolar Mood Disorder II, chronic psychosis (derogatory hallucinations), and persistent anxiety." Dr. Wisner concluded that it was his "professional opinion, held with reasonable medical certainty, that at and around the time of January 26, 2010, Charles M. Hall was under severe mental and emotional disturbance, and unusual and substantial duress."

Dr. Wisner recommended that brain imaging and EEG testing be conducted on Mr. Hall.

Dr. Park Dietz was the government's mental health rebuttal witness, a forensic psychiatrist. Dr. Dietz was "asked by the government to evaluate the mental health aspects of the case and if necessary to prepare to address various kinds of competency, insanity issues or sentencing issues." Dr. Dietz examined Mr. Hall at the Greene County Jail in Springfield, Missouri, in April of 2014. He estimated that he spent six hours interviewing Mr. Hall in a recorded session I was able to view. Dietz also evaluated Mr. Coonce, so his testimony is about both Mr. Hall and his codefendant. Dietz acknowledged that Mr. Coonce had a "terrible childhood."

Dr. Dietz "did not find harmful life events in Mr. Hall's childhood because Mr. Hall had a middle-class upbringing in a reasonable, stable, adoptive family that met his day-to-day needs. His parents afforded him access to private educational opportunities when he didn't succeed in public school. In fact, Mr. Hall identified his adopted mother and father as the best people he had ever dealt with, saying that no matter what he's done, they've always supported him, had his back and provided unconditional love. He told me he always had nice clothes and school supplies." Dr. Dietz's evaluation, like other evaluations at the time of trial, was obviously severely limited because of his lack of access to relevant information about Mr. Hall's experience of childhood sexual abuse.

Further, Dr. Dietz's interview style was not conducive to eliciting a trauma history. Dr. Dietz had a computer between himself and Mr. Hall, typing notes throughout the interview despite the fact that it was being recorded. Dr. Dietz's questioning style was confrontational and more akin to an attorney taking a deposition than that of a mental health practitioner attempting a trauma informed interview. Persons with trauma often require more time for rapport-building and are reticent to disclose their abuse, particularly male sexual trauma. Closed-ended questions will not elicit these details and male sexual abuse survivors often minimize their trauma so as to avoid being re-traumatized by it. Dr. Gariety, Mr. Hall's treating psychiatrist, highlighted this phenomena by explaining that while Mr. Hall was willing to say his sister was sexually abused, he was concerned that in fact it was Mr. Hall who was abused. It is common for men to

20

deflect and project the abuse perpetrated upon them as having happened to someone else instead.

*Shame and Isolation*

Mr. Hall has repeatedly over the course of his incarceration requested to be housed apart from other inmates and in total isolation. Dr. Dietz believed "there was a pattern of that in which Mr. Hall repeatedly wanted people to know he was homicidal in an effort to get himself segregated."

In support of this pattern Dr. Dietz recounted that in 2004 Mr. Hall put in writing, "I would like to go to a federal superMax where there is little to no human contact. I would do best in that environment. I've spoken numerous times in the past with Dr. Smith as well as Dr. Redondo about how I prefer to be completely isolated. As of late I've had many suicidal thoughts and ideations."

On August 25, 2005, Mr. Hall "falsely confessed to a murder on the outside. He claimed to have disemboweled someone on the street." Dr. Dietz said that Mr. Hall gave this false confession "in an effort to be transferred back to the segregation unit." On January 21, 2008, Mr. Hall assaulted another inmate named Bonin after telling a third inmate that he planned to do so. Dr. Dietz referred to the "official description being that Mr. Hall put Mr. Bonin in a headlock and punched him in the cheek and head." The jury was then shown a clip of Mr. Hall's description of events concerning Mr. Bonin as he provided it to Dr. Dietz. Dr. Dietz testified about a letter that Mr. Hall wrote to his psychiatrist at that time, in January 2008, Dr. Shine. In the letter Mr. Hall said that he wished to correct the record about assaulting Mr. Bonin and he wrote: "What actually took place was I wrapped my hands around his throat and squeezed. My intent was to choke him to death. My intent then was to kill someone – – my intent then was to kill someone, not just assault." He went on to say, "if I was on the open unit today, that would be my intent and goal."

On January 28, 2010, two days after the homicide, Mr. Hall "asked to be moved to an isolation cell and said he had thoughts about killing people when he hears them talking or yelling." He said he "wanted to kill again and does not care if it's an inmate or a staff member." On March 1, 2010, Mr. Hall told a psychologist he "continued to have thoughts of murdering people." He "indicated he would attempt to kill someone, staff or inmate, if given the opportunity." In August 2010, Mr. Hall wrote to Prosecutor Eggert saying, "The only thing that will stop me from killing again is to put me to death. That will not be limited to inmates but staff as well. I just want to make myself clear on this issue. I will continue killing every chance I get." On April 26, 2014, during Dr. Dietz's exam, Mr. Hall "admitted he would kill again if someone tried to harm him or showed him blatant disrespect."

IFCD 00028675

Dietz further diagnosed Mr. Hall with agoraphobia. According to Dietz, Mr. Hall "has an anxiety disorder that started in childhood and I think the right label for it is agoraphobia. The symptoms are very similar to what's known as social anxiety disorder which one of the psychologists along the way suspected, or what's known as specific phobia situational type." Dietz explained that "these are related and similar anxiety disorders for which there are technical differences."

Mr. Hall told Dr. Nagle in 2006 that he had discovered that he was constantly "pissing people off to keep them away from me." While he was able to get his space that way, it also fed his depression. Dr. Dietz said that "[o]ne way to keep yourself in isolation is to make people angry so they leave you alone and go away but then you feel lonely and get depressed about it." In Dr. Dietz's examination of Mr. Hall "he confirmed that he does make people angry to keep them away."

Dr. Dietz also referenced that when Mr. Hall "has to empty his ostomy bag with other people around, his heart races and he begins to perspire. When he is bleeding from the stoma or an obstruction or a flare up of his Crohn's, he feels ashamed that he is so different from other people."

Dr. Dietz's diagnosis of agoraphobia and description of symptoms is at odds with the fact that Mr. Hall has spent his entire adult life in prison and has actively sought to be incarcerated. Mr. Hall's anxiety related to his ostomy is situational and not symptomatic of agoraphobia generally.

Dr. Dietz is aware that Mr. Hall has experienced periods of depression. His opinion is that the depression has been related to Mr. Hall's Crohn's disease. In his judgment, it is most accurate to diagnose Mr. Hall's experience with depression as an adjustment disorder with depressed mood, 'because it is a reaction to physical illness or other stressors in life." Dr. Dietz does note that Mr. Hall experiences very severe depression caused by his illness, which has resulted in multiple suicide attempts. He notes that each of Mr. Hall's suicide attempts followed his 1993 diagnosis of Crohn's.

Dr. Dietz fails to reference the depression that Mr. Hall apparently suffered from depression as a teenager, including as early as 1985. Dr. Dietz also fails to account for Mr. Hall's suicide note he left his parents as a teenager.

Dr. Dietz disputes the diagnosis of Bipolar Disorder, since Mr. Hall did not endorse symptoms of mania or hallucinations with Dr. Dietz. Yet, as noted above, Dr. Dietz conducted his interview in ways that were not conducive to building rapport and eliciting reliable information from Mr. Hall.

22

*Shame and Humiliation*

Shame and humiliation are common responses to one having an ostomy. Shame and humiliation are also very common responses to childhood sexual trauma. Mr. Hall's deep seated shame is related to both of these experiences in his life.

Mr. Hall expressed after the homicide that he was "reluctant to talk about some things in an environment where other inmates to hear him." He "asked if it might be possible to have a private therapy session." Psychologist Chad Brinkley reminded him he could only be removed from cell with a Lieutenant present. (TF.FD.14.08.003204)

Mr. Hall was "hoping to escape from the risk of having his Crohn's disease symptoms provoke his shame response, humiliation at the hands of the other inmates, violence at the hands of other inmates, and the threat of violence that pervades all correctional institutions for everyone."

Dietz testified "The one thing I'm really persuaded about is that he [Mr. Hall] wants to be away from people because of the feelings of shame and because it makes him anxious that they may discover his shameful secret about the Crohn's disease and that he doesn't want to be harassed and attacked by them. That, I think, is the central reason he wants to be isolated."

This sense of shame is also entirely consistent with Mr. Hall being a survivor of sexual abuse.

In our second interview, Mr. Hall was more open about his childhood history and disclosed the fact of his sexual abuse, but still showed significant symptoms of avoidance and numbing, not surprising given the chronic nature of trauma in his childhood.

*Neuroimaging results*

Imaging reviewed by Drs. Bigler and Knapp indicate significant brain abnormalities including scattered predominately subcortical white matter hyperintensities. Given the patient's indication, the differential diagnosis includes trauma/traumatic brain injury, as well as other etiologies such as vasculitis and migraine headache which should be ruled out clinically. Mr. Hall also has a 6 x 4 x 4 pineal cyst with associated crowding of the pineal gland. There is asymmetrically greater volume loss in the parietal lobe with normative percentile of 1.1 suspicious for atrophy. On PET-CT imaging there is temporoparietal volume loss, with reduction of metabolic activity in these regions, right greater than left.

**Opinions**

Mr. Hall has significant and serious medical illnesses which cause him significant anxiety and depressive symptoms. He has been diagnosed with bipolar disorder in the past and

treated accordingly. He is presently being treated for depression and appears, as most people with bipolar are, to be chronically depressed. He additionally demonstrated neurocognitive deficits as described in Dr. Marlyne Israelian's report.

A trauma evaluation was conducted by Dr. Howard Fradkin, which revealed significant symptoms consistent with Post Traumatic Stress Disorder. Dr. Marlyne Israelian conducted a comprehensive neuropsychological evaluation, concluding that Mr. Hall suffers from Post Traumatic Stress Disorder as well as dyscalculia (a learning disability) and brain abnormalities on neuroimaging that are consistent with his learning disability, but also reveal additional developmental weaknesses including visuospatial deficits, deficits in visual memory, difficulty learning from experience, poor forethought and reasoning and vigilance. Mr. Hall has abnormalities in key brain regions that are essential for social competence and for emotional and behavioral regulation.

I concur with Dr. Fradkin and Dr. Israelian's assessments. Mr. Hall described a history of significant childhood sexual abuse and based on his visceral reaction to discussing it, I believe it is likely that the abuse was worse than he was willing to talk about. He exhibits a great deal of numbing and avoidance symptoms as a result of his childhood trauma, which is what characterizes complex Post-Traumatic Stress Disorder. Based on the symptoms elicited, it appears Mr. Hall had the classic symptoms of PTSD in childhood including nightmares, flashbacks, hypervigilance, and avoidance symptoms stemming from the childhood sexual abuse. His childhood acting-out behaviors can best be viewed in this light, as a common reaction to trauma, rather than the result of a lack of empathy or conduct disorder.

I hold the opinions expressed throughout this report to a reasonable degree of medical certainty.

Sincerely,

Bhushan S. Agharkar, MD, DFAPA
Distinguished Fellow, American Psychiatric Association
Diplomate, American Board of Psychiatry and Neurology, with Added Qualifications in Forensic Psychiatry

24

# Bhushan S. Agharkar, M.D.

**Mailing Address**
4062 Peachtree Road NE, Suite A-203
Atlanta, Georgia 30319
404.939.6636
agharkarmd@gmail.com

**Professional Experience:**

Comprehensive Psychiatric Services of Atlanta, July 2005-present
Atlanta, GA 30319
Private Practice

Emory University School of Medicine, July 2005-present
Atlanta, GA 30322
Adjunct Assistant Professor

Morehouse School of Medicine, August 2005-present
Atlanta, GA 30310
Assistant Professor
Associate Residency Training Director, 2005-2011
Course Director, *Patient Evaluation and Treatment I and II*, 2005-2013
Course Director, *Business of Medicine*, 2005-2013
Course Director, *Forensic Psychiatry*, 2005-present
Course Director, *Applied Clinical Psychopharmacology*, 2014-present
Faculty Advisor, *Resident Journal Club*, 2005-2011
Member, *Residency Training and Admissions Committee*, 2005-2011

Columbia Law School, New York, NY
Guest Lecturer, 2021-present

Mercer School of Law, Macon, GA
Guest Lecturer, 2020-present

University of Denver School of Law, Denver, CO
Guest Lecturer, 2019-present

University of Texas School of Law, Austin, TX
Guest Lecturer, 2016-present

Emory University School of Law, Atlanta, GA
Guest Lecturer, 2015-present

Forefront Behavioral Telecare, December 2009-present
Founder and Director of Physician Network Development

Georgia Tech Student Health Services, March-May 2007, September 2008-February 2009
Atlanta, GA 30313
Staff Psychiatrist

Georgia State University Student Health Services, August 2007-June 2008
Atlanta, GA 30303
Staff Psychiatrist

Skyland Trail, July 2006-January 2007
Atlanta, GA 30319
Interim Medical Director

DeKalb Community Service Board, July 2005-February 2007
Decatur, GA 30031
Staff Psychiatrist

**Education:**
Emory University School of Medicine, 2004-2005
Department of Psychiatry and Behavioral Sciences
Atlanta, GA 30322
Forensic Psychiatry Fellowship

Emory University School of Medicine, 2000-2004
Department of Psychiatry and Behavioral Sciences
Atlanta, GA 30322
Adult Psychiatry Residency
Chief Resident at Emory University Hospitals, 2003-2004

State University of New York Health Science Center at Syracuse, 1996-2000
Syracuse, NY 13210
Doctor of Medicine degree, May 2000

Case Western Reserve University (CWRU), 1993-1997
Cleveland, OH 44106
Grade Point Average 3.83 (A= 4.00)
BA in Psychology, senior *in absentia* privilege
Magna Cum Laude

<u>**Certification and Licensure:**</u>

Diplomate in Forensic Psychiatry, American Board of Psychiatry and Neurology, 2007, Re-certified 2017

Diplomate in Adult Psychiatry, American Board of Psychiatry and Neurology, 2005, Re-certified 2015

Georgia Medical License, 2002

United States Department of Defense TS/SCI Security Clearance, active

Certified Mediator, California State University, Sacramento, 2008

<u>**Research Experience and Publications**</u>:

- "Developmental Impairments in Moral Competence as Mitigation in Capital Cases" Walker, R., Clark, J., Monahan, E.C., Shechet, A., Agharkar, B., Kheibari, A., & Victor, G. [Journal of Behavioral Sciences and the Law 2018; 36:437–456]

- "Traumatic Brain Injury in Criminal Litigation" Stacey Wood, JD, and Bhushan S. Agharkar, MD [84 UMKC L. Rev. 411, Winter 2015]

- "Delusions and False Memories: Roadblocks to Competency to Stand Trial" Lloyd Warford, JD, and Bhushan S. Agharkar, MD [82 UMKC L. Rev. 389, Winter 2014]

- "Advantages of DSM-5 in the Diagnosis of Intellectual Disability: Reduced Reliance in IQ Ceilings in *Atkins* (Death Penalty) Cases" Nancy Haydt, JD, Stephen Greenspan, PhD, and Bhushan S. Agharkar, MD [82 UMKC L. Rev. 359, Winter 2014]

- "Ethnic and Cultural Factors in Identifying Fetal Alcohol Spectrum Disorders" George W. Woods, MD, Stephen Greenspan, PhD, and Bhushan S. Agharkar, MD, Journal of Psychiatry and Law, Spring 2011

- "Improving Cognition and Treatment Outcomes in Schizophrenia" Bhushan S. Agharkar, MD [The Psychiatry Report 2004; 2(1): 24-34]

- "Violence While on SSRIs – a Litigation Perspective" poster presentation at American Academy of Psychiatry and the Law conference, October 22, 2004

- "Prescribing Conventional Antipsychotics at Two Veterans Administration Hospitals: Are There Geographical Differences?" Prakash S. Masand, MD, Monica Arora, MD, Thomas L. Schwartz, MD, Anil Sharma, MD, Xiaohong Wang, MD, Subhash Bhatia, MD, Jacob Manjooran, MD, William Hardoby, MD, Subhdeep Virk, MD, Daniel J.

3

Kuhles, MPH, Bhushan Agharkar, BA, and Sanjay Gupta, MD [CNS Spectrums 2001; 6(11): 894-896]

· "Prescribing Conventional Antipsychotics in the Era of Novel Antipsychotics: Informed Consent Issues"  Prakash S. Masand, Thomas L. Schwartz, Xiaohong Wang, Daniel J. Kuhles, Sanjay Gupta, Bhushan Agharkar, Jacob Manjooran, M. Ahmad Hameed, William Hardoby, Subhdeep Virk, and Bradford Frank. [Am J Ther 2002 Nov-Dec; 9(6):484-7]

· Research Assistant in Neuropsychiatry laboratory working on the solubilization of the 5-HT2A receptor under Brian Roth, M.D., Ph.D., at Case Western Reserve University (20 hrs/wk, fall 1995)

· Summer Research Fellow in Retrovirology lab under Bernard Poiesz, M.D., at SUNY HSC at Syracuse (40 hrs/wk, 5/1995-8/1995)

· Research Assistant at CWRU, Department of Neurology, Division of Clinical Research (3-5 hrs/wk,1993-1994)

**Presentations:**
· *Stress in the time of COVID-19*, Continuing Medical Education lecture, Baptist Health South Florida, Miami, FL, April 30, 2020
· *Telehealth Modalities to Facilitate Evaluations Globally as well as in Use by Legal Teams for Case Coordination*, International Academy of Mental Health and the Law, Vienna, Austria, July16, 2015
· *Update on Post-Traumatic Stress Disorder*, Continuing Medical Education lecture, Sixth Annual Mental and Behavioral Health Symposium, Baptist Health South Florida, Miami, FL, March 8, 2014
· *Dealing with the Difficult Patient*, Continuing Medical Education lecture, Primary Care Medicine and Neurology Update for the Primary Care Provider, Chattanooga, TN, June 26, 2010
· *Conflict Prevention and Dispute Avoidance through Teambuilding: Can it be transferred to legal/medical teams?*, International Academy of Mental Health and the Law, New York, NY, July 2, 2009
· *Understanding and Treating Bipolar Disorder*, Continuing Education lecture, Pine River Psychotherapy Associates, Atlanta, GA, October 27, 2008
· *Risk Management Issues in Psychiatry*, Grand Rounds, Morehouse School of Medicine, Department of Psychiatry and Behavioral Sciences, Atlanta, GA, February 27, 2008
· *Suicide and Violence Risk Assessment*, Grand Rounds, Morehouse School of Medicine, Department of Psychiatry and Behavioral Sciences, Atlanta, GA, January 23, 2008

4

- *Suicide Risk Assessment*, Nepalese Association in Southeast America Convention, Atlanta, GA, September 1, 2007
- *Schizophrenia*, Continuing Education lecture, United Behavioral Healthcare, Atlanta, GA, September 28, 2006

**Consultations:**
- United States Department of Defense
- United States Armed Forces
- National Law University, Delhi, India
- 392nd District Court of Henderson County, Texas
- The Clemency Project 2014
- City of Little Rock
- Atlanta Journal Constitution
- Georgia State University
- Federal Bureau of Investigation
- Fulton County Sheriff's Department
- Cobb County School District
- Emory University Hospitals
- Georgia Composite State Board of Medical Examiners
- Georgia Tech Athletic Department
- Arizona Medical Board
- Maricopa County Office of the Attorney General

**Professional Society Memberships:**
- American Neuropsychiatric Association
- American Association on Intellectual and Developmental Disabilities
- American Psychiatric Association
- American Academy of Psychiatry and the Law
- Georgia Psychiatric Physicians Association
- American Association of Directors of Psychiatric Residency Training, 2005-2011
- International Academy of Mental Health and the Law
- American Psychological Association, Division 33

**Awards and Honors:**
- Distinguished Fellow, American Psychiatric Association, 2015
- Fellow, American Psychiatric Association, 2011
- Phi Beta Kappa
- Honorable Mention, The Joe and Hope Skobba Memorial Award Resident Research Competition, 2005
- Emory University Department of Psychiatry Resident Teaching Award, 2004
- State Farm Foundation Scholarship Recipient (through National Merit Scholarship Corporation), 1993-1997
- Presidential Scholarship Recipient at Case Western Reserve University, 1993-1996

5

- Psi Chi, National Honor Society in Psychology
- Dean's High Honors List at CWRU, 1993-1996
- Who's Who in American Colleges and Universities, 1996
- USAA All-American Scholar-Athlete, 1995

**<u>Leadership, Teaching, and Volunteer Activities</u>**:
- Georgia Psychiatric Physicians Association (GPPA) Trustee 2006-2007, 2008-2011
- GPPA Ethics Committee, Member 2007-present
- GPPA Distinguished Fellow Nominating Committee, Member 2016-present
- Review Editor, *Frontiers in Forensic Psychiatry,* 2011-present
- Georgia Composite State Board of Medical Examiners, Peer Reviewer, November 2008-present
- Arizona Medical Board, Outside Medical Consultant, 2019-present
- National Institute of Trial Advocacy Training, Golden Gate University School of Law, San Francisco, California, 2008
- The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento, CA, Member 2008-present
- National Institute of Trial Advocacy Training, Georgia State Law School, Atlanta, Georgia, 2007
- American Academy of Psychiatry and the Law *Private Practice* Committee, Member 2007-2010
- American Academy of Psychiatry and the Law *Forensic Training of Psychiatry Residents* Committee, Member 2007-2010
- American Academy of Psychiatry and the Law *Early Career Development* Committee, Member 2007-2010
- Skyland Trail, Professional Advisory Board, Member 2006-2009
- GPPA Board of Trustees Public Affairs Committee, Chair 2005-2011
- GPPA Board of Trustees Early Career Psychiatrists Committee, Chair 2004-2011
- GPPA co-representative to the Medicare Carrier Advisory Committee, 2003-2004
- Developed, organized and taught weekly seminar series in psychodynamic psychotherapy for medical students in Emory Psychiatry rotations, 2003-2004
- APA ECP Advocacy/Leadership Fellow, 2004
- Emory MIT Trustee to the GPPA Board of Trustees, 2003-2004
- Emory Psychiatry Residents Political Action Committee, Chair 2002-2003
- Blackwell Science Publications, Reviewer 2001-present
- Co-editor of BMM's *Vritta*, national Marathi youth newsletter, 1998
- Judo, Brown belt
- GASP and Better Bodies brand ambassador