# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

UNITED STATES

        Plaintiff,

Case No: 6:10-cr-3029-BCW

        v.

CHARLES MICHAEL HALL

        Defendant.

I, Maureen Patricia Baird, declare that the following statements are true:

## BACKGROUND OF DECLARANT

1.    From March 1989 through September 2016, I was employed by the Department of Justice, Federal Bureau of Prisons (BOP), and served in many capacities. My last three positions held were Warden, Federal Correctional Institution (FCI), Danbury, Connecticut (2009-2014); Senior Executive Service (SES) Warden, Metropolitan Correctional Center (MCC), New York (2014-2016); and SES Warden, United States Penitentiary (USP), Marion, Illinois (2016-Retired).

2.    In my capacity as Warden at these institutions, I was responsible for the overall operations and all components of each prison. I am fully knowledgeable of the operations, procedures, and policies of the BOP and very specifically familiar with the operations of the Communication Management Unit at USP Marion. My professional experience of working in federal corrections included many areas. In two of the BOP Regional Offices I worked, one of my duties included the classification and designation

1

of newly committed inmates, as well as reviewing and approving inmate transfers to other federal prisons. Initial designations and subsequent transfers required a thorough review of the inmate's complete pre and post commitment record, to ensure accurate placement at an appropriate security level prison. One of my other duties when I was assigned to the Regional Offices, was to conduct and at times chair after action investigations/reviews and prepare reports for the Regional Director concerning significant incidents, including homicides and suicides which occurred at the institutions within the region where I was assigned. I also was responsible for inmate grievances, regarding all topics pertaining to correctional programs, including appeals related to the discipline policy. Throughout the course of my career, in many of my positions, I was required to assess an inmate's risk formally and informally. This risk assessment was especially critical when an inmate was being considered for a lesser security prison transfer or a community program.

3. Since my retirement from the Bureau of Prisons, I have maintained contact with many former colleagues. Since early 2017, I have worked as an independent prison consultant and have provided expert witness testimony. I have kept abreast of new policies and laws that directly impact the BOP.

4. Most recently, I have been preparing reports for filing in various United States District Courts throughout the country. These reports are prepared for the purpose of Compassionate Release consideration or for inmates who are being considered for release under the Incarceration Reduction Amendment Act (IRAA). In preparation for these reports, I am required to review prison records of each inmate so I can provide a concise and thorough report for the Court.

2

5. I have previously been qualified as an expert witness in federal courts in the areas of prison management, prison practices, and prison adjustment. I have never been found not qualified to testify as an expert witness.

6. A copy of my resume which includes my relevant work experience is attached to this report as Exhibit A.

**STATEMENT OF WORK**

7. I was contacted by Italia Patti, an attorney and Assistant Federal Defender at Indiana Federal Community Defenders, who is representing Charles Hall, a federal inmate who is currently housed at USP Terre Haute. Hall and his codefendant, Wesley Paul Coonce, were convicted of murdering a fellow inmate in January 2010, while they were incarcerated at the United States Medical Center for Federal Prisoners (MCFP) Springfield, Missouri. Both inmates were subsequently found guilty of Murder, First Degree by a jury who sentenced them to death on June 2, 2014, in the United States District Court, Western District of Missouri.

8. I was asked to review various BOP documents related to Hall's incarceration prior to the homicide of Victor Manuel Castro-Rodriguez, as well as records pertaining to the investigation of the homicide and the events leading up to the incident. Additionally, Ms. Patti requested I review the trial transcripts of various government and defense prison experts and opine on the information, as it relates to Hall. I understand the legal team who represented Hall at trial did not offer a prison expert, although codefendant Coonce's team offered an expert for Coonce. As part of my review, I was asked to evaluate how a federal prison expert, had one been engaged, may have assisted in Hall's defense at trial.

3

9.  I reviewed thousands of documents provided by counsel. In developing an approach to review the volume of documents, I relied on my years of federal corrections experience, which enabled me to focus primarily on the records needed to formulate an opinion on the issues Hall's Counsel requested. In developing my opinion on whether a prison expert would have contributed to Hall's defense and, if so, how, an extensive part of my review focused on:

- Hall's actions, mental state, and disciplinary history prior to and after the homicide.
- Coonce's actions, mental state, and disciplinary history prior to the incident.
- Castro-Rodriguez's actions, mental state, and disciplinary history prior to the incident.
- Assessing the risks of Hall/Coonce/Castro-Rodriguez being housed together.
- Reviewing the BOP's internal After-Action Investigation/Report to identify and/or determine deviations from policy, non-compliance to policy by staff at MCFP Springfield, and any weaknesses identified by the BOP's After-Action Committee following the incident.
- Reviewing testimony of government and defense prison experts who testified at trial, with emphasis on testimonies of Scott Dodrill, Chris Synsvoll, and Mark Bezy.
- Summarizing how a prison expert, had one been retained, may have contributed to Hall's defense.

In my analysis I primarily attempted to answer the questions,

- Can Hall be safely managed by the BOP?
- Did any deviations from policy contribute the homicide?
- How might a BOP expert have assisted Mr. Hall's defense at trial?

### EXECUTIVE SUMMARY

10. As a result of my review of these documents, it is my opinion that Hall can safely be managed by the BOP for the remainder of his life in prison. Because of the homicide, Hall now has a serious disciplinary history. The BOP applies very specific security measures to offenders, like Hall, who present significant management concerns. These measures are taken to provide a safe environment for both staff and inmates. These

4

IFCD 00027685

enhanced security protocols were applied to Hall forthwith following the homicide and will remain in place throughout his time in federal prison. These enhanced security protocols are not solely dependent on Hall having a death sentence as the BOP regularly assesses security needs of all inmates and bases the security requirements on an individual's security needs. The BOP's security measures have proven effective and thus Hall has no discipline infractions or acts of violence noted in the record since the homicide.

11. Any time there is a significant incident within one of its prisons, like a homicide, large-scale riot, or suicide, the BOP conducts a thorough investigation. The After-Action investigation helps to determine the cause of the incident and an analysis of the events leading up to it. Following an After-Action investigation, the BOP establishes and implements new and best security practices to lessen the likelihood of a reoccurrence. These best practices are shared with wardens at every federal prison with the expectation that these practices will be implemented. The BOP will never be devoid of all serious incidents, like homicides and major assaults; however, the Agency learns valuable lessons every time they are faced with significant incidents, and additional security measures are enacted. Following a serious incident, the BOP assesses how agency or institution procedures may have contributed, which then results in tighter controls, enhanced staff training, and more vigilant prison employees, to lessen the risk of a repeat situation.

12. My opinion that the BOP can safely manage Mr. Hall in the future is in part because there were errors leading up to the incident. For example, Hall's self-reports of his mental state leading up to the incident should have raised concern that he may not have

5

IFCD 00027686

been appropriate for general population within the Mental Health Unit at Springfield. Moreover, the After Action Report's Recommendations indicate that general expectations and requirements, specifically, inmate boundaries, were not clearly identified in writing, and corrections staff were not enforcing this rule within the housing unit. Inmates were entering others' cells, in the presence of staff, and were not being held accountable. Hall and Coonce entered the cell of Castro-Rodriguez multiple times, yet this didn't trigger concern for the housing unit officer, Lieutenant, or the Control Room officers who all have access to the live camera footage of the unit.

13. Many years have passed since the homicide involving Hall, and the Agency's security procedures have improved not only because of lessons learned from the incident, but from other incidents which have occurred in federal prisons. The BOP is now better equipped to effectively manage inmates who pose significant security concerns and risks. Because of the Agency's ever evolving security processes, I am confident they will continue to safely house and manage Hall, for the remainder of his life, as they have already demonstrated over the last more than 13 years since January 2010, the day the homicide occurred.

14. At trial, Hall did not have the benefit of a prison expert to explain how the BOP would manage him. The BOP is a complex organization which incorporates and utilizes hundreds of policies which guide the operations of its federal prisons. Additionally, there are an enormous number of documents and forms utilized by the Agency in its day-to-day operations. Because these policies are complex and specific, they can be easily misinterpreted and confusing to a lay person unfamiliar with the corrections process.

6

IFCD 00027687

15. The BOP policies applicable to Hall would have been explained by a federal prison expert at trial. The expert would have described how enhanced security measures, like those initiated and applied to Hall following the homicide, would remain in place throughout his life in prison.

16. I believe a federal prison expert, had one been available for Hall, would have played an important role at trial. The expert would have opined on the various ways Hall would be managed by the BOP going forward, and the stringent security protocols applicable to him. At trial an expert would have provided an assurance that Hall, regardless of a life-or-death sentence, could be effectively controlled and managed by the BOP. My conclusion is based on a thorough review of relevant documents, my many years of federal corrections experience, and my understanding of the inner workings of the BOP.

17. Had a prison expert been retained for Hall's defense, in addition to testimony, the expert could have assisted counsel with matters related to the BOP. Assistance in the form of clarifying specific BOP policies, nuances related to the Agency, identifying prison records, and other matters, could have proven useful in aiding defense counsel.

18. I would not have been available as an expert during the time of Hall's trial; however, there were a plethora of experts, similar to experts offered in Coonce's defense, including retired BOP personnel, who likely would have been available and able to provide invaluable assistance during Hall's trial.

**COMPLEXITIES OF THE FEDERAL BUREAU OF PRISONS; POLICIES AND PROCEDURES**

19. During my lengthy career with the BOP, I was fortunate to hold many positions with varying and increasing levels of responsibility as I moved through the ranks. With each

7

IFCD 00027688

new assignment, I was surprised, yet educated, with the many facets and complexities of the BOP. The Agency has a mission statement, vision statement, and a multitude of policies and procedures, some of which specifically address the mission of a particular prison. As a result of changes in the law, new initiatives established by Congress, or for the purpose of creating a safer prison environments, the BOP was continuously modifying policies or introducing new ones. Since leaving the BOP I have conducted training classes for many stakeholders of the BOP ranging from federal defenders, prosecutors, probation officers and criminal defendants. During many of these training sessions, the lack of understanding the complexities of the BOP is apparent, which is understandable since these individuals have limited direct involvement with federal corrections. Even for those individuals outside of the Agency who have been involved to some degree with BOP cases in their professional capacities, comprehending and fully understanding the complexities of policies and inner workings of the BOP it is still a struggle. Absent years of direct involvement in the federal prison system, it is highly unlikely an individual could grasp specific concepts related to federal inmates and prisons.

20. Most individuals, including those who have limited knowledge of corrections, would likely understand that security and safety are the core principles; however, the mechanics of how those principles are practiced and established may be confusing and overwhelming. Learning and understanding the bevy of BOP policies was an ongoing process for me and my colleagues, who were entrenched in it daily, for, in my case, 27 years. For a layperson, unfamiliar with corrections, attempting to comprehend how

8

IFCD 00027689

these policies are put into practice, would require some explanation by an expert who has several years of experience working in federal corrections.

21. At Hall's trial, the benefit of a federal prison expert would have provided the jury with a clearer understanding of how BOP policies and security procedures would affect Hall, had a sentence of life imprisonment been imposed. Regardless of whether a death sentence was imposed, the security measures enacted for Hall immediately following the homicide would remain at least in part for the remainder of his time in custody. Having been equipped with this knowledge, the jury in his case would have been able to make a fully informed decision regarding the fate of Hall.

## THREE FACTORS DICTATE HOW HALL WILL BE MANAGED BY THE BOP: INCIDENT, CONVICTION, AND SENTENCE

22. The three primary factors which determine Hall's institution security measures include the homicide, conviction, and sentence imposed. The BOP classifies a homicide conviction as a Greatest Severity Offense. A conviction itself requires enhanced security measures by the BOP. Additional security protocols and procedures are applied because the homicide occurred within a BOP institution. A sentence greater than 30 years requires housing within a United States Penitentiary (USP) or depending on other factors in the case, at the Administrative Maximum Facility, Florence, Colorado, also known as ADX Florence.

23. Absent a death sentence, which usually results in placement in the Special Confinement Unit (SCU) at USP Terre Haute, Indiana, and providing Hall's medical conditions do not require placement at a Federal Medical Center, Hall would likely be incarcerated at

9

ADX Florence. This decision is based on his involvement in the homicide of a fellow inmate.

24. The ADX is one of the most secure prisons in the world and is designed to house dangerous and violent offenders, based on their criminal histories, backgrounds, and conduct in prison. When inmates are involved in the murder of staff or inmates and a death sentence is not imposed, absent medical conditions which would preclude their placement, they are typically housed at the ADX. The ADX has several missions and housing units within its institution. Two of these missions include the Control Unit and General Population. Inmates in the Control Unit and most General Population Units are single-celled, and there is no physical contact between inmates. The cells are comprised of solid walls and steel doors, with a small slot in the door which allows food trays to be delivered and restraints to be applied. Most cells comprise an additional security enhancement of a sallyport, which provides greater security for corrections officers. Each cell is configured with a concrete bed, desk, and stool and include a thin mattress and blanket. Sinks, toilets, and showers are also contained within each cell, further lessening the risk to staff by limiting contact with inmates. Small, narrow windows provide limited natural light in the cells. A small television and radio are provided in most of these cells.

25. Inmates are locked alone in their cells for up to 24-hours each day. Meals are delivered through the food slot three times a day. The only out-of-cell time is for scheduled legal and social visits, certain medical procedures, and limited hours each week of indoor or outdoor recreation.

10

IFCD 00027691

26. Periodic reviews of inmates' cases are conducted by BOP officials to determine if continued placement at the ADX is necessary and whether security controls need to be adjusted. These reviews assess an inmate's progress and behavior at the ADX, and a decision is made to increase, decrease, or maintain security protocols at the current level. The ADX incorporates a process referred to as the "Step-Down program". This program is designed to prepare offenders for less restrictive prison conditions. It may take several years for an inmate to process through the program and some inmates never complete the program. Participation in the Step-Down program is not automatic for all ADX offenders and inmates are considered on a case-by-case basis.

**HOUSING OPTIONS APPLICABLE TO HALL IF A SENTENCE OF LIFE IS IMPOSED – MEDICAL CENTER, ADMINISTRATIVE MAXIMUM (ADX), UNITED STATES PENITENTIARY**

**ADX Florence**

27. Following any sentence of life imprisonment and absent significant medical factors which would require placement at a federal medical facility, it is extremely likely Hall would be designated to ADX Florence. This designation will be assigned because of his discipline history which involved the murder of another inmate within a BOP facility. ADX is comprised of several housing units, with various missions. The operations of these units vary; however, regardless of an inmate's assigned housing unit, the foremost mission of maintaining safety, security, and control of inmates, never waivers. For purposes of this report, I will solely focus on the housing units with missions applicable to Hall.

11

IFCD 00027692

28. Upon initially entering ADX, Hall would be housed in what is considered General Population. General Population (GP) at the ADX is much different than the typical General Population at other federal prisons. Inmates assigned to ADX GP are confined alone in their cells for 22-23 hours a day, with up to two hours of out-of-cell time each day for "recreation". Depending on cell assignment, outdoor recreation may be a concrete pen area, something we referred to as the "dog run". The pens have remote controlled doors which are operated by corrections officers during an inmate's scheduled solitary recreation time. The alternate recreation area consists of outdoor, single-person recreation cages, where inmates may converse with each other, but physical contact is prohibited.

29. ADX GP incorporates a Step-Down Program, which allows select inmates to "earn" additional privileges, which could result in extra recreation time, extra phone calls, or other tangible benefits. The Program is also designed to allow inmates an opportunity to work toward less restrictive measures, so that one day they may be transferred to a mainstream federal penitentiary. There are stringent requirements which must be adhered to for inmates to work their way through the multiple phases of the Program. Educational participation, unblemished discipline record, and favorable adjustment are three factors considered by staff when determining whether an inmate is ready to move to the next phase of the Program. As inmates proceed through the Step-Down Program, they earn their way to housing units which will afford them limited contact with other inmates and additional out-of-cell time each day. For those inmates who earn their way to the final phase of the program, they are transferred to Kilo Unit, which is the least restrictive. Inmates with histories of staff assaults are typically excluded from

12

IFCD 00027693

placement in Kilo Unit. Additionally, several years of clear institutional conduct is a prerequisite for placement in this unit and advancement to this final phase of the program.

30. At any time, during any phase, inmates can lose their program placement status and be moved back to a previous phase. Regularly scheduled reviews are conducted by the inmate's unit team. The team makes decisions regarding program advancement. In some cases, because of a disciplinary infraction or unsatisfactory progress, inmates are moved back to the initial phase, and they must begin the process over. The Step-Down Program process is not a swift journey or quick exit out of the ADX. It may take years for an inmate to work through the program, before ever earning his way to a federal penitentiary (USP). Some inmates, for security reasons, will never be deemed appropriate for transfer to another institution, due to criminal background, discipline history, case notoriety, etc., and therefore will remain at the ADX for the remainder of their lives.

31. Following my recent tour of the ADX in April 2023, I learned of another housing unit utilized by the institution to house long-term elderly inmates, otherwise not eligible for transfer out of ADX. The unofficial name of the unit, as referred to by ADX staff, is the "AARP" unit. Inmates who are over the age of 55, who have demonstrated positive adjustment, and who have earned their way through positive interaction with others, may be eligible to reside in the AARP unit for the remainder of their lives. The AARP unit, still quite restrictive, affords a select group of inmates some additional privileges not available to inmates in ADX GP. There is additional out-of-cell time for a certain number of inmates at specified times throughout the day, additional phone time

IFCD 00027694

accessible, and limited contact with other inmates. Inmates are still contained to one unit and approximately 8-16 inmates are out of cells at one time.

**Federal Medical Center**

32. There are a number of inmates, who qualify for placement at ADX GP, but for medical reasons require placement, temporary or long-term within a BOP Medical Center. Those inmates who would typically be housed at the ADX but require placement at a Medical Center will be assigned special security protocols and measures, similar to what is found at the ADX. There are specific Federal Medical Centers which are equipped to house violent and dangerous offenders who would otherwise be assigned to the ADX. For instance, a special confinement cell was constructed at the MCFP Springfield, where inmate Clayton Fountain was kept in isolation until his death in 2004, following his conviction for murder of a BOP corrections officer, which occurred at USP Marion, in 1983. More specifically, FMCs can construct cells to meet specific security needs of an inmate and apply greater security protocols based on an inmate's history and security requirements. For instance, additional staff may be used to escort the inmate and the use of a higher degree of restraints including belly chain, black box, and leg/ankle restraints may be introduced as an additional means of security and control of the inmate. The BOP has in the past and continues to make special arrangements for certain inmates who pose security concerns. Although not always occurring at medical centers but offered as examples, in the cases of inmates Thomas Silverstein, and Manuel Noriega, they were housed in retrofitted secure cells due to their security requirements and inability to enter General Population. I have also been personally involved with planning and organizing the construction of a separate area within the Special Housing

14

IFCD 00027695

Unit at FCI Terminal Island in 2006, due to the temporary housing of some high ranking, extremely dangerous, Aryan Brotherhood members. There are various cells like this, and secure housing pockets within different federal prisons throughout the country.

**United States Penitentiary (USP)**

33. If successful through the Step-Down Program at the ADX, and only after the approval of high-ranking BOP officials, select inmates may be eligible for placement at a mainstream penitentiary. Apart from the ADX, USPs are the highest security level federal prisons operated by the BOP. USPs typically house inmates who have one or more of the following factors: violent backgrounds, life sentences, serious escape risks, high notoriety crimes, and serious or significant disciplinary histories.

34. Life within a USP is not as restrictive or isolative as the ADX; however, these institutions operate with tight security controls and measures. Each cell within the general population housing units typically holds two inmates. During frequent lockdowns of these types of prisons, all movement of inmates ceases, otherwise, controlled movement of inmates during all hours is routine. Cell doors are secured between the hours of 9:00 pm and 6:00 am, with no inmate movement during those times.

35. Monday through Friday, between the hours of 7:30 am and 3:00 pm, inmates report to work, and educational assignment, or authorized activity or program. Every hour, the institution allows for a 10-minute move for inmates to report from one area of the institution to their next required area. On the weekends and federal holidays, the institution operates on a different schedule. Except for food service workers, inmates typically are not assigned to work details on the weekends, which allows them time to

15

IFCD 00027696

participate in leisure activities, or social visits with approved visitors; however, the institution still adheres to controlled movement to ensure security of the inmates and the institution.

36. Based on my experience having worked in and around numerous federal prisons during my career, I can attest that there are numerous alternative housing options available to the BOP, which offer a more restrictive environment than that of Housing Unit 10B at MCFP Springfield during the time the incident occurred. All the options have higher security measures and the capability to isolate inmates who pose a continued threat to staff or fellow inmates.

## HALL HAS BEEN SUCCESSFULLY MANAGED SINCE THE INCIDENT

37. Immediately following the homicide in January 2010, enhanced security measures were placed on Hall. These enhanced procedures have remained in place, regardless of which federal prisons he was incarcerated in. Since 2010, Hall has been primarily housed at FMC, Butner, North Carolina, and his current designated facility, USP Terre Haute, Indiana.

38. In a preceding section of this report, I provided details regarding specific security measures at ADX and Terre Haute, including some particulars about items in a cell, recreational and educational programming protocols, and escort procedures for inmates with discipline histories like Hall. It is important to note, these enhanced measures will remain in place, regardless of which institutions Hall is incarcerated in, although every detail may not be exact. The foremost concern at any federal prison where Hall is located will be safety of staff and inmates. As a result, security procedures for Hall will

16

IFCD 00027697

remain rigid and unwavering for many years and until he can demonstrate a lessening of security protocols is warranted.

39. Under restrictive security measures imposed since the homicide, according to the records, Mr. Hall has not incurred any discipline infractions or engaged in any acts of violence.

## ANALYSIS OF LEADING UP TO THE INCIDENT EVENTS

40. The BOP's Program Statement 5100.08, Inmate Security Designation and Custody Classification policy is the primary tool utilized for classifying inmates to assist in assigning an appropriate prison. [1] There are five security classification levels assigned to BOP prisons, Minimum, Low, Medium, High, and Administrative. Hall, Coonce, and Castro-Rodriguez were housed in the Mental Health Unit at MCFP Springfield, which is considered an Administrative facility. Administrative prisons house inmates of all security levels.

41. In addition to security level classifications, the BOP began assigning Health Care Levels in the mid to late 2000's, which profiles the physical and mental health conditions/needs of the inmates. Care Levels are 1-4, with 1 being a healthy inmate and 4 being a very sick inmate. Although Hall has significant physical health problems, which existed prior to the incident and continue through the present, for purposes of this report, I will focus primarily on his Mental Health Care Level.

42. In the case of Hall, Coonce, and Castro-Rodriguez, all were classified as Mental Health Care Level 4 due to various factors attributed to their mental health and/or suicide

---

[1] Department of Justice, Federal Bureau of Prisons, "CPD/CPB, Number P5100.08, *Inmate Security Designation and Custody Classification,*" September 12, 2016.

IFCD 00027698

attempt histories. Those with Care Level 4s are typically housed at Federal Medical Centers (FMCs). Partly based on these reasons, the three offenders were assigned to the Mental Health Unit at MCFP Springfield prison.

43. Death resulting from inmate-on-inmate violence is an unfortunate reality, particularly with high security inmates and those with significant mental health concerns. The death of an inmate is a tragedy and one the BOP does and should take seriously. Violence between inmates places the safety of staff in imminent danger. To lessen the risk to staff, the BOP tries to carefully monitor and consistently assess inmate behavior, through regularly scheduled program reviews conducted by unit teams, psychology services, and other institution staff. These reviews help to ensure inmates are assigned to the proper facility, commensurate with their security needs, and in the event, they are not, redesignation to a more suitable prison or placement in restrictive housing units are initiated.

44. Hall was known to have homicidal thoughts and thoughts of harming himself in the years leading up to the MCFP Springfield incident. These were documented in BOP staff encounters and while I cannot directly attribute these ideations to the incident, they are worth noting that Hall has long struggled with thoughts of harm to others. In 2004-2005, Mr. Hall wrote a letter to his caseworker Christy Whitaker asking to be sent to a "Federal Supermax" where he could be "completely isolated" or have "little to no human contact". He stated in this letter "as of late, I've had homicidal thoughts and ideations." The response Hall received from Ms. Whitiker, states that his request will be noted for "when the time for a transfer request comes." (Doc. 1399_NOBATES_01466).

18

IFCD 00027699

45. Mr. Hall's June 6, 2007, Special Housing Unit Review notes that Mr. Hall denied suicidal ideation but thinks about "harming others 'once in a while'" but has no plan or intended victim". Despite the statement he made regarding his occasional thoughts of harming others, his potential for harm was assessed to be Low. During this psychology encounter, Hall expressed how he had recently requested an increase in his psychiatric medications to help control his behavior. (Doc. 0706_26469 at 026743).

46. Mr. Hall's July 2, 2007, Special Housing Unit Review, conducted by Psychology Services Department notes that Hall states "his paranoia is increasing" and he reiterated how he "thinks about harming others 'once in a while' but has no plan or intended victim". (Doc. 0706_26469 at 026741). Again, the attending psychologist deemed Hall a Low risk of threat to others.

47. On May 14, 2008, a Threat Assessment was conducted by BOP staff, following an assault incident involving Hall and another inmate at FMC Rochester. The Threat Assessment Memorandum states that on February 21, 2008, Hall wrote to Dr. Shine, Staff Psychiatrist, stating that, "he was having thoughts of hurting others". Hall described in this letter that his intent for the victim was to "choke him to death". (Docs. 1036_NOBATES_00515 and 0257_01252).

48. In an April 17, 2008, the Transfer Summary, prepared by Dr. Shine, Clinical Specialty Consultant, noted that Hall continued to describe "aggressive, assaultive, and homicidal ideation" and "homicidal ideation towards staff and inmates at FMC Rochester". (Doc. 0706_026469 at 026716).

49. Hall's mental state leading up the incident should have raised concern that he may not have been appropriate for general population within the Mental Health Unit at MCFP

19

IFCD 00027700

Springfield, especially considering Dr. Shine's comments on the Rochester Transfer Summary. Dr. Shine reports that Hall had expressed wanting to live in isolation and he had vocalized thoughts of self-harm and homicidal ideation to various psychology and unit team staff. Regarding the comments associated with one of the psychological assessments, in May 2009, Hall indicated that he had homicidal thoughts related to his brother-in-law and expressed detailed plans as to how he would carry out the homicide. This type of statement should have been more thoroughly vetted out.

50. On May 29, 2009, an Individual Therapy Session was recorded by Monica Ferraro Roy, PhD (Doc. 0706_26469 at 026641). Of note, the therapist stated that she challenged "... Hall about statements Mr. Hall had made about wanting to hit the inmate who had informed staff about Mr. Hall obtaining a razor while on mental health unit (i.e., asking if this was an attempt to expedite a transfer). Mr. Hall acknowledge that he could understand how it might appear to be this way but denied that his statements were manipulative." It was also noted that "... Hall needing to learn to manage his anger and be responsible for this own safety while on an open unit." Just prior to Hall being transferred from FMC Devens to MCFP Springfield, on October 15, 2009, the SHU Psych Review (Doc. 0706_26469 at 026628) indicates an increase from previous psychology assessments in his risk for self-injurious behaviors. His assessment was as follows:

- Mental Status – Significant Mental Health Problems
- Adjustment - Satisfactory
- Threat to Self - Moderate
- Threat to Others - Low

51. On October 27, 2009, an Intake Screening Form associated with Hall's arrival at MCFP

IFCD 00027701

Springfield, noted that while he denied hallucinations and suicidal ideations, he was **not** "OK FOR GENERAL POPULATION" citing his Psychological Evaluation. (Doc. 1213_ NOBATES_000989).

52. On January 11, 2010, just days before the incident, Hall is stating concerns he has about his being teased about his colostomy bag. Hall stated in the Psych Notes (Doc. 0706_26469 at 026606) that "… it would be difficult for him to live in an open unit where he had to deal with teasing about his medical issues." It was further noted that Hall was in an "open unit."

53. In leading up to the January 2010 incident, it is clear from BOP's own documentation (psychology summary assessments from the entirety of Hall's incarceration, and Court-ordered Forensic Evaluation of Hall completed on January 4, 2012, by mental health professionals from FMC Butner, North Carolina, Maureen L. Reardon, Ph.D., ABPP, Staff Psychologist, Sarah Ralston, M. D., Staff Psychiatrist, and Tracy Pennuto-O'Connor, Ph.D., J. D. Staff Neuropsychologist) that Hall, over the course of his incarceration, prior to the incident at MCFP Springfield, was hearing voices, had suicidal ideation, ongoing thoughts of harming others, and homicidal fantasies. In reviewing the cumulative records pertaining to Hall and leading up to the January 2010 incident, it is clear he had the propensity to act out on at least some of these thoughts. Had I been directly involved in this case, as a case manager or warden, at a minimum, I would have expected and/or ordered Hall to be placed in SHU until these concerns which he had vocalized to psychology staff had been fully addressed and explored.

54. The BOP has processes to continually evaluate inmates with propensities for self-harm or harm to others, particularly those with such significant mental health challenges who

21

IFCD 00027702

are designated to the limited number of Mental Health Units located at specific BOP facilities. Upon determining a threat exists, the BOP also has policies to lessen the likelihood that tragic incidents, like serious assaults and homicides, will occur. Despite the Agency's best efforts, it is impossible for the BOP to eradicate completely these types of incidents. Nonetheless, BOP did not heed Hall's warnings or threats to harm others along with Hall's bold statements that he wanted to be housed in isolation.

**OBSERVATIONS ON AFTER-ACTION REPORT**

55. The BOP conducts formal After-Action Reports on incidents involving a death at the institution. In accordance with BOP Program Statement 5500.12, Correctional Services procedures Manual, Chapter 6, the agency conducts such assessments to identify areas of operational strengths and weaknesses and gather information that can be utilized in formulating corrective strategies and policies.

56. Although the findings of the After-Action Committee did not identify specific concerns with the operations at MCFP Springfield prison, the follow-up report did note several general recommendations to security procedures at the institution.

57. I am familiar with the process of completing After-Action Reviews and Investigations following a significant incident in the BOP. During my career with the Agency, I was responsible and/or was the Chairperson of After-Action Investigations and After-Action Reports and made recommendations on improving security procedures within the affected federal prison. Two of these incidents in which I was directly involved, included an inmate homicide at USP Atwater and an inmate suicide at USP Allenwood.

22

IFCD 00027703

58. At a minimum, I find the MCFP Springfield After-Action Committee's findings troubling. Several policy discrepancies, which I identified from the materials reviewed, were not mentioned in the final Report. There were deviations from policy occurring within the Mental Health Unit at MCFP Springfield, which were listed as "Recommendations" rather than nonadherence to policy and procedure. Specifically, Post Orders lacked details of correctional officers' requirements and expectations and written standardized criteria regarding which inmates are placed or removed from MCFP Springfield Mental Health Unit had not been established, and the camera placement within lacked visibility of certain areas within the Unit. Additionally, general expectations and requirements, specifically, inmate boundaries, were not clearly identified in writing, and corrections staff were not enforcing this rule within the housing unit. Inmates were entering others' cells, in the presence of staff, and were not being held accountable. Hall and Coonce entered the cell of Castro-Rodriguez multiple times, yet this didn't trigger concern for the housing unit officer, Lieutenant, or the Control Room officers who all have access to the live camera footage of the unit. The After-Action Report also recommends increasing staff coverage during the evening shift, suggesting a higher complement of staff to inmate was needed and greater oversight of inmate activity was necessary.

59. There is no indication the After-Action Investigation Committee thoroughly reviewed the mental health professionals' assessments of Hall for the years leading up to the incident. In cases where I have been a member of After-Action Committees, I found it critical to conduct thorough reviews of the histories of all involved parties to an incident. The After-Action Report omits any discussion of Hall's history of expressing

23

homicidal ideation, similar to those examples I previously discussed in this report. It is impossible from the documents I was provided to determine if the Committee reviewed these records. Had I been part of the Committee who reviewed the MCFP Springfield incident, I would have undoubtedly made a point to discuss how the actions or inactions of BOP staff, with regards to Hall's history of threats of harm to others, may have been contributing factors in the homicide of Castro-Rodriguez.

60. Thorough After-Action Investigations, complete with corrective action recommendations, are a road map for institutions to fully understand how an incident occurred and what steps and procedures could be implemented to decrease the likelihood of reoccurring.

## CHARLES HALL'S INSTITUTIONAL ADJUSTMENT AND DISCIPLINARY RECORD LEADING UP TO THE INCIDENT

61. I reviewed Hall's disciplinary history. There are four levels of severity the BOP utilizes to categorize misconduct reports. Those categories are: Greatest (100), High (200), Moderate (300) and Low Moderate (400). Examples of Greatest severity prohibited acts are rioting, taking hostage(s), possession of narcotics, and possession of a weapon. High severity incident reports would include fighting, extortion/bribery, and threatening conduct. Moderate severity level misconduct may be for refusal to obey an order, insolence toward staff, lying, or being in an unauthorized area. The least severe misconduct violations are low moderate severity level and include acts like using abusive language, unauthorized physical contact with a visitor, possessing another inmate's property, or conducting a business.

62. Enforcement and consequences of incident reports result in a variety of disciplinary

IFCD 00027705

sanctions. The sanctions differ in severity and are administered based on the seriousness of the misconduct. Sanctions range from extra duty, verbal/written reprimands, loss of privileges, disciplinary segregation, with the more severe misconduct resulting in loss of good conduct time. Sustained guilty findings for incident reports usually have a negative impact on inmates overall security and custody score, which at times, results in a transfer to a more suitable prison which can better address the inmate's security needs.

63. Hall's disciplinary incidents are summarized as follows:

- March 1, 2009     Code 306, Refusing Work / Program Assignment
- November 22, 2009     Code 405, Tattooing or Self-Mutilating
- November 16, 2009     Code 305, Possessing Unauthorized Item
  Code 405, Tattooing or Self-Mutilating
- September 12, 2008     Code 305, Possessing Unauthorized Item
  Code 328, Giving Accepting Money
  Code 332, Smoking
- June 27, 2008     Code 405, Tattooing or Self-Mutilation
- January 21, 2008     Code 224, Assaulting without serious injury
- May 11, 2007     Code 108, Possessing a Hazardous Tool
  Code 305, Possessing Unauthorized Item
- May 11, 2007     Code 312, Being Insolent to Staff
- September 15, 2006     Code 305 Possessing Unauthorized Item
  Code 328 – Giving / Accepting Money without Authorization
- August 12, 2005     Code 397, Phone Abuse, Non-Criminal
- August 5, 2005     Code 201, Fighting with Another Person

64. None of these incidents, except for the one assault charge in January 2008, were indicative of Hall's propensity for violence within the institution. This is in stark contrast to Coonce's disciplinary record, which is replete with violent acts and sexual deviant infractions dating back to July 2002. In the testimony of prison experts at trial, Coonce's disciplinary history leading up to the homicide was addressed. The jury heard

25

IFCD 00027706

from prison experts how his disciplinary record, prior to the homicide, would impact his future prison housing assignments. However, because of the stark contrast between Coonce's and Hall's disciplinary history, it may have left questions for the jury as to future housing assignments that would affect Hall. Had a prison expert been offered for Hall, that expert would have been able to explain how similar security protocols despite the comparatively minimal discipline records, would also be in place for Hall. It would have been helpful for the jury to understand that despite Hall's more minimal discipline record as compared to Coonce, future housing assignments, security protocols, and prison designations would be similar because they both now had a significant and violent incident on their prison records.

65. In Mark Bezy's testimony at trial, he discussed in detail, various institutions exterior and interior designs/layouts, procedures, policies, protocols, and equipment, including less-lethal munitions, employed, and utilized by the BOP to maintain control and enhance safety and security of its institutions, staff, and inmates. Mr. Bezy explained the different types of staff training, including specialized training and the frequency of training. Further, Mr. Bezy testified how staff use sound correctional judgment regarding procedures employed to handle inmates.

66. Mr. Bezy opined on how the BOP is the "gold standard in corrections". He offers through testimony, his opinion that the BOP is top-notch amongst other corrections environments throughout the country. In cross-examination of Mr. Bezy, he concedes that despite the best security practices and efforts of the BOP, violent inmates continue to commit violent offenses within the prisons. Specific examples of violent incidents which occurred at different federal prisons are provided by the prosecution to the jury

26

IFCD 00027707

during the questioning of Mr. Bezy. One of the examples provided was the tragic incident involving Louis Pepe, a BOP Corrections Officer, who was employed at MCC New York. In November 2000, Officer Pepe was seriously assaulted in the 10-South high security unit at MCC. Officer Pepe was stabbed in the eye with a comb, which had been sharpened and fashioned into an icepick style weapon. Mr. Bezy may not have been familiar with details surrounding this incident since he didn't expound on it when questioned by the prosecution. I am familiar and privy to the details of the assault on Officer Pepe because of my position as Warden of MCC New York, in the years following the attack. Before I provide further details of the incident at MCC, I must clarify that I offer no leeway to Officer Pepe's attacker, as he is the cause and the reason why the assault occurred. As with any major incident within the Agency and as previously provided, there are takeaways and things to be learned with every significant incident which occurs within the BOP. Following significant incidents, the BOP conducts After-Action Investigations to identify amongst other things, contributing factors. The investigations often conclude, staff deviated from standard policies and/or circumvented security procedures. These types of "shortcuts", often initiated to save time, can have dire outcomes. Sadly, for Officer Pepe, deviations from security procedures, in that high security unit, almost cost him his life. The inmate responsible had carefully planned the attack, had been observing staff assigned within that housing unit, and was familiar with their routines. On the day of the incident, the attacker, who was having a legal visit, asked to return to his cell to retrieve legal documents. Contrary to policy, Officer Pepe, who was the only staff member working on 10-South at the time, solely escorted the inmate back to his cell. Inmates assigned to that unit require a

27

IFCD 00027708

minimum of two staff for escort. While being escorted, the attacker was not handcuffed, nor did he have leg irons, or a martin chain applied. The attacker had a cellmate, who also was the co-conspirator in the attack. Prior to unlocking cell doors within all high security units, all inmates within the cell, must, at a minimum, submit to hand restraints before the door is opened. Without requiring the cellmate to submit to restraints, Officer Pepe opened the cell door. It was at that time the attack ensued. I often used this tragic incident as an example during training, in the hopes of ensuring staff understood the dangers of taking shortcuts. Fortunately, the Agency learns from each incident and policies become tighter; however, we continue to learn of other significant incidents in federal prisons, which occurred because staff deviated from written procedures. Through my involvement with After-Actions interviews of staff following significant incidents, it wasn't unusual to hear staff admit that they knew what the procedures were, but they never thought it would happen to them.

67. Mr. Bezy was not able to provide this information at trial and I believe had it been conveyed to the jury, they may have better understood why some violent incidents continue to occur within the BOP, are sometimes because staff take shortcuts and deviate from policy and not because the Agency has failed to incorporate viable security protocols. The prosecution brought up a number of examples of violent acts which occur in federal prisons; however, no context was provided for any of those examples.

**WHAT THE JURY DID NOT HEAR DURING TRIAL TESTIMONY**

68. The jury in the Hall trial heard testimony from federal prison experts, primarily focused on Hall's codefendant. The backgrounds of Hall and Coonce, with regards to mental health, discipline history, and prison housing assignments, were in stark contrast. The

28

jury were provided details of future security procedures as they relate to Coonce; however, they were not provided specifics of whether these same procedures would be applicable to Hall.

69. In my reading through the records, from a non-mental health expert viewpoint, stark differences were apparent in the two defendants' mental health histories. During the trial, the jury heard from prison experts how Coonce's mental health diagnoses would directly impact where he would be incarcerated and the conditions at the facilities where he would be housed, if sentenced to life in prison. Hall did not have the benefit of a prison expert. The information the jury heard about Coonce from the prison experts, and considering the vast differences in the discipline and mental health histories of the two, they may have concluded because Hall was not as much of a management problem for corrections officials, he could more easily navigate being placed in an open population environment within a mainstream penitentiary, similar to the process described by the government's prison expert, Scott Dodrill. Mr. Dodrill very accurately described the security designation process, classification of inmates, and the factors used to assign inmates to appropriate security level institutions. Mr. Dodrill further expounded on the process considered when determining if offenders should or could be transferred to a less secure prison by demonstrating consistent positive adjustment. What was lacking in any of the testimony of the prison experts was the specifics of prison assignments as it pertained to Hall.

70. In his testimony, Chris Synsvoll very accurately and with great detail, explained how inmates assigned to the ADX, can work their way through a process of "stepping-down" which can ultimately result in greater privileges, more interaction with other inmates

IFCD 00027710

and staff, and potentially receiving a transfer to general population at a mainstream BOP penitentiary. Mr. Synsvoll was asked to describe the Secure Mental Health Unit, which had recently been opened at Atlanta and the prerequisites for entry into the program. The focus quickly turned to how Coonce, because of his specific mental health diagnoses, may be eligible for the Atlanta program. Again, the jury lacked any information on the specifics of how Hall might also be eligible for the Secure Mental Health Unit at USP Atlanta.

71. The BOP has numerous policies to manage the lives of inmates and to protect them from violence. Those policies and an understanding of inmates living in a correctional environment would have been important to explain to jurors during trial. Although a significant portion of trial testimony by prison experts focused on Mr. Coonce's serious mental health, there was nothing in the testimony of these individuals which outlined for the jury, how Hall's mental health might affect his prison assignment in the future. A prison expert's knowledge of policy and the context of how the policy is implemented would have been extremely important for Hall's defense.

72. In reading through trial transcripts, paying careful attention to the testimonies offered by government and defense prison experts, it clearly reveals how the jury members may have been confused when considering the fate of Hall. Had a prison expert also been retained to assist and explain the prison process moving forward, as it pertained not only to Coonce, but also to Hall, at a minimum, the jury would have been able to make a more informed decision in Hall's case. Instead, the jury heard all the information on how Coonce might move through the prison system process if given a life sentence but did not hear how these same processes would work for Hall.

30

IFCD 00027711

73. The mental health and institution disciplinary histories of Coonce prior to the incident was vastly different than that of Hall, as documented in the Forensic Evaluation Report previously referenced. For instance, the disciplinary record of Coonce prior to the incident, involved numerous threats and assault charges, some which resulted in serious injury. Contrary to Coonce's institution disciplinary record, except for one assault charge in 2008, Hall's infraction history involved non-violent infractions. As described by one of the staff psychologists, Hall's discipline history was classified as "minor rule infractions."

**CONCLUSION**

74. Castro-Rodriguez's death was attributable to the actions of Hall and Coonce. Hall did not have the benefit of a BOP expert to offer information which may have assisted in his defense.

75. Had an expert been retained; however, the jury would have understood, without question, that an opportunity for Hall to receive a transfer and/or serve his time in an open mainstream penitentiary would have been unlikely. Similar to the testimony of the prison expert for Coonce, an expert for Hall would have opined on how a person with his characteristics, including a new conviction for murdering a fellow inmate, would result in the BOP ensuring Hall was located in a prison, where he would not be in a position, in the future, to harm another person.

76. Absent specific information regarding Hall, by a prison expert, because Coonce and Hall's disciplinary and mental health backgrounds were so different, it could leave a person, who is unfamiliar with the federal prison system, the impression that he might pose a significant risk, especially if a transfer to a medical center or mainstream

31

penitentiary was the future scenario for Hall. A prison expert would have opined on the foremost philosophy of the BOP, safety, and security, and how a transfer for Hall which would result in lessening his security constraints and protocols would very much contradict the Agency's mission.

77. The government's witness, Mr. Dodrill, explained how the process of moving through the prison system works and how inmates can be transferred to lower security prisons. Again, the focus was on Coonce and his background which included several violent infractions and a serious mental illness. Because the backgrounds of the two codefendants were so contrasting, the jury may have believed that unlike Coonce, Hall would be allowed to serve his sentence in a less secure environment. The jury also did not receive information to indicate that Hall, like Coonce, would also likely be eligible for the Secure Mental Health Unit at Atlanta, and currently also at USP Allenwood.

78. The BOP is a conservative agency, and its decisions are made with careful consideration of staff safety and the orderly running of its institutions. I was assigned to positions during my career with the Agency, where I was responsible for making decisions on where an inmate would serve his sentence. I am confident the BOP would take extra precautions with inmate Hall, as they have already demonstrated for the last 13 years since the incident occurred. These precautions are in effect, and will remain in place, because of the incident and regardless of his conviction and subsequent death sentence. In looking at Hall's records since the incident, I noted that he has no incidents and I view this is evidence that he is able to be safely housed in a BOP facility for the remainder of his life. The jury was not apprised of these specifics during the trial,

32

IFCD 00027713

because Hall did not have the benefit of a prison expert who would have provided these details.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Date: Sep 14, 2023

*Maureen P Baird*
Maureen P Baird (Sep 14, 2023 15:34 EDT)

Maureen Patricia Baird

33

IFCD 00027714

<u>EXHIBIT A</u>

*Maureen Patricia Baird*

*617-858-5008 | Info@Prisonology.com*

*Professional Profile*
I currently work as a corrections consultant, specializing in Federal Corrections. I have provided Expert Witness testimony in United States District Courts, at Sentencing Hearings for defendants who are facing a sentence of incarceration in the Federal System. I work as an independent Consultant and provide consulting services on all aspects of the Federal Prison System for private attorneys, Federal Defenders Offices and individuals and family members of those facing a possible federal prison sentence or those who have already been sentenced/incarcerated. I have prepared numerous Declarations for Attorneys within the U.S., and for Barristers/Solicitors in the United Kingdom, working on extradition cases. I have also provided Expert Testimony at Extradition Hearings in the Westminster Magistrates' Court in the UK regarding conditions of confinement in the Bureau of Prisons. My career in Adult Male/Female Corrections spanned 28 years with the Bureau of Prisons in various capacities, with my final positions as Warden and Senior Executive Service Warden at three Federal Prisons that encompassed a variety of missions and programs. I am an experienced Executive in Correctional Management with a demonstrated history of working in the law enforcement industry.

My experience in Federal Corrections began in 1989 as a case manager with the Department of Justice, Federal Bureau of Prisons. Throughout my 28 years with the Agency, I continued to acquire positions of increasing responsibility. In 2009, I was appointed to the position of Warden at the Federal Correctional Institution, Danbury, Connecticut, and was later promoted to Warden at the Metropolitan Correctional Center in New York City. There, I was appointed to Senior Executive Staff by the United States Attorney General and within two years, I was transferred to a position of greater responsibility as the Warden of the United States Penitentiary in Marion, Illinois. As warden, I was responsible for the leadership and direction of 300 to 350 staff members and approximately 1200 to 1500 inmates. During my tenure as warden for seven years, I was responsible for staff development and various specialized inmate housing units, including a high security management unit which mainly housed international terrorists who were assigned maximum custody. I led staff through a mission change at the Federal Prison in Danbury, where we had housed female offenders for several years and then transitioned to male offenders in 2013. I was also a member of the Joint Terrorist Task Force, and a member of various other federal, state, and local groups. I was very active with joint training that involved local, state, and federal law enforcement entities. For the last several years I have held Top Secret Clearance, only issued to a small percentage of Wardens and Executive Staff.

34

IFCD 00027715

*Professional Experience*

*Warden*                                                       *Dec 2015 - Oct 2016*

**United States Penitentiary - Marion, IL**
- CEO of an institution which housed 1500 medium/high security male offenders
- Supervised 350 staff members and a 40-million-dollar budget
- Oversaw the institution and staffing, inmate programs, institution security, staff training, staff and inmate investigations and discipline, policy and procedural changes, community relations, regular training on emergency preparedness
- Provided training to all institution staff during an annual refresher training for six to eight weeks
- Provided training to new hires regarding procedures, rules, and regulations, ethics, and code of conduct requirements and both basic and advanced correctional duties

*Warden*                                                       *Jun 2014 - Dec 2015*

**Metropolitan Correctional Center - New York City, NY**
- CEO of a pre-trial federal prison which employed 350 staff and housed 700 all security level, pre-trial inmates and 150 low security sentenced offenders
- Performed all duties indicated above as warden at USP Marion, Illinois

**Warden**                                                     *Oct 2009 - Jun 2014*
Federal Correctional Institution - Danbury, CT
- CEO of an institution which employed 250 staff and housed 1200 female offenders
- Performed all duties indicated above as warden at USP Marion, Illinois, with an added emphasis on training geared toward female offenders

**Correctional Institution Administrator/Associate Warden**    *Aug 2007 - Oct 2009*
Metropolitan Detention Center - San Diego, CA
- Provided direction and leadership to 230 employees
- Assisted in the management of a multi-million-dollar budget
- Oversaw high security/maximum custody pre-trial inmates and 200 low security sentenced inmates
- Ensured all mandatory internal and external security requirements were maintained and properly implemented
- Served on a forward-thinking workgroup focusing solely on future training trends
- Provided training on a regular basis to institution staff as well as other government agency staff
- Implemented several new proactive security measures which resulted in a more open form of communication between staff and inmates, thus allowing staff to find more contraband and providing a safer environment for staff and inmates
- Worked with union representatives to assist in resolving employee concerns as the Chairperson of the Labor Management Relations Board

35

IFCD 00027716

**Regional Correctional Programs Administrator**      *Feb 2005 - Aug 2007*
Bureau of Prisons, Western Regional Office - Dublin, CA
- Oversaw 22 federal prisons located in the Western Region of the United States
- Primarily focused on the development and training of correctional programs staff who were employed by the individual facilities
- Orchestrated on-site training at the institutions, ensured the staff were familiar with policy, provided guidance, and compiled a report following each training
- Assembled a training manual for all new case managers to assist them in their duties
- Conducted regional training with all case management coordinators from the 22 institutions on an annual basis
- Was appointed to various after-action committees to investigate serious incidents that occurred at the prisons within the region
- Acted in the position of Regional Director and Deputy Regional Director multiple times
- Participated in and coordinated several Institution Character Profiles to evaluate programs and review security procedures at various institutions Recommendations were made with regards to enhancing security or reorganizing programs.
- Was involved in the activation of all aspects of newly constructed federal prisons within the Western Region
- Coordinated a four-week online training session for case management coordinators to provide information/training on their new responsibilities through the merging of the Inmate Systems Department falling under their purview
- Received the Supervisor of the Year award from the Regional Director in June 2006

**Correctional Institution Administrator/Executive Assistant**      *Aug 2000 - Feb 2005*
Federal Correctional Institution - Schuylkill, PA
- Planned, supervised, and evaluated programs, training of new staff, and quarterly training of correctional officers
- Was the Chairperson for inmate's initial classifications and program reviews
- Conducted ongoing training and guidance for mentors and proteges as the Mentoring Coordinator

**Assistant Correctional Programs Administrator**      *Apr 1997 - Aug 2000*
Bureau of Prisons, Northeast Regional Office - Philadelphia, PA
- Committee Member
- Assisted in designing the current Security and Classification System utilized for classifying sentenced female offenders
    o Performed extensive research which suggested a need for a separate classification system for male and female offenders
    o The Bureau of Prisons compiled our findings and in a short time implemented the Committees' suggestions and created a separate Classification System for female offenders, which is still being utilized to date
- Coordinated and conducted annual training programs for all case management coordinators throughout the 23 institutions that comprised the Northeast Region
- Submitted recommendations for policy changes which were adopted and implemented
- Conducted on-site staff assistance visits at various institutions to provide training to staff

36

- Participated in after-action reviews following significant incidents at institutions within the region

**Case Management Coordinator**                    *Dec 1992 - Apr 1997*
Federal Correctional Complex - Allenwood, PA
- Served as Victim Witness Coordinator, Central Inmate Monitoring Coordinator, Inmate Performance Pay Coordinator and Public Information Spokesperson for the institution
- Oversaw security with regards to review and approval of inmates designated to the institution
- Wrote lesson plans and provided on-the-job training for new case managers and new counselors
- Provided ongoing training to all case managers, counselors, unit secretaries, and correctional officers regarding correctional programs, procedures, and responsibilities
- Was responsible for quality control of all case management paperwork prior to submission to the warden for signature

**Assistant Parole Liaison Administrator**                    *Oct 1991-Dec 1992*
Mid-Atlantic Regional Office – Annapolis Junction, MD
Duty Station – U.S. Parole Commission – Chevy Chase, MD
- Was responsible for Security Classifications and Designations of parole violators returning to federal prisons

**Case Manager**                    *Mar 1989 – Oct 1991*
Federal Correctional Institution - Danbury, CT
Federal Prison Camp – Nellis Air Force Base - Las Vegas, NV
- Oversaw programs related to the 150-200 inmates assigned to my caseload
- Provided training to new case managers
- Conducted inmate classification and program reviews
- Assisted inmates with their release planning
- Provided guidance to inmates
- Conducted security and shakedowns within the institution
- Regularly filled in for correctional officer posts
- Wrote all reports pertaining to inmates on my caseload
- Regulated institution security and housing

*Education*
*Western Connecticut State University - Danbury, CT*
*Bachelor of Science in Justice and Law Administration, May 1988*
- Recipient of Justice and Law Administration Award of 1988

IFCD 00027718