<u>DECLARATION OF JOE BUCKMASTER</u>

I, Joe Buckmaster, declare under penalty of perjury under the laws of the United States that the forgoing, that:

1. I am over 18 years of age and competent to make this declaration.
2. I am retired. In my working life, I was a deputy for the Greene County Sheriff's department before working for the Missouri Department of Corrections at an institution for young males in Booneville, Missouri. After that, I worked at the Federal Medical Center in Springfield, Missouri, for twenty-two and a half years and was promoted from a Corrections Officer to a GS-11 Lieutenant. When I retired from the Bureau of Prisons on December 31, 2009, I worked for Darryl Johnson as an investigator in his private law firm that focused on family and criminal law.
3. I was involved in Chuck Hall's case in two ways: first, I was the Evening Watch Operations Lieutenant – which placed me in charge of 10 Building -- when Chuck Hall, Wesley Coonce and Victor Castro-Rodriguez were housed in that building, and, second, I worked for Chuck Hall's lawyers Darryl Johnson and Frederick Duchardt after the homicide had been committed and Chuck had been charged.

4. Being the 10 Building Lieutenant meant that I was the head person in charge of the entire building while I was on duty. The 10 Building housed all of the mental health inmates, whom we referred to as "patients." Within 10 Building were separate wings, each with a letter designation, like 10-A, 10-B, 10-C and so on. Each of these wings represented different security levels.

5. Unit 10-B, where Chuck, Coonce and Castro-Rodriguez were housed and the homicide occurred, was referred to as a general population unit. It was not actually general population, but it was the least restrictive setting within the mental health 10 Building. Patients/inmates were locked into their cells at nighttime until 6 a.m. the next morning, which qualified 10-B as a lockdown unit as well. During the day, the patients/inmates could move freely within Unit 10-B and every hour, for ten minutes, patients/inmates could leave Unit 10-B, go into the hallway and engage in general population activities like play musical instruments or make arts and crafts. The "move-on-the-hour" policy, like a high school with a bell going off hourly, was an adaptation after trying a policy that used slips or notes for patients/inmates when they wanted to leave Unit 10-B, but it became too burdensome from a paperwork perspective. The move period is actually announced over a loud speaker, so it's quite similar to a high school bell. Corrections officers were to make rounds in Unit 10-B every half hour at nighttime and every two hours during the day.

6. Unit 10-C and 10-D were more restrictive. For instance, Unit 10-D was on lockdown twenty-three hours a day, showers were given three times a week, recreation opportunities were limited, and all patients/inmates were cuffed prior to any cell door

1___

IFCD 00028526

being opened. To be on lockdown, for any unit within 10 Building, means that the patients/inmates are locked in their own cell. The Bureau of Prisons operates on a step-down/step-up system where if you are well behaved and nonproblematic, you can move from a more restrictive to a less restrictive environment. That would be a step-down and an example would be moving from Unit 10-D to Unit 10-B. A step-up occurs when a patient/inmate is poorly behaved and must move from a less restrictive to more restrictive environment, like moving from Unit 10-B to Unit 10-D.

7. Given Wesley Coonce's history, he should never have been on Unit 10-B. Coonce was a difficult patient/inmate with a violent record. I did not think Coonce should have been at Springfield, let alone Building 10. Coonce should have been in a lockdown facility. Coonce was aggressive and conniving and continually followed female staffers. I would consistently lock Coonce up for his misbehavior. Coonce was constantly in trouble. When I say that I locked up Coonce, it means that he was temporarily moved to the more restrictive Unit 10-D. By comparison, Chuck was a quiet guy who did not get into trouble.

8. Patient/inmate classifications, i.e. what security level and wing they are placed in, would be the subject of discussion at the morning Lieutenant's meeting. Prison staff and medical staff attended and collectively made these decisions. This includes lieutenants, corrections officers, unit managers, nursing staff, psychologists, and psychiatrists who supervised and/or treated patients/inmates in 10 Building. While I did not think Coonce should have been in 10 Building, let alone Unit 10-B, I was not the sole decisionmaker. If I could have unilaterally decided what to do with Coonce, I would have placed him in a secured mental health unit, like 10-D, where he would have been housed by himself and done recreation by himself.

9. I was not the only 10 Building Lieutenant. Lieutenant Relvas, who testified at trial, was the other 10 Building Lieutenant. When I was not working, staff psychologist Dr. Elizabeth Weiner would release Coonce from lockdown in Unit 10-D by getting Lieutenant Relvas' approval. Coonce could be a charming guy, and Dr. Weiner was a young doctor. Dr. Weiner was also an idealist and uneven in her application of security procedures. For instance, if another staff member, like me, reported that an inmate/patient, like Coonce, had acted aggressively and needed to be locked up, she would let that inmate/patient out. However, if she observed the slightest aggressiveness towards herself, then she would lock up that inmate without hesitation. It seemed like she only respected her own observations and did not respect the opinions of her colleagues.

10. When Coonce was in lockdown in Unit 10-D, he was very difficult. He would threaten self-harm, ram his head into doors, and start fires. He hated being caged and threw fits. This is common behavior for some patients/inmates. The correct way to deal with someone like Coonce is to place him restraints until he agrees to behave appropriately, not let him out of lockdown because he was troublesome while locked down.

2___

IFCD 00028527

11. Based on my personal observations and BOP-work history, I can say that had Coonce not been on 10-B, it is unlikely this homicide would have occurred. He should have been properly classified into a more restrictive area and been in restraints when walking freely. Chuck was more of a wannabe and a follower. He wanted to be a tough guy real bad, but on the inside he just wasn't.

12. Dr. Weiner was not alone in not following security procedures in 10 Building; many others were as well. Most focused on medicating the patients/inmates, because everyone knew if they were medicated, they would be docile. CO Logsdon was another who did not follow security procedures. He was the Corrections Officer in Unit 10-B when the homicide occurred. After I retired, I worked for Darryl Johnson. While in his employ, I reviewed the 10-B video surveillance footage from the day of the homicide. That video clearly demonstrates that CO Logsdon was not making thirty-minute rounds at nighttime like policy mandates for all locked units, which Unit 10-B qualified as since it was a part-time lockdown unit. The thirty-minute rounds were essential for Unit 10-B, because the patients/inmates had serious mental health issues and were known to "tongue" – or not take – their medication. The patients/inmates would change their temperament quickly, due to not taking their meds or because of their underlying mental health condition, so it was critical to monitor them every thirty minutes.

13. Castro-Rodriguez's murder was a perfect storm. It took a violent individual — Coonce — being inappropriately placed in a general population mental health wing. It took a victim with low cognitive abilities. Castro-Rodriguez was like a child. But it also took CO Logsdon's infrequent monitoring to make the homicide possible. I am surprised that CO Logsdon was not reprimanded more severely following the homicide.

14. When I left the prison and began working for Darryl Johnson, it was my first job in a law office. I worked on salary for Darryl. I would mostly run around for him, serving subpoenas and visiting criminal clients. I went to visit Chuck Hall as a member of the legal team. Darryl used me mostly to babysit criminal clients, and that is what I did in Chuck's case when I was working for Darryl. I would visit Chuck to see how he was doing and to show him discovery.

15. When Darryl withdrew from the case, I was brought back to work on the case by Frederick Duchardt. Duchardt rehired me as an investigator even though Duchardt already had his own investigator. Duchardt never inquired about my knowledge of BOP policies and procedures nor asked me open-ended questions about anything. Duchardt seemed to know what he wanted without being curious. Duchardt wanted me to provide confidential BOP policy information to the legal team, and when I provided Duchardt with the publicly available information, Duchardt was angered and, instead of relying on my twenty-three years of experience working in BOP to help him understand the significance of the information, said, "I could've done that myself." Even if I had been willing to share confidential information, my wife Mindy was still working at the Federal

3___

Ex. 9 Page 3 of 5

IFCD 00028528

Medical Center in Springfield, Missouri, and the BOP put pressure on her to ensure she was not sharing work product with me. Duchardt only worked with me for about six weeks. There was one face-to-face meeting and a handful of phone calls. After I refused to give Duchardt confidential BOP materials, he stopped calling me.

16. Duchardt was aware that I worked at MCFP Springfield prior to the homicide. But we never spoke long enough for Duchardt to discover that I was one of two or three people in the world who had recent work experience as the Lieutenant supervising the entire 10 Building within MCFP Springfield. I was in a unique position to know key information that I could share, like the policies and procedures controlling the building where the homicide occurred, the perpetrators and the victim, as well as the staff responsible for monitoring the prison. Duchardt never learned this information, but I would have shared all of the information in this declaration with anyone who took the time to ask me. Everything I've shared in this declaration could have been provided prior to Chuck's trial in 2014 and I would have gladly testified or spent time educating the lawyers and the experts who were going to testify.

17. I have met with Chuck's current legal team. They provided me with Fred Duchardt's *ex parte* funding request for my investigative services. (Trial Doc. 512). I read it in its entirety. This was the first time I had seen this document. I was shocked when I read it. I had no idea Duchardt said those things to the Court about me. Duchardt never gave me the impression that he wanted me around much less assist with reviewing BOP records and/or interviewing BOP witnesses. I did not do any of the things Duchardt told the Court I was being hired to do, but I could do those things and would have if Duchardt asked me.

18. Chuck's current legal team also provided me with the Unit 10-B Shake Down Logs and the Logbook. The Logbook shows that CO Logsdon's daily entries are nearly identical every day, except for the day of the homicide. That makes it difficult to evaluate what Logsdon did during his shifts since his documentation was lackluster. The Shake Down Logs do present a red flag though. Coonce was shaken down on January 18, 2010, and January 25, 2010. Castro-Rodriguez was shaken down five times within that same Shake Down Log. COs are required to shake down five inmates per shift and with 36 inmates in Unit 10-B, that means every inmate should be shaken down weekly. Castro-Rodriguez was well known to the staff at MCFP Springfield, so it does not make sense why he was being shaken down so frequently. Coonce, on the other hand, was not as well known to staff and had a violent record. The shake down of Coonce one day prior to the homicide resulted in the discovery of a broken razor blade. That, by itself, may not be enough for a write-up, but the next step inmates take with a broken razor is to fashion it into a weapon, which is certainly a write-up. The discovery of that type of contraband could provide a basis for a write-up and reassignment to a more secure wing, like Unit 10-D.

19. Chuck's current legal team also provided me with BOP expert Maureen Baird's declaration. I have read it in its entirety. Ms. Baird did a good job pointing out that Mr.

4___

IFCD 00028529

Hall and Mr. Coonce were two very different inmates. Reading it made me recall Mr. Hall's colostomy bag, and I remember it being an issue Mr. Hall dealt with. It seemed to embarrass Chuck. Chuck's desire to be housed by himself seemed to be to avoid teasing/harassment.

20. I know that Ms. Baird noted that she would have taken seriously Chuck's homicidal ideations, and that's wise. My reading of Chuck's homicidal ideations is colored by my experience dealing with Chuck. I think Chuck was afraid and would act tough to survive prison. For instance, I recall Chuck telling me once that he was a member of the Hell's Angels biker gang. I knew right away that Chuck was telling me this story to appear to be tougher than he was. Hell's Angels have tattoos that Chuck did not have. Hell's Angels also don't tell people that they are in the Hell's Angels. Ms. Baird is right that homicidal threats must be dealt with seriously, but I will always think that without Wes Coonce on Unit 10-B, this homicide would never have occurred.

21. To me, Unit 10-B was a good fit for Chuck because it answered his needs. He was locked down at night, so he had time to take care of his colostomy issues. He could sleep, because it was single celled which allowed him safety and privacy. If you look at Chuck's history, he should've been at Springfield. Chuck only had one minor altercation. He wasn't like Coonce. They're different people, and that's why they shouldn't have been housed together. I fully agree with Ms. Baird that the BOP has the tools to house someone like Chuck. It doesn't surprise me that Chuck hasn't had any violations since the homicide.

I, Joe Buckmaster, declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Joe Buckmaster

Date: 03/01/2024

IFCD 00028530