# DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

*Summary of Opinions*

1. I was asked by federal habeas corpus counsel for Charles Hall to address three questions in this declaration:

    a. What were the prevailing professional norms in the investigation and presentation of mitigation evidence at the time of Mr. Hall's pretrial capital representation and trial (2010 to 2014)?

    b. At the time of Mr. Hall's capital representation, how did the development of social history evidence through a mitigation investigation affect defense counsel's overall representation of a client facing the death penalty in a federal prosecution, in addition to necessary preparation for a sentencing proceeding, including pre-authorization strategy, plea negotiations, and the development of mental health evidence?

    c. Did Mr. Hall's trial counsel comply with the prevailing professional norms in the investigation and presentation of mitigation evidence at the time of his capital representation?

2. The prevailing norms in mitigation investigation are addressed in detail in this declaration, but the critical points can be summarized succinctly. Counsel's duty to conduct a thorough mitigation investigation was well established by the time Mr. Hall's counsel were appointed to represent him. By the time of his trial, five decisions of the Supreme Court of the United States had established trial counsel's duty to conduct a thorough mitigation investigation

1

IFCD 00028390

in a death penalty case: *Williams v. Taylor,* 529 U.S. 362 (2000); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Rompilla v. Beard,* 545 U.S. 374 (2005); *Porter v. McCollum,* 558 U.S. 310 (2009) (per curiam); and *Sears v. Upton,* 561 U.S. 945 (2010) (per curiam). The U.S. Supreme Court's decision in *Wiggins* not only underscored counsel's duty to conduct thorough mitigation investigation (*id.* at 522) but also acknowledged the critical role of the nonlawyer whose post-conviction mitigation investigation provided the proof of how Mr. Wiggins had been prejudiced by the deficient performance of his trial counsel (*id*. at 516-17). The American Bar Association's revised Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases were published in the same year as the *Wiggins* decision.[1] These Guidelines summarizing

---

[1]The revised Guidelines were published in 31 HOFSTRA L. REV. 913 (2003). The symposium issue of that law review included articles on the importance of teamwork (*see* Jill Miller, *The Defense Team in Capital Cases*, 31 HOFSTRA L. REV. 1117 (2003)) and the critical role of a mitigation specialist in conducting the required investigation (*see* Pamela Blume Leonard, *A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team,* 31 HOFSTRA L. REV. 1143 (2003)). The *Wiggins* Court favorably cited the original 1989 edition of the ABA Guidelines as "well-defined norms." *Wiggins, supra* ¶ 2, at 524. The *Rompilla* Court extensively discussed both editions of these Guidelines in finding trial counsel deficient despite consulting three mental health experts. *Rompilla, supra* ¶ 2, at 369 (three experts) and 387 n.7 (discussing 1989 and 2003 editions of the ABA Guidelines). By the time of Mr. Hall's trial, the ABA Guidelines had also received particular recognition in federal court, both for federal defender organizations and counsel appointed under the Criminal Justice Act. The Defender Services Program has four goals in its strategic plan: timely provision of assigned counsel, delivery of counsel services consistent with the best practices of the legal profession, cost-effective services, and protection of the independence of the defense function. Among its strategies for achieving the "best practices" goal, the Defender Services Program adopted a specific strategy for capital representation stating that appointed counsel should comply with the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (published in 36 HOFSTRA L. REV. 677 (2008)). *See* JON B. GOULD & LISA GREENMAN, REPORT TO THE COMMITTEE ON DEFENDER SERVICES, JUDICIAL CONFERENCE OF THE UNITED STATES, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES (2010) 91, n.90 (Goal 2, Quality of Representation, Strategy 16, Capital Representation). The Judicial Conference of the United States later endorsed similar language in its October 2016 Model CJA Plan. *See* Guide to Judiciary Policy, Vol. 7A, Appx. 2A: Model Plan for Implementation and Administration of the Criminal Justice Act, XIV.B.9: "All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Guidelines 1.1 and 10.2 et seq.) and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases." *Id*. at 28 (adopted by the Judicial Conference of the United States, Oct. 3, 2016; available at: http://www.uscourts.gov/sites/default/files/vol07a-ch02-appx2a.pdf).

IFCD 00028391

the prevailing professional norms at that time were widely circulated and discussed at capital training seminars at the time of Mr. Hall's representation. I was employed throughout this period as the National Mitigation Coordinator for the federal death penalty projects and served as faculty at over a hundred death penalty CLE programs (*see infra* ¶¶ 8, 12-13).

3. The U.S. Supreme Court's decision in *Rompilla*, *supra* ¶ 2, reiterated the importance of thorough mitigation investigation, finding trial counsel ineffective in a case where they had engaged the services of three mental health experts but had failed to conduct the thorough investigation that is essential to reliable assessments and effective mitigation. Likewise, the per curiam opinions issued by the Court by the time of Mr. Hall's capital prosecution, *Porter* and *Sears*, *supra* ¶ 2, both stressed the importance of thorough mitigation investigation, including early childhood investigation even for middle-aged defendants[2] and mental health evidence that "might not have made [the defendant] any more likable to the jury, but . . . might well have helped the jury understand [him], and his horrendous acts."[3]

4. The ABA Guidelines as revised in 2003 highlighted what capital defenders had long recognized: a team should be assembled to begin the mitigation investigation at the earliest opportunity.[4] The need to establish the team as early as possible stems from the complexity of capital defense representation. Commencing the mitigation investigation early derives in part

---

[2] Porter was fifty-four years old at the time of his trial; *see Porter*, *supra* ¶ 2, at 37. Mr. Hall was forty-three at the time of his trial (*infra* ¶ 94).

[3] *See Sears*, *supra* ¶ 2, at 951.

[4] *See* ABA Guideline 10.4.C (The Defense Team) ("As soon as possible after designation, lead counsel should assemble a defense team . . ."). 31 HOFSTRA L. REV. at 999; Commentary to Guideline 10.7 (Investigation):

> The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.

*Id.* at 1023 (citation omitted).

3

from the nature of mitigation investigation itself: it is a slow, time-intensive process involving the interaction between documentary records and witness interviews. Mitigation interviewing itself is a cyclical process that requires building trust and rapport with client and witnesses.[5] In addition, in federal death penalty cases it has always been important to begin the investigation as soon as possible in order to develop evidence that might persuade the Department of Justice not to authorize the filing of a Notice of Intent to Seek the Death Penalty and/or to accept a negotiated disposition.[6] Early investigation may also uncover evidence of intellectual disability establishing that the client is not even eligible for capital prosecution.[7]

5. The purpose of a thorough mitigation investigation is to develop social history evidence that will humanize the defendant, help jurors to understand why he may have committed the capital offense, and evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. When fully developed, it may be the basis for persuading the Government to reconsider an earlier decision to authorize seeking the death penalty, and either deauthorize the

---

[5] *See* Lee Norton, *Mitigation Investigation,* THE CHAMPION, May 1992, at 43, 45 (discussing cyclical interplay of records and interviews); Russell Stetler, *Mitigation Evidence in Death Penalty Cases,* THE CHAMPION, Jan./Feb. 1999, at 35, 39 (citing need for hundreds of hours to collect, decipher, and decode old records, as well as patience in eliciting disclosures from both witnesses and clients).

[6] *See* United States Attorneys' Manual § 9-10.030 (2001) (providing defense counsel reasonable opportunity to present information, including mitigation, for consideration before a Notice of Intent to Seek the Death Penalty is filed). *See also* Russell Stetler, *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1),* 31 HOFSTRA L. REV. 1157.

[7] *See* Atkins v. Virginia, 536 U.S. 304 (2002). Fourteen years earlier, Congress had exempted individuals with what was then known as "mental retardation" from execution. Anti-Drug Abuse Act of 1988, Pub. L. 100-690, § 7001(l), 102 Stat. 4390, 21 U. S. C. § 848(l). When Congress expanded the federal death penalty law in 1994, it again included a provision that prohibited any individual with "mental retardation" from being sentenced to death or executed. The Federal Death Penalty Act of 1994 was enacted as Title VI of the Violent Crime Control and Law Enforcement Act of 1994 and became effective on September 13, 1994. See Pub. L. 103-322, Title VI, Sections 60001-26, Sept. 13, 1994, 108 Stat. 1959 (codified at 18 U.S.C. 3591-3598). In October 2010, Congress passed Rosa's Law, which changed references in specified federal laws from "mental retardation" to "intellectual disability." See Fed. Register (Aug. 1, 2013), available at: https://www.federalregister.gov/documents/2013/08/01/2013-18552/change-in-terminology-mental-retardation-to-intellectual-disability (last visited Jan. 17, 2024).

IFCD 00028393

case or accept an agreed-upon disposition. Moreover, a thorough social history investigation also provides the foundation for reliable mental health evidence and enables counsel to make informed decisions about what kind of mental health experts to consult and what questions they should address. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation in the wide spectrum of areas that they may address, which range from the statutorily defined issues of competency and criminal responsibility to the broadest varieties of statutory and non-statutory mitigation that have mental health aspects. The fruits of a thorough mitigation investigation not only provide capital defendants with the effective representation to which they are entitled under the Sixth Amendment but assure jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just.

6. The need to investigate mental disorders and impairments in the context of sentencing evidence was also well established at the time of Mr. Hall's representation. *See Ake v. Oklahoma*, 470 U.S. 68, 80 (1985) (due process right to psychiatric assistance when mental condition is relevant to culpability *or punishment*).[8] Without the social history that results from a thorough mitigation investigation, trial counsel cannot make an informed and thoughtful decision about which experts to retain in order to gauge the nature and extent of a client's possible mental disorders or impairments. Mental health experts, in turn, require social history information for a complete and reliable evaluations, so consultations without such background information are inevitably futile.

---

[8] The High Court noted that "[m]any states, as well as the Federal Government, currently make psychiatric assistance available to indigent defendants," citing, among other statutes, MO. REV. STAT. § 552.030.4 (Supp. 1984).

IFCD 00028394

7. Based on the materials I have reviewed (summarized *infra* ¶ 51), I concluded to a reasonable degree of professional certainty that Mr. Hall's trial counsel failed to conduct the thorough mitigation investigation required by the prevailing professional norms of 2010 to 2014, and the resulting penalty-phase presentation fell far below those norms. Trial counsel failed to focus on the unusual medical conditions (Crohn's disease and ileostomy) that defined Mr. Hall's life situation and provided a unique basis for precluding a capital prosecution or accepting a negotiated disposition. *In fact, after hearing all the defense evidence, half the jurors did not even believe that Mr. Hall's Crohn's disease had been proved. See infra* ¶¶ 138-139. Mr. Hall's trial lawyers failed to conduct the early investigation that might have persuaded the Department of Justice not to seek the death penalty. They also failed to utilize the mitigation investigation to convince the client and the Government that a negotiated disposition was appropriate. Trial counsel's ultimate do-it-yourself mitigation investigation (without the assistance of a dedicated team member with the relevant expertise and adequate time) was superficial and constricted. In many ways, trial counsel's effort was also a textbook example of how *not* to develop reliable and credible mental health evidence. Mr. Hall was referred to the Bureau of Prisons for a lengthy competency evaluation before the defense had conducted a significant social history investigation or consulted its own mental health experts confidentially. The problems were aggravated by trial counsel's *opposition* to severance at the time of the sentencing hearing, further undermining any hope that jurors could render the individualized determination that the Constitution requires.

*Background and Qualifications*

6

IFCD 00028395

8. I served as the first National Mitigation Coordinator for the federal death penalty projects (described more fully at their web site, www.capdefnet.org) from 2005 until my retirement from full-time work in the spring of 2020. I continue to write, train, and consult on mitigation evidence in death penalty cases throughout the United States. The National Mitigation Coordinator position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith*, *supra* ¶ 2, and the revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases that same year.[9] During the entire time of Mr. Hall's representation, I served as the National Mitigation Coordinator, and my job was to consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that were pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254, 2255, and 2241). I was heavily involved in training and case brainstorming with defense teams in federal capital prosecutions in this time frame. During my service as the National Mitigation Coordinator, I did presentations ten times at the Federal Death Penalty Resource Counsel's annual Strategy Session (between 2005 and 2017) and served as faculty a dozen times at Authorized Case Trainings for federal death penalty cases (between 2008 and 2019) under the same auspices. In addition, defense teams regularly brought their federal death penalty cases to the weeklong Bryan R. Shechmeister Death Penalty College at Santa Clara University Law School, where I served on the program's faculty for twenty-five years between 1996 and 2021 (when the program was held virtually).

---

[9] *See* GOULD & GREENMAN, 2010 UPDATE, supra note 1, at 111-112 (Commentary describes authorization of the position "to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts" and my role as the National Mitigation Coordinator in case consultations and training). Gould and Greenman updated the 1998 Spencer Report discussed *infra* ¶ 23 & notes 31-33.

IFCD 00028396

9. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained by contract or employed directly by the Capital Defender Office or the private bar in connection with death penalty cases in New York.

10. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco that coordinated the appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

11. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. All my work on death penalty cases has been on behalf of indigent clients, either through funding authorized by courts or public defender offices, or as an employee of indigent defense agencies. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in post-conviction proceedings. Most of these conferences were organized and attended by

8

IFCD 00028397

attorneys specializing in capital work. I investigated mitigation evidence in over two dozen death penalty cases in California in the 1980s.

12. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in most of the other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death penalty cases have been prosecuted.[10] I have also lectured on numerous occasions under the auspices of the Administrative Office of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over more than three decades, I have lectured at over four hundred continuing legal education programs around the country (including sixteen capital defense and mitigation trainings in the State of Missouri), as well as dozens of additional programs at law schools and related professional conferences in the United States, Europe, and Asia.

13. Since the 1990s, I have lectured on mitigation investigation in death penalty cases at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual capital punishment conference, often referred to as the "Airlie" conference because of its traditional location at Airlie House in Warrenton, Virginia), the

---

[10] At the time I lectured on these subjects in Colorado, Connecticut, Delaware, Illinois, Maryland, New Jersey, New Mexico, New York, Virginia, and Washington, capital punishment was permitted in those jurisdictions.

9

IFCD 00028398

National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times over more than thirty years, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), which is attended by over a thousand practitioners. I was a co-chair of the planning committee for this seminar in 2009 and from 2011 to 2015. I delivered the virtual keynote address of this seminar in 2021 (attended by fifteen hundred participants and later published by *Santa Clara Law Review*) and have remained on the faculty through 2024. I have also taught at the death penalty colleges at the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois. I have taught at more than a dozen capital defense seminars throughout the country under the auspices of the National Institute of Trial Advocacy and over a dozen "bring-your-own-case" capital brainstorming seminars under the auspices of the National Consortium for Capital Defense Training and its regional counterparts. I also designed and organized the annual Capital Mitigation Skills Workshop, held annually under the auspices of the national Habeas Assistance and Training Counsel Project since 2012 until it was interrupted by the Covid pandemic in 2020. It resumed in January 2023 and was held again in May 2023 in response to the high demand for the skills training.

14. In the 1990s, I contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This multi-volume reference includes a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death*

IFCD 00028399

*Penalty Cases* and *Mental Disabilities and Mitigation* in *The Champion*, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in *Indigent Defense*, published by the National Legal Aid and Defender Association. These and other articles of mine were cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. 2003), *supra* note 1.[11]

15. I am the author or co-author of over a dozen law review articles,[12] several book chapters,[13] and a practice guide on mental health issues in capital cases.[14] My published work on mitigation has been cited by post-conviction courts in overturning death sentences because of

---

[11] Citations in the Commentary to Guideline 4.1, The Defense Team and Supporting Services, 31 Hofstra L. Rev. at 959-60 n.105; Guideline 10.7, Investigation, *id.* at 1022 n.210, 1027 n.226; Guideline 10.9.1, The Duty to Seek an Agreed-Upon Disposition, *id.* at 1042 n.249; Guideline 10.15.1, Duties of Post-Conviction Counsel, *id.* at 1085 n.348.

[12] *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA L. REV. 1157 (2003); *Dying Twice: Incarceration on Death Row*, 31 CAPITAL U. L. REV. 853 (2003), with Norman L. Greene, William D. Buckley, Craig Haney, Joseph Ingle, & Michael B. Mushlin; *Using the Supplementary Guidelines on the Mitigation Function to Change the Picture in Post-Conviction*, 36 HOFSTRA L. REV. 1067 (2008) with Mark E. Olive; *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE, (2008); The Unknown Story of a Motherless Child, 77 UMKC L. REV. 947 (2009); *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635 (2013) with W. Bradley Wendel; *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. REV. 407 (2014); *The ABA Guidelines: A Historical Perspective*, 43 HOFSTRA L. REV. 731 (2015) with Aurélie Tabuteau; *The Past, Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases*, 46 HOFSTRA L. REV. 1161 (2018); Lockett v. Ohio *and the Rise of Mitigation Specialists*, 10 CONLAWNOW 51 (2018); *Death Penalty Keynote: Why Mitigation Matters, Now and for the Future*, 61 SANTA CLARA L. REV. 699 (2021); *Mitigation Works: Empirical Evidence of Highly Aggravated Cases Where Juries Rejected the Death Penalty*, 51 HOFSTRA L. REV. 89 (2022), with Maria McLaughlin & Dana Cook; *Mitigation Reports in Capital Cases: Legal and Ethical Issues,* 13 ST. MARY'S J. LEGAL MAL. & ETHICS 48 (2023), with W. Bradley Wendel.

[13] *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., & Amy Smiley, Ph.D., eds., 2001) with Leah George; *Punishment*, *in* PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2d ed. (Richard Rosner, M.D., ed., 2003) with Robert Lloyd Goldstein; *Mitigation Matters*, *in* TELL THE CLIENT'S STORY: MITIGATION IN CRIMINAL AND DEATH PENALTY CASES (Edward Monahan & James Clark, eds., 2017) with John Blume; *The History of Mitigation in Death Penalty Cases, in* SOCIAL WORK, CRIMINAL JUSTICE, AND THE DEATH PENALTY (Lauren A. Ricciardelli, ed., 2020); *Mitigation and the Death Penalty: Successes, Obstacles, and Forced Constraints, in* THE DEATH PENALTY: A POST-MORTEM (Todd C. Peppers et al., eds., New York University Press, forthcoming).

[14] A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (2008), with DICK BURR, MATTHEW CROSS, DAVID FREEDMAN, ANNE JAMES, & KATHY WAYLAND.

IFCD 00028400

trial lawyers' failure to provide effective representation, as demonstrated by their failure to conduct thorough mitigation investigations. *See State v. Revis*, 49-CC-2005-000142.60, Circuit Criminal Court, Marion County, Alabama (Presiding Judge John H. Bentley) (Feb. 13, 2015) slip. op. at 27, and *Stokes v. Stirling,* 10 F.4th 236, 252 (4th Cir. 2021).[15]

16. Courts have qualified me as an expert witness in multiple state and federal jurisdictions, and I have provided opinion evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by live testimony or affidavit over two hundred fifty times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New Hampshire, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. I have testified as an expert witness thirty-three times, including testimony in capital habeas corpus cases in the Districts of Arizona, Arkansas (Eastern), California (Eastern), Iowa (Northern), Louisiana (Middle), Missouri (Western) (three times), Texas (Northern), and Wyoming, as well as in state capital post-conviction proceedings in Alabama, Arkansas, California, Colorado, Louisiana, Nevada, South Carolina, and Wyoming. I have also testified as a pretrial expert witness on mitigation standards in the state and federal trial courts of various states. The United States District Court for the Middle District of Louisiana in *Wessinger v. Cain,* Case No. 3:04-637-JJB-SCR (July 27, 2013), and the United States District Court for the District of Wyoming in *Eaton v. Wilson*, Case No.

---

[15] The Supreme Court vacated the grant of habeas relief in *Stokes* and remanded for further consideration in light of *Shinn v. Martinez Ramirez*, 142 S. Ct. 1718 (2022). *See Stirling v. Stokes*, 142 S. Ct. 2751 (2022). On remand, the Fourth Circuit "reaffirm[ed] [its prior] opinion" granting habeas relief and the Supreme Court denied the State's petition for writ of certiorari. *See Stokes v. Stirling*, 64 F.4th 131, 133 (4th Cir. 2023), cert. denied, No. 22-1234, 2023 WL 7287138 (U.S. Nov. 6, 2023).

IFCD 00028401

09-CV-261-J (November 20, 2014), issued orders in which the courts qualified me as an expert in the investigation and presentation of mitigating evidence, competent to testify about the performance of the petitioner's trial counsel, and found counsel deficient in each case. My testimony was also cited in a state post-conviction grant of relief for failure to investigate and present mitigation evidence in *Gutierrez v. State*, Case No. CR94-1795B, Second Judicial District Court, Washoe County, Nevada (Judge Jerome M. Polaha) (Aug. 21, 2017), slip op. at 30-32. The Ninth Circuit Court of Appeals also cited my testimony in granting sentencing relief for ineffective assistance of counsel in *Sanders v. Davis*, 23 F.4th 966, 979 (9th Cir. 2022), a case from Bakersfield (Kern County), California.

17. Over the years, I have been directly involved in hundreds of capital cases, including scores of trials and post-conviction hearings. I have also been consulted in various capacities on capital cases in numerous jurisdictions around the country, including Missouri, and on numerous federal death penalty cases.

***Prevailing Norms in the Development of Mitigating Evidence in Capital Cases, 2010 to 2014***

18. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case and has been for as long as I have done this work. In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. When I began working on capital cases in 1980, investigation was already firmly established as an integral part of the criminal defense function generally. When the American Bar Association

13

IFCD 00028402

published the second edition of its Standards for Criminal Justice (1980), Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction*." *Id*. at 4:53 (emphasis added). The Commentary to this Standard noted concisely, "Facts form the basis of effective representation." *Id*. at 4:54. In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id*. at 4:55.[16] These ABA Standards were cited by Justice Stevens in reference to counsel's obligation to conduct a thorough investigation of a capital defendant's background. *Williams v. Taylor*, *supra* ¶ 2, at 396.

19. These standards covered criminal defense generally. Discussions of *capital* defense provided more specific detail about counsel's duties in investigating mitigating evidence. As early as 1979, Dennis Balske (an experienced capital litigator who had practiced in the South) emphasized, "Importantly, the life story must be complete."[17] In 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases in a widely read and often cited law review article.[18] He wrote, "There must be inquiry into the client's childhood, upbringing, education,

---

[16] *See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice*, THE CHAMPION (Jan./Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case.").

[17] Dennis N. Balske, *New Strategies for the Defense of Capital Cases,* 13 AKRON L. REV. 331, 358 (1979).

[18] Gary Goodpaster's article was cited by Justice O'Connor, writing for the High Court's majority, in *Strickland v. Washington*, 466 U.S. 668, 689-90 (1984), Justice Marshall, dissenting, cited the article three times. *Id*. at 716 nn.13, 15; 718.  Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U. L. REV. 299 (1983).

IFCD 00028403

relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized."[19] Five years after his original law review article, Dennis Balske wrote in the national defense bar magazine to advise capital defense counsel that they "must conduct the most extensive background investigation imaginable. You should look at every aspect of your client's life from birth to present. Talk to everyone that you can find who has ever had any contact with the defendant."[20]

20. At the beginning of the 1980s, a capital defense lawyer in California hired a former *New York Times* reporter to investigate the life history of his client. The reporter, the late Lacey Fosburgh, had previously written a best-selling book about a murder case she had covered for the newspaper.[21] After her successful work in developing the capital client's mitigation evidence, Ms. Fosburgh wrote about the critical role she had played:

> A significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process. Neither one was suited to the task at hand here -- namely discovering and then communicating the complex human reality of the defendant's personality in a sympathetic way.
>
> Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence.

---

[19] Goodpaster, *The Trial for Life, supra* note 18, at 323-324.

[20] Dennis Balske, *The Penalty Phase Trial: A Practical Guide,* THE CHAMPION, Mar. 1984. at 40, 42. *Accord,* Norton, *Mitigation Investigation, supra* note 5, at 44 ("[I]t is necessary to interview almost literally everyone who has known him or her, including relatives, neighbors, medical and mental health personnel, teachers, friends, co-workers and employers, prison personnel and other inmates, military personnel, social service agency personnel, etc. This generally means going back decades, and usually with very few clues to trace these people.") *See also* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, Aug. 1986. at 14, 18 ("capital defense attorneys must recognize that the profession demands a higher standard of practice in capital cases"); Robert R. Bryan, *Death Penalty Trials: Lawyers Need Help*, THE CHAMPION, Aug. 1988, at 32 ("There is a requirement in every case for a comprehensive investigation not only of the facts but also the entire life history of the client.").

[21] LACEY FOSBURGH, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977).

IFCD 00028404

Instead they are both discovered and portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech -- things that to a jury convey as much information, if not more, as any set of facts. But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function. *This person should have nothing else to do* but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more. This takes a lot of time and patience.[22]

Capital defense lawyers across the country soon recognized the value of nonlawyers with expertise in the development of sentencing evidence -- ultimately referred to as "mitigation specialists." The California defense bar prominently featured one such nonlawyer on the cover of its monthly magazine *Forum* in 1987.[23] The national defense bar magazine, *The Champion*, discussed the use of social workers in developing mitigating evidence in 1986.[24] The following year, another article in the same magazine commented tersely, "The mitigation specialist is a professional who, as attorneys across the nation are now recognizing, should be included and will be primary to the defense team."[25]

21. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to

---

[22] Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7, July 1982 (emphasis added). This article also appeared in the magazine of the California defense bar, FORUM, Sept.-Oct. 1982. *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM, May-June 1978, and Michael G. Millman, *Interview: Millard Farmer*, FORUM, Nov.-Dec. 1984, at 31-33.

[23] Anne E. Fragasso, *Interview: Casey Cohen*, FORUM, Jan.-Feb. 1987, at 22, 26.

[24] Cessie Alfonso & Katharine Bauer, *Enhancing Capital Defense: The Role of the Forensic Social Worker,* THE CHAMPION, June 1986, at 26, 26-29.

[25] James Hudson et al., *Using the Mitigation Specialist and the Team Approach,* THE CHAMPION, June 1987, at 33, 36. Hudson and one of his co-authors had worked in the *Mitigation Specialists Department* of the Ohio State Public Defender's Office. *Id.* at 33.

IFCD 00028405

determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity.[26]

22. As noted *supra* ¶ 2, since 2000, the U.S. Supreme Court has found trial counsel ineffective in five cases for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam). Every case but *Sears* was tried in the 1980s, and *Sears* was tried in 1993, over two decades before Mr. Hall's trial. In *Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.). In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA Guidelines. "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Rompilla*, tried in 1988, trial counsel were found deficient "even when a capital defendant's family members and the

---

[26] *See, e.g.*, John Hill & Mike Healy, *The Death Penalty and the Handicapped*, FORUM, May-June 1986, at 18-20 (discussing implications of childhood disorders affecting the brain and other disabilities for penalty phases in capital cases); David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION, Apr.1988, at 34, 36 (discussing need for adequate time to overcome clients' distrust and the value of a neuropsychologist or neurologist in cases with head trauma).

IFCD 00028406

defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts. 545 U.S. at 377, 379. Similarly, in *Porter*, also tried in 1988, trial counsel were found deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under the prevailing professional norms" at the time of Porter's trial, counsel had an "obligation to conduct a thorough investigation of the defendant's background." *Id*. at 39 (citation omitted). Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior." *Id*. at 36. In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ." 561 U.S. at 954. Post-conviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. *Id*. at 946. Four of these five individuals have subsequently received sentences of less than death, and the fifth case remains in litigation as of this writing. Terry Williams received a life sentence by negotiated disposition in Danville, Virginia, in 2000.[27] On October 15, 2004, the State of Maryland agreed to a disposition sending Kevin Wiggins to a state facility for mental health treatment and rehabilitation services, but making him eligible for parole based on time already served.[28] On August 13, 2007, the Lehigh County (Pennsylvania) District Attorney's Office stipulated to a life sentence for Ronald

---

[27] Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia*, RICHMOND TIMES-DISPATCH (Apr. 9, 2001) at A1, *available at* truthinjustice.org/va-dpreview.htm.

[28] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624.

IFCD 00028407

Rompilla.[29] On July 21, 2010, the Brevard-Seminole (Florida) State Attorney's Office announced that it would allow George Porter, Jr., to be resentenced to life.[30] All five cases involved mental health evidence, including brain damage or cognitive impairment, that was not discovered and presented at trial.

### *The Need for a Qualified Mitigation Specialist*

23. After a decade of experience with the federal death penalty, the Committee on Defender Services of the Judicial Conference of the United States appointed a subcommittee under the Hon. James R. Spencer of the Eastern District of Virginia to study the cost and quality of defense representation. The subcommittee report, commonly referred to as the Spencer Report,[31] found that, as of 1998, the work of mitigation specialists was "part of the existing 'standard of care' in a federal death penalty case."[32] The report noted that mitigation specialists "have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review."[33] In a capital case, competent defense counsel have a duty to conduct a thorough life-history investigation, but generally lack

---

[29] Associated Press, *Death Row Inmate Gets New Life Term*, USA TODAY, usatoday.com *See* /news/topstories/2007-08-13-477084247_x.htm.
[30] Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row*, FLA. TODAY (July 21, 2010). [30] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624.
[31] FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May 1998), *available at:* https://www.uscourts.gov/sites/default/files/original_spencer_report.pdf (last visited Jan. 15, 2024).
[32] *Id.*, Commentary to 7. Experts, Sec. II, Recommendations and Commentary.
[33] *Id.*

IFCD 00028408

the skill to conduct the investigation themselves.[34] Moreover, even if lawyers had the training, skills, and patience, they do not have the time to conduct thorough mitigation investigation because of all the other work that is demanded of them in representing a capital client. Besides, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Capital defense counsel have long retained a mitigation specialist to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. As noted *supra* ¶ 20, even before the term "mitigation specialist" had been coined, penalty phase biographical investigation was widely accepted in the 1980s as a critical part of the capital defense function.

24. As revised in 2003, the ABA Death Penalty Guidelines, state unequivocally that lead counsel at any stage of capital representation should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The original edition of the ABA Guidelines, adopted in 1989 (*available at* ambar.org/1989guidelines), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." 1989 Guideline 11.4.1.C. The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation." 1989 Guideline 11.4.1.D(7). Notably, the 1989 Guidelines specifically stated that "the investigation

---

[34] *See*, generally, Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't Be Delegated*, THE CHAMPION, Mar. 2007, at 61.

IFCD 00028409

for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." 1989 Guideline 11.4.1.C.

25. The consensus supporting teamwork and using a mitigation specialist simply represents the most efficient and cost-effective means of conducting the thorough mitigation investigation that is constitutionally required. There are of course lawyers who are skilled in developing mitigation, and some even serve as mitigation specialists in cases where they are not serving as counsel. Training in mitigation investigation has always been available to lawyers, and it is imperative that lawyers fully appreciate what thorough mitigation investigation involves. However, mitigation specialists bring to the defense team knowledge and experience that is unsurpassed because they do nothing else: mitigation investigation is their full-time job.

26. Like all specialized professionals, mitigation specialists have toolkits that enable them to tackle all the problems from locating witnesses who are not eager to be found to organizing and distilling all the information that flows from the parallel tracks of interviews and document gathering. They obtain computerized detailed earnings reports from the Social Security Administration to identify employers that the client may not even remember and specific dates of employment even if the client recalls the job. They know how to use public records online and at courthouses, as well as state and county vital records offices. They are familiar with the federal Freedom of Information Act and the corresponding open records laws of individual states. They use the commercial vendors who market the non-financial data collected by credit bureaus, which relentlessly acquire consumer last known address information from every source from warranty cards on household appliances to the Social Security Administration's death index. Mitigation specialists have up-to-date knowledge of the

IFCD 00028410

authorizations needed to comply with the Health Insurance Portability and Accountability Act (HIPAA) and other privacy protections. They use chronologies to digest records, decode medical acronyms, and decipher handwritten notes; genograms to visualize the multigenerational family tree; and maps to track every address where the client ever lived. They use www.newspapers.com for media searches, government websites to identify toxic environmental locations, and a wide range of search engines from Google to the Wayback Machine.

*Evolution of Prevailing Norms*

27. The 1989 edition of the ABA Guidelines reflected a national consensus among capital defense practitioners based on their practices in the 1980s. These Guidelines were the result of years of work by the National Legal Aid and Defender Association (NLADA) to develop standards to reflect the prevailing norms in indigent capital defense. NLADA published its Standards for the Appointment of Defense Counsel in Death Penalty Cases in 1985 and updated the standards in 1988 (available at https://www.nlada.org/defender-standards/death-penalty (last visited Feb. 24, 2023). With initial support from the ABA's Standing Committee on Legal Aid and Indigent Defendants (SCLAID), NLADA developed its expanded Standards for the Appointment *and Performance* of Defense Counsel in Death Penalty Cases (emphasis added) over the course of several years. In February 1988, NLADA referred the Standards to SCLAID, which reviewed them and circulated them to appropriate ABA sections and committees. SCLAID incorporated the only substantive concerns expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more appropriate than "Standards." Each

22

IFCD 00028411

black-letter guideline is explained by a commentary, with references to supporting authorities. *See* Introduction to ABA Guidelines (1989 ed.).

28. Courts have found the various editions of the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel performance. As Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'" Justice Stevens cited *Strickland*, 466 U.S. 668, 688 (1984); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Justice Stevens concluded: "Although they are 'only guides,' *Strickland*, 466 U.S. at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ." Justice Stevens also cited law review articles and the publications of criminal defense and public defender organizations (such as the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association) as guides to prevailing professional norms. *Id.* at 367. *Accord Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (capital reversal finding trial counsel ineffective and citing *Padilla*'s analysis of "prevailing professional norms," 559 U.S. at 366, and quoting verbatim the first two sentences of Justice Stevens's analysis of prevailing norms).

29. The Commentary to the 2003 edition of the ABA Guidelines explained in detail why mitigation specialists are vital members of the capital defense team:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability

IFCD 00028412

to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .

. . . The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.[35]

30. Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases discuss these skills in even more detail.[36] Supplementary Guideline 5.1.B, for example, specifies the need for someone with

the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history. Life history includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.[37]

---

[35] 31 HOFSTRA L. REV. at 959 (citations omitted).

[36] Supplementary Guidelines, *supra* note 1. Published two years before Mr. Hall's prosecution began, 36 HOFSTRA L. REV. 677 (2008), the Supplementary Guidelines reflect the long-evolving practice of capital defense teams engaged in the mitigation function. *See* Sean D. O'Brien, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases: When Life Depends on It*, 36 HOFSTRA L. REV. 693 (2008) (noting that the survey and national review process for the Supplementary Guidelines was well under way by the time of publication). The draft of these Supplementary Guidelines was circulated and discussed at numerous national training programs in the years leading up to publication. I personally discussed them in presentations on mitigation at federal training programs before and after their publication. *See* ¶ 8 *supra*.

[37] Supplementary Guidelines, *supra* note 1, at 682.

IFCD 00028413

31. Supplementary Guideline 5.1.C continues:

> Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance.[38]

A core team member, usually the mitigation specialist, must also have the specialized training, as described in Supplementary Guideline 5.1.E, to identify, document and interpret "symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma."[39]

32. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for a juror to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and

---

[38] *Id.*
[39] *Id.* at 683.

25

IFCD 00028414

impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation.[40]

33. The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records.[41] Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Records are sometimes mistakenly presumed destroyed when they are in fact simply stored offsite in dusty warehouses that no one is eager to visit. Great diligence is required to ensure compliance with appropriate requests. In-person visits may be needed to obtain records that require extra effort to retrieve. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

---

[40] See Richard G. Dudley, Jr., & Pamela Blume Leonard, Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963 (2008); Douglas Liebert & David Foster, The Mental Health Evaluation in Capital Cases: Standards of Practice, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994). See also George W. Woods et al., Neurobehavioral Assessment in Forensic Practice, 35 INT'L J. OF L. & PSYCHIATRY 432 (2012).

[41] My list is abbreviated for the sake of describing some generic categories of records. Writing in 1992, Lee Norton offered a more comprehensive list: "birth certificate (vital statistics, county health department or hospital); birth records (hospital); mother's obstetric records (private physician clinic); school records; medical records (hospital, physician, emergency room, clinic); psychiatric/psychological records; records of all priors (court, police, jail, attorney, pre-sentence investigations); parole/probation (especially field notes); prison (daily, psychological, medical); 'training' schools/reformatories/juvenile detention centers; social services (food stamps, AFDC, WIC, welfare, Social Security, foster homes, counseling, reports of abuse); military (medical, psychological, training, tests/evaluations); lawsuits/involuntary commitments; employment (tests, evaluations, medical, job assignments, worker's compensation, pay scale)." Norton, *Mitigation Investigation, supra* note 5, at 45. She added, "Each record obtained will refer to other records and reports . . . which must be obtained, and individuals who must be located and interviewed, thus expanding the investigation." *Id.*

IFCD 00028415

34. The Commentary to ABA Guideline 10.7 (Investigation) notes, "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. . . . The collection of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence. Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes . . ."[42]

35. Records invariably provide valuable background information on clients and their families. *See Rompilla v. Beard*, *supra* ¶ 2, at 390 (court file – a readily available public document – contained "a range of mitigation leads that no other source had opened up"). In an earlier ineffectiveness case, *Williams v. Taylor*, *supra* ¶ 2 (2000), the Supreme Court found the life-history records such powerful mitigating evidence that the High Court added a footnote to quote a caseworker report verbatim:

> The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. … The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey.[43]

This excerpt provides a lucid example of a vivid illustration of family dysfunction – and a story that even the most skilled interviewer could never have elicited simply by talking with family members. The records documented an event that Terry Williams and his siblings were too young

---

[42] 31 HOFSTRA L. REV. at 1024-25.
[43] 529 U.S. at 395, n.19.

IFCD 00028416

to remember, and his parents were too intoxicated to register in memory. Records have no inherent bias, and contemporaneous records are in any event more credible than witnesses who share previously undisclosed memories.

36. Life-history records enable capital defense teams to interview all witnesses more effectively – not only the witnesses who created the records in the first place (like the teachers who produced report cards) but also family members and friends who can organize their memories more accurately if there is hard documentation of dates and places. The frailty of human memory obliges us all to rely on records, and they provide the essential skeletal framework for social history investigation. They are helpful in preparing witnesses to testify.

37. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation/LGBTQ+ status, ability/disability, body type, and physical appearance.[44]

---

[44] While these social and cultural differences have long been recognized as practical barriers in mitigation investigation (*see* Stetler, *Mitigation Evidence, supra* note 5, at 36), they are also seen as structural inequalities in the literature of social psychology analyzing intersectionality in the dynamics of power. In many ways, the unequal

38. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. It has long been recognized that an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required.[45] Dr. Norton summarized what is involved in every mitigation investigation succinctly:

> The two chief means of obtaining information in a life history investigation are intensive interviews and record searches. Life history investigations involve interviewing the client and virtually everyone who has ever known the client, and finding every piece of paper regarding the client ever generated. Both tasks require special knowledge and expertise which the attorney may not (and probably does not) possess. Therefore, one of the first tasks in the preparation of any capital case is securing the assistance of an individual with the skills that make him or her competent to conduct the life history investigation.[46]

Elaborating on the cyclical nature of the investigation, Dr. Norton stressed that "[t]he investigation is not complete until the information uncovered becomes redundant and provides no new insight."[47]

39. The most fundamental point in the Supplementary Guidelines for the Mitigation Function (*supra* note 1; ¶¶ 30-31) is the need for multiple, in-person, face-to-face, one-on-one interviews with family members and others who are familiar with the client's life and family

---

power relationship between imprisoned clients facing capital charges and defense teams in the free world (whom they did not choose) is the most fundamental obstacle to trust.

[45] *See* Norton, *Mitigation Investigation*, *supra* note 5, at 43-45. *See also* Leonard, *A New Profession for an Old Need: supra* note 1, at 1154 (reiterating a decade later that "it takes hundreds of hours to conduct a thorough social history investigation"); DAVID DEMATTEO ET AL., FORENSIC MENTAL HEALTH ASSESSMENTS IN DEATH PENALTY CASES 244 (2011) ("Typically, mitigation specialists invest hundreds of hours in a detailed mitigation investigation.").

[46] Norton, *Mitigation Investigations, supra* note 5, at 43.

[47] *Id*. at 45.

IFCD 00028418

history (Guideline10.11.C). Only with these multiple, in-person contacts can rapport and trust be patiently established. Psychologist Kathleen Wayland, Ph.D., has explained why such rapport is the key to eliciting traumatic disclosures:

> Rapport between interviewer and subject is a necessary, though by no means a sufficient, condition for disclosure to occur. Interviewers must be highly knowledgeable in their understanding of trauma dynamics in order to recognize the psychological meaning of the complex dynamics involved in interpersonal – often familial – violence. Given the nature of traumatic experience and the barriers to disclosure, there is a need for multiple, repeated interviews over time. Interviewers must be conscious of the possibility of retraumatization during interviewing. They must have skills to avoid or minimize this possibility and knowledge of how to respond to witnesses who are flooded and overwhelmed during interviews. Interviewers must be aware that clients often disclose traumatic material in small increments, and be able to judge the client's limits and allow him to discuss at a pace that is psychologically tolerable, to gauge the pace at which disclosure can occur, and to remain focused on the main goals of trauma interviews: (1) to maintain trust, rapport, and cooperation with those being interviewed; (2) to efficiently obtain information; and (3) to avoid or minimize retraumatization.[48]

Whether with clients or mitigation witnesses, this rapport is essential to *engagement* – the capacity to participate in the process of disclosing information that may be painful and invasive.

40. Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[49] Attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences. Cultural issues may involve not only race and ethnicity, but sexual orientation, gender, socioeconomic status, or any other characteristics that define social identity. Diversity in capital defense teams is of practical

---

[48] Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigation and Presentation*s, 36 HOFSTRA L. REV. 921, 960 (2008).

[49] *See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L. REV. 883 (2008); *see also* Dudley & Leonard, *Getting It Right, supra* note 40, at 978, 980 (noting importance of ethnocultural competency in mental health evaluations and the potential role of "cultural brokers" to advocate for the needs of people from cultures that are different from the defense team).

IFCD 00028419

importance. An all-white defense team representing a capital defendant of color will face enhanced barriers to disclosure of sensitive life-history information. *See supra* ¶ 37.

41. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy, and understanding. Unlike insanity and competency, both of which are strictly defined by statute and temporal limitations, mitigation need not involve a mental disease or defect, and it may encompass the entire trajectory of the client's life. In many cases, clients facing the death penalty suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

42. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same environment turn out differently. It is an objective scientific fact. Psychiatric evidence can provide a context to explain the capital crime and past behaviors as more than simply bad choices made by the client.

43. Over the years, I have been involved in hundreds of capital cases, including scores of trials and post-conviction hearings, throughout the country. I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in over two hundred fifty cases around the country. *See supra* ¶ 16. My personal experience of the effectiveness of mitigation evidence accords with the empirical research of

IFCD 00028420

social scientists who have studied the decision-making processes of actual jurors in death-penalty cases.[50]

### *How Early Mitigation Investigation Helps to Avoid Authorization and Promote Settlement*

44. Only a fraction of the cases that are eligible for federal death penalty prosecution go to trial with execution as a punishment option. Many cases are simply prosecuted in state court, where 98 percent of the death row population is found.[51] As noted *supra* ¶ 4 note 6, when death-eligible charges are filed in federal court, the Government provides defense counsel a reasonable opportunity to present information before a final decision is made about whether to file a Notice of Intent to Seek the Death Penalty. The process usually involves presenting information to the local U.S. Attorney's Office and then a presentation in writing and/or in person or by video to the Capital Case Committee at Main Justice in Washington. The ultimate decision rests with the Attorney General, so a written submission ensures that defense counsel can make their most persuasive presentation directly to the ultimate decision-maker. Even after a Notice has been

---

[50] *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness). *See also* John H. Blume et al., *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, 1038 (2008) ("The [Capital Jury Project] studies reveal that many different types of mitigation resonate with jurors. Low intelligence, mental illness, child abuse, extreme poverty, remorse, lack of a significant prior record, and lesser culpability are just some of the categories of mitigation that, in a particular case, can lead jurors to choose life over death."); *id*. at 1051 ("[E]vidence that the defendant was under the influence of extreme emotional disturbance or mentally ill at the time of the crime is also mitigating to almost half of all jurors. Almost a third of jurors found exposure to serious child abuse mitigating, and a like number found childhood poverty mitigating.").

[51] *See* DEBORAH FINS, DEATH ROW USA (Winter 2023) (finding 44 of 2,331 people on death row were federal prisoners as of Jan. 1, 2023), *available at:* https://www.naacpldf. org/wp-content/uploads/DRUSAWinter2023.pdf (last visited Jan. 1, 2024).

IFCD 00028421

filed, there have often been successful motions for deauthorization based on changed circumstances.[52]

45. As a practical matter, it is critical for the defense to provide information that the Government does not already know. The Government already knows, for example, its charging decisions and case outcomes in similarly situated cases (such as Bureau of Prison murders), so proportionality data are unlikely to add anything to the decision-making process in comparable individual cases, whereas previously confidential information about an individual defendant has the potential to offer new information to the capital calculus. It is therefore imperative to commence the mitigation investigation as early as possible in order to uncover information that may cast the defendant in a more sympathetic light or at least persuade the Government that a death sentence will not be as easily obtained as initially thought based on the crime.

46. I had related experience in this area when I served as Director of Investigation and Mitigation at the New York Capital Defender Office (1995 to 2005). New York had a statutory framework where prosecutors had 120 days from arraignment in the trial court in which to decide whether to seek the death penalty in an eligible case.[53] I know from personal experience how important it was to begin the mitigation investigation as soon as counsel was appointed, so that the defense would have information to share within that 120-day period that might persuade

---

[52] The Federal Death Penalty Resource Counsel Project has tracked the outcomes of federal capital prosecutions. By the time of Mr. Hall's capital representation, there had been a total of 465 defendants authorized for a capital prosecution (1988 to 2010), and 34 cases were pending. Of the remaining 431 closed cases, 100 had been resolved by plea agreement prior to trial; 25 had been resolved by plea during trial; 53 Notices of Intent to Seek the Death Penalty had been withdrawn prior to trial; and 12 Notices were withdrawn at trial. Thus, 185 of the authorized cases (43%) had avoided death sentences by means of a plea agreement or withdrawal of a Notice of Intent, according to a declaration by Kevin McNally, director of the project, on Feb. 24, 2010, appended hereto as Appendix A.

[53] *See* N.Y. CRIM. PROC. LAW § 250.40(2) (McKinney 2002). The notice could also be withdrawn at any time. *Id*. § 250.40(4).

IFCD 00028422

prosecutors not to elect to pursue execution in an individual case. While the New York death penalty statute was operative, there were over eight hundred cases eligible for capital prosecution, but only fifteen cases that ultimately went to trial with death as a punishment option. In most cases, prosecutors elected not to pursue the death penalty or to accept an agreed-upon disposition.[54]

### Standard of Care in Capital Mental Health Evaluations

47. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses and historical experts (i.e., the professionals who encountered the capital client long before the alleged offense).[55] Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and

---

[54] When the ABA Death Penalty Guidelines were revised in 2003, New York prosecutors had filed 780 death-eligible cases (1995 to 2003) but elected to file Notices of Intent to Seek the Death Penalty in only 48, largely owing the pre-authorization presentations by the defense. 31 HOFSTRA L. REV. at 1040-41, n.244. Pleas were negotiated in the majority of cases, including two that occurred after conviction but before the sentencing proceeding commenced. Stetler, *Commentary*, *supra* note 6, at 1158 n.3.

[55] During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81). People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999). In another case, a different school psychologist explained the impact of learning disabilities (at age eleven, reading just above a second-grade level; at fourteen, just above fourth grade; and at seventeen, just above fifth grade). People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000). In a third case, a psychiatrist had treated the client's mother after her suicide attempt when the client was nine -- thirty years before the capital trial. From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking. From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family. People v. John F. Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001). *See* Stetler, *The Mystery of Mitigation, supra* note 12 at 258 (n.92). *See also* Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109, 1123 (1997) (finding that two-thirds of the witnesses whom jurors thought "backfired" were defense experts).

IFCD 00028423

potential evidence can only be discovered through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of her life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities.[56] Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

48. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing.

---

[56] It has long been recognized that lay and expert testimony must be harmonized to be credible to the trier of fact. As one capital defense lawyer pointed out in 1988, "[T]estimony about the psycho-social development of the defendant explains the psychological diagnosis in human terms that the jury can understand." He continued,

Typical psychological testimony on sanity, competency, or diminished capacity sounds like it comes out of a textbook. Despite the best efforts of the mental health professional and the attorneys, most of this type of testimony is incomprehensible to a lay juror. There is also an unfortunate tendency to get caught up in technical terms that bore the jurors and do nothing to humanize the client. It makes little sense to spend several days putting on the testimony of relatives and friends of the defendant about the human characteristics of the defendant, and then put on a psychologist or psychiatrist who immediately turns this around by making the person sound like a casebook study out of some obscure and arcane psychology textbook.

David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (Apr. 1988) at 34, 38.

IFCD 00028424

The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

49. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. At the same time, it is important that counsel not prematurely rule out disorders and impairments simply because they have not observed florid symptoms. The signs of mental disorders typically wax and wane, and many clients are skilled at masking stigmatized impairments and conditions. It is not at all uncommon for capital defendants to present well, striving to avoid the potential shame and embarrassment of being labeled "crazy" or "retarded." Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert.[57] Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including the disciplines that

---

[57] *See* Dudley & Leonard, *Getting It Right, supra* note 40, for examples of referral questions:
• How does this type of mental health difficulty explain or contribute to the behavior of this defendant, especially as it relates to the crime?
• What is the course of this type of mental health difficulty? How do we know that the defendant was affected by the difficulty at the time of the crime?
• How do the defendant's multiple mental health difficulties interact with each other to result in the type of behavior evidenced by the defendant?
• Does the defendant suffer from mental health difficulties that the decision-maker might find mitigating even though they did not directly lead to the defendant's criminal behavior?
• Why was the defendant not treated for these mental health conditions before he was charged with this crime?
• If the defendant was never successfully treated for his mental health difficulties, does he still require, and is he still likely to benefit from treatment? And if so, is appropriate treatment available in a prison setting?
• How will the defendant's mental illness impact his ability to adjust to life in prison, including whether he is at risk of harming himself or others, and will treatment improve his ability to adjust to life in prison?

36

IFCD 00028425

study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to measure cognitive capacities or to elicit client disclosures (and/or to assess their credibility); and testifying witnesses, to name but a few. To make informed decisions about the kinds of experts that may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

50. The importance of independently corroborated social history data was also well recognized among mental health practitioners as early as the 1980s. A leading psychiatric text in that period described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis."[58] The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members."[59] Thus, "retrospective falsification, in which the patient changes the reporting of past events or is selective in what is able to be remembered, is a constant hazard of which the psychiatrist must be aware."[60] This problem is particularly acute in the forensic context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense and data on the subject's previous antisocial behavior, together with general "historical" information on the defendant, relevant medical and psychiatric history, and pertinent information in the clinical and criminological literature. To verify what the defendant tells him about these subjects and to obtain information unknown to the defendant, the clinician must consult, and rely upon, sources other than the defendant.[61]

---

[58] H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985).

[59] *Id.* at 488.

[60] *Id.*

[61] Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427, 508-509 (1980). Capital defenders also appreciated this need: "A psychologist armed with all of the records of the client's history is much better equipped to present a sympathetic and truthful explanation of the client's psychological make-up and of how the crime

37

IFCD 00028426

*Materials reviewed*

51. At the request of federal habeas corpus § 2255 counsel for Mr. Hall, I have reviewed the following materials: the direct appeal opinions affirming the convictions and death sentences of Mr. Hall, *United States v. Hall,* 945 F.3d 1035 (8th Cir. 2019), and his codefendant Wesley Coonce, *United States v. Coonce,* 932 F.3d 623 (8th Cir. 2019); the transcripts of the penalty phase proceedings relating to Mr. Hall, in the United States District Court for the Western District of Missouri, Case No. 10-cr-03029-GAF; the verdict forms regarding mitigating factors for Mr. Hall and Mr. Coonce (June 2, 2014); training records of trial counsel during their representation of Mr. Hall; trial counsel's funding applications for investigative and mental-health–related services; billing records of trial counsel, investigators, and experts; reports, correspondence (including e-mail), and work product of mental health experts employed by the defense and the Government (as well as the Bureau of Prisons) by the time of trial; and miscellaneous e-mails, correspondence, and mitigation work product, including memoranda, interview reports, and records known to trial counsel. I reviewed only material that was known or available to trial counsel at the time of sentencing.

*Overview*

---

occurred." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (Apr. 1988) at 34, 37.

IFCD 00028427

52. Mr. Hall and a codefendant, Wesley Coonce, were charged with the beating death of another prisoner, Victor Castro-Rodriguez, in the locked mental health ward of the federal medical center at Springfield, Missouri, on January 26, 2010. *United States v. Hall, supra* ¶ 51, at 1038; *United States v. Coonce, supra* ¶ 51, at 630. "Both initially objected to a joint trial, but … Hall withdrew his objection to a joint sentencing hearing" (on May 2, 2014). *Hall* at 1039. In the first phase of the trial, Coonce maintained that Hall was the driving force behind the murder. *Id*. After the joint sentencing phase, Coonce proposed three mitigating factors claiming that Coonce had played a lesser role. *Coonce* at 632; Coonce verdict form, mitigating factors 20 (more susceptible to the influence of others), 21 (lesser role than defendant Hall), and 22 (equally culpable inmates will not be punishable by death). Although Coonce had not sought an exemption from the death penalty for intellectual disability prior to trial, he did so on day fourteen of the sentencing proceeding, arguing that under *Hall v. Florida*, 572 U.S. 701 (2014), decided May 27, 2014, that age of onset might be more fluid than a rigid criterion of age eighteen. *Coonce* at 633. Coonce also presented evidence of brain damage. *Id*. at 636.

*Mr. Hall's pre-authorization representation*

53. Mr. Hall was initially represented by Darryl Johnson and Stuart Huffman, who later recused himself.[62] Mr. Johnson's spouse, Lynn Johnson, was appointed to take Mr. Huffman's place. I will sometimes refer to either combination of these lawyers generically as "initial trial counsel," since all three were gone by the time of trial. They had the assistance of an investigator, but not a mitigation specialist. Their paralegal, Sheila Cutbirth, does not appear to

---

[62] *See* Butner Forensic Evaluation at 28.

have been involved in investigation of any kind. Although the initial period is widely recognized as critical in capital defense representation (*see* ¶¶ 44-46, *supra*), these lawyers failed to utilize it to commence the thorough life-history investigation that is required, and they apparently accepted Mr. Hall's uninformed statement that he would rather receive the death penalty than a sentence of life without the possibility of release. As noted *infra* ¶ 78, Mr. Johnson reportedly told successor counsel that the original investigator was "grossly substandard" and "quickly exhausted all funding allotted for him with unnecessary tasks."

54. As I explained two decades ago, "Variants of Patrick Henry's 'liberty or death' rhetoric (often paraphrased as 'free me or fry me') are *normal* for capital defendants at some stage of the litigation."[63] These individuals are facing the two harshest punishments our law allows. They typically go through what Dr. Elisabeth Kübler-Ross popularized as the stages of grief: denial, anger, bargaining, depression, acceptance.[64] A recent case from the Ninth Circuit Court of Appeals is instructive. The Court granted penalty phase relief for failure to investigate mitigation evidence thoroughly in a case that had gone to trial forty years earlier, in 1982.[65] Trial counsel in that California case had attempted to excuse his failure to investigate mitigation promptly and thoroughly because of the client's early expressed preference for a death sentence, which included a threat to try to escape in order to be killed in the attempt if sentenced to life without parole. (Four decades later this individual has made no such attempt.) The court cited the testimony of the three expert witnesses called by habeas counsel who all described "how common it is for a client to resist life without parole and how often a client will change his

---

[63] Stetler, *Commentary on Counsel's Duty*, *supra* note 6, at 1161-62 (emphasis added).
[64] ON DEATH AND DYING (1969).
[65] Sanders v. Davis, 23 F.4th 966 (9th Cir. 2022).

IFCD 00028429

mind."[66] The opinion quoted my testimony that "[v]irtually all capital clients at the outset want to cling to the hope that the charges are all a bad dream and they will somehow go away."[67] Another expert opined that the idea of a life without parole sentence was "terrifying" to many defendants.[68]

55. Mitigation evidence is not investigated solely to identify potential witnesses and other evidence for a potential penalty phase. One of defense counsel's first duties in a potential capital case is to persuade the prosecution not to seek the death penalty. *See* ABA Guideline 10.2, Applicability of Performance Standards.[69] The Commentary to this Guideline notes that "early investigation to determine weaknesses in the State's case and uncover mitigating evidence is a necessity, and should not be put off in the hope that the death penalty will not be requested, or that the request will be dropped at a later point. Moreover, early investigation may uncover mitigating circumstances or other information that will convince the prosecutor to forego pursuit of a death sentence."[70]

56. According to ABA Guideline 10.7.A1 and A2, this duty to investigate applies "regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented" or "regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented."[71] Similarly, the Commentary to Guideline 10.9.1, The Duty to Seek an Agreed-Upon Disposition, concludes, "If the

---

[66] *Id.* at 979.
[67] *Id.*
[68] *Id.*
[69] 31 HOFSTRA L. REV. at 993.
[70] *Id.* at 994 (citations omitted).
[71] *Id.* at 1015.

IFCD 00028430

possibility of a negotiated disposition is rejected by either the prosecution or the client when a settlement appears to counsel to be in the client's best interest, counsel should continue efforts at persuasion while also continuing to litigate the case vigorously (Subsection G)."[72] Early mitigation investigation also helps to identify family members or other loved ones who care whether the client lives or dies, and these individuals may be important influences to motivate the client to want to live because they will be part of his life years into the future – visiting, taking collect telephone calls, or contributing funds to his commissary account.

57. These duties were discussed at multiple capital defense training programs during the pendency of Mr. Hall's prosecution (2010 to 2014). As I noted in ¶ 8 *supra,* the Federal Death Penalty Resource Counsel Project held annual Strategy Sessions (Austin November 2010, New Orleans November 2011, and Atlanta November 2012) and Authorized Case Trainings in this period, including specialized training programs on Bureau of Prison cases (Denver March 2010, March 2011, and March 2012), and nonspecialized programs (New Orleans June 2010, Chicago July 2011, Cincinnati July 2012, and Louisville March 2013). I served as faculty at all of them.[73] According to billing records, initial trial counsel Darryl Johnson attended the 2010 Strategy Session in Austin, where I did presentations on "Unlocking mitigation" and "Investigating

---

[72] *Id*. at 1035 (Guideline 10.9.1), 1043 (Commentary).

[73] There were numerous other death penalty training programs focused on the national standard of practice in those years, including the Habeas Assistance and Training Counsel Project, National Seminar on Mental Health and the Criminal Law (New Orleans Jan. 2011); Habeas Assistance and Training Counsel Project, National Seminar on the Development and Integration of Mitigation Evidence (Seattle Apr. 2010; Chicago April 2011; Atlanta Mar. 2012 and Baltimore Apr. 2013); Habeas Assistance and Training Counsel Project, Capital Mitigation Skills Workshop (Ithaca, N.Y Sept. 2012; Atlanta Feb. 2013; Kansas City, Missouri, Feb. 2014); National Association of Criminal Defense Lawyers, Making the Case for Life (Atlanta Sept. 2012); National Legal Aid and Defender Association, Life in the Balance (Nashville Mar. 2010 and Lake Buena Vista, Florida, Mar. 2011); and Santa Clara University School of Law, Bryan R. Shechmeister Death Penalty College (Santa Clara, California, Aug. 2010, July 2011, July 2012, and Aug. 2013).

42

IFCD 00028431

mental health, making decisions, choosing and working with experts," and the BOP program in Denver in March 2011, where I spoke on "Special mitigation problems with BOP clients."

58. Rather than recognizing and respecting the national consensus of practitioners representing people facing the death penalty – in other words, the prevailing norms of the profession – as endorsed in these training programs, the Johnsons seemed to fixate on Mr. Hall's early, uninformed statement that he *wanted* the death penalty. Mr. Johnson met with the local prosecutors and made a trip to Washington in April 2011 to discuss the death-penalty authorization decision at Main Justice. However, instead of trying to persuade the Government not to file a Notice of Intent to Seek the Death Penalty, he reportedly advocated in favor of filing such a Notice. *See infra* ¶ 77.

59. An analysis of the billing records during the entire period of their representation of Mr. Hall discloses that attorney Huffman did not interview any witnesses, before or after the Government's authorization decision.[74] During the time when the Johnsons were part of Mr. Hall's team, Ms. Johnson spent 29.7 hours interviewing witnesses and Mr. Johnson spent 36.1 hours.[75] The billing records do not provide any details about which witnesses were interviewed, or whether they were relevant to culpability, sentencing, or both. Many of the interviews were telephone calls, and the billed hours included time preparing for the interviews and reports written afterward. This tiny fraction of the initial trial team's time hardly demonstrates an early effort to investigate mitigation or the capital offense or the evidence that the Government might introduce in aggravation.

---

[74] The billing records are summarized in detail in ¶¶ 141-145, *infra.*
[75] *Id.*

43

60. Not surprisingly, the Government filed its Notice of Intent to Seek the Death Penalty on July 19, 2011.

*The competency evaluation at the Federal Medical Center, Butner*

61. Having conducted little or no social history investigation and without advice from any defense expert to which they were entitled under *Ake v. Oklahoma* (*see supra,* ¶ 6), initial trial counsel requested a competency evaluation.[76] Ms. Johnson told the Butner evaluators that the competency motion was prompted partially by "Mr. Hall's vacillation about how to handle his case (e.g., death penalty challenges)."[77] On August 3, 2011, Magistrate Judge James C. England granted the defense motion and ordered that Mr. Hall be committed to the custody of the Attorney General for a determination of his competency to stand trial.[78]

62. The risks of such evaluations were well known in the capital defense community and had been well summarized in the *International Journal of Law & Psychiatry* two years earlier.[79] The summary merits quotation at length:

> Especially in jurisdictions where resources are scarce, defense counsel may be tempted to raise a doubt as to a defendant's competence as a ruse to obtain a free evaluation of their client's functioning with the intent of using that information at a penalty phase or to raise questions of mens rea. In fact, based on anecdotal reports and post-conviction records, it is the common practice in some jurisdictions to obtain a free mental health evaluation by having a client evaluated for competency. The trick in these situations, however, is invariably played on the client. First, sending a client to a state hospital or federal medical center to be evaluated for competency may interfere with the development of trust and rapport that is essential to competent representation. Second, the client

---

[76] Butner Forensic Evaluation, transmitted January 3, 2012 (*hereinafter,* "Butner Evaluation") at 15.

[77] *Id.* In ¶ 54, *supra,* I discussed how routine such "vacillation" is among clients facing our society's two harshest penalties.

[78] Butner Evaluation, *supra* note 76, at 1.

[79] David Freedman, *When is a capitally charged defendant incompetent to stand trial?,* 32 INT'L J. L. & PSYCHIATRY 127 (2009).

44

IFCD 00028433

may well be held and observed for an extended period of time during which the defense has restricted access to the client. Third, competence to stand trial is not a substitute assessment for mitigation development as the questions being clinically assessed are vastly different. Fourth, such a practice puts the client at risk for rebuttal evidence which, although limited in scope, can be used by the prosecution. Fifth, such evaluations will inevitably be based on less information, and thereby be less reliable, than can be accomplished when the defense investigation is thorough and competently undertaken. Sixth, state hospital opinions are biased towards law enforcement and prosecution. Finally, state hospital doctors are typically not specialists, carry extensive caseloads and are underfunded. They therefore conduct assessments not particular to the symptoms and impairments of a particular client but rather conduct surface assessments without pursuing depth or nuance. This final point is the most important because when defense counsel chooses to send a client to a state or federal facility for evaluation, it suggests that counsel is seeking short-cuts to the extensive and thorough investigation required of them.[80]

63. I will not speculate on whether initial trial counsel were seeking a "free mental health evaluation" or feared that resources were scarce (although an internal memorandum by successor counsel, *infra* ¶ 71, acknowledged resource issues). However, the other enumerated risks certainly applied. Sending Mr. Hall away made it more difficult for counsel to build a relationship of trust and rapport. Their access to Mr. Hall became more restricted. The evaluation was in no way a substitute for a mitigation investigation. In fact, it provided potential rebuttal evidence for any mental health mitigation that might be developed – even though a reliable defense evaluation would build on the foundation of a social history investigation beyond the capacity of the prison evaluators. The Butner evaluators also had no specialized understanding of the assistance required from clients in a capital context.[81] The Butner Evaluation also gave the Government advance discovery of the rebuttal available in the event that the defense presented

---

[80] *Id.* at 129 (citation omitted).

[81] *See* John T. Philipsborn, *Searching for Uniformity in Adjudications of the Accused's Competence to Assist and Consult in Capital Cases*, 10 PSYCHOL. PUB. POL'Y & L., 417 (2004) (discussing the contextual differences in the assistance required in capital and noncapital cases).

IFCD 00028434

mental health mitigation – information that would otherwise have been unavailable until the defense had made an affirmative decision to offer such evidence.[82]

64. Mr. Hall was admitted to the Federal Medical Center at Butner, North Carolina, on November 6, 2011, and was under the day-to-day observation of mental health personnel there until the competency report was prepared on December 16.[83] Predictably, the Butner Evaluation was not only signed by multiple mental health practitioners (a psychologist, a psychiatrist, and a neuropsychologist), but it stated that "other members of the forensic team, correctional, and mental health staff had the opportunity to observe Mr. Hall's behavior throughout the study period, and their observations and comments were considered prior to the preparation of this report."[84] The Butner evaluators were free to administer whatever psychological tests they considered appropriate.[85] Initial trial counsel furnished a redacted report from a BOP Special Investigative Services technician and an FBI interview with Mr. Hall.[86] The Government provided over six hundred pages of discovery concerning the capital offense.[87] The team interviewed Ms. Johnson (forty-five minutes), Mr. Johnson (thirty minutes), and Mr. Hall's (adoptive) parents (fifty minutes) by telephone.[88] The parents reportedly said that "while they love their son, their relationship has suffered from his repeated lying, stealing, and ongoing trouble with the law."[89] No history of "neglect, physical or sexual abuse" was acknowledged by

---

[82] *See* Letter from Butner Warden Sara M. Revell (January 3, 2012) transmitting the Forensic Evaluation to Magistrate Judge England, AUSA Robert Eggert, and defense counsel Lynn Johnson.

[83] Butner Evaluation at 1.

[84] *Id.* at 3.

[85] *Id.* at 2-3. Not surprisingly, the MMPI-II generated a profile that placed Mr. Hall in a group that is "most similar to those who have difficulty incorporating societal values and engage in various antisocial acts, such as lying, cheating, and stealing." *Id.* at 25.

[86] *Id.* at 3.

[87] *Id.* at 4.

[88] *Id.* at 3.

[89] *Id.* at 4.

IFCD 00028435

the parents.[90] The Butner team's attempt to obtain state correctional and community mental health records in Maine were unsuccessful.[91]

65. Besides addressing the referral question of competency, the Butner Evaluation gratuitously provided an unsympathetic narrative of Mr. Hall's childhood and adult life, reflecting the law enforcement/prosecution bias discussed *supra* ¶ 62. The evaluators minimized the significance of the administration of psychotropic drugs when Mr. Hall reached federal prison.[92] They also dismissed the diagnosis of Bipolar II Disorder at FMC Rochester (Minnesota), and stressed the indications of exaggeration or feigned symptoms on psychological testing, including "inconsistent endorsement of atypical psychotic features."[93] In fact, the Butner evaluators implicitly blamed their colleagues at the Rochester medical center for offering Mr. Hall "basic education about Bipolar Disorder" symptoms, which he then endorsed.[94] They minimized the significance of his suicide attempts, but readily accepted Rochester's ultimate diagnosis of Antisocial Personality Disorder.[95] Another suicide attempt at FMC Devens prompted no further scrutiny.[96] At Devens, Mr. Hall received multiple diagnoses: Bipolar Disorder; Major Depressive Disorder; Depressive Disorder, Not Otherwise Specified (NOS); Personality Disorder (NOS); Antisocial Personality Disorder; and Psychotic Disorder (NOS).[97]

66. The Butner evaluators were dismissive of the Devens mental health diagnoses, and the treating team at Springfield that prescribed Prozac, trazodone, Geodone, and Artane for

---

[90] *Id.*
[91] *Id.* at 10.
[92] *Id.* at 11.
[93] *Id.* at 12-13.
[94] *Id*. at 13.
[95] *Id.*
[96] *Id*. at 14.
[97] *Id.*

47

IFCD 00028436

Psychotic Disorder (NOS) and Depressive Disorder (NOS), noting that Mr. Hall "volunteered for admission to the mental health unit" after he transferred to Springfield in the fall of 2009.[98] The implication seemed to be that the Springfield medical staff had allowed inmates to choose where they wanted to be housed and dispensed psychotropic drugs with little regard for whether the drugs were medically necessary and appropriate.

67. Interestingly, Mr. Hall told the Butner evaluators that his initial desire to plead guilty was "to get it over with" because he is not a patient person.[99] In addition, he "consistently denied any current intent to volunteer for the death penalty."[100] Mr. Hall reportedly added, "My lawyers think there is a good chance of acquittal. . . . As long as there is a 50-50 chance, I have to go to trial."[101] Whether initial trial counsel really told Mr. Hall that he had a good chance of acquittal, that is apparently what he heard, and it could only have fed his magical thinking about what could happen at trial at a time when he needed consistent, realistic advice about the risk of execution.[102] At very least, initial trial counsel should have educated Mr. Hall about how the death-qualification process leads to a more conviction-prone jury and drastically reduces any possibility of acquittal.[103]

---

[98] *Id.*

[99] *Id*. at 27.

[100] *Id*. at 32.

[101] *Id*. at 28.

[102] The reality of executions was well established by the time of Mr. Hall's trial. Three prisoners had already been executed under the federal death penalty (Timothy McVeigh, June 11, 2001; Juan Garza, June 19, 2001; and Louis Jones, March 18, 2003). By the end of 2014, there had been eighty executions in the State of Missouri in the modern era, including ten in that year alone. *See* Death Penalty Information Center, Execution Database, *available at:* http://www.deathpenaltyinfo.org/executions/execution-database (last visited May 29, 2023).

[103] See, for example, Craig Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process*, 8 L. & HUMAN BEHAVIOR 121 (1984); Claudia L. Cowan et al., *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation,* 8 L. & HUMAN BEHAVIOR 53 (1984); Phoebe Ellsworth, *To Tell What We Know or Wait for Godot*, 15 L. & HUMAN BEHAVIOR 77 (1991) (discussing fifteen studies of death-qualification biasing cited in American Psychological Association amicus brief in Lockhart v. McCree).

IFCD 00028437

68. The Butner evaluators agreed on a "principal diagnosis" of Antisocial Personality Disorder, as well as Depressive Disorder, Not Otherwise Specified.[104] They opined that "a personality disorder, and at times malingering, better account for symptoms previously ascribed to a major mental illnesses [sic]."[105] They provided a detailed description of Antisocial Personality Disorder, including why it is extremely difficult for those affected to abandon ingrained dysfunctional habits.[106] Mr. Hall was deemed competent to proceed in the opinion of the evaluators and returned to Court for the ultimate competency determination.[107]

*Pretrial preparation by the ultimate trial team*

69. Mr. Hall's initial lawyers failed him in important ways. They failed to assemble the minimal team that was recognized as essential in capital defense. They conducted little investigation themselves. They did not try to dissuade the Government from seeking Mr. Hall's execution. They exposed Mr. Hall to weeks of scrutiny by Government mental health experts who took every opportunity to develop evidence that could rebut any potential mental-health mitigation – and they provided this advance discovery of potential rebuttal before any decision had been made by the defense to put mental health evidence in issue. And then they withdrew from the case.

70. Frederick Duchardt was appointed as successor counsel on August 21, 2012. The three initial lawyers were gone, and Mr. Duchardt was appointed along with Robert Lewis and, later, Michael Walker. According to an undated (and unfinished) Case Summary (*hereinafter,*

---

[104] Butner Evaluation at 28.
[105] *Id.* at 30.
[106] *Id.*
[107] *Id.* at 32-33.

49

IFCD 00028438

Duchardt Case Summary) apparently prepared by Mr. Duchardt as trial approached in 2014,[108] Mr. Lewis became ill during the representation and Mr. Walker was relatively new to the case, so the lion's share of the work fell to Mr. Duchardt.[109] The failings of the initial team made their job harder, both in terms of developing a relationship of trust with Mr. Hall and in preparing for a penalty phase. The new team needed to learn everything that they could from the collective experience of the capital defense community. Both Mr. Duchardt and Mr. Lewis did attend the Strategy Session in Atlanta in November 2012 (where I did presentations on life-history investigation and mental health evidence in federal death penalty cases).[110] According to records of the Defender Services Office Training Division, this was the only federal death penalty training program attended by Mr. Duchardt during the pendency of Mr. Hall's prosecution.[111] However, Mr. Duchardt continued to pursue his own idiosyncratic approach to capital defense.

71. Ignoring or rejecting the national consensus of practitioners representing people facing the death penalty – in other words, the prevailing norms of the profession – Mr. Duchardt instead looked for authority for *not* hiring a mitigation specialist or seeking the funds required for effective representation when facing the virtually unlimited resources of the Department of

---

[108] The Duchardt Case Summary was apparently last worked on in April 2014 because it refers to his writing to Mr. Hall's birth mother on April 1, 2014. *Id.* at 11. Section XIII ends in mid-sentence, "By the fall of . . ." *Id*. at 21. There are titles for six more sections, but no content. Although this memorandum does summarize Mr. Duchardt's view of the case, it contains needless detail on the belated successful effort to find Mr. Hall's birth mother and memorializes Mr. Duchardt's reasons for various courses of action.

[109] *Id*. at 4.

[110] *See* Mr. Lewis's records relating to attendance of this program reflecting that he was awarded a scholarship covering travel and lodging. His records also confirm that Mr. Duchardt attended and that I was on the faculty. TF.RL.03.000716. *See also* e-mail from Chastain Smith, Meeting Manager, Training Division of the Defender Services Office of the Administrative Office of the United States Courts, to Russell Stetler, Aug. 17, 2022, 2:18 P.M.

[111] E-mail from Smith to Stetler, *supra* note 110.

IFCD 00028439

Justice in a federal death penalty prosecution.[112] On February 22, 2013, Mr. Duchardt e-mailed

co-counsel Robert Lewis about the Fifth Circuit Court of Appeals decision in *United States v.*

*Snarr,* 704 F.3d 368 (5th Cir. 2013):

> I came across this case today, out of the 5th Circuit last month. It covers lots of issues dear to our hearts. I draw particular attention to the last issue addressed, a limitation placed on professional expenses in the case. This just confirms my fear that we'll see such a limitation placed on us, and that's why I have been loath to spend any money on a "mitigation specialist," and want to keep whatever resources we might get trained on real experts. I'm not trying to convince you, because I know you are already on board with the strategy. I just wanted you to know that it appears we are right on.

Mr. Lewis responded:

> The *Snarr* case certainly does address our issues. I have analyzed what a mitigation specialist would do in our case that you and I (mainly you) have not already done. Our numerous face to face conferences with Chuck [Hall] have explored in depth what areas of mitigation we might have available to us. The truth of the matter is: In my opinion, you are in fact a mitigation specialist.

72. There are multiple flaws in their outlier analysis (aside from the fact that Mr. Snarr

had been sentenced to death, as the opinion affirmed). First, conferences with the client are not

the only means of identifying areas of mitigation. As the Supreme Court noted in *Rompilla v.*

*Beard, supra* ¶ 2 at 377, 379, counsel could be found deficient "even when a capital defendant's

family members and the defendant himself have suggested that no mitigating evidence is

available" and despite consulting three mental health experts. Second, the report of Judge

Spencer's subcommittee, *supra* ¶ 23, noted in 1998, "Because the hourly rates approved for

---

[112] *See* the Public Funds Hourly Rate Chart of Park Dietz Associates, Inc. (last updated Mar. 9, 2010), attached to this declaration as Appendix B. *See also* Pamela Manson, *Psychiatrist at Mitchell hearing worth his $500,000 fee, U.S. attorney says,* SALT LAKE CITY TRIB., June 1, 2010, *available at:* https://archive.sltrib.com/article.php?itype=NGPSID&id=14033588 (discussing kidnaping case where Government expert billed for a thousand hours, while defense experts were authorized to bill about 10 percent of what the Government spent); Jennifer Dobner, *Competency hearing ends for Smart kidnap suspect,* https://www.NBCnews.com/id/ (Apr. 30, 2009) ("Federal prosecutors, who paid [psychiatrist Michael] Welner $500,000 for his evaluation, contend his 205-page report is more complete than any previous evaluation.")

IFCD 00028440

mitigation specialists are substantially lower than those authorized for attorneys, the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation." (Citation omitted.)[113] Client conferences involving *two* lawyers were hardly reducing costs – and the hourly rates of mental health experts were even higher than those paid to lawyers. Third, as I pointed out *supra* ¶ 23, even if lawyers had the training, skills, and patience, they do not have the time to conduct thorough mitigation investigation because of all the other work that is demanded of them in representing a capital client.

73. Counsel seemed to believe that the client was responsible for identifying mitigation witnesses, rather than understanding that they had an obligation to conduct a thorough, expansive mitigation investigation that would have disclosed witnesses that might not have been remembered by, or even known to, the client and his family, such as the authors of reports and evaluations that should have been obtained in gathering multigenerational life-history documentation (as discussed *supra,* ¶¶ 4, 34). Counsel need to approach mitigation investigation at every stage with a spirit of curiosity aimed at discovering new sources "until the information uncovered becomes redundant and provides no new insight" (as described *supra,* ¶ 38). Or, as another capital defense specialist put it nearly forty years ago, "Talk to everyone that you can find who has ever had any contact with the defendant" (*supra* ¶ 19).[114] This fundamental point –

---

[113] The hourly rate of lawyers in federal death penalty cases under the Criminal Justice Act at the time Mr. Duchardt entered the case was not to exceed $178. GUIDE TO JUDICIAL POLICY, VOL. 7, DEFENDER SERVICES, PART A, GUIDELINES FOR ADMINISTERING THE CJA AND RELATED STATUTES, CHAPTER 6: FEDERAL DEATH PENALTY AND CAPITAL HABEAS CORPUS REPRESENTATIONS, § 630.10.10(A) Capital Hourly Rates. Mitigation specialists were generally paid no more than $100 per hour at that time. *See* note 116 *infra.*

[114] For a thoughtful analysis of the legal and ethical problems in conceding strategic decisions to clients in a death penalty case, *see* W. Bradley Wendel, *Autonomy Isn't Everything: Some Cautionary Notes on* McCoy v. Louisiana, 9 ST. MARY'S JOURNAL ON LEGAL MALPRACTICE & ETHICS 92 (2018) (as a matter of constitutional law

IFCD 00028441

not relying on the client's self-report or witnesses solely identified by the client – had been stressed in capital defense training throughout the modern era and in numerous articles prior to Mr. Hall's trial.[115]

74. A year after the Butner competency evaluation, Mr. Duchardt engaged the services of a neuropsychologist, Robert Fucetola, Ph.D., who spent twelve hours over two days (January 12-13, 2013) interviewing Mr. Hall and administering a flexible battery of neuropsychological tests at the private prison (Corrections Corporation of America) in Leavenworth, Kansas, where Mr. Hall was then held. Fucetola Evaluation at 1-6, 9. Dr. Fucetola's clinical interview reported leads from Mr. Hall that should have been followed, including the drinking of both adoptive parents (beer nightly for the father, vodka martinis on the weekends for the mother), and drunken arguments in which Mr. Hall said the parents threw things at one another). *Id*. at 2. Mr. Hall also reported that his adoptive sister, Michelle, had three children by three different fathers and had made, but later recanted, an allegation of sexual abuse during childhood. *Id*. According to Dr. Fucetola's report, Mr. Hall told him that he had a lot of childhood friends. *Id.*

75. Dr. Fucetola's twelve-page report was based on thirty-five pages of his own handwritten notes. He had also reviewed over three hundred pages of records. Dr. Fucetola

---

and professional ethics, the preference for autonomy and the standard allocation of decision-making authority presupposes a fully competent client, not a client who merely passes the extremely low constitutional bar of competency to stand trial). "State rules of professional conduct recognize a distinction between decisions concerning the objectives of the representation and those concerning the means by which they are to be pursued; the former decisions are for the client to make, and while lawyers should consult with clients about means decisions, they are presumptively within the lawyer's authority. The client may be 'the master of his or her own defense[,]' but the lawyer is 'captain of the ship' when it comes to matters of trial strategy.'" *Id*. at 108 (citations omitted).

[115] *See,* for example, Russell Stetler, *The Unknown Story of a Motherless Child,* 77 UMKC L. REV. 947 (2009) (discussing case where habeas corpus relief overturned death sentence where trial counsel relied on expert whose testimony was based entirely on client's self-report). "[O]ne of the prosecution's main strategies in cross-examining the defense psychologist at trial was to show that she relied entirely on [defendant]'s self-report and he was 'probably lying about his traumatic childhood.' According to the circuit court, '[e]ven reading a cold record, it is clear that this strategy was effective*.'" Id*. at 950 (citations omitted).

IFCD 00028442

enumerated the records reviewed as follows: (1) Young School, Saco, Maine (grades 1 to 3); (2) C. K. Burns School, Saco, Maine (grades 4 and 5); (3) Saco Middle School (retained in sixth grade); (4) Thornton Academy (ninth grade at age fourteen; records noted that he had attended Shaker Mountain School the year before); (5) Homestead Project, Ellsworth, Maine (with master treatment plans 1987 to 1989); (6) records from the Butner evaluation; and (7) superseding indictment in the capital prosecution. Fucetola Evaluation at 6-8.

76. The results of neuropsychological testing were mostly within normal limits and largely unremarkable, although there were deficiencies in visual memory, visual/nonverbal reasoning, and left-hand motor speed. *Id*. at 12. Dr. Fucetola could not determine the etiology of the deficiencies; in other words, whether they were neurodevelopmental (lifelong), posttraumatic (e.g., from a head injury), or "otherwise" (none of the above). *Id*. He did not find that Mr. Hall had malingered or exaggerated his cognitive deficiencies, as confirmed by several tests of symptom validity. *Id*. at 11. From the perspective of mental health mitigation, the findings were comparatively undramatic.

77. On August 22, 2013, Mr. Duchardt sent Assistant U.S. Attorney Randall D. Eggert a memorandum requesting reconsideration of the Attorney General's authorization to seek the death penalty based solely on his review of other Bureau of Prison cases where defendants had been permitted to plead to non-death sentences or where juries had declined to impose the death penalty or where he attributed death sentences to more aggravated facts. *All this information was known to the Department of Justice.* Mr. Duchardt alluded to the "meager presentation originally made on Mr. Hall's behalf by previous counsel." Duchardt Memorandum to Eggert, Aug. 22,

IFCD 00028443

2013, at 1. Mr. Duchardt was more forthcoming in a memorandum to his co-counsel as trial approached in 2014:

> According to accounts from former defense counsel Darryl Johnson and from [AUSA] Eggert, when the audience was had with the DOJ capital case committee in Washington, Johnson actually lobbied in favor of authorization of the death penalty. According to both Darryl and Chuck [Hall], Darryl approached things in this fashion at Chuck's instance, if not insistence.

Duchardt Memorandum to Bob Lewis/Mike Walker, March 2, 2014.

78. On August 23, 2013 – roughly a year after Mr. Duchardt's appointment as Mr. Hall's counsel – he applied for and obtained funding for a "case and mitigation investigator," Michael ("Mic") Armstrong. Ex Parte Request for Funds to Hire a Case and Mitigation Investigator, PACER Doc. 375, filed Aug. 23, 2013. He explained that it was his standard procedure to use one investigator for both "case and mitigation" investigation, as he had done in three prior cases before this same federal judge. *Id*. at 2-3, ¶ 5 (citing, among others, the federal death penalty prosecutions of German Sinisterra, Wesley Purkey, and John P. Street before Judge Fenner). Mr. Duchardt noted that prior counsel for Mr. Hall had obtained funding for a different investigator but Mr. Johnson had informed Mr. Duchardt that the prior investigator was "grossly substandard" and "had quickly exhausted all funding allotted for him with unnecessary tasks such as reviewing discovery on subjects not pertinent to investigative tasks, and failed to conduct other tasks that Mr. Johnson had assigned to him." *Id.* at 3, ¶ 6. Mr. Duchardt said that the CJA coordinator had also told him that this investigator thought "he was entitled to even more payment than he had received" and was therefore "disgruntled." *Id*. at 3-4, ¶ 6.

79. Mr. Duchardt instead proposed using the services of Michael Armstrong, with whom he had worked for twenty-eight years (80 percent of Mr. Armstrong's thirty-five-year career as a

IFCD 00028444

private investigator). *Id.* at 4. Mr. Duchardt averred that Mr. Armstrong would accept a rate of $50 per hour – below his "normal" rate, below the prevailing rate for "normal investigative services," and "about one-half to one-third the rate charged by *so-called mitigation specialists* for similar services." *Id.* at 4-5 (emphasis added to highlight Mr. Duchardt's disparagement of mitigation specialists). I can attest that mitigation specialists working on federal death penalty cases at that time were not routinely paid two to three times Mr. Armstrong's rate. The presumptive hourly range at that time was $75 to $100.[116] Mr. Duchardt alluded to hundreds of witnesses throughout the country who needed to be interviewed. *Id*. at 5. Judge Fenner signed the order authorizing funding on September 5, 2013. Order Granting Ex Parte Funding Request, PACER Doc. 379, Sept. 5, 2013. However, it was not until five months later that Mr. Duchardt sought and obtained authorization for Mr. Armstrong to travel to Texas between March 2 and March 9, 2014, to locate Mr. Hall's birth mother. Ex Parte Request for Travel Authorization, PACER Doc. 511, Feb. 24, 2014; Order Authorizing Travel, PACER Doc. 526, Feb. 26, 2014.

80. I have already discussed in this declaration how mitigation specialists had become part of the standard of care in federal death penalty cases two decades earlier (*supra,* ¶¶ 23-24) and how defense teams are needed as soon as counsel have been appointed. I have also written about the specific need for two investigators with different skill sets. Just as capital defense teams typically utilize two lawyers with complementary skills who share the immense burden of defending a death penalty case, so also is it necessary to divide the investigative responsibilities. As I wrote many years ago:

---

[116] *See* Defender Services Committee Memorandum, Dec. 10, 2019, at 2-3 (discussing revision of experience-based service provider rates in CJA "mega-cases" and noting that the recommended hourly-rate range for mitigation specialists set in 2013 was $75 to $100 based on the judiciary's budgetary constraints in fiscal years 2012 through 2014), *available at:* 2019-dec-10_dsc_memo_re_rev_experience-based_hourly_rate_changes_002.pdf (fd.org) (last visited Jan. 15, 2024).

IFCD 00028445

In the area of fact development as well, two heads are better than one. An uncommonly gifted individual with expertise ranging from DNA to the DSM can't diligently pursue the two investigative tracks that are part of every capital case: the reinvestigation of the factual allegations which constitute the capital charges, and the biographical inquiry aimed at discovering mitigating evidence that may inspire mercy or compassion in the hearts of jurors. Putting aside whether there are any such renaissance investigators, we can see at the outset that two very different skill sets are involved in the different tracks.[117]

81. In the winter of 2013-14, Mr. Duchardt retained a psychiatrist who interviewed Mr. Hall for only three and a half hours, but eventually offered opinions on a wide variety of subjects. John H. Wisner, M.D., interviewed Mr. Hall for an hour and a half on December 10, 2013, and two hours on January 23, 2014. Wisner Psychiatric Evaluation (February 9, 2014) at 1. Dr. Wisner also reviewed elementary and secondary school records (including Saco, Maine School records: Young School, grades 1-3; C. K. Burns School, grades 4-5; Saco Middle School, grades 6-8, and Thornton Academy High School), Homestead Project records, medical records (including those from correctional institutions), a revised pre-sentence report from Maine in 2001, and reports relating to the capital offense. *Id*. at 1-2. Although the American Psychiatric Association had abandoned the multiaxial diagnostic system in the fifth revision of its *Diagnostic and Statistical Manual of Mental Disorders* in 2013,[118] Dr. Wisner used the abandoned system for his diagnoses: Axis I: Affective (mood) Disorders; Axis II: Antisocial Personality Disorder; Axis III: Inflammatory Bowel Disease (Crohn's disease); Axis IV: severe medical illness, incarceration, and facing capital charges; and Axis V: Global Assessment of Functioning 45 (able to perform self-care but institutionalized). *Id*. at 6.

---

[117] Stetler, *A Duty That Demands Expert Help*, supra note 34, at 62.

[118] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed., also known as DSM-5) 16-17 (2013).

IFCD 00028446

82. Dr. Wisner's nine-page report covered Background (review of school and medical records, Butner Forensic Evaluation, presentence report from 2001, superseding indictment, and reports relating to capital offense) (*id*. at 1-2); Past Psychiatric History ("no documented history of diagnosed mental illness prior to his imprisonment in the Federal Bureau of Prisons"; three suicide attempts; Antisocial Personality Disorder diagnosis "assigned by some, but not all, mental health evaluators and treating professionals") (*id.* at 2); Past Medical History (1994 motorcycle accident with helmeted head contacting pavement; 1993 diagnosis of Crohn's Disease; ileostomy; nearly chronic doses of prednisone, which has the potential to produce difficulty controlling emotion, difficulty in maintaining train of thought, depression, mania, psychosis, or other psychiatric symptoms such as mental confusion, poor memory and attention, insomnia and anxiety) (*id.*at 2-3); Examinations (two private interviews) (*id.*at 3); Review of Psychiatric Symptoms (anxiety, nearly chronic depressed mood, exacerbated by concern about taunting because of his ileostomy, accusatory auditory hallucinations; episodes of becoming unaware of surroundings) (*id.*at 3-5); Mental State at the Time of the Offense (felt "disrespected" by victim and "humiliated" in front of others) (*id.*at 5); Mental Status Examination (alert and oriented; constricted range of emotions; memory grossly intact, but consistent difficulty associating dates and events) (*id.*at 5-6); Diagnoses (*see supra*, ¶ 77) (Wisner Report at 6); Discussion (current consensus that psychiatric and gastrointestinal conditions are mutually exacerbating; duress from Bipolar Mood Disorder, derogatory hallucinations, persistent anxiety) (*id.* at 7-8); and Conclusions (two statutory mitigating factors: unusual and substantial duress, and severe mental and emotional disturbance; consensus of professional organizations is that psychiatric predictions of future dangerousness are imprecise, but Mr. Hall's risk factors for

IFCD 00028447

future violence "are recognizable, relatively overt, and capable of being recognized and appropriately dealt with in a treatment/detention setting" with consistent approach utilizing mood stabilizing and anticonvulsant agents) (*id.* at 8-9).

83. Dr. Wisner became trial counsel's all-purpose expert: on mental health and statutory mitigation (*supra*, ¶¶ 81-82), future dangerousness (*id.*), and also on the standard of care for the psychiatric patients at the Federal Medical Center at Springfield. Wisner Addendum to Psychiatric Evaluation (April 28, 2014). At Mr. Duchardt's request, he reviewed the video surveillance around the time of the capital offense, as well as the Post Orders covering inmate management and observation in effect at the time. *Id.* at 1. He summarized standards based on his experience as chief medical officer of the inpatient medical facilities at the Veterans Affairs Medical Center in Kansas City, Missouri, and the Kansas University Hospital in Kansas City, Kansas. *Id.* at 2. He acknowledged that there was a risk of greater behavioral disturbance and mental instability in the Bureau of Prisons patient population (*id.*) but concluded that at the time of the capital homicide FMC Springfield "failed to apply the appropriate standard of care with regard to patient observation and monitoring" (*id.* at 3). The addendum notes that Dr. Wisner also saw Mr. Hall for the third time on March 4, 2014, but makes no additional reference to that interview. *Id.* at 1. The third page of Dr. Wisner's handwritten notes from that visit (discussing the homicide) report that Mr. Hall told the psychiatrist he "knew he'd be busted" but "didn't know Feds had death penalty."

84. As trial approached, Mr. Duchardt wrote a memorandum to his co-counsel discussing, among other things, his last request for reconsideration of the Government's decision to authorize pursuit of the death penalty. Duchardt Memorandum to Bob Lewis/Mike Walker,

IFCD 00028448

March 2, 2014. At that point, he had only "proportionality research" (information known to the Government about the outcomes of other BOP cases), and the report of psychiatrist John H. Wisner, M.D., from February 2014, discussed *supra* ¶¶ 81-83, but not actually mentioned in Mr. Duchardt's deauthorization request letter. In any event, by then the Government already had, as a result of initial trial counsel's ill-advised competency motion, advance discovery of the potential rebuttal to any mental health mitigation. Nonetheless, in this March 2, 2014, memorandum, Mr. Duchardt blamed Mr. Hall for his abandonment of efforts at reconsidering the authorization. *Id.* at 2. Until Dr. Wisner produced his report, Mr. Duchardt had also apparently hoped that the psychiatrist might support a first-phase defense of insanity or diminished capacity. *Id.* at 3.

85. According to this memorandum, as of Saturday March 1, 2014, Mr. Hall remained stuck in the "free me or fry me" stage, discussed *supra* ¶ 54. It was not that Mr. Hall wanted the death penalty, understanding "that there is a slim-to-none chance upon these facts for acquittal, but he still wants to take that slim-to-none chance." *Id.* at 5. Of course, if Mr. Duchardt had kept Mr. Hall's hopes alive until then with the possibility of a successful suppression motion or an affirmative mental-state defense, it is hardly surprising that Mr. Hall had not moved on in the direction of accepting the near certainty that a death-qualified jury would convict him. Mr. Duchadt concluded this section of his memorandum to co-counsel as follows: "Because Chuck [Hall] does not fear the death penalty, and even sees it preferable in certain ways, he wants it to remain on the table, as he believes that it keeps appeal options open which would close otherwise; therefore Chuck does not want the government to deauthorize, and wants us to stop trying to make that happen." *Id.*

60

IFCD 00028449

86. Mr. Duchardt memorialized that he did discuss with Mr. Hall the conviction-proneness of a death-qualified jury as a reason to pursue deauthorization, but he simultaneously discouraged efforts to deauthorize by advising Mr. Hall (and his co-counsel) that "prior national experience . . . teaches that there is always a quid pro quo, withdrawal of a death notice in return for a guilty plea." *Id* at 6.

87. Mr. Duchardt's memorandum to his co-counsel on the eve of trial also noted that the case might have been resolved by means of a negotiated disposition in the summer of 2013. There was apparently a point where Mr. Hall was willing to plead guilty. (In fact, in justifying his abandonment of any effort to deauthorize the case, Mr. Duchardt wrote, "Since Chuck (Hall) will not *offer back* the guilty plea, going back to Main Justice is a near lock to be a waste of time." *Id.* (emphasis added). According to the memorandum, AUSA Eggert had "trolled out the possibility of a negotiated settlement," but later "pulled out" of the plea negotiations. Mr. Hall had been interested if he could be assured placement in a facility where his Crohn's could be properly treated. *Id.* Surely any prisoner with such a medically complex condition should be constitutionally assured proper treatment, but Mr. Duchardt chose to exacerbate Mr. Hall's worst nightmare: "Chuck [Hall] rightly reminded me of what I told him during the summertime negotiations, that even if recommendations about his care were agreed to by prosecutors and obtained from the Court at sentencing, the BOP would still be free to ignore those recommendation if it saw fit in light of its statutory authority in such regards." *Id.*

88. At the same time, Mr. Duchardt's advice must have been confusing. He told his co-counsel that he had also assured Mr. Hall that he would continue to fight "for proper care for his Crohn's even if that meant me doing pro bono work after the criminal case was completed." *Id.*

61

IFCD 00028450

It would probably have been more reassuring – and more accurate – simply to acquaint Mr. Hall with the organizations that already litigate prison conditions, including medical care, such as the American Civil Liberties Union National Prison Project and the litigators in Denver who have challenged conditions at the United States Penitentiary AdMax in Florence, Colorado. The reality is that the Chief Medical Officers in the Bureau of Prisons will usually want to send an individual requiring the complex care of an ileostomy and inflammatory bowel disease to a federal medical center equipped with skilled nursing care and a full complement of specialists. Ironically, the exception is that death-sentenced prisoners may be placed at Terre Haute even though in-patient hospital care is less available there for flare-ups but custody status trumps medical needs.[119]

89. Although the memorandum concludes with an assurance that Mr. Duchardt would continue to prepare for the penalty phase with Mr. Hall's full cooperation, it further clarified that Mr. Duchardt had already culled "the list that he [Mr. Hall] had prepared for us for possible interview for many reasons, including for the sake of his parents, and their possible embarrassment." *Id.* at 7. Mr. Duchardt had already assured Mr. Hall that he had reduced the list to "just a few for actual interview, mostly because we determined that those few people would be the only ones with much to add." *Id*. In other words, Mr. Duchardt decided not to interview witnesses without knowing what they might have offered to expand his view of potential mitigation themes.

---

[119] *See* the testimony of psychiatrist James Kennedy, M.D. (Mr. Hall's psychiatrist at FMC Devens), noting that the Bureau of Prisons would likely place Mr. Hall in one of its four medical centers because of his Crohn's disease.

62

IFCD 00028451

90. Mr. Duchardt worked on a Case Summary that appears to have been fully outlined but never completed. It reads like a work in progress, where parts had been updated and he ran out of time to discuss or update some important areas. Nonetheless, it is a useful summary of pretrial preparation.

91. There were nineteen sections altogether, but only twelve were completed. Duchardt Case Summary at 21. Section I covered first-phase evidence and Mr. Hall's decision to "roll the dice." *Id.* at 1-2. Mr. Duchardt concludes that "there would have been a very creditable defense" if Mr. Coonce and Mr. Hall had not made statements incriminating themselves. *Id.* at 1. While each defendant had described the other as playing a more minor role, the Coonce team was expected to "continue into trial with the blame-it-on-Chuck defense." *Id.* Mr. Duchardt states that Mr. Hall has been cooperative, but has "drawn the line at certain things." *Id.* at 2. According to the Case Summary, Mr. Hall insisted on "a full defense," and thus trial counsel were "tasked to come up with a creditable first phase defense, followed by a creditable second phase defense." *Id.*

92. Section II of the summary outlines the first phase defense, including "legalistic" arguments against admitting Mr. Hall's statements, the general lack of physical evidence (and an alternative explanation for the victim's blood on Mr. Hall's shoe), the impeachability of incarcerated informants, and frontloading[120] mitigation (although he does not use the term)

---

[120] The research of the Capital Jury Project has disclosed that jurors frequently discuss punishment during the guilt phase of capital trials and decide on the death penalty even before the sentencing phase has begun. *See, e.g.,* William J. Bowers et al., *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision Making,* 83 CORNELL L. REV. 1476, 1488 & tbl.1, 1491-92 (1998) (explaining that interviews with 864 capital jurors in eleven states revealed that almost half of those jurors believed they knew what the punishment should be before the sentencing phase of trial began and that approximately seventy-five percent of those jurors never wavered from their initial choice). This research has led to the well-established capital defense practice of "frontloading" mitigating evidence during voir dire and the guilt-innocence phase of the trial.

IFCD 00028452

where possible. *Id.* at 2-4. Section III covers aggravating factors that had been dismissed or abandoned (and the risk of door opening to bring them back). *Id.* at 4-5.

93. Section IV covers the statutory aggravation, which "will be dealt with mostly in the first phase." *Id.* at 5-6. Section V discusses future dangerousness. *Id.* at 6-7. Section VI discusses grave indifference to human life, *id.* at 7; Section VII lack of remorse, *id.*; and Section VIII the Government's claim that the victim was killed in retaliation for his assisting prison officials, thus adding obstruction as a factor favoring death, *id.* at 7-8. The remaining sections of the Case Summary cover mitigation-related issues. *Id.* at 8-21.

94. Section IX discusses Mr. Hall's birth history and the search for his biological parents. *Id.* at 8-11. Although Mr. Duchardt acknowledged that "obviously" finding and interviewing Mr. Hall's biological birth parents was "one of our critical tasks," it was left to the last minute.[121] *Id.* at 8. Records from the Maine Department of Health and Human Services disclosed that Mr. Hall's birthmother was a teenager named Betty Jo Kelley who was living in Turnersville, Texas,

---

John H. Blume et al.*, Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation,* 36 HOFSTRA L. REV. 1035, 1044 (2008). *See also* Jesse Cheng, *Frontloading Mitigation: The "Legal" and the "Human" in Death Penalty Defense,* 35 L & SOC. INQUIRY 39 (2010) (discussing theory and practice of introducing mitigation as early as possible); Ashley Peterson, *Why Abolishing the Insanity Defense Is Unconstitutional In Death Penalty Cases,* 2 IDAHO L. REV. SPOTLIGHt 1, 14 (2023) ("strategy of injecting mitigating, penalty-type knowledge into the guilt phase to smooth over the divide between guilt and penalty phases is called 'frontloading'").

[121] In fact, a great deal was left to the last minute. In many instances, the Government had already interviewed potential mitigation witnesses before defense counsel bothered to do so. Mr. Duchardt "seriously considered immediately involving the government in the search [for the birth mother] by sharing with them what information we have, and asking them for help in the location process. The biggest reason why I chose to delay is that it is probable, if not a lock, that if [FBI agent] Rick McLain got to them first, he would have attempted to poison the well for us, *as he tried to do with every background witness he interviewed before our team got into the case."* Duchardt Case Summary at 9 (emphasis added). *See also* David J. Novak, *The Anatomy of a Federal Death Penalty Case: A Primer for Prosecutors,* 50 S.C. L. REV. 645 (1999) (urging prosecutors to seek mental health discovery; interview family members early, and find witnesses not aligned with defense). XIV. Defending Against the Mitigation Case (671-73).

IFCD 00028453

at the time of Mr. Hall's birth in 1971. *Id.* She was staying with her brother, Ray Holmes, in Maine at the time she gave up the baby for adoption. *Id.* Mr. Duchardt made a trip to Texas in December 2013 when he thought he had identified the birth mother through a database, but it turned out to be someone else with the same name. *Id*. at 8. In March 2014, Mr. Duchardt dispatched his investigator Mic Armstrong to Texas, to focus on Turnersville (a town of three hundred), where the investigator learned that the Kelleys had some notoriety. The town "gossip" was that "all those Kelleys are inbreeders." *Id.* at 9, 11. Mr. Armstrong found that Betty Jo had married David Smith and now lived in the Fort Hood area (a little over forty miles due south of Turnersville). *Id*. at 10.

95. The clumsy attempts to deal with this extremely sensitive witness were summarized by Mr. Duchardt himself, and his account documents why a trained mitigation specialist would have been preferable for the sensitive task of approaching a woman who had given up her child for adoption four decades earlier. (*See, supra* ¶ 39, for a discussion of the skills needed when exploring shameful subjects like a high school pregnancy, especially one attributed to a rape.) The investigator apparently left a business card or note at the home of Betty Jo Smith. *Id.* at 10. According to the Duchardt Case Summary:

> That same afternoon, March 5 [2014], Mic [Armstrong] got an aggravated call from David Smith who purported to be the husband of the woman we were looking for and wanted to know why we were hunting her. . . . In light of the nature and tone of the call, Mic alerted me, and I took on the task of calling back David. I explained to David who we are, that we believe his Betty Jo Smith is the Betty Jo Kelley who is the birth mother of our client, Chuck Hall, and that we need to talk to Betty Jo. David explained that he would have Betty Jo call me that same evening.
> Lo and behold, that same evening I received a call from Betty Jo Smith whose first words to me were "I thought those adoption records were sealed." With that obvious confirmation that we had the right person, I started trying to interview her about the critical information which we need about her. However,

65

IFCD 00028454

> answers I was getting were extremely brief. What Betty Jo said was that she had prenatal care, but does not remember from whom. Betty Jo also said that there are no hereditary issues in her family, but was not willing for me to go into details about that. Betty Jo additionally said that she did not know who the father was because she was "gang raped." And Betty Jo said she had not seen Chuck then, and does not want to see or hear from him now.

*Id.* Because Betty Jo had been "circumspect," Mr. Duchardt instructed Mr. Armstrong to interview other members of her family.

96. The next day, Mr. Armstrong began talking with relatives, but when David and Betty Jo learned about it, they called Mr. Duchardt, and he agreed to stop the family interviews in return for Betty Jo's agreement to talk with him. *Id.* at 11.[122] Mr. Duchardt told Betty Jo that he wanted to meet with her in person and that he "would write to her to further explain things, and set the stage for a meeting between us." *Id.* Weeks went by, and when she received no letter, Betty Jo called Mr. Duchardt on April 4 and said she "would meet me *at my hotel* in her area at 4:30 p.m. on April 18 [2014]," ten days before jury selection began. *Id.* (emphasis added). The Duchardt Case Summary does not indicate whether a meeting actually happened, but Mr. Duchardt was already thinking it was "highly unlikely that she would do us any good at trial. To the contrary, we might be perceived as bullies for making her come forward with such a difficult story." *Id.*[123]

---

[122] I advised against such agreements a quarter century ago when I wrote that the defense team should "never let one witness control or limit our access to others." Stetler, *Mitigation Evidence, supra* note 5, at 39.

[123] The problems documented here are manifold. Mr. Duchardt agreed not to interview other witnesses who may have been more reliable and candid about Betty Jo's teenage pregnancy. This critical investigation was occurring on the eve of trial. Mr. Duchardt did not want trial counsel to be perceived as "bullies" by calling Mr. Hall's biological mother as a witness, but he seemed to ignore the fact that the best witnesses might be others who knew her at the time of the pregnancy. In any event, she was not the only witness who could tell her "difficult story," but he agreed not to speak to them and instead to accept her uncorroborated version of the facts about Mr. Hall's mother and her lineage – not to mention her claim that the biological father was an unnamed assailant among anonymous participants in a gang rape. There was no attempt to identify Mr. Hall's biological father even though this man contributed half of Mr. Hall's DNA.

66

IFCD 00028455

97. Section X covers Mr. Hall's adoption and relationship with his adoptive family. *Id.* at 12-13. It does not even purport to chronicle Mr. Hall's childhood and developmental influences because trial counsel seemed to view his family as little more than potential character witnesses. According to Mr. Duchardt:

> While I certainly entertained the possibility that there would be childhood friends and extended family who might be able to witness for us, this did not turn out to be the case. *We had Chuck develop a list of possible witnesses in these fashions.* However, the more Chuck thought about things, the more he believed there was no one worth contacting in this regard because he simply did not develop close relations with anyone outside the family, and he certainly did not keep up such relations as he got older. This was confirmed through the family. Chuck's Dad said he had no recollections of Chuck ever bringing kids over for supper, or for overnights, or even for play.

*Id.* at 13 (emphasis added). Initial trial counsel also got to know the adoptive parents "and came to like them personally for obvious reasons related to how nice are the Halls. That led the Johnsons to offer to let the Halls stay in their home when trial happens, an offer the Johnsons extended when they were counsel for Chuck, and an offer they reiterated more recently." *Id.* In short, both initial trial counsel and Mr. Duchardt accepted the adoptive parents as "nice" people in their seventies, who loved their son in spite of everything, without making any attempt to inquire about what kind of parents they were four decades earlier. Trial counsel implicitly accepted that it was the client's fault if no one came to his home to play or share a meal.

98. The Halls had one natural daughter, Susan (later Susan Shumway), who was born in May 1955, six months after their marriage in November 1954. They were both twenty when the baby arrived. *Id.* at 12. We know nothing of their lifestyles as teenagers dealing with an unplanned pregnancy. Long after Susan's birth, the Halls adopted another daughter, Michelle (later Michelle Bories), born in 1969, and Chuck, born in 1971. *Id.* "Very soon after Chuck was

IFCD 00028456

adopted, Susan went away to nursing school," according to the Case Summary. *Id*. She visited the family infrequently when Michelle and Chuck were growing up, and by 2014 she was living in Vermont. *Id*. Susan's perspective "is not very flattering to the adopters or the adoptees." *Id*. She viewed Michelle and Chuck as "problem children from beginning to end." *Id*. However, Susan was a witness at a critical point in Chuck's adolescence: after he repeated sixth grade, he went to live with Susan and her husband in Vermont, where he attended an alternative school. *Id*. at 14. In addition, Susan had insight into the family dynamics at the time of the adoptions and before. Nonetheless, Mr. Duchardt concluded that Susan had "little to offer." *Id*. at 12. She was not called to testify in the penalty phase.[124]

99. Michelle and Chuck were "inseparable" and protective of one another in childhood. *Id*. Nonetheless, she was reluctant to meet with Mr. Duchardt and only agreed to come to him accompanied by Susan as a protective "buffer." *Id*. at 13. He never visited her at home but talked to her subsequently by telephone. *Id*.

100. I and others had discussed the need for in-person interviews in the witnesses' homes back in the 1990s. I wrote:

> Life-history witnesses should generally be interviewed in the setting which is most likely to evoke memories of the client – in the home, in the case of family members; at school, in the case of teachers; at work, if the witness is a former employer; etc. The goal of the visit is always to gather documents, snapshots, artwork, report cards, and other memorabilia, as well as to conduct the interview. The home environment or the school the client attended is itself a rich source of information about the client's social milieu.[125]

---

[124] Susan was also a classic example of the family member whom capital defense teams are trained to seek out: the witness "who is least invested in preserving secrets is the one you need to find." Stetler, *Mitigation Evidence, supra* note 5, at 39.

[125] *Id*. at 38-39.

IFCD 00028457

Other commentators emphasized the importance of visiting the location where a capital defendant lived in order to obtain records and to see with one's own eyes whether witnesses' descriptions of the home environment are even accurate:

> Whoever conducts the mitigation investigation must travel to every location where the accused lived to seek birth, adoption, health, education, pre-military employment, and criminal records. . . . While visiting the various locations where records are located, the mitigation investigator must also interview family, friends, neighbors, teachers, coaches, and anyone else with knowledge of the accused's history. To be successful in obtaining accurate and complete information, these interviews must be done in person, not by telephone. In many death penalty cases, the accused's "family is dysfunctional. Both the family and the client may confabulate, cover up, forget, and otherwise make it difficult for the lawyer to construct a persuasive case in mitigation." In one military capital case, for example, the trial defense counsel failed to obtain crucial mitigating evidence about the accused's adoptive home because they accepted the family's description of a "good Christian home" rather than visiting the house and interviewing neighbors to obtain an accurate account of the accused's highly dysfunctional upbringing. Only by traveling to locations where the accused grew up and lived can the mitigation specialist hope to gain an accurate picture of the accused's true history.[126]

Professor Sean O'Brien elaborated on similar points about the need for home interviews:

> While the capital defense practice borrows established interview protocols from the mental health field, there is one substantial difference. Mitigation specialists conduct interviews in the field. By going to the home of a witness or family member, the mitigation specialist will observe things about the interview subject that would not be visible in the office, thus providing a deeper perspective: "The home visitor often has greater opportunity to meet the client's friends and family; see family pictures; note relationships with cherished pets and neighbors that the client may not think to mention in the office; and experience the way the client puts together, develops, and protects living space. . . . [We] note the client's environment and the messages it conveys about the client and his or her situation." [127]

---

[126] Dwight H. Sullivan, Jerry L. Britain, Michael N. Knowlan, & Cheryl Pettry, *Raising the Bar: Mitigation Specialists in Military Capital Litigation*, 12 GEO. MASON U. CIV. RTS. L.J. 199, 213-214 (2002) (citing Alan W. Clarke, *Procedural Labyrinths and the Injustice of Death: A Critique of Death Penalty Habeas Corpus (Part One)*, 29 U. RICH. L. REV. 1327, 1374 (1995) and *United States v. Curtis*, 38 M.J. 530, 536-39 (N.M.C.M.R. 1993) rev'd, 46 M.J. 129 (C.A.A.F. 1997) (finding ineffective assistance of counsel)).

[127] Sean D. O'Brien, *When Life Depends on It*, *supra* note 36 at 746 (quoting BIANCA CODY MURPHY & CAROLYN DILLON, INTERVIEWING IN ACTION: PROCESS AND PRACTICE 28 (1998)).

IFCD 00028458

101. Section XI discusses Mr. Hall's "schooling history." Duchardt Case Summary. at 13-16. Mr. Duchardt explained that they had only the records kept by the parents when Chuck started developing behavioral problems. *Id*. at 13-14. His summary states, "Both we and the government attempted to obtain school records directly, without success." *Id*. at 13. It is unclear whether Mr. Duchardt visited the schools and school district in Maine or simply sent requests by mail. As noted *supra* ¶ 33, it is often necessary to visit institutions in person to obtain archived records that are stored offsite because understaffed personnel simply respond to requests with a recitation of local retention statutes, even though records are in storage and not destroyed. In fact, the trove of educational records was originally transmitted to initial trial counsel, the Johnsons, by Mr. Hall's parents. *Id*. at 16. "In those materials, there was a not-so-flattering description of Chuck's manipulative behaviors during school years," which Mr. Duchardt eventually learned had been written by his adoptive father, rather than school officials. *Id.* In the small community of Saco, Maine, one would have expected to find retired teachers and other personnel who remembered Mr. Hall and his family.[128] Yearbooks at the local schools or library would have identified teachers and classmates that the parents had forgotten or never knew.

---

[128] Although the defense ultimately had many records relating to Mr. Hall and Mr. Duchardt documented in detail some of his efforts to obtain records, trial counsel had no simple spreadsheet to show all the records that were requested (*see* the seven-page list of records that Mr. Duchardt requested from the federal Bureau of Prisons, Maine adoption authorities, Maine prisons and jails, hospitals and mental health facilities, schools, and a boxing club, file # 7806). The only records that he sought on anyone other than Mr. Hall concerned the homicide victim. There was no simple inventory of what records were received from the Government, and which came from the personal collection of Mr. Hall's adoptive parents. *See* Duchardt Case Summary at 13-14: "Fortunately, Mr. and Mrs. Hall had a full file of background information pertaining to Chuck, accumulated by them over the years when Chuck started developing behavioral problems." Mr. Hall reported various jobs, but trial counsel did not collect employment records or the easily accessible Social Security Administration detailed earnings reports that might have identified employers that Mr. Hall may not even have remembered.

IFCD 00028459

102. In the case of Shaker Mountain School in Burlington, Vermont, Mr. Duchardt did go to the location (a converted gas station) and found that the building had been razed. *Id*. at 14. He noted, "It is impossible to tell what happened at Shaker Mountain School during the year Chuck was there because there are absolutely no records and the school no longer exists." *Id.* Moreover, he concluded, "former staff members are nowhere to be found." *Id.*[129] After his return to the Saco school system, Mr. Hall was soon placed in a residential treatment facility called the Homestead Project. *Id.* at 15. Mr. Duchardt did locate two of the other residents whom Mr. Hall had recommended as potential witnesses, John Mandarelli and Steve Parks. *Id.* at 16.

103. Section XII, the last completed section of the Case Summary, covered the years 1989 to 1996 (in and out of hospital and prison). *Id.* at 17-21. Mr. Duchardt's "detailed, chronological account" is based on Maine jail and prison records. *Id.* at 17. Both the onset of Mr. Hall's Crohn's disease and a head injury from a motorcycle accident occurred during this period. *Id.* He also married a woman about twenty years his senior, Barbara Oettinger (by then deceased), and had a relationship with another woman, Ruth Mattson, whom the Government had already interviewed. *Id.* at 18-20. Mr. Hall and his wife (Ms. Oettinger) went through counseling with Richard Staples, Ph.D. Mr. Duchardt discussed the pros and cons of Dr. Staples and Ms. Mattson as witnesses. *Id.* at 19-20. As to Dr. Staples, he indicated that he would let Mr.

---

[129] Mr. Duchardt accepted "dead ends" too easily. One of the values of a full capital defense team is the ability to brainstorm with the rest of the team when one member is unable to find records or witnesses, especially when there is an experienced mitigation specialists who has previously encountered similar problems. As noted *supra* ¶ 33, we are often told that records no longer exist and have been destroyed pursuant to statute when they have simply been moved offsite to an inconvenient and often uncongenial location. Old-fashioned libraries are treasure troves of historical information, and more up-to-date search engines like Google readily retrieve valuable information. Specialty search engines like the Wayback Machine (a digital archive available to the public since 2001) and www.newspapers.com (a digital newspaper archive) are vital utilities in the mitigation-investigation toolbox.

IFCD 00028460

Hall decide whether to call him as a witness. *Id.* at 20. As to both witnesses, Mr. Duchardt noted that the Government would probably call them if the defense does not. *Id.* at 18-20.

104. Section XIII was meant to cover Mr. Hall's eight-year sentence in Maine after conviction in the fall of 1996, but the section ends in mid-sentence after half a dozen lines. *Id.* at 21. The remainder of the unfinished Duchardt Case Summary covers the rest of what he hoped to investigate and present at the impending trial: Section XIV (federal charges and convictions); XV (federal time before January 26, 2010); XVI (federal time since January 26, 2010); XVII (revival of family love); XVIII (mental health defense); and XIX (impact of Crohn's disease). *Id.* at 21.

105. Trial counsel's additional work product documenting interviews with penalty phase witnesses consists of a twelve-page memo memorializing interviews with six witnesses, mainly on a trip to Maine from March 11 to 13, 2014. The witnesses interviewed were former U.S. Attorney for the District of Maine Jay McCloskey (March 12, 2014); Geraldine Jane Francis (March 12, 2014; three and a half single-spaced pages; interviewed by telephone); "Maine inmate" Ron Harnish (March 11 and April 16, 2014; two single-spaced pages; interviewed by telephone); inmate William "Billy" Flynn (memo dated March 14, 2014; two paragraphs); inmate John Mandarelli (January 8, 2013 and March 12, 2014; four paragraphs); Steve Parks (March 12, 2014; three paragraphs; interviewed by telephone).

106. In addition to the paucity of interview summaries, the pretrial mitigation work product is missing two core tools of the mitigation trade: a genogram and a chronology. A genogram is a multigenerational visual representation of the client's family that can suggest not only the genetic vulnerabilities to heritable disorders and impairments but also the behaviors that

72

are reflected in family scripts that are replicated, even when an individual is raised by nonbiological parents. Mr. Hall's adoption in infancy does not render this tool irrelevant. In fact, every effort should have been made to identify biological family members and to obtain reliable historical information about them. As noted *supra* ¶¶ 94-96, it is to Mr. Duchardt's credit that he belatedly succeeded in locating Mr. Hall's birth mother, but the failure to pursue the investigation of the biological lineage is a flaw of his do-it-yourself approach, particularly since the catastrophic medical condition that most dramatically affected Mr. Hall, Crohn's disease, has a known familial risk factor.[130]

107. Chronologies are a standard tool for keeping track of the voluminous data acquired in a social history investigation, showing dates, events, and sources. They digest the records and make them accessible to the whole team. When someone deciphers a doctor's stereotypically poor handwriting, or decodes acronyms and abbreviations, they are typed out in the chronology to save the time of other readers. Chronologies are an indispensable resource for anyone who consults about mitigation issues in the case and often for experts (especially mental health experts), whose high hourly billing rates and limited number of court-authorized hours make it impossible for them to review more than a fraction of the available documents. In Mr. Hall's case, for example, psychiatrist John H. Wisner, M.D., said that he had been provided "in excess of twenty thousand pages of material." Wisner Report (Feb. 9, 2014) at 1. Dr. Wisner's billing records reflect that he did spend the bulk of his time reviewing documents, but the total number

---

[130] *See* Hugh J. Freeman, *Familial Crohn's disease in single or multiple first-degree relatives,* 35(1) J. CLIN. GASTROENTEROL. 9 (2002) (Study of 1,000 patients found, "The strongest currently recognized risk factor for Crohn's disease (CD) is having a relative with the disease.")

IFCD 00028462

of hours, 32.8, means that he would have had to skim *over six hundred pages per hour* (one page every six seconds) to determine what was, in his words, "psychiatrically relevant." *Id.*[131]

108. Chronologies are a basic tool of biography – not just the mitigation-focused social histories of capital clients. The late Columbia University professor, Manning Marable, for example, described what he had learned from the organizer of the Martin Luther King Jr. Papers Project at Stanford University when Marable was researching his own biography of Malcolm X. The Stanford archivist advised that

> the key to writing a full biography of Malcolm X would be the construction of an extremely detailed chronological grid of his life; in covering his last two years, 1963 to 1965, there would be almost daily entries. Each entry would indicate where the information came from and, whenever possible, multiple sources of documentation.[132]

Professor Marable's heightened scrutiny of the final years of the life of Malcolm X reflected his focus on the political conflicts within the Black Muslim community that he concluded led to Malcolm's assassination. In the lives of capital clients, there is often a comparably heightened scrutiny of the months, weeks, days, and even hours leading to the capital homicide, since that context is as important as the individual's developmental influences in explaining what happened.[133] In addition, the capital client's life chronology does not end with the crime, since his subsequent conduct is also potentially relevant to mitigation. *See Skipper v. South Carolina,* 476 U.S. 1, 4 (1986) (inferences from post-offense conduct in jail are relevant mitigation even though they would not relate specifically to culpability because they might serve as a basis for a

---

[131] Dr. Wisner later testified that he had been given approximately *forty thousand pages* of documents to review. Trial transcript, May 28, 2014, at 4728. In that case, he would have had to review about 1,200 pages per hour, or twenty pages per minute, or a page every three seconds.

[132] MANNING MARABLE, MALCOLM X: A LIFE OF REINVENTION 491 (2011).

[133] *See* CRAIG HANEY, CRIMINALITY IN CONTEXT: THE PSYCHOLOGICAL FOUNDATIONS OF CRIMINAL JUSTICE REFORM (2020) (emphasizing both individual risk factors and immediate situations in explaining crime in general and capital offenses in particular).

IFCD 00028463

sentence less than death). In capital cases, chronologies identify pivotal points in a client's life when there are significant changes that require closer investigation, such as a dramatic drop in school performance from one year to the next. What was going on, for example, when Mr. Hall had to repeat the sixth grade, as noted *supra* ¶ 75? Chronologies sometimes highlight developments in the client's life that coincide with problems affecting a sibling or parent (thus also confirming the practical importance of obtaining records for the entire household, not just the client).

109. About three weeks before the start of trial, Mr. Duchardt filed a request for various scans of Mr. Hall's brain. Ex Parte Request for Authorization of Budget for Brain Image Testing and Analysis, PACER Doc. 635, Apr. 4, 2014. He told the Court that both Dr. Wisner and Dr. Fucetola had "indicated the need to conduct electroencephalogram (EEG), positron emission tomography (PET), and magnetic resonance imaging (MRI) testing of Mr. Hall's brain in order to further develop medically important information regarding what they believe to be significant function [sic] brain abnormalities which they have detected in their work with Mr. Hall thus far." *Id.* at 3. Mr. Duchardt assured the Court that he had advised the Government of his intent to seek this testing and had attempted to find facilities that would provide services that would meet the anticipated criticism of the Government's imaging expert, Dr. Helen Mayberg. *Id*. at 3-5. However, Mr. Duchardt had ruled out the facility that would best meet those criticisms (the University of Pennsylvania Medical Center) because of cost and health risks to Mr. Hall himself in light of his Crohn's disease. *Id*. at 5. He proposed a two-stage plan utilizing testing at a nearby medical facility in Springfield, Missouri, and follow-up data analysis at the University of Pennsylvania. *Id*. at 6-9. Although the motion was filed ex parte, Mr. Duchardt made clear that

IFCD 00028464

the Government had been involved in the planning process and had been provided a copy of the motion. *Id*. at 8.

110. The Court held an ex parte hearing in chambers by telephone on April 7 with Mr. Duchardt and the magistrate judge. Transcript of Telephone Conference, Apr. 7, 2014. The proceeding is conversational and informal ("Hey, Judge, it's Fred here." "Hi, Fred. How are you?"). The Court immediately expressed concerns about the timing of the request, potential benefits, and *Daubert* issues. *Id.* at 2-3. Both the Court and the magistrate judge seemed to think that whether Mr. Hall had mental health issues was "fairly well settled." *Id*. at 3.

111. Mr. Duchardt blamed the Government for the timing issues, failing to recognize that more credible mental health evidence at the time of plea and deauthorization discussions might have benefited Mr. Hall. Instead, Mr. Duchardt suggested that this evidence was only needed after those discussions had ended:

> Last summer, when I probably would have been doing some of these things, the government came forward to both Coonce's counsel and I [sic] and made some serious overtures that they might offer a plea agreement or make some kind of withdrawal of the death penalty prosecution, and so I put my efforts pretty heavily on trying to go forward with all of that, and I tried to give them an awful lot of information along those lines, and at the same time I didn't figure it was wise to be spending government money on things that would not be necessary if that all came to fruition.
> Now, of course, by the fall it turned out that all of that fell apart and it didn't happen, but that's the reason why I wasn't working on those things in the summertime . . .

*Id.* at 4.

112. Mr. Duchardt conceded that the imaging might yield no useful information: "This may show nothing. I can't know that. Nobody can know that." *Id*. at 6. However, he argued that

IFCD 00028465

the Government was minimizing Mr. Hall's mental condition (*id.* at 7) and some of the Bureau of Prisons doctors were questioning the reliability of earlier BOP diagnoses (*id.* at 5).

113. When the Court indicated that it was denying the request, Mr. Duchardt did not make any objection on the record. On the contrary, he said he had nothing else to say: "You gave me a fair opportunity to explain it all to you, and I appreciate it." *Id*. at 7.

114. Meanwhile, the Government had been preparing to rebut mental health evidence offered by Mr. Coonce and Mr. Hall. The Government retained psychiatrist Park Dietz, M.D., to evaluate both defendants and report his findings to a "firewall" member of the U.S. Attorney's office who was not part of the trial team and to defense counsel. *See* Dietz Reports (on Coonce, May 3, 2014, and on Hall, April 30, 2014) at 1. Dr. Dietz's reports were not to be disclosed to the trial prosecutors until the defendants had been convicted and had affirmatively decided to introduce mental health testimony in the sentencing proceeding. As noted *supra,* ¶¶ 63, 69, this elaborate procedure for withholding the prosecution expert's findings from the members of the trial team was largely undermined in the case of Mr. Hall by his exposure for several weeks to a different set of Government mental health experts at FMC Butner during his competency proceeding. Dr. Dietz interviewed both defendants on videotape, Mr. Coonce on April 25 and Mr. Hall on April 26. His reports were lengthy (168 pages on Mr. Hall, and 203 pages on Mr. Coonce). Dr. Dietz said that the Government had provided him with forty thousand pages of material, but he had delegated its review to a former FBI agent. Dietz Report at 1.

115. The investigative deficiencies in the pretrial preparation were exacerbated by trial counsel's decision to withdraw their objection to a joint penalty phase. As noted *supra* ¶ 52, trial counsel for both Mr. Hall and Mr. Coonce initially objected to a joint trial, but on May 2, 2014

IFCD 00028466

(five days before the penalty proceeding began), Mr. Hall's counsel withdrew their objection to a joint sentencing hearing. This decision ignored both the social science research and the practical experience of the capital defense community. In fact, the inherent nature of a penalty phase proceeding requires jurors to make an *individualized* determination of whether life or death is the appropriate punishment, a moral decision that requires more heightened reliability than the legal determination of guilt in a capital trial. From the perspective of mitigation, it is essential that jurors give their undivided attention to the evidence about one individual. Both research and practical experience confirm that capital jurors simply cannot do so in a joint sentencing proceeding. Joinder in this case was particularly detrimental to Mr. Hall because of the potential disparity in resources between the two defendants since Mr. Coonce enjoyed the full support of the Federal Death Penalty Resource Counsel Project once an attorney from that project, Matthew Rubenstein, was appointed to his team (providing resources and funds from the project outside what was authorized by the trial judge).

116. The most respected researcher in the area of capital-sentencing severance and joinder, the late Professor Edward J. Bronson, succinctly summarized the problems.[134] From his study in Fresno, California, Professor Bronson found:

> Social history evidence is used in penalty-phase mitigation in an attempt to personalize the convicted murderer, as the defense attorney attempts to individualize and humanize the defendant. If jurors are less likely to consider such evidence in joint penalty hearings, the function of the jury to individualize its penalty decision-making may be adversely affected. The defendant becomes a stereotype, just another murderer of three in the same case engaged in the apparently routine practice of justifying his act by blaming others.[135]

---

[134] Declaration of Edward J. Bronson (Sept. 4, 1996), filed in the case of Timothy McVeigh and Terry Nichols, whose federal death penalty cases were severed nearly a decade prior to Mr. Hall's trial. Exhibit A to Nichols severance motion filed Sept. 30, 1996.
[135] Bronson Declaration, text accompanying n.25.

IFCD 00028467

Professor Bronson concluded, "Death penalty verdicts are more likely in joined trials, and there is also a leveling effect, wherein the most likely death candidates do a little better and the most likely LWOP candidates do significantly worse than the difference in their cases might suggest.[136] In a study from Butte County, California, Professor Bronson found that respondents often "lumped the defendants together or gave exactly the same comment for the penalty for each defendant." He found the data from these studies, consistent with earlier research, "support the hypothesis that joinder in a penalty trial leads to a higher percentage of death verdicts and to less individualized decision making. There is also evidence that jurors will be less likely to consider important social history mitigating evidence in a joined penalty trial."

117. Professor Bronson's analysis highlighted a number of issues directly relevant to the Coonce-Hall case, including

*confessions and admissions* (statements not only to law enforcement, but also to other inmates, prison personnel, and mental health experts retained by the Government or employed by the Bureau of Prisons)

*disputes between counsel* (including the dispute about penalty phase severance)

*fingerpointing*, where one individual argues his relative culpability, lesser role, or duress; or its opposite, where co-defendants are so reluctant to harm each other that neither fully cooperates with his defense team

*"lumping factors"* (Professor Bronson's term for prejudicial associations/guilt by association)

*dilution of mitigation*

*jury memory and confusion* (which aggravating and mitigating facts apply to which defendant)

---

[136] *Id*. Text accompanying n.28.

79

IFCD 00028468

118. The confusion in the penalty phase of the joined defendants, Mr. Coonce and Mr. Hall, was exacerbated by the random appearance of witnesses out of order and the simultaneous deliberations. At very least, trial counsel could have sought to have the same jury hear each defendant's mitigation separately and to deliberate on each defendant's fate one at a time.

119. Statistics from federal death penalty trials support Professor Bronson's conclusions. Not long after Mr. Hall's trial, the director of the Federal Death Penalty Resource Counsel Project, Kevin McNally, was asked to summarize the outcomes of multiple-defendant federal death penalty trials. Based on the case-tracking data maintained by the project Mr. McNally provided a declaration on September 4, 2018, in *United States v. Efrain Rodriguez-Mendoza,*[137] summarizing the outcomes in multiple-defendant federal death penalty trials. According to the data tracked by the project, district courts granted separate trials or separate penalty hearings "in a clear majority of cases." McNally Declaration at ¶ 4. Some form of severance had been granted in fifty-one of eighty multi-defendant capital prosecutions that had gone to trial (64 percent), and a motion for separate penalty hearings was under consideration in another case in which three defendants were acquitted. *Id* at ¶ 5. After joint penalty proceedings, juries reached the same verdict on punishment in 89 percent of cases. *Id.* at ¶ 6.

*Mr. Hall's penalty phase proceeding*

120. Although Mr. Duchardt called a number of witnesses, there was no coherence to his sentencing presentation. Many witnesses testified remotely. Some were inserted randomly during Mr. Coonce's mitigation presentation. Mr. Hall's first witness in the sentencing phase of the trial

---

[137] Mr. McNally's declaration is appended hereto as Appendix C.

80

was Mindy Graham, a health services administrator at the private prison where Mr. Hall was incarcerated during part of his pretrial detention. She testified that Mr. Hall had Crohn's disease, and he had had flare-ups that required emergency hospitalization. He was respectful in all her dealings with him. Ms. Graham's testimony was taken out of order by video conference on May 16, in between Mr. Coonce's penalty phase witnesses.

121. Three days later Mr. Hall called another witness out of order – in between members of Mr. Coonce's family. Kenneth Daugherty, the chief unit manager at CCA Leavenworth, testified that the private facility held pretrial detainees for the U.S. marshals. Mr. Hall had no disciplinary violations in the six months he was housed at that facility, and he was respectful. There was no cross-examination.

122. Trial counsel called most of his penalty phase witnesses on May 22. Ten witnesses were called altogether that day, all but one by a video link. Two knew Mr. Hall when he was in prison with them: Ron Harnish, and William Flynn. John Mandarelli Jr. and Steve Parks knew Mr. Hall from a juvenile treatment facility. All had been interviewed by Mr. Duchardt two months earlier, as noted *supra,* ¶ 105. Michael J. Tausek was a deputy prison warden in Maine. Two witnesses were mental health professionals, psychologist Richard Staples and psychiatrist James Kennedy, who knew Mr. Hall years before. The other two witnesses who testified by video link were women who might have had more emotional impact had the jury seen and heard them in person, Michelle Bories (Mr. Hall's adoptive sister) and Ruth Mattson (his former girlfriend). The only witness who testified in person that day was the defense neuropsychologist, Robert Fucetola, Ph.D.

IFCD 00028470

123. The importance of live, in-person witnesses in proceedings where jurors are asked to decide whether the accused should live or die cannot be overstated. For family members and loved ones especially, their very presence in the courtroom after their testimony has concluded conveys to jurors their connection to their family member or lover. It is important to show jurors that the witness cares enough to take the time and travel whatever distance is required, often at personal inconvenience, to bear witness. When witnesses comes from another state, jurors understand that they are taking time away from work and home, often having to leave behind the supports in their own lives who enable them to endure stress and painful emotions. When a sister or former girlfriend testifies, the jurors are scrutinizing not only her words and body language, but also assessing the defendant's reactions to her testimony and presence. Jurors are looking closely at the posture and facial expressions of the witness, drawing inferences about the nonverbal metrics that gauge the depth of the witness's feeling for the individual whose life is in their hands. Of course, jurors also inevitably draw negative inferences when the defendant's closest sibling or former partner declines to testify in person. In Mr. Hall's penalty proceeding, the jurors were also left to speculate negatively about why his other adoptive sister Susan did not testify at all.

124. Prisoner Mandarelli, then incarcerated for felony murder, testified that Mr. Hall had been like a big brother when they were incarcerated in a juvenile treatment facility in Maine. They once escaped together, but it was easy because the facility did not have a fence. Prisoner Harnish, then on home confinement in Maine after serving twenty-seven years for murder, testified to Mr. Hall's musical talent when they were incarcerated as adults. Prisoner Flynn was finishing a sentence of forty-years to life (with twelve years deferred) for a second-degree

IFCD 00028471

murder conviction in 1990 when he was sixteen. He testified that Mr. Hall was a good guy when he knew him in a Maine prison. Steven Parks, then a forty-two-year-old college student, knew Mr. Hall in the Maine juvenile treatment facility, where Mr. Hall was a role model and nice guy, and had not seen him in twenty years.

125. Dep. Warden Tausek testified about the musical program in the Maine prison. He had not spoken to Mr. Hall and had once worked at a federal Bureau of Prisons halfway house.

126. Adoptive sister Michelle Bories testified by video link. She recalled that her "baby brother" had had a motorcycle accident, but did not know the year. Afterward, he had lost his "photographic memory" but she did not recall other sequelae. She had visited him only once since his incarceration began in 1996, although they had had contact by telephone and letters. She said she did not believe Chuck had killed the victim even though the jury had convicted him. She distinguished between "respecting" and "accepting" the jury's verdict. She minimized Chuck's lying as "tall tales," but denied any of his allegations of a less than loving home in childhood.

127. Ruth Mattson testified that Mr. Hall was her lover in the middle 1990s. She liked how he played with her young son and wrote poetic lyrics, but she also agreed that Mr. Hall told many lies. She had previously described him as a pathological liar. She last saw Mr. Hall in 2001 and could not identify him on the video connection "after this many years."

128. As a therapist, Dr. Staples treated Mr. Hall's wife Barbara Oettinger, whom Mr. Hall married when he was in his twenties and she was in her forties. Dr. Staples saw them together and saw Mr. Hall once by himself in the context of his therapy with Barbara. Mr. Hall lied to him about academic accomplishments and a plan to attend the University of California, Berkeley.

IFCD 00028472

129. Dr. James Allen Kennedy was a treating psychiatrist at FMC Devens, and he treated Mr. Hall from 2008 to 2009. Mr. Hall had already been diagnosed as bi-polar at FMC Rochester, but Dr. Kennedy conceded on cross-examination that Mr. Hall's letters might suggest a diagnosis of Antisocial Personality Disorder. He noted Mr. Hall's depressive symptoms since childhood and his three suicide attempts. He identified Mr. Hall's Crohn's disease as a humiliating, embarrassing condition that aggravated his depression.

130. On May 23, 2014, Mr. Hall's adoptive mother, Dorothy, testified in person that she loved her son in spite of his bad choices (including being a thief, a liar, and a murderer). Despite her presumed sincerity, her testimony was conclusory in the way that initial reports from family members so often are: her son was a "lovable boy," a "happy baby," always "smiling." Mr. Duchardt used family photos to prompt the narration. Mrs. Hall had no insight into how her son acquired "sticky fingers," began stealing at home, skipped school, and then stole cars before they placed him in schools outside the home to straighten him out. They moved to Florida when he became an adult and had little contact after he visited them once there. Dorothy Hall said the parents drank but were not alcoholics, and she denied other negative reports attributed to their son.

131. The adoptive father, Charles Sr., gave similar testimony in person. Their son could not see a hurt animal without helping the creature. He reached adulthood at eighteen, the parents moved to Florida, and there was little subsequent contact. Charles Sr. had worked overtime but found time to attend peewee football games; he provided for his family and tried to be a good father.

IFCD 00028473

132. Mr. Duchardt read a stipulation on May 23 about Mr. Hall's biological mother, Betty Jo Smith. The jury learned by stipulation that her pregnancy resulted from a gang rape by a co-worker and three of his friends (names unknown). She received prenatal care; did not use drugs or alcohol while pregnant; and had no personal or familial history of mental illness or Crohn's disease.

133. The defense concluded its penalty phase evidence on May 27 and 28, 2014, with the testimony of board-certified psychiatrist John Wisner, M.D. He was used as an all-purpose expert to explain Mr. Hall's major medical conditions (Crohn's disease and his ileostomy), his mental disorders, and the failings of the Bureau of Prison's medical care (based on Dr. Wisner's experience and past responsibilities at a Veterans Administration hospital in Kansas City and the Kansas University Medical Hospital).

134. Dr. Wisner's testimony invited the classic "battle of the experts" in which jurors view both sides as employing hired guns. Jurors tend to be skeptical of all the experts, but the defense loses the battle because of its burden to establish the mitigating evidence. Dr. Wisner was retired but still consulting. He had spent twenty years at the local Veterans Administration Hospital, and then moved to the Kansas University Medical Center, where he taught medical students, treated patients, and had treating physician privileges in general medicine. He had accidentally become a forensic practitioner because so many Vietnam and World War II veterans at the Veterans Administration Hospital had issues requiring guardianships to manage their finances or involuntary hospitalizations.

135. Mr. Duchardt also relied on Dr. Wisner to critique the standard of psychiatric care at FMC Springfield, even though the defense psychiatrist had never set foot in the facility and had

IFCD 00028474

not spoken to any of its mental health staff or the unit manager where Mr. Hall was housed or any of the mental health staff at any of the predecessor BOP facilities where Mr. Hall had been treated (the federal medical centers in Rochester, Minnesota, and Devens, Massachusetts). Dr. Wisner did not even recall Springfield's After Action Report among the forty thousand pages he had been provided – a report that apparently found no problems with the institution's procedures in terms of psychiatric standard of care and correctional practice. He insisted that the lack of closer observation (monitoring every fifteen minutes rather than every thirty) contributed to the homicide. On direct examination, he referred to classic medical malpractice, but on cross-examination he retreated and claimed he was not saying malpractice but simply inadequate observation.

136. Dr. Wisner had spent only three and a half hours interviewing Mr. Hall on three occasions, but he had been provided about forty thousand pages of records. He did not personally observe symptoms of bipolar disorder, but he adopted that diagnosis because it was brought to his attention by the records. He admitted on cross-examination that he relied on the multiaxial diagnostic system that had been abandoned by the American Psychiatric Association in its 2013 update of its *Diagnostic and Statistical Manual of Mental Disorders*, fifth edition (DSM-5). He also agreed ("by all means") that Mr. Hall met the criteria for Antisocial Personality Disorder and on cross-examination agreed that the DSM-5 regards that diagnosis as synonymous with sociopathy and psychopathy.

137. Dr. Wisner responded to the final cross-examination questions by agreeing that Mr. Hall was a sociopath who had admitted killing the victim (to Dr. Wisner) and had threatened to kill again. Dr. Wisner's testimony was hardly the mitigation evidentiary summation that might

IFCD 00028475

have evoked empathy from any jurors, yet it was at this point that the defense rested after a brief and ineffectual redirect examination.

*Penalty phase verdict sheet*

138. Based on what trial counsel thought they had proved in the penalty proceeding, they offered the jurors seventeen mitigating factors on their special verdict form. Unlike Mr. Coonce, they did not ask the jury to find that Mr. Hall had played a lesser role in the offense, was vulnerable to the influence of others, or that others not susceptible to the death penalty were involved (*cf.* Coonce verdict form, *supra* ¶ 51). Trial counsel offered these mitigating factors:

(1) Defendant Hall has accepted responsibility for what he did in connection with this offense.

(2) Defendant Hall has shown remorse for what he did in connection with this offense.

(3) Defendant Hall has had no institutional rules or disciplinary violations since January 26, 2010, the date of this offense.

(4) Defendant Hall has, for many years, suffered from the mental illness of Bipolar disorder.

(5) Defendant Hall has, since 1993, suffered from the serious illness of Crohn's disease.

(6) On September 2, 1994, Defendant Hall suffered from a significant brain injury due to a motorcycle accident.

(7) At the time of this offense, Defendant Hall's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.

(8) Defendant Hall committed this offense under severe mental or emotional disturbance.

IFCD 00028476

(9) Defendant Hall has a loving and caring relationship with his mother, Dorothy Hall, his father, Charles V. Hall, and his sister, Michelle Bories, and those relationships would continue if Defendant Hall was sentenced to life imprisonment without the possibility of release.

(10) Defendant Hall has demonstrated his ability to help others, such as when he patiently taught his disabled nephew to crawl.

(11) Defendant Hall suffers from low self-esteem, as evidenced by him telling untruths to make himself sound more important to others.

(12) Defendant Hall has strong talents in sketch art, poetry, and music.

(13) While incarcerated, Defendant Hall has been the victim of serious assaults.

(14) Prior to January 26, 2010, the date of the offense, Defendant Hall gave warnings to prison officials about homicidal thoughts he was having, but those thoughts were not heeded by prison officials.

(15) Bureau of Prisons staff failed to properly monitor Defendant Hall by not placing him in seclusion, restraints, or twenty-four (24) hour observation on January 26, 2010.

(16) Dangers in prison, particularly the need to retaliate for conduct by Victor Castro-Rodriguez against Defendant Hall, explain in part why this offense happened.

(17) There are other reasons that weigh against the imposition of a sentence of death for Defendant Hall.

139. Only six of the twelve jurors found that the mitigating factor relating to Crohn's disease had been established, and only one agreed that Mr. Hall had a loving relationship with his family members. For the other fifteen factors, the verdict sheet recorded "zero" in the space for "the number of jurors who so find." The verdict sheet also recorded "NONE" in the space "provided to write in any additional mitigating factors, if any, found by any one (1) or more jurors." The jurors also found few mitigating factors for Mr. Coonce. However, all twelve found that Mr. Coonce's "childhood was marked by chaos, abuse (both physical and sexual), as well as

IFCD 00028477

neglect and abandonment." Eleven found that "[t]he chaotic and abusive life that Defendant Coonce endured as a young child increased his risk for emotional and mental disturbance in his adult life." Eight found Mr. Coonce "suffered from emotional and mental impairments from a very young age," and one found that Mr. Coonce's mother was "addicted to illegal drugs and alcohol." The contrasting verdict sheets illustrate concretely how the joint sentencing phase worked to Mr. Hall's disadvantage.

140. On direct appeal, the appellate lawyers (including Mr. Duchardt), claimed that the jury failed to follow the court's instruction to "make factual findings on each of the mitigating factors first, before deciding whether to assign them weight," since two factors ("good behavior in prison after the murder and his difficulties with a chronic gastrointestinal disease") were not disputed. *Hall, supra* ¶ 51, at 1041-42. The Court of Appeals for the Eighth Circuit found that any such mistake was harmless. *Id*. at 1042. Some jurors may also have rejected mitigating factors that were inartfully drafted with needless intensifying adjectives and adverbs (#5 "*serious* illness," #6 "*significant*" brain injury," #7 "*significantly* impaired," #8 "*severe*" disturbance, "#12 "*strong* talents," and #13 "victim of *serious* assaults." Other factors may have been rejected because they were compound or inferential (#11 low self-esteem as cause of "telling untruths"; #14 warned prison of homicidal thoughts but warnings not heard). [138] Regardless, the jurors

---

[138] *See* Johnson v. United States, 2012 U.S. Dist. LEXIS 38752 (N.D. Iowa Mar. 22 2012): "If capital sentencing juries 'must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual,' it follows that counsel in a capital case performs deficiently, even if counsel presents mitigating evidence, if counsel fails to formulate mitigating factors in a way that allows jurors to give meaningful consideration and effect to that mitigating evidence." (Citation omitted.) *Id*. at 357. The Johnson Court also warned of the danger of "multifaceted" and "convoluted" mitigating factors, or those that "required the jurors to find that one or more preconditions or a series of conditions had specific results." *Id*. at 359.

IFCD 00028478

either did not find these mitigating factors had been established, or trial counsel failed to persuade the jurors of their mitigating significance.

*Post-Script: The Metrics of Time*

141. As I explained *supra* ¶ 23 and reiterated *supra* ¶ 72, even if lawyers had the training, skills, and patience, they do not have the time to conduct thorough mitigation investigation because of all the other work that is demanded of them in representing a capital client. An analysis of the CJA vouchers in Mr. Hall's case dramatically confirms this point. (For legibility, larger versions of the following charts are appended to this declaration as Appendix D.)

142. Chart 1 shows the total billing per year of the core defense team based on the CJA vouchers, with the hours spent interviewing witnesses highlighted in red.



| CJA billing code/category | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| a - In Court | 1.2 | 0.6 |  | 11.7 | 325.2 |
| b - Client Intvw & Conf | 12.1 | 37.5 | 122.3 | 102.3 | 84.8 |
| c - Wx Intvws | 7.6 | 57.7 | 9.1 | 47.2 | 85.8 |
| d - consult w investigators & experts | 1 | 15.2 | 12.3 | 37.6 | 65.5 |
| e - obtaining & reviewing court rec | 5.8 | 1 | 17.2 | 81.3 | 372.7 |
| f - obtaining & reviewing docs & other evid | 71.5 | 95.3 | 534 | 605.15 | 602.7 |
| g - Consulting w/ expert counsel |  | 1.5 | 8.4 | 4.7 | 10 |
| h - Legal Research & Writing | 0.2 | 16.1 | 402.5 | 720.1 | 573.7 |
| i - Travel | 32 | 92 | 169.3 | 203.9 | 391.7 |
| j - Other | 44 | 185.9 | 208.5 | 176.3 | 527.35 |

90

IFCD 00028479

143. Chart 2 shows the same data in a pie chart capturing the sliver of time spent interviewing witnesses (highlighted in red) over the whole life of the case: 207.4 of 7191.5 hours, or roughly 2.88 percent of the total hours billed. By contrast, if a mitigation specialist had been retained, her time would have been spent exclusively in investigation – whether through interviews or document collection and analysis.



144. Chart 3 shows the percentage of the total billing per year of the core defense team based on the CJA vouchers spent interviewing witnesses (again highlighted in red).

IFCD 00028480

Case 4:21-cv-08001-BCW    Document 70-11    Filed 04/29/24    Page 91 of 120



| | Sum of 2010 | Sum of 2011 | Sum of 2012 | Sum of 2013 | Sum of 2014 |
|---|---|---|---|---|---|
| a - In Court | 0.68% | 0.12% | 0.00% | 0.59% | 10.70% |
| b - Client Intvw & Conf | 6.90% | 7.46% | 8.24% | 5.14% | 2.79% |
| c - Wx Intvws | 4.33% | 11.48% | 0.61% | 2.37% | 2.82% |
| d - consult w investigators & experts | 0.57% | 3.02% | 0.83% | 1.89% | 2.15% |
| e - obtaining & reviewing court rec | 3.31% | 0.20% | 1.16% | 4.08% | 12.26% |
| f - obtaining & reviewing docs & other evid | 40.76% | 18.95% | 35.99% | 30.41% | 19.83% |
| g - Consulting w/ expert counsel | 0.00% | 0.30% | 0.57% | 0.24% | 0.33% |
| h - Legal Research & Writing | 0.11% | 3.20% | 27.13% | 36.18% | 18.88% |
| i - Travel | 18.24% | 18.30% | 11.41% | 10.24% | 12.89% |
| j - Other | 25.09% | 36.97% | 14.05% | 8.86% | 17.35% |

145. Chart 4 contrasts the time billed annually for witness interviews with all the other billing categories by each of the trial lawyers and the defense investigators[139] over the whole duration of Mr. Hall's representation.

---

[139] In-house staff for the Johnsons' law firm, apparently did not bill hours to the CJA.

IFCD 00028481



*"Red flags" and other investigative deficiencies*

146. It is appropriate to pause here to review some of the deficiencies in the mitigation investigation and to identify the "red flags" that should have prompted more thorough investigation. The Supreme Court has consistently stressed the importance of pursuing leads. As in *Wiggins*, *supra* ¶ 2, the scope of the investigation in Mr. Hall's case was unreasonable "in light of what counsel actually discovered": "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." 539 U.S. at 525. Similarly, in *Rompilla*, also cited *supra* ¶ 2, the Court noted that counsel "could not have reasonably ignored mitigation evidence or red flags because they were unexpected." 545 U.S. at 391. In fact, post-conviction experts "found plenty of 'red flags' pointing up the need" for further investigation. *Id*. at 392. In *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009), the Court distinguished the weak claim of ineffectiveness in that case from the

IFCD 00028482

compelling claims in *Wiggins* and *Rompilla*, because it was "not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face [citation omitted], or would have been apparent from documents any reasonable attorney would have obtained [citation omitted]."

147. *Failure to pursue leads relating to Mr. Hall's biological family.* Trial counsel located his biological mother, Betty Jo Kelley (later Betty Jo Smith), but terminated the investigation of those who knew her with a telephone call in which Mr. Duchardt promised not to interview anyone else – and accepted many uncorroborated claims about the pregnancy. Roy Holmes, Betty Jo's brother who lived in Maine at the time she came there to give birth, was deceased by the time of Mr. Hall's prosecution. But those who knew him were an important source of leads when Mr. Duchardt traveled to Maine. Mr. Holmes's friends and neighbors should have been located and interviewed about Betty Jo's medical care, use of drugs, drinking and smoking, as well as whatever information she had disclosed about Mr. Hall's father when she lived in Maine.

148. *Failure to investigate the pregnancy and pre-natal history of Mr. Hall's biological mother.* Betty Jo's prenatal history in Texas should have been investigated on the ground in Turnersville, Texas, not only to examine her medical care but to inquire into her social life at the time she became pregnant, through interviews with neighbors, high school classmates, teachers, co-workers and employers, etc. In a town of just a few hundred residents, it should not have been difficult to find objective, candid witnesses. As noted *supra* ¶ 96, Mr. Duchardt made a deal not to interview such witnesses in return for Betty Jo's agreement to talk with him, when other

94

IFCD 00028483

witnesses were much more likely to be forthcoming and candid about her behavior during the pregnancy.

149. *Failure to gather familial records.* Trial counsel failed to gather records of anyone but their client at a time when it was widely recognized that it was important to obtain the records of other family members. Contrary to the prevailing norms at the time of trial (*see supra* ¶¶ 33-36),[140] there was no attempt to gather the life-history records of anyone except Mr. Hall himself.

150. *Failure to gather all of Mr. Hall's records.* Despite the illusion of a vast trove of records about Mr. Hall (as suggested by Dr. Wisner's testimony that he had been provided with over forty thousand pages to review, *supra* ¶ 135-137, note 131, actual record gathering was haphazard. The Commentary to ABA Guideline 10.7 (Investigation) identified the many available tools with which any mitigation investigator or capital defense team should have been familiar at the time: "all appropriate avenues, including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes."[141] A large portion of the client records available to trial counsel came either from the Government or the personal files of Mr. Hall's parents.[142]

---

[140] *See, supra* ¶ 33; Commentary to ABA Guideline 10.7, "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children . . ." 31 HOFSTRA L. REV. at 1024. *See also* Supplementary Guideline 5.1.F, "Mitigation specialists must possess the knowledge and skills to obtain all relevant records pertaining to the client and others." 36 HOFSTRA L. REV. at 683. Siblings' records often reveal insights into family dynamics or help to explain the differences between their life trajectories and that of the capital client. Multigenerational records show inherited predispositions and vulnerabilities, as well as patterns of behavior that are repeated from one generation to the next. Records from multiple family members often provide a context for understanding key changes in the client's life. The authors of reports and documents are themselves potential mitigation witnesses, otherwise unknown to the client and his family.

[141] ABA Guideline 10.7 at 1025.

[142] *See supra* note 128. As previously noted, the parents kept only the records "accumulated by them over the years when Chuck started developing behavioral problems," so they did not document the positive moments of hope and opportunity in Mr. Hall's childhood. Such moments are critical to an effective mitigation narrative because

IFCD 00028484

151. *Failure to utilize the records in their own files to identify potential witnesses and to challenge family myths.* Trial counsel failed to utilize the records that they had to identify objective witnesses who had contact with Mr. Hall and his adoptive parents in his developmental years. A couple of examples will illustrate the deficiency. As noted *supra* ¶ 102, Mr. Duchardt went to Vermont and quickly concluded, "It is impossible to tell what happened at Shaker Mountain School during the year Chuck was there because there are absolutely no records and the school no longer exists" and "former staff members are nowhere to be found." Jerry Mintz, one of the founders of Shaker Mountain School, is a well-known consultant, public speaker, and author on alternative education.[143] Shaker Mountain also has alumni, who might have been identified through the local public library.[144] Mr. Duchardt's file contained a three-page transcript from Shaker Mountain identifying Mr. Hall's counselor, C. C. McKegney (TF.FD.17.31.001592). The transcript noted that the school did not have a specialist in learning disabilities, but they suspected that Chuck might have a learning disability in reading comprehension (TF.FD.17.31.001593). The school's recommendation to place him in ninth grade was conditioned on testing him more thoroughly for this disability and providing help. *Id.* Another record identified staff member, Lisa Tomasi, who had purchased at her own expense

---

jurors and other decision makers can identify with someone who had a chance to overcome adversity, rather than one so different from us that he "never had a chance." *See* Mark E. Olive, *Narrative Works,* 77 UMKC L. REV. 989 (2009) (narrative must make decision makers "use their imagination to represent the suffering of the defendant and, through representing to themselves what it would be like to be in his place, to 'tremble and shudder' at what he must feel[.] *Id.* at 990 n.15, quoting PETER BROOKS, TROUBLING CONFESSIONS 13 (2001).

[143] *See* the Alternative Education Resource Education website (Our Team – Education Revolution – Alternative Education Resource Organization), which lists Mr. Mintz's contact information (e-mail and telephone), articles, podcasts, and videos.

[144] Whether there were official year books, it is likely that the public library in Burlington maintained information about people who attended the school. Likewise, the College of Education at the University of Vermont (also in Burlington) was a potential source of information about the school. There were numerous local archives and easy-to-find records that might have provided names of teachers and students at the school.

IFCD 00028485

hospital-prescribed medication when Mr. Hall "hurt his mouth," and who also noted that Mr. Hall's mother had asked "Jerry" (presumably Mr. Mintz) about the medication reimbursement (TF.FD.17.31.001597).

152. Trial counsel also ignored the multiple leads in their file from the eight-page closing summary following the nine-week intervention at Sweetser Children's Home (TF.FD.17.31.001863-70; April 9, 1986) after Mr. Hall returned to Saco, Maine, from Shaker Mountain School in Vermont. The summary was prepared by two Family Workers, Phil Studwell and Alice Cantara, in the Sweetser Children's Home of the Family Preservation Services Program. *Id*. at 1, 9. The family had been referred to the program by Liz Crockett, facilitator of the local "Tough Love" group. *Id*. at 1. Contrary to the image of the perfect, all-American, loving family embraced by trial counsel, this report portrayed an environment in which "Chuck had been reacting negatively to the chaos in the home." *Id*. It identified multiple agencies that had been involved, including D.H.S. (Department of Human Services), New Beginnings, Y.C.C.S. (York County Community Services)/Dr. Sabo, Tough Love, the priest at Most Holy Trinity Church (who had counseled Michelle periodically and provided the adoptive parents marriage counseling), and a Dr. Scholl who had counseled Michelle. *Id*. at 1-2. There were multiple ways to find addresses for all these witnesses and institutions: licensure for Drs. Sabo and Scholl, social workers Studwell, Cantara, and Crockett; diocesan records for the priest at Most Holy Trinity and half a dozen administrative staff of Good Shephers Parish; and other tools described *supra* ¶ 26.

153. At age fourteen, Chuck was described as experiencing "drastic mood swings." *Id*. at 3. The adoptive parents were described as alluding to "significant marital issues that have only

IFCD 00028486

been partially resolved through marital counseling." *Id*. at 4. Both the parents and the children reported regular Saturday night drinking in the home (mostly with unidentified "Church friends"), but the Family Preservation Program did not undertake a separate assessment of substance abuse. *Id.* Under Community Involvement/Services Plan, it was noted that the adoptive parents "stated they were going to have individual substance abuse evaluations" through York County Community Services, but neither followed up. *Id*. at 7. Michelle was to be evaluated psychiatrically by a Dr. Blackman, and the parents wanted Chuck evaluated as well, but there was no indication of whether these evaluations occurred. *Id.* A thorough investigation would have required efforts to obtain records from all these agencies, not just for Mr. Hall but for his adoptive sister Michelle and the two adoptive parents. It would have also entailed interviews with all the historical witnesses identified in the records.

154. The lawyers appointed to represent Mr. Hall in his capital case met his adoptive parents when they were in their seventies and decided that they were nice people and therefore good parents. They ignored documents in the records about chaos and drinking when the parents were much younger, and Mr. Duchardt in particular ignored whatever their natural daughter reported because it was "not very flattering to the adopters or the adoptees" (*supra* ¶ 98) and what their client told Dr. Fucetola about the drinking of both adoptive parents (beer nightly for the father, vodka martinis on the weekends for the mother), and drunken arguments in which Mr. Hall said the parents threw things at one another (*supra* ¶ 74).

*Conclusions*

IFCD 00028487

155. In summary, in Mr. Hall's case, trial counsel failed to conduct a thorough and expansive investigation of potential mitigating evidence, and in particular failed to investigate the numerous "red flags" outlined *supra* ¶¶ 146-154. Trial counsel did not obtain records of Mr. Hall's adoptive or biological family or generate the routine work product such as chronologies and genograms that were the basic tools of the trade required under the prevailing norms of 2010 to 2014. As in the *Wiggins* case, cited *supra* ¶ 2, counsel "abandoned [their] investigation" of Mr. Hall's background "after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. They chose the least credible witnesses – three convicted murderers, some poorly prepared lay witnesses, and experts who had been rushed to the stand without an opportunity to review what their testimony would be – to recount his life history, and the lay witnesses sometimes completely contradcted the experts or failed to support the experts' conclusions. Trial counsel offered no objective, credible lay witnesses, such as teachers, classmates, neighbors, and counselors, to discuss what was happening in Mr. Hall's developmental years. The totality of the presentation failed to humanize Mr. Hall, in the sense that it did not create the empathic identification that would allow jurors to recognize him as a member of their human community.[145]

156. It is my considered professional opinion that trial counsel's performance in Mr. Hall's case fell far below the prevailing norms of 2010 to 2014 in the investigation and presentation of mitigation evidence. It is also my considered professional opinion that the mental

---

[145] This need for empathic identification was noted in Witherspoon v. Illinois, 391 U.S. 510, 520 n.17 (1968), when the High Court quoted the writer Arthur Koestler: "The division is not between rich and poor, highbrow and lowbrow, Christians and atheists: it is between those who have charity and those who have not. . . . The test of one's humanity is whether one is able to accept this fact – not as lip service, but with the shuddering recognition of a kinship: here but for the grace of God, drop I." KOESTLER, REFLECTIONS ON HANGING 166-167 (1956).

IFCD 00028488

health evidence presented in 2014 lacked the foundational social history that is essential to both reliability and credibility and invited a battle of the experts for which the Government was more than adequately prepared because of the ill-advised competency motion filed by initial trial counsel in 2012.

157. The prevailing norms at the time of Mr. Hall's representation and trial required a robust and thorough mitigation investigation. Trial counsel overestimated their understanding of the scope of mitigation in death penalty cases and their capacity to investigate it on their own. It is my considered opinion that trial counsel's chaotic and haphazard investigation of Mr. Hall's life was unreasonably narrow and limited, and their desultory presentation to the jury was incomplete, incoherent, and destined to result in a sentence of death that lacked the reliability that can only come when the jurors have all the relevant mitigation evidence to consider.

* * *

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, and under the laws of the States of California and Missouri, that the foregoing is true and correct and was executed this _10_ day of February 2024 at Berkeley, California.

RUSSELL STETLER

100

# Appendix A
# to Declaration of Russell Stetler

# Declaration of Kevin McNally, Feb. 24, 2010

IFCD 00028490

# DECLARATION OF KEVIN McNALLY REGARDING THE DISPOSITION WITHOUT TRIAL OF AUTHORIZED FEDERAL CAPITAL CASES

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases.[1]

3. In order to carry out the duties entrusted to us, I maintain a comprehensive list of federal death penalty prosecutions and information regarding Department of Justice practices in these cases. I accomplish this by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

IFCD 00028491

4. To date, 465 defendants have been authorized for a capital prosecution since the federal death penalty was resurrected in 1988.

5. Of that number, the Department of Justice reached plea agreements involving prison sentences in 100 cases prior to trial and 20 cases at trial. The United States withdrew its Notice of Intent to Seek the Death Penalty, either prior to trial (53) or at trial (12), on 65 other occasions.

6. Thirty-four (34) defendants are currently pending or in trial. Therefore, 43% (185 of 431) of authorized federal capital defendants avoided a sentence of death by virtue of a plea agreement or the withdrawal of the Notice of Intent to Seek the Death Penalty.

7. In other cases, the Government extended a plea offer, or indicated its willingness to accept a non-capital plea, but the defendant rejected the offer.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this __24th__ day of February, 2010.

   /s/   Kevin McNally
Kevin McNally

IFCD 00028492

# Appendix B
## to Declaration of Russell Stetler

## Park Dietz Associates
## Public Funds Hourly Rate Chart
## March 9, 2010

IFCD 00028493

| Last Updated | | | |
|---|---|---|---|
| 3/9/2010 13:48 | | | |
| | | | **Public Funds** |
| **Specialty** | **Expert** | **Degree** | **Hourly Rate** |
| Forensic Psychiatry | Blum, Bennett | MD | $600 |
| Forensic Psychiatry | Bradford, John | MB, ChB | $450 |
| Forensic Psychiatry | Dietz, Park | MD, MPH, PhD | $600 |
| Forensic Psychiatry | Glancy, Graham | MB, ChB | $450 |
| Forensic Psychiatry | Harry, Bruce | MD | $375 |
| Forensic Psychiatry | Kleinman, Stuart | MD | $600 |
| Forensic Psychiatry | Pitt, Steven | DO | $600 |
| Forensic Psychiatry | Saathoff, Gregory | MD | $400 |
| Forensic Psychiatry | Salinas, Esperanza | MD | $300 |
| Forensic Psychiatry | Sorrentino, Renee | MD | $350 |
| Forensic Psychiatry | Wendler, Sheila | MD | $400 |
| Forensic Psychiatry | Kellaher, Denise | DO | $400 |
| Forensic Psychiatry | Ornish, Steven | MD | $500 |
| Forensic Psychiatry | Rosenbaum, Karen | MD | $450 |
| Forensic Psychiatry | Wettstein, Robert | MD | $525 |
| Forensic & Child Psychiatry | Beresin, Eugene | MD | $450 |
| Forensic & Child Psychiatry | Kenan, Joseph | MD | $400 |
| Forensic & Child Psychiatry | Szeftel, Roxy | MD | $750 |
| Forensic & Child Psychiatry | Swick, Susan | MD, MPH | $450 |
| Forensic & Child Psychiatry | Billick, Steven | MD | $600 |
| Forensic Social Work | Warren, Janet I. | DSW | $375 |
| Forensic Pathology | Case, Mary | MD | $600 |
| Forensic Pathology | Corey, Tracey S. | MD | $600 |
| Forensic Pathology | Graham, Michael | MD | $600 |
| Forensic Pathology | Melinek, Judy | MD | $750 |
| Forensic Pathology | Nichols, George R. II | MD | $600 |
| Forensic Neurology | Griesemer, David | MD | $600 |
| Forensic Neurology | Mayberg, Helen | MD | $600 |
| Forensic Neurology | Price, Bruce | MD | $600 |
| Neurology | Frecker, David G. | MD | $600 |
| Forensic Neuropsychology | Martell, Daniel A. | PhD | $450 |
| Forensic Neuropsychology | van Gorp, Wilfred | PhD | $600 |
| Forensic Neuropsychology | Mendoza, Robert | PsyD | $375 |
| Forensic Neuropsychology | Sacks, Amanda | Ph.D. | $300 |
| Forensic Psychology | Bernhard, Andrea | PsyD | $300 |
| Forensic Psychology | Dvoskin, Joel | PhD | $750 |
| Forensic Psychology | Hart, Stephen D. | PhD | $350 |
| Forensic Psychology | Heilbrun, Kirk | PhD | $350 |
| Forensic Psychology | Loftus, Elizabeth | PhD | $750 |
| Forensic Psychology | Roesch, Ronald | PhD | $350 |
| Forensic Psychology | Spiers, Erin | PsyD | $450 |
| Forensic Psychology | Sacks, Amanda | PhD | $300 |
| Psychology (autism spectrum disorders) | Postil, Jessica | PsyD | $350 |
| Criminal Behavior Analysis | Ankrom, Larry | MS (FBI ret.) | $350 |
| Criminal Behavior Analysis | Lanning, Kenneth | MS (FBI ret.) | $350 |
| Crminal Behavior Analysis | McCrary, Gregg | MA (FBI ret.) | $350 |
| Criminal Behavior Analysis | Walker, Ron | MA (FBI ret.) | $350 |
| Criminal Behavior Analysis | Wright, James | MPA (FBI ret.) | $350 |
| Criminal Behavior Analysis | Clemente, Jim | JD (FBI ret.) | $350 |
| Forensic Science | Fisher, Barry A. J. | MS, MBA | $375 |
| Criminalistics (serology) | Wraxall, Brian G. D. | | $400 |
| Criminalistics | De Forest, Peter | D. Crim | $500 |
| Forensic Pharmacology | Spiehler, Vina | PhD | $500 |
| Medical Strategist | Ainbinder, Steven | MD | $450 |
| Neuroradiology | Pope, Whitney | MD, PhD | $900 |
| Neuroradiology | Pressman, Barry | MD | $900 |
| Radiology | Hake, Steven | MD | $600 |
| | | | |

# Appendix C
# to Declaration of Russell Stetler

# Declaration of Kevin McNally, September 4, 2018

IFCD 00028495

**DECLARATION OF KEVIN McNALLY REGARDING JOINT AND SEPARATE TRIALS AND OUTCOMES IN MULTIPLE CAPITAL DEFENDANT FEDERAL DEATH PENALTY TRIALS**

1. I currently serve with the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. Counsel for Efrain Rodriguez-Mendoza requested that I submit this declaration discussing the statistics on the outcomes motions to sever defendants in multi-defendant federal capital trials. Counsel for Mr. Rodriguez-Mendoza also has requested that I provide statistics on the outcomes of federal capital trials where more than one capital defendant was tried together. I have served as Resource Counsel since the inception of the Resource Counsel Project (RCP) in January, 1992. I was the Director of the Project between 2007 and 2018. The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such

1

cases.  This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

3.    In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases.  I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. http://www.uscourts.gov/sites/default/files/original_spencer_report.pdf.    The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."

http://www.uscourts.gov/services-forms/defender-services/publications/update-cost-and-quality-defense-representation-federal

IFCD 00028497

counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. In the prosecutions which have been tried in federal court with more than one capital defendant, district courts have granted separate trials or separate penalty hearings in a clear majority of cases.

5. Eighty prosecutions which have commenced trial have involved multiple capital defendants. Of the multi-capital defendant prosecutions (80), which have begun trial, some form of severance has been granted in 51 instances[2] (or 64%)

---

[2] 1) *United States v. Alex Cooper and Darnell Davis* (N.D. IL No. 89-CR-580) (separate trials); 2) *United States v. Richard Tipton, et al.* (E.D. VA No. 3-92-CR-68) (one of four capital defendants severed); 3) *United States v. Reginald Brown, et al.* (E.D. MI No. 91-CR 81127) (separate trials); 4) *United States v. John Javilo McCullah, et al.* (E.D. OK No. 1:92-032-S) (separate penalty hearings and sequential jury deliberations before the same jury); 5) *United States v. Bruce Webster and Orlando Hall* (N.D. TX No. 4:94-CR-121-Y) (separate trials); 6) *United States v. Phouc Nguyen and Bountaem Chanthadara* (D. KS No. 94-CR 10129-01) (separate trials); 7) *United States v. Dennis Moore and Kevin Wyrick* (W.D. MO No. 94-00194-01-12-CR-W-9) (separate penalty hearings and sequential jury deliberations before the same jury); 8) *United States v. Everett Spivey and Richard Haworth* (D. NM No. 95-CR 491 LH) (separate trials granted to non-capital co-defendants); 9) *United States v. Jason de la Toree, et al.* (D. NM No. 95-CR 538-MV) (separate trials); 10) *United States v. Dean Beckford, et al.* (E.D. VA CR No. 3:95CR00087) (one capital defendant tried separately); 11) *United States v. Timothy McVeigh and Terry Nichols* (D. CO No. 96-CR-68-M) (separate trials); 12) *United States v. Jeffrey Williams Paul and Trinity Ingle* (W.D. AR No. 6:96CR60022) (separate trials); 13) *United States v. Quan Ray and Darrell Johnson* (N.D. IL No. 96

3

IFCD 00028498

CR 379) (separate trials); 14) *United States v. Marvin Lee Holley and Charles Holland* (N.D. AL No. 96-B- CR 0208-NE) (separate trials); 15) *United States v. Anthony Jones and Jerry Williams* (D. MD. No. WMN-96-0458) (separate trials for capital and non-capital defendants); 16) *United States v. Norris G. Holder and Billie Jerome Allen* (E.D. MO 4:97-CR-0141-ERW(TCM) (separate trials); 17) *United States v. Chevy Kehoe and Daniel Lee* (D. AR No. LR-CR-97-243) (separate penalty hearings and sequential penalty deliberations before the same jury); 18) *United States v. Ricky Lee Brown, Barbara M. Brown and Janette A. Ables* (N.D. WV No. 1:98CR34) (separate trials); 19) *United States v. Cornelius Peoples and Xavier Lamar Lightfoot* (W.D. MO No. 98-00149-02-CR-W-6) (separate penalty hearings and sequential jury deliberations before the same jury); 20) *United States v. Sinisterra, et al.* (W.D. MO No. 98-00311-01/05-CR-W-2) (separate penalty hearings and sequential jury deliberations before the same jury); 21) *United States v. Willis Haynes and Dustin Higgs* (D. MD No. PJM-98-CR 0502) (separate trials); 22) *United States v. Mohamed Rashed Daoud Al-'Owhali and Khalfan K. Mohamed* (S.D. NY No. S6 98 CR 1023) (one non-capital co-defendant severed; separate penalty hearings and sequential jury deliberations before the same jury); 23) *United States v. Jamal Shakir, et al.* (M.D. TN No. 3:98-00038) (three separate trials); 24) *United States v. Daymon Smith and Kenneth Tatum* (E.D. TX No. 2:99 CR 5) (separate trials); 25) *United States v. Mariano Martinez* (C.D. CA No. 99-CR 83-(A)-DT) (separate trial for Martinez); 26) *United States v. Billy Lyon and Charles Stewart* (W.D. KY No. 4:99-CR-11-M) (three separate trials for two capital and one non-capital co-defendant); 27) *United States v. Julius Omar Robinson and L.J. Britt* (N.D. TX No. 00-CR-260-ALL) (separate trials); 28) *United States v. Samuel Ealy, et. al.* (W.D. VA No. 00-CR-104-ALL) (separate trial granted for one of the three capital co-defendants); 29) *United States v. Dustin Honken and Angela Johnson* (N.D. IA No. 00 CR 3034 MWB) (separate trials); 30) *United States v. Elijah Bobby and Michael Williams* (S.D. NY No. 00-CR-1008) (separate penalty phase hearings); 31) *United States v. William and Rudy Sablan* (D. CO No. 00-CR-531) (separate trials); 32) *United States v. James Edward Frye and Billy D. Cooper* (S.D. MS No. 01-CR-8-ALL) (separate trials); 33) *United States v. Aaron Haynes and William Maxwell* (W.D. TN No. 01-CR-20247-ALL) (separate trials); 34) *United States v. Styles Taylor and Keoin Thomas* (N.D. IN No. 2:01 CR 073 JM) (separate penalty hearings and sequential jury deliberations before the same jury); 35) *United States v. Amesheo Cannon and Tyrese Hyles* (E.D. MO No. S1-1:01CR00073RWS) (separate trials); 36) *United States v. Michael Paul and Robert Norman Ostrander* (W.D. MI No. 01-CR-00218) (separate trials); 37) *United States v. Gilberto*

IFCD 00028499

and was being considered in another when the jury acquitted the three defendants.[3]  In four multi-capital defendant prosecutions, no pre-trial motion was filed by the capital defendants in three cases[4] or was opposed by one

*Caraballo and Martin Aguilar* (E.D. NY No. 01-CR-1367) (separate trials); 38) *United States v. Keon Moses, et al.* (D. MD CR No. 02-CR-410-ALL) (one capital defendant tried separately); 39) *United States v. Wilfredo Perez and Fausto Gonzales* (D. CT No. 02-CR-7-ALL) (separate trials); 40) *United States v. Branden Basham and Chadrick Fulks* (D. SC No. 02-CR-992-ALL) (separate trials); 41) *United States v. Lorenzo Catalan-Roman and Hernaldo Medina Villegas* (D. PR No. 3:02-CR-117-ALL) (separate penalty hearings before the same jury);  42) *United States v. Iouri Mikhel, et al.* (C.D. CA No. 02-220 (A)-NM) (one capital defendant tried separately); 43) *United States v. Barry Byron Mills, et al.* (C.D. CA CR No. 02-00938-GHK) (capital defendants severed in three groups); 44) *United States v. Richard James and Ronald Mallay* (E.D. NY No. 02-773) (separate trials); 45) *United States v. Gary Eye and Steven Sandstrom* (W.D. MO No. 4:05-CR-00344-ODS) (separate penalty hearings and sequential jury deliberations before the same jury);  46) *United States v. Antonio Argueta* (D. MD No. 8:05 CR 00393-DKC) (separate trials); 47) *United States v. Timothy O'Reilly* (E.D. MI No. 05-80025) (separate trials); 48) *United States v. Azibo and Azikiwe Aquart* (D. CT 3:06-CR-160 (PCD)) (separate trials) and 49) *United States v. Kaboni Savage and Steven Northington* (E.D. PA No. 2:07-CR-00550-RBS) (separate penalty hearings and sequential jury deliberations before the same jury).  In two cases, severance was denied prior to trial but granted after a new trial was ordered: 50) *United States v. Len Davis and Paul Hardy* (E.D. LA CR No. 94-381) and 51) *United States v. George Lecco and Valeri Friend* (S.D. WV CR No. 2:05-00107).

[3]*United States v. Edward Alexander Mack, et al.* (S.D. FL No. 93-252-CR-UUB).

[4]*United States v. Jean Claude Oscar, et al.* (E.D. VA No. 93-CR-131) (no motion filed); *United States v. Shaheem and Raheem Johnson* (E.D. VA No. 97-00314-A) (involved two brothers who wanted to be tried together) and *United States v. Peter Jordan and Lorenzo Gordon* (E.D. VA CR No. 04-CR-58) (no motion filed).

IFCD 00028500

defendant[5] in a fourth and fifth case.  In four cases, a pretrial guilty plea by one of two capital defendants mooted the issue.[6]  In another case, all three capital defendants entered guilty pleas during jury selection.[7] Severance was denied in fourteen other multi-capital defendant prosecutions or 18 % (14 of 80 cases).[8]  In two other cases, severance was granted from one or more non-capital

[5]*United States v. Tyrone Walker and Walter Diaz* (N.D. NY No. 94-CR-328) and *United States v. Wesley Paul Coonce and Charles Michael Hall* (W.D. MO No. 10-CR-03029-01/02-CR-S-GAF).

[6]*United States v. Robert Williams and Marvin Damon* (E.D. VA No. 3:95CR45); *United States v. Cornell Winfrei McClure and Rufus Jerry Millegan* (D. MD No. 01-CR-367-ALL); *United States v. Thomas Smith and Israel Ward* (W.D. MO No. 3:02 CR 05025) and  *United States v. Daryl Henderson and Charod Becton* (S.D. NY No. 1:02-CR-00451-MBM-ALL).

[7]*United States v. Raul Robledo, et al.* (C.D. CA No. 05 CR 578).

[8]1)*United States v. LaFawn Bobbitt & Rashi Jones* (E.D. VA No. 97 CR 129); 2) *United States v. Christopher Vialva and Brandon Bernard* (W.D. TX No. W99CR070); 4) *United States v. Kevin Gray,* 2001 WL 1344859 (D. DC); 5) *United States v. Lavin Matthews, Christopher McMillian and Tebiah Tucker* (N.D. NY No. 00-CR-269-ALL); 6) *United States v. Alan Quinones and Diego Rodriguez* (S.D. NY No. 00 CR 0761 (JSR)); 7)  *United States v. Andre Cooper, et al.* (E.D. PA CR No. 01-CR-512); 8) *United States v. Shawn Arnette Breeden and Michael Anthony Carpenter* (W.D. VA No. 03-CR-13-ALL); 9) *United States v.  Oscar Grande and Ishmael Cisneros* (E.D. VA No. 04-CR-283-ALL); 10) *United States v. Lanny Benjamin Bodkins and Antoine Plunkett* (W.D. VA No. 4:04-CR-70083-JLK-ALL); 11) *United States v. Ricardo Sanchez and Danny Troya* (S.D. FL 06-80171-CR-HURLEY/VITUNAC(s)(s)); 12) *United States v. Melvin Gilbert and James Dinkins* (D. MD No. 1:06-CR-00309-JFM); 13) *United States v. Mark Snarr and Edgar Garcia* (E.D. TX No. 1:09-CR-00015-MAC-KFG All) and 14) *United States v. Christopher*

IFCD 00028501

Ex. 10 Page 112 of 120

defendants.[9] The final two joint capital defendant trials involved two brothers and identical evidence.[10]

6. In those trials involving more than one capital defendant, juries have reached the same verdict on punishment - either life or death - for all defendants in nearly every case (89%). In 32 trials the penalty verdict was the same.[11] In only

---

Cramer and Ricky Allen Fackrel (E.D.TX No. 1:16-CR-00026-MAC-ZJH).

[9]United States v. Wilfredo Martinez-Acosta, Victor Rodriguez and Carlos Ivan Llera-Plaza (E.D. PA No. 98-CR-362) and United States v. Hector Acosta Martinez and Joel Rivera Alejandro (D. PR CR No. 99-044 (SEC)).

[10]United States v. Antonio and Robert Carpenter (W.D. TN No. 99-20155) and United States v. Reynaldo and Baldemar Villarreal (E.D. TX No. 9:91-CR-4).

[11]1) United States v. Reynaldo and Baldemar Villarreal (E.D. TX No. 9:91-CR-4) (two life sentences); 2) United States v. Richard Tipton, et al. (E.D. VA No. 3-92-CR-68) (three death sentences); 3) United States v. Jean Claude Oscar, et al. (E.D. VA No. 93-CR-131) (three life sentences); 4) United States v. Len Davis and Paul Hardy (E.D. LA No. 94-CR-381) (two death sentences); 5) United States v. Anthony Walker and Walter Diaz (N.D. NY No. 94-CR-328) (two life sentences); 6) United States v. Dean Anthony Beckford, et al. (E.D. VA No. 3:95-CR-00087) (four life sentences); 7) United States v. LaFawn Bobbitt & Rashi Jones (E.D. VA No. 97 CR 129) (two life sentences); 8) United States v. Shaheem and Raheem Johnson (E.D. VA No. 97-00314-A) (two life sentences); 9) United States v. Cornelius Peoples and Xavier Lamar Lightfoot (W.D. MO No. 98-00149-02-CR-W-6) (two life sentences); 10) United States v. Mohamed Rashed Daoud Al-'Owhali and Khalfan K. Mohamed (S.D. NY No. S6 98 CR 1023) (two life sentences); 11) United States v. Christopher Vialva and Brandon Bernard (W.D. TX No. W99CR070) (two death sentences); 12) United States v. Alan Quinones and Diego Rodriguez (S.D. NY No. 00 CR 0761 (JSR)) (two life sentences); 13) United States v. Michael Williams and Elijan Bobby Williams (S.D. NY No. 00-CR-1008) (two life sentences); 14) United States v. Matthews, McMillian and Tucker (N.D. NY No. 00-CR-269-ALL) (three life

7

four trials was the penalty verdict different for the defendants.[12] In four other

sentences); 15) *United States v. Kevin Gray and Rodney Moore* (D. DC CR No. 1:00CR00157) (two life sentences); 16) *United States v. Jamain Williams and Andre Cooper* (E.D. PA No. 01-CR-512) (two life sentences); 17) *United States v. Iouri Mikhel and Jurijus Kadamovas* (C.D. CA No. 02-CR-220 (A)-NM) (two death sentences); 18) *United States v. Lorenzo Catalan Roman and Hernaldo Medina Villegas* (D. PR No. 3:02-CR-117-ALL) (two life sentences); 19) *United States v. Barry Byron Mills and Tyler Davis Bingham* (C.D. CA No. 02-00938-GHK) (two life sentences); 20) *United States v. Wayne Bridgewater and Henry Michael Houston* (C.D. CA No. 02-00938-GHK) (two life sentences); 21) *United States v. Richard James and Ronald Mallay* (E.D. NY CR No. 02-778 (S-1) (SJ)) (two life sentences); 22) *United States v. Keon Moses and Michael Lafayette Taylor* (D. MD No. 02-CR-410) (two life sentences); 23) *United States v. Shawn Arnette Breeden and Michael Anthony Carpenter* (W.D. VA No. 03-CR-13-ALL) (two life sentences); 24) *United States v. Peter Jordan and Lorenzo Gordan* (E.D. VA No. 04-CR-58) (two life sentences); 25) *United States v. Oscar Grande and Ishmael Cisneros* (E.D. VA No. 04-CR-283-ALL) (two life sentences); 26) *United States v. Gary Eye and Steven Sandstrom* (W.D. MO No. 4:05-CR-00344-ODS) (two life sentences); 27) *United States v. George Lecco and Valeri Friend* (S.D. WV CR No. 2:05-00107) (two death sentences); 28) *United States v. Ricardo Sanchez and Danny Troya* (S.D. FL 06-80171-CR-HURLEY/VITUNAC(s)(s)) (two death sentences); 29) *United States v. Melvin Gilbert and James Dinkins* (D. MD No. 1:06-CR-00309-JFM) (two life sentences); 30) *United States v. Mark Snarr and Edgar Garcia* (E.D. TX 1:09-CR-00015-MAC-KFG All) (two death sentences); 31) *United States v. Wesley Paul Coonce and Charles Michael Hall* (W.D. MO No. 10-CR-03029-01/02-CR-S-GAF) (two death sentences) and 32) *United States v. Christopher Cramer and Ricky Allen Fackrel* (E.D.TX No. 1:16-CR-00026-MAC-ZJH) (two death sentences).

[12] 1)*United States v. James Norwood Hutching, Ramon Medina Molina and John Javilo McCullah* (E.D. OK No. 1:92-CR-032-S) (two life sentences and one death sentence); 2) *United States v. Chevy Kehoe and Daniel Lee* (D. AR No. LR-CR-97-243) (one life sentence, one death sentence); 3) *United States v. German Sinisterra, Arboleda Ortiz and Plutarco Tello* (W.D. MO No. 98-00311-01/05-CR-W-2) (two death sentences and one life sentence) and 4) *United States v. Kaboni Savage and Steven Northington* (E.D. PA No. 2:07-CR-00550-RBS) (one death sentence and one life sentence).

IFCD 00028503

cases, the jury acquitted all defendants.[13]

7. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project, and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of American, 28 U.S.C. §1746, that the foregoing is true and correct. Executed this 4th day of September, 2018.

 /s/   Kevin McNally
Kevin McNally
Federal Death Penalty Resource Counsel

---

[13]*United States v. Edward Alexander Mack, Chedrick Crummie and Kevin Denard Rozier* (S.D. FL No. 93-252-CR-UUB); *United States v. Ricky Lee Brown, Barbara M. Brown and Janette A. Ables* (N.D. WV No. 1:98CR34; *United States v. Hector Acosta-Martinez and Joel Rivera Alejandro* (D. PR No. 99-CR-044 (SEC)) and *United States v. Samuel Ealy and Walter Church* (W.D. VA No. 00-CR-104-ALL).

IFCD 00028504

# Appendix D
# to Declaration of Russell Stetler

# Hall Defense Team CJA billing

IFCD 00028505

Ex. 10, Page 116 of 120



Chart 1

| | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| a - In Court | 1.2 | 0.6 | | 11.7 | 325.2 |
| b - Client Intvw & Conf | 12.1 | 37.5 | 122.3 | 102.3 | 84.8 |
| c - Wx Intvws | 7.6 | 57.7 | 9.1 | 47.2 | 85.8 |
| d - consult w investigators & experts | 1 | 15.2 | 12.3 | 37.6 | 65.5 |
| e - obtaining & reviewing court rec | 5.8 | 1 | 17.2 | 81.3 | 372.7 |
| f - obtaining & reviewing docs & other evid | 71.5 | 95.3 | 534 | 605.15 | 602.7 |
| g - Consulting w/ expert counsel | | 1.5 | 8.4 | 4.7 | 10 |
| h - Legal Research & Writing | 0.2 | 16.1 | 402.5 | 720.1 | 573.7 |
| i - Travel | 32 | 92 | 169.3 | 203.9 | 391.7 |
| j - Other | 44 | 185.9 | 208.5 | 176.3 | 527.35 |

IFCD 00028506



Total

Chart 2

4.71%
4.99%
2.88%
1.83%
6.65%
26.54%
0.34%
23.81%
12.36%
15.88%

- a - In Court
- b - Client Intvw & Conf
- c - Wx Intvws
- d - consult w investigators & experts
- e - obtaining & reviewing court rec
- f - obtaining & reviewing docs & other evid
- g - Consulting w/ expert counsel
- h - Legal Research & Writing
- i - Travel
- j - Other

Chart 2

IFCD 00028507



IFCD 00028508

Case 4:21-cv-08001-BCW    Document 70-11    Filed 04/29/24    Page 119 of 120



Chart 4

Case 4:21-cv-08001-BCW   Document 70-11   Filed 04/29/24   Page 120 of 120

IFCD 00028509