## Declaration of John Wisner, MD

I, John Wisner, declare the following:

1.  I am a psychiatrist by training and education. I earned an MD in 1976 after having graduated from Seminary in 1972. I completed a residency in psychiatry from the University of Kansas School of Medicine in 1979.

2.  I was a professor of psychiatry from 1979 through my retirement in 2012, first as an assistant professor and then as an associate professor at the University of Kansas School of Medicine.

3.  I was also a staff psychiatrist at the Kansas City Veterans Affairs Medical Center from 1979 through 2000. Thereafter I was a staff psychiatrist at the University of Kansas Medical Center (KU-Med) from 2000 until my retirement in 2012.

4.  Simultaneous to my practicing medicine as a psychiatrist, I was also ordained as a priest in the Roman Catholic Church, serving as an associate vicar (associate pastor) at St. Agnes Parish in Roeland Park, KS from 1985 until 2012.  In 2012 I was accused of improprieties, of which I maintain my innocence.  This ended my service as a priest.

5.  Throughout much of my career I have also testified in civil and criminal cases as an expert witness. I have always told the attorneys who hired me that they pay me for my time, not my opinion. I am not of purchasable virtue. However, my relationships with the lawyers who hire me is often collaborative. There are often back and forths on what diagnosis I am going to offer. If I offer an opinion that lawyer is not seeking, I have been let go. Being let go as an expert witness is not rare. I have worked for both defense lawyers and prosecutors in my career.

6.  I came to know Fred Duchardt as a local attorney in the Kansas City area through his medical malpractice civil work. I was retained by Fred in over a

1

IFCD 00028385

dozen of his criminal cases. I was retained in the case against Charles Hall by Fred in August 2013.

7. Fred and I became friendly over the years of work together. I still speak with him occasionally, typically when he calls to chat about one of his cases. I was Fred's treating psychiatrist in 2013, as well as for his wife and son later. While I no longer hold an active license to practice medicine, I informally consulted with Fred on cases as recently as late 2023. When the allegations against me were published in the Kansas City Star in 2012, Fred was a true friend and had my back. He stood by me as my career was uncertain.

8. I first met Mr. Hall in December 2013. Shortly after I met Mr. Hall, I met with Fred and explained that it would be appropriate to obtain additional testing of Mr. Hall. I suggested that brain imaging and an EEG be done to understand the possible physical changes to Mr. Hall's brain. There was a known history of head injury and clues to suspect Mr. Hall suffered from seizures. Prior to finalizing my report, I explained this to Fred and said the only way to truly know the root cause was brain imaging and an EEG. As far as I know, neither an EEG nor brain imaging were done prior to the time of my testimony in Mr. Hall's case in 2014.

9. My psychiatric report in Mr. Hall's case is dated February 9, 2014. I wrote an addendum report dated April 28, 2014, after Fred asked me to address the BOP's monitoring and supervision of the mental health wing within MCFP Springfield.

10. I wrote in my original psychiatric report, "A known history of head trauma in a patient presenting with an unusual or apparently treatment resistant set of symptoms or [sic] should prompt investigation into the possibility of mental changes and psychiatric symptoms being related to or increased by 'partial seizures' or other brain abnormalities related to such an injury. Investigation by at the minimum electroencephalography (EEG) and brain imaging, if available, have the potential to bring this diagnosis in Mr. Hall from the realm of possibility into greater probability ·· and have a greater likelihood

2

IFCD 00028386

that brain injury has some impact on his vulnerability, severity of illness, and degree of duress."

11. Mr. Hall had a history of head trauma, as well as unusual or apparently treatment resistant symptoms. This was demonstrated, in part, by the fierce disagreement over what diagnosis was properly ascribed to Mr. Hall.

12. As medical professionals, we gather as much information about the clinical presentation of a patient, then render the diagnosis, if any, that is appropriate based on that information. New or changed information can certainly affect the diagnosis. Responsible practice of medicine leaves open the possibility that one will consider a new or different diagnosis when new information becomes available. This is particularly important because there is no testing -- no blood test, x-ray, imaging, or otherwise -- that can definitively confirm or rule out the diagnosis I gave Mr. Hall, bipolar disorder 2.

13. Mr. Hall's medical diagnosis was further complicated, as I noted in my original report, by chronic administration of the steroid prednisone, which can produce difficulty controlling emotions, mimic mania, or even evoke psychosis.

14. I have now been shown Mr. Hall's 2023 MRI/PET scan results. These results are remarkable, in that they support that Mr. Hall has abnormalities to his brain. While you can never know exactly what brain imaging will show prior to its administration (if you could, there would be no point in conducting the imaging) these abnormalities to Mr. Hall's brain are things I was asking Fred to explore back in 2013 and 2014.

15. The brain imaging conducted now would have been helpful in making an accurate diagnosis of Mr. Hall. When we can see and understand the areas of the brain that are abnormal, damaged, or dysfunctional, they can render clarity. Such brain changes can account for symptoms that might otherwise appear to be a mental illness but are more likely the result of brain dysfunction. This is the case for Mr. Hall.

3

IFCD 00028387

16. I have also been told that Mr. Hall was repeatedly molested when he was an adolescent. Certainly being a victim of childhood sexual abuse over the course of a year is an adverse experience that can impact the development of a child and cause traumatic or dysfunctional reactions. One would not be surprised if a child subject to traumatic experiences in formative years had rebellious behavior and/or suicidal ideation. This history of trauma could account for many of Mr. Hall's symptoms.

17. I would have wanted to have access to brain imaging and I would have wanted to know about Mr. Hall's history of sexual victimization prior to my testimony.

18. Many of Mr. Hall's symptoms, including mood lability, dishonesty or confabulation, depression, anxiety, misbehavior and criminal behavior, can stem from a number of different causes or diagnoses. With the additional information about Mr. Hall's abnormal brain imaging and his history of traumatic experiences, it is no longer apparent to me that my diagnoses were completely accurate or appropriate. I am particularly concerned with my prior diagnosis of Antisocial Personality Disorder (ASPD). I believe Mr. Hall's brain dysfunction and history of trauma may better explain his history of lying/confabulation and failure to conform with the law.

19. I based my ASPD diagnosis on the available information given to me by Fred. When I informed Fred that I intended to diagnosis Mr. Hall as ASPD, Fred did not push back or attempt to provide alternative interpretations of Mr. Hall's conduct to get me to reconsider my diagnosis.

20. Additionally, I knew that Mr. Hall suffered from Crohn's disease. The quality of life for individuals with Crohn's disease is negatively impacted in significant ways. I had some knowledge of gastroenterology based on my medical education. I knew he had a history of chronic prednisone use, but I never knew whether he was on prednisone at the time of the homicide and, if so, what dosage. I did not get into that level of detail in my analysis. Had Fred hired a gastroenterologist or some Crohn's disease specialist for Mr.

4

IFCD 00028388

Hall's case, that would not have bothered me. I would have worked with that expert and allowed that expert to testify about Mr. Hall's Crohn's disease and prednisone usage.

21. The addendum to my report came about after Fred realized that no one was really watching the inmates of unit 10B. I was able to say that the inmates in the unit where this homicide occurred were monitored much less than they would have been in a civilian mental health hospital setting. I was not then, and am not now, an expert in Bureau of Prisons records, classification, placement, or security. Had Fred hired a BOP or prison expert for Mr. Hall's case, that would not have bothered me. I would have worked with that expert and allowed that expert to testify about Mr. Hall's monitoring, classification, placement, and security within the Bureau of Prisons along with his or her discussion of Mr. Hall's prison records.

22. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.

_John Wisner, MD_
John Wisner, MD

Executed this day _February 7th_, 2024 in Kansas City, MO.

Witnessed by:

_Mary Stewart_
Mary Stewart

IFCD 00028389