_____

STATEMENT UNDER OATH OF: Frederick Duchardt

DATE: January 8, 2024

PLACE: Regus-South Kansas City
800 East 101st Terrace
Kansas City, MO 64131

EXAMINER: Ms. Angela Elleman
Indiana Federal
Community Defenders
111 Monument Circle
Suite 3200
Indianapolis, IN 46204
angie-elleman@fd.org

ALSO PRESENT: Ms. F. Italia Patti
Indiana Federal
Community Defenders
111 Monument Circle
Suite 3200
Indianapolis, IN 46204
Italia_patti@fd.org

Mr. Keith O'Connor
Keith O'Connor, LLC
PO Box 22728
Kansas City, MO 64113
Keith@keithoc.com

REPORTER: Alison A. Tracy
MO CCR #554

VIDEOGRAPHER: Mr. Mike DiNitto
_____

IFCD 00027941

Ex. 15 Page 1 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 1 of 423

E X H I B I T S

NO.                    DESCRIPTION:                    PAGE:

Exhibit 1    School Records                           82

Exhibit 2    Handwritten list of names           108

Exhibit 3    Robert D. Lewis Memo to
             Chuck Hall File, list of names   111

Exhibit 4    Shaker Mountain School records   113

Exhibit 5    Duchardt time sheet                  116

Exhibit 6    Sweetser Children's Home
             records                                 120

Exhibit 7    Handwritten note from Chuck       121

Exhibit 8    8/24/12 E-mail to Fred Duchardt
             from Ray Hill                          127

Exhibit 9    March, 2014 E-mail to Fred
             Duchardt from Sherry Wang        131

Exhibit 26   Authorization and Release          3

Copies of exhibits attached to Ms. Elleman's copy of statement.

THE VIDEOGRAPHER: Good morning. We are on the record. The time is 10:04 a.m. Today's date is January 8, 2024. This is the under oath video statement of Fred Duchardt. My name is Mike DiNitto representing Veritext. Our court reporter is Alison Tracy, who will now swear in the witness.

FREDERICK DUCHARDT, the Witness, being first duly sworn, testified under oath as follows:

EXAMINATION

BY MS. ELLEMAN:

Q. Thank you so much. I'm Angie Elleman, we conversed by E-mail and phone before but I think this is the first time we have met face to face.

A. Right.

Q. So this is obviously not really a formal deposition in the technical rules of court in any way, but when we wanted to meet and chat you asked me if you could record it. And I said you know what, if we are going to do that, if you were concerned I think at that point that your words be represented fairly --

A. Sure.

IFCD 00027943

Q. -- and I thought let's just make sure there is no dispute about beginning and ending, and if I show you any documents, we have them marked as exhibits so there is no dispute about what I have showed you. And so you voluntarily agreed to come and do this statement with us today, right?

A. Of course.

Q. So we are going to treat it, even though it is not a deposition, we are going to treat it a little bit like that way for the purposes of exhibits, and that means with the court reporter we will have the same like with the deposition that you will get a copy of the transcript and you will have an opportunity to take a look at it. And obviously you don't get to change your answers, but if there is any typos or things that you want to note, you will have an opportunity to do that.

A. Okay.

(Exhibit 26 was marked.)

Q. Okay? The other thing is I wanted to -- I think I will start out by I have what is marked as Exhibit 26. I just want to be clear that this is a release form signed by Mr. Hall which gives

you permission to relay things to us verbally about your representation and anything about him so that we are clear that he has waived any attorney/client privilege for the purposes of our conversation here today.

A. Well, that is attorneys talking to one another so that would have protections in itself.

Q. Well, absolutely, you are absolutely right about that. But, obviously he is just giving you permission to chat with me about things that he maybe confidentially chatted with you out about in the past.

A. Sure.

Q. So as we get started, do you have any questions for us?

A. No.

Q. Okay. Why don't you just start by telling me a little bit, Fred, about how you first got the call that you might be involved in Chuck Hall's case.

A. Judge Fenner called me and told me that Chuck's then counsel had had difficulties that were not going to allow them to continue to represent him and asked me if I would be willing to take over representation for Chuck.

IFCD 00027945

Ex. 15 Page 2 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 5 of 423

Q. Okay. And did you immediately agree, or did you take some time to think about it?

A. Immediately agreed.

Q. Okay. At that time the prior counsel in that case, are you talking about Darryl and Lynn Johnson?

A. Yes.

Q. And what were the nature of these problems as far as you understood them to be?

A. Well, all of that is in the records and pretty clear. I'm drawing on my recollection for now. Basically Lynn and Darryl had marital problems and there were difficulties that were on that level. So there had already been, and I'm spacing on the fellow who was representing Chuck with Darryl before Lynn took over, but --

Q. Does Stuart Huffman help you at all?

A. Yes, thank you, that's it. There had been a group of problems that had developed between the two of them and so that's when Lynn took over. And then when there were problems, personal problems that developed between Lynn and Darryl, it was never really clear to me why Darryl -- it certainly was clear that they couldn't work together, why one of them wasn't

IFCD 00027946

going to continue never was quite clear to me. But they had certainly convinced Judge Fenner that they shouldn't continue, and so that was really all that I needed to know.

Q. Do you remember that actually Darryl had criminal charges pending against him?

A. I don't remember if they were pending then or they were going to be charged. My recollection is nothing really came of those. But, in any event, that's my best recollection of that.

Q. Did you know Darryl and Lynn before this?

A. No.

Q. No. Did you know them even by reputation?

A. No.

Q. They were unknown to you at all?

A. True.

Q. What about Stuart Huffman, was he someone that you knew at all before this?

A. No, no.

Q. So, you understand and I assume one of the first -- and maybe I shouldn't assume, but I assume one of the things you wanted to do was get

a copy of the file --

A. Sure.

Q. -- from prior counsel, right?

A. Yes.

Q. Do you have any recollection of your impression about the condition of the file?

A. It was a mess.

Q. Tell me more about that.

A. Honestly, you pretty much got it not a whole lot differently than the way I got it. Because I frankly wanted to leave it as much as I could in the condition that I got it in. And I knew I was going to get -- I had already asked Randy Eggert for a fresh set of records, so. There really wasn't much in their files that was different. There were a few things.

There were some pictures that they took when they took their trips to Maine, and I think those things I singled out, a few of them. But by and large, I mean I poured through all of it but it was very difficult to get any good use out of what they had put together.

Darryl did an awful lot of organization, I guess is the right word for it. I didn't find it very helpful in terms of the organization he

had put to it.

Q. And you mentioned that they had taken a trip to Maine.

A. Uh-huh.

Q. And that --

A. I think two, if I remember it right.

Q. That's consistent with what I understand. And I think that first trip would have been while Darryl and Stuart were on the case.

A. Yes.

Q. But Stuart didn't go, does that sound right?

A. I don't recall that. It seems to me, and I can't recall exactly, but I thought that Lynn went with Darryl both times.

Q. I think that's correct. Yes. So, what did you know about what they did while they were in Maine?

A. From what I saw, not a hell of a lot.

Q. Do you have a sense of who they met with while they were there?

A. They met, my recollection is they met Chuck's parents. But really, beyond that. I mean the natural things you would, that I would

Ex. 15 Page 2 of 423   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 9 of 423

have been wanting to do by way of looking for records and stuff like that, none of that had been done.

Q. Beyond meeting with his parents, do you know if they met with anybody else or do you recall?

A. I don't recall. I can tell you that there was nothing that they had done in any of their trips, whether it be to Maine or to Maine DOJ, that I found in any way useful to what we were going to do.

Q. Okay. Do you recall seeing any like memos or notes taken during their meetings with the parents?

A. No, I did not see that. There were, my recollection is that there were some notes of going and it may have been -- and my recollection may have been I just saw that in his time sheets.

Q. Okay.

A. I can't distinguish for you if there were specific notes related to that work.

Q. I guess what I'm getting at is like did you have any work product that helped you understand like what information they got from the parents?

IFCD 00027950
Ex. 15 Page 10 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 10 of 423

A.   No.

Q.   Okay.  So you didn't have anything like that?

A.   No.

Q.   So when you got in the case you were essentially starting whatever sort of meeting his parents and stuff from scratch?

A.   Well, yes and no.  I mean, certainly when I talked to his parents they spoke very highly of Lynn and Darryl, as Chuck did.  All of them felt that they were both very nice, very personable, so they had obviously plowed the ground to have been -- to have created a relationship.

Now, as to anything that they had done by way of a mitigation investigation or something like that, I didn't see anything at all.

Q.   Besides mom and dad, are you aware of them talking to any other friends, family members, teachers, co-workers, people in Chuck's life?

A.   I do not have any specific recollections.  I just honestly can't think of any of that.  But it doesn't mean that there might not have been something in the file to that

effect. But, I mean, what I'm presuming you are looking for, had they talked to his sisters, had they talked to his teachers, coaches, people like that. Nothing that I recall in that regard at all.

Q. And then what about records? And I will tell you I think that they had some records from the parents.

A. Yes.

Q. Is that consistent with your recollection?

A. Yes, that helps my recollection.

Q. The reason I can sort of -- like sometimes in the file I can't tell what you obtained and what they obtained.

A. Yes.

Q. But the reason I think that is because they gave some of those records to the DOJ evaluator, and that evaluation was done before you were on the case, right?

A. Yes.

Q. So they did get some like school records and that sort of stuff that the parents had saved.

A. But that is it. Dot was a very good

historian and handled the family's sorts of things, transactional kind of things very well and she kept everything as far as I could tell.

Q. When you say Dot, you mean Dorothy Hall?

A. Correct.

Q. That's Chuck's mom?

A. Correct.

Q. She just had like somewhere in storage in their house old papers?

A. I don't know where they came from particularly. I just know that in dealing with her on lots of things during the case she was the historian. She was the person who kept track of that stuff. Charlie Hall went to work and made the living and Dot took care of everything else.

Q. When you say Charlie Hall, that's Charles, Sr., Chuck's dad?

A. Correct.

Q. So, did you ever get to see like where she kept these papers?

A. No.

Q. Like pull out the boxes with her?

A. No. She always had -- she didn't particularly want me to check the basement because she was a very tidy person type of thing.

IFCD 00027953

Ex. 15 Page 23 of 428   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 13 of 423

So she always had anything she needed to show me. Although my recollection is she had already given over everything that she had to them.

Q. Got it.

A. But no, where she particularly kept things in the house she didn't particularly share that with me.

Q. And then I mentioned that evaluation that Chuck had by the BOP evaluator, I think that was Maureen Reardon at Butner.

A. Uh-huh.

Q. That happened before you were on the case, right?

A. Boy, I'm trying to remember. They certainly -- I mean, of course you got the Park Dietz cadre that dealt with Chuck. I honestly don't remember off the top of my head about the Butner evaluation. I think you are right, but I just don't remember for sure. Certainly there would have been no reason -- my recollection is she did her work before we ever did any of our work.

Q. Correct.

A. But I don't remember that for sure. I know that I certainly never gave her permission.

IFCD 00027954
Ex. 15 Page 14 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 14 of 423

And the first thing I told Chuck is anybody who wants to talk to you, don't.

Q.   Right.  And that is absolutely consistent with the records, in that I think the time that he went to Butner and was evaluated by her was during the Johnson's representation. Now, the purpose of her evaluation was to assess competency.

A.   Right.

Q.   Do you have any thoughts about how you would have handled that differently?

A.   Not doing it.

Q.   And why is that?

A.   My experience with DOJ evaluators is that I have not met one who wasn't inclined to find against competency and was inclined against finding anything more than they absolutely had to about any aspect of anything.  There would have been nothing in a process like that that would have benefited Chuck, especially when you don't know, when you don't have a baseline of your own information and give him an opportunity to be seen by people who have got at least an open mind.

Q.   So, I take it your preference would have

been to have defense evaluators see him first?

A. Especially when you are in the situation of a capital case where resources are going to be allowed for that. If it is a non-capital case, then sometimes DOJ is the only game in town.

Q. Do you have a sense of like why the Johnsons thought he should be assessed for competency, what raised that for them?

A. I think in talking to Darryl, because Darryl is the one I mostly talked to on those kinds of things, because it seemed to me like he was driving the bus in that regard, was that -- I mean, frankly he didn't have any experience in doing those kinds of cases and didn't really know.

I think his experience, to the extent he had much experience in criminal law at all, was all non-capital. And I don't think he had had any kind of experience in dealing with mental health issues. And so the best I can recall is, I mean honestly I thought it was such a bad decision I didn't even probe with him why he would have done that. But I'm trying to think. It seems to me like he said something to me in terms of -- they both found, both he and Lynn

found dealing with Chuck difficult in that Chuck very much wanted the death penalty, wanted them to advocate for the death penalty. And Chuck was very candid with me from the beginning that yes, that's what he told them to do, that's what he wanted them to do. I think to some degree they were trying to figure out what they had. So, that's the impression that I had from them.

Q. And did you have the sense then that with Darryl and Lynn he had been pretty consistent in asking for the death penalty, or did you think he was waffling during that time?

A. I never got any impression from either Chuck or Darryl and Lynn that he ever waffled on that.

Q. Okay.

A. Now, did he? I don't know. I wasn't there.

Q. Fair.

A. But my impression was that Chuck was very, very much pushy. That's the reason why from day 1 that Chuck and I met I just said let me just tell you, I'm not going to advocate for the death penalty for you. If you want to do that, you can do that yourself, you don't need a

lawyer, and they will be more than happy to help you to keep doing that, if you insist. But if you tell me not to do something, I'm pretty much stuck to do that. For you to tell me to advocate in favor of the death penalty for you, that will never happen.

Q. And he was okay with that, it sounds like?

A. The interesting thing that -- once those ground rules got set and the ground rule that Chuck was going to be the person making the decisions, that it is his case, and that I made clear to him I wasn't going to do something unless he approved it, he didn't have any problems listening to advice saying yes, why don't we do this because this is not against your principles or anything like that, we are just telling the truth.

The big thing Chuck didn't want to do is make any excuses for what he did. Chuck is a very black and white, right and wrong kind of guy. It is the way he always was with me. And I imagine that's the way he has always been with you.

Q. So he was concrete, he wanted things to

be simple, and --

A. No, no. Chuck -- I think that takes it too far.

Q. Okay, okay.

A. Because Chuck is a very complex person. Chuck is a very deep thinker. Chuck wants you to give him all kinds of ideas and Chuck is open to all kinds of different ideas. All of us are concrete to some degree. But what he wanted is to have somebody not talk down to him. He wanted as broad of explanations as you could give him on anything. And he was amenable to change to the extent he felt like you are making a good argument to him. Does that explain it?

Q. Yes, it does. So you spent time with him and --

A. Yes, lots.

Q. -- you explained all of your actions. And in light of that, he never objected to you sort of fighting against the death penalty on his behalf?

A. Your word "waffle" is a good one for his and my relationship in terms of -- because what I felt like I was able to do with him is explain to him how telling the truth about his background

was not making excuses for things like that. A lot of it is how you approach Chuck on something. He is definitely -- if you tell him we have to do it this way, you might as well decide that you are never going to do it that way.

Q. So selling it to him a little?

A. Well, there is selling, and then there is persuading and convincing. Chuck was always interested in hearing a good argument. And most of the time he at least let me do -- let me go down roads that he I think would have never let Darryl and Lynn go down.

Q. And you thought that was because of your approach in explaining things?

A. And they didn't have any ideas for him as far as I can tell.

Q. And he never cut off your investigation or told you not to talk to witnesses or anything like that?

A. At first he really, really, really didn't want me to talk to his family, didn't want me to talk to his parents. But we really got over that. I think once it was clear in his mind that, you know, I was going to treat them nicely, that we would develop -- once I developed a good

relationship with him, there was never any problem. And the other thing that I tried very hard to do is try to restart that relationship, all of those relationships, get some interaction regularly going with them.

Q. Between Chuck and his family?

A. Correct. And that just helped in terms of -- he so much wanted to make sure that I wasn't going to be blaming him for -- them for what he had done. That was just, you know, if there was anything that was verboten, that was it.

Q. So tell me what you knew about the staff that Darryl had working on the case. Besides Lynn and Darryl and Stuart, who else had been involved in the case that you knew of?

A. There was an investigator, and I sat down with the investigator, and it seems to me that he provided some information but I'm not remembering exactly what that was off the top of my head. But that's really the only person that I recall.

Q. In that investigator -- are you thinking of Joe Buckmaster?

A. Yes, yes.

Ex. 15 Page 21 of 423  Case 4:21-cv-08001-BCW  Document 70-16  Filed 04/29/24  Page 21 of 423

Q.    So as far as you knew, it was just Joe Buckmaster that was working on the case?

A.    That's my recollection as of right now.

Q.    If I were to say there were some paralegals and stuff they had working, does that sound right, or you just don't know?

A.    My only recollection is they were putting together file stuff.  They may have been the ones that created whatever organization that there was.  But I don't recall -- that Joe I know particularly, even as we got a little closer to trial, we actually had him chase down a lead on something and I just don't remember what that was.  But in terms of anything that I can recall that was anything of substance, I don't remember anything by paralegals having done that.

Q.    Let me say, Fred, this is water for you if you want it.

A.    I got it.

Q.    Any time you want to take a break, you let me know.

A.    I'm good.

Q.    I don't want press on beyond our human limits, which I'm known to do, just barrel through.

IFCD 00027962

Ex. 15 Page 22 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 22 of 423

A.   Then you are a kindred spirit.  Let's get it going and let's get us done.  Actually for all of us with the weather it may or may not come up this afternoon is going to be interesting.

Q.   Yes.  Italia over here maybe her flight is in jeopardy this evening.  We will see.  Cross your fingers.  I'm hanging around for a few more days.  I will trudge through the snow with you.  So, Joe Buckmaster, do you know what he was doing when he was on the case with Darryl?

A.   You mean what work he did on Chuck's case?

Q.   On Chuck's, that's right.

A.   It seems to me that there were some reports that Joe developed.  And I just can't remember that one aspect of the case.  Because I literally had a meeting with Joe not too long before trial and there was a particular angle of investigation that he had gone down that I wanted him to do a little bit more work on and we ended up paying him for that.

Q.   That he had gone down during his time with Darryl?

A.   Yes, yes.  Or at least they had scratched the surface of it.  He had some kind of

Ex. 15 Page 23 of 428

in with somebody, one of the witnesses or something like that, and so. And again, it would be in my notes.

Q. If I told you his billing records with you you got him approved for I think it was $7500 --

A. Right.

Q. -- to do the work. He only billed $800.

A. Right. That's all he did.

Q. And it looks like all he did is look at the video.

A. Which video?

Q. The surveillance video from the prison. I don't see, I mean you guys can correct me if I'm wrong, I don't see where he did any actually field investigation or collecting of records or anything.

A. And I don't recall him doing anything, any of that kind of stuff. And that's why I say, whatever reports of his -- it seems to me like there were some kind of reports that were there from him, and I could be wrong, but it seems to me like there was something along those lines.

Q. And let me ask, because whatever those reports are don't come to mind for me from your

file.

A.  Okay.

Q.  Would you have thought they would be labeled as like to file or to Darryl from Joe Buckmaster?

A.  Yes.  That's what I'm -- that's why I have got a -- and there wasn't much.  And I could be --

Q.  I haven't seen any memos like that.

A.  Okay.  And I just may be conflating him with something else.

Q.  I will say there was another, I have also seen reports from, there had been another investigator that apparently according to some of your court filings had tried to bill for interviews he had never done.  But that wasn't under you, that was under Darryl, and someone besides Joe.

A.  I'm not remembering that specifically.

Q.  And it has been awhile.

A.  No, no, no, no.  And I don't want to be unfair to people needlessly.  But there seemed to be an awful lot of work that was not very productive during Darryl's and Lynn's time.  And so, and what you are saying about another

IFCD 00027965
Ex. 15 Page 25 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 25 of 423

investigator, did Darryl detect that or did I detect that?

Q. I think it was Darryl.

A. Okay.

Q. I do think it was Darryl.

A. Because that's what is coming to mind to me. I mean, I kept telling Chuck all of this stuff, and Chuck just defended Darryl and Lynn to the Nth degree. I'm just kind of going, Chuck, this is pretty straightforward here.

Q. Why do you think that was?

A. He is very loyal, very loyal to people. I mean, as much as he gets mad at the world in general and people particularly, he interestingly tries his best to think the best of people, was my experience.

Q. The times that we talked about earlier that Chuck did say he wanted the death penalty, as you developed a relationship with Chuck and got to know him better did you come to have an understanding of why he wanted that?

A. Well, you mean the 800 different reasons why he wanted that?

Q. Okay, okay.

A. I mean, the poor man. Crohn's disease

is a -- there isn't anything worse, I don't think, out there in terms of an ongoing disease. Especially thankfully in this day and age we have got some really good drugs to treat that. When he started with it -- my wife and I had a good friend who died of Crohn's. And in the days when Chuck was diagnosed and when this lady was dealing with Crohn's, Prednisone was the only thing, and what a horrible thing to have to deal with. And so you don't need to go very far to figure out Chuck if you understand his condition and trying to deal with it.

He did not particularly fear death and in a lot of ways understood that it would finally give him some comfort over all of that stuff. I would say number 2 to that is just his inherent right and wrong compass that, you know, if he did something wrong, he should be punished for it. He was in no way opposed to the death penalty philosophically. And, like I said, just you now know check well enough to know that Chuck never has just one reason for anything.

Q.   Was a big part of the reason, too, that Chuck wanted to be isolated from the other inmates and the shame that he experienced from

the Crohn's disease?

A.    Absolutely, absolutely.

Q.    You are right, there is lots of reasons.

A.    Although, Chuck very much thrived being around other people.  It is a push-pull kind of thing.  To the extent that Chuck is respected by the people he is around, then he very much wants contact.  The trouble is, in the places where he has been incarcerated those kind of people are few and far between and everybody is looking to get their own situation.

So, he has had antagonists every place that he has been and it is just very difficult for him to -- his sense of right and wrong is that let me out there, give me -- take off the shackles, put us together, we will settle it.  And if he does not get that, then it is very, very, very difficult for him.  So yes, that part comes in to play, too.

Q.    We have talked a little bit about the sort of push and pull with Chuck of he wants to be respected and he wants to be -- he has a deep sense of shame about I think his Crohn's and wants to be away from other inmates to not suffer that shame, but he also does want human

IFCD 00027968
Ex. 15 Page 28 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 28 of 423

connection. As much as he talks a big talk about wanting to be all alone and isolated, he wants connection like we all do.

A. That was the whole thing that Park Dietz played in his evaluation, basically his pull a rabbit out of the hat evaluation that is completely inconsistent with everybody else's determinations, but had a kernel of truth in it. Because Chuck does say that, except that's not true. It is kind of like Chuck saying he tried to kill his dad, when he really didn't.

Q. We will come back to that story. I want to sort of take a step back. I think I know a little bit about your background and your practice, but if you could just tell me a little bit about sort of -- did you start as a public defender?

A. Yes.

Q. How long were you a PD?

A. I was in the public defender system from 1980 to 1995.

Q. Okay. 15 years. It is a good haul as a PD. And then have you been in private practice since then?

A. Yes.

Q. Tell me, has your private practice always looked about the same or has it changed over the years?

A. Just, honestly, the vast majority of my work from 1995 to probably 2020 was death penalty litigation.

Q. It is a lot of years of death penalty litigation.

A. Well, and then the 10 years before I left the public defender system, from '85 to '95 was mostly -- was dealing with -- most of the cases I dealt with in that period of time were death penalty cases.

Q. So there at the PD's office they would have been state death penalty cases?

A. Uh-huh.

Q. And then in private practice they were a mix of state and federal?

A. No. I had -- well, yes. Many more -- it depends on what you are calling state. Federal habeas were state cases but done on the federal level. I had, at trial, I had one capital case at trial, one murder first degree case at trial in private practice but the rest were federal.

Q.   So only one state trial capital case?

A.   Yes.

Q.   Was that in Missouri?

A.   Yes.

Q.   Do you recall the name of that client?

A.   Sure, State versus Todd Johnson.

Q.   Todd Johnson.

A.   Yes.

Q.   What was the outcome of that case?

A.   Acquitted.

Q.   Acquitted.  Congratulations.  I assume if he is acquitted, you were prepared for a possible penalty phase?

A.   Uh-huh.

Q.   But you didn't have to make that argument in that case?

A.   Right.

Q.   And then all of the other capital trials have been in federal court?

A.   Well, if you are saying since I went into private practice?  You are not talking before?

Q.   Yes, since you went into private practice?

A.   Yes, yes.

Q.   Tell me, for your private practice a lot of people who do capital work in private practice are also doing other kinds of criminal cases.

A.   Uh-huh.

Q.   Robberies, DUIs, other things.  Do you have a practice of other kinds of criminal cases as well?

A.   I didn't accept many cases of other kinds just because I was so busy with the capital work.  There would be times when I would have other things going on.  What I generally tended toward was civil cases.  I tried a lot of different civil actions.  So I kind of broke up the criminal work with other kinds of things.

Q.   Tell me what are some of the kinds of civil cases that you ended up handling?

A.   Medical malpractice mostly.

Q.   Plaintiff's side?

A.   Uh-huh.

Q.   And then you mentioned post convictions, 2254's.  You did capital 2254 work?

A.   Yes.

Q.   Did you also ever do any capital 2255?

A.   Never did a 2255.

Q.   Tell me, did you have other attorneys

Ex. 15 Page 32 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 32 of 423

that you associated with in your private practice, or were you always solo?

A. I have always practiced solo. Obviously in the capital cases, because two attorneys were appointed, I generally in cases that I was appointed to the Court would ask me for a recommendation for co-counsel and I gave that and then would work very closely with that person.

Q. But they weren't part of your practice?

A. No.

Q. What about, did you have secretaries or paralegals sort of working for you as part of your practice?

A. No.

Q. Did you contract with like paralegals?

A. Well, not paralegals. I generally never -- I can't think of many times that I would ask a paralegal to do anything by way of file organization or research or stuff like that. I always wanted to do it myself.

Q. So you never had a staff person per se on salary that you worked with?

A. No, no, no.

Q. Not a secretary, either. So even just answering phones or setting your calendar, you

Ex. 15 Page 33 of 428    Case 4:23-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 33 of 423

did that yourself?

A.   Yes, yes.

Q.   Now let's talk about sort of including the time that you were in the state public defender's office.  How many cases went to capital trial as a state PD?

A.   I was looking at that the other day.

Q.   Were you?

A.   I had five.  The first murder case I tried was actually a murder 2.  We got an acquittal for that fellow.  And then one, two, three, four, five capital cases that went to trial while I was in the state public defender's system.

Q.   Of those five, how many of them went to penalty phase?

A.   The first two went to penalty phase, both of those guys got life.  The third one we convinced the jury it was actually murder 2 so we did not go to penalty phase.  The last two were both acquittals.

Q.   Wow.  Okay.  So only two went to penalty phase, only the first two?

A.   Yes.

Q.   And of those first two, what was the

Ex. 15 Page 34 of 423   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 34 of 423

penalty phase, sort of what was your sort of theme or argument to the jury about why your client shouldn't get the death penalty?

A. Well, we have two different cases with two very different people. William Worth, he had raped his stepdaughter and he was tried for that, got a hung jury. And then in retaliation after that killed her -- raped her corpse and then kidnapped her daughter and went on a crime spree from here to -- they ended up arresting him in Columbus, Mississippi.

So, our penalty phase had to do with a mental illness, defense, and, frankly, a lot of begging. So, not an incompetence, but basically I guess mitigating because of the mental illness aspects.

Q. Do you recall what his mental health diagnosis was?

A. I don't. That was 1985. I don't recall.

Q. Okay. And the second one, do you have a recollection?

A. Yes. Emmett Dunn killed two people, and it was all drug related. And what he had done is he tried to kill these two people and tried to

IFCD 00027975
Ex. 15, Page 35 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 35 of 423

submerge the car they were in, along with two children that he tried to kill, tried to strangle and didn't get it accomplished. There is a little area called Troost Lake in midtown Kansas City and there had been many bodies that have been tried to put in to cars and sunk in to Troost Lake and every time they get stuck as they are going in the mud. Emmett's situation was one more of those. So, they found everything. And he not only ended up confessing, he persistently sent confessions and invoking Allah and how it was all justified and everything like that.

So we looked at the possibility of a mental health evaluation or a mental health defense but it just it was not something that we came together with. So an awful lot of that relied on family and friends just supporting that he was -- the goodness and all of that kind of stuff. And was successful, thankfully.

Q. So your defense was essentially this is not the worst thing he has done, he is a good person despite this?

A. I don't think I used that terminology exactly. But it is one of those, it was essentially death penalty is not the right thing

to do here.

Q. Okay. Okay. And then so during the pendency of Chuck's case were you working on other cases as well?

A. I'm trying to remember. I don't remember. I think all of the others -- I'm trying to remember if Lisa's appeal was finished.

Q. I actually just looked that up. I think her Cert was denied before you were appointed but maybe after Chuck's case would have started.

A. Okay. That's what I couldn't remember. Because Lisa's would have been the -- I'm trying to remember if I had a federal habeas going then. But I don't think so.

Q. For the record, when we say Lisa, we mean Lisa Montgomery?

A. Yes.

Q. Who was another federal capital client of yours?

A. Correct.

Q. You don't have a, it sounds like you are not 100 percent sure whether you had any 2254's going on?

A. I don't think so. That's what I was trying to think back on that if I did. There was

also Thirplus Moose that. I think Thirplus's case may have been going on.

Q. What was the nature of his case?

A. It was murder first degree.

Q. Was it a 2254?

A. No, no. Thirplus's case was another -- basically we had it on -- you know what, I think Thirplus was finished before that. I'm pretty sure it was. So I do not recall having any other active capital cases going on when I was representing Chuck.

Q. Okay. And then non-capital stuff, would you have had civil cases going on and such?

A. Yes.

Q. So tell me a little bit about, when you got the call from Judge Fenner did you choose co-counsel?

A. No, he did.

Q. He did. So Bob Lewis was your co-counsel?

A. Yes.

Q. And Fenner said he is going to be your co-counsel?

A. Yes.

Q. And unfortunately Bob Lewis I understand

IFCD 00027978

is no longer with us?

A.   Right.

Q.   Has passed since the time of trial so we are not able to chat with him about the case.

A.   But you do have Mike Walker.  Because of Bob's health situation, which really started being problematic as he was representing Chuck and, therefore, he had to, for lack of a better term, take a leave of absence for a time, and we brought Mike in to help with the process.

Q.   Had you worked with Bob before?  Did you know him?

A.   No, I did not know Bob at all.

Q.   But Michael Walker you did know?

A.   Yes.

Q.   And when Bob got ill and wasn't able to contribute as much to Chuck's case, you actually asked -- Michael Walker was someone you proposed?

A.   Right.

Q.   Are you kin to Michael Walker?

A.   Well, kin through my sister.  He is my brother-in-law.

Q.   Okay, okay.  Had you practiced cases with Michael Walker before?

A.   Yes.  We had done other -- we did the

Thirplus Moose case together. What else that we did together. We also, there is a 2254 case we worked on together too, and I'm spacing right now on which that was.

Q. Okay. So Bob Lewis is on the case first. At some point you also bring Michael Walker on?

A. Yes.

Q. Who else worked on the case besides the three of you?

A. Mick Armstrong did a really good job of investigation for us.

Q. Okay. Anyone else?

A. Any other lawyers? Any other support staff?

Q. Yes, support staff, paralegals?

A. Nobody that I can think of.

Q. Besides Joe Buckmaster and Mick Armstrong, any other investigators?

A. No.

Q. No other people that would have been out talking to any witnesses or helping to collect records besides, I now said five people, the three lawyers, Mick and Joe?

A. Correct.

Q. Tell me a little bit about when you and Robert, you and Bob first get the case. Did you all divide responsibilities or duties, or what is your approach to sort of how you handle or approach the case with Bob?

A. My recollection is that we talked, and there were some particular things that I asked Bob to do, and I don't have any particular recollections as to what those were. The biggest thing that I wanted Bob to do is just get familiar with the voluminous stuff that we were going through, and basically come up with any additional ideas that he would have in terms of avenues of investigation, things like that. And that's where we confabbed on.

One of the things that Bob was helpful with that I didn't have any other source for, was to understand a little better on the Lynn and Darryl situation since he was right down there in Springfield and kind of knew the personalities, politics, things like that.

Q. Okay. Okay. Bob also is fluent in Spanish?

A. Yes.

Q. So one thing he did is probably he is

one of the main contacts with the victim's family?

A. Well, I tracked down Olga. It became very -- Olga Castro. But it was very helpful, I did use an interpreter for some of that.

Q. Oh, you did?

A. Yes. But we also -- one of the meetings that I had with her, probably two at least meetings with her with an interpreter. But one trip that Bob and I took together he was very helpful in terms of being able to converse with her.

Q. When you were talking about Bob sort of going through all of the stuff you had to review, by stuff you have had to review you mean discovery from the government?

A. Well, discovery, and the records we were accumulating about Chuck.

Q. Because you got on the case more than two and a half years after the offense occurred, I assume discovery has progressed and there is a fair amount there by the time you get on the case, a fair amount of discovery from the government?

A. The impression I got is that most of the

www.veritext.com                                        888-391-3376

discovery that I got was, and I kind of did a double check, we actually had I think there were two phases of discovery and that happens in most complex cases that I have dealt with, the initial discovery, and then everything they finally find as you are getting ready for trial and finally get to you within months of the trial going.

So my recollection is that the discovery that Darryl and Lynn had was pretty much the same stuff that I had when they gave me my fresh set. They didn't have any new stuff then. The new stuff really started coming in as we got closer to trial.

Q. Okay. So it keeps streaming in?

A. So that would have been what Bob would have been reviewing. And then of course all of the stuff that we were tracking down about Chuck and the investigation that we were doing on that, all of that stuff got shared with Bob.

Q. Let me circle back for just a minute about Darryl's time on the case. Because by the time you get the case, the Department of Justice in DC has already authorized this is proceeding as a capital case?

A. After Darryl asked them to.

Q. Well, I was going to ask you. So, you know of the two trips to Maine. There is also a trip to DC.

A. Yes.

Q. Tell me what you know about that trip to DC.

A. Darryl -- you have been to the training sessions.

Q. Sure.

A. One of the things, there was a presentation done, and I forget what year it was, but they were talking about Darryl. They said we understand that you all want -- and this was a DOJ person who was making the presentation at this particular seminar. They said we understand that you all want to come and make a presentation, but we just had a guy come up here and advocate for the death penalty. We don't need that. You don't need to come here and tell us that. That was Darryl, that's who they were talking about.

Q. So even the DOJ was it sounds like not thrilled with the defense advocate doing their job for them?

A. Well, he obviously didn't do a very good

job because they felt it was necessary to say don't come up here on a junket. If you really have something to tell us, then we would like to hear it.

Q. So what is your understanding of what Darryl did in DC, what his presentation was? What was his message?

A. It was like, my client wants the death penalty, thank you very much.

Q. And where did you learn that that is what happened? From this DOJ, this presentation?

A. Pretty much Darryl told me that's what he did. But then that was then confirmed when I heard the seminar presentation.

Q. How close in time was this seminar presentation after -- was that before you got Chuck's case or after?

A. No, no, no.

Q. It was after?

A. It was after.

Q. While Chuck's case was still pending?

A. Uh-huh. I don't remember if Chuck was on appeal at that point. It seems to me not. It seems to me that it was before we actually tried the case.

Q. And what I usually see in trial counsel's file after a presentation to DC is --

A. What the hell they said?

Q. Well, there is a memorandum, there is a paper trail --

A. I didn't find one.

Q. -- that outlines -- that's what I was going to ask you. You didn't see one?

A. There really were only two sources I had for what happened there; Darryl's recounting, and I mean he was very matter of fact about it, Chuck told us to seek the death penalty so that's what we went and told them. I didn't take that the next step.

Q. I will refresh your recollection a little bit about the timeline here. Because my understanding is that Stuart got off the case literally days before he would have left town to go with Darryl to DC. Did you ever ask Stuart about like what his plan was had he gone to DC?

A. No.

Q. And then did you have the impression that Lynn went with Darryl?

A. Yes.

Q. And was part of the presentation, or

just was on the trip?

A. I never found out if she was there for the presentation.

Q. Or lack thereof?

A. The pictures -- my recollection, and you have got the pictures so you can check, that all of these trips looked like vacations.

Q. So they looked like sightseeing pictures that they took while they were in DC that they made part of the file?

A. I don't remember specifically about -- I absolutely remember it from the Maine pictures. But it seems to me like there were some pictures from the trip to DC, too. But I could be wrong about that. Whatever is in there is in there.

Q. Other than the two trips to Maine and the trip to DC, do you know of any other locations that Darryl, Stuart or Lynn traveled with relation to this case with the exception of like a courthouse or to see Chuck?

A. It seems to me like one of the two or both of them went to Butner.

Q. Yes, I think that's right.

A. But those are the only, that's the only other trip that I remember.

Q. So tell me a little bit about your file. I have a copy of your file. But you tell me sort of like what is your general approach to sort of like how you maintain your records. Are you more of a paper person, more of a digital person?

A. Both.

Q. You are both. When you have a typed memo about an idea or something, does it usually start with handwritten notes or do you sometimes start right on the computer?

A. Both. It depend on what I started with, what the raw material was at the time, if I had paper and pencil at the time, if I couldn't get my laptop in. More generally if my laptop can go with me to where I'm going, then that's where a memo will start. But like tracking down witnesses and things like that, I don't whip out the laptop when I'm just chatting with somebody. That works a lot better when you just have a pad of paper.

Q. So generally when you talk to a witness you would have a pad of paper and you would at least make a note of who you are talking to, the date, that sort of stuff?

A. To the extent that I found out anything

Case 4:23-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 48 of 423
Ex. 15, Page 48 of 423

of significance.  If I tracked down the witness and I don't have a pad of paper with me, then I will generally then whatever, I will go back in some form when I get back and put down my recollections of what the discussion was.  So there wouldn't necessarily every time, especially with discussions with witnesses, wouldn't necessarily be any kind of medium that I got right in that moment.

Q.  Okay.  In those cases where you do have a pad of paper and you take notes and then later reduce it to a memo or something like that, do you destroy the paper notes or are they somewhere in your file, too?

A.  Generally I try to just put all of those things together, unless it is just a scribble about something.  If it is a one line kind of thing just to help me recall something, that I would probably get rid of.  If it is something that takes up even a half to three-quarters of the sheet of paper, I will generally just put that into a file that says Fritz's notes.

Q.  Do you normally -- like how do you communicate that with your co-counsel, like what happened or the interview?  Do you pick up the

phone and can call them?  Do you send E-mail?
What is the method?

A.   Both.

Q.   All of that.  What is your first, sort
of your first instinct when you get out of an
interview, how you are going to communicate that
information to co-counsel?

A.   It depends on what the situation is
going to be, whether we are going to be getting
together soon, whether we are going to be talking
soon.  If there is not going to be something like
that, then generally I will put it into the form
of an E-mail just to kind of here is what's going
on, let me update you on these things.

Q.   Okay.  When you are putting together
your team -- so, you've worked with Mick
Armstrong it sounds like a bunch?

A.   Mick was my investigator in the public
defender system.  I brought him in to the public
defender's office.  I was the Clay County Public
Defender from the end of '81 until 1988 and then
I became a supervising public defender.  I
brought Mick in to the public defender office in
'85.  I left in '95.  He left a couple of years
later.  After that he worked as my investigator

on every case -- well, not every case, almost every case that I had after that in private practice.

Q.   Okay.  And how did Mick relay to you his work product?

A.   That probably was the -- if I would have any complaints about Mick it was the difficulty to get anything in writing from him.  He wasn't good on computers.  He depended on his wife to do memos for him and things like that.  We ended up in some knock-down drag-outs to get him to put things in writing and get them done.  So that was his shortcoming.

Fortunately he was a bulldog of an investigator and found people that other people couldn't find.  So it all balanced out.  An awful lot of his work I ended up being the scrivener for and making my own notes about what he had told me.

Q.   So if he wasn't great at computers I'm assuming he is not E-mailing you a bunch?

A.   No.

Q.   So he would mostly call you on the phone?

A.   Yes.  No, I would get detailed

Veritext Legal Solutions
www.veritext.com                              888-391-3376
IFCD 00027991
Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 51 of 423

explanations. His excitement of finding something, I would be the first person he would be calling as soon as he was finished with the work. As I said, his creating paper to authenticate what all he was telling me about was difficult to get. The information was immediate.

Q. Okay. Tell me about the kind of work that Mick was doing for you on Chuck's case.

A. Well, the biggest piece of it was finding Chuck's birth mama which --

Q. Was a big task?

A. -- which was fortunately Mick's forte. So literally you just had to be a bloodhound and get on the ground in the place where things were going on and not be afraid to ask lots of questions of lots of people. And, lo and behold, he finds her and I get a call.

Q. I'm always amazed by investigators who can, when I say go find peaches, and they find peaches. It sounds like Mick found Bobbie Jo, is that her name, Bobbie Jo?

A. Yes.

Q. And it sounds like that was a long process, but you got there?

A. Yes.

Q.   And she ended up being in Texas?

A.   She ended up being near the, what is it, Killeen or whatever, the military base there, so yes.

Q.   I will say that I think that's consistent with Mick's billing records is the vast majority of the time he spent in this case was tracking down biological mother.

A.   Right.

Q.   And that's consistent with your recollection?

A.   Yes.

Q.   Do you recall, did he meet Chuck?

A.   Oh yes.

Q.   Mick did?

A.   Multiple times.

Q.   So in addition to tracking down Bobbie Jo, he met Chuck?

A.   Yes.

Q.   Do you remember any other work he did related to the case?

A.   Not off the top of my head.

Q.   Would agree he didn't go to Maine or to the Northeast?

A.   No, no.

Q. Other than his travel to Texas, he wasn't doing a lot of on the ground, sort of feet to the pavement knocking on doors kind of investigation in this case?

A. Correct.

Q. So the team at some point becomes you, Mick, Joe Buckmaster, Bob, and Mike Lewis?

A. I wouldn't include Joe. Joe was, he didn't play any role other than whatever the minimal things that I had him do. So I would say the defense team was the three lawyers.

Q. Okay. Was Mick's role sort of to be part of the team, or was it more hey, I'm going to give you some tasks and they were more discrete tasks he was doing rather than sort of being a full member of the team?

A. Well, I didn't run by Mick strategies on the penalty phase, the mental health issues, those kinds of things. His were discrete tasks. That having been said, he and Chuck developed a very good relationship. Chuck very much respected the work that Mick had done. So in terms of dealing with Chuck and making Chuck feel good about the work -- I mean, Chuck was always very curious about all of that, just in a

personal sense, and I think really was happy to know that information, taking away the importance to the case itself.

Q. You said Mick met Chuck. Obviously you spent time meeting Chuck, and Bob and Michael. Anyone else meet Chuck through you or on behalf of his legal team during the time you represented Chuck?

A. Not that I recall. Could have been, but I just honestly don't recall that we used anybody else.

Q. So when you would try to find a witness and say you knock on a door and nobody is home, would you document that in any way, make a note about it or a memo?

A. My inclination is to say yes. But probably the best way of knowing for sure that I did something would be to check my time records.

Q. So your time records are probably the better source of --

A. Well, and I can't honestly say that every call in trying to find a witness that I recorded on my time records either. But to the extent you were trying to figure out what I did, if you wanted to know the best way of finding

IFCD 00027995

Ex. 15, Page 55 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 55 of 423

those things I would say probably my time records.

Q.   When you have, let's say you identify a name of someone that you would like to talk to. How do you go about locating or finding out where this person might be, generally?

A.   Well, discovery, hopefully in the discovery you have got information about that person.  To the extent that Chuck gave me information, I would check that down to the extent that our investigation produced names of people, hopefully information about them is in that particular document.  But then I also used Accurint very extensively to locate people that we didn't have other information about.

Q.   So Accurint is the database that you were primarily using to locate people?

A.   Yes.

Q.   And you were using Accurint.  Did Mick use Accurint?

A.   I used Accurint and gave the information to Mick.  That's where he was able to at least get on the ground and start moving out from that, so that we at least had a general notion of where he should be going.

Q.   Did Bob or Mike ever use Accurint or was that really your role on the team?

A.   I don't recall any of them, either of them using Accurint.  It would have been on my subscription, probably.

Q.   Can you think of any other tools besides Accurint that you would use to sort of track down if you had a name from a record, for example, where this person might be or how to locate them?

A.   If it was a doctor I probably would refer to the state medical stuff.  Google many times has been a good source.  I don't recall needing to find anybody in this case that I didn't end up finding the information about.

Q.   So you don't remember there being a lot of just names out there that you couldn't find?

A.   No, there were none that I recall.

Q.   Okay.

A.   We found everybody.  Mama was the really difficult one.

Q.   The bio mom?

A.   Yes.

Q.   And ultimately you found her?

A.   Yes.

Q.   So, for the Accurint reports, did you

normally print them out? Like how did you sort of use Accurint once you typed in the name?

A. I either -- I think there are some PDFs of the Accurint. You should have either PDFs or paper copies of all of the Accurint reports that I would have done.

Q. Okay. So that was your habit, to print them out, to keep them in the file?

A. Or download it to a PDF.

Q. Anybody that you Accurint related to this case there should be an Accurint in your file?

A. There should be. Unless I didn't find anything.

Q. Well, yes.

A. If I generated a report. I figure you are paying for the doggone thing, you might as well print it out, put it in the file.

Q. That's right. Okay. Let me talk a little bit about the discovery from the government in this case. Among the three lawyers, was there one of you that was more responsible for sort cataloging, digesting, sort of keeping track of the discovery as it is coming in?

A.    No.    Everybody was equally responsible for going through all of that stuff.    Now, as lead counsel I certainly took the lead on trying to put together information for everybody.    And basically to the extent that I did something and I created a summary of those kinds of things, I shared them.    I wouldn't have expected anybody to then reinvent that wheel.    But basically we were all in it trying to figure out all of the aspects of how the defense was going to be presented; the first phase, which is where Bob and Mike ended up being mostly, most of their time ended up being devoted to, and then me putting together most of the penalty phase presentation.

Q.    Let me make sure I heard you correctly on that.    You were saying you, Bob and Mike all three were primarily working on the penalty phase?

A.    No.

Q.    I misheard.

A.    No.    The two of them, as everything came together and some of the limitations that Judge Fenner put on our time and what could be done, everybody got everything in terms of all of the discovery and all of the product of our

Ex. 15 Page 59 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 59 of 423

investigation so everybody had the opportunity and I think took the opportunity to look at everything. In terms of really mining down on things to the extent that -- I don't recall either Mike or Bob generating any reports for me about --

Q. Actually we been going for an hour and a half. Would you like to take a break?

A. No, that's fine. Sorry about that. I will turn this down. I don't recall either of them doing the kind of detailed report type of thing that I did. I could be mistaken. But I don't recall that. But in terms of -- and report about what records had in them, those kind of things. But in terms of preparing actual witness stuff, they really took over most of the first phase work in that regard. And I handled, as the record shows, the lion share of what was presented at the penalty phase.

Q. You mentioned earlier in terms of the limits that Judge Fenner put on your time. Tell me what you mean.

A. Well, particularly Judge Fenner made clear that he was not going to allow three lawyers to sit in the courtroom, period. We

ended up being able to get around that at certain times. But in particular he was not going to allow both Mike and Bob and me all three of us to be in the courtroom most any time. So that made it, frankly makes sense that for us to do what we did, which was Bob and Mike were in the courtroom during the penalty phase. That allowed me, because we were getting things like penalty phase instructions and those kinds of things at the last minute, it allowed me to basically work on those things and also some motions that were important at that point, so I could devote my time to that. So it worked out that way.

Q. So let me just -- because I think you might have misspoken or maybe I misheard. What you mean is you, Bob and Mike were in the courtroom for the guilt phase --

A. No, I was not in there.

Q. Bob and Mike were?

A. Yes.

Q. And you were largely not in the courtroom for the guilt phase?

A. Correct.

Q. You were preparing for the penalty phase during that?

Veritext Legal Solutions
www.veritext.com
888-391-3376
IFCD 00028001
Case 4:21-cv-08001-BCW Document 70-16 Filed 04/29/24 Page 61 of 423

A. And dealing with the instructions, frankly, for not only the first phase but also the initial instructions for the penalty phase.

Q. And as I recall, you just got the Park Dietz eval, right, as the trial had already started?

A. That was what I was doing pretty predominantly while the first phase was going on.

Q. So when Judge Fenner communicates to you I don't want the three lawyers in the courtroom at the same time, how does he communicate that with you?

A. Just like you did.

Q. I mean, did he call you in to chambers? Did he call you on the phone?

A. I mean --

Q. Because I don't think it is on the record.

A. No, I don't necessarily think it is. I mean, there is all kinds of time that you are with the judge in the context as the case is getting ready. In his perspective basically we had -- he never intended to appoint three lawyers instead of two, but we had the practical situation that Bob had done some work, and when

he was gone Mike had done some work, and so we had, it made sense -- and they did an awful lot of the work that was related to dealing with a lot of the defenses that Chuck wanted to at least try, and so it just ended up making sense. But no, Judge Fenner made very clear he was not going to pay for three lawyers to be in the courtroom. He thought that -- had there been -- had he been making the decisions for the Coonce team, they would not have had the number of people. That is where the advantages come in of the public defender office being able to handle things for capital clients, you don't have a judge to convince that you need, to justify thing.

Q. But Kent and Carver were appointed, too. It was that, you correct me if I'm wrong, but that Matt Rubenstein was resource counsel?

A. Matt and Matt's cadre of additional people who also sat.

Q. Maybe I don't even know if they don't speak on the record who else was in the courtroom.

A. I can't tell you all of the names. But I don't think there was ever a time where they had any less than five people at counsel table,

IFCD 00028003

Ex. 15 Page 63 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 63 of 423

and many times more.

Q. Okay. And maybe this is a good time for me to ask questions a little bit about -- because I know there were a lot of people in the courtroom during this trial. Can you just describe for me the layout in the courtroom of where everybody was sitting.

A. Sure. Have you been in the courthouse.

Q. I have not been in that courthouse.

A. That would be a good thing for you to do to get the perspective. Basically it is not a huge courtroom but it is a nice size courtroom. Let me see. Actually you have got in the pictures that I sent to you, pictures of Chuck sitting at counsel table.

Q. I don't remember that one, but okay.

A. You do. So, in any event, my recollection is we have got kind of a T type table. We have got one table kind of going across in front of the bench and then a table going, like this one, coming back, and you basically had the government on the corner that would be closest to the jury and then the rest of us kind of on either side of the table going back toward the gallery.

Q. Did somebody have their back then to the gallery and someone else had their back to the bench, one defense team?

A. My recollection is that Coonce had his back to the jury much of the time and his team had their backs to the jury most of the time. Then we were on the other side. Particularly -- well, that's --

Q. One of the reasons I ask about the layout is because I'm aware that at the beginning of the trial you make an oral motion to have Mr. Hall unshackled, and that's denied. And I'm curious if you can describe for me, did you have concerns -- like tell me about what --

A. They had it draped so you could not --

Q. Tell me what you --

A. You could not see it. It was for his comfort that I made the -- I mean, frankly, I will jump up and down and scream any time a client is restrained because it is just, it is difficult. Now Chuck handled it with a plum. He was very well behaved throughout, as opposed to Coonce who played the fool constantly.

Q. So he had ankle chains?

A. Yes, and a belly chain.

Q. And a belly chain. With his hands to the belly chain?

A. Yes.

Q. So he didn't have free use of his hands during the trial?

A. No.

Q. And were they metal chains?

A. Yes.

Q. Could they be heard --

A. No.

Q. -- if he fidgeted?

A. He didn't fidget.

Q. He wasn't much of a fidgeter. What about Coonce, was he a fidgeter?

A. Coonce in most situations was pretty stable. If somebody was asking me to tell the truth did I ever hear any chains, the answer is no.

Q. Okay. Okay. And it sounds like you felt satisfied that Chuck managed being shackled relatively well?

A. Chuck is a champ at putting up with lots of crap. Once he knows what he needs to do and once he realizes that it does need to be done that way, he is just not a problem. The biggest

Ex. 15 Page 66 of 423   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 66 of 423

problem Chuck had was just saying Fred, they sit there and they point at me during a thing and say mean stuff about me, I don't know what I'm going to do. So basically what I always did was I situated myself between the prosecutor and him so that when the prosecutor was pointing, he couldn't point at anybody but me. And that made Chuck feel a lot better.

MS. ELLEMAN: Let's all take a break.

THE VIDEOGRAPHER: The time is 11:35. We are off the record.

(Short recess was taken.)

THE VIDEOGRAPHER: The time is 11:46. We are back on the record.

Q. (By Ms. Elleman) We were just chatting about the snow outside. It is starting to come down. I see you pulled out your laptop. Was there something you were going to look up related to Chuck's case?

A. The pictures I was telling you about. Since we were still on the -- since we had just finished the courtroom setup, since you said you had not remembered seeing the pictures of Chuck at counsel table, I was seeing if I could find

that for you. But I will do that on my own time here in a minute.

Q. Let me know if you find it. I'm not saying we don't have it, I just don't recall it.

A. Sure, sure, I understand.

Q. What I will say is -- so who took the pictures of Chuck at counsel table? You did. Do you remember why?

A. He liked -- he wanted to see himself. It was him being in a professional situation. He very much -- I ended up making dozens of copies for him so he could send them to people and stuff.

Q. So he was wearing nice street clothes and he hadn't probably done that in a long time?

A. Uh-huh.

Q. He was proud of the way he looked and wanted people to see it?

A. Uh-huh.

Q. That makes sense. Before we talked about the courtroom we started talking about discovery.

A. Yes.

Q. And I feel I got a little sidetracked. One thing I noticed is you definitely made a lot

of E-mail requests to Randy Eggert for discovery items or for their sort of index of discovery and things like that that you were doing regularly.

A. Yes.

Q. Was there any discovery that you recall being able to go look at paper files but that you didn't have physical possession of?

A. No.

Q. No. Okay. I know you went --

A. Are you talking about exhibits?

Q. You looked at exhibits, right? But in terms of discovery, there wasn't anything that they said well you can look at this but only in our office.

A. I don't remember anything like that.

Q. One of the things I think my best guess in reconstructing it is what were the disciplinary files of BOP staff people. I think Randy gave you like a summary of these are the disciplinary records of some of the BOP employees.

A. See, so much of that was the Coonce team stuff.

Q. They were interested in that?

A. We received a lot of things that they

were particularly interested in just because they were giving everything to everybody. So particularly I don't remember asking any information about BOP personnel of that sort. So it is possible that there were those things and that there had been restrictions placed on that kind of stuff. But that wasn't anything I had asked for.

Q. So if those were made available to you, you didn't go see them, they were really for the Coonce team's benefit?

A. No. Everything they let me look at, I looked at. But I guess what I was talking about is anything that I had asked for, I had copies of.

Q. Do you recall that, going to the prison in Springfield and looking at BOP employee disciplinary files?

A. We went there, I mean.

Q. You certainly did a tour of 10B?

A. Uh-huh. I was there besides that, at other times. And again, my time records would -- it seems to me that they showed us some records. But mostly the records that I remember is going to the FBI office, because I insisted that they

Ex. 15 Page 70 of 423      Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 70 of 423

were going to show us everything, all of the physical evidence that they had. And it seemed to me like there might have been some records that we looked at that weren't particularly used. But those are my only two recollections on that subject.

Q. So would you agree then that you don't remember if you saw those or not?

A. I don't remember.

Q. Okay. Was there anything in terms of discovery that you were particularly concerned about, like this might be missing, this might be something I want and the government hasn't turned over?

A. The only thing I remember is exactly what you were talking about, is that I had to stay after Randy on some particular items that we hadn't gotten, and my recollection is that those things had to do with things that you found in the records that implied there were other things that should have been in the record. But, it sometimes took awhile. And like I said, this case was very similar to most cases, is that it is amazing how much stuff they find when they finally get ready to go to trial.

Q. At the end it suddenly starts showing up?

A. Yes.

Q. And I always suspect that has something to do with they are finally preparing for trial.

A. Exactly right. I very rarely have found that it was deliberate holding back. It is a combination of they are getting ready, they realize what there should be here. And generally it is more the cops that end up being the problem children in those kinds of situations.

Q. Right, right. So, one thing I'm going to ask you about, in your file there were lots of log books from Springfield. So log books on 10A and 10C and 10D and 10B for lots of different months and pages and pages and pages of log books. Do you remember that?

A. Uh-huh.

Q. 10B was the unit that we are concerned about where the homicide occurred, and there were some log books about 10B. I was unable to locate in your file 10B log books for the actual day and time of the homicide.

A. Okay.

Q. What do you make of that? What is your

impression when I say that?

A. I mean, we went step-by-step through everything that they had about that at the trial. So I don't know what to make of that, that you are not finding it. And also not in any of the electronic files?

Q. Correct. They were all electronic, I think.

A. Because, I mean, I know I saw them.

Q. For 10B for the time of the homicide?

A. Uh-huh.

Q. What stands out in your mind that you remember that you saw them?

A. Just because that was something I wanted to look at.

Q. Is there anything you remember reading in them?

A. No, nothing additional to than what the evidence turned out to be, the descriptions of what everybody was saying happened.

Q. Do you recall what was the last notation before the homicide that had Chuck's name in the log book?

A. I don't recall there being any notations. I don't recall people being named.

What I'm talking about is events like making the rounds, that kind of stuff.

Q. They do count and stuff?

A. Uh-huh.

Q. Sometimes in a log book it will note when there is contraband found in someone's cell, when someone leaves or enters the units, when someone changes cells, there is things that happen that will say Inmate Coonce found with contraband, Inmate Coonce entered the unit. Do you recall the last time Hall's name was mentioned in the log book --

A. No.

Q. -- before the homicide?

A. No.

Q. Do you have a hunch about like it hadn't been in there since -- like he had been under the radar and not mentioned since he moved in to that unit? Or do you have a hunch where his name was in there a bunch?

A. You understand he had just had surgery.

Q. Correct.

A. And so, I mean, my recollection is that what I saw from what I reviewed was him being out of the unit because of the surgery and coming

IFCD 00028014
Ex. 15, Page 74 of 428    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 74 of 423

back in to the unit. I mean, Chuck never had a disciplinary problem unless it was wanting to beat somebody up or something like that. But in terms of, for there, at that particular time, other than the incident with Castro, I mean, they didn't have problems with him. So it would not have surprised me to not see him being mentioned at all. But I'm really, if what your question is where do I think those records are? Some place in the file is the only thing I can think of.

Q. Does it change your perspective on that at all if I tell you I don't think the Coonce team also was able to locate those in -- the Coonce post-conviction team looked through their trial counsel's file with me and reported they also could not find the unit 10B log for the time of the homicide in the day.

A. And the question is?

Q. I guess I'm wondering, does that affect at all your certainty that you saw the log book for that day and that time?

A. Well, understand, this far, what are we now, almost 10 years ago, I am not absolutely certain of most anything.

Q. Okay. That's fair.

A.    And to the extent that you -- I'm sure this would be your situation, too.  My best guess is that I could probably find stuff in my file easier than you could find stuff in my file.  So that always -- and I'm sure you guys have thoroughly gone through anything, and I'm not saying this in any way as a criticism, but all I can tell you is it seems to me that I have seen the stuff that you are asking about and that I reviewed it and did not think there was anything to do about that other than what we did with those issues.

But, it would also not flabbergast me if what I have seen is something else, some other kind of document that gave me the same information and that I never did have the specific log books that you are talking about. That's a possibility, too, especially 10 years later.

Q.    Yes, yes.

A.    So, does that help?

Q.    Yes, it does.  I will say there were unit 10B logs, just not for that day.

A.    See I know I -- it seems to me that there were government exhibits that included

those particular things. But I could be wrong, again. But that's the reason even 10 years later I feel confident that I saw those. But, what you are saying is -- I mean, my file organization is not the greatest, but I don't think it is horrible. I think generally most of the stuff is where one would think it would be. If you can't find it after hunting for it, I don't know. I can look in my copies and see if I can track that down if you would like me to.

Q. And you got -- I know just in terms of turning over your file to us you had both electronic files and paper files.

A. Yes.

Q. And you turned those over to a third-party vendor, KC Document Solutions?

A. Yes.

Q. That did all of the scanning of the paper files?

A. Yes.

Q. Made them available to us for download and also made them available to you for download?

A. I don't think they ever did to me.

Q. You don't think that you ever got them from them?

A.    From them.

Q.    They probably don't have it on their cloud anymore is my guess this much time has passed.  But that was my intention is that they would have --

A.    Again, I'm not criticizing you.  I don't remember anybody offering.  But I may not have looked at their communication carefully.

Q.    So when you say look at my file, are you talking about the electronic file?

A.    Yes.  What I hear you saying is that I could have gotten from the vendor an electronic copy of what they scanned of my file for you guys.  I did not do that.

Q.    That's what I thought was happening.  And if that was my fault, I will apologize.

A.    No, you don't need to apologize.  It could very well have been, like I said, I didn't look at their communication that well.

Q.    And I will say that your paper copy of the file was scanned by them, and if any point you want me to make that available to you, I can.  But that's up to you.

A.    I'm just trying to help Chuck.  The bottom line here is that you guys have got it,

you guys have got what I had.  If it isn't in there, I don't have an explanation for that.  I would think that that would -- really the things that are, my recollection is most of the things that I only got on paper was defense material.  Most everything that we got from the government came -- I don't remember many pieces of paper that they provided.  Almost everything came electronically.  So that's the reason why I would think that if I have those things, I still got the electronic copy and not the other stuff.

Q.   That makes sense to me.  And to be clear, the logs were certainly handwritten logs but they were also scanned and provided to you in PDF form, I believe.

A.   Yes.

Q.   So tell me a little bit about how you went about gathering records from Chuck's life.  So not the discovery now, but things that you wanted to collect for your own purposes.

A.   Called up the records people, said can we get these, got subpoenas when we needed to get subpoenas.  I mean, by and large I cannot think of anything that we wanted to get that we didn't get.

Q. Okay. And it seems like you spent a lot of time getting the adoption records unsealed which allowed you to find biological mom.

A. No, actually that didn't help much in finding biological mom. What I always like to say is in the State of Maine you had to get more information to turn in a pop bottle than to turn in a kid for adoption.

Q. But you wouldn't have even known her name but for those records?

A. My recollection is that her name wasn't in there; that there was other investigation we had to do to come up with her name. That's not in the records.

Q. Okay. So that's not the way I understood it, but that's totally fine.

A. And again --

Q. Do you know how you got her name then?

A. I don't remember at this point.

Q. He was Baby Boy Kelly, you would have known the last name on the birth certificate.

A. Right. But I don't remember, and I could be wrong about this, again, 10 years ago, but I thought we didn't even have her first name and there was some other work we had to do to

come up with that.

Q. I don't know if that's an important point, quite frankly. But, so you get birth records. Then you had these school records and things you got from his mom, from Chuck's mom. In his sort of like pre-18 life let's say, so not prison records from his adult incarcerations, but 18 and under, were there any other records besides the adoption records you remember getting?

A. Sure. We got his various bouts with the law, getting his records from his lawyers and then from the various jurisdictions. And that whole thing of that head injury that he had with the motorcycle accident was quite an extensive search, but we found those.

Q. So those were post-18, those were post him being 18 years old.

A. Yes.

Q. Anything else from pre-18, childhood?

A. What we did was we tracked down all of the -- I think we independently got most of the school records and the medical records that we could find as well.

Q. What medical records did you have from

his childhood?

A.   That one, I'm trying to think.  I mean, there is a recollection that there were some, but again, you have got the records, so whatever I have got there are there.

Q.   Okay.  And then school records that you got independently, do you remember what schools they were from?

A.   Basically what you had to do is you had to go to the -- each of the schools kind of acted independently, and so tracking back -- the records you have got are not -- the records that Dot provided are not the records that we ended up using.  We actually contacted the various, the schools themselves.  I can't remember what all that we got in addition.  But we got more than what, far more than what Dot had.  And again, you should have in my time records who I contacted and what I got.

(Exhibit 1 was marked.)

Q.   I have marked for the record Exhibit 1 and I just, these are, they say school records at the top and they have Hall Bates stamps at the bottom.  Those Hall Bates stamps in the bottom would signify those are materials that you

actually provided in reciprocal discovery.

A. Correct.

Q. This is sort of a compilation of school records from a variety of schools.

A. Correct.

Q. Would this include records both that you obtained independently and came from Chuck's adopted mom, or would it be just one or the other?

A. This would be the records that I obtained.

Q. Okay. Okay. All right.

A. Now, what she had would be -- my recollection is what she had would be, some of those would be in here. It wasn't that she had anything that was different, it is just that she didn't have as much.

Q. Okay. Hang on to those because we are going to talk about them some more at some point. Again, I want to stay at under 18. I know the car accident, I know he has a criminal record as an adult and you talked to people he was in prison with and that sort of thing. Sort of pre-18, tell me about the people that you recall trying to track down and talking to. Can we sort

IFCD 00028023

Ex. 15 Page 83 of 423    Case 4:23-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 83 of 423

of make a list.  It would be mom and dad?

A.   Of course.  Sisters.

Q.   Two sisters.

A.   Uh-huh.

Q.   Biological mom?

A.   Uh-huh.

Q.   Who else?

A.   I remember on a trip to Maine there were some coaches that I talked to.  I don't recall talking to any of the elementary school teachers. I don't recall any friends of that age that Chuck ever told me about, is really older.  I can't think -- the more that I think about it, I can't think of any medical issues or psychiatric, psychological issues that I talked to anybody specifics about that prior to age 18.

Q.   I will help you out a little bit because I do think that you talked to at least two peers that were at Homestead with him, because he would have been a teenager when he was sent so Homestead, because you called them as witnesses at trial.

A.   Well, I guess they were primarily -- you are talking about Mandarelli and --

Q.   Parks.

A. So yes, that was just because they had more global contacts with Chuck both before and after.

Q. After 18 as well?

A. Yes.

Q. So mom, dad, Michelle, Susan, the sisters, and then these two guys from Homestead. Anyone else you can think of that would have known Chuck before the age of 18 that you spoke with?

A. Nothing that I'm remembering.

Q. Do you recall any efforts to find people that knew Chuck before then? I think you said before there wasn't anybody you really weren't able to locate.

A. Uh-huh. I guess I don't understand the question.

Q. Was there anybody you were looking for, anybody else you wanted to talk to that you weren't able to find?

A. No.

Q. I do think there might be one more person you spoke to, I will fill it in for you, there was a woman named Pat Bosquet who I think worked at Homestead that you spoke with. You

didn't call her as a witness but I think you interviewed her. Does that sound familiar?

A. Uh-huh, uh-huh.

Q. Anybody else you can think about?

A. No.

Q. Do you remember efforts to talk to school teachers or other people?

A. No. Everything would be in my time records.

Q. So anybody else that you tried to track down or locate there would be a record in your file somewhere or in your time records about your efforts to locate that person?

A. Yes, any particular witness there would be something related to that.

Q. Generally how did you go about sort of identifying who were the people that I want to talk to for the penalty phase?

A. Read the file, talked to Chuck, relied on experience, and identified people, I guess. Is that what you are looking for?

Q. So, I mean sort of the sources of finding out who are the people that might know something about Chuck; it would be talking to Chuck and it would be looking at your file?

A.   Uh-huh.

Q.   And by your file you mean the discovery? Do you mean the records you collected?

A.   Yes.

Q.   Both?

A.   Yes.

Q.   Any other source for finding potential witnesses?

A.   Family.

Q.   Family.  So other people that you spoke to, mom, dad?

A.   Uh-huh.

Q.   Any other sources for finding potential witnesses?

A.   No.

Q.   Now, Chuck has a reputation for telling things sometimes that aren't always 100 percent true.  Did you have difficulty with that when he is telling you information about people to go interview or anything like that?  Did you ever have concerns that you are not getting an accurate recounting of his life or childhood?

A.   I didn't rely on Chuck to give me -- I relied on Chuck to give me whatever information Chuck wanted to give me.  I did not rely on Chuck

Ex. 15 Page 87 of 423   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 87 of 423

to give me -- if I didn't find somebody, the last person I would blame would be Chuck, because Chuck would not necessarily -- Chuck doesn't know the kinds of things that we would look for in terms of -- I mean, Chuck understands what we do a lot better today than he did going in to the situation because I tried to keep him involved in all aspects of what was going on.  Plus, as I said, Chuck was reluctant to give me any information at first because he didn't want people to be bothered, people to be hurt, people to feel like they were being blamed for something, all of that kind of stuff.  So especially in that situation I wouldn't rely on Chuck as saying well, he didn't give it to me so therefore I didn't go look for it.

Q.   Right, right.  It sounds like that is both a Chuck specific approach, but it is also maybe your approach in capital cases generally?

A.   Sure.

Q.   That capital defendants aren't necessarily --

A.   Some are very good and they want to give you every little last person who you obviously don't need.  But no, Chuck's situation is -- all

Chuck wanted to do was make sure that he had the right to decide if a mitigating factor was something he wanted to present or not. And, generally speaking, most of what I suggested to him to do, he let me do. There were a couple of things, but not much.

Q. Tell me about those couple of things.

A. Not be tried together with Coonce in the penalty phase.

Q. Okay. So that had to do with the severance motion?

A. Uh-huh.

Q. And Chuck made a decision about what he would let you raise with the court?

A. No, we raised everything just fine. Chuck didn't --

Q. Continue pursuing?

A. Basically I had to swallow hard and say we were okay with being tried together in the penalty phase because Chuck didn't want them to do anything in the penalty phase that he didn't get to sit there and watch. And there was no changing his mind about that.

Q. And I get the impression he was pretty concerned about the Coonce team making him out to

be --

A.    Doing exactly what they had done from day 1 with him.

Q.    Pointing a finger at Chuck, blaming him for Coonce's actions?

A.    Right.

Q.    And Chuck wanted to have a joint penalty phase with him because he was worried in a separate penalty phase he wouldn't be able to respond to that stuff?

A.    I'm not even sure he wanted to necessarily respond, as he wanted to know what they were saying.  Part of it had to do with how Coonce was consistently saying I will never say anything against you, I will never throw you under the bus; and of course he did.  But the whole situation started out that -- even Chuck, and Chuck is far from naive, but he was naive about the particular workings of a capital case. He very well could see the kind of game that Kent and Carver were trying to play with him when they were trying to talk to him when Darryl and Lynn were still in the case.  So, he understood all of that stuff.  I think -- well, what I tried very much to explain to him is that what the

IFCD 00028030

Ex. 15 Page 90 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 90 of 423

government would do if we were in a joint penalty phase is exactly what they did do, which is try to --

Q. Prosecute him.

A. Well, they are certainly trying to prosecute him, but basically use the opportunity to basically make Coonce and Hall the same defendant by basically -- by presenting evidence about Hall, then evidence about Coonce, then evidence about Hall, then evidence about Coonce. There is no compartmentalization they ever did, there were no efforts to compartmentalize. There was an effort to combine, conflate the two of them. And that's what I tried to explain to Chuck what they would do is exactly what they did do. And so, therefore, Coonce's much more horrible background basically gets put on Chuck. But, anyway.

Q. You mentioned that this is an area where about the severance Chuck really had an opinion and he forcefully insisted on the direction you needed to take.

A. Well, he basically said this is what I wanted, and so I got onboard.

Q. Was there any other areas where you were

sort of hampered by Chuck?

A. No.

Q. Nothing else?

A. I really can't think of anything else off the top of my head. The whole situation of -- again, everything that I wanted to do by way of penalty phase themes he very much got onboard with.

Q. Okay. Okay. Now, interviewing a mitigation witness, a family member of a capitally charged client I think can be very different than interviewing a guilt phase witness. Do you agree with that?

A. I think every witness is different. I think you have to -- any time you are talking to somebody, you got to know who they are. And of course when you are talking about the kinds of things that are important in the penalty phase, that's a whole array of different considerations than just a guilt phase witness. But, they overlap. Does that answer your question?

Q. It kind of does. I will ask a little more. But let me ask first. Besides biological mom and the victim's family, are there any penalty phase witnesses that were interviewed by

somebody besides you, you were the one doing any interviews and attempts to interview the penalty phase people?

A.    Certainly Bob was there with Olga.  I don't recall Bob or Mike doing any interview.  So I would say me, yes.

Q.    So when you are interviewing somebody who might be a person who experienced trauma, like tell me about how you do that or what you expect of them as a witness.

A.    Is there somebody in particular you are thinking about in this case?

Q.    I guess I'm thinking a little bit just about the sort of general approach to, you have to be open to the idea that people may have trauma stories and how are you open to that?

A.    Usually by asking open-ended questions and basically empowering people to tell me what they want to tell me, and then probing where it is pretty clear they are not going into.  But trying to be respectful to the person and where they are coming from.

Q.    Do you expect that witnesses are going to tell you all of that trauma when you meet them?

A.   Do I expect?

Q.   I'm thinking about Chuck, too, right? With your own clients do you expect that they are going to share that with you, necessarily?

A.   I don't have an expectation of what anybody is going to say before they say it.  What I try to know is what is the most likely that their knowledge base is.  And to the extent I don't get that information, then there are multiple ways I can keep trying to probe for it. One is by asking them respectful questions about that situation then, and the other is to go back and have another try.

I would say Michelle is an excellent example of an onion that had to be peeled many steps at a time.

Q.   Tell me what you mean by that.

A.   Well, she was very reluctant to talk about anything at the beginning.  She was -- we even got to the point where she was willing to be a witness for us, and then became unwilling and became uncooperative.  It just took a lot of working with her to get to some of the bottom lines of the information that we needed that we knew that she had, that I guess I should say that

I needed and I knew that she had. And just get to know her well enough to appeal to the things that were important to her to get her to cooperate. I guess that would be one example.

Q. Okay. That's fair. I wanted to talk a little bit about the trip that you took to Vermont on Chuck's case. Tell me what you remember about that trip.

A. The biggest reason we went to Vermont is to see Susan.

Q. Okay. And you interviewed Susan?

A. Uh-huh.

Q. In Vermont. Anything else you were looking for in Vermont?

A. I don't remember. It seems to me like there were some records up there that we may have been pursuing. I'm trying to remember if one of his lawyers was up in Vermont, but I don't remember.

Q. Tell me, ultimately after you do this investigation, like what, as you recall it now, was your theory of the penalty phase?

A. Well, a lot of it had to do with the testimony of Dr. Wisner and Dr. Fucetola, the whole situation of the Crohn's. A lot related to

the positive aspects of Chuck's background, experience, efforts. I mean it was, to me, any type of good penalty phase approach is multi-faceted. But I would say those are probably the main ones.

Q. Okay. We will circle back to the experts, I think. But in terms of his mom and dad, it was you wanted to demonstrate that they were good people, that they tried hard in raising Chuck and they did a pretty good job?

A. The one thing that Chuck, and it wasn't hard to follow that, the one thing Chuck was not going to in any way countenance was in any way throwing his parents under the bus. That just wasn't going to happen. Fortunately I didn't find any reason to think that they had done anything but their level best and, frankly, far more than many people would have done.

Q. So that wasn't a conversation you ultimately had to have with Chuck?

A. No, we had the conversation. It was a one-sided conversation. He told me this shit ain't going to happen. And again, that wasn't hard to go along with him.

Q. You didn't have to push back because

that was your understanding as well?

A.   True.

Q.   So, you pointed out to the jury they were upstanding people, who brought Chuck to church, who gave him an education and did their best.

A.   The idea here is more along the lines of where as you have guilt by association, you have goodness by association.  They still love him, they still care for him.  It is kind of like many of my penalty phase arguments have gone, don't save him for him, save him for me.  And that was part of what we were trying to do with portraying mom and dad in some of the fashions.  But they also provided really good things about Chuck that you wouldn't see normally.  And just the amount of love they had for him was palpable.  So, I mean, they served us very, very well.

Q.   Now, there was this, I think you mentioned this earlier, this evidence at trial that Chuck told this story that he had once tried to poison his dad.  And as the story went, it was that he had taken dad's heart pills and replaced them with Drano crystals.  And you knew that couldn't be true because --

IFCD 00028037

Ex. 15 Page 91 of 423   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 97 of 423

A.   Dad said it wasn't true.

Q.   Well, dad wasn't even taking heart pills back then.

A.   Correct.

Q.   So it couldn't have been true?

A.   Yes.

Q.   As I recall Chuck said the reason he was killing his dad was because Michelle had said dad had sexually abused her.

A.   Correct.

Q.   But Michelle said I never said that?

A.   Correct.

Q.   You never had any reason to believe that Michelle had been sexually abused?

A.   No.

Q.   And you never had any reason to think that Chuck had been sexually abused?

A.   True.

Q.   And so that was like another reason that this wasn't -- the whole story didn't make sense to you?

A.   True.

Q.   And if you had any information that Michelle or Chuck had been victims of sexual abuse, that's something you would have

IFCD 00028038

investigated more, you would have wanted to follow up on?

A. Yes.

Q. And it would be documented in your file somewhere?

A. Yes.

Q. It appears -- I'm switching topics a little bit here. It appears that fetal alcohol syndrome was on your radar a little bit. Do you recall that as you were thinking about the case?

A. I don't specifically. Basically there was no -- once I finally got to meet birth mom, there was nothing that came up that made that plausible.

Q. She denied any drug or alcohol use during her pregnancy so at that point it was dead in the water. Do you recall why you suspected it before then or why it was on your radar?

A. I don't know that I suspected it. The best thing I can tell you is that in all probability that is just something I wanted to rule out.

Q. Okay. Okay. I want to look a little bit closer at the school records that I sent you. I'm going to look at them at the same time. I

have a copy over here.  These appear to be in the way that you turned them over in reciprocal discovery, sort of roughly in chronological order.  It starts out with him being in elementary school.  I understand that these records you were saying Maine kept them like separate.  Would it be like the elementary school had their own records and the middle school had their own records?

A.   Yes.

Q.   And the high school would have their own records?

A.   To some extent there was some overlap. But basically what ended up is happening is I ended up having to go to go to each of the schools to make sure I had everything from each of them.  And I kept getting more as I kept going through that process.

Q.   Okay.  And as early as first grade here on the very first page, there is like a first grade teacher, Sue Anne Bellavance.  Do you recall -- so, that's just an example, but do you recall speaking with her or trying to track her down and locate her?

A.   No.

Q.   And then as I look through it there is teachers for each grade during elementary school. Do you have any recollection of trying to track any of them down?

A.   You would have record if I did it.

Q.   Tell me about -- okay.  And if the records don't show that you looked for those folks --

A.   No, I didn't.  There is a better way of putting what I was saying.  I don't recall speaking -- I think you already asked me and I think I answered.  I don't recall speaking to any of the teachers.  But to the extent I'm wrong about that, there would be records in there.  But I have no recollection of talking to teachers.

Q.   Okay.  So then he goes from elementary school to Saco, S-a-c-o, Saco Middle School, which is also there in Saco, Maine.  And there is like another set of teachers.  And by now he is being evaluated for special ed services and such so there is other evaluators and those kinds of names in the files.

A.   Yes.

Q.   Do you recall trying to track down any of these people?

A. No.

Q. And what you will remember from the file, you will tell me if you remember this, is that he actually failed 6th grade twice.

A. Yes.

Q. He failed 6th grade the first time, the second time they say we are going to put you in 6th grade again, if you get great grades at the beginning of the school year we will promote you.

A. Yes.

Q. And lo and behold he stays in 6th grade the whole second year and fails again. After that you will see, if you go to -- she is going to find it for me. It seems like in elementary school at that point he is doing really poorly in school. He has been suspended one time for fighting. But he is not having a lot of behavior problems at that point, would you agree?

A. That's my recollection, without looking through the records copiously. Obviously they say it best. But that's my recollection.

Q. And then that second time he is in 6th grade and they evaluate him, they say that he had gone to summer camp at a place called the Shaker Mountain School in Burlington, Vermont, and that

his parents, while they are evaluating him for special ed and trying to figure out what services he needs, his parents are considering sending him to Shaker Mountain School for the following school year.

A. Yes.

Q. And do you recall that he actually did end up going, we for the summer camp and then he goes for the school year of --

A. Yes, he was at Shaker Mountain, is my recollection.

Q. Do you recall if you got any records from Shaker Mountain School?

A. Well, whatever records I got -- what I tried to do was track down Shaker Mountain, and it doesn't exist anymore. So my recollection is that I attempted to find more extensive records than we have and that I was unable to find those.

Q. Okay. And then so he spends that year at the Shaker Mountain School. You don't get any additional records from Shaker Mountain School.

A. Right.

Q. And so whatever records you did have some Shaker Mountain School, were those from Mrs. Hall?

A.    I'm trying to remember if she had some records and/or if those were records that were then passed back in to the Saco school system. I'm pretty sure there were both.

Q.    While I have had Italia over here furiously searching through these records, it is because there are no Shaker Mountain School records in here.

A.    Okay.

Q.    And so does that -- do you accept that as reasonable, that in the reciprocal discovery that you turned over there were no Shaker Mountain records?

A.    Sure.

Q.    Probably because it is closed, so you are not able to get records from that school. Tell me, so then when he comes back from Shaker Mountain he goes to a place called Thornton Academy.

A.    Uh-huh.

Q.    And those records are in there?

A.    Yes.  And maybe Thornton is what I'm thinking of as opposed to Shaker Mountain.

Q.    And Thornton is a private school?

A.    Yes.

IFCD 00028044

Q.   But it is also basically the public school because there is no public high school in this tiny town.

A.   Correct.

Q.   So, that's where everybody goes.

A.   That was my understanding.

Q.   By the time he is at Thornton Academy, he seems to be having a lot more problems.

A.   Uh-huh.

Q.   They say that he is depressed, he is acting out, he is cutting class, he has escalated his problems by then, correct?

A.   Yes.

Q.   And as we look at the Thornton records there are a bunch of names in here as well.  Do you recall speaking to any teachers or staff at Thornton Academy?

A.   I did not.

Q.   You did not.  In particular there is the name of a tutor he had, David Ruff.  Does that name sound familiar at all to you, David Ruff?

A.   No.

Q.   That is not someone you spoke to?

A.   No.

Q.   That is not someone you attempted to

speak to?

A. Correct.

Q. And then there is also at the end of that some records from Homestead Academy which is another residential place that he goes to.

A. Correct.

Q. And that's more of a, sort of treatment center or juvenile facility that Chuck goes to, right?

A. Well, it is also a school, but yes, as I understood it.

Q. Right. Then do you recall talking to anybody from Homestead? I guess you talked to John Mandarelli and Steve Parks you talked to, two kids?

A. I'm assuming you are meaning teachers, and the answer is no.

Q. In terms of teachers or administrators you don't recall anybody as you sit here?

A. No.

Q. If I told you you did talk to Pat Bosquet, a case manager from there.

A. Okay.

Q. You agree with me there?

A. Well, I imagine I talked to her in terms

IFCD 00028046
Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 106 of 423

of getting the records.

Q. Okay. Okay. So it was about records?

A. Uh-huh.

Q. But you don't remember talking to anybody substantively about Chuck or his recollection of them?

A. My recollection of her -- I just don't remember. Whatever is in my records of what I did, then that would be what I did.

Q. Well, and I think your billing records note that you talked to her but I don't see a memo about a substantive conversation.

A. So my guess is that, and my best recollection now is that there was no recollection of Chuck.

Q. Okay.

A. But I can't tell you that for sure.

Q. Okay. But that would explain to you why there would be no substantive memo about it?

A. Right.

Q. And just a notation in your time records?

A. Yes.

Q. Does the name Mary Tiegman, is that someone associated with Homestead that you have

Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 107 of 423
Ex. 3, Page 107 of 420

any recollection of?

A. The name rings a bell but I don't remember why.

Q. Her name is in the Homestead records but I don't think -- I don't have any indication that you spoke to her.

A. Okay.

Q. Do you have any recollection that would contradict that?

A. No.

Q. And then a couple of other peers. I'm going to -- let's mark one more thing, Exhibit 2.

(Exhibit 2 was marked.)

Q. I'm going to hand you a document we are about to mark as Exhibit 2. This is from your file. I will tell you that the stamp at the bottom is a Bates stamp and this is how the KC Document Solutions, the vendor, we asked them to Bates stamp it, and so this is TF for trial file, FD for Fred Duchardt, then 18 for box number 18, then 9 for file number 9, and then 622 for page 622. And that's our Bates stamping method, which I realize is convoluted, but helps us understand where we would find that if we were looking for it in your paper box.

A.   Isn't that Chuck's writing?

Q.   It is.  Good recollection.

A.   And my printing underneath it.

Q.   Okay.  So where it says like under Vince and Sheri Lombardi, where it says friends, that's your handwriting?

A.   Uh-huh.  Printing.

MS. PATTI:  So Chuck is writing in cursive and you are writing in block print?

THE WITNESS:  Correct.

Q.   (By Ms. Elleman) So the first name on this list is John Mandarelli?

A.   Sure.

Q.   That's actually someone that you did speak to and you called as a witness?

A.   Yes.

Q.   As we look -- let me ask you.  This is Chuck's handwriting.  Do you have any recollection of the context by which you got this?

A.   I'm sure I asked him to give me a list of people he would like me to talk to and that's my recollection of what this is.

Q.   Okay.  And the next name on the list, Bonnie Sue West, do you have any recollection of

talking to her or trying to talk to her?

A. My recollection on all of these is that I thought I did talk to all of these people.

Q. If Bonnie Sue West is not in your time records or there is no memo of an interview, would you help me understand that?

A. Sure. Either I didn't talk to her or I didn't note it them.

Q. As we sit here now do you have any recollection of talking to her?

A. The name rings a bell to me. Other than just this. But other than that, no.

Q. How would you go about locating her? I see that your handwriting there says --

A. Probably in Portland. And my guess is that Chuck added that additional information.

Q. He shared with you she is probably in Portland?

A. Yes.

Q. Do you have any recollection of trying to locate her?

A. I do not have any specific recollection of trying to locate her. The name is familiar enough to me that I think I might have, but I can't tell you for sure.

Q.   How would you go about finding a Bonnie Sue West who is was probably in Portland?

A.   Well, the same ways that we have talked about in terms of my investigation.  I don't recall doing an Accurint search for her.  But if there is one, it would be in the file.  But other ways of trying to locate her by a Google search or something like that, or Yellow Pages search.

(Exhibit 3 was marked.)

Q.   I'm going to hand you another document we are going to mark.  That was Exhibit 2, so we are going to mark this Exhibit 3.  This one you will see is actually from Bob Lewis's file.

A.   Right.

Q.   But I presume you would have seen a memo to file that Bob Lewis did?

A.   Uh-huh.

Q.   And this one also has a list of names?

A.   Yes.

Q.   That Bob says he got from Chuck?

A.   Yes.

Q.   As you look down that list of names, tell me, are any of those names familiar to you now?

A.   Sure.

IFCD 00028051
Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 111 of 423

Q. Tell me what names are familiar.

A. Steve Parks is one.

Q. Steve Parks, and you certainly called him as a witness?

A. Uh-huh.

Q. Anyone else?

A. No other specific recollections.

Q. So there is nobody on that list that you recall speaking with?

A. I may have, but I just don't remember. We certainly didn't call any of them as witnesses, obviously.

Q. Right, right. So, let me draw your attention to specifically Renee Dubois. I'm not sure if I'm pronouncing her name correctly. Number 3 on that list. Any recollection of that name?

A. I don't know.

Q. Any recollection of trying to locate her?

A. No, I do not.

Q. If there is no memo in the file about an interview, there is no Accurint in the file, what does that lead you to think?

A. Well, and especially since I don't

IFCD 00028052

Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 112 of 423

specifically recall anything with her, I would say that I did not talk to her.

Q. Okay. And then I'm going to ask the same thing about Edith Smith, number 7 on that list.

A. Edith Smith I have no recollection about.

(Exhibit 4 was marked.)

Q. We are going to mark and I'm going to hand you the next one, which is Exhibit 4. I'm going to note it has that same Bates stamp at the bottom, trial file, Fred Duchardt, box 17. Do these look familiar to you? They are from your box.

A. Sure.

Q. So these purport to be some kind of record or transcript from the Shaker Mountain School. Do you have a recollection now if these are part of the materials that you got from Dorothy Hall?

A. No. It seems to me that these were part of records that were provided by one of the other schools.

Q. Okay. On that first page it lists a counselor's name, C.C. McKegney.

IFCD 00028053
Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 113 of 423

A. Yes.

Q. I believe you attempted to track down C.C. McKegney.

A. Okay.

Q. Do you have any recollection of that?

A. No.

Q. I will tell you I think that Ms. McKegney was quite elderly at the time.

A. Okay.

Q. I think her son may have prevented you from speaking with her. Does that sound familiar?

A. I have a recollection about such an incident, yes.

Q. I have the impression it might have been a contentious conversation with her son.

A. I get into those many times.

Q. And so do you recall anything else about that encounter?

A. No.

Q. And then on the last page there there is a name Lisa Tomasi. Does that name ring a bell?

A. That name does ring a bell.

Q. Tell me how that name rings a bell.

A. I don't know.

Q. If I represented to you that in your file I don't see an Accurint or a memo or anything on your time sheets to suggest you tried to track her down, what does that tell you?

A. Same thing it told me about some of the other things, that either I didn't note it down or I didn't do it.

Q. These couple pages from Shaker Mountain School you will see they don't have the Hall Bates stamp at the bottom. I'm assuming that just means you had them in your file but you didn't turn them over in reciprocal discovery?

A. I would assume that too.

Q. If you didn't turn them over in reciprocal, that also means you didn't give them to your experts to, Fucetola or Wisner?

A. That's probably right.

Q. Do you recall speaking to any students or staff from the Shaker Mountain School at all?

A. Let me answer the question this way. In doing the investigation, trying to track down, there were some talks with people, but I think those would be reflected in my time records. But other than those general memories, I can't tell you anything.

(Exhibit 5 was marked.)

Q. I'm going to hand you a document which we are marking Exhibit 5. This is one very limited page from your billing records, but it happens to be the page that covers your time in Vermont. So you will notice the first entry on January 7 actually starts with you in Port Smith, New Hampshire. Then on January 7 it says, "Further investigation to locate witnesses in Burlington, Vermont area."

A. Okay.

Q. Then it has conference with Kevin McKegney. That I will represent to you is C.C. McKegney's son, so the conversation we mentioned before.

A. Sure.

Q. And you then you go back to Portland, Maine. So that shows two and a half hours further investigation to locate witnesses. I think that you are knocking on C.C. McKegney's door a bunch, which I think is what angers Kevin. Do you have any recollection of what else you were doing?

A. I don't.

Q. Or how you would have spent that two and

IFCD 00028056

Ex. 5, Page 116 of 423     Case 4:21-cv-08001-BCW     Document 70-16     Filed 04/29/24     Page 116 of 423

a half hours?

A. Probably figuring out where C.C. McKegney is, would have been part of that. I don't recall if I did an Accurint search for her and came up with that, or I had to talk to some other folks to figure out where she was. I could have probably done a better job of explaining who all I was trying to locate with that. But I don't have an independent recollection right now of who all I was doing. I cannot imagine that it would have taken me two and a half hours to figure out where Ms. McKegney was. So there obviously was other people I was looking for to talk to. And if I would have found them, I would have noted talking to them.

Q. Do you know if you knew before you got to Vermont that the Shaker Mountain School was closed?

A. I think I had some information to that effect, but I wasn't sure. And essentially part of the process was looking at where the -- I think I had various addresses, where it had been and where it had moved to, and so I was looking around at those areas to see if that would provide any information about where others might

Case 4:21-cv-02801-BCW   Document 70-16   Filed 04/29/24   Page 117 of 423

be.

Q. And that makes sense, since you categorized that two and a half hours as travel. Are you driving around to those buildings?

A. Correct.

Q. Got it. That makes sense. And what did you find?

A. Nothing, is my recollection. I found buildings that were vacant, purposed to something else, and nobody that had any kind of idea where anybody would be, other than Ms. McKegney.

Q. From the records you only had the two names, C.C. McKegney and Lisa Tomasi. Do you recall any efforts to try to find any other names associated with the school?

A. I don't. I mean, effort; did I ask people around? What I would have done is I would have asked the people who actually were there, do you know anything about this place. And my best recollection is that I got no information about the place, and, therefore, did not get any information about people associated with the place.

Q. As it turns out it had been closed for a long time by then, so it hadn't just recently

www.veritext.com                                888-391-3376

closed. The buildings that you drove around to, they didn't look like school buildings, did they?

A. Well, there are an awful lot of schools that are in storefronts that are put together, and that's what this was.

Q. Was one of the buildings a former gas station?

A. My recollection is yes.

Q. Do you remember how many different buildings you went to? Just give me a rough estimate. I'm not going to hold you to that.

A. At least half a dozen.

Q. At least half a dozen. Tell me what your impression of the Shaker Mountain School was, like what kind of school it was?

A. I don't think I really had an impression. To the extent I had an impression, it was nice people trying to help troubled kids through school efforts.

Q. And where did you form that impression?

A. From Chuck, from Dot and Charlie. I can't think of any other reason particularly other than that.

Q. We are going to do the next one, which is going to be Exhibit 6.

IFCD 00028059
Case 4:21-cv-03001-BCW   Document 70-16   Filed 04/29/24   Page 119 of 423
Ex. 3 Page 119 of 423

(Exhibit 6 was marked.)

Q. These are titled at the top Sweetser Children's Home. Do you remember the name of the Sweetser Children's Home?

A. I do.

Q. Do you recall if these are records you got from Sweetser or if you got those from Ms. Hall?

A. I do not recall.

Q. These are also not included in the Hall Bates stamped reciprocal discovery. So they were in your file but they are records that -- is it safe to assume that if they are not Bates stamped reciprocal discovery anywhere, you didn't provide them in reciprocal discovery and you didn't give them to your expert?

A. That's a good assumption. Although you have got a separate way of double checking that. I'm pretty sure you have got Dr. Wisner's file.

Q. Yes.

A. So that would probably be an even better way of knowing.

Q. Yes. And I will say they are not in Dr. Wisner or Dr. Fucetola's file. Let me also note these are records that are listed in the

Butner evaluation competency report, so I think that Darryl Johnson must have gotten these from Mrs. Hall.

A. And that's a good assumption.

Q. Because they were turned over to an expert before you were on the case.

A. Yes.

Q. That's my logical deduction there.

A. That sounds like good logic to me.

Q. So, tell me about Sweetser and the place there. Do you recall trying to speak to any staff from Sweetser Children's Home or anything that you did related to those records?

A. No.

Q. Okay.

(Exhibit 7 was marked.)

Q. We are going to mark the next one. This is a handwritten note that is in your file and is again not provided, as far as I can tell, in reciprocal discovery or to an expert. I want you to just tell me if you recognize this.

A. Okay. What's the question?

Q. Do you remember seeing this before?

A. Vaguely, yes.

Q. What is it?

A. I think it is a note from Chuck.

Q. Would you think it was a note from Chuck when he is a teenager?

A. Well --

Q. Or a child, maybe?

A. When he lived there.

Q. So you do think these two pages go together. They were next to each other in your file.

A. That is certainly my recollection.

Q. Do you have any recollection of where you got these?

A. It has to have been from Dot.

Q. So this is a handwritten note from Chuck at a time, and I will note when you said "when he lived there" you were pointing to the drawing of the floor plan of the family home on the second page?

A. Yes.

Q. And it has, it includes a room called mom and dad's bedroom?

A. Yes.

Q. So presumably this is a time when he is still living at home with his parents?

A. Presumably.

IFCD 00028062

Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 122 of 423

Q. And do you recall what, if anything, you did with this note?

A. I don't think I showed it to Chuck.

Q. Did you talk to Dot about it?

A. I did not.

Q. Did you provide it to your experts?

A. No. Not that I recall.

Q. I think that's all the records for the moment. So there will be more, probably. But one question I have for you is about experts. So, generally when you take a capital case usually there are mental health experts, whether they ultimately testify or not, that you hire and you retain on a case. Is that fair?

A. Yes.

Q. And how do you decide what kinds of experts that you want to retain on a case?

A. What the issues are that we need expert testimony on. For Chuck particularly, the issues of Crohn's and mental health.

Q. So you saw that there were Crohn's issues and mental health issues and you want to get experts to help you address those things?

A. Yes.

Q. How do you generally go about finding

IFCD 00028063
Ex. 35 Page 128 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 123 of 423

experts to use in a capital case?

A. Experience. I had dealt with both Dr. Fucetola and Dr. Wisner in previous cases and they had done very good jobs.

Q. Okay. I want to start actually with a different expert, and that is Dr. Ruben Gur. I will tell you my timeline puts it together that I think you actually contacted Gur before you were officially appointed in this case.

A. Yes.

Q. You agreed with that quickly. Tell me what you remember about that.

A. Ruben Gur is, as far as I'm concerned, right at the forefront of using brain imaging to help in understanding behavior. I attempted to use him but could not get him involved in the Purkey case, instead had a local doctor who did not do as well as I would have hoped in that case.

Q. Who was that local doctor?

A. I don't remember his name. But if you have got the Purkey transcript.

Q. I can find it, I imagine.

A. I can pull it out for you. I have the Purkey transcripts. And I said local, KU Med

Center, he is very well thought of. But he did not have the -- what we found out very quickly in using him in the Purkey case is that Park Dietz has a cadre of his experts, particularly Helen Mayberg, when it comes to doing things about brain imaging, and unfortunately some of the conclusions that he was reaching were -- that that doctor was reaching for us he could not justify based upon differential studies and some of the things that Ruben has set the forefront on. We tried to use Ruben then in the Montgomery case and were right on the precipice of that, but Mayberg, and I forget who the doctor is from Canada who was working with her on that case, but basically convinced the judge that they should have all of the rawest data from the machines that did the testing, and Ruben could not present all of that in a timely enough fashion, and so the judge just ruled that we could not use that testimony.

I wanted to get Ruben involved in this situation because what my idea was was to try to do brain imaging for -- was to have him do the brain imaging and then be able to do his differential analysis, and then whatever we came

up with on that, which we didn't know what we would come up with, but whatever we would come up with on that.  He also had worked with Rob Fucetola pretty extensively and he wanted Rob to do the neuropsyche testing.  So, I mean I have used Rob anyway, but it was just an additional plus that Ruben wanted him, too.

So, that's kind of -- the idea was to try, whatever results that we might get from our testing, that they would withstand the kind of battle that Helen Mayberg would wage against that.

Q.   So your contacting him even before you are appointed was sort of early trying to prepare and have all of your ducks in a row to anticipating a government challenge to the evidence?

A.   Correct.  Well, that's why I chose Ruben, what he could do that most doctors cannot do.  Well, Helen's argument against using results from PET MRI is that she takes issue that they are being used in areas that there is no scientific basis because there is not sufficient comparative analysis done on it to make whatever findings that you are finding in the MRI actually

IFCD 00028066
Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 126 of 423

be relevant to any particular condition.  And, as she put it, there are like one or two conditions that results from an MRI are actually going to be a definitive diagnosis for a particular condition.  And she is very good at what she does.  She is very persuasive.  And to the extent we ended up with something that was going to be shown by the MRIs, I wanted it to actually have -- to be able to meet that kind of challenge that she was going to come forward with.

Q.  Do you recall at the time that you initially reached out to Ruben Gur, that his assistant was Ray Hill?

A.  Uh-huh.

Q.  You interacted with Ray, his assistant?

A.  Sure.

(Exhibit 8 was marked.)

Q.  I'm going to hand you what has been marked as Exhibit 8.  This is I believe an E-mail to you.

A.  Yes.

Q.  From Ray Hill.

A.  Yes.

Q.  This appears to be a follow-up, this is August, the printing is a little off on mine, but

it is in August of 2012, which is the same month that you get appointed to the case.

A. Uh-huh.

Q. It appears to be a summary of or a recap of a conversation, a phone conversation that you all probably had.

A. Uh-huh.

Q. And like you said, it suggests that neuropsyche testing has to be done first before scanning?

A. Uh-huh.

Q. So then you set about to have Dr. Fucetola do the neuropsychological testing?

A. Uh-huh.

Q. Tell me what happened after that.

A. With?

Q. With Dr. Gur.

A. We went through a process of getting, as you said, the Fucetola work done. I also enlisted Dr. Wisner to do the work. And there was some serious talk going on at that point with Randy Eggert about the possibility of the case not having to go to trial, and so I put the further work in seeking the funding for Dr. Gur on hold. Once it became clear that we weren't

going to get any kind of positive resolution out of the government, then that's when I made the request for the funding for Dr. Gur.

Q. And ultimately the court denied that funding?

A. Correct.

Q. As I understand it, denied that funding because by that point it is on the eve of, in the court's mind on the eve of trial and we don't really have time to be dealing with all of this?

A. Well, and of course Judge Fenner had gone through the situation in the Montgomery case of the battle that we had had over all of that. But what I explained to him is exactly what I explained to you, is that he had also charged me with not asking for funding until we were at a place where we were sure that we needed it. And that I had waited when I did in the way that I did because there was legitimate reason to believe that the case might not go to trial.

And so since we were at that -- since that was the situation, and since we had all been through this process before, and since there was every indication that Ruben was going to be able to get on it and do it, that we should be fine.

IFCD 00028069
Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 129 of 423
Ex.C35 Page 129 of 423

The other problem that the judge raised is tell me what is going to be -- what's going to come out of this that is going to help you. And I had to say I don't know, because that we have Dr. Fucetola's recommendation that the further testing be done, but beyond that I couldn't give him any more information.

Q. So your answer to Judge Fenner was we don't know if it is going to be helpful or not ultimately?

A. No, it is more along the lines of I could not show him in any particular ways how it was going to be helpful other than the experts who know are saying it needs to be done.

(Exhibit 9 was marked.)

Q. And that's your recollection of what you represented to Fenner was the experts say this is what needs to happen?

A. Yes. In Judge Fenner's office Judge Maughmer, Judge Fenner and I met about this and basically I gave those explanations. And essentially the question was whether I was sandbagging or something like that, waiting too late. And they made clear to me they understood where I was coming from but that they were not

IFCD 00028070

Case 4:21cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 130 of 423

going to, because of the two reasons, when the request was coming and also that I couldn't identify in advance what the results were going to be, that they weren't going to do it.

Q. And do you recall that after Ray, Ruben Gur's assistant was Sherry Wang? Does that sound familiar to you?

A. That does sound familiar.

Q. Maybe later toward the time of trial you would have been interacting with Sherry as opposed to Ray?

A. Okay. Well again, that would be in the time sheets, I think.

Q. Yes, yes. Do you off the top of your head know who Paul Moberg is? I'm happy to fill in and see if this refreshes your memory. He is a neuropsychologist that works with Dr. Gur at the University of Pennsylvania.

A. Okay.

Q. Does that ring a bell to you at all?

A. No.

Q. I'm going to hand you now what has been marked as Exhibit 9. I took this out of a different binder than I have been taking it out of. But this one is an E-mail, would you agree,

www.veritext.com                                     888-391-3376

IFCD 00028071

from Sherry Wang at University of Pennsylvania, to you in March of 2014?

A. Yes.

Q. And this one it says, "Hi Fred. Dr. Paul Moberg has determined that a BI would show deficits."

A. Okay.

Q. What does that mean to you?

A. I'm trying to remember what BI was, what that acronym was for. We have the MRI and the PET. I think that is Ruben's comparative, my best recollection is that is his comparative analysis.

Q. This is what he calls a Behavioral Image?

A. There you go.

Q. It is an image of the brain.

A. Okay.

Q. That he takes the neuropsyche testing with Paul Moberg, since he is the neuropsyche.

A. Right.

Q. And predicts what is going to show up on an MRI or a PET scan. Does that sound right?

A. That makes sense, sure.

Q. Okay. So this is a communication you

IFCD 00028072

Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 132 of 423

had in March that hey, we are just letting you know we are predicting this is going to show something?

A. Uh-huh. And my recollection is I shared that with Judge Fenner.

Q. And, in fairness, I sent you in advance of this meeting some of the school records and things that we talked about today so that you could review those.

A. Sure.

Q. I also sent you some MRI results --

A. Yes.

Q. -- that our team has done. So to sort of summarize for you, Chuck was finally given an MRI?

A. Yes.

Q. In September of 2023.

A. That's what I would have hoped you would do.

Q. And it in fact showed a number of problems. So it demonstrates first some areas that are called hyperintensities.

A. I saw that.

Q. Or lesions on his brain.

A. Those are the kinds of results that I

www.veritext.com                                    888-391-3376

would be concerned that Helen Mayberg would basically say, "so what".

Q. Right. Because normal people can have those areas of hyperintensities without necessarily having correlative problematic symptoms.

A. That's her argument, yes.

Q. But, nonetheless, they were something that you were looking for?

A. Absolutely.

Q. And you would have wanted to have that?

A. Absolutely.

Q. And you would have wanted to share with the jury?

A. Absolutely.

Q. And they also show volume loss in the parietal lobes, greater on one side than the other?

A. Sure. And again, there is why I wanted Ruben involved in the situation. Because the test that or the -- what is his name here. What Moberg is talking about was not what I was looking for. What I was looking for is Ruben, they basically can put together a calculation and they actually have a database of normal people or

wide and so they literally can say the significance then of the particular problem. So absolutely, what you guys have done is part of what I wanted to do.

Q. Okay. And this may not have been apparent because we are not neuroradiologists looking at it, but these also appear to show a pineal cyst on Chuck's pineal gland. Does that mean anything to you?

A. I think it is pronounced pineal.

Q. Pineal.

A. But, other than that.

Q. Other than that. That is also something you would have wanted to know?

A. Sure.

Q. One of the reasons you were seeking an MRI to see what else can we find?

A. But again, that's where somebody like Ruben is critical to add in the component of does this -- this is an anomaly doesn't mean anything. And so yes. It isn't that the presentation that we made in the Purkey case was bad. They are nice pretty pictures you can show to a jury that show off things. The trouble is, you get somebody like Helen Mayberg, who since we had

IFCD 00028075

Dietz involved in the thing and they make clear early on that Dietz was going to be their go-to guy, that Mayberg would become part of this, and what she essentially does is shows a presentation to the jury of well, I can change this color here and this color here and tweak this and it all looks incredibly important and it really doesn't mean a damn thing.  So that's the reason why it was critical to not only have the testing but also have Ruben to make sense of it.

Q.  And because Ruben is particularly so well-credentialed?

A.  And he is such a -- his presentation is impeccable.

Q.  Yes, yes.  Okay.  You mentioned as we were talking about the sort of reasons that you are hiring mental health experts, one of them is because of Chuck's Crohn's disease, you talked earlier about how significant that was as a fact of Chuck's life of suffering from Crohn's disease.

A.  Well, and to the extent he didn't have mental problems before, the amount of Prednisone he was on is enough to fry anybody's brain.

Q.  Prednisone certainly matters.  I think

IFCD 00028076
Ex. 3 Page 136 of 423    Case 4:21-cv-02801-BCW    Document 70-16    Filed 04/29/24    Page 136 of 423

that's an important point.  I'm under the impression from your file that at one point you spoke to a possible Crohn's expert about the case.  Do you recall that?

A.    Uh-huh.

Q.    Tell me about that.  It sounds like that expert wanted nothing to do with it.

A.    Right.  I have only a very small amount. The fortunate part is that Dr. Wisner had a lot of experience and so that didn't -- we really didn't need to find anybody independent to do that.

Q.    I see.  So once that expert didn't pan out, you just relied on Dr. Wisner?

A.    No.  It was more along the lines of as soon as I covered it more extensively with Dr. Wisner, it was pretty clear that he was going to give us everything that we needed on that.

Q.    And then it looks like initially you were intending or were working with Mark Beezy.

A.    No, I just called Mark and he says I'm working for the other side, for your co-defendant.

Q.    From the E-mails it looks like there is some E-mails back and forth in which he is

IFCD 00028077
Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 137 of 423

advising you about discovery you need and then he send you an E-mail that says I have to withdraw.

A. Yes, like rapid fire. My recollection is that one happens one day and one happens within the week.

Q. Okay. So you initially were going to work with Mark Beezy?

A. No, I was just more, just interested in seeing -- I was just kind of checking through the possibilities what I thought might be helpful.

Q. And then at some point it looks like the team considered using Mark Cunningham as an expert.

A. Yes.

Q. But ultimately chose not to.

A. Right.

Q. Do you know more about that?

A. I felt that what we had through Dr. Fucetola and Dr. Wisner was everything and more than what Mark could offer. I have used Mark previously in I want to say three cases.

Q. He's a treat.

A. Well, again, somebody who is so well-spoken and so articulate. Mark did me a good job on every situation I have used him for.

I just did not see that he was going to add a lot that we didn't already have.

Q. So Beezy and Cunningham they are very different expert but they are both sort of getting at future dangerousness kinds of stuff in different angles?

A. But Beezy is a cop and Mark is a psychologist/scientist. Now, where Mark could have added more would been with the educational records, because he is pretty good at that as well. It is not his forte, but he certainly does some good things with that.

Q. Because he is a psychologist and so he reviews -- meaning Mark Cunningham, not Mark Beezy.

A. Did I say Beezy?

Q. You just said Mark. They are both Marks.

A. That is true. Cunningham.

Q. Yes. We have the plethora of Marks.

A. Indeed.

Q. So, ultimately you go to trial relying on Wisner for whatever you are going to do with school records and with future dangerousness and with like the BOP, sort of whatever criticisms --

IFCD 00028079
Case 4:21-cv-03001-BCW    Document 70-16    Filed 04/29/24    Page 139 of 423

A.   That it was their fault; which it was.

Q.   Did you consider asking for a continuance in this case?

A.   I mean, we got a continuance.

Q.   From the ultimate trial date.

A.   When it was clear they still weren't going to give me the money for Ruben Gur, no.

Q.   So once you know there was no money for Gur, you thought, let's try it?

A.   No.   Once I knew that a continuance was not going to change their mind about giving me the money for Gur.

Q.   I see.   What made you think that a continuance wouldn't change their mind about that?

A.   Because they said so.

Q.   Who said that?

A.   The judges.

Q.   When?

A.   During the discussion.

Q.   At the ex parte conference you had with them about funding for Gur --

A.   Yes, yes.

Q.   -- they said no continuance?

A.   I did not say how about if -- how did

that, I'm trying to remember exactly how that all went down. It was something along the lines of well, would it change your mind if we had a continuance to have more time to do this, and the answer was no. Because the decision, even though purportedly made on the time factor, was more made, in my understanding, on the basis of I could not show that I was going to get anything more out of that than what I already had in the experts who had already been provided.

Q. Okay. All right. I want to talk to you a little bit about what we know about Chuck. Let me say that what we have learned is that the headmaster of the Shaker Mountain School was a man named Jerry Mintz. You never spoke to him?

A. No.

Q. You never had any interaction with him. But that he sexually molested many, many boys at the Shaker Mountain School. That he engaged in a pattern of grooming behavior, would take them to the local arcade and he would take them out for special treats and he would invite them to sleepovers at the loft at this former gas station that was the school at the time Chuck was there, and they would sleep on a mattress with Jerry in

IFCD 00028081
Ex.Case 4:21-cv-08301-BCW   Document 70-16   Filed 04/29/24   Page 141 of 423

their underwear was a requirement and that then he would molest those boys.

What is I think maybe most shocking is that many of the adults that were staff people at that school were aware of the sleepovers, were aware that some of the boys had raised allegations of sexual abuse. This abuse spans a time from long before Chuck was there until the school abruptly closes the year after Chuck is there, or maybe two years after, but shortly after Chuck is there.

We have learned that Chuck himself was a victim of this abuse from other boys who remember him being in the loft with Jerry, and from Chuck himself, who didn't spontaneously offer this information, but upon questioning of "Tell me more about Jerry," hung his head and said, "Do I have to?", and told us about that.

A. Good for you.

Q. That's information that you didn't have back then.

A. No.

Q. And I'm assuming it is information you would have wanted to have?

A. I would have wanted to have, sure, yes.

IFCD 00028082
Case 4:21-cv-02001-BCW   Document 70-16   Filed 04/29/24   Page 142 of 423

Q. And it is information that you think a jury should have known?

A. Not necessarily. That would have been up to Chuck. Have you talked to Chuck as to whether he would have wanted that information to come out?

Q. I have. So that's a decision you would have left completely to Chuck? Would you have advocated?

A. In the context of the defense we were raising, I would have left that decision up to Chuck.

Q. Okay. But it is information --

A. Oh hell yes I would have wanted to know, yes, yes. Good for you for finding it.

Q. And if you had known it, you would have investigated it more?

A. Of course.

Q. You would have interviewed everybody you could find associated with that school?

A. Sure, sure.

Q. And would you agree with me that we have Chuck doing poorly in school, and then going to the Shaker Mountain School, and then coming back a behavioral wreck. Does it to you really sort

IFCD 00028083
Case 4:21-cv-08301-BCW    Document 70-16    Filed 04/29/24    Page 143 of 423

of explain something about Chuck?

A. Well of course it explains something about Chuck. I don't think that it is as simple as he was not a behavioral problem before he went. Frankly that's why he went was because he was a behavioral problem. It was not because of him not doing well in school. But absolutely, I mean yes, that is information that unfortunately I did not get him to share with me. And that's where you have got an advantage on me, because I think that is something, believe it or not, that a man would share with a woman before he would share with another man.

Q. Yes. And there weren't any women on your team?

A. True.

Q. Okay.

MS. ELLEMAN: I feel like it is time for another break.

THE VIDEOGRAPHER: The time is 1:37 and we are off the record.

(Short recess was taken.)

THE VIDEOGRAPHER: The time is 1:49. We are back on the record.

EXAMINATION

IFCD 00028084

Case 4:21-cv-02801-BCW    Document 70-16    Filed 04/29/24    Page 144 of 423

BY MS. PATTI:

Q. If it is okay, I'm going to ask you a couple of questions about the Bureau of Prisons.

A. Yes.

Q. What was your approach to just thinking through handling a Bureau of Prisons homicide case?

A. Can you be more specific?

Q. Sure. One thing I'm aware that the Bureau of Prisons loves is records. And I was just wondering if you felt like you needed help understanding the BOP records or picking up on some of the nuances?

A. No.

Q. You felt like you just had a handle on them?

A. Uh-huh. Actually -- who is the resource counselor, who is the guru on all of that.

Q. When you say resource counselor, you mean federal death penalty resource counselor?

A. Yes.

Q. Mark Donatelli?

A. Donatelli, yes.

Q. Did he himself help you go through them?

A. No. Basically what Mark and others had

IFCD 00028085

Ex. 35 Page 145 of 423    Case 4:21-cv-08301-BCW    Document 70-16    Filed 04/29/24    Page 145 of 423

done a good job of is conducting seminars about that type of stuff, and I had seen all of those. Mark was actually supposed to help us, I'm trying to remember if it was on this case or if it was on a different case, and I just honestly don't remember, but Mark was unable to be of much help until the last minute, I'm almost positive it was this case, because he was having some fairly serious medical problems of his own. And literally it came to the point where he was finally able to engage, and we were like 30 days out from trial, and I just said Mark, I don't have time to get you up to speed to be of any help to us, thanks for thinking of us but not now.

So I guess to answer your question, while I'm not sure -- I mean certainly if Mark -- well, they had done a good job of helping with that, and then I had had the Purkey case -- well, several cases where I had to deal with prison records and so I felt okay in terms of the ability to look through and figure out what we had and didn't have.

Q.   Okay.  Great.  Had you had other cases that were crimes that occurred in a BOP facility?

IFCD 00028086

Ex. 13 Page 146 of 423   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 146 of 423

A.   What I had were situations where it wasn't a prison killing but there were issues that came up within the context of the case itself and particularly behavior by the clients within a prison facility.  Particularly the Street case, we needed his records on that as part of the mitigation that we were doing that basically he was protecting other inmates from other inmates and so we did a lot of investigation related to that and were able to get records related to that.

Q.   Just so I understand.  What you are talking about is post the crime that led to Mr. Street's charges?

A.   Correct.

Q.   He had some issues in BOP and so you needed his records to kind of clarify what was going on or present your mitigation case?

A.   Yes.  Basically he was one of our -- in his second trial where he was given life, he was regularly -- he would get into trouble for beating up inmates, but he was beating up inmates basically saying you touch this guy, I will kill you.  So our mitigation was, and we brought in the guy who he saved, who basically said I would

be dead right now if it wasn't for Phil Street. So we needed to bring in some of the information about that. So that's one of the instances where we had -- and other, I also had other incarcerating entities that we had had to deal with records about. But that's one particularly that we had specifically with the BOP.

Q. You are like steeped in central files --

A. I don't know if anybody is steeped in it. Well, I mean, Mark Donatelli, now another Mark, has made a cottage industry out of it, out of necessity, like we all do when these things happen.

Q. But primarily in the cases where you got records, it was records pertaining to your client's incarceration?

A. Yes.

Q. But despite all of that, did you at any point consider getting a BOP expert? And if you need me to clarify what I mean by BOP expert, I can.

A. I think I understand what you mean. Did I think of it? Sure. Once the rubber met the road and we got what we were looking at and decided on what the issues were that we were

IFCD 00028088
Ex. 3 Page 148 of 423     Case 4:21-cv-03001-BCW     Document 70-16     Filed 04/29/24     Page 148 of 423

going to approach, I did not think it was something that we needed to do.

Q. Okay.

A. Because we did not -- other than the situation that we presented on "this is really the BOP's fault," and frankly Dr. Wisner was great on that because this really was a hospital within the BOP and, therefore, the best practices did not have to do with BOP prison policies, it had to do with what the best practices of a hospital were. And Dr. Wisner who had run mental health facilities had all of the expertise we needed on that. And I wasn't going some of the directions that the other, that the Coonce team were going in terms of being able to protect against future dangerousness. Chuck was our best evidence on that which was he spent four years doing absolutely nothing. As opposed to Coonce, they needed to try to prove with somebody that used literally every opportunity they had to stir up trouble, they needed that.

Q. That all makes sense.

A. Does that answer the question?

Q. Yes, I think so.

MS. ELLEMAN: When you say he spent

IFCD 00028089
Ex. 3, Page 149 of 423

four years doing nothing, you mean Chuck had a lack of any disciplinary write-ups?

THE WITNESS: I should not say doing nothing. He did lots of things, all of them were good, none of them were bad.

Q. (By Ms. Patti) None of them were getting disciplinary write-ups. I'm going to switch gears just a little bit and just ask you a couple of questions about jury selection. Starting with, can you tell me what your approach to capital jury selection is?

A. A lot of -- is the question what I would like to do, or is the question what do I try to do in light of the restrictions that are put on me?

Q. I would love to know the answer to both.

A. In the case that I got an acquittal for a capital case client in a state case in 1980, we spent a week in individual voir dire, so we got an awful lot of good information that -- nothing quite like asking an open-ended question to get a lot of good information. We tried do that in the Sinisterra case and Judge Fenner stopped us cold. And all of that got upheld by the Eighth Circuit. And so knowing who I was dealing with with

Judge Fenner, what I tried to do was get as much accomplished, and knowing that the appeal would go to the Eighth Circuit, ask as many good questions in as much an open-ended fashion as I could. As you noticed, he didn't let us really have individual voir dire. It was really more small group voir dire that to the extent you got a good enough answer that you could then hone it down to one person.

You are just trying to figure out as best you can who really is -- well, who are the automatic death penalty people who aren't willing to admit that they are, and trying your best to not hurt those people who are pretty obviously anti-death penalty but believe that they are not. And the court is trying to see the people who might -- who are inclined to try to really be fair as opposed to just think that they are.

One example, I wanted to throttle the Coonce team, you probably saw Randy Eggert's daughter's teacher who they decided to strike. And I wanted to kill them. She was not somebody who would have led a life verdict, but she was somebody who would have supported somebody who did. And the thing that I always ask myself is,

how is she going to go in and tell that class at her next class, I gave the death penalty.

Q. Is it correct that what I hear you saying is it is important to get as much information as you can?

A. Yes.

Q. And it sounds like you are also alluding to the fact that in federal court you are more restricted, but to the extent that you can, you want to get as much information within the strictures of federal court, and, in particular, Judge Fenner?

A. Yes, that would be fair.

Q. And then did you coordinate at all with the Coonce team to try to like work together to get more information from individual jurors?

A. The Coonce team was -- the Coonce team often played fast and loose with us in terms of not being honest with us about situations. The Coonce team was clearly angling at every juncture trying to more find out information that would support their theory that Chuck is the one who is really at fault. So getting anything substantive out of them by way of mutual strategies just ended up being a dry hole.

Q.   Okay.

A.   And I was surprised on that with Matt Rubenstein being part of that and really not working more collaboratively.  That's it.

Q.   At the time were you aware that the government used 75 percent of its strikes on women?

A.   Was I particularly aware of that?  I think I noticed, yes.

Q.   Is there any reason you didn't raise a JEB challenge?

A.   I was -- when we finished our strikes there were a lot of people I wished I had more, more challenges to use.  I did not see anybody who I felt we were better off with that they took off than who we ended up with on the jury.  So that's where unfortunately, and if I had it to do over again I would not have supported, basically given, Rubenstein's Batson challenge help, because the juror we ended up with, the black man, trading him for the one we lost was a terrible trade.  So I guess the bottom line is, I didn't approach that basically a challenge about gender because I didn't particularly want any of the ones that they had struck, other than the

teacher. And they had too good of an argument against her.

Q. But you did notice it?

A. Sure.

Q. Okay. Have you ever raised a JEB challenge?

A. No.

Q. Have you ever raised a Batson challenge?

A. Oh yes.

Q. Can you kind of walk through how you approach that.

A. You try to figure out if -- well, exactly what I did to support Rubenstein's Batson challenge, which is you try to figure out if you can make a case that similarly situated people from the other gender or the other race were not challenged. I mean, to the extent you can't do that, it then just becomes a fact that really doesn't -- that you can't really do much about. I mean, I have seen thousands of Batson challenges which are nothing more than they are black, you struck them, you must be a racist. To the extent you can show, as I did in the case of the one black juror, that they literally, somebody who had given virtually the same answers

was still on the jury and they didn't exercise a challenge, that's something that I look at it as a fact-based determination as to whether or not you are going to make the challenge or not.

MS. PATTI: That makes sense. That makes sense.

EXAMINATION

BY MS. ELLEMAN:

Q. I wanted to ask you about, we talked a little bit earlier about when you turned over your file to KC Document Solutions and to us. After you gave them your paper boxes, at some point you collected E-mails and provided me E-mails from your file.

A. Yes.

Q. Tell me about what you did to collect those E-mails.

A. I had to find a program that would be able to download the E-mails. I finally found that program. Because basically they were all just in amongst all of the rest of my E-mails. And I'm trying to remember, Aid for Mail I think is the program.

Q. So you used or used at the time Yahoo Mail, right?

Case 4:21-cv-00301-BCW   Document 70-16   Filed 04/29/24   Page 155 of 423

A. Yes.

Q. Did all of your E-mails regarding Chuck's case just reside in your inbox, or did you have like a folder for them?

A. No, it was not -- I had a Chuck folder.

Q. And is that how you decided what E-mails --

A. The received E-mails were in a Chuck folder. The sent E-mails were just --

Q. In your sent folder?

A. Correct. That's where the problem really came in.

Q. I see. In your received E-mails that were in the Chuck folder, you gave me all of them?

A. Yes.

Q. And then in your sent E-mail you used this program to try to --

A. I had to first go through and identify them all.

Q. Were there like search terms you used?

A. No. I just did them one at a time.

Q. You went through one-by-one?

A. Yes.

Q. Wow.

IFCD 00028096

A.   Because then -- I mean, the program is great because nothing in your -- you have to convert it to a PDF and that's what the Aid for Mail.  Does once you have identified all of those then it will convert them to the PDFs and then it can go.

Q.   What is your normal practice about like when you get an E-mail related to a case, do you ever delete E-mails?

A.   Yes.

Q.   You do?

A.   Yes.

Q.   How do you decide whether it is an E-mail you are going to drop to the Chuck folder or versus one you delete?

A.   Important, not important.  Repetitive. I usually try to get the last E-mail in a thread and delete the previous half dozen.

Q.   Okay.  Let me ask you.  Judge Fenner, he is senior status now, correct?

A.   Yes.

Q.   And he has recused himself from the post-conviction case.

A.   Because he -- if you have seen his history, he has by far the most death penalty

cases than any of the judges in the Western District and is right up there with some of the Texas judges. So he just, he doesn't want to have to deal with them anymore.

Q. So his recusal is just I don't want to deal with it, I'm senior status and essentially retired?

A. Correct.

Q. Fair enough.

A. As a matter of fact, he and I talked about that. There was a, for Judge Laughrey there was a nice retirement presentation for her that was done, and actually at that he said Fred, did you see I recused myself? Yep.

Q. Fair enough. Is there anything else that you thought we were going to ask you about today that we haven't asked you about?

A. Huh-uh, no. I'm delighted you did the -- I'm delighted you are on the Lynn and Darryl situation, I'm delighted you are on the Ruben Gur and the testing situation. I was hoping you would ask me about those. Those have always been the things that I thought would hopefully be fertile ground for you all.

Q. And then if we have additional follow-up

questions and stuff, how would you best like for us to contact you and ask you?

A. You do however you want to.

Q. Are we free to just call?

A. Of course.

Q. E-mail?

A. Of course.

Q. And just chat about anything else that comes up?

A. Of course.

Q. Okay. Great. Any other questions you have for us?

A. And my concerns about the recording had nothing personal to do with you all.

Q. I understand that has to do with your experience in another case.

A. It is, and a different office.

Q. Fair enough.

A. You ask can Chuck. I recommended your office to him when we first were talking about counsel for him.

Q. And I think that was before I was there even.

A. That is true.

MS. ELLEMAN: Excellent. Well, I

IFCD 00028099
Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 159 of 423

think that's all we have.  Thank you so much.  We can go off the record.

THE VIDEOGRAPHER:  The time is 2:12.  We are off the record.

C E R T I F I C A T E

I, Alison A. Tracy, a Certified Court Reporter in the State of Missouri, do hereby certify:

That prior to being examined the witness was by me duly sworn;

That said deposition was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to writing under my direction;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

WITNESS my hand this 12th day of January, 2024.

Alison A. Tracy CCR No. 554

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

January 18th, 2024

Frederick Duchardt
fduchardt@yahoo.com

Case Name: Under Oath Video Statement Of Fred Duchardt v.

Veritext Reference Number: 6352656

Deposition Date: 1/8/2024

Dear Sir/Madam:

Enclosed you will find a transcript of your deposition.

As the reading and signing have not been expressly

waived, please review the transcript and note any

changes or corrections on the errata sheet

included, indicating the page, line number, change and

reason for the change. Sign at the bottom of the sheet

in the presence of a notary and forward the errata sheet

back to us at the address shown above or email to

production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 6352656
CASE NAME: Under Oath Video Statement Of Fred Duchardt v.
DATE OF DEPOSITION: 1/8/2024
WITNESS' NAME: Frederick Duchardt

In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.

I have made no changes to the testimony
as transcribed by the court reporter.


_____          _____
Date                       Frederick Duchardt

Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20_____.


_____
Notary Public
_____
Commission Expiration Date

                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS


        ASSIGNMENT REFERENCE NO: 6352656
        CASE NAME: Under Oath Video Statement Of Fred Duchardt v.
        DATE OF DEPOSITION: 1/8/2024
        WITNESS' NAME: Frederick Duchardt
        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
        I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
        I request that these changes be entered
as part of the record of my testimony.

        I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.
_____          _____
Date                      Frederick Duchardt

        Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
        They have read the transcript;
        They have listed all of their corrections
        in the appended Errata Sheet;
        They signed the foregoing Sworn
        Statement; and
        Their execution of this Statement is of
        their free act and deed.
        I have affixed my name and official seal
this _____ day of_____, 20_____.
            _____
            Notary Public


            _____
            Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 6352656

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____

Date                    Frederick Duchardt

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

_____

Notary Public

_____

Commission Expiration Date

IFCD 00028105

| 1 | | | |
|---|---|---|---|
| **1** 2:3 17:22 82:20,21 90:3 | 84:16 85:4,9 108:20,20 | **26** 2:14 4:21,24 **2:12** 160:4 | **8** |
| **1/8/2024** 162:8 163:3 164:3 | **1820** 162:2 **18th** 162:4 | **3** | **8** 1:5 2:11 3:3 127:17,19 |
| **10** 30:9 75:23 76:18 77:2 80:23 | **1980** 29:21 150:18 | **3** 2:5,14 111:9 111:12 112:16 | **8/24/12** 2:11 **800** 1:7 24:8 26:22 |
| **100** 37:22 87:17 | **1985** 35:19 **1988** 50:21 | **30** 146:11 **3200** 1:11,16 | **81** 50:21 **82** 2:3 |
| **101st** 1:7 | **1995** 29:21 30:5 | **4** | **85** 30:10 50:24 |
| **108** 2:4 | **1:49** 144:24 | **4** 2:6 113:8,10 | **9** |
| **10:04** 3:2 | **2** | **44114** 162:2 | **9** 2:12 108:21 108:21 130:15 131:23 |
| **10a** 72:14 | **2** 2:4 27:16 34:10,19 | **46204** 1:11,16 | **95** 30:10 50:24 |
| **10b** 70:20 72:15,19,21,22 73:10 75:16 76:23 | 108:12,13,15 111:11 | **5** | **a** |
| **10c** 72:15 | **20** 163:16 164:22 165:22 | **5** 2:7 116:1,3 **554** 1:22 161:21 | **a.m.** 3:2 **ability** 146:22 |
| **10d** 72:15 | **2012** 128:1 | **6** | **able** 19:24 39:4 39:16 42:11 56:22 61:1 63:12 69:6 75:13 85:15,20 90:9 104:16 125:24 127:9 129:24 146:11 147:10 149:15 155:19 |
| **1100** 162:1 | **2014** 2:12 132:2 | **6** 2:8 119:25 120:1 | |
| **111** 1:10,15 2:5 | **2020** 30:5 | **622** 108:21,22 | |
| **113** 2:6 | **2023** 133:17 | **6352656** 162:7 163:2 164:2 165:2 | |
| **116** 2:7 | **2024** 1:5 3:3 161:16 162:4 | **64113** 1:20 | |
| **11:35** 67:12 | **216-523-1313** 162:3 | **64131** 1:7 | |
| **11:46** 67:15 | **2254** 32:21 38:5 40:2 | **6th** 102:4,6,8 102:11,22 | **above** 162:17 |
| **120** 2:9 | **2254's** 32:21 37:22 | **7** | **abruptly** 142:9 |
| **121** 2:10 | **2255** 32:23,24 | **7** 2:10 113:4 116:7,8 121:16 | **absence** 39:9 |
| **127** 2:11 | **22728** 1:19 | **75** 153:6 | **absolutely** 5:8 5:8 15:3,17 28:2,2 47:12 75:23 134:10 |
| **12th** 161:15 | **24959** 161:20 | **7500** 24:6 | |
| **131** 2:13 | | | |
| **15** 29:22 | | | |
| **17** 113:12 | | | |
| **18** 81:6,8,17,18 81:20 83:20,24 | | | |

IFCD 00028106

134:12,15 135:3 144:7 149:18

**abuse** 98:25 142:7,7,13

**abused** 98:9,14 98:17

**academy** 104:19 105:7 105:17 106:4

**accept** 32:8 104:10

**accident** 81:15 83:21

**accomplished** 36:3 151:2

**accordance** 163:5 164:5

**accumulating** 42:18

**accurate** 87:22

**accurint** 56:14 56:16,19,20,21 57:1,4,7,25 58:2,4,5,10,11 111:5 112:23 115:2 117:4

**acknowledge** 163:11 164:16

**acquittal** 34:11 150:17

**acquittals** 34:21

**acquitted** 31:10 31:11,12

**acronym** 132:10

**act** 163:14 164:20

**acted** 82:10

**acting** 105:11

**action** 161:14

**actions** 19:18 32:13 90:5

**active** 38:10

**actual** 60:15 72:22

**actually** 7:5 22:12 23:2 24:15 34:10,19 37:8 39:17 43:2 45:24 60:7 64:13 80:4 82:14 83:1 102:4 103:7 109:14 111:13 116:7 118:18 124:5,8 126:25 127:3,8 134:25 145:17 146:3 158:13

**add** 135:19 139:1

**added** 110:16 139:9

**addition** 53:17 82:16

**additional** 41:13 63:18 73:18 103:21

110:16 126:6 158:25

**address** 123:23 162:17

**addresses** 117:22

**administrators** 106:18

**admit** 151:13

**adopted** 83:8

**adoption** 80:2 80:8 81:9

**adult** 81:7 83:22

**adults** 142:4

**advance** 131:3 133:6

**advantage** 144:10

**advantages** 63:11

**advice** 18:15

**advising** 138:1

**advocate** 17:3 17:23 18:4 44:18,23

**advocated** 143:9

**affect** 75:19

**affixed** 163:15 164:21

**afraid** 52:15

**afternoon** 23:4

**age** 27:3 84:11 84:16 85:9

**ago** 75:23 80:23

**agree** 6:1 53:23 71:7 92:13 102:18 106:24 131:25 143:22

**agreed** 4:6 6:3 124:11

**aid** 155:22 157:3

**ain't** 96:23

**alcohol** 99:8,15

**alison** 1:22 3:6 161:2,21

**allah** 36:11

**allegations** 142:7

**allow** 5:23 60:24 61:3

**allowed** 16:4 61:7,10 80:3

**alluding** 152:7

**amazed** 52:18

**amazing** 71:24

**amenable** 19:12

**amount** 42:22 42:23 97:16 136:23 137:8

**analysis** 125:25 126:24 132:13

**angela** 1:9

**angers** 116:21

**angie** 1:12 3:13

Ex. 35 Page 2 167 of 423 Case 4:21-cv-08001-BCW Document 70-16 Filed 04/29/24 Page 167 of 423

angle 23:18

angles 139:6

angling 152:20

ankle 65:24

anne 100:21

anomaly 135:20

answer 66:17 92:21 106:17 115:20 130:8 141:5 146:16 149:23 150:16 151:8

answered 101:12

answering 33:25

answers 4:17 154:25

antagonists 28:12

anti 151:15

anticipating 126:16

anybody 10:5 15:1 55:10 57:13 58:10 59:7 67:7 78:7 84:15 85:14,18 85:19 86:4,10 94:6 106:13,19 107:5 118:11 137:11 148:9 153:14

anybody's 136:24

anymore 78:3 103:16 158:4

anyway 91:18 126:6

apologize 78:16 78:17

apparent 135:6

apparently 25:14

appeal 37:7 45:23 95:2 151:2

appear 100:1 135:7 163:11 164:15

appears 99:7,8 127:24 128:4

appended 164:11,18

appoint 62:23

appointed 33:5 33:6 37:9 63:15 124:9 126:14 128:2

approach 20:2 20:14 41:4,5 48:3 88:18,19 93:14 96:3 145:5 149:1 150:10 153:23 154:11

approved 18:14 24:5

arcade 141:21

area 36:4 91:19 116:10

areas 91:25 117:24 126:22 133:21 134:4

argument 19:14 20:9 31:16 35:2 126:20 134:7 154:1

arguments 97:11

armstrong 40:11,19 50:17

array 92:19

arresting 35:10

articulate 138:24

asked 3:21 5:24 8:13 39:18 41:7 43:25 70:8,14 101:11 108:18 109:21 118:18 158:17

asking 17:11 66:16 70:3 76:9 93:17 94:11 129:16 140:2 150:21

aspect 15:18 23:16

aspects 35:16 59:9 88:8 96:1

assess 15:7

assessed 16:7

assignment 163:2 164:2 165:2

assistant 127:13,15 131:6

associated 33:1 107:25 118:15 118:22 143:20

association 97:8,9

assume 7:23,24 7:25 31:11 42:21 115:13 120:13

assuming 51:21 106:16 115:10 142:23

assumption 120:17 121:4

attached 2:16 164:7

attempted 103:17 105:25 114:2 124:15

attempts 93:2

attention 112:14

attorney 5:4 161:12,13

attorneys 5:6 32:25 33:4

IFCD 00028108

**august** 127:25 128:1
**authenticate** 52:5
**authorization** 2:14
**authorize** 164:11
**authorized** 43:23
**automatic** 151:12
**available** 70:9 77:21,22 78:22
**ave** 162:1
**avenues** 41:14
**aware** 11:18 65:10 142:5,6 145:9 153:5,8
**awful** 8:23 25:23 36:16 51:16 63:2 119:3 150:20
**awhile** 25:20 71:22

**b**

**b** 2:1
**baby** 80:20
**back** 29:12,13 37:25 43:20 49:3,4 64:21 64:24 65:1,2,5 67:15 72:7 75:1 82:11 94:12 96:6,25

98:3 104:3,17 116:17 137:25 142:21 143:24 144:24 162:17
**background** 19:25 29:14 91:17 96:1
**backs** 65:6
**bad** 16:21 135:22 150:5
**balanced** 51:16
**barrel** 22:24
**base** 53:3 94:8
**based** 125:9 155:3
**baseline** 15:21
**basement** 13:24
**basically** 6:12 29:5 35:14 38:7 41:12 59:5,8 61:10 62:22 64:11,22 67:4 82:9 89:18 91:6,7,8 91:17,23 93:18 99:11 100:14 105:1 125:15 130:21 134:2 134:24 145:25 147:8,19,23,25 153:18,23 155:20
**basis** 126:23 141:7

**bates** 82:23,24 108:17,19,22 113:11 115:10 120:11,13
**batson** 153:19 154:8,13,20
**battle** 126:11 129:13
**beat** 75:3
**beating** 147:22 147:22
**bedroom** 122:21
**beezy** 137:20 138:7 139:3,7 139:15,16
**begging** 35:14
**beginning** 4:2 17:4 65:10 94:19 102:9
**behalf** 19:21 55:6
**behaved** 65:22
**behavior** 102:17 124:15 141:20 147:4
**behavioral** 132:14 143:25 144:4,6
**behold** 52:16 102:11
**believe** 79:15 98:13 114:2 127:19 129:20 144:11 151:15

**bell** 108:2 110:11 114:22 114:23,24 131:20
**bellavance** 100:21
**belly** 65:25 66:1,2
**bench** 64:20 65:3
**benefit** 70:11
**benefited** 15:20
**best** 7:10 16:20 26:15,15 55:17 55:25 69:16 76:2 96:17 97:6 99:20 102:21 107:13 118:19 132:12 149:8,10,16 151:11,13 159:1
**better** 26:20 39:8 41:18 48:19 55:20 67:8 88:6 101:9 117:7 120:21 153:15
**beyond** 9:24 10:4 22:23 130:6
**bi** 132:5,9
**big** 18:19 27:23 29:1 52:11

IFCD 00028109
Ex. 3 Page 169 of 423
Case 4:21cv-08001-BCW     Document 70-16     Filed 04/29/24     Page 169 of 423

**biggest** 41:9
52:9 66:25
95:9
**bill** 25:15
**billed** 24:8
**billing** 24:4
53:6 107:10
116:4
**binder** 131:24
**bio** 57:21
**biological** 53:8
80:3,5 84:5
92:23
**birth** 52:10
80:21 81:3
99:12
**bit** 4:11 5:18
23:20 28:20
29:14,16 38:15
41:1 46:16
48:1 58:20
64:3 79:17
84:17 93:13
95:6 99:8,9,24
141:12 150:8
155:10
**black** 18:21
153:20 154:22
154:24
**blame** 88:2
**blamed** 88:12
**blaming** 21:9
90:4
**block** 109:9

**bloodhound**
52:13
**bob** 38:19,25
39:11,13,16
40:5 41:2,5,8
41:10,16,22
42:10,13 43:15
43:19 54:7
55:5 57:1
59:11,16 60:5
61:3,6,16,19
62:25 93:4,5
111:13,16,20
**bob's** 39:6
**bobbie** 52:20
52:21 53:17
**bodies** 36:5
**bonnie** 109:25
110:4 111:1
**book** 73:23
74:5,12 75:20
**books** 72:14,14
72:17,21,22
76:17
**bop** 14:9 69:18
69:20 70:4,17
139:25 145:12
146:25 147:16
148:7,19,20
149:8,9
**bop's** 149:6
**bosquet** 85:24
106:22
**bothered** 88:11

**bottle** 80:7
**bottom** 78:25
82:24,24 94:23
108:17 113:12
115:10 153:22
162:15
**bouts** 81:11
**box** 1:19
108:20,25
113:12,14
**boxes** 13:22
155:12
**boy** 14:14
80:20
**boys** 141:18
142:2,6,13
**brain** 124:14
125:6,23,24
132:17 133:24
136:24
**break** 22:20
60:8 67:10
144:19
**bring** 40:6
148:2
**broad** 19:11
**broke** 32:13
**brother** 39:22
**brought** 39:10
50:19,23 97:4
147:24
**buckmaster**
21:24 22:2
23:9 25:5
40:18 54:7

**buildings** 118:4
118:9 119:1,2
119:6,10
**bulldog** 51:14
**bunch** 50:17
51:21 74:20
105:15 116:21
**bureau** 145:3,6
145:10
**burlington**
102:25 116:10
**bus** 16:12
90:16 96:14
**busy** 32:9
**butner** 14:10
14:18 15:5
47:22 121:1

**c**

**c** 101:17 161:1
161:1
**c.c.** 113:25
114:3 116:13
116:20 117:2
118:13
**ca** 162:25
**cadre** 14:16
63:18 125:4
**calculation**
134:24
**calendar** 33:25
**call** 5:19 38:16
50:1 51:23
52:17 55:22
62:14,15 86:1
112:11 159:4

Ex. 13 Page 170 of 423   Case 4:21-cv-03001-BCW   Document 70-16   Filed 04/29/24   Page 170 of 423

**called** 5:21 36:4 79:21 84:21 102:24 104:18 109:15 112:3 122:20 133:22 137:21

**calling** 30:20 52:3

**calls** 132:14

**camp** 102:24 103:8

**canada** 125:14

**candid** 17:4

**capital** 16:3,4 16:18 30:23 31:1,18 32:2,9 32:21,23 33:4 34:6,12 37:18 38:10,12 43:24 63:13 88:19,21 90:19 123:11 124:1 150:11 150:18

**capitally** 92:11

**car** 36:1 83:21

**care** 13:15 97:10

**carefully** 78:8

**cars** 36:6

**carver** 63:15 90:21

**case** 5:20 6:5 9:10 11:5 12:20 13:12 14:13 16:3,4

18:12 21:14,16 22:2 23:10,12 23:16 30:23,24 31:1,9,16 34:9 37:3,10 38:2,3 38:6 39:4,17 40:1,2,5,9 41:2 41:5 42:19,23 43:21,22,24 45:17,21,25 46:17 47:19 51:1,1,2 52:8 53:7,21 54:4 55:3 57:13 58:11,21 62:21 67:20 71:23 90:19,23 93:12 95:7 99:10 106:22 121:6 123:11,14,17 124:1,9,17,19 125:3,12,14 128:2,22 129:12,20 135:22 137:4 140:3 145:7 146:4,5,8,19 147:3,6,18 150:17,18,18 150:23 154:15 154:23 156:3 157:8,23 159:16 162:6 163:3 164:3

**cases** 16:14 30:12,13,15,21 32:3,6,8,12,16 33:4,5 34:5,12 35:4 37:4 38:10,13 39:23 43:4 49:10 71:23 88:19 124:3 138:21 146:20,24 148:14 158:1

**castro** 42:4 75:5

**cataloging** 58:23

**categorized** 118:3

**ccr** 1:22 161:21

**cell** 74:6

**cells** 74:8

**center** 106:8 125:1

**central** 148:8

**cert** 37:9

**certain** 61:1 75:24

**certainly** 6:24 7:2 11:8 14:15 14:19,25 59:3 70:20 79:13 91:5 93:4 112:3,11 122:10 136:25 139:11 146:17

**certainty** 75:20

**certificate** 80:21 164:11

**certification** 163:1 164:1

**certified** 161:2

**certify** 161:4

**chain** 65:25 66:1,2

**chains** 65:24 66:7,17

**challenge** 126:16 127:9 153:11,19,23 154:6,8,14 155:2,4

**challenged** 154:17

**challenges** 153:14 154:21

**chambers** 62:14

**champ** 66:22

**change** 4:16 19:12 75:11 136:5 140:11 140:14 141:3 162:14,15 164:8 165:3

**changed** 30:2

**changes** 74:8 162:13 163:7 164:7,9

**changing** 89:23

www.veritext.com 888-391-3376

IFCD 00028111
Ex.13 Page 17 of 42
Case 4:21-cv-02001-BCW Document 70-16 Filed 04/29/24 Page 171 of 423

| | | | |
|---|---|---|---|
| **charged** 7:8 92:11 129:15 | 15:1,20 17:1,1 17:3,14,20,22 | 122:1,2,14 123:3,19 | **class** 105:11 152:1,2 |
| **charges** 7:6 147:14 | 18:11,19,20 19:2,5,6,6,7 | 133:14 141:12 141:24 142:8,9 | **clay** 50:20 |
| **charles** 13:17 | 20:2,8 21:6 | 142:11,12,14 | **clear** 4:24 5:3 6:11,23,24 7:1 |
| **charlie** 13:14 13:16 119:21 | 26:7,8,9,18,19 27:7,11,21,24 | 143:4,4,8,12,23 144:1,3 149:16 | 18:13 20:23 60:24 63:6 |
| **chase** 22:12 | 28:4,6,21 29:9 | 150:1 152:22 | 79:13 93:20 |
| **chat** 3:20 5:10 39:4 159:8 | 29:10 38:11 39:7 42:18 | 156:5,8,14 157:14 159:19 | 128:25 130:24 136:1 137:17 |
| **chatted** 5:11 | 43:17 45:22 | **chuck's** 5:22 9:24 11:20 | 140:6 |
| **chatting** 48:18 67:16 | 46:11 47:20 53:13,18 54:20 | 13:6,17 23:11 23:13 37:3,10 | **clearly** 152:20 |
| **check** 13:24 27:21 43:2 | 54:21,23,23,24 55:4,5,6,8 56:9 | 39:17 45:17,21 52:8,10 67:20 | **cleveland** 162:2 **client** 5:4 31:5 35:3 37:18 |
| 47:6 55:18 56:10 | 63:4 64:14 65:21 66:20,22 | 73:22 79:18 81:5 83:7 | 45:8 65:20 92:11 150:18 |
| **checking** 120:18 138:9 | 67:1,8,24 68:7 75:1 78:24 | 88:25 95:7 96:1 109:1,18 | **client's** 148:16 **clients** 63:13 |
| **child** 122:5 | 84:11 85:2,9 85:13 86:19,24 | 135:8 136:18 136:20 156:3 | 94:3 147:4 **close** 45:15 |
| **childhood** 81:20 82:1 87:22 | 86:25 87:16,23 87:24,25,25 | **church** 97:5 **circle** 1:10,15 | **closed** 104:15 117:18 118:24 |
| **children** 36:2 72:11 | 88:2,3,3,5,9,15 88:18 89:1,13 | 43:20 96:6 **circuit** 150:24 | 119:1 **closely** 33:8 |
| **children's** 2:8 120:3,4 121:12 | 89:16,20 90:4 90:7,17,18 | 151:3 **city** 1:6,7,20 | **closer** 22:11 43:12 99:24 |
| **choose** 38:16 | 91:15,17,20 92:1 94:2 | 36:5 **civil** 32:12,13 | **closes** 142:9 **closest** 64:23 |
| **chose** 126:18 138:15 | 96:10,11,12,20 97:4,15,21 | 32:16 38:13 163:5 164:5 | **clothes** 68:14 **cloud** 78:3 |
| **chronological** 100:3 | 98:7,17,24 106:8 107:5,15 | **clarify** 147:17 148:20 | **coaches** 12:3 84:9 |
| **chuck** 2:5,10 5:20,25 6:15 11:10 14:9,16 | 109:8 110:16 111:20 119:21 | | **cold** 150:23 |

**collaboratively** 153:4

**collect** 40:22 79:20 155:16

**collected** 87:3 155:13

**collecting** 24:16

**color** 136:5,6

**columbus** 35:11

**combination** 72:8

**combine** 91:13

**come** 4:6 23:3 24:25 26:20 29:12 41:12 44:16,17,19 45:2 63:11 67:17 80:13 81:1 126:2,2 127:10 130:2 143:6

**comes** 28:19 104:17 125:5 159:9

**comfort** 27:15 65:18

**coming** 26:6 43:12 58:24 64:21 74:25 93:22 130:25 131:2 143:24

**commission** 163:19 164:25

165:25

**communicate** 49:24 50:6 62:11

**communicates** 62:9

**communication** 78:8,19 132:25

**community** 1:10,15

**comparative** 126:24 132:11 132:12

**compartment...** 91:11

**compartment...** 91:12

**compass** 27:17

**competency** 15:8,16 16:8 121:1

**compilation** 83:3

**complaints** 51:7

**completely** 29:7 143:8

**complex** 19:5 43:4

**component** 135:19

**computer** 48:10

**computers** 51:9 51:20

**concerned** 3:23 71:11 72:19 89:25 124:13 134:1

**concerns** 65:14 87:21 159:13

**conclusions** 125:7

**concrete** 18:25 19:9

**condition** 8:6 8:12 27:11 127:1,5

**conditions** 127:2

**conducting** 146:1

**confabbed** 41:15

**conference** 116:12 140:21

**confessing** 36:10

**confessions** 36:11

**confident** 77:3

**confidentially** 5:11

**confirmed** 45:13

**conflate** 91:13

**conflating** 25:10

**congratulations** 31:11

**connection** 29:1,3

**consider** 140:2 148:19

**considerations** 92:19

**considered** 138:12

**considering** 103:3

**consistent** 9:7 12:10 15:4 17:11 53:6,10

**consistently** 90:14

**constantly** 65:23

**contact** 28:8 159:2

**contacted** 82:14,18 124:8

**contacting** 126:13

**contacts** 42:1 85:2

**contentious** 114:16

**context** 62:21 109:19 143:10 147:3

**continuance** 140:3,4,10,14 140:24 141:4

**continue** 5:23 7:1,3 89:17

Ex. Case 4:21-cv-00001-BCW   Document 70-16   Filed 04/29/24   Page 173 of 423

**contraband** 74:6,10
**contract** 33:15
**contradict** 108:9
**contribute** 39:17
**conversation** 5:5 96:19,21 96:22 107:12 114:16 116:14 128:5,5
**converse** 42:11
**conversed** 3:14
**convert** 157:3,5
**conviction** 75:14 157:23
**convictions** 32:20
**convince** 63:14
**convinced** 7:2 34:19 125:15
**convincing** 20:8
**convoluted** 108:23
**coonce** 63:9 65:4,23 66:14 66:15 69:22 70:11 74:9,10 75:12,14 89:8 89:25 90:14 91:7,9,10 149:14,18 151:20 152:15

152:17,17,20
**coonce's** 90:5 91:16
**cooperate** 95:4
**coordinate** 152:14
**cop** 139:7
**copies** 2:16 58:5 68:11 70:14 77:9
**copiously** 102:20
**cops** 72:10
**copy** 2:16 4:14 8:1 48:2 78:13 78:20 79:11 100:1
**corner** 64:22
**corpse** 35:8
**correct** 9:17 13:5,7,18 14:23 21:7 24:14 37:20 40:25 54:5 61:23 63:16 73:7 74:22 83:2,5 98:4,10 98:12 105:4,12 106:2,6 109:10 118:5 126:18 129:6 147:15 152:3 156:11 157:20 158:8
**corrections** 162:13 164:17

**correctly** 59:15 112:15
**correlative** 134:5
**cottage** 148:11
**counsel** 5:22 6:4 8:3 33:7 38:17,20,23 49:24 50:7 59:3 63:17,25 64:15 67:25 68:7 159:21 161:12,14
**counsel's** 46:2 75:15
**counselor** 145:18,19,20
**counselor's** 113:25
**count** 74:3
**countenance** 96:13
**county** 50:20 163:10 164:15
**couple** 50:24 89:5,7 108:11 115:8 145:3 150:8
**course** 4:8 14:15 43:16 84:2 90:16 92:17 129:11 143:18 144:2 159:5,7,10

**court** 3:6,19 4:12 25:15 31:19 33:6 89:14 129:4 151:16 152:8 152:11 161:2 163:7
**court's** 129:9
**courthouse** 47:20 64:8,9
**courtroom** 60:25 61:4,6 61:17,22 62:10 63:7,22 64:5,6 64:12,12 67:23 68:21
**covered** 137:16
**covers** 116:5
**crap** 66:23
**created** 11:13 22:9 59:6
**creating** 52:4
**credentialed** 136:12
**crime** 35:9 147:13
**crimes** 146:25
**criminal** 7:6 16:17 32:3,6 32:14 83:21
**critical** 135:19 136:9
**criticism** 76:7
**criticisms** 139:25

**criticizing** 78:6
**crohn's** 26:25
  27:6,8 28:1,23
  95:25 123:20
  123:21 136:18
  136:20 137:3
**cross** 23:6
**crystals** 97:24
**cunningham**
  138:12 139:3
  139:14,19
**curious** 54:25
  65:13
**cursive** 109:9
**cut** 20:17
**cutting** 105:11
**cyst** 135:8

**d**

**d** 2:5
**dad** 11:18
  13:17 29:11
  84:1 85:6
  87:11 96:8
  97:14,22 98:1
  98:2,8,8
**dad's** 97:23
  122:21
**damn** 136:8
**dangerousness**
  139:5,24
  149:16
**darryl** 6:5,12
  6:16,23,24 7:5
  7:12 8:23 9:9
  9:16 11:10

16:9,10 17:10
17:14 20:12
21:14,15 23:10
23:23 25:4,17
26:1,3,5,8
41:19 43:9,25
44:7,12,20
45:6,12 46:19
46:23 47:18
90:22 121:2
158:19
**darryl's** 25:24
  43:21 46:10
**data** 125:16
**database** 56:16
  134:25
**date** 1:5 3:3
  48:24 140:5
  162:8 163:3,9
  163:19 164:3
  164:13,25
  165:20,25
**daughter** 35:9
**daughter's**
  151:21
**david** 105:20
  105:21
**day** 17:22 27:3
  34:7 72:22
  75:17,21 76:23
  90:3 138:4
  161:15 163:16
  164:22 165:22
**days** 23:8 27:6
  46:18 146:11

162:19
**dc** 43:23 44:3,6
  45:6 46:2,19
  46:20 47:9,14
  47:17
**dead** 99:16
  148:1
**deal** 27:9,12
  146:20 148:5
  158:4,6
**dealing** 13:11
  16:19 17:1
  27:8 30:11
  54:23 62:1
  63:3 129:10
  150:25
**dealt** 14:16
  30:12 43:4
  124:2
**dear** 162:9
**death** 17:2,3,11
  17:24 18:5
  19:20 26:18
  27:13,19 30:5
  30:7,13,15
  35:3 36:25
  44:18 45:8
  46:12 145:20
  151:12,15
  152:2 157:25
**decide** 20:4
  89:2 123:16
  157:13
**decided** 148:25
  151:21 156:6

**decision** 16:22
  89:13 141:5
  143:7,11
**decisions** 18:12
  63:9
**deduction**
  121:8
**deed** 163:14
  164:20
**deemed** 162:20
**deep** 19:6 28:22
**defendant** 91:8
  137:23
**defendants**
  88:21
**defended** 26:8
**defender** 29:17
  29:20 30:10
  50:19,21,22,23
  63:12
**defender's** 34:5
  34:13 50:20
**defenders** 1:10
  1:15
**defense** 16:1
  35:13 36:15,20
  44:23 54:11
  59:10 65:3
  79:5 143:10
**defenses** 63:4
**deficits** 132:6
**definitely** 20:3
  68:25
**definitive** 127:4

degree 17:6 19:9 26:9 30:23 38:4

delete 157:9,15 157:18

deliberate 72:7

delighted 158:18,19,20

demonstrate 96:8

demonstrates 133:21

denied 37:9 65:12 99:15 129:4,7

department 43:22 162:23

depend 48:11

depended 51:9

depends 30:20 50:8

deposition 3:19 4:10,13 161:7 162:8,10 163:1 163:3 164:1,3

depressed 105:10

describe 64:6 65:13

description 2:2

descriptions 73:19

despite 36:22 148:18

destroy 49:13

detailed 51:25 60:11

detect 26:1,2

determination 155:3

determinations 29:8

determined 132:5

develop 20:25

developed 6:19 6:22 20:25 23:15 26:19 54:20

devote 61:12

devoted 59:13

diagnosed 27:7

diagnosis 35:18 127:4

died 27:6

dietz 14:16 29:4 62:5 125:3 136:1,2

different 8:16 19:8 26:22 32:13 35:4,5 72:15 83:16 92:12,14,19 119:9 124:6 131:24 139:4,6 146:5 159:17

differential 125:9,25

differently 8:10 15:11

difficult 8:21 17:1 28:13,18 52:6 57:20 65:21

difficulties 5:22 6:13

difficulty 51:7 87:18

digesting 58:23

digital 48:5

dinitto 1:24 3:5

dire 150:19 151:6,7

direction 91:21 161:10

directions 149:14

disciplinary 69:18,20 70:18 75:2 150:2,7

discovery 42:16,17,21,23 43:1,3,5,8 56:7 56:8 58:20,24 59:25 68:22 69:1,2,5,12 71:11 79:19 83:1 87:2 100:3 104:11 115:12 120:11 120:14,15 121:20 138:1

discrete 54:15 54:19

discussion 49:5 140:20

discussions 49:7

disease 26:25 27:2 28:1 136:18,21

dispute 4:2,4

distinguish 10:20

district 158:2

divide 41:3

doctor 57:10 124:17,20 125:8,13

doctors 126:19

document 55:14 56:13 76:15 77:16 108:14,18 111:10 116:2 155:11

documented 99:4

documents 4:3

doggone 58:17

doing 15:12 16:14 18:2 23:9 24:18 32:3 43:18 44:23 52:8 54:2,15 60:11 62:7 69:3 90:2

Ex. 05 Page 176 of 423 Case 4:21-cv-08001-BCW Document 70-16 Filed 04/29/24 Page 176 of 423

93:1,5 102:15
111:5 115:21
116:23 117:10
125:5 143:23
144:7 147:7
149:18 150:1,4
**doj** 10:10 12:18
15:14 16:5
44:14,22 45:11
**donatelli**
145:22,23
148:10
**door** 55:13
116:21
**doors** 54:3
**dorothy** 13:4
113:20
**dot** 12:25 13:4
13:15 82:13,17
119:21 122:13
123:4
**double** 43:2
120:18
**download** 58:9
77:21,22
155:19
**dozen** 119:12
119:13 157:18
**dozens** 68:11
**dr** 95:24,24
120:19,24,24
124:2,3,6
128:13,17,20
128:24 129:3
130:4 131:17

132:4 137:9,14
137:17 138:19
138:19 149:6
149:11
**drag** 51:11
**drano** 97:24
**draped** 65:15
**draw** 112:13
**drawing** 6:11
122:16
**driving** 16:12
118:4
**drop** 157:14
**drove** 119:1
**drug** 35:24
99:15
**drugs** 27:4
**dry** 152:25
**dubois** 112:14
**duchardt** 1:3
2:7,11,13 3:4,8
108:20 113:12
162:5,6 163:3
163:4,9 164:3
164:4,13
165:20
**ducks** 126:15
**duis** 32:5
**duly** 3:9 161:6
**dunn** 35:23
**duties** 41:3

**e**

**e** 2:1,11,12 3:14
50:1,13 51:21
69:1 127:19

131:25 137:24
137:25 138:2
155:13,14,17
155:19,21
156:2,7,8,9,13
156:17 157:8,9
157:14,17
159:6 161:1,1
**earlier** 26:17
60:20 97:20
136:19 155:10
**early** 100:19
126:14 136:2
**easier** 76:4
**east** 1:7
**ed** 101:20
103:2
**edith** 113:4,6
**education** 97:5
**educational**
139:9
**effect** 12:1
117:20
**effort** 91:13
118:16
**efforts** 85:12
86:6,13 91:12
96:2 118:14
119:19
**eggert** 8:14
69:1 128:22
**eggert's** 151:20
**eighth** 150:24
151:3

**either** 17:13
33:24 55:23
57:3 58:3,4
60:5,10 64:24
110:7 115:6
**elderly** 114:8
**electronic** 73:6
73:7 77:13
78:10,12 79:11
**electronically**
79:9
**elementary**
84:10 100:5,7
101:2,16
102:14
**elleman** 1:9,12
3:12,13 67:9
67:16 109:11
144:18 149:25
155:8 159:25
**elleman's** 2:16
**else's** 29:7
**email** 162:17
**emmett** 35:23
**emmett's** 36:8
**employee** 70:17
161:11,13
**employees**
69:21
**empowering**
93:18
**enclosed**
162:10
**encounter**
114:19

**ended** 23:20 32:16 35:10 36:10 51:10,17 53:1,2 59:11 59:12 61:1 63:5 68:11 82:13 93:17 100:14,15 127:7 150:21 151:4 152:25 153:16,20
**engage** 146:11
**engaged** 141:19
**enlisted** 128:20
**entered** 74:10 164:9
**enters** 74:7
**entire** 163:5 164:5
**entities** 148:5
**entry** 116:6
**equally** 59:1
**errata** 162:13 162:16,19 164:7,10,18 165:1
**escalated** 105:11
**especially** 15:20 16:2 27:3 49:6 76:18 88:14 112:25
**essentially** 11:6 36:20,25

117:20 130:22 136:4 158:6
**estimate** 119:11
**eval** 62:5
**evaluate** 102:23
**evaluated** 15:5 101:20
**evaluating** 103:1
**evaluation** 12:19 14:8,18 15:7 29:5,6 36:14 121:1
**evaluator** 12:19 14:9
**evaluators** 15:14 16:1 101:21
**eve** 129:8,9
**evening** 23:6
**event** 7:10 64:17
**events** 74:1
**everybody** 28:10 29:7 57:19 59:1,4 59:24 60:1 64:7 70:2 73:20 105:5 143:19
**evidence** 71:2 73:19 91:8,9 91:10,10 97:20

126:17 149:17
**ex** 140:21
**exactly** 9:15 21:20 36:24 71:15 72:6 90:2 91:2,15 129:14 141:1 154:13
**examination** 3:11 144:25 155:7
**examined** 161:5
**examiner** 1:9
**example** 57:8 94:15 95:4 100:22 151:19
**excellent** 94:14 159:25
**except** 29:9
**exception** 47:19
**excitement** 52:1
**excuses** 18:20 20:1
**executed** 164:10
**execution** 163:14 164:19
**exercise** 155:1
**exhibit** 2:3,4,5 2:6,7,8,10,11 2:12,14 4:21 4:24 82:20,21

108:12,13,15 111:9,11,12 113:8,10 116:1 116:3 119:25 120:1 121:16 127:17,19 130:15 131:23
**exhibits** 2:16 4:4,12 69:10 69:11 76:25
**exist** 103:16
**expect** 93:10,23 94:1,3
**expectation** 94:5
**expected** 59:7
**experience** 15:14 16:13,16 16:17,19 26:16 86:20 96:2 124:2 137:10 159:16
**experienced** 27:25 93:8
**expert** 120:16 121:6,20 123:18 124:6 137:3,7,13 138:13 139:4 148:19,20
**expertise** 149:12
**experts** 96:7 115:16 123:6 123:10,12,17

Ex. 13 Page 178 of 423 Case 4:21-cv-03801-BCW Document 70-16 Filed 04/29/24 Page 178 of 423

123:23 124:1
125:4 130:13
130:17 136:17
141:10
**expiration**
163:19 164:25
165:25
**explain** 19:14
19:24 90:25
91:14 107:18
144:1
**explained**
19:18 129:14
129:15
**explaining**
20:14 117:7
**explains** 144:2
**explanation**
79:2
**explanations**
19:11 52:1
130:21
**expressly**
162:11
**extensive** 81:15
103:17
**extensively**
56:14 126:4
137:16
**extent** 16:16
19:13 28:6
48:25 55:24
56:9,11 59:5
60:4 76:1 94:8
100:13 101:13

119:17 127:6
136:22 151:7
152:9 154:17
154:23

**f**

**f** 1:14 161:1
**face** 3:15,16
**faceted** 96:4
**facilities**
149:12
**facility** 106:8
146:25 147:5
**fact** 46:11
133:20 136:19
152:8 154:18
155:3 158:10
**factor** 89:2
141:6
**failed** 102:4,6
**fails** 102:12
**fair** 17:19
42:22,23 75:25
95:5 123:14
151:18 152:13
158:9,15
159:18
**fairly** 3:24
146:8
**fairness** 133:6
**familiar** 41:11
86:2 105:21
110:23 111:23
112:1 113:13
114:12 131:7,8

**family** 11:19
20:21 21:6
36:17 42:2
87:9,10 92:10
92:24 122:17
**family's** 13:1
**far** 6:9 13:3
19:3 20:16
22:1 27:10
28:10 75:22
82:17 90:18
96:17 121:19
124:13 157:25
**fashion** 125:18
151:4
**fashions** 97:14
**fast** 152:18
**fault** 78:16
140:1 149:6
152:23
**favor** 18:5
**fbi** 70:25
**fd** 108:20
**fd.org** 1:12,17
**fduchardt**
162:5
**fear** 27:13
**federal** 1:9,14
30:18,21,22,25
31:19 37:13,18
145:20 152:8
152:11
**feel** 54:23 67:8
68:24 77:3
88:12 144:18

**feet** 54:2
**fellow** 6:15
34:11
**felt** 11:11 19:13
19:24 45:1
66:20 138:18
145:11,15
146:21 153:15
**fenner** 5:21 7:2
38:16,22 59:23
60:21,23 62:9
63:6 129:11
130:8,17,20
133:5 150:23
151:1 152:12
157:19
**fenner's** 130:19
**fertile** 158:24
**fetal** 99:8
**fidget** 66:12
**fidgeted** 66:11
**fidgeter** 66:13
66:14
**field** 24:16
**fighting** 19:20
102:17
**figure** 17:7
27:11 55:24
58:16 59:9
103:2 117:6,12
146:22 151:10
154:12,14
**figuring** 117:2
**file** 2:5 8:1,6
11:25 12:14

22:8 25:1,4
33:18 46:2
47:10 48:1,2
49:14,22 58:8
58:12,18 72:13
72:22 75:10,15
76:3,4 77:4,12
78:9,10,13,21
86:12,19,25
87:2 99:4
102:3 108:16
108:19,21
111:6,13,16
112:22,23
113:12 115:2
115:11 120:12
120:19,24
121:18 122:9
137:2 155:11
155:14
**files** 8:15 69:6
69:18 70:18
73:6 77:13,13
77:19 101:22
148:8
**filings** 25:15
**fill** 85:23
131:15
**finally** 27:14
43:5,6 71:25
72:5 99:12
133:14 146:11
155:19
**financially**
161:14

**find** 8:24 15:16
43:5 46:6
51:16 52:19,19
55:12,22 57:13
57:16 58:13
67:25 68:3
71:24 75:16
76:3,4 77:8
80:3 81:24
85:12,20 88:1
96:16 102:14
103:17,18
108:24 118:7
118:14 124:23
135:17 137:11
143:20 152:21
155:18 162:10
**finding** 15:17
52:1,10 55:25
56:5 57:14
73:5 80:5
86:23 87:7,13
111:1 123:25
126:25 143:15
**findings** 126:25
**finds** 52:17
**fine** 60:9 80:16
89:15 129:25
**finger** 90:4
**fingers** 23:7
**finished** 37:7
38:8 52:3
67:23 153:12
**fire** 138:3

**first** 3:9,15
5:19 7:24 9:8
15:1 16:1
20:20 30:23
34:9,17,23,25
38:4 40:6 41:2
50:4,5 52:2
59:11 60:16
62:2,8 80:24
88:10 92:23
100:19,20,20
102:6 109:11
113:24 116:6
128:9 133:21
156:19 159:20
**five** 34:9,12,15
40:23 63:25
**flabbergast**
76:13
**flight** 23:5
**floor** 122:17
**fluent** 41:22
**folder** 156:4,5
156:9,10,14
157:14
**folks** 101:8
117:6
**follow** 96:12
99:2 127:24
158:25
**following** 103:4
**follows** 3:10
**fool** 65:23
**forcefully**
91:21

**forefront**
124:14 125:10
**foregoing**
163:13 164:18
**forget** 44:11
125:13
**form** 4:25 49:4
50:12 79:15
119:20
**formal** 3:18
**former** 119:6
141:23
**forte** 52:12
139:11
**forth** 137:25
**fortunate** 137:9
**fortunately**
51:14 52:12
96:15
**forward** 127:10
162:16
**found** 10:10
16:25 17:1
36:9 47:2
48:25 51:15
52:20 57:19,23
71:19 72:6
74:6,9 81:16
117:14 118:8
125:2 155:19
**four** 34:12
149:17 150:1
**frankly** 8:11
16:13 35:13
61:5 62:2

Ex. 13 Page 180 of 423 Case 4:21-cv-02801-BCW Document 70-16 Filed 04/29/24 Page 180 of 423

65:18 81:3
96:17 144:5
149:6

**fred** 2:11,12
3:4 5:18 22:17
67:1 108:20
113:12 132:4
158:13 162:6
163:3 164:3

**frederick** 1:3
3:8 162:5
163:4,9 164:4
164:13 165:20

**free** 66:4 159:4
163:14 164:20

**fresh** 8:14
43:10

**friend** 27:6

**friends** 11:19
36:17 84:11
109:5

**fritz's** 49:22

**front** 64:20

**fry** 136:24

**fucetola** 95:24
115:16 124:3
126:4 128:13
128:19 138:19

**fucetola's**
120:24 130:5

**full** 54:16

**funding** 128:24
129:3,5,7,16
140:22

**furiously** 104:6

**further** 116:9
116:19 128:24
130:5

**future** 139:5,24
149:16

**g**

**gallery** 64:25
65:2

**game** 16:5
90:20

**gas** 119:6
141:23

**gathering**
79:18

**gears** 150:8

**gender** 153:24
154:16

**general** 26:14
48:3 56:24
93:14 115:24

**generally** 32:11
33:5,16 48:14
48:21 49:3,15
49:21 50:12
56:6 72:9 77:6
86:16 88:19
89:4 123:11,25

**generated**
58:16

**generating**
60:5

**getting** 10:22
43:6 50:9 61:8
62:22 72:8

80:2 81:10,12
87:21 100:17
107:1 128:18
139:5 148:19
150:6 152:23

**give** 15:22 19:7
19:11 27:15
28:15 54:14
87:23,24,25
88:1,9,15,23
109:21 115:15
119:10 120:15
130:6 137:18
140:7

**given** 14:2
133:14 147:20
153:19 154:25

**gives** 4:25

**giving** 5:10
70:2 140:11

**gland** 135:8

**global** 85:2

**go** 9:12 20:10
20:12 27:10
34:20 46:19
48:14 49:3
52:19 53:23
56:5 69:6
70:10 71:25
82:10 86:16
87:19 88:16
94:12 96:24
100:15,15
102:13 110:13
111:1 116:17

122:7 123:25
128:23 129:20
132:16 136:2
139:22 145:24
151:3 152:1
156:19 157:6
160:2

**goes** 101:16
103:9 104:18
105:5 106:5,8

**going** 3:22 4:9
4:10 5:23 7:1,8
8:13 10:11,17
16:3 17:23
18:11,13 20:5
20:24 21:5,9
23:2,4 26:9
32:11 36:8
37:13,23 38:2
38:10,13,22
41:12 42:14
43:7 44:1 46:8
48:15 50:6,9,9
50:10,11,13
52:15 54:13
56:25 59:2,10
60:7,24 61:2
62:8 63:6
64:19,21,24
67:3,19 70:16
70:24 71:1
72:12 83:19
88:6,8 93:20
93:23 94:4,6
96:13,15,23

Ex. 13 Page 18 of 23   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 181 of 423

99:25 100:17
102:7,13 103:8
108:12,14
111:10,11,12
113:3,9,9,11
116:2 119:11
119:24,25
121:17 127:3,7
127:10,18
128:21 129:1
129:24 130:2,2
130:3,9,13
131:1,3,4,22
132:22 133:2
136:2 137:17
138:6 139:1,23
140:7,11 141:8
143:23 145:2
147:18 149:1
149:13,15
150:7 152:1
155:4 157:14
158:16
**good**  3:1 8:21
12:25 19:13,22
20:9,25 22:22
27:4,5 29:22
36:21 40:11
44:25 51:9
54:21,24 57:12
64:2,10 88:23
96:3,9,10
97:15 109:2
120:17 121:4,9
124:4 127:5

138:25 139:10
139:12 142:19
143:15 146:1
146:18 150:5
150:20,22
151:3,8 154:1
**goodness**  36:18
97:9
**google**  57:11
111:7
**gotten**  71:18
78:12 121:2
**government**
42:16,24 58:21
64:22 71:13
76:25 79:6
91:1 126:16
129:2 153:6
**grade**  100:19
100:21 101:2
102:4,6,8,11,23
**grades**  102:8
**great**  51:20
102:8 146:24
149:7 157:2
159:11
**greater**  134:17
**greatest**  77:5
**grooming**
141:20
**ground**  11:13
18:10,10 52:14
54:2 56:23
158:24

**group**  6:19
151:7
**guess**  8:24
10:22 35:15
69:16 70:13
75:19 76:2
78:3 84:23
85:16 86:20
93:13 94:25
95:4 106:13
107:13 110:15
146:16 153:22
**guilt**  61:17,22
92:12,20 97:8
**gur**  124:6,8,13
127:12 128:17
128:24 129:3
131:17 140:7,9
140:12,22
158:20
**gur's**  131:6
**guru**  145:18
**guy**  18:22
44:17 136:3
147:23,25
**guys**  24:14
34:18 76:5
78:14,25 79:1
85:7 135:3

**h**

**h**  2:1
**habeas**  30:21
37:13
**habit**  58:7

**half**  42:20
49:20 60:8
116:18 117:1
117:11 118:3
119:12,13
157:18
**hall**  2:5 4:25
13:4,14,16
65:12 82:23,24
91:7,9,10
103:25 113:20
115:9 120:8,10
121:3
**hall's**  5:20
74:11
**hampered**  92:1
**hampshire**
116:8
**hand**  108:14
111:10 113:10
116:2 127:18
131:22 161:15
**handle**  41:4
63:12 145:15
**handled**  13:1
15:11 60:17
65:21
**handling**  32:16
145:6
**hands**  66:1,4
**handwriting**
109:6,18
110:14
**handwritten**
2:4,10 48:9

79:13 121:18 122:14

**hang** 83:18

**hanging** 23:7

**happen** 18:6 74:9 96:15,23 130:18 148:13

**happened** 14:12 45:11 46:10 49:25 73:20 128:15

**happening** 78:15 100:14

**happens** 43:3 116:5 138:4,4

**happy** 18:1 55:1 131:15

**hard** 21:3 89:18 96:9,12 96:24

**hat** 29:6

**haul** 29:22

**head** 14:17 21:21 53:22 81:14 92:5 131:15 142:17

**headmaster** 141:14

**health** 16:20 35:17 36:14,14 39:6 54:18 123:12,20,22 136:17 149:12

**hear** 45:4 66:17 78:11 152:3

**heard** 45:14 59:15 66:9

**hearing** 20:9

**heart** 97:23 98:2

**helen** 125:4 126:11 134:1 135:25

**helen's** 126:20

**hell** 9:20 46:3 143:14

**help** 6:17 18:1 39:10 49:18 76:21 78:24 80:4 84:17 110:6 119:18 123:23 124:15 130:3 145:11 145:24 146:3,6 146:14 153:19

**helped** 10:23 21:7

**helpful** 8:25 41:16 42:4,11 130:9,13 138:10

**helping** 40:22 146:18

**helps** 12:12 108:23

**hereinbefore** 161:9

**hey** 54:13 133:1

**hi** 132:4

**high** 100:11 105:2

**highly** 11:10

**hill** 2:11 127:13 127:22

**hire** 123:13

**hiring** 136:17

**historian** 13:1 13:13

**history** 157:25

**hold** 119:11 128:25

**holding** 72:7

**hole** 152:25

**home** 2:8 55:13 120:3,4 121:12 122:17,24

**homestead** 84:19,21 85:7 85:25 106:4,13 107:25 108:4

**homicide** 72:20 72:23 73:10,22 74:14 75:17 145:6

**hone** 151:8

**honest** 152:19

**honestly** 8:9 11:23 14:16 16:21 30:4 55:10,21 146:5

**hoped** 124:18 133:18

**hopefully** 56:7 56:12 158:23

**hoping** 158:21

**horrible** 27:9 77:6 91:17

**hospital** 149:7 149:11

**hour** 60:7

**hours** 116:18 117:1,11 118:3

**house** 13:9 14:6

**huffman** 6:17 7:20

**huge** 64:12

**huh** 9:4 14:11 30:16 31:14 32:4,19 45:22 68:16,19 70:21 72:18 73:11 74:4 84:4,6 85:16 86:3,3 87:1,12 89:12 95:12 104:20 105:9 107:3 109:7 111:17 112:5 127:14 128:3,7,11,14 133:4 137:5 145:17 158:18

**human** 22:23 28:25

**hunch** 74:16,19

**hung** 35:7 142:17

IFCD 00028123

**hunting** 77:8
**hurt** 88:11
  151:14
**hyperintensit...**
  133:22 134:4

**i**

**idea** 48:8 93:15
  97:7 118:10
  125:22 126:8
**ideas** 19:7,8
  20:15 41:13
**identified**
  86:20 157:4
**identify** 56:3
  131:3 156:19
**identifying**
  86:17
**illness** 35:13,15
**image** 132:15
  132:17
**imagine** 18:23
  106:25 117:10
  124:23
**imaging** 124:14
  125:6,23,24
**immediate** 52:6
**immediately**
  6:1,3
**impeccable**
  136:14
**implied** 71:20
**importance**
  55:2
**important**
  61:12 81:2

92:18 95:3
  136:7 137:1
  152:4 157:16
  157:16
**impression** 8:6
  17:8,13,20
  42:25 46:22
  73:1 89:24
  114:15 119:14
  119:17,17,20
  137:2
**inbox** 156:3
**incarcerated**
  28:9
**incarcerating**
  148:5
**incarceration**
  148:16
**incarcerations**
  81:7
**incident** 75:5
  114:14
**inclination**
  55:16
**inclined** 15:15
  15:16 151:17
**include** 54:8
  83:6
**included** 76:25
  120:10 162:14
**includes** 122:20
**including** 34:3
**incompetence**
  35:14

**inconsistent**
  29:7
**incorporated**
  164:12
**incredibly**
  136:7
**independent**
  117:9 137:11
**independently**
  81:22 82:7,11
  83:7
**index** 69:2
**indiana** 1:9,14
**indianapolis**
  1:11,16
**indicating**
  162:14
**indication**
  108:5 129:24
**individual**
  150:19 151:6
  152:16
**industry**
  148:11
**information**
  10:24 15:22
  21:19 50:7
  52:6 55:2 56:8
  56:10,12,15,21
  57:14 59:4
  70:4 76:16
  80:7 87:19,24
  88:10 94:9,24
  98:23 110:16
  117:19,25

118:20,22
  130:7 142:16
  142:20,23
  143:1,5,13
  144:8 148:2
  150:20,22
  152:5,10,16,21
**inherent** 27:16
**initial** 43:4
  62:3
**initially** 127:12
  137:19 138:6
**injury** 81:14
**inmate** 74:9,10
**inmates** 27:25
  28:24 147:8,9
  147:22,22
**insist** 18:2
**insisted** 70:25
  91:21
**instances** 148:3
**instinct** 50:5
**instructions**
  61:9 62:1,3
**intended** 62:23
**intending**
  137:20
**intention** 78:4
**interacted**
  127:15
**interacting**
  131:10
**interaction**
  21:4 141:17

IFCD 00028124

Ex. 35 Page 184 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 184 of 423

interested 20:9 69:24 70:1 138:8 161:14
interesting 18:9 23:4
interestingly 26:14
interpreter 42:5,9
interview 49:25 50:6 87:20 93:2,5 110:5 112:23
interviewed 86:2 92:25 95:11 143:19
interviewing 92:9,12 93:7
interviews 25:16 93:2
investigated 99:1 143:17
investigation 11:16 20:17 23:19 24:16 40:12 41:14 43:18 54:4 56:11 60:1 80:12 95:21 111:4 115:21 116:9,19 147:10
investigator 21:17,18,23 25:14 26:1

50:18,25 51:15
investigators 40:19 52:18
invite 141:22
invoking 36:11
involved 5:19 21:16 88:7 124:16 125:21 134:20 136:1
isolated 27:24 29:2
issue 126:21
issues 16:20 54:18 76:12 84:14,15 123:18,19,22 123:22 147:2 147:16 148:25
italia 1:14,17 23:5 104:5
items 69:2 71:17

**j**

january 1:5 3:3 116:7,8 161:16 162:4
jeb 153:11 154:5
jeopardy 23:6
jerry 141:15,25 142:14,17
jo 52:20,21 53:18
job 40:11 44:24 45:1 96:10

117:7 138:25 146:1,18
jobs 124:4
joe 21:24 22:1 22:10 23:9,15 23:17 25:4,18 40:18,24 54:7 54:8,8
john 106:14 109:12
johnson 6:6 31:6,7 121:2
johnson's 15:6
johnsons 16:7
joint 90:7 91:1
judge 5:21 7:2 38:16 59:22 60:21,23 62:9 62:21 63:6,13 125:15,19 129:11 130:1,8 130:19,19,20 133:5 150:23 151:1 152:12 157:19 158:11
judges 140:18 158:1,3
jump 65:19
juncture 152:20
junket 45:2
jurisdictions 81:13
juror 153:20 154:24

jurors 152:16
jury 34:19 35:2 35:7 64:23 65:5,6 97:3 134:14 135:23 136:5 143:2 150:9,11 153:16 155:1
justice 43:22
justified 36:12
justify 63:14 125:9
juvenile 106:8

**k**

kansas 1:6,7,20 36:4
kc 77:16 108:17 155:11
keep 18:2 58:8 88:7 94:10
keeping 58:24
keeps 43:14
keith 1:18,19 1:20
keithoc.com 1:20
kelly 80:20
kent 63:15 90:20
kept 13:3,13,20 14:5 26:7 100:6,17,17
kernel 29:8
kevin 116:12 116:21

Ex. 3, Page 185 of 423

kid 80:8

kidnapped 35:9

kids 106:15 119:18

kill 29:11 35:25 36:2 147:23 151:22

killed 35:8,23

killeen 53:3

killing 98:8 147:2

kin 39:20,21

kind 13:2 16:19 18:21 23:25 24:19,21 26:9 28:5,9 29:10 32:13 36:18 41:20 43:1 49:8,17 50:13 52:7 54:3 60:11,14 64:18 64:19,24 70:7 74:2 76:15 82:10 88:13 90:20 92:22 97:10 113:16 118:10 119:15 126:8,10 127:9 129:1 138:9 147:17 154:10

kindred 23:1

kinds 16:11,14 19:7,8 32:3,6,9 32:14,15 54:19

59:6 61:9 62:20 72:11 88:4 92:17 101:21 123:16 133:25 139:5

knew 7:21 8:13 21:13,16 22:1 41:20 85:13 94:25 95:1 97:24 117:16 140:10

knock 51:11 55:13

knocking 54:3 116:20

know 3:22 7:4 7:12,15 9:18 10:5 13:10,11 14:25 15:21 16:15 17:17 20:24 21:10 22:6,10,21 23:9 26:20 27:17,21,21 29:13 38:7 39:12,13,14 44:2,5 47:17 55:2,25 63:20 64:4 67:3 68:3 69:9 73:4,9 76:24 77:8,11 80:18 81:2 83:20,21 86:23 88:3 90:12 92:16 94:7

95:2 99:19 112:18 114:25 117:16 118:19 126:1 130:4,9 130:14 131:15 133:2 135:14 138:17 140:8 141:12 143:14 148:9 150:16

knowing 55:17 120:22 150:25 151:2

knowledge 94:8

known 22:24 80:9,21 85:9 143:2,16

knows 66:23

ku 124:25

**l**

labeled 25:4

lack 39:8 47:4 150:2

lady 27:7

lake 36:4,7

laptop 48:14,14 48:18 67:18

large 8:20 79:23

largely 61:21

late 130:24

laughrey 158:11

law 16:17 39:22 81:12

lawyer 18:1

lawyers 40:14 40:24 54:11 58:22 60:25 62:10,23 63:7 81:12 95:18

layout 64:6 65:10

lead 22:12 59:3 59:3 112:24

learn 45:10

learned 141:13 142:12

leave 8:11 39:9

leaves 74:7

led 147:13 151:23

left 30:10 46:18 50:24,24 143:8 143:11

legal 55:7 162:1 165:1

legitimate 129:19

lesions 133:24

letter 162:20

letting 133:1

level 6:14 30:22 96:17

lewis 2:5 38:19 38:25 40:5 54:7 111:16

lewis's 111:13

life 11:21 34:18 79:18 81:6

Ex. 23 Page 186 of 423   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 186 of 423

87:22 136:20 147:20 151:23

**light** 19:19 150:14

**liked** 68:9

**likely** 94:7

**limitations** 59:22

**limited** 116:4

**limits** 22:24 60:21

**line** 49:17 78:25 153:22 162:14 164:7 165:3

**lines** 24:23 94:24 97:7 130:11 137:15 141:2

**lion** 60:18

**lisa** 37:15,16 114:22 118:13

**lisa's** 37:7,12

**list** 2:4,5 84:1 109:12,21,24 111:18,22 112:8,16 113:5

**listed** 120:25 164:7,17

**listening** 18:15

**listing** 164:7

**lists** 113:24

**literally** 23:17 46:18 52:13 135:1 146:10

149:20 154:24

**litigation** 30:6 30:8

**little** 4:11 5:18 20:6 22:11 23:20 28:20 29:14,15 36:4 38:15 41:1,18 46:16 48:1 58:20 64:3 68:24 79:17 84:17 88:24 92:22 93:13 95:6 99:8,9,23 127:25 141:12 150:8 155:10

**lived** 122:6,16

**living** 13:15 122:24

**llc** 1:19

**lo** 52:16 102:11

**lobes** 134:17

**local** 124:17,20 124:25 141:21

**locate** 56:14,17 57:9 72:21 75:13 85:15 86:11,13 100:24 110:21 110:23 111:7 112:19 116:9 116:19 117:8

**locating** 56:5 110:13

**locations** 47:18

**loft** 141:23 142:14

**log** 72:14,14,16 72:21,22 73:23 74:5,12 75:16 75:20 76:17

**logic** 121:9

**logical** 121:8

**logs** 76:23 79:13,13

**lombardi** 109:5

**long** 23:17 29:19 52:23 68:15 118:25 142:8

**longer** 39:1

**look** 4:15 24:10 60:2 67:19 69:6,13 70:12 73:15 77:9 78:9,19 88:4 88:16 99:23,25 101:1 105:14 109:17 111:22 113:13 119:2 146:22 155:2

**looked** 30:2 36:13 37:8 47:7,8 68:17 69:11 70:13 71:4 75:14 78:8 101:7

**looking** 10:1 12:2 28:10

34:7 70:17 85:18 86:21,25 95:14 102:19 108:24 117:13 117:21,23 134:9,23,23 135:7 148:24

**looks** 24:10 136:7 137:19 137:24 138:11

**loose** 152:18

**loss** 134:16

**lost** 153:21

**lot** 8:10,23 9:20 20:2 25:23 27:14 30:7 32:1,12 35:13 36:16 48:19 51:17 54:2 57:15 63:2,4 64:4 67:8 68:25 69:25 80:1 88:6 94:22 95:23,25 102:17 105:8 119:3 137:9 139:1 147:9 150:12,20,22 153:13

**lots** 13:12 19:17 28:3 52:15,16 66:22 72:13,15 150:4

**love** 97:9,17 150:16

Veritext Legal Solutions

www.veritext.com

888-391-3376

IFCD 00028127

**loves** 145:10
**loyal** 26:12,12
**lynn** 6:5,12,16
6:20,22 7:12
9:16 11:10
16:25 17:10,14
20:12 21:15
26:8 41:18
43:9 46:23
47:18 90:22
158:19
**lynn's** 25:24

**m**

**machines**
125:16
**mad** 26:13
**madam** 162:9
**made** 13:14
18:12 47:10
60:23 61:4
63:2,6 65:18
67:7 68:25
70:9 77:21,22
89:13 99:13
129:2 130:24
135:22 140:13
141:6,7 148:11
163:7
**mail** 2:11,12
3:14 50:1,13
69:1 127:19
131:25 138:2
155:22,25
156:17 157:4,8
157:14,17

159:6
**mailing** 51:21
**mails** 137:24,25
155:13,14,17
155:19,21
156:2,7,8,9,13
157:9
**main** 42:1 96:5
**maine** 8:18 9:3
9:19 10:9,9
44:2 47:12,16
53:23 80:6
84:8 100:6
101:18 116:18
**maintain** 48:4
**majority** 30:4
53:7
**make** 4:1 18:20
21:8 31:15
44:16 48:23
55:14 59:15
65:11 72:25
73:4 78:22
84:1 89:1 91:7
98:20 100:16
126:24 136:1
136:10 154:15
155:4
**makes** 61:5
68:20 79:12
118:2,6 132:24
149:22 155:5,6
**making** 18:11
19:13 20:1
44:14 51:18

54:23 63:5,9
68:11 74:1
89:25
**malpractice**
32:17
**mama** 52:10
57:19
**man** 26:25
141:15 144:12
144:13 153:21
**managed** 66:20
**manager**
106:22
**mandarelli**
84:24 106:14
109:12
**march** 2:12
132:2 133:1
**marital** 6:12
**mark** 108:12
108:15 111:11
111:12 113:9
121:17 137:20
137:21 138:7
138:12,20,21
138:24 139:7,8
139:14,14,17
145:22,25
146:3,6,12,17
148:10,11
**marked** 4:4,21
4:23 82:20,21
108:13 111:9
113:8 116:1
120:1 121:16

127:17,19
130:15 131:23
**marking** 116:3
**marks** 139:18
139:20
**mary** 107:24
**material** 48:12
79:5
**materials** 82:25
113:19
**matt** 63:17,18
153:2
**matt's** 63:18
**matter** 46:11
158:10
**matters** 136:25
**mattress**
141:25
**maughmer**
130:20
**maureen** 14:10
**mayberg** 125:5
125:13 126:11
134:1 135:25
136:3
**mckegney**
113:25 114:3,8
116:13 117:3
117:12 118:11
118:13
**mckegney's**
116:14,20
**mean** 8:20 9:25
11:8,24 12:1
13:4 14:15

www.veritext.com

888-391-3376

IFCD 00028128

Ex. 13 Page 188 of 423 Case 4:21-cv-02001-BCW Document 70-16 Filed 04/29/24 Page 188 of 423

16:13,21 23:11 24:14 26:7,13 26:22,25 37:16 42:15 46:11 54:24 60:22 61:16 62:14,16 62:20 65:18 67:3 70:19 73:2,9 74:23 75:1,5 77:4 79:23 82:2 86:22 87:2,3 88:5 94:17 96:2 97:18 118:16 126:5 132:8 135:9,20 136:8 140:4 144:8 145:20 146:17 148:10 148:20,22 150:1 154:17 154:20 157:1

**meaning** 106:16 139:14

**means** 4:12 115:11,15

**med** 124:25

**medical** 32:17 57:11 81:23,25 84:14 146:9

**medium** 49:8

**meet** 3:20 53:13 55:6 93:24 99:12 127:9

**meeting** 10:4 11:6 23:17 55:5 133:7

**meetings** 10:13 42:7,9

**member** 54:16 92:10

**members** 11:20

**memo** 2:5 48:8 48:16 49:12 55:15 107:12 107:19 110:5 111:15 112:22 115:2

**memorandum** 46:4

**memories** 115:24

**memory** 131:16

**memos** 10:13 25:9 51:10

**mental** 16:19 35:13,15,17 36:14,14 54:18 123:12,20,22 136:17,23 149:11

**mentioned** 9:2 14:8 32:20 60:20 74:12,18 75:7 91:19 97:20 116:14 136:15

**mess** 8:7

**message** 45:7

**met** 3:15 9:21 9:23,23 10:5 15:15 17:22 53:18 55:4 130:20 148:23

**metal** 66:7

**method** 50:2 108:22

**michael** 39:14 39:18,20,24 40:6 55:5

**michelle** 85:6 94:14 98:8,11 98:14,24

**mick** 40:11,18 40:24 50:16,18 50:23 51:4,7 52:8,20 53:15 54:7,17,22 55:4 56:19,22

**mick's** 52:12 53:6 54:12

**middle** 100:8 101:17

**midtown** 36:4

**midwest** 162:18 165:1

**mike** 1:24 3:5 39:5,10 54:7 57:1 59:11,16 60:5 61:3,6,16 61:19 63:1 93:5

**military** 53:3

**mind** 15:24 20:23 24:25 26:6 73:12 89:23 129:9 140:11,14 141:3

**mine** 127:25

**minimal** 54:10

**mining** 60:3

**mintz** 141:15

**minute** 43:20 61:10 68:2 146:7

**misheard** 59:20 61:15

**missing** 71:12

**mississippi** 35:11

**missouri** 31:3 161:3

**misspoken** 61:15

**mistaken** 60:12

**mitigating** 35:15 89:2

**mitigation** 11:16 92:10 147:7,18,24

**mix** 30:18

**mo** 1:7,20,22

**moberg** 131:15 132:5,20 134:22

IFCD 00028129

Ex. 13 Page 189 of 423 Case 4:21-cv-00001-BCW Document 70-16 Filed 04/29/24 Page 189 of 423

**molest** 142:2
**molested** 141:18
**mom** 11:18 13:6 57:21 80:3,5 81:5,5 83:8 84:1,5 85:6 87:11 92:24 96:7 97:14 99:12 122:21
**moment** 49:9 123:9
**money** 140:7,8 140:12
**montgomery** 37:16 125:11 129:12
**month** 128:1
**months** 43:7 72:16
**monument** 1:10,15
**moose** 38:1 40:1
**morning** 3:1
**mother** 53:8
**motion** 65:11 89:11
**motions** 61:11
**motorcycle** 81:15
**mountain** 2:6 102:25 103:4 103:10,13,15

103:20,21,24 104:7,13,18,23 113:17 115:8 115:19 117:17 119:14 141:14 141:19 143:24
**moved** 74:18 117:23
**moving** 56:23
**mri** 126:21,25 127:3 132:10 132:23 133:11 133:15 135:17
**mris** 127:8
**mud** 36:8
**multi** 96:4
**multiple** 53:16 94:10
**murder** 30:23 34:9,10,19 38:4
**mutual** 152:24

**n**

**naive** 90:18,18
**name** 3:5 31:5 52:21 56:4 57:8 58:2 73:22 74:11,19 80:10,11,13,18 80:21,24 105:20,21 107:24 108:2,4 109:11,24 110:11,23 112:15,17

113:25 114:22 114:22,23,24 120:3 124:21 134:21 162:6 163:3,4,15 164:3,4,21
**named** 73:25 85:24 141:15
**names** 2:4,5 56:11 57:16 63:23 101:22 105:15 111:18 111:22,23 112:1 118:13 118:14
**natural** 9:25
**nature** 6:8 38:3
**near** 53:2
**necessarily** 49:6,8 62:19 88:3,22 90:12 94:4 134:5 143:3
**necessary** 45:1
**necessity** 148:12
**need** 17:25 27:10 44:19,19 63:14 66:24 78:17 88:25 123:18 137:11 138:1 148:20
**needed** 7:4 14:1 79:22 91:22 94:24 95:1

129:17 137:18 145:11 147:6 147:17 148:2 149:2,13,19,21
**needing** 57:13
**needlessly** 25:22
**needs** 66:23 103:3 130:14 130:18
**neuropsyche** 126:5 128:9 132:19,20
**neuropsychol...** 128:13
**neuropsychol...** 131:17
**neuroradiolo...** 135:6
**never** 6:23 7:1 14:25 17:13 18:6 19:19 20:5,11,17 21:1 25:16 27:21 32:24 33:17,21 47:2 62:23 75:1 76:16 90:14,15 98:11,13,16 141:15,17
**new** 43:11,11 116:8
**nice** 11:11 64:12 68:14 119:18 135:23

Ex. Case 4:21-cv-08301-BCW Document 70-16 Filed 04/29/24 Page 190 of 423

158:12
**nicely** 20:24
**non** 16:4,18
  38:12
**normal** 134:3
  134:25 157:7
**normally** 49:23
  58:1 97:16
**northeast**
  53:24
**notary** 162:16
  162:25 163:10
  163:18 164:15
  164:23 165:23
**notation** 73:21
  107:21
**notations** 73:25
**note** 2:10 4:18
  48:23 55:14
  74:5 107:11
  110:8 113:11
  115:6 120:25
  121:18 122:1,2
  122:14,15
  123:2 162:12
**noted** 117:15
**notes** 10:13,16
  10:21 24:3
  48:9 49:11,13
  49:22 51:18
**notice** 116:6
  154:3
**noticed** 68:25
  151:5 153:9

**notion** 56:24
**nth** 26:9
**nuances** 145:13
**number** 27:16
  63:10 108:20
  108:21 112:16
  113:4 133:20
  162:7,14
**numbers** 164:7

**o**

**o** 101:17
**o'connor** 1:18
  1:19
**oath** 1:3 3:4,10
  162:6 163:3
  164:3
**objected** 19:19
**obtained** 12:15
  12:15 83:7,11
**obviously** 3:18
  4:16 5:9 11:12
  33:3 44:25
  55:4 88:24
  102:20 112:12
  117:13 151:14
**occurred** 42:20
  72:20 146:25
**offense** 42:20
**offer** 138:20
  142:15
**offering** 78:7
**office** 30:14
  34:5 50:20,23
  63:12 69:14
  70:25 130:19

159:17,20
**official** 163:15
  164:21
**officially** 124:9
**oh** 42:6 53:14
  143:14 154:9
**ohio** 162:2
**okay** 4:20,22
  5:17 6:1,4
  10:12,19 11:2
  17:16 18:7
  19:4,4 25:2,10
  26:4,24,24
  29:22 34:22
  35:21 37:2,2
  37:11 38:12
  39:23,23 40:5
  40:13 41:22,22
  43:14 49:10
  50:15 51:4
  52:7 54:12
  57:18 58:7,19
  64:2,16 66:19
  66:19 69:9
  71:10 72:24
  75:25 80:1,15
  82:6 83:12,12
  83:18 89:10,19
  92:9,9 95:5,11
  96:6 99:23,23
  100:19 101:6
  101:16 103:19
  104:9 106:23
  107:2,2,16,18
  108:7 109:4,24

113:3,24 114:4
  114:9 116:11
  121:15,22
  124:5 131:12
  131:19 132:7
  132:18,25
  135:5 136:15
  138:6 141:11
  143:13 144:17
  145:2 146:21
  146:24 149:3
  153:1 154:5
  157:19 159:11
**old** 13:9 81:18
**older** 84:12
**olga** 42:3,4
  93:4
**onboard** 91:24
  92:8
**once** 18:9 20:23
  20:25 58:2
  66:23,24 97:21
  99:12 128:25
  137:13 140:8
  140:10 148:23
  157:4
**ones** 22:9 96:5
  153:25
**ongoing** 27:2
**onion** 94:15
**open** 15:23
  19:7 93:15,16
  93:17 150:21
  151:4

Ex. 13 Page 190 of 420    Case 4:21-cv-02001-BCW    Document 70-16    Filed 04/29/24    Page 191 of 423

**opinion** 91:20
**opportunity** 4:15,18 15:22 60:1,2 91:6 149:20
**opposed** 27:19 65:22 104:23 131:11 149:18 151:18
**oral** 65:11
**order** 100:4
**organization** 8:23,25 22:9 33:19 77:4
**outcome** 31:9
**outlines** 46:7
**outs** 51:11
**outside** 67:17
**overlap** 92:21 100:13
**own** 15:21 28:11 51:18 68:1 79:20 94:3 100:8,9 100:11 146:9

**p**

**pad** 48:19,22 49:2,11
**page** 2:2 100:20 108:21 113:24 114:21 116:4,5 122:18 162:14 164:7 165:3

**pages** 72:16,16 72:16 111:8 115:8 122:7
**palpable** 97:17
**pan** 137:13
**paper** 46:5 48:5 48:13,20,22 49:2,11,13,21 52:4 58:5 69:6 77:13,19 78:20 79:5,7 108:25 155:12
**papers** 13:9,20
**paralegal** 33:18
**paralegals** 22:5 22:16 33:12,15 33:16 40:16
**parents** 9:24 10:4,14,25 11:7,9 12:8,23 20:22 96:14 103:1,3 122:24
**parietal** 134:17
**park** 14:15 29:4 62:4 125:3
**parks** 84:25 106:14 112:2,3
**part** 27:23 28:18 33:9,12 46:25 47:10 54:13 90:13 97:13 113:19 113:21 117:3 117:20 135:3

136:3 137:9 147:7 153:3 164:9
**parte** 140:21
**particular** 23:18 41:7,8 44:15 56:13 61:2 71:17 75:4 77:1 86:14 90:19 93:11 105:19 127:1,4 130:12 135:2 152:11
**particularly** 13:11,24 14:5 14:6 22:11 26:14 27:13 60:23 65:7 70:1,3 71:4,11 119:22 123:19 125:4 136:11 147:4,5 148:6 153:8,24
**parties** 161:12
**party** 77:16
**passed** 39:3 78:4 104:3
**past** 5:12
**pat** 85:24 106:21
**pattern** 141:20
**patti** 1:14,17 109:8 145:1 150:6 155:5

**paul** 131:15 132:5,20
**pavement** 54:3
**pay** 63:7
**paying** 23:21 58:17
**pd** 29:19,23 34:6
**pd's** 30:14
**pdf** 58:9 79:15 157:3
**pdfs** 58:3,4 157:5
**peaches** 52:19 52:20
**peeled** 94:15
**peers** 84:18 108:11
**penalty** 17:2,3 17:11,24 18:5 19:20 26:18 27:19 30:5,7 30:13,15 31:13 34:16,17,20,22 35:1,3,12 36:25 44:18 45:9 46:12 54:18 59:14,17 60:19 61:7,8 61:24 62:3 86:18 89:9,20 89:21 90:7,9 91:1 92:7,18 92:25 93:2 95:22 96:3

www.veritext.com 888-391-3376

IFCD 00028132

97:11 145:20 151:12,15 152:2 157:25

**pencil** 48:13

**pendency** 37:3

**pending** 7:6,7 45:21

**pennsylvania** 131:18 132:1

**people** 11:20 12:3 15:23 25:22 26:12,14 26:15 28:5,7,9 32:2 35:5,23 35:25 40:21,23 51:15,15 52:16 56:12,14,17 63:10,19,25 64:4 68:12,18 69:18 73:25 79:21 83:22,24 85:12 86:7,17 86:20,23 87:10 87:19 88:11,11 88:11 93:3,15 93:18 96:9,18 97:4 101:25 109:22 110:3 115:22 117:13 118:17,18,22 119:18 134:3 134:25 142:4 151:12,14,16 153:13 154:15

**percent** 37:22 87:17 153:6

**period** 30:12 60:25

**permission** 5:1 5:10 14:25

**persistently** 36:10

**person** 13:13 13:25 18:11 19:5 21:21 33:8,21 36:22 44:14 48:5,5 52:2 56:6,9 57:9 85:23 86:13 88:2,24 93:8,21 151:9

**personable** 11:12

**personal** 6:22 55:1 159:14

**personalities** 41:20

**personally** 163:11 164:15

**personnel** 70:4

**perspective** 62:22 64:11 75:11

**persuading** 20:8

**persuasive** 127:6

**pertaining** 148:15

**pet** 126:21 132:11,23

**phase** 31:13 34:16,17,20,23 35:1,12 54:18 59:11,14,18 60:17,19 61:7 61:8,17,22,24 62:2,3,8 86:18 89:9,20,21 90:8,9 91:2 92:7,12,18,20 92:25 93:3 95:22 96:3 97:11

**phases** 43:3

**phil** 148:1

**philosophically** 27:20

**phone** 3:14 50:1 51:24 62:15 128:5 162:3

**phones** 33:25

**physical** 69:7 71:2

**pick** 49:25

**picking** 145:12

**pictures** 8:17 47:5,6,8,12,13 64:14,14 67:21 67:24 68:7 135:23

**piece** 52:9

**pieces** 79:7

**pills** 97:23 98:2

**pineal** 135:8,8 135:10,11

**place** 1:6 28:12 52:14 75:9 102:24 104:18 106:5 118:19 118:21,23 121:10 129:17 161:8

**placed** 70:6

**places** 28:8

**plaintiff's** 32:18

**plan** 46:20 122:17

**plausible** 99:14

**play** 28:19 54:9 90:21

**played** 29:5 65:23 152:18

**please** 162:12

**plethora** 139:20

**plowed** 11:12

**plum** 65:21

**plus** 88:8 126:7

**po** 1:19

**point** 3:23 40:6 45:23 54:6 61:12 67:2,7 78:21 80:19 81:3 83:19 94:20 99:16

Ex. C 33 Page 193 of 423    Case 4:21-cv-08001-BCW    Document 70-16    Filed 04/29/24    Page 193 of 423

102:15,18
128:21 129:8
137:1,2 138:11
146:10 148:19
155:13
**pointed** 97:3
**pointing** 67:6
90:4 122:16
**poison** 97:22
**policies** 149:9
**politics** 41:21
**poor** 26:25
**poorly** 102:15
143:23
**pop** 80:7
**port** 116:7
**portland**
110:15,18
111:2 116:17
**portraying**
97:13
**positive** 96:1
129:1 146:7
**possession** 69:7
**possibilities**
138:10
**possibility**
36:13 76:18
128:22
**possible** 31:13
70:5 137:3
**post** 32:20
75:14 81:17,17
147:13 157:23

**potential** 87:7
87:13
**poured** 8:20
**practical** 62:24
**practice** 29:15
29:23 30:1,17
30:24 31:21,24
32:1,2,6 33:2,9
33:13 51:3
157:7
**practiced** 33:3
39:23
**practices** 149:8
149:10
**pre** 81:6,20
83:24
**precipice**
125:12
**predicting**
133:2
**predicts** 132:22
**prednisone**
27:8 136:23,25
**predominantly**
62:8
**preference**
15:25
**pregnancy**
99:16
**prepare** 126:14
**prepared** 31:12
**preparing**
60:15 61:24
72:5

**presence**
162:16
**present** 1:14
89:3 125:17
147:18
**presentation**
44:11,14,17
45:6,11,14,16
46:2,25 47:3
59:14 135:21
136:4,13
158:12
**presented**
59:10 60:19
149:5
**presenting** 91:8
**press** 22:23
**presumably**
122:23,25
**presume**
111:15
**presuming**
12:1
**pretty** 6:11 8:9
17:10 18:3
26:10 38:8
43:9 45:12
62:7 66:15
89:24 93:20
96:10 104:4
120:19 126:4
135:23 137:17
139:10 151:14
**prevented**
114:10

**previous** 124:3
157:18
**previously**
138:21
**primarily**
56:17 59:17
84:23 148:14
**principles**
18:17
**print** 58:1,7,18
109:9
**printing** 109:3
109:7 127:25
**prior** 6:4 8:3
84:16 161:5
**prison** 24:13
70:16 81:7
83:23 146:20
147:2,5 149:9
**prisons** 145:3,6
145:10
**private** 29:23
30:1,17,24
31:21,23 32:1
32:2 33:1 51:2
104:24
**privilege** 5:4
**probability**
99:21
**probably** 30:5
41:25 42:8
49:19 51:6
55:17,19 56:1
57:5,10 68:15
76:3 78:2 96:5

www.veritext.com

888-391-3376

IFCD 00028134

104:15 110:15 110:17 111:2 115:17 117:2,7 120:21 123:9 128:6 151:20

**probe** 16:22 94:10

**probing** 93:19

**problem** 21:2 66:25 67:1 72:10 75:2 130:1 135:2 144:4,6 156:11

**problematic** 39:7 134:5

**problems** 6:9 6:13,19,21,22 18:15 75:6 102:18 105:8 105:12 133:21 136:23 146:9

**procedure** 163:5 164:5

**proceeding** 43:23

**process** 15:19 39:10 52:24 100:18 117:21 128:18 129:23

**produced** 56:11

**product** 10:23 51:5 59:25

**production** 162:18,23

**productive** 25:24

**professional** 68:10

**program** 155:18,20,23 156:18 157:1

**progressed** 42:21

**promote** 102:9

**pronounced** 135:10

**pronouncing** 112:15

**proposed** 39:18

**prosecute** 91:4 91:6

**prosecutor** 67:5,6

**protect** 149:15

**protecting** 147:8

**protections** 5:7

**proud** 68:17

**prove** 149:19

**provide** 117:25 120:14 123:6

**provided** 21:19 79:8,14 82:13 83:1 97:15 113:22 121:19 141:10 155:13

**psychiatric** 84:14

**psychological** 84:15

**psychologist** 139:8,13

**public** 29:16,20 30:10 34:4,13 50:18,19,20,22 50:23 63:11 105:1,2 163:10 163:18 164:15 164:23 165:23

**pull** 13:22 28:5 28:21 29:5 124:24

**pulled** 67:18

**punished** 27:18

**purkey** 124:17 124:22,25 125:3 135:22 146:19

**purport** 113:16

**purportedly** 141:6

**purpose** 15:7

**purposed** 118:9

**purposes** 4:11 5:4 79:20

**pursuing** 89:17 95:17

**push** 28:5,21 96:25

**pushy** 17:21

**put** 8:22 9:1 28:16 36:6 49:4,15,21

50:12 51:11 58:18 59:4,23 60:21 91:17 102:7 119:4 127:2 128:23 134:24 150:14

**puts** 124:7

**putting** 22:8 50:15 59:13 66:22 101:10

**q**

**quarters** 49:20

**question** 75:8 75:18 85:17 92:21 115:20 121:22 123:10 130:22 146:16 149:23 150:12 150:13,21

**questioning** 142:16

**questions** 5:15 52:16 64:3 93:17 94:11 145:3 150:9 151:4 159:1,11

**quickly** 124:11 125:2

**quite** 7:1 81:3 81:15 114:8 150:21

**r**

**r** 161:1

**rabbit** 29:6
**race** 154:16
**racist** 154:22
**radar** 74:18
  99:9,18
**raise** 89:14
  153:10
**raised** 16:8
  89:15 130:1
  142:6 154:5,8
**raising** 96:9
  143:11
**randy** 8:14
  69:1,19 71:17
  128:22 151:20
**raped** 35:6,8
**rapid** 138:3
**rarely** 72:6
**rather** 54:15
**raw** 48:12
**rawest** 125:16
**ray** 2:11 127:13
  127:15,22
  131:5,11
**reached** 127:12
**reaching** 125:7
  125:8
**read** 86:19
  163:5,6,12
  164:5,6,17
**reading** 73:16
  162:11,20
**ready** 43:6
  62:22 71:25
  72:8

**realize** 72:9
  108:23
**realizes** 66:24
**really** 3:18 6:23
  7:4,9 8:15 9:24
  16:14 20:20,20
  20:20,22 21:21
  27:4 29:11
  39:6 40:11
  43:12 45:2
  46:9 55:1 57:2
  57:19 60:3,16
  70:10 75:8
  79:3 84:12
  85:14 91:20
  92:4 97:15
  102:15 119:16
  129:10 136:7
  137:10 143:25
  149:5,7 151:5
  151:6,11,17
  152:23 153:3
  154:18,19
  156:12
**reardon** 14:10
**reason** 12:13
  12:17 14:20
  17:21 27:22,23
  77:2 79:9 95:9
  96:16 98:7,13
  98:16,19
  119:22 129:19
  136:8 153:10
  162:15 164:8
  165:3

**reasonable**
  104:11
**reasons** 26:22
  28:3 65:9
  131:1 135:16
  136:16
**recall** 9:14,15
  10:6,7,12 12:4
  16:20 21:22
  22:10,14 24:18
  31:5 35:17,20
  38:9 49:18
  53:13 55:9,10
  57:3,12,17
  60:4,10,13
  62:4 68:4 69:5
  70:16 73:21,24
  73:25 74:11
  83:24 84:9,11
  85:12 93:5
  95:21 98:7
  99:10,17
  100:22,23
  101:10,12,24
  103:7,12
  105:16 106:12
  106:19 111:5
  112:9 113:1
  114:18 115:18
  117:4 118:14
  120:6,9 121:11
  123:1,7 127:11
  131:5 137:4
**recap** 128:4

**receipt** 162:19
**received** 69:25
  156:8,13
**recently** 118:25
**recess** 67:13
  144:22
**reciprocal** 83:1
  100:2 104:11
  115:12,15
  120:11,14,15
  121:20
**recognize**
  121:21
**recollection**
  6:11 7:9,10 8:5
  9:23 10:16,17
  12:11,12 14:2
  14:20 22:3,7
  35:22 41:6
  43:8 46:15
  47:5 53:11
  64:18 65:4
  71:18 74:23
  79:4 80:11
  82:3 83:14
  101:3,15
  102:19,21
  103:11,16
  107:6,7,14,15
  108:1,8 109:2
  109:19,23,25
  110:2,10,20,22
  112:16,19
  113:6,18 114:5
  114:13 116:22

Ex. 3 Page 196 of 423 Case 4:21-cv-02801-BCW     Document 70-16     Filed 04/29/24     Page 196 of 423

117:9 118:8,20
119:8 122:10
122:11 130:16
132:12 133:4
138:3

**recollections**
11:23 41:9
49:5 71:5
112:7

**recommendat...**
33:7 130:5

**recommended**
159:19

**reconstructing**
69:17

**record** 3:2,21
37:15 57:8
60:18 62:18
63:21 67:12,15
71:21 82:21
83:21 86:11
101:5 113:17
144:21,24
160:2,4 164:9

**recorded** 55:23

**recording**
159:13

**records** 2:3,6,9
6:10 8:14 10:2
12:6,7,18,22
15:4 24:4,16
40:23 42:17
48:4 53:6
55:18,19,23
56:2 60:14

69:20 70:22,23
70:24 71:3,20
75:9 79:18,21
80:2,10,14
81:4,4,7,8,9,12
81:23,23,25
82:4,6,12,12,13
82:18,22 83:4
83:6,10 86:9
86:12 87:3
95:16 99:24
100:6,8,9,12
101:7,14
102:20 103:12
103:14,17,21
103:23 104:2,2
104:6,8,13,16
104:21 105:14
106:4 107:1,2
107:8,10,22
108:4 110:5
113:22 115:23
116:4 118:12
120:6,12,25
121:13 123:8
133:7 139:10
139:24 145:10
145:12 146:21
147:6,11,17
148:6,15,15

**recounting**
46:10 87:22

**recusal** 158:5

**recused** 157:22
158:14

**reduce** 49:12

**reduced** 161:9

**refer** 57:11

**reference** 162:7
163:2 164:2

**referenced**
163:11 164:15

**reflected**
115:23

**refresh** 46:15

**refreshes**
131:16

**regard** 12:4
16:12 60:17

**regarding**
156:2

**regularly** 21:5
69:3 147:21

**regus** 1:6

**reinvent** 59:8

**related** 10:21
35:24 53:21
58:10 63:3
67:19 86:15
95:25 121:13
147:10,11
157:8

**relation** 47:19

**relationship**
11:14 19:23
21:1,3 26:19
54:21

**relationships**
21:4

**relative** 161:11
161:13

**relatively** 66:21

**relay** 5:1 51:4

**release** 2:14
4:25

**relevant** 127:1

**relied** 36:17
86:19 87:24
137:14

**reluctant** 88:9
94:18

**rely** 87:23,25
88:14

**relying** 139:22

**remember** 7:5
7:7 9:6 14:14
14:17,19,24
22:13,15 23:16
37:5,6,7,11,13
45:22 47:11,12
47:25 53:20
57:15 64:16
68:8 69:15
70:3,24 71:8,9
71:15 72:17
73:13,16 78:7
79:7 80:19,22
81:9 82:7,15
84:8 86:6 95:8
95:15,17,19
102:2,3 104:1
107:4,8 108:3
112:10 119:9
120:3 121:23

Ex. 3, Page 197 of 423 Case 4:21-cv-08001-BCW Document 70-16 Filed 04/29/24 Page 197 of 423

124:12,21 132:9 141:1 142:13 146:4,6 155:22

**remembered** 67:24

**remembering** 21:20 25:19 85:11

**renee** 112:14

**repetitive** 157:16

**replaced** 97:23

**report** 58:16 60:11,13 121:1

**reported** 75:15

**reporter** 1:22 3:6 4:12 161:3 163:7

**reports** 23:15 24:20,21,25 25:13 57:25 58:5 60:5

**represent** 5:24 116:13

**representation** 5:2,25 15:6

**represented** 3:24 55:7 115:1 130:17

**representing** 3:5 6:15 38:11 39:7

**reputation** 7:16 87:16

**request** 129:3 131:2 164:9,11

**requests** 69:1

**required** 162:25

**requirement** 142:1

**research** 33:19

**reside** 156:3

**residential** 106:5

**resolution** 129:1

**resource** 63:17 145:17,19,20

**resources** 16:3

**respected** 28:6 28:22 54:22

**respectful** 93:21 94:11

**respond** 90:10 90:12

**responsibilities** 41:3

**responsible** 58:23 59:1

**rest** 30:24 64:23 155:21

**restart** 21:3

**restrained** 65:20

**restricted** 152:9

**restrictions** 70:6 150:14

**results** 126:9 126:20 127:3 131:3 133:11 133:25

**retain** 123:14 123:17

**retaliation** 35:7

**retired** 158:7

**retirement** 158:12

**returned** 162:19

**review** 42:14 42:15 133:9 162:12 163:1 164:1

**reviewed** 74:24 76:10

**reviewing** 43:16

**reviews** 139:14

**rid** 49:19

**right** 3:17 4:7 5:9 8:3,24 9:6 9:13 12:20 14:13,18 15:3 15:9 18:21 22:3,6 23:13 24:7,9 27:17 28:3,14 31:17 36:25 39:2,19 40:3 41:19 47:23 48:10 49:9 53:9 58:19 62:5

69:11 72:6,12 72:12 80:22 83:12 88:17,17 89:2 90:6 94:2 103:22 106:9 106:12 107:20 111:14 112:13 112:13 115:17 117:9 124:14 125:12 132:21 132:23 134:3 137:8 138:16 141:11 148:1 155:25 158:2

**ring** 114:22,23 131:20

**rings** 108:2 110:11 114:24

**road** 148:24

**roads** 20:11

**rob** 126:3,4,6

**robberies** 32:5

**robert** 2:5 41:2

**role** 54:9,12 57:2

**room** 122:20

**rough** 119:10

**roughly** 100:3

**rounds** 74:2

**row** 126:15

**rubber** 148:23

**ruben** 124:6,13 125:10,11,17 125:21 126:7 126:19 127:12

Case 4:21-cv-02801-BCW Document 70-16 Filed 04/29/24 Page 198 of 423

129:24 131:5
134:20,23
135:19 136:10
136:11 140:7
158:20
**ruben's** 132:11
**rubenstein**
63:17 153:3
**rubenstein's**
153:19 154:13
**ruff** 105:20,21
**rule** 18:10
99:22
**ruled** 125:19
**rules** 3:19
18:10 163:5
164:5
**run** 54:17
149:11

**s**

**s** 2:1 101:17
164:8,8 165:3
**saco** 101:17,17
101:18 104:3
**safe** 120:13
**salary** 33:22
**sandbagging**
130:23
**sat** 21:17 63:19
**satisfied** 66:20
**save** 97:12,12
**saved** 12:24
147:25
**saw** 9:20 10:18
71:8 73:9,13

74:24 75:20
77:3 123:21
133:23 151:20
**saying** 18:15
25:25 29:10
31:20 59:16
67:1 68:4
73:20 76:7
77:4 78:11
88:15 90:13,14
100:6 101:10
130:14 147:23
152:4
**says** 49:22
109:4,5 110:14
111:20 116:8
132:4 137:21
138:2
**scan** 132:23
**scanned** 78:13
78:21 79:14
**scanning** 77:18
128:10
**school** 2:3,6
12:22 81:4,23
82:6,22 83:3
84:10 86:7
99:24 100:5,7
100:8,11 101:2
101:17,17
102:9,15,16,25
103:4,5,9,13,20
103:21,24
104:3,7,16,24
105:2,2 106:10

113:18 115:9
115:19 117:17
118:15 119:2
119:14,15,19
133:7 139:24
141:14,19,24
142:5,9 143:20
143:23,24
144:7
**schools** 82:7,10
82:15 83:4
100:16 113:23
119:3
**scientific**
126:23
**scientist** 139:8
**scratch** 11:7
**scratched**
23:25
**scream** 65:19
**scribble** 49:16
**scrivener** 51:17
**se** 33:21
**seal** 163:15
164:21
**search** 81:16
111:5,7,8
117:4 156:21
**searching**
104:6
**second** 35:21
102:7,12,22
122:17 147:20
**secretaries**
33:11

**secretary** 33:24
**see** 10:15 11:17
13:19 16:1
23:6 24:14,15
46:1,8 47:20
64:13 65:17
67:18 68:9,18
69:22 70:10
75:7 76:24
77:9 90:20
95:10 97:16
102:13 107:11
110:14 111:13
115:2,9 117:24
131:16 135:17
137:13 139:1
140:13 151:16
153:14 156:13
158:14
**seeing** 10:12
67:24,25
121:23 138:9
**seek** 46:12
**seeking** 128:24
135:16
**seemed** 16:11
25:22 71:2
**seems** 9:14
16:24 21:18
23:14 24:20,22
45:23,24 47:13
47:21 70:23
76:8,24 80:1
95:15 102:14
105:8 113:21

IFCD 00028139
Ex. Case 4:21-cv-08001-BCW Document 70-16 Filed 04/29/24 Page 199 of 423

**seen** 15:23 25:9
25:13 76:8,14
111:15 146:2
154:20 157:24
**selection** 150:9
150:11
**selling** 20:6,7
**seminar** 44:15
45:14,15
**seminars** 146:1
**send** 50:1 68:12
138:2
**sending** 103:3
**senior** 157:20
158:6
**sense** 9:21 16:6
17:9 28:14,23
55:1 61:5 63:2
63:5 68:20
79:12 98:20
118:2,6 132:24
136:10 149:22
155:5,6
**sent** 36:11
64:14 84:20
99:24 133:6,11
156:9,10,17
**separate** 90:9
100:7 120:18
**september**
133:17
**serious** 128:21
146:9
**served** 97:18

**services** 101:20
103:2
**sessions** 44:8
**set** 8:14 18:10
43:10 101:19
125:10 128:12
**setting** 33:25
**settle** 28:16
**setup** 67:23
**several** 146:20
**severance**
89:11 91:20
**sexual** 98:24
142:7
**sexually** 98:9
98:14,17
141:18
**shackled** 66:20
**shackles** 28:16
**shaker** 2:6
102:24 103:4
103:10,13,15
103:20,21,24
104:7,12,17,23
113:17 115:8
115:19 117:17
119:14 141:14
141:19 143:24
**shame** 27:25
28:23,25
**share** 14:6
60:18 94:4
134:13 144:9
144:12,13

**shared** 43:19
59:7 110:17
133:4
**sheet** 2:7 49:21
162:13,15,16
164:7,10,18
165:1
**sheets** 10:18
115:3 131:13
**sheri** 109:5
**sherry** 2:13
131:6,10 132:1
**shit** 96:22
**shocking** 142:3
**short** 67:13
144:22
**shortcoming**
51:13
**shorthand**
161:8
**shortly** 142:10
**show** 4:3 14:1
71:1 101:7
130:12 132:5
132:22 133:2
134:16 135:7
135:23,24
141:8 154:23
**showed** 4:5
70:23 123:3
133:20
**showing** 72:1
**shown** 127:8
162:17

**shows** 60:18
116:18 136:4
**side** 32:18
64:24 65:7
134:17 137:22
**sided** 96:22
**sidetracked**
68:24
**sightseeing**
47:8
**sign** 162:15
**signature**
161:20
**signed** 4:25
163:13 164:18
**significance**
49:1 135:2
**significant**
136:19
**signify** 82:25
**signing** 162:11
162:20
**similar** 71:23
**similarly**
154:15
**simple** 19:1
144:3
**sincerely**
162:21
**singled** 8:19
**sinisterra**
150:23
**sir** 162:9
**sister** 39:21

IFCD 00028140

sisters  12:2 84:2,3 85:7
sit  60:25 67:1 89:22 106:19 110:9
sitting  64:7,15
situated  67:5 154:15
situation  16:2 28:11 36:8 39:6 41:19 50:8 62:25 68:10 76:2 88:7,14,25 90:17 92:5 94:12 95:25 125:22 129:12 129:22 134:20 138:25 149:5 158:20,21
situations  66:15 72:11 147:1 152:19
size  64:12
sleep  141:25
sleepovers  141:23 142:5
small  137:8 151:7
smith  113:4,6 116:7
snow  23:8 67:17
solo  33:2,3

solutions  77:16 108:18 155:11 162:1 165:1
somebody  19:10 24:1 48:18 65:1 66:16 75:3 88:1 92:16 93:1,7,11 135:18,25 138:23 149:19 151:22,24,24 154:25
someone's  74:6
son  114:10,16 116:14
soon  50:10,11 52:3 137:16
sorry  60:9
sort  11:6 12:13 12:23 19:20 28:21 29:13,16 33:12 34:3 35:1,1 41:4 42:13 48:2,3 48:24 50:4 54:2,12,15 57:7 58:1,23 58:23 69:2 70:4 81:6 83:3 83:23,23,25 86:16,22 92:1 93:14 100:3 106:7 126:14 133:13 136:16

139:4,25 143:25
sorts  13:1
sound  9:12 22:6 86:2 105:21 114:11 131:6,8 132:23
sounds  18:7 37:21 44:22 50:17 52:20,23 66:19 88:17 121:9 137:6 152:7
source  41:17 55:20 57:12 87:7
sources  46:9 86:22 87:13
south  1:6
spacing  6:15 40:3
spanish  41:23
spans  142:7
speak  63:21 106:1 109:15 121:11
speaking  89:4 100:23 101:11 101:12 105:16 112:9 114:11 115:18
special  101:20 103:2 141:22
specific  10:21 11:22 76:17

88:18 110:22 112:7 145:8
specifically  25:19 47:11 99:11 112:14 113:1 148:7
specifics  84:16
speed  146:13
spends  103:19
spent  19:15 53:7 55:5 80:1 116:25 149:17 149:25 150:19
spirit  23:1
spoke  11:9 85:9 85:23,25 87:10 105:23 108:6 137:3 141:15
spoken  138:24
spontaneously  142:15
spree  35:9
springfield  41:20 70:17 72:14
sr  13:17
stable  66:16
staff  21:13 33:21 40:15,16 69:18 105:16 115:19 121:12 142:4
stamp  108:16 108:17,19 113:11 115:10

Ex. 35 Page 200 of 423   Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 201 of 423

**stamped** 120:11,13

**stamping** 108:22

**stamps** 82:23 82:24

**stands** 73:12

**start** 4:23 5:17 29:16 48:9,10 48:16 56:23 124:5

**started** 5:14 27:5 37:10 39:6 43:12 48:11 62:6 68:21 90:17

**starting** 11:6 67:17 150:9

**starts** 72:1 100:4 116:7

**state** 30:15,18 30:20,21 31:1 31:6 34:4,6,13 57:11 80:6 150:18 161:3 163:10 164:15

**stated** 161:9

**statement** 1:3 2:16 3:4 4:6 162:6 163:3,13 163:14 164:3 164:19,19

**station** 119:7 141:23

**status** 157:20 158:6

**stay** 71:17 83:20

**stays** 102:11

**steeped** 148:8,9

**step** 29:13 46:14 73:2,2

**stepdaughter** 35:6

**steps** 94:16

**steve** 106:14 112:2,3

**stir** 149:20

**stopped** 150:23

**storage** 13:8

**storefronts** 119:4

**stories** 93:16

**story** 29:12 97:21,22 98:20

**straightforward** 26:10

**strangle** 36:2

**strategies** 54:17 152:24

**streaming** 43:14

**street** 68:14 147:6 148:1

**street's** 147:14

**strictures** 152:11

**strike** 151:21

**strikes** 153:6 153:12

**struck** 153:25 154:22

**stuart** 6:17 7:20 9:9,12 21:15 46:17,19 47:18

**stuck** 18:4 36:7

**students** 115:18

**studies** 125:9

**stuff** 10:2 11:7 12:23 13:14 22:5,8 24:19 26:8 27:15 33:19 36:19 38:12 41:11 42:14,15 43:10 43:11,12,17,19 48:24 57:11 59:2 60:16 67:3 68:13 69:23 70:7 71:24 74:2,3 76:3,4,9 77:6 79:11 88:13 90:10,24 139:5 146:2 159:1

**subject** 71:6

**submerge** 36:1

**subpoenas** 79:22,23

**subscribed** 163:10 164:14

165:21

**subscription** 57:5

**substance** 22:15

**substantive** 107:12,19 152:23

**substantively** 107:5

**successful** 36:19

**suddenly** 72:1

**sue** 100:21 109:25 110:4 111:2

**suffer** 28:24

**suffering** 136:20

**sufficient** 126:23

**suggest** 115:3

**suggested** 89:4

**suggests** 128:8

**suite** 1:11,16 162:2

**summarize** 133:14

**summary** 59:6 69:19 128:4

**summer** 102:24 103:8

**sunk** 36:6

**superior** 162:1

IFCD 00028142

Ex.C3Se-4:21-cv-08301-BCW Document 70-16 Filed 04/29/24 Page 202 of 423

**supervising** 50:22

**support** 40:14 40:16 152:22 154:13

**supported** 151:24 153:18

**supporting** 36:17

**supposed** 146:3

**sure** 3:25 4:1 5:13 8:2 14:19 14:24 21:8 31:6 37:22 38:9 44:9 55:17 59:15 64:8 68:5,5 76:1,5 81:11 88:20 89:1 90:11 100:16 104:4,14 107:17 109:13 109:21 110:7 110:25 111:25 112:15 113:15 116:16 117:20 120:19 127:16 129:17 132:24 133:10 134:19 135:15 142:25 143:21,21 145:9 146:17 148:23 154:4

**surface** 23:25

**surgery** 74:21 74:25

**surprised** 75:7 153:2

**surveillance** 24:13

**susan** 85:6 95:10,11

**suspect** 72:4

**suspected** 99:17,19

**suspended** 102:16

**swallow** 89:18

**swear** 3:7

**sweetser** 2:8 120:2,4,7 121:10,12

**switch** 150:7

**switching** 99:7

**sworn** 3:9 161:6 163:10 163:13 164:14 164:18 165:21

**symptoms** 134:6

**syndrome** 99:9

**system** 29:20 30:10 34:14 50:19 104:3

**t**

**t** 2:1 64:18 161:1,1

**table** 63:25 64:15,19,19,20

64:24 67:25 68:7

**take** 4:15 5:25 6:2 15:25 22:20 28:15 29:13 39:9 46:13 49:11 60:8 67:9 91:22 123:11 141:20,21

**taken** 9:2 10:13 67:13 97:23 117:11 144:22 161:7

**takes** 19:2 49:20 126:21 132:19

**talk** 15:2 19:10 20:18,21,22 29:1 34:3 48:21 56:4 58:19 83:19 85:19 86:6,18 90:22 94:18 95:5 106:21 109:22 110:1,3 110:7 113:2 117:5,14 123:4 128:21 141:11

**talked** 11:9 12:2,3 16:10 26:17 28:20 41:6 68:20 83:22 84:9,15 84:18 86:19

106:13,14,25 107:11 111:3 133:8 136:18 143:4 155:9 158:10

**talking** 5:6 6:5 11:19 16:9 31:21 40:22 42:13 44:12,21 48:23 50:10 68:21 69:10 70:13 71:16 74:1 76:17 78:10 83:25 84:10,24 86:24 92:15,17 101:15 106:12 107:4 110:1,10 117:15 134:22 136:16 147:13 159:20

**talks** 29:1 115:22

**task** 52:11

**tasks** 54:14,15 54:19

**teacher** 100:21 151:21 154:1

**teachers** 11:20 12:3 84:10 86:7 101:2,13 101:15,19 105:16 106:16 106:18

Ex. 35 Page 203 of 423 Case 4:21-cv-03001-BCW    Document 70-16    Filed 04/29/24    Page 203 of 423

team   50:16
54:6,11,13,16
55:7 57:2 63:9
65:3,5 69:22
75:13,14 89:25
133:13 138:12
144:15 149:14
151:20 152:15
152:17,17,20
team's   70:11
technical   3:19
teenager   84:20
122:3
tell   8:8 10:7
12:7,14 13:3
17:23 18:3,4
20:3,16 21:13
29:15 30:1
32:1,15,25
38:15 41:1
44:5,19 45:3
48:1,2 52:7
60:21 63:23
65:14,16 66:16
75:12 76:8
79:17 83:24
89:7 93:9,18
93:19,24 94:17
95:7,20 99:20
101:6 102:3
104:17 107:17
108:16 110:25
111:23 112:1
114:7,24 115:4
115:24 119:13

121:10,19,21
124:7,11
128:15 130:1
137:6 142:16
150:10 152:1
155:16
telling   5:18
18:18 19:25
26:7 52:5
67:21 87:16,19
tended   32:11
term   39:9
terminology
36:23
terms   8:25
16:25 19:23
21:7 22:14
27:2 41:13
42:11 54:23
59:24 60:3,13
60:15,20 69:12
71:10 75:4
77:11 88:5
96:7 106:18,25
111:4 146:21
149:15 152:18
156:21
terrace   1:7
terrible   153:22
test   134:21
testified   3:9
testify   123:13
testimony
95:24 123:19
125:20 163:6,7

164:6,9,12
testing   125:17
126:5,10 128:9
128:13 130:6
132:19 136:9
158:21
texas   53:1 54:1
158:3
tf   108:19
thank   3:13 6:18
45:9 160:1
thankfully   27:3
36:19
thanks   146:14
theme   35:2
themes   92:7
theory   95:22
152:22
thereof   47:4
thing   4:22
13:25 15:1
18:9,19 21:2
27:9,9 28:6
29:4 36:21,25
41:10,25 49:18
58:17 60:12
63:14 64:10
67:2 68:25
71:15 72:12
75:10 81:14
83:23 96:11,12
99:20 108:12
113:4 115:5
136:1,8 145:9
151:25

things   4:17 5:1
5:11 7:25 8:16
8:19 9:25 13:2
13:2,12 14:6
16:11 18:25
20:1,14 32:5
32:11,14 41:7
41:14,16,21
44:10 48:17
49:16 50:14
51:10,12 52:14
54:10,19 56:1
59:6 60:4,15
61:8,9,11
63:12 69:3,16
69:25 70:5
71:19,19,20
74:8 77:1 79:3
79:4,10,19
81:5 87:17
88:4 89:6,7
92:18 95:2
97:15 115:6
123:23 125:5
125:10 133:8
135:24 139:12
148:12 150:4
158:23
think   3:15,23
4:23 6:2 8:18
9:6,8,17 11:23
12:7,17 14:9
14:18 15:4
16:9,16,18,23
17:6,12 19:2

IFCD 00028144

20:11,23 24:5
26:3,5,11,15
27:2 28:23
29:13 33:17
36:23 37:6,8
37:14,24,25
38:1,7 40:17
43:2 47:23
53:5 55:1 57:6
58:3 60:2
61:14 62:17,19
63:24 69:16,18
73:8 75:9,10
75:12 76:10
77:5,6,7,23,24
79:3,10,23
81:22 82:2
84:13,13,14,18
85:8,13,22,24
86:1,4 90:24
92:4,11,14,15
96:7,16 97:19
98:16 101:11
101:12 107:10
108:5 110:24
112:24 114:7
114:10 115:22
116:20,21
117:19,22
119:16,22
121:1 122:1,2
122:7 123:3,8
124:8 131:13
132:11 135:10
136:25 140:13

142:3 143:1
144:3,11
148:22,23
149:1,24
151:18 153:9
155:22 159:22
160:1
**thinker** 19:6
**thinking** 21:23
93:12,13 94:2
99:10 104:23
145:5 146:14
**third** 34:18
77:16
**thirplus** 38:1,8
40:1
**thirplus's** 38:1
38:6
**thirty** 162:19
**thornton**
104:18,22,24
105:7,14,17
**thoroughly**
76:6
**thought** 4:1
9:15 16:7,21
20:13 25:3
63:8 78:15
80:24 110:3
125:1 138:10
140:9 158:16
158:23
**thoughts** 15:10
**thousands**
154:20

**thread** 157:17
**three** 34:12
40:10,24 49:20
54:11 58:21
59:17 60:24
61:3 62:10,23
63:7 138:21
**thrilled** 44:23
**thrived** 28:4
**throttle** 151:19
**throw** 90:15
**throwing** 96:14
**tidy** 13:25
**tiegman** 107:24
**time** 2:7 3:2,15
6:2,4 10:18
15:5 17:12
19:15 20:10
22:20 23:22
25:24 30:12
34:4 36:7 39:3
39:9 42:22
43:21,22 45:15
48:12,13 49:6
53:7 55:5,7,18
55:19,23 56:1
59:12,23 60:21
61:4,13 62:11
62:20 63:24
64:2 65:5,6,19
67:11,14 68:1
68:15 70:22
72:23 73:10
74:11 75:4,16
75:21 78:3

80:2 82:18
86:8,12 92:15
94:16 99:25
102:6,7,16,22
105:7 107:21
110:4 114:8
115:3,23 116:5
118:25 122:15
122:23 127:11
129:10 131:9
131:13 141:4,6
141:24 142:8
144:19,20,23
146:13 153:5
155:24 156:22
160:3 161:8
**timeline** 46:16
124:7
**timely** 125:18
**times** 9:16
26:17 32:10
33:17 53:16
57:12 61:2
64:1 70:22
114:17
**tiny** 105:3
**titled** 120:2
**today** 4:7 5:5
88:6 133:8
158:17
**today's** 3:3
**todd** 31:6,7
**together** 6:25
8:22 22:8
28:16 36:16

Ex. 13 Page 205 of 423 Case 4:21-cv-08001-BCW Document 70-16 Filed 04/29/24 Page 205 of 423

40:1,2,3 42:10
49:16 50:10,15
59:4,13,22
89:8,19 119:4
122:8 124:7
134:24 152:15
**told** 5:21 15:1
17:5 20:18
24:4 45:12
46:12,13 51:19
84:12 96:22
97:21 106:21
115:5 142:18
**tomasi** 114:22
118:13
**took** 6:16,21
8:17,18 13:15
42:10 47:9
59:3 60:2,16
68:6 71:22
94:22 95:6
131:23 153:15
**tools** 57:6
**top** 14:17 21:20
53:22 82:23
92:5 120:2
131:14
**topics** 99:7
**totally** 80:16
**touch** 147:23
**tour** 70:20
**toward** 32:12
64:25 131:9
**town** 16:5
46:18 105:3

**track** 13:13
57:7 58:24
77:9 83:25
86:10 100:23
101:3,24
103:15 114:2
115:4,21
**tracked** 42:3
49:1 81:21
**tracking** 43:17
48:16 53:8,17
82:11
**tracy** 1:22 3:6
161:2,21
**trade** 153:22
**trading** 153:21
**trail** 46:5
**training** 44:7
**transactional**
13:2
**transcribed**
163:7
**transcript** 4:14
113:17 124:22
162:10,12
163:5,12 164:5
164:11,17
**transcripts**
124:25
**trauma** 93:8,16
93:24
**travel** 54:1
118:3
**traveled** 47:18

**treat** 4:9,10
20:24 27:4
138:22
**treatment**
106:7
**treats** 141:22
**trial** 22:12
23:18 30:22,23
30:24 31:1
34:6,13 39:3
43:6,7,13 46:1
62:5 64:5
65:11 66:5
71:25 72:5
73:3 75:15
84:22 97:20
108:19 113:12
128:23 129:9
129:20 131:9
139:22 140:5
146:12 147:20
**trials** 31:18
**tried** 21:2
25:15 29:10
32:12 34:10
35:6,25,25
36:2,2,6 45:24
86:10 88:7
89:8,19 90:24
91:14 96:9
97:21 103:15
115:3 125:11
150:22 151:1
**tries** 26:15

**trip** 9:3,8 42:10
44:3,5 47:1,14
47:17,25 84:8
95:6,8
**trips** 8:18 10:9
44:2 47:7,16
**troost** 36:4,7
**trouble** 28:8
135:24 147:21
149:21
**troubled**
119:18
**trudge** 23:8
**true** 7:19 29:10
87:18 97:2,25
98:1,5,18,22
139:19 144:16
159:24
**truth** 18:18
19:25 29:8
66:17
**try** 21:3 49:15
55:12 63:5
91:2 94:7,13
118:14 125:22
126:9 140:9
149:19 150:13
151:17 152:15
154:12,14
156:18 157:17
**trying** 14:14
16:23 17:7
27:12 37:5,7
37:12,25 55:22
55:24 59:3,9

Ex. 3, Page 206 of 423

78:24 82:2
83:25 90:21,22
91:5 93:21
94:10 95:17
97:13 100:23
101:3,24 103:2
104:1 110:1,20
110:23 111:7
112:19 115:21
117:8 119:18
121:11 126:14
132:9 141:1
146:3 151:10
151:13,16
152:21 155:22
**turn**  60:10 80:7
  80:7 115:12,14
**turned**  71:13
  73:19 77:15
  100:2 104:12
  121:5 155:10
**turning**  77:12
**turns**  118:24
**tutor**  105:20
**tweak**  136:6
**twice**  102:4
**two**  6:20 9:6
  33:4 34:11,17
  34:20,22,23,25
  35:4,5,23,25
  36:1 42:8,20
  43:3 44:2 46:9
  47:16,21 59:21
  62:24 71:5
  84:3,18 85:7

91:13 106:15
116:18,25
117:11 118:3
118:12 122:7
127:2 131:1
142:10
**type**  13:25
  60:11 64:18
  96:3 146:2
**typed**  48:7 58:2
**typos**  4:17

**u**

**uh**  9:4 14:11
  30:16 31:14
  32:4,19 45:22
  68:16,19 70:21
  72:18 73:11
  74:4 84:4,6
  85:16 86:3,3
  87:1,12 89:12
  95:12 104:20
  105:9 107:3
  109:7 111:17
  112:5 127:14
  128:3,7,11,14
  133:4 137:5
  145:17 158:18
**ultimate**  140:5
**ultimately**
  57:23 95:20
  96:20 123:13
  129:4 130:10
  138:15 139:22
**unable**  72:21
  103:18 146:6

**uncooperative**
  94:22
**under**  1:3 3:4
  3:10 25:17,17
  74:17 81:8
  83:20 90:16
  96:14 109:4
  137:1 161:10
  162:6 163:3
  164:3
**underneath**
  109:3
**understand**
  7:23 9:8 10:24
  27:11 38:25
  41:18 44:13,15
  68:5 74:21
  75:22 85:16
  100:5 108:23
  110:6 129:7
  147:12 148:22
  159:15
**understanding**
  26:21 45:5
  46:17 97:1
  105:6 124:15
  141:7 145:12
**understands**
  88:5
**understood**  6:9
  27:14 80:16
  90:23 106:11
  130:24
**underwear**
  142:1

**unfair**  25:22
**unfortunately**
  38:25 125:6
  144:8 153:17
**unit**  72:19
  74:10,19,25
  75:1,16 76:23
**units**  74:7
**university**
  131:18 132:1
**unknown**  7:18
**unsealed**  80:2
**unshackled**
  65:12
**unwilling**  94:21
**update**  50:14
**upheld**  150:24
**ups**  150:2,7
**upstanding**
  97:4
**use**  8:21 42:5
  56:20 57:1,7
  58:2 66:4 91:6
  99:15 124:1,16
  125:11,19
  153:14
**used**  36:23
  55:10 56:13,21
  71:4 126:6,22
  138:20,25
  149:20 153:6
  155:24,24
  156:17,21
**useful**  10:10

Case 4:21-cv-03001-BCW    Document 70-16    Filed 04/29/24    Page 207 of 423

**using** 56:17,19 57:4 82:14 124:14 125:3 126:20 138:12
**usually** 46:1 48:8 93:17 123:12 157:17

**v**

**v** 162:6 163:3 164:3
**vacant** 118:9
**vacations** 47:7
**vaguely** 121:24
**variety** 83:4
**various** 81:11 81:13 82:14 117:22
**vast** 30:4 53:7
**vendor** 77:16 78:12 108:18
**verbally** 5:1
**verboten** 21:11
**verdict** 151:23
**veritext** 3:5 162:1,7 165:1
**veritext.com.** 162:18
**vermont** 95:7,9 95:13,14,18 102:25 116:6 116:10 117:17
**versus** 31:6 157:15
**victim** 142:13

**victim's** 42:1 92:24
**victims** 98:24
**video** 3:4 24:11 24:12,13 162:6 163:3 164:3
**videographer** 1:24 3:1 67:11 67:14 144:20 144:23 160:3
**vince** 109:4
**virtually** 154:25
**voir** 150:19 151:6,7
**volume** 134:16
**voluminous** 41:11
**voluntarily** 4:5

**w**

**waffle** 19:22
**waffled** 17:14
**waffling** 17:12
**wage** 126:11
**waited** 129:18
**waiting** 130:23
**waived** 5:3 162:12,20
**walk** 154:10
**walker** 39:5,14 39:18,20,24 40:7
**wang** 2:13 131:6 132:1

**want** 4:18,24 13:24 17:24 18:19 20:21,21 22:18,20,23 25:21 28:25 29:12 44:13,16 62:10 71:13 78:22 83:20 86:17 88:10,23 89:20 93:19 99:23 121:20 123:17,22 124:5 138:21 141:11 152:10 153:24 158:3,5 159:3
**wanted** 3:20 4:22 7:25 8:11 17:2,2,6 18:25 19:9,10 21:8 23:19 26:18,21 26:23 27:24 33:20 41:10 55:25 63:4 68:9,18 73:14 79:20,24 85:19 87:25 89:1,3 90:7,11,12 91:24 92:6 95:5 96:8 99:1 99:21 125:21 126:4,7 127:8 134:11,13,19 135:4,14 137:7 142:24,25

143:5,14 151:19,22 155:9
**wanting** 10:1 29:2 75:2
**wants** 15:2 19:6 28:7,21 28:22,24 29:2 45:8
**watch** 89:22
**water** 22:17 99:17
**way** 3:20 4:11 8:10 10:1,10 11:16 18:22,23 20:4,5 27:19 33:18 55:14,17 55:25 61:13 66:25 68:17 76:7 80:15 92:7 96:13,13 100:2 101:9 115:20 120:18 120:22 129:18 152:24
**ways** 27:14 94:10 111:3,7 130:12
**wearing** 68:14
**weather** 23:3
**week** 138:5 150:19
**went** 9:16 13:14 15:5 31:20,23 34:5

IFCD 00028148

| | | | |
|---|---|---|---|
| 34:12,15,17,22 35:9 46:13,23 47:22 69:9 70:19 73:2 79:18 95:9 97:22 119:10 128:18 141:2 144:5,5 156:23 | 92:13,14,20 93:10 94:21 109:10,15 112:4 150:3 161:6,15 163:1 163:4,11 164:1 164:4,15 | 138:7 152:15 **worked** 33:22 39:11 40:3,9 50:16,25 61:13 85:25 126:3 **workers** 11:20 **working** 21:14 | **x** |
| | | | **x** 2:1 |
| | | | **y** |
| **west** 109:25 110:4 111:2 | **witnesses** 20:18 24:1 40:22 48:17 49:7 | 22:2,5 33:12 37:3 59:17 | **yahoo** 155:24 **yahoo.com** 162:5 |
| **western** 158:1 **wheel** 59:8 **whip** 48:17 **white** 18:21 | 84:21 87:8,14 92:25 93:23 112:12 116:9 116:19 | 94:23 125:14 137:20,22 153:4 **workings** 90:19 | **year** 44:11 102:9,12 103:5 103:9,19 142:9 **years** 29:22 |
| **wide** 135:1 **wife** 27:5 51:9 **william** 35:5 **willing** 5:24 94:20 151:12 | **woman** 85:24 144:12 **women** 144:14 153:7 **wondering** | **works** 48:19 131:17 **world** 26:13 **worried** 90:8 **worse** 27:1 | 30:3,7,9 42:20 50:24 75:23 76:18 77:2 80:23 81:18 142:10 149:17 |
| **wished** 153:13 **wisner** 95:24 115:16 120:24 | 75:19 145:11 **word** 8:24 19:22 | **worst** 36:21 **worth** 35:5 **wow** 34:22 | 150:1 **yellow** 111:8 **yep** 158:14 |
| 124:3 128:20 137:9,14,17 138:19 139:23 149:6,11 | **words** 3:24 **work** 6:25 10:21,23 13:14 14:21,22 23:11 | 156:25 **wreck** 143:25 **write** 150:2,7 **writing** 51:8,12 | |
| **wisner's** 120:19 **withdraw** 138:2 **withstand** 126:10 | 23:20 24:8 25:23 30:5 32:2,10,14,21 33:8 51:5,17 | 109:1,8,9 161:10 **wrong** 18:21 24:15,22 27:17 | |
| **witness** 3:7,9 48:21 49:1 55:12,22 60:15 86:1,14 92:10 | 52:4,7 53:20 54:22,24 60:17 61:10 62:25 63:1,3 80:25 128:19,20,24 | 27:18 28:14 47:14 63:16 77:1 80:23 101:13 | |

IFCD 00028149
Ex. 13 Page 209 of 423    Case 4:21-cv-02001-BCW    Document 70-16    Filed 04/29/24    Page 209 of 423

Indiana Rules of Trial Procedure

Depositions Upon Oral Examination

Rule 30

(e) Submission to witness--Changes--Signing.

(1) When the testimony is fully transcribed, the deposition shall be submitted to the witness for reading and signing and shall be read to or by him, unless such reading and signing have been waived by the witness and by each party. "Submitted to the witness" as used in this subsection shall mean (a) mailing of written notification by registered or certified mail to the witness and each attorney attending the deposition that the deposition can be read and examined in the office of the officer before whom the deposition was taken, or (b), mailing the original deposition, by registered or certified mail, to the witness at an address designated by the witness or his attorney, if requested to do so by the witness, his attorney, or the party taking the deposition.

(2) If the witness desires to change any answer in the deposition submitted to him, each change, with a statement of the reason therefor, shall be made

by the witness on a separate form provided by the officer, shall be signed by the witness and affixed to the original deposition by the officer. A copy of such changes shall be furnished by the officer to each party.

(3) If the reading and signing have not been waived by the witness and by each party the deposition shall be signed by the witness and returned by him to the officer within thirty (30) days after it is submitted to the witness. If the deposition has been returned to the officer and has not been signed by the witness, the officer shall execute a certificate of that fact, attach it to the original deposition and deliver it to the party taking it. In such event, the deposition may be used by any party with the same force and effect as though it had been signed by the witness.

(4) In the event the deposition is not returned to the officer within thirty (30) days after it has been submitted to the witness, the reporter shall execute a certificate of that fact and cause the certificate to be delivered to the party taking it. In such event, any party may use a copy of the

deposition with the same force and effect as though the original had been signed by the witness.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

IFCD 00028153

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

## SCHOOL RECORDS



HALL00008217

0001

**First Quarter**

Teacher comment: Charles is capable of doing good work, but does not always pay attention.
*S. A. Bellavance*

Parent comment:

Parent signature_ *Charles V. Hall*_

**Second Quarter**

Teacher comment: Chuck does a lot of day-dreaming and can't keep his mind on finishing his work. He can do quite well but he must prove it.

Parent comment:

Parent signature_ *Mrs Charles V. Hall*_

**Third Quarter**

Teacher comment: Chuck is trying harder and his work has improved. I would like to see him be neater but I am very pleased with his progress.

Parent comment:

Parent signature_ *Mrs Charles V. Hall*_

**Fourth Quarter**

Teacher comment: Chuck has been having a hard time concentrating again. His work can be good but he has to be prodded to pass it in or to get it finished. He is a nice little boy. It's been fun working with him.

Parent comment:

Parent signature_____

Assigned to_ *Room 10*_

**SACO PUBLIC SCHOOLS**
Report to Parents
Howard L. Cushman, Superintendent

NAME_ *Charles Hall*_

GRADE_ *1*_   YEAR_ *1977-78*_

TEACHER_ *Sue Anne Bellavance*_

SCHOOL_ *Young*_

PRINCIPAL_ *Franklin Thompson*_

HALL 08218

Ex. 2 Page 216 of 423   Case 4:16-cv-02801-BCW

Name _Charles Hall_

## REPORTING SCALE

1. Excellent Progress
2. Good Progress
3. Acceptable Progress
4. Unacceptable Progress
5. Parent Conference Requested

| SUBJECTS: | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **Language Arts** | | | | |
| Listens attentively | 3 | 3 | 2 | 2 |
| Follows directions | 2 | 2 | 2 | 3 |
| Speaks clearly | 2 | 2 | 2 | 2 |
| Uses good grammar | 2 | 2 | 2 | 2 |
| Uses simple sentences | 2 | 2 | 2 | 2 |
| Participates in group discussion | 2 | 2 | 2 | 2 |
| Tells a story in sequence | 2 | 2 | 2 | 2 |
| Letter formation | 3 | 4 | 3- | 3- |
| Neatness | 3 | 4 | 3- | 4 |
| Simple sentences | | | | 3 |
| Spelling | 2 | 3+ | 1 | 2 |

**Reading Skills**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| *Reading level | PP¹ | PP² | 1ᶠ | 2¹ |
| Phonetic ability | 3 | 3 | 3+ | 2 |
| Sight vocabulary | 3 | 3 | 3+ | 3+ |
| Word attack | 3 | 3 | 3+ | 2- |
| Oral reading | 3 | 3 | 3+ | 2- |
| Comprehension | | 3 | 3 | 3 |

*Level: Readiness (PP) Preprimers 1,2,& Primer, (1+) First Reader

| Mathematics | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Geometric shapes | 1 | 1 | 1 | 1 |
| Numbers to 100 | | to 50 2 | 2 | 2 |
| Addition | 2 | 2 | 1 | 2 |
| Subtraction | 2 | 2 | 2+ | 2 |
| Counting by 2's, 5's, 10's | | | 2 | 2 |
| Fractions | | 2 | 2 | 2 |
| Measurement | | 3 | 2 | 2 |
| Money, penny, nickel, dime | | 2 | 2 | 2 |
| Time, hour, half hour | | 2+ | 2+ | 2+ |

## SOCIAL BEHAVIOR

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Conduct | 3 | 2 | 2 | 2 |
| Effort | 2 | 3 | 2 | 3 |
| Works at own level | 2 | 3 | 2 | 3 |
| Health habits | 1 | 1 | 1 | 1 |

## ATTENDANCE

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Days absent | 3 | 0 | 2 | 1 |
| Times tardy | 2 | 1 | 0 | 1 |
| Times dismissed | 0 | 1 | 0 | 1 |

Taught, but not graded

Social Studies, Science and Health, Art, Music and Physical Education.

IFCD 00028158
Filed 04/29/24   Document 70-16

**First Quarter**
Teacher comment: *Charles needs to put more effort into his school work.*

Parent comment:

Parent signature *Mrs Charles V. Hall*

**Second Quarter**
Teacher comment: *Charles has been doing good scholastically. He needs to do less socializing.*
Parent comment:

Parent signature *Mrs Charles V. Hall*

**Third Quarter**
Teacher comment:

Parent comment:

Parent signature *Mrs Charles V. Hall*

**Fourth Quarter**
Teacher comment: *I enjoyed having Charles in my class.*

Parent comment:

signature

Assigned to *Grade 3   Room 9*

---

**SACO PUBLIC SCHOOLS**
Report to Parents
Howard L. Cushman, Superintendent

NAME *Charles Hall*

GRADE *2*    YEAR *1978-1979*

TEACHER *Mrs. Grant*

SCHOOL *Young*

PRINCIPAL *Franklin Thompson*

0005

HALL 08220

HALL00008221

IFCD 00028159

**ATTENDANCE**

| | | | | | |
|---|---|---|---|---|---|
| Absent | 1 | 5 | 0 | 2 | 4 |
| Tardy | 0 | 1 | | 1 | 2 |
| Dismissed | 2 | 1 | | 1 | 1 |

Green Feet

| | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| GRADE LEVEL | Primer | 800.3' | 800.3' | Corksine 3 |

Column headings (repeated for each period): Excellent Progress, Good Progress, Acceptable Progress, Unsatisfactory Progress, Parent Conference Requested

Items not checked do not apply.

**READING**
- Adequate sight vocabulary
- Phonetic skills
- Comprehension
- Oral reading
- Silent reading

**LANGUAGE**
- Capitalization - - punctuation
- Language oral & written
- Creative writing
- Spelling
- Penmanship

**MATHEMATICS**
- Facts to ten
- Facts to eighteen
- Set recognition
- Place value
- Identifying numbers to 100
- Time
- Money
- Measurement
- Adds & subtracts with numbers to 10
- Adds & subtracts with numbers to 100
- Adds & subtracts with numbers to 1000
- Sequence of patterns & numbers

**SOCIAL STUDIES**
- Social Awareness

**SCIENCE**
- Science concepts
- Health habits
- Safety

**SOCIAL BEHAVIOR**
- Assumes responsibilities
- Listens to and follows directions
- Works independently
- Works up to his own level
- Respects and relates to peers and adults
- Shows positive attitudes
- Self-motivation
- Respects property and material
- Displays self-discipline
- Works in small group
- Makes good use of time

0004

0005

First Quarter
   Teacher comment:

Parent comment:

Parent signature _Charles V. Hall_

Second Quarter  *Charles is a bright boy, but his*
  Teacher comment: *attitude is poor. He still day-*
*dreams, talks, and wanders around the room.*
*He needs to settle down & get his mind on*
Parent comment; *his work. He is capable of do-*
*ing much better, but he must try a lot*
*harder.*
Parent signature _Mrs Charles V. Hall_

Third Quarter  *Charles' grades are not consistent,*
  Teacher comment: *His marks are good when*
*his behavior is good, and when his be-*
*havior is poor, his work suffers.*
Parent comment:

Parent signature _Charles V. Hall_

Fourth Quarter  *I am pleased with the progress*
  Teacher comment: *Charles has made with his be-*
*havior and attitude this quarter. Apparent-*
*ly, he really needs that type of positive*
*reinforcement and attention that the behavior*
*charts provided. I wish him the best of*
*luck at Burns School. Have a good summer!*

SACO PUBLIC SCHOOLS
Report to Parents
Howard L. Cushman, Superintendent

NAME _Charles Hall_

GRADE _3_    YEAR _1979-1980_

TEACHER _Mrs. Loughlin_

SCHOOL _Young School_

PRINCIPAL _Franklin Thompson_

HALL 08222

Name *Charles Hall*

REPORTING SCALE

1. Excellent Progress
2. Good Progress
3. Acceptable Progress
4. Unacceptable Progress
5. Parent Conference Requested

| Social Studies | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Social Studies | 2 | 2 | 2 | 2 |
| Science | 2 | 2 | 2 | 2 |

Social Behavior

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Assumes responsibility (effort) | 3 | 3 | | 2 |
| Listens to and follows directions | 2 | 3 | | 2 |
| Health habits | 1 | 1 | 1 | 1 |
| Works independently | 1 | 1 | | 1 |
| Relates to peers and adults | 1 | 1 | | |
| Shows positive attitude | 1 | 1 | 1 | |
| Respects property and material things | 1 | 1 | | |
| Displays self-discipline | 3 | 3 | | 3+ |

| SUBJECTS | 1 | 2 | 3 | 4 |
|---|---|---|---|---|

Reading Skills

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reading Level | 3¹ | 3¹ | 3² | 3² |
| Oral Reading | 2 | 2 | 2 | 2 |
| Comprehension | 2 | 2 | 2 | 2 |
| Phonics | 3 | 2 | 2 | 2 |
| Dictionary Skills | | | 3 | 4 |

Language

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Correct Use of grammar | 2 | 2- | 2 | 2 |
| Spelling usage | 3 | 3 | 3 | 3 |
| Produces or creates something original | 3 | 4 | 2 | 2 |

Attendance

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Absent | 2 | 2 | 0 | 2 |
| Tardy | 1 | 0 | 0 | 0 |
| Dismissed | 0 | 0 | 0 | 0 |

Handwriting

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Handwriting | 2 | 2 | 2 | 2 |

Mathematics

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Problem solving | | 4 | 4 | 2 |
| Computation | 2 | 3- | 3 | 3 |

Taught, but not graded
Art, Music and Physical Education.

*Promoted to Grade 4*
*Burns School*
*Charles Grade 3*
*1979-1980*

HALL 08223

IFCD 00028161

# *SCHOOL RECORDS*

HALL00008217

SACO PUBLIC SCHOOLS
Report to Parents
Howard L. Cushman, Superintendent

NAME _Charles Hall_

GRADE _1_    YEAR _1977-78_

TEACHER _Sue Anne Bellavance_

SCHOOL _Young_

PRINCIPAL _Franklin Thompson_

---

First Quarter
Teacher comment: Charles is capable of doing good work, but does not always pay attention. J.G. Bellavance
Parent comment:

Parent signature _Charles V. Hall_

Second Quarter
Teacher comment: Charles does a lot of day dreaming and can't keep his mind on finishing his work. He can do quality work but he must finish it.
Parent comment:

Parent signature _Mrs. Charles V. Hall_

Third Quarter
Teacher comment: Charles is trying harder and his work has improved. I would like to see him do neater work. I am very pleased with his progress.
Parent comment:

Parent signature _Mrs. Charles V. Hall_

Fourth Quarter
Teacher comment: Charles has been having a hard time concentrating again. His work has been poor but he is capable to grow his level to get it finished. He is a quiet little boy. His been growing little too.
Parent comment:

Parent signature

Assigned to _Room 10_

HALLC 08218

0001

Name: *Charles Hall*

## REPORTING SCALE

1. Excellent Progress
2. Good Progress
3. Acceptable Progress
4. Unacceptable Progress
5. Parent Conference Requested

### SUBJECTS:

| Language Arts | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Listens attentively | 3 | 3 | 2 | 2 |
| Follows directions | 2 | 2 | 2 | 3 |
| Speaks clearly | 2 | 2 | 2 | 2 |
| Uses good grammar | 2 | 2 | 2 | 2 |
| Uses simple sentences | 2 | 2 | 2 | 2 |
| Participates in group discussion | 2 | 2 | 2 | 2 |
| Tells a story in sequence | 2 | 2 | 2 | 2 |
| Letter formation | 3 | 4 | 3- | 3- |
| Neatness | 3 | 4 | 3- | 4 |
| Simple sentences | | | | 3 |
| Spelling | 2 | 3+ | 1 | 2 |

| Reading Skills | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| *Reading level | PP¹ | PP² | 1⁺ | 2¹ |
| Phonetic ability | 3 | 3 | 3+ | 2 |
| Sight vocabulary | 3 | 3 | 3+ | 3+ |
| Word attack | 3 | 3 | 3+ | 2- |
| Oral reading | 3 | 3 | 3+ | 2- |
| Comprehension | | 3 | 3 | 3 |

| Mathematics | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Geometric shapes | 1 | 1 | 1 | 1 |
| Numbers to 100 | | to 50 2 | 2 | 2 |
| Addition | 2 | 2 | 1 | 2 |
| Subtraction | 2 | 2 | 2 | 2 |
| Counting by 2's, 5's, 10's | | | 2 | 2 |
| Fractions | | 2 | 2 | 2 |
| Measurement | | 2 | 2 | 2 |
| Money, penny, nickel, dime | | 2 | 2 | 2 |
| Time, hour, half hour | | 2+ | 2+ | 2+ |

### SOCIAL BEHAVIOR

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Conduct | 3 | 2 | 2 | 2 |
| Effort | 2 | 3 | 2 | 3 |
| Works at own level | 2 | 3 | 2 | 3 |
| Health habits | 1 | 1 | 1 | 1 |

### ATTENDANCE

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Days absent | 3 | 0 | 2 | 1 |
| Times tardy | 2 | 1 | 0 | 1 |
| Times dismissed | 0 | 1 | 0 | 1 |

Taught, but not graded

Social Studies, Science and Health, Art, Music and Physical Education.

*Levels: Readiness (PP) Preprimers 1,2,& Primer, (1+) First Reader

HALLC 08219

First Quarter
 Teacher comment: *Charles needs to put more effort into his school work.*

Parent comment:

Parent signature _Mrs Charles V. Hall_

Second Quarter
 Teacher comment: *Charles has been doing good scholastically. He needs to do less socializing.*

Parent comment:

Parent signature _Mrs Charles V. Hall_

Third Quarter
 Teacher comment:

Parent comment:

Parent signature _Mrs Charles V. Hall_

Fourth Quarter
 Teacher comment: *I enjoyed having Charles in my class.*

Parent comment:

: signature _____

Assigned to _Grade 3 Room 9_

---

SACO PUBLIC SCHOOLS
Report to Parents
Howard L. Cushman, Superintendent

NAME _Charles Hall_

GRADE _2_   YEAR _1978-1979_

TEACHER _Mrs. Grant_

SCHOOL _Young_

PRINCIPAL _Franklin Thompson_

3003

HALL0  08220

**ATTENDANCE**

| | | | | |
|---|---|---|---|---|
| Absent | / | 7 | 0 | 2½ |
| Tardy | 0 | / | / | 2 |
| Dismissed | 2 | / | / | / |

*Green Feet*

| | 1st Period | 2nd Period | 3rd Period | 4th Period |
|---|---|---|---|---|
| GRADE LEVEL | Primer | BPD 3¹ | BPD 3¹ | Cordispone 3¹ |

Column headers for each period: Excellent Progress, Good Progress, Acceptable Progress, Unsatisfactory Progress, Parent Conference Requested

Items not checked do not apply.

**READING**
- Adequate sight vocabulary
- Phonetic skills
- Comprehension
- Oral reading
- Silent reading

**LANGUAGE**
- Capitalization - - punctuation
- Language oral & written
- Creative writing
- Spelling
- Penmanship

**MATHEMATICS**
- Facts to ten
- Facts to eighteen
- Set recognition
- Place value
- Identifying numbers to 100
- Time
- Money
- Measurement
- Adds & subtracts with numbers to 10
- Adds & subtracts with numbers to 100
- Adds & subtracts with numbers to 1000
- Sequence of patterns & numbers

**SOCIAL STUDIES**
- Social Awareness

**SCIENCE**
- Science concepts
- Health habits
- Safety

**SOCIAL BEHAVIOR**
- Assumes responsibilities
- Listens to and follows directions
- Works independently
- Works up to his own level
- Respects and relates to peers and adults
- Shows positive attitudes
- Self-motivation
- Respects property and material
- Displays self-discipline
- Works in small group
- Makes good use of time

HALL00008221

0004

First Quarter
Teacher comment:

Parent comment:

Parent signature __Charles V. Hall__

Second Quarter
Teacher comment: Charles is a bright boy, but his attitude is poor. He still day-dreams, talks, and wanders around the room. He needs to settle down & get his mind on

Parent comment: his work. He is capable of doing much better, but he must try a lot harder.

Parent signature __Mrs Charles V. Hall__

Third Quarter
Teacher comment: Charles' grades are not consistent. His marks are good when his behavior is good, and when his behavior is poor, his work suffers.

Parent comment:

Parent signature __Charles V. Hall__

Fourth Quarter
Teacher comment: I am pleased with the progress Charles has made with his behavior and attitude this quarter. Apparently, he really needs that type of positive reinforcement and attention that the behavior charts provided. I wish him the best of luck at Burns School. Have a good summer!

0005

SACO PUBLIC SCHOOLS
Report to Parents
Howard L. Cushman, Superintendent

NAME _Charles Hall_

GRADE __3__ YEAR _1979-1980_

TEACHER __Mrs. Loughlin__

SCHOOL __Young School__

PRINCIPAL __Franklin Thompson__

HALL 08222

Ex.Case 2:22-cv-02001-BCW Document 70-16 Filed 04/29/24 Page 227 of 423

Name *Charles Hall*

REPORTING SCALE

1. Excellent Progress
2. Good Progress
3. Acceptable Progress
4. Unacceptable Progress
5. Parent Conference Requested

| SUBJECTS | 1 | 2 | 3 | 4 |
|---|---|---|---|---|

**Reading Skills**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reading Level | 3¹ | 3¹ | 3² | 3² |
| Oral Reading | 2 | 2 | 2 | 2 |
| Comprehension | 2 | 2 | 2 | 2 |
| Phonics | 3 | 2 | 2 | 2 |
| Dictionary Skills | | | 3 | 4 |

**Language**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Correct Use of grammar | 2 | 2- | 2 | 2 |
| Spelling usage | 3 | 3 | 3 | 3 |
| Produces or creates something original | 3 | 4 | 2 | 2 |

**Handwriting**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Handwriting | 2 | 2 | 2 | 2 |

**Mathematics**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Problem solving | | 4 | 4 | 2 |
| Computation | 2 | 3- | 3 | 3 |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Social Studies | 2 | 2 | | 2 |
| Science | 2 | 2 | | 2 |

**Social Behavior**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Assumes responsibility (effort) | 3 | 3 | | 2 |
| Listens to and follows directions | 2 | 3 | 1 | 2 |
| Health habits | 1 | 1 | | 1 |
| Works independently | 1 | 1 | | 1 |
| Relates to peers and adults | 1 | 1 | | |
| Shows positive attitude | 1 | 1 | 1 | |
| Respects property and material things | 1 | 1 | | |
| Displays self-discipline | 3 | 3 | | 3+ |

**Attendance**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Absent | 2 | 2 | | |
| Tardy | 1 | 0 | | |
| Dismissed | 0 | 0 | | |

Taught, but not graded
Art, Music and Physical Education.

*Promoted to Grade 4*
*Burns School*
*Charles Grade 3*
*1979-1980*

HALLO 08223

IFCD 00028168

## PUPIL RECORD FOR ▼

CHARLE HALL

**Iowa Tests of Basic Skills**

## PROFILE NARRATIVE REPORT

Grade: 3   Sex: M
Birth Date: APR, 1971   Age: 8/06
I.D. Number:

Houghton Mifflin Company

| SUBTESTS | SCORE | | PROFILE |
|---|---|---|---|
| | GE | PR | NATIONAL PERCENTILE RANK |
| VOCABULARY | | 71 | |
| READING | | 41 | |
| SPELLING | | 40 | |
| CAPITALIZATION | | 44 | |
| PUNCTUATION | | 67 | |
| LANGUAGE USAGE | | 70 | |
| LANGUAGE, TOTAL | | 58 | |
| VISUAL | | 63 | |
| REFERENCES | | 48 | |
| WORK-STUDY, TOTAL | | 58 | |
| MATH CONCEPTS | | 60 | |
| MATH PROBLEMS | | 20 | |
| MATH COMPUTATION | | 51 | |
| MATHEMATICS, TOTAL | | 42 | |
| COMPOSITE (COMPLETE) | (33) | 53 | |

THE SECOND HALF OF THE SECOND GRADE

Teacher: MRS LOUGHLIN
Date Tested: OCT, 1979
Test Form: 7
Process Number: ^90-1551-005

School: YOUNG SCHOOL
System: SACO ~~MIDDLE SCHOOL~~
Level: 9

LEGEND FOR SCO___ ═: GE=Grade Equivalents, S=Stanines, and PR=Percentile Ranks

HALLO 08224

TO THE PARENTS OF CHARLE HALL
FROM YOUNG SCHOOL SCHOOL

HOW WELL IS CHARLE LEARNING THE BASIC SKILLS?

TO OBTAIN INFORMATION TO ANSWER THIS QUESTION, CHARLE TOOK THE IOWA TESTS OF BASIC SKILLS, (FORM 07, LEVEL 9) IN OCT. 1979. CHARLE ATTENDS YOUNG SCHOOL ~~SCHOOL~~ IN SACO ~~MIDDLE SCHOOL~~ AND IS IN THIRD GRADE. MRS LOUGHLIN IS CHARLE'S TEACHER.

CHARLE'S OVERALL ACHIEVEMENT IN THE BASIC SKILLS IS BEST SHOWN IN HIS COMPOSITE SCORE. CHARLE'S COMPOSITE GRADE EQUIVALENT SCORE OF 33 SHOWS THAT HIS TEST PERFORMANCE WAS APPROXIMATELY THE SAME AS THAT MADE BY THE TYPICAL STUDENT IN THE THIRD GRADE AT THE END OF THE THIRD MONTH. CHARLE'S STANDING IN OVERALL ACHIEVEMENT AMONG THIRD GRADERS NATIONALLY IS SHOWN BY HIS COMPOSITE PERCENTILE RANK OF 53. THIS MEANS THAT OVERALL CHARLE SCORED BETTER THAN 53 PERCENT OF THIRD GRADERS NATIONALLY AND THAT 47 PERCENT SCORED AS WELL OR BETTER. CHARLE'S OVERALL ACHIEVEMENT APPEARS TO BE ABOUT AVERAGE FOR HIS GRADE.

HOW WELL A STUDENT IS DOING IN READING IS A BIG FACTOR FOR SUCCESS IN SCHOOL WORK GENERALLY. CHARLE'S APPROXIMATE READING LEVEL IS THAT OF THE SECOND HALF OF THE SECOND GRADE. CHARLE'S LEVEL OF READING DEVELOPMENT IS ABOUT AVERAGE FOR HIS GRADE. HE SHOULD HAVE LITTLE OR NO DIFFICULTY WITH HIS SCHOOL READING ASSIGNMENTS.

THE IOWA TESTS OF BASIC SKILLS COVER MANY IMPORTANT SKILL AREAS. LET US EXAMINE THESE TO SEE CHARLE'S AREAS OF STRENGTH AND WEAKNESS. CHARLE IS HIGHEST IN VOCABULARY. THIS IS A RELATIVE STRENGTH ON WHICH CHARLE CAN BUILD DURING THE COMING YEAR. AREA OF GREATEST NEED APPEARS TO BE MATHEMATICS PROBLEMS. IT IS HERE THAT CHARLE NEEDS MOST WORK.

FOR MORE INFORMATION ABOUT HOW CHARLE IS DOING IN SCHOOL, PLEASE CONTACT CHARLE'S TEACHER, MRS LOUGHLIN.

PARENTS COPY

*1978, The University of Iowa. All __ __served. Printed in the U

Ex.CaseP4g12130vf0280201-BCW    Document 70-16    Filed 04/29/24

## PUPIL RECORD FOR ▼

**CHARLE HALL**

Iowa Tests of Basic Skills

### PROFILE NARRATIVE REPORT

Grade: 4    Sex: M
Birth Date: APR, 1971    Age: 9/05
I.D. Number:

Houghton Mifflin Company

| | SCORE | | PROFILE |
|---|---|---|---|
| | | | NATIONAL PERCENTILE RANK |
| | GE | PR | BELOW AVERAGE / AVERAGE / ABOVE AVERAGE |
| VOCABULARY | | 66 | |
| READING | | 72 | |
| SPELLING | | 35 | |
| CAPITALIZATION | | 58 | |
| PUNCTUATION | | 31 | |
| LANGUAGE USAGE | | 72 | |
| LANGUAGE, TOTAL | | 50 | |
| VISUAL | | 35 | |
| REFERENCES | | 56 | |
| WORK-STUDY, TOTAL | | 46 | |
| MATH CONCEPTS | | 37 | |
| MATH PROBLEMS | | 5 | |
| MATH COMPUTATION | | 34 | |
| MATHEMATICS, TOTAL | | 19 | |
| COMPOSITE (COMPLETE) | 43 | 53 | |

### APPROXIMATE READING LEVEL
### THE FIRST HALF OF THE FIFTH GRADE

Teacher: MRS ROSE
Date Tested: SEP, 1980
Test Form: 8
Process Number: 000-2545-001

School: C K BURNS
System: SACO MIDDLE SCHOOL
Level: 10

LEGEND: SCORES: GE=Grade Equivalents, S=Stanines, and PR=Percentile Ranks

HALLO 08225

---

TO THE PARENTS OF CHARLE HALL
FROM C K BURNS SCHOOL

HOW WELL IS CHARLE LEARNING THE BASIC SKILLS?

TO OBTAIN INFORMATION TO ANSWER THIS QUESTION, CHARLE TOOK THE IOWA TESTS OF BASIC SKILLS, (FORM 08, LEVEL 10) IN SEP, 1980. CHARLE ATTENDS C K BURNS SCHOOL IN SACO MIDDLE SCHOOL, AND IS IN FOURTH GRADE. MRS ROSE IS CHARLE'S TEACHER.

CHARLE'S OVERALL ACHIEVEMENT IN THE BASIC SKILLS IS BEST SHOWN BY HIS COMPOSITE SCORE. CHARLE'S COMPOSITE GRADE EQUIVALENT SCORE OF 43 SHOWS THAT HIS TEST PERFORMANCE WAS APPROXIMATELY THE SAME THAT MADE BY THE TYPICAL STUDENT IN THE FOURTH GRADE AT THE END OF THE THIRD MONTH. CHARLE'S STANDING IN OVERALL ACHIEVEMENT AMONG FOURTH GRADERS NATIONALLY IS SHOWN BY HIS COMPOSITE PERCENTILE RANK OF 53. THIS MEANS THAT OVERALL CHARLE SCORED BETTER THAN 53 PERCENT OF FOURTH GRADERS NATIONALLY AND THAT 47 PERCENT SCORED AS WELL OR BETTER. CHARLE'S OVERALL ACHIEVEMENT APPEARS TO BE ABOUT AVERAGE FOR HIS GRADE.

HOW WELL A STUDENT IS DOING IN READING IS A BIG FACTOR FOR SUCCESS IN SCHOOL WORK GENERALLY. CHARLE'S APPROXIMATE READING LEVEL IS THAT OF THE FIRST HALF OF THE FIFTH GRADE. CHARLE IS SOMEWHAT ABOVE AVERAGE FOR HIS GRADE IN READING DEVELOPMENT. HE SHOULD HAVE NO DIFFICULTY WITH HIS SCHOOL READING ASSIGNMENTS.

THE IOWA TESTS OF BASIC SKILLS COVER MANY IMPORTANT SKILL AREAS. LET US EXAMINE THESE TO SEE CHARLE'S AREAS OF STRENGTH AND WEAKNESS. CHARLE IS HIGHEST IN READING, AND LANGUAGE USAGE. THESE ARE RELATIVE STRENGTHS ON WHICH CHARLE CAN BUILD DURING THE COMING YEAR. AREAS OF GREATEST NEED APPEAR TO BE SPELLING, PUNCTUATION, WORK-STUDY VISUAL MATERIALS, MATHEMATICS PROBLEMS, AND MATHEMATICS COMPUTATION. IT IS HERE THAT CHARLE NEEDS MOST WORK.

FOR MORE INFORMATION ABOUT HOW CHARLE IS DOING IN SCHOOL, PLEASE CONTACT CHARLE'S TEACHER, MRS ROSE.

PARENTS COPY

S000

©1978 The University
All rights reserved  Prin

First Quarter
Teacher comment: Chuckie is capable of good work
if he tries. He lacks
the motivation + maturity to complete many
tasks. I hope he will improve.
Parent comment:

Parent signature _Mrs. Charles V. Hall_

Second Quarter
Teacher comment:

Parent comment:

Parent signature _Charles V. Hall_

Third Quarter
Teacher comment:

Parent comment:

Parent signature _Mrs Charles V Hall_

Fourth Quarter
Teacher comment:

Assigned to Room: _9_

Grade: _5_

Teacher: _Mrs. St. Michael_

C. K. BURNS SCHOOL

Report to Parents

Howard L. Cushman, Superintendent

1980-19 81

NAME _Charles Hall_

GRADE _4_

TEACHER _M. A. Rose_

Robert W. Moody, Principal

HALL 08226

IFCD 00028171

6000

Ex. 4, Page 213 of 423    Case 4:22-cv-02801-BCW    Document 70-16    Filed 04/29/24    Page 231 of 423

## GRADES ACCORDING TO INDIVIDUAL ABILITY

A   93 - 100                    C   76 - 84

B   85 - 92                     D   70 - 75

    U   Unacceptable work       E   Failure

✓ Needs Improvement    + Progressing Satisfactorily

Items not checked do not apply

| ARITHMETIC | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **ARITHMETIC** | B- | C- | D | C- |
| Addition | + | + | + | + |
| Subtraction | ✓ | ✓ | ✓ | ✓ |
| Multiplication | ✓ | ✓ | ✓ | ✓ |
| Division | | | ✓ | ✓ |
| Problem Solving | ✓ | ✓ | ✓ | ✓ |
| Measurements | | | ✓ | ✓ |
| Fractions | | | | ✓ |
| Decimals | | | | |

| LANGUAGE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **LANGUAGE** | B- | B- | D | C- |
| Sentence structure | + | + | + | + |
| Grammar | ✓ | ✓ | ✓ | ✓ |
| Oral expression | + | + | + | + |
| Use of reference material | | | ✓ | ✓ |
| Penmanship | ✓ | ✓ | ✓ | ✓ |

| SPELLING | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **SPELLING** | C | B- | B | C |
| Vocabulary | ✓ | ✓ | ✓ | ✓ |
| Correlation to daily work | ✓ | ✓ | ✓ | ✓ |

| READING | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **READING** | B- | C | C | C |
| Level | 5² | 9¹ | 4¹ | 4¹ |
| Word attack skills | + | + | + | + |
| Comprehension | + | ✓ | ✓ | ✓ |
| Independent work | ✓ | ✓ | ✓ | ✓ |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **SOCIAL STUDIES** | U | C- | D | C- |
| Map skills | ✓ | ✓ | ✓ | ✓ |
| Comprehension of content | ✓ | ✓ | ✓ | ✓ |
| Supplementary activities | ✓ | ✓ | ✓ | ✓ |
| **SCIENCE** | C- | D | D | C |
| **PHYSICAL EDUCATION** | + | | + | + |
| **MUSIC** | + | | + | + |

| ATTITUDES | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **ATTITUDES** | ✓ | ✓ | ✓ | |
| Behavior | ✓ | ✓ | ✓ | ✓ |
| Respect for other children | + | + | + | + |
| Respect for adults | + | + | + | + |
| Respect for school property | + | + | + | + |
| Assignments | ✓ | ✓ | ✓ | ✓ |

| ATTENDANCE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Days absent | 1 | 1 | 5½ | 3 |
| Times tardy | 1 | 0 | 0 | 0 |
| Times dismissed | 1 | 0 | 1 | 1 |

| PARENT-TEACHER CONFERENCE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Requested | | ✓ | | |

Charles Grade 4
1980-1981

HALLC  08227

IFCD 00028173

Case 4:13-cv-02801-BCW  Document 70-16  Filed 04/29/24  Page 233 of 423

Ex. Page 236 of 409

0011

Name **Charles Hall**

REPORTING SCALE

1. Excellent Progress
2. Good Progress
3. Acceptable Progress
4. Unacceptable Progress
5. Parent Conference Requested

SUBJECTS

**Reading Skills**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reading Level | 3¹ | 3¹ | 3² | 3² |
| Oral Reading | 2 | 2 | 2 | 2 |
| Comprehension | 2 | 2 | 2 | 2 |
| Phonics | 3 | 2 | 2 | 2 |
| Dictionary Skills | | | 3 | 4 |

**Language**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Correct Use of grammar | 2 | 2- | 2 | 2 |
| Spelling usage | 3 | 3 | 3 | 3 |
| Produces or creates something original | 3 | 4 | 2 | 2 |

**Handwriting**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Handwriting | 2 | 2 | 2 | 2 |

**Mathematics**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Problem solving | | 4 | 4 | 2 |
| Computation | 2 | 3- | 3 | 3 |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Social Studies | 2 | 2 | 2 | 2 |
| Science | 2 | 2 | 2 | 2 |

**Social Behavior**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Assumes responsibility (effort) | 3 | 3 | 3 | 2 |
| Listens to and follows directions | 2 | 3 | 3 | 2 |
| Health habits | 1 | 1 | 1 | 1 |
| Works independently | 1 | 1 | 1 | 1 |
| Relates to peers and adults | 1 | 1 | 1 | 1 |
| Shows positive attitude | 1 | 1 | 1 | 1 |
| Respects property and material things | 1 | 1 | 1 | 1 |
| Displays self-discipline | 3 | 3 | 3 | 3+ |

**Attendance**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Absent | 2 | 2 | 6 | 0 |
| Tardy | 1 | 0 | 0 | 0 |
| Dismissed | 0 | 0 | 0 | 0 |

Taught, but not graded
Art, Music and Physical Education.

*Promoted to Grade 4*
*Burns School*

HALL 08228 *Room 4*

## GRADES ACCORDING TO INDIVIDUAL ABILITY

A 93 - 100          C 76 - 84

B 85 - 92           D 70 - 75

U  Unacceptable work    E  Failure

✓ Needs Improvement    + Progressing Satisfactorily

Items not checked do not apply

| ARITHMETIC | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | B- | C- | D | C- |
| Addition | + | + | + | + |
| Subtraction | ✓ | ✓ | ✓ | ✓ |
| Multiplication | ✓ | ✓ | ✓ | ✓ |
| Division | | | ✓ | ✓ |
| Problem Solving | ✓ | ✓ | ✓ | ✓ |
| Measurements | | | ✓ | ✓ |
| Fractions | | | | ✓ |
| Decimals | | | | |

| LANGUAGE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | B- | B- | D | C- |
| Sentence structure | + | + | + | + |
| Grammar | ✓ | ✓ | ✓ | ✓ |
| Oral expression | + | + | + | + |
| Use of reference material | | | ✓ | ✓ |
| Penmanship | ✓ | ✓ | ✓ | ✓ |

| SPELLING | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | C | B- | B- | C |
| Vocabulary | ✓ | ✓ | ✓ | ✓ |
| Correlation to daily work | ✓ | ✓ | ✓ | ✓ |

| READING | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | B- | C+ | C | C |
| Level | $3^a$ | $9'$ | $4'$ | $4'$ |
| Word attack skills | + | + | + | + |
| Comprehension | + | ✓ | ✓ | ✓ |
| Independent work | ✓ | ✓ | ✓ | |

HALLC    08229

| SOCIAL STUDIES | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | U | C- | D | C- |
| Map skills | ✓ | ✓ | ✓ | ✓ |
| Comprehension of content | ✓ | ✓ | ✓ | ✓ |
| Supplementary activities | ✓ | ✓ | ✓ | ✓ |

| SCIENCE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | C- | D | D | C |

| PHYSICAL EDUCATION | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | + | | + | + |

| MUSIC | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | + | | + | + |

| ATTITUDES | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | ✓ | ✓ | ✓ | |
| Behavior | ✓ | ✓ | ✓ | ✓ |
| Respect for other children | + | + | + | + |
| Respect for adults | + | + | + | + |
| Respect for school property | + | + | + | + |
| Assignments | ✓ | ✓ | ✓ | ✓ |

ATTENDANCE

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Days absent | 8 | 1 | 5½ | 3 |
| Times tardy | 1 | 0 | 0 | 0 |
| Times dismissed | 0 | 0 | 1 | 1 |

| PARENT- TEACHER CONFERENCE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Requested | ✓ | ✓ | | |

0012



IFCD 00028175

Case 2:23-cv-02301-BCW   Document 70-16   Filed 04/29/24   Page 235 of 423

Ex. 46 Page 235 of 423

# PUPIL RECORD FOR ▼

CHARLE HALL

PROFILE NARRATIVE REPORT

Grade: 5
Sex: M
Birth Date: APR, 1971
Age: 10/06
I.D. Number:

THE RIVERSIDE PUBLISHING COMPANY

| | SCORE | | PROFILE |
|---|---|---|---|
| | | | NATIONAL PERCENTILE RANK |
| | GE | PR | BELOW AVERAGE / AVERAGE / ABOVE AVERAGE |
| VOCABULARY | | 73 | |
| READING | | 37 | |
| SPELLING | | 10 | |
| CAPITALIZATION | | 48 | |
| PUNCTUATION | | 36 | |
| LANGUAGE USAGE | | 1 | |
| LANGUAGE, TOTAL | | 16 | |
| VISUAL | | 80 | |
| REFERENCES | | 21 | |
| WORK-STUDY, TOTAL | | 51 | |
| MATH CONCEPTS | | 48 | |
| MATH PROBLEMS | | 28 | |
| MATH COMPUTATION | | 16 | |
| MATHEMATICS, TOTAL | | 31 | |
| COMPOSITE (COMPLETE) | 48 | 41 | |

APPROXIMATE READING LEVEL
THE SECOND HALF OF THE FOURTH GRADE

Teacher: MRS ST MICHEL
Date Tested: OCT, 1981
Test Form: 7
Process Num: 000-3060-001

School: C K BURNS SCHOOL
System: SACO MIDDLE
Level: 11

HALL  08230

TO THE PARENTS OF CHARLE HALL
FROM C K BURNS SCHOOL SCHOOL

HOW WELL IS CHARLE LEARNING THE BASIC SKILLS?

TO OBTAIN INFORMATION TO ANSWER THIS QUESTION, CHARLE TOOK THE IOWA TESTS OF BASIC SKILLS, (FORM 07, LEVEL 11) IN OCT, 1981. CHARLE ATTENDS C K BURNS SCHOOL SCHOOL IN SACO MIDDLE, AND IS IN FIFTH GRADE. MRS ST MICHEL IS CHARLE'S TEACHER.

CHARLE'S OVERALL ACHIEVEMENT IN THE BASIC SKILLS IS BEST SHOWN BY HIS COMPOSITE SCORE. CHARLE'S COMPOSITE GRADE EQUIVALENT SCORE OF 48 SHOWS THAT HIS TEST PERFORMANCE WAS APPROXIMATELY THE SAME AS THAT MADE BY THE TYPICAL STUDENT IN THE FOURTH GRADE AT THE END OF THE EIGHTH MONTH. CHARLE'S STANDING IN OVERALL ACHIEVEMENT AMONG FIFTH GRADERS NATIONALLY IS SHOWN BY HIS COMPOSITE PERCENTILE RANK OF 41. THIS MEANS THAT OVERALL CHARLE SCORED BETTER THAN 41 PERCENT OF FIFTH GRADERS NATIONALLY AND THAT 59 PERCENT SCORED AS WELL OR BETTER. CHARLE'S OVERALL ACHIEVEMENT APPEARS TO BE ABOUT AVERAGE FOR HIS GRADE.

HOW WELL A STUDENT IS DOING IN READING IS A BIG FACTOR FOR SUCCESS IN SCHOOL WORK GENERALLY. CHARLE'S APPROXIMATE READING LEVEL IS THAT OF THE SECOND HALF OF THE FOURTH GRADE. THOUGH SOMEWHAT BELOW AVERAGE IN READING, CHARLE'S LEVEL OF READING DEVELOPMENT IS HIGH ENOUGH THAT HE SHOULD HAVE LITTLE DIFFICULTY WITH READING IN MOST SCHOOL WORK.

THE IOWA TESTS OF BASIC SKILLS COVER MANY IMPORTANT SKILL AREAS. LET US EXAMINE THESE TO SEE CHARLE'S AREAS OF STRENGTH AND WEAKNESS. CHARLE IS HIGHEST IN VOCABULARY, AND WORK-STUDY VISUAL MATERIALS. THESE ARE RELATIVE STRENGTHS ON WHICH CHARLE CAN BUILD DURING THE COMING YEAR. AREAS OF GREATEST NEED APPEAR TO BE SPELLING, LANGUAGE USAGE, WORK-STUDY REFERENCES, AND MATHEMATICS COMPUTATION. IT IS HERE THAT CHARLE NEEDS MOST WORK.

FOR MORE INFORMATION ABOUT HOW CHARLE IS DOING IN SCHOOL, PLEASE CONTACT CHARLE'S TEACHER, MRS ST MICHEL.

PARENTS COPY

1979, The University of Iowa    rights reserved    Printed in

First Quarter
Teacher comment: *Chuck must complete all work.*

Parent comment:

Parent signature *Mrs Charles V Hall*

Second Quarter
Teacher comment: *all A's + B's if work were all in ! —*

Parent comment:

Parent signature *Mrs C. V. Hall*

Third Quarter
Teacher comment:

Parent comment:

Parent signature *Mrs Charles V. Hall*

Fourth Quarter
Teacher comment: *Hopefully Chuck will always do his best. He is a fun boy!!*

Assigned to Room: *Saco Middle School*

Grade: _____ 6

Teacher: _____

C. K. BURNS SCHOOL

Report to Parents

Howard L. Cushman, Superintendent

1981 -1982

NAME *Charles Hall*

GRADE _____ 5

TEACHER *Mrs D. Michel*

Robert W. Moody, Principal

HALLO 08231

0015

# GRADES ACCORDING TO INDIVIDUAL ABILITY

A 93 - 100  
B 85 - 92  

C 76 - 84  
D 70 - 75  
E Failure  

U Unacceptable work

√ Needs Improvement     + Progressing Satisfactorily

Items not checked do not apply

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **ARITHMETIC** | U | D- | B- | C |
| Addition | + | + | + | + |
| Subtraction | + | + | + | + |
| Multiplication | | + | + | + |
| Division | | | + | + |
| Problem Solving | √ | √ | + | + |
| Measurements | √ | + | + | + |
| Fractions | | | √ | + |
| Decimals | | | | + |
| **LANGUAGE** | C | C+ | B- | B |
| Sentence structure | + | + | + | + |
| Grammar | + | + | + | + |
| Oral expression | + | + | + | + |
| Use of reference material | + | + | + | + |
| Penmanship | √ | √ | + | + |
| **SPELLING** | B | C+ | C | D |
| Vocabulary | + | + | + | √ |
| Correlation to daily work | + | + | + | √ |
| **READING** | C | U | U | U |
| Level | 4 | 5² | 5² | 5¹ |
| Word attack skills | + | √ | √ | √ |
| Comprehension | √ | √ | √ | √ |
| Independent work | √ | √ | √ | √ |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **SOCIAL STUDIES** | D- | B- | D | C |
| Map skills | √ | + | + | + |
| Comprehension of content | √ | + | √ | + |
| Supplementary activities | √ | √ | √ | + |
| **SCIENCE** | B | U | E | D |
| **PHYSICAL EDUCATION** | + | + | + | + |
| **MUSIC** | + | √ | √ | √ |
| **ATTITUDES** | | | | |
| Behavior | √ | + | √ | √ |
| Respect for other children | + | + | + | + |
| Respect for adults | + | + | + | + |
| Respect for school property | + | + | + | + |
| Assignments | √ | √ | √ | √ |
| **ATTENDANCE** | | | | |
| Days absent | ½ | 3 | 6 | 2 |
| Times tardy | 0 | 0 | 0 | 0 |
| Times dismissed | 1 | 0 | 2 | 0 |
| **PARENT-TEACHER CONFERENCE** | | | | |
| Requested | | | | |

Charles  
Grade 5 1981-82

HALLO 08232

Saco Public Schools
SACO MIDDLE SCHOOL
Gilbert Reynolds, Principal
PUPIL PROGRESS REPORT GRADES 6 - 8

Superintendent - Howard L. Cushman

Assistant Principal - Elaine White
Guidance Director - Nancy A. Tarbox

Name _Charlie Hall_ Grade _6_ Year _82-83_ Teacher _Mrs. Riley_

**Explanation of Basic Subject Grades**

A — 93 - 100 Superior or Excellent
B — 85 - 92 Good or Above Average
C — 76 - 84 Average
D — 70 - 75 Poor but Passing
E — 0 - 69 Failure
I Incomplete
* Below Grade Level

1 — Shows interest and desire to work
2 — Shows improvement
3 — Uses time and ability to good advantage
4 — Good school citizen
5 — Low test scores
6 — Required Work late or incomplete
7 — Poor conduct
8 — Working below ability level
9 — Poor attitude
10 — Too many absences

**Explanation of Special Subject Grades**

H — Outstanding
S — Satisfactory
U — Unsatisfactory

| | 1 Rank | 1 Effort | 2 Rank | 2 Effort | 3 Rank | 3 Effort | 4 Rank | 4 Effort | |
|---|---|---|---|---|---|---|---|---|---|
| Reading M: Riley | D | 6/7 | D- | 6/7 | E | 6/7 | C- | 6/7 | D |
| Language M | | | E | 6/9 | E | 6/5 | E | 5,6/7 | E |
| Spelling M | C | 5 | E | 5/6 | E | 5/6 | E | 5/6/7 | D- |
| Mathematics M | J | 5 | E | 6/7 | E | 5/6 | E | 5,6,7 | E |
| Science Mr. Wilder | E | 5/6 | E | 5/7 | E | 5/6 | E | 5/6 | E |
| Social Studies M | E | 5/6 | D- | 5/6 | E | 5/6 | D- | 5/6 | |

| | 1 Rank | 1 Effort | 2 Rank | 2 Effort | 3 Rank | 3 Effort | 4 Rank | 4 Effort | |
|---|---|---|---|---|---|---|---|---|---|
| Art | | 1 | S | S | S | S | S | S | |
| Music | | | | | | | | | |
| Physical Ed. | S | 1 | 11 | 2,3 | S+ | 1 | S | 1 | S+ |
| Home Ec. | | 1 | B+ | | | | | | B+ |
| Industrial Arts | | | | | B | 1 | A | 1 | B+ |
| Band | | | | | | | | | |

**Teacher Comments**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Parent Conference Requested | | | | |

1.

2.

3.

4.

| Attendance | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Days Absent | 2 | 1 | 2 | 0 |
| Times Tardy | 1 | 0 | 0 | 0 |
| Times Dismissed | 1 | | 1 | 0 | 0 |

PARENT'S COMMENTS:

Charles will be retained in grade 6 for the first 4 weeks. If Charles has no grade lower than a C, then he will be promoted to grade 7.

Please discuss this report with your son or daughter. If a conference is requested, call the school for an appointment. Tel. 282-4181

Assign. to Grade _6_ For School Year _

This Progress Report must be signed by the parent and returned to Saco Middle School. Please return in an envelope if parent comments are made.

PARENT SIGNATURE

HALLC 08233
0016

Superintendent - Howard L. Cushman

Saco Public Schools
**SACO MIDDLE SCHOOL**
Larry Littlefield, Principal
PUPIL REPORT CARD  GRADES 6 - 8

Assistant Principal - Elaine White
Guidance Director - Nancy A. Tarbox

Name __Charles Hall__    Grade __6__   Year __1983-34__  Section __6-4__   HR 21

**Explanation of Basic Subject Grades**
A – 93 - 100  Superior or Excellent
B – 85 - 92  Good or Above Average
C – 76 - 84  Average
D – 70 - 75  Poor but Passing
E – 0 - 69  Failure
I    Incomplete

1 — Low test scores
2 — Required work late or incomplete
3 — Poor conduct
4 — Working below ability level
5 — Poor attitude
6 — Too many absences

7 — Shows interest and desire to work
8 — Shows improvement
9 — Uses time and ability to good advantage
10 — Good school citizen
11 — Below grade level
12 — Above grade level
13 — Over a tutor

**Explanation of Special Subject Grades**
H — Outstanding
S — Satisfactory
U — Unsatisfactory

| | 1 Rank | 1 Effort | 2 Rank | 2 Effort | 3 Rank | 3 Effort | 4 Rank | 4 Effort | Year Ave. |
|---|---|---|---|---|---|---|---|---|---|
| Mathematics M: Massey | C- | 8 | E | 2 | E | 2 | | | |
| Language Mr. Moody | E | 8 | C- | 2 | E | 2 | | | |
| Reading M: Perry | D | 2 | D | 2 | E | | | | |
| Spelling M: Perry | C | 7 | | | E | | | | |
| Social Studies M: Frank | | | D | 2 | C | 8 | | | |
| Science M: | E | | | | E | 1/2 | E | E | |

| | 1 Rank | 1 Effort | 2 Rank | 2 Effort | 3 Rank | 3 Effort | 4 Rank | 4 Effort | Year Ave. |
|---|---|---|---|---|---|---|---|---|---|
| Health MD Anagnostis | | | | | C | | E | | E |
| Physical Ed. M. | J | 7 | S | 1 | S | 7 | S | 7 | S+ |
| Home Ec. Mr Bickford | C | 13 | B | | | | | | |
| Industrial Arts M. Huston | | | | | B | 7 | | | |
| Art M. | | | 5 | S | S | | | | |
| Band M. | | | | | | | | | |

**Teacher Comments:**

**Attendance**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Days Present | 41 | 42 | 40 | 43 |
| Days Absent | | 0 | 4 | 2 |
| Times Tardy | 1 | 0 | 0 | 0 |
| Times Dismissed | 1 | 1 | 1 | 0 |

**PARENT'S COMMENTS:**

This Report Card must be signed by the parent and returned to Saco Middle School. Please return in an envelope if parent comments are made.

PARENT SIGNATURE ____

Please discuss this report with your son or daughter. If a conference is requested, call the school for an appointment. Tel. 282-4181

Assigned to Grade ____ For School Year ____
HALLC  08234



Document 70-16   Filed 04/29/24

## PUPIL RECORD FOR ▼

**CHARLE HALL**

Iowa Tests of Basic Skills

**PROFILE NARRATIVE REPORT**

Grade: 6    Sex: M
Birth Date: APR, 1971    Age: 11/11
I.D. Number:

THE RIVERSIDE PUBLISHING COMPANY

| SUBTESTS | SCORE GE | PR | PROFILE — NATIONAL PERCENTILE RANK |
|---|---|---|---|
| VOCABULARY | | 66 | |
| RE..NG | | 30 | |
| SPELLING | | 5 | |
| CAPITALIZATION | | 40 | |
| PUNCTUATION | | 26 | |
| LANGUAGE USAGE | | 8 | |
| LANGUAGE, TOTAL | | 14 | |
| VISUAL | | 48 | |
| REFERENCES | | 33 | |
| WORK-STUDY, TOTAL | | 41 | |
| MATH CONCEPTS | | 29 | |
| MATH PROBLEMS | | 56 | |
| MATH COMPUTATION | | 52 | |
| MATHEMATICS, TOTAL | | 46 | |
| COMPOSITE (COMPLETE) | 62 | 38 | |

THE PROFILE ABOVE SHOWS AT A GLANCE HOW WELL CHARLE HALL IS LEARNING BASIC SKILLS

Teacher: MRS RILEY
Date Tested: MAR, 1983
Test Form: 8
Process Number: 000-1275-004
School: SACO MIDDLE SCHOOL
System: SACO MIDDLE SCHOOL
Level: 12

LEGEND FOR SCOR  GE=Grade Equivalents, S=Stanines, and PR=Percentile Ranks

HALLO 08235

TO THE PARENTS OF CHARLE HALL FROM SACO MIDDLE SCHOOL

HOW WELL IS CHARLE LEARNING THE BASIC SKILLS?

TO OBTAIN INFORMATION TO ANSWER THIS QUESTION, CHARLE TOOK THE IOWA TESTS OF BASIC SKILLS (FORM 08, LEVEL 12) IN MAR, 1983. CHARLE ATTENDS SACO MIDDLE SCHOOL SCHOOL IN SACO MIDDLE SCHOOL, AND IS IN SIXTH GRADE. MRS RILEY IS CHARLE'S TEACHER.

FOR MORE INFORMATION ABOUT HOW CHARLE IS DOING IN SCHOOL, PLEASE CONTACT CHARLE'S TEACHER, MRS RILEY.

©1978, The University of Iowa. All rights reserved. Printed in the U.



HALLO 08236

©1978, The University of Iowa. All rights reserved. Printed in the U.

## PSYCHO-EDUCATIONAL EVALUATION

Identifying Data:

Name:  Charles Hall

DOB:  4-6-71

Age:  13, 4

School:  Saco Middle School

Grade:  7

Dates of Evaluation:  August 15, and 18, 1984

Tests Administered:  Wechsler Intelligence Scale for Children- Revised
Bender Gastalt Test
Wide Range Achievement Test
SPIRE
Draw a Person and Incomplete Sentences

Reason For Referral:  Charles was referred to the Pupil Evaluation
Team by Mr. Larry Littlefield, Principal, Saco Middle School.
Charles had failed almost all subjects even though he was
repeating the sixth grade.  Mrs. Hall had requested that the
testing be done during the summer to help plan Charles' program
for the fall 1984.

Background Information:  Charles is adopted.  He resides with his
mother, father and older sister, (who is also adopted) in Saco.
Both parents are employed.

A review of Charles' school records indicates that he has always
attended school in Saco.  His grades began to decline in the
third grade.  Mrs. Hall feels that several factors may have
contributed to this decline, including the family moving, death
of a grandparent, and a neighbor needing to remove foster
children from her home.  At the end of his sixth grade year,
Charles was retained with the understanding that if he obtained
satisfactory grades during the first quarter, he would be
promoted to the seventh grade.  He did not attain such grades
and repeated the sixth grade.  Charles failed most subjects with
no significant improvement observed in his grades.  Charles reports
that he has been suspended from school once for fighting.

Mrs. Hall indicated that she has been called into school numerous
times to meet with Charles' teachers and discuss his school
performance.  She notes that Charles has received counseling from
a church priest; however, they have not observed any significant
changes in his behavior.  Earlier this summer, Charles attended a
summer school camp program at Shaker Mountain School, in Burlington,
Vermont.  Charles' parents are considering enrolling him in that
Alternative School this fall.

HALL00008237

0020

Psycho-Educational Evaluation
Charles Hall
Page 2

Test Results: Charles obtained a verbal scale I.Q. of 95, performance scale I.Q. of 101 and full scale I.Q. of 98 on the WISC-R. This overall performance represents an average range of intellectual functioning at the 45th percentile of students Charles' age in the normative population.

An analysis of the verbal scale illustrates that 4 of the 6 subtests fell slightly below the mean (scale scores of 8 and 9). Charles showed a relative strength in his vocabulary development, recording a scale score of 11 (slightly above the mean). A definate weakness was noted in Charles' short term auditory memory, as he was able to only repeat 5 numerals forward and 3 numerals backward resulting in a scale score of 6 (moderately below the mean) on the Digit Span subtest. However, when informally presented with a sequence of numerals visually, Charles showed substantial improvement by repeating 6 digits forward and coming very close to accurately repeating the 7 digit sequence.

Within the performance scale, Charles' scale scores also clustered within one point of the mean, with the exception of a score of 14 on the Picture Arrangement subtest. This subtest measures the ability to visually comprehend and sequentially organize a series of events. Experiences of social interaction and awareness are drawn upon. As well as showing a strength in the cognitive funtions of perceptual planning and sequencing, Charles' performance on the the Picture Arrangement subtest is also significant when compared to the Comprehension subtest (scale score 9). Both subtests are sensitive to social stimuli. Charles' higher performance on the Picture Arrangement subtest suggests that he is sensitive to inter-personal nuances, but may disregard social conventions. This is also evident within his responses on the Comprehension subtest. For example, when asked a question about a smaller boy and a possible fight, Charles clearly expressed a difference between what he should do and what he would do.

On the Bender-Gastalt Test, another measure of visual motor functioning, Charles recorded no scorable errors showing satisfactory maturation in visual motor perception consistent with the performance scale of the WISC-R. However, of significant note is the generally arbitrary manner in which the designs are scattered on the paper. This confused order tends to suggest a lack of planning and immature, unsystematic thinking.

Charles' correctly identified 51 of 63 words presented on the Wide Range Achievement Test. This performance results in a raw score of 78 and corresponding grade equivilent of 7.3. At approximately a mid-fifth grade level his flash recognition of words decreased and he needed to phonetically sound out many words.

HALL00008238

0021

Psycho-Educational Evaluation
Charles Hall
Page 3

On the Spelling sub-test of the WRAT, similar performance
was noted as he obtained a raw score of 46 and grade equivalent of
6.3. When he was unsure of a word, he tried to spell it
phonetically (example; advice - edvise, success - sucses).
Poor formation of the letters "k", "n" and "r" were also
observed on the spelling sample.

Charles' instructional reading level, or the level at which
he should be presented with printed material, was obtained at
a 7th to 8th grade level with 5 word recognition errors in
context and 80% comprehension of the SPIRE. His word recognition
errors were very minor, word substititions and ommissions or a
minor change in the word ending. None of the word recogntion
errors substantially effected the content of the passage. Although,
only a very limited reading comprehension section was administered,
Charles showed a satisfactory recall of factual details and
ability to draw inferences. He had difficulty with vocabulary
questions.

Charles was able to add and subtract whole numbers involving
regrouping with no difficulty. He appeared to understand the
multiplication process; however, his accuracy was hampered by
poor knowledge of the basic facts. He was also unable to do
any division problem which required the long division process.
Charles demonstrated a basic understanding of fractions, and
was able to add and subtract simple fractions with common
denominators. When mixed denominators were presented he added
both the numerator and the denominator. This overall performance
results in a raw score of 36 and overall grade equivalent of 5.1
on the Arithmetic subtest of the WRAT.

Charles' draw a person is well proportioned with appropriate
detail. The drawing is somewhat restricted by the absence of
indicators of motion. The figures arms are clinging to the body
suggesting insecurity and an inability to reach out to others.
During the interview portion of the evaluation, Charles was guarded
in his responses. However, on the incomplete sentences blank,
3 major themes were evident:. His constant conflict with his
sister, feelings of inadequacy when he lets his parents down by
"lying" and a lack of confidence in both academic and social
situations.

Summary and Recommendations: In conclusion, Charles is a youth of
average intelligence. He shows a relative strength in vocabulary
development. Charles' strongest performance was on a task involving
visual attention to detail, social comprehension and sequencing. A
significant weakness was recorded in his auditory attention and
short term memory. This weakness was readily compensated for by
providing visual cues. Charles' reading, spelling and math skills

HALL00008239

0022

Psycho-Educational Evaluation
Charles Hall
Page 4

were assessed at levels 7, 6 and 5, respectively. Charles presents
as disorganized and insecure in school, peer, and family settings.
He seems to know what is socially appropriate, but may elect
to do otherwise. His conflict with his sister is a constant
source of disruption at home.

Mr. and Mrs. Hall have decided to place Charles at the
Shaker Mountain School, an Alternative School in Burlington,
Vermont. If Charles were to continue to attend Saco Middle
School, this examiner would recommend the Pupil Evaluation
Team consider the following actions.

1. Referral for projective testing with the school social
worker to further delinate the nature and extent of any
emotional adjustment difficulties.

2. During the interim of additional testing, temporary
diagnostic placement in the Resource Room for Math,
and individual and/or group counseling with the school
social worker emphasizing peer interaction skills and
self confidence building would be recommended.

3. To monitor his school more closely and hold him accountable
for completion of school work, a weekly progress report
and monthly meeting between Charles' parents and teachers
could be coordinated by the social worker and Resource Room
teacher.

Lawrence L. Spencer
Special Services Coordinator

HALL00008240

0023

Name: Charles M. Hall
Date: 9/17/85

This 14-5 year old boy was seen for psychological evaluation as part of a psycho-educational diagnostic process at Thornton Academy. Chuck is a ninth grade student who has had chronic school learning and adjustment difficulties since grade 3 and attended Shaker Mountain School last year in lieu of eighth grade public school. He was tested by Larry Spencer on 7/84 and obtained intelligence test scores within the Average range.-WIAC-R - V. 95, P. 101 & F.S. 98. A Wide Range Achievement TEst administered that time indicated a word recognition level of 7.3, spelling level of 6.3 and arithmetic level of 5.1. A SPIRE administered identified an instructional reading level between 7th and 8th grade in a 7th grade placement.

Review of school record produced the following achievment test data:

| ITBS | Grade 3 | 10/79 | Vocabulary | 3.9 |
| | | | Reading | 2.9 |
| | | | Spelling | 2.9 |
| | | | Total Language | 3.5 |
| | | | Total Math | 3.0 |
| | | | Composite | 3.3 |
| | Grade 4 | 9/80 | | 4.8 |
| | | | | 5.1 |
| | | | | 3.6 |
| | | | | 4.2 |
| | | | | 3.3 |
| | | | | 4.3 |
| | Grade 5 | 10/81 | | 6.2 |
| | | | | 4.6 |
| | | | | 2.9 |
| | | | | 3.6 |
| | | | | 4.5 |
| | | | | 4.8 |
| | Grade 6 | 3/83 | | 7.6 |
| | | | | 5.7 |
| | | | | 3.3 |
| | | | | 4.6 |
| | | | | 6.6 |
| | | | | 6.2 |
| | Grade 6 (Repeat) | 3/84 | | 9.2 |
| | | | | 7.1 |
| | | | | 4.6 |
| | | | | 7.1 |
| | | | | 6.6 |
| | | | | 7.4 |
| Stanford Achievement | Grade 4 | 6/81 | Vocabulary | 5.2 |
| | | | Reading Comprehension | 6.2 |
| | | | Word Study Skills | 5.9 |
| | | | Total Reading | 6.2 |

0024
HALL00008241

denial of negative feelings. Impulse expression is more likely to be seen in the form of passive aggressive behaviors versus open demonstrations of affect. Reality testing, in general, is satisfactory. In the area of interpersonal relationships, Chuck seems distant from people. Adults are seen as benevolent but firm limit setters. With peers, he would like to be socially popular and accepted but doesn't seem to know how to accomplish this.

## DISCUSSION:

Chuck is a socially withdrawn, somewhat depressed boy who is showing a mixture of academic learning problems, passive aggressive behaviors and compulsive traits. He seems to want to go his own way, however, he feels intimidated by his environment and tries to keep a low profile. He is emotionally constricted and tries to avoid the direct expression of feelings. Chuck is unmotivated in school and is likely to be a poor performer despite average cognitive ability and grade level language. Math and spelling skills are weak but functional.

Pending contradictary data from the learning disabilities work-up, it would seem that Chuck's academic needs can be best addressed through general programming with remedial support in math and spelling, academic structure and close liason with family relative to scholastic expectations and Chuck's performance. Parents need to be cognisant of his assignments and provide supervised study opportunities. He should be on a three week check. Becuase of his somewhat limited organizational ability, care should be taken that he fully understands the nature of his assignmentsand the work being expected of him. Chuck's depression, his difficulty dealing openly with feelings and his passive aggressive stance should be addressed by individual counseling. Chuck and his family should be put in contact with local mental health services.

Stanley L. Payson, II, Ed.D.
Consulting School Psychologist

SLP:ns

0026

HALL00008243

SACO/DAYTON/THORNTON

Date: 11-20-85

PUPIL EVALUATION TEAM MEETING
and
INDIVIDUAL EDUCATIONAL PROGRAM

Student: CHARLES HALL                    School: THORNTON ACADEMY

Birthdate: 4-6-71      Age: 14      Sex: M      Grade: 9

Teacher(s): NA

Parent/Guardian: Mr. & Mrs. Charles Hall

Address: Jenkins Road, Saco, ME 04072      Telephone #: 2-1844

PET MEMBERSHIP (names)

Administrator: Richard Beaumont          Resource Teacher: R. Cretaro
Guidance Director: Richard Beaumont      Speech Therapist: ——
Parent/Guardian: Mrs. Hall               Social Worker: ——
Teacher(s): Mr. Woodward - music;        *Other: Mrs. Donovan-nurse
Mr. Mullett · IA; Ms. Yeaton - Math;     Recorder: C. Sabo
Mr. Mattais - Science!                   * Mr. Studwell  ⟩ Family Preserva-
                                         Ms. Cantara  ⟋ tion Program at
PARENT NOTIFICATION                                    Sweetser

Was parent notified of the meeting in writing? ✓ Yes _____ No (explain) _____

PET MEETING NOTES (use reverse side if necessary, please review history, teacher observations and evaluation results)

Annual review

Yeaton - discipline is no problem, but homework completion is a problem. Sent progress report home. Cut class twice this week. 71 for Qtr. 1. Feels others "pick on him."

Woodward - For most recent test. Chuck doesn't seem to know what's going on. He seems interested. Doesn't test well. Told him he could do extra credit. Failed for ytr., but could pass for year

| Strengths | Concerns |
|---|---|
| Classroom Behavior | Homework completion Attendance Classroom attitude |

HALL00008244

0027

PET NOTES (continued from Page 1

A. _Mullett_- has skipped my class. Has done _no_ shop assignments out of 5. _Quiz grades are average._ "In a daze" often..
Is failing.

.. Mattais/ takes a lot of prodding to get Chuck going.
No discipline problem, but is not motivated.

_Cretaro_ (reading Dr. Payson's report): socially withdrawn,
passive/aggressive; emotionally constricted. Intim. by environ.
Rec: general program w/support in spelling & math Keeps low profile
     5 week check
     individual & family counseling.
(see acad. testing results & psych. eval.)

Mr. Beaumont discussed contract made with Chuck about
coming to Thornton Academy.

PET RECOMMENDATIONS:

1.) Place on 5 week check
2.) Keep mainstreamed in all classes.
3.) Individual & family counseling to be sought
   by parents.
4) Sweetser to set up contract with Chuck involving
   his homework, classroom attitude, attendance
   at Thornton

GOALS (set goals in priority)

Priority
1.
2.
3.
4.
5.
6.

HALL00008245

00.8

-3-

IDENTIFICATION OF EDUCATIONAL HANDICAP:

____ 1. Vision
____ 2. Audition
____ 3. Speech & Language Functions
____ 4. Specific Learning Functions
____ 5. Behavior

____ 6. Physical Mobility Functions
____ 7. Mental Development or Maturation
____ 8. Other Health Functions(specify) _____

____ 9. Pregnancy or Temporary Traumatic Injury
        (specify) _____

TYPE OF SERVICE(S)

____ 1. Consultation: Student attends a regular class and receives special learning activities developed in consultation with the special education teacher.
____ 2. Resource Room: Student is enrolled in a regular class and receives less than ½ of his/her instruction from a special education teacher.
____ 3. Composite Program: Student attends a special education class more than ½ of his/her instruction.
____ 4. Speech and Language Therapy.
____ 5. Social Work Services: The school social worker consults with the classroom teacher to develop a specific behavior management plan and/or provides individual or small group counseling for the student.
____ 6. Home or Hospital Bound Instruction.
____ 7. Out-of-District Placement-Day School.
____ 8. Out-of-District Placement- Residential School.
____ 9. Occupational Therapy.
____ 10. Physical Therapy.
____ 11. Other:

OTHER INFORMATION REGARDING PLACEMENT

School: _____ Key Contact Specialist: _____

Anticipated Duration: _____ Triennial Review Date: _____

Next PET Meeting Date: _____

SPECIAL TRANSPORTATION

____ No    ____ Yes(explain): _____

SCHEDULE OF SERVICES (include lunch, recess and all specials)

| Special Services | | | | | Regular Programming | | | |
|---|---|---|---|---|---|---|---|---|
| Subject | Service Provider | Start Date | Hrs-Min/week | | Subject | Teacher | Start Date | Hrs-Min/week |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

Total Hrs-Min/wk for Special Services _____    Total Hrs-Min/wk for Regular Program _____

HALL00008246 9

## SIGNATURE PAGE

The Pupil Evaluation Team members, whose signatures appear below, agree that the program described in this document is appropriate and the least restrictive for this student. Dissenting members of the Pupil Evaluation Team are required to submit a minority report to the Special Services Coordinator within ten (10) school days.

C. Sabo - LD teacher

David Maltais - Science

(Ule D Cantan (Swoton FPS.)

Dorothy L Hall

Phil Stodwell - FPS

Perry Downes C.N, School Nurse

Richard Beaumont

## PARENTAL CONSENT TO IMPLEMENT THE IEP

### APPROVAL

I have read and <u>agree</u> with the provision of special education and related services, described in this Individual Education Program. I have been fully informed of all information relevant to this program and understand that the granting of consent is voluntary on my part and may be revoked in writing at any time.

x ___Mrs Dorothy L Hall___      ___4/4/85___
          Signature of Parent/Guardian                    Date

***************

### DISAPPROVAL

I have read and <u>disagree</u> with the provision of special education and related services described in this Individual Education Program. I understand that I have the right to request an impartial hearing to review the recommendations of the Pupil Evaluation Team. I also understand that the school has the same rights of due process which are available to me.

_____      _____
Signature of Parent/Guardian                    Date

0030

HALL00008247

IFCD 00028191
Case 4:21-cv-08001-BCW   Document 70-16   Filed 04/29/24   Page 251 of 423
Ex. 13 Page 250 of 423



ALL.          CHARLES     89241          THORNTON ACADEMY    1985-86

PREVIOUS CREDITS:    0.000

| COURSE NAME | NUMBER | TEACHER | 1 GR | 1 C1 | 1 C2 | 2 GR | 2 C1 | 2 C2 | MID-YEAR EX | MID-YEAR AV | 3 GR | 3 C1 | 3 C2 | 4 GR | 4 C1 | 4 C2 | FIN AV | FINAL EX | FINAL AV | COURSE CREDIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NGL.SH I  10 | 99- 1 | DUTREMBLE | D+ | 7 | 5 | F | 7 | 6 | B+ | F | | | | | | | | | | |
| N. MATH I | 347- 2 | YEATON | D- | 5 | 5 | F | 7 | 7 | E | F | | | | | | | | | | |
| ) & INV SCIENCE | 443- 1 | MALTAISE | D- | 8 | 5 | C | 4 | 6 | C+ | C | | | | | | | | | | |
| NTRO INDUST ART | 642- 2 | MULLETT | F | 9 | 6 | F | | | 6 | F | | | | | | | | | | |
| JSIC APPREC | 811- 2 | WOODWARD | F | 7 | 8 | D- | 2 | 4 | D+ | D- | | | | | | | | | | |
| E I | 741-13 | MORIN | P | 6 | 5 | P | 3 | 4 | D+ | P | | | | | | | | | | |

DAYS

| ABS | TAR | DIS | ABS | TAR | DIS | ABS | TAR | DIS | ABS | TAR | DIS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 3 | | 4 | 3 | | | | | | | | CUR YR CRDS:   0.000 |
| | | | | | | | | | | | | CAREER CRDS:   0.000 |

******************** GRADE SCALE ********************

| A+ = 98-100 | B- = 85-87 | D  = 72-73 |
| 95-97 | C+ = 82-84 | D- = 70-71 |
| 93-94 | C  = 79-81 | F  = BELOW 70 |
| B+ = 90-92 | C- = 76-78 | |
| B  = 88-89 | D+ = 74-75 | |

W = WITHDREW          P = PASS
M = MEDICAL           I = INCOMPLETE

******************** COMMENT ********************

COMMENT C1                          COMMENT C2
1  EXCELLENT ATTITUDE IN CLASS        INDICATES DAYS ABSENT FROM CLASS
2  WORK IMPROVED THIS QUARTER
3  DOES COMMENDABLE WORK
4  ATTITUDE IN CLASS HAS IMPROVED
5  HOMEWORK ASSIGNMENTS NOT COMPLETE
6  ABSENCES INTERFERE WITH PROGRESS
7  LOW TEST AND QUIZ SCORES
8  POOR ATTITUDE IN CLASS
9  A CONFERENCE IS REQUESTED

0031

HALL00008248



ALL                  CHARLES       89241        THORNTON ACADEMY

PREVIOUS CREDITS:    2.000

| COURSE NAME | NUMBER | TEACHER | 1 | | | 2 | | | MID YEAR | | 3 | | | 4 | | | FINAL | | COURSE |
| | | | GR | C1 | C2 | GR | C1 | C2 | EX | AV | GR | C1 | C2 | GR | C1 | C2 | AV | EX | AV | CREDIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NGLISH I A | 97- 1 | NADEAU S | YRI | 7 | | | | | | | | | | | | | | | | |
| HYSICAL SCIENCE | 442- 2 | MORRISON | YRD | | 6 | | | | | | | | | | | | | | | |
| E II LAB | 932- 6 | STROMME | YRP | | | | | | | | | | | | | | | | | |

DAYS

| ABS TAR DIS | ABS TAR DIS | ABS TAR DIS | ABS TAR DIS | CUR YR CRDS: | 0.000 |
|---|---|---|---|---|---|
| | | | | CAREER CRDS: | 2.000 |

```
************************** GRADE SCALE ******************************
A+ = 98-100            B- = 85-87              D  = 72-73
     95-97             C+ = 82-84              D- = 70-71
     93-94             C  = 79-81              F  = BELOW 70
B+ = 90-92             C- = 76-78
B  = 88-89             D+ = 74-75
     W = WITHDREW              P = PASS
     M = MEDICAL               I = INCOMPLETE
****************************** COMMENT ******************************
     COMMENT C1                            COMMENT C2
1    EXCELLENT ATTITUDE IN CLASS        INDICATES DAYS ABSENT FROM CLASS
2    WORK IMPROVED THIS QUARTER
3    DOES COMMENDABLE WORK
4    ATTITUDE IN CLASS HAS IMPROVED
5    HOMEWORK ASSIGNMENTS NOT COMPLETE
6    ABSENCES INTERFERE WITH PROGRESS
7    LOW TEST AND QUIZ SCORES
8    POOR ATTITUDE IN CLASS
9    A CONFERENCE IS REQUESTED
```

0032

HALL00008249

IFCD 00028193
Ex.008 Page 258 of 423
Case 4:21-cv-00801-BCW    Document 70-16    Filed 04/29/24    Page 253 of 423

Charlie Hall          Testing Results          10/24/8-

Peabody Individual Achievement Test
   Math                               4.9
   Reading Recognition       12.9
   Reading Comprehension    9.5
   Spelling                     4.4
   General Information     10.5
     Total Test             6.4

Woodcock Reading Mastery Test
   Letter Identification    12.9
   Word Identification     9.9
   Word Attack          12.9
   Word Comprehension   2.5 (analogies)
   Passage Comprehension  5.4
     Total Reading      6.8

Key Math   54

0093

HALL00008250

<u>THORNTON ACADEMY ACADEMIC STATUS REPORT</u>

Dear Parent or Guardian:

This is to inform you of your child's academic status mid-way through the quarter. If you have any questions regarding the contents of this report, please do not hesitate to contact the school.

Student _Chuck Hall_     Date _12/13/85_

Course _English I_     Quarter _2_

Approximate Grade _F_     Working to potential_____

More effort needed _✓_     Excellent attendance_____

In danger of failure due to excessive absences_____

Conference requested by the teacher_____

Teacher Comments:

_Chuck has 3 missing grades. Chuck also lost his book weeks ago and will to pay for it. He has been using a spare book from the class because he says he can't get the money._

_____ Teacher's signature

To Parent(s) or Guardian(s):

Please sign and return to the issuing teachers.

Home Phone_____

_____Please check if a personal conference is requested.

Parent Comments:

_____ Signature

HALL00008251

0034

IFCD 00028195
Case 4:21-cv-03001-BCW    Document 70-16    Filed 04/29/24    Page 255 of 423
Ex.C page 255 of 423

THORNTON ACADEMY ACADEMIC STATUS REPORT

Dear Parent or Guardian:

This is to inform you of your child's academic status 'd-way through the quarter. If you have any questions /garding the contents of this report, please do not hesitate to contact the school.

Student __Chuck Hall__      Date __12/15/85__

Course __English I__      Quarter __2__

Approximate Grade __E__      Working to potential_____

More effort needed __✓__      Excellent attendance_____

In danger of failure due to excessive absences_____

Conference requested by the teacher_____

Teacher Comments:

_Chuck has 3 missing grades. Chuck also lost his book weeks ago and needs to pay for it. He has been using a spare book from the class because he says he_

_and get the money_      __Susan E. Patinotes__
                           Teacher's signature

To Parent(s) or Guardian(s):

Please sign and return to the issuing teachers.

Home Phone_____

_____Please check if a personal conference is requested.

Parent Comments:


_____
            Parent Signature


0025

HALL00008252

<u>THORNTON ACADEMY ACADEMIC STATUS REPORT</u>

Dear Parent or Guardian:

    This is to inform you of your child's academic status mid-way through the quarter. If you have any questions regarding the contents of this report, please do not hesitate to contact the school.

Student _Chuck Hall_    Date _12/15/85_

Course _English I_    Quarter _2_

Approximate Grade _E_    Working to potential _____

More effort needed _✓_    Excellent attendance _____

In danger of failure due to excessive absences _____

Conference requested by the teacher _____

Teacher Comments:

_Chuck has 3 missing grades. Chuck also lost his book weeks ago and need to pay for it. He has been using a spare book from the class because he says he can't get the money_

_____ Teacher's signature

To Parent(s) or Guardian(s):

    Please sign and return to the issuing teachers.

Home Phone _____

_____Please check if a personal conference is requested.

Parent Comments:

_____
Parent Signature

0036

HALL00008253



THORNTON ACADEMY

PREVIOUS CREDITS: 0.000

| COURSE NAME | NUMBER | TEACHER | 1 | | | 2 | | | MID-YEAR | | 3 | | | 4 | | | FINAL | | COURSE CREDIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | GR | C1 | C2 | GR | C1 | C2 | EX | AV | GR | C1 | C2 | GR | C1 | C2 | MY | EX | AV |
| ENGLISH I 10 | 99- 1 | DUTREMBLE | YRD+ | 7 | 5F | | 7 | AB+F | F | | 81CF | | 81CF | F | F | | | | |
| GEN MATH | 34- 3 | EATON | YRD | | 5F5 | | | 7 | | F | 5 | 7 | 6F | 5 | 7 | | | | |
| ID & INV SCIENCE | 443- 1 | MALTAISE | YRD- | 8 | 5C | | 4 | 6C+C | C | 4 | 7D- | | | 6D-D-D- | 1.000 |
| CNTPY INDUS ART | 842- 2 | MULLEN | | | 3 | 6F5 | | | 7 | 5 | 7 | 6B | 5 | 6C+C+D | 1.000 |
| MUSIC APPREC | 811- 2 | WOODWARD | YRF | 7 | 8D- | 2 | 4D+D-D- | | 7F | 7 | F | F | | |
| HEALTH | 960- 1 | BOVIE | S | | | | | | | | 7 | 8C-F | | | | |
| P E I | 941-13 | MORIN | YRP | 3 | 5P | 3 | 4D+P | | | | | | | | | W | |

DAYS

| ABS TAR DIS | ABS TAR DIS | ABS TAR DIS | ABS TAR DIS | |
|---|---|---|---|---|
| 3  3 | 4  3 | 6  6  2 | 3  4 | CUR YR CRDS:  2.000 |
| | | | | CAREER CRDS:  2.000 |

*************************** GRADE SCALE ***************************

```
A+  = 98-100            B-  = 85-87          D   = 72-73
A   = 95-97            C+  = 82-84          D-  = 70-71
    93-94             C   = 79-81          F   = BELOW 70
    90-92             C-  = 76-78
B   = 88-89            D+  = 74-75
    W = WITHDREW                    P = PASS
    M = MEDICAL                     I = INCOMPLETE
```

*************************** COMMENT ***************************

COMMENT C1

1  EXCELLENT ATTITUDE IN CLASS
2  WORK IMPROVED THIS QUARTER
3  DOES COMMENDABLE WORK
4  ATTITUDE IN CLASS HAS IMPROVED
5  HOMEWORK ASSIGNMENTS NOT COMPLETE
6  ABSENCES INTERFERE WITH PROGRESS
7  LOW TEST AND QUIZ SCORES
8  POOR ATTITUDE IN CLASS
9  A CONFERENCE IS REQUESTED

COMMENT C2
INDICATES DAYS ABSENT FROM CLASS

0037

HALL00008254



**THORNTON ACADEMY**
SACO, MAINE

Bernard D. LaPlante
Submaster

February 27, 1986

Mr. and Mrs. Charles Hall
RFD #2, Box 582
Saco, Maine 04072

Dear Mr. and Mrs. Hall,

This is to inform you that Chuck will be in In School Suspension on Friday, February 28 for cutting an assigned detention.

If you have any questions concerning this matter, please feel free to contact the school and request to speak with Mr. LaPlante.

Respectfully,

Bernard D. LaPlante
Assistant Headmaster

BDL/ljw

0038

HALL00008255



HALL   CHARLES          89241                                    THORNTON ACADEMY

1986/87

(CLASS OF 1990)



| PERIODS BGN | END | SEM | COURSE DESCRIPTION | ROOM | DAYS SCHEDULED | TEACHER | COURSE NO. | SEC. | CREDITS |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | RESOURCE MATH I | 33 | M T W R F | CRETARO | | | 9-4-86 |
| 2 | 2 | | TUTORING | 33 | M T W R F | WILLETT | | | |
| 3 | 3 | S1 | P E I | 3000 | M T W R F | STROMME | | | 9-4-86 |
| 3 | 3 | S2 | HEALTH | 55 | M T W R F | BOWIE | | | |
| 4 | 4 | | INTRO INDUST. ART | 76 | M T W R F | GRAY | | | |
| 5 | 5 | | PHYSICAL SCIENCE | 56 | M T W R F | MORRISON | | | |
| 6 | 6 | S1 | FUND/DESIGN | 2 | M T W R F | MERRY | | | |
| 6 | 6 | S2 | STUDY HALL | 45 | M T W R F | JEWETT | | | |
| 7 | 7 | | ENGLISH I | 45 | M T W R F | NADEAU, S. | | | |
| 1 | 1 | S1 | PE I | 3000 | M T W R F | STROMME | | | 9-4-86 |
| 3 | 3 | S1 | Res Math I | 33 | M T W R F | CRETARO | | | 9-4-86 |

HALLC  08256

Ex. 15 Page 216 of 423    Case 4:16-cv-02801-BCW    Document 70-16    Filed 04/29/24

Student: Charles Hall    School: Thornton Academy    DOB:

Service Provider: Dr. Stanley Payson    Statement of Goal: Counseling

| Diagnostic and/or Pre-Post Test Information | Instructional Objectives (Conditions-Behaviors-Criteria) | Evaluation Procedures | Date of Program Review 1986/87 Progress towards objectives |
|---|---|---|---|
| | 1. To improve academic performance. | a) Monitor school performance - teacher report of classroom performance and assignment completion. | |
| | 2. To improve social adjustment. | b) Monitor school attendance. | |
| | | c) Encourage vocational interests. | |
| | 3. To improve family relationships. | d) Encourage increased participation in organized social activities - sports, clubs, etc. | |
| | 4. To improve emotional adjustment. | e) Encourage extra curricular interests, hobbies, work, etc. | |
| | | f) Encourage age appropriate socialization with peers. | |
| | | g) Work on family structure communications through parent contact. | |
| | | h) Encourage development of sense of responsibility, and personal problem solving - Skills through supportive counseling. | |

HALL 008257



# THORNTON ACADEMY
SACO, MAINE

Bernard D. LaPlante
Submaster

March 17, 1986

Mr. and Mrs. Charles Hall
RFD #2, Box 582
Saco, Maine 04072

Dear Mr. and Mrs. Hall,

This is to inform you that Chuck will be in In School Suspension on Tuesday, March 18 for not serving an assigned detention on Friday, March 14.

If you have any questions concerning this matter, please feel free to contact the school and request to speak with Mr. LaPlante.

Respectfully

Bernard D. LaPlante
Assistant Headmaster

BDL/ljw

0041

HALL00008258



IFCD 00028202



**THORNTON ACADEMY**
SACO, MAINE

Bernard D. LaPlante
Submaster

April 7, 1986

Mr. and Mrs. Charles Hall
RFD #2, Box 582
Saco, Maine 04072

Dear Mr. and Mrs. Hall,

This is to inform you that Chuck will be in In School Suspension on Tuesday, April 8 for cutting an assigned detention and not attending period six class.

If you have any questions concerning this matter, please feel free to contact the school and request to speak with Mr. LaPlante.

Respectfully,

Bernard D. LaPlante
Assistant Headmaster

BDL/ljw

0042

HALL00008259



NEW ENGLAND
ASSOCIATION
OF SCHOOLS
AND COLLEGES



**THORNTON ACADEMY**
SACO, MAINE

JAMES A. JORTBERG
HEADMASTER

April 16, 1986

Mr. and Mrs. Charles Hall
Jenkins Road
Saco, Maine 04072

Dear Mr. and Mrs. Hall,

This is to inform you that Chuck will be suspended out of school on Thursday, April 17 for smoking in an unauthorized area.

Also, Michelle will be suspended out of school on Thursday, April 17 and Friday, April 18 for leaving campus without being appropriately dismissed on Tuesday, April 15 and did not show for the second time for an assigned detention. Additionally, she left campus again on Wednesday, April 16.

If you have any questions concerning this matter, please feel free to contact the school and request to speak with Mr. LaPlante.

Respectfully,

Bernard D. LaPlante
Assistant Headmaster

BDL/ljw



0043

HALL00008260

Department of Pupil Services    SCHOOL UNION #7    Pupil Evaluation Team Meeting
Saco, Maine

L.D. Assessment Report

Student _Charles Hall_ DOB _4/6/71_ SCHOOL _T.A._ DATE _6/16/8_

In accordance with State Regulations (101.6 Par. E and 101.7 Par. M), the PET has determined that the above-named child has a specific learning disability. The basis for this determination is as follows:

1. Achievement Level-child's actual achievement compared to his/her age and ability:

   Grade placement _9.9_ Achievement level _5.4_ Determined by _Key Math_

2. Discrepancy in Abilities-child's actual achievement in the area(s) checked below is/are widely variant (5.5 years) in relation to his/her overall ability and achievement:

   Oral expression _____        Basic reading skills _____
   Listening skills _____        Reading comprehension _____
   Comprehension _____           Math calculation skills _✓_
   Written expression _____       Math reasoning skills _✓_
   Spelling _____

3. Elimination of Other Factors-the Team has determined that the discrepancies noted above are _not_ primarily the results of visual, hearing, or motor handicaps; emotional disturbance; _or_ environmental, cultural, or economic disadvantage.

4. Observation of Academic Functioning-behaviors relevant to this child's determined disability have been noted by a person qualified to conduct such an evaluation. Evidence of this is included in the Educational Evaluation Report.

The PET does not feel that this child's discrepancy between achievement and demonstrated ability is correctable without the Special Education Program recommended in the IEP to which this report is attached.

As a Team member, I certify that this report reflects my conclusions:

| Signature | Position | Date | Signature | Position | Date |
|---|---|---|---|---|---|
| R. Cretaro | L.D. Teacher | 6/16/86 | Michael King | T.A. | 6/16/86 |
| L.L. Spinen | Spec. Services Coord. | 6/16/86 | | | |
| Terry Denova R.N. | School Nurse | 6/16/86 | David Maltais | Science | Jun 16/8 |
| Phil Beaumont | | 6/16/86 | Deborah Yeaton | Math | 6/16/8 |
| | | | Dorothy L. Hall | | 6/16/86 |
| JBeaudry | English | 6/16/86 | Charles V. Hall | | 6/16/86 |
| | | | C. Sabo | L.D. | 6/16/86 |

As a Team member I certify that this report _does_ _not_ reflect my opinion:

| Signature | Position | Date | Statement of conclusion regarding Disagreement with report |
|---|---|---|---|
| | | | |

HALL00008261

SACO/DAYTON/THORNTON

Saco, Maine

July 16, 1986
Date

CHARLES HALL
Student

Mr. and Mrs. Charles Hall
Jenkins Road
Saco, Maine    04072

Dear Mr. and Mrs. Hall:

I have reviewed your child's Educational Program (Form C) of the Pupil Evaluation Team (PET), and as required to, by Law (101.2, Par. C & E), and I have made the following decision:

X   1.   APPROVE the services to be provided in addition to services and activities normally provided to regular students and as necessary in order for your child to benefit from his or her educational experience.

    2.   DISAPPROVE the services to be provided for the following reason(s):

Please find enclosed a copy of your child's educational program and, on the reverse side of this page, a copy of your rights regarding the decision.

If we do not hear to the contrary, we assume that you have read and understand this decision and your rights and do not object to the decision of your school with regard to your child. If you have any questions, please contact your child's principal or the Coordinator of Special Services, telephone 284-4505.

Sincerely,

Howard L. Cushman
Superintendent of Schools

HLC/ns
cc:   file

0045

HALL00008262

SCHOOL UNION NUMBER 7
SACO AND DAYTON
Tasker Street
SACO, MAINE 04072
Telephone
284-4505

Howard L. Cushman
Superintendent

Lawrence L. Spencer
Special Services Coordinat

July 17, 1986

Christopher Littlefield
Vocational Rehabilitation
121 Main Street
Biddeford, ME 04005

RE: Charles Hall
DOB: 4/6/71

Dear Chris:

The Pupil Evaluation Team (PET) at Thornton Academy has recently recommended a vocational evaluation for Charles. Charles is identified as educationally handicapped in the areas of learning disabilities and emotional functioning. He receives resource room instruction for math, tutorial assistance in other academic areas and group counseling with the school social worker. Enclosed is a copy of the PET recommendation and recent educational and psychological tests results.

Please advise me if Charles is an appropriate referral for your office to assist with obtaining a vocational assessment.

Thank you for your attention and consideration.

Sincerely,

Lawrence L. Spencer
Special Services Coordinator

LLS/jg

Enclosure

cc Mr. & Mrs. Charles Hall
Richard Beaumont

0046

HALL00008263

R.F.D. 2 Box 582
Saco, Maine 04072
May 9th 1986

Dear Mr. Spencer,

We are writing you concerning Charles M. ( 9th grade) and Michelle L.(10th) grade Hall's poor performance at Thornton Academy. We did not expect miracles but the progress they are making will not even barely prepare them for the hi-tech society we now live in.

In this regard we are formally requesting an independent evaluation for each of them. In the hope it will pinpoint the cause of two apparently average teen agers totally missing out of a high school education.

We would appreciate hearing from you in the near future concerning this matter.

Yours Truly
Mr. & Mrs Charles V. Hall
Mr & Mrs Charles V. Hall

Copies sent to:
Thornton Academy
Advocates for the Developmentally Disabled

0047

HALL00008264

SACO/DAYTON/THORNTON

Date: JUNE 16, 1986

PUPIL EVALUATION TEAM MEETING
and
INDIVIDUAL EDUCATIONAL PROGRAM

Student: CHARLES HALL                    School: THORNTON ACADEMY

Birthdate: 4-6-71          Age: 15          Sex: M          Grade: 9

Teacher(s): NA

Parent/Guardian: Mr. & Mrs. Charles Hall

Address: Jenkins Road, Saco, ME 04072          Telephone #: 2-1844

PET MEMBERSHIP (names)

Administrator: RICHARD BEAUMONT          Resource Teacher: R. CRETARO

Guidance Director: Richard Beaumont          Speech Therapist: ___

Parent/Guardian: Mr. & Mrs. Hall          Social Worker: ___

Teacher(s): Ms. Venton - Math; Mr. Bowie. Other: Mrs. Donovan-nurse

Health; Mr. Beaudre - English;          Recorder: C. Sabo

Mr. Gray - IA; Mr. Mattais - Science          L. Spencer - Dir. Spec. Ed.

PARENT NOTIFICATION          B. LaPlante - Submaster

Was parent notified of the meeting in writing? ✓ Yes ___ No (explain) ___

PET MEETING NOTES (use reverse side if necessary, please review history, teacher observations and evaluation results)

To discuss progress & educ. program for next yr.

Bowie - Chuck won't pass for the year. Didn't do term paper. Low homework avg. (35) 1st term + 62 quiz avg.; 67 test avg. Did term paper 2nd sem. No effort put into course. No behav. probs. Capable of passing class. Will have to repeat next year.

LaPlante - has been suspended a number of times this year. (for skipping detentions & leaving

| Strengths | Concerns |
|---|---|
| Respectful of authority | Motivation |
| Honesty w/ authority | Skipping class attendance |
| | Social skills |
| Academic skills- | Organizational skills |
| reading | |
| grammar | Math skills |
| | Depression |
| Avg. cog. ability | Passive-resistance |
| Vocab. develop. | Unprepared for class |
| Parental involvement | Homework completion |

HALL00008265

0700

<u>PET NOTES</u> (continued . m Page 1

Campus w/o permission.) Chuck is honest w/me. May at times be an istigator in situations. Not disrespectful.

<u>Beaudre</u> - capable of doing the work. Would prob. be passing if he hadn't lost pts. for suspension. Some missing homework.

<u>Gray</u> - C avg. Chuck does his work. Has missed 11 days 2nd sem. Social skills good. No behav. probs.

<u>Mattais</u> - comes to class unprepared. Not a discipline prob. Often comes in late. Capable of doing work. Good written expression skills.

<u>Yeaton</u> - failing for qtr. However, seemed to put more effort into work & participated more. Came unprepared to class. Not hostile toward teacher. Discipline not a major prob. Admits when he does wrong. 57 test avg.; 77 quiz avg. Doesn't always do homework.

<u>Spencer</u> - Chuck has tested out to have avg. ability. Math weakness.

<u>PET RECOMMENDATIONS</u>: Psych. Eval. - depression; passive-aggres. socially isolated.

1.) Schedule in Rescurce Room for math.
( ) Schedule one period with tutor.
3.) If possible, Chuck will participate in group counseling. (to begin w/Dr. Payson)
4.) Repeat freshman year.
5.) Vocational assessment - to be coord. w/VR.

---

<u>GOALS</u> (set goals in priority)

Priority
1. <u>To improve math skills.</u>
2. <u>To improve organizational skills.</u>
3. <u>To improve social skills.</u> - Objectives to be developed in Fall 86.
4.
5.
6.

HALL00008266

-3-

IDENTIFICATION OF EDUCATIONAL HANDICAP:

| | |
|---|---|
| ___1. Vision | ___6. Physical Mobility Functions |
| ___2. Audition | ___7. Mental Development or Maturation |
| ___3. Speech & Language Functions | ___8. Other Health Functions(specify)_____ |
| ✓4. Specific Learning Functions | |
| ✓5. Behavior | ___9. Pregnancy or Temporary Traumatic Injury (specify)_____ |

TYPE OF SERVICE(S)

___1. Consultation: Student attends a regular class and receives special learning activities developed in consultation with the special education teacher.
✓2. Resource Room: Student is enrolled in a regular class and receives less than ½ of his/her instruction from a special education teacher.
___3. Composite Program: Student attends a special education class more than ½ of his/her instruction.
___4. Speech and Language Therapy.
___5. Social Work Services: The school social worker consults with the classroom teacher to develop a specific behavior management plan and/or provides individual or small group counseling for the student.
___6. Home or Hospital Bound Instruction.
___7. Out-of-District Placement-Day School.
___8. Out-of-District Placement- Residential School.
___9. Occupational Therapy.
___10. Physical Therapy.
✓11. Other: (Tutorial, Group Counseling)

OTHER INFORMATION REGARDING PLACEMENT

School: Thornton Academy     Key Contact Specialist: R. Cretan)

Anticipated Duration: 1 yr.     Triennial Review Date: 9/88

Next PET Meeting Date: Nov. 1986

SPECIAL TRANSPORTATION

✓ No     ___ Yes(explain): _____

SCHEDULE OF SERVICES (include lunch, recess and all specials)

Special Services

| Subject | Service Provider | Start Date | Hrs-Min/week | | Subject | Teacher | Start Date | Hrs-Min/week |
|---|---|---|---|---|---|---|---|---|
| math | Cretan | ~~9/5~~ 9/86 | 3.75 | | To | be scheduled | | |
| Tutorial | TBA | " | " | | w/ | mr. Beaumont | | |
| Grp.Couns. | TBA | " | TBA | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Regular Programming

Total Hrs-Min/wk for Special Services     Total Hrs-Min/wk for Regular Program

_____     _____

HALL00008267     0050

## SIGNATURE PAGE

The Pupil Evaluation Team members, whose signatures appear below, agree that the program described in this document is appropriate and the least restrictive for this student. Dissenting members of the Pupil Evaluation Team are required to submit a minority report to the Special Services Coordinator within ten (10) school days.

C. Sabo - LD Teacher

Sue Beaumont - Counselor

Perry Demers W. School Nurse

L. Brown

R. Cietaro - LD Teacher

## PARENTAL CONSENT TO IMPLEMENT THE IEP

### APPROVAL

I have read and agree with the provision of special education and related services, described in this Individual Education Program. I have been fully informed of all information relevant to this program and understand that the granting of consent is voluntary on my part and may be revoked in writing at any time.

_____     6/16/86
Signature of Parent/Guardian              Date

****************

### DISAPPROVAL

I have read and disagree with the provision of special education and related services described in this Individual Education Program. I understand that I have the right to request an impartial hearing to review the recommendations of the Pupil Evaluation Team. I also understand that the school has the same rights of due process which are available to me.

_____     _____
Signature of Parent/Guardian              Date

HALL00008268

0051



**THORNTON ACADEMY**
SACO, MAINE

September 17, 1986

Mr. and Mrs. Charles Hall
RFD #2, Box 582
Saco, Maine 04072

Dear Mr. and Mrs. Hall,

This is to inform you that Chuck will be in In School Suspension on Friday, September 19 for cutting detention.

If you have any questions concerning this matter, please feel free to contact the school and request to speak with Mr. LaPlante.

Respectfully,

Bernard D. LaPlante
Assistant Headmaster

BDL/ljw

0952

HALL00008269



NEW ENGLAND
ASSOCIATION
OF SCHOOLS
AND COLLEGES

SCHOOL UNION NUMBER 7
SACO AND DAYTON
Tasker Street
SACO, MAINE 04072
Telephone
284-4505

Howard L. Cushman
Superintendent

Lawrence L. Spencer
Special Services Coordinator

September 17, 1986

Mr. and Mrs. Charles Hall
Jenkins Road
Saco, Maine    04072

Dear Mr. and Mrs. Hall:

Recently, Mr. Christopher Littlefield from the Bureau of Vocational Rehabilitation informed me that Charles is not eligible for a vocational evaluation through his agency. The School Department still wants a vocational evaluation and will arrange for one to be conducted at Sweetser Children's Home. The vocational assessment process will help identify Charles' work interest and experiences, discover his vocational strengths and weaknesses, help identify his present level of vocational competency, and help identify performance capabilities related to the world of work. When the evaluation is completed, a Pupil Evaluation Team (PET) meeting will be scheduled to review the results and discuss any recommendations.

To initiate this process, I need you to sign the enclosed form and return it to me in the self-addressed stamped envelope.

Thank you for your cooperation. If you have any questions, please do not hesitate to call.

Sincerely,

Lawrence L. Spencer
Special Services Coordinator

LLS:ns
Enclosure

cc: Richard Beaumont
    Christopher Littlefield, Bureau of Vocational Rehabilitation

0053

HALL00008270

SACO/DAYTON/THORNTON

Date: November 3, 1986

PUPIL EVALUATION TEAM MEETING
and
INDIVIDUAL EDUCATIONAL PROGRAM

Student: CHARLES HALL          School: THORNTON ACADEMY

Birthdate: 4-6-71     Age: 15     Sex: M     Grade: 9

Teacher(s): MISS STROMME-MR. RUFF-MR. GRAY-MR. MORRISON-MRS. MERRY-MRS. NADEAU
MISS CRETARO

Parent/Guardian: Mr. & Mrs. Charles Hall

Address: R.F.D. #2-Box 582-Saco, ME 04072     Telephone #: 282-1844

PET MEMBERSHIP (names)

Administrator: Mr. Beaumont          Resource Teacher: R. Cretaro
Guidance Director: Mr. Richard Beaumont     Speech Therapist:
Parent/Guardian: Mr. Charles Hall     Social Worker:
Teacher(s): Mrs. Merry; Mr. Gray     Other: Mrs. Donovan-Nurse
Mr. Ruff, Mr. Morrison, Mr. Cretaro Recorder: Mr. LaPlante R. Cretaro
Mrs. Nadeau

PARENT NOTIFICATION

Was parent notified of the meeting in writing? ___✓___ Yes _____ No (explain) _____

PET MEETING NOTES (use reverse side if necessary, please review history, teacher observations and evaluation results)

Mr. Cretaro - B+ average in Math. Doing very well.

Mrs. Merry - Chuck was not passing before Mr. Ruff started to work with him. He has 3 incompletes right now as well as 3 assignments.

Mrs. Donovan - Chuck needs to have a physical for sports (basketball). Can have the physical here.

Mr. Ruff - Chuck has been doing better with his assignment.

| Strengths | Concerns |
|---|---|
| Polite | Basic Math skills Organization skills |

HALL00008271

Ms. Strange (note) attitude has improved. + controls temper better. Is passing.

Mr. Gray - Chuck has a major project due on Fri. He does not stay on task as well as he should. No problem in class

Mrs. Nadeau - He has improved but has not done his homework (8-0's out of 14 assignments). Gets conversation going with other students in class. He needs to make up some tests.

Mr. Morrison - If he is interested then he participates + if not then he talks with others. He is passing.

Mr. La Plante - he failed last year because social life was more important to him than his education. Cutting classes was also a problem in Oct.

PET RECOMMENDATIONS:

1) Continue program as is.

2) ~~Chuck~~ Needs to stay after school to do his make-up work-esp. in English + any other class. Mr. Ruff will follow-up to see that Chuck follows through.

3) Continue counseling with the school psychologist.

_____

GOALS (set goals in priority)

Priority
1. Math skills.
2. Organization skills.
3.
4.
5.
6.

HALL00008272

IDENTIFICATION OF EDUCATION. HANDICAP:

____1. Vision        ____6. Physical Mobility Functions
____2. Audition      ____7. Mental Development or Maturation
____3. Speech & Language Functions    ____8. Other Health Functions(specify)_____
✓4. Specific Learning Functions
✓5. Behavior

      ____9. Pregnancy or Temporary Traumatic Injury
          (specify)_____

TYPE OF SERVICE(S)

____1. Consultation: Student attends a regular class and receives special learning activities developed in consultation with the special education teacher.
✓2. Resource Room: Student is enrolled in a regular class and receives less than ½ of his/her instruction from a special education teacher.
____3. Composite Program: Student attends a special education class more than ½ of his/her instruction.
____4. Speech and Language Therapy.
____5. Social Work Services: The school social worker consults with the classroom teacher to develop a specific behavior management plan and/or provides individual or small group counseling for the student.
____6. Home or Hospital Bound Instruction.
____7. Out-of-District Placement-Day School.
____8. Out-of-District Placement- Residential School.
____9. Occupational Therapy.
____10. Physical Therapy.
✓11. Other: Counseling.

OTHER INFORMATION REGARDING PLACEMENT

hool: Thornton Academy    Key Contact Specialist: R. Cretaro

Anticipated Duration: 1 yr.    Triennial Review Date: 11/89

Next PET Meeting Date: 1/87

SPECIAL TRANSPORTATION

✓ No    ____Yes(explain): _____

SCHEDULE OF SERVICES (include lunch, recess and all specials)

Special Services

| Subject | Service Provider | Start Date | Hrs-Min/ week | | Subject | Teacher | Start Date | Hrs-Min/ week |
|---------|---------|-------|----------|---|---------|---------|-------|----------|
| Math Cretaro | Cretaro | 9/86 | 3.75 | | Eng. | Nadeau | 9/86 | 3.75 |
| Tutoring | Ruff | 9/86 | 3.75 | | T.A. | Gray | 9/86 | 3.75 |
| Counseling | Payson | 10/86 | 1 pd. | | Science | Morrison | 9/86 | 3.75 |
| | | | | | P.E. | Stromme | 9/86 | 3.75 |
| | | | | | Art | Merry | 9/86 | 3.75 |

tal Hrs-Min/wk for Special Services
7.55

Total Hrs-Min/wk for Regular Program
18.75

0056

— 4 —

SIGNATURE PAGE

The Pupil Evaluation Team members, whose signatures appear below, agree
that the program described in this document is appropriate and the least re-
strictive for this student. Dissenting members of the Pupil Evaluation Team
are required to submit a minority report to the Special Services Coordinator
within ten (10) school days.

R. Cretaro - L.D. teacher          Bernard Latente, Submaster

Meteor  English teacher            David J. Roff, Suto

J. Morison  Science teach          Perry Samondi, School Nurse

M. Guy                             Jennifer Menig, art

Dick Beaumont - Counselor.

PARENTAL CONSENT TO IMPLEMENT THE IEP

APPROVAL

I have read and agree with the provision of special education
and related services, described in this Individual Education Program.
I have been fully informed of all information relevant to this program
and understand that the granting of consent is voluntary on my part
and may be revoked in writing at any time.

_____Charles V. Hall_____          _____11/3/86_____
Signature of Parent/Guardian                Date

****************

DISAPPROVAL

I have read and disagree with the provision of special education
and related services described in this Individual Education Program. I
understand that I have the right to request an impartial hearing to re-
view the recommendations of the Pupil Evaluation Team. I also understand
that the school has the same rights of due process which are available
to me.

_____              _____
Signature of Parent/Guardian                Date

0057

HALL00008274



**THORNTON ACADEMY**
SACO, MAINE

BERNARD D. LaPLANTE
Submaster

November 4, 1986

Mr. and Mrs. Charles Hall
RFD #2, Box 582, Jenkins Road
Saco, Maine 04072

Dear Mr. and Mrs. Hall,

This is to inform you that Chuck will be in In School Suspension on Thursday, November 6 for not attending an office detention that was assigned for cutting Mrs. Nadeau's personal detention.

If you have any questions concerning this matter, please feel free to contact the school and request to speak with Mr. LaPlante.

Respectfully,

Bernard D. LaPlante
Submaster

BDL/ljw

0058

HALL00008275


NEW ENGLAND ASSOCIATION OF SCHOOLS AND COLLEGES

Saco, Maine

November 25, 1986
Date

CHARLES HALL
Student

Mr. and Mrs. Charles Hall
RFD #2, Box 582
Saco, Maine    04072

Dear  Mr. and Mrs. Hall:

I have reviewed your child's Educational Program (Form C) of the Pupil Eval-
uation Team (PET), and as required to, by Law (101.2, Par. C & E), and I have
made the following decision:

   X  1.  APPROVE the services to be provided in addition to services
and activities normally provided to regular students and as
necessary in order for your child to benefit from his or her
educational experience.

       2.  DISAPPROVE the services to be provided for the following reason(s):

Please find enclosed a copy of your child's educational program and, on the
reverse side of this page, a copy of your rights regarding the decision.

If we do not hear to the contrary, we assume that you have read and under-
stand this decision and your rights and do not object to the decision of your
school with regard to your child.  If you have any questions, please contact your
child's principal or the Coordinator of Special Services, telephone 284-4505.

Sincerely,

Howard L. Cushman
Superintendent of Schools

HLC/ ns
cc: file

0059

HALL00008276



BERNARD D. LaPLANTE
Submaster

**THORNTON ACADEMY**
SACO, MAINE

December 18, 1986

Mr. and Mrs. Charles Hall
RFD #2, Box 582, Jenkins Road
Saco, Maine 04072

Dear Mr. and Mrs. Hall,

This is to inform you that Chuck will be in In School Suspension on Monday, December 22 for leaving campus on December 17 without being appropriately dismissed.

If you have any questions concerning this matter, please feel free to contact the school and request to speak with Mr. LaPlante.

Respectfully,

Bernard D. LaPlante
Submaster

BDL/ljw

0060

HALL00008277



SACO/DAYTON/THORNTON

Saco, Maine

February 5, 1987
Date

CHARLES HALL
Student

Mr. and Mrs. Charles Hall
RFD #2, Box 582
Saco, Maine   04072

Dear Mr. and Mrs. Hall:

I have reviewed your child's Educational Program (Form C) of the Pupil Evaluation Team (PET), and as required to, by Law (101.2, Par. C & E), and I have made the following decision:

   X  1.  APPROVE the services to be provided in addition to services and activities normally provided to regular students and as necessary in order for your child to benefit from his or her educational experience.

      2.  DISAPPROVE the services to be provided for the following reason(s):

Please find enclosed a copy of your child's educational program and, on the reverse side of this page, a copy of your rights regarding the decision.

If we do not hear to the contrary, we assume that you have read and understand this decision and your rights and do not object to the decision of your school with regard to your child. If you have any questions, please contact your child's principal or the Coordinator of Special Services, telephone 284-4505.

Sincerely,

Howard L. Cushman
Superintendent of Schools

HLC/ns
cc: file

0061

HALL00008278

SACO/DAYTON/THORNTON

Date: January 13, 1987

PUPIL EVALUATION TEAM MEETING
and
INDIVIDUAL EDUCATIONAL PROGRAM

Student: CHARLES HALL                                School: THORNTON ACADEMY

Birthdate: 4-6-71              Age: 15           Sex: M         Grade: 9

Teacher(s): Miss Stromme-Mr. Ruff-Miss Cretaro-Mr. Gray-Mr. MOrrison-Mrs. Merry-
Mrs. Nadeau
Parent/Guardian: Mr. & Mrs. Charles Hall

Address: R.F.D. #2-Box 582-Saco, ME 04072              Telephone #: 282-1844

PET MEMBERSHIP (names)

Administrator: Mr. LaPlante/Mr. Stasio          Resource Teacher: R. Cretaro
Guidance Director: Richard Beaumont             Speech Therapist: ——
Parent/Guardian: Mr. Hall                       Social Worker: ——
Teacher(s): Mr. Ruff- tutor ; Mr. Morrison      Other: B.LaPlante-submaster
Mrs. Stromme - gym. Mrs. Merry; Science Recorder: C. Sabo
                            Art            * K. Olson - Sweetser (Vce.)
PARENT NOTIFICATION                                  Pre-Voc. Coord.
                                            ✓ S. Payson - school psych.
Was parent notified of the meeting in writing? ___ ✓ Yes ___ No (explain)
                                            * L. Spencer - Dir. of Spec. Ed.

PET MEETING NOTES (use reverse side if necessary, please review history, teacher observa-
tions and evaluation results)

Update from Last PET

| | Strengths | Concerns |
|---|---|---|
| Stromme - Chuck is doing well. Removes himself from group when angry. Socializes well. Participates. | Electrical/carpentry, interest   Problem solving skills Organizational skills | math skills Short term auditory memory |
| Morrison - has a test to make up. (Grade dependent on this) Some days does very well; other days can be a nuisance | | |
| Merry - started off well, but has been going down the past 3 wks. Owes 2 projects before end of qtr. | | |

HALL00008279

0062

PET NOTES (continued ...om Page 1)

___

Gray (written) - Chuck is doing very well - B+. All projects completed.

B___ feels Chuck's sister's behavior interferes with Chuck's behavior. He doesn't see same punishments for same behavior.

Payson - Chuck seems to feel better about himself lately.

Cretaro - B+ in math; Chuck is doing well. Progressing well on basic skills.

Olsen - interested in electricity, carpentry. Good physical skills, prob. solving skills, organic. skills. Chuck enjoyed hands on activities.

Weaknesses in math, spatial-tactile. Low self-esteem; prob. w/motivation. Instruc. need to be precise - should include "hands on".

PET RECOMMENDATIONS:

1.) Look into Biddeford Vocational program for next year, with the possibility of entering Co-op program senior year.

2.) Continue educational program with one period in Resource Room, one period with tutor and counseling with Dr. Payson.

___

GOALS (set goals in priority)

Priority
1. To improve basic math skills.
2. To maintain academic standards in mainstreamed classes
3.
4. To improve self-concept.
5.
6.

0063

HALL00008280

-3-

## IDENTIFICATION OF EDUCATIONAL HANDICAP:

1. Vision
2. Audition
3. Speech & Language Functions
4. Specific Learning Functions
5. Behavior

6. Physical Mobility Functions
7. Mental Development or Maturation
8. Other Health Functions(specify)

9. Pregnancy or Temporary Traumatic Injury (specify)

## TYPE OF SERVICE(S)

___ 1. Consultation: Student attends a regular class and receives special learning activities developed in consultation with the special education teacher.

✓ 2. Resource Room: Student is enrolled in a regular class and receives less than ½ of his/her instruction from a special education teacher.

___ 3. Self-Contained Program: Student attends a special education class more than 1/2 of his/her instruction.

___ 4. Speech and Language Therapy.

___ 5. Social Work Services: The school social worker consults with the classroom teacher to develop a specific behavior management plan and/or provides individual or small group counseling for the student.

___ 6. Home or Hospital Bound Instruction.

___ 7. Out-of-District Placement-Day School.

___ 8. Out-of-District Placement- Residential School.

___ 9. Occupational Therapy.

___ 10. Physical Therapy.

✓ 11. Other: (Tutorial) (Counseling)

## OTHER INFORMATION REGARDING PLACEMENT

School: Thornton Academy        Key Contact Specialist: R. Cretaro

Anticipated Duration: 1 yr.        Triennial Review Date: 11/89

Next PET Meeting Date: May 1987

## SPECIAL TRANSPORTATION

✓ No    ___ Yes(explain):

## SCHEDULE OF SERVICES (include lunch, recess and all specials)

| Special Services | | | | | Regular Programming | | | |
|---|---|---|---|---|---|---|---|---|
| Subject | Service Provider | Start Date | Hrs-Min/ week | | Subject | Teacher | Start Date | Hrs-Min/ week |
| Math | Cretaro | 9/86 | 3.75 | | Art | merry | 9/86 | 3.75 |
| Tutor | Ruff | " | " | | Gym | Stromme | " | " |
| | | | | | Science | morrison | " | " |
| | | | | | English | Nadeau | " | " |
| | | | | | IA | Gray | " | " |

Total Hrs-Min/wk for Special Services
7.50

Total Hrs-Min/wk for Regular Program
18.75

HALL00008281                    0064

IFCD 00028225

-4-

The Pupil Evaluation Team members, whose signatures appear below, agree that the program described in this document is appropriate and the least restrictive for this student. Dissenting members of the Pupil Evaluation Team are required to submit a minority report to the Special Services Coordinator within ten (10) school days.

PARENTAL CONSENT TO IMPLEMENT THE IEP

## APPROVAL

I have read and _agree_ with the provision of special education and related services, described in this Individual Education Program. I have been fully informed of all information relevant to this program and understand that the granting of consent is voluntary on my part and may be revoked in writing at any time.

X _____      _1-13-87_
Signature of Parent/Guardian              Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DISAPPROVAL

I have read and _disagree_ with the provision of special education and related services described in this Individual Education Program. I understand that I have the right to request an impartial hearing to review the recommendations of the Pupil Evaluation Team. I also understand that the school has the same rights of due process which are available to me.

_____      _____
Signature of Parent/Guardian              Date

0065

HALL00008282



BERNARD D. LAPLANTE
Submaster

**THORNTON ACADEMY**
SACO, MAINE

March 23, 1987

Mr. and Mrs. Charles Hall
RFD #2, Box 582, Jenkins Road
Saco, Maine 04072

Dear Mr. and Mrs. Hall,

This is to inform you that Chuck will be in In School Suspension on Tuesday, March 24 for cutting detention.

If you have any questions concerning this matter, please feel free to contact the school and request to speak with Mr. LaPlante.

Respectfully,

Bernard D. LaPlante
Submaster

BDL/ljw

0066

HALL00008283



-1-

Date: March 26, 1987

## PUPIL EVALUATION TEAM MEETING
### and
## INDIVIDUAL EDUCATIONAL PROGRAM

Student: CHARLES HALL                    School: THORNTON ACADEMY

Birthdate: 4-6-71        Age: 15        Sex: M     Grade: 9

Teacher(s): Mr. Ruff-Miss Cretaro-Mr. Bowie-Mr. Gray-Mr. Morrison-Mrs. Nadeau

Parent/Guardian: Mr. & Mrs. Charles Hall

Address: R.F.D. #2-Box 582-Saco, ME 04072          Telephone #: 282-1844

### PET MEMBERSHIP (names)

Administrator: Mr. Stasio/Mr. LaPlante        Resource Teacher: R. Cretaro
Guidance Director: Rich ard Beaumont          Speech Therapist: _____
Parent/Guardian: Mr. & Mrs. Hall              Social Worker: _____
Teacher(s): D. Ruff - tutor                   Other: Mrs. Donovan - nurse.
                                              Recorder: C. Sabo
                                              L. Spencer- Dir. of Spec. Ed.

### PARENT NOTIFICATION

Was parent notified of the meeting in writing? ✓ Yes _____ No (explain) _____

### PET MEETING NOTES (use reverse side if necessary, please review history, teacher observations and evaluation results)

Referred due to recent behavioral probs.

LaPlante - have seen Chuck this year for cutting classes, cutting detentions, leaving campus.
Discussed recent dealings with Chuck.

Ruff - feel something is bothering Chuck; however, he is getting his schoolwork done.

| Strengths | Concerns |
|---|---|
| | math skills |
| | Cutting classes/ detention: |

HALL00008284

0067

n .Uett/(written) - 1st 5 wks. of qtr. did nothing. Has not been in class lately.

morrison (written) - Chuck has missed last 12 classes. Received progress report. When in class; not attentive.

Cretaro (written) - 90 avg. (80 avg. w/ pts. subtracted for suspension). Works well in Resource Room.

Chuck brought into meeting. h. Spencer explained current situation to Chuck.

LaPlante - owes detention on 3/26. Owes one day ISS. Five day ISS can be served by alternate means w/ D. Ruff which will be documented.

PET RECOMMENDATIONS:

1.) Make application for out-of-district residential and day school program.
2.) Continue with current educational program at Thornton.
3.) Chuck, along with other necessary school personnel, will meet with IA teacher before re-entering IA class.
4) An emergency PET meeting will be held if Chuck does not follow educ./program (recommendations)
5.) Five day ISS can be served by alternate means w/ D. Ruff which will be documented.

GOALS (set goals in priority)

Priority
1. To improve math skills.
2. To maintain academic standards.
3. To improve class attendance.
4.
5.
6.

HALL00008285

0008

-3-

____ 1. Vision
____ 2. Audition
____ 3. Speech & Language Functions
__✓_ 4. Specific Learning Functions
__✓_ 5. Behavior

____ 6. Physical Mobility Functions
____ 7. Mental Development or Maturation
____ 8. Other Health Functions(specify)

____ 9. Pregnancy or Temporary Traumatic Injury (specify) _____

TYPE OF SERVICE(S)

____ 1. Consultation: Student attends a regular class and receives special learning activities developed in consultation with the special education teacher.

__✓_ 2. Resource Room: Student is enrolled in a regular class and receives less than ½ of his/her instruction from a special education teacher.

____ 3. Self-Contained Program: Student attends a special education class more than 1/2 of his/her instruction.

____ 4. Speech and Language Therapy.

____ 5. Social Work Services: The school social worker consults with the classroom teacher to develop a specific behavior management plan and/or provides individual or small group counseling for the student.

____ 6. Home or Hospital Bound Instruction.

____ 7. Out-of-District Placement-Day School.

____ 8. Out-of-District Placement- Residential School.

____ 9. Occupational Therapy.

____ 10. Physical Therapy.

__✓_ 11. Other: (Tutorial, Counseling)

OTHER INFORMATION REGARDING PLACEMENT

School: Thornton Academy     Key Contact Specialist: R. Cretaro

Anticipated Duration: see recom.     Triennial Review Date: 11/89

Next PET Meeting Date: See recommendations

SPECIAL TRANSPORTATION

__✓_ No     ____ Yes(explain): _____

SCHEDULE OF SERVICES (include lunch, recess and all specials)

Special Services

| Subject | Service Provider | Start Date | Hrs-Min/week | Subject | Teacher | Start Date | Hrs-Min/week |
|---|---|---|---|---|---|---|---|
| Math | Cretaro | 9/86 | 3.75 | Gym | Fromme | 9/86 | 3.75 |
| Tutor | Ruff | " | " | Science | Morrison | " | " |
| | | | | IA | Mullett | " | " |
| | | | | English | Nadeau | " | " |
| | | | | Health | Bowie | 1/87 | " |

Regular Programming

Total Hrs-Min/wk for Special Services
7.50

Total Hrs-Min/wk for Regular Program
18.75

HALLD0008286

The Pupil Evaluation Team members, whose signatures appear below, agree that the program described in this document is appropriate and the least restrictive for this student. Dissenting members of the Pupil Evaluation Team are required to submit a minority report to the Special Services Coordinator within ten (10) school days.

_(handwritten signatures)_

Bernard LaFlamme - Submaster

C. Sabo - LD Teacher

## PARENTAL CONSENT TO IMPLEMENT THE IEP

### APPROVAL

I have read and _agree_ with the provision of special education and related services, described in this Individual Education Program. I have been fully informed of all information relevant to this program and understand that the granting of consent is voluntary on my part and may be revoked in writing at any time.

_(handwritten signature)_                3/26/87
Signature of Parent/Guardian            Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DISAPPROVAL

I have read and _disagree_ with the provision of special education and related services described in this Individual Education Program. I understand that I have the right to request an impartial hearing to review the recommendations of the Pupil Evaluation Team. I also understand that the school has the same rights of due process which are available to me.

_____        _____
Signature of Parent/Guardian            Date

0070

HALL00008287

SACO/DAYTON/THORNTON

Date: 4/7/87

## PUPIL EVALUATION TEAM MEETING
and
## INDIVIDUAL EDUCATIONAL PROGRAM

Student: Charles Hall                          School: Thornton Academy

Birthdate: 4/6/71        Age: 16            Sex: M          Grade: 9

Teacher(s): Mr. Bowie, Ms. Cretaro, Mr. Morrison, Ms. Nadeau and Mr. Ruff

Parent/Guardian: Mr. and Mrs. Charles Hall

Address: RFD #2, Box 582, Saco, Maine                    Telephone #: 282-1844

PET MEMBERSHIP (names)

Administrator: Carl Stacio                     Resource Teacher: Caren Sabo

Guidance Director: Richard Beaumont            Speech Therapist:

Parent/Guardian: Mr. and Mrs. Hall             Social Worker:

Teacher(s): David Ruff                         Other: Stanley Payson, School Psychologist
                                                      Terry Donovan, School Nurse
                                               Recorder: Lawrence Spencer, Special Services
                                                                                   Coordinator
                                               Recorder:  Caren Sabo/Lawrence Spencer

PARENT NOTIFICATION

Was parent notified of the meeting in writing?  X   Yes _____ No (explain) _____

PET MEETING NOTES (use reverse side if necessary, please review history, teacher observations and evaluation results)

| | Strengths | Concerns |
|---|---|---|
| The PET last met on March 26, 1987, at which time Mr. LaPlante reviewed Chuck's behavioral and attendance problems. At the end of that meeting, Chuck had agreed to complete his in-school suspension and return to class. A five day suspension was going to be waived in lieu of an alternate plan to be worked out between Chuck and Mr. Ruff. Chuck showed improvement for approximately two days, and then began cutting class again. An emergency PET meeting was scheduled today to review his situation and try to develop additional appropriate PET recommendations. | | |
| Mr. Ruff reports that he and Chuck met with Mr. Mullett before he was to re-enter Industrial Arts class, but it was not a positive meeting. Mr. Beaumont notes that Chuck saw him and requested dropping Industrial Arts (one of the options presented to Chuck at the March 26 PET meeting). However, he did not follow up with any of the designated procedures. | | |

HALL00008288

0071

PET NOTES (continued from Page 1)

Charles' classroom teachers have no new information to report, because he has been present in their classes nly three or four days during the last four weeks.

Mr. and Mrs. Hall indicate that Chuck's behavior at home has also been escalating. He has stolen their car, run away from home and become more physically threatening. Many items around the house have been stolen, as well as holes punched in walls. Everything in their house is now locked up at all times. Chuck is currently on probation for previously stealing their car. A condition of his probation requires him to see a counselor at York County Counseling Services.

PET RECOMMENDATIONS:

1. Continue pursuit of out-of-district placement as recommended at the previous PET meeting on March 26. Both Sweetser Day School and Homestead will be considered.

2. Chuck will be removed from all mainstreamed classes and placed in the resource room and or with Mr. Ruff for the remainder of the school year.

3. Dr. Payson will contact Chuck's counselor at York County Counseling Services to coordinate treatment interventions.

4. Mr. and Mrs. Hall will contact Mr. Maslowski and advise him of the PET action.

5. In light of the severe crisis situation at home, Mr. and Mrs. Hall are encouraged to consider Jackson Brook Institute and/or Youth Alternatives as an immediate intervention for Chuck.

GOALS (set goals in priority)

Priority
1. _____
2. _____
3. _____
4. _____
5. _____
6. _____

0072

HALL00008289

IDENTIFICATION OF EDUCATIONAL HANDICAP:

____ 1. Vision
____ 2. Audition
____ 3. Speech & Language Functions
__✓__ 4. Specific Learning Functions
__✓__ 5. Behavior

____ 6. Physical Mobility Functions
____ 7. Mental Development or Maturation
____ 8. Other Health Functions (specify) ____
____ 9. Pregnancy or Temporary Traumatic Injury (specify) ____

## TYPE OF SERVICE(S)

____ 1. Consultation: Student attends a regular class and receives special learning activities developed in consultation with the special education teacher.
____ 2. Resource Room: Student is enrolled in a regular class and receives less than ½ of his/her instruction from a special education teacher.
__✓__ 3. Self-Contained Program: Student attends a special education class more than 1/2 of his/her instruction.
____ 4. Speech and Language Therapy.
____ 5. Social Work Services: The school social worker consults with the classroom teacher to develop a specific behavior management plan and/or provides individual or small group counseling for the student.
____ 6. Home or Hospital Bound Instruction.
____ 7. Out-of-District Placement-Day School.
____ 8. Out-of-District Placement- Residential School.
____ 9. Occupational Therapy.
____ 10. Physical Therapy.
__✓__ 11. Other: Counseling.

## OTHER INFORMATION REGARDING PLACEMENT

School: Thorton Academy          Key Contact Specialist: R. Cretaro/S Payse

Anticipated Duration: 3 months     Triennial Review Date: 11/89

Next PET Meeting Date: 6/87

## SPECIAL TRANSPORTATION

__✓__ No     ____ Yes(explain): _____

SCHEDULE OF SERVICES (include lunch, recess and all specials)

| Special Services | | | | | Regular Programming | | | |
|---|---|---|---|---|---|---|---|---|
| Subject | Service Provider | Start Date | Hrs-Min/week | | Subject | Teacher | Start Date | Hrs-Min week |
| All academics | Cretaro, Sabo, Keff | 4/87 | 34 pds. | | | | | |
| Counseling | Paysu | | 1 pd. | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Total Hrs-Min/wk for Special Services     Total Hrs-Min/wk for Regular Program
35 pds/wk.

HALL00008290

IFCD 00028234
Case 4:21-cv-03001-BCW    Document 70-16    Filed 04/29/24    Page 294 of 423
Ex. 135 Page 294 of 423

-4-

## SIGNATURE PAGE

The Pupil Evaluation Team members, whose signatures appear below, agree that the program described in this document is appropriate and the least restrictive for this student. Dissenting members of the Pupil Evaluation Team are required to submit a minority report to the Special Services Coordinator within ten (10) school days.

_Perry Benson R.N. School Nurse_ _____

_____ _____

_____ _____

_C. Sabo - AD Teacher_ _____

## PARENTAL CONSENT TO IMPLEMENT THE IEP

### APPROVAL

I have read and <u>agree</u> with the provision of special education and related services, described in this Individual Education Program. I have been fully informed of all information relevant to this program and understand that the granting of consent is voluntary on my part and may be revoked in writing at any time.

_L. Hall   Charles T. Hall_ _____ _4/7/87_ _____
Signature of Parent/Guardian           Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DISAPPROVAL

I have read and <u>disagree</u> with the provision of special education and related services described in this Individual Education Program. I understand that I have the right to request an impartial hearing to review the recommendations of the Pupil Evaluation Team. I also understand that the school has the same rights of due process which are available to me.

_____ _____
Signature of Parent/Guardian           Date

0074

HALL00008291

Charles Hall    Dates of Instruction: 9/86-6/8
   Individual Educational Program (I.E.P.)

Strengths                      Weaknesses
1. Academic skills        1. Math skills
2. Parental support
3. Respect for authority
4. Average cognitive ability
5. Reading + grammar

| 1. Goals: | Evaluation | Completed |
|---|---|---|
| 1. To improve math skills to the 6.5 grade level. | measures | |
| Objectives: | | |
| 1. Given the following topics on basic math skills, can complete the exercises with 80% accuracy: | Daily work | |
| A) Addition | " | |
| B) Subtraction | " | |
| C) Multiplication | " | |
| D) Division | " | |
| E) Fractions | " | |
| F) Decimals | " | |
| G) Variables + open sentences | " | 0075 |

HALL00008292

| H) Percents | Evaluation | Completed |
|---|---|---|
| 2. Given a mid-year exam on math skills, will obtain a score of 80. | measures Teacher made | |
| 3. Given a final exam on math skills, will obtain a score of 80. | " | |
| 4. Given the Key Math test will score at the 6.5 grade level or better. | Key Math | |
| | 0076 | |

HALL00008293

Discipline report from T.A.

STUDENT NAME: Chuck Hall

GRADE: Freshman

(Dave Ruff)
Mr. Beaumont

TELEPHONE # 2-1844

EMERGENCY # _____

| DATE | PROBLEM | CONSEQUENCE | COMMENTS |
|---|---|---|---|
| 9/17 | cut dets 9/15 | 1 day ISS - 9/19 - | ok |
| 9/22 | cut det Mr. Gray | * ALSO Disreport pd. 5,6 + 7 | |
| 9/23 | cut det. Mrs. Nadeau | * ALSO D'screport pd. 5, 6 + 7 | |
| 9/24 | truant | discipline proves handed to | |
| | "Mr. Ruff *" PET - 11/3/86 | | |
| 12/18 | left camp 12/17 | 1 day ISS - 12/22 | letter home! |
| 1/7 | left campus 1/6 | 3 days ISS - 1/8 + 1/9 + 1/12 | letter home! |
| 2/5/87 | lft Campus - | brought back by Officer Leuticco | |
| 3/11/87 | Thurs - 3/5 | not stay office det. | |
| | Fri - did not attend pd. 2, 4, + 7 classes | | |
| | Mon - did not attend classes!, but was here | | |
| | *' | 3 days susp from school 3/11,12,13 | |
| | * report a possible break in to Dan Mason | | |
| | at 9:00 on 3/13 | | |
| 3/17/87 | cut study | 1 hr. det | |
| 3/23/87 | Cut off det. on 3/19 | ISS - 1 day - 3/24 | |
| 3/24/87 | Cut off det on 3/23 | ISS - 3 days. 3/25, 26, +27 | |
| 3/26/87 | Cut off. det → Dave Ruff + Chuck - doc a commit. | | |
| | * if Chuck violates the commit - will | | |
| | serve his 5 days in ISS or | | |
| | | | 0077 |

HALL00008294

Pd. 1 Gym
Pd. 2 TUDR
Pd. 3 ___

Pd. 4 IA
<u>＝＝＝</u>

Pd. 5 Sci

Pd. 6 Res.

Pd. 7 ___

... make application for out of district
placement - day school, and residential ....
... return to period 4 - & meet with M. Mullett -



0078

HALL00008295

Chuck Hall -

3/16  absent

3/17  cut pd. 5 study

3/18  cut pd. 4  7 A
      Cut pd. 5  study

3/19  — Cut pd. 1 (P 5)
      in lib. instead.

      — Cut offire detention
        ISS on 3/24

3/23  — cut offire det —
      3 days ISS - 3/25, 26, 27

HALL00008296

0079

3/25 — in ISS

(Cut — 1 hr. office det)

3/26 — in ISS

Looking at
5 days. of
ISS!

HALL00008297

Chuck Hall - not stay
for det. Thurs 3/5 /A.
- not in pd. 4 Fri.5
- not in pd. 7 Fri. 3/6
{ not in pd. 3 Mon. 3/9
{ left campus -

- broke into M. Mullett's
Storage - rockets -
- Creating stories - said
Mike Paul pulled a knife
on him in P.E. on 3/10 -
Mike is in the hospital.

HALL00008298

0081

Student: __Charles Hall__     School: __Thornton Academy__     DOB: _____

Service Provider: __David Ruff__     Statement of Goal: __To improve study and organizational skills.__

| Diagnostic and/or Pre-Post Test Information | Instructional Objectives (Conditions-Behaviors-Criteria) | Evaluation Procedures | Date of Program Review 6/87 Progress towards objectives |
|---|---|---|---|
| Charles is showing improvement in his use of study time, but still has mental lapses \ daydreams. His attention span remains quite short. Sometimes Charles desires to quit without a full understanding of the current topic. | Chuck will be introduced to Outlining, Networking, and SQ3R tecniques, by February, 1987. | Records of the L.D. instructor. | |
| | Chuck will demonstrate a knowledge and understanding of networking, outlining, and SQ3R through regular classroom assignments by June, 1987. | Records of the L.D. instructor | |
| | Theough the use of these study tecniques, Chuck will increase his attention span to a point where he is able to concentrate without supervision upon an assigned task for an entire classroom period by June, 1987. | Rocords of the L.D. instructor. | |
| | | | |
| | | | |
| | | | |

HALLO 08299

Student: Charles Hall     School: Thornton Academy     DOB: _____

Service Provider: David Ruff     Statement of Goal: To maintain satisfactory school achievement

| Diagnostic and/or Pre-Post Test Information | Instructional Objectives (Conditions-Behaviors-Criteria) | Evaluation Procedures | Date of Program Review 6/87 Progress towards objectives |
|---|---|---|---|
| Charles failed all of his classes last year. He experienced diffi-culty with organization, attendance in school, and completion of assigned work. He has the ability to do the required work, and has shown renewed desire and interest in com-pleting satisfactory work during the first six weeks of the 1986-87 school year. | Charles will continue to accurately report assigned home work and complete and pass in all class assignments. | Bi-monthly progress reports from teachers | |
| | Charles will maintain grades of C or above in all academic subjects. | Quarterly report cards. | |
| | Charles will eliminate all unexcused absenses from school | Records of the Submaster | |
| | | | |
| | | | |
| | | | |

HALL008300

IFCD 00028244

May 8, 1987

Chuck does indeed currently have an
A in every class. He's doing great

David Ruf

0084

HALL00008301

Saco, Maine

May 18, 1987
Date

CHARLES HALL
Student

Mr. and Mrs. Charles Hall
RFD #2, Box 582
Saco, Maine    04072

Dear Mr. and Mrs. Hall:

I have reviewed your child's Educational Program (Form C) of the Pupil Evaluation Team (PET), and as required to, by Law (101.2, Par. C & E), and I have made the following decision:

___X___ 1.    APPROVE the services to be provided in addition to services and activities normally provided to regular students and as necessary in order for your child to benefit from his or her educational experience.

_____ 2.    DISAPPROVE the services to be provided for the following reason(s):

Please find enclosed a copy of your child's educational program and, on the reverse side of this page, a copy of your rights regarding the decision.

If we do not hear to the contrary, we assume that you have read and understand this decision and your rights and do not object to the decision of your school with regard to your child. If you have any questions, please contact your child's principal or the Coordinator of Special Services, telephone 284-4505.

Sincerely,

Howard L. Cushman
Superintendent of Schools

HLC/ns
cc: file

0085

HALL00008302

# NOTIFICATION OF RIGHTS

As the parent of a child, who may require, or who is receiving, special education and related services, you have the following rights.

1. The right to inspect, to review, and to obtain copies of all records relating to your child's education.

2. The right to receive prior written notice whenever the local educational agency proposes to initiate or to change the special education referral, evaluation and/or educational placement of your child, and before the initial preplacement evaluation of your child.

3. The right to question any matter, decision or recommendation relating to your child's referral, evaluation and/or educational placement.

4. The right to an independent education evaluation of your child at public expense if you disagree with the evaluation obtained by the local educational agency. However, the public agency may initiate a hearing (see #5 below) to show that its evaluation is appropriate, or it will have an evaluation conducted by a certified or licensed professional examiner who is independent of the local educational agency and it will be performed at no cost to you.

5. If you have any complaints regarding the referral, evaluation and/or educational placement of your child, you have the right to an impartial hearing if your complaints cannot be resolved to your satisfaction in any other way.

6. At this hearing, you have the right to be assisted by a person or persons of your choosing, and the right to present evidence and confront, cross-examine and compel the attendance of witnesses.

7. After this hearing you have the right to a written or electronic verbatim recording of such hearing. You have the right to obtain written findings of fact and decisions of the hearing at no cost.

8. When the decision of the due process hearing is not acceptable to you, you have the right to appeal this decision to the Superior Court or to a United States District Court.

9. During any of the hearing or appeal procedures, your child shall remain in the current educational program or, if applying for initial admission to the public school shall be placed in the public school program until all proceedings have been completed, unless you and the local school officials agree otherwise.

If you have any question about your rights, or wish to exercise them, please contact the Special Services Coordinator at 284-4505.

0086

HALL00008303

SCHOOL UNION NUMBER 7
SACO AND DAYTON
Tasker Street
SACO, MAINE 04072 ....
Telephone
284-4505

Howard L. Cushman
Superintendent

Lawrence L. Spencer
Special Services Coordinator

February 10, 1988

Mr. and Mrs. Charles Hall
RFD #2, Box 582
Saco, Maine    04072

Dear Mr. and Mrs. Hall:

     This letter is to inform you that the Pupil Evaluation Team (PET) is
meeting to review the educational program of your child, _Charles
_Hall_____, and determine if it should be continued and/or modified.
Attending this meeting will be appropriate Homestead staff and myself.

          The PET will meet on:          DATE _Monday, 2/29/88_____

                                         TIME _11:30 a.m._____

                                         PLACE _Homestead_____

     You have the legal right and are urged to attend and participate as a
member of the Pupil Evaluation Team during its discussion of your child's
educational needs.  A further description of your rights, as a parent or
guardian of a child receiving special education services, is on the reverse
side of this letter.

     If you are unable to attend, please contact me (telephone 284-4505 ), so
that this meeting can be rescheduled to a more mutually convenient time.

                                             Sincerely,

                                             Lawrence L. Spencer
                                             Special Services Coordinator

LLS:ns

cc: file
     Pamela Damon, Homestead Project; P. O. Box 663, Ellsworth, Me. 04605

                                                                0087

                         HALL00008304

# The Homestead Project, Inc.

P. O. BOX 663
ELLSWORTH, MAINE 04605

## INFORMATION FOR PARENTS & GUARDIANS

Persons admitted to Homestead have histories of disturbing behaviors and feelings, which require a strong program with considerable time and control to help bring about desired changes. The full cooperation and support of parents and guardians is essential to the successful completion of treatment. These pages contain some important information.

Seriously inadequate internal and/or external control oftentimes is an important part of the troubles of these youngsters. Therefore, many customary teenage freedoms are not allowed at Homestead until adequate controls are demonstrated. Please ask if you question anything about what we are doing with your child. We may angrily scold kids or affectionately praise them as their behavior merits. We demand responsibility of them. Somtimes it is necessary to physically restrain them from attacking others, hurting themselves, or running away. We do not beat youngsters, tear them down, or lock them up. If they break the law, we notify the police. The police may occasionally press charges.

The legal guardian of the Homestead member has full access to information about his or her treatment and status here, and is invited to call or write at any time to communicate with the member's Primary Counselor, A treatment Supervisor, or the Treatment Director. Parents and other family members who are not legal guardians have access to information only as permitted by the Treatment Director and the legal guardian. Each member has supervised access to all records and communications about him or herself.

Many Homestead members have a history of seriously disturbed functioning in their family. Often, the family has not had many positive experiences with an adolescent prior to Homestead admission. Thus, sometimes family members have mixed feelings about each other when a teenager comes to Homestead. As a member progresses through our four phase program, we increasingly encourage your participation in his or her Homestead experience. This may require time, travel to Homestead and expense on your part. We hope to facilitate a successful return to home or school for your child.

We need your cooperation in several ways. Our program is based on four phase system. Each phase has increasing responsibilities, and privileges. A manual describing the phase system is available.

One of the privileges of phase two is that a member may have family visits at Homestead. When you are invited for a social visit, every attempt will be made to have it be a positive experience for you and your family. However, sometimes a member has not earned the privilege of an unsupervised visit. A staff member, generally the member's primary counselor, will be with you during the visit, though should be as unobtrusive as possible. This is not the time to rehash negative experiences you and your child have had, but to have a relaxed enjoyable visit with your child. Social visits are not the time to discuss your child's treatment plan in depth.

0088

HALL00008305

In depth discussions of your child's progress and future goals in the educational, residential, and treatment program occur every three months when you are invited to Homestead to meet with your child, the primary counselor, the group therapist, and the education supervisor plus representatives of community agencies who assisted you in your child's admission to Homestead. This meeting will be arranged by a telephone call from Pam Jordan. She will discuss with you who will be invited to this meeting and will notify them. She will attempt to arrange a time that is convenient for all participants.

This is an important event in your child's Homestead experience. Even though it may require your taking time from work we urge you to support your child's efforts by attending case conferences. A sample of the format used for the case conference is enclosed. Please feel free to ask questions and share your observations with us. Treatment is a hard experience. It requires persons to face up to very painful and often shameful realizations about themselves. Youngsters can be expected to resist it intensely at times, and to try to avoid treatment. Sometimes they run away or try to persuade their guardians or families to let them escape treatment. These can be trying moments. Your child may complain that we are cruel, or don't care, or he or she may try to make you feel guilty for keeping him/her here. If such things are happening please contact us to arrange a meeting to confront and reclarify the issues. Don't get drawn into undermining the very treatment you worked so hard to find for your child.

Eventually your child will earn the privilege of home visits with you. Generally this happens on phase two. Usually family counseling begins around this time. Family counseling with our reentry coordinator allows us to work with you to learn of your concerns regarding your childs behavior at home and in your community and what you think needs to change before he/she returns home. Hopefully we can facilitate resolution of issues which were troublesome for you and your teenager. Sometimes we suggest that a family works with a family counselor in their community to provide continued support during the transition home.

During transition we will meet with you and school officials to make recommenda- tions for credit for educational material completed at Homestead. Though we do not give credits as a regular high school our recommendations regarding granting of credits are generally accepted. We are licensed by the Department of Education and Cultural Services as a Special Purpose School. We do not give report cards. Students must have 85% or better competency in a subject area for us to recommend credit. Often a school will give us books and course work for a member about to return home. Homestead teachers integrate this material in classroom work. The members begin to gain confi- dence that they can successfully return to a regular school program.

After a member returns home, there is a three month period before the Homestead graduation. In order to graduate, a member must show that he/she can live in the community without reverting to destructive behaviors. A graduation plan is developed by the member and his family with our reentry coordinator before the youngster leaves Homestead. If the member fulfills the plan, a festive graduation is held at Homestead to celebrate your child's success. This is the final good-bye to Homestead relationships. As with any graduation, there is sadness at saying good-bye to good friends, yet, happiness at the growth demonstrated by someone who can return to family and friends successfully.

We hope this answers some questions you have about Homestead. We understand that families often have mixed feelings about having a member go to a residential treatment facility. Please do not hesitate to contact us if you have further questions.

We share with you the same goal for your child's successful return to your family and community.

0089

HALL00008306

*Pat Bousquet*

HOMESTEAD TREATMENT PHILOSOPHY

Homestead Project, Inc.
Ellsworth, Maine 04605
207-667-2021

Homestead provides therapeutic treatment to adolescents who require more than the typical resources available through the educational system, the outpatient mental health system and the criminal justice system. Adolescents coming to Homestead for help, willingly or unwillingly, have serious behavior problems and improperly cope with many common life situations. While there is little unique about our treatment method, it represents a special combination of approaches and sequential experiences that have a flavor of their own.

It is well established that the power of the peer group is paramount with adolescents. It is also recognized that personality disorders (habitual inappropriate ways of interacting with others) are very difficult to change and that impersonal, primarily verbal and intellectual treatment approaches have little success. It is known as well that weekly outpatient therapy has minimal influence on the personality disordered. Thus, we have a program which focuses therapy on the power of the group process, which emphasizes practical behavior and emotional honesty as distinct from intellectual understanding, and which is residential.

Our goal is to accept young persons who are irresponsible in the practical aspects of living and/or social relationships, and who are dishonest with themselves and others at the emotional level, and to challenge and nourish them to grow into persons who can lead responsible and joyful lives.

The treatment approach is many faceted, but generally follows this pattern. First, we identify the particular ways in which an adolescent avoids experiencing his or her emotions, and/or avoids responsible expression of them. Examples of irresponsible expression are to get stoned, to blame others for one's problems, to lie, to steal, to run away, to attempt suicide, or to have assaultive outbursts. Second, we conceptualize the avoidance device and clearly state it to the adolescent and other community members. Each time the adolescent exhibits that behavior, we confront it with a realistic consequence of some sort. Third, in order to create situations in which some response is required, whether appropriate or inappropriate, we require of all community members that they accept responsibility for daily living and learning activities and for the straight expression of feelings. OUR METHOD IS NOT TO AVOID STRESS, BUT TO CREATE THAT KIND OF NATURAL STRESS WHICH PROVOKES A RESPONSE TO WHICH WE CAN; IN TURN, MAKE A THERAPEUTIC RESPONSE. A function of an irresponsible behavior pattern is that it masks the sense of weakness, inadequacy, and inferiority which some adolescents feel at a deeper level. Developing new responses to stress usually involves revealing such feelings, many times requiring huge personal risk. Thus, the fourth part of our treatment approach is to provide an environment in which risk taking is possible, that is, a physically and psychologically safe one. Neither loving support by itself nor direct confrontive challenge will suffice to bring about the important changes in life which our members need to make. It is a combination of the two which makes this possible.

Consistency is of paramount importance to our treatment approach. The way in which we follow through with daily program activities, treatment policies, and residential chores is critical to the development of responsible social living. The recruitment of residential staff who themselves exhibit emotional honesty, directness and realness and serve as role models for residents is crucial.

0090

HALL00008307

In one way or another it can be seen that most members of our community have been victims of poor life circumstances. While that may be an *explanation* for a persons current maladaptive behavior it can in no instance be taken as an *excuse*.

The flavor of our therapeutic environment is of great importance and there is no single word to describe it. It is humanistic, deeply interpersonal, reality-oriented, and earthy rather than sanitary. It is an environment in which everyone, staff and members alike, are encouraged to stick their necks out and take emotional risks. We know that if we play it safe we have very little chance of seriously affecting the lives of our members in a therapeutic way. We have to throw in all our energy if we are to be able to dislodge them from their ruts.

We practice a wide variety of specific therapeutic techniques within these overall goals and methods. These include reality therapy, gestalt therapy, bioenergenics, sensitivity training, psycho-drama, art therapy, family therapy, therapeutic approaches to school education, diet and wilderness camping, physical fitness, and in rare instances psychoactive medication.

Once major problems are overcome most residents will still have another large growing task to accomplish. Because of their history of disordered life most of them will be far behind what is suitable for their age in both academic and social development. We then have relatively receptive but empty young people who must be replenished and caught up.

During this latter period of treatment the emphasis is on remediating educational deficits, developing independent living skills for some, and/or vocational training. At the same time, we require greatly increased peer leadership roles and encourage gradual community reentry through part-time jobs and outside social activities. Discharge plans - job, school, residence - are actively developed during this period, to provide concrete goals to keep striving for and to combat the tendency to regress in treatment in order to remain in this safe environment.

We certainly do not expect that all problems are resolved at the time of graduation from Homestead. Rather, we aim to have taught the *means* of resolving problems, the process of building mutually supportive relationships, and the use of community resources.

0091

HALL00008308

**SCHOOL UNION NUMBER 7**
Saco and Dayton
Tasker Street
Saco, Maine 04072

Howard L. Cushman
Superintendent

July 17, 1987

Telephone
284-4505

Mr. and Mrs. Charles Hall
RFD #2, Box 582
Saco, Maine    04072

Dear Mr. and Mrs. Hall:

I am writing to follow up our telephone conversation and confirm Chuck's intake interview at Homestead. The appointment has been scheduled for 10:00 a.m. on Tuesday, July 21, 1987. I have other meetings previously scheduled for that day; and therefore, will be unable to attend.

Directions to Homestead are as follows: Take Interstate 95 to Bangor, then pick up Route 1A to Ellsworth. Approximately 24 miles from Bangor, you will then turn left onto Route 179 (it is a sharp left with a small convenience store on the corner). Go about 2 more miles, then turn left onto Route 180. Homestead is on your right approximately 1/2 mile on from that turn, look for the sign next to the road. If you get lost, please call Douglas Hauck, telephone 667-2021. Good Luck!

Sincerely,

Lawrence L. Spencer
Special Services Coordinator

LLS:ns

cc:   Douglas Hauck, Ed. Director
      The Homestead Project
      P. O. Box 663
      Ellsworth, Maine

0092

HALL00008309



## The Homestead Project

POST OFFICE BOX 663
ELLSWORTH, MAINE 04605
(207) 667-2021

July 30, 1987

Larry Spencer
Special Services Coordinator
School Union #7
Tasker Street
Saco, Maine  04072

Dear Larry:

We are planning on admitting Charles Hall at 11:30 a.m. on Monday, August 3, 1987.  We are still waiting for the DSM III diagnosis which is needed for our records.  Pat Bousquet, the Case Manager/Therapist, will be in contact with Chuck's family regarding the admission.

Thank you for your continuing assistance.

Sincerely,

Douglas Houck, Ed.D.
Executive Director

cc:  Pat Bousquet, Case Manager
     Mr. Charles Hall

0093

HALL00008310



② right now were watching a movie "National Lampons European Vaction" it's alright but i've seen many times so I'll wright and watch. Oh. bye the way "Wendedry November 25th" I'll be taking the bus home and I'll be getting off in Biddeford. That's if I make phase two. I think I will so when I get off the bus if it's before five I'll walk to the store but if it's after five I'll call and someone can after me

① mom                    Oct. 21st

What's up, My phase two review is a week from today. But next week were going for a three day camping trip. So I'll call Monday night or thursday night. Yesterday I reported three people for planning a Awol and they got discapline and run-watch for three day's. We also had two phase one's go Awol. Staff also feel that I'm doing Well.

HALLO 08311



④

be able to by
stuff and I'm going
to need some money
for my bos ride.
Tell Michelle that
I'll be down to
see her and I
love her. When
you wright next
please wright down
what the plans
are from wendsday
to Sonday morning
so I can tell past
what my plans
are and what
my goals for
this visit are.

③

this is going to take
for ever to get phase
two but when I
do I'll be able
to make one call
home then the
next week you
can call so on
and soforth. I'll
also be able to
go home once
a month so
hopefully I'll make
it. I can't wait to
see you. Could you
send five dollars
up because on the
camping trip. We'll

HALL 08312



⑤

Well that enough about me how are you? Have you given Sue the adress yet. Hopefully if we go see michelle I'll have time to see her and talk to her alone. I realy miss her I'll talk to people today to see if they want Bruno. This time I don't have to sneak around to smoke and I don't have to steal any thing because that's not the way to live and I want to change

⑥

my old behaviors. there's only about three more minute's but that's alright to I'll mail this out today and you should get it friday or saturday well gotta go

Love

Ya

Chuck

p.s. Don't forget to send up the agenda and Five love you

HALLO 08313

(7)

also tell
Michelle
coming
thanks gi
tell her
her. So
see you lo
don't forge
pray that
make phase
See's ya

Chica

HALL00008314

0097

HOMESTEAD PROJECT, INC.
P.O. BOX 663
ELLSWORTH, MAINE    04605

October 23, 1987

Dear Parent/Legal Guardian,

Just a note to let you know that Clinical, Education, and Residential Staff are taking the Homestead members camping at Cobscook Bay State Park in Washington County from October 27 thru October 29.

Pat Bousquet, Case Manager is the Trip Leader although many staff are participating in the planning and implementation of the trip.

Everyone is looking forward to the hiking, clam digging, and natural beauty available at Cobscook Bay.

Please call me, Brenda Simon, or Doug Houck if you have any questions regarding the trip.

Sincerely,

Sally L. Smith, LCSW
Director of Treatment

cc:  Master Files

0098

HALL00008315

Homestead Project, Inc.
P.O. Box 663
Ellsworth, Maine    04605

October 26, 1987

Mrs. Dorothy Hall
73 Jenkins Road
Saco, Maine    04072

Dear Mrs. Hall:

When Chuck  had his physical with Dr. Kipperman on September 4, 1987,, a flat, black mole approximately 3cm  was found  on the posterior surface of Chuck's right shoulder.  Dr. Kipperman asked me to  have it  evaluated by  a dermatologist.  This morning Dr. Thomas Watt in Bangor examined Chuck.

Dr. Watt's feeling is that the mole is probably safe at this time, but most likely is the type that will become cancerous with time.  Dr. Watt's recommended treatment is removal  and analysis. The  removal  would  be  done  in  the  doctor's office as an out patient procedure.  Under a local  anesthetic, a  shallow disc of skin would be removed.

Before  I  schedule  this  procedure, I would like a written statement from you either giving or denying your permission.

Please also enclose a  few  more  completed  insurance forms with your answer.  If you have any questions, please feel free to call me here at Homestead.

Sincerely,

Al Jenkins, LPN

c.c:    Sally L. Smith, Director of Treatment Services
        Chuck's Master File

AJ/jf

0099

HALL00008316

MEMBER: Charles Hall

DATE: 11/18/87

## MASTER TREATMENT PLAN

NOW ON PHASE: II  TREATMENT PLANNING CONFERENCE #_____

DATE OF ARRIVAL: 8/5/87  DATE OF BIRTH: 4/6/71

REASONS FOR REFERRAL:

1. History of criminal behavior -- currently on probation
2. History of passive/aggressive and manipulating behaviors
3. Poor peer interaction skills
4. Family stress related to adoption issue
5. Poor parent/child communication
6. Confusion over sense of self and sexual identity
7. Non-compliance with rules and authority

FINDINGS OF ASSESSMENT:

MENTAL HEALTH:

Charles has kept a low profile since admission, staying out of major trouble and learning the ropes. He had plans to go A.W.O.L. with other members, but was found out. He appears very sensitive to issues of family fighting, loss and abandonment, and parental alcohol use in Intensive Therapy Group. He is starting to use group therapy effectively.

EDUCATIONAL:

0100

HP - 1  11/87  PAGE 1
HOMESTEAD PROJECT, INC.  P.O. BOX 663  ELLSWORTH, MAINE  04605

HALL00008317

IFCD 00028261

MEMBER: CHARLES HALL

DATE: 11/16/87

## MASTER TREATMENT PLAN

NOW ON PHASE : II          TREATMENT PLANNING CONFERENCE #_____

DATE OF ARRIVAL: 6/5/87 DATE OF BIRTH: 4/6/71

REASONS FOR REFERRAL:

6 cd from 1.S.P.

FINDINGS OF ASSESSMENT:

MENTAL HEALTH:

EDUCATIONAL:

MEDICAL:

0101

CHAS. HALL PSYCHIATRIC: Check presents as a pleasant, pleasant 14 year old boy with a history of fighting the neighbors...

HP-1-09/87
HOMESTEAD PROJECT, INC. HALD0000B318 ELLSWORTH, MAINE, 9550

Case 4:21-cv-00201-BCW   Document 70-16   Filed 04/29/24   Page 323 of 423

IFCD 00028263

| .TE/ APR. | THERAPEUTIC ISSUES (NUMBER) | GOALS L=LONG/S=SHORT | TARGET DATE | SPECIFIC TREATMENT STRATEGY | STATUS | RE FA |
|---|---|---|---|---|---|---|
| /18/87 | 1. Criminal behavior (theft, property destruction) | L – Learn to get needs met in other healthier ways | 12 mos | 1. Immediate 3 Day Restriction Plan for any criminal behaviors/notify Probation Officer and look into pressing charges L.E. should focus on other ways to get needs met | Started | ALL |
| | | S – Eliminate criminal behaviors | 6 mos | 2. Discuss in Intensive Therapy Group | Started | CM |
| /18/87 | 2. Manipulation/Subtle intimidation of others and lying (seeing self as above the rules) | L – Learn that rules apply to him and others equally that he is not "better" | 12 mos | 1. 1 Day Restriction Plan for manipulation and/or intimidation. L.E. should focus on why rules apply to everyone and includes apology to victim | Started | ALL |
| | | | | 2. Discuss in Intensive Therapy Group | Started | CM |
| | | S – Eliminate manipulation and intimidation | 6 mos | | | |
| 7/18/87 | 3. Poor peer interaction skills | L – Learn ways to get along with others | 12 mos | 1. Encourage getting along during program, in school, etc. Give praise for co-operation | Started | AL |
| | | S – Eliminate fighting, antagonizing, etc. | 6 mos | 2. Discuss in Intensive Therapy Group | Started | CM |
| /18/87 | 4. Family stress related to adoption issue and poor parent/child communication | L – Resolve negative feelings | 12 mos | 1. Discuss in Intensive Therapy Group | Started | CM |
| | | | | 2. Use open house and other family contact to promote positive interaction | Started | AL |
| | | S – Begin to identify and talk about issues | 6 mos | 3. Use home visits to improve interaction | Phase II | CM fa |
| | | | | 4. Begin family counseling | Phase | CM fa |
| | | | | 5. Write up and discuss phone calls home in Intensive Therapy Group | Phase II | CM AL |
| /18/87 | 5. Confusion over sense of self and sexual identity | L – Gain sense of self and self-acceptance | 12 mos | 1. Discuss in Intensive Therapy Group | Started | CM |
| | | | | 2. Discuss in family counseling | Phase II | CM fa |
| | | S – Begin to identify and discuss issues | | | | |

3RD PAGE

HALL 08319

| DATE/ APR. | THERAPEUTIC ISSUES(NUMBER) | GOALS L=LONG/S=SHORT | TARGET DATE | SPECIFIC TREATMENT STRATEGY | STATUS | R P |
|---|---|---|---|---|---|---|
| 1/18/87 | 6. Non-compliance with rules and authority | L – Learn how to resolve differences in healthy ways S – Learn to accept staff authority | 12 mos 6 mos | 1. Minimum 1 Day Restriction Plan for non-compliance 2. Discuss in Intensive Therapy Group | Started Started | Al CM |
| 1/18/87 | 7. Inability to function in public school | L – Return to public school S – Attend classes here regularly | 12 mos 6 mos | Refer to I.E.P. | | He To |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

OJECTED TREATMENT/PLAN REVIEW CONFERENCE DATES: 2/88

RSONS TO BE INVITED: Parents
Probation Officer
School Personnel

RSONS PRESENT (NAME & TITLE):

REQUIRED SIGNATURES:

DIRECTOR OF TREATMENT SERVICES: _Paul Grabowsk_

CASE MANAGER/THERAPIST: _Patricia A. Bernstein_

EDUCATION SUPERVISOR: _Fred Ketchum Filed 1/28/8_

HOMESTEAD MEMBER: _Church M Hall_

LEGAL GUARDIAN: _Charles Hall   Dorothy L Hall_

PLACEMENT AGENCY: _____

HALL 08320

0103

MEMBER: Charles Hall
DATE: 11/18/87

BEHAVIOR MANAGEMENT HIERARCHY OF INTERVENTION (initial appropriate interventions to use and note any contraindications).

| | |
|---|---|
| PB | Request for Behavior Change |
| PB | Scolding |
| PB | Confrontation |
| PB | Fines |
| PB | Lines |
| PB | Essays |
| PB | Corner Time |
| PB | Early Beds |
| PB | Additional Chores |
| PB | Scrubbing |
| PB | Visual Reminders of Negative Behavior - with Clinical approval |
| PB | Restriction Table |
| PB | Communication Bans (Clinical Approval for more than 24 hours) |
| PB | Jumpsuit for Restriction (blue) - as needed |
| PB | Jumpsuit for Suicide Watch (red) |
| PB | Jumpsuit for Run Watch (blue) |
| PB | Moon Boots - as needed |
| PB | Privilege Bans |
| PB | Member - Initiated Isolation |
| PB | Staff - Initiated Isolation |
| PB | Floor Scrubbing Chore (walk through) |
| PB | Passive Physical Restraint |
| PB | Restriction Status |
| PB | Intensive Work Program |
| | Other (Specify) |

HALL00008321

0104

Homestead Project, Inc.
P.O. Box 663
Ellsworth, Maine   04605

February 18, 1988

Dear _Charles & Dorothy_ :

We are scheduling an extended home visit for our members
this coming Easter.  The members will be leaving Homestead at
around noon on Thursday, March 31, 1988, and arrive home later
that afternoon or evening.  They will be home on Good Friday,
April 1st, Saturday, April 2nd, and Sunday, April 3rd.  They
should come back to Homestead on Monday, April 4th.

It is expected that all of the members will be home on these
dates.  If some clinical reason should interfere with these
plans, I am requesting that the Case Manager let you and me know
as soon as possible. If there is a reason why you will not be
able to have your son or daughter home at this time, I wish to
request that you contact the Case Manager and provide the Case
Manager with a grandparent or other relative with whom your child
could visit during this period.

It is important that our young people have the opportunity
to spend some time with their loved ones.  Families are very
important, especially at holiday times.  If you should have any
questions or concerns about these plans, please call.

Thank you for your continuing work, effort, and support.

Sincerely,

Douglas W. Houck, Ed.D.
Executive Director

DWH/jmf

0105

HALL00008322

TREATMENT SUMMARY

Chuck Hall                                                          2/29/88

This report will identify the progress which Chuck has made in dealing with his treatment issues since his admission to Homestead on 8/5/87. Included will be treatment recommendations for the coming six months.

Issue #1:  Criminal Behavior (theft, property destruction)
Status:  The only problems in this area have been related to going AWOL on one occasion, and planning to run with other members a second time.  Staff members have had suspicions that Chuck could be involved in some unsolved thefts around the Lodge and at Ramsay Hall, but so far these suspicions are unsubstantiated.
Recommendation:  Continue present plan, since it is possible that Chuck is engaged in criminal behavior but hasn't yet been caught.

Issue #2:  Manipulation/Subtle Intimidation of Others (seeing himself as above
           the rules)
Status:  Chuck has had three incidents of manipulation since admission, most recently in early February.  This behavior is a primary treatment concern, since the attendant attitude of "I'll get whatever I want however I can" permeates most of Chuck's interactions.  The fact that he is extremely subtle and diffi- cult to pin down has made it hard for staff to address this issue.
Recommendation:  Modify treatment strategy #1 from one day restriction to three days restriction for instances of target behavior.  When Chuck is caught, the penalty must be severe enough for him to realize how serious this misbehavior is.

Issue #3:  Poor Peer Interaction Skills (threatening; antagonism; making hurtful,
           sarcastic comments to other members)
Status:  Chuck has spent time on restriction twice for threatening, and once for      making inappropriate comments.
Recommendation:  Add treatment strategy #3:  "Three day restriction plan for instances of target behaviors".  Add specifics, in parenthesis, to description of issue.

Issue #4:  Family Stress Related to Adoption
Status:  Chuck has done very little work in Intensive Therapy Group on this issue.  Although family visits have gone well thus far, Mr. and Mrs. Hall have been advised that including Chuck in family counseling is premature until he does some serious groundwork here first.  Write-ups of phone calls and home visits have been marginally adequate.
Recommendation:  Continue present plan.

Issue #5:  Confusion Over Sense of Self and Sexual Identity
Status:  Chuck has barely started to use Intensive Therapy Group to look at



**HOMESTEAD**   PO BOX 663   ELLSWORTH, MAINE 04605   207/667-2021

Sally L. Smith MSW, LCSW           David R. Bousquet M.ED          Brenda L. Simon BA, LSW
DIRECTOR OF TREATMENT              CASE MANAGER, THERAPIST         CASE MANAGER/AFTERCARE COORDINATOR

Mark Jones MA                      Karin Shearer MSW              Patricia A. Bousquet MSW, LMSW
CASE MANAGER, THERAPIST            CASE MANAGER, THERAPIST         CASE MANAGER, THERAPIST

0106

HALL00008323

α.

this issue. The problem can be seen most clearly when he follows others into negative behaviors or attitudes as a way of gaining acceptance, rather than thinking for himself.
Recommendation: Continue present plan.

Issue #6: Non-Compliance with Rules and Authority
Status: Chuck has been on restriction twice for outright non-compliance and once for "hands-on" behavior (aggressive "play" with roommates after lights out). He appears to have a significant problem following bedtime rules, often earning low-level consequences for his night time acting out. His compliance with staff direction often has a subtly disrespectful flavor.
Recommendation: Continue present plan, but add "verbal disrespect" to issue description and target behaviors earning minimum one day restriction plan. If disrespect is not blatant ("I don't feel like it", "I'll be there when I finish this" etc.) Chuck should earn an immediate one hour of I.W.P.. This will become intervention #3 on present plan. Intervention #4 will be added: breaking communication while on restriction = immediate one hour of I.W.P..

Issue #7: Inability to Function in Public School (refer to education report)

Overall Recommendation: Chuck has created a difficulty by presenting himself to other members as someone with few (if any) serious treatment issues. He realizes now that he is wasting time and needs to begin using Intensive Therapy Group, but he is fearful of the reaction group members may have to this attitude change. Addressing this problem head-on needs to be the first order of business if Chuck is to get off dead center and begin making progress. He certainly needs to continue his placement for the coming six months.

Pat Bousquet, LMSW
Case Manager/Therapist

0107

HALL00008324

case confrance
a/a9/e8

Case Confrance    Write up        1st page

behavior # 1)  History of criminal behaviors.
theft of property, destruction
of property.
Long term goal "learn. to get
needs met in other healthy
ways" target date 12 months.
Short term goal "Elinate criminal
behaviors" target date 4 months

personal feedback.
I havent shown any criminal
behaviors of any sort since I've
been here at Homestead. I don't
realy see this as a behavioral
problem for myself as much
as it was on the outside
Due to the fact that I
have realized and learned that
it's not the right thing to
do.
So if I had a choice on
which one I wanted to work on
it would probably be the short
term goal

0108

HALL00008325

cuse confirmce
2/20/08

4.

bavior #2

History of passive/agresive and manipulating behaviors.

long term goal "learn that rules apply to him and others equally"; "that he is not "Better" than any one" target date 12 months

Short term goal " Elimanate manipulative and intimidating behaviors". target date 6 months

personal feedback

This is the behavior that I show the most. Not as much the intimidating as the manipulating behaviors

If I had the choice between the long term and the short term goals. I would like to work on both and I feel s. would like and need to work on this behavior.

0109

HALL00008326

2/22/88                                              5.

Case Confrance

behavior #3    Poor Peer interaction skills

long term goal is to learn how
to get along with others" target
date 12 months.

Short term goal is to "learn
to stop fighting and antagonizing
with my peers" target date 6 months

I feel I'm doing alright in
this area. I don't see my ~~self~~
self antagonizing. I would like to
see the goals on this particular
treatment issue changed. I also
see my self as having some
positive relationships with
Staff and members.

0110

HALL00008327

2/38/88

6.

Case Confrance

behavor by Family stress related issues with adoption.

Long term goal is to "Resolve negative feelings". target date 12 months

Short term goals are to "Begin to Identify and talk about issues" target date 6 months

I realy haven't started dealing with this issue. But I would like to keep these goals the way they are. As soon as I start to work on this issue I would like to start family counciling.

0111

HALL00008328

2/29/88                                                    7.

Case Confrance

behavior #5      Poor parent/child comunication
                 Long term goal "Resolve negative
feelings" target date 12 months
                 Short term goal " Begin to
Identify and talk about issues"
target date 6 months
                 Same personal feedback
as behavior #4.

0112

HALL00008329

2/29/88                                        8,

Case Confrance

behavior #6 Confusion over self and sexual
identity.
Long term goal is to "Gain self
and self sexual acceptance. target date
12 month    short term "Begin to identify
and discuss" target date 6months

I feel that I can
accept myself and have others
accept me for who I am
and I don't feel that this
is a major issue for me
and I feel that the goals
can be changed.

0113

HALL00008330

2/29/88                                                      9.

Case Conference

behavior #7 Don Complaince with rules and
authority.

Long term goal "learn to resolve
different healthier ways" target
date 12 months.

Short term "learn to accept
staff authority. target date
6 months.

I dont usaly see
my self as Non Complicant
that often but I would
like to keep the goals.
the way they are.

0114

HALL00008331

IFCD 00028275
Ex. 5 Page 335 of 423   Case 4:21-cv-02801-BCW   Document 70-16   Filed 04/29/24   Page 335 of 423

2/27/88 10.

Case Conference

behavior the inability to function in
public school

long term goals "Return to
public school" target date 12 months
short term "Attend classes
here regulary. target date 6 months

At the present time
I feel I'm doing well in
school I'm enjoying it. And
I would like to resume going
to public school as soon as
possible.

0115

HALL00008332

Individual Educ( )onal Program: Status Report a( )Update

Instructional Area __ __Overall Academic Observations

Member __Chuck Hall__ Date of Report __2/29/88__

Dates covered by Report: __8/5/87__ to __2/29/88__

| | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

Individual Conduct — X

Withdrawal — X

Maturation — X

Social Aggression — X

2. Long-Term Educational Goal:
   To return to public school.

3. Goals for current period of instruction:
   Academic: — Percentage of Success Achieved

   1. Attend class each day as scheduled. — 95%
   2. Engage in assigned schoolwork without disturbing others. — 85%
   3. Be responsible for materials used in class. — 95%
   4. Be honest about school work. — 80%

   Behavioral:

4. General comment and observation: Chuck's school work has improved in the last six weeks, giving him a B average. He has the capability of being a good student and is growing in that direction. Some areas which need attention are: 1) a real committment to learning, even if it means hard work, 2) a committment to being personally honest and straightforward when relating to staff and fellow students.

5. Objectives to work on for the next four-month period:
   Academic:

   1. Work diligently in all subjects, earning A's and B's in all subjects.

   Behavioral:

   1. Speak clearly and plainly to get his needs met, avoiding manipulation and "buttering up
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of his fellow students.
   4. Follow school rules and teacher's direction.

0116

6. Hours of instruction: __27 wks__ Grade: __P__ Teacher: Fred Ketchum-Education Supervisor
   (Grades of /HALL00008333r Passing can be assigned)

HALL00008333

1d

Individual Educ onal Program: Status Report & Update

Instructional Area __Health__

Member __Chuck Hall__     Date of Report __2/29/88__

Dates covered by Report: __9/13/87__     to __2/29/88__

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

   Individual Conduct ———————————————— X ————————————————|

   Withdrawal |—— X ——————————————————————————————|

   Maturation |—— X ——————————————————————————————|

   Social Aggression |—— X ——————————————————————————————|
   1        2        3        4        5

2. Long-Term Educational Goal:

   Return to public school.

3. Goals for current period of instruction:

   Academic:                                          Percentage of Success Achieved
   1. Complete modules on nutrition, digestion and alcohol awareness.    100%
   2. Complete reading assigned in text, Essentials of Health.           100%
   3. Be involved in class discussions.                                  100%
   4. Maintain an accuracy level of 80% or better on tests and quizzes.  100%

   Behavioral:
   1. Be prepared with all necessary materials for school.              90%
   2. Work independently, to the best of ability.                       90%
   3. Engage in assigned schoolwork without disturbing others.          85%
   4. Be honest about schoolwork.                                       90%

4. General comment and observation:   Chuck has been working hard lately on his
   health work. He has handed in homework on time and the quality has been acceptable.
   Chuck's school behavior has been erratic. He can be distracting and destructive
   during discussions but usually turns it around after feedback. Chuck has improved
   his behavior during the last two weeks. This needs his continued attention.

5. Objectives to work on for the next four-month period:
   Academic:
   1. Complete modules on Sexual Awareness and Substance Abuse.
   2. Be involved in all discussions appropriately.
   3. Make up missed work when class is unattended.
   4. Hand in school work on time.

   Behavioral:
   1. Speak clearly and plainly to get his needs met, avoiding manipulation and
      "buttering up".
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of his fellow students.
   4. Follow school rules and teacher's directions.

01

6. Hours of instruction: __40__   Grade: __A__   Teacher: __Richard Dupont__
   (Grades of HABL00008334 or Passing can be assigned)

Individual Educa_ _nal Program: Status Report a_ Update

Instructional Area __Practical Arts__

Member ___Chuck Hall___  Date of Report ___2/29/88___

Dates covered by Report: ___9/10/87___ to ___10/15/87___

1. Behavior Assessment

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|
| Individual Conduct | X | | |
| Withdrawal | X | | |
| Maturation | X | | |
| Social Aggression | X | | |

1    2    3    4    5

2. Long-Term Educational Goal:
Gain an awareness of the proper use of hand and power tools.

3. Goals for current period of instruction:

Academic:                                        Percentage of Success Achieved

1. Come to class prepared with all necessary materials.    100%
2. Learn to read a standard tape measure.                  100%
3. Demonstrate proper use of the tools used.               90%
4. Complete project in allotted time.                      100%

Behavioral:

1. Replace all tools after use.                            90%
2. Always use safety equipment when necessary.            90%
3. Follow all safety rules when working.                   100%
4. Show patience and courtesy when working with or around others.  90%
5. Help in clean up.                                       90%

4. General comment and observation:  Chuck was a very enthusiastic student during
the six week shop course. Chuck was prepared and ready for work. He worked
well with others and could be counted on to assist others when necessary.

5. Objectives to work on for the next four-month period:
Academic:

1. Come to class prepared with all necessary materials.
2. Learn to read a standard tape measure.
3. Demonstrate proper use of the tools used.
4. Complete project in allotted time.

Behavioral:

1. Speak clearly and plainly to get his needs met, avoiding manipulation and "buttering up
2. Act as a regular and ordinary member, avoiding putting himself above the rules.
3. Be respectful of the needs and rights of his fellow students.
4. Follow school rules and teacher's directions.

6. Hours of instruction: ___6___ Grade: _Passing_ Teacher: _Richard Dupont_

(Grades of **HALL00008835**r Passing can be assigned)

IFCD 00028279

HALL00008835

Individual Educ. onal Program: Status Report / Update

Instructional Area __Math__

Member __Chuck Hall__                     Date of Report __2/29/88__

Dates covered by Report:___8/5/87___.        to ___2/29/88___

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

   Individual Conduct       X (position 1)

   Withdrawal                  X (position ~1.5)

   Maturation               X (position 1)

   Social Aggression          X (position ~1.5)

   Scale: 1  2  3  4  5

2. Long-Term Educational Goal:
   1. To complete Silver-Burdett level 8 with an 80% or better average.
   2. To return to public school.

3. Goals for current period of instruction:
   Academic:                                            Percentage of Success Achieved
   1. To complete chapter 1 (Whole Numbers) with 80% or better average.    75% averag·
   2. To complete chapter 2 (Decimals) with 80% or better average.         75% averag·
   3. To complete chapter 3 (Measurement) with 80% or better average.      100%
   4. To complete chapter 4 (Fractions) with 80% or better average.        95% not co·

   Behavioral:
   1. Engage in assigned school work without disturbing others.     90%
   2. Work independently to the best of your aiblity.               85%
   3. Acknowledge academic weaknesses and address them.             85%
   4. Complete daily assignments doing homework if necessary.       75%

4. General comment and observation:  Chuck had a very shaky start this year.  He was accomplishing very little quality work and was often not in focus.  Since the beginning of the year he has made significant improvement.  Now he rarely fails to get the minimum class requirements done and often does more.  He is now interested in learning, is understanding the materials and is quite effective in helping others which is helping him get a more thorough understanding.  If he continues with his present attitude he should make up a great deal of ground lost over the past years.

5. Objectives to work on for the next four-month period:
   Academic:
   1. Finish chapter 4 (Fractions) with an 80% or better average.
   2. Complete chapter 5 (Ratio, Prop & Percent) with an 80% or better average.
   3. Complete chapter 6 (Geometry) with an 80% or better average.
   4. Complete chapter 7 (Area and Volume) with an 80% or better average.

   Behavioral:   Chuck will:
   1. Speak clearly and plainly to get his needs met, avoiding manipulation and 'buttering u
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of his fellow students.
   4. Follow school rules and teachers' direction.

6. Hours of instruction:__70__  Grade:__C__  Teacher:__Barbara Fenderson__   01
   (Grades of **HALL00008336**or Passing can be assigned)

IFCD 00028280

Individual Educational Program: Status Report and Update

Instructional Area __Science__

Member __Chuck Hall__    Date of Report __2/29/88__

Dates covered by Report: __8/5/87__    to __2/29/88__

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

   Individual Conduct — X (between 2 and 3)

   Withdrawal — X (near 1)

   Maturation — X (near 1)

   Social Aggression — X (between 2 and 3)

   (scale: 1   2   3   4   5)

2. Long-Term Educational Goal:
   Return to public school.

3. Goals for current period of instruction:

| Academic: | Percentage of Success Achieved |
|---|---|
| 1. Complete all assigned reading in Holt Earth Science. | 80% |
| 2. Complete all written assignements. | 100% |
| 3. Maintain a 90% level of accuracy on all written work. | 100% |
| 4. Participate in group discussions. | 100% |
| 5. Participate in lab and field activities. | 80% |

| Behavioral: | |
|---|---|
| 1. Communicate appropriately with peers; show respect. | 75% |
| 2. Show respect for others' level of work. | 75% |

4. General comment and observation: Chuck is outwardly polite and cheerful, even charming. Behind the facade he is subtley defiant, uncooperative and impertinent. His sarcastic wit often has a cutting edge that insults and antagonizes others. Chuck appears to be easily influenced by ambience and suggestion, and readily follows a well-defined group. He will readily manipulate others to serve his needs.

5. Objectives to work on for the next four-month period:
   Academic:
   1. Keep pace with all reading and written assignments in Holt Earth Science.
   2. Continue to maintain at least a 90% level of accuracy on all written work.
   3. Correct or re-do all unsatisfactory papers.
   4. Participate in lab and field activities.

   Behavioral:    Chuck will:
   1. Speak clearly and plainly to get his needs met, avoiding manipulation and "buttering up"
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of his fellow students.
   4. Follow school rules and teachers' direction.

6. Hours of instruction: __91__    Grade: __A__    Teacher: __Rick Hirte__    0120

   (Grades of **HALL00008837** or Passing can be assigned)

IFCD 00028281
HALL00008837

Individual Educ onal Program: Status Report / Update

Instructional Area __English__

Member ____Chuck Hall____          Date of Report __2/29/88__

Dates covered by Report: __8/5/87__     to __2/29/88__

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

   Individual Conduct

   Withdrawal

   Maturation

   Social Aggression

2. Long-Term Educational Goal:

   To return to public school.

3. Goals for current period of instruction:
   Academic:                                      Percentage of Success Achieved

   1. Read from Types of Literature.                        90%
   2. Finish the summer program well.                       90%

   Behavioral:

   1. To avoid trying to pal around with teachers.          85%
   2. To develop leaderships skills.

4. General comment and observation:      Chuck reads well and seems to enjoy
   reading. He is very agreeable to work with. He has a small tendency to talk
   with other members. He needs to really concerntrate on his academic work in
   order to work to potential.

5. Objectives to work on for the next four-month period:
   Academic:

   1.     To read in Understanding Literature.
   2.     To work on writing in Organizing and Reporting.
   3.     To work in SRA lab.

   Behavioral:

   1. Speak clearly and plainly to get his needs met, avoiding manipulation and
      "buttering up".
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of his fellow students.
   4. Follow school rules and teachers' directions

6. Hours of instruction: __100__  Grade: __B+__  Teacher: __Katherine Sweek__

   (Grades of NALL00008838r Passing can be assigned)

IFCD 00028282

Individual Educt  )nal Program: Status Report & Update

Instructional Area __Social Studies__

Member __Chuck Hall__          Date of Report __2/29/88__

Dates covered by Report: ___8/5/87___ to ___2/29/88___

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

   Individual Conduct — X (attempts to manipulate)

   Withdrawal — X

   Maturation — X

   Social Aggression — X

   (scale 1 — 2 — 3 — 4 — 5)

2. Long-Term Educational Goal:
   1. Have a basic understanding and appreciation for United States History.
   2. Return to public school.

3. Goals for current period of instruction:

   Academic:                                        Percentage of Success Achieved
   1. Keep pace with the class in United States History, level 2.     100%
   2. Complete first semester of Maine studies.                       100%
   3. Maintain an accuracy level of 79% or better.                     95%

   Behavioral:

   1. Attend class each day as scheduled.                              95%
   2. Engage in assigned schoolwork without    disturbing others.      90%
   3. Be responsible for materials used in class.                     100%
   4. Be honest about school work.                                    100%

4. General comment and observation:    Chuck is a good student and very likeable.
   However, he feels he needs to compliment and smooth talk to the point of being
   sickening in order to make progress in the program.  I'd like to see Chuck "cut
   the crap" and rely on his real feelings and pleasant personality in order to work
   his way through the program.

5. Objectives to work on for the next four-month period:
   Academic:
   1. Keep pace with class in United States History, level 3.
   2. Complete 12 hours in Maine Studies.
   3. Actively participate in classroom activities.
   4. Maintain an accuracy level of 85% or better.

   Behavioral:        Chuck will:
   1. Speak clearly and plainly to get his needs met, avoiding manipulation and "buttering up
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of his fellow students.
   4. Follow school rules and teachers' direction.

6. Hours of instruction: __60__  Grade: __A-__  Teacher: __Doug Fogg__        012
   (Grades of HALL00008339r Passing can be assigned)

MEDICAL REPORT

Chuck Hall                                                                    2/29/88

8/5/87       Admitted to Homestead. No major illnesses or surgery. No medications
             at this time. Denies any medical problems.

9/4/87       To Dr. McCann for eye exam. Vision is 20/25.

9/4/87       To Dr. Kipperman for physical. 136½ lbs., 68½" and B/P 122/80.
             Polio, T.B. and D.T. immunizations given. Consult with Dr. Watt
             requested for a black mole on right shoulder.

9/17/87      To Dr. Goodman for ISP evaluation.

10/23/87     To Dr. Meyer for dental exam, x-rays, cleaning and flouride treat-
             ment. To return for further work.

10/26/87     To Dr. Watt for evaluation of mole on posterior right shoulder. Mole
             is flat, black and approximately 3 cm. Dr. Watt recommends removal
             as it appears to be a pre-cancerous mole. Parents will be notified
             first.

11/16/87     To Dr. Watt for removal of possbile pre-cancerous mole on posterior
             surfase of right shoulder. Sample sent for biopsy. Chuck tolerated
             local anesthetic and removal very well.

12/9/87      To Dr. Meyer for dental fillings. To return for more work.

12/10/87     Results from biopsy of mole, totally benign.

12/15/87     To Dr. Meyer for fillings.

12/30/87     To Dr. Meyer for fillings.

2/3/88       To Dr. Meyer for fillings.


                                        *A.L. Jenkins* (signature) LPN
                                        A.L. Jenkins, LPN


**HOMESTEAD**   PO BOX 663, ELLSWORTH, MAINE 04605   207/667-2021      0123

HALL00008340

MEMBER: Charles Hall

DATE: 2/29/88

## MASTER TREATMENT PLAN

NOW ON LEVEL: II   TREATMENT PLANNING CONFERENCE # 2

DATE OF ARRIVAL: 8/5/87 DATE OF BIRTH: 4/6/71

REASONS FOR REFERRAL:

1. History of criminal behavior -- currently on probation
2. History of passive/aggressive and manipulating behaviors
3. Poor peer interaction skills
4. Family stress related to adoption issue
5. Poor parent/child communication
6. Confusion over sense of self and sexual identity
7. Non-compliance with rules and authority

FINDINGS OF ASSESSMENT:

MENTAL HEALTH:

11/18/87  Charles has kept a low profile since admission, staying out of major trouble and learning the ropes. He had plans to go A.W.O.L. with other members, but was found out. He appears very sensitive to issues of family fighting, loss and abandonment, and parental alcohol use in Intensive Therapy Group. He is starting to use group therapy effectively.

2/29/88   Chuck has created a difficulty by presenting himself to other members as someone with few (if any) serious treatment issues. He realizes now that he is wasting time and needs to begin using Intensive Therapy Group, but he is fearful of the reaction group members may have to this attitude change. Addressing this problem head-on needs to be the first order of business if Chick is to get off dead center and begin making progress. He certainly needs to continue his placement for the coming six months.

EDUCATIONAL:

11/18/87  See I.E.P.

HP - 1  11/87  PAGE 1
HOMESTEAD PROJECT, INC.    P.O. BOX 663   ELLSWORTH, MAINE   04605

HALL00008341



012.

2/29/88    Chuck's school work has improved in the last six weeks, giving him a B average. He has the capability of being a good student and is growing in that direction. Some areas which need attention are: 1) a real commitment to learning, even if it means hard work, 2) a commitment to being personally honest and straightforward when relating to staff and fellow students.


MEDICAL:



PSYCHIATRIC:


HP-1  11/87  PAGE 2

HALL00008342

0125

Case 4:21-cv-02001-BCW    Document 70-16    Filed 04/29/24    Page 347 of 423

IFCD 00028287

| DATE/<br>FROM APR. | THERAPEUTIC ISSUES(NUMBER) | GOALS<br>L=LONG/S=SHORT | TARGET<br>DATE | SPECIFIC<br>TREATMENT STRATEGY | STATUS | RESP.<br>PARTY |
|---|---|---|---|---|---|---|
| 2/29/88 | 1. Criminal Behavior<br>(Theft, Property des-<br>truction) | L – Learn to<br>get needs met<br>in other heal-<br>thier ways<br>S – Eliminate<br>criminal behavi-<br>ors | 2/89<br><br><br><br>8/88 | 1. Immediate 3 day restriction<br>for any criminal behaviors/notify<br>Probation Officer and look into<br>pressing charges. Learning experi-<br>ence should focus on other ways to<br>get needs met.<br>2. Discuss in Intensive Therapy<br>Group. | started<br><br><br><br><br><br>started | ALL<br><br><br><br><br><br>CM |
| 2/29/88 | 2. Manipulation/subtle<br>intimidation of others<br>and lying (seeing self<br>as above the rules) | L – Learn that<br>rules apply to<br>him and others<br>equally, that he<br>is not "better"<br>S – Eliminate<br>manipulation<br>and intimidation | 2/89<br><br><br><br><br>8/88 | 1. 3 day restriction plan for<br>manipulation and/or intimidation.<br>Learning experience should focus<br>on why rules apply to everyone and<br>include apology to victim.<br>2. Discuss in Intensive Therapy<br>Group. | 2/29/88<br><br><br><br><br>started | ALL<br><br><br><br><br>CM |
| 2/29/88 | 3. Poor peer inter-<br>action skills (threaten-<br>ing, antagonizing, making<br>hurtful, sarcastic re-<br>marks, etc.) | L – Learn ways<br>to get along<br>with others<br>S – Eliminate<br>fighting,<br>antagonizing,<br>etc. | 2/89<br><br><br>8/88 | 1. Encourage getting along during<br>program, in school, etc. Give praise<br>for co-operation.<br>2. Discuss in Intensive Therapy<br>Group.<br>3. 3 day restriction plan for<br>instances of target behavior. | started<br><br><br>started<br><br>2/29/88 | ALL<br><br><br>CM<br><br>ALL |
| 2/29/88 | 4. Family stress<br>related to adoption issue<br>and poor parent/child<br>communication | L – Resolve<br>negative feelings<br>S – Begin to<br>identify and<br>talk about<br>issues | 2/89<br><br>8/88 | 1. Discuss in Intensive Therapy<br>Group.<br>2. Use open house and other family<br>contact to promote positive inter-<br>action.<br>3. Use Home Visits to improve<br>interaction.<br>4. Begin family counseling<br><br>5. Write up and discuss phone<br>calls home in Intensive Therapy<br>Group. | started<br><br>started<br><br><br>started<br><br>Level<br>II<br><br>started | CM<br><br>A<br><br><br>Chuck<br>family<br>Chuck<br>family<br><br>CM |

3

HP-1 11/87
HOMESTEAD PROJECT, INC.  P.O. BOX 663  ELLSWORTH, MAINE  04605

HALL  08343

Case 4:23-cv-00201-BCW   Document 70-16   Filed 04/29/24   Page 348 of 423

| 2/29/88 | 5. Confusion over sense of self and sexual identity | L - Gain sense of self and self-acceptance | 2/89 | 1. Discuss in Intensive Therapy Group. | started | CM |
| | | S - Begin to identify and discuss issues | 8/88 | 2. Discuss in family counseling. | Level II | Chuck family |
| 2/29/88 | 6. Non-compliance with rules and authority and verbal disrespect. | L - Learn how to resolve differences in healthy ways | 2/89 | 1. Minimum 1 day restriction plan for instances of target behavior. | started | ALL |
| | | | | 2. Discuss in Intensive Therapy Group. | started | CM |
| | | S - Learn to accept staff authority | 8/88 | 3. If disrespect is not blatant ("I don't feel like it", "I'll be there when I finish this", etc.) Chuck should earn an immediate one hour of IWP. | 2/29/88 | ALL |
| | | | | 4. Breaking communication while on restriction = immediate one hour of IWP. | 2/29/88 | ALL |
| 2/29/88 | 7. Inability to function in public school | L - Return to public school | 2/89 | 1. Refer to I.E.P. | Started | Fred K. |
| | | S - attend classes here regularly | 2/88 | | | |

0127

HP-1 11/87
HOMESTEAD PROJECT, INC.   P.O. BOX 663   ELLSWORTH, MAINE   04605

HALE 008344
IFCD 00028288

MEMBER: Charles Hall

DATE: 2/29/88

## MASTER TREATMENT PLAN

NOW ON LEVEL: II     TREATMENT PLANNING CONFERENCE # 2

DATE OF ARRIVAL: 8/5/87 DATE OF BIRTH: 4/6/71

REASONS FOR REFERRAL:

1. History of criminal behavior -- currently on probation
2. History of passive/aggressive and manipulating behaviors
3. Poor peer interaction skills
4. Family stress related to adoption issue
5. Poor parent/child communication
6. Confusion over sense of self and sexual identity
7. Non-compliance with rules and authority

FINDINGS OF ASSESSMENT:

MENTAL HEALTH:

11/18/87  Charles has kept a low profile since admission, staying out of major trouble and learning the ropes. He had plans to go A.W.O.L. with other members, but was found out. He appears very sensitive to issues of family fighting, loss and abandonment, and parental alcohol use in Intensive Therapy Group. He is starting to use group therapy effectively.

2/29/88  Chuck has created a difficulty by presenting himself to other members as someone with few (if any) serious treatment issues. He realizes now that he is wasting time and needs to begin using Intensive Therapy Group, but he is fearful of the reaction group members may have to this attitude change. Addressing this problem head-on needs to be the first order of business if Chick is to get off dead center and begin making progress. He certainly needs to continue his placement for the coming six months.


EDUCATIONAL:

11/18/87  See I.E.P.


HP - 1  11/87  PAGE 1
HOMESTEAD PROJECT, INC.    P.O. BOX 663    ELLSWORTH, MAINE    04605

HALL00008345                                    0128

2/29/88    Chuck"s school work has improved in the last six weeks, giving him a B average. He has the capability of being a good student and is growing in that direction. Some areas which need attention are: 1) a real commitment to learning, even if it means hard work, 2) a commitment to being personally honest and straightforward when relating to staff and fellow students.

MEDICAL:

PSYCHIATRIC:

HP-1   11/87   PAGE 2

HALL00008346

0120

Case 4:23-cv-00201-BCW   Document 70-16   Filed 04/29/24   Page 351 of 423

| DATE/ CM APR. | THERAPEUTIC ISSUES (NUMBER) | GOALS L=LONG/S=SHORT | TARGET DATE | SPECIFIC TREATMENT STRATEGY | STATUS | RES. PART |
|---|---|---|---|---|---|---|
| 2/29/88 | 1. Criminal Behavior (Theft, Property destruction) | L - Learn to get needs met in other healthier ways | 2/89 | 1. Immediate 3 day restriction for any criminal behaviors/notify Probation Officer and look into pressing charges. Learning experience should focus on other ways to get needs met. | started | ALL |
|  |  | S - Eliminate criminal behaviors | 8/88 | 2. Discuss in Intensive Therapy Group. | started | CM |
| 2/29/88 | 2. Manipulation/subtle intimidation of others and lying (seeing self as above the rules) | L - Learn that rules apply to him and others equally, that he is not "better" | 2/89 | 1. 3 day restriction plan for manipulation and/or intimidation. Learning experience should focus on why rules apply to everyone and include apology to victim. | 2/29/88 | ALL |
|  |  | S - Eliminate manipulation and intimidation | 8/88 | 2. Discuss in Intensive Therapy Group. | started | CM |
| 2/29/88 | 3. Poor peer interaction skills (threatening, antagonizing, making hurtful, sarcastic remarks, etc.) | L - Learn ways to get along with others | 2/89 | 1. Encourage getting along during program, in school, etc. Give praise for co-operation. | started | ALL |
|  |  | S - Eliminate fighting, antagonizing, etc. | 8/88 | 2. Discuss in Intensive Therapy Group. | started | CM |
|  |  |  |  | 3. 3 day restriction plan for instances of target behavior. | 2/29/88 | ALL |
| 2/29/88 | 4. Family stress related to adoption issue and poor parent/child communication | L - Resolve negative feelings | 2/89 | 1. Discuss in Intensive Therapy Group. | started | CM |
|  |  | S - Begin to identify and talk about issues | 8/88 | 2. Use open house and other family contact to promote positive interaction. | started | ALL |
|  |  |  |  | 3. Use Home Visits to improve interaction. | started | Chuck family |
|  |  |  |  | 4. Begin family counseling | Level II | Chuck family |
|  |  |  |  | 5. Write up and discuss phone calls home in Intensive Therapy Group. | started | CM |

HP-1 11/87
HOMESTEAD PROJECT, INC.  P.O. BOX 663  ELLSWORTH, MAINE 04605

0130

HALL   08347

Case 4:23-cv-02301-BCW   Document 70-16   Filed 04/29/24   Page 352 of 423

| Date | Problem | Goal | Date | Intervention | Status | Responsible |
|---|---|---|---|---|---|---|
| 2/29/88 | 5. Confusion over sense of self and sexual identity | L - Gain sense of self and self-acceptance | 2/89 | 1. Discuss in Intensive Therapy Group. | started | CM |
| | | S - Begin to identify and discuss issues | 8/88 | 2. Discuss in family counseling. | Level II | Chuck family |
| 2/29/88 | 6. Non-compliance with rules and authority and verbal disrespect. | L - Learn how to resolve differences in healthy ways | 2/89 | 1. Minimum 1 day restriction plan for instances of target behavior. | started | ALL |
| | | | | 2. Discuss in Intensive Therapy Group. | started | CM |
| | | S - Learn to accept staff authority | 8/88 | 3. If disrespect is not blatant ("I don't feel like it", "I'll be there when I finish this", etc.) Chuck should earn an immediate one hour of IWP. | 2/29/88 | ALL |
| | | | | 4. Breaking communication while on restriction = immediate one hour of IWP. | 2/29/88 | ALL |
| 2/29/88 | 7. Inability to function in public school | L - Return to public school | 2/89 | 1. Refer to I.E.P. | Started | Fred K. |
| | | S - attend classes here regularly | 2/88 | | | |

0131

HP-1 11/87
HOMESTEAD PROJECT, INC.  P.O. BOX 663  ELLSWORTH, MAINE  04605

HALL 008348

Case 1:23-cv-02201-BCW Document 70-16 Filed 04/29/24 Page 353 of 423

PROJECTED TREATMENT/PLAN REVIEW CONFERENCE DATES:  8/88

PERSONS TO BE INVITED:
Parents, Probation Officer, School Personnel

PERSONS PRESENT (NAME & TITLE):

REQUIRED SIGNATURES:

DIRECTOR OF TREATMENT SERVICES: _Philip Smith LCSW_

CASE MANAGER/THERAPIST: _Pat Bohs LMSW 4/18/88_

EDUCATION SUPERVISOR: _Fred Kitchener MEd_

HOMESTEAD MEMBER: _____

LEGAL GUARDIAN: _____

PLACEMENT AGENCY: _____

0132

HP-1 11/87
HOMESTEAD PROJECT, INC.  P.O. BOX 663  ELLSWORTH, MAINE  04605

HALL  08349

IFCD 0002B293

Case 1:23-cv-00001-BCW   Document 70-16   Filed 04/29/24   Page 354 of 423
Ex. 42 to Complaint   IFCD 00028294

PROJECTED TREATMENT/PLAN REVIEW CONFERENCE DATES:   8/88

PERSONS TO BE INVITED:
Parents, Probation Officer, School Personnel

PERSONS PRESENT (NAME & TITLE):

REQUIRED SIGNATURES:

DIRECTOR OF TREATMENT SERVICES: _Ralph Smith LCSW_

CASE MANAGER/THERAPIST: _Pat Bohr Lmsw 4/18/88_

EDUCATION SUPERVISOR: _Fred Ketcham MSed_

HOMESTEAD MEMBER: _____

LEGAL GUARDIAN: _____

PLACEMENT AGENCY: _____

0133

5    HP-1 11/87
HOMESTEAD PROJECT, INC.   P.O. BOX 663   ELLSWORTH, MAINE  04605

HALL 008350

Individual Educational Program:  Status Report and Update    *13.*

Instructional Area _____ Practical Arts _____       C.C. #3

Member __Chuck Hall_____       Date of Report __12/14/88_____

( es covered by Report: ___8/25/88_____   to ____12/14/88_____

|                        | No Problem Noted | Moderate Problem | Severe Problem |
|------------------------|:----------------:|:----------------:|:--------------:|

1. Behavior Assessment

   Individual Conduct    — X ——————————————————————————————

   Withdrawal           — X ——————————————————————————————

   Maturation           — X ——————————————————————————————

   Social Aggression    — X ——————————————————————————————
                        1       2       3       4       5

2. Long-Term Educational Goal:
   1. To gain an awareness of the proper use of hand and power tools.
   2. To return to public school.

3. Goals for current period of instruction:
   Academic:                                        Percentage of Success Achieved
   1. Come to class prepared with all necessary materials.        90%
   2. Demonstrate the proper use of all tools used in the shop.   95%
   3. Follow all safety procedures.                               95%
   4. Complete project in allotted time.                         85%

   Behavioral:
   1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".  90%
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.            90%
   3. Be respectful of the needs and rights of fellow students.                                  95%
   4. Follow school rules and teachers' directions.                                              95%

4. General comment and observation:
   When Chuck has attended this class he has done a good job.  He uses most of the
   tools properly and with skill, shows patience and courtesy when working with those
   around him.  He knows and follows safety procedures and complies with teacher
   directives.  Due to homevisits and other excused absences Chuck has not attended
   many classes.  However, his performance has been good.

5. Objectives to work on for the next six -month period:
   Academic:
   1. Demonstrate the proper use of all tools used in the shop.
   2. Follow all safety procedures.
   3. Complete project in allotted time.
   4. Assist in clean up.

   Behavioral:
   1. Show patience and courtesy when working with and around others.
   2. Behave appropriately without disturbing others.

                                                                        0171

6. Periods of instruction:___7____  Grade___B___ Teacher:___Stephen Krichels_____
HALL00008388
                         (Grades of A, B, C, D, F, or Passing can be assigned)

IFCD 00028295

Individual Educational Program:  Status Report and Update                  1 d.

Instructional Area ___Health___                     C.C. #3

Member ___Chuck Hall___                     Date of Report ___12/14/88___

□  ∙s covered by Report: ___8/25/88___    to ___12/14/88___

|                          | No Problem Noted | Moderate Problem | Severe Problem |
|--------------------------|:----------------:|:----------------:|:--------------:|

1.  Behavior Assessment

    Individual Conduct    X

    Withdrawal            X

    Maturation            X

    Social Aggression     X
                          1          2          3          4          5

2.  Long-Term Educational Goal:
    1.  To learn to make good decisions concerning physical, mental and social health.
    2.  To return to public school.
3.  Goals for current period of instruction:
    Academic:                                      Percentage of Success Achieved
    1.  Complete modules on circulatory, respiratory & digestive systems & nutrition.  95%
    2.  Continue to work in text _Essentials of Health_.                               95%
    3.  Be part of class discussions in a mature manner.                               90%
    4.  Work to best of ability to complete class assignments.                         90%

    Behavioral:
    ..  Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".  85%
    2.  Act as a regular and ordinary member, avoiding putting himself above the rules.            90%
    3.  Be respectful of the needs and rights of fellow students.                                  90%
    4.  Follow school rules and teachers' directions.                                              90%

4.  General comment and observation:
    Chuck has been a good student in this class.  He has done the assignments with
    care and has participated maturely in class discussions.  On occasion, Chuck has
    been too insistent as to how the class should be run, putting himself in authority.
    However, this behavior has improved and Chuck has recently cooperated with class
    routines and acted as a good role model.  Usually Chuck has been helpful and con-
    tributed to the class.

5.  Objectives to work on for the next six-month period:
    Academic:
    1.  Complete modules on First Aid and Sexual Awareness.
    2.  Continue to work in text _Essentials of Health_.
    3.  Be part of class discussions in a mature manner.
    4.  Request homework if class is missed.

    Behavioral:

    1.  Behave appropriately without disturbing others.
    2.  Be cooperative and respectful toward others.                                   0170

6. Periods of instruction:___13___   Grade HALL00008387 Teacher:___Stephen Krichels___
                            (Grades of A, B, C, D, F, or Passing can be assigned)

IFCD 00028296

Individual Educational Program: Status Report and Update    11.

Instructional Area  Language Arts                    C.C. #3

Member  Chuck Hall                    Date of Report  12/14/88

es covered by Report:    8/25/88        to      12/14/88

| | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1.  Behavior Assessment

    Individual Conduct          X

    Withdrawal                  X

    Maturation              X

    Social Aggression       X

    1       2           3           4       5

2.  Long-Term Educational Goal:
    To return to public school.

3.  Goals for current period of instruction:
    Academic:                                    Percentage of Success Achieved
    1.  To finish the summer program well.                          90%
    2.  To read in SRA Lab.                                         90%
    3.  Read in Exploring Literature.                               90%

    Behavioral:
    1.  Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".   85%
    2.  Act as a regular and ordinary member, avoiding putting himself above the rules.              85%
    3.  Be respectful of the needs and rights of fellow students.                                    90%
    4.  Follow school rules and teachers' directions.                                                90%

4.  General comment and observation:

    Chuck is generally a good student. He is self-motivated and tries to measure
    up to his ability. He is usually pleasant and cooperative. He teases about
    behavior sometimes, but he is not usually disruptive.

5.  Objectives to work on for the next six-month period:
    Academic:
    1.  Continue to work in SRA lab.
    2.  Read in Exploring Literature.
    3.  Read in "Scope" orally.

    Behavioral:
    1.  Not to place himself above the behavior standards.
    2.  To avoid trying to "butter up" staff.
    3.  To perform as a good role model.                                    0169

6.  Periods of instruction:  58     Grade     Teacher:  Katherine Hudson
                            (Grades of A, B, C, D, F, or Passing can be assigned)

HALL00008386

Instructional Area __Social_Studies_____     C.C. #3

Member __Chuck Hall_____     Date of Report __12/14/88__,

☐ is covered by Report: __8/25/88_____ to _____12/14/88_____

| | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

    Individual Conduct     X (occasionally disruptive, antagonizes)

    Withdrawal     X

    Maturation     X

    Social Aggression     X (involved in group misbehavior)

    1   2   3   4   5

2. Long-Term Educational Goal:
    1. Demonstrate a basic understanding and appreciation for United States History.
    2. Return to public school.

3. Goals for current period of instruction:
    Academic:         Percentage of Success Achieved

    1. Keep pace with the class in United States History, level 3.    90%
    2. Actively participate in Maine Studies program.    65%
    3. Actively participate in classroom activities.    85%
    4. Maintain an accuracy level of 85% or better.    75%

    Behavioral:
    1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".    80%
    2. Act as a regular and ordinary member, avoiding putting himself above the rules.    75%
    3. Be respectful of the needs and rights of fellow students.    75%
    4. Follow school rules and teachers' directions.    90%

4. General comment and observation:
    Chuck is generally an excellent student, he works hard and is conscientious. He
    does have times, however, when his behavior interferes with his school work.
    Though he is not too disruptive, he can make very cutting remarks which hurt
    others and he will, at times, neglect to do his schoolwork when he is having a
    hard time behaviorally.

5. Objectives to work on for the next six-month period:
    Academic:
    1. Successfully complete one unit per month in United States History.
    2. Actively participate in all Maine Studies activities.
    3. Maintain an accuracy level of 85% or better.
    4. Make daily entries in his journal responding to class lessons.

    Behavioral:
    1. Be cooperative and respectful of others.
    2. Work independently to the best of ability.
    3. Show leadership in class participation and activities.

    0168

6. Periods of instruction:___50___ Grade__C__ Teacher:___Doug Fogg_____
    (Grades of A, B, C, D, F, or Passing can be assigned)

HALL00008385

Individual Educational Program: Status Report and Update 4.

Instructional Area  <u>Science</u>                                    C.C. #3

Member  <u>Chuck Hall</u>                            Date of Report  <u>12/14/88</u>

☑  is covered by Report:  <u>8/25/88</u>           to  <u>12/14/88</u>

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1.  Behavior Assessment

    Individual Conduct     X

    Withdrawal     X

    Maturation     X

    Social Aggression     X
       1   2   3   4   5

2.  Long-Term Educational Goal:
    To return to public school.

3.  Goals for current period of instruction:
    Academic:                    Percentage of Success Achieved

| | | |
|---|---|---|
| 1. | Complete all assigned reading and writing. | 25% |
| 2. | Maintain a 90% level of accuracy on all written work. | 0% |
| 3. | Correct or re-do all unsatisfactory papers. | 90% |
| 4. | Act as a peer tutor when requested. | 100% |
| 5. | Participate in class discussions. | 90% |

    Behavioral:

| | | |
|---|---|---|
| .. | Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up". | 75% |
| 2. | Act as a regular and ordinary member, avoiding putting himself above the rules. | 90% |
| 3. | Be respectful of the needs and rights of fellow students. | 75% |
| 4. | Follow school rules and teachers' directions. | 90% |

4.  General comment and observation:

Due to his frequent, prolonged home visits, Chuck has completed only 25% of his
assignments.  He has not made a conspicuous effort to make up or replace work
that was missed.  Chuck has made much more efficient use of his time in the class-
room, averaging 87% on all completed work.  Behaviorally, Chuck is very successful
communicating and relating to peers and adults, but on a superficial level.  He
does not, at this point, ellicit my complete confidence or trust, though I have
left him in charge of the class in my absence on a number of occasions - with no
regret.

5.  Objectives to work on for the next six-month period:
    Academic:

1.  Complete all assigned reading and writing.
2.  Maintain an 80% level of accuracy on all written work.
3.  Make up missed assignments.
4.  Participate in class discussions, labs, and field activities.

    Behavioral:

1.  Show respect to peers - including those younger and smaller.
2.  Act as a peer tutor when possible.

<span style="float:right">0167</span>

6.  Periods of instruction: <u>41</u>   Grade <u>B (87)</u> Teacher: <u>Rick Hirte</u>
      (Grades of A, B, C, D, F, or Passing can be assigned)

HALL00008384

Individual Educational Program: Status Report and Update

Instructional Area ___Math___     C.C. #3

Member ___Chuck Hall___     Date of Report ___12/14/88___

is covered by Report: ___8/25/88___ to ___12/14/88___

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

    Individual Conduct    X

    Withdrawal    X

    Maturation    X

    Social Aggression    X

    1    2    3    4    5

2. Long-Term Educational Goal:
    1. To complete Holt Mathematics Unlimited with an 80% or better average.
    2. To return to public school.

3. Goals for current period of instruction:

Academic:          Percentage of Success Achieved
    1. To complete chapter 4 with an 80% or better average.    90%
    2. To review chapters 5 & 6 with an 80% or better average.    0%
    3. To review chapters 7 & 8 with an 80% or better average.    0%

Behavioral:
    1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".    90%
    2. Act as a regular and ordinary member, avoiding putting himself above the rules.    90%
    3. Be respectful of the needs and rights of fellow students.    90%
    4. Follow school rules and teachers' directions.    95%

4. General comment and observation:

    Chuck is doing very well. He is reviewing material again, but each time he does he gets more and more confident in his abilities. Although this teacher has some-times questioned the advisability of letting Chuck choose his own direction, it seems to be paying off. He should readily adjust to a more structured situation. Chuck has surprised himself, and me too.

5. Objectives to work on for the next six-month period:

Academic:
    1. To review chapters 5 & 6 with an 80% or better average.
    2. To review chapters 7 & 8 with an 80% or better average.

Behavioral:
    To work on completing the above academic objectives.

0166

6. Periods of instruction: ___40___ Grade ___ Teacher: ___Barbara Fenderson___

(Grades of A, B, C, D, F, or Passing can be assigned)

HALLO0008383

#6

Non-compliance with rules and authority
and verbal disrespect
Long term - learn to resolve differences in healthy
ways
Short term - learn to accept staff authority.

I really haven't had to many problems with
non compliance. And the same goes for disrespect
I have found other healthier ways to deal
with things than to be disrespectfull or
non-compliant with staff and members.

#7    Inability to function in public school
long term - Return to public school
short term- attend classes More regularly

I feel class assignments in school and
going to school are in my personal best intrest
at the present time. And now that I'm going
to be able to make the decision on which type
of schooling I would like to do. I feel that enrolling
in Adult ed is the best thing for me and I
feel that I will be able to function in public
school settings (Night school /Adult Ed, GED
program)

0165

HALL00008382

6.

#3 poor peer interaction skills (threatning, antagonizing, making hurtfull, sarcastic remarks, etc.)
   Long term - learn ways to get along with others
   Short term - Eliminate fighting, antagonizing, etc.

   I feel that I could do more work on this, because I still make sarcastic comments regulary and I recently was involved in an exclosive group which was based on a negative vote. So I do feel I need to work a little more on this specific issue.

4# family stress related to adoption issue and poor parent/child comunication
   long term - Resolve negative feelings
   short term - Begin to talk and identify issues.

   I feel this issues is well under control due to the fact that this issue has been talked about in meetings at homestead, family counciling and homevisits. So I think that I've done soficiant work on this issue with my group, and with my parents etc.

#5 confusion over sence of self and sexual identity
   Long term - Gain sense of self and self acceptance
   short term - Begin to identify and discuss issues.

   I feel good about this issue because I do have a better sence of who I am and what I need to do to feel good about myself and not let it realy bother me what others think or say about me.

HALL00008381

0164

5.

#4
Criminal Behavior

Long term - learn to get needs met in other healthier ways

Short term - Eliminate criminal behaviors

      I don't feel that I realy worked on this issue until late in my treatment. After the theft of a sleeping bag. When this incident happend that's when I realy took a close look at this problem after doing a lot of thinking I can honestly say I don't think I'll have any more problems with theft or destruction. Presently I'm on informal adjustment for this theft charge until completeting and graduating the Homestead project.

#2

      Manipulation/subtle intimidation of others and lying (seeing self as above the rules)

      I don't see this as a major treatment issue anymore. One of the things that I learnt at homestead is when I do, do something own up to what I do and probably most of the time the consequence isn't as severe as when I lie. When I first came into the program being subtle was a big thing for me, that took a lot before I finally realized that. But now I see myself as being more straight forward. And I see myself and others as an equal long term - learn ways that rules apply to him and others equally "that he is not" better"

short term eliminate manipulation and intimidation.

HALL00008380

0163

4.

Overall Recommendation: Chuck is a young man who will soon be turning 18. It is time for him to return to his home and community, and to start learning about and facing up to adult responsibilities. His plan to return to his parents home, pursue a combination of night school and vocational classes, and hold a part-time job is a workable one. His willingness to truly invest himself in an ongoing individual or group therapy process will be a key factor in determining his future emotional investment in relationships and in gaining self-acceptance. A discharge date in January is anticipated.

*Pat Bousquet LMSW*

Pat Bousquet, LMSW
Case Manager/Therapist

0162

HALL00008379

Issue # 5  Confusion over sense of self and sexual identity.

Status:  Chuck is still very insecure about who he is and what he wants from relationships with others.  He continues to keep friendships superficial, to do little emotional investing, and to stay "a loner" in many respects.  He is very reluctant to explore this issue, and may choose to drift in and out of relationships for some time to come.  Group confrontation has done little to impact this issue.

Recommendation:  Continue per present plan until discharge. Change short term goal to "continue to work on developing a clearer identity and self-acceptance".

Aftercare Treatment Strategies:      1.  Use recommended group therapy and/or individual therapy to address this issue.  2.  Use available community and/or school based resources to assist with career-counseling.

Issue # 6 Non-compliance with Rules and Authority.

Status:  Chuck has broken rules about not communicating with members on restriction status on several occasions (getting both himself and them in trouble), has been disruptive and disrespectful in meetings, and has had trouble being supportive during the group therapy process.  Again, the attitude of being "above the rules" and acting as he pleases without much thought to consequences to himself or others is apparent. Chuck has the ability to be a leader and a helpful, considerate individual, but he has a tendency to go too far and play "junior staff" which can be distasteful.

Recommendation: Continue per plan until discharge.  Change short term goal to "continue to demonstrate respectful attitude and cooperation with authority figures".

Aftercare Treatment Strategies:      1. Use available in-school or on the job assistance to monitor and improve attitude.

Issue # 7 Inability to function in public school

Status/Recommendation: Refer to education section of report.

0161

HALL00008378

Issue # 3 Poor peer interaction skills (Threatening, antagonizing, making hurtful comments, etc.).

Status: Chuck has had 5 documented problems in this area, which included name calling, hurtful comments of a sexual nature, swearing and general disrespect. This issue parallels the one above, since Chuck often becomes impatient, sarcastic, and openly critical of others whom he sees as "below" him. This attitude could well create difficulties for him in a night school, vocational school, or job setting.

Recommendation: Continue per plan until discharge. Change short term goal to read " learn to accept that everyone has value, despite differences".

Aftercare Strategies: 1. Use recommended group therapy to address this issue.
2. Use available resources at vocational school to deal with interpersonal conflicts with other students.

Issue # 4 Family stress

Status: Chuck's adoptive parents have been involved in and supportive of the treatment process. They have come up with reasonable and realistic rules and expectations which can enable Chuck to co-exist as part of their family unit. They have also stated their support of attempts he may choose to make to locate information about his biological parents. For his part, Chuck tends to keep his adoptive parents at a "safe" emotional distance. He appears torn between wanting to rejoin the family unit and wanting to be on his own. Since he is approaching 18, this is a normal dilemma, but it is hoped that Chuck will be able to make the eventual break with his family in a healthy way, rather than in anger over some broken rules or misunderstanding.

Recommendation: Continue present plan until discharge. Change short term goal to read "continue to work on developing a healthy relationship with family members".

Aftercare Treatment Strategies: 1. Engage in family therapy.
2. Work with parents on rules.

0160

HALL00008377

Homestead Project, Inc.
P.O. Box 663
Ellsworth, Maine 04605

Charles Hall          Treatment Summary          December 14, 1988

This report will summarize progress which "Chuck" has made toward achieving treatment goals, as outlined on his Master Treatment Plan, since his last case conference of 8/25/88. Specific recommendations will be made for each treatment issue to cover the transition and aftercare of his treatment process.

Issue # 1  Criminal behavior (theft, property destruction)

Status:  Chuck has had no documented problems in this area since August. His seeming lack of remorse for past criminal behaviors and his continued reluctance to seriously consider the long range consequences of his actions make him "at risk" for future difficulties.

Recommendation:  Change short term goal to read "continue to get needs met in other, healthier ways". Continue per plan until discharge.

Aftercare Treatment Strategies:     1. Gain useful employment to earn necessary money to meet needs.
2. Engage in individual therapy.

Issue #2 Manipulation/subtle manipulation of others (Seeing himself as above the rules).

Status:  Chuck's suspected involvement in a negative subculture at Homestead, and his general condescending attitude toward both staff and members, indicate the on-going nature of this problem. He can be pleasant, cooperative, and helpful, but his sincerity is often suspect.

Recommendation:  Chuck needs to come to the realization that, sooner or later, people do see through his attempts to "con" them. Perhaps only time will convince him of the need to change. Continue per plan until discharge. Change short term goal to read "continue to comply with rules and expectations".

Aftercare Treatment Strategies:     1. Locate and join a young adult therapy group, where this issue can continue to be addressed.

HALL00008376                              0159

Homestead Project, Inc.
P.O. Box 663
Ellsworth, Maine 04605

November 18, 1988

Bud Presley
Saco School District
Union # 7
Saco, Maine 04072

Dear Bud:

Per our phone conversation of November 18, 1988, we are scheduling a final PET for Chuck Hall on Wednesday 12/14 at 11:00 a.m. This meeting will take place at Homestead and will focus on finalizing a discharge date and specific aftercare plan for Chuck. I hope the weather cooperates!

Sincerely,

Pat Bousquet, LMSW
Case Manager/Therapist

cc: Mr. and Mrs. Hall
Chuck Hall
Brenda Leavitt, Aftercare Coordinator
Scott Erickson
Master File
Log (re-entry)

0158

HALL00008375

MEDICAL REPORT

Chuck Hall                                                    8/25/88

2/29/88      Date of last medical report.

3/7/88       To Dr. Meyer for fillings.  No need to return.

4/13/88      Chuck fell on basketball court, twisting his right ankle.  Treat-
             ment:  rest, ice, elevate foot, crutches for ambulation.  Medicated
             with Coated Asprin.  No sports for five days.

5/19/88      To Dr. Kipperman for severe case of poison ivy.  Culture taken.
             Treatment:  Kelflex 250 mgm. four times per day, Benedryl 25-50
             mgm. every four to six hours PRN itch, Phisohex and baking soda
             wash two times a day, dress area with triple Antibiotic and DSD.

5/23/88      Culture grew  staph aureous.    Continue current treatment.
5/24/88      To Dr. Kipperman to recheck poison ivy.  Area still raw and in-
             fected.  Continue present treatment and add 2.5 Hydrocortisone
             Cream two times a day.

5/30/88      To Dr. Kipperman to recheck poison ivy.  Healed up, may dis-
             continue treatment.

8/2/88       To Dr. McCann for eye exam.  Vision is 20/20 in both eyes.

             To Dr. Meyer for dental exam, prophylaxsis, x-rays, cleaning and
             flouride treatment.  Needs more work, but awaiting financial
             arrangements from parents.  Flourigard two tsp. at bedtime or-
             dered to help prevent further cavities.



                                        Bonnie A Moretto LPN
                                        Bonnie Moretto, LPN

0157

HOMESTEAD   PO BOX 663   ELLSWORTH, MAINE 04605   207/667-2021
HALL00008374

IFCD 00028309

Individual Educational Program: Status Report and Update [10.]

Instructional Area ___Health___

Member ___Chuck Hall___ Date of Report ___8/25/88___

Dr : covered by Report: ___2/29/88___ to ___5/31/88___

1. Behavior Assessment

| | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

Individual Conduct    X (disruptive, manipulating)

Withdrawal    X

Maturation    X

Social Aggression    X

     1    2    3    4    5

2. Long-Term Educational Goal: 1. Become aware of the necessity of good hygiene and health practices as well as concepts on sexual awareness and substance abuse.
     2. Return to public school.

3. Goals for current period of instruction:

Academic:        Percentage of Success Achieved

   1. Complete modules on sexual awareness and substance abuse.    100%
   2. Continue to work in text, Essentials of Health.    100%
   3. Be part of class discussion in a mature manner 80% or the time.    70%
   4. Work to best of ability when completing assignments.    80%
   5. Request homework if class is missed or student is on a home visit.    70%

Behavioral:

   .. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".    70%
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.    70%
   3. Be respectful of the needs and rights of fellow students.    85%
   4. Follow school rules and teachers' directions.    70%

4. General comment and observation:    Chuck has not given the impression that he has put in an honest effort. He has been disruptive during class discussions, usually minimizing when brought to his attention. Chuck has not been conducting himself as an upper level member. He seems to think that by shaking your hand all is forgotten. This is unfortunate. Chuck has the capability but he is not applying himself.

5. Objectives to work on for the next six -month period:

Academic:

   1. Complete module on first aid.
   2. Continue to work in text, Essentials of Health.
   3. Be part of class discussion in a mature manner 80% of the time.
   4. Work to best of ability when completing assignments.
   5. Request homework if class is missed or student is on a home visit.

Behavioral:

   1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of fellow students.
   4. Follow school rules and teachers' directions

0156

6. Hours of instruction: ___25___ Grade ___ Teacher: ___Richard Dupont___
     (Grades of A, B, C, D, F, or Passing can be assigned)

HALL00008373

Instructional Area _____ Math _____

Member ___ Chuck Hall ___          Date of Report ___ 8/22/88 ___

U' :s covered by Report: ___ 2/29/88 ___ to ___ 5/31/88 ___

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

   Individual Conduct

   Withdrawal

   Maturation

   Social Aggression

2. Long-Term Educational Goal:
   1. To complete Silver Berdett level 8 with an 80% or better average.*
   2. To return to public school.

3. Goals for current period of instruction:
   Academic:                                    Percentage of Success Achieved
   1. Finish chapter 4 (Fractions) with an 80% or better average.           100%
   2. Complete chapter 5 (Ratio, Prop. & %) with an 80% or better average. 100%
   3. Complete chapter 6 (Geometry) with an 80% or better average.          90%
   4. Complete chapter 7 (Area and Volume) with an 80% or better average.    0%

   Behavioral:
   1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".  65%
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.             65%
   3. Be respectful of the needs and rights of fellow students.                                   85%
   4. Follow school rules and teachers' directions.                                               95%

4. General comment and observation: Chuck's behavior has slipped since he has become more comfortable with the program and since he has been charged with upper phase responsibilities. (See behavioral 1&2 above.) In spite of this, Chuck is a very upbeat member of the class although he states every day that he hates math. Although he will probably never be a mathematics super star, he holds his own very well. He asks questions readily, listens to the answers given, and works to improve his skills.

5. Objectives to work on for the next six-month period:
   Academic:
       *Chuck has moved into an Addison Wesley consumer math book at his request. This seems like an appropriate area for Chuck to be working in.
       1. Complete chapter 1 (Calculating, Organizing Data & Formulas) with an 80% or better average.
       2. Complete chapter 2 (Earning Money) with an 80% or better average.
   Behavioral:
   1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of fellow students.
   4. Follow school rules and teachers' directions

0155

6. Hours of instruction: ___ 48 ___ Grade ___ Teacher: Barbara Fenderson ___
   (Grades of A, B, C, D, F, or Passing can be assigned)

HALL00008372

Instructional Area __Social Studies__

Member __Chuck Hall__                    Date of Report __8/25/88__

D.  covered by Report: __2/29/88__          to __6/10/88__

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

    Individual Conduct        ├_____X (occasional antagonism and disruptiveness)

    Withdrawal        ├_____X_____+_____+_____+_____+_____┤

    Maturation        ├____X_____+_____+_____+_____+_____┤

    Social Aggression        ├___X____+_____+_____+_____+_____┤
                            1        2        3        4                                5

2. Long-Term Educational Goal:
    1. Obtain a basic understanding and appreciation of United States History.
    2. Return to public school.

3. Goals for current period of instruction:                Percentage of Success Achieved
    Academic:
    1. Keep pace with the class in United States History, level 3.        85%
    2. Complete 12 hours of Maine Studies.                                100%
    3. Actively participate in classroom activities.                     85%
    4. Maintain an accuracy level of 85% or better.                       70%

    Behavioral:
    1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".   100%
    2. Act as a regular and ordinary member, avoiding putting himself above the rules.              60%
    3. Be respectful of the needs and rights of fellow students.                                    70%
    4. Follow school rules and teachers' directions.                                                60%

4. General comment and observation:    I have been disappointed in Chuck's behavior since the last case conference. Since February he has passed assignments in late, antogonized other members and fooled around in class to a greater degree than he had in the past. Though he has made progress, I feel he needs to do much more work before he will be ready to leave Homestead.

5. Objectives to work on for the next six-month period:
    Academic:

    1. Keep pace with the class in United States History, level 3.
    2. Actively participate in the Maine studies program.
    3. Actively participate in classroom activities.
    4. Maintain an accuracy level of 85% or better.

    Behavioral:
    1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".
    2. Act as a regular and ordinary member, avoiding putting himself above the rules.
    3. Be respectful of the needs and rights of fellow students.
    4. Follow school rules and teachers' directions

0154

6. Hours of instruction: __40__   Grade __HALL00008371__   Teacher: __Doug Fogg__
                          (Grades of A, B, C, D, F, or Passing can be assigned)

Individual Educ[..]onal Program: Status Report & Update

Instructional Area ___ Science ___

Member __Chuck Hall__  Date of Report __8/25/88__

Dates covered by Report: __2/29/88__ to __6/10/00__

1. Behavior Assessment

| | No Problem Noted | | Moderate Problem | | Severe Problem |
|---|---|---|---|---|---|
| Individual Conduct | X | | | | |
| Withdrawal | X | | | | |
| Maturation | X | | | | |
| Social Aggression | X | | | | |
| | 1 | 2 | 3 | 4 | 5 |

2. Long-Term Educational Goal:
Return to public school.

3. Goals for current period of instruction:

Academic:                                           Percentage of Success Achieved
1. Complete all assigned reading and writing.                        100%
2. Maintain a 90% level of accuracy on all written work.             100%
3. Correct or re-do all unsatisfactory papers.                        90%
4. Participate in lab and field activities.                           90%

Behavioral:
1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".   50%
2. Act as a regular and ordinary member, avoiding putting himself above the rules.             70%
3. Be respectful of the needs and rights of fellow students.                                  65%
4. Follow school rules and teachers' directions.                                              90%

4. General comment and observation:  The superficial nature of Chuck's polite and cooperative demeanor can be fully appreciated when he is in the company of peers and unaware of the presence of adults. Chuck readily puts down others — taking advantage of his familiarity with the program and his seniority among the members. He continues to use sarcastic humor and subtle insults to express himself.

Chuck is very bright, and capable of using charm and influence in a helpful positive nature.

5. Objectives to work on for the next six-month period:
Academic:

1. Continue meeting all reading and writing requirements.
2. Continue current level of achievement in written work.
3. Act as a peer tutor when requested.
4. Participate in class discussions.

Behavioral:

1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".
2. Act as a regular and ordinary member, avoiding putting himself above the rules.
3. Be respectful of the needs and rights of fellow students.
4. Follow school rules and teachers' directions

0153

6. Hours of instruction: __59__ Grade HALL00008370 Teacher: __Richard Hirte__
(Grades of A, B, C, D, F, or Passing can be assigned)

Individual Educational Program: Status Report and Update          ld.

Instructional Area ___Practical Arts___

Member ___Chuck Hall___                    Date of Report ___8/25/88___

th͜ s covered by Report: ___2/29/88___     to ___5/31/88___

1.  Behavior Assessment

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

Individual Conduct

Withdrawal

Maturation

Social Aggression

2.  Long-Term Educational Goal:
    To gain an awareness of the proper use of hand and power tools.

3.  Goals for current period of instruction:
    Academic:                                       Percentage of Success Achieved
    1.  Come prepared to all classes.                                90%
    2.  Follow all safety procedures, wearing safety equipment when necessary. 100%
    3.  Show patience and courtesy when working with or around others.  80%
    4.  Complete project in allotted time.                           100%

    Behavioral:
    1.  Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up". 80%
    2.  Act as a regular and ordinary member, avoiding putting himself above the rules.  80%
    3.  Be respectful of the needs and rights of fellow students.    80%
    4.  Follow school rules and teachers' directions.               90%

4.  General comment and observation:    Chuck's performance during this project was
    satisfactory.  Chuck improved in his use of tools, following directions and working
    among others.  I was pleased with Chuck's overall performance.

5.  Objectives to work on for the next six-month period:
    Academic:
    1.  Come prepared to all classes.
    2.  Follow all safety procedures, wearing safety equipment when necessary.
    3.  Show patience and courtesy when working with or around others.
    4.  Complete project in allotted time.

    Behavioral:
    1.  Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".
    2.  Act as a regular and ordinary member, avoiding putting himself above the rules.
    3.  Be respectful of the needs and rights of fellow students.
    4.  Follow school rules and teachers' directions

                                                                        0152

6.  Hours of instruction:___13___ Grade___ HALL00008369 acher:___Richard Dupont___
                    (Grades of A, B, C, D, F, or Passing can be assigned)

IFCD 00028314

Individual Educational Program: Status Report and Update

Instructional Area __English__

Member __Charles Hall__      Date of Report __8/22/88__

Time covered by Report: __2/29/88__ to __6/10/88__

1. Behavior Assessment

| | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

Individual Conduct — X (at 2)

Withdrawal — X (at 2)

Maturation — X (at 1.5)

Social Aggression — X (at 1.5)

Scale: 1   2   3   4   5

2. Long-Term Educational Goal:
   To return to public school.

3. Goals for current period of instruction:
   Academic:      Percentage of Success Achieved

   1. To work in Understanding Literature.     95%
   2. To work on writing in Organizing and Reporting.     90%
   3. To work in SRA lab.     90%

   Behavioral:

   1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".   85%
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.   85%
   3. Be respectful of the needs and rights of fellow students.   90%
   4. Follow school rules and teachers' directions.   90%

4. General comment and observation: Chuck does not utilize his full capacity. He
   tries to manipulate instead of concentrating and doing his best work at times.
   He is a pleasant person to work with. Most of the time he is helpful and co-
   operative.

5. Objectives to work on for the next six-month period:
   Academic:

   1. Perform well in the Summer Program.
   2. Read in SRA lab.
   3. Read in Exploring Literature.

   Behavioral:

   1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of fellow students.
   4. Follow school rules and teachers' directions

0151

6. Hours of instruction __56__ Grade __B__ Teacher: __Katherine Sweek__
   (Grades of A, B, C, D, F, or Passing can be assigned)

HALL00008368

Individual Educational Program: Status Report and Update  10.

Instructional Area _____ Writing Skills _____

Member ___ Charles Hall _____        Date of Report _____ 8/25/88 _____

Dɑ ɟ covered by Report: ____ 2/29/88 _____   to _____ 6/10/00 _____

|  | No Problem Noted | Moderate Problem | Severe Problem |
|---|---|---|---|

1. Behavior Assessment

   Individual Conduct — X ———————————————————

   Withdrawal — X ———————————————————

   Maturation — X ———————————————————

   Social Aggression — X ———————————————————
   1          2          3          4          5

2. Long-Term Educational Goal:
   To return to public school at grade level.

3. Goals for current period of instruction:
   Academic:                                    Percentage of Success Achieved
   1. To write on self-selected and assigned topics.              80%
   2. To become fluent in various types of writing.              90%
   3. To learn to write using correct grammar and spelling.      90%
   4. To have conferences with class members to aid in revising writing.   85%

   Behavioral:
   .. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".   85%
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.   80%
   3. Be respectful of the needs and rights of fellow students.   80%
   4. Follow school rules and teachers' directions.   85%

4. General comment and observation:   Chuck has shown good writing skills during
   this semester. He has written on a variety of subjects, exhibiting good mechanical
   and organizational skills as well as knowledge of audience and purpose. Chuck
   occasionally has a tendency to talk too much and he could have produced more work.
   Still, for the most part, Chuck's behavior has been exemplary and he has been
   a good role model. Chuck has a desire to continue his education; his writing
   skills should send him well in this endeavor.

5. Objectives to work on for the next six-month period:
   Academic:
   1. To write on self-selected and assigned topics.
   2. To become fluent in various types of writing.
   3. To learn to write using correct grammar and spelling.
   4. To have conferences with class members to aid in revising writing.

   Behavioral:
   1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of fellow students.
   4. Follow school rules and teachers' directions

0150

5. Hours of instruction: ___23___ Grade ___B___ Teacher: ___Stephen Krichels___
   (Grades of A, B, C, D, F, or Passing can be assigned)

HALL00008367

Individual Educational Program: Status Report and Update                    ~l.

Instructional Area  Overall Academic Observations

Member ___Chuck Hall___                    Date of Report ___8/25/88___

Dates covered by Report: ___2/29/88___ to ___8/25/88___

|                          | No Problem Noted | | Moderate Problem | | Severe Problem |
|--------------------------|---|---|---|---|---|
| 1. Behavior Assessment   |   |   |   |   |   |
| Individual Conduct       |   | X |   |   |   |
| Withdrawal               | X |   |   |   |   |
| Maturation               | X |   |   |   |   |
| Social Aggression        | X |   |   |   |   |
|                          | 1 | 2 | 3 | 4 | 5 |

2. Long-Term Educational Goal:
   To return to public school.

3. Goals for current period of instruction:
   Academic:                                    Percentage of Success Achieved

   1. To work diligently in all subjects, achieving grades of A or B in
      each subject.

                                                              All but one

   Behavioral:

   1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".   75%
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.             75%
   3. Be respectful of the needs and rights of fellow students.                                  85%
   4. Follow school rules and teachers' directions.                                              90%

4. General comment and observation:   Chuck's overall school performance since his
   last case conference has noticeably slipped.  There is some respectable academic
   work, but the theme running through the teachers' reports is that Chuck has not
   put in an honest effort.  Instead he has relied on his charm and "buttering up"
   of the teachers.  But the charm and cooperativeness seem to be superficial
   when it comes to his fellow students.  I see the progress Chuck has made since
   his arrival but there is plenty of room for improvement.

5. Objectives to work on for the next six-month period:
   Academic:

   1. To work diligently in all subjects, achieving grades of A or B in each subject.

   Behavioral:

   1. Speak clearly and plainly to get his needs met, avoiding manipulating and "buttering up".
   2. Act as a regular and ordinary member, avoiding putting himself above the rules.
   3. Be respectful of the needs and rights of fellow students.
   4. Follow school rules and teachers' directions

                                                                              0149

6. Hours of instruction: 25 wks.  Grade ___ HALE00008366 Teacher: Fred Ketchum—Education Supervisor
                    (Grades of A, B, C, D, F, or Passing can be assigned).

Church
Hall
8/24
8.

CASE Confrance

AS for AS school is Concerned I
feel that I could go to A
public school and take care
of my self appropriatly

HALL00008365

0148

*Chuck*
*Hall* 7.

*Case Conference*
8/84

4) Inability to Function in Public school
long term (12 months) Return to
Public School

Short term (6 months) *starting 2/88* Attend class
here (at Homestead) Regulary.

I see my self as of making
a big improvement in school
from the outside, I've attended
class Regulary and enjoy school
much more than I used to.
With school I would like to
attend a diffrent school system
~~&~~ besides Thornton ACIADAMY.

0147

HALL00008364

Case Confrance

Chuck b.
2/11
8/24

5) Confusion over self and sexual identity

Long term (12 months) Gain sense of self and selfacceptance

Short term (6 months) Begin to Identify and discuss issues

I don't see this as an issue for myself, I can accept ~~there~~ who I am and what people think of me and what I think of myself.

6) Non-compliance with rules and athority and verbal disrespect.
Long tem - learn to resolve difrences in healthy ways

Short term - learn to accept staff authority

I see disrespect as a Minor issue due to the fact that I have not recieved a consequencos that I remember for disrespect Non-Compliance I have had incedents of Non-compliance but I don't see it as a chronic problem.

0146

HALL00008363

CASE Conferance

3 Poor Peer Interaction Skills (threatning, antagonizing, Making Hurt full Coments, sarcastic remarks, etc.)

Long term (12 months) Learn to get along with others

Short term (6 months) Elimanate fighting, antagonizing, etc.

I see this as a minor issue for myself I've had no problems since I've been at Homestead with fighting, and I've recieved no consequences for antegonizing I have antagonized somewhat but I don't think of it as a major issue.

4) Family stress related to adoption issue and poor parent/child comunication.

Longterm (12 months) Resolve negative feelings

Short term (6 months) begin to identify and talk about issues.

Comunication is the biggest part of this issue And that's the only part of the up above listed problems that I see as a Serious issue,

0145

HALL00008362

4.

Case Confrence Report                    Chuck Hall

1) History of Criminal Behaviors theft, destruction of property

Long term goal (12 months) "learn to get needs met in other healthy ways"

Short term goal (6 months) "Elimanate crimanal behaviors"

I feel I have done some improvement on this issue. I have recently gone A.W.O.L. and stole a sleeping bag. But that's the only part of crimanal behavoir that I have shown since I've been at homestead

2) Manupulation intimidation (subtle) and lying (seeing self above the rules)

long term (12 months) learn that rules apply to him to. "He is not better"

short term (6 months) Elimonate manipulation and intimadation

I think I have Elimanated a great part of this issue. I don't go around trying to intimadate others. And I don't see my self going around trying to minipulate others to get my own way.

0144

HALL00008361

Issue # 7 Inability to function in public school

Status/Recommendation: Refer to education section of report.

Overall Recommendation: As Chuck's ability to play the "I don't have any real problems" game is decreasing with time, he is growing more and more uncomfortable. He dislikes the group pressure to really look at himself or his situation, and is becoming fearful of turning 18 fairly soon with no definte plan in mind. This increase stress may be excatly what Chuck needs to motivate himself towards positive change. Certainly his decision to run away put him clearly in the spotlight for group and staff attention. His placement at Homestead needs to continue, with a primary focus on what Chuck wants for his personal future and what he intends to do about making it happen.

Pat Bousquet, LMSW
Pat Bousquet, LMSW

0143

HALL00008360

Issue # 3 Poor peer interaction skills (Threatening, antagonizing, making hurtful comments, etc.).

Status: Chuck has had no specific problems in this area, but his general inter-action style with peers is certainly not direct nor assertive.

Recommendation: Change short term goal to read: Learn to verbalize opinions and feelings to peers in an open, honest and assertive way.

Issue # 4 Family stress related to adoption

Status: Chuck has recently been involved in some family therapy sessions while on home visits and has gone on 2 extended family trips. Chuck has voiced displeasure here at how the therapy sessions have gone, but has not dealt directly with those involved. In ITG, Chuck has been reluctant to examine feelings toward family members, despite group pressure to do so. He is currently feeling that a return home not what he wants, but has no definite alternate plan. Chuck has not sufficiently addressed the issue of his adoption, nor his feelings about it, to the best of my knowledge.

Recommendation: Continue present plan. A decision about Chuck's future after Homestead must be made by the involved parties in the near future, since he turns 18 on 4/6/89.

Issue # 5 Confussion over sense of self and sexual idenity.

Status: Chuck's pattern of passively reacting and refusing to take an active stance has recently become quite clear. He avoids looking at critical identity issues in ITG, often using other members to get him off the hook. His recent AWOL from the group trip followed a discussion of this issue, and Chuck chose to run away. It is obvious that this one treatment issue is far from being resolved.

Recommendation: Continue per present plan.

Issue # 6 Non-compliance with Rules and Authority.

Status: Chuck appears to have learned superficial behavioral compliance with rules, and has kept himself out of major trouble until the recent AWOL/theft incident. His actual respect for rules or authority or his understanding of why they are important, is questionable.

Recommendation: Change short term goal to read - demonstrates consistently respectful attitude toward those in authority. Continue present plan.

HALL00008359          0142

Homestead Project, Inc.
P.O. Box 663
Ellsworth, Maine 04605

Charles Hall          Treatment Summary          August 25, 1988

This is a summary of the progress Chuck has made on his treatment issues since his last case conference on 2/29/88. It will include recommendations for the next 6 months.

Issue # 1   Criminal behavior (theft, property destruction)

Status:   Chuck chose to go AWOL from a group trip on 8/12/88, taking with him several articles not belonging to him. Theft charges have been filed. Chuck was also out until approximately 2 a.m. on a recent home visit, in the company of several youths who were drinking. The driver of the vehicle Chuck was in was stopped for speeding. Chuck was still on probation at that time. To my knowledge, no charges wre pressed for that incident. Chuck has minimized the severity of his behavior and shown little if any remorse.

Recommendation:   Homestead plans to follow through on the theft charges. If is clear that Chuck is not taking his behavior seriously, or anticipating the probable consequences. Continue per present plan.

Issue # 2   Manipulation/subtle manipulation of others (Seeing himself as above the rules).

Status:   The only clear example of this, aside from those listed above, had to do with Chuck's request to get an off-grounds job. He had permission to get some job applications; he proceeded to accept a job and actually start working without either parental or Case Manager permission. (This was for 2 days over a weekend). While this could be seen as positive – Chuck taking the initiative, etc. – it was also clearly overstepping the boundaries of his responsibility.

Recommendation:   Continue present plan.

0141

HALL00008358

Homestead Project, Inc.
P.O. Box 663
Ellsworth, Maine 04605

PROJECTED TREATMENT PLAN REVIEW DATES: 12/88   and/or 3/89

PERSONS TO BE INVITED: Same as below — School person

PERSONS PRESENT AT CURRENT CONFERENCE:
Mr and Mrs Charles Hall
Fred Ketchum
Pat Bousquet
Chuck Hall - member

REQUIRED SIGNATURES:

DIRECTOR OF TREATMENT SERVICES: _Sally L. Smith LCSW_ 10/14/88

CASE MANAGER/THERAPIST: _Patricia Bousquet MSW_

EDUCATION SUPERVISOR: _Fred Ketchum MEd_

HOMESTEAD MEMBER: _Chuck Hall_

LEGAL GUARDIAN: _____

member's name _Chuck Hall_

0140

HALL00008357

| | | | | | |
|---|---|---|---|---|---|
| 2/29/88 | 5. Confusion over sense of self and sexual identity | L - Gain sense of self and self-acceptance S - Begin to identify and discuss issues | 2/89 2/89 | 1. Discuss in Intensive Therapy Group. 2. Discuss in family counseling. | started CM Level II Chuck family |
| 8/25/88 | 6. Non-compliance with rules and authority and verbal disrespect. | S-Demonstrate a consistenly respectful attitude to authority figures | 12/88 | 1. Minimum 1 day restriction plan for instances of target behavior. 2. Discuss in Intensive Therapy Group. 3. If disrespect is not blatant ("I don't feel like it", "I'll be there when I finish this", etc.) Chuck should earn an immediate one hour of IWP. 4. Breaking communication while on restriction = immediate one hour of IWP. | started ALL started CM 2/29/88 ALL 2/29/88 ALL |
| 8/25/88 | 7. Inability to function in public school | S-Develop specific re-entry plan (credits, grade, placements, etc.) S-Arrange for 2 week trial home/school visits then evaluate for return | 2/89 | 1. Refer to I.E.P. | Started Fred K. |

HALL00008356

0139

| DATE | THERAPEUTIC ISSUES (NO.) | GOALS L=LONG/S=SHORT | TARGET DATE | SPECIFIC TREATMENT STRATEGY | STATUS | RESP. PARTY |
|---|---|---|---|---|---|---|
| 2/29/88 | 1. Criminal Behavior (Theft, Property destruction) | L - Learn to get needs met in other healthier ways<br>S - Eliminate criminal behaviors | 2/89<br><br>2/89 | 1. Immediate 3 day restriction for any criminal behaviors/notify Probation Officer and look into pressing charges. Learning experience should focus on other ways to get needs met.<br>2. Discuss in Intensive Therapy Group.<br>3. Member and his belongings will be searched upon return from home visits and unsupervised off grounds trip. | started<br><br>started<br><br>Started | ALL<br><br>CM<br><br>Staff |
| 2/29/88 | 2. Manipulation/subtle intimidation of others and lying (seeing self as above the rules) | L - Learn that rules apply to him and others equally, that he is not "better"<br>S - Eliminate manipulation and intimidation | 2/89<br><br>2/89 | 1. 3 day restriction plan for manipulation and/or intimidation. Learning experience should focus on why rules apply to everyone and include apology to victim.<br>2. Discuss in Intensive Therapy Group. | 2/29/88<br><br>started | ALL<br><br>CM |
| 8/25/88<br><br>2/29/88 | 3. Poor peer interaction skills (threatening, antagonizing, hurtful, sarcastic remarks, etc.) | S-Learn to verbalize in an open honest, and assertive way | 12/88 | 1. Encourage getting along during program, in school, etc. Give praise for co-operation.<br>2. Discuss in Intensive Therapy Group.<br>3. 3 day restriction plan for instances of target behavior. | started<br><br>started<br><br>2/29/88 | ALL<br><br>CM<br><br>ALL |
| 2/29/88 | 4. Family stress related to adoption issue and poor parent/child communication | L - Resolve negative feelings<br>S - Begin to identify and talk about issues | 2/89<br><br>2/89 | 1. Discuss in Intensive Therapy Group.<br>2. Use open house and other family contact to promote positive interaction.<br>3. Use Home Visits to improve interaction.<br>4. Begin family counseling.<br>5. Write up and discuss phone calls home in Intensive Therapy Group. | started<br><br>started<br><br>started<br><br>Level II<br>started | CM<br><br>ALL<br><br>Chuck family<br>Chuck family<br>CM |

HALL00008355

0138

His placement at Homestead needs to continue, with a primary focus on what Chuck wants for his personal future and what he intends to do about making it happen.

EDUCATIONAL:

11/18/87 See I.E.P.

2/29/88 Chuck's school work has improved in the last six weeks, giving him a B average. He has the capability of being a good student and is growing in that direction. Some areas which need attention are: 1) a real commitment to learning, even if it means hard work, 2) a commitment to being personally honest and straight forward when relating to staff and fellow students.

8/25/88 see I.E.P.

MEDICAL: see nurses notes of previous plan/daily chart

PSYCHIATRIC:see previous plan dated 11/17/87

0137

HALL00008354

*Your copy*

*10/14/88*

MEMBER: Charles Hall

DATE: 8/25/88

## MASTER TREATMENT PLAN

NOW ON LEVEL: III   TREATMENT PLANNING CONFERENCE # 3

DATE OF ARRIVAL: 8/5/87   DATE OF BIRTH: 4/6/71

### REASONS FOR REFERRAL:

1. History of criminal behavior -- currently on probation
2. History of passive/aggressive and manipulating behaviors
3. Poor peer interaction skills
4. Family stress related to adoption issue
5. Poor parent/child communication
6. Confusion over sense of self and sexual identity
7. Non-compliance with rules and authority

### FINDINGS OF ASSESSMENT:

#### MENTAL HEALTH:

11/18/87  Charles has kept a low profile since admission, staying out of major trouble and learning the ropes. He had plans to go A.W.O.L. with other members, but was found out. He appears very sensitive to issues of family fighting, loss and abandonment, and parental alcohol use in Intensive Therapy Group. He is starting to use group therapy effectively.

2/29/88  Chuck has created a difficulty by presenting himself to other members as someone with few (if any) serious treatment issues. He realizes now that he is wasting time and needs to begin using Intensive Therapy Group, but he is fearful of the reaction group members may have to this attitude change. Addressing this problem head-on needs to be the first order of business if Chick is to get off dead center and begin making progress. He certainly needs to continue his placement for the coming six months.

8/25/88 As Chuck's ability to play the "I don't have any real problems" game is decreasing with time, he is growing more and more uncomfortable. He dislikes the group pressure to really look at himself or his situation, and is becoming fearful of turning 18 fairly soon with no definite plan in mind. This increased stress may be exactly what Chuck needs to motivate himself towards positive change. Certainly his decision to run away put him clearly in the spotlight for group and staff attention.

0136

HALL00008353

Case 4:19-cv-02033-BCW    Document 70-16    Filed 04/29/24    Page 391 of 423
Exhibit 23 to Complaint

IFCD 00028331

ROJECTED TREATMENT/PLAN REVIEW CONFERENCE DATES:  8/88

ERSONS TO BE INVITED:
arents, Probation Officer, School Personnel

ERSONS PRESENT (NAME & TITLE):

REQUIRED SIGNATURES:

DIRECTOR OF TREATMENT SERVICES: _Smith LSW_

CASE MANAGER/THERAPIST: _Pat Bois LMSW 4/18/88_

EDUCATION SUPERVISOR: _Fred Ketchum MSed_

HOMESTEAD MEMBER: _____

LEGAL GUARDIAN: _Mr & Mrs Charles O. Hoes_

PLACEMENT AGENCY: _____

0135

HP-1 11/87
HOMESTEAD PROJECT, INC.  P.O. BOX 663  ELLSWORTH, MAINE  04605

HALL 008352

Homestead Project, Inc.
P.O. Box 663
Ellsworth, Maine 04605

July 27, 1988

Mr. and Mrs. Charles Hall
73 Jenkins Road
Saco, Maine 04072

Dear Mr. and Mrs. Hall:

Your son, Chuck, has recently asked to be allowed to exercise 2 upper phase priviledges:

1. Several hours of off-grounds free time during a typical weekend (usually on Saturday afternoons); and

2. Applying for and holding a part-time job, probably in Ellsworth.

I need your written response to these two questions, since your willingness to allow Chuck to excercise off-grounds freedom is very important.

Can you please think about it, call me with any questions/concerns and send me something in writing saying either yes you approve to the questions one and two or no, you disapprove.

I am not going to allow Chuck to use off-grounds time in the future until I hear from you.

Sincerely,

Pat Bousquet, LMSW
Case Manager

cc: John Durant, Residential Life Manager
    Sally Ketchum, Director of Treatment
    Chuck Hall, member

0134

HALL00008351

FINAL MEDICAL REPORT

Chuck Hall                                                        12/14/88

8/23/88        Date of last medical report.

11/2/88        To Dr. Meyer for fillings.

11/9/88        To Dr. Goodman for yearly evaluation.

12/6/88        To Dr. Meyer for fillings.  To return on 12/15/88 to finish
               up work.


                                    _Bonnie Moretto LPN_
                                    Bonnie Moretto, LPN




HOMESTEAD    PO BOX 661   ELLSWORTH MAINE 04605   207/667-2021

0172

HALL00008389

MEMBER: Charles Hall

DATE: 1/16/89

## MASTER TREATMENT PLAN

NOW ON LEVEL: III TREATMENT PLANNING CONFERENCE # 4 Final

DATE OF ARRIVAL: 8/5/87 DATE OF BIRTH: 4/6/71

REASONS FOR REFERRAL:

1. History of criminal behavior -- currently on probation
2. History of passive/aggressive and manipulating behaviors
3. Poor peer interaction skills
4. Family stress related to adoption issue
5. Poor parent/child communication
6. Confusion over sense of self and sexual identity
7. Non-compliance with rules and authority

FINDINGS OF ASSESSMENT:

MENTAL HEALTH:

11/18/87 Charles has kept a low profile since admission, staying out of major trouble and learning the ropes. He had plans to go A.W.O.L. with other members, but was found out. He appears very sensitive to issues of family fighting, loss and abandonment, and parental alcohol use in Intensive Therapy Group. He is starting to use group therapy effectively.

2/29/88 Chuck has created a difficulty by presenting himself to other members as someone with few (if any) serious treatment issues. He realizes now that he is wasting time and needs to begin using Intensive Therapy Group, but he is fearful of the reaction group members may have to this attitude change. Addressing this problem head-on needs to be the first order of business if Chick is to get off dead center and begin making progress. He certainly needs to continue his placement for the coming six months.

8/25/88 As Chuck's ability to play the "I don't have any real problems" game is decreasing with time, he is growing more and more uncomfortable. He dislikes the group pressure to really look at himself or his situation, and is becoming fearful of turning 18 fairly soon with no definite plan in mind. This increased stress may be exactly what Chuck needs to motivate himself towards positive change. Certainly his decision to run away put him clearly in the spotlight for group and staff attention.

HALL00008390

0173

His placement at Homestead needs to continue, with a primary focus on what Chuck wants for his personal future and what he intends to do about making it happen.

12/14/88 Chuck is a young man who will soon be turning 18. It is time for him to return to his home and community and to start learning about and facing up to adult responsibilities. His plan to return to his parents home, pursue a combination of night school and vocational classes, and hold a part-time job is workable one. His willingness to truly invest himself in an ongoing individual or group therapy process will be a key factor in determining his future emotional investment in relationships and in gaining self-acceptance. A discharge date in January is anticipated.

1/16/89 Chuck is discharged from Homestead effective this date. He will participate in aftercare for 2 months and tentative graduation is March 10, 1989. (See plan for specific aftercare services.

EDUCATIONAL:

11/18/87   See I.E.P.
12/14/88   See I.E. P. Date 12/14/88
2/29/88    Chuck's school work has improved in the last six weeks, giving him a B average. He has the capability of being a good student and is growing in that direction. Some areas which need attention are: 1) a real commitment to learning, even if it means hard work, 2) a commitment to being personally honest and straight forward when relating to staff and fellow students.

8/25/88 see I.E.P.

     MEDICAL: see nurses notes of previous plan/daily chart

     PSYCHIATRIC:see previous plan dated 11/17/87

0174

HALL00008391

IFCD 00028335

CRIMINAL MIND

| DATE | THERAPEUTIC ISSUES (NO.) | GOALS L-LONG/S-SHORT | TARGET DATE | SPECIFIC TREATMENT STRATEGY | STATUS | RESP. PARTY |
|---|---|---|---|---|---|---|
| 1/16/89 | 1. Criminal Behavior (Theft, Property destruction) | S/L - Learn to get needs met in other healthier ways<br>S/L - Eliminate criminal behaviors | 4/89<br><br>4/89 | 1. Gain useful employment to earn necessary money to meet needs.<br>2. Engage in individual therapy. | On-Go. | Chuck |
| 1/16/89 | 2. Manipulation/subtle intimidation of others and lying (seeing self as above the rules) | S/L - Learn that rules apply to him and others equally, that he is not "better"<br>S/L - Eliminate manipulation and intimidation | 4/89<br><br><br><br>4/89 | 1. Locate and join a young adult therapy group, where this issue can continue to be addressed. | On-Go. | Chuck |
| 1/16/89 | 3. Poor peer interaction | S/L Learn skills (threatening, antagonizing, making hurtful, sarcastic remarks, etc.)<br>S/L-learn to verbalize in an open honest, and assertive way | 4/89 | 1. Use recommended group therapy to address this issue.<br>2. Use available resources at vocational school to deal with interpersonal conflicts with other students. | On Go.<br><br><br>" | Chuck<br><br><br>" |
| 1/16/89 | 4. Family stress related to adoption issue and poor parent/child communication | S/L - Resolve negative feelings<br>S/L - Begin to identify and talk about issues | 4/89<br><br>4/89 | 1. Engage in family therapy.<br>2. Work with parents on rules | On-Go.<br><br>" | Chuck<br><br>" |
| 1/16/89 | 5. Confusion over sense of self and sexual identity | S/L - Gain sense of self and self-acceptance<br>S/L - Begin to identify and discuss issues | 4/89<br><br><br>4/89 | 1. Use recommended group therapy and/or individual therapy to address this issue.<br>2. Use available community and/or school based resources to assist with career counseling. | On-Go.<br><br><br>" | Chuck<br><br><br>" |

Linda S. Leavitt LSW 1/10/89
Chuck M. Hall 1/10/89
Charles V. Hoe 1/12/85

HALL00008392

0175

CHARLES HALL

| | | | | |
|---|---|---|---|---|
| 1/16/89 | 6. Non-compliance with rules and authority and verbal disrespect. | S/L-Demonstrate a consistently respectful attitude to authority figures | 4/89 | 1. Use available in-school or on the job assistance to monitor and improve attitude. On-Go. Chuck |
| 1/16/89 | 7. Inability to function in public school | S/L-Develop specific re-entry plan (credits, grade, placements, etc.) S/L-Arrange for 2 week trial home/school visits then evaluate for return | 4/89 | 1. Attend night school classes to prepare for completion of his GED. On-Go. Chuck |
| 1/16/89 | 8. Active participation in aftercare phase of treatment. | S/L-actively work on goals established in master treatment plan and graduate from Homestead | 4/89 | 1. To make phone contact with Brenda Leavitt once a week to discuss status of aftercare plan. On-Go. Ch 2. Actively utilize resources and supports available. 3. To attend monthly booster groups as scheduled. Thursday Feb. 16 and March 16, 1989. ~~10~~ BSL CMH 4. To graduate from Homestead March 10, 1989. BSL CMH |

Brenda S. Leavitt, LSW   1/10/89
Chuck M Hall   1/10/89
C L Hall   1/12/89

0176

HALL00008393

Homestead Project, Inc.
P.O. Box 663
Ellsworth, Maine 04605


PROJECTED TREATMENT PLAN REVIEW DATES:
N/A

PERSONS TO BE INVITED:
N/A

PERSONS PRESENT AT CURRENT CONFERENCE:
N/A


Projected discharge date: January 16, 1989
Projected discharge placement: Mr. & Mrs. Charles Hall, parents
Saco, Maine

REQUIRED SIGNATURES: _Marilyn L. Smith RSW_   DATE: 1-10-89
Clinical Consultant:

ACTIVE
DIRECTOR OF TREATMENT SERVICES: _Patricia A. Baumgartner MSW_ 1/19/89

AfterCare
CASE MANAGER/THERAPIST: _Brenda S. Leavitt LSW_   1/10/89

EDUCATION SUPERVISOR: _Fred L. Kuhn MEd_ 1/12/89

HOMESTEAD MEMBER: _Chuck M Hall_   1/10/89

LEGAL GUARDIAN: _Charles V. Hall & Dorothy L. Hall_   1/12/89

PLACEMENT AGENCY: _____


member's name _Charles Hall_

0177

HALL00008394

Homestead Project, Inc.
P.O. Box 663
Ellsworth, Maine 04605

Discharge Summary

Name of Child:        Charles "Chuck" Hall
Date of Discharge:    January 16, 1989
Date of Admission:    August 5, 1987

Charles was officially discharged from Homestead Project on January 16, 1989. He left to return to the home of his parents/legal guardians Charles and Dorothy Hall of 73 Jenkins Road, Saco, Maine (282-1844). His aftercare plan calls for his enrollment in adult education classes to help prepare him to take his GED exam this spring. He also intends to take some vocational education courses,and hold a part-time job. Specifics are outlined on his aftercare master treatment plan of 1/16/89.

Between his arrival date of 8/5/87 and his discharge, Charles participated in group therapy, wilderness activities, residential life skill programming, family meetings with treatment staff and our specialized education program. As part of routine home visits, Chuck engaged in both individual and family therapy at Homestead's recommendation.

Treatment issues which were addressed during Charles stay in residential treatment appear on his Master Treatment Plan. They were:

1. History of criminal behavior
2. History of passive/aggressive and manipulating behaviors
3. Poor peer interaction skills
4. Family stress related to the adoption issue
5. Poor parent/ child communication
6. Confusion over sense of self and sexual identity
7. Non-compliance with rules and authority
8. Inability to function in public school.

As his aftercare plan indicates, Charles made considerable progress on many of these issues, while others — notably his identity confusion and the tendency to relate to people and situations in a passive/aggressive manner — will need continued therapeutic work. Again, the specific recommendations for follow-up appear on the aftercare master treatment plan.

0178

HALL00008395

In general, Charles utilized Homestead's services well. His family supported decision against returning to a regular public school was based, in part, on the approach of his 18th birthday in April. Provided that Charles uses the community based supports and prescribed aftercare intervention strategies, his chances for successful reintegration are good.

Pat Bousquet, LMSW
Case Manager/Therapist

0179

HALL00008396

John Mandenelli, Maine State Prison, Warren Maine, Friend, from Homestead Prog. through 2004 when I left State & came to Feds!
IN PRISON FOR HOMICIDE

Bonnie Sue West, Friend from Homestead, As well as after.
PROVIDLY IN PART ___

Julie Smith, Friends with myself and Ruth.

Jaime Temple, Case Manager while I was at Maine State Prison
LAST TIME SHE WAS 2004

Deane Smith, Nurse from Maine State Prison
WAY, H SAY DEALT WITH JUNIOR STAFF GROWNS

Rhonda Thibodeau, Friend, (Can contact through Julie Smith.)
MY E SHOULD KNOW HOW TO CONTACT

Vince & Sheri Lombardi - Friends Portland Maine
FRIENDS - DONTO

Allen McDonald - Employed by Cumberland County Sheriff Dept
Best man at wedding, with Mary

Torrie Sacco, Friend from Portland

EXHIBIT
2
Duchardt
AT

TF.FD.18.09.000622

**ROBERT D. LEWIS**
ATTORNEY AT LAW
435 East Walnut Street
SPRINGFIELD. MISSOURI 65806

Se Habla Español

Telephone: (417) 849-9834
FAX: (417) 864-7000
E-MAIL: bobalew003@yahoo.com

MEMO TO CHUCK HALL FILE:

My meeting with Chuck on 12/12/2012:

Although the main purpose of my meeting with Chuck was to make sure he had calmed down and was still on board, Chuck did provide the following names as people who might have something good to say about him. Chuck was very vague on the time periods when he knew these people:

1. Charlene Davis – ex-girfriend, lived on Ross Rd, Old Orchard Beach, Maine – in the 80's – she could say he was not a lawbreaker – she lived with her Dad – Chuck and her Dad got along well.
2. Michelle Cline – ex-girlfriend, in Old Orchard Beach – he was approx 16 she was 15-16 – he moved in with her and her Dad (this was the time period when some guys burned his Mustang.
3. Renee Dubois – Friend at Homestead, address in Lewiston, Maine – she and he in therapy groups together, did group trips, participated in after care programs to help those who had not graduated yet.
4. Renee Demmons, Lewiston, Maine – a friend.
5. Rhonda Grant, Milo or Meadford, Maine – a friend.
6. Krystal Paradis, Lewiston, Maine – ex-girlfriend and a friend.
7. Edith Smith, Hollis, Maine – a friend.
8. Eric Prescott, Portland, Maine – a friend.
9. Jennifer Haynes, Portland, Maine, ex-girlfriend.
10. Jennifer Kumball, Portland, Maine, a friend.
11. Pamela Pomacy (or, Pomercy), Biddeford, Maine, exi-girlfriend.
12. Lisa LaRose, Saco, Maine, a friend.
13. Toni Dewitt, Saco, Maine, ex-girlfriend.
14. Michelle James, Biddeford, Maine, ex-girlfriend.
15. Eric Blaisdel, Winslow, a friend.
16. Arthur Scott, Grey, Maine – a friend.
17. Lori Spachek, Westbrook, a nurse.

1



EXHIBIT
3

Duchardt

18. Craig Cain, Portland or Florida, a friend.
19. Steve Marcoux, Biddeford, a friend.
20. Sue Marcoux, ? as to address, a friend.
21. Pamela Howell, Kennebunk, ex-girlfriend.
22. Effie Brown, Biddeford, a friend.
23. Beth Nichols, Saco, a friend.
24. Holly LaRochelle, Waterville, ex-girlfriend.
25. Darryl McPherson, ? as to address, a friend.
26. Janet McPherson, ? as to address, a friend.
27. Steve Parks, Brewer/Hyannis, a friend.
28. Rick Taymen, Falmouth/Portland, a codefendant and ex-friend.
29. David Nixon, Portland, a friend.
30. Wanda Chipman, Warren, a friend.
31. Spephanie Stanchfield, Agusta, a friend.

End of list. rdl, 12/19/2012.

2

IFCD 00028343

School Record Tran ·ipt

STUDENT INFORMATION

Student's name: Charles Hall

Home Address:
Saco, Maine

Parent or Guardian: Charles V. Hall

Telephone Number: (207) 282-1844

Date of Birth: April 4, 1971

Reason for Leaving:

School Information

Name: Shaker Mt. School

Address: 188 So. Winooski Ave
Burlington VT 05401

Telephone (802) 862-5970

Accredidation:
VT Reporting School

Couselor's name:
C.C. McKegney

Test Scores: Peabody Achievement Test - at 14yr, 1mo - 5/10/1986
Percentile within his age group          age equivalent

| | Percentile | age equivalent |
|---|---|---|
| PVOC | 102 | 15-11 |
| Math | 49 | 11-11 |
| Reading Recognition | 68 | 16-4 |
| Reading Comprehension | 48 | 11-5 |
| Spelling | 40 | 9-1 |
| General Information | 56 | 13-9 |

Recommended Grade Level:
Ninth Grade - but see Additional Comments on last page

Outstanding Activities and Awards:
Student Gov't : Meeting Chairperson, Meeting Secretary

Subject Areas Covered:                                    Pass/Fail

Math
Computer Math Games                                       pass
Introduction to Algebra
Sets, Fractions, Neg. Numbers, Bases                      pass
Balancing Checkbook                                       pass

English
reading skills
expository writing
creative writing
spelling and grammer

Science
Astronomy            Black Box Observation
Flower Dissection    Archeological Dig of          pass
Geology - Caves      a Fishing Village
Using a microscope         Slide Show
Goldfish      ids Wildlife

EXHIBIT
4
Duchardt    AT

TF.FD.17.31.001592

Subject Areas Cover...:     (part 2)                          Pass/Fail

Social Studies
Do-it-Yourself Current Events                                 pass
South African Apartheid                                       pass
Guest Speaker on Sexuality                                    pass

Pychology                                                     pass
    Small group dynamics

Philosophy
Perception: Each person sees differently.                     pass
Essentialism: Bicycle Identity                                pass
Moral Issues Seminar                                          pass
Sociology                                                     pass
Animal Farm

Geography                                                     pass
    General Global Geography

Art/Music
Mural Painting in Acrylic + Pastels                           pass
Sketching; Painting with Inks                                 pass
Carving                                                       pass
History of Rock 'n Roll                                       pass
Media
Operating a Video Camera                                      pass

Vocational/Business Ed.
Budget Committee Member

Home Economics
Cooking + Grocery Shopping for                                pass
  a household of ten

TF.FD.17.31.001595

Student's name:  Charles Hall

Subject Areas Covered cont. :   (part 3)          Pass/Fail

Physical Education

| | |
|---|---|
| Raquetball | pass |
| Skiing | pass |
| Swimming | pass |
| Biking | pass |
| Gymnastics - acrobatics | pass |
| Massage | |
| Speakers from Heart Assoc. + Rape Crisis Center | pass |

Student's comment:

Additional comment:

Although we do not have a specialist ob our school, we suspect that Chuckie has a learning disability in reading comprehension. If he can be tested for that more thoroughly and helped with it, we recommend he be placed in ninth grade.

TF.FD.17.31.001593

IFCD 00028346

# Shaker Mountain School

188 SOUTH WINOOSKI AVENUE
BURLINGTON, VERMONT 05401
(802) 862-5970

POST OFFICE BOX 74
HINESBURG, VERMONT 05461
(802) 453-3080

March 5, 1985

Dear Mrs. Hall,

I was with Chuckie when he hurt his mouth. I bought the medication the hospital prescribed for him. Unfortunately, I did not keep the receipt — my mistake. But the amount was $29.79 as Chuckie told you. Thank you for asking Jerry about it.

Sincerely,

Lisa Tomasi

TF.FD.17.31.001597

| Date | Brief Description of Service | Client Conf/ Interv | Witnes Interv | Cunf w/ Expert/ Invest | Obtain Review Court Record | Obtain Review Docs & Evidenc | Consul With Resour Center | Legal Research & Writing | Travel | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/7 | phone confs w/witnesses Leslie Silverstein, Philip Notis, Skip Spurling, Chuck Reeves, Portsmouth NH PD | | 0.7 | | | | | | | | |
| 1/7 | further investigation to locate witnesses in Burlington VT area | | | | | | | | 2.5 | | |
| 1/7 | conf w/Kevin McKegney re Shaker Mountain School | | 0.4 | | | | | | | | |
| 1/7 | travel from Burlington VT to Portland ME for witness interviews | | | | | | | | 4.1 | | |
| 1/7 | phone conf w/Michelle Bories to set up interview | | 0.1 | | | | | | | | |
| 1/7 | interview w/Charles and Dorothy Hall | | 3.2 | | | | | | | | |
| 1/8 | prep for interview w/John Mandarelli, Bruce Merrill | | | | | | | | | 1.2 | |
| 1/8 | travel to Windham ME for conf w/John Mandarelli | | | | | | | | 0.8 | | |
| 1/8 | conf w/John Mandarelli | | 1.2 | | | | | | | | |
| 1/8 | travel to Portland ME for conf w/Bruce Merrill | | | | | | | | 0.6 | | |
| 1/8 | conf w/Bruce Merrill | | 1.5 | | | | | | | | |
| 1/8 | phone conf w/BOP medical records custodian re providing records | | 0.2 | | | | | | | | |
| | PAGE TOTAL | 0 | 7.3 | 0 | 0 | 0 | 0 | 0 | 8.2 | 1.2 | 16.7 |

PAGE 11 OF 19

EXHIBIT
5
1-8-24
Duchardt AT

IFCD 00008310



# Sweetser-Children's Home

50 Moody Street, Saco, Maine 04072
207-284-5981

FAMILY PRESERVATION SERVICES PROGRAM

## Closing Summary

**DATE:** April 9, 1986  **DATES OF INVOLVEMENT:** 11/5/85 - 1/8/86

**PREPARED BY:** Phil Studwell/ Alice Cantara  **REASON FOR CLOSING:** Normal 9-week intervention

**FAMILY NAME:** Hall  **FAMILY ADDRESS:** Jenkins Road Saco, Maine 04072

**FAMILY MEMBERS:**

| Name: | Birthdate: | Relationship | Grade/School - Occupation: |
|---|---|---|---|
| Charles Hall | 10/29/34 | Father | Portsmouth Naval Shipyard |
| Dorothy Hall | 8/14/ | Mother | Mother/employee in shoe store |
| Chuck Hall | 4/06/71 | adopted Son | 9th grade |
| Michelle Hall | 10/18/69 | adopted Daughter | 10th grade |

## REASON FOR REFERRAL:

The family was referred by Liz Crockett, facilitator of the local Tough Love group. She knew of the Hall's situation through her daughter's friendship with Michelle. Mr. Hall also called to refer his family.

Michelle was having difficulties at home and at school. At home she had been defiant, verbally abusive, and had run overnight three times. She had fallen from an honor student last year to failing this year and had been cutting classes. Recently she had been placed at a 3-week shelter, New Beginnings (Lewiston), and was returning just prior to our involvement.

Michelle's brother Chuck had been reacting negatively to the chaos in the home.

## PREVIOUS SERVICE/OUTCOME:

New Beginnings:    Michelle stayed here for about a week returning shortly before our involvement after signing a contract drawn up by her father.



EXHIBIT
6
Duchardt

TF.FD.17.31.001863

D.H.S.:

D.H.S. had been called by Mr. Hall sometime before New Beginnings.  The intake worker informed him D.H.S. could not help because Michelle was not an abused child.  Mr. Hall was very dissatisfied.

Y.C.C.S.-Dr. Sabo:

Referral information stated Dr. Sabo was a treatment service the Halls had ended. However, one week into our involvement we learned that the Hall's were only then ending service. We held a meeting with Dr. Sabo and the Halls proposing our separate roles. The Halls chose not to continue with Dr. Sabo because of 1.)  cost and 2.) general dissatisfaction.

Tough Love:

The parents and children had recently joined Tough Love.  They remained involved during Family Preservation Services Program.

Priest at Most Holy
Trinity Church:

Michelle had had counseling periodically over the past few years.  The parents had some marital counseling.

Dr. Scholl:

Michelle had had counseling with Dr. Scholl.  We do not know the nature of this.

ASSESSMENT:

Family Worker I -

The Hall family consists of two parents, Charles and Dot, a daughter Susan who lives with her husband and four children in Vermont, and two teenage adopted children, Michelle and Chuck.  The family resides in a nicely furnished three bedroom home, which Charles has put a lot of time and effort into remodeling.  Besides being a handy-man around the house, Charles also has interests in gardening, working on automobiles, fixing statues for the Church, building winter homes for stray cats, etc.. Charles is employed at the Naval Shipyard in New Hampshire, which requires him to leave the home early in the morning and return around 5:30 at night. Dot is employed part-time as a saleswoman in a shoe store and has interests in cooking, baking, hair-styling and keeping a nice home for her family. Subsequently, since Dot is the most accessible during the day, she is placed in the position of answering the calls from the high school (where both Chuck and Michelle attend), handling the problems that arise, and communicating these to Charles when he comes home at night.  This is a difficult position for Dot for two reasons:  (1.) Dot is uncomfortable dealing with school officials; (2.) Dot has a tendency to protect the kids and Charles by withholding information, and taking care of things in her own way.  As a result of this, Michelle and Chuck take full advantage laying one parent against the other, and, in a lot of situations, avoid taking responsibility for their misbehaviors.

Michelle is a pretty, intelligent, sixteen year old whose main interests at this point in her life are friends, boyfriends, animals, rock music, and

TF.FD.17.31.001864

talking on the phone. The family reports that for about 2 years Michelle has become more and more isolated from the rest of the family. She spends long hours in her room, only coming for an occasional meal, she experiences drastic mood swings and exhibits poor impulse control which shows itself by her running away, skippng school, and sexually acting out. Michelle is a good student but as a result of missing so much school, her grades are suffering.

Chuck is a nice looking fourteen year old who likes music, video games, sports, friends and is beginning to become more and more interested in girls. Chuck is intelligent but not very motivated in school. He spent a year in Vermont at an alternative education school to work on his motivation. He seems to have benefited from this experience, which led to his being accepted to the local high school on a trial basis. Like Michelle, Chuck experiences drastic mood swings. When he is angry, he destroys property, steals, skips school and lies.

The two children, in competition with each other take turns acting out, which leaves no break for the parents. This constant stressful atmosphere has resulted in a lack of consistency around parenting and setting limits, poor communication between parents and children, children and children and spouses, and an overall lack of family fun time. Dot and Charles have been very successful in soliciting professionals in the community to help their family.

Family Worker II -

Dorothy and Charles Hall are caring loving parents of their adopted teenage children, Michelle (17) and Chuck (14). All relationships in the family are currently undergoing severe testing as the two children (led by Michelle) go through adolescent identity struggles. It appears that the family would be surviving these without calling for outside intervention if several family circumstances were not compounding to result in reducing the confidence and increasing the feelings of failure for the parents. This, in turn, is frequently paralyzing the parents as they attempt to assert authority over the children, leaving both kids free to negatively assert control and thus perpetuate the problem.

The first circumstance is that both kids' adolescences are apparently more unpredictable than the Hall's natural child's. The parents are interpeting this as their failure at parenting and perceive many reinforcements of this feeling stemming from the kids, their community and, very significantly, from each other. They tend to dismiss other considerations (i.e., "adopted kids usually have more extreme identity searches at adolescence, naturally, and act out more extreme fantasies of 'self' or Michelle and Chuck are just different than their natural child, etc., etc.) in favor of downgrading their parenting, their marriage and themselves.

Secondly, the "different" adolescences of Michelle and Chuck have by their nature, brought the parents into more and more contact with school authorities. For Dorothy this is a particularly significant stress because (1.) she apparently associates them with school authorities of her own childhood and feels intimidated by them and (2.) she senses they feel she is to blame for her children's behavior. The latter effects both of the Halls because they are very socially sensitive and live in a small community.

TF.FD.17.31.001865

Thirdly, although no separate assessment was made by Family Preservation Services, the Hall's allude to significant marital issues that have only been partly resolved through marital counseling. These interfere in the necessary presentation of a united front as parental authority.

Lastly, the parents and the children refer to a regular Saturday night social drinking in the home (Church friends) mostly. No separate Family Preservation assessment of substance abuse was made. The children are pointing to this family pattern with the result of distracting attention from their own individual life tasks.

## PROBLEM DEFINITION

Michelle was identified as the problem child, however, it became apparent that Chuck owned an equal share. For the past two years both Michelle and Chuck have been taking turns acting out to the point where their parents' coping resources became nearly exhausted. They never seemed to have a chance to replenish their energies as they alternately rallied their dwindling resources to put out one child's fire after the other's.

Goal I:     The parents will contract with their children around their behavior and related privileges and/or consequences.

    Objectives: a.   The parents will develop a back up plan to deal with Michelle's and Chuck's acting out.

             b.   The parents will be united in holding the children responsible for their behavior

             c.   The children will develop more positive means for getting their needs met.

Goal II:    The children's educational needs will be better fulfilled.

    Objectives: a.   Dot will be supported in advocating for her children's educational needs.

             b.   Chuck will work towards permanent status in the high school.

             c.   Michelle will negotiate her status within the high school.

Goal III:   Dorothy and Charles will be more empowered as parents.

    Objective:  a.   The parents will trust their own decisions.

Issue:      The Hall children were stuck in a place where their only method of communicating and negotiating their needs was one of negative acting out. They were lacking the skill of how to sit down with an adult and negotiate for what they want.

TF.FD.17.31.001866

IFCD 00028352

Closing Summary
Family Name: Hall
Page 5

Intervention: A contract was developed for each child with the help of Family Preservation Services Program which included clear privileges, expectations and consequences for the children. The forum for this contract development was Family Worker I who worked with the adolescents and Family Worker II who worked with the parents separately. When the two parties were brought together negotiation and mediation were role-modeled.

Outcome: The contract was accepted by all. The Hall children seemed to be relieved in that there was a clear vehicle for them to begin earning their parents' trust back. It also appeared to clarify the limits for Chuck and Michelle and gave them a sense of independence and power. The contract also seemed to have a positive effect in diminishing some of the manipulation around getting out of doing consequences. The kids were not as successful in confusing the issues by threats of more acting out. During Family Preservation Service's involvement, there had been a clear reduction in the children's pattern of negative acting out.

As a direct result of Michelle fulfilling her contract she successfully renegotiated her way back into school.

Issue: After attending a P.E.T. on Chuck, it was made clear by the school that Chuck's status at the high school was probationary and not very secure by his present performance. He was having problems with skipping classes, not passing work in and a suspicion of being "high" alot. The school agreed to give him another quarter to improve his performance, because of the support and involvement of Dorothy and Charles in their children's education.

Intervention: The suggestion of a weekly performance report was agreed upon by the school at the P.E.T.. Family Preservation Services helped develop a form in which each one of Chuck's teachers would sign and give an up-date on the week. This was to be done on Fridays with the last signature being Chuck's guidance counselor and they were to spend ten minutes reviewing Chuck's progress.

Outcome: Chuck agreed to this program initially, because it was similar to what he had at the alternative school in Vermont. For about two weeks, Chuck was responsible in getting his signatures and then started to come up with excuses as to why he could not follow through. Both the school and

TF.FD.17.31.001867

IFCD 00028353

parents were on top of this, but felt the ultimate responsibility fell on Chuck.

Issue:  It quickly became apparent to Family Preservation Services that Michelle and Chuck were taking turns negatively acting out.

Intervention:  Following several weeks work with the family implementing the kids' contracts, Michelle gave the parents and Family Preservation Services a test by having a crisis (concerning her boyfriend).  After supporting the parents through their successful handling of her behavior, we told the parents, in front of Chuck, that we would bring ideas for the handling of the crisis he was soon to have to our next meeting with them.  We told him we knew that it was his turn now by what the family had told us.

Outcome:  Chuck said immediately he was not going to have a crisis.  He did not have one that week.  The parents did describe an episode near the end of our involvement when he had taken some wine.

Issue:  The parents' unity was weak and their front was becoming more and more vulnerable as Dorothy tried to protect family members from each other and Charles, in his disciplinary role, tried to keep order as his children presented issues he was unfamiliar with dealing with (i.e., sexual acting out, complete defiance, running away).  Their consistency and communication had diminished.

Intervention:  We worked on the parents' unity and vulnerability as they had to deal with issues raised when the contracts were implemented.  We suggested a daily check-in time together privately after Charles got home from work and before the children were encountered.  We also developed a back-up plan to deal with Michelle's running away, reviewed this in Michelle's presence, and encouraged the parents to support each other in its delivery (the plan was to follow-through on calling the police).  We role-modeled dealing with Michelle's negative acting-out on one occasion.

Outcome:  The parents recalled and reinstated a 5 minute check-in they formerly held to.  They backed each other up as the other asserted his authority over the children during several incidents that occurred during the 9 weeks.  They did call the police when Michelle ran away once.  She did not run overnight again during our 9 weeks.  The parents stated they felt more together as parents.

TF.FD.17.31.001868

Closing Summary
Family Name: Hall
Page 7

Issue: For approximately the last two years, Dorothy and Charles' inner resources were being drained to the point where they felt as if they were being held hostage emotionally by their own children.

Intervention: Family Preservation Services structured meetings twice a week with the family with built-in parent support time. Our goal was to revive some of the energy that was lost and provide the parents with tools in order to regain the confidence and trust in each other that was needed.

We provided support in several ways for the parents both individually and together. With Dorothy we backed her up through th P.E.T. process with Chuck. She worked to improve her relationship with Michelle without sacrificing her authority. For the couple we encouraged and validated the Tough Love experience they were getting and we consistently emphasized the children's ownership of the negative acting-out behavior. We supported the parents' inclination to seek a psychiatric evaluation for Michelle.

Outcome: At the end of 9 weeks, Dorothy and Charles were a lot stronger and feeling better about their family and their own ability to manage their children. They were able to begin to enjoy games together, weekend outings, and basically have fun together.

## Community Involvement/Services Plan:

Y.C.C.S. Substance Abuse Evaluation: The Hall's stated they each were going to have individual substance abuse evaluations. Neither followed through during our work.

Tough Love The Halls continue their involvement.

Dr. Blackman: Michelle was evaluated psychiatrically and 4 sessions with Dr. Blackman were arranged. The parents also wanted Chuck evaluated.

## RECOMMENDATIONS: We recommend that:

1. The Halls contract professionally with a marriage counselor as they were still concerned with the issues to which they allude.

TF.FD.17.31.001869

Closing Summary
Family Name: Hall
Page 8

2. The Halls protect themselves with knowledge about their relationships with Alcohol so that they can better withstand their kids' attempts to manipulate them around this. This can be gained only by an evaluation.

3. The Halls all read the book <u>Changing Bodies, Changing Selves</u> which we left with them.

4. The Halls' schedule plenty of fun time together.

_____     _____
Phil Studwell, Family Worker II     Alice Cantara, Family Worker I

TF.FD.17.31.001870

EXHIBIT
7
Duchardt

IF Jim call's ericks
tell him at dady way
I'm for the already
Mom + Dad I know a
How to
kill my
self.

I ran away because some
one told me I should
I will not be in the
State of maine if you call
the cops before i call you.
I shall kill myself end
that's not a threat it's
a promise. And this is one
problem you can't solve with cops
so please don't call anyone.
or I adead man.

(thanks
for the
Idea
mom)

(Carbon
monoxide
poisonin

This is one promise I will
keep.

Chuck Hell

Please give me until 5:30 pm.
Sunday (Till kill myself if you don't)

TF.FD.09.00.001322



TF.FD.09.00.001323

**Subject:** Re: need for consultation

**From:** Ray Hill (hillrp@mail.med.upenn.edu)

**To:** fduchardt@yahoo.com;

**Date:** Friday, August 24, 2012 7:07 PM

Hi Fred,

Great speaking with you today. To recap, we spoke about having Ruben perform a review of neuropsych testing (to be conducted), perform quantitative analyses on MRI and PET, and generate a report of findings. Below is an overview of the process and cost for these services as requested.

Process:

1. After we receive the neuropsychological testing, our postdoctoral fellow generates a behavioral image from the raw data. This is essentially a topographical rendering of functional performance mapped onto the brain. This allows Dr. Gur to identify areas of potential damage. After the behavioral image is generated, Dr. Gur would confer with you to discuss results and recommendations for imaging if damage is suspected. Turn around time from receipt of raw testing data to phone conference of results is between 3-5 weeks.

2. You would then contact me to coordinate getting the patient scanned at Penn. There is a rather burdensome process for scanning an incarcerated patient. Coordination and transportation arrangements take a minimum of a month to coordinate.

3. After imaging is acquired, Drs. Andrew Newberg and Christos Davatzikos conduct quantitative analyses on the PET and MRI scans, respectively. Turn around time for their work is roughly 3 weeks.

4. Once their analyses are received, the results are interpreted and integrated by Dr. Gur. Dr. Gur then writes a final comprehensive report. Turn around time for Dr. Gur's analysis and report is 3 weeks.

Costs:

1. I cannot provide exact costs for the MRI and PET scans, as we do not bill for these. Payment in full at the self-pay rate is due in advance of the scan. The most recent estimates I saw were as follows:
- MRI of the brain without contrast $542.27 (hospital fee $448.11 + professional fee $94.16)
- FDG PET scan of the brain $1617.53 (hospital fee $1522.69 + professional fee $94.84)

2. Penn Police assess a security fee of roughly $1000 for outfitting a special detail at the hospital.

3. I have attached both a fee schedule and an estimate for costs of Dr. Gur's analysis.

Please let me know if you have any questions or need anything further.

Have a great weekend,
Ray

On Aug 16, 2012, at 3:48 PM, Frederick Duchardt wrote:



EXHIBIT
8
Duchardt
1-8-24

Good afternoon Ruben, I hope you are doing well

I have just been appointed to a capital case for a client who has neurological issues. Therefore, I am needing to talk to you, if you have time. Let me know when would be a good time to reach you, and what would be a good number to call. Thanks.

Fred Duchardt

IFCD 00028360

From: Sherry Wang <shwang2@mail.med.upenn.edu>
Subject: **Re: US v. Hill, consultation issues**
Date: Tue, 11 Mar 2014 12:15:32 -0400
To: Frederick Duhardt <fduchardt@yahoo.com>
Message-Id: <2223EE17405-494B-8BDA-28ABF121957C@upenn.edu>
X-Email-Status: read
X-Source-Folder: Hall Case
X-Email-Hash-MD5: 8ec6d078fd5764c95cb5c85c8eae81c
Attachments: **Hall_Estimate_MobergNeuropsych.pdf**

Hi Fred,

Dr. Paul Moberg has determined that a BI would show deficits according to the summary of scores you sent. Attached is an estimate for the BI, MRI, and PET. You will see that the 'Integration of findings' and 'Comprehensive Report Writing' are duplicated - I am in the process of automating the generation of estimates, but it is not complete, so for now, they are duplicated for each section in case all three (BI, MRI, and PET) cannot be done for some reason.

Also, just in case separate contracts are needed in order to pay Drs. Davatzikos and Newberg for the MRI and PET, I am giving a breakdown of the estimates for their work. Work done by Drs. Davatzikos and Newberg need to be payable to them, and not to Dr. Ruben Gur (to be later disbursed to them).

Dr. Gur - $21,700
Dr. Davatzikos - $4000
Dr. Newberg - $1200

If you have any further question please do not hesitate to contact me. Thank you!

Best,
Sherry

---

Hall_Estimate_MobergNeuropsych.pdf

---

### SMTP Header

X-Email-UID: 1370869887.73699
X-IMAP-Flags: \Seen
X-Date-Stored: 11-Mar-294 16:49:07 +0000
X-Apparently-To: fduchardt@yahoo.com via 72.30.239.237; Tue, 11 Mar 2014 16:49:03 +0000
Return-Path: <shwang2@mail.med.upenn.edu>
Received-SPF: none (domain of mail.med.upenn.edu does not designate permitted sender hosts)
X-YMailISG: CCsCpfgfLDfTK8_4W2B_5MbY8YaA_5PA40UMMVyCCh1Cy6
IO6fq59s8mfy60qD6ma.oTjuchQAZb6MfLoU__b_YELf9iah6Aa4HQj6i
0FBO5r9fWJ4_bhx.Y4k9PV.JMe5GDwjF.NqkRQg6U6DR6GY.LJHFWUcJ.x5nsW
5_ly0GvtdRorgKuk9z7jYowuz_vO2ZpngFj9lo6OX581X.Mo8xgJJFD30aj
lpsW3Onfgm6y.JYDKiRQKB_ylmbp9tPsiNRnHu3OD696yY_cF4dGVgzyPhK
g_905C0jDqSMb4EMRV_mLzbkhNfPuA2GWN_mbJXQVODTySoqfw8qvcOTDEx
9K0VpV.JsaM2fV0uJn87xbxvwCFVpeRgTv4XOuonrpn8KGXQtmhNrOOfpnim
phajr6eEjfK2M_F.jk47V2yrdeH14la4UYUM40kjCYjx8INubB5NmbUwhbw
kzPd6f33f97_UHOOTm2hnLUdx0FH48aeiw9XdRJ6byZUAWYnKQgV.HredD7ONo
o42f5faQfjGw3OZ.craFFmd4GsLJLs8QfIObzBG8bq8isvbUCZpPjYshoolGP
b4yO6W2fnRG00OisWYYupqng1LC.JS8y5OPnqr6f58RH4fa56oFMb79jN1h9kY
gTPT3398KMtRjeYjdZaksc9K__86SFj82KPzCqnoGh.zL7_uJaARTFe2K
6wonTfNuup8cCg9nvVbYN6TS3eAV6XeEnM5YoTw4ENUiQ.3m5pKvc5CU_8
XfT_UkN6bhbdmFfMoAWQf8iK3t31P_VTBZWaKdCdOxz8t5vDd21N0naiDY
VsPDBn86gBzDufvyW9i6R42f49vh3h1wggetRphJnAP8qjsnHUW01RAzrkO
ZDB48uG8fBX7fYfat0V9p.c0JOCEBoi6EoPjF0VjjXZMeT3_ID_GafOdHaw5Bg
OhbQ1v46DNFSeNEffuO_stW_M4_IQ07yoqjO3y2n.HywgRjCL.PAXjuRqg
sQ4rn5Y98Cx9JJXfaFMAwJfYyoVzp66vNK58fd58.PmQBy2DGuVGwuaNU
jf_feskdaqHWFL9B1e7Gbsirbhv.hlq4z1Zzep3.hxfA0pVsQXcyCrnsOhf
2TfiUM67gn8wMs8Sr9dyfXWLGO7K1Ph06cd36fNTQN8MXatL8rdQZ5azLF7
5dHtDCQsuRTgfbpLX0QxtLoxTN0XuaJtGWBnkUf6xr9maNi7VcKvcz8ULUm
GGubUU8fk_mUR3fxKh.v3Q2XbXUpeB96V9UVOC5spYljAnGM8d7TA2jj.E4K
o9rKZ5Q3IP9AwSSfMg6OyKQ.Tkz9fTP6jANR0Ay97Gtvce/ZrHf5gp9CfATQd
ScVAAJrfq253Pt34Mnrwg4qTiGu8ujZ06KrkaPg0aJXUv2196f8sv4JMg5Z.6CJiL8Vmad0SP6Z59B5aTR7yz9hKqU0-
X-Originating-IP: [128.91.28.124]
Authentication-Results: mta1385.mail.ne1.yahoo.com from=mail.med.upenn.edu; domainkeys=neutral (no sig); from=mail.med.upenn.edu; dkim=neutral (no sig)
Received: from 127.0.1 (EHLO smtp3.net.isc.upenn.edu) (128.91.251.124) by mta1385.mail.ne1.yahoo.com with SMTPS; Tue, 11 Mar 2014 16:22:23 t000
Received: from proxy.zimbra.upenn.edu (proxy1.zimbra.upenn.edu [128.91.251.132]) by smtp3.net.isc.upenn.edu (Postfix) with ESMTP id A1843190B for <fduchardt@yahoo.com>; Tue, 11 Mar 2014 12:22:20 -0400 (EDT)
Received: from sparkuphs.upenn.edu (node3.uphs.upenn.edu [165.123.243.167]) by smtp.mail.med.upenn.edu (Postfix) with ESMTP 8B4BBA148 for <fduchardt@yahoo.com>; Tue, 11 Mar 2014 12:22:20 -0400 (EDT)
From: Sherry Wag <shwang2@mail.med.upenn.edu>



EXHIBIT
9
Duchardt

Mime-Version: 1.0 (Apple Message framework v1283)
Content-Type: multipart/alternative; boundary="Apple-Mail-_996A66BC-3792-45AC-B98A-5A2C20155098"
Subject: **Re: US: Hall, consultation issues**
Date: Tue, 11 Mar 2014 12:15:32 -0400
In-Reply-To: <4756EBD-FA6E-40EB-9049-277838EFB672@upenn.edu>
To: Frederid Duchardt <ffduchardt@yahoo.com>
References: <139382198.50476.YahooMailNeo@web140603.mail.bf1.yahoo.com> <4756EFBD-FA6E-40EB-9049-277838B8672@upenn.edu>
Message-Id: <2223E87-21D5-494B-8BDA-28ABF121957C@upenn.edu>
X-Mailer: Apple Mail (2.1283)
Content-Length: 90584



# AUTHORIZATION & RELEASE

**TO:**

Frederick A. Duchardt, Jr.

P.O. Box 216

Trimble, MO 64492

fduchardt@yahoo.com

**RE:**

I, Charles Michael Hall, Jr. , do hereby authorize the above-named agency or individual to release to the Indiana Federal Community Defenders, Inc., the following:

any and all information relating to your representation of me, which

can be relayed verbally to my current counsel,

and any other records maintained pertaining to myself. I further authorize the above-named agency or individual to discuss any of the legal representation, treatment, counseling, or other programming provided by them to me including discussion of any statements I made during my treatment, counseling, or other programming.

_____  _____12/18/2023_____
Signature                       Date

Charles Michael Hall, Jr.
Printed Name

111 Monument Circle, Suite 3200, Indianapolis, Indiana 46204
Phone: (317) 383-3520
Facsimile: (317) 383-3525
www.indianafederaldefender.org

**EXHIBIT**
26
Duchardt

IFCD 00028363