# Declaration of Michelle Bories

I, Michelle Bories, declare the following:

1. My name is Michelle Bories. I am over the age of 18 and competent to testify to the matters herein.

2. My maiden name was Michelle Hall. I am Chuck Hall's sister. I am older than him by about a year and a half.

3. I testified by video at my brother's capital trial in 2014.

4. Chuck and I were both adopted when we were babies, me in 1969 and him in 1971. As I described in my trial testimony, we were inseparable as kids and always protective of each other. We had very loving parents who provided a nice home and everything we needed or wanted, and who took us to church every week.

5. The fact that Chuck and I were adopted was never kept from us. Our parents were always very clear with us, from as far back as I can remember, that adopted children are no different from any other children, that being adopted is just like having brown hair or green eyes: it's simply a fact about a person. It doesn't define you. I never doubted our parents' love for us, or that they did everything they could to make our lives the best they could be.

6. But that doesn't mean I ever forgot I was adopted. It wasn't always at the conscious forefront of my mind, but it was often present, even if only subconsciously. I knew my parents loved me, and I didn't want them ever to think I didn't know that, but I could not wrap my head around my birth mother not keeping me. My parents had limited information about her for me, which they gave to me. It was hard for me to learn that I was her second baby and she had kept the first one but given me up. They always told us

1

IFCD 00027344

that when we turned 18, they would help us register with the state for contact with our birth parents if we wanted to. I did it as soon as I could, not because I didn't love and appreciate my adoptive parents, but because I just had to know, to try to understand, why my birth mother had abandoned me. I also wanted to know about any medical or genetic history that I might have to worry about. As a child and a teenager though, I didn't think any of this through. Instead, I was just angry and confused without really understanding why, and it influenced the way I acted.

7. I don't know if Chuck ever registered with the state for information about his birth parents, but I do know that he didn't forget about his adoption, even if he subconsciously blocked it out. It's a fact that's always there for every adopted person, even if we all deal with it differently, and no matter how much we are loved by our adoptive families. I think Chuck was a lonely kid, because I can remember two of my own childhood best friends off the top of my head, but I can't remember any friends of Chuck's. When I think of Chuck as a child, I think of Linus from the Peanuts comic strip. He even had a blanket he carried around for a while, but the comparison is more because Chuck was a follower, someone who just wanted to be included. All he wanted to do was please people. I think some of this stemmed from the insecurity that people who are adopted live with, consciously or not, and it may have led to Chuck's lifelong habit of telling stories that aren't true. I was asked at trial about his habit of doing this, and I said I didn't remember the majority of his stories – which is still true – because they were so inconsequential that it wasn't worth confronting him about them. But no one asked where I thought his tendency to make things up came from. If I'd been asked that question, I would have said I think he never believed that people would like him for being himself. After all, his birth

2

IFCD 00027345

Ex. 34 Page 2 of 12

parents didn't – at least that's what he thought, like any adopted kid thinks. So he talked himself up to be someone he wasn't, and it never turned out well, because he couldn't live up to it.

8. But we didn't talk about any of this as kids, and then Chuck and I grew apart as we got older. We didn't love each other any less, but we didn't hang out together anymore. I started acting out. I started cutting class and running away, staying gone for days, and I got together with boys much older than me. I'm ashamed of my behavior to this day, because I now know, as a parent myself, that the most terrifying experience is to not know where your child is or who they are with. I feel awful about putting my parents in that position over and over again, and I don't think I'll ever forgive myself for it. I understand now that I was testing them, that the knowledge of my adoption nagged at me, making me wonder why, if my own birth mother didn't want me, if she could just give me away, why would these people who had no biological connection to me want to keep me? It didn't fully sink in until I got older that they did really want me, always. Until I finally understood that, I kept testing them.

9. Since I was wrapped up in my own issues, I didn't pay a whole lot of attention to what Chuck was doing as he went through middle school and into high school. I barely even registered that he went to live with our older sister Susan in Burlington, Vermont for a year, to go to a private school there. I also didn't know, until his current legal team told me in 2022, that he got Special Education services at our high school, Thornton Academy, once he came back to school in Maine. I did know that he started getting into his own trouble when he got back, but his looked different than mine: he cut class and ran away too, but he also stole from our parents, and he lied to them (all of which I was asked

3

*MLB*

IFCD 00027346

about at trial). What I didn't know, what I only learned about in 2022 from Chuck's current legal team, was that he might have been suicidal at the time. His team showed me a note he wrote to our parents. It isn't dated, but I recognize the child-like handwriting as Chuck's. It mentions killing himself three times. I found the note horrifying when I saw it in 2022, and I can only imagine how my parents felt when they found it at the time. Here is the note:



10. I feel terrible now knowing that Chuck was in this kind of pain and I didn't do anything to help him. When I also learned from his current legal team in 2023 that he was molested by the headmaster at the private school in Burlington, I felt even worse. I

4

IFCD 00027347

realize I couldn't have known these things if he didn't tell me about them, which he didn't, but it makes me feel even more guilty for acting the way I did – for making things so difficult for my parents, and for taking their attention away from Chuck when he might have needed it more than me. Learning these things about Chuck makes me see the stories he tells, the "tall tales" I was asked about at his trial, in a new light, like him saying that our mother had tried to kill herself and us, or that our father had molested me, or that Chuck had tried to kill our father with Draino. I realize now that these stories were how he coped with his pain and confusion over what had happened to him in Burlington. As I said at his trial, I've always had to go through all kinds of channels to find out how he's really feeling, because he kept everything inside. I just never realized how much he was hiding.

11. When I testified at trial, the prosecutor asked me if I remembered my family participating in a "nine-week facility program" at the Sweetser Children's Home, which he described as a "tough love program." I told him I was familiar with the Sweetser Children's Home – I knew it was a residential school for children who were having problems – but I didn't recall my family going there. Chuck's current legal team has since shown me a 1986 report from the Sweetser Family Preservation Program, which I realize now must be what the prosecutor was referring to when he asked me that question in 2014. Chuck's current team showing me this report is the first time I've ever seen it. Chuck's trial lawyer, Fred Duchardt, never mentioned it to me, much less showed it to me. I did not see it before I testified in 2014 and no one gave it to me while I was on the stand. Now that I have seen it, I remember the therapists coming to our house; their names on the report even sound somewhat familiar to me. I recall that, as part of the treatment, Chuck and I had to sign

5

IFCD 00027348

Ex. 34 Page 21 of 12

behavioral contracts with our parents. The report also mentions that, before Sweetser, we were involved with a program called Tough Love, which is maybe where the prosecutor got the idea to describe Sweetser as a "tough love program." In any case, those programs were two different things. I don't remember much about Tough Love, though I do remember that I thought at the time that it sucked, and I hated it.

12. Like I said in my testimony on cross examination, there was nothing my parents wouldn't have done to help Chuck (and me too). This was something Fred told me he really wanted me to get across to the jury, how hard my parents tried – and I wanted the jury to understand it too, because it's true, they did try everything that was recommended to them: religious counseling, local programs, residential programs, even getting the police involved with Chuck. They needed those recommendations, because they just weren't equipped to deal with us on their own. My sister Susan had been a very different kind of child when they raised her, not rebellious like me and Chuck, and they raised her in a different era – the 1950s and '60s, instead of the '70s and 80's. Also, of course, she wasn't adopted, so she didn't have any of the abandonment issues that all people who are adopted deal with, especially in their childhood. My parents truly believed that loving me and Chuck enough and providing us the services and resources available at the time was all we needed. The sad truth was that we needed more. They tried to give it to us by sending us to the places they thought or had been told would be best for us, because they didn't know how to help us on their own.

13. They felt guilty about not being able to help us. They felt like they had failed, especially with Chuck. They carried that guilt right up until the end of their lives. Up until the time of their passing, they talked about how they felt they had somehow let Chuck down by

6

IFCD 00027349

not being able to figure out what he needed. Besides feeling guilty, they were also frustrated by me and Chuck acting out, and they took that frustration out on each other. Like it says in the Sweetser report that Chuck's current team showed me, my parents did sometimes drink too much, and then they argued. I realize now that it was just how they handled the stress we were creating for them, but I clearly remember the regular Saturday evenings when they fed me and Chuck early, whatever we wanted, and then they had their own special dinner, which always included cocktails. The dinners always started out nice, but as they drank, they began to argue, and that would lead to throwing things and slamming doors. I remember being with Chuck and hearing it happen. It scared us.

14. I still believe that my parents were doing the best they could when they sent me and Chuck away to schools or residential treatment programs. I don't think they realized that being sent away, even knowing how much my parents loved me, triggered my abandonment issues, and I'm sure it was the same for Chuck, whether or not he's ever acknowledged it. Abandonment is a lifetime issue for most people who are adopted. It's hard to explain to someone who hasn't experienced it, and when I was a kid I didn't have the words for it, but it's just something that you know and feel. I don't know if fear of abandonment for adoptees was a recognized issue when I was a kid, but I do know that no one ever warned me about it or explained to me that it was normal, and I'm fairly certain no one ever talked to my parents about it either, at least not before the Sweetser treatment. I see in the Sweetser report that the therapists believed my parents "dismiss[ed]" the idea that "adopted kids usually have more extreme identity searches at adolescence," although I can't tell from the report if they actually talked to my parents about this idea. In any case, because my parents believed so strongly that loving us was

7



IFCD 00027350

the answer to our problems, they focused on that, rather than on anything that had to do with adoption.

15. The residential treatment program I went to was in Hampton, New Hampshire. It was called Odyssey House. I still have nightmares about Odyssey. It had a privilege system with five levels: pre-treatment, and then freshman through senior. Seniors had free reign to go where they pleased. Pre-treatment and freshman had to ask for permission to go outside, requesting that a junior or senior "be aware" of them if they left the immediate area. If no one replied to their request, they couldn't go anywhere. The program was stifling. I hated it there and left the minute I turned 18. I know that Chuck went to a place called the Homestead Project in Maine after he started messing up at Thornton Academy. He never talked to me about it, but from what I've heard about it from his current legal team, it was a lot like Odyssey, with its rigid rules, and maybe even more so, with its punishment system. If that's true, I can only imagine that the Homestead system was about as good for him as Odyssey was for me, which was not at all.

16. After Homestead, Chuck started picking up legal charges. I might have headed in the same direction after Odyssey, except for one thing: I had a baby. I got married for the first time when I was 19. It wasn't a good marriage – my husband was abusive – but after I had my son Josh in 1990, when I was 21, I had something to focus on, something that was bigger than my own problems. Josh was developmentally disabled, and, as I testified at Chuck's trial, he was eventually diagnosed with autism when he was two and a half years old. When I look back on it, I realize that before Josh's diagnosis, I was in a similar position to my parents when Chuck and I started getting into trouble: I didn't know what was wrong with my child, but I was determined to do whatever I could to address it. The

8



IFCD 00027351

difference was in our personalities. My parents' generation was taught to be polite and to accept the answers they were given, to take whatever help was offered and do the best they could with it. I'm not rude, but I'm much more demanding when I need to be, like when I know that the people who are supposed to be helping me or my child are not doing what they should, or I disagree with their approach.

17. Josh's diagnosis gave me a mission: to learn everything there was to know about autism – which, at the time, was a lot less than what's out there now. By this time, I had taken Josh and left my husband, and I was living on a farm in Acton, Maine, with my boyfriend and the farm's owners, a married couple. Chuck had been in and out of jail over the past couple of years and struggled to keep a job, so when my boyfriend decided to give up his job on the farm, I suggested Chuck take it. As I testified at Chuck's trial, Chuck and Barbara, the wife of the couple that owned the farm, who was about 20 years older than Chuck and legally blind, quickly fell in love. Barbara and her husband split up, Chuck moved in with the rest of us, and he and Barbara got married.

18. Like I testified at trial, Chuck was great with Josh for the couple of years that they were around each other, before Chuck went to prison for good. Josh was pre-verbal for a much longer time than is normal developmentally, but even so, he and Chuck clicked. They were like two peas in a pod. It was like Chuck understood Josh, as if they were on the same wavelength; they didn't have to talk. As Josh has grown up, I've noticed characteristics in him that remind me of Chuck, like being compulsive, being impulsive, having difficulty expressing his feelings, and having trouble reading the room. Another thing they have in common is a look Josh gets that I remember seeing Chuck get, like they're there, but at the same time they're not there. I'm not saying that I think Chuck is

9

IFCD 00027352

on the autism spectrum, but I've known for a long time that Chuck struggles with some type of undiagnosed psychological and/or mental health challenges. When I think about it now, I wonder if Chuck was so close with Josh because he recognized himself in Josh too. Maybe that's why he told someone once – as I testified at trial – that Josh was his son rather than his nephew. I was mad about it at the time – I thought it would be confusing for Josh – but now I wonder if Chuck was just happy to have someone in his life that he could relate to.

19. I met with Chuck's lawyer Fred once before I testified at the trial, at a mall near my home in New Hampshire. My sister Susan came with me because I was nervous. Fred and I talked on the phone too, about what he planned to ask me on the stand, and then he sent me a letter on May 1, 2014, reminding me of each of those topics. After being shown by Chuck's current team an email message that I sent Fred on January 12, 2013, in which I refer to Fred asking me about my "top 5" memories of Chuck, I'm sure that's where the stories I told on the stand about Chuck's nickname of "Bumbles" and me swiping Chuck's ice cream and the two of us discovering the kittens in the wood pile came from, because those are some of my favorite childhood memories of him. When we met and talked before trial, Fred told me to focus on the good memories of my family, so that's what I did. He was very clear, as it says in the letter he sent me, that I should talk about the "strong love and support" Chuck and I got from our parents, and the "loving relationship" he and I had as children and as adults.

20. I testified by video at Chuck's trial because Fred suggested that's how we do it. My parents were worried about leaving their pets while they went to Missouri for the trial, and I was concerned about leaving Josh if I went. Fred didn't want my parents to worry,

10

IFCD 00027353

so we all decided that I would stay at my parents' house in Maine while they were in Missouri. (I was living in New Hampshire at the time.) In retrospect, I believe that I could have had more of an impact on the jury if I'd been there in person, especially if I testified to everything contained in this declaration, in addition to what I addressed in my testimony. If I had been told my presence in the courtroom could have made a difference, I would have figured out a way to be there, but Fred never said it was important.

21. Other than the topics Fred listed in the letter he sent me about my testimony, I realize now – especially since Chuck's current legal team has shown me the Sweetser report and I've reviewed my testimony – that I was not prepared for cross examination. I had told Fred multiple times during our meeting and phone calls that, like I said on the stand to the prosecutor, I did not believe Chuck killed Victor Castro. I warned Fred that if I was asked on the stand about whether Chuck had committed this crime, I would answer from a purely emotional place, where I found it impossible to believe that my baby brother would kill anyone. I thought Fred understood what I would say, because, as he wrote in the letter, he wanted me to testify to my "inability to wrap your head around what Chuck has done." In my mind, that's what I did when I answered the prosecutor that I didn't believe Chuck had actually killed Victor Castro.

22. In our meeting and phone calls before trial, I asked Fred for details about the crime so I could understand exactly what they were saying Chuck had done, but he never gave them to me. He didn't explain that, in fact, the evidence showed Chuck going into and coming out of the victim's cell, or that – as the prosecutor told me when I was on the stand – the victim's DNA was on Chuck's shoe. If I had known these details before I testified, I would have answered the prosecutor's question differently. I would have been clearer

11

IFCD 00027354

that I was answering emotionally. It has never been lost on me that the Castro family lost their loved one to this crime, and I can accept cold hard facts, like video and DNA. If I had been aware of the evidence before I testified, and if I had been told that I needed to answer any questions about the crime based on fact rather than emotion, I could have done that.

23. I think Fred didn't give me the details about the crime because he didn't want to upset me. He and my family became close while he worked on the case, and I think he wanted to protect us from the hardest parts of it. I know I spoke with him multiple times about how hard the case was for my parents, and I told him each time that, if he needed information he thought would be difficult for them to talk about, he should ask me first. But I think he felt as protective of me as he did of my parents, so he only told us as much as he thought we needed to know.

24. I did not type this declaration. Instead, I related the above information to a member of Chuck's current legal team, who typed it for me. I have carefully reviewed the contents of this declaration.

25. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date at 40 Greenfield lane Biddeford me 04005

Signature

September 6, 2023
Date

12

IFCD 00027355