# Declaration of David Ruff

I, David Ruff, declare the following:

1. My name is David Ruff. I am over the age of 18 and competent to testify to the matters herein.

2. I worked at Thornton Academy in Saco, Maine for eight years, beginning in 1986.

3. After leaving Thornton, I worked for thirteen years at the University of Southern Maine where I was the co-director of the Southern Maine Partnership and taught graduate classes on an annual basis. Today, I am the executive director of Great Schools Partnership, a non-profit organization where our goal is to redesign public education and improve learning for all students by providing school and district coaching, professional development, and technical assistance to educators, schools, districts, organizations, and government agencies. We also create tools and resources for educators and communities, administer public and private grant programs, and coordinate large-scale school-improvement initiatives for foundations and states. I have consulted with regional and national educational organizations, including the Council of Chief State School Officers (CCSSO), the U.S. Department of Education, and the American Institutes for Research. I have also advised state agencies in New Hampshire, Vermont, Rhode Island, Connecticut, and Maine.

4. In 1986, however, when I was 23 years old, I had no training or experience in teaching. I had never taken a course in education. In fact, I had no particular interest in the field. I had a bachelor's degree in English from Dartmouth; a year's experience working for a contractor setting steel buildings; and the experience of a three-month trek across Europe.

1

I had no money left when I returned to Maine from Europe, so I opened the newspaper to the classifieds and started looking for a job.

5. I found an ad for an ISS monitor at Thornton Academy. I didn't know what that was, but it didn't require a teaching certificate, so I applied. When I learned from Bernard LaPlante, the submaster, that the duties of the job approximated a high school cop (ISS stood for in-school suspension), I decided I wasn't interested. I was surprised to get a second interview, and out of respect, showed up to inform them I was withdrawing from consideration. The second interview was with Carl Stasio, the new headmaster. When I politely told Carl that I'd decided the job wasn't for me, he suggested we just talk instead, which we did for an hour.

6. Carl recommended me for another job instead: special education tutor. This one sounded more interesting, and Carl said I still wouldn't have to get certified, yet I would nonetheless receive a full first-year teacher's salary, paid by the City of Saco. I accepted. I don't recall ever seeing an official job description, but the essence of what I was told my job would entail was: keep these kids in school and get them to pass.

7. The Thornton Academy special education department at the time was made up of three members: two certified teachers, Becky Cretaro and Caren Sabo, and me. The department was under the auspices not of Thornton itself, but rather the city of Saco. Thornton is a private school, but an overwhelming majority of its students are local kids from Saco whose tuition is paid by the city because there is no local public high school. Unlike the rest of the teachers at Thornton, special education staff was paid by the city. Thornton special education students' Individualized Education Programs (IEP's) were determined through Saco's system but delivered by Thornton staff. The head of the city's special

2

IFCD 00027497

education department, Larry Spencer, was officially my supervisor, but I only saw him maybe once a month. There was very little oversight. I felt supported by the Thornton submaster, headmaster and the guidance department, but they were in the position of managing a program they didn't create and didn't have authority over, so I imagine they felt hampered in what they could do.

8. I was only in the special education tutor position for one school year, 1986-1987. I had first seven, and then nine, students. I saw each of them for one period throughout the day, except for a few who doubled up. Each of them had an IEP, and each had their own particular struggles. They would not have been assigned to me unless they were struggling academically in some way, but I never saw them as bad or as problem kids. I saw them simply as kids who needed my help, and it was my duty – one I embraced – to help them.

9. Though I didn't perceive or treat my students as if they were less important than any other students, I suspect it was a little disheartening for them to come to my "classroom." There were three separate special education rooms, one regular-sized classroom each for Becky and Caren, and then my room, which had been a storage closet. All the rooms were in a building that used to be the gym. We weren't exactly in a basement, but my room had a twelve-foot ceiling and windows you couldn't see out of because they started at about eight feet. When I arrived on the first day, the room was stuffed full of reams of paper the school had bought cheap in bulk. I was repeatedly told that the paper would be taken care of, but when it repeatedly wasn't, my students and I finally moved it out ourselves, and then painted the room. It wasn't a terrible space; it just wasn't designed to be a classroom.

3

10. I remember going to IEP meetings, and I'm sure I looked at the IEPs themselves, but I don't recall ever using them to figure out lesson plans. Instead of studying them, I spoke to my students' other teachers for up-to-the-minute information. Not every student needed help in every subject; if a class teacher said a student was doing fine, I took their word for it and focused only on the subjects where my students were struggling. Some of my students were in mainstreamed classes, others had special education subjects with Becky or Caren. Either way, I didn't teach independent lessons or administer grades; those tasks were in the class teachers' purview.

11. Chuck Hall was one of my special education tutoring students. He doubled up periods with me, so I spent more time with him each day than some of my other students. I remember him being spur-of-the-moment in his personality, not calculating. I recall that he came across as someone who really wanted other people to like him, and yet he always seemed to feel like he was on the outside. He just didn't seem to know how to be social in a productive way, to achieve the regard he sought. I have reviewed Chuck's school records, and I would agree with a comment in a November 20, 1985 IEP by teacher Deborah Yeaton that Chuck felt others picked on him.

12. When I look at Chuck in his class photo from the 1986-87 Thornton yearbook (which I have kept all these years), I notice that his head is down, which I recall being his usual posture. To me, this illustrated Chuck's low self-esteem. I recall that he sometimes told improbable stories, but I read that as an effort, again, to get people to like him. Reviewing Chuck's records reminded me that he had been retained twice in sixth grade (and once in ninth), and spent the year before high school at an out-of-district private school in

4

IFCD 00027499

Vermont. This meant he entered Thornton on unequal social footing with his peers. It was almost as if he were a new kid, starting all over again.



13. I do not recall Chuck being in fights or exhibiting any violent behavior. I was never fearful of him or worried about him in any physical way. He was not a kid who I would have assumed would end up in a violent situation. Though I don't recall them independently, I assume I was aware at the time of the troublesome incidents noted in Chuck's records – shoplifting, stealing cars, punching walls – but I did not see any troublesome behavior from him myself. In fact, I experienced good effort with Chuck, as reflected in my May 8, 1987 note stating that he "does indeed currently have an A in every class. He's doing great." It's possible he was not a good match for some of the teachers at Thornton, but the records don't indicate any significant friction with them,

5

other than one late isolated incident with the shop teacher. The majority of the disciplinary infractions in his records appear to involve truancy. Other than that, I don't remember him being much of a behavior problem at all.

14. I do not recall what I was referring to when I noted in the January 13, 1987 IEP meeting that "Chuck's sister's behavior interferes with Chuck's behavior." I do think it was clear at the time, as it is to me now when I review the records, that something seemed to be bothering Chuck, as I noted at the March 26, 1987 IEP meeting. And this circumstance seems to have predated me, as indicated by numerous documents in his records. For instance, in an evaluation by Saco school psychologist Stanley Payson a year before I started working with Chuck (dated September 17, 1985), Chuck is noted to be "apprehensive," "marginally cooperative," "mildly depressed," and "socially withdrawn." In a November 20, 1985 IEP, he is noted to be "[i]n a daze often" and in need of "a lot of prodding," and described as someone who "doesn't seem to know what's going on." Finally, a May 9, 1986 letter in the records from Chuck's parents to Larry Spencer – my later supervisor – begs for an evaluation of both Chuck and his sister Michelle, "two apparently average teen agers [sic] totally missing out of a high school education," whose current progress "will not even barely prepare them for the hi-tech society we now live in."

15. I do not recall Chuck's parents at all. I didn't have much contact with my students' parents during my first year at Thornton, I think because I was so naïve that it probably didn't even occur to me to call home about any issues. But in reviewing their letter, I can see that Chuck's parents were obviously distressed by his lack of progress at Thornton, and their distress seems to have been well-placed. In my opinion, it was Thornton's

6

IFCD 00027501

responsibility to address that, which it appears to have done by getting Chuck approved for special education services in June of 1986, at the end of the school year before I arrived.

16. Both my memory and notes in my learning goals for Chuck show that he started the next school year with "renewed desire and interest in completing satisfactory work during the first six weeks of the 1986-87 school year." I noted that he was "showing improvement in his use of study time," but also that he "still has mental lapses and daydreams" and his "attention span remains quite short." I recall Chuck's attentional deficits. I don't recall exactly how I got him to focus such that we got any work done, but I know that I did. We seemed off to a decent start. In the end, however, what I had to offer wasn't enough.

17. The thing that hooked me on education – the reason I chose it as a career, despite having never considered it prior to my first year at Thornton – was my realization during that year that while school had always worked for me, it didn't for everyone. It had never occurred to me that the system might be flawed not the student. I had assumed that if you wanted it to work for you, it would, but I learned from my students that year, none of whom actively wanted the system to fail them, that sometimes wanting it isn't enough. I saw good kids being let down by a system that wasn't built for them. I don't blame Thornton; I think it was a good place, and I consider several people there to be mentors. But the special education system back in Chuck's time was not what it is today, especially not when the program was split between Saco and Thornton. The split meant that no one at Thornton was in charge, and the result was that Chuck didn't get what he needed.

7

18. Instead, what Chuck got was me. I don't mean to denigrate myself or underappreciate my dedication to my students, but when Chuck was my student, I was a very young – barely older than my students! – untrained, uncertified, barely supervised first year teacher. When I saw the November 3, 1986 note in the list of Chuck's disciplinary actions advising that the "discipline process [was] handed to 'Mr. Ruff'" on that date, it struck me that I was, at that time, a 23-year-old kid who'd been on the job for two months. I was hardly more advanced five months later at the March 26, 1987 IEP meeting, when it was decided that "five day ISS can be served by alternate means w/ D. Ruff." I want to be clear that I didn't feel put upon or taken advantage of by assignment of these duties – I don't think it even occurred to me at that point that perhaps I was being asked to do more than my experience or capacity allowed – but from my current vantage point, I see it as a sign that the administration and other teachers simply didn't know what to do with Chuck. I don't ascribe anyone any malintent in putting me in charge of Chuck. I just think they probably saw that whatever I was doing was keeping him occupied, if nothing else, so for lack of any better plan, they opted to default to me.

19. By April 1987, soon after I noted that something seemed to be bothering Chuck, it's clear that Thornton was struggling to figure out next steps with Chuck. They were actively looking for an out-of-district placement for him. In the meantime, an emergency IEP meeting was held on April 7, 1987, at which it was recommended that Chuck be removed from all mainstreamed classes and placed in the Resource Room or with me for 34 out of 35 weekly periods, with one period for counseling with Dr. Payson. It doesn't seem a coincidence to me that my May 8, 1987 note about Chuck's current A-grade status in every class was written after the transition to full Resource Room attendance. However, it

8

appears that by May of 1987, even my strategies were no longer working, as indicated by Dr. Payson's File Note, in which he states that Chuck "has clearly exhausted the resources of Thornton Academy and will require a more restrictive placement if he is to receive an education."

20. I recall thinking about Chuck the next year, once he was gone. I felt a sense of regret, and wished that he hadn't had to go. Of course, I would no longer have been his tutor if he had stayed, because after my first year at Thornton, I accepted a full-time teaching position in the English department (with the caveat that I begin the certification process, which I did, at the University of Southern Maine). I don't know if the tutor position was even retained after my year in it, because the following year, 1987-88, was when Thornton finally took over its own special education program, hiring a special education director named Mary Nasse. She redeveloped and managed the program, but I no longer had anything to do with it.

21. In conversations with Chuck's current legal team I was surprised to learn of the sexual assaults he suffered while at the Shaker Mountain School – and then cognizant of how so much of what I had observed in Chuck made sense. Chuck never shared his experiences at the Shaker Mountain School with me, but now knowing what he went through there, it helps to explain his desire to be accepted by his peers, his embarrassment and simultaneous outbursts, and his anger regarding what he saw as an unfair system. I can only imagine how hurtful it must have felt to hide this secret, embarrassed by it, and afraid that no one would take any actions to support him if he was public with this information.

9

22. I was shattered to hear about Chuck ending up on death row when I was contacted in 2022 by a member of his current legal team about his appeal. I had heard nothing about him since the year I worked with him at Thornton, and while he certainly was not in a great position by the end of that year, I never would have expected something like this. I was available at the time of Chuck's trial in 2014 and during the preceding years in the Portland, Maine area, and I would have been more than happy to speak with Chuck's trial attorney if he'd reached out to me, but neither he nor anyone else representing Chuck ever contacted me before 2022. If I had been asked to testify at Chuck's trial, I certainly would have done that as well, and I would have happily provided all the information contained in this declaration.

23. I did not type this declaration. Instead, I related the above information to a member of Chuck's current legal team, who typed it for me. I have carefully reviewed the contents of this declaration.

24. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date at _Portland, Maine_.

_____ Signature

_4/11/23_____ Date

10