# Declaration of Mary Tilghman

I, Mary Tilghman, declare the following:

1. My name is Mary Tilghman. I am over the age of 18 and competent to testify to the matters herein.

2. I worked at the Homestead Project, a juvenile residential treatment program in Ellsworth, Maine, in the 1980s. My husband and I had moved to Maine from New Jersey after our six children were grown, and although I didn't necessarily need to work, I didn't want to sit around doing nothing. I got the job through my friend Lou Moretto, who was already on staff there. I started as a residential team member and worked my way up to team leader.

3. I loved the kids at Homestead. They had had difficult lives and were troubled, but that made them easier to love. However, I generally disagreed with Homestead's philosophy. I understood that restraint was necessary at times, but I thought it was used there too often. I thought it was necessary only if a child was threatening to hurt himself or others. If the problem was just that they were screaming or creating too much commotion, my position was that you should just let them do it, because they'd stop when they were tired.

4. I always thought that earning the kids' trust and confronting them on their level was the better way to go. Another thing that worked was to try to understand why they were acting the way they did. One day when I arrived for my shift, I found a boy on the floor in a restraint because he had gotten into an argument with a staff member named Mark. Since my team was coming on, which put me in charge, I took over the situation, told the staff members to break the restraint, and told the boy to get up. He calmed down and

1

IFCD 00027543

walked away, and I let him go. When I found him later stuffing a full roll of toilet paper into the toilet, I confronted him and asked if he was pretending the toilet paper was Mark's head. That got him to smile and nod, and after that, he caused no more trouble on my shift. On another day when I arrived for my shift, I saw a different boy being held in a restraint, spread-eagled. It made me uncomfortable, so I told the staff again to let him go. When the child got up, I told him he was not an animal. The next day, I learned that he had told his therapist that no one had ever stuck up for him before.

5. Besides the restraints, Homestead used a consequences system called IWP (Intensive Work Program). I thought the IWP assignments were just plain stupid, things like carrying rocks back and forth in a bucket. If kids refused to do it, the staff made them do it longer. I remember this happening to one really small boy, who was carrying the rocks when I arrived for my shift. His crime had been sneaking crackers out of the kitchen and eating them. When he and a few friends did the same thing again on my shift that night, I called them into the kitchen and offered them more crackers. They were surprised, but they came and ate all the crackers I offered them. When they got thirsty, they asked for something to drink. I told them I was only offering crackers, not drinks, suggesting that perhaps they should have thought ahead. I thought that was a better lesson than anything carrying rocks could teach you.

6. A lot of times, these "consequences" were assigned by the therapists, even though they had to be carried out by the residential staff. I didn't think much of the therapists at Homestead. Besides giving out punishments that were too harsh for what a kid had done, I also remember them being hypocritical. For example, Pat Bousquet, the head of the

2

IFCD 00027544

therapists, always made a big stink about the kids swearing, but yet she had no problem swearing herself, right in front of them.

7. Because I was concerned about the excessive punishment at Homestead, I brought home copies of records with me, in case I was ever accused of anything or had to prove any accusations I had to make. In the end, I never needed them, so I burned them all after I quit. Besides, by that time it looked like the state was onto what was happening, because an investigator had showed up at Homestead. Several kids asked me if they could talk to him, so I asked him on their behalf. He told me that he had a list of kids' names. When he showed it to me and none of the kids who had told me they wanted to talk were on it, I gave him all of their names. I encouraged him to talk to them, since his list had come from the administration, and I didn't trust who they might have picked.

8. I know that Homestead was eventually shut down, but I don't know the details of how. I was too busy once I quit, because I went into foster care. Just like with Homestead, I never needed the job for the money; all I wanted to do was help kids, and I believed they were better off with me and my husband than at Homestead. I stayed in foster care until I was 60 years old, when the kids we got were getting younger and younger, with more and more trauma. It was ultimately too much, so we had to stop. But I still stay in touch with as many of my foster children as I can. I consider them all family.

9. I ~~did not know~~ do not remember Chuck Hall. However, when a member of his current legal team contacted me in 2022 to ask about Homestead, I was happy to talk to her. If anyone else representing Mr. Hall had approached me any earlier than 2022, I would have talked to them as well, but no one ever did. I also would have been willing to testify to everything in this declaration at Mr. Hall's trial in 2014, if I had been asked to do so.

3

IFCD 00027545

10. I did not type this declaration. Instead, I related the above information to a member of Mr. Hall's current legal team, who typed it for me. I have carefully reviewed the contents of this declaration.

11. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date at _Ellsworth Maine_

_Mary Silphman_
Signature

_May 30, 2023_
Date

4

IFCD 00027546