# Declaration of Louis Moretto

I, Louis Moretto, declare the following:

1. My name is Louis Moretto. I am over the age of 18 and competent to testify to the matters herein.

2. I was a staff member at The Homestead Project, Inc. in Ellsworth, Maine, from 1986 to 1992.

3. Before working at Homestead, I served in the Navy; trained horses; cooked at a restaurant; performed custodial work; and volunteered as a football coach. I'm now retired and on disability for neurocardio syncope, and I also have Parkinson's Disease, but my job at Homestead was my favorite of all my jobs. I loved the kids there.

4. Homestead was a state-funded residential treatment program for kids who couldn't function in regular schools and were causing or having problems at home, and acting out. A lot of them came as wards of the state; some came as a condition of probation. Others came because there was no place else for them to go.

5. There were three different kinds of staff at Homestead: teachers, treatment, and residential life. Treatment staff was therapists, who were called case managers. I was residential staff. I started on the night shift, then moved up to residential team leader, and eventually became the residential life manager. For the majority of my years there, I was a team leader.

6. Homestead functioned on a system of consequences, and treatment staff believed that harsh consequences were the only way for the kids to learn. They believed that rewarding kids who followed through with their consequences was counterproductive, because what

1

IFCD 00027475

a kid would learn from that would be that whatever they did to get the consequence, eventually led them to the reward. For example, if a kid hit someone and the consequence was to clean the kitchen, and then they got a reward or even just positive feedback for cleaning the kitchen until it sparkled, the kid would make a connection between hitting someone and being rewarded. Instead, treatment staff's goal was to have the consequences make them work and accomplish nothing, so that they used the time to think about what they had done, rather than what they might be getting out of it.

7. This was how the Intensive Work Program (IWP) worked. The idea behind IWP was to get compliance in the moment. Carrying a bucket of rocks or a backpack full of bricks around in a circle for 3 hours would wear a kid out; so would repeatedly digging a hole only to fill it back in, or repetitively scrubbing the same spot on the floor. If you wore them out, they wouldn't have energy to act out or disrupt everyone else.

8. Another type of consequence was called "restriction." This was separate from IWP, although a kid could get both at the same time. Restriction lasted three days. For that whole time, kids had to be within an arm's length of staff at all times – even when they were sleeping. To do that, they had to bring their mattresses out of their rooms and into a common area. Their meals were limited to oatmeal and toast for breakfast, salad and a PB&J for lunch, and dinner with no dessert. They were not allowed to speak at any time without raising their hand and being recognized. If other kids wanted to speak to them, they had to ask for staff permission.

9. Kids would get consequences for swearing or for stealing from each other (there was a lot of that). Sometimes the boys got it for sneaking out of the basement where they slept and up to the girls' rooms on the second floor, since no doors could be locked because of fire

2

code. Some staff went overboard with consequences: I saw kids get punished for the way they walked, just because it was seen as being intimidating. I saw other kids get IWP for not asking permission to go into another room.

10. In addition to IWP and restriction, there were also the red and blue suits, for suicide watch and run watch, when kids had tried to hurt themselves or run away, or there was concern they might try. With the blue suit (run watch), the kids also had to wear a pair of moon boots – big puffy boots that were very hard to walk in – to make running away even harder. The pockets on the red suit (suicide watch) were sewn up so the kids couldn't hide anything in them. The kids wore nothing but underwear under the suits.

11. There was always residential staff on site, but our real duties started at 3:00 p.m., when the kids got out of school. We were all assigned to a few kids, so that each kid had a certain number of eyes on him at all times. (During the time I worked at Homestead, there were between 12 and 35 kids at a time.) We organized and supervised activities, like softball or swimming, or sometimes the kids just hung out, playing board games or making art. Activities depended on how many kids were on restriction: for example, if too many of them were, we couldn't play softball. Activities lasted until dinner, and after that was chores. But we always started every afternoon with a community meeting, which was to air things out. I remember one meeting when a girl named Edith Smith just repeated over and over: "You don't know, you don't know, you don't know." I didn't know what she was talking about, but it helped her to get it out.

12. Each kid was assigned to a therapy group, which they met with every day. In addition to regular therapy groups, there were sometimes Behavior Encounter Groups, or BEGs. These were for kids who had developed or were having trouble stopping bad habits. The

3

IFCD 00027477

groups would focus on certain behaviors, like practicing eye contact. But there was a humiliating aspect to the BEGs if the kids struggled to control the behavior they were working on. I remember a boy named Travis who chewed his nails and couldn't stop; he was made to wear socks on his hands. When he also got caught lying, he was made to wear a long paper Pinocchio nose and a sign around his neck that said: "I will follow my BEG contract."

13. I believe that the worst thing you can do is humiliate someone. I had to enforce consequences as part of my job, but my method with the kids was to see if I could make them laugh. Time after time, I saw that humor took them off guard, because they were always so ready to be scolded or ordered around. I remember a tense moment with one of my favorite kids, a girl named Christy, who was very short. When I told her where she needed to go for her consequence, I asked if she knew how to get there. When she grumbled that she didn't, I told her she needed to take the Yellow Brick Road. It made her crack a smile, and we had a bond from then on.

14. I believed that the first thing you had to do with the kids at Homestead was make them feel safe. They didn't know what that felt like, so you had to show them, whether it was with humor or something else. It didn't mean you tolerated things they shouldn't be doing, but people forget that kids are kids, and that underneath the anger and the aggression is a scared kid – and especially the kids who were at Homestead. I wanted to let them know they were going to be ok.

15. Don't get me wrong: the way I am, I'm gentle, but I'll drop you like a heartbeat if I have to. Restraints were a regular part of the Homestead program, because some of our kids were really troubled and they could completely lose control – I remember one kid named

4

Ryan who ate his own feces and never should have even been at Homestead, because he needed mental health care – and that could be dangerous for everyone. A restraint was putting the kid down on their belly with their palms up so they couldn't push themselves up off the ground. Sometimes you just held them there until they got control over themselves again, but sometimes you had to bring them to the padded room. I didn't like doing either of these things, but I did when I had to. But I knew that the kids looked up to me, and I felt a responsibility to use that the right way. And I think it worked, because out of probably 1,500 restraints that I had to do over the years, I never got spit on, kicked, punched – nothing. The kids didn't want to hurt me.

16. The teaching staff mostly functioned on their own, but residential and treatment staff overlapped more. There were some good therapists, but there was tension between some of them and us. They thought that because of their degrees they knew everything and they could do no wrong, and the administration treated them that way too. They sometimes treated us like we were only there to do the dirty work, like restraints. Pat Bousquet, who was head of the case managers, didn't even think that residential staff should participate in management meetings, because we weren't as important as treatment staff. I thought this was foolish, since we were in charge of the kids 14 hours out of the day. But Pat told me more than once that I could have as many ideas as I wanted…once I got my degree.

17. I felt like treatment staff tried to humiliate residential staff. They didn't like it when we had success with a kid that they hadn't been able to turn around. Their attitude was: if a kid responded better to residential staff than treatment staff, then residential staff was doing something wrong. For example, one time I was called out by treatment staff for "doing therapy" with a student named Dan. I had been restraining Dan because he was

5

out of control, and he started to cry. I held him as gently but effectively as I could, and I said, "That's right, just let it out." And it worked: Dan calmed down. This was what treatment staff considered "therapy," and they said I'd overstepped my bounds. That's how much treatment staff wanted to maintain control.

18. I remember an incident with Dave Bousquet, Pat's husband, who worked under her as one of the therapists/case managers. I pretty much stayed away from the wilderness aspects of the Homestead program, because I'm not an outdoorsman; my definition of wilderness is bad room service. But I had agreed to assist on one particular trip because there were going to be cabins instead of tents, and Dave was the therapist on the trip. Once we were out in the woods, he had all the kids write letters to someone from their past who was deceased. He then gathered the letters and set off into the woods. When he came back, he told the kids that he had delivered their letters to the spirits of the dead people, and that he had messages from those spirits for the kids. I was really upset, because I thought these kids had enough trouble dealing with reality as it was, and getting messages made up by a therapist pretending to be someone they knew would only confuse and upset them. I reported Dave as soon as we got back from the camping trip, but other than asking Dave if it was true, the administration didn't do anything, which only made the therapists believe even more that they could do nothing wrong.

19. I also got upset when I overheard Pat one day yelling at a girl who had refused to go to class. Pat told the girl she better get her "fucking fat ass" over to where she was supposed to be. Even one swear word could get a kid put on restriction, and yet here was one of the therapists – the head one! – swearing at a kid, with no consequences. As far as I was concerned, it didn't matter if you were residential or treatment staff, or a teacher: you just

6

had to be the right kind of person and you had to treat the kids fair. I believe there's a difference between treatment and rules. If you make rules, then everyone has to follow them. I remember another time when I overheard Sally Smith, the director of treatment – she was the administrator over Pat – swearing at a kid. Then there was the time when I was told by a therapist to put a 12-yr-old kid named Greg on restriction for saying "Fuck" after he accidentally hit his own thumb with a hammer, but then, when I was filling out the paperwork for Greg's restriction, another 16-yr-old kid stood behind me calling him every name in the book, and the therapist said I couldn't put the 16-yr-old on restriction for swearing because his treatment plan called for "ignoring his inappropriate behaviors." I was frustrated many times by the fact that residential staff wasn't allowed to make our own decisions to give consequences. We always had to check with a therapist first.

20. As many issues as I had with some aspects of Homestead, I did love the place, and I always felt like the state wasn't fair with the way they handled us. On the one hand, Homestead was licensed to do what it did, but on the other hand, the state would sometimes come in and suddenly say there were things we couldn't do. I remember one meeting with the heads of the Department of Human Services (DHS) and the Department of Education (DOE). The DHS Child Advocate was also there, and he threw his feet up on the table, insisting the kids should go directly to him with any complaints, not through staff. I thought this made no sense, since we were right onsite and we had developed trusting relationships with the kids, whereas the DHS guy was no one to them, so why should they trust him? After I said so, the Child Advocate got up and blocked the doorway so I couldn't leave. It was eventually the state that got Homestead shut down.

7

IFCD 00027481

21. I vaguely remember Chuck Hall, although I have no particular memories of incidents or interactions with him. This suggests to me that Chuck wasn't much of a problem, because I would remember him better if he was. My recollection is of a kid who tended to coast along, someone who navigated situations to try to avoid work or responsibility. This kind of behavior was common with Homestead kids. It was a result of their histories, not a conscious choice to manipulate, but it made them tricky to deal with, because it usually made it hard for them to completely commit to treatment. I believe strongly that the kids who Homestead worked for were the ones who wanted it to work.

22. When I was contacted by a member of Chuck Hall's current legal team in 2022 to talk about Homestead, I was happy to do it. I would have done the same thing if anyone else representing Chuck had approached me any earlier, but no one did. I also would have been willing to testify to everything in this declaration at Chuck's trial in 2014, if I had been asked to do so.

23. I did not type this declaration. Instead, I related the above information to a member of Chuck's current legal team, who typed it for me. I have carefully reviewed the contents of this declaration.

24. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date at _Ellsworth, M.E._

_Louis Moretto_
Signature

_5-20-23_
Date

8

IFCD 00027482