# Declaration of Steven Parks

I, Steven Parks, declare the following:

1. My name is Steven Parks. I am over the age of 18 and competent to testify to the matters herein.

2. I testified by video at Chuck Hall's capital trial in 2014.

3. My family moved a lot when I was a kid, all in Maine, but to different towns, where I always had to change schools. The worst move for me was when I was had to leave my middle school, where I'd worked hard to make a name for myself in football, and start from the bottom at my new high school. I'm a small guy, and they wouldn't really give me a chance at my new school, so I quit. Everything started going downhill from there.

4. Both my brother and my sister were adopted like me (I'm Korean like my sister; my brother was born in Sweden), but I was always the black sheep in my family. My siblings did whatever my mom and dad said, but I was more independent, and if what my parents said seemed unreasonable, I went my own way. For example, they didn't want me to take up martial arts, but I did it anyway, and before long I was able to kick my brother's butt, even though he's three years older than me and was much bigger.

5. When I started picking up juvenile charges for things like skipping school and shoplifting, my parents put me in therapy. I actually found it interesting, because learning about psychology taught me how to understand how people work and how I could interact better with them. But things stayed tense between me and my parents, so they brought me to visit the Homestead Project in Ellsworth, Maine, which is, as I described in my trial testimony, a residential treatment program for juveniles. It is true, as I said in my

1

IFCD 00027489

testimony, that you had to have a problem with school to go there, at least to have your home school district pay the tuition, but I didn't actually have a school problem. And I hated Homestead so much when I visited – it had so many rules and restrictions, and the kids there were under constant supervision – that I decided I would keep my grades up just so I didn't have to go there.

6. My plan with my grades helped keep me out of Homestead for a while, so my parents found another place to send me, a group home called Atrium. I refused to participate there, though, so I got kicked out. The other way to get to Homestead, besides school problems, was if your probation officer made a referral, so after Atrium, the next time I picked up another juvenile charge, my parents asked my P.O. to send me there, and he did.

7. I refused to go when my parents told me about the referral, so my dad, my brother, and my brother's friend dragged me kicking and screaming out of the house. They removed me physically and held me in the car until we got to Homestead. When we pulled in, a crowd of Homestead staff surrounded the car. I was told I could enter the building myself, or I would be forcefully escorted. I thought about running and/or busting enough jaws to give me a head start, but it was too much, there were too many people working against me. I gave up. I learned later that my arrival had been scheduled for a Wednesday because it was changeover day for staff, which meant the entire staff would be there for back-up if I acted up.

8. Chuck was probably the third person I met at Homestead, after the doctor and my group therapy leader, Pat Bousquet. Like I said in my testimony, Chuck was in my therapy group. He was also assigned as my mentor, which meant, like I testified, that he showed

2

me the ropes during my two-week orientation. We hit it off, like I said at trial, because of our mutual love of music. I also testified about Chuck being a role model because he was pretty far along in his program, so he was on one of the upper levels, and he seemed like he really had it together, and that's all true.

9. When Chuck's lawyer asked me during my testimony about me and Chuck running away from Homestead, I agreed that we had, and I explained that we did it because of all the rules. But Chuck's lawyer didn't ask me, either when we first talked on the phone or during trial, about what those rules were, or why they bothered us so much, enough to run away.

10. Homestead was all about the rules and the punishments, which they called Behavior Management. When I met with a member of Chuck's current legal team in 2021, she showed me a list from Chuck's Homestead records of all the various punishments. The ones you got depended on what you did. Seeing the list of them in 2021, I remembered all of them. One that wasn't so bad was called "Lines," which was writing a sentence over and over about what you did wrong. But a lot of the other punishments were humiliating or pointless, like scrubbing one spot on the floor from a kneeling position not for the purpose of cleaning but to make you think about what you'd done; or wearing an orange vest and sitting at a "Restriction Table" for meals, so everyone knew you were in trouble – and also you were only allowed to eat certain things and you didn't get seconds. "Communication Bans" were supposed to last only 24 hours, but I got put on it for weeks at a time. It meant that you were only allowed to speak to answer questions, participate in group, or request permission, like for using the bathroom, and you always had to raise

3

IFCD 00027491

your hand for any of it. Sometimes I was on it so long that I thought I'd forgotten how to talk.

11. Like the orange vest to let everyone know you were on restriction, there were also the jumpsuits you had to wear if you were on Suicide Watch (red jumpsuit) or Run Watch (blue jumpsuit). For Run Watch, you also had to wear Moon Boots, big clumsy puffy boots like people wore in the 1980s, to make it harder to run. Obviously everybody could see when you were wearing any of this, and it was humiliating. There was also Restriction Status, which was total restriction, which was different than the orange vest for more minor infractions; total restriction meant that in addition to being isolated in public (like at the Restriction Table), you were also on constant supervision, 24/7, even when you went to the bathroom and all through the night. This status usually lasted three days. Then there was Intensive Work Program, or IWP. It meant you had to do things like carry a bucket of rocks back and forth, going nowhere, supposedly to give you time to think about what you had done, but also to humiliate you.

12. The time that Chuck and I ran away, we were put on Run Watch and had to wear the blue jumpsuits and moon boots, plus we got put on Restriction Status at the same time. We had to sleep on yoga mats in the common area of the main lodge and have staff members go to the bathroom with us.

13. Passive Physical Restraint was for when the staff had to force you to do something. It was actually more aggressive than passive, because they took you down to the ground. I remember seeing six staff taking down my friend Jason one time. Sometimes after they got you down, they'd take you to the "rubber room" for Staff-Initiated Isolation, which

4

meant you were locked in there. You could also request to go in there – Member-Initiated Isolation – if you felt like you needed some space.

14. There was a central logbook called the Consequences Book, where each one of us was listed with all the punishments we got. I ripped out my own page once and tore it into pieces when I was mad about something. My punishment was to tape it all back together, and then do every punishment listed on it.

15. Chuck and I managed to have some fun at Homestead, playing and listening to music. Fun was hard to come by, so we organized things like Dungeons & Dragons tournaments and music jams. After Chuck left, I continued these things with another friend, and me and two of my buddies started up a group that pooled our petty cash to give to the upper levels to buy us some good snacks when they were allowed off-campus. We let in anyone in who paid 50 cents a week, in either cash or Homestead tokens (because lower levels weren't allowed to have cash). What we were really going for was a sense of community for all of us together, because otherwise we mostly stuck to our four separate therapy groups. But instead of appreciating that we were organizing ourselves for positive purposes, the staff and administration accused us of acting like a secret society. My friends and I who started the group got demoted down to the lowest level and I got violated on my probation, which added an extra six months to my program, meaning I had to stay longer at Homestead.

16. The staff finally did agree to let us have a student government, but they said it had to be only for representation at meetings and stuff like that, not for organizing fun activities. I got elected president, and I fought to get them to change the petty rules, like they wouldn't let us wear hats or bandanas outside, or let boys wear earrings, or get our hair

5

cut how we wanted. But Chuck had already graduated from the program by the time this happened. It's true, like I said in my testimony, that Chuck was a nice guy and tended to help out the new people when they got there, me included. He wasn't a troublemaker, and he was more of a follower than a leader. I don't remember him being rebellious the way I was. I did see him get restrictions and punishments during his time at Homestead, but he never had a reputation like mine, where other kids told me they were afraid of me at first because I'd been so angry when I got there.

17. It is true, like I told both Chuck's lawyer and the prosecutor at trial, that I finally did get myself turned around at Homestead, and like the prosecutor said, it was me making better decisions that got me there. It wasn't, as far as I'm concerned, the therapy. I've been through a lot of therapy, and in my opinion the quality of what was provided at Homestead was quite poor. I'm not a big fan of group therapy anyway, I do much better individually, but also Pat Bousquet, Chuck's and my group leader, was tough. She didn't put up with crap, and she didn't take no for an answer. Group therapy was the only kind they had at Homestead. I don't remember Chuck talking about anything very personal in group or when we were just hanging out. I knew he was adopted too, but that was about it. We mostly just enjoyed music together and each other's company.

18. Before testifying at Chuck's trial, I had one phone conversation with Chuck's lawyer where he asked me questions. He seemed to know exactly what he was looking for. He told me that my role was to provide positive character evidence for Chuck. He was mostly interested in whether Chuck had any problems at Homestead, which I told him he really didn't. But he didn't ask me about the culture at Homestead, or what my own experience there was. If he had, I would have told him everything in this declaration. I

6

would also have been willing to testify to this information at Chuck's trial, if I had been asked about it, and I even would have been willing to travel to Missouri to do it in person.

19. I did not type this declaration. Instead, I related the above information to a member of Mr. Hall's current legal team, who typed it for me. I have carefully reviewed the contents of this declaration.

20. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date at ___Plymouth, MA___.

Signature

Date ___6/1/23___

7

IFCD 00027495