# Declaration of Richard Staples, Ph.D.

I, Richard Staples, declare the following:

1. My name is Richard Staples. I am over the age of 18 and competent to testify to the matters herein.

2. At the request of attorney Fred Duchardt, I testified for the defense at Charles Hall's capital trial in 2014. The topic of my testimony was my treatment of Mr. Hall in 1995.

3. I was not asked to travel to the trial in Missouri to testify in person. Instead, I testified via videoconference from the Federal courthouse in Bangor, Maine.

4. After going through a careful process, for which I had to hire an attorney, to be sure that Mr. Hall gave proper authorization for release of my records and conversations with people involved in the litigation, Mr. Duchardt interviewed me by phone twice. Since I had seen Mr. Hall for only one individual session, my records were limited, containing one short progress note and two pages of handwritten notes. I told Mr. Duchardt what I remembered about Mr. Hall and we went over the content of my records.

5. After we discussed the things Mr. Hall had told me during that one session, as reflected in my notes and from my memory, Mr. Duchardt informed me that the majority of them were untrue: Mr. Hall had not lived in Portland for his early years of high school; he had not been ranked fourth in his class at Thornton Academy in Saco, nor had he ever graduated from that school; he had never been accepted to nor planned to attend the University of California at Berkeley; and he had not been arrested for beating up a man who had molested Mr. Hall's friend's daughter, nor had he ever committed such an

1

IFCD 00028520

assault. As I said in my trial testimony, I was taken aback to learn this and didn't know what to think.

6. But Mr. Duchardt did not ask me what I thought about the fact that Mr. Hall had lied to me; he simply said he wanted me to testify. I recall that I was never really clear as to why he sought my testimony or what he hoped to establish with it, but of course I honored the subpoena I was served and testified to the best of my ability. By contrast, I felt that I knew with considerable certainty what the Government attorneys wanted from me, because they had come to Maine to interview me in person, and they made it very clear. They told me that the trend in capital defense at the time was to try to avoid a death sentence by claiming an IQ below 70, so they were determined to establish Mr. Hall's intelligence, and wanted to assess whether I was going to provide evidence to the contrary. In the end, that did not seem to be a point of contention, and my testimony was mostly about Mr. Hall's medical situation and his marriage, and the effect of both of those issues on him.

7. Mr. Duchardt did not provide me with any documents to review, nor did he give me any information about Mr. Hall's life prior to my treatment of him other than to clarify what had *not* happened, so my testimony was based purely on my assessment from 1995 and my memory. If I were to testify again today without any further information, I would likely testify substantially the same as I did in 2014.

8. However, I have recently been provided additional information about Mr. Hall's childhood that sheds light on Mr. Hall's history and would have allowed me to put my 1995 observations and assessment into better context in 2014. That information, provided to me by Mr. Hall's current legal team in late 2023, included the sworn declarations of

2

IFCD 00028521

multiple people connected to the Shaker Mountain School in Burlington, Vermont in the 1970s and '80s (Mark LeClaire, Jessie Mashteare, Malcolm Sawyer, Bruce Sanderson, Fred M. Jackson, Patricia Miles, Richard Dougherty, Peter Lauffer Carr, Lisa Tomasi-Carr, Jane Ginsberg, and Lucy Abair), as well as a declaration by Mr. Hall's sister Michelle and one by Dr. Howard Fradkin, Ph.D. These declarations paint a vivid picture of a pedophile repeatedly grooming and assaulting generations of boys entrusted to his care, with Mr. Hall, at the age of 13 in 1984, being one of them. I was particularly impressed by Dr. Fradkin's declaration, which laid out the trauma Mr. Hall experienced in an extremely clear manner.

9. The declarations I reviewed describe an environment sorely lacking not only in safety, but in structure. Even setting aside the trauma of the sexual abuse, the Shaker Mountain School was one of the worst places Mr. Hall could have gone at that particular time in his life. He was already struggling with his very deficient skills related to appropriately and effectively responding to common societal expectations and structure, possibly complicated by issues surrounding his adoption. Emotionally and in terms of self-control, he was a child with above-average energy that was manifesting significant attention deficits, so putting him in an environment where he was encouraged to ignore mainstream expectations and instead follow his own internal compass was exactly the wrong course to take. What he needed was rather a balanced, organized, positive environment that would help him learn to function effectively within existing societal structures.

10. Children are not short adults. They depend on the adults around them for guidance and structure. There are times when society can make a positive difference in children's lives

3

IFCD 00028522

when they are struggling, or during critical developmental periods when they are primed to learn new skills. Mr. Hall was that child, but at the moment of his struggle and during an impressionable developmental stage, when placement in an appropriately structured program could have helped him turn things around, the opportunity was missed. Mr. Hall's placement at the Shaker Mountain School not only denied him an environment that could help him thrive, but he was traumatized there on top of it.

11. The result of this "double whammy" was severe traumatic impairment of a normal developmental progression in a child already at a disadvantage because of his energy and attention issues. With no acknowledgment of the sexual abuse, there could be no treatment for the trauma it caused. When a trusted adult does something that is harmful or confusing to a child, it tremendously undermines and exploits that child's sense of what is right and true, including telling the truth about themselves. Early adolescence is an impressionable stage, when things are still perceived as all good or all bad, right or wrong, true or false. In the case of the director of Shaker Mountain, here was a charismatic man in a position of power who seemed to garner a great deal of respect, who was doing something that did not comport with his exalted public persona or the truth of what was happening in the loft of the school. From a child's perspective: If the director presented himself as good, and society corroborated that estimation by the way they treated him, then, regardless of whatever he did in that loft to make the child feel bad, why wouldn't the child think that he, too, could simply claim something and have it be right and true?

12. These observations are ones I am able to make thanks not only to my long career (my CV is attached to this declaration), but also to an experience early in my professional

4

IFCD 00028523

development. I was director of The Northern Region and Emergency Services at the Kennebec Valley Mental Health Center in the 1980's and early 1990's. At that time the local District Attorney was ahead of his time with regard to prosecuting sex offenders. This resulted in an explosion of evaluations and treatment that I was overseeing, of both abuse survivors, family members, and perpetrators. Thanks to a conspiracy of silence that surrounded sexual abuse at the time, my staff and I had been naïve about the extent of it until D.A. David Crook drew attention to the issue. We learned as we went, gaining knowledge with every new case. The number of cases grew large. At any point in time during the 1980's and early 1990's, our agency had at least 600 open cases related to child sexual abuse. I supervised staff providing treatment to about half of those cases. I would have been in a position to apply the knowledge gained from that experience to a 2014 re-assessment of my work with Mr. Hall in 1995, if I had been apprised of his history as a sexual abuse survivor.

13. Had I been made aware of this history before my testimony in 2014, I would have been better able to understand the intense anger, irritability, and righteous indignation in Mr. Hall that I had observed and documented in 1995. I would have been able to view his made-up stories as a version of the way he had wished things had been, so much so that he believed it himself, particularly with regard to the tale of assaulting his friend's daughter's abuser, as perhaps verbalizing as reality a fantasy he had in reaction to his own unaddressed molestation.

14. To be clear, I do not disavow my assessment in both 1995 and 2014 that Mr. Hall's medical situation caused him a great deal of pain, both physical and psychological, resulting in my contemporaneous diagnosis of depression. I do not doubt that the daily

5

IFCD 00028524

reality of living with Crohn's disease could damage any person's psychological well-being, and certainly did Mr. Hall's. What the knowledge of the sexual abuse history would have given me was a broader field in which to consider the depression. It also would have allowed me to answer Mr. Duchardt's question about what, in retrospect, "also might have been at play here," in a different, more accurate way. In addition to surmising that Mr. Hall's 1995 symptomology could potentially be characterized as bipolar disorder, I would have proposed a retrospective consideration of post-traumatic stress disorder as well, because in fact, Mr. Hall's tendency toward disproportionate emotional reactions is a hallmark of PTSD.

15. I did not type this declaration. Instead, I related the above information to a member of Mr. Hall's current legal team, who typed it for me. I have carefully reviewed the contents of this declaration, and I can confirm that, had I been apprised of the information pertaining to the Shaker Mountain School and asked about it during the trial in 2014, my testimony would have comported with the words I have used in this declaration.

16. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date at __The Villages, Florida__

_Richard T. Stppler Ph.D._
Signature

__2-18-2024__
Date

6

IFCD 00028525