FD-302 (Rev 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/25/2011

RUTH A MATTSON, white female, date of birth ████ ████ Social Security Account Number ████████ was interviewed at her residence located at ████████ telephone number ████████ MATTSON was informed of the identity of the interviewing agent and the purpose of the interview. She thereafter furnished the following information:

MATTSON advised she first met CHARLES HALL (referred to by MATTSON as "CHUCK") in late 1995 just before Christmas. She was introduced to him by a mutual friend. Not long after they met, the two started to date one another and within a week he moved into her residence, which at that time was located at 59 Waters Street, Waterville, Maine. After about two or three months, MATTSON kicked him out primarily because of lies he had told her in which he claimed to have been divorced from his wife BARBARA OTTENGER (phonetic spelling). MATTSON realized he was not being truthful to her regarding this after having located in his personal belongings divorce papers he had not submitted. After having kicked him out, HALL slept in a dog house located outside her residence for a couple of nights before finding some place else to live.

After about two weeks, MATTSON and HALL reunited their relationship, and HALL moved back in with her. MATTSON noted the two discussed marriage, and she considered herself his fiancé. However, MATTSON started realizing that things he said were not making sense, and she started to catch him in more lies. One lie in particular that she recalled was one in which he stated he had been assaulted by an individual when in fact she learned he was not. MATTSON once again broke up with HALL after the two had lived together for about five or six months.

Less than a month after she broke up with him the second time, HALL was arrested and subsequently charged with breaking and entering a restaurant located in Winslow, Maine. While he was in jail, the two routinely wrote letters to one another; however, after a while the letters were exchanged sporadically until they eventually stopped altogether. The last time she heard from HALL was about two years ago when he was at the federal penitentiary located in Michigan.

| | | | |
|---|---|---|---|
| Investigation on | 10/19/2011 | at | Clinton, Maine |
| File # 90A-KC-93015 | | Date dictated | 10/25/2011 |
| by SA Rick Eric McLain | | | |
| rem39803.302 | | | |

This document contains neither recommendations nor conclusions of the FBI It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

11/3
11/3/11

002557

00002557

FD-302a (Rev. 10-6-95)

90A-KC-93015

Continuation of FD-302 of ___RUTH A. MATTSON___ , On 10/19/2011 , Page ___2___

MATTSON noted that with the exception of HALL's lies, she considered him to be a very good person and was shocked to learn that he had been indicted for the crime of murder. She stated that she was also shocked when she learned he had been convicted several years ago for having made threats to the airport in Portland, a judge and an attorney. She told him in one of her letters just how "stupid" it was to have made these threats.

MATTSON noted that during the time HALL lived with her, her son, DUSTIN, who at the time was three years old, lived with her as well. She stated that she completely trusted HALL around her son and at times left him alone with DUSTIN.

She advised that HALL "did not have a violent bone in his body" and has never known him to hurt anyone. Prior to the aforementioned threats, she was not aware of anyone he threatened to hurt. She also stated that she never witnessed him display a bad temper. According to her, he just lied a lot. Because of the frequent lies, she did not believe he knew the difference between right and wrong. If he did, he would not have lied at all because many of the lies he told did not make sense. She believed at times he told the lies for no real reason, and he most likely did not know why he told them either. On other occasions though he lied to make it appear as though he was a "big man." She learned from another inmate in one of the prisons HALL was in that he was showing a picture of DUSTIN and her to inmates and telling them that they were his deceased family.

She noted HALL and she both had an interest in writing poetry. She provided the interviewing agent with a poem HALL had written that she had saved. A copy of the poem written by HALL will be attached to this FD-302. She stated that most of the poems he wrote were emotionally deep and did not recall any that he wrote where he expressed anger, or appeared violent and/or threatening in nature. She noted too that HALL could draw very well and was a good song writer with a great singing voice. HALL was also able to play several musical instruments including a guitar, keyboards and drums.

MATTSON was aware that HALL was adopted. She has never met or had any contact with his adoptive parents. HALL portrayed his relationship with his adoptive parents as abusive, so much so that he suffered from post traumatic stress disorder. He told her that his family has disowned him. HALL also claimed that his adoptive mother was at one point going to dress HALL and his

11/3/11

11/3
11/3/11

002558

00002558

FD-302a (Rev. 10-6-95)

90A-KC-93015

Continuation of FD-302 of _____RUTH A. MATTSON_____ , On 10/19/2011 , Page 3

adopted sister, MICHELLE, in their "Sunday best" clothing and then drown them. She had no such plans for their biological daughter. HALL told MATTSON that MICHELLE often tried to get HALL to believe that life with their adoptive parents was good. MATTSON did not recall all the details, but HALL related to her that his adoptive parents told him that MICHELLE's adoption was very expensive, and his was very cheap. Based on what HALL told her, she thought his adoption may have only cost $24 for the paperwork involved in the adoption process. HALL believed his adoptive parents told him this as if to say that his biological parents did not want anything to do with him.

During the time that HALL and she lived together, HALL worked a few times with her father HOWARD MICHAUD doing odd jobs such as cleaning out a garage. Other than that, she was not aware of any job he had. She did not know why he did not work. She noted that he can be lazy but also added that it could have been because of his Crohn's Disease. She advised HALL was very self conscious about having Crohn's Disease and when it "acted up" she noticed it broke his spirit. She stated he at times would cry like a baby and ask her why it had to be him with the disease. MATTSON advised that HALL and she unsuccessfully attempted to locate HALL's biological parents to determine if Crohn's Disease ran in the family.

MATTSON advised that HALL has tried suicide on a couple occasions. Once he tried cut his wrist but did not catch the spot that would have caused him to bleed to death. The second time she did not know any details other than he was hospitalized at the Maine General Hospital in Waterville. She was subsequently contacted by the hospital and asked if he could be released to her.

MATTSON noted that HALL smoked marijuana a couple of times and would occasionally drink alcohol. He told her that he has used "acid" prior to meeting her, but she did not know if he was telling her the truth or not. She was not aware of him abusing pain pills.

MATTSON did not know MARY BLAKENY and has never met her. She thought that BLAKENY may have been the woman HALL met and then married while the two were in prison in Portland, Maine.

MATTSON has met OTTENGER on one occasion. MATTSON's impression of OTTENGER was that she seemed to be "a woman scorned."

11/3/11

11/3
11/3/11

002559

00002559

90A-KC-93015

Continuation of FD-302 of _____RUTH A. MATTSON_____ , On __10/19/2011__ , Page __4__

She knew OTTENGER lived in Winslow and offered to try to locate her for the interviewing agent.

At the conclusion of the interview, MATTSON furnished a newspaper article written after HALL was sentenced for the aforementioned breaking and entering. MATTSON noted that HALL was made an example of by the prosecuting attorney and given eight years in prison, a sentence she felt was much too harsh for what he did. A copy of the newspaper article will be attached to this FD-302.

MATTSON also provided the interviewing agent with a copy of a printed out Facebook email conversation she recently had with a friend named JULIE SMITH, a copy of which will be attached to this FD-302.

Additionally, MATTSON provided the interviewing agent with a copy of a letter she intended to mail HALL. A copy of the letter will also be attached to this FD-302.

MATTSON advised that she opposed the death penalty for any reason.

She can be contacted via email at the following address:

11/3/11

11/3
11/3/11

002560

00002560