# Declaration of Mary Nasse

I, Mary Nasse, declare the following:

1. My name is Mary Nasse. I am over the age of 18 and competent to testify to the matters herein.

2. I became the director of the Special Education department at Thornton Academy in Saco, Maine in the 1987-88 school year. I remained in that position until 1995, when I left Thornton and became the principal at Gray-New Gloucester High School in Gray, Maine. I then returned to Thornton two years later as an associate headmaster, a position I held until my retirement. Before working at Thornton, I worked as a Special Education teacher at Saco Middle School, and then as the Special Education department head at Wells High School in Wells, Maine, where I also taught in the LD (Learning Disability) classroom.

3. When I took up my post at Thornton, the professional Special Education community was still grappling with the tangible realities of a law called the Education for All Handicapped Children Act of 1975 (Public Law 94-142, or PL 94-142). This law was later updated as the Individuals with Disabilities Education Act of 1990. In 1987, there were differing opinions about how to implement the law. The goal of the law was to be more inclusionary of children with various types of disability. Prior to the law, school for children with disabilities had provided varying degrees of services: you got the in-school educational services, or you didn't (and most didn't). When I arrived at Thornton, the trend was toward wrap-around services – a care management concept that involves not just educational assistance, but coordinates social, emotional, psychological and

1

IFCD 00027483

vocational assistance as well – and it was my job to identify what those were, and make sure they were provided to each and every student who qualified for them.

4. Before I arrived at Thornton, the department was two Special Education teachers, Becky Cretaro and Caren Sabo, and an uncertified Special Education tutor, David Ruff. When I began, David had taken a teaching position in the mainstream English department. The Special Education classrooms were collectively and informally called the "Resource Room." The room where they were housed had originally been been a shower room. The building where they were housed had originally been a gymnasium. Larry Spencer, who was Special Services Director for School Union 7, as Saco was called in those days, was responsible for the Special Education program at Thornton. He was not a Thornton employee. He went to Thornton regularly to make sure the appropriate records were being kept and to check on the classes. He attended all PET (Pupil Evaluation Team) meetings, at which the students' IEP's (Individualized Education Programs) were developed. He didn't have much input regarding daily programming. Ms. Cretaro and Ms. Sabo were responsible for daily programming. The only options available to Special Education students before I arrived was an all-day self-contained class or call-out classes in the Resource Room. There was no social worker nor psychological services specifically designated for Special Education purposes.

5. The new Thornton headmaster wanted me to expand the school's Special Education services, primarily by hiring more staff. I was also concerned about improving conditions. To address the conditions issue, I got the Resource Room classes moved to a former math classroom. To address services, I took on a half-load of teaching on top of my administrative duties. I also hired two more Special Education teachers, as well as a

2

IFCD 00027484

social worker solely for Special Education students. On top of that, I introduced ed techs for mainstreamed Special Education kids. This allowed for better implementation of the post-P.L. 94-142 trend toward providing the least restrictive environment for Special Education students. Ed techs accompanied students to their mainstream classes. They maintained direct contact with parents as to whether and how a student was progressing.

6. I was asked by a member of the current appellate legal team representing Chuck Hall, whom I did not know, to review his school records and assess the Special Education services he received at Thornton during the 1985-86 school year – the year before I arrived. The first thing that stood out to me was the number of suspensions he received. During the era when Chuck was at Thornton, the general Special Education philosophy was to maintain students in mainstream classes. It appears to me that this was attempted with Chuck, by giving him tutor services and minimal pull-out classes. It wasn't until his truancy persisted and his behavior in school (and out) became more problematic that he was relegated to the Resource Room full-time. This was an unusual move for a student with what looks like Chuck's relatively minor level of academic difficulty. It was an attempt to keep him in school. PL 94-142 requires every attempt must be made to keep a student in regular education.

7. It was finally determined that Thornton could not meet Chuck's needs. The Homestead Project in Ellsworth, Maine was chosen for him as his ultimate out-of-district placement. It seems somewhat unusual that Homestead was chosen rather Sweetser's residential program, which was located in Saco. This seemed especially curious after Chuck's current legal representative informed me that his family had a history of treatment with Sweetser. Both the Sweetser and Homestead programs dealt with adolescent behavioral

3

IFCD 00027485

issues, which seem to have been Chuck's most prominent problem, and Chuck's records reflect that Sweetser was considered as an option.

8. The File Note of May 25, 1987 by Saco school psychologist Stanley Payson offers a possible explanation: noting the number of suspensions, the reports of Chuck's aggressive behavior at home, and Chuck's parents' desperation, Dr. Payson suggested that Chuck required a "more restrictive environment if he is to receive an education," and perhaps the PET considered Homestead a more restrictive than Sweetser, and necessary for Chuck's management. In my experience, a recommendation for out-of-district placement was quite unusual in and of itself. The only more restrictive recommendation would have been a hospital – and I note that Jackson Brook Institute, which is a psychiatric facility, is proposed in the records as an immediate, temporary consideration. This speaks to how serious the PET thought Chuck's situation was.

9. Having been nominally familiar with Homestead and its treatment program, I can agree that it was likely more restrictive than Sweetser (with which I was more familiar, given its Saco location). I was also vaguely familiar with the Shaker Mountain School in Burlington, Vermont, to the extent that I knew it embraced a free democratic philosophy, in which the students had input equal to the staff on all decisions affecting the school. Learning from Chuck's records and his current legal representative that he attended Shaker Mountain prior to Thornton and then Homestead afterwards, it struck me that these were two very different programs, Shaker Mountain being very unconventional and Homestead more restrictive and traditional. It would be like a child being in a free-range environment and then turning around and joining the Marines. Not having known Chuck, I can't say how suitable or effective either environment would have been for him, but I

4

IFCD 00027486

can certainly say that the polar-opposite philosophies would be a shock to anyone's system.

10. The biggest problem for Chuck at Thornton, in my opinion, was that necessary services were not available to him at that time. The Thornton process started Chuck, as was the trend, with the least restrictive environment (mainstreaming), then identified him as having a behavioral handicap, then added counseling, then added tutoring. All of these were appropriate increases in service as Chuck's progress stalled and his behavior deteriorated. Perhaps adding a designated Special Education counselor and Special Education ed tech would have helped. Both could have maintained regular contact with Chuck's parents, communicating on a daily or at least weekly basis about what he was getting done at school and what needed to be done at home. The social worker could have addressed behavioral and family issues as part of wraparound services, the latter of which seems even more critical having learned from Chuck's current legal representative that he was adopted. While it is true that Chuck was assigned counseling with Dr. Payson, the fact is that, in Chuck's era, educational counseling was focused more on academic success than on behavior or interpersonal development, with the effort geared toward keeping the student in school.

11. As I have mentioned, I did not know Chuck Hall, and he was no longer a Thornton student by the time I began my post as Special Education director. Nonetheless, I was willing to review and assess Chuck's records based on my personal and professional experience as a Thornton Special Education educator and administrator when I was asked to do so in 2022 by a member of the legal team representing Chuck in his death penalty appeal. I would have been equally willing to speak with anyone representing Chuck at

5

any earlier point in his case, at which point I would have told them everything contained in this declaration, but no one ever approached me before 2022. I would also have been willing to testify to this information at Chuck's trial in 2014, if I had been asked to do so.

12. I did not type this declaration. Instead, I related the above information to a member of Chuck's current legal team, who typed it for me. I have carefully reviewed the contents of this declaration.

13. I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct. Executed this date at _Jncn Mo . 7/3/23_

_Mary Nass_
Signature

_7/3/23_
Date

6

IFCD 00027488