**Rebecca L. Cohen**
**Mitigation Investigator**
**50 Gray Street #2**
**Portland, Maine 04102**
**(678) 361-6773**
**rlcvt27@gmail.com**

## SOCIAL HISTORY REPORT
October 20, 2023

Charles Michael "Chuck" Hall was born Baby Boy Kelley on April 6, 1971, in Portland, Maine. The 18-year-old girl who bore him, Betty Jo Kelley, was from Texas. She had been sent to stay with her stepbrother in Maine as a means to hide the pregnancy from family and friends, with the "express purpose," as documented by what was then the Maine Department of Health & Welfare, "of placing her child for adoption in Maine." It was an intention in which "[a]t no time did Miss Kelley waiver." She refused even to look at the baby she delivered: she "did not see her child nor did she wish to."[1]

Betty Jo, like her parents, felt the entire episode, including the baby who ultimately became Chuck Hall, was better left forgotten. Where her parents' motive in hiding the pregnancy seems to have been pride, however, Betty Jo's feelings were rooted in trauma: she had become pregnant after being gang-raped. This was not the story she gave to the Maine agency handling the adoption. At the time of the birth, she described, without naming, the father (paternity is noted as "no legal" in the birth paperwork) as a high school graduate in excellent health who worked as a mechanic and planned to attend college, even attributing to him brown hair and eyes. It wasn't until decades later that she disclosed the rape and its perpetrators, identifying a co-worker from her job at a department store and his friends. Their names and other distinguishing details have been lost to history.

Baby Boy Kelley was not unwanted for long, however. A couple named Charles and Dorothy Hall in Saco, Maine, a small town (at the time) of about 10,000 in southern Maine, had adopted one baby in 1969 and were ready to welcome another into their family. They were approved for the second adoption in March 1971, three weeks before Betty Jo gave birth. After a short stay in a foster home with another Maine couple, the baby who would soon be named Chuck was placed in "pre-adoption" status with the Halls on May 27, 1971.[2] He was seven weeks old and described by his foster mother as "a very good baby" who "is relaxed, eats and sleeps well, loves to cuddle and likes to be rocked." Social services personnel further stated that he was

---

[1] Child for Adoptive Placement Summary, Maine Department of Health & Welfare Case #29885-v5, undated.
[2] Adoptive Home Placement Agreement, Maine Department of Health & Welfare, May 27, 1971.

IFCD 00027745

"lifting his head, smiling and cooing."[3] On the date marking his two-month birthday – June 6, 1971 – Chuck was baptized at the Halls' church, Notre Dame de Lourdes, in Saco.[4]

Charles Vere and Dorothy (née Danis) Hall were both born in 1934, and thus each was closing in on 40 years old when they adopted Chuck. Dorothy, born and raised in Biddeford, Maine, came from a close-knit family of eight siblings, to whom she was "attached…in a wholesome way."[5] Herself the youngest, she grew up wanting to replicate the warmth and camaraderie she experienced throughout her childhood. She attended three years of high school – a longer educational career than either of her parents, who both had only elementary school educations – but dropped out to work full-time as a salesgirl instead.

Charles' childhood in Erie, Pennsylvania was perhaps not as idyllic as Dorothy's, with a father who left the family after several bouts of separation and reconciliation before an eventual divorce when Charles was five years old. Charles had minimal contact with his biological father as he grew up, but his stepfather, whom his mother married several years after the divorce, stepped willingly into the paternal role. When one of Charles' two sisters became pregnant as a teenager, his mother and stepfather took in the baby as their own, eventually adopting him; Charles thereafter considered the boy, almost 20 years his junior, a brother rather than a nephew.

Charles and Dorothy met on a blind date in 1954, and, as they told an adoption caseworker in 1969, "from the beginning knew that they were meant for each other."[6] They were married in Biddeford, Maine, several months later. Charles had enlisted in the Army straight out of high school (at the non-negotiable suggestion of the principal, who had caught him forging his draft card in order to obtain alcohol), and was assigned to the base at Devens, Massachusetts. It was during the couple's residence at Devens that their daughter, Susan, was born in 1955. Within two years, with Charles' service complete and Dorothy homesick, the young family moved back to Biddeford, and then several years later to Saco, Biddeford's sister city across the river.[7] Upon their return to Maine, Charles worked first for a lumber company and then was hired as a civilian at the Portsmouth Naval Shipyard in Portsmouth, NH, where he stayed until retirement, moving up through the ranks from electrician apprentice to general foreman, and then into management, running the submarine test division.[8]

In 1969, when the Halls first applied to adopt a child, the social worker who did their intake described them this way:

> From all outward appearances the Halls have a very good
> relationship. They appear to be sensitive to each other's needs

---

[3] Child for Adoptive Placement Summary, Maine Department of Health & Welfare Case #29885-v5, undated.
[4] Certificate of Baptism, June 6, 1971.
[5] Adoptive Family Record, Maine Department of Health & Welfare, 1969, p.3.
[6] Adoptive Family Record, Maine Department of Health & Welfare, 1969, p.5.
[7] Adoptive Family Record, Maine Department of Health & Welfare, 1969, pp.5, 8.
[8] Trial testimony of Charles Vere Hall, 05/23/14.

and wholly compatible…They are intelligent, hardworking, sensitive people who certainly give ever[y] indication of stability.[9]

They were, that is, at least in the social worker's eyes, the epitome of good New England stock. It is, of course, not surprising that a couple wanting to be approved to adopt a child would put their best foot forward during their assessment, and the Halls were without a doubt financially and materially stable due to their intelligence and hard work. Their daughter Susan, however, who experienced daily life with them, offers a bit more nuance:

> When I was seven years old, we moved from an apartment into a new house in a moderate-sized housing development. Like so many others in the neighborhood, my parents were one of many young working couples with children. My parents seemed happier in this new neighborhood. In my mind this was the beginning of [my parents'] weekend social events with friends and neighbors. Money was limited and my parents lived within their means. On the weekends, their activities included playing cards in the evening, cook-outs and gatherings with family or friends. This where I see them becoming socially interactive with others…My parents became active in many of the church activities and committees.
>
> While I was growing up, they'd had their struggles. Social gathering and drinking were a large part of my parents' life. They were of a generation that would go out every Friday or Saturday evening. Alcohol consumption was a large part of their weekend. During my childhood, I remember several occasions when their arguments would progress to knock-down, drag-out fights, including punching holes in the walls and breaking large numbers of glass items. However, I never saw them physically assault each other. On one occasion, I remember being about eight years old and hiding in the closet to try to escape their yelling and screaming. When they found me, they blamed each other for scaring me. I also remember a time when one of them broke a bottle, and in response the other swept an entire shelf of items out of the fridge so that everything shattered on the floor.
>
> After this last big argument, I believe my parents realized they were not happy with the events in their lives. They made several changes: my dad stopped bowling in a league, and my mother started taking evening classes. They met with our priest for marriage counseling. A few years later they attended a marriage

---

[9] Adoptive Family Record, Maine Department of Health & Welfare, 1969, p.6.

IFCD 00027747

counseling program, to strengthen their relationship as a couple.[10]

Susan recalls when she was very young asking her mother why she had no siblings, and her mother's response that her inability to have more children made her "sad" because she'd always dreamed of a large family.[11] It was only in retrospect, however, that Susan put together the alcohol and arguments with this reality and realized that her parents' "plan to resolve their problems was to enlarge their family."[12]

Dorothy and Charles fully included Susan in the decision to adopt, a decision that delighted her. The family moved to a larger house to accommodate the eventual addition. As the application and assessment process moved forward, Susan recalls that her parents "argued a lot less and were less hostile" because they were "committed to prove to everyone that they would be good parents."[13]

The Maine Department of Health & Welfare was convinced, and in January 1970, a three-month-old girl was placed with the Halls. They named her Michelle. Her adoption was complete by the end of July.[14] Less than a year later Chuck joined the family so close to Susan's seventeenth birthday that Charles and Dorothy referred to him as her birthday present.[15] Susan describes her parents as "thrilled" to have both children, as was Susan herself, though she soon tired of the babysitting duties that fell to her on Saturday evenings as Dorothy and Charles continued their weekly socializing.

Dorothy and Charles had assured their caseworker that they had "every intention of telling their child or children as soon as possible about being adopted and what it means."[16] Indeed, Dorothy, in her trial testimony, explained that "[w]e were told when we adopted them to tell them, to use the word…every day like you would use bread in a house." The caseworker determined that they "certainly had no visible inhibitions around adoption," and that they "both…feel that a child's background has very little meaning to them as they are firm believers in enviroment [sic] determination of a child's potential."[17] True to their word, Susan confirms, they "always adjusted the stork stories to include [Michelle's and Chuck's] adoption."[18]

Susan continues:

---

[10] Declaration of Susan Shumway, pp.1-2.
[11] Declaration of Susan Shumway, p.1.
[12] Declaration of Susan Shumway, p.2.
[13] Declaration of Susan Shumway, p.3.
[14] Maine Department of Health & Welfare internal notes: January 30, July 30, and July 31, 1970.
[15] Declaration of Susan Shumway, p.3.
[16] Adoptive Family Record, Maine Department of Health & Welfare, 1969, p.7.
[17] Adoptive Family Record, Maine Department of Health & Welfare, 1969, pp.6-7.
[18] Declaration of Susan Shumway, p.4.

IFCD 00027748

> They wanted Chuck and Michelle to know they were wanted and loved, unconditionally, from the moment they entered our lives. My parents never withheld the fact of their adoption, but always said it didn't matter, that we were a family: biological or adopted was not relevant…The subject of legal or biological was no longer important and not discussed openly.[19]

There is so much laudable in the way Charles and Dorothy approached the fact of their children's adoption, and they made their choices for all the right reasons, love for their children primary among them. The problem, Susan posits, was the likelihood of "negative thoughts an adopted child lives with as a sort of trauma over being given away."[20] Michelle, informed by her own experience, confirms that, her adoptive parents' love notwithstanding, the fact of her adoption "wasn't always at the conscious forefront of my mind, but it was often present, even if only subconsciously."[21] The knowledge of it, even latent, made her "angry and confused without really understanding why."[22]

Though she might not have understood them at the time, Michelle made her feelings known. As Dorothy recounted it at trial, "Michelle, if you would say adopted, she'd leave the room." Dorothy contrasted this with Chuck's reaction to the topic: "[I]t's just a word. It didn't bother him." She recalled the only time he asked her about his birth mother, when he was five years old, and seems to have believed that her answer – that his birth mother loved him but simply couldn't care for him – put the issue to rest for once and for all. "He was a happy boy," she concluded.

Michelle however, remembers Chuck as a lonely kid, even as he smiled "constantly," according to Dorothy, who testified at trial that "he's always got a smile on his face" in old pictures. And his school records describe a child who, while likeable – "He is a nice little boy," wrote his first-grade teacher – was regularly distracted. Teacher assessments from first through third grade note that he "does not always pay attention," "does a lot of day-dreaming," "needs to put in more effort," and "day-dreams, talks, and wanders around the room."[23] While none of this is mutually exclusive with him being a "happy boy" at times, it does indicate that something was amiss. In Michelle's estimation,

> Chuck was a follower, someone who just wanted to be included. All he wanted to do was please people. I think some of this stemmed from the insecurity that people who are adopted live with, consciously or not, and it may have led to Chuck's lifelong habit of telling stories that aren't true... I think he never believed that people would like him for being himself. After all, his birth

---

[19] Declaration of Susan Shumway, p.4.
[20] Declaration of Susan Shumway, p.4.
[21] Declaration of Michelle Bories, p.1.
[22] Declaration of Michelle Bories, p.2.
[23] Saco Public Schools report cards 1977-1980, Young School, grades 1-3.

IFCD 00027749

> parents didn't – at least that's what he thought, like any adopted
> kid thinks. So he talked himself up to be someone he wasn't, and
> it never turned out well, because he couldn't live up to it.[24]

Indeed, Dorothy, in her trial testimony, related an outlandish story Chuck told his first-grade teacher – about someone shooting his father with an arrow – that startled the teacher enough to call the police.

Chuck's third-grade teacher requested a parent conference; in fourth grade, it was two. When a school psychologist later noted a concurrent decline in academic performance around this time, Dorothy attributed Chuck's struggles to "the family moving, death of a grandparent, and a neighbor needing to remove foster children from her home."[25] The situation deteriorated until he failed sixth grade in 1983, despite relatively strong standardized test scores. He was unable to take advantage of a probationary period the next fall, offering him the first four weeks of the school year to maintain a C-average or higher and then promptly be promoted to seventh.[26] Instead, he failed sixth grade a second time, and was even suspended once for fighting.[27]

No one directly attributed Chuck's difficulties to his adoption, but Michelle, who was exhibiting her own maladaptive behaviors around the same time, offers an explanation that rings true for Chuck as well:

> I understand now that I was testing them, that the knowledge of
> my adoption nagged at me, making me wonder why, if my own
> birth mother didn't want me, if she could just give me away, why
> would these people who had no biological connection to me want
> to keep me? It didn't fully sink in until I got older that they did
> really want me, always. Until I finally understood that, I kept
> testing them.[28]

The principal of Saco Middle School referred Chuck for educational testing. At the same time, Chuck's concerned parents – whom Susan notes "were at their wits' end" due to Michelle's increasing promiscuity and Chuck's "serious mischief"[29] – had already started looking for an alternative to the public schools. Not knowing where to turn, they asked Susan, who was by now married and living in Burlington, Vermont with three children and a fourth on the way. She was familiar with two schools in her area "for kids who had not been able to make it in regular public school," one of which was the Shaker Mountain School.[30] As Dorothy stated in her trial

---

[24] Declaration of Michelle Bories, pp.2-3.
[25] Saco Public Schools Psycho-Educational Evaluation, Lawrence L. Spencer, August 1984, p.1.
[26] Saco Middle School report cards, 1982-84.
[27] Saco Public Schools Psycho-Educational Evaluation, Lawrence L. Spencer, August 1984, p.1.
[28] Declaration of Michelle Bories, p.3.
[29] Declaration of Susan Shumway, p.5.
[30] Declaration of Susan Shumway, p.5.

IFCD 00027750

testimony, Shaker Mountain was "supposedly a reputable school" that "sounded good," and "at least his sister is in town, [so] he won't feel abandoned."

Chuck attended a summer camp at Shaker Mountain in the summer of 1984 as a trial run. Were he to stay in Saco for the upcoming school year, wrote the Special Services Director who performed the August 1984 testing requested by the middle school principal, options to consider were: testing by the school social worker to "further delinate [sic] the nature and extent of any emotional adjustment difficulties"; temporary remedial math placement; individual or group counseling; weekly progress reports; and monthly teacher-parent meetings. Instead, Dorothy and Charles "decided to place [Chuck] at the Shaker Mountain School, an Alternative School in Burlington, Vermont."[31]

Though Shaker Mountain offered boarding at an off-site location, the plan, in order to save money, was for Chuck to live with Susan's family in Burlington and attend the school as a day student. This was an adjustment for everyone:

> When Chuck came to live with us, we all soon realized that we
> didn't know each other very well. Chuck and I had grown up in the
> same home, but are nearly 17 years different in age. We…did not
> have the same experiences.[32]

Susan had just started working again after staying home for the early years with her older children. She was on second shift while her husband's hours rotated, so "[j]uggling our work schedules and childcare was challenging," such that their family time was limited and the two adults were most often not home at the same time.[33] They also had a baby who was barely six months old. Susan recalls "some nice times at the beginning," but in retrospect wonders if Chuck felt left out.[34]

The Shaker Mountain School (variably referred to hereinafter as "SMS") was another adjustment for Chuck. Established in 1968 in Burlington, Vermont by Jerome A. "Jerry" Mintz, in the midst of an alternative education boom, the school was based on the European model of "free" or "democratic" education popularized by the Summerhill school in Britain. As Jerry explains in his 2003 book, *No Homework and Recess All Day: How to Have Freedom and Democracy in Education*, the philosophy was rooted in a concept of "freedom, not license" to learn the way that most appealed to each child. A former member of the staff, Joni AvRutick, describes how this played out:

I felt Shaker Mountain was a good and even a healing place for many kids/teenagers who came from difficult backgrounds and had a history of failure in the system. They were seen and heard

---

[31] Saco Public Schools Psycho-Educational Evaluation, Lawrence L. Spencer, August 1984, p.4.
[32] Declaration of Susan Shumway, p.6.
[33] Declaration of Susan Shumway, p.6.
[34] Declaration of Susan Shumway, p.8.

IFCD 00027751

and were equal participants in all our school daily meetings. They were not seen as failures…It was an opportunity for them to take control and have autonomy in their own education.[35] John Kimber, a student in the school's early years (the 1970s), gives a student's perspective:

> I felt totally free there. It was like a constant camp situation, and what kid wouldn't like that?...I couldn't believe I got to be in school doing all kind of fun things, like hiking and reading and swimming….[36]

Zack Durbin, who attended during the 1982-83 school year, recalls:

> There's no denying the school was fun…I spent most of my days playing foosball and pinball or skiing or other non-school-like activities. I remember a big hill at an old folks' home a few blocks from the school where we used to go sledding. We built the sleds we used from old skis, so that was kind of cool and like a learning experience….[37]

The focus at Shaker Mountain was on experiential learning, which manifested in regular field trips – local, national, and even international. Traditional academics, however, were peripheral at best:

> Being a teacher didn't mean that they necessarily held classes. It just meant that they were available to help us students learn about any topic we wanted. We all made our own curriculum. We had to initiate the process by approaching the teacher with our interests…[and] there were no rules about who taught what. The idea was that each student would become our own person and choose the path to get there.[38]
>
> I did not get a good academic education. I learned nothing. They called it an alternative school, but the alternative part was the schoolwork, as in: they didn't do any. If you wanted to get anything even close to traditional schooling, you had to approach a counselor – they called the teachers counselors, or the counselors teachers; they were all the same thing – and request that they teach you a certain topic or concept. If they agreed, it would result in one lesson, never a full class or curriculum. The only formal lesson I remember having in my whole time there was

---

[35] Declaration of Joni AvRutick, p.1.
[36] Declaration of John Kimber, p.2.
[37] Declaration of Zackary Durbin, p.2.
[38] Declaration of Bruce Sanderson, p.2.

IFCD 00027752

> one on math that I requested…which lasted about five minutes. Sometimes random people from the Burlington community would come in and give a class in something or another, but only one time each. Other than that, all I learned at SMS was how to draw the numeral eight: I remember being taught during my first year there that it was like the infinity sign.[39]
>
> None of the teachers at SMS had teaching certificates, and we didn't have regular classes. But when we did have classes, students were allowed to teach them too, about anything we wanted. This mean that everyone taught only what they were interested in…[40]

The school's teaching methods were based on a general philosophy about learning, but its recruitment was geared toward a specific category of child. When Jerry was honored by the Vermont Governor's Committee on Children and Youth in 1970, it was described as "a new chance for disadvantaged youth and dropouts."[41] As student Elizabeth Miles puts it:

> SMS was basically a holding pen. It took in the kids no one else wanted, corralling them and keeping them out of the system, so the system seemed to pretty much leave the school alone.[42]

Student Fred M. "Bruce" Jackson concurs:

> Most of us were local, and we were like the underbelly of the Burlington area, kids who got kicked out of public school or at least were getting into trouble there, but whose families never could have afforded private school on their own.[43]

Shaker Mountain accepted all applicants regardless of ability to pay. Student Derek Foxwell remembers his family paying five dollars a week.[44] As a result, the school relied upon a meagre budget comprised of donations and fundraisers, which were liberally defined to include panhandling, something that was encouraged and sometimes even required of the students.[45] The only other financial resource was state monies for those students in state custody.

---

[39] Declaration of Elizabeth Miles, pp.1-2.
[40] Declaration of Chris Duval, p.4.
[41] "Lewis Hill Honored For Youth Work," Hardwick Gazette, January 22, 1970.
[42] Declaration of Elizabeth Miles, p.2.
[43] Declaration of Fred M. Jackson III, p.2.
[44] Declaration of Derek Foxwell, p.1.
[45] Declarations of Theresa Koenke Diaz, Derek Foxwell, Fred M. Jackson III, Jessie Mashteare, Torley Meister.

IFCD 00027753

Shaker Mountain was, says former staff member Jane Ginsberg, Jerry's brainchild and his life.[46] He was the public face of the school, what Joni AvRutick calls its "backbone and benefactor."[47] He was well-known throughout town, a personal acquaintance of both Lt. Governor Peter Smith and Burlington mayor Bernie Sanders. A former local child welfare worker named Lucy Abair describes him as "an eccentric proponent of alternative education and a self-styled advocate for youth at risk."[48] Through his eight-year joust with the Board of Education for accreditation, he gained a reputation as David to the state's Goliath. "The epic struggles of Jerry Mintz's Shaker Mountain School in Burlington to stay afloat financially," one reporter wrote in 1976, "are legendary."[49]

But on the ground at the school, Jerry had a more domineering presence. Despite the school's fealty to democracy, Doris Herbst experienced him as "persuasive and heavy-handed about [his] preferences."[50] Former staff member Lisa Tomasi-Carr recalls that he "tended to dominate the meetings" with a "superior attitude."[51] Student Juno Lamb concurs that he "spent much of the air-time at the meetings haranguing the rest of us to vote for his point of view."[52] Peter Lauffer Carr, also former staff, describes him as "not a good listener" and a bully.[53] Jane Ginsberg describes a culture of reverence in which "anything other than adoring him was not an option."[54]

And then there was a third side of him, experienced by the students. As described by child welfare worker Lucy Abair, there was "something not quite right about the way [he] was with kids. There was something about him that drew kids to him, like a Pied Piper."[55] To hear the students tell it, however, the draw was in the other direction:

> Jerry invited any kids in the community who wanted to come along [to the twice-weekly stock car races]: all you had to do was call SMS and ask for a spot…One of the ways Jerry got out the word about the races was telling boys who were playing video games at Upton's, the local Burlington arcade…Jerry took the opportunity to talk up his school, both to us kids and our parents.[56]

> The way I ended up at SMS was kind of random…Jerry came up to me at the arcade and offered me a few quarters. He asked what I

---

[46] Declaration of Jane Ginsberg, p.4.
[47] Declaration of Joni AvRutick, p.2.
[48] Declaration of Lucy Abair, p.1.
[49] "Alternative Schools Battle for Survival," Rutland Daily Herald, September 12, 1976.
[50] Declaration of Doris Herbst, p.1.
[51] Declaration of Lisa Tomasi-Carr, p.5.
[52] Declaration of Juno Lamb, p.1.
[53] Delcaration of Peter Lauffer Carr, p.2.
[54] Declaration of Jane Ginsberg, p.2.
[55] Declaration of Lucy Abair, p.2.
[56] Declaration of Chris Duval, p.1.

IFCD 00027754

liked to do. When I told him I was into Dungeons & Dragons, Jerry said he knew someone else who played D&D, and he offered to introduce us.[57]

Even before I was an SMS student, Jerry started taking me out to do stuff. He'd take me bowling or to the movies or a baseball game or to get something to eat…[58]

It was a regular thing that he'd offer to take a few kids at a time to a Montreal Expos' game…or to go bowling, or play video games at Upton's…I remember him taking what seemed like hundreds of dollars out of the school account in quarters, which he'd give us to feed the video games.[59]

…either Jerry invited a couple of us at a time, or I asked some friends or acquaintances on my own. Jerry even encouraged me to do that. They didn't have to be SMS students; they could just be kids from the neighborhood.[60]

Jerry was at the detention center looking for kids who might want to go to his school. I don't know if he came by happenstance or if someone had given him my file, but there he was, and he asked if I'd like to go to SMS and live in the group home…that was run by the school…[61]

Looking back, I see that I was bowled over by Jerry's hard sell [to attend Shaker Mountain], but at the time, I was utterly taken by his enthusiasm and intelligence – and his interest in me.[62]

The one restriction on Jerry's invitations, however, was that they were for boys only:

Jerry also kept inviting me to…baseball games in Montreal, football games in Massachusetts[,] movies, eating out. He did this a lot, with lots of different boys, sometimes a few of us together, sometimes just one of us at a time. It was always only boys, never girls.[63]

---

[57] Declaration of Derek Foxwell, p.1.
[58] Declaration of Jessie Mashteare, p.1.
[59] Declaration of Fred M. Jackson III, p.3.
[60] Declaration of John Kimber, p.2.
[61] Declaration of Richard Dougherty, p.1.
[62] Declaration of Malcolm Sawyer, p.2.
[63] Declaration of Jessie Mashteare, p.2.

IFCD 00027755

> …Jerry even encouraged me to [ask other boys to come along]…I knew it had to be boys; I remember a time I showed up with another SMS student named Barbara, and I could see the disappointment on Jerry's face. He made clear he wasn't interested…because she was a girl. He himself only ever invited boys, never girls.[64]

> It was usually me and Frank on those evenings out…and sometimes some other boys too, but never any girls.[65]

> He would invite some of the boys to do something fun with him after school or on a weekend…I remember being jealous of the boys, and me and my [female] friend…thought it was unfair that the boys got to do the fun activities when we didn't.[66]

In fact, student Patricia Miles believes that "Jerry chose to work with at-risk kids and wards of the state because it gave him easier and free access to young boys, and that he had the school so he could enroll children he wanted to use for his own purposes."[67]

The key factor in Jerry's invitations to the boys was that they always ended in overnights. Boarding students, a group that comprised state wards and out-of-state students, lived in a group home on a run-down farm on property Jerry owned in the town of Starksboro, about 30 minutes south of Burlington. Several staff members lived there with them, but not Jerry. He was the only staff member with sleeping quarters at the school itself. This remained true even as the school changed locations over the years. By the time Chuck was in attendance, it was housed in an old gas station, which had been renovated to include a loft explicitly for Jerry's use.

Former students are remarkably consistent as to the set-up of Jerry's various bedrooms and the sleeping conditions:

> We would stay wherever he was living at the time, which changed a lot, because he stayed wherever someone gave him free rent. He always had multiple mattresses laying out on the floor. He'd bring us back to his place and everyone would tumble into bed, sprawled out on the mattresses. We all slept in our underwear, Jerry included….[68]

---

[64] Declaration of John Kimber, p.3.
[65] Declaration of Derek Foxwell, p.3.
[66] Declaration of Elizabeth Miles, pp.3-4.
[67] Declaration of Patricia Miles, p.3.
[68] Declaration of Mark LeClaire, p.2.

IFCD 00027756

> Sleeping with Jerry meant sleeping in the same bed, in only your underwear – Jerry included. The bed was a bunch of mattresses on the floor, all pushed together, with one set of sheets…[Jerry] always slept in the middle…It felt like you were trapped.[69]

> All [the loft] had in it was a few mattresses on the floor, with disgusting, stinky sheets on them. Jerry insisted that we were only allowed to stay over if we slept in the loft with him…[70]

> When it was time for bed, I said I'd sleep on one of the van seats in the meeting room. Jerry corrected me: he told me I would be sleeping upstairs, in the loft, with everyone else. I didn't want to, but I did what he said, and that's where I slept every time I spent the night there.[71]

> The loft was up a ladder on top of the classrooms. It was a long, narrow space. There was only one bed, and he had us sleep in it with him. If there was more than one of us, he was always in the middle, with us on either side of him.[72]

Some boys remember more distinctly than others what Jerry did to them, but again, the details in their stories correspond closely:

> …I woke up with him in his underwear and his arm wrapped around me, my back to his front, I pretended it wasn't happening. I heard him tell me that I should really sleep naked, with only a very think sheet, and I knew I felt very uncomfortable, but I didn't understand what it meant that he was touching me. I still try not to think about being on that mattress with him, because I worry there are more details that I've kept myself from remembering.[73]

> At first, Jerry would offer us backrubs. I never wanted one, but he kind of pushed himself on you. And then, after a while, when I'd be trying to sleep, I'd feel his hands on me. First it was just touching my hand, which seemed like it could maybe be by mistake, but then his hands started moving to other places, like around my waist, and near the top of my underwear. And then he

---

[69] Declaration of John Kimber, p.3.
[70] Declaration of Richard Dougherty, p.3.
[71] Declaration of Zackary Durbin, p.3.
[72] Declaration of Jessie Mashteare, p.3.
[73] Declaration of Malcolm Sawyer, p.4.

IFCD 00027757

> started pressing up against me or lying partially on top of me, and when he did that, I could feel that he had an erection.[74]
>
> …that night, for the first time, Jerry called me over to sleep next to him…Not long after I lay down, Jerry started massaging my back and buttocks, and then there was his hand, coming around to the front to fondle my penis.[75]
>
> I stayed tense and on alert all night, squished up between Jerry and the wall…We were lying there on the mattresses, and then I felt his arm reaching over me, and his hand heading for my groin area. I could also feel his erection against my back.[76]
>
> …Jerry would ask one of us to give him a massage, or he gave us massages instead. And he would talk about things he shouldn't, like one time I remember him asking if we knew what the strongest muscle in the body was. I guessed it was the leg, but Jerry said No, it's the buttocks…[then] he started massaging mine, and then he reached around and fondled my penis.[77]

The students of Shaker Mountain were generally a vulnerable group. As Jane Ginsberg puts it, "often even those who weren't [state wards] had their own troubles at home, at school, or in life in general."[78] While numerous students recall various loving and dedicated staff members, and former staff themselves credibly convey the compassion and affection they had for the students, there is no doubt that staff failed the students in a critical way. As Doris Herbst herself acknowledges, "There was a little whisper in the back of my head when I learned about [the sleepovers], but I am sorry to say that I brushed it off."[79]

The fact is, Jerry's sleepovers with the boys were an open secret. Joni AvRutick attests that "He made no effort to hide it."[80] Doris Herbst concurs that she was "well aware from almost the beginning of my time at SMS that Jerry regularly had young boys stay overnight with him."[81] Peter Carr was always "bothered" by the fact that Jerry "often invited some of the boy students to stay overnight with him," and he "felt, deep down, like something wasn't quite right about the situation."[82] Jane Ginsberg's concern about the sleepovers grew until it was "impossible to

---

[74] Declaration of Jessie Mashteare, p.4.
[75] Declaration of Mark LeClaire, p.3.
[76] Declaration of Richard Dougherty, p.3.
[77] Declaration of Fred M. Jackson III, p.4.
[78] Declaration of Janes Ginsberg, p.5.
[79] Declaration of Doris Herbst, p.2.
[80] Declaration of Joni AvRutick, p.2.
[81] Declaration of Doris Herbst, p.2.
[82] Declaration of Peter Lauffer Carr, pp.2-3.

ignore."[83] And yet, as Joni puts it, "In the 1970s and early '80s no one really talked about these things."[84]

While Joni's observation is well taken, it is still true that, by the time Chuck arrived at the school in 1984, several students had made efforts over the years to disclose their abuse. After being dismissed by his mother; the Burlington community, which "pretty much just ignored Jerry[] because they were happy for him to take in us local hoodlums and get us off the streets"; and his brother-in-law, John Kimber gave up trying.[85] Richard Dougherty reports that "none of the staff stood up for me" upon his disclosure, some of them even "asking what proof I had."[86] Malcolm Sawyer, after an investigation Lucy Abair describes as "botched," was told by child welfare personnel that his account was insufficient to substantiate charges.[87] And so, with Jerry facing no accountability for his actions, Chuck was thrust into an environment ripe for his victimization.

Chuck's sister Susan remembers him going on "special outings" with Jerry. Former staff member Theresa Koenke Diaz recalls Chuck at that time, age 13, as "quiet and observant, a gentle soul," and a "sweet boy." Considering his tendency to keep things to himself; his "mildly troubled" presentation; and that fact that he "was not particularly carefree, the way I would have expected someone his age to be," Theresa sees in retrospect that Chuck was "vulnerable to Jerry's advances."[88] Peter Carr, staff member, who remembers Chuck staying in the loft, now realizes that Chuck "was a perfect victim for Jerry" and recalls "even having some sense that Chucky and Jerry had some kind of special relationship."[89] Student Jessie Mashteare, to whom Chuck was "just a quiet kind of kid, nobody who caused trouble or seemed liked he'd do anything bad," recalls the two of them spending nights in the loft.[90] Remembering Chuck as a day student who was sometimes at school earlier than the rest of his peers, which generally indicated an overnight with Jerry, student Bruce Sanderson recalls that "Chucky's demeanor changed over time, [] he got more irritable."[91] Student Patricia Miles remembers only one thing about Chuck:

> ...my only memory of him is from the smoking area. He wasn't there to smoke: he was looking for Jerry. It was clear that he wasn't seeking Jerry out, but instead was being vigilant about where he might be. His eyes were red-rimmed. "Where's Jerry?" he'd ask us. "Do you know where Jerry is?"[92]

---

[83] Declaration of Jane Ginsberg, p.2.
[84] Declaration of Joni AvRutick, p.2.
[85] Declaration of John Kimber, p.5.
[86] Declaration of Richard Dougherty, p.3.
[87] Declaration of Lucy Abair, p.4.
[88] Declaration of Theresa Koenke Diaz, p.4.
[89] Declaration of Peter Lauffer Carr, p.4.
[90] Declaration of Jessie Mashteare, p.4.
[91] Declaration of Bruce Sanderson, pp.3-4.
[92] Declaration of Patricia Miles, p.2.

IFCD 00027759

Like many of the boys Jerry molested, Chuck told no one about what Jerry did to him. Even forty years later, his reaction to being asked in 2023 to discuss it for the first time was to ask, "Do I have to?" He ultimately disclosed details that closely tracked the experiences of multiple other boys, now men who Chuck either never knew or hasn't spoken to since 1985. There is no doubt of its impact on his life, evoked by fellow victim Fred "Bruce" Jackson's description of his own survival after "the nightmare of what happened to me at SMS":

> I'm not sure exactly how I managed to wake up; I guess it must have been part maturity and part therapy. I slowly realized that I was always the hero in my own stories, as if I needed to prove somehow that I was worth being liked or admired, and I realized how angry I was. Over time, I identified two cycles of dealing with things like what happened at SMS: either you get very angry and you do something productive with the anger, or you're the other person who never wakes up from it and then becomes violent or sexually abusive yourself. If you don't wake up from the nightmare that you're a bad person, you just keep hurting yourself and everyone around you.[93]

As the abuse and his own silence about it persisted, Chuck continued attending Shaker Mountain. In fact, he became even more deeply ensconced in the school community, leaving his sister's home to become a boarding student and live on Jerry's property at the Starksboro group home. This was not his choice but rather Susan's, after she caught him taking checks from her checkbook and he started playing her and her husband against each other. As understandable as Susan's position may have been – her finances were tight and all four of her children were under the age of six – her decision constituted, in the experience of an adopted child who had already been sent away by his parents, another instance of abandonment.

Staff at the group home appear to have been largely good people, committed to the Shaker Mountain mission and genuinely fond of their charges. The problem, especially during the year Chuck was there, was that they were barely older than those children placed in their care. The four who lived on site with Chuck were just out of college, all in their early to mid-twenties and, according to student Juno Lamb, "preoccupied with their own lives or interests."[94] For three of them, this constituted romantic interest in each other – perhaps distracting, but not directly detrimental to the students. It may, however, have contributed to their failure to appropriately monitor other relationships amidst a general aura of permissiveness, both between students and between students and staff.

When Chuck entered the Shaker Mountain School, he was fresh off his second failure of sixth grade. At the end of his one year there – a year marked by questionable academic offerings –

---

[93] Declaration of Fred M. Jackson III, pp.8-9.
[94] Declaration of Juno Lamb, p.3.

IFCD 00027760

Shaker Mountain's conclusion was that, with more thorough testing of and attention to the learning disability they suspected with his reading comprehension, he could be placed in ninth grade.[95] The only additional testing done, however, appears to have occurred *after* he had already begun the ninth grade at Thornton Academy in Saco. Testing conducted on September 17, 1985, by Stanley Payson, Ed.D., was "limited to behavioral and personality factors," due to "fairly recent cognitive assessment," which would appear to refer to the Peabody Individual Achievement Test (PIAT) administered by Shaker Mountain in May 1985, on which only one of Chuck's scores was above the 50th percentile.[96]

Limited as it may have been, this testing indicated clearly that something was wrong. Even Dr. Payson's initial impressions suggested as much: "His mood seemed mildly depressed and his affect was flat. Eye contact was only fair."[97] The testing confirmed this impression: "Assessment of personality functioning suggests that…he is an individual who is moderately depressed." In addition, he

> …has difficulty dealing with his own internal processes. Chuck is very unsure of himself…His level of emotional development is below what might be expected for his chronological age. He has limited organizational ability and deals with life in a very practical concrete fashion. Thought content is immature and self oriented [sic]. He does have inner resources, however, access to them is limited. He is affectively sensitive but tries to avoid expression of feelings. When pushed by inner pressure or external events, perceptual distortions are noted. Although personality make up [sic] is immature and there is some difficulty in delaying gratification, he typically deals with conflict through fantasy and denial of negative feelings. Impulse expression is more likely to be seen in the form of passive aggressive behaviors versus open demonstrations of affect…Chuck seems distant from people.[98]

In other words: Chuck was repressing something, and he was taking pains, consciously or not, to avoid revealing it.

Following the affective testing in September, Chuck was re-administered the PIAT at the end of October, which was followed by the first Pupil Evaluation Team (PET) meeting to initiate an Individual Educational Program (IEP) for him, on November 20, 1985. The plan instituted some checks and balances, but kept Chuck mainstreamed in all classes. By that time – in fact, only 15

---

[95] Shaker Mountain School Record Transcript, undated, p.3.

[96] Untitled psychological evaluation by Stanley Payson II, Ed.D., Consulting School Psychologist, September 17, 1985, p.2; *see also* Shaker Mountain School Record Transcript, undated p.1.

[97] Untitled psychological evaluation by Stanley Payson II, Ed.D., Consulting School Psychologist, September 17, 1985, p.2.

[98] Untitled psychological evaluation by Stanley Payson II, Ed.D., Consulting School Psychologist, September 17, 1985, pp.2-3.

IFCD 00027761

days earlier – the Hall family (excepting Susan) had begun treatment with the Family Preservation Services Program (FPS) through the Sweeter Children's Home in Saco. This does not appear to have been based on Dr. Payson's suggestion that "Chuck and his family should be put in contact with local mental health services,"[99] however. Rather, the family had been referred to the FPS by the facilitator of a local parent support group, Tough Love, who "knew of the Hall's [sic] situation though her daughter's friendship with Michelle."[100]

The FPS treatment was, at least initially, primarily focused on Michelle, whose behavior had become untenable, including defiance, running away, promiscuity, school failure, and truancy. Once the family treatment began, however, the providers learned that Chuck was "reacting negatively to the chaos in the home" and realized that he "owned an equal share of the problem."[101] This would explain why the FPS therapists – Phil Studwell and Alice Cantara – are listed as participants at Chuck's November 20th PET meeting.

The report from the FPS team and Chuck's school records combine to paint a picture of the after-effect of the abuse at Shaker Mountain. The depression and emotional dysregulation noted by Dr. Payson is supported by notes from teachers that he was "'in a daze' often," "d[id]n't seem to know what [was] going on," and "[wa]s not motivated."[102] His failing grades and complaint that others "pick[ed] on him" are further indication that he was struggling. The FPS documents "drastic mood swings," as well as clear bids for negative attention: "When he is angry, he destroys property, steals, skips school and lies." In essence, it was behavior similar to what he had exhibited in grade school – distracted attention, fantastic stories, "serious mischief" – but with a darker flavor and more serious consequences.

To their credit, his parents sought help, aware that their own resources were tapped out – or, as the FPS therapists noted, "nearly exhausted."[103] As Susan puts it, "They were trying their best, but they were out of their depth." She adds,

> They raised me by the book, taught me right from wrong and not to color outside the lines, and I didn't. I was expected to grow up, go to school, get a husband, and get a good job. They ingrained those expectations in me, and I know they tried to do the same with Chuck and Michelle, but neither of them chose to follow the same standards/rules as I did, or it just didn't stick with them. For them, when they were told not to color outside the lines, it was like: Why? Whose lines are they anyway? Why are they better

---

[99] Untitled psychological evaluation by Stanley Payson II, Ed.D., Consulting School Psychologist, September 17, 1985, p.3.

[100] Closing Summary, Sweetser-Children's Home Family Preservation Services Program, April 9, 1986, p.1.

[101] Closing Summary, Sweetser-Children's Home Family Preservation Services Program, April 9, 1986, pp.1, 4.

[102] Pupil Evaluation Team Meeting and Individual Educational Program, November 20, 1985, pp.1-2.

[103] Closing Summary, Sweetser-Children's Home Family Preservation Services Program, April 9, 1986, p.4.

IFCD 00027762

than my own lines? And my parents had no idea what to do with that.[104]

Michelle concurs:

> My sister Susan had been a very different kind of child when they raised her, not rebellious like me and Chuck, and they raised her in a different era – the 1950s and '60s, instead of the '70s and 80's. Also, of course, she wasn't adopted, so she didn't have any of the abandonment issues that all people who are adopted deal with, especially in their childhood. My parents truly believed that loving me and Chuck enough and providing us the services and resources available at the time was all we needed. The sad truth was that we needed more.[105]

Michelle continues:

> I still believe that my parents were doing the best they could when they sent me and Chuck away to schools or residential treatment programs. I don't think they realized that being sent away, even knowing how much my parents loved me, triggered my abandonment issues, and I'm sure it was the same for Chuck, whether or not he's ever acknowledged it. Abandonment is a lifetime issue for most people who are adopted. It's hard to explain to someone who hasn't experienced it, and when I was a kid I didn't have the words for it, but it's just something that you know and feel. I don't know if fear of abandonment for adoptees was a recognized issue when I was a kid, but I do know that no one ever warned me about it or explained to me that it was normal, and I'm fairly certain no one ever talked to my parents about it either, at least not before the Sweetser treatment.[106]

Dorothy and Charles placed their hope and trust in professionals and followed the recommendations they got…with one notable exception. The FPS therapists identified several areas in which the parents' own issues were exacerbating the difficulties they encountered with Chuck and Michelle. One was the "significant marital problems" that "interfere in the necessary presentation of a united front as parental authority." Dorothy and Charles don't appear to have described exactly what the martial issues were, but they acknowledged that they had "only been partly resolved through marital counseling."[107] It would appear that communication was

---

[104] Declaration of Susan Shumway, pp.10-11.
[105] Declaration of Michelle Bories, p.6.
[106] Declaration of Michelle Bories, p.7.
[107] Closing Summary, Sweetser-Children's Home Family Preservation Services Program, April 9, 1986, p.4.

IFCD 00027763

among them, as illustrated by Dorothy's "tendency to protect the kids and Charles by withholding information, and taking care of things in her own way" and the "lack of consistency around parenting and setting limits."[108] (p.2)

Another area of FPS concern was Dorothy and Charles' drinking habits. Both Michelle and Chuck confirm that the pattern Susan describes earlier in her parents' marriage – the alcohol consumption spurring arguments that led to "knock-down, drag-out fights" – persisted. Though no formal substance abuse assessment was done by FPS, one of the four ultimate recommendations issued by the FPS team was for each parent to get one, which the report notes they had indicated they would, but had not throughout the pendency of the treatment. The therapists believed that the parents could "protect themselves with knowledge about their relationships with Alcohol [sic]," which could "be gained only by an evaluation."[109]

Dorothy testified at trial that the FPS conclusion following treatment was: "The problem in this house is that it's not child abuse, it's parent abuse." While this may be the way she heard the feedback, and even the way she felt, and the therapists clearly held the children responsible for their behavior, it is also clear that they felt the parents were part of the problem. Despite viewing them as "caring loving parents," the therapists also saw them as victims of their own self-doubt:

> …[B]oth kids' adolescences are apparently more unpredictable than the Hall's [sic] natural child's. The parents are interpreting this as their failure at parenting and perceive many reinforcements of this feeling stemming from the kids, their community and, very significantly, from each other. They tend to dismiss other considerations (i.e., "adopted kids usually have more extreme identity searches at adolescence, naturally, and act out more extreme fantasies of 'self'…) in favor of downgrading their parenting, their marriage and themselves.[110]

The therapists suggest that Charles and Dorothy's concern about their public reputation crippled them further:

> …[T]he "different" adolescences of Michelle and Chuck have by their nature, brought the parents into more and more contact with school authorities. For Dorothy this is a particularly significant stress because…she senses they feel she is to blame for her children's behavior…[This] effects [sic] both of the Halls

---

[108] Closing Summary, Sweetser-Children's Home Family Preservation Services Program, April 9, 1986, pp.2-3.
[109] Closing Summary, Sweetser-Children's Home Family Preservation Services Program, April 9, 1986, pp.7-8.
[110] Closing Summary, Sweetser-Children's Home Family Preservation Services Program, April 9, 1986, p.3.

IFCD 00027764

because they are very socially sensitive and live in a small community.[111]

Susan confirms these FPS conclusions by advising that "the worst part for [Dorothy and Charles] was the shame of what they considered their failure at parenting."[112] Michelle concurs that

> They felt guilty about not being able to help us. They felt like they had failed, especially with Chuck. They carried that guilt right up until the end of their lives. Up until the time of their passing, talked about how they felt they had somehow let Chuck down by not being able to figure out what he needed.[113]

The FPS program lasted nine weeks. The report notes some progress by the end of treatment, which came in January 1986. By May of that year, Charles and Dorothy felt empowered enough to pen a letter to the Saco director of Special Services:

> We are writing you concerning Charles N. [sic] (9th grade) and Michelle L. (10th) grade [sic] Hall's poor performance at Thornton Academy. We did not expect miracles but the progress they are making will not even barely prepare them for the hi-tech [sic] society we now live in. In this regard we are formally requesting an independent evaluation for each of them. In the hope it will pinpoint the cause of two apparently average teenagers totally missing out of a high school education.

For Chuck, this seems to have resulted in a learning disability assessment.[114] It is unclear why this assessment was not part of the testing at the beginning of the Thornton school year, especially since Shaker Mountain had explicitly recommended it, but the blank section of Chuck's first IEP from November titled "Identification of Educational Handicap" would seem to confirm that it was not. For the second IEP, dated June 16, 1986 – the same day as the L.D. Assessment Report, which determined a disability in math[115] – the "Identification" section is marked for Specific Learning Functions (presumably the math issue) and Behavior. It assigns Chuck to the Resource Room for math, as well as to a tutorial and group counseling. The supports would begin the following year, when Chuck returned to Thornton to repeat ninth grade.[116]

David Ruff was assigned as Chuck's tutor. Though a 23-year-old neophyte at the time, Mr. Ruff is now a highly respected education professional with decades of experience, who attributes his

---

[111] Closing Summary, Sweetser-Children's Home Family Preservation Services Program, April 9, 1986, p.3.
[112] Declaration of Susan Shumway, p.11.
[113] Declaration of Michelle Bories, pp.6-7.
[114] A vocational assessment conducted in October 1986 was another result of the Halls' letter to Special Services.
[115] L.D. Assessment Report, June 16, 1986.
[116] Pupil Evaluation Team Meeting and Individual Educational Program, June 16, 1986.

IFCD 00027765

choice of career to "my realization during that year [1986-87] that while school had always worked for me, it didn't for everyone."[117] Currently executive director of Great Schools Partnership in Portland, Maine, Mr. Ruff has made it his mission to work toward a future where every student gets what they need from their schools.

Mr. Ruff, who worked at Thornton Academy for an additional seven years after his year with Chuck, considered it a good place. Nonetheless, he explains, "the special education system back in Chuck's time was not what it is today…and the result was that Chuck didn't get what he needed." Mr. Ruff continues,

> Instead, what Chuck got was me…[W]hen Chuck was my student, I was a very young – barely older than my students! – untrained, uncertified, barely supervised first year teacher. When I saw the November 3, 1986 note in the list of Chuck's disciplinary actions advising that the "discipline process [was] handed to 'Mr. Ruff'" on that date, it struck me that I was, at that time, a 23-year-old kid who'd been on the job for two months. I was hardly more advanced five months later at the March 26, 1987 IEP meeting, when it was decided that "five day ISS can be served by alternate means w/ D. Ruff"… I didn't feel put upon or taken advantage of by assignment of these duties – I don't think it even occurred to me at that point that perhaps I was being asked to do more than my experience or capacity allowed – but from my current vantage point, I see it as a sign that the administration and other teachers simply didn't know what to do with Chuck. I don't ascribe anyone any malintent in putting me in charge of Chuck. I just think they probably saw that whatever I was doing was keeping him occupied, if nothing else, so for lack of any better plan, they opted to default to me.
>
> By April 1987…it's clear that Thornton was struggling to figure out next steps with Chuck. They were actively looking for an out-of-district placement for him. In the meantime, an emergency IEP meeting was held on April 7, 1987, at which it was recommended that Chuck be removed from all mainstreamed classes and placed in the Resource Room or with me for 34 out of 35 weekly periods, with one period for counseling with Dr. Payson. It doesn't seem a coincidence to me that my May 8, 1987 note about Chuck's current A-grade status in every class was written after the transition to full Resource Room attendance. However, it appears that by May of 1987, even my strategies were no longer working, as indicated by Dr. Payson's File Note, in which he states that

---

[117] Declaration of David Ruff, p.7.

IFCD 00027766

> Chuck "has clearly exhausted the resources of Thornton Academy and will require a more restrictive placement if he is to receive an education."[118]

The File Note referenced by Mr. Ruff, transcribed on May 25, 1987, is the only record that exists of the counseling Chuck received during his second year of ninth grade at Thornton. Its author, Stanley Payson, was the school psychologist who had conducted the personality and behavioral testing the year prior.[119] In the one-page Note, Dr. Payson notes six sessions with Chuck in total. Stated areas of concentration were to improve academics, social adjustment, family relationships, and emotional adjustment.[120] The last session was in February 1987, at which point Chuck was "increasingly in crisis," exhibiting truancy, "temper outbursts," theft, and running away.[121]

Though undated, it seems likely that it was during this time period that Chuck left the following note for his parents:

---

[118] Declaration of David Ruff, pp.7-9.
[119] Dr. Payson died in 2019.
[120] Thornton Academy untitled, undated goal/objective form.
[121] File Note, Stanley L. Payson II, Ed.D., May 25, 1987.

IFCD 00027767

*Mom + Dad*

*I ran away because some one [sic] told me I should[.] I will not be in the State of Maine if you call the cops before I call you. I shall kill myself and that's not a threat it's a promise. And this is one problem you can't solve with cops so please don't call anyone. Or I a dead man [sic].*

*This is one promise I will keep.*

*Chuck M. Hall*

*Please give me until 5:30 pm Sunday (I'll kill myself if you don't)*

*If Jim call's [sic] tell him I'm at erick's [sic] for the day*

*I already know a way how to kill my self [sic]. ([T]hanks for the Idea mom) Carbon monoxide poisoning*

IFCD 00027768

Michelle was overcome when she saw the note for the first time in 2022:

> I feel terrible now knowing that Chuck was in this kind of pain and I didn't do anything to help him. When I also learned from his current legal team in 2023 that he was molested [at Shaker Mountain], I felt even worse. I realize I couldn't have known these things if he didn't tell me about them, which he didn't, but it makes me feel even more guilty for acting the way I did – for making things so difficult for my parents, and for taking their attention away from Chuck when he might have needed it more than me. Learning these things about Chuck makes me see the stories he tells, the "tall tales" I was asked about at his trial, in a new light, like him saying that our mother had tried to kill herself and us, or that our father had molested me, or that Chuck had tried to kill our father with Draino. I realize now that these stories were how he coped with his pain and confusion over what had happened to him in Burlington. As I said at his trial, I've always had to go through all kinds of channels to find out how he's really feeling, because he kept everything inside. I just never realized how much he was hiding.[122]

Mr. Ruff, as well, found the revelation of Chuck's sexual victimization at Shaker Mountain illuminating:

> …[S]o much of what I had observed in Chuck [suddenly] made sense. Chuck never shared his experiences at the Shaker Mountain School with me, but now knowing what he went through there, it helps to explain his desire to be accepted by his peers, his embarrassment and simultaneous outbursts, and his anger regarding what he saw as an unfair system. I can only imagine how hurtful it must have felt to hide this secret, embarrassed by it, and afraid that no one would take any actions to support him if he was public with this information.[123]

Even without knowledge of the abuse, however, Mr. Ruff noticed Chuck's distress. He generally observed Chuck as "someone who really wanted other people to like him, and yet he always seemed to feel like he was on the outside…[and] just didn't seem to know how to be social in a productive way, to achieve the regard he sought."[124] More specifically, Mr. Ruff advised the PET in March 1987, about six weeks after Chuck's last session with Dr. Payson, that he felt

---

[122] Declaration of Michelle Bories, pp.4-5.
[123] Declaration of David Ruff, p.9.
[124] Declaration of David Ruff, pp.4-5.

IFCD 00027769

"something [wa]s bothering Chuck."[125] The PET's response was to recommend that application be made for Chuck's out-of-district placement. Still unable to factor in the effect Chuck's adoption may have had on his psyche; unaware of the Shaker Mountain sexual abuse; and facing Thornton's refusal to keep him on, Dorothy and Charles concurred in the decision by expressing "their desperation and a search for different living arrangements"[126] – unwittingly introducing yet another trigger for abandonment issues.

The alternative placement chosen for Chuck was The Homestead Project, Inc., a residential program located in Ellsworth, Maine, about three hours north of Saco. It is hard to imagine a program more philosophically opposed to the Shaker Mountain School than Homestead. According to its introductory materials,

> Persons admitted to Homestead have histories of disturbing behaviors and feelings, which require a strong program with considerable time and control to help bring about desired changes…Seriously inadequate internal and/or external controls oftentimes is an important part of the troubles of these youngsters. Therefore, many customary teenage freedoms are not allowed at Homestead until adequate controls are demonstrated…We may angrily scold kids or affectionately praise them as their behavior merits. We demand responsibility of them. Sometimes it is necessary to physically restrain them from attacking others, hurting themselves, or running away. We do not beat youngsters, tear them down, or lock them up.[127]

Lou Moretto, a former residential staff member, describes the program a bit differently:

> Homestead functioned on a system of consequences, and treatment staff believed that harsh consequences were the only way for the kids to learn. They believed that rewarding kids who followed through with their consequences was counterproductive, because what a kid would learn from that would be that whatever they did to get the consequence, eventually led them to the reward…Instead, treatment staff's goal was to have the consequences make them work and accomplish nothing, so that they used the time to think about what they had done, rather than what they might be getting out of it.[128]

Mary Tilghman, another former staff member, is more direct:

---

[125] Pupil Evaluation Team Meeting and Individual Educational Program, March 26, 1987, p.1.
[126] File Note, Stanley L. Payson II, Ed.D., May 25, 1987.
[127] Information for Parents and Guardians, The Homestead Project, Inc., undated.
[128] Declaration of Louis Moretto, pp.1-2.

IFCD 00027770

Homestead used a consequences system called IWP (Intensive Work Program). I thought the IWP assignments were just plain stupid, things like carrying rocks back and forth in a bucket. If kids refused to do it, the staff made them do it longer.[129]

Steve Parks, a resident and friend of Chuck's who testified at trial but was dissuaded on the stand from sharing his full experience of Homestead, felt that IWP was designed for humiliation. Lou Moretto agrees that there was a "humiliating aspect" to many of the consequences meted out at Homestead. He recalls one child who was made to wear socks on his hands when he couldn't stop biting his nails, and a paper Pinocchio nose when he was caught in a lie.

Former resident John Mandarelli, who also testified at trial and, like Steve, was mostly cut off from speaking about his experience at Homestead, experienced the rock-bucket firsthand, and gives a visceral description:

> …[T]he 35-pound bucket was full of rocks…[and] you had to walk it back and forth for hours, until you got blisters on your hands, and blisters on your feet from the moon boots they made you wear while you were doing it. The moon boots, like the kind people used to wear in the 1980s, were big and clumsy and very hard to walk in – and they took the air out of them and removed the string so you couldn't adjust them, which made them really heavy.[130]

Other IWP assignments included carrying a backpack full of bricks; building and taking down a rock wall; repeatedly digging a hole in the sand and filling it back in, sometimes with a spoon; and continually scrubbing by hand the same spot on the floor. John Mandarelli again, this time on the floor scrubbing:

> If you refused to do it, they would hold your arm and force you to. The way they got you to do that was to grab you by the back of your neck, trip you, put a knee in the back of your neck and one on your spine, and then 4-5 staff members would hold you down as they made you scrub.[131]

In addition to IWP consequences, the kids could be put on "restriction," described here by former resident Edith Smith:

---

[129] Declaration of Mary Tilghman, p.2.
[130] Declaration of John Mandarelli, pp.2-3.
[131] Declaration of John Mandarelli, p.3.

IFCD 00027771

> …[Y]ou had to wear an orange vest for usually one to three days at a time and you had to: sit on the floor during the three daily community meetings, while everyone else sat on chairs; bring your mattress to the main floor to sleep, where everyone could see you and staff could watch you;  not talk to anyone without raising your hand and being recognized by a staff member; and sit at the "naughty" table for meals, where you got only plain Cream of Wheat with an apple for breakfast and two peanut butter sandwiches – no jelly – and an apple for both lunch and supper.[132]

Two further consequences were the red and blue "suits," jumpsuits that residents had to wear after being caught running away (blue) or harming themselves (red). Former resident Renee Dubois recalls being put in the blue suit simply for *talking* about running away, and given the moon boots to complement the outfit, which she was made to wear for five days. Steve Parks testified at trial about running away with Chuck, but did not get a chance to say that he and Chuck ended up in the same outfit as Renee after their own excursion, and on restriction besides. John Mandarelli recalls that the suits were worn without underwear, while Lou Moretto remembers the kids being allowed underwear only. Either scenario seems designed to urge compliance: the suits engendered shame, as a constant visual reminder to the entire program that the residents wearing them had misbehaved. Such a response to suicidal behavior seems particularly misguided.

Chuck was assigned to a therapy group facilitated by social worker Patricia (Pat) Bousquet. In a report dated November 18, 1987, after he'd been there almost four months, she noted that he "appears very sensitive to issues of family fighting, loss and abandonment, and parental alcohol use."[133] Her treatment strategy for addressing these issues, which she generally named "Family stress related to adoption issue and poor parent/child communication," included a recommendation of family counseling.[134] Pat's next note on this recommendation, however, four months later, is that she'd told Charles and Dorothy that "including Chuck in family counseling is premature until he does some serious groundwork here first."[135] Six months after that, Pat's update documented little progress:

> Chuck has recently been involved in some family therapy sessions while on home visits and has gone on 2 extended family trips. Chuck has voiced displeasure here at how the therapy sessions have gone, but has not dealt directly with those involved. In [Homestead group therapy], Chuck has been reluctant to examine feelings toward family members, despite group pressure to do so. He is currently feeling that a return home not [sic] what he wants,

---

[132] Declaration of Edith Smith, p.2.
[133] Master Treatment Plan, November 18, 1987.
[134] Untitled therapeutic issues chart, November 18, 1987.
[135] Treatment Summary, February 29, 1988, p.1.

IFCD 00027772

but has no definite alternate plan. Chuck has not sufficiently addressed the issue of his adoption, nor his feelings about it, to the best of my knowledge.[136]

Pat's final assessment of Chuck's progress in this area, a month before his completion of the Homestead program in January 1989, is similarly disheartening: she notes that, despite his parents' support, he still "tends to keep [them] at a 'safe' emotional distance."[137]

A second therapeutic issue in Chuck's Homestead treatment plan was "Confusion over sense of self and sexual identity." Pat's strategy on this front was twofold: get Chuck to talk about the issue in group therapy, and in family counseling. Given that Chuck was doing his best to forget that he'd ever been molested by Jerry, if he even understood that was what had happened, it is no surprise that this treatment goal was unmet as well. Pat's initial assessment of Chuck's progress in this area (or lack thereof) was that he had "barely started" to address it four months into the program, a reality she saw reflected in his tendency to "follow[] others into negative behaviors or attitudes as a way of gaining acceptance, rather than thinking for himself."[138]

Six months later, things were no better:

> Chuck's pattern of passively reacting and refusing to take an active stance has recently become quite clear. He avoids looking at critical identity issues in [group therapy], often using other members to get him off the hook. His recent AWOL from the group trip followed a discussion of this issue, and Chuck chose to run away. It is obvious that this one treatment issue is far from being resolved.[139]

It was no further along at the time of Pat's final assessment:

> Chuck is still very insecure about who he is and what he wants from relationships with others. He continues to keep friendships superficial, to do little emotional investing, and to stay "a loner" in many respects. He is very reluctant to explore [his identity], and may choose to drift in and out of relationships for some time to come.[140]

One element that seems to be missing from Pat's work with Chuck is any sense of empathy. This observation is supported by multiple witnesses' memories of Pat. Residential staff Lou

---

[136] Treatment Summary, August 25, 1988, p.2.
[137] Treatment Summary, December 14, 1988, p.2.
[138] Treatment Summary, February 29, 1988, pp.1-2.
[139] Treatment Summary, August 25, 1988, p.2.
[140] Treatment Summary, December 14, 1988, p.3.

Moretto describes her dismissing his opinions on the kids simply because he lacked an academic degree. Also,

> I overheard Pat one day yelling at a girl who had refused to go to class. Pat told the girl she better get her "fucking fat ass" over to where she was supposed to be. Even one swear word could get a kid put on restriction, and yet here was one of the therapists – the head one! – swearing at a kid, with no consequences.[141]

Mary Tilghman, Lou's co-worker, corroborates this behavior, noting that Pat "always made a big stink about the kids swearing, but yet she had no problem swearing herself, right in front of them."[142] Resident Bonny Sue (West) Curtis had strong feelings about her:

> Pat Bousquet…was a bitch. She was cranky and mean. The therapists were the ones who decided who needed to be restrained, and she did that to a lot of kids. She even put me on suicide watch once after I said I had such a bad headache that I wanted to die. Obviously I didn't mean that I was suicidal – I was a teenager and I was a drama queen! – but Pat put me on watch anyway.[143]

Resident Edith Smith found Pat unfriendly, and heard from one of Pat's group members that she "let them get away with just coasting along."[144] Steve Parks, who was in Pat's group with Chuck, recalls the opposite: that she was "tough," not "put[ting] up with crap…[or] tak[ing] no for an answer."[145] In either case, she would seem to have been a poor match for Chuck, who needed space, yet steady guidance, to process his trauma.

Without that space and guidance, Chuck's coping mechanisms were misinterpreted. Though his peers remember him as helpful and likable, if unremarkable, his Homestead records are replete with staff comments about what they perceived as manipulative and passive-aggressive behavior. They were, of course, unaware of Chuck's victimization at Shaker Mountain, and through that retrospective lens, it is easy to see that his behavior was aimed at keeping his truth well hidden, even from himself. Being "extremely subtle and difficult to pin down,"[146] being disrespectful, making "hurtful comments of a sexual nature" to his peers, "often becom[ing] impatient, sarcastic, and openly critical of others"[147]– all of these actions would tend to cast him as more in control of situations than at anyone's mercy.

---

[141] Declaration of Louis Moretto, p.6.
[142] Declaration of Mary Tilghman, pp.2-3.
[143] Declaration of Bonny Sue West, p.2.
[144] Declaration of Edith Smith, p.3.
[145] Declaration of Steve Parks, p.6.
[146] Treatment Summary, February 29, 1988, pp.1-2.
[147] Treatment Summary, December 14, 1988, p.2.

IFCD 00027774

There were glimmers of cracks in the façade, as noted by Pat Bousquet in February 1988:

> Chuck has created a difficulty by presenting himself to other members as someone with few (if any) serious treatment issues. He realizes now that he is wasting time and needs to begin using [group therapy], but he is fearful of the reaction group members may have to this attitude change. Addressing this problem head-on needs to be the first order of business if Chick [sic] is to get off dead center and begin making progress.[148]

…and then again in August of the same year:

> As Chuck's ability to play the "I don't have any real problems" game is decreasing with time, he is growing more and more uncomfortable. He dislikes the group pressure to really look at himself or his situation, and is becoming fearful of turning 18 fairly soon with no definte [sic] plan in mind. This increase [sic] stress may be excatly [sic] what Chuck needs to motivate himself towards positive change. Certainly his decision to run away put him clearly in the spotlight for group and staff attention.[149]

There is nothing in the existing records that documents whether Chuck was indeed able to turn his discomfort into "positive change," but his ultimate trajectory suggests that he was not. It suggests rather that, even as he drew negative attention to himself in an (albeit subconscious) effort to get help, the fear of disclosure was too great. It was still, after all, a time when the stigma of male sexual abuse loomed large, if there was even any awareness of it at all. What seems to have happened instead is that Chuck aged out of Homestead. The next available data, from December 1988, addresses not the progress he had or had not made, but rather the impending future:

> Chuck is a young man who will soon be turning 18. It is time for him to return to his home and community and to start learning about and facing up to adult responsibilities…His willingness to truly invest himself in an ongoing individual or group therapy process will be a key factor in determining his future emotional investment in relationships and in gaining self-acceptance.[150]

He was discharged from Homestead a month later. His discharge summary specifies his eight targeted treatment issues: criminal behavior; passive/aggressive and manipulating behaviors; poor peer interaction skills; family stress related to the adoption issue; poor parent/child communication; confusion over sense of self and sexual identity; non-compliance with rules and authority; and inability to function in public school. The summary notes that he "made

---

[148] Master Treatment Plan, February 29, 1988, p.1.
[149] Treatment Summary, August 25, 1988, p.3.
[150] Master Treatment Plan, December 14, 1988, p.2.

IFCD 00027775

considerable progress on many of these issues" except for those related to his "identity confusion and the tendency to relate to people and situations in a passive/aggressive manner."[151] This seems a somewhat disingenuous conclusion, given that none of Pat's assessments note any fully positive developments. In fact, the final Homestead summary reads as a whitewash of the fact that, as Chuck prepared to rejoin the community, the problems consistently documented throughout his treatment remained mostly unresolved.[152]

Returning to live with his parents after Homestead, Chuck initially stuck to his discharge plan, even after he officially graduated in March 1989. He earned his GED in May, and sought employment, cycling through jobs with a snowmobile dealership, a radio station, an amusement park, and finally a security company.[153] But by the fall of 1989 and into the winter of 1990, burglary charges began piling up against him. In May 1990, his father filed a theft complaint alleging that Chuck had taken Charles' car keys, house keys, and credit card; Charles further noted that he planned to change the locks on the house (where Chuck was no longer living).[154] Chuck continued to amass burglary charges and then probation violations, bouncing in and out of the York County Jail, until he entered a plea in November 1990 to a combination of charges that yielded a sentence of three years with 18 months to serve. He was sent to the Maine Correctional Center (MCC) in Windham, Maine. He was 19 years old.

Released after serving far less than 18 months, he picked up where he'd left off, this time splitting his time between Saco and Portland, Maine, a bigger city twenty miles north. The draw in Portland was a friend, Rick Tayman, to whom Chuck had been introduced by a Homestead acquaintance. Rick was, by his own admission, a "hard partier, into cars and girls," and "adrenaline junkie," and a thief. Chuck, on the other hand, according to Rick, was quiet and

> …a nice kid. I never saw him do anything even close to violent, and I never saw him angry. He wasn't a fighter, didn't confront people. He was a follower. Anything we got into was my idea; Chuck was always just along for the ride…He was like a nerdy guy who wanted people to like him. He would give you his last dollar, his jacket. He would even let us borrow his beloved Mustang.[155]

---

[151] Discharge Summary, January 16, 1989, p.1.

[152] The Homestead Project, Inc. after "steady fire…from the state Department of Mental Health and Mental Retardation's Bureau of Children with Special Needs" regarding "several controversial punishments" and its "philosophy which holds the children as being problems in themselves, rather than as products of difficult environments," was acquired in 1992 by the Wiley House Treatment Centers of New England, in an effort to solve fiscal problems and repair the program's reputation. See Bangor Daily News articles: "Homestead Project files suit after state withdraws contract" (June 23, 1990); "Nearly 20 hired to staff youth treatment facility" (December 4, 1991); "Treatment center has new owners" (February 13, 1992).

[153] District of Maine Revised Presentence Investigation Report, January 11, 2001, p.18.

[154] Saco Police Department Offense Report & Investigation, Offense #90-0681, May 21, 1990.

[155] Declaration of Richard Tayman pp.1-2.

IFCD 00027776

What they "got into" was yet more burglaries, including one that got them both arrested in Portland in September 1991.[156] Though Chuck continued to commit other burglaries on his own closer to home, Rick still carries guilt about their joint arrest, because

> …the cops pressured me to blame Chuck for everything, and I did.
> I still feel really bad about that to this day, because I knew then
> and I know now that I was the real mastermind, and yet I only got
> probation while Chuck ended up serving some time.[157]

Rick attributes his lesser sentence to the fact that his family supported him and hired a high-powered Portland defense attorney, while his impression was that Chuck's family kept their distance – an impression not too far from the truth. Chuck's father had recently filed yet another complaint alleging that Chuck had stolen some of his checks (though he withdrew the complaint the next day, realizing that he'd been mistaken and had simply miscopied the check numbers).[158]

In fact, not long after Chuck and Ricky's arrest, Charles and Dorothy moved to Florida. As Charles explained at trial, Chuck's criminal activity "was bad on both our nerves," such that they wanted to remove themselves from any connection to it. Susan offers further insight:

> Things started adding up: car repairs [when Chuck "borrowed" his
> parents' cars without permission], lawyer fees, home invasion
> repairs…I thought my parents should have declared bankruptcy,
> but they never did. I watched my parents go from living a
> comfortable life to wearing clothes with holes, using threadbare
> towels, driving old cars. But the…shame was, my mother told me
> much later, the real reason they moved to Florida and the reason
> my dad took early retirement. She was mortified when Chuck's
> charges and arrests were printed in the local newspaper; she
> didn't want to be seen in public. In Florida, no one knew them,
> and no one knew Chuck… My mother once told me that she did
> not know which prison he was in, but she could sleep at night not
> worrying about him breaking into their house.[159]

And so: Chuck was on his own. Michelle had married in 1989 and was pregnant with her first child. Susan was still in Burlington with her brood, working as a nurse. By June 1992, Chuck's charges and probation violations – almost all for theft and stolen property – had piled up again. He once again pleaded guilty to consolidated charges in York County (Saco/Biddeford), but the

---

[156] Portland Police Department Incident Report & Investigation, Offense #91-49146, September 19, 1991.
[157] Declaration of Richard Tayman, p.3.
[158] Saco Police Department Offense Report & Investigation, Offense #SACO91-1517, August 31, 1991.
[159] Declaration of Susan Shumway, p.11.

IFCD 00027777

hammer came down on Portland case with Ricky: a five-year sentence with three to serve. He was on his way back to MCC.

Not long into his sentence, abdominal pain, vomiting and weight loss led to a colon study at the Mid-Maine Medical Center. When the symptoms persisted, a doctor who performed a colonoscopy noted suspicion of Crohn's Disease; four months later, in March 1994, another doctor sent him for an official Crohn's evaluation. As all this was happening, Chuck suffered two hand injuries, both requiring surgery, and twice requested to be removed from dorm housing. The reason he gave his caseworker for the first request was "because of hand and his youth" (he was 22).[160] The second time, he presented at the mental health unit, requesting a bed there because he couldn't sleep in the dorm. While there are very few details about either injury or re-housing request, in conjunction they raise the question of whether Chuck was being harassed, or worse, by older prisoners, or whether he'd realized that he simply did better when he was isolated from others. In any case, though his housing request was not accommodated, he was released from the state prison at Thomaston on May 3, 1994.

With his parents still in Florida and Susan in Vermont, Chuck's options upon release were limited. He went to live with Michelle, her boyfriend, and her son Josh on a horse farm in Acton, Maine, where her boyfriend worked as a farmhand. Michelle was in the midst of having Josh's developmental disabilities assessed, which were eventually diagnosed as autism, but when her boyfriend decided to take another job, she suggested that Chuck replace him. The owners of the farm, a married couple, agreed.

Within months, the couple had split up, and the woman, Barbara, a friend of Michelle's who was legally blind, had taken up with Chuck, despite being more than 20 years his senior. Together they ran the farm, and also cared for an older, developmentally disabled man, a ward of the state whom Barbara had taken in before Chuck's arrival. Chuck and Barbara married in November 1994, seven months after Chuck's release from prison. His best man was someone he'd met in the York County Jail. Several months before the wedding, Chuck was in a motorcycle accident in New Hampshire, the one about which both his parents and Michelle testified at trial, saying it robbed him of his photographic memory.

At some point, the horses and the state ward became too much, in addition to the fact that Barbara wanted to be closer to her parents, who lived a few hours north. She and Chuck sold the farm and moved in with her parents in Waterville, Maine. Things between them headed quickly south. Her parents disapproved of his criminal background, and he resented Barbara's expectation that he would take them to all their appointments and errands, since she was legally unable to drive.

At the same time, Chuck's Crohn's worsened. In April 1995, his new doctor expressed concern that he had not been fully weaned off the steroid Prednisone for over a year, finding his

---

[160] Maine Department of Corrections Caseworker Summary/Recommendations, January 20, 1994.

IFCD 00027778

"inability to discontinue…during this time somewhat curious."[161] The same doctor, who projected the eventual need for surgery, reiterated a week later that he was "concerned about the long-term use of steroids."[162] Surgery came sooner than later, in May 1995: a colectomy (partial to total removal of the colon, or big intestine) and an ileostomy (creation of a stoma, an abdominal surgical opening to collect intestinal waste into an external bag attached to the body).

For a couple of weeks post-surgery, he felt "terrific."[163] Within a month, however, he was reporting pain at the ileostomy site and symptoms of depression, including multiple crying jags a day. He was embarrassed when the bag attached to the ileostomy leaked. He was referred for a psychiatric consult in August 1995, which yielded a diagnosis of Major Depression. He and Barbara had reconciled to a certain extent by that point: she was supportive throughout his surgery and recovery, and he had been accompanying her to her therapy sessions, where they discussed the conflict with her family. In September, after Chuck's depression diagnosis, the therapist, Dr. Richard Staples, held a separate session with Chuck alone. At trial, he described Chuck's issues this way:

> He's then a 24-year-old man with the Crohn's disease, the
> unpleasant symptoms of the Crohn's disease itself…he had had a
> procedure that he dreaded, that was very uncomfortable, and he
> ended up with a port on his body through which waste material
> came out and he was very distressed…to have that happen at age
> 23 or 24 and face all of the concerns that it raises…[164]

Chuck's presentation during what turned out to be his only individual session with Dr. Staples perfectly illustrates his coping mechanism of altering history to mask his feelings of powerlessness. He told Dr. Staples that he had graduated Thornton Academy with the fourth highest grades in his class and was headed to the University of California at Berkeley, but that his trajectory was disrupted by an arrest for aggravated assault for avenging the sexual molestation of a friend's four-year-old daughter. Chuck described the invented assault for Dr. Staples in detail, assigning a broken pelvis and kneecaps to the predator he'd attacked. There was nothing even close to such an incident in Chuck's criminal history up to that point, so it is not hard to imagine that the predator in his mind while telling Dr. Staples this story was none other than Jerry Mintz, while he recast himself in the image of an innocent four-year-old girl.

As Dr. Staples further testified at trial, Chuck described to him

> periods of really dramatically increased anger and that he felt that
> his anger would get the best of him, would overwhelm him…and

---

[161] Doctor's Note, Michael J. Saletta M.D., April 25, 1995.
[162] Doctor's Note, Michael J. Saletta M.D., May 3, 1995.
[163] Doctor's Note, Michael J. Saletta M.D., June 6, 1995.
[164] Trial testimony of Richard J. Staples, Ph.D., May 22, 2014.

IFCD 00027779

sometimes he couldn't identify a precipitant, that he would just get very angry and feel overwhelmed by it."[165]

It is unclear why Chuck never returned for additional sessions with Dr. Staples, although he was in the midst of working with a lawyer to try to get on disability for the Crohn's and his physical symptoms from the disease were worsening. By February 1996, he was deeply distressed and desperate to have his surgery reversed, thus obviating the need for an ostomy bag. He reported that he'd lost jobs due to his medical complications. In addition, his doctor noted that he was no longer living with his "ex-wife" Barbara, indicating that the marriage had finally failed.[166]

While things with Barbara were falling apart, Chuck had begun a relationship with a woman named Ruth Mattson. As she testified at trial, they met through a friend of Ruth's whom Chuck had dated, whose child had medical problems. Ruth was taken by Chuck's assistance with her friend's child's care, and then by his equal dedication to her own young son, with whom Chuck "had no problem getting on the floor and playing around with." He was, Ruth observed, "very, very into being involved in a family situation."[167] Her description of Chuck's facility with children is reminiscent of Charles' and Michelle's descriptions of Chuck's interaction with Michelle's autistic son Josh:

> The little boy couldn't seem to learn how to crawl…and Chuckie got down on his hands and knees and on his belly and just helped the kid. Took about a week but he got the kid so he could crawl…he had the patience and just cuddled that little guy until he got him going.[168]
>
> Josh was pre-verbal for a much longer time than is normal developmentally, but even so, he and Chuck clicked. They were like two peas in a pod. It was like Chuck understood Josh, as if they were on the same wavelength; they didn't have to talk.[169]

In retrospect, Michelle wonders whether Chuck identified with Josh, recognizing himself in the boy's isolation. Perhaps he felt the same kinship with the young children of his later girlfriends, or perhaps he was simply yearning for family of any kind, since, by the time his marriage unraveled, his own family situation had diminished to almost nothing. His parents were in Florida, intent on creating a new life; Susan had drifted further and further into the background of his life; and Michelle was preoccupied with Josh's care and eventually moved to New Hampshire with a new husband.

---

[165] Trial testimony of Richard J. Staples, Ph.D., May 22, 2014.
[166] Nurse's Note, Dartmouth Family Clinic, February 26, 1996.
[167] Trial testimony of Ruth Mattson, May 22, 2014.
[168] Trial testimony of Charles V. Hall, May 23, 2014.
[169] Declaration of Michelle Bories, p.9.

IFCD 00027780

But as much as he wanted to be part of a family, Chuck's unresolved past and his circumstances created obstacles. His efforts to present himself as less wounded than he was persisted, resulting in falsehoods concocted in the moment that were easily exposed in time; as Ruth put it at trial, she "couldn't seem to get him to stop lying about even the small things." It wasn't until well after their relationship had ended that he was able to explain to her that "he didn't like the person he was so he didn't think that [she] would like [him either]…so he tried to make himself out to be somebody different."[170]

Even in her frustration with their relationship, Ruth was sympathetic to what she called Chuck's "self-consciousness" surrounding the reality of his Crohn's. She recognized it in his choice of large shirts to hide any suggestion of the ostomy bag, and his daily concern that

> if he had an accident [with leakage from the ostomy bag] while he was out that people would make fun of him and he himself would just be embarrassed because it made quite the mess…It actually took him quite a while before he even allowed me to come in and learn about the [ostomy bag] so that if something came up I could assist him in changing it.[171]

Ruth also told the FBI that Chuck's Crohn's flare-ups "broke his spirit," causing him to "cry like a baby and ask her why it had to be him with the disease."[172]

The extent of his shame and sensitivity further reveals itself in the histories he provided to various medical providers just after his surgery to reverse the ileostomy on April 5, 1996. Upon complications with the healing stoma, he informed one provider that the reason for his original surgery was that he'd been shot in the abdomen. The next day, he told another provider that he'd rather been stabbed. It was almost as if he hoped that by inventing a more dashing explanation for his painful and humbling circumstances, he could will it to be true.

But the real truth – that he had a particularly unpleasant and humiliating chronic condition – was inescapable. Almost two months after the surgical reversal, the site of his stoma was still draining excessively. Several months later, in August 1996, he began experiencing renewed abdominal cramping, and an endoscopy showed recurrent Crohn's. Divorced from Barbara and on the outs with Ruth, he had no stable residence – Ruth told the FBI that he even slept in a literal doghouse for several nights after she kicked him out. His disability case was pending on appeal, and his employment options, given the Crohn's complications, were slim. With time on his hands and little to his name, he began burglarizing again.

Arrested on September 18, 1996 in Winslow, Maine for his fifth burglary that month, the Kennebec district attorney requested revocation of his existing probation in Cumberland

---

[170] Trial testimony of Ruth Mattson, May 22, 2014.
[171] Trial testimony of Ruth Mattson, May 22, 2014.
[172] FBI 302 of Ruth Mattson, October 19, 2011, p.3.

IFCD 00027781

County (Portland). In short order, he was booked at the Kennebec County Jail. It was, unbeknownst to him, the last time he would see the free world. At first, however, it appeared he would be out within a matter of six years, the plea deal offered by the district attorney. But Chuck instructed his lawyer to reject the offer and request instead, in an unusual move, a longer sentence. His reasoning was based on his belief that he would receive better treatment, including adequate medical care, only at the state's maximum security facility, the Maine State Prison (MSP) at Thomaston. The result was a convoluted plea agreement for eight years and one day, imposed on November 22, 1996.

After the machinations to obtain the sentence that secured him classification to Thomaston in mid-state Maine, it is curious that (and unclear why) Chuck requested and was approved a transfer less than two months into his sentence to the Downeast Correctional Facility (DCF) at Bucks Harbor, Maine, located about 40 miles south of the Canadian border. The application for reduction of sentence filed by his lawyer in April 1997, after his transfer, further suggests some regret over the extended terms of his plea agreement.

He did not settle in easily at DCF: within six months, he'd requested placement in administrative segregation because he was "stressed out over his medical problems" and "needed to be alone to think it out."[173] Upon being so placed, he then immediately requested transfer to MCC to be closer to family, friends, and doctors familiar with his Crohn's, as well as because "I'm having difficulties with a few people here who seem to be going out of thier [sic] way to try to make my time here more stressfull [sic] and dificult [sic]."[174] Five days later, on June 6, 1997, he cut his wrist with a razor.

He was disciplined for Bodily Injury (to himself) and his security level was increased from Medium to Maximum. Just over a month later, he was transferred to MCC. Things did not go markedly better there. He had a Crohn's flare-up, suffered multiple injuries to his hands, head, and back, and appears to have experienced several panic attacks. The latter two circumstances were potentially related to a situation which prompted him to send a letter to another prisoner seeking information about someone "running his face" about Chuck, which resulted in a disciplinary ticket for extortion.[175] In December 1997, he was placed on administrative segregation "as a result of his safety concerns" after he "maintain[ed] he has been labeled a 'rat' and 'child molester.'"[176]

In January 1998, his sentence reduction application was denied. His Crohn's symptoms were escalating. He sent a prison doctor "a very long letter re being 'tired of being tired' – i.e. recurrent + ongoing GI problems." He weighed only 152 pounds. The doctor noted that he "appears mildly depressed."[177] Chuck reported that urine had been thrown into his cell in

---

[173] Protective Custody or Administrative Segregation Placement, 5/30/97.
[174] Letter from Charles M. Hall #873 to Marica Murphy, June 1, 1997.
[175] Handwritten letter to "Ted" from "Chuck," 9/30/97; Incident Report #97-418, October 6, 1997.
[176] Maine Correctional Center Memorandum re: Transfer/Placement of Prisoner Charles Hall (0873) to MCI, August 17, 1998.
[177] Doctor's Notes, January 12, 1998.

general population, and that he'd prefer to remain in segregation until he was transferred back to Thomaston "because he has a lot of things happening right now."[178] That preference was honored for another four weeks, but he was removed from administrative segregation on February 24th. Soon enough, he was incurring physical injuries again to his hands and head, which he attributed generally to accidents, but which correspond suspiciously with his return to general population.

His next action seems calculated, if subconsciously, to gain some internal sense of control in the face of his distress, to once again present himself as someone more powerful than he was. On July 16, 1998, he mailed a letter from the prison to Maine U.S. District Court Judge Gene Carter, in which he disparaged the "piss poor" legal system that federally convicts low level marijuana dealers "while pieces of shit who rape kids get state or county time." He opined that prosecutors and judges were "scum bags [who] should have [their] balls cut off for allowing these scums to violate children again and again." He did not attempt to disguise his name or address, and ended the letter advising that the judge could "take this as a threat if you'd like, but if you don't take me serious [sic] you'll look stupid in the end."[179]

Again, it is not hard to imagine that the real "scum bag" in Chuck's mind was Jerry Mintz, and that his misguided (and illegal) actions were a subconscious attempt to address his unresolved trauma. He sent two more similar letters to Judge Carter over the next week, both in his own name, and then, upon receiving no reply (though he hardly allowed enough time for delivery), sent a letter addressed to "Justice Dept., C.E. Dept.," which named target locations including the federal courthouse in Portland and the Bush family compound in Kennebunkport, among others. The letter warned that "everything is in place to do what I feel is necessary in order to get my point across," adding that the fact of his incarceration should not "lead you to believe that I am unable to accomplish things in the 'free world.'"[180]

The letters were forwarded to the FBI, which informed MCC of their investigation. MCC in turn requested a transfer to the Maine Correctional Institution (MCI), the Special Management Unit in Warren, Maine. Arriving there in late August 1998, Chuck began reporting stress, culminating in a note to the Mental Health unit advising that

> I'm dealing with a stressful situation that is beccoming [sic] more
> of a black cloud above me as each day passes. With each passing
> day I feel myself falling further and further into a depression, that
> I fear I may never be able to fully climb out of. As I fall deeper into
> this depressive state of mind, I find myself going down a path of
> self-destruction. I'm not saying I'm suicidal. Please don't think
> that, because I'm not. I just find myself not carring [sic] about

---

[178] Administrative Segregation/Protective Custody Review Minutes, January 20, 1998.
[179] U.S. District Court Presentence Investigation Report, Docket No. 98-54-P-H, p.3.
[180] U.S. District Court Presentence Investigation Report, Docket No. 98-54-P-H, p.4.

IFCD 00027783

anything anymore. I fear the longer I hold out and try to deal with
this alone the worse this depression will get.[181]

He was at MCI only two months before he was transferred to the Cumberland County Jail (CCJ) in Portland to plead guilty to charges pertaining to the Judge Carter letters, which he did on October 28, 1998. Just over a month later, on December 1, 1998, from the jail, a bomb threat to the Portland ATF office was called in from his unit. The next day, jail staff described him as tired, with bloodshot and droopy eyes. He reported not having slept for three days and indicated a desire for medication for depression. He was placed on sleep watch, with a plan to add him to the "pysch [sic] list."[182] The day after that, a man in his unit hanged himself on the handicapped bars in his cell. Chuck was reported to be "very quite [sic] – not smiling requests to see Dr for ? depression."[183] One day later, the man in the cell next to Chuck's, Bobby Hale, who suffered from bipolar disorder and whom Chuck had befriended, also tried to hang himself from the handicapped bars. He died after six days on life support.[184]

During those six days, Chuck reported being "upset + angry[,] stressed, anxious, thoughts are running 90 miles/hr."[185] He contracted for safety, but was "weepy" and reported difficulty sleeping.[186] In the midst of the suicides, he refused to provide fingerprints requested by the FBI, likely for comparison pertaining to investigation of the bomb threat called in from the jail. On December 14, 1998, he was ordered to comply with the request. On January 19, 1999, he was sentenced in federal court to 43 months for the letters to Judge Carter, consecutive to his existing state sentence. Two days later, he was transferred back to MCI to continue serving that state sentence.

He requested placement in general population, noting that his previous fear of assault by other prisoners had subsided. After only a few weeks, however, he reported threats to his safety based on being pegged as an informant and was retained in administrative custody. He reported anxiety, stress and insomnia, and was assigned to a sleep study. He received a ticket for making a verbal threat of his own on March 28, 1999. On the same day that he was disciplined for that threat with a verbal reprimand, he sent a letter to Maine U.S. Attorney Jay McCloskey inquiring about the status of the ATF bomb threat investigation.

Just as it had when he received no response to his letters to Judge Carter, his behavior escalated when he did not hear back from Mr. McCloskey – when he was treated, he felt, as if he didn't exist or didn't matter. He proceeded to send, over the next six weeks, at least twelve more increasingly threatening letters to parties involved in the investigation, all – again – signed or with his name in the return address.

---

[181] Handwritten letter to "Noreen" from Charles M. Hall, October 4, 1998.
[182] Prison Health Services Progress Notes, December 2, 1998.
[183] Prison Health Services Progress Notes, December 4, 1998.
[184] See: Mulkern v. Cumberland County, Civil No. 00-382-P-C, United States District Court, D. Maine, November 30, 2001.
[185] Prison Health Services Progress Notes, December 7, 1998.
[186] Prison Health Services Progress Notes, December 7, 9 and 11, 1998.

IFCD 00027784

Throughout the time he was sending the letters, he reported excessive stress and experienced an exacerbation of his Crohn's symptoms, including prednisone-induced acne on his face, neck, back and chest that "not only is…embarrassing, but it's painfull [sic]…I'm constantly bathing."[187] He also, seemingly paradoxically, pursued release from administrative segregation, which was denied at least twice, with notation by the hearing committee of continued threats to his safety.

On June 10, 1999, he was held in contempt of court for refusing to provide handwriting exemplars for the grand jury hearing the new threats case and sent back to CCJ. Within two weeks of his arrival there, the Portland airport received a bomb threat directly and the U.S. Secret Service received a call warning of bombs at the airport, the Bush compound, and a Portland building that housed federal offices. As the investigation into these calls proceeded, he was sent to FCI Raybrook on the contempt charge.

Upon arrival at his first federal facility, during a psychiatric consult, he complained of anxiety and insomnia, referencing Bobby Hale's suicide, and Crohn's symptoms. He was placed in the SHU (Special Housing Unit). At a follow-up psychiatric consult on November 10, 1999, he was in bad shape. He reported minimal response to medication prescribed for anxiety and insomnia; exacerbated Crohn's symptoms; and feeling overwhelmed, angry, irritable, and hopeless about his legal case. The doctor found him "anxious and drawn" with constricted affect, his "face [] covered with a rash and pustules." Chuck disclosed that he was "worried that he might loose [sic] control and hurt someone." The doctor suggested consideration of transfer to a medical facility.[188]

On November 11, he was indicted on 11 federal counts related to the bomb threats and additional letters. Once again, his reaction was to embellish the stakes: he threatened a hunger strike and expressed fear of a death sentence. He reported increased stress and Crohn's symptoms, and then reported threats and abuse by three C.O.'s, including a hand injury and saliva in his food. Before any of this could be addressed, he was sent back to CCJ to face the new indictments. He arrived there in early December 1999.

His agitation rose exponentially over his time at CCJ, where he was put on psychotropic medication to control it. He was also back on Prednisone to treat the Crohn's. He told a medical provider on March 16, 2000, that he "just d[id]n't want to feel so angry and uptight all the time," but his agitation persisted: on April 12, 2000, just after his 29th birthday, staff expressed concern about his potential volatility, and he was described as sitting on his bed with his right leg "constantly jumping" and his eyes wide open, having drunk two bags of coffee the previous day.[189] Over the next few days, experiencing decreased sleep, staff reported that he was "rageful, ready to kill somebody" and involving himself in other people's fights, claiming that he

---

[187] Handwritten letter to Dr. Tafani from Chuck Hall, undated.
[188] Consultation Report, B. Wurzberger, M.D., November 10, 1999.
[189] Prison Health Services Progress Notes, April 12, 2000.

IFCD 00027785

had nothing to lose.[190] His Crohn's symptoms worsened. He repeatedly stated that he was facing the death penalty. (He was not.) His psychotropics were increased. He remained on Prednisone.

In the midst of all this, he somehow managed to marry for a second time. He and Mary Louise Blakeney, another prisoner at CCJ he'd met during his time there, were married on May 16, 2000. Three days after they wed, Chuck was hospitalized outside the prison for severe abdominal pain, where he ultimately had surgery to create a new ileostomy, this time with the additional step of completely excising his internal sphincter and distal rectum and closing the external sphincter with sutures. He struggled with pain over the next two months, regularly expressing anger and irritation, until his lawyer requested transfer to a medical facility and a continuance for his trial in July 2000. He was sent to Devens FMC, where he stayed for three months until being recalled to CCJ for trial. He pleaded guilty on November 13, 2000 to one count of Mailing Threatening Communications pursuant to a sentencing agreement of 151 months, consecutive to the first federal sentence. He was then transported to MCI to finish out his state sentence.

Crohn's continued to dog him, requiring numerous trips between MCI in Warren and hospitals in Portland, eventually leading to a revision of his ileostomy with relocation to the left side in March 2001. In July, he requested transfer to a federal medical facility because he believed his "medical needs could be met more effectively and easier" there.[191] MCI administration and medical concurred with this idea, and the Maine Interstate Compact Administrator contacted the BOP Northeast Regional Office with the request, but the wheels moved slowly, so in October 2001, Chuck requested a transfer to the Maine State Prison instead, which was closing its location in Thomaston and opening a brand-new building in Warren. That request was approved in January 2002.

The threats Chuck made were at least in part an attempt to get himself into the federal prison system, where he believed that health care for his significant medical needs would be better. Yet, the federal transfer didn't come through before the completion of his state sentence in June 2004, so he spent two and a half years at MSP. He held various jobs and participated in programming when he could – HIV peer education training, anger management, and guitar classes. But Crohn's persisted in its chronic assault: he had an episode in October 2003, and in March 2004 required another ileostomy revision after insufficient pain control resulted in high doses of narcotics, causing respiratory distress and periods of apnea. It was only six weeks after the surgery that he completed his state sentence and was transferred to FCI Fairton in June 2004.

He experienced complications with his ileostomy within months of his arrival and was unwell through the rest of the year. In February 2005 he requested a medical transfer because he wasn't getting his ostomy supplies in a timely fashion. It wasn't until he renewed the request in

---

[190] Prison Health Services Progress Notes, April 13-14, 2000.
[191] Prisoner's Request to Classification, July 15, 2001.

IFCD 00027786

May 2006 that it came through: he arrived at FMC Rochester in August 2006. Though he now had access to consults and treatment at the Mayo Clinic, his medical situation was the same, and in October 2006, yet another ileostomy revision was performed. Post-surgery, he was noted to be very depressed. In this state, he wrote to prison doctor Ronald Ilvedson:

> I don't believe it's in my best interest to be treated here at FMC Rochester. I don't feel I can trust everyone fully in the medical dept. It's not everyone but there are a certain few that I'm actually afraid to go to for medical attention. Therefore I need to request that a transfer summary be made and from this point forward I will be refusing further medical attention.[192]

Not long after writing this letter, he was assaulted by another prisoner:

> I was coming back from the Rec building heading towards 10 building…I got hit in the eye by a guy – all because of my ostomy bag.[193]

He requested to talk to someone because "I've been depressed about my medical condition and now I've got these guys giving me a hard time about it."[194]  He reported that he had recently suffered a leakage event from his ostomy bag in the chow hall. When, on November 15, 2006, Dr. Ilvedson canceled the psychiatry consult that would have cleared the way for the transfer summary Chuck had requested, Chuck was distraught. The next day, he attempted to hang himself with his ostomy strap.

He was placed on suicide watch and referred to BOP psychiatrist Daniel Shine. In treatment, he continued to express embarrassment related to leaking stool and other prisoners' awareness of it. He described a history of depressive and manic symptoms, based upon which Dr. Shine gave a working diagnosis of Bipolar II. Chuck also disclosed, as he had previously at FCI Raybrook in 1999, that he worried he may hurt someone. He raised this concern again in May and June of 2007, stating in May that he was "full of anger" and requesting a mood stabilizer, and in June that, mental health issues notwithstanding, he was "sick of FMC and will do whatever it takes to get transferred."[195] He specifically requested a transfer to a United States Penitentiary (USP).

In July, he abruptly denied any plans to hurt anyone, stating, with constricted affect, that "I gave that up. They're not going to transfer me."[196] And he was right: they didn't. So he was still at Rochester in the fall of 2007 when his sister Susan responded to his efforts to reach out to

---

[192] Handwritten letter to Dr. Ilvedson from Charles Hall, October 31, 2006.
[193] Inmate Injury Assessment and Followup (Medical), November 3, 2006.
[194] Chronological Record of Medical Care, November 3, 2006.
[195] Psychiatry Note, Daniel J. Shine MD, May 15, 2007; Outpatient Psychiatric Progress Note, Daniel J. Shine, June 13, 2007.
[196] Outpatient Psychiatric Progress Note, Daniel J. Shine, July 12, 2007.

her by saying she preferred only to write, rather than speak by phone, and even then failed to reply to his letters. She also declined to provide him with their parents' contact information, disheartening him further. His reaction, as he later explained to Dr. Shine, was to "'shut[] myself in' and alienat[e] himself from supports at FMC Rochester"[197] – another way of saying what he had in July: he gave up.

His depression deepened until, on November 14, 2007, he attempted suicide again, this time by an overdose of aspirin. When he was revived, he expressed regret that his attempt had failed. He was started on antidepressants, and Dr. Shine redesignated him from the medical unit, where he was receiving mental health care on an outpatient basis, to the mental health unit, where he could receive, as Dr. Shine related at trial, "more aggressive, more focused treatment for his depression."[198]

In January 2008, Chuck reported symptoms indicating a resurgence of Crohn's. On January 12, he reported leakage from his ostomy bag. On January 21, another mental health prisoner named Walter Bonin accused Chuck of attacking him. Chuck initially denied it. He presented with terse speech, constricted affect and depressed mood at a meeting with Dr. Shine on February 6, and also reported psychotic symptoms (auditory hallucinations). Then, on February 21, a month after Mr. Bonin made his accusation, Dr. Shine received the following letter Chuck:

> As you know I've been having thoughts of hurting others. Well, last night was that way as well, only it was more intense. I was thinking more along the lines of killing someone. While having these thoughts I became sexually aroused and my mood actually raised. For the first time I actually felt happy. Therefore, I decided that maybe that's what I should do...As you know I've been charged with assault. That wasn't my intent, just to punch him. What was called a headlock wasn't accurate. What actually took place was I wrapped my hands around his throat and squeezed. My intent was to choke him to death. But he was able to get out of my grasp and ran out of the room. If it wouldn't have been him it would've been someone else. My intent then was to kill someone not just assault. And to be honest with you, if I was on the open unit today, that would be my intent and goal.[199]

This would appear to be the most explicit Chuck had been so far as to his homicidal ideation. While the words are certainly unsettling, they harken back to his comment in July that he had "given up" trying to get transferred, ostensibly because no one was taking his admissions of homicidal ideation seriously enough. This letter would appear to suggest that he had revived his efforts to get them to do so, that he chose to use the incident with Mr. Bonin as evidence for the case he'd been trying to make. It's important to remember *why* he wanted a transfer so

---

[197] Transfer Summary Update, April 17, 2008.
[198] Trial testimony of Daniel J. Shine, May 13-14, 2014.
[199] Handwritten letter to Dr. Shine from Charles Hall, received February 21, 2008.

IFCD 00027788

desperately: of course it was partly because of the humiliation he'd endured at Rochester over his ostomy bag, but it was also because he was genuinely worried about his own ability to control himself – and rightfully so, as the altercation with Mr. Bonin showed.

It is unclear whether the transfer would have occurred if Chuck and Mr. Bonin were not both in the mental health unit and could not, given their separatee status following the incident, both remain there. In any case, this is the reason Dr. Shine gave for proceeding with the Transfer Summary. Once it was approved, Chuck was moved back to FMC Devens, on June 10, 2008.

Other than reporting irritability, his first few months at Devens were relatively uneventful. In September 2008, he once again developed problems with the ileostomy after being hit in the side by a soccer ball, resulting in persistent bleeding. Devens eventually determined that they were unequipped to manage the issue, so he was sent to an outside hospital – once, and then again. On October 8, 2008, he underwent surgery for his fourth ostomy revision, with relocation of the stoma site. He expressed appreciation for the care and concern he was shown upon his return to Devens, but reported abdominal pain. On October 17, after his bed was discovered covered in blood from a full ostomy bag that had burst open, he was sent back out for hospitalization. There was some concern that he had caused the bleeding in an effort to self-harm, but a psych consult on October 20 was inconclusive. Regardless, the hospital decided to re-do the revision.

Ten days post-surgery, Chuck was discovered semi-unresponsive and sent out for treatment yet again. He had attempted suicide for a third time, again with an overdose of over-the-counter medication (Tylenol). While being treated for the overdose, he experienced more bleeding from his stoma as well as blood in his urine, and required a blood transfusion. As he had after his first overdose, he expressed regret that the second attempt had also failed, as well as embarrassment about other prisoners seeing him manage his ostomy, but by November 9, 2008, he was able to state a reason to live: his release date. After several more days, his suicide watch was discontinued.

In January 2009, he was transferred once again to an outside hospital due to bleeding at the ostomy. When he reported to hospital staff that he was a Jehovah's Witness and therefore could not receive blood transfusions, there was some concern at Devens that he could have disturbed his ostomy and then declared this religious conversion "in an indirect effort at suicide." The treating hospital, however, cleared him for discharge after determining "no obvious suicidal intentions."[200] Chuck later explained to a Devens doctor that he'd been reluctant to accept another transfusion, as the last one he'd received had made him feel ill for three weeks subsequent.

The bleeding continued after his return to Devens, debilitating and discouraging him to the extent that, after some confusion about whether he had requested a razor from another prisoner, he reported, on February 4, 2009, that he could no longer contract for safety. He

---

[200] UMass Memorial Medical Center Discharge Summary, January 14, 2009.

IFCD 00027789

came off suicide watch after a week. The months that followed featured persistent abdominal pain and depressed mood, until, after many years of no communication with his parents, he reconnected with them. As Susan explains it,

> My parents lost touch with Chuck for a while when he was in the prison system. He changed prisons a number of times. To my knowledge, they did not know how to locate him and they were ashamed to ask for help. Chuck didn't know where they were after they moved to Florida…My mother…shared her fear that he would someday be released from prison and show up on their doorstep or in their house…He [also] had a tendency to call incessantly, and besides being exhausting, calls from prison are really expensive.[201]

The reconciliation in May 2009 gave Chuck a new lease on life. He reported that suicide was no longer an option – "I know one thing for sure, the suicide stuff, I am all done with [sic], I don't want to disappoint my parents again"[202] – and that he wanted to be released to Maine (where they had returned from Florida) so he could care for his parents. His physical health, however, did not similarly improve: in June, he suffered another resurgence of Crohn's, which led to another revision and relocation of his ileostomy. Despite pain during recovery from the surgery, he continued to maintain a more positive outlook for several months. He looked forward to an anticipated transfer to a less restrictive facility, where he might have access to more vocational opportunities.

As the transfer process stalled into September, he began to experience agitation and insomnia, as well reporting again a recurrence of auditory hallucinations. Nonetheless, he continued to reject suicidal ideation out of respect for his parents. When the transfer came through, it was for MCFP Springfield, where he arrived on October 27, 2009. Throughout November, while in general population, he reported abdominal cramping and bleeding at the ostomy site, and then auditory hallucinations. On December 9, 2009, he was voluntarily admitted into inpatient mental health treatment unit.

He reported to psychiatrist Patrick Gariety that his primary goal was to "find a way to control his negative affect so he can eventually function in a normal prison setting without difficulty."[203] But before he could do any real work to that end, reemerging Crohn's symptoms demanded his attention. On January 2, 2010, he was transported off-site via ambulance to St. John's Mercy Hospital due to uncontrolled bleeding from the ostomy. It resumed on and off over the next ten days after his return to MCFP, necessitating a transfusion on-site on January 11. Stool leakage onto his bed prompted the kind of jeering he'd endured at Devens, which he escaped only by requiring a return to St. John's to treat the unrelenting bleeding. St. John's

---

[201] Declaration of Susan Shumway, pp.11-12.
[202] BOP Health Services Clinical Encounter, May 24, 2009.
[203] United States Medical Center for Federal Prisoners Master Treatment Plan, p.4.

performed a new revision of the ostomy – his seventh – on January 12. He was discharged with the bleeding finally resolved two days later. MCFP determined him stabilized, with an order to taper Prednisone, on January 20.

Victor Castro-Rodriguez was killed on January 26. There are no immediately contemporaneous records detailing Chuck's actions or thoughts during the six days between Chuck's return to MCFP from St. John's and Mr. Castro's death, but on January 27th, Chuck told Dr. Gariety that he had been experiencing homicidal auditory hallucinations during the five preceding days. He reported severe anxiety in the days following the homicide and was observed by staff to have hand tremors. He persisted in requesting isolated housing away from other inmates.

Mr. Hall has continued to suffer from serious health problems, surviving cancer in 2017 and having additional bowel surgeries. He suffers from degeneration of his hip joint, likely as a response to prolonged use of prednisone to treat his Crohn's disease. In 2022 he spent most of the year in a federal medical facility due to his need for lifesaving nutrition through a port in his chest, as his bowel was not absorbing adequate nutrients to sustain life. His health remains precarious to this day and into the foreseeable future, as no cure exists for Crohn's disease.

IFCD 00027791