**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

IN RE: CHARLES HALL         )
         )
         )
         )        2:23-mc-00001-JPH-MG
         )
         )
         )
         )

**MOTION BY CHARLES HALL TO UNSEAL**
**ALL DEPOSITIONS IN *UNITED STATES V. ROGERS***

Charles Michael Hall, by and through undersigned counsel, respectfully submits this motion seeking an order unsealing all depositions in *United States v. Rogers*, 2:16-cr-0018.

Mr. Hall is not a party to this case. Mr. Hall is a person under a sentence of death imposed by the United States District Court for the Western District of Missouri for a murder that occurred while Mr. Hall was confined in the mental health unit of the United States Medical Center for Federal Prisoners in Springfield, Missouri. Mr. Hall is currently housed in the Special Confinement Unit of USP Terre Haute. Undersigned counsel, attorneys from the Indiana Federal Community Defenders Capital § 2255 Unit, represent Mr. Hall in post-conviction proceedings in the Western District of Missouri.

The depositions that were taken in *United States v. Rogers* are directly relevant to Mr. Hall's post-conviction proceedings. In Mr. Rogers' case, there were allegations of misconduct by attorneys from the Department of Justice Capital Case Section. Some of the misconduct allegations concerned hiding information about the BOP's failure to address Mr. Rogers' self-reported mental health problems and homicidal ideations. Mr. Hall was also convicted of a homicide in the BOP after also self-reporting homicidal ideations and seeking mental health care.

1

Additionally, in Mr. Rogers' case, some of the alleged misconduct was committed by CCS attorney James Peterson. Mr. Peterson was one of the prosecutors who represented the United States at Mr. Hall's trial.

As such, and as more fully explained in the attached Memorandum in Support, the depositions concerning potential prosecutorial misconduct taken in *United States v. Rogers* are directly relevant to Mr. Hall's § 2255 litigation. They are also of interest to the public. Therefore, these depositions should be unsealed.

Respectfully submitted,

 /s/ F. Italia Patti
Angela S. Elleman, Chief
F. Italia Patti, Assistant Federal Defender
§ 2255 Unit
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN   46204
Phone: 317-383-3520
angie_elleman@fd.org
italia_patti@fd.org

Dated:  November 29, 2023

2

## CERTIFICATE OF SERVICE

I hereby certify that on November  29, 2023, the foregoing document was sent via email and/or U.S. Mail to counsel for the United States and Andrew Rogers in *United States v. Rogers*, 2:16-cr-0018.

/s/ F. Italia Patti
F. Italia Patti
Assistant Federal Defender

3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

IN RE: CHARLES HALL       )
                             )
                             )
                             )        2:23-mc-00001-JPH-MG
                             )
                             )
                             )
                             )

## MEMORANDUM IN SUPPORT OF MOTION BY CHARLES HALL TO UNSEAL ALL DEPOSITIONS IN *UNITED STATES V. ROGERS*

Charles Michael Hall was convicted and sentenced to death for the murder of a fellow prisoner in the mental health unit of the United States Medical Center for Federal Prisoners. The United States District Court for the Western District of Missouri imposed the death sentence on July 18, 2014. The Eighth Circuit affirmed Mr. Hall's sentence on direct appeal and the Supreme Court denied certiorari.

On March 3, 2021, the Western District of Missouri appointed undersigned counsel Angela Elleman, Chief of the Indiana Federal Community Defenders (IFCD) Capital § 2255 Unit, and Keith O'Connor to represent Mr. Hall in post-conviction proceedings. Ms. Elleman and Mr. O'Conner entered appearances on April 8, 2021. On August 17, 2023, undersigned counsel Italia Patti, an Assistant Federal Defender in the IFCD Capital § 2255 Unit, also entered an appearance. Counsel are preparing a § 2255 motion challenging Mr. Hall's death sentence.[1] It is in that capacity that undersigned counsel seek to have the depositions in Mr. Rogers' case unsealed.

---

[1] As a result of the disruption caused by the COVID-19 pandemic, the government agreed to waive any statute of limitations defense so long as Mr. Hall files his § 2255 motion by February 9, 2024.

1

The depositions that were taken in *United States v. Rogers*, 2:16-cr-0018, are directly relevant to Mr. Hall's post-conviction proceedings challenging his death sentence. In Mr. Rogers' case, there were allegations of misconduct by attorneys from the Department of Justice Capital Case Section (CCS). Some of the misconduct allegations concerned hiding information about the BOP's failure to address Mr. Rogers' self-reported mental health problems and homicidal ideations. Mr. Hall was also convicted of a homicide in the BOP after self-reporting homicidal ideations and seeking mental health care. Additionally, in Mr. Rogers' case, CCS attorney James Peterson was implicated in the alleged misconduct. Mr. Peterson was one of the prosecutors who represented the United States at Mr. Hall's trial.

To briefly review the relevant procedural history of Mr. Rogers' case: Andrew Rogers was indicted for the murder of a fellow prisoner in USP Terre Haute on May 17, 2016. On May 31, 2016, the government filed a Notice of Intent to Seek the Death Penalty. On the same day, Monica Foster, Chief Defender of IFCD, and Gwendolyn Beitz, Assistant Federal Defender, entered their appearances on behalf of Mr. Rogers, and they were later joined as counsel by Nathan Chambers and Patrick Burke. On January 29, 2018, counsel for Mr. Rogers filed Defendant Andrew Rogers' Motion to Strike the Notice of Intent to Seek the Death Penalty for the Government's Intentional Withholding and Destruction of *Brady* Information because "counsel for Mr. Rogers [became] aware that one of the prosecutors in charge of this case during the death-penalty authorization process conducted more than a dozen witness interviews, which revealed information favorable to Mr. Rogers. Mr. Rogers has also become aware of rampant misconduct in the Department of Justice Capital Case Section (CCS)." Dkt. No. 92 at 1. In a declaration filed in a sex discrimination lawsuit by a CCS colleague, former CCS prosecutor Amanda Haines said that "the CCS attorney in charge of the death-penalty protocol review of the

2

case against Mr. Rogers," James Peterson, "intentionally destroyed favorable information and then provided false information in an effort to cover up his misdeeds." *Id.* at 4. Ms. Haines' declaration explained:

> After familiarizing myself with Rogers, I learned that Mr. Peterson had committed a fundamental error in judgment and a violation of the *"Ogden Memo,"* by interviewing over a dozen witnesses without a law enforcement agent or other witness being present. These witnesses were suspected of having information that was potentially harmful to the government's penalty phase case. Mr. Peterson compounded this error by destroying his interview notes, a fact he initially falsely denied, neglecting to memorialize his conversations with the witnesses, and failing to keep records of what documents he showed them to refresh their recollections or lack thereof.

*Id.* at 5 (quoting Haines Dec, attached as Exhibit 1 to Dkt. No. 92) (footnote omitted) (emphasis in original).

In response to this motion, on March 16, 2018, the Court announced its "intent to allow depositions of Amanda Haines and James Peterson regarding the *Brady* violation allegations Rogers makes in his motion" and that it would "allow limited discovery preliminary to those depositions." Dkt. No. 114. The government moved for reconsideration, *see* Dkt. No. 137, which the Court denied, *see* Dkt. No. 243.

Counsel for Mr. Rogers uncovered additional evidence of misconduct, including a document noting that the BOP had not responded adequately to Mr. Rogers' mental health issues and that "were these matters to be addressed in a death penalty proceeding, then the BOP might be embarrassed as a result of its incomplete response to Roger's mental health issues." Dkt. 161 at 1. The Court characterized this document as "directly contradict[ing] the position that the Government repeatedly has taken that it has not withheld any information that would indicate that the Bureau of Prisons was negligent in treating Rogers' mental health conditions." *Id.* at 2. This Court also noted the government's "lack of candor" and that the government's "assurances

3

that it understands, has complied with, and will comply with its *Brady* obligations ring hollow."

*Id.* at 3. Mr. Rogers' counsel requested to take additional depositions, of Dr. Steven Eckert and

James Warden, and the Court granted that request. Dkt. 243. The Court did, however, limit the

scope of the depositions. Dkt. No. 271.

> Pursuant to the Court's order, the deposition of Ms. Haines would address:

> (1) Questions pertaining to the contents of Haines's declaration; (2) Questions pertaining to statements allegedly made to Haines by Peterson as reflected in the document Haines prepared that was provided to Rogers as part of the discovery in this cause; (3) Conversations with Peterson regarding this case, including those pertaining to any witness interviews he conducted; (4) The basis of Haines's allegations of alleged acts of misconduct by Peterson, specifically: i. He interviewed over a dozen witnesses without a law enforcement officer or other witness being present, in contravention of the Ogden Memo, ii. He destroyed his notes, iii. He initially lied to Haines regarding the destruction of his notes, iv. He did not memorialize his conversations with the witnesses, v. He did not make a record of the documents he used to refresh the witnesses' recollections, and vi. The witnesses provided what is arguably Brady material; (5) Questions pertaining to the withholding of discoverable information in this case; and (6) Questions pertaining to the investigative and discovery policies of the DOJ.

Dkt. No. 271 at 2. And the deposition of James Peterson would address:

> (1) Questions pertaining to the contents of Peterson's declaration; (2) Questions pertaining to e-mail communications between Peterson and P. Kevin Carwile concerning the authorization process or the investigation undertaken by CCS protocol attorneys in furtherance of authorization of the death penalty from November 12-17, 2015; (3) Questions pertaining to documents related to Peterson's interviews and his preparation of any memoranda in connection therewith; (4) Conversations with Haines regarding this case, including those pertaining to any witness interviews he conducted; (5) Whether he interviewed witnesses without a law enforcement officer or other witness being present; (6) The circumstances of the witness interviews; (7) The witnesses who were interviewed; (8) What the witnesses said; (9) Whether he prepared notes of his interviews; (10) Whether he destroyed his notes of the interviews; (11) Whether he made a record of any documents used to refresh the witnesses' recollections; (12) His statements to Haines regarding his notes of the interviews; (13) Whether the witnesses provided Brady material during the interviews, and if so, what it was; (14) Questions pertaining to the withholding of discoverable information in this case; and (15) Questions pertaining to his investigative and discovery policies and the policies of the DOJ.

4

*Id.* at 2-3.

Mr. Rogers' counsel took Mr. Peterson's deposition on February 8, 2019, and took Ms. Haines' deposition on February 11, 2019. Dkt. No. 288. Counsel for Mr. Rogers furnished the depositions to the Court, and, in a motion signed by Monica Foster, requested that the depositions be sealed. Dkt Nos. 288, 290, 296, 298. In Response to Ms. Foster's motions, the Court ordered that the depositions should be maintained under seal. Dkt. Nos. 292, 301.

On March 18, 2019, "[a]fter reviewing the parties' relevant submissions," the Court "determined that Defendant Andrew Rogers' Motion to Strike the Notice of Intent to Seek the Death Penalty for the Government's Intentional Withholding and Destruction of Brady Information cannot be resolved without an evidentiary hearing. In this motion and supplements to this motion, Rogers has raised serious allegations of misconduct on the part of various Government attorneys." Dkt. No. 309 at 1 (internal record citations omitted). On March 29, 2019, in an Order granting (in part) a motion for an extension of time, the Court noted:

> In granting the Government's motion, the Court notes that the Government misapprehends the scope of the hearing. The initial inquiry into possible misconduct was precipitated by Amanda Haines' declaration, which indicated that James Peterson had destroyed what was arguably *Brady* material in Rogers' case. However, information gleaned though the discovery process into that specific allegation, coupled with what appear to be multiple Government filings containing false statements, has created concerns about additional possible misconduct and convinced the Court that a full inquiry is necessary. As such, the Government's statement that "there is only one issue potentially in need of 'clarification': the apparent conflicting accounts of Dr. Eckert's statements as recounted by the witness himself in his deposition and as summarized by Attorney Peterson and AUSA Warden following their responsive interviews of Dr. Eckert," is incorrect. Rather, there appear to be many allegations of serious government misconduct that warrant inquiry and clarification.

Dkt. No. 332 at 1-2 (internal record citations omitted).

As the hearing approached, the government sought and received permission from the Attorney General to cease seeking the death penalty in return for Mr. Rogers' guilty plea and

5

acceptance of a life sentence. Dkt Nos. 393, 395. Although Mr. Rogers' offer to plead guilty in exchange for a life sentence had been pending for years (since well in advance of his indictment), the deauthorization occurred just days before the misconduct hearing was scheduled to commence. Thus, the hearing on "many allegations of serious government misconduct that warrant inquiry and clarification" that initially "was precipitated by Amanda Haines' declaration, which indicated that James Peterson had destroyed what was arguably *Brady* material in Rogers' case" never occurred. Because no hearing ever occurred and because the depositions of Ms. Haines, Mr. Peterson, and other witnesses are under seal, there is limited publicly available information about the alleged misconduct.[2]

The information in these sealed depositions is highly relevant to Mr. Hall's litigation. Like Mr. Rogers, Mr. Hall was accused and ultimately found guilty of murdering a fellow federal prisoner. Like Mr. Rogers, Mr. Hall had a documented history of mental health problems and specifically sought help from BOP staff because he did not want to act on his homicidal ideations. And Mr. Peterson, who was accused of misconduct in Mr. Rogers' case specifically for withholding potentially mitigating information about Mr. Rogers' mental health care, represented the government in its prosecution of Mr. Hall. *See* Docket Report, *United States v. Hall*, 6:10-cr-02029. Mr. Peterson may have committed misconduct in Mr. Hall's case.

Non-parties may intervene in criminal cases to assert a right to access documents and information. *See, e.g.*, *United States v. Blagojevich*, 612 F.3d 558, 559 (7th Cir. 2010) (citing *In*

---

[2] Certainly, the public is interested in potential misconduct by CCS prosecutors, as evidenced by a *New York Times* article on the topic, which appeared on the first page, above the fold. *See* Katie Benner, *At the Justice Dept.'s Death Penalty Unit, Accusations of Favoritism, Gender Bias, and Unwanted Groping*, New York Times, https://www.nytimes.com/2018/03/31/us/politics/justice-department-harassment-bias.html. Despite the headline, this article covers not only sexual harassment and gender discrimination, but also professional misconduct such as withholding *Brady* material.

*re Associated Press*, 162 F.3d 503, 507-08 (7th Cir. 1998); Fed. R. Crim. P. 57(b)); *see also Doe v. Marsalis*, 202 F.R.D. 233, 236 (N.D. Ill. 2001). Although "[t]he Federal Rules of Criminal Procedure lack a counterpart of Federal Rule of Civil Procedure 24, which allows intervention" in civil cases, "courts have permitted intervention" by intervenors who sought to make public records and evidence in criminal cases. *Blagojevich*, 612 F.3d at 559; *see also Associated Press*, 162 F.3d at 507-08. In deciding whether information should be made public, "the constitutional and common law right of access to judicial records and proceedings must be balanced against competing values that may require closure." *Associated Press*, 162 F.3d at 508. The "presumption" is "in favor of disclosure" of court documents. *Blagojevich*, 612 F.3d 558; *see also Jessup v. Luther*, 277 F.3d 926, 929 (7th Cir. 2002). Here, this presumption cannot be overcome. To the contrary, the public, and specifically Mr. Hall, unquestionably have strong interests in documents related to a possible pattern of prosecutorial misconduct in death penalty cases.

Therefore, undersigned counsel for Mr. Hall respectfully requests that the Court unseal the depositions taken in *United States v. Rogers*, 2:16-cr-0018.

Respectfully submitted,

 /s/ F. Italia Patti
Angela S. Elleman, Chief
F. Italia Patti, Assistant Federal Defender
§ 2255 Unit
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN   46204
Phone: 317-383-3520
angie_elleman@fd.org
italia_patti@fd.org

Dated:  November 29, 2023

7

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November  29, 2023, the foregoing document was sent via email and/or U.S. Mail to counsel for the United States and Andrew Rogers in *United States v. Rogers*, 2:16-cr-0018.

<u>/s/ F. Italia Patti</u>
F. Italia Patti
Assistant Federal Defender

8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

IN RE: CHARLES HALL                )
                                    )
                                    )
                                    )      2:23-mc-00001-JPH-MG
                                    )
                                    )
                                    )
                                    )

**JOINDER IN CHARLES HALL'S MOTION TO UNSEAL ALL DEPOSITIONS**
**AND MOTION TO UNSEAL ALL DEPOSITIONS**


Andrew N. Rogers, by and through undersigned counsel, respectfully joins the

Motion filed by non-party Charles Michael Hall for an order unsealing all depositions in

*United States v. Rogers* and moves for the Court to unseal all depositions in this case.

Undersigned counsel agrees that the depositions concerning potential prosecutorial

misconduct in *United States v. Rogers* are directly relevant to Mr. Hall's § 2255

litigation. More important to undersigned counsel, they are also of interest to the public.

There have been disturbing instances of misconduct by the Department of Justice

attorneys litigating capital cases. The public has a right to know about the serious

misconduct engaged in by attorneys for the federal government while seeking the death

penalty in cases against defendants who are poor, severely mentally ill, even

intellectually disabled. Because unsealing these depositions would help shed light on

this misconduct, undersigned counsel, who initially moved for these depositions to be

sealed, now urges the Court to unseal them.

1

Respectfully submitted,

/s/ Monica Foster
Monica Foster
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN   46204
Phone: 317-383-3520
Monica_Foster@fd.org

Dated:  December 13, 2023

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

IN RE: CHARLES HALL           )
                                   )
                                   )
                                 )       2:23-mc-00001-JPH-MG
                                 )
                                 )
                                 )
                                 )

## MEMORANDUM IN SUPPORT OF MOTION TO UNSEAL ALL DEPOSITIONS

Non-party Charles Hall, represented by attorneys in the § 2255 Unit of Indiana Federal Community Defenders, of which undersigned counsel Monica Foster is the Executive Director, has moved to unseal the depositions taken in *United States v. Rogers*. Undersigned counsel for Mr. Rogers agrees that the depositions are relevant to Mr. Hall's post-conviction proceedings and, more importantly, are of interest to the public. Therefore, these depositions should be unsealed.[1]

**I. Counsel discovered serious misconduct by DOJ attorneys during litigation of Mr. Rogers' case, but much of that information remains concealed from public scrutiny.**

In the course of litigating Mr. Rogers' case, undersigned counsel learned of serious misconduct by Department of Justice attorneys, including by attorneys in the Capital Case Section. *See* Dkt. No. 92 at 1. In response to undersigned counsel bringing this information to the Court's attention, this Court announced its "intent to allow depositions of Amanda Haines and James Peterson regarding the *Brady* violation

---

[1] The motion and this memorandum in support are being filed in *United States v. Rogers* and in the separate case opened to have the depositions unsealed, *In re Charles Hall*, 2:23-mc-00001-JPH-MG.

1

allegations Rogers makes in his motion" and that it would "allow limited discovery preliminary to those depositions." Dkt. No. 114. Mr. Rogers' counsel took Mr. Peterson's deposition on February 8, 2019, and took Ms. Haines' deposition on February 11, 2019. Dkt. No. 288 (Status Report). Undersigned counsel for Mr. Rogers furnished the depositions to this Court, and requested that the depositions be sealed. Dkt. Nos. 288, 290, 296, 298. In Response to undersigned counsel's motions, the Court ordered that the depositions should be maintained under seal.

After being furnished with evidence of misconduct, such as the depositions at issue, this Court ordered an evidentiary hearing to explore Mr. Rogers' "serious allegations of misconduct on the part of various Government attorneys". Dkt. No. 309. But as this litigation ensued, the local United States Attorney's Office sought deauthorization of the death penalty it had previously endorsed. The government's request for deauthorization was granted by then-Attorney General William Barr days before the misconduct hearing was scheduled to commence and Mr. Rogers entered a guilty plea in return for a life sentence immediately thereafter.[2] Dkt. Nos. 393, 395. Thus, the hearing on "many allegations of serious government misconduct that warrant inquiry and clarification" that initially "was precipitated by Amanda Haines' declaration, which indicated that James Peterson had destroyed what was arguably *Brady* material in Rogers' case" never occurred. Dkt. 332.

Because no hearing ever occurred and because the depositions of Ms. Haines, Mr. Peterson, and other witnesses are under seal, there is limited publicly available

---

[2] This exact plea offer had been extended by Mr. Rogers for the preceding four years, dating back to before he was even indicted.

information about the government's misconduct in *United States v. Rogers.*

Undersigned counsel is aware of at least two other death penalty cases involving

allegations of serious misconduct by Capital Case Section attorneys, including Mr.

Peterson. In both cases, the government withdrew its notice of intent to seek the death

penalty and accepted a guilty plea after the potential misconduct was brought to light.

Unsealing the depositions in *United States v. Rogers* would provide the public with more

information about the Capital Case Section's misconduct.

## II. There is a disturbing history of misconduct by Department of Justice attorneys litigating death penalty cases.

Department of Justice attorneys, in particular but certainly not limited to attorneys

from the Capital Case Section, have engaged in various forms of professional

misconduct in capital cases. This misconduct includes *Brady* violations,

misrepresentations to the court, and misrepresentations on subpoenas. In addition, the

*New York Times* has reported on Capital Case Section attorneys' workplace sexual

harassment, ranging from preferential treatment of male attorneys, showing naked

photographs of a woman at a work gathering, and groping an administrative assistant

during a work-sanctioned happy hour. *See* Katie Benner, *At the Justice Department's*

*Death Penalty Unit, Accusations of Favoritism Gender Bias and Unwanted Groping*,

New York Times (Mar. 13, 2018), https://www.nytimes.com/2018

/03/31/us/politics/justice-department-harassment-bias.html.

### A. *Brady* violations and misrepresentations to the court about *Brady* violations

There have been *Brady* violations and misrepresentations about *Brady* violations

by Department of Justice prosecutors. James Peterson was actually reprimanded by the

3

Virginia State Bar for a *Brady* violation committed before he became a federal prosecutor.

On March 12, 2014, James Peterson, then a prosecutor in Virginia, was reprimanded by the Virginia State Bar for withholding evidence. It was a "private reprimand" that "is not a matter of public record." But a copy of the private reprimand was sent to Antonio Navarro-Covert, the defendant in the case in which Mr. Peterson committed the *Brady* violation. Anjaulyeke Covert-Bryant explains that she and her family "filed a bar complaint with the Virginia State Bar against James Dennis Peterson for his actions arising from the prosecution of [her] grandson, Antonio C. Navarro-Covert." Ex. 1 (Bryant dec.).[3] Mr. Navarro-Covert "was convicted by a jury and sentenced to more than 6 years for an alleged assault." *Id.* "The victim of the assault, Nick Goss, did not testify at trial." *Id.* The family spoke to the victim, who said that, before trial, "he had described the assailant to law enforcement as a dark skinned black male." *Id.* Mr. Navarro-Covert "is a light skinned white and Hispanic male." *Id.* After the evidence Mr. Peterson withheld came to light, Mr. Navarro-Covert's conviction was set aside. *Id.*

Discussing Mr. Peterson's *Brady* violation, the Stafford County Circuit Court judge said, "The Commonwealth's position in this case seems to be, well, maybe he didn't assault Goss, but he assaulted somebody, and other people assaulted somebody anyway, so it really doesn't make any difference, he is guilty. And I just don't think that's true in this case." Ex. 2 (5/2/12 Stafford Cty. Tr.). Indeed, in seeking to uphold the

---

[3] This declaration and a letter about the reprimand were later made part of the record in *United States v. Ham*, discussed below.

conviction, Mr. Peterson argued that unless the defense specifically identified and requested contradictory eyewitness statements, he was not obligated to turn them over, and, in any event, if the defendant was not guilty of the charged offense, he must be guilty of something. Ex. 3 (Sanctions Motion, *United States v. Ham*). This is not the law.

In 2015, Mr. Peterson, at that point an attorney in the Department of Justice's Capital Case Section, began working on the prosecution of James Wayne Ham in the Southern District of Texas. The government was seeking the death penalty against Mr. Ham. According to a filing by Mr. Ham's attorneys, although the court instructed Mr. Peterson to disclose any ethics violations, he did not disclose the Virginia reprimand. Ham Dkt. No. 183. Mr. Peterson's supervisor at the Capital Case Section, Richard Burns, has admitted that he knew about the reprimand but he also did not disclose it to the court. *Id.* Counsel for Mr. Ham learned of the reprimand family and notified the judge presiding over Mr. Ham's prosecution. *Id.*

Mr. Ham's attorneys filed for sanctions against Mr. Peterson on March 5, 2020. Ham Dkt. No. 171 (also attached as Ex. 3). Fourteen days later, on March 19, 2020, Mr. Peterson sent a letter to the court stating that he was no longer counsel in the case "[d]ue to Department of Justice staffing issues." Ham. Dkt. No. 182.[4] Later, the government withdrew its Notice of Intent to Seek the Death Penalty and Mr. Ham plead guilty and received a life sentence. Ham Dkt. Nos. 205, 208. Issues surrounding Mr.

---

[4] Removing CCS lawyers from cases when they come under fire for ethical lapses is a common strategy at CCS and a review of the docket in this case bears this out. This is in spite of former Director Carwile's sworn testimony that he was loathe to replace CCS lawyers once they entered an appearance in a particular capital case.

Peterson's withholding of evidence in a prior case and prosecutors' potential withholding of evidence in Mr. Ham's case were not addressed further in publicly available filings.

**B. Improper deceptive subpoenas**

In 2016, the government initiated its prosecution of Carlo Wilson in the Eastern District of Michigan. The government was seeking the death penalty against Mr. Wilson. In July 2020, the court determined that Department of Justice attorneys prosecuting Mr. Wilson issued an improper subpoena to the Huron County Jail for records pertaining to Mr. Wilson's detention. Wilson Dkt. Nos. 1298, 1509. The Eastern District of Michigan's Local Rules direct that a party seeking a subpoena under Federal Rule of Criminal Procedure 17(c) must seek prior approval from the court and that the subpoena must state that the requested items be sent to the court, not the party. In contravention of this rule, the government sent a subpoena for Mr. Wilson's records without the court's approval and the subpoena directed that the materials go directly to the government, not the court. The court determined that, even if the subpoena did not violate Federal Rule of Criminal Procedure 17, it unquestionably violated Local Rule 17.1. The government also issued three other improper subpoenas. Wilson Dkt. No. 1509. Mr. Peterson was working on the prosecution of Mr. Wilson. Although Mr. Peterson was apparently not the attorney who issued the improper subpoena to the Huron County Jail, he was aware of the subpoena. Wilson Dkt. No. 1517.

Before the court made its ultimate decision about what sanctions would be appropriate, the government withdrew its notice of intent to seek the death penalty in that case.

## C. Sexual misconduct

In addition to the *Brady* violations and other deceptive conduct, attorneys in the Capital Case Section have also been accused of sexual misconduct. According to reporting by the *New York Times*, the Section's former Chief, "promoted gender bias and a 'sexualized environment'" and "fostered a culture of favoritism and sexism." Katie Benner, *At the Justice Department's Death Penalty Unit, Accusations of Favoritism Gender Bias and Unwanted Groping*, New York Times (Mar. 13, 2018), https://www.nytimes.com/2018/03/31/us/politics/justice-department-harassment-bias.html. "In one episode, his deputy groped an administrative assistant at a bar in view of their colleagues, according to some who were present. [The Chief] Mr. Carwile asked the witnesses to keep it secret, one said." *Id.* "Employees of the unit, the capital case section, complained about the issues to Justice Department officials, the inspector general and the Equal Employment Opportunity Commission at least 12 times." *Id.* However, "[b]oth Mr. Carwile and his deputy, Gwynn Kinsey, remained Justice Department employees despite the inquiries." Indeed, according to the New York Times' reporting, Mr. Carwile was not removed from his post until the New York Times inquired about the grievances.

In July 2018, the Office of the Inspector General released its Investigative Summary, attached as Exhibit 4, which found that Kinsey had sexually harassed a subordinate employee by making unwanted sexual advances and creating an "intimidating, hostile, and offensive working environment." It concluded Carwile gave a "non-specific" instruction not to discuss the above matters. The OIG also concluded Carwile "lacked candor with the OIG", an apparent reference to his not being truthful.

7

All of this was in violation of DOJ regulations and policy. In spite of this, the OIG protected the anonymity of Kinsey and Carwile by referring to them as Supervisory Attorneys 1 and 2. It should be noted the OIG is a division of the DOJ, the entity they were investigating.

The complaints of sexual misconduct are relevant to this Court's decision about whether to unseal the depositions in this case for three reasons. First, prosecutors exercise an enormous amount of discretion and have ample opportunities to commit misconduct. Thus, whether a prosecutor acts with integrity greatly impacts whether justice is carried out. Sexual misconduct, including groping a coworker, reveals a lack of integrity. This indicates that discussions of case-related misconduct should be open to public scrutiny, so the public can assess whether prosecutors carried out their case-related duties with a similar lack of integrity. Second, a "culture of favoritism" and bias is a culture where some prosecutors may get away with repeated misconduct, if they are favored by supervisors. Mr. Carwile's handling of sexual misconduct reveals as much. His response to his deputy groping a co-worker was, according to the *New York Times*, to ask everyone who witnessed the incident not to say anything. The public should have the chance to scrutinize case-related misconduct that occurred in the context of this "culture of favoritism." Third, the *New York Times* notes that Mr. Carwile kept his leadership position until the paper inquired about employees' grievances. This reveals that public scrutiny was the only reason misconduct within the Capital Case Section was meaningfully addressed. The public should have the opportunity to scrutinize the case-related misconduct that occurred in an environment apparently devoid of accountability.

**D. Disregarding the rule of law and rushing executions**

The Department of Justice's rush to execute thirteen individuals in 2020 and 2021 also provides important context for why the public must be able to scrutinize the actions of federal prosecutors seeking the death penalty. There is significant public concern about how the executions were carried out, with many people voicing concern that the rule of law, due process, justice, and public health were all cast aside in the rush to kill thirteen people. As Justice Sotomayor explained the unseemly judicial rush to kill:

> Rather than permit an orderly resolution of these suits [challenging death sentences], the Government consistently refused to postpone executions and sought emergency relief to proceed before courts had meaningful opportunities to determine if the executions were legal.
>
> Throughout this expedited spree of executions, this Court has consistently rejected inmates' credible claims for relief. The Court has even intervened to lift stays of execution that lower courts put in place, thereby ensuring those prisoners' challenges would never receive a meaningful airing. The Court made these weighty decisions in response to emergency applications, with little opportunity for proper briefing and consideration, often in just a few short days or even hours. Very few of these decisions offered any public explanation for their rationale.
>
> This is not justice.

*United States v. Higgs*, 141 S. Ct. 645, 647 (2021) (Sotormayor, J., dissenting from the grant of certiorari and the order vacating the lower court's stay of execution).

"Secrecy was a hallmark of the 13 federal executions during the last six months of Trump's presidency." Michael Tarm, *Fuller picture emerges of the 13 federal executions at the end of Trump's presidency*, Associated Press (Oct. 3, 2023), https://apnews.com/article/trump-executions-biden-death-penalty-brandon-bernard-

9

c1b26807c5c40b337d14485c3d6df2de. As more details about the executions have come out, an ever more disturbing picture has developed.

"In its hurry to use its final days in power to execute federal prisoners, the administration of President Donald Trump has trampled over an array of barriers, both legal and practical, according to court records that have not been previously reported." Isaac Arnsdorf, *Inside Trump and Barr's Last-Minute Killing Spree*, ProPublica (Dec. 23, 2020), https://www.propublica.org/article/inside-trump-and-barrs-last-minute-killing-spree. "The fuller picture reveals that officials cut corners and relied on a pliant Supreme Court to get the executions done, even when some — including Trump himself, in [Brandon] Bernard's case — agreed that there might be valid reasons not to proceed with them all." Michael Tarm, *Fuller picture emerges of the 13 federal executions at the end of Trump's presidency*, Associated Press (Oct. 3, 2023), https://apnews.com/article/trump-executions-biden-death-penalty-brandon-bernard-c1b26807c5c40b337d14485c3d6df2de.

In addition to cutting corners and trampling over legal barriers, the Justice Department also chose to carry out the executions despite the COVID-19 pandemic, at a time when the virus was spreading rapidly. The Caligula-like atmosphere existing at CCS described above apparently extended to the BOP's executions in Terre Haute. The executions themselves became superspreader events when BOP staff caught COVID-19 in a Terre Haute strip club, where they gathered to celebrate after carrying out three executions in a single week.[5] Health officials traced prison worker COVID-19 cases

---

[5] WFIU, *Rush to Kill* (podcast), Episode 1: The Gold Standard, https://indianapublicmedia.org/news/episode-1-the-gold-standard.php; Michael Tarm, Michael Balsamo & Michael R. Sisak, Federal executions likely a COVID superspreader, Associated Press (Feb. 5, 2021),

back to a topless dancer in Terre Haute. "As a result of lapses like this one the Federal Correctional Complex in Terre Haute became the epicenter of the corona pandemic in the federal system."[6]

Concerns raised by the Justice Department's killing spree remain relevant because under the current Administration, questions persist about how the government decides who it wants to kill. David Nakamura, *Justice Department Standards on Federal Death Penalty Called Confusing*, Wash. Post (Feb. 11, 2023), https://www.washingtonpost.com/national-security/2023/02/11/death-penalty-justice-department/. In addition, many of the lawyers involved in facilitating the executions are still with the Justice Department. Continued scrutiny of their actions is warranted.

This is the backdrop against which undersigned counsel asks this Court to take the simple step of unsealing depositions—depositions that were sealed in the first place because of undersigned counsel's own request.

**III. This Court has the authority to unseal the depositions taken in this case and should exercise that authority to expose the government's actions to public scrutiny.**

This Court has the authority to unseal the depositions taken in this case. "It is beyond dispute that most documents filed in court are presumptively open to the public." *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009). This includes discovery materials filed with the court. *Id.* at 1075; *see also, e.g.*, *Jessup v. Luther*, 277 F.3d 993, 997 (7th Cir. 2002). The Court must find good cause to maintain documents under seal, and here there is not good cause to keep these depositions under seal. To the contrary, there is

---

https://apnews.com/article/public-health-prisons-health-coronavirus-pandemic-executions-956da680790108d8b7e2d8f1567f3803.

[6] *Rush to Kill* (podcast), Episode 1.

11

every reason to allow public access to these documents because they address misconduct by government attorneys in death penalty cases. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945-46 (7th Cir. 1999).

Therefore, undersigned counsel respectfully requests that this Court unseal the depositions taken in *United States v. Rogers* and joins Mr. Hall's motion to unseal.

Respectfully submitted,

/s/ Monica Foster
Monica Foster
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN   46204
Phone: 317-383-3520
Monica_Foster@fd.org

Dated:  December 13, 2023

12

**CERTIFICATE OF SERVICE**

I certify that on December 13, 2023, a copy of the foregoing document was filed electronically in *United States v. Rogers*, 2:16-cr-0018-WTL, and *In re Hall*, 2:23-mc-00001-JPH-MG. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Monica Foster</u>
Monica Foster

13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| VS. | § § | CRIMINAL NO. 4:13-cr-00363 |
| JAMES WAYNE HAM | § § | |

**DECLARATION OF ANJAULYEKE COVERT BRYANT**

I, Anjaulyeke Covert Bryant, having been first duly sworn to under pain and penalty of perjury, do state the following:

1. I am over the age of eighteen years old.

2. I and my family filed a bar complaint with the Virginia State Bar against James Dennis Peterson for his actions arising from the prosecution of my grandson, Antonio C. Navarro-Covert.

3. In that bar proceeding, we alleged that James Dennis Peterson failed to produce Brady evidence in the trial of our grandson, Antonio C. Navarro-Covert.

4. Our grandson was convicted by a jury and sentenced to more than 6 years for an alleged assault. The victim of the assault, Nick Goss, did not testify at trial. Ultimately, we found the victim of the crime, and he said that he had described the assailant to law enforcement as a dark skinned black male. Mr. Goss gave law enforcement this description before the trial. Our grandson is a light skinned white and Hispanic male.

5. When we learned of this statement, we hired an attorney. The attorney filed a motion alleging that James Dennis Peterson did not produce this exculpatory Brady evidence before or during the trial. Our grandson's conviction was set aside.

6. We presented this information to the Virginia State Bar.

7. We received notice from the Virginia State Bar that on March 12, 2014, the Sixth District Subcommittee of the Virginia State Bar made a decision after a year-long investigation.

8. Our understanding is that the Virginia State Bar issued a private reprimand to James Dennis Peterson as a result of his failure to produce the Brady evidence during my grandson's jury trial. The case was called In the Matter of James Dennis Peterson, VSB Docket No. 12-060-091920, regarding Antonio C. Navarro-Covert. The Bar

urged us to maintain the confidentiality of reprimand, and so we did not show the reprimand our give a copy to counsel for James Ham, nor did they ask us to see the contents of the reprimand.

SWORN TO AND SUBSCRIBED BEFORE ME, a notary public in the State of South Carolina, County of Richland, on this the 11th day of February, 2020 by Anjaulyeke Covert Bryant, to certify which, witness my hand and seal of office.

Notary Public in and for the State of South Carolina

ORIGINAL

FILED
BY COUNTY CLERK OF COURT

JUN 1 2 2012
11:59 Am
STAFFORD COUNTY CIRCUIT COURT
STAFFORD, VIRGINIA

VIRGINIA:

IN THE CIRCUIT COURT OF THE COUNTY OF STAFFORD

- - - - - - - - - - - - - - - - - - - - - - - - -

COMMONWEALTH OF VIRGINIA :

vs.                          :    CR11000621-00

ANTONIO NAVARRO-COVERT    :

- - - - - - - - - - - - - - - - - - - - - - - - -

Complete TRANSCRIPT of the motion and other incidents in the above styled case, when heard on May 2, 2012, at 9:04 a.m., before Honorable J. Howe Brown, Judge.

APPEARANCES:

Mr. James D. Peterson, Attorney at Law
1300 Courthouse Road
Stafford, Virginia  22555
Assistant Commonwealth's Attorney

Mr. James J. Ilijevich, Attorney at Law
Ms. Robin N. Krueger, Attorney at Law
Ilijevich & Krueger, Attorneys at Law
510 Princess Anne Street, Suite 101
Fredericksburg, Virginia  22401
Counsel for the Defendant

The Defendant in Person

Reported by:  Beverly J. Mahoney

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone:  (540)898-1527   Fax:  (540)898-6154

THE COURT: The burden is on the Commonwealth to produce Brady evidence, it's not up to defense counsel to know about statements and ask for them, and then cause the Commonwealth to go looking for statements and give them. It's up to the Commonwealth to know what the statements are and to give them, that's the focus of Brady and the progeny. And defense counsel is entitled to a full arsenal of potentially exculpatory evidence before the trial so that he can develop his trial strategy, and his cross examination, and calling of witnesses based on full knowledge of what the evidence is that has been given to agents of the Commonwealth before the trial.

The Commonwealth's position in this case seems to be, well, maybe he didn't assault Goss, but he assaulted somebody, and other people assaulted somebody anyway, so it really doesn't make any difference, he is guilty. And I just don't think that's true in

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527    Fax: (540)898-6154

this case.

I heard the evidence in the trial, obviously, and I was convinced that this defendant pushed Nick Goss off the wall, and that that started the fight, and I suspect that the jury was convinced of that. Would it have made a difference if they had known that he wasn't the person, or had evidence from which they could find that he wasn't the person, I think that's a reasonable probability that it would have made a difference to them. And certainly the way that Mr. Ilijevich handled the trial would have been different if he had known what Shannon Jackson had said in a statement previously, and what Nick Goss had said previously.

So I don't think you can just -- I mean, I know this mob statute allows you to find people guilty that just happen to be hanging around with their gang, and as Mr.

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527   Fax: (540)898-6154

Ilijevich openly says, maybe it will turn out the same way, but I think there is a reasonable probability that at least some of those charges won't. And I think it was an important part of this trial, the evidence that he pushed Nick Goss off the wall. And there is certainly at least a reasonable probability that that isn't going to be found next time. So I think there is a reasonable probability of a different result if defense counsel had been armed with the full arsenal of statements that he should have been.

Now, let me say this also. This is not a case where some federal judge is going to yell at the prosecutor, and the prosecutor is going to be forced to resign because he was terrible and all of that. I don't find any nefarious motive on the part of the Commonwealth to hide this. And that isn't what Brady is all about. This is just simply a case where defense counsel was deprived of

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527   Fax: (540)898-6154

information that they should have had, that he should have had, in the full preparation of the trial and defending his client. So the verdict is set aside. And we need to set a trial date. And I don't know that -- I mean, do you want to set a trial date now?

MR. PETERSON: I would like to set a trial date now. And I will offer up to the Court Mr. Goss, who is now in the courtroom. I spoke with him briefly I think last week or the week before, and I believe he is being stationed or sent somewhere for the military in a couple of days, and I would just ask, if Mr. Ilijevich wants, to make inquiry of him for his availability, because, obviously, I don't want it to come up later.

THE COURT: You mean his availability for the next couple of days?

MR. PETERSON: I think he is gone for a while.

THE COURT: Well, what I mean

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527   Fax: (540)898-6154

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. H-13-363** |
| | ) | |
| | ) | |
| **JAMES WAYNE HAM** | ) | |

**MOTION FOR SANCTIONS AND OTHER APPROPRIATE RELIEF**
**AGAINST DOJ AND DOJ ATTORNEY JAMES D. PETERSON FOR FAILURE TO**
**SELF-REPORT HIS VIRGINIA STATE BAR REPRIMAND AND JUDICIAL**
**FINDINGS OF *BRADY* VIOLATIONS TO THIS COURT**

In February of 2020, attorney Kimberly C. Stevens was contacted by a witness in Virginia who had seen the Houston Chronicle article covering this Court's June 19, 2019 hearing in this case. Exhibit 10. Because that witness came forward, we have learned: On March 12, 2014, the Virginia State Bar issued a private reprimand against James Dennis Peterson for committing *Brady* violations while prosecuting a criminal case in Stafford, Virginia. Exhibits 1, 2, 3 and 4.

On June 19, 2019, this Court required the Government to produce to the defendant and this Court: "You know, the notes of the discussion about the use of the perjured testimony could have been argued to have been attorney/client privilege except committing a crime is not covered; **and while not all violations of bar rules and ethics are crimes, we need to see those**." Transcript, at 34 (emphasis added). The Court continued: "Well, let's get this, what we've discussed today; and I will do a written order on a couple of those things, but what I said here is binding." Transcript, at 45.

1

On June 24, 2019, this Court further ordered the Government to answer, among other things: "3.  By July 12, 2019, the government must file a statement about whether there are complaints by the Capital Case Section attorney in this case."  Doc. 138, Paragraph 3.  In response, the Government answered:  "The Government contacted Richard Burns, Acting Chief of the Capital Case Section, regarding whether there were any complaints against Capital Case Section Attorney, James Peterson.  According to Richard Burns, other than the complaints made by Amanda Haines, about which this Court is aware, there have been **no complaints** against James Peterson during his tenure with the Department of Justice." Doc. 142 at 1 (emphasis added).[1]   Mr. Peterson failed to properly answer the Court's question.

In Document 131, filed on April 12, 2019, the defense noted that the Court has a Pro Hac Vice form which applies to out-of-state private attorneys seeking to practice in the Southern District of Texas: "Being a government attorney, Mr. Peterson did not fill this out (or if he did, he did not file the form in this case).  The Pro Hac Vice Form asks the following question of private attorneys:  '**has applicant been sanctioned by any bar association or court?**  Yes__ No __.  On a separate sheet for each sanction, please supply the full particulars.'"  Document 131, at 3, fn1 (emphasis added).   That form was filed as Document 131, Exhibit 7.

Mr. Peterson was on notice that the issue of whether he had ever been sanctioned by any bar association or court was a relevant issue in the June 19, 2019 hearing.  Yet, Mr. Peterson sat through the entire hearing and disclosed nothing.  "Peterson, seated with fellow counsel, looked flushed and shook his head.  He never addressed the judge nor did he look up from the table during the scolding."   Exhibit 10 at 3.  Mr. Peterson did not report his Virginia State Bar

---

[1] Similarly, in Document 144, in response to this Court's Order, the Government issued this blanket statement: "There has been no destruction or withholding of Brady information in the case of *United States v. James Wayne Ham*.  Additionally, there has been no discovery failures.  All discovery items, in the possession of the United States have been produced to the Defense."  Document 144, at 5.  This issue will be addressed further below.

reprimand to this Court during the hearing. He could have asked to approach the bench in order to inform the Court of this matter. He could have disclosed the matter in open court. Instead, he said nothing. Mr. Peterson has not corrected the record or reported his reprimand since this Court's Order in July of 2019. Instead, because of the private nature of the reprimand, the defense had to discover the reprimand from external sources. It is notable that since our last hearing, and as of July 12, 2019 when undersigned counsel checked the Texas State Bar website, Mr. Peterson has surrendered his Texas Bar license completely.

When this Court said that all violations of bar rules and ethics should be disclosed, the Court was clear. Mr. Peterson had the opportunity right then to inform the court of his Virginia State Bar reprimand.

Mr. Peterson was reportedly hired by the DOJ in 2012. Exhibit 5. On March 12, 2014, the Sixth District Subcommittee of the Virginia State Bar issued a private reprimand to James Dennis Peterson for his role in the prosecution of Antonio C. Navarro-Covert. Exhibit 1. We understand that the reprimand was for Mr. Peterson's *Brady* violations committed in the trial of that defendant's assault case. Exhibit 3, Paragraph 8. A Circuit Court Judge in the County of Stafford, Virginia, who presided over the original trial, found that Mr. Peterson violated *Brady* by failing to turn over exculpatory witness statements, and granted that defendant a new trial. The judicial findings of the *Brady* violations in that case will be discussed further below. Exhibit 2. The family of the defendant in the Navarro case then filed a Bar grievance, and the Virginia State Bar issued a reprimand during Mr. Peterson's tenure with the DOJ.

Moreover, this Court ordered the Government to give Mr. Ham, by July 22, 2019, "all documents relating to the government's withholding and destruction of Brady information or discovery failures in this case." Document 138, Paragraph 5. In response, the Government

claims that *Brady* has not been violated in this case, nor have there been any discovery failures, and that "[a]ll discovery items, in the possession of the United States have been produced to the defense." Doc. 114 at 5.

As this Court noted previously: "And the point of the Rogers case was not that the facts of that case in terms of the offense are relevant, but that the government process is tainted by character that doesn't change from case to case. The lawyers in Ohio or wherever it was that tried [Senator Ted] Stevens had probably done the same thing in thousands of cases. Just an honest FBI agent in those cases didn't go to the Judge." 6/19/19 Pre-Trial Hearing Transcript at 25. Further: "Donald Rumsfeld said, the problem's not what we know we don't know, it's what we don't know we don't know." *Id*. at 28.

Given Mr. Peterson's failure to disclose his Virginia State Bar reprimand to this Court, his administrative suspension of his Texas Bar license, and his conduct attested to by co-worker Amanda Haines in the *Rogers* case (covered at length in Document 129), the only way to assess the accuracy of the Government's assurances that *Brady* has been complied with is for the defense to be provided with Mr. Peterson's entire file and compare it with those statements.

## I. Mr. Peterson's *Brady* Violation in *Commonwealth of Virginia v. Antonio Navarro-Covert*

In the year preceding his employment with the Department of Justice, while serving as an Assistant Commonwealth's Attorney in Stafford, Virginia, James Dennis Peterson prosecuted a young man named Antonio Navarro-Covert. On November 9, 2011, Mr. Navarro-Covert was convicted by a jury and sentenced to more than six years for an alleged assault on Nick Goss.

Prior to trial, the victim of the crime, Nick Goss, described his assailant to law enforcement as a dark-skinned black male. Navarro-Covert is a light skinned white and Hispanic male. Exhibit 6. Mr. Peterson did not turn that statement over to the defense before trial. Mr.

4

Peterson obtained the conviction without calling victim Goss as a witness.  After trial, Goss signed an affidavit saying Navarro-Covert was not his assailant, and he was sorry that the wrong person had been convicted. Exhibit 6.

Further, Mr. Peterson did not turn over a pre-trial statement by a witness named Shannon Jackson.  Her pre-trial statement indicated that she was outside when the melee occurred, and she did not mention seeing Navarro-Covert assault anybody.  In another document, Jackson reportedly said to another person that Mr. Peterson pressured her into providing false testimony, and to have her testimony "mirror" the others.  Exhibit 7.  Neither did Mr. Peterson turn these documents over to the defense prior to trial.

After filing a motion alleging that Mr. Peterson did not produce exculpatory *Brady* evidence before or during trial, Navarro-Covert's conviction was set aside.  On May 2, 2012, the trial judge granted the motion for new trial, holding:

> The burden is on the Commonwealth to produce *Brady* evidence, it's not up to defense counsel to know about statements and ask for them, and then cause the Commonwealth to go looking for statements and give them.  It's up to the Commonwealth to know what the statements are and to give them, that's the focus of Brady and the progeny.  And defense counsel is entitled to a full arsenal of potentially exculpatory evidence before the trial so that he can develop his trial strategy, and his cross examination, and calling of witnesses based on full knowledge of what the evidence is that has been given to agents of the Commonwealth before the trial.

> The Commonwealth's position in this case seems to be, well, maybe he didn't assault Goss, but he assaulted somebody, and other people assaulted somebody anyway, so it really doesn't make any difference, he is guilty.  And I just don't think that's true in this case.  I heard the evidence in the trial, obviously, and I was convinced this defendant pushed Nick Goss off the wall, and that that started the fight, and I suspect the jury was convinced of that.  Would it have made a difference if they had known that he wasn't the person, or had evidence from which they could find that he wasn't the person, I think that's a reasonable probability that it would have made a difference to them.

5

Exhibit 2 at 3-4 (Transcript pages 41-42). Subsequently, the defendant and his family presented evidence of the *Brady* violation to the Virginia State Bar, and on March 12, 2014, Mr. Peterson was reprimanded. Exhibits 1, 3.

**II. Mr. Peterson's Lack of Disclosure Regarding His Texas and Virginia Bar Licenses and Reprimand**

Mr. Ham filed a Motion for Discovery on March 26, 2019, in which he noted that a search for Mr. Peterson's Texas bar license status showed that he was ineligible to practice law in the State of Texas due to administrative suspension of his license. Doc. 129 at 3. The government responded that he was formerly licensed in Texas, after a period of years abandoned his Texas bar license, and that the printout Mr. Ham cited to reflected "abandonment not discipline." Doc. 130 at 7. Mr. Ham replied that the Texas State Bar informed undersigned counsel that the bar administratively suspends someone's license if they fail to pay their bar dues, and therefore Mr. Peterson did not properly "abandon" his Texas State Bar license. Mr. Ham further explained that the Texas Disciplinary Rules of Professional Conduct note that a lawyer shall not "engage in the practice of law when the lawyer is on inactive status [including] where a lawyer's right to practice has been administratively suspended for failure to timely pay required fees or assessments…" Doc. 149 at 7 n. 2; TX Disciplinary Rule of Professional Conduct 8.04. The government replied that "at all times during these proceedings James Peterson was a licensed attorney in good standing with the Virginia State bar as required." Doc. 157 at 1.

Additionally, in a footnote in Mr. Ham's reply regarding the discovery motion, Mr. Ham referenced this Court's Pro Hac Vice form, noting that, had Mr. Peterson been a private attorney, he would have had to self-report any bar disciplinary infractions. Document 131, at 3, n1, Exhibit 7 thereto. Neither the government nor Mr. Peterson addressed this statement in

6

subsequent pleadings.  In oral argument on June 19, 2019, Mr. Peterson's Texas bar license status was discussed, including the argument made by the government that Mr. Peterson held a valid Virginia license.  And while his license may technically be valid, that does not excuse Mr. Peterson's failure to report the disciplinary sanction imposed by the Virginia State Bar.  This Court, and the Texas State Bar, have the right to depend upon attorneys to accurately self-report out-of-state disciplinary infractions.

Mr. Peterson, who was present in court, remained silent, again failing to notify the Court about the disciplinary action taken by the Virginia State Bar.  Not only did Mr. Peterson remain silent about the reprimand, but in a reply regarding the discovery motion, the government stated that he was "in good standing with the Virginia state bar" "at all times during these proceedings."  Doc. 157 at 1.

The only way that defense counsel – and now this Court – have been made aware of the *Brady* violation for which Mr. Peterson was reprimanded in Virginia was by a third-party coming forward.[2]  Mr. Peterson has been involved with this case since February of 2015.  Doc. 144, at 1.  His narrative, at document 144, is wholly insufficient to describe his activities in this case.  *See* Doc. 149 for the Defendant's Objections to the Government's Narrative Response to Items 1, 2 and 5.   Mr. Peterson neglects to identify exculpatory information that had to have been learned in his prison interviews; he does not inform the Court of his conversations with James Ham's evaluating psychologist, Maureen Reardon.  The only way that we have learned of

---

[2] Note that Texas Rule of Disciplinary Procedure 15.08(5)(c) states "A private reprimand should not be utilized when a Respondent has engaged in misconduct involving the failure of a prosecutor to make timely disclosure to the defense all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigate the offense."  Thus, it appears that, had this reprimand occurred in Texas, it would have been public.  And, Mr. Peterson had an obligation to report his Virginia State Bar disciplinary infraction to the Texas Bar of which he was also a member (albeit a member on administrative suspension). Texas Disciplinary Rule of Professional Conduct 8.03(f).

the suspension of his Texas Bar license, or his Virginia State Bar reprimand, is that the defense discovered them. Similarly, the only way that Mr. Peterson's misconduct in *United States v. Rogers* was discovered was because Amanda Haines was assigned the case after Mr. Peterson had worked on it, and she inherited his file. Doc. 129, Exhibit 1, Haines Declaration, Paragraphs 9-11.

In looking at the timeline of events related to Mr. Peterson's involvement in the *Navarro-Covert* case, the *Rogers* case, and now Mr. Ham's case, they all occurred within relatively quick succession. Mr. Peterson tried the Navarro case in November of 2011; he was hired by the DOJ in 2012 (*see* Exhibit 5); the Virginia State Bar decision was in March 2014 (*see* Exhibit 1); Mr. Peterson was assigned to the *Rogers* case in September 2014; and assigned to Mr. Ham's case in February of 2015 (*see* Doc. 144 at 1). The close proximity of Mr. Ham's case with the Virginia reprimand, and with his work on the *Rogers* case, where there were serious allegations of misconduct, raise reasonable concerns about his conduct during the time frame relevant here, and his conduct during his years of handling Mr. Ham's case. Further, he was faulted in *Rogers* for his conversations with mental health professionals, and a month later he was noted to be dropping off records in Mr. Ham's case for Dr. Maureen Reardon to review. *See* Exhibit 9; 6/19/19 Pretrial Hearing Transcript at 18. Despite this Court's directives, Mr. Peterson has not revealed or described any of his conversations with Dr. Reardon to the defense. It is critical that Mr. Ham have a full understanding of the details of Mr. Peterson's work on Mr. Ham's case through the evidence contained in his file itself.

On June 24, 2019, this Court ordered the government to, among other things, "file a statement about whether there are complaints by the Capital Case Section attorney in this case." Doc. 138. In response, the government stated that, other than the complaints made by Amanda

Haines in the *Rogers*, case, "there have been no complaints against James Peterson during his tenure with the Department of Justice." Doc. 142 at 1. Unless "complaint" can fairly be read *not* to include a Bar reprimand (which it cannot – especially given this Court's directive that all bar rule or ethics violations be provided), the Government's statement is inaccurate.

This Court further ordered the Government to draft a statement as to whether *Brady* has been violated here. The government says *Brady* has not been violated in this case, nor have there been any discovery failures, and that "[a]ll discovery items, in the possession of the United States have been produced to the defense." Doc. 114 at 5. We cannot simply accept Mr. Peterson's word for that – given his apparent lack of understanding of, or disregard for, the requirements of *Brady*. Only by review of the underlying documents – his file – can we learn whether exculpatory information on guilt or penalty exists in that file.

**III.     Discovery Requests regarding Mr. Peterson**

In the government's Response to Court Order Items 1, 2, and 5, when asked to give a narrative of all Mr. Peterson's activity in Mr. Ham's case, the government states that Mr. Peterson "reached out to and arranged to retain" Mr. Ham's evaluating mental health doctor, Dr. Maureen Reardon. Doc. 144 at 2. His narrative, contrary to this Court's directives, says nothing about what was discussed with Dr. Reardon. His narrative also states that he was present "during pre-competency hearing interviews of prison staff." Doc. 144 at 3. Mr. Ham has not had a single infraction for a violent act while in custody. Those interviews, therefore, *must* contain exculpatory information regarding penalty phase; however, Mr. Peterson provided no detail from those interviews.

Defense counsel has also learned that a number of witnesses were brought to Houston and interviewed, or interviewed by the government and/or law enforcement at another location.

In the course of our investigation, we have identified nine witnesses who have told us that they were interviewed at length by the government, yet we have received no statements from the government summarizing those interviews. That is nine witnesses that we know about – we have no idea how many others exist. No information on these interviews has been provided by the government, and defense counsel does not know who was present during those interviews.

Recall that in *Rogers*, DOJ Attorney Amanda Haines swore that Mr. Peterson had:

committed a fundamental error in judgment and a violation of the 'Ogden Memo,' by interviewing over a dozen witnesses without a law enforcement agent or other witness being present. These witnesses were suspected of having information that was potentially harmful to the government's penalty phase case. Mr. Peterson compounded this error by destroying his interview notes, a fact he initially falsely denied, neglecting to memorialize his conversations with the witnesses, and failing to keep records of what documents he showed them to refresh their recollections or lack thereof.

Doc. 129, Exhibit 1, Paragraph 10. Here, the government stated in oral argument that anything that is not work product has been provided to the defense. 6/19/19 Pretrial Hearing Transcript at 24. Defense counsel has not, though, seen any documentation related to these interviews listed above, including who was present, what was said, and whether there is any *Brady* material included in those interviews.

Defense counsel needs Mr. Peterson's complete file to understand the scope of his interviews and his work on this matter. Without it, we cannot test the facts underlying his incomplete narrative and his blanket statement saying no *Brady* violations have occurred here. In Mr. Peterson's Opposition to the Motion to Set Aside Trial in *Navarro-Covert*, he clearly argues for an interpretation of *Brady* that is inaccurate, and that was rejected by the court hearing the motion. There, Mr. Peterson suggested that it was the defense's obligation to request specific statements made by the alleged victim, Nick Goss, or a witness, Shannon Jackson. Mr. Peterson admitted that "[t]he Commonwealth did not provide the defense counsel with Mr. Goss' written

or oral statement to law-enforcement or Shannon Jackson's statement… The defendant never requested to see any Nick Goss statements or other specific witness statements." Exhibit 8 at 2. He further claims that cases dealing with *Brady* don't find materiality when the statements are incomplete and do not exonerate the defendant, but are simply inconsistent with some of the evidence at trial. *Id*. at 4. This is simply not the law, and the Court rejected Mr. Peterson's interpretation when granting a new trial. Exhibit 2 at 3 (Transcript page 41).

Mr. Peterson's misguided interpretation of *Brady* lends all the more support for providing the DOJ's Blue Book to the defense in this case. The defendant has demonstrated his need to review departmental policies as compared with Mr. Peterson's conduct in this Court. Has Mr. Peterson been as cavalier with the application of *Brady* to the evidence in this capital case as he has with his Texas Bar License, his Virginia State Bar reprimand, the local rules of this Court, and his disregard for this Court's orders to produce evidence?

As mentioned above, Mr. Ham has reason to believe there have been witness interviews for which we have seen no reports or notes, and Mr. Peterson himself responded in his narrative that he spoke to Dr. Reardon and prison staff. The responses regarding his role have thus far been incomplete and insufficient, and the defense now requests access to Mr. Peterson's complete file, and the DOJ's Blue Book governing the provision of discovery, as previously briefed in Document 160.

**IV. Sanctions**

It is within this Court's authority to impose sanctions on the Government for violating the Local Rules for the Southern District of Texas and the Texas Disciplinary Rules of Professional Conduct. In this case, when confronted regarding his apparent suspended Texas Bar license, Mr. Peterson – rather than apologize to this Court and correct the situation – represented to this Court

in a filed responsive document that his license was properly surrendered, when it was not. Rule 8.04 of the Texas Disciplinary Rules of Professional Conduct clearly states that a failure to pay dues is a violation of those rules, and there is no exception for "abandonment" of a license. He has now failed to disclose his Virginia State Bar Reprimand to this Court, upon this Court's request that he do so.

Federal courts enjoy the inherent power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–31 (1962)). This power includes the ability to discipline attorneys, punish for contempt, control admission to its bar, and vacate judgments. *Id.* at 43–44. It is well established "that a district court always has jurisdiction to impose sanctions designed to enforce its own rules." *Fleming & Assocs. v. Newby & Tittle*, 529 F.3d 631,637–38 (5ᵗʰ Cir. 2008) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990)).

The Fifth Circuit has explicitly held that there is no requirement to find bad-faith when imposing sanctions pursuant to a local rule of court. *In re Goode*, 821 F.3d 553, 559 (5th Cir. 2016) ("As we conclude that the district court was not required to make a finding of bad faith before sanctioning Goode under [the local rules], we turn to Goode's constitutional challenge"); *see also In re Hermesmeyer*, 688 F. App'x 300, 304 (5th Cir. 2017). Thus, without regard to Mr. Peterson's good or bad faith in allowing his Texas Bar license to be suspended, his conduct in signing pleadings in the United States District Court for the Southern District of Texas while ineligible to practice law in Texas warrants the sanctions sought here, including that the court strike all pleadings signed by James Peterson in this matter, including the superseding indictment, the amended Notice of Intent to Seek the Death Penalty, the second amended Notice of Intent to Seek the Death Penalty, and every pleading which bears his signature. Further, his

12

failure to report his Virginia State Bar reprimand, following an Order that he do so, is grounds for the sanctions sought below.

Finally, the defense has reason to wonder whether Mr. Peterson reported his Virginia State Bar reprimand to the Texas State Bar. He held a license in Texas (though on administrative suspension for failure to pay dues and, on information and belief, on inactive status) at the time of his Virginia State bar reprimand. The Texas State Bar required that Mr. Peterson self-report his Virginia State Bar reprimand. See Texas Disciplinary Rule of Professional Conduct 8.03(f) ("A lawyer who has been disciplined by the attorney-regulatory agency of another jurisdiction must notify the chief disciplinary counsel within 30 days of the date of the order or judgment. The notice must include a copy of the order or judgment"). And, in Texas, when a prosecutor violates *Brady*, the reprimand cannot be confidential. *See* Texas Rule of Disciplinary Procedure 15.08(5)(c) ("A private reprimand should not be utilized when a Respondent has engaged in misconduct involving the failure of a prosecutor to make timely disclosure to the defense all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigate the offense").

## CONCLUSION

Based on the argument presented above, Mr. Ham believes that the following sanctions are warranted, and respectfully requests that this Court:

1. Order the Department of Justice provide to the defense a copy of Mr. Peterson's entire file from this case;

2. Order the Department of Justice to produce Mr. Peterson's personnel file;

3. Order Mr. Peterson to produce to this Court the contents his entire private reprimand from the Virginia State Bar;

13

4. Order Mr. Peterson to answer whether he self-reported his Virginia reprimand to the Texas Bar at any time while serving as counsel for the government in this case;

5. Release the "Blue Book" to defense counsel;

6. Order Mr. Peterson and the Department of Justice to produce copies of his and Amanda Haines' complete depositions in *United States v Rogers*;

7. All items previously requested in Documents 129, 143, 149, and 160; and

8. Any and all such other relief as justice requires.

This being a motion for sanctions, the defense has not conferred with the government with respect to whether they consent to the filing of this motion.

Respectfully submitted, this the 5th day of March, 2020.

*/s/ Kimberly C. Stevens*
Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Public Defender
1070-1 Tunnel Road, STE 10-215
Asheville, NC 28805
(336) 575-4337 – cell
(336) 788-3779 – voicemail
(336) 788-3836 – fax
North Carolina State Bar No. 20156

*/s/ Anthony S. Haughton*
Anthony S. Haughton
Capital Resource Counsel
Assistant Federal Public Defender
C/O SD Federal Public Defender
Lyric Centre
440 Louisiana, Suite 1350
Houston, TX 77004-1669
(832) 287-9548 - cell
(713) 718-4610 - fax
Texas Bar No. 09234150

COUNSEL FOR JAMES WAYNE HAM

CERTIFICATE OF SERVICE

This is to certify that on the 5th day of March, 2020, a copy of the foregoing was served on counsel for the United States by electronic transmission.

/s/ Kimberly C. Stevens
Kimberly C. Stevens
Capital Resource Counsel
Assistant Federal Public Defender
1070-1 Tunnel Road, Suite 10-215
Asheville, NC 28805
(336) 575-4337 – cell
(336) 788-3779 – voicemail
(336) 788-3836 – fax
North Carolina State Bar No. 20156

**EXHIBIT 1**



# Virginia State Bar

SIXTH DISTRICT COMMITTEE

PLEASE REPLY TO:
Barbara Lanier, Clerk
707 East Main Street
Suite 1500
Richmond, VA 23219-2800

March 12, 2014

PERSONAL AND CONFIDENTIAL

Antonio C. Navarro-Covert #20074451
1301 Dunes Street, Apt. 101
Fredericksburg, VA 22401

Re:   In the Matter of James Dennis Peterson
      VSB Docket No. 12-060-091920

Dear Mr. Navarro-Covert:

Enclosed is a copy of the Subcommittee Determination Private Reprimand by the Sixth District Subcommittee of the Virginia State Bar issued to the Respondent.

A private reprimand is not a matter of public record. Under the Rules of the Virginia Supreme Court, this matter is confidential. I urge you to maintain its confidentiality.

Thank you for your cooperation with the committee.

Very truly yours,

Melanie B. Economou
Chair

KRM:ssd

Enclosure

cc:   Kathryn R. Montgomery, Deputy Bar Counsel

# EXHIBIT 2

# ORIGINAL

FILED
BY COUNTY CLERK OF COURT

JUN 1 2 2012
11:59 Am
STAFFORD COUNTY CIRCUIT COURT
STAFFORD, VIRGINIA

1

VIRGINIA:

IN THE CIRCUIT COURT OF THE COUNTY OF STAFFORD

- - - - - - - - - - - - - - - - - - - -

COMMONWEALTH OF VIRGINIA :

vs. : CR11000621-00

ANTONIO NAVARRO-COVERT :

- - - - - - - - - - - - - - - - - - - -

Complete TRANSCRIPT of the motion and other incidents in the above styled case, when heard on May 2, 2012, at 9:04 a.m., before Honorable J. Howe Brown, Judge.

APPEARANCES:

Mr. James D. Peterson, Attorney at Law
1300 Courthouse Road
Stafford, Virginia  22555
Assistant Commonwealth's Attorney

Mr. James J. Ilijevich, Attorney at Law
Ms. Robin N. Krueger, Attorney at Law
Ilijevich & Krueger, Attorneys at Law
510 Princess Anne Street, Suite 101
Fredericksburg, Virginia  22401
Counsel for the Defendant

The Defendant in Person

Reported by:  Beverly J. Mahoney

---

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone:  (540)898-1527   Fax:  (540)898-6154

THE COURT: The burden is on the Commonwealth to produce Brady evidence, it's not up to defense counsel to know about statements and ask for them, and then cause the Commonwealth to go looking for statements and give them. It's up to the Commonwealth to know what the statements are and to give them, that's the focus of Brady and the progeny. And defense counsel is entitled to a full arsenal of potentially exculpatory evidence before the trial so that he can develop his trial strategy, and his cross examination, and calling of witnesses based on full knowledge of what the evidence is that has been given to agents of the Commonwealth before the trial.

The Commonwealth's position in this case seems to be, well, maybe he didn't assault Goss, but he assaulted somebody, and other people assaulted somebody anyway, so it really doesn't make any difference, he is guilty. And I just don't think that's true in

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527 Fax: (540)898-6154

this case.

I heard the evidence in the trial, obviously, and I was convinced that this defendant pushed Nick Goss off the wall, and that that started the fight, and I suspect that the jury was convinced of that.  Would it have made a difference if they had known that he wasn't the person, or had evidence from which they could find that he wasn't the person, I think that's a reasonable probability that it would have made a difference to them.  And certainly the way that Mr. Ilijevich handled the trial would have been different if he had known what Shannon Jackson had said in a statement previously, and what Nick Goss had said previously.

So I don't think you can just -- I mean, I know this mob statute allows you to find people guilty that just happen to be hanging around with their gang, and as Mr.

Ilijevich openly says, maybe it will turn out the same way, but I think there is a reasonable probability that at least some of those charges won't. And I think it was an important part of this trial, the evidence that he pushed Nick Goss off the wall. And there is certainly at least a reasonable probability that that isn't going to be found next time. So I think there is a reasonable probability of a different result if defense counsel had been armed with the full arsenal of statements that he should have been.

Now, let me say this also. This is not a case where some federal judge is going to yell at the prosecutor, and the prosecutor is going to be forced to resign because he was terrible and all of that. I don't find any nefarious motive on the part of the Commonwealth to hide this. And that isn't what Brady is all about. This is just simply a case where defense counsel was deprived of

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527   Fax: (540)898-6154

information that they should have had, that he should have had, in the full preparation of the trial and defending his client. So the verdict is set aside. And we need to set a trial date. And I don't know that -- I mean, do you want to set a trial date now?

MR. PETERSON: I would like to set a trial date now. And I will offer up to the Court Mr. Goss, who is now in the courtroom. I spoke with him briefly I think last week or the week before, and I believe he is being stationed or sent somewhere for the military in a couple of days, and I would just ask, if Mr. Ilijevich wants, to make inquiry of him for his availability, because, obviously, I don't want it to come up later.

THE COURT: You mean his availability for the next couple of days?

MR. PETERSON: I think he is gone for a while.

THE COURT: Well, what I mean

Ex. 96 Page 30 of 152

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:13-cr-00363 |
| | § | |
| JAMES WAYNE HAM | § | |

### DECLARATION OF ANJAULYEKE COVERT BRYANT

I, Anjaulyeke Covert Bryant, having been first duly sworn to under pain and penalty of perjury, do state the following:

1.      I am over the age of eighteen years old.

2.      I and my family filed a bar complaint with the Virginia State Bar against James Dennis Peterson for his actions arising from the prosecution of my grandson, Antonio C. Navarro-Covert.

3.      In that bar proceeding, we alleged that James Dennis Peterson failed to produce Brady evidence in the trial of our grandson, Antonio C. Navarro-Covert.

4.      Our grandson was convicted by a jury and sentenced to more than 6 years for an alleged assault. The victim of the assault, Nick Goss, did not testify at trial. Ultimately, we found the victim of the crime, and he said that he had described the assailant to law enforcement as a dark skinned black male. Mr. Goss gave law enforcement this description before the trial. Our grandson is a light skinned white and Hispanic male.

5.      When we learned of this statement, we hired an attorney. The attorney filed a motion alleging that James Dennis Peterson did not produce this exculpatory Brady evidence before or during the trial. Our grandson's conviction was set aside.

6.      We presented this information to the Virginia State Bar.

7.      We received notice from the Virginia State Bar that on March 12, 2014, the Sixth District Subcommittee of the Virginia State Bar made a decision after a year-long investigation.

8.      Our understanding is that the Virginia State Bar issued a private reprimand to James Dennis Peterson as a result of his failure to produce the Brady evidence during my grandson's jury trial. The case was called In the Matter of James Dennis Peterson, VSB Docket No. 12-060-091920, regarding Antonio C. Navarro-Covert. The Bar

Page 1 of 2

urged us to maintain the confidentiality of reprimand, and so we did not show the reprimand our give a copy to counsel for James Ham, nor did they ask us to see the contents of the reprimand.

SWORN TO AND SUBSCRIBED BEFORE ME, a notary public in the State of South Carolina, County of Richland, on this the 11th day of February, 2020 by Anjaulyeke Covert Bryant, to certify which, witness my hand and seal of office.

Notary Public in and for the State of South Carolina

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:13-cr-00363 |
| | § | |
| JAMES WAYNE HAM | § | |

### AFFIDAVIT OF BRANDI RIDDLE

I, Brandi Riddle, having been first duly sworn, under pain and penalty of perjury, do state the following:

1. I am over the age of eighteen years old.

2. I am an investigator working on the case of *United States v. James Wayne Ham.*

3. On February 11, 2020, I saw a cover letter from the Virginia State Bar addressed to Antonio Navarro-Covert, stating that a private reprimand was issued by the Virginia State Bar against James Dennis Peterson. The cover letter was captioned, In the Matter of James Dennis Peterson, VSB Docket No. 12-060-091920. The letter is dated March 12, 2014. Mr. Navarro-Covert informed me that he was the complainant in the matter.

4. I witnessed that, stapled to the cover letter from the Virginia State Bar, was a multi-page document. The cover letter from the Virginia State Bar stated that the contents of the reprimand were confidential under the rules of the Virginia Supreme Court and the language urged Mr. Navarro-Covert to maintain its confidentiality. Therefore, I did not read the contents of the document attached to the cover letter. The complainant and his family explained to me that the attachment was in fact a reprimand against Mr. Peterson, for Peterson's *Brady* violation in Mr. Navarro-Covert's case.

5. A true and accurate copy of the cover letter was provided to me, Ms. Stevens and Mr. Haughton with the complainant's permission, and is attached to this Affidavit as Exhibit A.

6. On February 12, 2020, I went to the Stafford County Courthouse and copied the following pleadings related to the case of the *Commonwealth of Virginia v. Antonio Navarro-Covert*, In the Circuit Court of the County of Stafford, Case No. CR11-0621-00 *et al.* True and accurate copies of each pleading referenced with an exhibit letter are attached to this Affidavit:

   a. May 2, 2012 Order Vacating Charges and Setting New Trial (Exhibit B);

   b. May 2, 2012 Transcript and Judicial Findings on Defense Motions to Dismiss, wherein the court finds *Brady* violations requiring a new trial; pages 1, 41-44 (Exhibit C);

Page **1** of **2**

c. February 14, 2012 Defense Motion to Set Aside Jury Verdict. This motion included an attached affidavit of victim, Nick Goss. Goss' affidavit states that the suspect he described as assaulting him was a tall, dark skinned, black male with a high-top fade. After viewing a photograph of Antonio Navarro-Covert, Goss stated that Antonio (the defendant who was convicted) did not assault him. (Exhibit D);

d. March 1, 2012 Defense Motion to Reconsider Sentence;

e. March 22, 2012 Defense Motion to Set Aside Verdict for Non-Disclosure of Exculpatory Evidence; and

f. March 30, 2012 Commonwealth's (James D. Peterson's) Opposition to Motion for New Trial.

g. I can provide true and accurate copies of the documents listed at (d), (e), and (f) above upon request, but have not attached them here due to their length.

3/2/2020

Brandi Riddle

SWORN TO AND SUBSCRIBED BEFORE ME, a notary public in the State of South Carolina, County of Richland, on this the 2nd day of March, 2020 by Jennie Crider, to certify which, witness my hand and seal of office.

Notary Public in and for the State of South Carolina

My Commission Expires May 12, 2026

Page 2 of 2

# EXHIBIT A



# Virginia State Bar

SIXTH DISTRICT COMMITTEE

PLEASE REPLY TO:
Barbara Lanier, Clerk
707 East Main Street
Suite 1500
Richmond, VA 23219-2800

March 12, 2014

PERSONAL AND CONFIDENTIAL

Antonio C. Navarro-Covert  #20074451
1301 Dunes Street, Apt. 101
Fredericksburg, VA 22401

Re:   In the Matter of James Dennis Peterson
      VSB Docket No. 12-060-091920

Dear Mr. Navarro-Covert:

Enclosed is a copy of the Subcommittee Determination Private Reprimand by the Sixth District Subcommittee of the Virginia State Bar issued to the Respondent.

A private reprimand is not a matter of public record. Under the Rules of the Virginia Supreme Court, this matter is confidential. I urge you to maintain its confidentiality.

Thank you for your cooperation with the committee.

Very truly yours,

Melanie B. Economou
Chair

KRM:ssd

Enclosure

cc:   Kathryn R. Montgomery, Deputy Bar Counsel

# EXHIBIT B

**VIRGINIA:**

IN THE CIRCUIT COURT FOR THE COUNTY OF STAFFORD,

HELD ON THE 2ND DAY OF MAY, 2012

PRESENT: THE HONORABLE J. HOWE BROWN, JR., JUDGE

| | |
|---|---|
| **COMMONWEALTH OF VIRGINIA** | CASE # CR11000621-00, 03 & 04 |
| | OFFENSE DATE 3-16-11 |
| v. | D.O.B. 10-22-89 |
| | SSN: 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 |

**ANTONIO NAVARRO-COVERT**

### ORDER

**THIS DAY** came the Defendant, Antonio Navarro-Covert, who was led to the bar in the custody of the Sheriff, and who stands convicted of a felony, to-wit: participation in criminal gang activity, in violation of Section 18.2-46.2 of the Code of Virginia, and 2 misdemeanors, to-wit: assault by mob, in violation of Section 18.2-42 of the Code of Virginia and assault & battery, in violation of Section 18.2-57 of the Code of Virginia, and came his attorney, James Ilijevich and the Attorney for the Commonwealth.

Thereupon, the Defendant, by counsel, moved the Court to set aside the jury verdicts and findings of guilt in this case, and having heard the evidence and the argument of counsel, such motion is granted over the objection of the Attorney for the Commonwealth, for reasons as stated to the record.

Whereupon, it is hereby ordered that the findings of guilt in the above stated charges are hereby vacated and this case is set for a new trial with a jury on July 18, 2012 at 10:00 a.m. and July 19, 2012 at 9:00 a.m.

The Defendant was remanded to the custody of the Sheriff.

**ENTERED THIS** 2 **DAY OF MAY 2012**

J. Howe Brown, Jr., Judge Designate

# EXHIBIT C

ORIGINAL

FILED
BY COUNTY CLERK OF COURT

JUN 1 2 2012
11:59 Am
STAFFORD COUNTY CIRCUIT COURT
STAFFORD, VIRGINIA

VIRGINIA:

IN THE CIRCUIT COURT OF THE COUNTY OF STAFFORD

- - - - - - - - - - - - - - - - - - - - - - -

COMMONWEALTH OF VIRGINIA :

vs. : CR11000621-00

ANTONIO NAVARRO-COVERT :

- - - - - - - - - - - - - - - - - - - - - - -

Complete TRANSCRIPT of the motion and other incidents in the above styled case, when heard on May 2, 2012, at 9:04 a.m., before Honorable J. Howe Brown, Judge.

APPEARANCES:

Mr. James D. Peterson, Attorney at Law
1300 Courthouse Road
Stafford, Virginia 22555
Assistant Commonwealth's Attorney

Mr. James J. Ilijevich, Attorney at Law
Ms. Robin N. Krueger, Attorney at Law
Ilijevich & Krueger, Attorneys at Law
510 Princess Anne Street, Suite 101
Fredericksburg, Virginia 22401
Counsel for the Defendant

The Defendant in Person

Reported by: Beverly J. Mahoney

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527  Fax: (540)898-6154

THE COURT: The burden is on the Commonwealth to produce Brady evidence, it's not up to defense counsel to know about statements and ask for them, and then cause the Commonwealth to go looking for statements and give them. It's up to the Commonwealth to know what the statements are and to give them, that's the focus of Brady and the progeny. And defense counsel is entitled to a full arsenal of potentially exculpatory evidence before the trial so that he can develop his trial strategy, and his cross examination, and calling of witnesses based on full knowledge of what the evidence is that has been given to agents of the Commonwealth before the trial.

The Commonwealth's position in this case seems to be, well, maybe he didn't assault Goss, but he assaulted somebody, and other people assaulted somebody anyway, so it really doesn't make any difference, he is guilty. And I just don't think that's true in

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527   Fax: (540)898-6154

this case.

I heard the evidence in the trial, obviously, and I was convinced that this defendant pushed Nick Goss off the wall, and that that started the fight, and I suspect that the jury was convinced of that. Would it have made a difference if they had known that he wasn't the person, or had evidence from which they could find that he wasn't the person, I think that's a reasonable probability that it would have made a difference to them. And certainly the way that Mr. Ilijevich handled the trial would have been different if he had known what Shannon Jackson had said in a statement previously, and what Nick Goss had said previously.

So I don't think you can just -- I mean, I know this mob statute allows you to find people guilty that just happen to be hanging around with their gang, and as Mr.

Ilijevich openly says, maybe it will turn out the same way, but I think there is a reasonable probability that at least some of those charges won't. And I think it was an important part of this trial, the evidence that he pushed Nick Goss off the wall. And there is certainly at least a reasonable probability that that isn't going to be found next time. So I think there is a reasonable probability of a different result if defense counsel had been armed with the full arsenal of statements that he should have been.

Now, let me say this also. This is not a case where some federal judge is going to yell at the prosecutor, and the prosecutor is going to be forced to resign because he was terrible and all of that. I don't find any nefarious motive on the part of the Commonwealth to hide this. And that isn't what Brady is all about. This is just simply a case where defense counsel was deprived of

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527   Fax: (540)898-6154

information that they should have had, that he should have had, in the full preparation of the trial and defending his client. So the verdict is set aside. And we need to set a trial date. And I don't know that -- I mean, do you want to set a trial date now?

MR. PETERSON: I would like to set a trial date now. And I will offer up to the Court Mr. Goss, who is now in the courtroom. I spoke with him briefly I think last week or the week before, and I believe he is being stationed or sent somewhere for the military in a couple of days, and I would just ask, if Mr. Ilijevich wants, to make inquiry of him for his availability, because, obviously, I don't want it to come up later.

THE COURT: You mean his availability for the next couple of days?

MR. PETERSON: I think he is gone for a while.

THE COURT: Well, what I mean

FRANCES K. HALEY & ASSOCIATES, Court Reporters
10687 Spotsylvania Avenue, Fredericksburg, VA 22408
Phone: (540)898-1527 Fax: (540)898-6154

# EXHIBIT D

VIRGINIA:

IN THE CIRCUIT COURT OF THE COUNTY OF STAFFORD

COMMONWEALTH OF VIRGINIA　　　:

Complainant　　:

v.

:CaseNo.CR11-0621-00, ET AL

ANTONIO C. NAVARRO-COVERT　　:

Defendant　　:

## MOTION TO TO SET ASIDE VERDICT

Please take notice that, on February 15, 2012 at 9:00 a.m, the defendant, by counsel, will present a Motion to Set Aside the Verdict of this matter, following a jury trial on November 3, 2011.

As grounds for this motion, defendant states the following:

- This case was heard by a jury on November 3, 2011. At the conclusion of the evidence, the jury found the defendant guilty of gang activity, in violation of Va. Code §18.2-46.2, assault, in violation of Va. Code Ann. §18.2-57(A) and assault by mob, in violation of Va. Code §18.2-42. The jury recommended a sentence and the matter is awaiting sentencing.

- The alleged victim of the assault, Nick Goss, has since indicated that he was not assaulted by the defendant. (see attached affidavit) The Commonwealth never offered to the defendant that there was any doubt about the identity of Goss'

2-15 CR3

assailant.

- The Commonwealth's expert witness on gangs, Detective Hopkins, has subsequently testified under oath differently about the 'gang' identified as 'Goon Squad.' (see attached transcript from preliminary hearing of Belinda Yates, dated 1/11/12) This witness' testimony about the existence of a gang was obviously a crucial consideration by the jury when considering its verdict.

- Additionally, the defendant states that the Commonwealth failed to prove its case against him on the charge of assault by mob and gang participation.

The Defendant respectfully requests that this Court set aside the jury's finding of guilt. To find a person guilty of assault by mob, the Commonwealth must prove that he or she was part of of group that formed with the *common* intent to commit an assault and battery. Harrell v. Commonwealth, 11 Va. App. 1, 396 S.E.2d 680 (1990) All of the evidence, both from the commonwealth and from the defendant indicated that the defendant and his friends were at a party engaging others peacefully. A statement of a co-defendant admitted into evidence indicated no prior intent to commit an assault. With regard to the assault, the Commonwealth's evidence only indicates the act of an individual, not a group. Therefore, the jury did not have sufficient evidence to find the defendant guilty of assault by

mob.

This lack of proof is also fatal to the Commonwealth's case regarding the conviction for gang activity. To sustain a conviction under Va. Code §18.2-46.2, gang activity, the Commonwealth must show that the existence of a gang and that a person who knowingly and willfully participates in in any predicate criminal act for the benefit of, at the direction of, or in association with any criminal street gang. Corrado v. Commonwealth, 47 Va. App. 315, 623 S.E.2d 452 (2005) Again, the Commonwealth's evidence failed to show that the actions of the defendant at the party in Stafford County were in any way related to his alleged gang participation.

Similarly, the Commonwealth failed to properly establish the existence of a criminal street gang as required by Va. Code Ann. §18.2-46.1. At trial, Detective Hopkins could not identify any of the elements of a gang, specifically sign, symbol, or creed which he could attach to the 'goon squad'. Additionally, and significantly, at a later hearing, under oath, he testified that 'goon squad' was a group with 'identifiable name, sign and symbol.' This difference in testimony calls into question his opinion that the 'goon squad' was actually a criminal street gang, a necessary element under Va. Code Ann. §18.2-46.1 and §18.2-46.2.

Finally, the Commonwealth prosecuted the defendant for assault and battery of one Nick Goss. Nick Goss has, subsequent

to the trial indicated that he was not asked to identify the defendant by the Commonwealth and now states that the defendant was not the person who assaulted him by pushing him off a wall. Additionally, he says he identified his assailant as tall and dark skinned; the defendant is a light skinned Hispanic male.

The defendant respectfully requests that Court grant the defendant relief by setting aside the verdict reached by this Court at the conclusion of the defendant's trial.

Respectfully Submitted,
ANTONIO NAVARRO-COVERTY
By Counsel

James J. Ilijevich, Esq.
510 Princess Anne Street. Suite 101
Fredericksburg, VA   22401
(540) 310-0045

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of February, 2012, I hand delivered a true copy of the foregoing Notice and Motion to the Commonwealth's Attorney for the County of Stafford, Virginia.

James J. Ilijevich
510 Princess Anne Street, Suite 101
Fredericksburg, VA   22401
(540) 310-0045

## AFFIDAVIT

Commonwealth of Virginia

Nick Goss personally appeared before me in Stafford, VA

Betsy Sonnier this 5th day of October, 2011 who being
　　　　Notary                    February 2012

by me first duly sworn, on her/his oath to the following:

On April 16, 2011 I was at a party in Stafford and saw an individual who I now know as Antonio Curtis Covert' Navarro who was accused of assault and battery on me. Now that I (Nick Goss) have seen a picture of Antonio Curtis Covert' Navarro I swear it is not him that assaulted me. In fact I saw him that night and he wasn't even fighting. The suspect that I described as assaulting me was a tall, dark skinned, black male with a high top fade. I learned of his name by the newspaper and that is why I thought it was him that assaulted me. I was never shown his picture before, until now. I'm sorry that the wrong man has been convicted of a crime he did not commit. This is the picture of Antonio Curtis Covert' Navarro shown to me this day.



Signed _____ Nick Goss
　　　　　　Nick Goss

Address _____

Phone _____

Betsy Sonnier
Notary Public
Commonwealth of Virginia
Commission #: 7226540
My Commission Expires July 31, 2012

Sworn before me, This 5th day of October, 2011. February 2012

Seal _____ my commission expires 7/31/12

# EXHIBIT 5

each contributes to the death.[26]

The government also asked for, and received the following instruction:

> If the defendant's conduct placed Kee Smith in a position of danger, and the defendant failed to safeguard Kee Smith, the defendant's conduct should be regarded as having caused the death of Kee Smith.[27]

The Tenth Circuit affirmed the correctness of both instructions and held that "[w]hen a person puts another in a position of danger, he creates for himself a duty to safeguard or rescue the person from that danger."[28]

# VI. Back to the Vaughn Prison Riot

Revisiting the facts of the Vaughn Prison Riot in the context of aiding and abetting and *Pinkerton* liability shows how flexible and plastic those concepts can be in order to achieve justice for those who participated in the riot that resulted in the murder of Officer Floyd. Those who agreed to participate in the riot share responsibility for Officer Floyd's foreseeable death. Those inmates who agreed to participate in the ruse to lure Officer Floyd to try to break up a fight are responsible for his kidnapping, assault, and murder under a *Pinkerton* liability theory. Likewise, all inmates who practiced and participated in the riot may share *Pinkerton* liability for the kidnappings, assaults, and murder. Concerning the inmates participating in the detention, assault, and intimidation of correction officers Tuxward, Hammond, McCall, and Floyd, all are responsible for the kidnappings, assaults, and murder under a *Pinkerton* liability theory, as well as under aiding and abetting law.

Although the Vaughn Prison Riot is one of the more recent and serious examples of mass violence resulting in death, the state prison riot at Vaughn is not unique to the state system. On May 20th, 2012, as many as 300 inmates were involved in a riot that resulted in the death of one guard and injury to five other correctional officers and three inmates at the Adams County Correctional Center, a federal penal facility operated by a private corporation in Mississippi. In 1987, thousands of inmates rioted and took control of the U.S. Penitentiary in Atlanta, Georgia, for eleven days. Fortunately, no innocent staff or inmate lives were lost. More common, and more relevant to this article, are the many murders and serious assaults that take place each year in federal prison facilities. Aiding and abetting and *Pinkerton* conspiracy liability should be fully explored in order to hold accountable all inmates who participate in these violent crimes.

**ABOUT THE AUTHOR**

> ❏ **James D. Peterson** is a trial attorney in the Capital Case Section, providing litigation and trial assistance and expertise to local U.S. Attorneys' Offices that are prosecuting death penalty cases. Jim has been with the Department of Justice in the Capital Case Section since 2012. Prior to joining CCS, Jim was a state prosecutor in Virginia for over eighteen years. During that time, he tried more than 130 jury trials, including multiple capital murder cases. Jim is a past recipient of the Warren Von Schuch Award for outstanding Virginia prosecutor. He has lectured throughout the country on subjects relating to computer crimes, the insanity defense, and capital case litigation, as well as mental health issues in criminal trials.

---

[26] *Id.* at 1406.
[27] *Id.*
[28] *Id.*

**EXHIBIT 6**

12:05:24 p.m.     05-20-2012     02/03

400564031

STAFFORD COUNTY SHERIFF'S OFFICE

Upon arrival, we observed a vehicle with four males sitting in the vehicle. ne of the occupants had an obvious abrasion to his left eye and a long scratch pproximately 5 inches across his throat. He was identified as Nicholas Goss. asked him to describe the incident.

oss stated he was outside the house in the garage area with his friends when wo "black dudes" got into a verbal argument with someone and he observed one f the "black dudes" kick a smaller teenager off a ledge in the driveway. He :ated at that point, we went over to help the teenager when one of the boys illed out a gun and "started waving it" in his face then "shot in the air". : stated his friend Carey attempted to jump in between the gunman and Goss. oss stated he and his friends went to leave but the black males began fighting em. Goss fought with the "guy with the gun" until he pulled it out again and iot "four" times in the air. Goss provided a written statement.

Date: 4/16/11            Page No.: ____

STATEMENT OF: _____

I was chillin with my friends when there two black dudes came over and kicked this 16 year old off the ledge so I got up to see what happened and one of them pulled out a gun & started waving it in my face then shot in the air. Then Carey jumped in front of me and I try to show him out the way then we turn to leave & they run to get their "boys" so when we walked to leave they tried to start fighting us and & so I fought the guy with the gun untill he pulled it out again and shot 4 more times in the air. His friend from the beginning and him to started to both fight me then everyone started running. I got hit in my left eye & its swolen.

Nicholas (Goss

703-362-1480

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

Nick Goss

.WITNESSED BY: ~~Deter~~
Deputy JC Montgomery
#375 SCSO 4/16/11

## AFFIDAVIT

Commonwealth of Virginia

Nick Goss personally appeared before me in Stafford, VA

Betsy Sonnier this 5th day of ~~October, 2011~~ February 2012 who being
Notary

by me first duly sworn, on her/his oath to the following:

On April 16, 2011 I was at a party in Stafford and saw an individual who I now know as Antonio Curtis Covert' Navarro who was accused of assault and battery on me. Now that I (Nick Goss) have seen a picture of Antonio Curtis Covert' Navarro I swear it is not him that assaulted me. In fact I saw him that night and he wasn't even fighting. The suspect that I described as assaulting me was a tall, dark skinned, black male with a high top fade. I learned of his name by the newspaper and that is why I thought it was him that assaulted me. I was never shown his picture before, until now. I'm sorry that the wrong man has been convicted of a crime he did not commit. This is the picture of Antonio Curtis Covert' Navarro shown to me this day.



Signed _____ Nick Goss
Nick Goss

Address_____

Phone _____

Betsy Sonnier
Notary Public
Commonwealth of Virginia
Commission #: 7226540
My Commission Expires July 31, 2012

Sworn before me, This 5th day of ~~October, 2011.~~ February 2012

Seal _____ my commission expires 7/31/12

**EXHIBIT 7**

5406584031                                          12:03:12 p.m.   03-20-2012       61 /63

STAFFORD COUNTY SHERIFF'S OFFICE

_____EVIDENCE_____

PROCESSED:        BY:                                    PHOTOS:        PRINTS:

_____ADMINISTRATION_____

OFFICER1: FOUTS, JAMES ROBERT                 #:                   DATE: 04/16/11
OFFICER2:                                     #:
ROUTE    :                        ATT:        DATE:                               DIV:
CLEARANCE / :EXCEPTION:●NOT APPLICABLE
SUPERVISOR : BELTRAN, RENZO ALBERTO            #: 01003
APPROVED BY: HORTON-LARKIN, GAIL              #: 01004
ATTACHMENTS:

_____NARRATIVE_____

I (Deputy Fouts) responded to 35 Brandy Hills Lane to assist with a disturbance
with a weapon.  Upon arrival, numerous other units were already on scene and
had several individuals detained on the driveway and were in the process of
detaining numerous others that were exiting the residence.  I took up a
position at the front o the residence and assisted with handcuffing individuals
that had just come out of the front door.  As the last were being detained by
other units, I pulled one of the females aside and asked what happened.  I
identified that individual as Ms. Shannon Jackson who told me that she was a
guest of the homeowner for an eighteenth birthday party.  She stated that there
was only supposed to be between 50 or 60 people by invitation only, but that
ny more just started showing up.  She says that at one point several
ividuals got into an argument outside of the house.  She did not know what
 argument was about, but said that one of the individuals pulled a gun out
of his front waistband.  Shannon identified the individual with the gun as Tre
Fauntleroy.  She went on to say that Tre then fired several shots into the air
while standing in the driveway near a black SUV.  She said that he then ran
from the house toward the woods.  Shannon said that she then ran inside the
house where she remained until Sheriff's Office personnel arrived and escorted
her out of the house.  Shannon stated that she was able to positively identify
Tre as one of the shooters, and knows him by face.

5406584031                                              12:02:55 p.m.    03-20-2012        60/63

STAFFORD COUNTY SHERIFF'S OFFICE

ind smelled of alcohol.

individuals found on scene were placed on their stomachs in the front yard
n their hands on their heads for officer safety. Being the only female on
icene, I was directed by the on-scene supervisor to pat down all the females
for weapons. During one of my pat-downs, I observed a very young female,
ntoxicated to the point I had to physically hold her up during the pat-down.
I asked the female her age and she replied she was "twelve".

During my pat-downs, I observed a number of deputies interviewing the juveniles
ind completing field interview paperwork. I was approached by Deputy Fouts who
indicated he had a possible witness to the incident. I went over and began
ipeaking to a young female, Ms. Shannon Leigh Jackson (DOB: 05/30/92). I spoke
rith Ms. Jackson at the front of Deputy Fouts patrol vehicle. She provided her
iddress as 827 Campers Lane, Ruther Glen, VA. I asked her to describe the
incident.

ihe stated she was dropped off at the party by her father at around 2330 hours.
She indicated the party was very large, around 90-100 people. I asked her if
ihe knew the suspects involved in the incident. She replied in the affirmative,
stating she used to go to high school with a few of the suspects. She stated
ipecifically Kendrick (Killa) Covert, Antonio (Tone) Navarro-Covert, Geremy (G-
:il) Tillery, Alvin (AJ) Fauntleroy, Termaine (Tre) Fletcher and a boy named
ibdul. She maintained she did not know Abdul's last name however, she believed
ie was of a tall, thin stature, of Pakistani descent and whose parents owned a
.ocal Subway restaurant. Jackson said the boys were known as the "Goon Squad".
Detective Hopkins and I, having been involved in a recent Spotsylvania
iomicide involving Covert and Fauntleroy, were familiar with the suspects.
.kson was able to bring up her Facebook account from cell phone and brought
Covert's Facebook account because they were Facebook "friends". In Covert's
.:ebook profile photo, he was standing next to Alvin Fauntleroy.

I asked her to describe the incident. She stated the boys were already at the
iarty when she had arrived. She was outside and noticed that behind the GMC
.ruck parked in the large driveway, Alvin had pulled out a gun out of his waist
iand and she heard one shot fire into the air. At this point, she ran into the
iouse and about three minutes later, she heard another shot.

is she was running into the house, she observed Kendrick, Antonio, Alvin, and
'remaine run behind the neighbor's house. She did not observe Geremy at this
.ime. Jackson was asked to write a witness statement and was released.

ifter concluding the interview with Jackson, another female named Maryland
:odriguez came forward and stated she believed a boy who attended Mountain View
iigh School named Carey Hart was involved however she could provide little
idditional.

broadcasted the BOL for Carey Hart at which point Deputy Johnson advised

PAGE 31

## STAFFORD COUNTY SHERIFF'S OFFICE

Mr. Fletcher advised the DVD was supposedly a video tape recording of Shannon Jackson confessing to perjury at the May 25th preliminary hearing for Alvin Fauntleroy, Kendrick Covert and Antonio Navarro-Covert. He stated he had spoken to Sherri Navarro this morning and that she was attempting to "lift" the video off the phone which it was recorded on to a DVD. Mr. Fletcher claimed he never physically viewed the video but Sherri informed him what was on the DVD. Shannon was on the video saying the prosecutor (Jim Peterson) instructed her exactly what to say and that I specifically state "Don't forget about the marijuana", alluding to black mailing her for her testimony. On the video, allegedly both Shannon and Sherri are present.

I asked Mr. Fletcher when he became aware of this video and he stated he was informed of the DVD two weeks ago and had spoke with Sherri multiple times regarding the cases. I asked her if he spoke to Sherri prior to the court cases and he said no. Sherri also advised Mr. Fletcher that someone tried to abduct her son; that the DJ at the party fired the first gun shots; and that Spotsylvania Sheriff's Office and Fredericksburg Police Department had been "harassing" her and her family.

Mr. Fletcher maintained Sherri had not made any threats toward him. She told him this morning she was going to bring the DVD for Termaine's defense.

An attempt to obtain the DVD from Sherri was unsuccessful by Commonwealth Attorney Jim Peterson using consent, to which Sherri advised the DVD was "in my car". Commonwealth Attorney Eric Olsen and I began to draft a search warrant for Sherri's vehicle but Sherri's sister Belinda Yates provided consent to search the vehicle in the Courthouse parking lot.

I responded outside to the parking lot where the search of Belinda's Mustang was being conducted by Stafford Deputies Shannon and Hallam. I approached and advised both Sherri and Belinda the purpose of the search was to recover a DVD which Shannon Jackson admits to perjury. Sherri and Belinda maintained the only DVD they had in their possession was a DVD of the Spotsylvania Mall Fight. A search of the vehicle as well as Belinda's purse was negative for the perjury DVD.

I attempted a secondary search of the Mustang to which Sherri and Belinda inquired if they could videotape the search as well as the entire police encounter on their cell phones. I advised them they could videotape anything they wished but they decided against the videotaping. During this incident, I briefly interviewed Sherri and Belinda in the parking lot. Before any questioning, I asked Sherri and Belinda if they wanted their lawyer present however Sherri pulled me aside with Belinda and we spoke. Unlike previous encounters with Sherri, she appeared cooperative and friendly. She reintroduced herself to me and stated she had "nothing against" me and that I was just "doing my job". I told her I understood her passion for her children despite the fact I did not have any of my own.Sherri initially spoke of her

PAGE 40

STAFFORD COUNTY SHERIFF'S OFFICE

family being targeted by the police. She specifically claimed the Spotsylvania Mall Fight video had been purposely doctored to show her children and their friends initiating the fight. She maintained the original video was longer and the first part showed the "other side" starting the fight.

I asked her about Shannon. Sherri stated Shannon had approached her son Johnny "The Peace Maker" Navarro at a party the day immediately following the May 25th preliminary hearing. She advised Johnny refused to speak with Shannon but Shannon stated she had been pressured into providing false testimony by me and Jim Peterson.

Shannon attempted multiple times to contact Sherri via phone. Shannon explained to Sherri that the testimony she provided at the preliminary hearing was false.

Shannon stated while she was "proned out" on the front yard of 35 Brandy Hills Lane with the other party-goers, I announced "Where is Shannon Jackson?" to which I promptly searched her and discovered marijuana on her person. I then threatened to charge her with possession of marijuana if she did not agree to name the Goon Squad suspects I "was after". Shannon also states that CA Jim Peterson pressured her into providing false testimony to have her testimony "mirror" the others.

Sherri stated Shannon has been hiding from me and Shannon has my cell phone number logged in her cell phone under "Cop Bitch" and that she will "never be found". She also admitted to seeing text messages I had sent Shannon and heard voicemails Fredericksburg Detective Hopkins had left requesting an immediate call back. I stressed to Sherri the importance of Shannon being present for court after she is properly subpoenaed or charges would follow. Sherri stated she was willing to "three-way" over the phone with her, me and Shannon.

I thanked Sherri and Belinda for their time and provided my phone number to Sherri if she had any additional questions.

In addition, on 28 May 2011, Sherri had conducted a jail phone call with Antonio claiming there were "new developments in the case", that Sherri was "doing their own investigation", and that "the truth will come out in court".

Follow-up will be conducted on Shannon's whereabouts as well as my initial encounter with Shannon at the 35 Brandy Hills party.

SCM/slc

PAGE 41

# EXHIBIT 8

CR11-621

VIRGINIA:

IN THE CIRCUIT COURT OF STAFFORD COUNTY

COMMONWEALTH OF VIRGINIA

v.

ANTONIO NAVARRO-COVERT

OPPOSITION TO MOTION FOR NEW TRIAL

COMES NOW the Attorney for the Commonwealth and hereby files its memorandum of points and authorities in opposition to the motion for a new trial, and in opposition thereto, says the following:

1. Antonio Navarro-Covert ("defendant") was tried by a jury on November 2 and 3, 2011 and was found guilty of assault and battery, assault by mob and participating in a criminal street gang. The Grand jury of Stafford County returned indictments for the assault and battery and A&B by mob of the following listed victims "*Mr. Adams, Mr. Goss and others*." See Exhibit A.   One co-defendant, AJ Fauntleroy, pled guilty to the Stafford gang charges. Another co-defendant (and the defendant's cousin) Kendrick Covert, was tried by a jury on March 13, 2012. He was also convicted of assault and battery, A&B by mob and participating in a criminal street gang. The charges, and convictions, stem from a melee that occurred at a high school party attended by between 100 and 200 people. The uncontradicted evidence established that the defendant, and his co-defendants were all members of the criminal street gang the Goon Squad, that they arrived uninvited together to a high school party, instigated fights together, and that the defendant pushed an individual off of a wall which started the fighting.

2. Nicholas Goss was a subpoenaed witness in both cases. Mr. Goss was

1

unavailable for the defendant's trial because he was at boot camp in another state. He testified at the trial of Kendrick Covert's trial and corroborated most of the facts of the defendant's trial. His testimony from the March 13, 2012 trial as well as Shannon Jackson's testimony is attached to the defendant's motion.

3.      There was a discovery order in this case. Prior to trial, the Commonwealth timely provided defense counsel discovery, the production included all co-defendant statements, criminal history information concerning those Commonwealth witnesses with impeachable records, the fact that charges were nolle prossed against Tremaine Fletcher (although there was no agreement with him), some gang information about Sedrick Brown (although he was never called as a witness), and access to all trial exhibits. The Commonwealth did not provide the defense counsel with Mr. Goss' written or oral statement to law-enforcement or Shannon Jackson's statement. See Exhibit B. The defendant never requested to see any Nick Goss statements or other specific witness statements. In a separate larceny of a gun case involving this defendant scheduled during the same time period, defense counsel asked to see witness statements and they were shown to him.

4.      At trial, the defendant introduced the statement of his co-defendant A.J. Fauntleroy. In that statement offered by the defendant, he states **"We went back to the house and Antonio asked a short, light skinned black male with an afro wearing a red shirt where they could get a beer pong table. An argument broke out when the light skinned black male made a smart comment. Antonio then used his foot and pushed the male off a ledge and a physical altercation ensued."** Exhibit C.

2

5.  At some point, the defendant's mother and his girlfriend (Carley Delbueno) contacted Mr. Goss. Subsequently, on February 5, 2012, the defendant's mother, Sherri Covert, Herb Lux, a man pretending to be a lawyer, and a notary met Mr. Goss at Panera Bread Restaurant and handed him an affidavit to sign that they had prepared. He signed the affidavit, although he later repudiated portions of the affaidavit during the trial of Kendrick Covert. They also videotaped Mr. Goss. The affidavit is attached as Exhibit D.

6.  Shannon Jackson was friends with this defendant and was a reluctant Commonwealth witness who has always consistently identified the defenadnt as being part of the melee. Prior to trial, the defendant's mother, Sherri Covert, made contact with Shannon Jackson on several occasions. Ms. Covert even videotaped Ms. Jackson discussing the events of the evening and provided that to counsel for her son prior to trial. At one point after the preliminary hearing, Ms. Jackson co-habitated with the defendant's brother Johnny Navarro. See Exhibit E. At all times, she was friendly with the defendant and his friends.

7.  The Defendant now seeks to have the Court set aside the verdict and order a new trial for the non-disclosure of Nicholas Goss' statements and the Shannon Jackson statements to law-enforcement.

### THE TESTIMONY/STATEMENTS OF NICHOLAS GOSS ARE NOT MATERIAL UNDER BRADY V. MARYLAND

8.  Any discrepancy between the Goss' statements and Shannon Jackson's trial testimony is not material to the defendant's guilt under *Brady v. Maryland* for

3

several reasons:

1. First, the theory of the Commonwealth's prosecution was that all members of the Goon Squad were responsible for all of the crimes committed that night by members of the Goon Squad. That theory is proven by the concert of action, principal in the second degree and assault by mob jury instructions that were given to the jury as well as by the indictments that list multiple victims, including unidentified persons. See Exhibit A.

2. Second, the defendant's own evidence (the A.J. Fauntleroy statement) showed unquestionably that the defendant himself assaulted a person at the party and started the fighting. See Exhibit C.

3. Third, those cases dealing with *Brady* claims in the context of undisclosed statements don't find materiality when the statements are incomplete and do not exonerate the defendant, but rather are simply inconsistent with some of the evidence adduced at trial.

4. Finally, Shannon Jackson's testimony aside, the totality of the evidence adduced at trial was sufficient to sustain the defendant's conviction.

9. The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Taylor v. Commonwealth*, 41 Va. App. 429, 432, 585 S.E.2d 839, ___ (2003). More specifically, the Supreme Court has held:

Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted unlimitedly in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, ***but whether in its absence he received a fair trial, understood as a trial resulting in a verdict [worthy] of confidence. A "reasonable probability" of a different result is accordingly shown when the***

4

> *government's evidentiary suppression "undermines confidence in the outcome of the trial."*

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995). More specifically, "the standard of materiality required to set aside a criminal conviction on *Brady* grounds varies with the specificity of the defendant's request and the conduct of the prosecutor." *United States v. Buchanan*, 891 F.2d 1436 (10th Cir. 1989); *United States v. McElhiney*, 275 F.3d 928 (10th Cir. 2001). If the defendant makes a request for specific evidence and the prosecutor fails to disclose responsive evidence, then the evidence is material if it might have affected the outcome of trial. *United States v. McElhiney*, 275 F.3d 928 (10th Cir. 2001). If the defendant, however, either makes no request for evidence or simply makes a general request (e.g., asking for "all *Brady* material or "anything exculpatory"), then the evidence is material *only if* it creates "a reasonable doubt that did not otherwise exist." *Id.*

10.    The inculpatory statement of the co-defendant A.J. Fauntleroy introduced by the defendant is alone fatal to his materiality claim. In that statement, offered by the defendant, the co-defendant states:

> We went back to the house and *Antonio asked a short, light skinned black male with an afro wearing a red shirt where they could get a beer pong table. An argument broke out when the light skinned black male made a smart comment. Antonio then used his foot and pushed the male off a ledge and a physical altercation ensued.*

See Exhibit C. That statement, consistent with the Commonwealth's evidence of the defendant's guilt, directly implicates the defendant and proves his criminal culpability. Moreover, that evidence introduced by the defendant is entirely consistent with the Commonwealth's evidence of the defendant's guilt. This evidence was buttressed by

5

testimony of Shannon Jackson which directly implicated the defendant in starting the fight and participating in the gang activity.  Transcript of trial, November 3, 2011, pgs. 5-22.  Tremaine Fletcher, the defendant's friend and criminal associate also directly implicated the defendant in the instigation and participation in the fighting and gang activity.  Transcript of trial, November 2, 2011 pgs. 182-264.  Tremaine Fletcher testified at one point "they were like arguing I guess.  And when I looked over, he like just pushed him off the edge."  Transcript of trial, November 2, 2011 at 200.  He went on to explain that by the people in the dispute he meant "AJ and Tone."  Id.  "Tone" is of course Antonio Navarro-Covert.  Tremaine Fletcher also identified all of the participants on a photo and shows that the defendant was mixed up with all of the other gang members.  See Exhibit F.  Importantly, when the defendant's cousin and co-defendant testified in his own behalf several months later, he also places the defendant in the same place.  See Trial Exhibit, March 13, 2012, attached as Exhibit G.  In fact, the evidence presented by the defendant himself (Fauntleroy statement), Tremaine Fletcher's testimony as well as the gang testimony was sufficient to sustain the defendant's conviction.

### THE GOSS STATEMENTS ARE NOT INCONSISTENT WITH THE DEFENDANT'S GUILT

11.     Perhaps most importantly, the Goss statements to law-enforcement are not inconsistent with the defendant's guilt.  The defendant was charged with, and convicted of, gang participation, assault and battery and assault and battery by mob. The incident that brings the defendant to court was a melee at a party with between 100-200 people

6

present. A melee is defined as "a confused hand to hand fight or struggle among several people." It is important to note that the nature of the crime and the circumstances surrounding its commission inevitably results in a trial and testimony in which numerous witnesses observe portions of an incident from different perspectives. There were inconsistencies within the evidence presented by the Commonwealth as well as the that presented by the defense. For example, the AJ Fauntleroy statement states that "An argument broke out when the *light skinned black male* made a smart comment. Antonio then used his foot and pushed the male off a ledge and a physical altercation ensued." Shannon Jackson testified that Nick Goss was white. That in no way diminishes the probative value of Faultleroy's statement that the defendant engaged in assaultive behavior that started the brawl. It is understandable that there is some discrepancy between the witness accounts. Defense counsel himself argued to the jury that:

> Antoine White said he came out and he described it as a big brawl. Multiple people up and down the driveway fighting, multiple groups, boys, girls fighting, everybody was fighting. When asked did you see who hit who and who did you hit, he couldn't remember who hit him. He couldn't remember, Jesse Adams, when asked who hit you, he couldn't identify who hit him. He doesn't know whether it was my client. He doesn't know whether it was my client's friend. He doesn't know if it was Nick Goss. He didn't know who hit him. **It was that kind of altercation**.

Transcript of Trial, November 3, 2011, pg. 198. The consistent evidence through all of the testimony, including the defendant's own evidence, is that the defendant was present in close proximity with his fellow gang members and that he was participating in the affray. It is also significant, and conclusive the Commonwealth suggests, that Nicholas Goss subsequently testified that the people he was exchanging blows with were AJ Fauntleroy and Kendrick Covert, people standing right next to the defendant and his

7

fellow gang members.  The jury was fully instructed on accessory liability as well as concert of action liability.  Specifically, the were instructed that:

> If there is a concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

Moreover, the law as it relates to mob violence is that any collection of people, assembled for the purpose and with the intention of committing an assault or a battery upon any person or an act of violence, without authority of law, shall be deemed a 'mob.' *Johnson v. Commonwealth*, 58 Va. App. ___ 2091101, ___ S.E.2d ___ (2011).  Every person composing a mob becomes criminally culpable even though the member may not have actively encouraged, aided, or countenanced the act.  **In other words, the statute imposes individual liability based on collective act and intent**. *Johnson v. Commonwealth*, 58 Va. App. ___ 2091101, ___ S.E.2d ___ (2011).

12.     It is also significant that both Shannon Jackson and AJ Fauntleroy knew the defendants and the Goon Squad members.  Both Shannon Jackson and AJ Fauntleroy identified the defendant, a man who was a friend and fellow gang member, respectively, as the person who pushed someone off the ledge.  They were both at a vantage point to see the events unfold when the defendant pushed the individual off of the wall and the fighting started.  Nicholas Goss did not know any of the gang members and was confronted with the situation he neither expected nor anticipated.  Nicholas Goss identifies both AJ Fauntleroy and Kendrick Covert as the individuals he was fighting with for the first time at trial one year after the incident.  Transcript of trial, March 13, 2012

8

163. The Commonwealth never argued that this defendant was exchanging blows with Nicholas Goss. All of the testimony proved that the defendant was in close proximity to his fellow Goon Squad members when the fighting took place. Tremaine Fletcher, AJ Fauntleroy, Shannon Jackson, Kendrick Covert, and even the defendant's girlfriend Carley Delbueno place the defendant in close proximity to the fighting. The fact that Nicholas Goss does not see the defendant push an individual does not negate his guilt at all. Rather, the Goss statement is simply a reflection of the realities of the crime: a chaotic incident in which multiple individuals (AJ Fauntleroy, Kendrick Covert, Antonio Navarro Covert, Tremeaine Fletcher and others) created a melee and were fighting with multiple individuals (Nicholas Goss, Antoine White, Jesse Adams and others).

13. The Goss statement appears somewhat inconsistent with aspects of Shannon Jackson's testimony and the written statement of A.J. Fauntleroy offered by the defendant himself. The Goss statement is not, however, inconsistent with the defendant's guilt. Defendant now also claims the Shannon Jackson initial statement is exculpatory. The Commonwealth contends that there is nothing exculpatory about the statement. She was simply responding to questions about the shooting and was not asked anything about a pushing incident at a wall. In fact, it was Shannon Jackson who identified the defendant as being involved in the altercation and that was in the initial statement. When cross examined by defense counsel in the Kendrick Covert trial, Ms. Jackson testified "They just asked me a picture of who had the gun and that was AJ." Transcript of trial, March 13, 2012, pg. 249. Considering the totality of the evidence, there is ample evidence of the defendant's guilt and the Goss and Jackson statements do not change that analysis.

9

## THE GOSS AFFIDAVIT IS TAINTED AND NOT MATERIAL

14.     The Goss affidavit is tainted and is not material under *Brady v. Maryland*. Simply put, the history behind the procurement of the affidavit is bizarre. The history behind the defendant's mother and Herb Lux's involvement in this case is also bizarre and disturbing. In short, Sherri Covert, Carly Delbueno and Herb Lux set out to author a document with the purpose of not finding the truth, but, rather to create an appealable issue. Herb Lux is not an attorney, but holds himself out as an attorney. He is a multiple convicted felon who has entered his appearance as an attorney in all of the Goon Squad cases (five cases) and has filed pleadings on behalf of his "clients." See Exhibit H. He has pending criminal charges in Spotsylvania for intimidating a jury forewoman in his son's criminal case as well as in Stafford County for practicing law without a license and obstruction of justice. See Exhibit I. He has civilly sued Deputy Commonwealth's attorney Jim Peterson, Commonwealth's Attorney William Neely from Spotsylvania, former Commonwealth's Attorney Daniel M. Chichester, the entire Spotsylvania County Board of Supervisors, the entire Stafford Board of Supervisors, the victim in his pending Spotsylvania case who is also the jury forewoman of his son's case, that woman's attorney who represents her, Circuit Court Judge D.W. Murphy and others. See Exhibit I. Sherri Covert has been equally prolific when advocating on behalf of her son. She has shown up at the scene of a traffic stop involving her son and nephew and attempted to intimidate police, shown up a crime scenes involving the shooting of a young child to tell witnesses not to cooperate with law-enforcement, shown up at the work place of a victim of malicious wounding to encourage her not to testify, tape recorded Shannon Jackson

10

allegedly confessing to perjury at the preliminary hearing of her son in this case, as well as other instances of misconduct. See Exhibit J. Moreover, in Court under oath Mr. Goss repudiated portions of his affidavit.

## VIRGINIA COURTS HAVE ADDRESSED THESE ISSUES

15. Several Virginia courts have addressed similar issues and have uniformly held that (1) the statements at issue were not exculpatory under a *Brady* analysis and/or (2) were not material under a *Brady* analysis.

16. First, in *Lovitt v. Warden,* 266 Va. 216, 216, 585 S.E.2d 801, ___ (2003), the Supreme Court of Virginia held that neither the failure of the prosecution to disclose allegedly exculpatory information to defense counsel before trial, nor destruction of evidence after the trial, provided any valid basis for habeas corpus. In that case, the defendant's counsel procured an affidavit impeaching a main witnesses trial testimony. At the habeas hearing, the court considered an affidavit handwritten by the defendant's habeas counsel and signed by a material witness after the trial. The affidavit, which was prepared after the defendant's trial, contained several statements that conflicted with his trial testimony. For example, in the affidavit, Lucas stated that he initially informed the prosecutors that Lovitt had stated he used a gun to shoot Dicks, that Lovitt had discarded the weapon in a drain, and that Warren Grant had driven Lovitt from the pool hall to Grant's house. These statements contradicted the witnesses trial testimony that Lovitt stated he used a knife or other object to stab Dicks, and that he discarded the weapon while walking from the pool hall to Grant's house. *Lovitt v. Warden,* 266 Va. 216, 236,

11

585 S.E.2d 801, ___ (2003).

17.    At the hearing in the *Lovitt v. Warden* case, the witness largely repudiated the affidavit. The witness testified that the inconsistent statements contained in the affidavit were not accurate and that his testimony during Lovitt's trial was truthful. He stated that on the day he signed the affidavit, he was "confused" after answering "three hours' worth of questions" posed by Lovitt's habeas counsel. Lucas also stated that he did not feel "too good" that day because he had undergone a tooth extraction and was waiting to receive some medication.  Lucas further testified that he did not thoroughly read the affidavit, but merely "glimpsed through it" and "glanced over it," not paying attention to its content. He also testified that he was mistaken when he had stated that he received a sentence reduction in exchange for his cooperation in the Young case. *Lovitt v. Warden*, 266 Va. 216, 237, 585 S.E.2d 801, ___ (2003).  The Court found no *Brady* violation and held:

> This due process analysis requires consideration on an item-by-item basis whether the evidence at issue was exculpatory. *Kyles*, 514 U.S. at 436 n.10; *United States v. Ellis*, 121 F.3d 908, 916 (4th Cir. 1997). However, the determination whether undisclosed exculpatory evidence was material must be made by considering its cumulative effect. *Kyles*, 514 U.S. at 436 n.10; *Monroe v. Angelone*, 323 F.3d 286, 302 (4th Cir. 2003); *Ellis*, 121 F.3d at 916

> \*                        \*                        \*

> The circuit court found that Lucas did not make the inconsistent statements to the police detailed in the affidavit. This factual finding is supported by Lucas' testimony that he did not read the entire affidavit prepared by habeas counsel before signing it, and that he did not agree with its contents. The circuit court's factual finding also is supported by Margaret Eastman's testimony that Lucas' statements before trial were consistent with those Lovitt gave to the police when he was arrested.

12

> Because the circuit court's finding is supported by the evidence, we conclude that Lovitt has not demonstrated that the Commonwealth failed to provide exculpatory evidence regarding statements Lucas made prior to trial.
>
> We conclude our *Brady* inquiry by examining the effect of the one item of exculpatory evidence that the Commonwealth failed to disclose to Lovitt's trial counsel, namely, the fact that Lucas had received a benefit for his cooperation with the police in the Evans case. We conclude that the failure to disclose this evidence did not place Lovitt's trial in a posture that would undermine confidence in the verdict. *See Strickler*, 527 U.S. at 290; *Kyles*, 514 U.S. at 435.

*Lovitt v. Warden*, 266 Va. 216, 247, 585 S.E.2d 801, ___ (2003).

18.     The Court of Appeals also considered a motion for new trial based upon a *Brady* claim in *Taylor v. Commonwealth*, 41 Va. App. 429, 431, 585 S.E.2d 839, ___ (2003). In that case, the defendant argued that the undisclosed investigatory notes of the two detectives who interviewed witnesses at the crime scene contained accounts that were exculpatory and inconsistent with the witnesses' trial testimony. Specifically, the defendant claimed that several of the witnesses' accounts did not mention that the defendant was "out there shooting at the scene of the crime" and that the failure to mention the defendant as one of the shooters was inconsistent with their testimony. In upholding the trial court's denial of the *Brady* claim, the Court held:

> The testimony of Detectives McTernan and Thompson concerning the witnesses' pretrial statements did not identify inconsistent or contradictory statements that could have been used to impeach a particular witness. The investigatory notes, to the effect that "they" were shooting, or that "they" got out of their cars and started shooting, or which specifically identified Nash, but did not specifically mention Taylor by name, are not inconsistent with the witnesses' trial testimony. Moreover, to the extent that the detectives' notes would support a claim that the witnesses identified only Nash and did not mention Taylor, we do not believe that on this record the disclosure would have materially affected the outcome of the case. Therefore, the trial court did not err in concluding that the

13

Commonwealth did not withhold exculpatory evidence from the accused.

*Taylor v. Commonwealth*, 41 Va. App. 429, 434, 585 S.E.2d 839, ___ (2003).

19.     Other cases discussing *Brady* claims in the context of a motion for new trial based upon the non-disclosure of evidence include: *Bly v. Commonwealth*, 55 Va. App. 1, 3, 682 S.E.2d 556, ___ (2009)(motion properly denied where government failed to disclose prior times that confidential informant lied to police about drug sale); *Coley v. Commonwealth*, 55 Va. App. 624, 629-630, 688 S.E.2d 288, ___ (2010)(motion for new trial properly denied despite claim that 1) that police recovered a document from motel bearing the name of someone other than defendant; 2) that the officers testified differently as to the location of the indentation on appellant's face; 3) that witness was aware of defendant's tattoo prior to the encounter, but did not observe the tattoo from a distance of less than 13 feet; 4) that neither officer knew who wrote the police report and that the report did not mention any indentation on the driver's face; and 5) that witness had previously testified that the Explorer struck the police vehicle a second time on 95 south, causing more damage than the first impact); *Hemphill v. Commonwealth*, 09 Vap UNP 1363084 (2009)(motion properly denied where government failed to disclose .00 bac reading where trial court found defendant guilty stating "that witnesses had testified to "a strong odor of alcohol" coming from appellant and that appellant's drinking had played a role in the incident"); *Frontanilla v. Commonwealth*, 38 Va. App. 220, 225, 562 S.E.2d 706, ___ (2002)(motion properly denied despite fact that government did not disclosed that multiple officers present at scene in spite of officer's claim that she was only officer and claim that officers could both dispel the identification of the defendant by testifying

14

officer as well as be used for impeachment of said officer); *Lee v. Commonwealth*, 09 Vap UNP 0211082 (2009)(undisclosed fact that Commonwealth paid witneses rent for two months not material); *Rashad v. Commonwealth*, 00 Vap UNP 1697992 (2000)(failure to disclose witnesses pre-trial inability to identify perpetrator of robbery not material where defendant was guilty under accessory liability theory).

20.   In this case, the evidence and information the defendant relies upon should not be the basis for a new trial because the evidence in no way casts doubt upon the defendant's guilt and because the defendant himself introduced evidence that affirmatively proves the point of which he complains, it being uncontested at trial that the defendant pushed a person off of a wall and instigated the fighting.  Defendant cannot be heard to complain that information or evidence was *Brady* material when the issue at the heart of his complaint was uncontested and agreed upon by both parties.

WHEREFORE, based upon the facts and evidence in the case and applicable law, the Attorney for the Commonwealth respectfully requests that the Court deny the motion to set aside the verdict.

_____
Attorney for the Commonwealth

James D. Peterson
Assistant Commonwealth's Attorney
P.O. Box 66
Stafford, VA 22555
(540) 658-8780

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing opposition was delivered by fax this 30th day of March, 2012 to James Ilijevich, 510 Princess Anne Street, Suite 101, Fredericksburg, VA 22401.

_____
Attorney for the Commonwealth

15

# EXHIBIT 9

From: Khandelwal, Sharad (USATXS)
To: Nelson, Melody (USATXS)
Subject: FW: United States v. James Wayne Ham - SDTX - Competency examination
Date: Tuesday, February 26, 2019 3:15:58 PM

Melody can you scan and bates for production?



SHARAD S. KHANDELWAL, DEPUTY CRIMINAL CHIEF
U.S. Attorney's Office, S.D. Tx, Human Rights & Organized Crime Section
Tel: (713) 567-9345    Cell: (832) 444-7577

From: Peterson, James D (CRM) <James.D.Peterson@usdoj.gov>
Sent: Wednesday, February 20, 2019 3:22 PM
To: Khandelwal, Sharad (USATXS) <SKhandelwal@usa.doj.gov>; Stotts, Jill (USATXS)
<JStotts@usa.doj.gov>; Nelson, Melody (USATXS) <MNelson3@usa.doj.gov>
Subject: FW: United States v. James Wayne Ham - SDTX - Competency examination

Here is a copy of the December 16, 2015 e-mail.

I do not know if it is "discoverable," but do not have any issue with the contents.

Take care,

Jim

From: Peterson, James D
Sent: Wednesday, December 16, 2015 4:35 PM
To: Reardon, Maureen (BOP) (Maureen.Reardon@usdoj.gov) <Maureen.Reardon@usdoj.gov>
Cc: Khandelwal, Sharad (USATXS) <Sharad.Khandelwal@usdoj.gov>; Elmilady, Suzanne (USATXS)
<Suzanne.Elmilady@usdoj.gov>
Subject: United States v. James Wayne Ham - SDTX - Competency examination

Dear Dr. Reardon:

I was told that you have been assigned to handle the James Wayne Ham competency evaluation. Is
that correct?

I was in Butner last week preparing for trial in another case and hand delivered the Ham competency
materials to Dr. Gillespie Wadsworth to give to you.

Did you receive the materials?

Did you receive the defense materials? They have shared their submission materials with us and I

H13-363-A-06747

can forward them to you as well.

On a related note, I feel that it would be helpful to review the non-privileged jail calls by inmate Ham to friends, family members and others.

Do you have access to those materials?

We have not reviewed the calls to date, but can make arrangements to forward them to you if you would like.

Please call me at your earliest convenience to discuss the examination.

Thank you for your time.

Take care,

Jim

James D. Peterson
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F Street N.W.
6th Floor
Washington, D.C. 20530
(202) 353-0796
James.d.peterson@usdoj.gov

H13-363-A-06748

**From:** Khandelwal, Sharad (USATXS)
**To:** Nelson, Melody (USATXS)
**Subject:** FW: United States v. James Wayne Ham - SDTX - Competency examination
**Date:** Tuesday, February 26, 2019 3:16:17 PM

Same with this.

 SHARAD S. KHANDELWAL, DEPUTY CRIMINAL CHIEF
U.S. Attorney's Office, S.D. Tx, Human Rights & Organized Crime Section
Tel: (713) 567-9345    Cell: (832) 444-7577

**From:** Peterson, James D (CRM) <James.D.Peterson@usdoj.gov>
**Sent:** Wednesday, February 20, 2019 3:23 PM
**To:** Khandelwal, Sharad (USATXS) <SKhandelwal@usa.doj.gov>; Stotts, Jill (USATXS) <JStotts@usa.doj.gov>; Nelson, Melody (USATXS) <MNelson3@usa.doj.gov>
**Subject:** FW: United States v. James Wayne Ham - SDTX - Competency examination

**From:** Peterson, James D
**Sent:** Thursday, December 17, 2015 9:33 AM
**To:** Khandelwal, Sharad (USATXS) <Sharad.Khandelwal@usdoj.gov>; Elmilady, Suzanne (USATXS) <Suzanne.Elmilady@usdoj.gov>
**Subject:** FW: United States v. James Wayne Ham - SDTX - Competency examination

FYI

**From:** Maureen Reardon [mailto:mreardon@bop.gov]
**Sent:** Thursday, December 17, 2015 8:18 AM
**To:** Peterson, James D <James.D.Peterson@CRM.USDOJ.GOV>
**Subject:** Re: United States v. James Wayne Ham - SDTX - Competency examination

Dear Mr. Peterson,

Yes, I have been assigned to evaluate Mr. Ham, and will consult with neuropsychologist, Dr. Tracy Pennuto. I did receive a CD-ROM containing many documents but am unsure if this included the "defense materials" you reference. I contacted defense counsel yesterday via e-mail, but if you have ready access to those materials, by all means forward them. I am open to reviewing the non-privileged jail calls as well, and will look into how I may access that from FDC-Houston. Let me know a good time to reach you by telephone. I am in today, tomorrow, and Tuesday/Wednesday next week. I'm also in the 28, 29, and 30th the following week.

Sincerely,

Maureen L. Reardon, PhD, ABPP
Deputy Chief Psychologist

H13-363-A-06749

Federal Medical Center
Old Oxford Highway 75
Butner, NC 27509
(919) 575-3900, ext. 5294

*** NOTE ***
The information contained in this transmission is intended only for the individual or organization named above and may contain confidential or privileged information. If you are not the intended recipient, any dissemination, distribution, or copying of this communication is prohibited. If you received this information in error, please notify the sender immediately.

>>> "Peterson, James D" <James.D.Peterson@usdoj.gov> 12/16/2015 4:35 PM >>>
Dear Dr. Reardon:

I was told that you have been assigned to handle the James Wayne Ham competency evaluation. Is that correct?

I was in Butner last week preparing for trial in another case and hand delivered the Ham competency materials to Dr. Gillespie Wadsworth to give to you.

Did you receive the materials?

Did you receive the defense materials? They have shared their submission materials with us and I can forward them to you as well.

On a related note, I feel that it would be helpful to review the non-privileged jail calls by inmate Ham to friends, family members and others.

Do you have access to those materials?

We have not reviewed the calls to date, but can make arrangements to forward them to you if you would like.

Please call me at your earliest convenience to discuss the examination.

Thank you for your time.

Take care,

Jim

James D. Peterson
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F Street N.W.
6th Floor

H13-363-A-06750

Washington, D.C. 20530
(202) 353-0796
James.d.peterson@usdoj.gov

H13-363-A-06751

# EXHIBIT 10

Chron https://www.chron.com/news/houston-texas/houston/article/Houston-judge-questions-capability-of-federal-14021645.php

## Houston judge questions capability of federal prosecutor in San Jacinto County death penalty case

By Gabrielle Banks   Published 8:08 pm CDT, Wednesday, June 19, 2019



**IMAGE 1 OF 3**

James Wayne Ham, 36, was foundaround midnight by the Texas Rangers and Postal Inspectors. He is considered a person of interest in the death of Marie Youngblood, a postal worker who was found murdered in her
... more

A federal judge publicly rebuked a Justice Department prosecutor in a Houston death penalty case over allegations the Washington, D.C., lawyer hid exculpatory evidence in another capital case in Indiana federal court.

U.S. District Judge Lynn N. Hughes, who is known to air his feelings candidly about government employees and policies, made his opinion of Assistant U.S. Attorney James D. Peterson clear Wednesday during a discovery hearing.

"I think that America could find a better representative of its values and ideals than Mr. Peterson," Hughes told another prosecutor on the case. It was the second time in the past year the judge has clashed in court with Peterson.

The judge's admonition came during a hearing for James Wayne Ham, of San Jacinto County, who faces a capital trial on charges that in 2013 he fatally shot Eddie "Marie" Youngblood, a 52-year-old Coldspring postal worker and then burned her remains.

D031020



Recommended Video                                                                      X

Your California Privacy Rights          Interest Based Ads

Privacy Notice          Advertising          Terms of Use          Contact Us

 POWERED BY CONCERT                                                                    FEEDBACK

Ham's defense lawyers say that amid a dysfunctional culture in their unit, Peterson and two other Justice Department lawyersdemonstrated a pattern of misconduct in other death penalty cases around the country that warrants further scrutiny of their work regarding Ham. If the judge orders the release of additional documents, the defense team will assess whether they believe evidence that weighs in favor of Ham's innocence was withheld.

**RELATED:** Justice Department still seeking death penalty in 2013 slaying of San Jacinto County mail carrier

The lead defense lawyer in the Houston case, Kimberly C. Stevens, also noted that Peterson's Texas Bar license has been suspended since 1996 for failure to pay his dues. She told the judge that becoming ineligible due to an administrative suspension constitutes a violation of the federal and local rules. Peterson has an active law license in Virginia and could appear in federal court without a Texas license, according to the state bar association.

Evidence presented in a civil suit in Connecticut that Peterson and Steve Mellin, another prosecutor previously tied to the Ham case, had destroyed or failed to produce evidence favorable to the defense in other federal death penalty cases. And a declaration by Amanda Haines, a former co-worker, in an Indiana death penalty case stated that she had resigned due to ethical breaches she had reported that were never addressed by management.

Haines, the aggrieved ex-prosecutor, said in a sworn statement that Peterson "committed a fundamental error in judgment" and a violated protocol in the Indiana case when he interviewed dozens of witnesses who had evidence favorable to the defendant without law enforcement present.

Peterson then compounded the error, in her view, by destroying his notes and then denying he had disposed of them. Haines said that attorney Mellin, who worked on the Ham case in Houston from 2013 to 2014, had missed deadlines and failed to review documents or identify exculpatory Brady material boxes of evidence in the Indiana case.

Justice lawyers said under oath that Peterson's department was riddled with personnel problems, including allegations of a sexualized environment at the office that was both hostile to and discriminatory against women. Male lawyers accused of

D031021

failing to cover the basics won awards and got plum assignments, like the Boston Marathon bombing case, while femal x

Your California Privacy Rights        Interest Based Ads

Privacy Notice        Advertising        Terms of Use        Contact Us

at Ham's death penalty determination hearing in Washington opposite two female defense lawyers. These top capital prosecution officials subsequently faced scrutiny and were ousted from their roles in the wake of allegations of misconduct and disparate treatment.

Hughes, the judge in the Houston case, ordered the prosecutors to produce a list of all events and documents involving Peterson and the other Justice lawyers. The judge said he would hold off on ruling on the defense's request for new evidence until he reviews these lawyers involvement in the investigative process and trial preparation.

Peterson, seated with fellow counsel, looked flushed and shook his head. He never addressed the judge nor did he look up from the table during the scolding. Peterson's supervisor, the acting chief of the Capital Case Section in Washington, sat in front of the courtroom gallery witnessing the discussion about his staffer.

Ham sat at the end of the defense table in olive green uniform of the federal detention center downtown. A family member and friend were the only members of the public watching the hearing.

Hughes, who is 77, has drawn the spotlight on a number of occasions since his 1985 appointment to the bench by President Ronald Reagan. While some lawyers familiar with the judge's temperament are quick to defend him, Hughes has a reputation for tossing out off-the cuff comments that recipients perceive as denigrating to women and people of color. He also publicly castigates lawyers for improper attire and poor decorum. He famously issued an "order of ineptitude" to a D.C. lawyer who showed up in his courtroom in a track suit after an international flight.

The judge last clashed with Petersonin October when the team of Houston and Washington prosecutors declined to accept a guilty plea from Ham. The 42-year-old defendant had offered to forgo a murder trial in exchange for a sentence of life prison without parole.

The judge asked Peterson at that hearing the benefit of spending $600,000 to $800,000 of taxpayers' money to have a defendant potentially wait for years on end to be executed. Peterson and another lawyer told Hughes the decision to pursue the death penalty was made by former Attorney General Eric Holder.

Hughes complained about Peterson's "very long bureaucratic answer" to his question.

Prosecutors said Wednesday that the rationale for seeking the death penalty is due in part to Ham's lack of remorse.

On Wednesday, the judge considered the sworn statements from other jurisdictions indicating Peterson and Mellin had withheld evidence. After defense lawyers in Terre Haute submitted allegations of so-called Brady violations involving their client earlier this year, the federal prosecutors agreed to accept a guilty plea and closed the case.

gabrielle.banks@chron.com

© 2019 Hearst Communications, Inc.

HEARST



**OFFICE OF THE INSPECTOR GENERAL**
U.S. Department of Justice

(202) 514-3435 | oig.justice.gov

### INVESTIGATIVE SUMMARY

**Findings of Misconduct by a DOJ Supervisory Attorney for Sexually Harassing a Subordinate and for Creating a Hostile Work Environment, and by a Second DOJ Supervisory Attorney for Instructing a Subordinate Not to Discuss Certain Events and for Lack of Candor**

The Department of Justice (DOJ) Office of the Inspector General (OIG) initiated an investigation of two DOJ supervisory attorneys based upon information it received that a supervisory attorney (Supervisory Attorney 1) sexually harassed a subordinate employee by making unwanted sexual advances, including physical contact, making telephone calls, sending text messages and e-mails, and extending invitations.  In addition, the information alleged that Supervisory Attorney 1's supervisor (Supervisory Attorney 2) instructed subordinate employees not to discuss certain events, including Supervisory Attorney 1's sexual harassment of a subordinate employee.

The OIG found that Supervisory Attorney 1 sexually harassed the subordinate employee by making unwanted sexual advances, including physical contact, making telephone calls, sending text messages and e-mails, giving a gift, and extending invitations, all in violation of federal regulations and DOJ policy regarding prevention of harassment in the workplace.  Supervisory Attorney 1's misconduct created an intimidating, hostile, and offensive working environment.

The OIG also found that Supervisory Attorney 2 gave a non-specific instruction to a subordinate not to discuss certain events, which the subordinate reasonably understood to relate to his observations of potential misconduct by DOJ employees, possibly including sexual harassment committed by Supervisory Attorney 1.  Such an instruction is inconsistent with Department regulations, which require DOJ employees to report misconduct that they witness.  The OIG also found that Supervisory Attorney 2 lacked candor with the OIG.

The OIG has provided this report to the supervisory attorneys' DOJ division management and to the Department of Justice Office of Professional Responsibility for action they deem to be appropriate.

*Posted to oig.justice.gov on July 18, 2018*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

IN RE:   CHARLES HALL              )
                                  )
                                  )   2:23-MC-00001-JRS-MG
                                  )
                                  )
                                  )

**UNITED STATES OF AMERICA'S RESPONSE TO CHARLES HALL'S MOTION TO
UNSEAL ALL DEPOSITIONS IN *UNITED STATES V. ROGERS*
AND ANDREW ROGERS' MOTION TO UNSEAL ALL DEPOSITIONS**

The United States of America, by counsel, respectfully submits its response to intervenor

Charles Hall's Motion to Unseal All Depositions in *United States v. Rogers* and supporting

memorandum [Doc. Nos. 1 & 2] and Andrew Rogers' Joinder In Charles Hall's Motion to Unseal

All Depositions and Motion to Unseal All Depositions [Doc. 5].

Hall's claim is constitutionally and factually inapt.  Hall, a prisoner in the Western

District of Missouri, seeks discovery in this Court, in a long-closed matter, preliminary to his

prospective filing of a 28 U.S.C. § 2255 motion.  In doing so, Hall observes that one of the

attorneys who prosecuted him, James Peterson, was accused of misconduct during the litigation

of the capital case against Andrew Rogers—which occurred several years after Hall's

prosecution.  Hall theorizes that this coincidence could provide the basis for a claim of relief in

his unfiled § 2255 action.  Thus, he requests that this Court aid in his speculative search for

colorable claims by unsealing all depositions in this case related to allegations of misconduct

against Mr. Peterson.  In support of Hall's position, Rogers, whose case has been concluded for

nearly five years, filed a document joining in the motion and requesting unsealing.  Doc. No. 5.

The Court should deny the motions to unseal.  Hall lacks Article III standing to intervene, has no right to intervene in a closed matter, cannot claim a public right of access by proxy (he actually desires the materials for his own litigation purposes, not for the public), and cannot meet the standard to unseal documents.   Beyond that, Hall has not met the standard to obtain discovery in a § 2255 motion—a question which, in all events, should be addressed in the first instance by the Western District of Missouri.

## BACKGROUND

As noted, Charles Hall's case derives from another district court.  In July of 2014, Hall was convicted of murder and sentenced to death by a jury in the Western District of Missouri. His conviction and sentence were upheld on direct appeal, and the Supreme Court denied certiorari from that judgment.

Hall is now preparing a motion to vacate that sentence under 28 U.S.C. § 2255.  He and the government have agreed to a February 9, 2024, deadline for the filing of the § 2255 motion in the Western District of Missouri.  *United States v. Hall*, 4:21-cv-08001-BCW, ECF Doc. No. 54 (W.D. Mo. June 26, 2023).

In evident preparation for his unfiled § 2255 motion, Hall requests that this Court unseal documents in another criminal case.  Because Hall's claims rest on facts pertaining to Andrew Rogers' case, some background into Rogers is necessary here:

On July 25, 2013, Andrew Rogers entered the custody of the Bureau of Prisons ("BOP") and was confined to the U.S. Penitentiary at Terre Haute ("USP-TH").  On September 9, 2013, he was assigned to the prison's Security Housing Unit ("SHU").  In the early morning hours of December 26, 2013, a correctional officer performing rounds in the SHU observed Rogers, one of the two occupants of cell B-223, standing just inside the door.  Rogers told the officer to "[g]et

this dead motherfucker out of my cell," referring to the body of Thomas Sim, the other inmate assigned to cell B-223.  Sim's body lay motionless in a pool of blood on the cell floor.  Sim's hands were tied behind his back to the frame of the cell's bunkbed. Emergency personnel responded and pronounced Sim dead.

Rogers was escorted to a holding area while officials processed his cell for evidence.  In the holding area, Rogers told the warden he would "kill anyone you put in the cell with me" and that he would "keep killing until I force you guys to give me the death penalty. . . . I'm not going to do the rest of my time in a bathroom with another inmate."  Later that day, Rogers waived his constitutional rights and submitted to an interview with an FBI special agent.  In that interview, he admitted to killing Sim and reiterated his explanation that he wanted to be given the death penalty.  He also told the agent he planned the killing for weeks, having used nail clippers to fashion a weapon from his metal bunkbed.  A few months after the homicide, Rogers participated in another interview in which he identified a photograph of the murder weapon recovered from his cell, stating, "That's my shank" and "I stabbed my cellie to death with it."  In a letter to his father written about 10 days after the murder, Rogers claimed to have killed Sim because he "refuse[d] to live with another man in a 8' x 12' 'bathroom' for 27 years."  Rogers was charged by indictment with first-degree murder, in violation of 18 U.S.C. § 1111 in May of 2016.

Because Rogers was charged with death-eligible offense, his case was subject to the capital case review process outlined in Title 9, Chapter 9-10.000 of the *United States Attorney's Manual*, subsequently retitled the *Justice Manual*.  *See* https://www.justice.gov/jm/jm-9-10000-capital-crimes.  As then prescribed, the Protocol was facilitated by the Justice Department's Capital Case Section and culminated in the Attorney General's decision to seek, or not to seek,

the death penalty.[1] To commence the review process, the prosecuting U.S. Attorney in the *Rogers* case provided CCS with a written memorandum, summarizing the facts and evidence of the crime, the backgrounds and criminal records of the defendant and victim, the views of the victim's family on seeking the death penalty, and a recommendation whether to pursue capital punishment.  U.S.A.M. § 9-10.080.  The memo also discussed applicable intent and sentencing factors under 18 U.S.C. §§ 3591 and 3592.  *Id.*  CCS distributed the memorandum to a Capital Case Review Committee ("the Committee"), which was composed of attorneys from the Office of the Deputy Attorney General ("ODAG"), the Office of the Assistant Attorney General for the Criminal Division ("OAAG"), and prosecutors from other Department components.  U.S.A.M. § 9-10.130.

In some instances, the Protocol afforded defense counsel an opportunity to meet with the Committee and present evidence and argument in mitigation.  U.S.A.M. § 9-10.130.  Such meetings were chaired by the Chief of CCS, or his designee, and attended by representatives of the prosecuting U.S. Attorney's Office.  *Id.*  After considering all the information presented to it, the Committee forwarded a memo to the Attorney General recommending whether to seek the death penalty.  *Id.*  The Attorney General issued the final decision by letter.  *Id.*  The documents generated during the review process were not subject to discovery by the defendant or his counsel.  U.S.A.M. § 9-10.080; *see also* Fed. R. Crim. P. 16(a)(2) (prohibiting disclosure of internal government documents in connection with investigating or prosecuting the case).

---

[1] The Department subsequently amended the Protocol to reduce the Attorney General's role but not that of CCS.  *See generally* J.M. §§ 9-10.070 and 9-10.080.  The description of the Protocol, as applied to Rogers' case, relies explicitly on the then-prevailing authority, the U.S. Attorney's Manual and uses the past tense regardless of prevailing rules.

On September 16, 2014, CCS Trial Attorney James D. Peterson was assigned to facilitate the capital case review of Rogers's case. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 99-1 at ¶ 4 (S.D. Ind., Feb. 12, 2018).  During the review, defense counsel provided a written mitigation submission.  *Id.* at ¶ 6.  Defense counsel also met with the Committee.  *Id.*  The Committee, which did not include Mr. Peterson, made its recommendation to the Attorney General Loretta Lynch in a memorandum dated April 17, 2015.  *Id.* at ¶ 8.

In November 2015, CCS learned that a question had arisen at the executive level of the Justice Department regarding the extent to which Rogers had, before the murder, asked BOP officials to provide mental health treatment that he later refused or the BOP denied.  *Id.* at ¶ 9.  In response to this question, Mr. Peterson contacted the U.S. Attorney's Office, which provided him with records concerning Rogers' custody in USP-TH.  *Id.* at ¶ 10.  Those records were possessed by Rogers, cited in his mitigation presentation, and thereafter transmitted to the Attorney General.  To develop information from the documents, Mr. Peterson—with his supervisors' knowledge—contacted BOP employees named in the records.  *Id.* at ¶ 12.  Several of those people did not recall any pertinent contact with Rogers or had no recollection beyond the contents of the records.  *Id.* at ¶ 13.  None of the interviewees offered facts that would exculpate Rogers or impeach the government's witnesses against him.  *Id.* at ¶ 13.  For those persons who had substantive recollections, Mr. Peterson noted their comments in a word processing document that became a supplemental memorandum for the Attorney General.  *Id.* at ¶ 14.

 On November 17, 2015, Peterson provided the supplemental memorandum to a supervisor, who forwarded it to the Attorney General. Peterson saved an electronic copy of the supplemental memo in a computer drive accessible to all CCS staff.  *Id.* at ¶ 15.  On January 19,

2016, Attorney General Lynch authorized the United States Attorney to seek the death penalty against Rogers.

On August 17, 2017, Peterson prepared a memorandum for disclosure to Rogers' counsel. *Id.* at ¶¶ 26-29. The memo summarized Peterson's contacts with BOP personnel but was sanitized of privileged communications included in the document he had prepared for the Attorney General. The sanitized memorandum was provided by CCS to the U.S. Attorney's Office on August 17, 2017, and, again, on January 17, 2018, for disclosure to Rogers.

On January 29, 2018, Rogers' counsel moved to strike the notice of intent to seek the death penalty ("NOI") based on alleged wrongdoing by Attorney Peterson. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 92. As the basis of his claims, Rogers relied on an affidavit from a former CCS attorney, Amanda Haines. The affidavit was filed in support of a meritless lawsuit advanced by Jacabed Rodriguez-Coss, another past CCS employee who alleged gender discrimination by CCS management. *See generally Rodriguez-Coss v. Barr*, 776 F. App'x 717, 718 (2d Cir. 2019) (holding that plaintiff failed to demonstrate discriminatory conduct: "In light of Rodriguez-Coss's resistance to trying the [an assigned] case and the repeated criticisms she received from federal judges for failing to meet court deadlines, we agree with the District Court that Rodriguez-Coss has failed to meet her burden"). Haines' affidavit alleged that Peterson had engaged in misconduct by interviewing witnesses in the *Rogers* case without a law enforcement agent present, destroying his interview notes, and neglecting to memorialize his conversations.

In light of Haines' allegations, the *Rogers* court allowed depositions of her and Peterson[2] to determine whether the government had committed misconduct and whether the record required further development. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 243 at 2. The depositions transcripts and video recordings were provided to the Court and sealed pursuant to Rogers' request. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. Nos. 288, 290, 296, & 298. The government also requested that the Court enter a protective order regarding the depositions, but the Court never ruled on that motion, perhaps deeming the issue moot because the depositions were sealed. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 294. The Court thereafter ordered an evidentiary hearing to assess the credibility of witnesses and clarify certain issues. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 309 at 1. Prior to the hearing, Attorney General William Barr authorized the U.S. Attorney to withdraw the NOI and enter a plea agreement with Rogers. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. Nos. 388, 393. The withdrawal obviated the hearing, and Rogers eventually pled guilty and received a life sentence. Final judgment was entered on May 8, 2019. *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 396.

Due to the nature of the allegations, Attorney Peterson self-reported the claim of misconduct on or about February 1, 2018, to the Office of Professional Responsibility ("OPR") at the Department of Justice. On September 30, 2019, OPR advised Peterson that after reviewing the discovery materials, court filings, declarations, and several deposition transcripts, further investigation was unlikely to result in a finding of professional misconduct and that OPR had

---

[2]   The *Rogers* court also allowed depositions of AUSA James Warden (the prosecutor initially assigned to the case) and Dr. Stephen Eckert, a BOP psychologist.

closed the matter.  OPR again reviewed the matter in greater detail as part of an expanded

investigation following additional allegations by defense counsel.  On August 25, 2022, OPR

advised Peterson that upon further review, it had again concluded that with respect to Peterson's

conduct, there was insufficient evidence to support the allegation that he engaged in professional

misconduct and that OPR considered the matter closed.

**ARGUMENT**

Hall requests leave to intervene in the *Rogers* case and to unseal all depositions as

possible factual bases for § 2255 claims.  The Court should deny his motion for several reasons.

First, Hall lacks constitutional standing to seek unsealing in this closed case.  Second, Hall does

not have a cognizable right to intervene in a criminal proceeding.  Third, to the extent Hall seeks

to vindicate the public's right to access, his motion to intervene is untimely.  Finally, neither Hall

nor Rogers have presented valid justifications for unsealing the documents.

**I.      Hall Lacks Standing Under Article III**

Article III of the United States Constitution only allows the exercise of federal court

power over "cases" or "controversies."  *See Bond v. Utreras*, 585 F.3d 1061, 1068 (7th Cir. 2009)

(citing *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007)).  Valid cases, in turn,

require plaintiffs with "standing."  *Id*.  That standing requirement applies to third parties seeking

to intervene in a dismissed case, as the previous "case" or "controversy" has been extinguished

by its dismissal.  *See id.* at 1071-72 (holding that third parties seeking to challenge protective

orders in closed cases must establish standing under Article III); *see also McMillan v. Hyzy,* 738

F. App'x 365, 366 (7th Cir. 2018) (citing *Bond* for the proposition that "[s]tanding is required for

intervention as of right and for permissive intervention under most circumstances.").  Intervenors

must establish standing even where the "existing parties remain in the case."  *See City of*

8

*Chicago v. FEMA*, 660 F.3d 980, 984 (7th Cir. 2011) (discussing disagreement among the circuit courts and noting the Seventh Circuit position).

To establish standing, a party must demonstrate "an injury-in-fact capable of being redressed by a favorable decision of the court." *Bond*, 585 F.3d at 1072 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Standing does not turn on the merits of a party's claim, but rather the nature and source of the claim, and the actual or threatened injury may "exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)).

Here, Hall seems to rely on the right of access to court records. *See* Doc. No. 2 at 6-7. However, he lacks a cognizable interest in the documents to establish standing to intervene.

Citizens enjoy common law and First Amendment rights to access documents filed in court. *See Bond*, 585 F.3d at 1073-74. Those general rights are "enough to give members of the public standing to attack a protective order that seals this information from public inspection." *Id*. at 1074. But those rights do not attach to all documents generated through litigation. Instead, the "public's right of access is limited to traditionally publicly available sources of information, and 'discovered, but not yet admitted, information' is not 'a traditionally public source of information.'" *Id*. (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984)). Because discovery materials, such as depositions, were not traditionally open to the public at common law, there is no public right to access those materials before they enter the judicial record. *See Seattle Times Co.*, 467 at 33; *Baxter Int'l, Inc. v. Abbott Labs.,* 297 F.3d 544, 545 (7th Cir. 2002).

In *Bond*, a third party sought to intervene in a closed civil case to obtain documents that were never filed on the court's docket. *Bond*, 585 F.3d at 1074. As part of its standing analysis,

9

the court evaluated whether any right of access to unfiled discovery materials existed under common law, statute, or the First Amendment. *Id*. at 1075-77. The Seventh Circuit concluded that third parties have no legally enforceable interest in unfiled discovery materials, and therefore cannot establish standing to intervene for the purpose of obtaining such materials. *Id.* The *Bond* court noted that entry on the court docket, by itself, does not transform discovery materials into "judicial records," to which the right of access attaches: the public does not have a right even to discovery material that a judge reviews in the course of discovery proceedings. *Id*. at 1075 n.8.

Thus, the right of access turns, not on public filing, but on a record's characterization as a "judicial document." *See S.E.C. v. TheStreet.Com*, 273 F.3d 222, 232 (2d Cir. 2001) (discussing a rule that publicly accessible judicial documents are those that are "filed [with the court that are] relevant to the performance of the judicial function and useful in the judicial process."); *see also Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312-13 (11th Cir. 2001) ("material filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right."). Courts have similarly held that "judicial documents" are those that a court relies upon in resolving motions or "exercise[ing] of its supervisory powers." *See Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019); *see also Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 184 F. Supp. 2d 1353 (N.D. Ga. 2002) (discovery materials submitted as part of pretrial motions that the court must resolve on the merits are "judicial," but not materials submitted in support of discovery motions").

The depositions at issue here are not judicial, because it is not apparent that the Court relied upon them in resolving a substantive motion or exercising its judicial authority. The depositions related to Rogers' motion to strike the NOI. But the government's voluntary

dismissal of the NOI mooted the motions and thereby deprived the depositions of any relevance. Indeed, the Court ordered the depositions "to determine whether an evidentiary hearing will be required on Rogers' misconduct allegations," *United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 243 at 2.  Its decision to schedule that hearing indicates the depositions were inadequate to resolve the motion to strike the NOI.  And, as the Court never held an evidentiary hearing, the depositions ultimately played no role in a judicial resolution of the misconduct allegations, much less the case against Rogers.  The depositions are not judicial documents and not subject to the public right of access.  With no cognizable right of access to the documents, Hall lacks standing to intervene in this case.

## II.     Hall Cannot Intervene in a Closed Criminal Proceeding

Assuming Hall had standing to intervene, he could not do so in a closed criminal case as a private individual.

No statutes or procedural rules allow intervention in a criminal proceeding.  *See United States v. Blagojevich*, 612 F.3d 558, 559 (7th Cir. 2010).  However, "courts have permitted intervention when the potential intervenor has a legitimate interest in the outcome and cannot protect that interest without becoming a party."  *Id.*  Still, the parameters of those rights are ambiguous, with some courts even questioning whether such a right exists at all.  *See In re Globe Newspaper Co.*, 920 F.2d 88, 90 (1st Cir., 1990) ("the right of a non-party to intervene in a criminal proceeding is doubtful"); *see also United States v. Fast*, 876 F. Supp. 2d 1087, 1088 n.1 (D. Neb. 2012) (doubting that a victim had a right to intervene in a criminal proceeding).  The allowance for intervention in criminal cases, however ad hoc, has generally related to media interests in the proceedings.  *See, e.g., Blagojevich*, 612 F.3d at 559 (addressing intervention where media groups sought to access juror names); *In re Associated Press*, 162 F.3d 503, 505-06

11

(7th Cir. 1998) (recognizing the propriety of intervention where a media outlet opposed allowing state official's testimony by video deposition and sought release of sealed records); *see also United States v. Ford*, 2008 WL 11351617 at *2 (M.D. Tenn., Feb. 26, 2008) ("Intervention in a criminal case is generally limited to situations in which a media outlet seeks access to closed proceedings or sealed documents . . . or cases in which an individual or company seeks to protect privileged or confidential information seized during a criminal investigation.").

No body of case law establishes an individual's right to intervene in a criminal case to obtain sealed records for private use. In fact, the United States District Court for the Eastern District of Wisconsin rejected that very proposition. In *United States v. Collins*, a firearms dealer sought to intervene in a closed criminal case to obtain evidence with which to defend himself in a civil suit instituted by two police officers. *United States v. Collins*, No. 09–CR–155, 2013 WL 4780927 at *1 (E.D. Wisc., Sept. 5, 2013). The officers had been shot with a firearm that Jacob Collins purchased from the dealer's store and gave to the shooter. *Id*. Collins was charged with making false statements to a firearms dealer, who sought to unseal a psychological report from the criminal case. The dealer asserted the report would establish that Collins, by dint of reading deficits, did not understand the questions on the firearms purchase forms. *Id*.

The court observed the dearth of law to authorize intervention in a criminal proceeding and stated the general rule: "private citizens lack a judicially cognizable interest in the prosecution of another." *Collins*, 2013 WL 4780927 at *1 (citing *Linda R.S.*, 410 U.S. at 619). The court recognized the rights of media outlets to intervene in criminal proceedings and noted that the gun dealer claimed a right as a member of the public and as a private party to the lawsuit. *Id*. at 2. The court found that the dealer "provide[d] no authority for permitting a private party to intervene in the manner and for the purpose he suggests." *Id*. The court discussed cases in

12

which a third party was permitted to intervene in a criminal case to prevent the disclosure of materials—a defensive intervention—and found that same interests do not attach to affirmative intervention, especially when the dealer could obtain the information through other means. *Id.*

The same logic applies here. Hall's motion mentions the public interest in the sealed documents, but his interest stems from a desire to advance his own litigation. He even states that "the information in these sealed depositions is highly relevant to [his] litigation." Doc. 2 at 6. He states that the depositions are relevant because "Mr. Peterson may have committed misconduct in Mr. Hall's case." *Id.* Indeed, defense counsel state that they are seeking intervention in their capacity as Hall's § 2255 attorneys. *Id.* at 1. Defense counsel also state that "the public, and specifically Mr. Hall, unquestionably have strong interests in documents related to a possible pattern of prosecutorial misconduct in death penalty cases." *Id.* at 7. But this statement elides the significant difference between those interests: the public could have an interest in the workings of the criminal justice system, but Hall has an interest in obtaining evidence for his private litigation. As *Collins* makes clear, Hall cannot simply adopt the mantle of the public's interest to vindicate his own endeavor.

No authority allows Hall to intervene in a closed criminal proceeding to obtain evidence sealed evidence for his own purposes. He does not fit within the narrow category of litigants permitted to insert themselves in criminal prosecutions for public benefit, and the Court should therefore deny the motion to intervene.

## III.    Hall's Motion is Untimely[3]

---

[3] In contrast, as discussed below, Hall fails in his arguments that he is entitled to unsealing in aid of his § 2255 litigation because his assertions are premature.

13

Even if this Court determines that Hall has standing and a basis for intervention on behalf of the public, it should deny his motion as too late.  Due to the ad hoc nature of intervention in criminal cases, there is no prescribed time limit.  However, the Seventh Circuit has held in the context of sealing juror names, "Once the judge not only flags an issue as important but also sets a schedule for its resolution, the time has come to intervene.  People potentially affected by the decision can't sit on the sidelines, as if intervention were a petition for rehearing."  *Blagojevich*, 612 F.3d 558, 561.

The *Rogers* case was closed in 2019.  As Hall notes, public interest in the allegations against CCS attorneys may have existed in 2018, when *The New York Times* published an article, cited by Hall, that mentions the allegations against Peterson.  Notably, the article mentions the allegations in reference to Rodriguez-Coss's meritless discrimination suit.  Any party seeking to unseal documents for public consumption could have and should have done so at that time—not years after the resolution of *Rodriguez-Coss v. Barr*, when every person mentioned by name in the article has left CCS.  Indeed, Rogers moved to seal the depositions almost a year <u>after</u> *The New York Times* published its article.  In that regard, any newfound concern of his for a right of public access rings hollow.

To the extent Hall seeks to unseal on that basis now, the motion is untimely.

## IV.     Hall's and Rogers' Requests to Unseal are Lack Merit In any Event

Assuming without conceding that Hall has standing to intervene, is entitled to intervene, and has timely moved to intervene, the Court should still deny his and Rogers' motions on the merits.

The standard for unsealing judicial documents depends on the source from which the right to access the records springs.  Courts have generally recognized two sources of the right of

access:  common law and the First Amendment.  *See In re Associated Press*, 162 F.3d at 506; *United States v. Corbitt*, 879 F.2d 224, 228 (7th Cir. 1989).

### A.  Common Law

The Supreme Court recognized a "common law right of access" in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978), which includes the right to "inspect and copy public records and documents, including judicial records and documents."  That right is not, however, absolute, and courts have "supervisory power over [their] own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Id*. at 598.  Therefore, the "discretionary decision whether to release judicial records should be informed by a 'sensitive appreciation of the circumstances that led to . . . [the] production [of the particular document in question.'" *Corbitt*, 879 F.2d at 228 (quoting *Nixon*, 435 U.S. at 598). The Seventh Circuit has recognized that the common law right of access creates a "strong presumption in favor of public access to materials submitted as evidence in open court." *Id.* (citing *United States v. Edwards*, 672 F.3d 1289, 1294 (7th Cir. 1982)).  But that presumption does not apply to "materials properly submitted to the court under seal." *Id*.  Instead, a party seeking disclosure of such documents must "make a specific showing of need for access to the document." *Id*.  The party may not rely upon presumptions of access. *Id*.

Here, neither Hall nor Rogers contend that the Court improperly sealed the depositions. Indeed, Rogers requested the sealing.  As such, they are materials "properly submitted to the court under seal."  Thus, Hall and Rogers must make a specific showing of their need for the documents.  They fail to do so.

Hall and Rogers refer to the purported need of the public to gain information about the allegations of misconduct in the *Rogers* case and death penalty prosecutions.  And Hall mentions

15

his own speculative desire for information in service of his private litigation aims.  Neither alleged interest warrants unsealing.  As to the public interest, the claims are stale—neither *The New York Times* nor any other media source sought to investigate this aspect of a public exposé of CCS, which now five years later, has new management and largely new personnel.  General references to a public interest, either long vindicated or long forgotten, do not demonstrate a compelling need for unsealing the depositions.

Of course, Hall's own private interest will not warrant unsealing.  In fact, Hall's expressed rationale—that unsealing could fortify a § 2255 claim—counsels *against* the request.  Rule 6 of the Rules Governing § 2255 Proceedings provides that discovery can only be conducted if authorized by the presiding court.  A § 2255 movant "is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Rather, he must show "good cause," which only exists where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate he is  . . . entitled to relief. *Id*. at 908-09 (quotation marks omitted).

At this point, Hall has demonstrated no cause for disclosure of any document, and this Court, which has no familiarity with his trial, should not determine whether his claims justify discovery.  Hall has not filed a motion to vacate and, therefore, has not set out any specific allegations that could provide good cause for discovery.  Even if he had, the court that tried Hall must determine whether his claims justify discovery, a determination that will turn on the apparent merit of his arguments.

At this point, Hall's allegations amount to no more than a bare assertion that because Attorney Peterson was accused of misconduct in the *Rogers* case, that accusation could give rise to a legitimate claim in his own case—which took place several years before the *Rogers* case.

16

Those assertions rely on unsupported supposition, including that Attorney Peterson ever participated in the discovery process in Hall's case.  Hall offers no facts or argument that would take the bald assertions into the realm of a colorable claim or evidentiary theory.  Hall cannot use a speculative hope that sealed documents he has never seen might afford him a litigation advantage as the basis for unsealing.  By seeking the sealed depositions from this Court, Hall is attempting an end-around federal rules and the oversight of the court that will decide his § 2255 motion, should he file one.  This is an improper purpose and should be rejected.

On the other side of the scale, good reasons exist not to unseal the transcripts. Significantly, the deponents answered questions to which objections were lodged.  Those objections were never resolved, and the transcripts therefore potentially contain responses that should properly be struck and outside of any judicial record, much less public view.  *See United States v. Rogers*, 2:16-cr-00018-WTL-CMM, ECF Doc. No. 294 at 2 & n.1 (S.D. Ind., Feb. 22, 2019).  Second, the depositions touched on subjects that are typically confidential, including discussions about investigations by state bars and the Department of Justice's Office of Professional Responsibility.  *Id*. at 2.  The government, therefore, has a strong interest in maintaining the confidentiality of the sealed depositions.

Neither Hall nor Rogers can show a specific need for the depositions, and the interests in maintaining the seal are strong.  The Court should, thus, reject unsealing as requested under the common law right of access.[4]

**B. First Amendment**

---

[4]  Hall is not without recourse.  If he files his § 2255 motion to vacate and demonstrates good cause, Hall may seek leave from the habeas court to conduct discovery (to include, perhaps, depositions) of Attorney Peterson or any other individual pertaining to the precise issues of Hall's case and under terms set forth by the habeas court.

17

Whether an individual has a First Amendment right to court records turns on whether the document or proceeding has "historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *See Press-Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1, 8 (1986). The First Amendment right of public access attaches only if the material in question satisfies both inquiries. *Id*. at 9.

The sealed depositions satisfy neither. Depositions were not proceedings open to the public at common law, and they are generally conducted privately in modern practice. *See Seattle Times v. Rhinehart*, 467 U.S. 20, 33 (1984). Indeed, at common law, "pretrial proceedings were closed to the public." *Bond*, 585 F.3d at 1074 (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 389 (1979)). There is therefore no basis for concluding that a deposition or transcript of a deposition, even a deposition to determine the need for an evidentiary hearing, would be historically open to the public.

Moreover, there is no basis for concluding that public access to a deposition would significantly enhance the judicial process. In the civil context,

> if such access were to be mandated, the civil discovery process might actually be made more complicated and burdensome than it already is ... The public's interest is in seeing that the process works and the parties are able to explore the issues fully without excessive waste or delay. But rather than facilitate an efficient and complete exploration of the facts and issues, a public right of access would unduly complicate the process. It would require the court to make extensive evidentiary findings whenever a request for access was made, and this could in turn lead to lengthy and expensive interlocutory appeals.

*Anderson v. Cryovac, Inc.*, 805 F.2d 1, 12 (1st Cir. 1986).

Because depositions have not been historically open to the public, and because there is no basis for suggesting that public access to depositions would play a significant

positive role in the judicial process, no First Amendment right of public access attaches to the sealed depositions at issue here.  Hall's and Rogers' motions should be denied.

### C. Assuming, Arguendo, the Court Unseals the Depositions, it Should do so Subject to a Protective Order

This Court should deny the motions.  However, if the Court orders unsealing, the government requests that it do so subject to a protective order.  As discussed above, the depositions touched on sensitive topics, and contain questions and answers that garnered unresolved objections.  Any unsealing should therefore be done in conjunction with the imposition of the following restrictions:

- Copies of the referenced transcripts and audio/video recordings shall be used solely and exclusively in connection with Hall's motion to vacate under § 2255 (including investigation, hearing, and appeal) and not for any other purposes. If necessary in preparation for future proceedings, the deponents shall be allowed to review the transcript and audio/video recordings of his/her own deposition.

- Copies of the deposition transcripts and audio/video recordings shall be maintained by Hall's attorneys in person, at their place of business. Hall's attorneys may provide redacted deposition transcripts (NOT the audio/video recordings) to prison officials at for Hall's use, but the transcripts will be maintained at USP-TH in accordance with its policies and sanitized of the deponents' personally identifiable information.

- A copy of this protective order shall be kept with the copies of the deposition materials at all times.

- In no event shall the parties in this cause and/or the deponents disclose or describe any of the referenced transcripts and audio/video recordings to any other person,

19

entity, or other court or in any other legal proceedings, absent notice to and permission from this Court.

- Counsel shall promptly notify this Court if the transcripts or audio/video recordings are disclosed to anyone not designated by this Order or further order of the Court, either intentionally or unintentionally.

- At the end of the § 2255 proceedings, Hall's attorneys shall destroy the documents.

These restrictions are necessary to prevent disclosure of confidential information.

## CONCLUSION

Hall lacks standing to obtain the documents at issue, he has no right to intervene for the purpose of obtaining the depositions for use in his own litigation, any intervention on behalf of the public is untimely, and he cannot establish an entitled to the documents under common law or the First Amendment.  The Court should deny the motion in full or, at a minimum, impose a protective order to limit dissemination of private information.

Respectfully submitted,

ZACHARY A. MYERS
United States Attorney

By:   /s/ William L. McCoskey
William L. McCoskey
Brian Reitz
Assistant United States Attorneys


/s/ Aaron J. Stewart
Aaron J. Stewart
Trial Attorney, Capital Case Section
United States Department of Justice

**CERTIFICATE OF SERVICE**

I certify that on January 22, 2024, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/<u>Aaron J. Stewart</u>
Aaron J. Stewart
Trial Attorney, Capital Case Section
United States Department of Justice

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

IN RE: CHARLES HALL            )
                                               )
                                               )
                                               )          2:23-mc-00001-JRS-MG
                                               )
                                               )
                                               )
                                               )

## <u>REPLY IN SUPPORT OF MOTION BY CHARLES HALL TO</u><br><u>UNSEAL ALL DEPOSITIONS IN *UNITED STATES V. ROGERS*</u>

None of the government's arguments in response to Mr. Hall's motion to unseal

depositions is convincing. The government argues that this Court should not unseal depositions

about a pattern of prosecutorial misconduct because Mr. Hall lacks Article III standing or a

cognizable right to intervene in a closed criminal proceeding, because his motion is untimely,

and because he has not presented a valid reason to unseal the depositions. Gov. Resp. at 8. As to

the government's first and second points, Mr. Hall has standing and a cognizable right to

intervene in a closed criminal case because the documents Mr. Hall seeks are judicial documents

and there is a strong public interest in their disclosure. The public and Mr. Hall have an interest

in ensuring the integrity of federal death penalty prosecutions. As to the government's third

point, Mr. Hall's motion is timely. The government's argument that the public interest in the

integrity of federal death penalty prosecutions goes "stale" has no basis. Even if this argument

were logical, recent news articles dispute its premise. As to the government's fourth point, Mr.

Hall has presented valid justifications for unsealing the documents—namely, the strong public

interest in the integrity of federal death penalty prosecutions and Mr. Hall's interest in the

integrity of his own federal death penalty prosecution. Although the government attempts to

1

separate the public interest from Mr. Hall's, there is no daylight between them: the public has an interest in uncovering, correcting, and preventing misconduct in criminal prosecutions, death penalty prosecutions in particular; Mr. Hall has the same interest, because a federal prosecutor who has been implicated in misconduct in multiple death penalty cases obtained a death sentence against him. Therefore, the government has shown no reason, either procedural or substantive, why this Court should keep the depositions under seal.

### I. Mr. Hall has standing because the records are judicial records to which there is a public right of access.

The government's first argument is that Mr. Hall does not have Article III standing because the depositions are not "judicial records" or "judicial document[s]" and therefore that there is no right of public access to the documents. The government attempts to rely on *Bond v. Utreras*, 585 F.3d 1061 (7th Cir. 2009), to argue that some documents filed on the docket are not judicial records. But *Bond* supports Mr. Hall's position, not the government's.

*Bond* held that "[t]he rights of the public" to access documents "kick in when material produced during discovery is filed with the court." *Bond*, 585 F.3d at 1075 (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 & n.19 (1984)). Those rights "kick in" with filing because "[a]t this point, the documents have been 'used in [a court] proceeding,' and consequently the possibility exists that they could 'influence or underpin the judicial decision' and they are therefore presumptively 'open to public inspection unless they meet the definition of trade secret or other categories of bona fide long-term confidentiality.'" *Bond*, 585 F.3d at 1075 (second alteration in original) (quoting Fed. R. Civ. P. 5(d); *Baxter Int'l v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002)) (citing *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999)).

The government says that "[t]he *Bond* court noted that entry on the court docket, by itself, does not transform discovery materials into 'judicial records,' to which the right of access attaches: the public does not have a right even to discovery material that a judge reviews in the course of discovery proceedings." Gov. Resp. at 10 (citing *Bond*, 585 F.3d at 1075 n.8). This point has no bearing on this case. While *Bond* certainly says that "the public does not acquire a right to access discovery material just because a judge might review it in camera in the course of discovery proceedings," *Bond* is clear that "*discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right*." *Bond*, 585 F.3d at 1075 n.8 (emphasis added) (quoting *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312-13 (11th Cir. 2001)). Since the *Bond* opinion, the Seventh Circuit has emphasized again that "'documents *filed in court* are presumptively open to the public'" and "the 'general right of public access . . . is enough to give members of the public standing' to seek them." *Carlson v. United States*, 837 F.3d 753, 760 (7th Cir. 2016) (alterations in original) (quoting *Bond*, 585 F.3d at 1066, 1074).

Persisting in its argument that the depositions are not "judicial records," the government asserts "it is not apparent that the Court relied upon [the depositions] in resolving a substantive motion or exercising its judicial authority." Gov. Resp. at 10. The government points out that "[t]he depositions related to Rogers' motion to strike the NOI [Notice of Intent to Seek the Death Penalty]" and then asserts that "the government's voluntary dismissal of the NOI mooted the motions and thereby deprived the depositions of any relevance." *Id.* at 10-11.

For three reasons, this argument is baseless. First, the government is wrong about the standard for when a document is a "judicial record" subject to the common law right of public access. "[D]iscovery material *filed in connection* with pretrial motions that require judicial

3

resolution of the merits is subject to the common-law right" of public access to court documents. *Bond*, 585 F.3d at 1075 n.8 (emphasis added); *see also Carlson*, 837 F.3d at 760. There is no requirement that it be "apparent that the Court relied upon" the documents at issue in resolving any motions or exercising its judicial authority. Gov. Resp. at 11. It is enough that the documents were "filed in connection with pretrial motions" because, as *Bond* explains, "[a]t this point . . . *the possibility exists* that they could 'influence or underpin the judicial decision.'" *Bond*, 585 F.3d at 1075 & n.8 (emphasis added) (quoting *Baxter Int'l*, 297 F.3d at 545; *Chi. Tribune Co.*, 263 F.3d at 1312-13). It is this possibility that renders the documents subject to a right of access, even without conclusive evidence that the court relied on them.

Second, although it need *not* be "apparent that the Court relied upon" the documents at issue in resolving any motions in exercising judicial authority, in this case, it *is*, in fact, "apparent that the Court relied upon" the documents in ordering an evidentiary hearing on government misconduct, a quintessential exercise of judicial authority. As the government notes, "the Court ordered the depositions 'to determine whether an evidentiary hearing will be required on Rogers' misconduct allegations.'" Gov. Resp. at 11 (quoting Dkt. No. 243 at 2). In its order setting a hearing on potential government misconduct, the Court explained, "[a]fter reviewing the parties' relevant submissions, the Court has determined that Defendant Andrew Rogers' Motion to Strike the Notice of Intent to Seek the Death Penalty for the Government's Intentional Withholding and Destruction of Brady Information cannot be resolved without an evidentiary hearing" and thus ordered a hearing to take place. Dkt. No. 309 at 1 (internal record citations omitted).[1] Later orders also make clear that the Court based its determination that a hearing was necessary on the

---

[1] Citations to "Dkt. No. . . ." reference the documents on the docket in *United States v. Rogers*.

depositions. The Court explained, "information *gleaned though the discovery process*

. . . coupled with what appear to be multiple Government filings containing false statements, has

created concerns about additional possible misconduct and convinced the Court that a full

inquiry is necessary." Dkt. No. 332 at 1 (emphasis added). Clarifying the issues to be addressed

at the ordered hearing, the Court ruled, "[t]opics explored during the depositions of Amanda

Haines, James Peterson, James Warden, and Steven Eckert also may be relevant." Dkt. 380 at 1.

Third, because it is enough that the documents were "filed in connection with pretrial

motions," *see Bond*, 585 F.3d 1075 n.8, the government's statement that its "voluntary dismissal

of the NOI mooted the motions and thereby deprived the depositions of any relevance" is

immaterial. In addition to being entirely immaterial, the government's assertion that dismissing

the NOI "deprived the depositions of any relevance" also defies logic.

For the Court to accept the argument that dismissal of the NOI "deprived the depositions

of any relevance," the Court would have to believe that it was entirely coincidental that four days

before a hearing on the government's misconduct was set to commence, the government

accepted Mr. Rogers's offer to plead guilty in exchange for a life sentence, although Mr. Rogers

initially made the plea offer years earlier, before he was indicted. A much more plausible

explanation is that the government accepted Mr. Rogers's long-standing plea offer to avoid the

hearing. The government had every incentive to avoid the hearing. At the time the government

accepted Mr. Rogers's long-standing plea offer, the government had pending a motion to quash

the subpoena to the United States Attorney for the Southern District of Indiana, who was on Mr.

Rogers's witness list. *See* Dkts. 385 (government's motion to quash subpoena to Josh Minkler,

filed May 1, 2019); 386 (Court's entry acknowledging that parties had informed the court that

the parties may be entering an agreement to resolve the case, also filed May 1, 2019). Mr.

Rogers's witness list also included Department of Justice attorneys who were at that time or had previously been assigned to the Capital Case Section (including the current section chief); Assistant United States Attorneys from the Southern District of Indiana; a BOP psychologist; and an FBI agent. Dkt. No. 376-1 at 1. Yet the government would now have this Court believe that their decision to accept Mr. Rogers's long-standing plea offer was in no way calculated to avoid having these individuals testify about possible misconduct, and in turn accept that depositions that prompted the Court to set this hearing were irrelevant to the outcome of Mr. Rogers's case. In light of the government's argument, it is worth recalling that Capital Case Section attorneys have been accused of misconduct in other cases as well, and those cases were also resolved by plea agreements that effectively cut off further inquiry into misconduct. This more plausible explanation—that the government accepted Mr. Rogers's plea offer to avoid the hearing—makes the depositions extremely relevant to the ultimate resolution of the case because the depositions convinced the Court that a hearing was necessary.

Therefore, "'documents *filed in court* are presumptively open to the public'" and "the 'general right of public access . . . is enough to give members of the public standing' to seek them." *Carlson*, 837 at 760. Mr. Hall has standing to seek unsealing of the depositions in *United States v. Rogers*, documents which were filed in court.

**II. Mr. Hall does have a right to intervene although *United States v. Rogers* is closed because there is a public interest in the depositions.**

The government's second argument is that Mr. Hall does not have a right to intervene in *United States v. Rogers* because the case is closed. The government's reasoning appears to be that regardless of whether the documents are of public interest, Mr. Hall's personal stake in the integrity of federal death penalty prosecutions makes him ineligible to intervene in a closed

6

criminal case. The government cites no basis for its suggestion that in order to intervene, a third-party must be unaffected by the issue that is of public interest. Courts have generally held that documents that shed light on the conduct of government officials are documents in which there is a public interest. *See, e.g.*, *CREW v. DOJ*, 978 F.Supp.2d 1, 12 (D.D.C. 2013). Consequently, there is a public interest in documents about potential misconduct in federal death penalty cases. Mr. Hall's individual interest in these documents does not negate this public interest or disqualify him from pursuing the documents. There is no reason why Mr. Hall having a personal reason for pursing the documents would render him ineligible to seek to unseal records in which there is a public interest.

The government cites *United States v. Collins*, No. 09-CR-115, 2013 WL 4780927 at *1 (E.D. Wisc., Sept. 5, 2013), for the proposition that "[n]o body of case law establishes an individual's right to intervene in a criminal case to obtain sealed records for private use." Gov. Resp. at 12. Even if cases from the Eastern District of Wisconsin were binding on this Court, the circumstances in *Collins* are entirely unlike the circumstances in this case; as such, *Collins* has no bearing on this case.

In *Collins*, a third-party "filed in this court a motion to intervene in defendant's criminal case to obtain an order unsealing a psychological report authored by Dr. Sheryl Dolezal, which defendant submitted prior to his sentencing hearing" arguing that that Federal Rule of Civil Procedure 24(b) "afforded him a right to intervention, and that he had a particularized and compelling need for Dr. Dolezal's report because it constituted the only evidence reflecting the depth of defendant's reading comprehension problems and the difficulty he had completing forms." *Collins*, 2013 WL 4780927 at *1. The court held that a third-party could not intervene to obtain another person's psychological report that he sought solely for his own purposes.

7

In protecting a litigant's medical information in which there was no public interest, *Collins* did not hold that when there is a public interest in documents, a third-party who also has a particular interest in the documents is not permitted to seek to obtain those records. *Collins* stands for the proposition that an exclusively private interest in documents is insufficient to intervene in a closed criminal case. *Collins* does not stand for the proposition that a private interest in documents disqualifies someone from intervening to seek documents in which there is a public interest.

The depositions Mr. Hall seeks could not be more distinct from a private citizen's psychological records. The depositions Mr. Hall seeks address a possible pattern of misconduct by government attorneys pursuing the death penalty. The integrity of government officials when seeking the ultimate punishment is an issue in which the public undoubtedly has an interest. Mr. Hall's interest and the public interest align. In fact, Mr. Hall seeks these records in part to support a pending clemency application. The president may be persuaded to commute an individual's sentence because of matters of profound public interest. The relevance of these depositions to Mr. Hall's clemency application highlights how interconnected Mr. Hall's own interest is with the public's interest.

Therefore, Mr. Hall can seek unsealing of the depositions in *United States v. Rogers* even though the case is closed, because there is a public interest in these records. The fact that a public interest and Mr. Hall's interest align does not exempt these records from scrutiny.

**III. Mr. Hall's motion is not untimely as public interest in the integrity of federal death penalty prosecutions does not go "stale."**

The government's third argument is that "[e]ven if this Court determines that Hall has standing and a basis for intervention on behalf, of the public, it should deny his motion as too

late," although the government also admits that "[d]ue to the ad hoc nature of intervention in criminal cases, there is no prescribed time limit." Gov. Resp. at 14. The government argues that "public interest in the allegations against CCS attorneys may have existed in 2018, when *The New York Times* published an article, cited by Hall, that mentions the allegations against Peterson." Gov. Resp. at 14. But at this point, the government argues, "the claims are stale." Gov. Resp. 16.

There are several problems with this argument. There is no support for the notion that the public interest in the integrity of federal criminal prosecutions goes "stale" after a few years, while defendants continue to serve time in prison and face possible execution. (The documents at issue in *Carlson*, for example, were seventy-year-old grand jury materials. *Carlson*, 837 F.3d at 755.) Nor is there any requirement that a leading news outlet have recently published an article about an issue to establish public interest.[2] That said, the alleged misconduct in *United States v. Rogers* was, in fact, discussed in an article the Associated Press published in July 2023. *See* Michael Tarm, *How DOJ Made Different Death Penalty Decisions in the Pittsburgh Synagogue and Texas Mall Massacres*, Associated Press (July 14, 2023), https://apnews.com/article/death-penalty-capital-section-garland-bowers-crusius-27d61a947178e2a6e505c97bcb55f78a (saying that "[c]ritics of the department single out an enigmatic department division, the Capital Case

---

[2] The government may misunderstand the definition of "interest" being used in the phrase "public interest." "Public interest" (like "best interest" or "in one's interest") refers to public *benefit* or *importance*, not the public's *curiosity*. Leading news outlets often bring light to matters of public importance, as the *New York Times* did in publishing an article about CCS misconduct. But something can be *important* without having recently been featured in a leading news outlet (and indeed many important issues are not *interesting*). Regardless, CCS misconduct was recently featured in a leading news outlet, because the public is interested in (that is, curious about) this important issue.

9

Section" and discussing the misconduct allegations in Andrew Rogers's case, quoting Monica Foster).[3]

The government also argues that any public interest claim is "stale" because CCS "has new management and largely new personnel." Gov. Resp. at 16. Yet the Department of Justice website lists Richard E. Burns, who was on Mr. Rogers's witness list for the May 2019 misconduct hearing, as the current Chief of the Capital Case section. *See* Capital Case Section, https://www.justice.gov/criminal/capital-case-section (last visited Feb. 5, 2024); Dkt. No. 376-1 at 1. Further, Mr. Hall and others were prosecuted, convicted and sentenced under the "prior" management and personnel. There is a public interest in interrogating the circumstances under which those convictions and sentences were obtained.

Therefore, even if the public interest in ensuring the integrity of death sentences could go "stale," it has not, and Mr. Hall's motion is timely.

---

[3] Additionally, many other articles have recently been published about the federal death penalty. *See, e.g.*, Michael Tarm, *Fuller Picture Emerges of the 13 Federal Executions at the End of Trump's Presidency*, *Associated Press* (Oct. 3, 2023), https://apnews.com/article/trump-executions-biden-death-penalty-brandon-bernard-c1b26807c5c40b337d14485c3d6df2de; David Nakamura, *Justice Department Standards on Federal Death Penalty Called Confusing*, *Wash. Post* (Feb. 11, 2023), https://www.washingtonpost.com/national-security/2023/02/11/death-penalty-justice-department/. *NPR* and *WFIU* Public Radio recently published an eight-episode podcast entirely about the federal death penalty. *See NPR* Podcast Directory, *Rush to Kill*, https://www.npr.org/podcasts/1205108509/w-f-i-u-rush-to-kill (last visited Feb. 5, 2024). Sen. Dick Durbin and Rep. Ayanna Pressley released a statement about the federal death penalty as recently as January 2024. *See* U.S. Senate Committee on the Judiciary, *Durbin, Pressley Statement on Justice Department Seeking the Death Penalty in Buffalo Supermarket Shooting Case*, https://www.judiciary.senate.gov/press/releases/durbin-pressley-statement-on-justice-department-seeking-the-death-penalty-in-buffalo-supermarket-shooting-case (last visited Feb. 5, 2024).

**IV. Mr. Hall's motion is meritorious, as he has a common law and First Amendment right to depositions about prosecutorial misconduct by the prosecutor who obtained a death sentence against him.**

Finally, the government argues that Mr. Hall's motion to unseal lacks merit. The government's arguments on the merits of Mr. Hall's motion repeat their procedural arguments. The government's argument that there is no common law right to access the documents repeats its argument that the claim is untimely, asserting that "[a]s to the public interest, the claims are stale" because "[g]eneral references to a public interest, either long vindicated or long forgotten, do not demonstrate a compelling need for unsealing the depositions." Gov. Resp. at 16. As noted above, it is not clear where the government got the idea that that public interest in the integrity of federal death sentences could go "stale." Even if it does, and even if the way to prove freshness is pointing to news articles on the subject, a recent Associated Press article and the plethora of other recent articles about the federal death penalty selection process undermine the government's argument that the public interest has gone stale. And DOJ's own website undermines the government's argument that current CCS personnel are unconnected to Mr. Rogers's misconduct allegations, as the current section chief was on Mr. Rogers's witness list for the misconduct hearing.

The government then tries to argue that Mr. Hall's own interest in the records "counsels against the request." Gov. Resp. at 16. As noted above, Mr. Hall's interest in the documents does not disqualify him from seeking these documents, given that there is a public interest in the documents. Mr. Hall's interest and the public interest align, but that does not negate the fact that these records are of public interest. For this reason, Mr. Hall's motion to unseal is not a discovery request, but a request to unseal documents in which there is a public interest.

11

The government's First Amendment argument is equally unavailing, also for reasons discussed above. The government argues that "[w]hether an individual has a First Amendment right to court records turns on whether the document or proceeding has 'historically been open to the press and general public' and whether 'public access plays a significant positive role in the functioning of the particular process in question.'" Gov. Resp. at 18 (quoting *Press-Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1, 8 (1986)). The government then argues that depositions historically were not open to the public. As discussed above, however, the depositions in this case were made a part of the docket, making them judicial records, which historically were open to the public. In the same vein, the government argues that allowing public access to depositions in civil cases would make the civil discovery process more burdensome and that the public does not have the right to see how that process works. Gov. Resp. at 18. The documents at issue in this case are not depositions in a civil case and the interest at issue is not in seeing how civil discovery works. The documents at issue are depositions that the Court relied on in determining that it was necessary to hold a hearing on whether prosecutorial misconduct should preclude the government from seeking the death penalty in a criminal prosecution.

Therefore, Mr. Hall's motion is meritorious, and he has established why the depositions in *United States v. Rogers* should be unsealed.

**V. The Court should unseal these depositions, not grant Mr. Hall access pursuant to a protective order, and the government's argument to the contrary contradicts nearly every other argument in the government's Response.**

Having spent most of its Response arguing that Mr. Hall would have standing to obtain these documents only if there is a broader public interest at stake, the government concludes by urging the Court that if it releases the depositions at all, it should do so subject to a protective

12

order that prevents anyone not directly involved in Mr. Hall's case from seeking them. Gov.

Resp. at 19-20. The government contradicts itself and, moreover, the government has made no

convincing arguments that these documents should not be available to the public. If anything, the

government invites the question of why they are working so hard to keep the depositions secret.

Therefore, for the foregoing reasons, the depositions in *United States v. Rogers* should be

unsealed or Mr. Hall and his counsel should be granted access to these documents to aid his

litigation, petition for clemency, and other efforts seeking to overturn his death sentence.

Respectfully submitted,

*/s/ F. Italia Patti*
Angela S. Elleman, Chief
F. Italia Patti, Assistant Federal Defender
§ 2255 Unit
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN   46204
Phone: 317-383-3520
angie_elleman@fd.org
italia_patti@fd.org

Dated:  February 5, 2024

13

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2024, the foregoing document was filed

electronically. Notice of this filing will be sent to the parties of record by operation of the

Court's electronic filing system and parties may access this filing through the Court's system.

*/s/ F. Italia Patti*
F. Italia Patti
Assistant Federal Defender

14