UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| CHARLES MICHAEL HALL, | ) | Case No. 4:21-CV-08001-BCW |
| | ) | |
| Movant, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## <u>REPLY IN SUPPORT OF MOTION FOR AUTHORIZATION TO CONDUCT DISCOVERY UNDER THE FEDERAL RULES OF CIVIL PROCEDURE AND CRIMINAL PROCEDURE</u>

Angela S. Elleman
Chief, Capital § 2255 Unit
F. Italia Patti
Assistant Federal Defender
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN   46204
Phone: 317-383-3520
E-Mail: angie_elleman@fd.org
italia_patti@fd.org

Keith O'Connor
Mo Bar No. 63134
PO Box 22728
Kansas City, MO 64113
Phone: 816-225-7771
E-Mail: keith@keithoc.com

Attorneys for Movant Charles Michael Hall

## Table of Contents

Table of Authorities......................................................................................................i

Introduction............................................................................................................... 1

I. The government's specific objections to Mr. Hall's proposed discovery requests are premature. ................................................................................................................................. 1

II. The government's objections to Mr. Hall's initial discovery requests lack merit. ..................... 3

III. The Court should grant Mr. Hall's Motion for Leave to Conduct Discovery and, following the procedure Mr. Hall suggested, require the parties to try to resolve any specific objections to discovery requests on their own............................................................................................ 28

## Table of Authorities

Cases

*Bracy v. Gramley*, 520 U.S. 899 (1997)...................................................................... 1
*Stankewitz v. Wong*, 698 F.3d 1163 (9th Cir. 2012)......................................................... 28
*Wharton v. Chappell*, 765 F.3d 953 (9th Cir. 2014)....................................................... 27
*Wiggins v. Smith*, 539 U.S. 510 (2003) ............................................................... 27, 28
*Williams v. Alabama*, 2021 WL 4325693 (N.D. Ala. Sept. 23, 2021).......................................... 27
*Williams v. Alabama*, 791 F.3d 1267 (11th Cir. 2015) ................................................... 27

Statutes

5 U.S.C. § 552a.................................................................................................. 17, 24

Rules

Fed. R. Civ. P. 26.............................................................................................. 17, 24

**Introduction**

Charles Hall, through counsel, has moved for leave to conduct discovery. His Motion for Authorization to Conduct Discovery explained that he satisfies the "good cause" standard because his § 2255 Motion alleged specific facts that would entitle him to relief. *See* Dkt. 77-1 (Mot. to Conduct Disc.) at 1 (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)). Mr. Hall additionally proposed that, if the Court agrees that he has satisfied the good cause standard and authorizes discovery, he should conduct discovery according to the procedures set out by the Federal Rules of Civil Procedure. Mr. Hall suggested handling any disputes about specific discovery requests according to the Federal Rules of Civil Procedure, which require the parties to confer in good faith before petitioning the Court. Mr. Hall also outlined the initial discovery requests he would serve if the Court granted him leave to conduct discovery. The government's Response offers no compelling reason why this Court should deny Mr. Hall's Motion.

First and foremost, the government's specific objections to Mr. Hall's proposed discovery requests have no merit, as explained detail below. Some of the government's objections are premised on incorrect factual assertions. Others misapply the legal standard. None are convincing.

Before explaining why the government's specific objections are thoroughly unconvincing, however, Mr. Hall will address why the Court should not even reach the government's specific objections at this juncture.

**I. The government's specific objections to Mr. Hall's proposed discovery requests are premature.**

Mr. Hall's suggested discovery procedures sought to avoid the protracted discovery litigation that the government has launched into without addressing Mr. Hall's suggested procedure for streamlining the discovery process. Mr. Hall's request was narrow and sought

1

limited relief: leave to serve discovery requests and subpoenas. Mr. Hall explicitly noted that he did "not seek an order that any particular request satisfies the relevancy provisions of the Federal Rules or any of the other requirements of those rules" because "[t]hose issues, if any, can be best addressed in the typical manner in which discovery issues are addressed: after service of a discovery request, the filing of objections and a meet and confer." Dkt. 77-1 (Mem. in Supp. Mot. to Conduct Disc.) at 10. Yet the government's Response objects to Mr. Hall's discovery requests without explaining why it disagrees with Mr. Hall's suggested procedure for handling discovery in a manner that would be less burdensome for the Court.

To be clear, Mr. Hall in no way disputes that the Court has authority to prohibit certain depositions or subpoenas, pursuant to Federal Rules of Civil Procedure 26(c) and 45(d)(3) or Rule 6 of the Rules Governing Section 2255 Proceedings. But that is an entirely separate question from whether the parties should be required to confer and attempt to resolve disputes before petitioning the Court, as Mr. Hall suggested they should.

Without addressing Mr. Hall's suggestions for streamlining the Court's involvement, the government objects to all of Mr. Hall's discovery requests, including those that do not request information from the government. The government offers no argument for why it should have a say in whether Mr. Hall can seek sworn testimony from his trial counsel and an expert retained by trial counsel or seek documents from Vermont agencies that may have information about sexual abuse of Mr. Hall and other boys by a serial predator. The only interest the government has in whether Mr. Hall deposes trial counsel and defense trial experts is that the government would be entitled to attend depositions. The government has no interest in whether Mr. Hall seeks documents from Vermont agencies. Undersigned counsel is, of course, willing to work with the government to conduct depositions with the least possible inconvenience to the

government as well as deponents. And undersigned counsel is also willing to confer with the government about any legitimate concerns over third-party subpoenas.

Following Mr. Hall's suggestion would save the Court, and likely the parties, significant time and inconvenience.[1] As such, in addition to submitting this Reply to address the government's arguments against each of Mr. Hall's proposed discovery requests, Mr. Hall also moves for a conference to discuss the proper procedures for discovery in this case. A Motion for a Conference Pursuant to Federal Rule of Civil Procedure 16 with Suggestions in Support is being filed along with this Reply.

**II. The government's objections to Mr. Hall's initial discovery requests lack merit.**

Mr. Hall included in his motion a list of the documents and testimony that he would initially seek *if* this Court grants leave to conduct discovery. The government's primary response was to point out that Mr. Hall did not cite the page numbers in his § 2255 Motion in support of these requests. Mr. Hall now provides these citations. Mr. Hall also explains why the government's other arguments are unconvincing.

***Depositions***

**Depose counsel Darryl Johnson**

Page citations:

- Claim 1 of Mr. Hall's § 2255 Motion alleges ineffective assistance at the penalty phase. Claim 1 begins on page 48. Claim 1, Part A begins on page 51 and alleges: "Trial counsel was ineffective for failing to conduct an adequate life-history investigation," specifically, alleging that "[w]hile serving as Mr. Hall's lead trial counsel, Mr. Johnson and then Mr. Duchardt were responsible for ensuring that a thorough life history investigation was conducted. Neither fulfilled this obligation." On pages 53-56, Mr. Hall details the failures by Mr. Johnson's team. On pages 54-55, the motion explains that, by his own account,

---

[1] And while Mr. Hall's suggested procedure would streamline the process, the procedure the government appears to be following would invite many rounds of litigation as to each discovery request. The government has objected to each of Mr. Hall's proposed initial requests, many of which, as noted, do not request information from the government. So, if the Court does rule that Mr. Hall may proceed with any of these discovery requests, Mr. Hall would then serve subpoenas for depositions and documents, at which point the subject of each subpoena could also raise objections.

Mr. Johnson was focused on winning the guilt-innocence phase and did not think it was important to investigate Mr. Hall's life history. Pages 48-51 explain that Mr. Johnson's view is contrary to Supreme Court precedent and the ABA Guidelines that explain the ethical standards for representing people facing the death penalty. These precedents and standards establish that "[e]ffectively representing a client facing the death penalty requires an extensive investigation into '*all reasonably available* mitigating evidence.'" Dkt. 70 (§ 2255 Mot.) at 49 (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C))). Pages 188-200 discuss the prejudice from trial counsel's inadequate investigation.

- Claim 1, Part I begins on page 174. On page 175, the Motion alleges that, when meeting with DOJ officials, rather than using the meeting as an opportunity to present mitigating evidence and make a forceful argument against the death penalty, Mr. Johnson told the DOJ that Mr. Hall wanted the death penalty. On page 176, the Motion goes on to explain that "[a]t the time of the presentation, Mr. Johnson had not retained a mitigation specialist or hired any experts of any kind on behalf of Mr. Hall" and so had no understanding of Mr. Hall's mental health struggles. Mr. Stuart Huffman's – Mr. Johnson's co-counsel – declaration, which is Exhibit 14 and discussed extensively on page 176, explains that Mr. Hall "waivered about his desire for the death penalty during the time I represented him, going back and forth about what he wanted." Pages 175-77 explain that in the presentation to the DOJ, Mr. Johnson completely failed to advocate for his client. Page 201 discusses the prejudice from trial counsel's failure to advocate for Mr. Hall to the DOJ committee.

Reply to additional arguments:

Despite Mr. Hall making specific allegations about Mr. Johnson's ineffectiveness that would entitle Mr. Hall to relief, the government argues that deposing Mr. Johnson "is unnecessary" because his representation "was for a limited time, in the case's early stages" and due to "competent attorneys taking over the case almost two years prior to trial." Dkt. 80 (Resp.) at 5. Neither of these arguments accurately reflects the facts.

First, as to the argument that Mr. Johnson represented Mr. Hall for a limited time, this is incorrect. Of the four years between indictment and trial, Mr. Johnson represented Mr. Hall for two years and four months, while Mr. Duchardt represented Mr. Hall for one year and eight months.[2] Mr. Johnson did not represent Mr. Hall for "a limited time"; rather, at the time of trial,

---

[2] Mr. Hall was indicted in April 2010. Mr. Johnson represented Mr. Hall from April 2010 until August 2012 (two years four months). Mr. Duchardt began representing Mr. Hall in August 2012. The trial began in April 2014

4

Mr. Hall had been represented by Mr. Johnson's team longer than he had been represented by Mr. Duchardt's team.[3]

Any suggestion that Mr. Johnson's role was unimportant because he represented Mr. Hall during the "case's early stages" ignores the critical importance of the early stages of a criminal case, especially a capital case. As the ABA Guidelines explain: "The period between an arrest or detention and the prosecutor's declaration of intent to seek the death penalty is often critically important" in part because "effective advocacy by defense counsel during this period may persuade the prosecution not to seek the death penalty." 2003 Guidelines 1.1. This means "it is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible[.]" *Id.*

Second, as to the argument that Mr. Johnson was replaced by competent counsel, this is also incorrect. The subsequent trial team was ineffective. Mr. Hall has cataloged their extensive errors, most notably in failing to conduct a constitutionally adequate penalty phase investigation. As the government notes, Mr. Hall's allegations regarding the trial team's ineffectiveness span nearly 300 pages, Dkt. 80 (Resp.) at 9, and they are the subject of many of the other proposed discovery requests discussed here.

The government also argues that, "[r]egarding the allegation that Johnson told the Department of Justice that Hall wanted a death sentence, this information is already known, because Hall wrote two letters to the government and defense counsel stating he wanted a death

---

(one year eight months after Mr. Duchardt began representing Mr. Hall). The trial lasted through May, and the jury returned its verdict on June 2, 2014 (one year ten months after Mr. Duchardt began representing Mr. Hall).

[3] Because Mr. Duchardt stayed on as counsel through the direct appeal, he ultimately represented Mr. Hall for longer than Mr. Johnson had. But Mr. Duchart's time representing Mr. Hall post-trial is irrelevant to the adequacy of trial counsel's investigation for the penalty phase of trial.

sentence." Dkt. 80 (Resp.) at 6. But the issue here is not whether Mr. Hall said he wanted a death sentence. The issue is how Mr. Johnson and his team failed Mr. Hall.

As the § 2255 Motion explains, Mr. Johnson failed to understand, and consequently to advocate for, his client. "At the time of the presentation, Mr. Johnson had not retained a mitigation specialist or hired any experts of any kind on behalf of Mr. Hall." Dkt. 70 (§ 2255 Mot.) at 176. He had requested an evaluation of Mr. Hall's competency to stand trial, but had hired no experts to assess mental health issues beyond competency even though he "should have immediately recognized the need to investigate Mr. Hall's mental health: Mr. Hall experienced cycles of depression and suicidality." *Id.* Indeed, co-counsel Stuart Huffman believed Mr. Hall's "stated desire for the death penalty was due primarily to his poor medical condition and the suffering he experienced from it" and thought the team should have looked more deeply into Mr. Hall's mental health. *Id.* (quoting Ex. 14). Mr. Hall's § 2255 Motion also points out that that a client "saying he wanted the death penalty would not have surprised an attorney who had done their research." *Id.* The ABA Guidelines specifically advise that some clients will initially insist that they want to be executed but "[i]t is ineffective assistance of counsel to simply acquiesce to such wishes, which usually reflect the distorting effects of overwhelming feelings of guilt and despair rather than a rational decision . . . ." *Id.* (quoting 2003 Guidelines 10.5, commentary).

That is, Mr. Hall saying he wanted the death penalty does not undermine the claim that counsel was ineffective for repeating this statement to the DOJ without providing necessary context about Mr. Hall's serious mental health problems, history of trauma and PTSD, history of suicide attempts, painful medical condition, and frequent use of prescription medication that causes severe psychological side effects. Perhaps most importantly, Mr. Johnson failed to provide the necessary context that Mr. Hall waivered about whether he wanted to be killed. As such, the

materials Mr. Johnson submitted to the DOJ, if any, are relevant to the claim of ineffectiveness, regardless of the letters Mr. Johnson's mentally ill client sent.

Finally, the government argues that "Johnson's refusal to sign a declaration or a letter in support of Hall's petition for clemency has absolutely no bearing on a motion to vacate under 28 U.S.C. § 2255 and should be disregarded." Dkt. 80 (Resp.) at 7. As it appears there may be some confusion, undersigned counsel clarifies that Mr. Johnson was asked to sign a declaration conveying information relevant to Mr. Hall's § 2255 Motion, not in support of a clemency petition.[4]

Mr. Johnson's refusal to make a sworn statement about his representation of Mr. Hall so that the Court will be fully apprised of the facts relevant to allegations of ineffectiveness in Mr. Hall's § 2255 Motion is absolutely a reason to depose him. To the extent that the government contests this point, the government's argument falls flat because Mr. Hall has made specific allegations of ineffectiveness that would entitle him to relief, and as such has met the good cause standard for discovery.

Furthermore, Mr. Johnson is not affiliated with the government. The government has not made any argument for why it should have a say in whether Mr. Hall is permitted to depose his trial counsel who he alleges provided constitutionally inadequate representation that resulted in an unreliable death sentence.

**Depose counsel Lynn Johnson**

Page citations:

- Claim 1 of Mr. Hall's § 2255 Motion alleges ineffective assistance at the penalty phase. Claim 1 begins on page 48. Claim 1, Part A begins on page 51 and alleges: "Trial counsel was ineffective for failing to conduct an adequate life-history investigation," specifically,

---

[4] Undersigned counsel and Mr. Johnson also discussed the possibility of a letter in support of Mr. Hall's petition for clemency. But undersigned counsel agrees with the government that Mr. Johnson's refusal to submit a letter in support of Mr. Hall's clemency petition is not a reason to depose him in conjunction with § 2255 proceedings.

alleging that "[w]hile serving as Mr. Hall's lead trial counsel, Mr. Johnson and then Mr. Duchardt were responsible for ensuring that a thorough life history investigation was conducted. Neither fulfilled this obligation." On pages 52-53, Mr. Hall explains that Ms. Johnson was appointed as Mr. Johnson's co-counsel following the withdrawal of Stuart Huffman, Mr. Johnson's initial co-counsel with whom he "did not have a good working relationship." On pages 53-56, Mr. Hall details the failures by Mr. Johnson's team. Ms. Johnson was a member of this team. She was at minimum a witness to and more likely partly responsible for the team's failures. She has knowledge of Mr. Johnson's decisions regarding the (lack of) life-history investigation and what steps the team failed to take to conduct such an investigation. Pages 188-200 discuss the prejudice from trial counsel's inadequate investigation.

- Claim 1, Part I begins on page 174. On page 175, the Motion alleges that, when meeting with DOJ officials, rather than using the meeting as an opportunity to present mitigating evidence and make a forceful argument against the death penalty, Mr. Johnson told the DOJ that Mr. Hall wanted the death penalty. On page 176, the Motion goes on to explain that "At the time of the presentation, Mr. Johnson had not retained a mitigation specialist or hired any experts of any kind on behalf of Mr. Hall" and so had no understanding of Mr. Hall's mental health struggles. Mr. Huffman's declaration, which is Exhibit 14 and discussed extensively on page 176, explains that Mr. Hall "waivered about his desire for the death penalty during the time I represented him, going back and forth about what he wanted." Pages 175-77 explain that in the presentation to the DOJ, Mr. Johnson completely failed to advocate for his client. Ms. Johnson was a member of Mr. Johnson's team. She was at minimum a witness to and more likely partly responsible for the team's failures. She has knowledge of Mr. Johnson's decisions regarding the presentation. Page 201 discusses the prejudice from trial counsel's failure to advocate for Mr. Hall to the DOJ committee.

Reply to additional arguments:

Arguing that Mr. Hall should not be permitted to depose Ms. Johnson, the government repeats the same arguments it relied on to argue against deposing Mr. Johnson. These arguments are no more convincing as to Ms. Johnson than Mr. Johnson. Ms. Johnson also represented Mr. Hall during the critical pretrial period when life history investigation and mental health evaluations should have been occurring and provided ineffective assistance of counsel by failing to ensure these steps were taken. Mr. Hall has made specific allegations of ineffectiveness of Ms. Johnson that would entitle him to relief, and as such has met the good cause standard. Ms. Johnson refused to even meet with undersigned counsel. Furthermore, Ms. Johnson is not affiliated with the government, and the government has not made any argument for why it should

8

have a say in whether Mr. Hall is permitted to depose his trial counsel who he alleges provided constitutionally inadequate representation that resulted in an unreliable death sentence.

**Depose trial counsel Michael Walker**

Page citations:

- Claim 1 of Mr. Hall's § 2255 Motion alleges ineffective assistance at the penalty phase. Claim 1 begins on page 48. On page 56, Mr. Hall explains that because Mr. Duchardt's initial co-counsel, Robert Lewis, was facing serious health problems, Mr. Michael Walker was appointed to the case in January 2014 and that both Mr. Walker and Mr. Lewis assisted with the trial. Claim 1 includes several subparts. Parts A-K spans pages 51-185, and details counsel's myriad failures in investigating, preparing for, and presenting evidence for the penalty phase. Mr. Walker was a member of Mr. Duchardt's trial team. He was at minimum a witness to and more likely partly responsible for the team's failures in the penalty phase. He has knowledge of decisions regarding penalty-phase investigation and presentation. Pages 185-203 explain how Mr. Hall was prejudiced by trial counsel's unreasonable errors.

- Claim 2 of Mr. Hall's § 2255 Motion alleges ineffective assistance of counsel at the culpability phase. Claim 2 begins on page 204. Mr. Walker and Mr. Lewis (who is deceased) were responsible for the culpability phase of trial. On pages 213-14, Mr. Hall explains that in April 2014, Mr. Duchardt wrote a memo to the trial court stating: "Bob [Lewis] and Mike [Walker] had first phase responsibiliites [sic.], and I had control over the penalty phase presentation." According to Mr. Duchardt "a division of duties" "ha[d] developed naturally" and "Bob and Mike would be handling nearly all of the first phase in-court duties." Mr. Walker was in court for the entire culpability phase. Consequently Mr. Walker has relevant information about trial counsel's investigation and presentation of culpability phase evidence. Pages 216-18 explain how Mr. Hall was prejudiced by trial counsel's unreasonable errors.

- Claim 3 alleges ineffective assistance of counsel during jury selection. Claim 3 begins on page 219. Although, as reflected in the transcript and explained on page 220, Mr. Duchardt handled the questioning, Mr. Duchardt's memo on counsel's division of responsibilities states that "Mike addressed all voir dire preparations." The memo is quoted on page 214 of the § 2255 Motion and attached as Exhibit 76. Mr. Walker has relevant information about trial counsel's preparation for and decisions during jury selection. Pages 228-229 explain how Mr. Hall was prejudiced by trial counsel's unreasonable errors.

- Claim 4 alleges a conflict of interest because lead trial counsel Mr. Duchardt hired his friend Dr. John Wisner as a mental health expert even though Dr. Wisner had been publicly accused of sexually abusing minors, potentially undermining his credibility with the jury as well as his ability to elicit sensitive information from Mr. Hall. Claim 4 starts on page 230. Mr. Walker at minimum would have information about how the decision to hire Dr. Wisner was made, which is of course relevant to the claim that Mr. Duchardt was

9

operating under a conflict of interest. Pages 239-43 explain the adverse impact of this conflict of interest.

Reply to additional arguments:

The government argues that "[s]ince Hall has already spoken to counsel Walker and declined Walker's affidavit, Hall fails to show 'good cause' and this request should be denied." Dkt. 80 (Resp.) at 9. In fact, the circumstances surrounding undersigned counsel's discussions with Mr. Walker, if anything, make it more critical that counsel have the opportunity to question Mr. Walker under oath.

Undersigned counsel has reported that the draft declaration Mr. Walker sent was inconsistent with counsel's memory of the conversation with Mr. Walker. Under oath testimony, with the ability to ask follow-up questions and use documents to refresh the witness' recollection, is critical to understanding the facts surrounding trial counsel's representation of Mr. Hall. Mr. Hall has made specific allegations of ineffectiveness that would entitle him to relief, and as such has met the good cause standard.

Furthermore, Mr. Walker is not affiliated with the government. The government has not made any argument for why it should have a say in whether Mr. Hall is permitted to depose his trial counsel who he alleges provided constitutionally inadequate representation that resulted in an unreliable death sentence.

**Depose trial expert Dr. Robert Fucetola**

Page citations:

- Claim 1 of Mr. Hall's § 2255 Motion alleges ineffective assistance at the penalty phase. Claim 1 begins on page 48. In Claim 1, Part A, on pages 52-60, the Motion alleges trial counsel's failure to investigate mitigating evidence, including failing to learn that Mr. Hall suffered sexual abuse.

- In Claim 1, Part B, on pages 94-100, the Motion alleges trial counsel's failure to secure brain imaging showing that Mr. Hall's brain is abnormal. Pages 99-100 and 105-13 explain that undersigned counsel had brain imaging conducted in 2023 and the PET/MRI images reveal abnormalities in Mr. Hall's brain. Exhibits that Mr. Hall submitted in

support of his § 2255 Motion, including Exhibits 1, 2, 5, 6 and 11, also explain the relevance of the brain imaging. Exhibit 11 is the actual results of the MRI/PET conducted at Indiana University Health on September 26, 2023.

- In Claim 1, Part C, on page 115-16, the motion alleges that trial counsel failed to give experts and mental health professionals, including Dr. Fucetola, complete and accurate information about Mr. Hall. This failure rendered his testimony unreliable. The Motion specifically explains that Dr. Fucetola had "recommended that brain imaging be conducted prior to trial" and "[h]aving recently seen the results of brain imaging and heard about Chuck's sexual abuse at Shaker Mountain, he likewise can say that this additional information would have informed his testimony at trial." Footnote 49, on page 115, explains: "Dr. Fucetola met with undersigned counsel and relayed this information during that meeting. He declined to sign a sworn declaration." Pages 122-23, as well as Exhibits 1, 2, and 5 further explain how brain imaging results would have filled in significant gaps in Dr. Fucetola's testimony.

Reply to additional arguments:

The government argues that Mr. Hall should not be permitted to depose Dr. Fucetola because Mr. Hall "fails to identify the date and findings of said 'MRI/PET'"; "did not allege sexual abuse until his § 2255 petition, 10 years after conviction"; and has already spoken to Dr. Fucetola, yet Hall has provided no information regarding that discussion to the Government," adding that "[s]ince Hall has already gathered the information needed from Dr. Robert Fucetola, a deposition is not needed." Dkt. 80 (Resp.) at 10.

Taking each of these arguments in turn. First, as to the argument that Mr. Hall "fails to identify the date and findings of said 'MRI/PET,'" that is incorrect. Mr. Hall extensively discussed the MRI/PET findings in his § 2255 Motion. As noted above, pages 99-100 and 105-13 explain that undersigned counsel had brain imaging conducted in 2023 and the PET/MRI images reveal abnormalities in Mr. Hall's brain. Exhibit 11 to Mr. Hall's § 2255 Motion is the PET/MRI results. Exhibit 11's first page reflects a date of September 26, 2023. Exhibits 1, 2, 3, 5, and 6 discuss the significance of these results.

Second, as to the argument that Mr. Hall "did not allege sexual abuse until his § 2255 petition, 10 years after conviction," this argument has no bearing on whether Mr. Hall should be

11

able to depose Dr. Fucetola about brain imaging. This argument does not establish that Mr. Hall cannot depose Dr. Fucetola about other information trial counsel failed to provide, including evidence of sexual abuse. For one, trial counsel's failures are the reason why Mr. Hall did not disclose sexual abuse until after his conviction. Exhibit 4 is the declaration of Dr. Howard Fradkin, an expert in male sexual victimization. This exhibit addresses how common it is for male victims of sexual abuse not to disclose their history of abuse, particularly when they do not feel safe. Exhibit 13 is the declaration of Dr. Wisner, who was one of trial counsel's mental health experts. This exhibit acknowledges that, prior to interviewing Mr. Hall, Dr. Wisner was himself been publicly accused of serially sexually abusing young boys. This information helps explain why Mr. Hall was unlikely to disclose his abuse to the trial team. When questioned by undersigned counsel, Mr. Duchardt surmised that Mr. Hall was probably more likely to disclose abuse to a woman, while acknowledging that his trial team included no women. The transcript of Mr. Duchardt's statement is Exhibit 15 to Mr. Hall's § 2255 Motion. The fact is, trial counsel failed to conduct an adequate life history investigation including an investigation into Mr. Hall's time at the Shaker Mountain School. If conducted, this investigation would have revealed a school where sexual abuse occurred to many young men like Mr. Hall.

In sum, the government has correctly pointed out that Mr. Hall failed to share a painful secret—the kind of secret that men in particular often never share—with an incompetent legal team that included a psychiatrist facing his own accusations of sexual predation. This fact does not establish that Mr. Hall should be forbidden from deposing Dr. Fucetola.

Third, the government argues that Mr. Hall failed to provide any information about undersigned counsel's conversation with Dr. Fucetola. That is incorrect. Mr. Hall's § 2255 Motion, on pages 114-15, explained that Dr. Fucetola told counsel that "[h]aving recently seen

12

the results of brain imaging and heard about Chuck's sexual abuse at Shaker Mountain, he likewise can say that this additional information would have informed his testimony at trial." In footnote 49, on page 115, undersigned counsel explained that Dr. Fucetola declined to sign a declaration memorializing this statement. Thus, the government has been provided with the relevant information regarding trial counsel's meeting with Dr. Fucetola.

Finally, the government argues that a deposition is unnecessary because Mr. Hall has already gathered the necessary information from Dr. Fucetola. Certainly, if the government agrees to stipulate that Dr. Fucetola's testimony would have been different had trial counsel's deficient performance not deprived him of relevant information, then Mr. Hall may not need to depose Dr. Fucetola. But if the government plans to contest this point, then Dr. Fucetola should be deposed so that Mr. Hall has the opportunity to fully develop the facts supporting his allegations. Mr. Hall has made specific allegations of ineffectiveness that would entitle him to relief, and as such has met the good cause standard.

Furthermore, Dr. Fucetola is not affiliated with the government. The government has not made any argument for why it should have a say in whether Mr. Hall is permitted to depose an expert retained by trial counsel who he alleges provided constitutionally inadequate representation that resulted in an unreliable death sentence.

**Depose government witness BOP psychologist Dr. Chad Brinkley**

Page citations:

- Claim 5 of Mr. Hall's § 2255 Motion alleges *Brady* violations. Pages 246-50 allege that the government suppressed evidence showing that in the hours before the homicide Mr. Hall spoke with psychologist Dr. Chad Brinkley (along with psychiatrist Dr. Patrick Gariety) and asked for additional mental health care. On page 248-49, Mr. Hall explains that Dr. Brinkley testified at trial but did not tell the jury about his encounter with Mr. Hall in the hours before the homicide. Trial counsel did not raise the issue during cross-examination.

- Claim 7 of Mr. Hall's § 2255 Motion alleges a *Napue* violation because Dr. Brinkley's testimony failed to disclose that earlier on the day of the homicide, Mr. Hall asked to

13

speak privately with Dr. Brinkley or psychiatrist Dr. Gariety. Pages 273-75 explain Dr. Brinkley's misleading testimony and that undersigned counsel learned about Dr. Brinkley's misleading omission by speaking with Dr. Gariety, who was also present for the conversation with Mr. Hall but not called to testify at trial.

Reply to additional arguments:

The government argues that "Mr. Hall has not shown that merely requesting to speak to [Dr. Gariety or Dr. Brinkley] is 'powerful mitigating evidence.'" Dkt. 80 (Resp.) at 11. BOP mental health professionals are the only lifeline for someone in BOP custody having a mental health crisis. Mr. Hall was reaching to the only available source for mental health care. The government's argument ignores important details emphasized in Mr. Hall's § 2255 Motion. Throughout his time in BOP custody, Mr. Hall had repeatedly requested to be housed in segregation because he was afraid he would hurt himself or someone else. *See, e.g.*, Dkt. 70 (§ 2255 Mot.) at 124, 149, 248. In the days leading up to the homicide, Mr. Hall had been dealing with serious complications of Crohn's disease. *Id.* at 154-55. He was taking a high dose of prednisone pursuant to a prescription by BOP medical staff, even though prednisone was contraindicated for people with Mr. Hall's mental health problems because it causes mania and rage. *Id.* at 157-58, 207. On January 11, 2010, just fifteen days before the homicide, Mr. Hall told Dr. Brinkley that "it would be difficult for him to live in an open unit where he had to deal with teasing about his medical issues." *Id.* at 156, 246. Dr. Brinkley "reassured the inmate [Mr. Hall] that the treatment team would not transfer him to a hostile housing situation." *Id.* at 247. Yet after Mr. Hall returned from surgery on January 12, 2010, he was placed in an open unit. *Id.* Early in the day on January 26, 2010, Mr. Hall asked to speak to Dr. Brinkley or Dr. Gariety privately. *Id.* at 246. No such conversation occurred. *Id.* The homicide occurred that evening. *Id.*

The government also argues that "any context of an alleged conversation would be contained in Hall's medical records, which have been provided in voluntary discovery." Dkt. 80

(Resp.) at 11. But Mr. Hall's point is that there was no conversation. Mr. Hall asked to speak with a mental health professional but was unable to do so. Unsurprisingly, the lack of a conversation is not documented in Mr. Hall's medical records.

Finally, the government argues that "since Dr. Gariety provided a declaration, this information is cumulative." Dkt. 80 (Resp.) at 11. Certainly, if the government agrees to stipulate that Dr. Brinkley provided to the government information that Mr. Hall requested to speak to him or Dr. Gariety in the hours prior to the homicide, but that this information was not disclosed to the defense, then Mr. Hall may not need to depose Dr. Brinkley. But if the government plans to contest this point, then Dr. Brinkley should be deposed so that Mr. Hall has the opportunity to fully develop the facts supporting his allegations. Mr. Hall has made specific allegations of misconduct and ineffectiveness that would entitle him to relief, and as such has met the good cause standard.

**Depose BOP psychologist Dr. Elizabeth Weiner**

Page citations:

- Claim 5 of Mr. Hall's § 2255 Motion alleges *Brady* violations. Page 250 alleges that Dr. Weiner sent an email explaining that an inmate, David Bruesch, told her he had submitted a request to staff stating that things were out-of-hand. Exhibit 95 is Dr. Weiner's email. Mr. Hall's § 2255 Motion also discuss Dr. Weiner's email in relation to Claim 1, the failure to investigate mitigating evidence. Page 131-32 alleges that trial counsel conducted no follow up investigation into Mr. Bruesch's statement, despite having a copy of Dr. Weiner's email and even being in the same room with Dr. Weiner for the interview of Johnny Bass. Also in relation to Claim 1, page 126 alleges that staff improperly placed inmates who required enhanced security, like Mr. Hall's co-defendant Mr. Coonce, in Unit 10-B. Exhibit 9, the Declaration of Joe Buckmaster, specifically points to Dr. Weiner as a staff member who would allow Mr. Coonce to be in a relatively unrestricted environment when he should been subject to tighter controls.

Reply to additional arguments:

The government argues that the court should give limited weight to any statements by Joe Buckmaster because he is "being paid for delivering his opinion by the defendant." Dkt. 80

(Resp.) at 12. That statement is incorrect. Undersigned counsel did not pay or enter into any financial agreement with Mr. Buckmaster.

The government also points out that Mr. Buckmaster is not a doctor or medical professional. *Id.* But Mr. Buckmaster has not claimed to have any medical expertise. His declaration discusses his experiences with staff members and observations about security protocols at the United States Medical Center for Federal Prisoners. Having served as a lieutenant at the facility, his testimony on these topics is not only proper and relevant, but illuminating.

The government also argues that Mr. Hall has not produced evidence that Mr. Bruesch actually submitted a written complaint stating that Unit 10-B was getting out of hand. This argument is unconvincing for two reasons. First, Mr. Hall has submitted such evidence—the email from Dr. Weiner stating that Mr. Bruesch told her he submitted such a complaint. Second, to the extent the government is arguing that this email is not conclusive evidence that Mr. Bruesch actually submitted such a complaint, that is precisely why Mr. Hall seeks discovery on this issue, to further develop the facts as to this allegation. Mr. Hall seeks to depose Dr. Weiner because her email is the evidence that such a complaint may exist. Mr. Bruesch is deceased, so as far as Mr. Hall is aware, Dr. Weiner is the living person most likely to be able to fill in the details of Mr. Bruesch's statement that he submitted a complaint that Unit 10-B was getting out of hand.

**Depose government witness Correctional Officer Robert Logsdon**

Page citations:

- Claim 1 of Mr. Hall's § 2255 Motion alleges ineffective assistance at the penalty phase. Claim 1, Part D alleges that counsel was ineffective for failing to investigate and present evidence of the BOP's mismanagement contributing to Mr. Castro-Rodriguez's death. Page 137, citing Exhibit 9, Mr. Buckmaster's declaration, alleges that Mr. Logsdon did not follow proper security procedures. As discussed on page 138, a summary of BOP employees' disciplinary histories provided to trial counsel, Exhibit 78, shows that Mr. Logston has a troubling disciplinary history. Page 138 quotes Mr. Buckmaster's

16

declaration, which states, "it also took CO Logsdon's infrequent monitoring to make the homicide possible"—naming Mr. Logsdon specifically as one but-for cause of the homicide.

- Claim 5 of Mr. Hall's § 2255 Motion alleges *Brady* violations. Page 250 alleges that the government suppressed evidence of BOP mismanagement. Page 251 specifically discusses documents regarding Mr. Logsdon's inattention to duty that were not disclosed.

Reply to additional arguments:

The government argues evidence of Mr. Logsdon's history of being disciplined for inattention would not have changed the outcome because Mr. Logsdon already told the jury that he felt responsible because Mr. Castro-Rodriguez died on his watch. Dkt. 80 (Resp.) at 13. However, the jury hearing that Mr. Logsdon feels responsible is completely different from the jury hearing that Mr. Logsdon had been disciplined repeatedly for inattention to duty and yet continued to be responsible for safety and security of individuals who were so mentally ill that they were held in one of BOP's very few designated mental health units. Mr. Logsdon's feelings of contrition and guilt do not address the question as to whether the BOP made a grave mistake by putting Mr. Logsdon in that position despite his troubling history. As to the government's concerns about the Privacy Act, 5 U.S.C. § 552a, any valid concerns can be addressed by a protective order. *See* Fed. R. Civ. P. 26(c); *see also* 5 U.S.C. § 552a(b)(11); § 552a(b)(8).

### *Requests for Production of Documents*

**BOP Employee Disciplinary files for relevant BOP employees, including those who testified at trial and those who were on duty at the time of the homicide.**

Page citations:

- Claim 5 of Mr. Hall's § 2255 Motion alleges *Brady* violations. On page 251, the Motion explains that a summary of BOP employees' disciplinary histories was provided to trial counsel. The summary was submitted to the Court as Exhibit 78 to Mr. Hall's § 2255 Motion. Full disciplinary files for the relevant employees have not been provided to undersigned counsel. Page 251 notes that "undersigned counsel's review of [the disciplinary files] at the U.S. Attorney's Office reveals discrepancies between the summary provided to trial counsel and the records" and details some of the discrepancies. The motion explains, "[f]or example, the summary notes that CO Logsdon was involved in an incident where an inmate escaped from the hospital because he was not in the

17

proper restraints. The summary also notes that CO Logsdon was found sleeping on duty but makes no reference to an inmate dying. The employee disciplinary files reveal that an inmate died. Both of these events predated Mr. Castro-Rodriguez's death. After reviewing these files at the U.S. Attorney's Office undersigned counsel requested copies but has not yet received them."

Reply to additional arguments:

Despite the government's contention, Mr. Hall's request is neither overly broad nor burdensome, and it is not a fishing expedition for irrelevant information; Mr. Hall requests disciplinary information about a discrete group of individuals: those who testified at trial or were on duty at the time of the homicide. The number of individuals covered by this request is small and easily identifiable. And, furthermore, there is no doubt that disciplinary matters involving at least some of the individuals who testified at trial or were on the premises at the time of the homicide is relevant.

**Any documents related to Dr. Chad Brinkley's treatment of Mr. Hall.**

Page citations:

- Claim 5 of Mr. Hall's § 2255 Motion alleges *Brady* violations. Claim 5 starts on page 244. Pages 246-50 allege that the government suppressed evidence that in the hours before the homicide Mr. Hall spoke with psychologist Dr. Chad Brinkley (along with psychiatrist Dr. Patrick Gariety) and asked for additional mental health care. On page 248-49, Mr. Hall explains that Dr. Brinkley testified at trial but did not tell the jury about his encounter with Mr. Hall in the hours before the homicide. Trial counsel did not raise the issue during cross-examination.

- Claim 7 of Mr. Hall's § 2255 Motion alleges a *Napue* violation because Dr. Brinkley's testimony failed to disclose that earlier on the day of the homicide, Mr. Hall asked to speak privately with Dr. Brinkley or psychiatrist Dr. Gariety. Pages 273-75 explain Dr. Brinkley's misleading testimony and that undersigned counsel learned about Dr. Brinkley's misleading omission by speaking with Dr. Gariety, who was also present for the conversation with Mr. Hall but not called to testify at trial.

Reply to additional arguments:

The government contends that all relevant documents were disclosed to trial counsel. But the government offers this assertion without acknowledging the troubling history of *Brady* violations by James Peterson, who represented the government at trial. Mr. Hall's proposed

18

discovery request seeks to have the government conduct an additional search for potentially relevant documents. If the government is saying that this information does not exist or has been disclosed, there would be no reason to oppose this request.

**Any documents related to Dr. Chad Brinkley's conversations with government investigators or attorneys between the date of the homicide and his trial testimony; any documents related to Dr. Patrick Gariety's conversations with government investigators or attorneys between the date of the homicide and his trial testimony.**

Page citations:

- Claim 5 of Mr. Hall's § 2255 Motion alleges *Brady* violations. Claim 5 starts on page 244. Pages 246-50 allege that the government suppressed evidence that in the hours before the homicide Mr. Hall spoke with psychologist Dr. Chad Brinkley (along with psychiatrist Dr. Patrick Gariety) and asked for additional mental health care. On page 248-49, Mr. Hall explains that Dr. Brinkley testified at trial but did not tell the jury about his encounter with Mr. Hall in the hours before the homicide. Trial counsel did not raise the issue during cross-examination.

- Claim 7 of Mr. Hall's § 2255 Motion alleges a *Napue* violation because Dr. Brinkley's testimony failed to disclose that earlier on the day of the homicide, Mr. Hall asked to speak privately with Dr. Brinkley or psychiatrist Dr. Gariety. Pages 273-75 explain Dr. Brinkley's misleading testimony and that undersigned counsel learned about Dr. Brinkley's misleading omission by speaking with Dr. Gariety, who was also present for the conversation with Mr. Hall but not called to testify at trial.

Reply to additional arguments:

The government offers some of the same objections here as to Mr. Hall's request to depose Dr. Brinkley, that the information is cumulative because Dr. Gariety provided a declaration and would not change the outcome. But as explained above, Mr. Hall's request to speak to a mental health professional is powerful mitigating evidence. And the requested information is not cumulative of the declaration of a mental health professional who was not called to testify.

**Any documents related to a written request to staff (aka "cop-out") by David Bruesch about things being "out of hand" on Unit 10-B.**

Page citations:

- Claim 5 of Mr. Hall's § 2255 Motion alleges *Brady* violations. Claim 5 starts on page 244. Page 250 alleges that Dr. Weiner sent an email explaining that an inmate, David Bruesch, told her he had submitted a request to staff stating that things were out-of-hand. Exhibit 95 is Dr. Weiner's email.

Reply to additional arguments:

The government contends that it is not aware of any such documents but does not outline any steps taken to search for such documents. If the government is confident such a document does not exist, then there is no reason to mount an objection to this discovery request. And here again, the government offers this objection without acknowledging the troubling history of *Brady* violations by James Peterson, who represented the government at trial. Mr. Hall's proposed discovery request seeks to have the government conduct an additional search for potentially relevant documents.

**Any records related to Darryl Johnson's presentation to the Department of Justice.**

Page citations:

- Claim 1 of Mr. Hall's § 2255 Motion alleges ineffective assistance of counsel. Page 175 alleges that, rather than using his meeting with the DOJ Committee deciding whether to pursue the death penalty to present mitigating evidence and make a forceful argument against the death penalty, Mr. Johnson told the Committee that Mr. Hall wanted the death penalty. Mr. Huffman's declaration, which is Exhibit 14 and discussed extensively on page 176, explains that Mr. Hall "waivered about his desire for the death penalty during the time I represented him, going back and forth about what he wanted." Pages 175-77 explain that in the presentation to the DOJ, Mr. Johnson completely failed to advocate for his client by, without having investigated Mr. Hall's mental health, telling the DOJ that Mr. Hall wanted the death penalty when in fact he waivered.

Reply to additional arguments:

As with Mr. Hall's request to depose Mr. Johnson, the government argues that that this information is cumulative because Mr. Hall sent letters to the DOJ saying he wanted the death penalty. But the issue here is not that Mr. Hall said he wanted a death sentence. The issue is how

20

Mr. Hall's trial counsel failed him. The allegation is not about whether Mr. Hall said he wanted the death penalty; rather, it is that Mr. Johnson was ineffective by telling the DOJ his client wanted the death penalty without acknowledging that Mr. Hall waivered and without investigating his mental health. The materials Mr. Johnson submitted to the DOJ, if any, are relevant to the claim of ineffectiveness, regardless of the letters Mr. Johnson's mentally ill client sent.

**Any DOJ Capital Case Section memos and training materials about capital jury selection.**

Page citations:

- Claim 3 alleges trial counsel was ineffective assistance during jury selection. Claim 3, Part B begins on page 226. On pages 226-27, Mr. Hall alleges that the government intentionally excluded women from the jury and on pages 227-28 alleges that trial counsel was ineffective for failing to object to the government's unlawful exclusion of women.

Reply to additional arguments:

First, the government argues that this request is overbroad and vague, which it is not. This request is for a specific category of materials—Capital Case Section memos and training materials—about a specific topic—capital jury selection. Dkt. 80 (Resp.) at 16.

Second, the government states that training manuals are not intended to create rights. However, that does not mean they are not relevant evidence of whether the government violates defendants' or prospective jurors' rights in their jury selection methods. *Id.*

Third, the government argues that the requested information would be protected work product but makes this assertion without providing any details. Mr. Hall acknowledges that some DOJ materials may be protected by work product privilege, but certainly not all DOJ-generated materials are privileged. *Id.*

The question of whether any materials Mr. Hall requested are privileged is precisely the kind of issues that the parties could discuss and potentially resolve without this Court's

21

involvement. Mr. Hall's suggested procedure for handling discovery would require the parties to discuss and try to resolve any disagreements about this request before petitioning this Court for an order. Mr. Hall stands ready to engage in such a process in good faith.

**Any DOJ Capital Case Section memos and training materials about prosecutors' *Brady* obligations. These documents are relevant to, at minimum, Claim 5: *Brady* Violations.**

Page citations:

- Claim 5 of Mr. Hall's § 2255 Motion alleges *Brady* violations. Claim 5 starts on page 244. Pages 246-50 allege that the government suppressed evidence that in the hours before the homicide Mr. Hall spoke with psychologist Dr. Chad Brinkley (along with psychiatrist Dr. Patrick Gariety) and asked for additional mental health care. On page 248-49, Mr. Hall explains that Dr. Brinkley testified at trial but did not tell the jury about his encounter with Mr. Hall in the hours before the homicide. Trial counsel did not raise the issue during cross-examination. Page 250 alleges that Dr. Weiner sent an email explaining that an inmate, David Bruesch, told her he had submitted a request to staff stating that things were out-of-hand. Exhibit 95 is Dr. Weiner's email. No request to staff from Mr. Bruesch has been disclosed.

Reply to additional arguments:

The government has not submitted any objections to this proposed request.

**Any records related to allegations of professional misconduct by attorneys working in the Capital Case Section at the time of Mr. Hall's trial, including but not limited to James D. Peterson.**

Page citations:

- Claim 5 of Mr. Hall's § 2255 Motion alleges *Brady* violations. Pages 249-50 and 252-56 outline Mr. Peterson's demonstrated pattern of withholding evidence, a pattern that has come to the attention of multiple federal courts. On 252, Mr. Hall alleges that in 2014, Mr. Peterson was reprimanded by the Virginia State Bar for withholding evidence while he was a prosecutor in Virginia. On 253, Mr. Hall alleges that in 2015, Mr. Peterson failed to disclose the Virginia reprimand to a federal court when asked to do so. On pages 254-55, Mr. Hall alleges that in 2018, Mr. Peterson violated DOJ procedure by failing to memorialize interviews with witnesses suspected of having information harmful to the government's penalty-phase case. Mr. Peterson was deposed in that case. On page 256, Mr. Hall alleges that in yet another case Mr. Peterson was involved in, prosecutors were reprimanded by the federal court for misconduct, although Mr. Peterson was not directly implicated in the misconduct.

Reply to additional arguments:

Records of allegations James Peterson's professional misconduct do exist. The government states that, "AUSA James Peterson was the only attorney in the Capital Case Section

22

who entered an appearance on Hall's case, to which no records of professional misconduct exist." Dkt. 80 (Resp.) at 17. This is incorrect.

Undersigned counsel asked for documents about allegations of misconduct and is aware of documents in the DOJ's possession regarding such allegations. First, on March 17, 2022, undersigned counsel received from the DOJ's Professional Responsibility Advisory Office (PRAO) a response to a FOIA request for records pertaining to James Peterson. The PRAO's response refused to disclose records, but did acknowledge that it located one record responsive to IFCD's request for records about Mr. Peterson. Accordingly, undersigned counsel is aware of at least one record about Mr. Peterson in the possession of the DOJ's PRAO, an office that deals specifically with professional responsibility.

Second, on June 11, 2019, IFCD's Executive Director Monica Foster submitted a twenty-eight page letter to Judge William Lawrence of the Southern District of Indiana (who has since retired). This letter alleged serious misconduct in *United States v. Andrew Rogers*, including misconduct by James Peterson. Ms. Foster was informed on November 21, 2022, via letter from the DOJ Office of Professional Responsibility (OPR), that OPR issued a 114-page report of its investigation. Because OPR made misconduct findings, there was additional review by the Professional Misconduct Review Unit (PMRU). The PMRU affirmed the OPR's findings. Accordingly, undersigned counsel is aware of at least a 114-page report of an investigation into misconduct, including alleged misconduct by Mr. Peterson, in the possession of OPR. Undersigned counsel is also aware of records related to this investigation, which may also discuss Mr. Peterson, in the possession of PMRU.

Third, Mr. Peterson's supervisor at CCS acknowledged to Judge Lynn Hughes of the Southern District of Texas that he was aware that the Virginia bar had reprimanded Mr. Peterson

23

for a *Brady* violation in a criminal case in Virginia state court. Accordingly, undersigned counsel is aware of records generated in litigation in the Southern District of Texas that discuss professional misconduct, and it is very likely that additional records about the Virginia reprimand are in DOJ's possession.

In addition to (incorrectly) asserting that no records exist, the government also argues that the request is overly broad. In fact, the request is very narrow and particularized. Mr. Hall requests a discrete category of documents—records about misconduct—about a small and identifiable group of attorneys—attorneys from the DOJ's Capital Case Section. The request even specifically names a single attorney: James Peterson.

The government also argues that Mr. Hall fails to explain how these documents could change the trial's outcome. Of course, a *Brady* or *Napue* violation may necessitate reversal of a conviction or death sentence. Mr. Hall has alleged that the government withheld materials in violation of the obligations imposed by *Brady* and its progeny and presented misleading testimony in violation of *Napue* and its progeny. Mr. Hall specifically pointed to Mr. Peterson's documented history of misconduct in capital cases. Mr. Peterson's pattern of misconduct, specifically *Brady* violations, and more specifically *Brady* violations as to statements from BOP employees, makes Mr. Hall's allegations more credible.

Finally, as to the government's concerns about the Privacy Act, 5 U.S.C. § 552a, any valid concerns can be address by a protective order. *See* Fed. R. Civ. P. 26(c); *see also* 5 U.S.C. § 552a(b)(11); § 552a(b)(8).

*Requests to Serve Third-Party Subpoenas*

**Subpoenas to Vermont government agencies that may have information about investigations into Shaker Mountain School or Jerome (Jerry) Mintz.**

Page citations:

- Claim 1 of Mr. Hall's § 2255 Motion alleges ineffective assistance at the penalty phase. Claim 1 begins on page 48. Claim 1, Part A begins on page 51 and alleges: "Trial counsel was ineffective for failing to conduct an adequate life-history investigation." Pages 66-78 explain the evidence that was available to trial counsel but that they failed to uncover about sexual abuse by Jerry Mintz at Shaker Mountain School (SMS). Mr. Hall was a victim of this abuse, as were many other young boys (now adult men) who signed declarations about the abuse. On page 76, Mr. Hall alleges that "Some students reported the abuse, but many were not heeded for years until the school was apparently quietly shut down after one more allegation." Exhibits 16, 18, 27, 29, 30, and 87—all referenced on page 76— mention an investigation into the school, which eventually was shut down.

Reply to additional arguments:

To begin, the Vermont government agencies Mr. Hall seeks to subpoena are not affiliated with the federal government, and the government has not made any argument for why it should have a say in whether Mr. Hall is permitted to seek documents from state agencies. Nor has the government made any argument for why it should have a say in the scope of this subpoena, which is, contrary to the government's contention, limited and particularized. The subpoena would seek, from agencies that protect children, investigations into a specific school where children were sexually abused and into a specific school headmaster who sexually abused the children in his care. Mr. Hall has already determined that at least one investigation into Shaker Mountain School took place, as referenced on page 76 of his § 2255 Motion. As such, this proposed subpoena is not a fishing expedition.

Additionally, the government seeks to have it both ways. The government argues that "Hall never mentioned any sexual abuse until his present motion, 10 years after conviction" and "was also known as one to make up stories, tell tall tales." Dkt. 80 (Resp.) at 17-18. In

25

suggesting that Mr. Hall is prone to making up stories, the government is apparently suggesting that he may not have been sexually abused. But the government's objections also seek to prevent Mr. Hall from requesting evidence of investigations into sexual abuse at SMS that could provide additional corroboration. Trying to prevent Mr. Hall from finding additional corroborating evidence by arguing that his claims are untrue is incongruent. If the government is going to contest the veracity of Mr. Hall's allegations, it should not in the same breath try to prevent him from corroborating them.

To be clear, Mr. Hall was sexually abused by Jerry Mintz. He has presented substantial evidence of this abuse. This evidence is extensively discussed on pages 66-78 of Mr. Hall's § 2255 Motion and includes several sworn declarations, such as the declaration of fellow victim Jessie Mashteare (Exhibit 27); the declaration of fellow SMS student Patricia Miles (Exhibit 16); declarations from SMS teachers (Exhibits 21, 22, and 23); and declarations from mental health experts, including psychologist and expert on male sexual victimization Dr. Fradkin (Exhibit 4), neuropsychologist Dr. Israelian (Exhibit 5), and psychiatrist Dr. Agharkar (Exhibit 6).

To highlight just one of many pieces of evidence of sexual abuse, the declaration of Dr. Gariety—a psychiatrist formerly employed by the BOP who treated Mr. Hall at the United States Medical Center for Federal Prisoners—is Exhibit 80 to Mr. Hall's § 2255 Motion. Dr. Gariety stated that he "always suspected Mr. Hall to be a victim of sexual abuse." Dr. Gariety previously did not have conformation that Mr. Hall had been sexual abused but it "tracks with the behaviors" he observed. Among the behaviors that suggested to Dr. Gariety that Mr. Hall had been a victim of sexual abuse are Mr. Hall saying that his sister had been sexually abused. Dr. Gariety explains: "The fact that Mr. Hall shared this story with me, even if it's not true, still suggests the possibility that he was sexually abused. It would be unsurprising for a male inmate

to have deep shame about any history of sexual abuse and to substitute his own story with a fictional one for someone like his sister." Dr. Gariety "could see that Mr. Hall suffered deep shame."

Finally, the government argues that Mr. Hall should not be permitted to subpoena Vermont agencies for information about sexual abuse at SMS because "the jury was also aware that Hall suffered from mental illnesses, including depressive disorder, psychotic disorder, antisocial personality disorder, Axis III, and Crohn's disease." Dkt. 80 (Resp.) at 18. At trial the government fiercely disputed that Mr. Hall suffered from a psychotic disorder and suggested that this diagnosis was a result of his malingering. Moreover, the jury heard about Mr. Hall's mental health from experts who did not know crucial information, such as his history of sexual abuse, is precisely why Mr. Hall should be permitted to seek additional evidence about sexual abuse at SMS. Whatever Mr. Hall's diagnoses were at trial, they do not diminish the value of evidence that he was a victim of childhood sexual abuse.

As Mr. Hall explained in his § 2255 Motion (including on pages 117-18, page 165-66, 173, 189-91) the diagnoses offered at trial would have been far more accurate and reliable if those experts knew about his history of sexual abuse. With the benefit of his actual history of trauma, the same symptoms now indicate he suffers from PTSD, not antisocial personality disorder. Dr. Wisner, who concluded that Mr. Hall suffered from antisocial personality disorder, no longer believes this conclusion to be reliable, now that he has more information about Mr. Hall, including his abnormal brain and history of sexual abuse.

Moreover, regardless of what else jurors were told about Mr. Hall's mental health, evidence of sexual abuse is "powerful mitigation evidence." *Williams v. Alabama*, 2021 WL 4325693, at *45 (N.D. Ala. Sept. 23, 2021). As page 188 of Mr. Hall's § 2255 Motion explained,

courts have recognized that "[c]hildhood sexual abuse can be powerful evidence in mitigation, particularly when it is not an isolated event." *Wharton v. Chappell*, 765 F.3d 953, 977 (9th Cir. 2014). "[E]vidence that [a defendant] was a victim of sexual abuse during his childhood formative years is 'precisely the type of evidence that is "relevant to assessing a defendant's moral culpability."'" *Williams*, 2021 WL 4325693, at *45 (quoting *Williams v. Alabama*, 791 F.3d 1267, 1277 (11th Cir. 2015); *Wiggins v. Smith*, 539 U.S. 510, 535 (2003)).

Finally, it is disingenuous for the government to imply that evidence of sexual abuse would not have made a difference to the jury because Mr. Hall's jurors have actually said that it would have made a difference. Regardless of whether this evidence is admissible evidence of prejudice, it is information the government is aware of, as Mr. Hall submitted declarations from jurors as Exhibits 53, 54, and 55 of his § 2255 Motion. Being aware of these declarations, the government should not outright deny what jurors have said, which is that the evidence would have mattered.

## III. The Court should grant Mr. Hall's Motion for Leave to Conduct Discovery and, following the procedure Mr. Hall suggested, require the parties to try to resolve any specific objections to discovery requests on their own.

Mr. Hall has made specific allegations that, if true, would require vacating his death sentence. Mr. Hall's § 2255 Motion alleged that his counsel was ineffective by failing to conduct an adequate life history investigation. Mr. Hall's trial team spoke to nobody outside Mr. Hall's immediate family who knew him before he was sixteen. Trial counsel's deficient investigation wholly failed to comply with the obligation on counsel in a capital case to investigate "all reasonably available mitigating evidence," *Wiggins*, 539 U.S. at 524, including interviewing "teachers . . . or anyone else who may have examined or spent time with [the defendant] during his upbringing," *Stankewitz v. Wong*, 698 F.3d 1163, 1166 (9th Cir. 2012). As a result of their deficient investigation, trial counsel had no idea that their client was a victim of sexual abuse,

28

that he has a structurally abnormal brain, and that many of the symptoms attributed to Mr. Hall being "antisocial" were in fact symptoms of PTSD. Mr. Hall also makes other compelling claims for relief.

Nowhere does the government dispute that these allegations, if proven true, would entitle Mr. Hall to relief. Indeed, the government effectively concedes that Mr. Hall's allegations establish the need for an evidentiary hearing. Rather than making the frivolous argument that the specific allegations in Mr. Hall's § 2255 Motion do not entitle him to relief, the government argues that the discovery requests are cumulative or premature and faults Mr. Hall's counsel for failing to cite to specific pages in his § 2255 Motion in explaining the relevance of his discovery requests. Unless the government agrees that Mr. Hall has already satisfied the standard to prove his claims, the discovery requests are not cumulative because Mr. Hall is seeking to develop additional facts to support his claims. And unless the government agrees that it will consent to Mr. Hall amending his motion following discovery, the discovery requests are not premature, again because Mr. Hall is seeking to develop additional facts to support his claims. As to page citations, in this Reply, Mr. Hall provides citations to specific pages in his § 2255 Motion to further explain how each discovery request is relevant to his allegations—allegations which the government does not contest that, if proven true, would entitle Mr. Hall to relief.

Mr. Hall reiterates that Section § 2255 proceedings are Mr. Hall's *only* opportunity to litigate ineffective assistance of counsel claims, *Brady* and *Napue* claims, and other serious constitutional claims that require factual development outside the trial record. To fully develop these claims, Mr. Hall's § 2255 counsel must be able to speak with witnesses, including trial counsel, and collect records, including records about sexual abuse trial counsel was unaware of.

29

Therefore, for the reasons stated above, the Court should grant Mr. Hall's Motion for Authorization to Conduct Discovery. The Court should specifically order the parties to meet and confer as to any objections to future discovery requests Mr. Hall may serve on the government. As to the specific objections the government has already raised, the Court should overrule them. In the alternative, because the government's objections are premature, the Court should decline to rule on the government's specific objections until after Mr. Hall actually serves the discovery requests on the government and the parties have the chance to meet and confer.

Respectfully submitted,


 */s/ Angela S. Elleman*
Angela S. Elleman
Chief, Capital § 2255 Unit
F. Italia Patti
Assistant Federal Defender
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN   46204
Phone: 317-383-3520
E-Mail: angie_elleman@fd.org
italia_patti@fd.org

Keith O'Connor
Mo Bar No. 63134
PO Box 22728
Kansas City, MO 64113
Phone: 816-225-7771
E-Mail: keith@keithoc.com

Dated:  August 30, 2024